IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ROBERT D. CHRIST,                              )
                                               )
                    Plaintiff,                 )
                                               )
        v.                                     )
                                               )
BRETT J. CORMICK, ELAN SUISSE                  )        C.A. No. 06-275-GMS
INTERNATIONAL HOLDINGS (USA)                   )
LLC, ELAN SUISSE (PTY) LTD.,                   )
NICOGEL LTD., JOHN WALTERS,                    )
DIANNE MARSHALL and MERCARI                    )
FINANCIAL SERVICES (PTY) LTD.,                 )
                                               )
                    Defendants.                )


**OPENING BRIEF OF DEFENDANTS BRETT J. CORMICK, ELAN SUISSE
INTERNATIONAL HOLDINGS (USA) LLC, ELAN SUISSE (PTY) LTD.,
NICOGEL LTD., JOHN A. WALTERS AND DIANNE E. MARSHALL
IN  SUPPORT OF THEIR MOTION TO DISMISS FOR LACK OF PERSONAL
JURISDICTION AND FAILURE TO STATE A CLAIM, OR, IN THE
ALTERNATIVE, TO STAY PENDING RESOLUTION OF A PRIOR-FILED
ACTION IN SOUTH AFRICA, AND FOR SANCTIONS**


David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155
(302) 884-6766
Attorney for defendants Brett J.
Cormick, Elan Suisse International
Holdings (USA) LLC, Elan Suisse
(Pty) Ltd., Nicogel Ltd., John A.
Walters and Dianne E. Marshall


Dated:  May 22, 2006

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       A.     THE PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       B.     THE TRANSACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.     THERE IS NO BASIS TO ASSERT PERSONAL JURISDICTION OVER DR.
      CORMICK, ELAN SUISSE, NICOGEL, DR. WALTERS OR DR. MARSHALL
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       A.     DR. CORMICK IS NOT SUBJECT TO JURISDICTION PURSUANT TO
            6 DEL. C. §18-109(a) OF THE DELAWARE LIMITED LIABILITY
            COMPANY ACT, AS ANY ALLEGED ACTIONS WERE NOT
            UNDERTAKEN IN HIS CAPACITY AS A MANAGER OF AN LLC. OR
            RELATED TO THE BUSINESS OF THE LLC. . . . . . . . . . . . . . . . . . . . 7

       B.     THERE IS NO BASIS FOR JURISDICTION UNDER A CONSPIRACY
            THEORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

       C.     THE COURT SHOULD NOT PERMIT JURISDICTIONAL DISCOVERY
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR CONSPIRACY. . . . . . 15

III.   THE FRAUD AND CONSPIRACY CLAIMS ARE BARRED BY THE STATUTE
      OF LIMITATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

       A.     PENNSYLVANIA LAW APPLIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

       B.     PENNSYLVANIA'S TWO-YEAR STATUTE OF LIMITATIONS APPLIES
            TO MR. CHRIST'S TORT CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . 19

IV.    THE COURT SHOULD STAY THIS ACTION PENDING RESOLUTION OF
       PRIOR-FILED PARALLEL LITIGATION INSTIGATED BY MR. CHRIST IN
       SOUTH AFRICA.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

V.     THIS COURT SHOULD SANCTION MR. CHRIST FOR HIS UNJUSTIFIED
       ACTIONS DESIGNED TO HARASS AND INCREASE EXPENSE. . . . . . . . . 25

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## **TABLE OF AUTHORITIES**

**Cases**

**AAR Intern., Inc. v. Nimelias Enterprises, S.A.**, 250 F.3d 510 (7th Cir. ), *cert. denied*, 534 U.S. 995 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Alfero v. E.F. Hutton &Co, Inc.**, 606 F. Supp. 1100 (E.D. Pa. 1985). . . . . . . . . . . . . 20

**Ammlung v. City of Chester**, 494 F.2d 811 (3rd Cir. 1994). . . . . . . . . . . . . . . . . . . . . . 19

**Arunga v. AIPAC**, No. Civ. A. 93-24, 1993 WL 533177, Yohn, J. (E.D, Pa. Dec. 20, 1993), *aff'd mem.*, 37 F.3d 1485 (3rd Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**Assist Stock Management L.L.C. v. Rosheim**, 753 A.2d 974 (Del. Ch. 2000). . . . . . . . 8

**Atlantic Paper Box Co. v. Whitman's Chocolates**, 844 F.Supp. 1038 (E.D. Pa. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Autrey v. Chemtrust Industries Corp.**, 362 F.Supp. 1085 (D. Del. 1973). . . . . . . . . . 19

**Beauty Time, Inc. v. VU Skin Systems, Inc.**, 118 F.3d 140 (3rd Cir. 1997). . . . . . . . . 20

**Callahan v. A.E.V., Inc.**, 182 F.3d 237 (3rd Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . 19

**Colorado River Water Conservation Dist. v. U.S.**, 424 U.S. 800 (1976). . . . . . . . . . . 22

**Computer People, Inc. v. Best International Group, Inc.**, C.A. No. 16648, 1999 WL 288119, Jacobs, V.C. (April 27, 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Crescent/Mach I Partners, L.P. v. Turner**, 846 A.2d 864 (Del. Ch. 2000).. . . . . . . . . 11

**David B. Lilly Co., Inc. v. Fisher**, 18 F.3d 1112 (3rd Cir. 1994). . . . . . . . . . . . . . . . . . 19

**de la Mata v. American Life Ins. Co.**, 771 F.Supp. 1375 (D. Del. 1991).. . . . . . . . . . . 23

**Deleski v. Raymark Industries, Inc.**, 819 F.2d 377 (3rd Cir. 1987).. . . . . . . . . . . . . . . 19

**Deutschman v. Beneficial Corp.**, 132 F.R.D. 359 (D. Del. 1990), *recons. denied*, 761 F.Supp. 1080 (D. Del. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Drelles v. Manufacturers Life Ins. Co.**, 881 A.2d 822 (Pa. Super. 2005). . . . . . . . . . . 20

**E.I. DuPont de Nemours & Co. v. Rhodia Fiber & Resin Intermediates**, 197 F.R.D. 112 (D. Del. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**EFCO Corp. v. Aluma Systems USA, Inc.**, 983 F.Supp. 816 (S.D. Iowa 1997). . . . . . 24

**Evergreen Marine Corp. v. Welgrow Intern., Inc.**, 954 F.Supp.101 (S.D.N.Y. 1997).23

**Finova Capital Corp. v. Ryan Helicopters U.S.A., Inc.**, 180 F.3d 896 (7th Cir. 2005)22

**Harris v. Carter**, 582 A.2d 222 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**Hirshman v. Vendamerica, Inc.**, C.A. No. 90C-AP-40-1CV, 1992 WL 52141, Toliver, J. (Del. Super. Mar. 9, 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.**, 147 F.Supp.2d 268 (D. Del. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**In re Freuhauf Trailer Corp.**, 250 B.R. 168 (D. Del. 2000).. . . . . . . . . . . . . . . . . . . 20

**In re Student Finance Corp.**, 335 B.R. 539 (D. Del. 2005). . . . . . . . . . . . . . . . . . . . 15

**Iotex Communications, Inc. v. Defries**, C.A. No. 15817, 1998 WL 914265, Lamb, V.C. (Del. Ch. Dec. 21, 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Istituto Bancario Italiano SpA v. Hunter Engineering Co.,** 449 A.2d 210 (Del.1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Joint Stock Society v. Heublein**, 936 F.Supp. 177 (D. Del. 1996). . . . . . . . . . . . . . . . 6

**Kalmanovitz v. G. Heilman Brewing Co., Inc.**, 595 F.Supp. 1385 (D. Del. 1984). . . . 15

**Klaxon Co. v. Stentor Electric Mfg. Co.**, 313 U.S. 457 (1941). . . . . . . . . . . . . . . . . . 18

**Marketing Products Management, LLC v. Healthandbeautydirect.com, Inc.**, C.A. No. 02C-04-256 CLS, 2004 WL 249581, Scott, J. (Del. Super. Jan. 28, 2004). . . . . . . . . . . 13

**Resources Ventures, Inc. v. Resource Management Intern., Inc.**, 42 F.Supp.2d 423 (D. Del. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Reyes v. State**, 819 A.2d 305 (Del.), ***cert. denied***, 540 U.S. 862 (2003). . . . . . . . . . . . 12

**Robinson v. Johnson**, 313 F.3d 128 (3rd Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . 18

iv

**Steinman v. Levine**, C.A. No. 19107, 2002 WL 31761252, Lamb, V.C. (Del. Ch. Nov. 27, 2002), *aff'd mem.,* 822 A.2d 397 (Del. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Telcordia Technologies, Inc. v. Alcatel S.A.,** No. Civ. A. 04-874 GMS, 2005 WL 1268061, Sleet, J. (D. Del. May 27, 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Transportes Aeros de Angola v. Ronair, Inc.**, 544 F.Supp. 858 (D. Del. 1982). . . . . . . 6

## Other authorities

6 **Del. C.** §18-109(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7, 8, 10

10 **Del. C.** §3104. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

10 **Del. C.** §8106. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

10 **Del. C.** §8121. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

42 **Pa. Cons. Stat.** §5524(7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Federal Rule of Civil Procedure 11(c)(1)(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Federal Rule of Civil Procedure 12(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Federal Rule of Civil Procedure 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Restatement (Second) of Torts** §148, comment g. . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Restatement (Second) of Torts** §541. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## NATURE AND STAGE OF THE PROCEEDINGS

On April 27, 2006, plaintiff Robert D. Christ filed the present action against Brett J. Cormick, Elan Suisse International Holdings (USA) LLC, Elan Suisse (Pty) Ltd., Nicogel Ltd., John A. Walters, Dianne E. Marshall (collectively, the "Defendants") and Mercari Financial Services (Pty) Ltd.[1]  The Complaint  asserts claims against Mr. Cormick for promissory estoppel, breach of contract and fraud, and asserts a conspiracy claim against all of the defendants.

On May 22, 2006, the Defendants filed a motion (i) to dismiss the Complaint for lack of personal jurisdiction, (ii) to dismiss the conspiracy claim for failure to state a claim, (iii) to dismiss the fraud claim as being outside the statute of limitations, and  (iv) to stay this action pending resolution of a prior-filed action initiated by Mr. Christ in South Africa. Separately, in accordance with Federal Rule of Civil Procedure 11(c)(1)(a), the Defendants filed a motion for sanctions.

This is the Defendants' opening brief in support of those motions.

---

[1]

Mercari Financial Services (Pty) Ltd., a South African corporation (Complaint ¶8), apparently is defunct.

1

## SUMMARY OF ARGUMENT

1.    6 **Del. C.** §18-109(a), the LLC manager consent statute, cannot provide a basis for jurisdiction over Dr. Cormick, as the alleged misrepresentations was made and the alleged oral agreement was entered into before the formation of the Delaware LLC. Moreover, the statute does not apply to a claim arising from an arms-length negotiated sale of an equity interest which does not address management rights and obligations, does not involve Delaware law, and as to which Delaware has no particular interest.

Further, the "conspiracy theory" of jurisdiction cannot be applied here. The basis for Mr. Christ's assertion of the conspiracy theory is that Elan Suisse USA was formed in Delaware. Delaware court's have consistent rejected the formation or use of a Delaware corporation as a nexus for the application of the "conspiracy theory" of jurisdiction, especially where (as here) the claim does not arise from the formation of the Delaware entity.

2.    The Complaint fails to state a claim for conspiracy, as it does not allege any specific facts establishing how or when the conspiracy was formed or its intended scope, as required by applicable Pennsylvania and Third Circuit law.

3.    The fraud claim is barred by the applicable statute of limitations, as the Complaint fails to allege any facts showing that Mr. Christ could not have discovered his injury or claim before two years of the date of filing.

4.    The Court should stay this action in favor of a parallel action filed by Mr. Christ in South America in 2005 as a matter of international comity, in order to avoid a duplication of effort, a waste of judicial and litigant resources, and to avoid the possibility of inconsistent rulings.

5.      The Court should exercise its inherent power and sanction Mr. Christ for his harassing, vexatious and cost-increasing actions in (i) bringing a duplicative proceeding in Delaware while simultaneously maintaining an action against Mr. Cormick that he previously filed in South Africa over one year ago, thereby putting Mr. Cormick to the cost of addition attorneys' fees; (ii) bringing in action in Delaware against foreign defendants in the absence of a colorable basis for jurisdiction; (iii) falsely alleging a conspiracy without any factual support, relying solely on the fact of a prior business relationship between Dr. Cormick and Dr. Walters.

## STATEMENT OF FACTS[2]

### A.    THE PARTIES.

Plaintiff Robert D. Christ is a citizen of the State of Pennsylvania who resides in Pottstown, Pennsylvania. (Compl. ¶1). Mr. Christ is also the plaintiff in a lawsuit filed and presently pending against Dr. Cormick in South Africa arising from the same transaction giving rise to the present suit. (Cormick Decl. Exs A-1 & A-2[3]).

Defendant Brett J. Cormick is a citizen of the Commonwealth of Australia who resides in the United Kingdom and the Republic of Zimbabwe. (Compl. ¶2).

Defendant Elan Suisse International Holdings (USA) LLC ("Elan Suisse USA") is a limited liability company organized under the laws of the State of Delaware. (Compl. ¶3).

Defendant Elan Suisse (Pty) Ltd. "(Elan Suisse") is a corporation organized under the laws of the Republic of South Africa. (Compl. ¶4).

Defendant Nicogel Ltd. ("Nicogel") is a corporation formed and organized under the laws of the United Kingdom. (Compl. ¶5).

Defendant John Walters is a citizen of the United Kingdom, and is the Chief Executive Officer of Nicogel. (Compl. ¶6).

---

[2]

Defendants strongly deny the facts as alleged in the Complaint, but recognize that, for the limited purpose of a motion to dismiss, the allegations must be taken as true.

[3]

The Declaration of Dr. Brett J. Cormick is appended hereto as Exhibit A. The Declaration of Nicogel Ltd. by Dr. Dianne E. Marshall is appended hereto as Exhibit B. The Affidavit of Dr. Dianne E. Marshall is appended hereto as Exhibit C. The Declaration of Dr. John A. Walters is appended hereto as Exhibit D. Unreported opinions cited to herein are appended hereto in alphabetical order beginning at Exhibit E.

Defendant Dianne Marshall is a citizen of the United Kingdom, and an officer and shareholder of Nicogel. (Compl. ¶7).

Defendant Mercari Financial Services (Pty) Ltd. ("Mercari") is a corporation organized under the laws of the Republic of South Africa. (Compl. ¶8).

### B.    THE TRANSACTION.

Over the course of early 2004, Mr. Christ and Dr. Cormick discussed a business proposal whereby, according to Mr. Christ's version of events, in exchange for Mr. Christ investing $350,000, Dr. Cormick would transfer to Mr. Christ a 50% equity interest in Elan Suisse and another entity that was to be subsequently formed (Elan Suisse USA). (Compl. ¶¶15-18). Elan Suisse would be used to market United States-based financial products and investment vehicles to investors located in South Africa, and Elan Suisse USA would hold certain intellectual property rights. (Compl. ¶18).

In March, 2004, Mr. Christ wired an initial investment of $250,000 to Dr. Cormick's personal bank account in London. (Compl. ¶19). Mr. Christ complains that he has never received documentation to prove his ownership interest in Elan Suisse and Elan Suisse USA. (Compl. ¶20).

Mr. Christ alleges that on September 9, 2004, Dr. Cormick offered to refund Mr. Christ's investment, which offer Mr. Christ accepted, but Mr. Christ has yet to receive the funds. (Compl. ¶20).

Mr. Christ further alleges that his money was used by Dr. Cormick, Dr. Walters and Dr. Marshall to capitalize Nicogel when it was formed in 2005, over nine months later. (Compl. ¶37).

5

## ARGUMENT

### I.  THERE IS NO BASIS TO ASSERT PERSONAL JURISDICTION OVER DR. CORMICK, ELAN SUISSE, NICOGEL, DR. WALTERS OR DR. MARSHALL.

Federal Rule of Civil Procedure 12(b)(2) requires a court to dismiss defendants from a case upon motion when the court lacks personal jurisdiction over them.  **E.I. DuPont de Nemours & Co. v. Rhodia Fiber & Resin Intermediates**, 197 F.R.D. 112, 119 (D. Del. 2000).

In determining whether personal jurisdiction exists, courts engage in a two-step analysis.  First, the Court must decide whether jurisdiction is authorized by the laws of the forum state.  **Transportes Aeros de Angola v. Ronair, Inc.**, 544 F.Supp. 858, 864-65 (D. Del. 1982).

If the first test is satisfied, the Court must then determine whether there are "minimum contacts" between the defendant and the forum state such that exercising jurisdiction comports with fair play and substantial justice under the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.  **Id.**

The burden is on Mr. Christ, as plaintiff, to allege facts sufficient to make a *prima facie* showing over the defendants.  **ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.**, 147 F.Supp.2d 268, 270-71 (D. Del. 2001).  To meet this burden, Mr. Christ must allege facts which "'establish with reasonable particularity'" that jurisdiction over the defendants exists.  **Id.** (quoting **Joint Stock Society v. Heublein**, 936 F.Supp. 177, 193 (D. Del. 1996)).

6

As demonstrated below, there is no basis in Delaware law for exercising personal jurisdiction over the non-Delaware defendants (*i.e.,* all defendants other than Elan Suisse USA), much less justification under the Due Process Clause.

**A.    DR. CORMICK IS NOT SUBJECT TO JURISDICTION PURSUANT TO 6 DEL. C. §18-109(a) OF THE DELAWARE LIMITED LIABILITY COMPANY ACT, AS ANY ALLEGED ACTIONS WERE NOT UNDERTAKEN IN HIS CAPACITY AS A MANAGER OF AN LLC. OR RELATED TO THE BUSINESS OF THE LLC.**

Mr. Christ alleges that Dr. Cormick is subject to personal jurisdiction in Delaware pursuant to 6 **Del. C.** §18-109(a) because he is "a person who participates materially in the management of Elan Suisse USA." (Compl. ¶11). Section 18-109(a) states, in pertinent part, that:

> A manager ... of a limited liability company may be served with process in the manner prescribed in this section in all civil actions or proceedings brought in the State of Delaware involving or relating to the business of the limited liability company or a violation by the manager ... of a duty to the limited liability company, or any member of the limited liability company.... A manager's ... serving as such constitutes such person's consent to the appointment of the registered agent of the limited liability company ... as such person's agent upon whom service of process may be made as provided in this section. Such service as a manager ... shall signify the consent of such manager ... that any process when so served shall be of the same legal force and validity as if served upon such manager ... within the State of Delaware and such appointment of the registered agent (or, if there is none, the Secretary of State) shall be irrevocable.

6 **Del. C.** §18-109(a).

Initially, it should be noted that the Complaint is not clear whether Elan Suisse was even in existence at the time Mr. Christ sent his money to Dr. Cormick. Elan Suisse USA

was formed on March 15, 2004. (Compl. ¶19).  Mr. Christ alleges that he sent his money in March 2004, but curiously does not identify the date. (**Id.**).  If Elan Suisse was not in existence when the alleged fraud was perpetrated and Mr. Christ sent his money, then Section 18-109(a) is not applicable.  Moreover, the alleged false representations and oral agreement were made in January and February, 2004, prior to the formation of Elan Suisse on March 15, 2004.  (Compl. ¶¶16-19).  As such, the statute cannot be applied as there was no Elan Suisse at that time and therefore any alleged actions of Dr. Cormick were not in furtherance of the business or management of Elan.

Even if the Court were to disregard these facts (which, of course, it should not), Section 18-109(a) still is not applicable to Mr. Christ's claims.  The statute clearly applies to claims alleging breaches of fiduciary duties, which have not been alleged here. Beyond fiduciary claims, however, the statute has to be interpreted in such a way as to avoid being unconstitutionally overbroad.  To do this, in cases not alleging breaches of fiduciary duty, the Court of Chancery has taken a case-by-case approach in analyzing the connection between the claim asserted and the business of the company.  **Assist Stock Management L.L.C. v. Rosheim**, 753 A.2d 974, 980 (Del. Ch. 2000).

In **Rosheim**, the plaintiff brought an action to determine what management rights each member of the LLC had. The Court found that the assertion of jurisdiction was justified because (i) the claim asserted directly related to the issue of the managers' rights, duties and obligations to the LLC; (ii) resolution of the issue was inextricably tied up in Delaware law; and (iii) Delaware has a strong interest in providing a forum to resolve disputes regarding the proper discharge of managerial functions of Delaware entities.  **Id.** at 981.

8

The present action provides a stark contrast.  First, there is no issue requiring an analysis or determination of the rights, duties or obligations any manager of Elan Suisse USA.  Indeed, Mr. Christ is not seeking a determination that he has any managerial rights in Elan Suisse USA, or that Dr. Cormick has breach any duties arising from Dr. Cormick's alleged status as a manager of Elan Suisse USA.  To the contrary, he is seeking to avoid this by demanding a return of his money as opposed to confirming his equity ownership.  As such, all Mr. Christ is asserting is a simple breach of a contract (and alleged fraud in the inducement of entry of a contract) that was the result of an arms-length negotiation outside of Delaware, with any breach occurring outside of Delaware.

Second, with a transaction between a Pennsylvania resident and citizen of Australia who resides in England and Zimbabwe (Compl. ¶¶1, 2), Delaware law will not apply in resolving the matter.  Indeed, as shown in Section III, *infra*, Pennsylvania law will apply.

Finally, "the State of Delaware does not have an interest in providing a forum for claims ... where those claims involve events occurring out of state, caused no injury in Delaware, and involve a plaintiff and defendants who are not Delaware residents." **Steinman v. Levine**, C.A. No. 19107, 2002 WL 31761252, WL Op. at 11, Lamb, V.C. (Del. Ch. Nov. 27, 2002), ***aff'd mem.,*** 822 A.2d 397 (Del. 2003).[4]

---

[4]

Although Mr. Christ may emphasize the fact that Elan Suisse USA was formed in Delaware, there is no allegation that this formation was itself the cause of any injury to him, that the formation itself gave rise to any cause of action, that Elan Suisse USA received the money (which it did not, *see* Compl. ¶¶20, 37), or that the formation itself is anything other than peripheral to his claims.

9

This action does not relate to the management of the business and affairs of a Delaware entity. All that the Complaint presents is a request for damages arising from the alleged breach of an arms-length relationship. *See* **Harris v. Carter**, 582 A.2d 222, 232 (1990) ("[m]erely selling shares of stock in a company on whose board one sits is not a directorial act within the meaning of the statute"). Mr. Christ does not allege a single tortious act or contractual breach occurring in Delaware, or that any wrongful act had any impact in Delaware. Interpreting Section 18-109(a) as authorizing the assertion of personal jurisdiction over Mr. Cormick in these circumstances would be overbroad and constitutionally impermissible. *See* **Hirshman v. Vendamerica, Inc.**, C.A. No. 90C-AP-40-1CV, 1992 WL 52141, WL Op. at *3, Toliver, J. (Del. Super. Mar. 9, 1992) (allegation that corporate director breached contract and made false representations inadequate under analogous corporate director consent statute).

### B.     THERE IS NO BASIS FOR JURISDICTION UNDER A CONSPIRACY THEORY.

Mr. Christ alleges jurisdiction over Dr. Cormick, Nicogel, Dr. Walters, Dr. Marshall and Mercari "pursuant to 10 **Del. C.** § 3104, as they individually and/or in conspiracy with each other formed and utilized a Delaware entity to defraud and cause harm" to Mr. Christ. (Compl. ¶12).

Initially, as to Nicogel, it is difficult to imagine how Nicogel could have participated in the formation of Elan Suisse USA in Delaware since Elan Suisse USA was formed on March 15, 2004 (Compl. ¶19), and Mr. Christ alleges that Nicogel was founded "in early

2005...." (Compl. ¶37).  Aside from that metaphysical puzzle, Mr. Christ has failed to satisfy the strict pleading requirements to invoke the conspiracy theory of jurisdiction.

Under the conspiracy theory of obtaining personal jurisdiction, a court may in certain circumstances exercise personal jurisdiction over nonresidents based on the forum contacts of their co-conspirators. In order to establish personal jurisdiction, Mr. Christ must establish that: (1) an unlawful conspiracy existed; (2) the defendants were a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in Delaware; (4) the defendants knew or had reason to know of the act in Delaware or that acts outside Delaware would have an effect in Delaware; and (5) the act in, or effect on, Delaware was a direct and foreseeable result of the conduct in furtherance of the conspiracy. **Resources Ventures, Inc. v. Resource Management Intern., Inc.**, 42 F.Supp.2d 423, 432 (D. Del. 1999) (citing **Istituto Bancario Italiano SpA v. Hunter Engineering Co.,** 449 A.2d 210, 225 (Del.1982)).

This test is considered a strict one with a narrow scope. **Istituto Bancario Italiano SpA,** 449 A.2d at 225.  Mr. Christ is obligated to allege specific facts establishing each element, not mere conclusory allegations. **Crescent/Mach I Partners, L.P. v. Turner**, 846 A.2d 864, 876 (Del. Ch. 2000).

The first issue is whether there was a conspiracy.  As set forth in more detail in Section II, *infra*, the Complaint offers nothing but a conclusory statement that there was a conspiracy.  Such a conclusory allegation is inadequate.

Additionally, there is a question of timing.  As noted previously, Mr. Christ avoided alleging whether he sent the money to Dr. Cormick before or after the formation of Elan

11

Suisse USA in March 2004. (*See* Compl. ¶19).  If Mr. Christ sent the money *before* Elan Suisse USA was formed, it could not be argued that the formation of the Delaware entity was an act in furtherance of a conspiracy, as the alleged purpose of the alleged conspiracy (obtaining Mr. Christ's money) would have already been achieved. "Generally, a conspiracy terminates upon accomplishment of the principal objective unless evidence is introduced indicating that the scope of the original agreement includes acts taken to conceal the [wrongdoing]." **Reyes v. State**, 819 A.2d 305, 312 (Del.), ***cert. denied***, 540 U.S. 862 (2003). Here the alleged principal objective may have been completed before any alleged conspiracy could be formed, and there is no allegation of any agreement to conceal any conspiracy.

The Court, however, need not dwell on those issues, as there is a more fundamental reason why the conspiracy theory of jurisdiction does not apply:  The formation of Elan Suisse USA does not satisfy the third element, *i.e.,* a substantial act or substantial effect in furtherance of the conspiracy occurring in Delaware.

Mr. Christ's entire basis for jurisdiction in this Court is the formation in Delaware of Elan Suisse USA.  However, "[m]ere use of a Delaware corporate entity in connection with a civil conspiracy has never been held to satisfy this element" of the conspiracy theory of jurisdiction. **Iotex Communications, Inc. v. Defries**, C.A. No. 15817, 1998 WL 914265, WL Op. at *7, Lamb, V.C. (Del. Ch. Dec. 21, 1998).

In **IOTEX**, the plaintiff claimed that a Delaware entity was used to commit the fraud. **Id.**  In the present case, the facts are even more attenuated.  Here, Elan Suisse USA played no part other than simply existing.  Mr. Christ did not send money to Elan Suisse USA. Instead, he sent the money directly to Dr. Cormick.  (Compl. ¶19).  As such, the formation

12

of Elan Suisse USA not only does not constitute a substantial act or substantial effect in Delaware, it also was not a direct or foreseeable result of any conduct in furtherance of the alleged conspiracy. ***See also* Marketing Products Management, LLC v. Healthandbeautydirect.com, Inc.**, C.A. No. 02C-04-256 CLS, 2004 WL 249581, WL Op. at *3, Scott, J. (Del. Super. Jan. 28, 2004) (incorporation in Delaware is not a "substantial act" in furtherance of a conspiracy in breach of contract case); **Computer People, Inc. v. Best International Group, Inc.**, C.A. No. 16648, 1999 WL 288119, WL Op. at *7, Jacobs, V.C. (April 27, 1999) (incorporation is not a "substantial act or effect").

In light of the foregoing, there is no basis under either Delaware law or the Due Process clause of the Constitution of the United States to assert personal jurisdiction over any of the non-Delaware parties (all but Elan Suisse).

## C.    THE COURT SHOULD NOT PERMIT JURISDICTIONAL DISCOVERY.

Mr. Christ may ask the Court to permit him to engage in jurisdictional discovery. This Court has stated that, in order to obtain jurisdictional discovery:

> "[t]he court must be satisfied that there is some indication that this particular defendant is amenable to suit in this forum." For example, "a plaintiff may not rely on the bare allegations in his complaint to warrant further discovery." Likewise, "a mere unsupported allegation that [a] defendant 'transacts business' in an area is 'clearly frivolous.'" Rather, "there must be *some* competent evidence to demonstrate that personal jurisdiction over [a] defendant might exist before allowing discovery to proceed." Furthermore, "[w]hen the lack of personal jurisdiction is clear, ... further discovery serves no purpose and should be denied.

**Telcordia Technologies, Inc. v. Alcatel S.A.**, No. Civ. A. 04-874 GMS, 2005 WL 1268061, WL Op. at *9, Sleet, J. (D. Del. May 27, 2005) (citations omitted, italics in original).

Mr. Christ's claims of jurisdiction, as alleged in his Complaint, have been proven untenable as a matter of law, and it is unlikely that Mr. Christ can point to any evidence suggesting additional facts that would change the results. Additionally, Mr. Christ has not asserted that jurisdiction could be asserted based on any of the specific provisions of Delaware's long-arm statute, 10 **Del. C.** §3104, or alleged any facts suggesting that any of the non-Delaware defendants had any connection with Delaware. As such, allowing jurisdictional discovery would amount to a fishing expedition. In these circumstances, the Court should exercise "special vigilance" to protect these foreign defendants from unduly burdensome and expensive discovery. ***See* id.** WL Op. at 8-9.

14

II.    **THE COMPLAINT FAILS TO STATE A CLAIM FOR CONSPIRACY.**

Mr. Christ alleges that "[a]s these facts demonstrate, defendants Elan Suisse, Elan Suisse USA, Nicogel, Walters, Marshall and Mercari conspired with defendant Cormick to defraud plaintiff and to unlawfully misappropriate the $250,000 paid by plaintiff to Cormick." (Compl. ¶38).

The meager facts alleged, however, do not "demonstrate" a conspiracy sufficient to withstand a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

Under applicable Pennsylvania law[5]:

> In order to state a claim for civil conspiracy under Pennsylvania law, a plaintiff must allege:"(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." In addition "[p]roof of malice, *i.e.*, an intent to injure, is essential in proof of a conspiracy."

**In re Student Finance Corp.**, 335 B.R. 539, 552 (D. Del. 2005) (applying Pennsylvania law) (citations omitted).  Moreover, as this Court stated in **Kalmanovitz v. G. Heilman Brewing Co., Inc.**, 595 F.Supp. 1385 (D. Del. 1984):

> It is a longstanding rule in the Third Circuit that a mere general allegation of conspiracy is insufficient.  A general averment of conspiracy or collusion without alleging the facts which constituted such conspiracy or collusion is a conclusion of law and is insufficient. As has been noted: Generally, fraud, conspiracy and collusion must be charged by allegations of fact; and general allegations of fraud, fraudulent intent, and conspiracy or collusion, without a statement of supporting facts, are conclusions of law and are insufficient.

---

[5]    Why Pennsylvania law applies is addressed in Section III.

15

> The plaintiffs must plead with particularity the "circumstances" of the alleged wrongdoing in order to place the defendants on notice of the precise misconduct with which they are charged. . Only allegations of conspiracy which are particularized, such as those addressing the period of the conspiracy, the object of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose, will be deemed sufficient.

**Id.** at 1400-01 (citations omitted).

As bare conclusory allegations of "conspiracy" or "concerted action" will not suffice. Mr. Christ must expressly allege facts leading to an agreement or make averments of communication, consultation, cooperation, or command from which such an agreement can be inferred. **Arunga v. AIPAC**, No. Civ. A. 93-24, 1993 WL 533177, WL Op. at 2, Yohn, J. (E.D, Pa. Dec. 20, 1993), *aff'd mem.*, 37 F.3d 1485 (3rd Cir. 1994).

Mr. Christ's allegations fail to meet this standard. Indeed, he even hedges his bets as to whether there was a conspiracy. In paragraph 12 of the Complaint, Mr. Christ alleges that the defendants acted "individually and/or in conspiracy with each other" in forming Elan Suisse USA. In any event, this allegation is conclusory. There are no allegations of any facts indicating that there was a mutual understanding among the defendants at the time of the formation of Elan Suisse USA that this entity would be used somehow as part of a scheme to defraud Mr. Christ.

The only other allegation is that "the $250,000 paid by plaintiff to Cormick...was used by Cormick and defendants Walters and Marshall to capitalize defendant Nicogel, a start-up company which was known originally as Aquacine Ltd." (Compl. ¶37). Assuming, purely for the sake of this motion, that this allegation is true (which it is not), there is nothing

16

anywhere in the Complaint which suggests that either Dr. Walters or Dr. Marshall had any knowledge of the source of this money, much less that they participated in obtaining this money from Mr. Christ. Nor is there any allegation suggesting that the parties agreed to use this money for the purpose of hiding it from Mr. Christ.

In the absence of any specific allegations establishing the conclusion of conspiracy, this Count should be dismissed.

## III.   THE FRAUD AND CONSPIRACY CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS.

The statute of limitations may be raised in a motion to dismiss if the allegations of the Complaint show that the requirements of the statute have not been satisfied. **Robinson v. Johnson**, 313 F.3d 128, 135 (3rd Cir. 2002).

According to the Complaint, Dr. Cormick allegedly made fraudulent representations in e-mails sent to Mr. Christ in Pennsylvania in January and February 2004, which induced Mr. Christ to wire $250,000 to Dr. Cormick in March, 2004. (Compl. ¶¶16-20).

As demonstrated below, Pennsylvania law, including Pennsylvania's two-year statute of limitations, applies to the causes of action for fraud and conspiracy to defraud, and so the fraud claim and the derivative conspiracy claim are time-barred.

### A.   PENNSYLVANIA LAW APPLIES.

The Complaint does not allege that any alleged misrepresentations were either made from or communicated to Delaware. The Complaint alleges that (i) Mr. Christ resides in Pennsylvania (Compl. ¶1), and (ii) the alleged fraudulent representations were delivered to Mr. Christ via e-mail. (Compl. ¶¶16-17). Thus, it appears that Mr. Christ received allegedly fraudulent e-mails in Pennsylvania.

In diversity actions, federal courts look to the conflicts of law rules applied by the forum state. **Klaxon Co. v. Stentor Electric Mfg. Co.**, 313 U.S. 457, 496 (1941). Under Delaware's conflicts law, in tort actions, where the injury claimed is purely financial, the law of the state where the economic injury is felt applies. **Deutschman v. Beneficial Corp.**, 132 F.R.D. 359, 379 (D. Del. 1990), ***recons. denied***, 761 F.Supp. 1080 (D. Del. 1991). ***See also***

18

**Autrey v. Chemtrust Industries Corp.,** 362 F.Supp. 1085, 1090 (D. Del. 1973) (where tort is misrepresentation, the wrong is deemed to occur where the misrepresentation operated to cause the injury or loss, not where the fraudulent representation was made); **Restatement (Second) of Torts** §148, comment g ("the place where a plaintiff acted in reliance on defendant's representation is more important than the place where the defendant made or the plaintiff received the representations"). Thus, Mr. Christ's tort claims are governed by Pennsylvania law.

### B.    PENNSYLVANIA'S TWO-YEAR STATUTE OF LIMITATIONS APPLIES TO MR. CHRIST'S TORT CLAIMS.

Delaware's limitations period for fraud claims is three years. 10 **Del. C.** §8106. However, Delaware's "borrowing" statute provides that, where a cause of action arises outside of the state, the Court applies the shorter of the limitations period of Delaware and the state where the cause of action accrued. 10 **Del. C.** §8121.

The choice of law principles which were applied above to determine what law applies also determine which state's statute of limitation applies. *See* **David B. Lilly Co., Inc. v. Fisher**, 18 F.3d 1112, 1117 (3rd Cir. 1994); **Deleski v. Raymark Industries, Inc.**, 819 F.2d 377, 379 n.2 (3rd Cir. 1987). As demonstrated above, application of those principles results in the determination that Pennsylvania law applies.

Pennsylvania's statute of limitations requires that fraud claims be filed within two years of their accrual. 42 **Pa. Cons. Stat.** §5524(7). This includes the conspiracy claim, which is dependant upon the fraud claim. **Ammlung v. City of Chester**, 494 F.2d 811, 814-15 (3rd Cir. 1994); **Callahan v. A.E.V., Inc.**, 182 F.3d 237, 246 n.7 (3rd Cir. 1999).

19

The Third Circuit has ruled that this two year period is subject to the "discovery rule" in fraud cases, meaning that the two-year period is tolled until the plaintiff learns or reasonably should have learned through the exercise of due diligence of the existence of a claim. **Beauty Time, Inc. v. VU Skin Systems, Inc.**, 118 F.3d 140 (3rd Cir. 1997).

This rule of tolling, however, does not assist Mr. Christ.  First, where, as here, the Complaint sets forth facts showing on its face that the statute of limitations applies, a plaintiff is obligated to plead facts demonstrating why he is entitled to the benefit of the tolling rule. **Atlantic Paper Box Co. v. Whitman's Chocolates**, 844 F.Supp. 1038, 1044 (E.D. Pa. 1994) (when statute of limitation is raised on a motion to dismiss, plaintiff must allege facts that permit court to conclude that the statute does not apply); **In re Freuhauf Trailer Corp.**, 250 B.R. 168, 186 (D. Del. 2000) ("the plaintiff bears the burden of alleging facts to prove that the statute should be tolled").  In other words, given that he filed suit on April 26, 2006, he must allege facts explaining why he could not, in the exercise of reasonable diligence, have determined prior to April 27, 2004 (two years less one day prior to the date of filing), whether Dr. Cormick misled him about (i) his personal credentials and background, (ii) his relationship with investors in South Africa, and (iii) the validity and operation of his business venture.  (*See* Compl ¶31).[6]  *See* **Alfero v. E.F. Hutton & Co, Inc.**,

---

[6]

  Defendants further suggest that Mr. Christ is not entitled to the benefit of the tolling rule since there are no allegations that Mr. Christ, a sophisticated businessman who owned his own business (Compl. ¶14), undertook any investigation prior to investing in Dr. Cormick's business idea. *See* **Drelles v. Manufacturers Life Ins. Co.**, 881 A.2d 822, 840 (Pa. Super. 2005) (a plaintiff may not recover for fraud "if he blindly relies upon a misrepresentation the falsity of which would be patent if he had used his opportunity to make a cursory examination or investigation," quoting **Restatement (Second) of Torts** §541).

606 F.Supp. 1100, 1112 (E.D. Pa. 1985) (complaint must state why discovery could not be made earlier).

Any alleged injury occurred almost immediately, when Mr. Christ did not receive his "equity shares" or written agreement. (Compl. 20). The Complaint alleges that the next contact with Dr. Cormick was in September, 2004, some five months later. (**Id.**). There is no explanation about what was, if anything, Mr. Christ did to investigate why he had not received his documents. Absent any allegation to establish due diligence after not receiving his shares, Mr. Christ is not entitled to the benefit of the tolling rule.

**IV.    THE COURT SHOULD STAY THIS ACTION PENDING RESOLUTION OF PRIOR-FILED PARALLEL LITIGATION INSTIGATED BY MR. CHRIST IN SOUTH AFRICA.**

In early 2005, Mr. Christ filed suit against Dr. Cormick in the High Court of South Africa, seeking to recover the same money that is the crux of the present action.  (Cormick Decl. Ex. A-1).  Dr. Cormick filed a plea in response in June, 2005. (**Id.** Ex. A-2).  That case is currently awaiting a trial date.  (**Id.** ¶10).

Federal courts should stay actions and await the outcome of parallel proceedings in foreign courts as a matter of international comity and "wise judicial administration, giving regard to the conservation of judicial resources and comprehensive disposition of litigation." **Finova Capital Corp. v. Ryan Helicopters U.S.A., Inc.**, 180 F.3d 896, 898 (7th Cir. 2005) (quoting **Colorado River Water Conservation Dist. v. U.S.**, 424 U.S. 800, 817 (1976)).

In determining whether to stay an action pending resolution of a prior-filed foreign action, the Court must first determine whether the federal and foreign cases are parallel, *i.e.,* whether substantially the same parties are litigating substantially the same issues simultaneously.  **Finova Capital Corp.**, 180 F.3d at 898.  There is no legitimate argument that the two actions here are parallel.  In both actions, Mr. Christ is seeking to recover the same money from Dr. Cormick, which Mr. Christ claims Dr. Cormick wrongfully took and/or refused to return.

Mr. Christ will likely point out that the present action involves a number of parties who are not in the South African action.  This is of little consequence.  "Suits need not be identical to be parallel, and the mere presence of additional parties or issues in one of the cases will not necessarily preclude a finding that they are parallel."  **AAR Intern., Inc. v.**

22

**Nimelias Enterprises, S.A.**, 250 F.3d 510, 518 (7th Cir. ), *cert. denied*, 534 U.S. 995 (2001).

The conspiracy claim against parties other than Dr. Cormick (to the extent it survives) is derivative of the claim against Dr. Cormick. If Dr. Cormick is successful on the merits in South Africa, then, assuming the judgment is recognized in the U.S. under principles of comity, *see* **de la Mata v. American Life Ins. Co.**, 771 F.Supp. 1375, 1381 (D. Del. 1991), it will be *res judicata* and will require dismissal of any remaining claim against the other defendants. As such, the suits are parallel notwithstanding the additional conspiracy claim.

Once it has been established that the two actions are parallel, then the Court must balance the considerations that weigh in favor of and against abstention, **Finova Capital Corp.**, 180 F.3d at 898, including:

1.     The order in which the respective proceedings were filed. Mr. Christ filed the South African action well over a year before he filed the present action (and has had the benefit of this time to prepare his case for trial and seek a trial date). This militates in favor of a stay.

2.     The relative inconvenience of the federal forum. All of the defendants, except Elan Suisse USA, are residents of foreign nations (England and South Africa). (Compl. ¶¶2-8). As such, litigation in the United States would be inconvenient. By contrast, since Mr. Christ was the one who selected South Africa as the location to file the first suit, he cannot now claim inconvenience as to the foreign forum. Moreover, the forum choice of a non-resident plaintiff is entitled to less deference. **Evergreen Marine Corp. v. Welgrow Intern., Inc.**, 954 F.Supp.101, 105 (S.D.N.Y. 1997).

23

3.    <u>Whether federal or foreign law applies.</u>  Mr. Christ does not assert any federal law claim, or even any Delaware law claim.  As demonstrated previously, Pennsylvania law governs.  Although this Court is certainly capable of interpreting and applying Pennsylvania law, there is no special policy emphasizing the need for this Court to do so.

4.    <u>Whether the foreign action protects the federal plaintiff's rights.</u>  There is no indication that Mr. Christ will be denied a fair trial in South Africa.  Moreover, a judgment in Delaware would still need to be registered in England and/or South Africa, since there is no indication that Dr. Cormick or any of the other defendants has any assets in Delaware.

5.    <u>The relative progress of the federal and foreign proceedings.</u>  This action is in its infancy, whereas the South African case has been pending for over one year.

6.    <u>Whether a stay will promote judicial efficiency.</u>  "Maintaining two concurrent and simultaneous proceedings would consume a great amount of judicial, administrative, and party resources for only speculative gain." **EFCO Corp. v. Aluma Systems USA, Inc.**, 983 F.Supp. 816, 824 (S.D. Iowa 1997).

All of these elements support staying this action.

## V.      THIS COURT SHOULD SANCTION MR. CHRIST FOR HIS UNJUSTIFIED ACTIONS DESIGNED TO HARASS AND INCREASE EXPENSE.

The Court should exercise its inherent power and sanction Mr. Christ[7] and award defendants their attorneys' fees for the following reasons[8]:

1.      Mr. Christ initiated this action while maintaining a prior-filed action alleging the same facts and seeking the same relief against Dr. Cormick in South Africa (and without first dismissing the South Africa action).  This has now required Dr. Cormick to engage a lawyer in Delaware in addition to his lawyer in South Africa to defend parallel proceedings.  Such action is vexatious and harassing and designed merely to increase expense to Dr. Cormick.

2.      Mr. Christ impleaded Dr. Cormick, Elan Suisse, Nicogel Ltd., Dr. Marshal and Dr. Walters (all based in either England or South Africa) without any reasonable basis for the assertion of jurisdiction in Delaware, and contrary to well-established Delaware law.

3.      Mr. Christ made false accusations that Nicogel, Dr. Walters and Dr. Marshall conspired with Dr. Cormick to defraud him.  First, Mr. Christ claims that Nicogel and/or Dr. Walters and/or Dr. Marshall formed Elan Suisse USA.  (Compl. ¶12).  This accusation was made without a shred of evidence to support it, and is false (particularly as to Nicogel, which Mr. Christ alleged to have been formed *after* the formation of Elan Suisse USA (Compl. ¶¶19, 37; *see also* Cormick Decl. ¶7, Nicogel Decl. ¶9; Marshall Decl. ¶¶7-8; Walters Decl.

---

[7]      Defendants' claim for sanctions is limited to Mr. Christ.  Defendants do not suggest any wrongdoing by Mr. Christ's attorney.

[8]      In asserting these reasons for sanctions, defendants do not imply that anything else Mr. Christ has done or alleged in this action has any merit.

25

¶9). Indeed, Mr. Christ contradicts himself by attributing the formation of Elan Suisse only to Dr. McCormick at paragraph 19 of the Complaint.

Mr. Christ also falsely alleged, without any reasonable basis in fact, that Dr. Cormick, Dr. Walters and Dr. Marshall used Mr. Christ's money to capitalize Nicogel. (Compl. ¶37). This is absolutely false and unjustified. Indeed, there is not even an allegation that either Dr. Walters, Dr. Marshall or Nicogel had any knowledge of Dr. Cormick's dealings with Mr. Christ. (Cormick Decl. ¶8; Nicogel Decl. ¶8).

The only "reason" Mr. Christ has for this allegation is that he is aware that Dr. Walters at some point briefly had a business relationship with Dr. Cormick. Thus, Mr. Christ is suing Dr. Walters because of "guilt by association." The only rationale Mr. Christ appears to have for suing Dr. Marshall (who never even met Dr. Cormick until August 2005 (Marshall Decl. ¶10)) is the fact that she is associated with Dr. Walters and Nicogel. This is not sufficient justification for dragging citizens of foreign nations into a Delaware court. This conduct should not be tolerated by this Court.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Dr. Cormick, Elan Suisse USA, Elan Suisse, Nicogel Ltd., Dr. Walters and Dr. Marshall respectfully request that this Court either dismiss this action for want of personal jurisdiction, or, alternatively, dismiss the conspiracy claim for failure to state a claim, dismiss the fraud claim as being outside the relevant statute of limitations, and stay the balance of the suit pending resolution of the suit Mr. Christ previously filed in South Africa.  Defendants also request that the Court sanction Mr. Christ for his vexatious and harassing conduct.

Dated: May 22, 2006

<div style="margin-left:40%">

Respectfully submitted,


 /s/ David L. Finger
David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155
(302) 884-6766
Attorney for defendants Brett J. Cormick, Elan Suisse International Holdings (USA) LLC, Elan Suisse (Pty) Ltd., Nicogel Ltd., John Walters and Dianne Marshall

</div>

27

## CERTIFICATE OF SERVICE

I, David L. Finger, hereby certify that on this 22nd day of May, 2006, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF which will send electronic notification to the following counsel of record:

> Thad J. Bracegirdle, Esq.
> Buchanan Ingersoll PC
> The Nemours Building
> 1007 North Orange Street, Suite 1110
> Wilmington, DE 19801-1236

/s/ David L. Finger
David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155
(302) 884-6766

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-00275 GMS |
| | ) | |
| BRETT J. CORMICK, ELAN SUISSE | ) | |
| INTERNATIONAL HOLDINGS (USA) | ) | |
| LLC, ELAN SUISSE (PTY) LTD., | ) | |
| NICOGEL LTD., JOHN WALTERS, | ) | |
| DIANNE MARSHALL and MERCARI | ) | |
| FINANCIAL SERVICES (PTY) LTD., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF DR. BRETT J. CORMICK

1.     My name is Dr. Brett J. Cormick. I make this declaration in support of my
Motion to Dismiss or Stay and for Sanctions.

2.     I have never transacted any business in or with anyone from Delaware
(apart from causing Elan Suisse International Holdings (USA) LLC ("Elan Suisse USA")
to be formed in Delaware). I have never sold anything to or provided any services to
anyone located in Delaware, nor have I ever purchased goods or services from anyone
located in Delaware (apart from causing Elan Suisse USA to be formed in Delaware) .

3.     I have never set foot in Delaware.

4.     I do not possess, have any interest in, or use any real property in
Delaware.

5.     I have never contracted to insure or act as a surety for or on any person,
property, risk, contract, obligation or agreement located, executed or to be performed
within Delaware at the time any such contract was made.

6.      I am not aware of any action or transaction I may have undertaken outside of Delaware having any impact on anyone in Delaware.

7.      I, and I alone, caused Elan Suisse USA to be formed in Delaware. Neither Dr. Walters nor Dr. Marshall nor Nicogel Ltd. (which was not in existence at the time Elan Suisse was formed) had anything to do with the formation of Elan Suisse. Any statement to the contrary is pure fiction.

8.      I never gave any money from I received from Mr. Christ (or its equivalent) to Dr. Walters and/or Dr. Marshall and or Nicogel Ltd. to fund Nicogel Ltd., and neither did any company I control. Any statement to the contrary by Mr. Christ is pure fiction.

9.      Attached to this declaration as Exhibit A-1 is a true and correct copy of a summons issued in 2005 in a lawsuit in the High Court of South Africa styled *In the matter between Robert D. Christ and Brett John Cormick*, Case No. 05/2033.

10.      Attached to this declaration as Exhibit A-2 is a true and correct copy of the plea I filed in response to the summons issued in the lawsuit in the High Court of South Africa styled *In the matter between Robert D. Christ and John Cormick*, Case No. 05/2033. I am currently waiting for Mr. Christ to apply to the African court for a trial date.

11.      I declare, under penalty of perjury under the laws of the United States and of Delaware, pursuant to 28 U.S.C. § 1748, that the foregoing is true and correct. Executed on this 22nd day of May, 2006, in England.

Dr. Brett J. Cormick

# Exhibit A-1

*Mr    Al*
*David Fryer.*

# COMBINED SUMMONS

## IN THE HIGH COURT OF SOUTH AFRICA

### (Witwatersrand Local Division)

*05/2033*

In the matter between:-

CASE NO:

**ROBERT D CHRIST**                                         Plaintiff

and

**BRETT JOHN CORMICK**                              Defendant

To the Sheriff or his Deputy

**INFORM:**

**DR BRETT JOHN CORMICK**, and adult male whose full and further particulars are to the Plaintiff unknown, carrying on business at Ground Floor 512 Nupen Crescent, Halfway House, Cia Oxford Gate, Hyde Park Lane, Hyde Park, Johannesburg, referred to as "the Defendant").

**THAT:**

**ROBERT D CHRIST**, an adult male businessman residing at 2333 Jones Road, Pottstown, PA 19465, United States of America (hereinafter referred to as "the Plaintiff") hereby institutes action against the Defendant in which

2

action the Plaintiff claims the relief on the ground set out in the Particulars of Claim annexed hereto.

**INFORM** the Defendant further that if Defendant disputes the claim and wishes to defend the action, the Defendant shall:-

(i)     Within 10 (ten) days of the service upon the Defendant of this Summons, file with the Registrar of this Court at the Witwatersrand Local Division, Notice of Defendant's intention to defend and serve a copy thereof on the Attorneys of the Plaintiff, which notice shall given an address (not being a post office or poste restante) as referred to in Rule 6(5)(b) for service upon the Defendant of all notices and documents in the action.

(ii)    Thereafter and within 21 (twenty one) days after filing and serving Notice of Intention to Defend as aforesaid, file with the Registrar and serve upon the Plaintiff a Plea, Exception, Notice to Strike Out, with or without a counter claim.

**INFORM** the Defendant further that if the Defendant fails to file and serve the notices as aforesaid, Judgment as claimed may be given against the Defendant without further notice to the Defendant, or if having filed and served such notice, the Defendant failing to plead, except, make application to strike our or counter claim, judgment may be given against the Defendant.

**AND** immediately thereafter serve on the Defendant a copy of this Summons and return the same to the Registrar with whatsoever you have done thereupon.

**DATED** AT JOHANNESBURG ON 12 JANUARY 2005

_____

REGISTRAR OF THE HIGH COURT

A060-12.1.05

3

(Sgd ) C. J LEE

**ASSHETON-SMITH INC**
PLAINTIFF'S ATTORNEY
TEL: (021) 685-6766
REF: C B ASSHETON-SMITH/se/CHR 002
**C/O CHRISTOPHER LEE ATTORNEYS**
75 KING STREET
BERARIO
TEL: (011) 476-3217
FAX: (011) 476-9863
REF: C J LEE/A060

A060-12.1.05

## PARTICULARS OF CLAIM

1.  The Plaintiff is Mr Robert D Christ, an adult male businessman whose address is as reflected on the Summons.

2.  The Defendant is Dr Brett John Cormick, an adult male ~~businessman~~ whose full and further particulars are to the Plaintiff unknown and who carries on business ~~at Ground Floor – Oxford Gate, Hyde Park Lane, House, Gautstsg~~ Hyde Park, Johannesburg.

    *c/o 55 Loots 572 Nufan Cres 825, 1 Balfway*

3.  In and during December 2003 to February 2004, the Plaintiff and the Defendant held certain discussions pertaining to an investment of US$350,000.00 to be made by the Plaintiff in two companies, being:

    3.1    Elan Suisee (Pty) Ltd, a company incorporated in the Republic of South Africa ("the South African company"); and

    3.2    a company to be incorporated in Delaware, United States of America ("the United States company").

4.  The Defendant represented the following in regard to the proposed investment:

    4.1    The Plaintiff would invest the sum of US$350,000.00;

22 MAY 2006 14:54   Locke Lord   NO.637   P.5

- 2 -

4.2    In exchange for the aforesaid investment the Plaintiff would receive:

4.2.1    50% of the issued share capital in the United States company, which was to hold certain intellectual property, and

4.2.2    a proportional shareholding in the South African company, worth R350.000,00;

4.3    That the South African company was engaged in certain 'financial engineering' and had access to a large number of brokers and institutions through which certain United States based financial products would be sold to an investor base accessed through such brokers and institutions in the Republic of South Africa.

4.4    That the South African company held certain intellectual property rights which would be ceded and delivered to the United States company.

5.    In contemplation of the conclusion of a written agreement to regulate the investment by the Plaintiff in the aforestated entities, the Plaintiff

- 3 -

attended to deposit the sum of US$250.000,00 to the account of the Defendant, in and during March 2004.

6.    Despite various discussions held between the Plaintiff and the Defendant, the Plaintiff and Defendant were unable to conclude the terms of such written agreement.

7.    On or about 9 September 2004, and in writing, the Defendant offered to refund the Plaintiff the sum paid to him of US$250.000,00.  Such offer was accepted in writing by the Plaintiff on 30 November 2004, and the Plaintiff simultaneously demanded repayment of the said sum of US$250.000,00.

8.    Despite such demand, the Defendant has failed and/or refused and/or neglected to pay the amount of US$250.000,00 to the Plaintiff.

**WHEREFORE** the Plaintiff prays for judgment against the Defendant for:

(a)    Payment of the sum of US$250.000,00 (or the Rand equivalent thereof as at the date of judgment herein);

(b)    Interest thereon at the rate of 15.5% *a tempore morae*, to date of payment;

- 4 -

(c)    Costs of suit on the attorney and client scale;

(d)    Further and/or alternative relief.


DATED at                    on this        day of DECEMBER 2004.


**J-H ROUX**
Counsel for Plaintiff




**ASSHETON – SMITH INC**

Per:_____

Attorneys for Plaintiff
Ground Floor, West Block
Tannery Park
Belmont Road
RONDEBOSCH
c/o Christopher Lee Attorneys
75 King Street
Belonia
Tel: (011) 476 3217
Fax: (011) 476 9863
Ref: C.J Lee/A060


TO:        **THE REGISTRAR**

- 5 -

AND TO:    **DR BRETT JOHN CORMICK**
Defendant
Ground Floor – Oxford Gate
Hyde Park Lane
Hyde Park
JOHANNESBURG

# Exhibit A-2

# IN THE HIGH COURT OF SOUTH AFRICA
## WITWATERSRAND LOCAL DIVISION



**CASE NO: 05/2033**

In the matter between:

**CHRIST: ROBERT D.**          **PLAINTIFF**

and

**CORMICK: BRETT JOHN**        **DEFENDANT**

## DEFENDANT'S PLEA

The Defendant pleads as follows to the Plaintiff's particulars of claim:

## 1.

### SPECIAL PLEA *IN LIMINE*:

The Defendant pleads *in limine*:

1.1    The Defendant is an Australian Citizen;

1.2    The Defendant permanently resides in Zimbabwe;

1.3    The Defendant, for the purposes of visiting South Africa, temporarily resides from time to time in Hermanus, in the Western Cape Province;

1.4    The Defendant neither resides nor carries on business at any place within the area of jurisdiction of the Honourable Court;

22.MAY.2006  14:55    JJ LOOTS INC 805 4633

2

1.5    The Plaintiff resides in the United States of America;

1.6    The Plaintiff is employed in the United States of America;

1.7    The Plaintiff owns no property within the area of jurisdiction of the Honourable Court;

1.8    The Defendant owns no property within the area of jurisdiction of the Honourable Court;

1.9    Plaintiff's claim against the Defendant is for the amount of US$250 000 which was:

1.9.1   deposited by the Plaintiff from the United States of America in two amounts of US$125 000 each into the bank accounts of the Defendant in London in the United Kingdom; and

1.9.2   agreed to be so deposited while the Plaintiff and the Defendant were outside the borders of the Republic of South Africa.

1.10   The basis on which the Plaintiff claims the aforesaid sum of money from the Defendant is that, on or about the 9th of September 2004, and in writing, the Defendant offered to refund the Plaintiff the said sum and said offer was accepted in writing by the Plaintiff on or about the 30th of November 2004; and

1.11   In this regard, while making the alleged offer, the Defendant was resident or carrying on business within the area of jurisdiction of the Honourable Court and while accepting such offer the Plaintiff was not residing or carrying on business within the area of jurisdiction of the Honourable Court.

**2.**

2.1    In the premises the Defendant pleads:

2.1.1  Neither the Plaintiff nor the Defendant is ordinarily resident or carries
       on business within the area of jurisdiction of the Honourable Court;
       and

2.1.2  The cause of action herein did not arise within the area of jurisdiction of
       the Honourable Court;  and

2.1.3  that the Honourable Court consequently has no jurisdiction to entertain
       this action.


**3.**


<u>**AD THE PLAINTIFF'S PARTICULARS OF CLAIM:**</u>


<u>**AD PARAGRAPH 1 THEREOF:**</u>


The Defendant admits this paragraph.


**4.**


<u>**AD PARAGRAPH 2 THEREOF:**</u>


4.1    The Defendant admits that he is Dr Brett John Cormick, an adult male
       businessman.

4.2    The Defendant denies that he carries on business at Ground Floor,
       Oxford Gate, Hyde Park lane, Hyde Park, Johannesburg and puts
       Plaintiff to the proof thereof.

4.3   The Defendant in particular pleads, at all times relevant to this action:

4.3.1  the Defendant neither carried on business nor resided within the area
       of jurisdiction of the Honourable Court;  and

4.3.2  the Defendant does not own any property, be it movable or immovable,
       within the area of jurisdiction of the Honourable Court.


**5.**


**AD PARAGRAPH 3 THEREOF:**


5.1   The Defendant admits that, during or about December 2003 to
      February 2004, the Plaintiff and the Defendant held certain discussions
      pertaining to an investment of US$350 000 to be made by the Plaintiff
      in a company to be incorporated in Delaway, United States of America.

5.2   The balance of the allegations contained in the paragraph under reply
      are denied as if specifically traversed and the Plaintiff is put to the proof
      thereof.


**6.**


**AD PARAGRAPH 4, 4.1, 4.2 AND 4.2.1 THEREOF:**


The Defendant admits the contents of these paragraphs.

**7.**

**AD PARAGRAPH 4.2.2 THEREOF:**

The Defendant denies the contents of this paragraph as if specifically traversed and puts the Plaintiff to the proof thereof.

**8.**

**AD PARAGRAPHS 4.3 AND 4.4, THEREOF:**

The Defendant admits the contents of these paragraphs.

**9.**

**AD PARAGRAPH 5 THEREOF:**

9.1   The Defendant admits that the Plaintiff deposited the sum of US$250 000 to the accounts of the Defendant during or about March 2004.

9.2   The Defendant denies the balance of the allegations contained in the paragraph under reply as if specifically traversed and puts the Plaintiff to the proof thereof.

**10.**

**AD PARAGRAPHS 6 AND 7  THEREOF:**

The Defendant denies the contents of these paragraphs as if specifically traversed and puts the Plaintiff to the proof thereof.

**11.**

**AD PARAGRAPH 8 THEREOF:**

The Defendant admits demand and his failure to pay but pleads that the Defendant is not indebted to the Plaintiff in the amount claimed or any amount and puts the Plaintiff to the proof thereof.

**WHEREFORE THE DEFENDANT PRAYS** that the Plaintiff's claim be dismissed with costs.

SIGNED and DATED at Pretoria      on the 21st day of June 2005.

_____
**K SWANEPOEL**
**DEFENDANT'S COUNSEL**

 

**J J LOOTS INCORPORATED**
**ATTORNEYS FOR DEFENDANT**
**512 NUPEN CRESCENT**
**HALFWAY HOUSE**
**TEL: (011) 805-5030**
**C/O JOWELL GLYN & MARAIS INC**
**4TH FLOOR, 72 GRAYSTON DRIVE**
**SANDOWN**
**TEL: (011) 292-6700**

**TO:**      **THE REGISTRAR OF THE HIGH COURT**
          **WITWATERSRAND LOCAL DIVISION**

**AND TO:**    **ASSHETON-SMIT INC.**
          **ATTORNEYS FOR PLAINTIFF**
          **C/O CHRIS LEE ATTORNEY**
          **75 KING STREET**
          **BERARIO**
          **C/O JAY INCORPORATED**

**9 ARNOLD ROAD**
**ROSEBANK**
**JOHANNESBURG**

Received a copy hereof on
the day of June 2005.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-00275 GMS |
| | ) | |
| BRETT J. CORMICK, ELAN SUISSE | ) | |
| INTERNATIONAL HOLDINGS (USA) | ) | |
| LLC, ELAN SUISSE (PTY) LTD., | ) | |
| NICOGEL LTD., JOHN WALTERS, | ) | |
| DIANNE MARSHALL and MERCARI | ) | |
| FINANCIAL SERVICES (PTY) LTD., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF NICOGEL LTD. BY DR. DIANNE E. MARSHALL

1.     My name is Dr. Dianne E. Marshall. I am an officer of Nicogel Ltd. ("Nicogel") and am authorized to make this declaration on its behalf.  I make this declaration in support of Nicogel's Motion to Dismiss or Stay, and for Sanctions.

2.     Nicogel is an entity formed under the laws of the United Kingdom, and is based in Cambridgeshire, England.  Nicogel was formed in early 2005.  Nicogel has never transacted any business in or with anyone from Delaware.  Nicogel has never sold anything to or provided any services to anyone located in Delaware, nor has Nicogel ever purchased goods or services from anyone located in Delaware.

3.     None of Nicogel's employees, officers or directors has ever set foot in Delaware.

4.     Nicogel does not possess have any interest in, or use any real property in Delaware.

5.      Nicogel has never contracted to insure or act as a surety for or on any person, property, risk, contract, obligation or agreement located, executed or to be performed within Delaware at the time any such contract was made.

6.      Nicogel is unaware of any action or transaction it may have undertaken outside of Delaware having any impact on anyone in Delaware.

7.      Nicogel is unaware of any Delaware resident reviewing its website (other than Nicogel's Delaware counsel).

8.      Nicogel never received any money from Brett Cormick or any entity associated with or affiliated with him.  Mr. Christ's allegation to the contrary is a pure fiction and designed merely to harass and injure Nicogel.

9.      Nicogel never played any role in and had nothing to do with the incorporation of Elan Suisse International Holdings (USA) LLC.  Mr. Christ's allegation to the contrary is a pure fiction and designed merely to harass and injure Nicogel.

10.     I declare, under penalty of perjury under the laws of the United States and of Delaware, pursuant to 28 U.S.C. § 1748, that the foregoing is true and correct. Executed on this 22nd day of May, 2006, in England.


_____
Nicogel Ltd. by Dr. Dianne E Marshall

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-00275 GMS |
| | ) | |
| BRETT J. CORMICK, ELAN SUISSE | ) | |
| INTERNATIONAL HOLDINGS (USA) | ) | |
| LLC, ELAN SUISSE (PTY) LTD., | ) | |
| NICOGEL LTD., JOHN WALTERS, | ) | |
| DIANNE MARSHALL and MERCARI | ) | |
| FINANCIAL SERVICES (PTY) LTD., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF DR. DIANNE E. MARSHALL

1.     My name is Dr. Dianne E. Marshall. I make this declaration in support of my Motion to Dismiss or Stay, and for Sanctions.

2.     I have never transacted any business in or with anyone from Delaware.  I have never sold anything to or provided any services to anyone located in Delaware, nor have I ever purchased goods or services from anyone located in Delaware.

3.     I have never set foot in Delaware.

4.     I do not possess, have any interest in, or use any real property in Delaware.

5.     I have never contracted to insure or act as a surety for or on any person, property, risk, contract, obligation or agreement located, executed or to be performed within Delaware at the time any such contract was made.

6.     I am not aware of any action or transaction I may have undertaken outside of Delaware having any impact on anyone in Delaware.

7.    I never played any role in and had nothing to do with the incorporation of Elan Suisse International Holdings (USA) LLC.  Mr. Christ's allegation to the contrary is a pure fiction and designed merely to harass.

8.    I did not even hear of Elan Suisse International Holdings (USA) LLC until Mr Christ's false and vexatious writ. Mr. Christ's allegation to the contrary is a pure fiction and designed merely to harass.

9.    I had no knowledge of any Mr Christ until December 2005, following a legal representative drawing his disgusting and incorrect web site to my attention. Mr. Christ's allegation to the contrary is a pure fiction and designed merely to harass.

10. The first time I met Brett Cormick was August 2005. Mr. Christ's allegation to the contrary is a pure fiction and designed merely to harass.

11.    I declare, under penalty of perjury under the laws of the United States and of Delaware, pursuant to 28 U.S.C. § 1748, that the foregoing is true and correct. Executed on this 22nd day of May, 2006, in England.


_____

Dr. Dianne E. Marshall

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-00275 GMS |
| | ) | |
| BRETT J. CORMICK, ELAN SUISSE | ) | |
| INTERNATIONAL HOLDINGS (USA) | ) | |
| LLC, ELAN SUISSE (PTY) LTD., | ) | |
| NICOGEL LTD., JOHN WALTERS, | ) | |
| DIANNE MARSHALL and MERCARI | ) | |
| FINANCIAL SERVICES (PTY) LTD., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF DR. JOHN A. WALTERS

1.      My name is Dr. John A. Walters. I make this declaration in support of my Motion to Dismiss or Stay, and for Sanctions.

2.      I have never transacted any business in or with anyone from Delaware.  I have never sold anything to or provided any services to anyone located in Delaware, nor have I ever purchased goods or services from anyone located in Delaware.

3.      I have never set foot in Delaware.

4.      I do not possess, have any interest in, or use any real property in Delaware.

5.      I have never contracted to insure or act as a surety for or on any person, property, risk, contract, obligation or agreement located, executed or to be performed within Delaware at the time any such contract was made.

6.      I am not aware of any action or transaction I may have undertaken outside of Delaware having any impact on anyone in Delaware.

7.     I had not met Brett Cormick at the time of the allegations, thus Mr. Christ's allegations of conspiracy is a pure fiction and designed merely to harass.

8.     I never heard of Mr Christ until May 2005 and thus Mr. Christ's allegations of conspiracy is a pure fiction and designed merely to harass.

9.     I never played any role in and had nothing to do with the incorporation of Elan Suisse International Holdings (USA) LLC.  Mr. Christ's allegation to the contrary is a pure fiction and designed merely to harass.

10.     I declare, under penalty of perjury under the laws of the United States and of Delaware, pursuant to 28 U.S.C. § 1748, that the foregoing is true and correct. Executed on this 22nd day of May, 2006, in England.

_____
Dr. John A. Walters



Not Reported in F.Supp.                                                                                    Page 1

Not Reported in F.Supp., 1993 WL 533177 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

**H** Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
James Aggrey-Kweggyirr ARUNGA, Plaintiff
v.
AIPAC, et al., Defendants.
**No. CIV. A. 93-24.**

Dec. 20, 1993.

MEMORANDUM AND ORDER%

YOHN.
**\*1** Pending before the court is the motion of
defendant American Israeli Public Affairs
Committee ("AIPAC") to dismiss plaintiff's
amended complaint pursuant to Federal Rules of
Civil Procedure 12(b)(1), 12(b)(2), 12(b)(3), and
12(b)(6) for lack of standing, lack of personal
jurisdiction, improper venue, and for failure to state
a claim upon which relief can be granted. In this
amended complaint, plaintiff has alleged, as he did
in his prior complaint, a vast conspiracy,
orchestrated by AIPAC and "its enumerated
principals and agents" (presumably the other 367
defendants named in plaintiff's amended complaint)
to injure and destroy him, his family, and his
property in violation of his rights under federal
statutes and the United States Constitution (Am.
Compl. ¶¶ C, D at 4.) The court dismissed
plaintiff's prior complaint without prejudice because
it was "unintelligible as a legal document and
therefore neither the defendants nor the court can
determine what an appropriate response would be."
(Memorandum and Order entered 7/29/93 ("Mem.
and Order") at 2.)

Mindful of the plaintiff's pro se status, the court
granted him leave to amend his complaint and
endeavored to guide him in his task. Specifically,
the court instructed plaintiff "to set forth as simply
as possible what happened to him, how he was

injured, the nature of the injuries and the conduct of
individual defendants that caused those injuries,"
and noted that "[w]ith regard to the alleged
conspiracy, plaintiff must allege facts bearing out
the existence of the conspiracy and indicating its
broad objectives and the role of each defendant
allegedly played in it." (Mem. and Order at 10.)
As discussed below, plaintiff has failed to comply
with the court's instructions. While the amended
complaint is perhaps more coherent than the
original, it remains virtually impossible to discern
the basis for plaintiff's claims and purported injuries
or the relationship of AIPAC's actions to those
claims and injuries yet alone any facts bearing out
the existence of a conspiracy and AIPAC's role
therein.[FN1]

In his amended complaint, plaintiff sets forth
sixtyfour chronologically ordered paragraphs which
purport to allege "when and how defendants
conspire(d), in perpetuity, to subject him to
irreparable injuries." (Pl.'s Resp. to Def.'s Mot. to
Dismiss at 5-6.) All of the paragraphs follow the
same pattern. In each, plaintiff asserts that at least
one, and in some instances as many as nearly a
hundred, of the 368 defendants named in the
amended complaint caused him "irreparable injuries,
" and alleges that such defendants are either "ADL
Jews" [FN2] or "AIPAC principals and agents" or
often some combination of the two such as "ADL
Jews organized as AIPAC principals and agents."
Plaintiff fails, however, to specify both the actions
of the individual defendants that allegedly caused
his injuries and their role in the alleged conspiracy.

In practically all of the paragraphs, plaintiff's
allegations of irreparable injury rest upon vague
accusations such as "racial and political
harassments," "physical, mental and emotional
torture," "cult and terrorist threats," "shock and
anguish," "humiliations," "conspiracies to destroy
him," and "education, housing, and employment
discriminations." And those are among the more
coherent accusations. Nowhere, however, does

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 2

Not Reported in F.Supp., 1993 WL 533177 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

plaintiff identify the specific conduct of the defendants that allegedly constituted, for example, " education, housing, or employment discrimination," yet alone the more nebulous accusations such as " humiliations."

**\*2** In dismissing plaintiff's prior complaint, the court noted that the complaint lacked sufficient " substantive information ... to allow the defendants to understand what they have done to the plaintiff." (Mem. and Order at 8.) Despite the court's clear direction, plaintiff has not remedied this deficiency in his amended complaint, and once again declines to specify the actions of AIPAC and the other defendants with sufficient clarity to allow them to frame "meaningful responses." (Mem. and Order at 8.) Accordingly, the amended complaint fails to state a cause of action because it does not give AIPAC and the other 367 defendants "fair notice of what [his] claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47 (1957). *See also Rodgers v. Lincoln Towing Service, Inc.,* 771 F.2d 194, 198 (7th Cir.1985) ("Even the liberal notice pleading allowed by the federal rules requires the complaint to include the operative facts upon which a plaintiff bases his claim") (citing *Conley v. Gibson,* 355 U.S. 41, 47 (1957) (emphasis added); *Campana v. Eller,* 755 F.2d 212, 215 (1st Cir.1985) ("it of course is axiomatic that a defendant is entitled to know the nature and extent of the claim being made against him") (citation omitted); *Pamel Corp. v. Puerto Rico Highway Authority,* 621 F.2d 33, 36 (1st Cir.1980) ("complaint [must] state with some minimal [degree of] particularity how overt acts of the defendant caused a legal wrong") (citation omitted).

Moreover, even in the rare instance where plaintiff specifies the conduct which allegedly caused his injuries with some degree of clarity, he fails to adequately delineate the contours of the alleged conspiracy. For example, in one paragraph, he alleges that he "sustained irreparable injuries when his home telephone was abruptly disconnected, without previous billings, warnings sent to him, at any time, by ADL Jews and AIPAC principals and agents named PacBell/Telesis, AT & T, J. May and Joseph Detone." (Am. Compl. ¶ 61 at 22.) While this allegation does identify the conduct which

plaintiff alleges caused his injuries, it gives AIPAC no notice of how it is alleged to have participated in the conspiracy.[FN3]

As the court previously noted, stringent pleading requirements apply to allegations of conspiracy: The plaintiff's allegations must be supported by facts bearing out the existence of the conspiracy and indicating its broad objectives and the role of each defendant allegedly played in carrying out those objectives. Bare conclusory allegations of " conspiracy" or "concerted action" will not suffice to allege a conspiracy. The plaintiff must expressly allege an agreement or make averments of communication, consultation, cooperation, or command from which such an agreement can be inferred.... [A] defendant [must] be given notice of how he is alleged to have participated in the conspiracy, so that he may intelligently prepare his answer and defense.

**\*3** (Mem. and Order at 5.) (quoting *Flanagan v. Shively,* 783 F.Supp. 922, 928-29 (M.D.Pa), *aff'd mem.,* 980 F.2d (3d Cir.1992), *cert. denied,* 114 S.Ct. 95 (1993)). Plaintiff has not even remotely satisfied these requirements. He makes only a conclusory allegation of a conspiracy between " AIPAC and AIPAC enumerated principals and agents ... to destroy him, his family as well as his family property," (Am. Compl. ¶ D at 4), and avers that defendants, such as PacBell/Telesis and AT & T, whose conduct allegedly injured him are agents of AIPAC. Nowhere does he set forth "facts bearing out the existence of the conspiracy," nor does he ever "expressly allege an agreement or make averments of communication, consultation, cooperation, or command from which such an agreement can be inferred." (Mem. and Order at 5.) (quoting *Flanagan v. Shively, supra* ). And most pertinently, he has utterly failed to give AIPAC " notice of how [it] is alleged to have participated in the conspiracy, so that [it] may intelligently prepare [its] answer and defense." *Id.*

In summary, plaintiffs' amended complaint once again fails to state a claim upon which relief can be granted because it fails to give AIPAC any notice of what it is alleged to have done wrong. The allegations contained in the amended complaint not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1993 WL 533177 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

only fail to adequately delineate AIPAC's role in the alleged conspiracy and the contours of the conspiracy itself, but also fail to designate the specific conduct of AIPAC that allegedly caused plaintiff's injuries with sufficient clarity to allow AIPAC to frame a meaningful response. Accordingly, plaintiff's amended complaint will be dismissed with prejudice as to AIPAC.

Finally, the court is left with the question of what to do with the other 367 defendants, in addition to AIPAC, named in plaintiff's amended complaint. Plaintiff has served only a minuscule fraction of the defendants named in the amended complaint.[FN4] Correspondingly, only eight defendants in addition to AIPAC have thus far moved to dismiss the amended complaint. For many of the same reasons discussed above, the court has granted those motions and dismissed plaintiff's amended complaint with prejudice as to those defendants. The court previously, upon its own initiative, dismissed plaintiff's original complaint, with leave to amend, as to all non-moving defendants, and will now do the same with the amended complaint-only this time the dismissal will be with prejudice.

The court's authority to dismiss sua sponte was fully documented in its previous decision dismissing plaintiff's original complaint (*see* Mem. and Order at 3-5), and will not be revisited here. Plaintiff was given a chance to amend his complaint in conformance with the court's direction, but has again offered the court a largely unintelligible complaint that fails to give the defendants "fair notice of what [his] claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47 (1957). The same deficiencies in the amended complaint which have compelled the court to grant AIPAC's and the other moving defendants' motions to dismiss are equally applicable to the non-moving defendants. Plaintiff has simply failed "to set forth as simply as possible what happened to him, how he was injured, the nature of the injuries and the conduct of individual defendants that caused those injuries," nor has he "allege[d] facts bearing out the existence of the [alleged] conspiracy ... and the role of each defendant allegedly played in it." (Mem. and Order at 10.)

**\*4** Moreover, although complaints by pro se litigants are held to less stringent standards than those drafted by legal counsel, *Haines v. Kerner,* 404 U.S. 519 (1972); *Fischer v. Cahill,* 474 F.2d 991 (3d. Cir.1973), plaintiff's pro se status [FN5] cannot excuse him from complying with the basic pleading requirements under the Federal Rules of Civil Procedure. *See Engle v. U.S.,* 736 F.Supp. 670, 671-72 (D. Md.1989) (although "*pro se* litigants must be held to less stringent standards than trained lawyers, .... a *pro se* litigant must nevertheless fairly put a defendant on notice of the claims being asserted and the essential bases therefor") (emphasis added) (citations omitted), *aff'd mem.,* 902 F.2d 28 (4th Cir.1990); *see also* Mem. and Order at 5-6 (citing cases). Accordingly, the court will, on its own motion, dismiss plaintiff's amended complaint with prejudice as to all non-moving defendants.

An appropriate order follows.

### ORDER

AND NOW, this _____ day of December 1993, upon consideration the motion of defendant American Israel Public Affairs Committee to dismiss the amended complaint, plaintiff's response, and the briefs thereto, it is hereby ORDERED that:

1. Said motion is hereby GRANTED and the amended complaint is DISMISSED WITH PREJUDICE AS TO DEFENDANT AMERICAN ISRAEL PUBLIC AFFAIRS COMMITTEE.

2. The amended complaint is DISMISSED WITH PREJUDICE AS TO ALL NON-MOVING DEFENDANTS ON THE COURT'S OWN MOTION.

3. Plaintiff's motion to Vacate and for Injunction, motion for Default Judgment, and motion for Summary Judgment are hereby DENIED as moot.

The clerk is directed to mark the case closed for statistical purposes.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 4

Not Reported in F.Supp., 1993 WL 533177 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

> FN1. AIPAC's other grounds for dismissal all appear to contain significant merit, and are opposed only by plaintiff's cryptic statement that "[t]he United States Federal Courts are not and should not be on TRIAL for want of Venue, Personal, and Subject Matter Jurisdiction ..." (Pl.'s Resp. to Def.'s Mot. to Dismiss at 5.) Nevertheless, because the court is convinced that plaintiff's amended complaint must be dismissed for failure to state a claim upon which relief can be granted, it will not address AIPAC's additional grounds for dismissal.

> FN2. ADL is the Anti-Defamation League of B'nai B'rith, one of the many defendants in this action.

> FN3. Additionally, the court notes that plaintiff fails to tie the conduct complained of-the disconnection of his telephone-to a specific and cognizable legal theory. Nowhere does he specify exactly what federal statute or constitutional right this action allegedly violates.

> FN4. At best, plaintiff has served ten to fifteen defendants, and the court expresses some doubt as to whether such service has been properly effected.

> FN5. The court notes that plaintiff does contend that he is "currently, [a] registered student of, and candidate for London LLB Honors Degree Program, University of London, U.K., with intention to pursue a professional career as a Barrister-at-Law." (Am. Compl. at 3.)

E.D.Pa. 1993

Arunga v. AIPAC

Not Reported in F.Supp., 1993 WL 533177 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:93cv00024 (Docket) (Jan. 04, 1993)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                 Page 1

Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**C**
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
         Court of Chancery of Delaware.
     COMPUTER PEOPLE, INC. Plaintiff,
                     v.
   BEST INTERNATIONAL GROUP, INC., a
   Delaware corporation, Best International Group
   PLC, a foreign corporation, Best People Limited, a
     foreign corporation, and Raymond Arello, an
            individual, Defendants.
              **No. CIV. A. 16648.**

               April 27, 1999.

David C. Weiss and Richard S. Cobb, Esquires, of
Duane, Morris & Heckscher LLP, Wilmington,
Delaware; and Michael N. Sheetz and Peter M.
Coppinger, Esquires, of Gadsby & Hannah LLP,
Boston, Massachusetts, Attorneys for Plaintiff.
Robert J. Stearn Jr., Esquire, of Richards, Layton &
Finger, Wilmington, Delaware; and John M. Murphy
and Anthony G. Stamato, Esquires, of Baker &
McKenzie, Chicago, Illinois, Attorneys for the Best
Defendants.
R. Judson Scaggs, Jr. and William M. Lafferty,
Esquires, of Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware; and Bruce L. Atkins and
Christine M. Stevenson, Esquires, of Contant,
Scherby & Atkins, Hackensack, New Jersey,
Attorneys for Defendant Raymond Arello.

            MEMORANDUM OPINION
JACOBS, Vice Chancellor.
**\*1** In this action, the plaintiff, Computer People,
Inc. ("Computer People" or "the company"), claims
that the defendants have engaged in a conspiracy to
induce several of the company's managers and other
high level employees to leave Computer People and
join forces with the defendants. The named
defendants are Best International Group PLC ("Best
PLC") and Best People Limited ("Best Ltd."), both

United Kingdom corporations; Best International
Group, Inc., a Delaware corporation ("Best USA");
and Raymond Arello ("Arello"), a New Jersey
resident.

The defendants other than Best USA have moved to
dismiss the complaint as to them under Court of
Chancery Rule 12(b)(2) for lack of personal
jurisdiction. Additionally, all defendants have
moved to dismiss the action under Court of
Chancery Rule 12(b)(6) for failure to state a claim
upon which relief can be granted.

For the following reasons, the Court determines that
it lacks personal jurisdiction over defendants
Arello, Best PLC, and Best Ltd ., and grants the
motion to dismiss the complaint as to those
defendants. The result is to leave Best USA as the
sole remaining defendant. Because neither side has
adequately briefed the 12(b)(6) motion with that
contingency in mind, the Court denies the Rule
12(b)(6) motion, with leave to renew based on
briefs that take into account the procedural
consequences of the jurisdictional ruling made here.

              I. BACKGROUND

The facts set forth below are derived from the
complaint and the affidavits filed in connection with
these motions.

              A. The Parties

              1. Computer People

Computer People, a Delaware corporation, is a
subsidiary of Delphi PLC, a British corporation
with branch offices throughout the United
Kingdom. Computer People provides specialized
employment staffing services on a contract basis
within the information technology ("IT") industry.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                  Page 2

Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

The company has 14 branch offices nationwide grouped into three regions.[FN1] Its business is to hire IT professionals ("consultants") and then place those consultants with commercial and governmental entities. In those environments, the consultants perform tasks that include programming, system administration, applications development, system analysis and design, and network administration and installation.

> FN1. The Western region, which has its headquarters in Los Angeles, includes branch offices in Seattle, Portland, Dallas, and Houston. The Midwest region, which is headquartered in King of Prussia, Pennsylvania, includes branch offices in Chicago, Detroit, Columbus, and Atlanta. The Mid-Atlantic region, which has its headquarters in Wilmington, Delaware, includes branch offices in New York City and King of Prussia, Pennsylvania.

Each Computer People branch office has a manager who is responsible for operating that office, and who has access to highly confidential and sensitive information, including a database containing detailed information about Computer People's consultants and clients. Because of the sensitive and confidential nature of this information, all managers are required to sign employment agreements that contain various restrictive covenants covering topics such as employee non-solicitation, customer non-solicitation, and confidentiality. Some Computer People employees are also required to include non-competition provisions in their employment agreements.

### 2. The Defendants

Best PLC, a British corporation, is the corporate parent of several IT placement subsidiaries throughout the world, including defendants Best USA and Best Ltd. Defendants Best PLC and Best Ltd. do not own any real estate, maintain any office, or conduct any business; and neither company is registered to do business in Delaware. Best PLC and Best Ltd. also have no Delaware mailing address, post office box, telephone number or listing; nor do they generate any substantial revenue from Delaware operations or have a designated agent for service of process in Delaware.

**\*2** Best PLC incorporated Best USA in Delaware on August 12, 1998 to take advantage of the administrative convenience and corporate tax considerations associated with being a Delaware corporation. Best USA, like Computer People, is in the business of placing consultants in the IT field on a contractual basis. Best USA's principal place of business is in Freehold, New Jersey, and it also maintains three branch offices outside New Jersey, none of which are located in Delaware.[FN2]

> FN2. The branches are located in Los Angeles, California; Dallas, Texas; and Seattle, Washington.

Raymond Arello worked for Computer People from May 22, 1989 through May 15, 1998. Originally hired as the New York branch manager, Arello served as Vice President and Regional Manager for Computer People's Northeast region from January 1, 1993 through March 1, 1998. On March 1, 1998, Arello was promoted to Senior Vice President for Computer People and Alpine Computer System (a separate operating division located in New York),[FN3] with oversight responsibility for profit improvement in New York and New Jersey.

> FN3. Alpine is involved in remote systems management, outsourcing, computer network design, and consulting services.

Although he was a New Jersey resident, Arello initially had many Delaware contacts as a Computer People employee. As a regional Vice President from 1993 to 1996, Arello was responsible for supervising Computer People's Delaware branch office; and in that role he had frequent contacts in Delaware with Michael Stanley, Computer People's Wilmington branch office manager. Arello visited the Delaware branch office weekly and communicated with that office almost daily by telephone and e-mail. He also frequently attended

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 3

Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

sales and staff meetings in Delaware and was available to answer operational and other questions for Stanley as needed. Arello never lived in Delaware, however, and after 1996 his Delaware contacts declined significantly.

In April 1998, Best Ltd. executives Susan E. Cuff (" Cuff") and Michael R. Bayfield ("Bayfield") contacted Arello and offered him a position with Best USA. In May 1998, Arello left Computer People after being terminated as part of the company's cost-reduction plan. Thereafter, Arello became Best USA's President and Chief Executive Officer, and presently works out of Best USA's Freehold, New Jersey headquarters. After he left Computer People, Arello's only Delaware contact occurred in 1998, when he had lunch with Stanley in Delaware and toured Computer People's new Wilmington, Delaware facility.

### B. The Defendants' Alleged Solicitation of Computer People Employees

Computer People claims that the defendants have conspired to lure away five key Computer People employees (including 4 of its 14 branch managers) who had access to sensitive and confidential company information. These defecting employees included former branch managers Thomas P. Meola ("Meola"), William Kalinowski ("Kalinowski"), Jon Raymond ("Raymond"), and Brian Mitchell (" Mitchell"), and former employee Chelsey D. English ("English"). What follows is a brief summary of the alleged wrongful acts committed by the defendants. None of those acts occurred in Delaware.

### 1. Meola

**\*3** From December 16, 1994 until he resigned on September 8, 1998, Meola was Computer People's New York branch manager. During the summer of 1998, Meola met twice with Bayfield, and he also met with Cuff on an unspecified number of occasions. According to the complaint, at these meetings Bayfield allegedly promised Meola that he would be the "number two" person in charge of

Best USA, and he offered Meola a one-year guaranteed employment contract that promised yearly compensation of approximately $350,000.

On August 27, 1998, Meola gave Computer People notice of his resignation effective September 25, 1998. Over the Labor Day weekend, Arello, who had remained friends with Meola since he left Computer People,[FN4] contacted Meola and persuaded him to accept employment with Best USA, where Meola is now currently employed.

> FN4. Arello and Meola were colleagues working in the same region while both were employed at Computer People. Arello hired and managed Meola in the New York branch office for two years.

### 2. Kalinowski

From January 1, 1989 until September 30, 1993, Kalinowski was Computer People's Los Angeles branch manager; and from October 1, 1993, to September 30, 1997, he was its Atlanta branch manager. Kalinowski again served as Computer People's Los Angeles branch manager from October 1, 1997, until he resigned on September 4, 1998.

In July or August 1998, Bayfield and Cuff, acting on behalf of Best Ltd. and/or Best PLC, solicited Kalinowski to leave Computer People and join Best USA. On August 6, 1998, Kalinowski tendered his resignation and gave Computer People one month's notice. Kalinowski now works for Best USA in its Los Angeles branch office.

### 3. Raymond

From July 7, 1997, until February 2, 1998, Raymond was an account manager in Computer People's Seattle office. On February 2, 1998, Raymond became the Seattle branch office manager, where he remained until his resignation on May 26, 1998. Shortly thereafter, Bayfield and Cuff, acting on behalf of Best Ltd. and/or Best PLC, offered Raymond a position with Best USA. Raymond is now Best USA's Seattle office branch

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 4

Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

manager.

### 4. Mitchell

From July 1, 1987 until he resigned on July 28, 1998, Mitchell was employed by Computer People, first as a contract sales executive in its New York office, then as its Wilmington, Delaware branch manager, and finally as its Dallas, Texas branch manager. By letter dated June 29, 1998, Mitchell tendered his resignation, effective July 28, 1998. Sometime during the summer of 1998, the defendants, including Bayfield and Cuff acting on behalf of Best Ltd. and/or Best PLC, contacted Mitchell in an effort to recruit him for Best USA. It is unclear from the complaint whether this contact occurred during or after Mitchell's employment with Computer People; but in any event, Mitchell now works for Best USA as its Dallas branch manager.

### 5. English

On July 27, 1998, English resigned from Computer People's Dallas office, effective August 14, 1998. At some point, Mitchell allegedly contacted English to recruit her on behalf of Best USA for the Dallas office. It is unclear from the complaint whether this contact occurred before or after English terminated her employment with Computer People. In any event, English now works for Mitchell in Best USA's Dallas office.

### C. Other Alleged Solicitation Efforts

**\*4** The plaintiff also alleges that beginning in January or February 1998, Bayfield and Cuff (on behalf of Best Ltd. and Best PLC) began to solicit Computer People's Mid-Atlantic branch manager, Michael Stanley, who is based in Wilmington, Delaware. That is the only solicitation activity claimed to have occurred in Delaware. There were two other alleged telephone call solicitations by Bayfield from outside Delaware to Stanley's Delaware office, during which Bayfield allegedly informed Stanley that Best was "coming to the United States" and invited Stanley to join them. On

May 21, Bayfield and Cuff met with Stanley at the Philadelphia Airport and again solicited him to join Best's "United States team." One month later, in June or July 1998, Stanley had a follow up meeting with Bayfield and Cuff in New York, and also received an e-mail from Bayfield at his Wilmington office. Ultimately, however, Stanley resisted these blandishments and decided to stay with Computer People.

In April 1998, Best Ltd. executives Cuff and Bayfield contacted Geoffrey Richardson, who at that time was Computer People's Senior Vice President of Recruiting and the Director of its National Resourcing Office. Cuff and Bayfield offered Richardson a position with Best USA. The complaint does not allege that Richardson presently works for the defendants or that he intends to work for the defendants in the future.

### II. THE CONTENTIONS

Computer People's complaint has six counts. Count One alleges that the defendants tortiously interfered with Computer People's contractual relationship with its employees through its various solicitations. Computer People contends that its former employees cannot perform similar services for Best USA without violating the express terms of their Computer People employment agreements, because those employees, once employed by Best USA, will inevitably: (i) solicit and/or disclose the names of the customers and consultants that are a part of Computer People's database and/or workforce; and (ii) use and disclose other confidential Computer People information in the course of performing their managerial duties.

Count Two alleges that the defendants have tortiously interfered with Computer People's business relations by intentionally recruiting Computer People's key managerial employees. This depletion of its upper-level employees, Computer People claims, has caused or will cause the termination of Computer People's present or prospective business relations with its clients.

Count Three alleges that Arello's solicitation of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                        Page 5

Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Computer People's employees (in particular Meola) violated his employment agreement with Computer People. Count Four contends that that same conduct breached Arello's common law fiduciary duty owed by him to Computer People. Count Five alleges that Best Ltd. and Best PLC, through Bayfield and Cuff, knowingly participated and assisted in Arello's breach of fiduciary duty to Computer People.

The final count, Count Six, alleges that the defendants are parties to a conspiracy to create and operate Best USA as the vehicle for defendants' efforts to interfere tortiously with Computer People's contractual and business relationships.

**\*5** Defendants Arello, Best PLC, and Best Ltd., have moved to dismiss this action under Court of Chancery Rule 12(b)(2) for lack of jurisdiction over the person. (The defendants concede that the Court has personal jurisdiction over Best USA, which is a Delaware corporation.). In addition, all four defendants have moved to dismiss the complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Only the first of these motions is addressed, for the reasons discussed later herein.

### III. ANALYSIS

#### A. Applicable Legal Standards

To overcome a challenge to personal jurisdiction under Court of Chancery Rule 12(b)(2), a plaintiff must establish, *prima facie,* that this Court has personal jurisdiction over the moving defendant.[FN5] In that context all factual inferences are viewed in the light most favorable to the plaintiff.[FN6] Where, as here, the plaintiff attempts to effect service of process under the Delaware Long Arm Statute, 10 *Del. C.* § 3104, the plaintiff must prove that (i) the defendants' alleged conduct falls within one or more of the statutorily enumerated categories that confer jurisdiction and that (ii) the Court's exercise of personal jurisdiction satisfies the due process requirements of the Fourteenth Amendment of the United States Constitution.[FN7]

FN5. *Newspan, Inc. v. Hearthstone Funding Corp.,* Del. Ch., C.A. No. 13304, mem. op. at 8, Allen, C. (May 10, 1994). The plaintiff bears the burden of showing by evidence that the fact finder could determine that the factual predicate for jurisdiction has been proven. *Id.* at 2 (citing *Hart Holding Co. v. Drexel Burnham Lambert, Inc.,* Del. Ch., 593 A.2d 535, 539 (1991)).

FN6. *See Outokumpu Eng. Entrs., Inc. v. Kvaerner Enviropower, Inc.,* Del.Super., 685 A.2d 724, 727 (1996).

FN7. *Hercules Inc. v. Leu Trust & Banking (Bahamas) Ltd.,* Del.Supr., 611 A.2d 476, 480 (1992), *cert. dismissed,* 507 U.S. 1025 (1993).

The pertinent provisions of Delaware's Long Arm Statute, 10 *Del. C.* § 3104(c), state:
(c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
(1) Transacts any business or performs any character of work or service in the State;

(3) Causes tortious injury in the State by an act or omission in this State;
(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State.

Subsections (c)(1) and (c)(3) authorize "transactional" or "specific" jurisdiction in cases where the cause of action arises out of the defendant's conduct in the State of Delaware.[FN8] Under those subsections a single act in Delaware will suffice. Subsection (c)(4), on the other hand, creates "general" jurisdiction in cases where the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                          Page 6

Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

cause of action is unrelated to the relevant Delaware contacts.[FN9] General jurisdiction under subsection (c)(4) requires a greater, more continuous pattern of contacts with the forum than does "single act" jurisdiction under subsection (c)(1), (2), or (3). The "tradeoff" for this stricter requirement is that the activities which create that general presence need not be the basis for the plaintiff's cause of action.

> FN8. *Sears. Roebuck & Co. v. Sears PLC,* D. Del., 744 F.Supp. 1289, 1292 (1990).

> FN9. *Id.*

In narrowly defined circumstances, personal jurisdiction may also be established under a common law "conspiracy theory." The conspiracy theory of jurisdiction is not, strictly speaking, an independent jurisdictional basis, but rather, is a shorthand reference to an analytical framework where a defendant's conduct that either occurred or had a substantial effect in Delaware is attributed to a defendant who would not otherwise be amenable to jurisdiction in Delaware.[FN10]

> FN10. *Newspan, supra* note 5, at 19-20 (citing *Hercules Inc. v. Leu Trust & Banking,* Del.Supr., 611 A.2d 476, 482 n. 6 (1992)).

### B. The Jurisdictional Motion

**\*6** In opposition to the defendants Rule 12(b)(2) motion, Computer People has identified three categories of "Delaware contacts" that, it claims, support personal jurisdiction over the defendants. These contacts are: (i) Arello's continuing presence in Delaware as a Computer People employee from 1993 to 1996; (ii) two telephone calls and one e-mail made by Bayfield and Cuff to Stanley at his Delaware office; and (iii) the incorporation of Best USA in Delaware. These three sets of contacts, Computer People argues, are sufficient to establish personal jurisdiction (a) over Arello under 10 *Del. C.* § 3104(c)(1), (c)(3), (c)(4), and under the conspiracy theory; and (b) over Best PLC and Best Ltd. under 10 *Del. C.* § 3104(c)(1) and the

conspiracy theory. I disagree, and conclude that the plaintiff has failed to establish that this Court has personal jurisdiction over any of these defendants.[FN11]

> FN11. That finding makes it unnecessary to reach the due process component of the jurisdictional analysis.

### 1. The Conspiracy Theory

Computer People first attempts to support jurisdiction over Best Ltd., Best PLC, and Arello on the basis that Best USA was incorporated in Delaware and then was operated as part of a conspiracy among the non-Delaware defendants to interfere tortiously with Computer People's contractual and business relationships with employees, consultants, and customers. This alleged conspiracy forms the linchpin of Computer People's jurisdictional argument.

Under the "conspiracy theory" of jurisdiction, a plaintiff may establish personal jurisdiction over a nonresident only if it satisfies five elements, namely, by showing that:
(1) a conspiracy...existed; (2) the defendant was a member of the conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[FN12]

> FN12. *Instituto Bancario Italiano SpA v. Hunter Eng'g Co.,* Del.Supr., 449 A.2d 210, 225 (1982); *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, mem. op. at 29, Allen, C. (Nov. 21, 1995) (the "proper invocation of this basis of jurisdiction requires factual proof of each enumerated element."), *appeal refused,* Del.Supr., 676 A.2d 908

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 7

Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

(Jan. 22, 1996); *Newspan, supra* note 5, at 18-19 ("all [five elements] must be satisfied before a Delaware court may exercise personal jurisdiction").

The test ultimately "turns on the imputation to the [alleged] conspirator of meaningful activity on behalf of the conspiracy *which occurred and caused effects in Delaware.*" [FN13]

> FN13. *HMG/Courtland Properties, Inc. v. Gray,* Del. Ch., C.A. No. 15789, mem. op. at 15-16, Strine, V.C. (Jan. 13, 1999) (emphasis added).

The conspiracy theory of jurisdiction is narrowly and strictly construed; otherwise, that theory would become a facile way for a plaintiff to circumvent the minimum contacts requirement of *International Shoe Co. v. Washington.* [FN14] For that reason, where a conspiracy is alleged and the defendants submit factual evidence controverting personal jurisdiction as to them, the plaintiff may not rely upon conclusory allegations in his pleading that are unsupported by evidence.[FN15] Such allegations will not be sufficient to overcome a motion to dismiss for lack of personal jurisdiction.

> FN14. 326 U.S. 310 (1945).

> FN15. *See Newspan, supra* note 5, at 20-21; *Carlton Invs., supra* note 12, at 29; *Nartex Consulting Corp. v. Watt,* D.C.Cir., 722 F.2d 779, 787 (1983) (Wald, J.) (" [b]ald speculations that defendants are alleged co-conspirators do not constitute the threshold showing needed to carry the burden of establishing personal jurisdiction "), *cert. denied,* 467 U.S. 1210 (1984); *Jarmuth v. Turetsky,* D.D.C., 815 F.Supp. 4, 6 (1993) (noting that the " 'bare allegation' of conspiracy or agency is insufficient to establish personal jurisdiction"); *Hasenfus v. Corporate Air Servs.,* D.D.C., 700 F.Supp. 58, 62 (1988) (noting the insufficiency of an "argument... based solely on conclusory statements and

allegations that the nonresident defendants were co-conspirators.").

The Delaware contacts upon which Computer People relies to support its conspiracy theory of jurisdiction are (i) the two phone calls and one e-mail directed to Stanley at his Delaware office, and (ii) the incorporation of Best USA in Delaware. I find, for the reasons next discussed, that these contacts are insufficient to support personal jurisdiction in Delaware over Best PLC, Best Ltd., or Arello.

**\*7** First, assuming there was a conspiracy, there is no evidence (or even a claim) that any meaningful, " substantial act or effect" in furtherance of that conspiracy took place in Delaware.[FN16] As discussed below, the aforementioned Delaware contacts are insufficient to sustain personal jurisdiction over any of the defendants, because those contacts are not a sufficiently significant basis to support jurisdiction under § 3104(c). For this reason also, these contacts are also not "substantial acts or effects" in furtherance of the conspiracy that would support personal jurisdiction under the conspiracy theory.

> FN16. *See Instituto Bancario,* 449 A.2d at 225 (requiring for jurisdiction that a " substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state"); *Abajian v. Kennedy,* Del. Ch., C.A. No. 11425, mem. op. at 27, Allen. C. (Jan. 17, 1992) ("[T]he conspiracy theory...requires that a substantial act or substantial effect [occur] in the forum state in furtherance of the alleged conspiracy.").

Second, Computer People has furnished the Court with only conclusory and unsupported allegations that there was a conspiracy.[FN17] In the face of the contrary evidence offered by the defendants, the plaintiff has failed factually to support the conclusory allegation in its complaint that the defendants conspired to interfere tortiously with Computer People's contractual and business relationships. That is, there is no record *evidence* of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 8

Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

any conspiracy among Arello, Best PLC, and Best Ltd. (through Bayfield and Cuff) to solicit Computer People employees. Accordingly, the plaintiff has failed to satisfy the first of *Instituto Bancario* 's five elements.

>  FN17. In fact, many of the critical allegations in their complaint are based solely "upon information and belief."

#### 2. Arello's Delaware Contacts as a Computer People Employee

Despite the plaintiff's contrary argument, Arello's Delaware contacts as a Computer People employee between 1993 and 1996 are not sufficient to sustain general personal jurisdiction over him under 10 *Del. C.* § 3104(c)(4). That provision (to repeat) authorizes jurisdiction in cases where the defendant (or the defendant's agent) has a "general presence in the State," even if both the tortious act and the injury occur outside of Delaware.[FN18] The exercise of "general" jurisdiction under § 3104(c)(4) requires a higher level of activity within the forum state than does the exercise of "specific" jurisdiction under (c)(3).[FN19] Specifically, subsection (c)(4) jurisdiction arises only "when a defendant has had contacts with this state that are so extensive and continuing that it is fair and consistent with state policy to require that the defendant appear here and defend a claim." [FN20]

>  FN18. *Applied Biosystems, Inc. v. Cruachem Ltd.*, D. Del., 772 F.Supp. 1458, 1469 (1991).

>  FN19. *United States v. Consolidated Rail Corp.*, D. Del., 674 F.Supp. 138, 145 (1987).

>  FN20. *Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Prods., Inc.*, Del. Ch., C.A. No. 12036, mem. op. at 5-6, Allen, C. (July 10, 1991).

Computer People argues that Arello's extensive Delaware contacts during the 1993 to 1996 period

while he was employed with Computer People, were extensive and continuing. The difficulty, however, is that to establish general jurisdiction under subsection (c)(4), the defendant must have *current* contacts with the forum state.[FN21] That Arello may have had substantial contacts with Delaware from 1993 to 1996 is not probative of whether this Court has general jurisdiction over him today, where (as here) (i) the cause of action does not arise out of those earlier contacts, and (ii) Arello's post-1996 Delaware contacts are too attenuated to support personal jurisdiction grounded upon his "general presence in this state." [FN22]

>  FN21. *See* § 3104(c)(4) (providing for jurisdiction when "person regularly *does* or *solicits* business, *engages* in any other persistent course of conduct in the State or *derives* substantial revenue from services, or things used or consumed in the State." (italics added)).

>  FN22. *Cf. J. Royal Parker Assocs. Inc. v. Parco Brown & Root, Inc.*, Del. Ch., C.A. No. 7013, mem. op. at 7, Berger, V.C. (Nov. 30, 1984) (finding that general jurisdiction was satisfied where defendant " regularly advertises in Delaware or carries on some other continuous course of activity in the state"); *Red Sail, supra* note 20, at 5-6 (holding that statutory provision will only apply where defendant "has had contacts with [Delaware] that are so extensive and continuing that it is fair and consistent with state policy to require the defendant [to appear and] defend a claim." ).

#### 3. The Two Phone Calls and One E-mail to Stanley at his Delaware Office

**\*8** Computer People next argues that the two telephone calls and one e-mail directed to Stanley at his Delaware office suffice to support personal jurisdiction over Best PLC, Best Ltd., and Arello under § 3104(c)(1). Again, I cannot agree.

Section 3104(c)(1) authorizes a court, in its

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 9

Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

discretion, to exercise jurisdiction over a non-resident defendant who "[t]ransacts any business or performs any character of work or service in" Delaware and whose cause of action arises from that transaction or work. Under that subsection, an act or acts must have occurred in Delaware, and the plaintiff's causes of action must arise from that act or acts.[FN23] To "transact business" in Delaware, a party must purposefully avail itself of the privileges and benefits of Delaware law.[FN24]

> FN23. *Applied Biosystems,* 772 F.Supp. at 1466.

> FN24. *Consolidated Rail Corp.,* 674 F.Supp. at 142; *Regency Housing & Drilling L.P.I. v. Cohen,* Del.Supr., C.A. No. 89C-DE-70, 1991 WL 190311, at *4, Gebelein, J. (Sept. 11, 1991).

As to Best PLC and Best Ltd., Computer People's argument fails because as a general matter telephone calls and an e-mail do not, in and of themselves, automatically constitute "transact[ing] business" within Delaware sufficient to invoke jurisdiction under § 3104(c)(1).[FN25] Even when the argument is considered in this specific factual context it does not work, because the two telephone calls and one e-mail cannot be a basis for the plaintiff's causes of action for tortious interference. The company does not claim these Delaware contacts induced Stanley to leave Computer People to work for Best USA; indeed, plaintiff concedes that Stanley remained a Computer People employee. Nor are these "contacts" relevant as evidence of a conspiracy because, for the reasons earlier discussed, the plaintiff's conspiracy theory is legally deficient.

> FN25. *See Fischer v. Hilton,* D. Del., 549 F.Supp. 389, 390 (1982) (finding that mere "phone calls do not constitute a transacting of business within the State of Delaware for purposes of subsection (c)(1)."); *Koster v. Automark Indus., Inc.,* 7th Cir., 640 F.2d 77, 79 (1981) (discussing minimum

contacts, court found that telephone calls, in and of themselves, could not confer personal jurisdiction).

Computer People next claims that Arello is subject to personal jurisdiction under § 3104(a)(1) because Bayfield and Cuff's solicitation of Stanley on behalf of Best USA may be attributed to Arello as the president and CEO of Best USA. Stated differently, Computer People argues that Bayfield and Cuff were Arello's agents, and that therefore Bayfield's two telephone calls to Stanley and the e-mail to Stanley's Delaware office should be attributed to Arello.

This argument also lacks merit. Under the agency theory of personal jurisdiction, only acts of the agent that are directed by the principal may serve as a basis to assert jurisdiction over the principal.[FN26] The complaint here does not allege, nor does the factual record show, that Arello directed anyone-Bayfield included-to contact Stanley in Delaware to induce him to join Best USA. Therefore, Bayfield and Cuff's Delaware contacts with Stanley may not be imputed to Arello to establish personal jurisdiction over him under § 3104(c)(1).[FN27]

> FN26. *Applied Biosystems,* 772 F.Supp. at 1465-66.

> FN27. Although the plaintiff in its complaint invokes jurisdiction under 10 *Del. C.* § 3104(c)(3), they do not make any argument based upon subsection (c)(3) in their brief. Accordingly, that argument is deemed to have been abandoned.

4. The Incorporation of Best USA in Delaware

Finally, the plaintiff asserts that the act of incorporating Best USA in Delaware is enough, in and of itself, to establish jurisdiction over Best PLC and Best Ltd. The plaintiff relies on a line of cases that raise the issue presented here: whether the creation, ownership, and operation of a Delaware subsidiary (Best USA) is sufficient to invoke personal jurisdiction over the foreign parent (Best

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 10

Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

PLC).[FN28]

> FN28. *Shaffer v. Heitner,* 433 U.S. 186 (1977); *Sternberg v. O'Neil,* Del.Supr., 550 A.2d 1105 (1988); *Papendick v. Robert Bosch GmbH,* Del.Supr., 410 A.2d 148 (1979).

**\*9** In *Shaffer v. Heitner* ("*Shaffer* "),[FN29] the United States Supreme Court held that the mere ownership of stock in a Delaware corporation is not a sufficient "minimum contact" with Delaware to permit a Delaware court to exercise personal jurisdiction over a nonresident defendant consistent with due process. Thereafter, in *Papendick v. Robert Bosch GmbH* ("*Papendick* "),[FN30] the Delaware Supreme Court confronted the issue of whether the "mere ownership" principle of *Shaffer* precluded a Delaware court from exercising jurisdiction over a foreign corporation in a case where the cause of action was related to and arose out of the foreign parent's creation and operation of a Delaware subsidiary. Later, in a somewhat different context, the Delaware Supreme Court revisited the *Shaffer* issue in *Sternberg v. O'Neil* ("*Sternberg* ").[FN31]

> FN29. 433 U.S. 186 (1977).

> FN30. Del.Supr., 410 A.2d 148 (1979).

> FN31. Del.Supr., 550 A.2d 1105 (1988).

In *Papendick,* a German corporation (Bosch) formed a Delaware subsidiary (RBNA) to serve as a vehicle to acquire the stock of another company. The plaintiff filed a breach of contract action in Delaware. The action arose out of that stock acquisition transaction. Bosch argued that because its sole Delaware contact was its "mere" ownership of RBNA stock, under *Shaffer* that was an insufficient basis to establish personal jurisdiction. The Delaware Supreme Court disagreed. It held that Delaware could exercise jurisdiction over Bosch because the formation of RBNA was an integral part of the scheme of wrongdoing challenged in the complaint, and because in forming RBNA, Bosch

had purposefully utilized the benefits and protections of Delaware law in connection with the challenged stock acquisition transaction.[FN32]

> FN32. *Papendick,* 410 A.2d at 152.

*Papendick* stands for the proposition that while the stock ownership of a Delaware subsidiary is not, without more, a sufficient contact upon which to predicate jurisdiction, that contact may be sufficient where the cause of action arises from the creation and operation of the Delaware subsidiary. In this case, Computer People alleges that the defendants incorporated Best USA in Delaware in furtherance of a conspiracy to cause key Computer People employees to desert the company. Accordingly, the plaintiff contends, the creation and operation of Best USA supports personal jurisdiction over Best USA for the same reason that the formation of RBNA supported jurisdiction over Bosch in *Papendick.*

I have already determined that the plaintiff's conspiracy theory argument fails, not as a matter of theory but as a matter of evidence. As earlier discussed, the plaintiff has not satisfied the conspiracy theory requirements for establishing jurisdiction, because there is no record evidence (save, perhaps, for Computer People's suppositions based on "information and belief") to support that conspiracy theory. Having rejected the conspiracy theory, the Court will not now reverse itself and permit plaintiff to use that theory to prop up its *Papendick /Sternberg* argument. The plaintiff has failed to show, in a procedurally proper way, that Best USA was created to further a conspiracy to steal Computer People's employees.

**\*10** Also misplaced is the plaintiff's reliance on *Sternberg.* There, a plaintiff brought a double derivative action against an Ohio corporation (GenCorp) and its wholly-owned Delaware subsidiary (RKO). Although no claim was alleged directly against the parent, GenCorp was named as a defendant because "in double derivative actions, both parent and subsidiary corporations are indispensable parties." [FN33] In upholding personal jurisdiction over GenCorp, the Supreme Court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 11

**Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)**
**(Cite as: Not Reported in A.2d)**

articulated two separate grounds for its decision. The first was that GenCorp had consented to general jurisdiction in the Delaware courts, because it had registered as a foreign corporation and had appointed a Delaware agent for service of process. [FN34] Second (and even though the Court could have ended its analysis at that point), it proceeded to uphold personal jurisdiction over GenCorp on the ground that its ownership of RKO was a sufficient minimum contact, since the basis for the double derivative action was GenCorp's operation of RKO. [FN35]

> FN33. *Sternberg,* 550 A.2d at 1124.

> FN34. *Id.* at 1115-16. The same is not true of the defendants in the instant case.

> FN35. *Id.* at 1116-26. Specifically, the Court held that "a foreign corporation cannot use the laws of this State to govern the operations of its subsidiary and then, in a suit relating to the operation of the subsidiary, claim that jurisdiction in Delaware offends traditional notions of fair play." *Id.* at 1121.

Commentators have interpreted *Sternberg* in two quite different ways. One interpretation views *Sternberg* as recognizing a narrow "double derivative suit exception" to the *Shaffer* rule. The other interpretation reads *Sternberg* more broadly, as expanding *Shaffer* to validate personal jurisdiction in Delaware over a majority stockholder of a Delaware subsidiary, in any suit "relating to the operation of the subsidiary." [FN36] In this case, the Court need not decide which interpretation is correct, because under either view the plaintiff's argument falls short.

> FN36. *See* Donald J. Wolfe, Jr. and Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* (1998), at § 3-5(c)(3); William A. Voxman, *Jurisdiction Over a Parent Corporation in its Subsidiary's State of Incorporation,* 141 U. Pa. L.Rev.

327, 363-66 (1992); *see also Outokumpu, supra* note 6, at 728 (rejecting the broad interpretation of *Sternberg* by stating that the decision "cannot mean that Delaware courts may always exercise personal jurisdiction over the foreign parent of a Delaware subsidiary or any cause of action arising out of the operation or acts of that subsidiary, regardless of where the operative facts transpired or the parent's contacts with Delaware. Otherwise, mere ownership of a Delaware subsidiary would in practice subject a foreign parent to our jurisdiction, a result inconsistent with due process.").

Under the narrow ("double derivative suit exception") reading of *Sternberg,* the plaintiff's argument fails because the plaintiff here has not brought a double derivative action. Under the broad interpretation, the argument falters because Computer People has failed to show in a factually sufficient way that its causes of action arise out of Best PLC's operation, control, or ownership of Best USA. Although the complaint alleges conclusorily that all four defendants were involved in incorporating Best USA for wrongful purposes, all that the undisputed *evidence* shows is that Best USA "was established as a subsidiary of [Best PLC]. ..in Delaware exclusively for reasons of administrative convenience and corporate tax considerations." [FN37] That, without more, does not support this conclusory allegation for purposes of sustaining jurisdiction over Best USA's foreign corporate parent, Best PLC. That evidence is also insufficient to establish personal jurisdiction over Best Ltd., a separate subsidiary of Best PLC (and sister corporation of Best USA), which is not alleged to have played any role in incorporating Best USA in Delaware.

> FN37. Bayfield Aff. at 8.

For the foregoing reasons, the Court determines that it lacks personal jurisdiction over defendants Arello, Best PLC, and Best Ltd ., and grants their motion to dismiss under Rule 12(b)(2). Because

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 12

Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Best USA will remain in the case as the sole
defendant, I deny the defendants' 12(b)(6) motion
with leave to renew based on briefs that take into
account the Court's jurisdictional ruling. IT IS SO
ORDERED.

Del.Ch.,1999.
Computer People, Inc. v. Best Intern. Group, Inc.
Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                                              Page 1

Not Reported in A.2d, 1992 WL 52141 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

H
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware, New Castle County.
Elsie HIRSHMAN, Nora Reape and William
Muller, Plaintiffs,
v.
VENDAMERICA, INC. and Mini-Computer
System, Inc. William Doniger and Andrew Poulo,
Defendants.
**No. CIV. A. 90C-AP-40-1CV.**

Submitted: March 22, 1992.
Decided: March 9, 1992.

Upon Defendant William Doniger's Motion to
Dismiss.

Stuart B. Young, E. Scott Bradley and Janet Z.
Charlton of Young, Conaway, Stargatt and Taylor,
Wilmington, for plaintiffs.
Allen M. Terrell, Jr. of Richards, Layton and
Finger, Wilmington, and Robin Fitelson of Werbel,
McMillin and Carnelutti, New York City, for
defendants.

MEMORANDUM OPINION

TOLIVER, Judge.
**\*1** This is the Court's response to Defendant
William Doniger's motion to dismiss the complaint
as to him under Civil Rule 12(b) on the ground that
this Court lacks personal jurisdiction over him.
The motion was jointly filed on behalf of Mr.
Doniger and Defendant Andrew Poulo on June 22,
1990, but Mr. Poulo has subsequently been
dismissed from the action. The motion will
therefore be decided as to Mr. Doniger only. For
the reasons set forth below, that defendant is
entitled to the relief sought.

FACTS

Mr. Doniger, a resident of Connecticut, is an officer
and director of VendAmerica, Inc. and
Mini-Computer Systems, Inc. ("Corporate
Defendants"), two Delaware corporations with their
principal places of business in Connecticut. On
May 15, 1990, Elsie Hirshman, Nora Reape and
William Muller ("the Plaintiffs") brought suit
against the Corporate Defendants, Mr. Poulo and
Mr. Doniger. In their complaint, the Plaintiffs
allege: (1) the Corporate Defendants breached
certain provisions of a contract between the
Plaintiffs and the Corporate Defendants, and (2)
Mr. Doniger, in his capacity as director, made false
representations with respect to certain material
terms of the contract. None of the negotiations or
communications prior to the formation of the
contract took place in the State of Delaware. The
contract was not executed or performed in the State
of Delaware. Damages in the amount of
$1,033,455.40 are claimed.

The only contact alleged to have existed between
Mr. Doniger and the State of Delaware was his
status as a director and officer of the Corporate
Defendants. The Plaintiffs claim that by virtue of
this status, Mr. Doniger impliedly consented to this
Court's jurisdiction and waived any defense based
on a lack of jurisdiction.

DISCUSSION

The *sine qua non* of any exercise of jurisdiction
based upon implied consent is the requirement that
a defendant have "certain minimum contacts with
[the forum], such that the maintenance of the suit
does not offend 'traditional notions of fair play and
substantial justice.' " *International Shoe Co. v.
Washington,* 326 U.S. 310, 316 (1945) and
*Sternberg v. O'Neil,* Del.Supr., 550 A.2d 1105,
1118 (1988). Whether the requisite minimum
contacts exist is determined by examining the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 2

**Not Reported in A.2d, 1992 WL 52141 (Del.Super.)**
**(Cite as: Not Reported in A.2d)**

relationship between the defendant, the forum and the litigation. *Shaffer v. Heitner,* 433 U.S. 186, 204 (1977). In *Shaffer,* the United States Supreme Court struck down the method which had previously been used in Delaware to achieve jurisdiction over non-resident directors in derivative suits. In reaction to *Shaffer,* the Delaware Legislature drafted 10 *Del.C.* § 3114 to be the means by which Delaware courts could exert personal jurisdiction over non-resident corporate directors. 61 Del.Laws, c. 119 (July 7, 1977), cited in *Armstrong v. Pomerance,* Del.Supr., 423 A.2d 174 179 n. 8 (1980). Under § 3114(a), a director of a Delaware corporation is deemed to have consented to personal jurisdiction:

**\*2** in all civil actions or proceedings brought in this State, by or on behalf of, or against such corporation, in which such director, trustee or member is a necessary or proper party, *or* in any action or proceeding against such director, trustee or member for violation of his duty in such capacity. ... (emphasis added)

The resolution of the Plaintiffs' claim must be based on an analysis of not only 10 *Del.C.* § 3114, but also on the constitutional parameters of *in personam* jurisdiction stemming from traditional notions of fair play and substantial justice. *Pestolite, Inc. v. Cordura Corp.,* Del.Super., 449 A.2d 263 (1982). Mere status as a director of a Delaware corporation, without more, is insufficient to satisfy the constitutional requirements associated with *in personam* jurisdiction. *Prudential-Bache v. Franz Mfg. Co.,* Del.Super., 531 A.2d 953, 954 (1987) and *Pestolite, supra,* at 265.

The Plaintiffs interpret § 3114 as providing two distinct categories of action against non-resident directors of a Delaware corporation: (1) where the non-resident director is a necessary or proper party to an action brought against his Delaware corporation, or (2) where the cause of action is brought against the non-resident director based upon an alleged breach of his fiduciary duty to his corporation in his capacity as a director. The Plaintiffs argue that Mr. Doniger falls into either or both of these categories.

The first issue to be considered is whether Mr. Doniger is a "necessary or proper party" as encompassed by § 3114(a). The Plaintiffs argue that Mr. Doniger's false representations to the Plaintiffs were made as a director of the Corporate Defendants and he is thus subject to the jurisdiction of this Court whether or not the representations were made in violation of his fiduciary duties and obligations to the corporation.

The Plaintiffs' interpretation of § 3114 has been consistently and specifically rejected by Delaware courts. *Pestolite, supra;* and *Hana Ranch v. Lent,* Del.Ch. 424 A.2d 28 (1980). In *Hana Ranch,* the Court of Chancery found the jurisdictional reach of § 3114 to be limited to claims based on acts performed by a director of a Delaware corporation *in his capacity as such. Id.* at 28 (emphasis added). In *Pestolite,* a case factually similar to the case at bar, the only contact the individual defendants had with Delaware was their status as directors of a Delaware corporation and their power under Delaware corporate law to act in that capacity. The court held that this single contact was an insufficient basis for an individual defendant to reasonably anticipate being haled into a Delaware court. *Pestolite* at 267. Thus, the Plaintiffs' interpretation of § 3114, without more, is not sufficient to grant jurisdiction to this Court.

The second issue to be considered is the Plaintiffs' claim that Mr. Doniger breached a duty imposed on him as a director of a Delaware corporation.

**\*3** Directors, in carrying out their managerial roles, are charged with a fiduciary duty to the corporation and its shareholders. It is fundamental that a fiduciary duty exists only by virtue of a relationship between persons which involves a heightened degree of trust or confidence between them. Corporate directors are technically not trustees, however, they stand in a position of trust and confidence in relation to the corporation and its shareholders. *Loft v. Guth,* Del.Ch., 2 A.2d 225 (1938), *aff'd,* Del.Supr. 5 A.2d 503 (1939).

Although the complaint alleges that Mr. Doniger committed tortious acts to and breaches of a contract with third parties (the Plaintiffs), it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                        Page 3

Not Reported in A.2d, 1992 WL 52141 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

contains no allegation that Mr. Doniger breached any fiduciary duty as a director of a Delaware corporation. All that the complaint presents, is a request for damages for breach of an arms-length relationship. The complaint, stripped down to its essential elements, does not arise out of or relate to any breaches of fiduciary duties imposed on Mr. Doniger by the very laws which empowered him to act in his corporate capacity.

It is not alleged that a single tortious act was committed within this State or that the alleged torts had any impact in Delaware. The contract was not made or performed in Delaware. Delaware substantive law cannot apply to these tort or contract claims since these causes of action are not " inextricably bound in Delaware law." *Pestolite, supra,* at 267, citing *Friday v. Smoot,* Del.Super., 211 A.2d 594, 595 (1965). Thus, there is no nexus between Delaware and the alleged acts.

Under these circumstances, it would be constitutionally impermissible to subject Mr. Doniger to personal jurisdiction under 10 *Del.C.* § 3114. The Court lacks personal jurisdiction over Mr. Doniger. The motion to dismiss as it relates to the Plaintiffs' claims against Mr. Doniger is granted.

IT IS SO ORDERED.

Del.Super.,1992.
Hirshman v. Vendamerica, Inc.
Not Reported in A.2d, 1992 WL 52141 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                                          Page 1

Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: Not Reported in A.2d)**

**H**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
IOTEX COMMUNICATIONS, INC., a Delaware
corporation, Plaintiff and Counterclaim Defendant,
v.
Anthony DEFRIES and David Bayendor,
Defendants,
andIOTA, INC., a Delaware corporation, Defendant
and Counterclaim and Third-Party Plaintiff,
v.
ioWAVE, INC., Third-Party Defendant.
**No. 15817.**

Dec. 21, 1998.

Grover C. Brown, Esquire, Michael J. Maimone,
Esquire and Joseph C. Schoell, Esquire, of Morris,
James, Hitchens & Williams, Wilmington,
Delaware, Attorneys for Plaintiff and Counterclaim
Defendant Iotex Communications, Inc.
Iota, Inc., Defendant and Counterclaim and
Third-Party Plaintiff (C.A. No. 15817);Anthony
Defries and David Bayendor, Defendants (C.A. No.
15817);Urs Maag, Plaintiff and Counterclaim
Defendant (C.A. No. 16082); Neosoft, A.G.,
Plaintiff (C.A.16036).[FN*]

> FN* On December 18, 1998, an Order was
> entered permitting counsel for these parties
> to withdraw his representation and
> allowing 60 days for Iota, Inc. to secure
> new counsel.

Allen M. Terrell, Jr., Esquire and Srinivas M. Raju,
Esquire, of Richards, Layton & Finger, P.A.,
Wilmington, Delaware; Of Counsel: Blair G. Brown
, Esquire and Lynn F. Kaumann, Esquire, of
Zuckerman, Spaeder, Goldstein, Taylor & Kolker,
L.L.P., Washington, D.C., Attorneys for
Counterclaim Defendant ioWave, Inc.

MEMORANDUM OPINION
LAMB, Vice Chancellor.

I. INTRODUCTION

**\*1** These motions arise out of a complex,
multi-party, multi-suit [FN1] litigation begun in July
1997. Various motions to dismiss were filed by
several of the parties and oral argument on these
motions was held on November 10, 1998. At the
conclusion of the hearing held in these consolidated
matters, I reserved decision on the motion of David
Bayendor to dismiss the complaint against him in
C.A. No. 15817 for want of personal jurisdiction,
the motions of David Bayendor ("Bayendor") and
Anthony Defries ("Defries") to dismiss the Eighth
Claim for Relief alleged by counterclaim in C.A.
No. 15817 for failure to state a claim (as well as the
motion of Defries to dismiss for lack of personal
jurisdiction over the Eighth Claim for Relief), and
the motion of Urs Maag ("Maag") to dismiss the
counterclaims filed against him in C.A. No. 16082
for failure to state a claim upon which relief may be
granted. For the reasons that follow, these motions
will be granted.

> FN1. Three actions have been consolidated
> for all purposes, C.A. Nos. 15817-NC,
> 16036-NC, and 16082-NC.

> A. Background [FN2]

> FN2. Except as otherwise noted, the facts
> recited herein are taken from the Amended
> Complaint in C.A. No. 15817 and the
> counterclaim in C.A. No. 16082.

In 1991, Defries caused the formation of Iota, Inc. ("
Iota"), a Delaware corporation, to serve as a vehicle
for continuing research into certain wireless
communications technology ("Technology') under
development since the late 1980s. In 1993, Iota

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 2

Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: Not Reported in A.2d)**

succeeded in inventing the Technology and undertook further development work in order to create a commercially viable product. That same year, Defries caused Iota to transfer its rights to all of the intellectual property associated with the Technology to NeoSoft, A.G. ("Neosoft"), a Swiss company he created for that purpose.

In 1994, Defries entered into discussions with Peter Friedli ("Friedli") concerning a commitment to invest $5.4 million in the further development of the Technology. On July 22, 1994, a certificate of incorporation was filed with the Delaware Secretary of State organizing a corporation that is now known as IOTEX COMMUNICATIONS, INC. ("IOTEX"). Defries and Maag were named as directors of IOTEX. It is not alleged that Defries, or persons or entities affiliated or associated with him, controlled IOTEX. Rather, it appears from one or more pleadings that a majority of the shares of IOTEX were issued to Friedli or persons associated with him.

In July 1994, IOTEX began negotiations over a License Agreement with NeoSoft whereby NeoSoft would grant IOTEX restricted rights to certain applications of the Technology in North America for a fifteen year term. In return, IOTEX would pay NeoSoft royalties based on a percentage of revenues from the use of these applications. As part of these discussions, IOTEX also negotiated a Project Management Agreement with Iota, whereby Iota would agree to act as project manager for IOTEX's research and development of the Technology licensed from NeoSoft.

Maag resigned as a director of IOTEX on October 24, 1994. There is no allegation of fact in the counterclaims filed in C.A. No. 16082 that Maag participated in the negotiation of either of these agreements. Nor is there any allegation that Maag did anything, while he was an IOTEX director or afterward, in furtherance of or in connection with either of them.

**\*2** The License Agreement and Project Management Agreement (collectively, the "Agreements") were executed on or about November 2, 1994. Under the terms of the Project

Management Agreement, IOTEX agreed to fund the costs and expenses associated with the development of the Technology in accordance with a detailed, four-page document (the "Budget") establishing the amounts, timing and manner in which all of the money invested by IOTEX would be spent by Iota. Iota agreed to comply with the provisions of the Budget and further agreed that no material changes would be made to the Budget without first submitting a variance report and obtaining IOTEX's approval for the change. Iota was also required to submit written reports detailing its expenditures to IOTEX. The Budget provided for an 18-month development period that was to be continued only if the parties were satisfied with the progress in the development of the Technology.

In late 1995 and early 1996, IOTEX became concerned that Iota was not complying with the provisions of the Budget and was not developing the Technology as required under the Agreements. Allegedly having concluded that Iota breached the Project Management Agreement, IOTEX stopped making payments to Iota in February 1996. Iota then terminated the Project Management Agreement. Thereafter, IOTEX transferred all of its employees and operations to ioWave, Inc. ("ioWave"), also a Delaware corporation.

On July 18, 1997, IOTEX filed C.A. No. 15817 against Defries, David Bayendor,[FN3] and Iota, alleging claims of breach of fiduciary duty, fraud, aiding and abetting and civil conspiracy arising out of the negotiation and performance of the Project Management Agreement. IOTEX amended its complaint on November 7, 1997, *inter alia,* to add claims against Defries and Bayendor under the federal Racketeer Influenced and Corrupt Organization Act (RICO"), 18 U.S.C. § 1961, *et seq.* Iota answered and counterclaimed against IOTEX on August 19, 1997. On October 27, 1997, Iota amended its counterclaims to assert claims against ioWave, as an additional third-party defendant.

FN3. Bayendor is Defries' nephew. Bayendor was a former President of IOTEX, resigning his position on October

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: Not Reported in A.2d)**

14, 1994, and a former director and Vice President of Iota. He resigned from these latter position on June 18, 1997.

On November 13, 1997, NeoSoft filed C.A. No. 16036 against IOTEX for failure to make payments as required by the License Agreement. On December 10, 1997, Maag, as a stockholder of IOTEX, filed C.A. No. 16082, a derivative suit on behalf of IOTEX against Friedli, alleged to be the sole director of IOTEX, Taher Behbehani, the former CEO of IOTEX, and ioWave, alleging that they wrongfully transferred the business of IOTEX to ioWave. In response, IOTEX brought five counterclaims against Maag, alleging essentially the same claims it set forth in its July 18, 1997 complaint against Defries, Bayendor and Iota.

## II. DISCUSSION

### A. Standard

A claim will be dismissed where it fails to allege facts that entitle plaintiff to relief. *See* Ch. Ct. R. 12(b)(6); *Rabkin v. Philip A. Hunt Chem. Corp.,* Del.Supr., 498 A.2d 1099, 1104 (1985). In evaluating a motion to dismiss, the allegations of fact must be construed in the light most favorable to the plaintiff and all well-pleaded facts must be accepted as true. *In re Tri-Star Pictures, Inc., Lit.,* Del.Supr., 634 A.2d 319, 326 (1993). Conclusions " will not be accepted as true without specific allegations of fact to support them." *Id.*

**\*3** Where a complaint alleges fraud or conspiracy to commit fraud, the Rules of this Court call for a higher pleading standard, requiring the circumstances constituting the fraud or conspiracy to "be pled with particularity." *Atlantis Plastics Corp. v. Sammons,* Del. Ch., 558 A.2d 1062, 1066 (1989) (citing Court of Chancery Rule 9(b), which states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."). The particularity requirements will be met where the complaint " specif[ies] the time, place, speaker, and sometimes even the content of the alleged mi srepresentations...

." *Luce v. Edelstein,* 2d Cir., 802 F.2d 49, 54 (1986) .

### B. The Maag Motion

In the counterclaim filed in C.A. No. 16082, IOTEX alleges that Maag (plaintiff in that derivative action), together with Defries, Bayendor, Iota and NeoSoft "devised, agreed upon and pursued a scheme" to defraud IOTEX and its stockholders that has resulted in a loss of over $5.2 million and forced IOTEX to abandon its operations. IOTEX alleges that Maag and the others fraudulently induced IOTEX to "(i) incur significant expenses in becoming a newly-created entity to invest funds in connection with the Technology, (ii) realize substantial costs in negotiating and entering into the License Agreement with NeoSoft and the Project Management Agreement with Iota, and operating as an on-going entity, and (iii) raise funds from individual investors and forward an amount greater that $5.2 million to Iota in accordance with the terms of the Budget." IOTEX's Answering Br. at 12 (citations omitted). IOTEX also alleges that monies contributed by IOTEX according to the Agreements have been misappropriated by various individuals associated with Iota and NeoSoft, including, " possibly" Maag.

In his Motion to Dismiss, Maag attacks each of the five counterclaim allegations alleged by IOTEX, which are: (1) breach of fiduciary duty, (2) breach of duty of disclosure, (3) aiding and abetting breach of another's fiduciary duty, (4) common law fraud and (5) civil conspiracy. I will address allegations (1), (2) and (3) together and will do the same for allegations (4) and (5).

### 1. Breach of Fiduciary Duty, Duty of Disclosure and Aiding and Abetting Breach of Fiduciary Duty

IOTEX claims Maag breached his fiduciary duties, owed in his capacity as an IOTEX director, by allowing IOTEX to negotiate and enter into the Agreements and further, to invest funds over the course of performance of the Project Management

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 4

Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: Not Reported in A.2d)**

Agreement, *knowing* that NeoSoft and Iota "would not satisfy their respective contractual obligations" and would use the Agreements to "fraudulently induce IOTEX to forward funds to Iota," and in failing to inform the IOTEX board of directors of this knowledge.[FN4] Further, IOTEX claims that Maag aided and abetted a breach of Defries' fiduciary duties, owed by Defries in his capacity as an IOTEX director, by failing to prevent Defries from "causing and permitting" IOTEX to enter into the Agreements, when Maag *knew* that Iota and NeoSoft would not meet their contractual obligations. [FN5] In support of these claims, IOTEX alleges with particularity the following: (1) Maag was a director of IOTEX during the negotiation of the Agreements (but had resigned before the Agreements were approved), (2) Maag was a director of NeoSoft during the negotiation of the Agreements, (3) Maag was associated with Defries and (4) Iota, it is alleged, breached the Project Management Agreement.

> FN4. For the purpose of this motion, I accept as true IOTEX's averment that Maag was a director of IOTEX between July and October 1994. I do note, however, that this is a disputed fact.

> FN5. IOTEX contends that Maag's actions must be evaluated under the entire fairness standard, since he was a director of both IOTEX and NeoSoft between July 22, 1994 and October 24, 1994, the period in which the Agreements were negotiated. I do not reach this issue, as I find IOTEX's claims are not adequately substantiated by specific allegations of fact.

**\*4** Thus, a central element of the claims against Maag for breach of fiduciary duty rests on the general allegation that he "knew" as a "fact" (and failed to disclose) something about the state of mind of Defries and others during the period of negotiation of the Agreements. The "fact" that he is alleged to have known is not itself alleged with particularity but, rather, as a conclusion based on events which transpired during the course of performance of the Project Management

Agreement. There are also no allegations of fact that Maag played any substantial role in the negotiation or execution of the Agreements, as a director of IOTEX or otherwise.[FN6] Finally, there is no allegation that he profited from the alleged misapplication of the development funds. The best IOTEX is able to say is that funds were transferred to a Swiss bank where it is "possible" that Maag has an account.

> FN6. IOTEX's only claim of Maag's participation in the negotiation or approval of the Agreements is made by reference to an October 27, 1994 letter from Defries, on behalf of Iota, addressed to Maag, which states: "Enclosed find three copies of the Project Management Agreement that we have signed on behalf of Iota Inc. Please have Peter Friedli sign and date yellow tabs where indicated on behalf of [IOTEX] retaining one copy for your records and returning one copy to us for our files." Of course, IOTEX concedes that Maag resigned as an IOTEX director on October 24, 1994. Moreover, it makes no allegation of fact that Maag either obtained Friedli's signature or otherwise participated in securing IOTEX's approval of the Project Management Agreement.

While recognizing that Court of Chancery Rule 9(b) provides that "knowledge ... may be averred generally," where pleading a claim of fraud or breach of fiduciary duty that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this " something" was knowable and that the defendant was in a position to know it. IOTEX contends the scant well-pleaded facts in its counterclaim support the conclusion that Maag knew that Defries and Iota were not acting in good faith in negotiating the Agreements. I cannot agree. Speculative conclusions unsupported by fact do not allege breaches of fiduciary duty. *See In re Tri-Star,* Del.Supr., 634 A.2d at 326 (conclusions "will not be accepted as true without specific allegations of fact to support them."). For the same reasons, I

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 5

Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: Not Reported in A.2d)**

reject IOTEX's argument that Maag aided and abetted Defries alleged breach of duty.

My decision in this regard is premised importantly on the general rule of law that one cannot "bootstrap" a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations. *See* discussion pages 11 to 12, *infra.* The same considerations lead me to conclude that one cannot, ordinarily, premise a claim for breach of fiduciary duty on the assertion that a director knew and failed to disclose that a party negotiating a contractual arrangement with the corporation did not intend to perform its obligations under the contract. I do recognize that there are rare circumstances in which this general rule should not apply. This is not one of them. Here, there is no allegation that the Technology was not valuable at the time the Agreements were executed. Indeed, it is alleged that Defries had been working on the Technology for some years and it is clear from the positions of the parties that they all regard the Technology as having substantial value. There also is no allegation that Iota failed to begin its performance under the Project Management Agreement and continue rendering some performance for more than a year. In short, despite the conclusory allegations of fraud and breach of fiduciary duty, the dispute between the parties is essentially one for breach of contract, and the well-pleaded facts alleged in that regard do not support the inference that Defries and Iota did not intend to perform the Agreements. In the circumstances, the claims for breach of fiduciary duty against Maag must be dismissed.

### 2. Fraud and Conspiracy to Commit Fraud

**\*5** IOTEX's final two counterclaim allegations contend that Maag committed fraud and conspired to commit fraud. Again, these charges are predicated on the allegations that Maag *knew* that Defries and Iota did not intend to meet their contractual obligations and were "merely using the [Agreements] to fraudulently induce IOTEX to forward funds to Iota." In failing to disclose this *knowledge,* IOTEX argues, Maag participated in a scheme to defraud IOTEX, as it "would not have

expended the time and resources negotiating, entering into and satisfying its obligations under the [Agreements] had it been aware of the actual intent of NeoSoft, Iota, Defries and Maag." Further, IOTEX argues that Maag's knowledge and participation in the scheme to defraud IOTEX makes him liable as a conspirator for any other wrongful acts committed in furtherance of the conspiracy.

Under New York law,[FN7] a scheme to defraud is shown where the complaint asserts facts that demonstrate: (1) a scheme, (2) involving defendants (3) directed against the interests of plaintiffs and (4) defendant's conduct in connection with the scheme. *See Shearson Lehman Bros. Inc. v. Bagley,* N.Y.App. Div., 614 N .Y.S.2d 5, 6 (1994). Fraudulent misrepresentation is shown where facts are alleged that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 2d Cir., 57 F.3d 146, 153 (1995). The courts have noted that "[i]t is almost impossible to state in detail the circumstances constituting a fraud where those circumstances are peculiarly within the knowledge of the party against whom the (fraud) is being asserted." *CPC Int'l Inc. v. McKesson Corp.,* N .Y., 519 N.Y.S.2d 804, 812 (1987) (quoting *Jered Contracting Corp. v. New York City Transit Auth.,* N.Y., 292 N.Y.S.2d 98, 104 (1968)). However, a complaint must "allege the misconduct complained of in sufficient detail to inform the defendants of the substance of the claims." *Bernstein v. Kelso & Co., Inc.,* N.Y.App. Div., 659 N.Y.S.2d 276, 280 (1997).

> FN7. The parties are in agreement that New York law governs these claims for fraud.

IOTEX's fraud claims suffer from the same defect as its breach of fiduciary duty claims. Moreover, IOTEX has failed to allege sufficient facts to establish that, even if there was fraud, Maag participated in it. *See In re Tri-Star,* Del.Supr., 634

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 6

Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: Not Reported in A.2d)**

A.2d at 326 (Conclusions "will not be accepted as true without specific allegations of fact to support them.").

IOTEX does allege the elements of a claim for breach of contract against Iota. That claim, however, cannot be "bootstrapped" into a fraud claim merely by adding the words "fraudulently induced" or alleging that the contracting parties never intended to perform. *See Dann v. Chrysler Corp.,* Del. Ch., 174 A.2d 696, 700 (1961) ("Using the word 'fraud' or its equivalent in any form is just not a substitute for the statement of sufficient facts to make the basis of the charge reasonably apparent.").

**\*6** New York law is decisively to the same effect: " It is well settled under New York law that 'a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations." ' *International CableTel Inc. v. Le Group Videotron LTEE,* S.D.N.Y., 978 F.Supp. 483, 486 (1997) (quoting *Rocanova v. Equitable Life Assurance Soc'y of the U.S.,* N.Y., 612 N.Y.S.2d 339, 343 (1994)). New York law does recognize that a promise made "with a preconceived and undisclosed intention" of non-performance " constitutes a misrepresentation of a 'material existing fact." ' *Id.* at 487 (quoting *Sabo v. Delman,* N.Y., 164 N.Y.S.2d 714, 716 (1957). Nevertheless, this rule is limited by the requirement that "a false promise can support a claim of fraud only where that promise was 'collateral or extraneous' to the terms [of] an enforceable agreement in place between the parties." *Id.* IOTEX has alleged no facts showing that Maag was aware or participated in a "false promise" that was "collateral or extraneous" to the terms of the Agreements. On the contrary, the false promise alleged by IOTEX goes to the heart of the Agreements. Therefore, I do not find IOTEX to have met the requirements for pleading a fraud claim where, as is true here, the underlying action is for breach of contract.

Since I find IOTEX has failed to meet the pleading requirements for fraud, I need not address the conspiracy claim, as there is no underlying independent claim of fraud sufficient to withstand a motion to dismiss. *See Demalco Ltd. v. Feltner,* S.D.N.Y., 588 F.Supp. 1277, 1278 (1984) ("It is well settled in New York that 'civil conspiracy to commit fraud, standing alone, is not actionable .' Instead, the gravamen of a claim of conspiracy is the underlying independent tort, and if the independent tort has not been adequately pleaded, the conspiracy claim will also fail." (quoting *Cullen v. BMW of North Am., Inc.,* E.D.N.Y., 490 F.Supp. 249, 254 (1980) and citing *Danahy v. Meese,* N.Y.App. Div., 446 N.Y.S .2d 611, 614 (1981))).

### B. The Bayendor Motion

The complaint in C.A. No. 15817 was served on Bayendor in the manner described in 10 *Del. C.* § 3114, the Delaware director service statute. Apparently, IOTEX relied on that statute due to Bayendor's status as a director of Iota, his co-defendant. On August 19, 1997, Bayendor moved to dismiss for lack of personal jurisdiction and insufficiency of service of process, contending that Section 3114 was unavailable for use by IOTEX as its complaint was unrelated to Bayendor's fiduciary duties to Iota. In response, IOTEX served Bayendor again, this time under 10 *Del. C.* § 3104, the general long-arm service statute, and directed certain discovery at him in connection with his motion to dismiss. On November 21, 1997, IOTEX filed an amended complaint that added claims against Bayendor for civil conspiracy and violations of the federal Racketeer Influenced and Corrupt Organization Act ("RICO"). That amended complaint was served in reliance on Section 3104.

**\*7** As a result of the briefing on Bayendor's motion, the issue has narrowed to whether or not IOTEX is entitled to rely on the "civil conspiracy" theory of personal jurisdictional to obtain jurisdiction over Bayendor in Delaware. That is, I understand IOTEX fairly to concede that Section 3114 has no application to its claim and that no other head of jurisdiction under Section 3104 is available in this case.

The civil conspiracy theory of personal jurisdiction was recognized by the Delaware Supreme Court in *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.,*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 7

Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: Not Reported in A.2d)**

Del.Supr., 449 A.2d. 210, 225 (1982), but, because it affords "an easy technique to evade the thrust of the *International Shoe* holding," it has been narrowly construed by this Court. *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, Allen, C., slip op. at 29 (Nov. 21, 1995). In *Istituto Bancario,* the Supreme Court surveyed the law from other jurisdictions regarding the conspiracy theory of jurisdiction and determined to adopt what it characterized as the "strict test" requiring a plaintiff to satisfy each of five elements: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

*Istituto Bancario,* Del.Supr., 449 A.2d at 225. While not conceding the existence of elements (1) and (2), Bayendor's argument focuses on the final three elements, and in particular on the absence of any allegation of an act or effect in Delaware in furtherance of the alleged conspiracy.

IOTEX cites three matters that it characterizes as " substantial acts and effects in the State of Delaware. " None of these bear analysis.

IOTEX argues that the "principal effect involving Delaware" was "the use of a Delaware corporation-Iota-as the vehicle through which the fraud was committed." Mere use of a Delaware corporate entity in connection with a civil conspiracy has never been held to satisfy this element of the *Istituto Bancario* test. In support of this position, IOTEX cites to *Hercules, Inc. v. Leu Trust & Banking (Bahamas) Ltd.,* Del.Supr., 611 A.2d 476 (1992); *Istituto Bancario,* Del.Supr., 449 A.2d 210; and *Macklowe v. Planet Hollywood, Inc.,* Del. Ch., C.A. No. 13689, Steele, V.C. (Oct. 13, 1994). I do not read any of these cases to hold that " use" of a Delaware corporation in furtherance of a civil conspiracy can alone be found to have a substantial effect in Delaware sufficient to satisfy

the "strict" test of *Istituto Bancario.* In *Hercules,* of course, the plaintiff corporation was headquartered in Delaware. *Hercules,* Del.Supr., 611 A.2d at 478. Thus, the effect of the conspiracy was actually felt in this State. In *Istituto Bancario,* a substantial act in furtherance of the civil conspiracy-the filing of a certificate of amendment with the Delaware Secretary of State authorizing the issuance of the shares there in question-actually take place in the Delaware. *Istituto Bancario,* Del.Supr., 449 A.2d at 226-27.

**\*8** *Macklowe* held that personal jurisdiction over a Florida limited partnership could be obtained in Delaware by service on its Delaware incorporated general partner. *Macklowe,* Del. Ch., C.A. No. 13689, slip op. at 11. This result was not followed by Chancellor Allen in *Carlton* in relation to a New York limited partnership. *Carlton Invs.,* Del. Ch., C.A. No. 13950, slip op. at 27. Moreover, while *Macklowe* also discusses the applicability of the civil conspiracy of jurisdiction, nothing in that opinion suggests that persons affiliated with a Delaware corporation who are alleged to "use" that corporation to the injury of a third party by actions wholly outside of Delaware thereby subject themselves to the jurisdiction of our courts. *Macklowe,* Del. Ch., C.A. No. 13689, slip op. at 14-17.

The second and third arguments are that Defries' alleged breach of his fiduciary duties as one of IOTEX's directors caused a "substantial effect" in Delaware simply by virtue of IOTEX's incorporation in this State and that Bayendor's alleged breach of fiduciary while he was President of IOTEX's predecessor (Iotel, Inc.) caused injury in this State. Indeed, IOTEX goes so far as to describe Bayendor's alleged breach of fiduciary (which is not alleged to have happened physically in Delaware) as an "additional act in Delaware [that] supports the assertion of jurisdiction here." These alleged "effects" add nothing to the analysis because they have only a metaphysical connection with this jurisdiction. In my judgment, as a general rule, in the case of Delaware corporations having no substantial physical presence in this State, an allegation that a civil conspiracy caused injury to the corporation by actions wholly outside this States

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 8

Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: Not Reported in A.2d)**

will not satisfy the requirement found in the Supreme Court's opinion in *Istituto Bancario* of a " substantial effect ... in the forum state. *Istituto Bancario,* Del.Supr., 449 A.2d at 225.

For these reasons, I conclude that IOTEX cannot satisfy elements (3), (4) or (5) of the *Istituto Bancario* test for the assertion of personal jurisdiction over persons alleged to be participants in a civil conspiracy. Thus, service under 10 *Del. C.* § 3104 was improper and the amended complaint must be dismissed as to defendant Bayendor.

C. Defries and Bayendor's Motions to Dismiss the
Eighth Claim for Relief (RICO) [FN8]

FN8. Since I have dismissed the amended complaint as it pertains to defendant Bayendor, my discussion of the RICO claim applies only to defendant Defries.

In the amended complaint in C.A. No. 15817, IOTEX alleges that Defries and Bayendor engaged in a pattern of racketeering activity in violation of RICO. Specifically, Defries and Bayendor are alleged to have schemed (through Iota) "to defraud (among others) IOTEX and its stockholders of approximately [$5.2 million] and in devising, agreeing upon and pursuing such scheme to have: (i) misappropriated the approximately $5.2 million that IOTEX invested in connection with the Technology, (ii) forced IOTEX to abandon its operations, (iii) forced IOTEX to defend itself-and expend significant funds-in a recent action concerning the Technology brought against IOTEX by a former employee of Iota, and (iv) forced IOTEX to defend itself in connection with the unmeritorious counterclaim brought by Iota, and in the unmeritorious claims brought by another entity (Neosoft, A.G.) and individual (Urs Maag) controlled by Defries and Bayendor." IOTEX's Answering Br. at 3-4.

**\*9** The RICO statute provides for civil damages for any person or entity injured in his, her or its business or property by reason of a violation of 18 U.S.C. § 1962. *See* 18 U.S.C. § 1964(c). The statute

is violated where the injured party demonstrates that defendants are engaged in a "pattern of racketeering activity." *See H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229 (1989). A pattern is defined as " requiring 'at least two acts of racketeering activity within a ten year period." ' *Tabas v. Tabas,* 3d Cir., 47 F.3d 1280, 1290 (1995) (quoting 18 U.S.C. § 1961(5)). Racketeering activity is defined as, *inter alia,* any act that is indictable under 18 U.S.C. § 1961(1), and includes wire fraud and mail fraud, the specific acts alleged to have occurred by IOTEX. *See* 18 U.S.C. §§ 1341 (mail), 1343 (wire), 1961(1)(B) (definition); *Tabas,* 47 F.3d at 1290.

Courts have held that a "pattern of racketeering activity" is shown where the plaintiff has alleged two or more acts of an indictable offense and further shown "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." [FN9] *H.J. Inc.,* 492 U.S. at 239. "[P]redicate acts are related if they ' have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." ' *Tabas,* 47 F.3d at 1292 (quoting *H.J. Inc.,* 492 U.S. at 240). Continued criminal activity, i.e., continuity, may be one of two types: closed-end, referring to "a closed period of repeated conduct"; or open-ended, referring to "past conduct that by its nature projects into the future with a threat of repetition." *Id.* (quoting *H.J. Inc.,* 492 U.S. at 241). Analysis of either of the two types is temporal, so "a party may establish continuity as a closed-ended concept by ' proving series of related predicates extending over a substantial period of time." ' *Id.* (quoting *H.J. Inc.,* 492 U .S. at 242).

FN9. The pleading requirements to allege a violation of RICO are the same as previously discussed, see *supra,* p 5-6.

IOTEX contends that both items necessary to establish a pattern of racketeering activity have been met; pointing first to Defries and Bayendor's allegedly false statements made during the IOTEX/Iota negotiations concerning the Project Management Agreement and to Iota's allegedly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                 Page 9

Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: Not Reported in A.2d)**

false status reports as the related predicate acts; and second, to the fact that the conduct "intended to defraud IOTEX had occurred over several years, continues through the present, and represents the normal course of doing business for defendant Defries and defendant Bayendor," as evidence of a continued threat of criminal activity.

In addressing IOTEX's argument, I focus on the latter aspect of the United States Supreme Court's RICO analysis, that the defendants' acts "amount to or pose a threat of continued criminal activity." *H.J. Inc.,* 492 U.S. at 239. [FN10] IOTEX argues that both types of continuing criminal activity (open-ended and closed-ended) are present in the instant case.

> FN10. Defendants apparently concede that IOTEX has plead sufficiently to meet the requirement that "the racketeering predicates are related," as they do not address this aspect of the *H.J. Inc.* test in their brief. *See H.J. Inc.,* 492 U.S. at 239.

**\*10** Defendants contend that the allegedly criminal activities (if at all) could in no event have lasted past February 1996 (the last date that IOTEX made payments to Iota) thereby making an open-ended analysis inapplicable. In response, IOTEX cites three events alleged to meet the open-ended standard: (1) Iota's assertion of contract claims in this Court, (2) Iota's alleged refusal to provide an accounting of the funds IOTEX has paid to Iota and (3) Defries alleged grant of an option in IOTEX stock to a former Iota employee.[FN11] In my judgment, these mere conclusory allegations do not evidence continuing fraudulent conduct and require no further discussion. *See Continental Realty Corp. v. J.C. Penney Co., Inc.,* S.D.N.Y., 729 F.Supp. 1452, 1455 (1990) ("[The plaintiff's] conclusory allegations fail to satisfy Fed.R.Civ.P. 9(b)'s requirement that averments of fraud be stated with particularity and therefore cannot be relied upon to demonstrate a continuing pattern of fraudulent acts." ).

> FN11. The option arises out of a

Separation Agreement between Iota and Andrew Denis, which grants Denis the choice of either, "shares equal and equivalent to two hundred and fifty shares of Series A Preferred Stock in Iota, or:
b) Shares in Iotex, Incorporated equal and equivalent to that percentage as may be represented by the like number and proportion of shares issued in Iota pursuant to paragraph 6.C.a above when calculated against the Iotex shares which Iota or its associates may hold or control following the initial public offering of Iotex as such offering is defined by the Securities and Exchange Commission.
Defendants argue persuasively that the quoted provision obligates only Iota (and not IOTEX) to perform and, in any event, relates to shares of IOTEX owned or to be owned by Iota.

In the alternative, IOTEX contends that defendants' actions have met the closed-ended requirement of continuing criminal activity, i.e., a "series of related predicates extending over a substantial period of time." *H.J. Inc.,* 492 U.S. at 242. In making this determination, courts look to a number of factors, which can include: the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the number of schemes involved and the occurrence of distinct injuries. *Vicom, Inc. v. Harbridge Merchant Services,* 7th Cir., 20 F.3d 771, 781-82 "(1) the number of unlawful acts; (2) the length of time over which the acts were committed; (3) the similarity of the acts; (4) the number of victims; (5) the number of perpetrators; and (6) the character of the unlawful activity." (citing *Barticheck v. Fidelity Union Bank/First Nat'l State,* 3d Cir., 832 F.2d 36 (1987))).

IOTEX relies primarily on the Third Circuit's decision in *Tabas* as support for its argument. In *Tabas,* the plaintiff alleged that two brothers formed a partnership to conduct real estate and other business ventures. *Id.* at 1282. In the event of the death of either partner, the partnership agreement provided that the surviving partner would distribute partnership income jointly to himself and the estate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 10

Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: Not Reported in A.2d)**

of the deceased partner. *Id.* One of the partners died, and the surviving partner began making partnership income payments to the deceased partner's estate. *Id.*

Some years thereafter, the estate filed a civil RICO claim, alleging misappropriation based on its contention that the surviving partner was not allocating an equal share to the deceased partner's estate, in violation of the partnership agreement. *Id.* at 1282-83. The Third Circuit agreed, reversing the district court and finding that the RICO continuity requirement was satisfied. *Id.* at 1281. In its assessment of whether or not continuing criminal activity was shown, the Court focused on "the duration of the underlying scheme," noting that plaintiffs had provided evidence tending to show that the alleged acts of mail fraud began on November 10, 1987 and ended in July 1991, a period of three and a half years. *Id.* at 1294. The Court found a three and a half year period constituted a "substantial" period of time, and comported with the type of "long-term criminal conduct that RICO was enacted to address." *Id.* [FN12]

> FN12. IOTEX makes further argument as evidence of the applicability of the closed-ended type by contending that defendants' criminal conduct "began on or before July 20, 1994 (the date IOTEX was formed for the sole purpose of investing capital in connection with the Technology)". Even if this were true, the resulting period is still substantially shorter than that addressed in *Tabas,* and the multi-factor analysis would lead me to conclude that the element of continuity is not present.

**\*11** *Tabas* is distinguishable from the instant case. While *Tabas* involved conduct occurring over a three and a half year period, the activities here lasted only 15 months, a decidedly shorter period, and one that, alone, will not satisfy the RICO continuity requirement. *See Vemco, Inc. v. Camardella,* 3d Cir., 23 F.3d 129, 135 (1994) ("We cannot conclude that [defendant's] alleged actions here, involving a single victim and single scheme

for a single purpose over seventeen months, constitute the type of 'long-term criminal conduct' Congress sought to prohibit with RICO." (quoting *H.J. Inc.,* 492 U.S. at 241-42)). The other factors identified in the case law lead me to conclude that the RICO claim is not properly plead.

First, the predicate acts that IOTEX rely on all arise out of or are related to the same transaction, the Project Management Agreement. This Agreement required periodic status reports and such reports, while independent of each other, were all dependent on and related to the Agreement. Commonsense, which the Supreme Court mandates be used in a RICO analysis, requires a finding that these reports are not separate predicate acts as contemplated by the RICO statute, but are mutually dependent on the Agreement. *See H.J. Inc .,* 492 U.S. at 241 (promulgating an approach to analyzing the continuity requirement that is based on a "commonsense, everyday understanding of RICO's language and Congress' gloss on it"). As one court has stated, "courts must take care to ensure that the plaintiff is not artificially fragmenting a single act into multiple acts simply to invoke RICO." *Schlaifer Nance & Co. v. Estate of Andy Warhol,* 2d Cir., 119 F.3d 91, 98 (1997).[FN13]

> FN13. This same analysis applies to the other predicate acts attacked by IOTEX, that the defendants made fraudulent communications during the negotiation of the Project Management Agreement that led to IOTEX's payments to Iota. These payments were directly related to the Budget and are an integral part of the Project Management Agreement. They cannot be segmented to create the predicate acts necessary to meet the RICO continuity requirement.

Second, notwithstanding IOTEX's footnote argument to the contrary, the predicate acts allegedly injure only one party, IOTEX itself. IOTEX contends that in addition to itself, allegedly injured by defendants' misappropriation of its funds and fraudulent status reports, its stockholders have also been injured, since the corporation was formed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: Not Reported in A.2d)**

specifically for the purpose of investing in the Technology and by misappropriating funds paid by IOTEX to Iota for the Technology, the defendants injured the stockholders investing in IOTEX. I reject this argument because it would require me to disregard the existence of IOTEX as a legal entity. IOTEX alone experiences any effect of defendants' allegedly fraudulent acts. The shareholders do not suffer any injury separate from or unrelated to that alleged to be experienced by IOTEX. *See Kramer v. Western Pac. Indus., Inc.,* Del.Supr., 546 A.2d 348, 351 (1988) (by analogy in derivative standing cases, "[p]laintiff must allege more than an injury resulting from a wrong to the corporation").

Lastly, the alleged injury itself is a single injury. If defendants, through Iota, did breach the Project Management Agreement by sending false status reports and not complying with the Budget's directives regarding the allocation of the IOTEX funds, then the end result of Iota's noncompliance is a single injury to IOTEX, not multiple injuries based on each allegedly fraudulent communication. To find otherwise would fragment the Project Management Agreement, which is contrary to law and commonsense.

**\*12** For all of the foregoing reasons, I find that IOTEX has failed to meet the continuity requirement necessary to show a pattern of racketeering activity under the RICO statute. Therefore, defendant Defries and Bayendor's Motions to Dismiss the Eighth Claim for Relief are hereby granted.[FN14]

> FN14. Having reached this conclusion, I do not address Defries' argument that the consent to jurisdiction under 10 *Del. C.* § 3114 is not broad enough to subject him to the personal jurisdiction of this Court for the purpose of adjudicating the RICO claim.

### III. CONCLUSION

For all of the foregoing reasons, the motions to dismiss addressed in this Memorandum Opinion, i.e., (1) Urs Maag's Motion to Dismiss for Failure to State a Claim upon which Relief can be Granted (C.A. No. 16082), (2) David Bayendor's Motion to Dismiss for Lack of Personal Jurisdiction (C.A. No. 15817), and (3) Anthony Defries and David Bayendor's Motions to Dismiss the Eighth Claim for Relief (C.A. No. 15817), are all GRANTED. IT IS SO ORDERED.

Del.Ch.,1998.
Iotex Communications, Inc. v. Defries
Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                                    Page 1

Not Reported in A.2d, 2004 WL 249581 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**C**
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware.
MARKETING PRODUCTS MANAGEMENT,
LLC and Chris Lundin, Plaintiffs,
v.
HEALTHANDBEAUTYDIRECT.COM, INC.,
f/k/a Health and Beauty Direct, Inc., and Brian
Fraidin, Defendants.
**No. 02C-04-256 CLS.**

Submitted Sept. 3, 2003.
Decided Jan. 28, 2004.

On Defendants' Motion to Dismiss Brian Fraidin on
Jurisdictional Grounds. Granted.

Dennis B. Phifer, Dennis Bruce Phifer, P.A.,
Wilmington, Delaware; Francis G.X. Pileggi, and
Sheldon K. Rennie, Fox Rothschild LLP,
Wilmington, Delaware, for Plaintiffs.
Philip Trainer, Jr., and Carolyn S. Hake, Ashby &
Geddes, Wilmington, Delaware; William C. Davis,
III, Shulman Rogers Gandal Porty & Ecker, P.A.,
Rockville, Maryland, for Defendants.

*MEMORANDUM OPINION*

SCOTT, J.

## I. INTRODUCTION

**\*1** Defendant Brian Fraidin ("Fraidin") has filed a
Motion to Dismiss on Jurisdictional Grounds. Upon
consideration of the briefs submitted by the parties,
this court concludes Fraidin's motion should be
GRANTED.

## II. BACKGROUND

This action arises from the alleged breach of a
contract between plaintiff Marketing Products
Management, Inc. ("MPM") and defendant
HealthandBeautyDirect.com, Inc. ("HBD"). MPM
disputes the calculation of the profit participation
under the contract upon which payments to MPM
are made. MPM also alleges fraudulent inducement
of the contract. The Second Amended Complaint
added Fraidin as a defendant, alleging he,
individually and through HBD, fraudulently
induced MPM to enter into the contract and
fraudulently breached the contract. Currently before
the court is Fraidin's Motion to Dismiss on
Jurisdictional Grounds.

## III. STANDARD OF REVIEW

Once a defendant challenges personal jurisdiction,
the plaintiff bears the burden of establishing a
*prima facie* case that the court has personal
jurisdiction over the defendant.[FN1] All factual
inferences must be viewed in a light most favorable
to plaintiffs [FN2] and all allegations of jurisdictional
fact are presumed to be true.[FN3] Delaware's Long
Arm Statute is to be construed to the maximum
extent possible, consistent with due process.[FN4] "
Failure to make an adequate evidentiary showing of
facts sufficient to satisfy the requirements of either
component of the personal jurisdiction test [is] fatal
to plaintiffs' defense of [a] motion [to dismiss for
lack of personal jurisdiction].[FN5]

FN1. *Wright v. American Home Products
Corp.,* 768 A.2d 518, 526 (Del.Super.2000)
.

FN2. *Id.*

FN3. *Jeffreys v. Exten,* 784 F.Supp. 146,
151 (D.Del.1992) (internal citation
omitted).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 2

Not Reported in A.2d, 2004 WL 249581 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

FN4. *Id.*

FN5. *Newspan, Inc. v. Hearthstone Funding Corp.,* 1994 WL 198721 at *4 (Del.Ch.)

### IV. DISCUSSION

Fraidin states he is merely a stockholder and officer and/or director of HBD. He has no other contacts with the state of Delaware and the allegations in the complaint do not relate to his status as officer or director. He argues, therefore, this court has no personal jurisdiction over him.

MPM counters that jurisdiction in Delaware is proper over Fraidin under several theories. First, as a director of HBD, Fraidin is subject to jurisdiction under 10 Del. C. § 3114. Second, the act of incorporating HBD in Delaware constitutes a transaction sufficient to satisfy 10 Del. C. § 3104(c). Third, that HBD and other entities [FN6] were incorporated in Delaware, thereafter operated as part of a conspiracy to defraud MPM, and this conspiracy is a sufficient ground for asserting personal jurisdiction over Fraidin. Fourth, MPM alleges HBD is the mere alter ego of Fraidin and jurisdiction is proper by "piercing the corporate veil." Fifth, MPM attacks the fiduciary shield doctrine which otherwise would insulate Fraidin from being sued in Delaware where his sole contacts with Delaware have been on behalf of HBD.

FN6. Plaintiffs are seeking to add these other entities as defendants in a Third Amended Complaint. That Motion to File a Third Amended Complaint remains pending before this court.

A. Jurisdiction under 10 Del. C. § 3114.

Section 3114 requires that, in order to obtain jurisdiction over corporate directors, the suit must concern acts performed in their directorial capacities.[FN7]

FN7. *Armstrong v. Pomerance,* 423 A.2d

174, 175 (Del.1980).

The court finds in the case at bar, the allegedly fraudulent actions involved Fraidin acting as an individual and not in his directorial capacity. The allegedly fraudulent actions, therefore, are not related to his status as a director of HBD. Therefore, personal jurisdiction is improper under 10 Del. C. § 3114.

B. Jurisdiction under 10 Del. C. § 3104.

**\*2** Section 3104 provides personal jurisdiction in Delaware courts over nonresidents based on acts performed within the state. The analysis of whether jurisdiction is proper under § 3104 requires a two-part analysis. First, does § 3104 authorize service? Second, if service is authorized, are constitutional due process requirements satisfied?[FN8] These two tests are independent.[FN9] There must first be an analysis of whether service is authorized under § 3104 and then a due process analysis.[FN10]

FN8. *Wright,* 768 A.2d at 527.

FN9. *Id.*

FN10. *Id.*

1. Whether service is authorized.

It is clear that mere ownership of stock in a Delaware corporation is insufficient to establish jurisdiction over a majority or sole shareholder.[FN11] The act of incorporation *may* constitute a transaction sufficient for the purposes of satisfying § 3104(c)(1).[FN12] The act of incorporation is sufficient to confer personal jurisdiction, however, only if the claims at issue are related to the act of incorporation [FN13] or are based upon Delaware corporate law.[FN14]

FN11. *Shaffer v. Heitner,* 433 U.S. 186, 212, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 3

Not Reported in A.2d, 2004 WL 249581 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

> FN12. *Papendick v. Bosch,* 410 A.2d 148, 152 (Del.1979).

> FN13. *Id.*

> FN14. *Outokumpu Engineering Enterprises, Inc. v. Kvaerner Enviropower, Inc.,* 685 A.2d 724, 728 (Del.Super.1996).

The court finds that HBD was incorporated in 1999. The contract under which MPM is suing was formed in 2001. The court finds no basis to support the contention HBD was incorporated with the intent to defraud MPM since it was formed nearly two years prior to the formation of the contract at issue. The court concludes there is no basis to authorize service upon Fraidin under § 3104.

2. Whether due process is violated.

Assuming *arguendo* that service was proper under § 3104 (based on the act of incorporation constituting a sufficient act to authorize service), MPM would still have to establish that the exercise of personal jurisdiction over Fraidin by this court would not offend "traditional notions of fair play and substantial justice." [FN15] MPM must show that Fraidin had such minimum contacts with Delaware that he can be shown to have "purposely availed" himself of the privilege of conducting activities in Delaware and reasonably should have anticipated being haled into a Delaware court. [FN16]

> FN15. *Sternberg v. O'Neil,* 550 A.2d 1105, 1109 (Del.1987) (internal citation omitted).

> FN16. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980).

The court finds there are insufficient contacts with Delaware by Fraidin to satisfy this requirement. The contract at issue was formed in Massachusetts, Fraidin lives in Maryland, HBD has its primary place of business in Maryland, and none of the allegedly fraudulent activity took place within Delaware. The court concludes Fraidin's due

process rights would be violated by an assertion of personal jurisdiction over him by this court. The court thus finds MPM has met neither test under § 3104, and concludes there is no basis for asserting personal jurisdiction over Fraidin under 10 Del. C. § 3104.

C. Jurisdiction under a conspiracy theory.

Civil conspiracy can be a ground for asserting personal jurisdiction over a defendant who otherwise is not amenable to suit under § 3104. [FN17] In order to establish jurisdiction, the plaintiff must show that: (1) a conspiracy existed, (2) the defendant was a member of that conspiracy, (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state, (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state, and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy. [FN18] Delaware courts have consistently held that this five-part test is a strict one with a narrow scope. [FN19] Plaintiffs must assert specific factual evidence to show that the nonresident defendant was a conspirator and that a substantial wrongful act in furtherance of the conspiracy took place in Delaware in order to establish jurisdiction. [FN20]

> FN17. *Instituto Bancario Italiano SpA v. Hunter Eng'g Co., Inc.,* 449 A.2d 210, 225 (Del.1982).

> FN18. *Id.*

> FN19. *Id., see also Hercules, Inc. v. Leu Trust & Banking (Bahamas) Ltd.,* 611 A.2d 476, 482 n. 6 (Del.1992); *HMG/Courtland Props. Inc. v. Gray,* 729 A.2d 300, 307 (Del.Ch.1999); *Computer People, Inc. v. Best Int'l Group, Inc.,* 1999 WL 28819 at *5 (Del. Ch.).

> FN20. *Computer People,* 1999 WL 28819 at *7.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 4

Not Reported in A.2d, 2004 WL 249581 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

**\*3** While MPM alleges the incorporation of HBD
was a sufficient "substantial act" in furtherance of a
conspiracy, the court holds otherwise. For the same
reasons the act of incorporation is not sufficient to
establish jurisdiction under 10 Del. C. § 3104,[FN21]
the act of incorporation of HBD is insufficient to be
a "substantial act" in furtherance of a conspiracy.
Having found no substantial act in furtherance of a
conspiracy occurred in Delaware, the court finds no
basis for establishing personal jurisdiction over
Fraidin under a conspiracy theory.

FN21. See discussion at B, *supra.*

D. HBD as Fraidin's alter ego.

The alter ego theory of jurisdiction is based on the
premise that the contacts of a Delaware entity may
be attributed to another person or entity if the
Delaware entity is the mere alter ego of such other
person or entity.[FN22] This theory permits courts to
ignore corporate boundaries where fraud or inequity
in the use of the corporate form is found.[FN23] This
is generally termed "piercing the corporate veil."

FN22. *Fitzgerald v. Cantor,* 1998 WL
842316 at \*2 (Del.Ch.); *Sears, Roebuck &
Co. v. Sears plc,* 744 F.Supp. 1297, 1304
(D.Del.1990); *Mobil Oil Corp. v. Linear
Films, Inc.,* 718 F.Supp. 260, 266
(D.Del.1989).

FN23. *Id.*

This court finds it cannot establish jurisdiction over
Fraidin under an alter ego theory because this court
lacks jurisdiction to "pierce the corporate veil."[FN24]
As an equitable remedy, Delaware Court of
Chancery has sole jurisdiction over actions to "
pierce the corporate veil."[FN25]

FN24. *John Julian Constr. Co. v. Monarch
Builders, Inc.,* 324 A.2d 208, 210 n. 1
(Del.1974); *Sonne v. Sacks,* 314 A.2d 194,
197 (Del.1973).

FN25. *Id.*

Even if this court had jurisdiction to "pierce the
corporate veil," the court finds the record shows
HBD is a legitimate business and not merely the
alter ego of Fraidin. The court, therefore, cannot
assert personal jurisdiction over Fraidin under an
alter ego theory.

E. Fiduciary shield doctrine.

The fiduciary shield doctrine prohibits acts
performed by an individual, in his capacity as a
corporate officer or employee, from serving as the
basis for personal jurisdiction over that individual.
[FN26] The "underpinning of this fiduciary shield
doctrine is the notion that it is unfair to force an
individual to defend a suit brought against him
personally in a forum with which his only relevant
contacts are acts performed not for his own benefit
but for the benefit of his employer." [FN27] There is
an exception to the doctrine when the corporation is
a mere shell for its owner.[FN28] The court in
*Plummer* noted the standard for finding the
corporation was a "mere shell" was more liberal
than "normally applied in other contexts for
piercing the corporate veil ." [FN29] However, the
court in *Plummer* also noted the fiduciary shield
doctrine was an *equitable* doctrine.[FN30]

FN26. *Tristrata Technology, Inc. v.
Neoteric Cosmetics, Inc.,* 961 F.Supp. 686,
690 (D.Del.1997).

FN27. *Plummer & Co. Realtors v. Crisafi,*
533 A.2d 1242, 1246 (Del.Super.1987)
(internal citation omitted).

FN28. *Id.*

FN29. *Id.* at 1247.

FN30. *Id.* at 1246 (emphasis supplied).

This court finds, under the facts in the case at bar,
that finding an exception to the fiduciary shield
doctrine is indistinguishable from "piercing the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 5

Not Reported in A.2d, 2004 WL 249581 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

corporate veil." Therefore, as discussed above in
part D, this court does not have jurisdiction to find
an exception to the fiduciary shield doctrine, as
Delaware Court of Chancery has sole jurisdiction
over equitable doctrines. The court finds, as well,
that HBD is a legitimate business and, as noted in
part D, not the mere alter ego of Fraidin. This court,
therefore, does not have jurisdiction over Fraidin
under an exception to the fiduciary shield doctrine.

## V. CONCLUSION

**\*4** For the above reasons, this court finds it cannot
exercise personal jurisdiction over defendant Brian
Fraidin. Therefore, Fraidin's Motion to Dismiss is
GRANTED.

Del.Super.,2004.
Marketing  Products  Management,  LLC  v.
HealthandBeautyDirect.com, Inc.
Not Reported in A.2d, 2004 WL 249581
(Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                                                          Page 1

Not Reported in A.2d, 2002 WL 31761252 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**H** Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
Mark H. **STEINMAN**, Plaintiff,
v.
Arthur E. **LEVINE**, Mark Mickelson, Andrew
Cohen, Carol Adeshak, **Levine** Leichtman Capital
Partners, L.P., **Levine** Leightman Capital Partners,
Inc., and Ing (U.S.) Capital, L.L.C., Defendants.
**No. Civ.A. 19107.**

Submitted Aug. 6, 2002.
Decided Nov. 27, 2002.

Edmond D. Lyons, Jr., the Lyons Law Firm,
Wilmington, Delaware; Michael J. Maimone,
Gordon    Fournaris    &    Mammarella,    P.C.,
Wilmington, Delaware, for Plaintiff.
Josy W. Ingersoll, Martin S. Lessner, Sara Beth
Reyburn, Young Conaway Stargatt & Taylor, LLP,
Wilmington,    Delaware;    Michael    Sherman,
Alschuler Grossman Stein & Kahan, LLP, Los
Angeles, California, for Defendants Arthur Levine,
Levine Leichtman Capital Partners, Inc., and Levine
Leichtman Capital Partners, L.P.
David L. Finger, Wilmington, Delaware, for
Defendant Mark Mickelson.
Alan J. Stone, Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware, for Defendant Andrew
Cohen.
Raymond J. DiCamillo, Becky A. Hartshorn,
Richards, Layton & Finger, Wilmington, Delaware,
for Defendant ING (U.S.) Capital, L.L.C.

*MEMORANDUM OPINION AND ORDER*
LAMB, Vice Chancellor.

I.

**\*1** This action arises out of a series of loan and
pledge agreements between a Delaware corporation,

its nonresident founding stockholder, and its
nonresident creditors and current controlling
stockholders. The loan agreements at issue provided
more than $32,000,000 in financing to the Delaware
corporation. At the time the loan agreements were
executed, the plaintiff owned one-third of the
Delaware corporation's common stock. Pursuant to
a pledge agreement executed contemporaneously
with the loan agreements, the plaintiff agreed to
secure the corporation's obligations by a pledge of
all his stock in the Delaware corporation. If the
corporation defaulted on the loans, the creditors
could exercise certain rights under the pledge
agreement, including voting the plaintiff's pledged
shares.

The Delaware corporation defaulted on its loan
agreements at various times and the corporation's
creditors waived the defaults and restructured the
loans. To induce the corporation's creditors to
restructure the loans and waive the defaults, the
Delaware corporation issued warrants exercisable
for 50% of the corporation's voting stock, on a fully
diluted basis. Finally, after the Delaware
corporation's third default, its creditors chose to
exercise their rights under the pledge agreement by
voting the plaintiff's shares. The plaintiff thereafter
filed suit alleging various causes of action.

The plaintiff's complaint contains essentially two
core allegations. First, the plaintiff alleges that the
Delaware corporation did not default on its most
recent loan agreement. Second, the plaintiff alleges
that the directors of the Delaware corporation
should not have made principal payments pursuant
to the most recent loan agreement, even though such
amounts were legally owed. The plaintiff argues
that the actions of the defendants were part of some
overarching scheme to usurp the plaintiff's rights in
his stock and to obtain control of the corporation.

The plaintiff's complaint must be dismissed for
several reasons. First, the complaint must be
dismissed against two of the corporation's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2002 WL 31761252 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

creditors-controlling stockholders because this court cannot exercise personal jurisdiction over those defendants. The complaint must also be dismissed against the remaining defendants because it fails to state a claim upon which relief can be granted.

The plaintiff is estopped from arguing that the Delaware corporation was not in default on its loans because he previously obtained a judgment in California state court based on the fact that the corporation was in default. Moreover, the plaintiff's claims related to its principal payments pursuant to the loan agreements must be dismissed because these claims are derivative in nature and the complaint fails to comply with Rule 23.1. In addition, there is no valid claim because the challenged payments were admittedly made with respect to legally enforceable obligations. Finally, none of the disclosures or non-disclosures in this case rise to the level of a breach of the directors' fiduciary duty of disclosure, nor do they amount to fraudulent or negligent misrepresentations.

II.

A. *The Parties*

1. *The Plaintiff*

**\*2** Mark Steinman is a California resident and was co-founder of Chorus Line Corporation ("Chorus"). From 1975 until 1996 Steinman was President and Chief Operating Officer of Chorus. From 1975 until 1997, he was a director of Chorus. At all times relevant to this litigation, Steinman was a Chorus stockholder. Chorus was originally a California corporation founded in 1975 by Steinman and Barry Sacks. In September 1987, Chorus reincorporated in Delaware. In the mid-1990s, Chorus was one of this country's largest designers and marketers of women's and junior's dresses, with sales in 1996 exceeding \$240,000,000. By 1999, however, revenues had decreased to \$130,000,000. Before the events alleged in Steinman's complaint, Steinman, Sacks and Jay Balaban each owned one-third of the issued and outstanding shares of

Chorus stock.[FN1]

> FN1. For purposes of this motion, the following facts are taken from Steinman's well-pleaded allegations in his Amended Complaint.

2. *The Defendants*

Arthur E. Levine, Mark Mickelson, Andrew Cohen and Carol Adeshak (collectively the "Defendant Directors") constituted a majority of the five-person board of directors (the "Board") of Chorus during the relevant period. Cohen was Chorus's CEO from 1997 until 2000, and from 1998 until 2000 he was also its CFO.

Levine Leichtman Capital Partners, Inc. ("LLCP") is a California corporation that manages hundreds of millions of dollars of institutional capital. LLCP invests capital through various entities, including Fund I (see below). LLCP (through its control of Fund I) has been a controlling stockholder of Chorus since 1998.

Levine Leichtman Capital Partners, L.P. ("Fund I") is a California limited partnership that manages over \$100 million of institutional capital. Fund I has been a creditor of Chorus since 1996, and has been a controlling stockholder since 1998. Fund I is managed and controlled by LLCP. Mickelson, in addition to being a director of Chorus, was a general partner of Fund I during the relevant period.

Levine, in addition to being a director of Chorus, is a co-founder and general partner of Fund I. He is also a director, President, and a stockholder of LLCP. As disclosed in various public filings, Levine, Fund I, and LLCP are "affiliated" under the federal securities laws.

ING (U.S.) Capital, L.L.C. ("ING") is a Delaware corporation. ING has been a creditor of Chorus since 1994. In 1999, ING entered into an agreement with LLCP (through its control of Fund I) appointing Fund I as ING's agent and permitting LLCP (through its control of Fund I) to exercise ING's rights (including voting rights) in connection

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 3

Not Reported in A.2d, 2002 WL 31761252 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

with ING's investment in Chorus.

### B. *LLCP And ING Make Loans To Chorus*

On February 1, 1994, Chorus and ING (among others) entered into an agreement where (a) ING agreed to invest in Chorus by purchasing notes of Chorus from a third-party investor, and (b) Chorus agreed to issue warrants to ING exercisable for 30% of Chorus stock on a fully diluted basis. The obligations of Chorus under the loan agreement were secured by, among other things, a pledge by Sacks, Balaban and Steinman of all their Chorus stock.

**\*3** On April 30, 1996, Chorus and Steinman entered into a Separation Agreement related to the termination of Steinman's employment with Chorus. The Separation Agreement provided (among other things) that Steinman had a right to receive accurate financial information from Chorus, but only if requested by Steinman.

On November 18, 1996, Chorus, LLCP (through its control of Fund I) and ING entered into an agreement, whereby Chorus and ING agreed to amend the above described loan agreement, and LLCP (through its control of Fund I) and ING agreed to loan additional funds to Chorus (the "November 1996 Agreement"). Specifically, under the November 1996 Agreement, Chorus, LLCP (through its control of Fund I) and ING agreed that: (a) ING would purchase additional long-term notes from Chorus that would result in a loan to Chorus from ING with an aggregate value of $22,500,000, (b) LLCP (through its control of Fund I) would acquire from ING a portion of the long-term notes originally purchased from Chorus with an aggregate value of $10,500,000, and (c) LLCP (through its control of Fund I) would purchase additional long-term notes from Chorus with a value of $1,500,000. In addition, LLCP (through its control of Fund I) and ING agreed to provide Chorus with two short-term loans in the aggregate amount of $14,000,000 (a "Term A Note" in the amount of $8,000,000 and a "Term B Note" in the amount of $6,000,000). Chorus agreed to issue a "Deferred Fee Note" to ING in the amount of approximately $1,600,000. All of the loans made by ING to Chorus under the November 1996 Agreement were secured with a pledge by Sacks, Balaban, and Steinman of all their stock in Chorus. The warrant agreement between Chorus and ING was also amended, which resulted in Chorus issuing warrants to ING exercisable for 15% of Chorus stock on a fully diluted basis, and Chorus issuing warrants to LLCP (through its control of Fund I) exercisable for 20% of Chorus stock on a fully diluted basis.

The November 1996 Agreement provided that Chorus would repay the loans in accordance with a repayment schedule. On or about December 31, 1996, and continuing until May 29, 1997, Chorus defaulted on various provisions of the November 1996 Agreement. On May 29, 1997, as a result of such defaults, Chorus requested that: (a) LLCP (through its control of Fund I) and ING waive the events of default that occurred, (b) the maturity date of the Term A Note be extended, and (c) various financial covenants in the November 1996 Agreement be amended. LLCP (through its control of Fund I) and ING agreed to the requests of Chorus (the "May 1997 Agreement"). Again, Sacks, Balaban and Steinman pledged all their shares of Chorus stock to secure the loans. In connection with the May 1997 Agreement, the warrant agreement between Chorus, ING and LLCP was again amended, which resulted in Chorus issuing warrants to ING exercisable for 20% of Chorus stock on a fully diluted basis, and Chorus issuing warrants to LLCP (through its control of Fund I) exercisable for 25% of Chorus stock on a fully diluted basis.

**\*4** On November 21, 1997, the Board approved various amendments to the May 1997 Agreement (the "November 1997 Agreement"). Under the terms of the November 1997 Agreement, LLCP (through its control of Fund I) and ING waived the events of default that occurred after May 29, 1997, and agreed to make an additional loan to Chorus under the provisions of the Term B Note in the aggregate amount of $3,000,000. The November 1997 Agreement also required Chorus to repay its loans in accordance with an amended payment schedule. The November 1997 Agreement was again secured by a pledge of all Chorus stock held by Sacks, Balaban and Steinman (the "1997 Pledge

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 4

Not Reported in A.2d, 2002 WL 31761252 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Agreement").

In order to induce ING to agree to the November 1997 Agreement, the warrant agreement between Chorus, ING and LLCP (through Fund I) was further amended, which resulted in Chorus issuing warrants to ING and LLCP (through Fund I) exercisable for 25% of Chorus stock, respectively, on a fully diluted basis. Thus, after execution of the November 1997 Agreement, Chorus had issued warrants to LLCP (through its control of Fund I) and to ING exercisable for, in the aggregate, 50% of the shares of voting stock of Chorus on a fully diluted basis.

During the end of 1997 and the beginning of 1998, LLCP and Fund I (in their capacity as creditors) became involved in the day-to-day operations of Chorus. On March 19, 1998, Chorus, LLCP (through Fund I) and ING agreed to amend the payment schedule set forth in the November 1997 Agreement (the "March 1998 Agreement"). The March 1998 Agreement was not consented to by Steinman, and Steinman was never asked to execute an amendment to the 1997 Pledge Agreement. However, neither Steinman's consent nor an amendment to the 1997 Pledge Agreement was required. Instead, the 1997 Pledge Agreement refers to the "[e]xisting [Loan Agreement] as amended by the [Loan Agreement Amendment] and as it may be subsequently amended, restated or otherwise modified." [FN2] The 1997 Pledge Agreement goes on to state that ING and LLCP could, without notice to Steinman, "renew, extend, accelerate or otherwise change the time, place, manner or terms of payment by Chorus of the Underlying Debt." [FN3]

FN2. Amend. Comp. Ex. D at § 1.1.

FN3. Amend. Comp. Ex. B at § 14(a).

C. *Fund I Obtains Board Representation*

On July 20, 1998, LLCP (through its control of Fund I) exercised the warrants it received from Chorus in connection with the various loan agreements. After LLCP's exercise, it controlled 47% of Chorus's voting stock on a non-diluted

basis. Levine then approached a Chorus representative and insisted that Fund I be allowed to appoint members to Chorus's Board. As a result, on or about October 20, 1998, Levine and Mickelson were nominated and elected as directors of Chorus during a special meeting of the Board. The Board then consisted of Levine, Mickelson, Cohen, Sacks and Balaban.

At various times before an October 20, 1998 special meeting of the Board, Levine and Mickelson allegedly contacted Cohen and stated that if Cohen agreed to side with LLCP, LLCP (a) would grant Cohen a significant increase in compensation and would provide Cohen with other employee-related benefits (including an equity interest in Chorus), (b) would support Cohen's continued employment as the Chorus CEO, (c) would support the removal of Sacks as the CFO of Chorus and the election of Cohen as the new CFO, and (d) would make Cohen responsible for the operations of all major Chorus divisions, including the divisions that Balaban had been managing. Essentially, LLCP offered to remove Sacks and Balaban from their respective positions of responsibility at Chorus and replace them with Cohen. Cohen allegedly agreed.

**\*5** At a special meeting of the Board on October 20, 1998, Cohen was granted an increase in compensation and other benefits. At another special meeting of the Board on December 3, 1998, Levine moved that the Board elect Adeshak to fill a vacant seat on the Board. Cohen seconded the motion, and the Board elected Adeshak as a Chorus director. At the same meeting, the Board decided not to renew Sacks's employment agreement, and, thus, terminated Sacks as the CFO. It then elected Cohen to replace Sacks as the CFO.

As a result of the events that occurred during December 1998, LLCP essentially obtained control of the Board. However, this control was far from secure. So long as Sacks, Balaban, and Steinman voted their stock as a group, they continued to have voting control of Chorus. Thus, they had the authority to (a) expand the Board, pursuant to Chorus's Certificate of Incorporation, and elect individuals to serve in the vacant and newly-created seats on the Board, [FN4] and (b) replace any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                            Page 5

Not Reported in A.2d, 2002 WL 31761252 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

director at the end of the director's term or "for cause," and nominate and elect an individual to fill such vacancy on the Board. On February 5, 1999, at a special meeting, the Board demoted Balaban and promoted Cohen to manage all of Chorus's major divisions (including those divisions formerly managed by Balaban).[FN5]

> FN4. Article FIFTH of Chorus's Certificate of Incorporation provides:
> The business affairs of the corporation shall be managed under the direction of the Board of Directors. The number of directors constituting the Board shall be seven (7); provided, however, that the Board of Directors shall be authorized to increase the number of directors to not more than ten (10).
> Amend. Comp. at 19.

> FN5. Specifically, the Board approved the following resolution:
> BE IT HEREBY RESOLVED, that Andrew Cohen be responsible for the running of the operations of all of the divisions of the Company, and all division heads report to him; that Jay Balaban be delegated the responsibility of (i) operating a new "private label" division of the Company, (ii) continuing to operate the Company's Jazz Sport division and (iii) continuing to deal with certain customers designated by the Company's Chief Executive Officer.
> *Id.* at 22.

Balaban was removed from his duties as an employee of Chorus "for cause" at a February 26 Board meeting. Balaban contested the Board's decision and threatened litigation. In order to avoid litigation, on or about May 25, 1999, Chorus, LLCP and Balaban entered into a stock purchase agreement. Pursuant to the stock purchase agreement, LLCP agreed to purchase 90% of Balaban's Chorus shares. After this purchase, LLCP (through its control of Fund I) controlled approximately 65% of Chorus's voting stock, and with ING (if ING executed the warrants it received

from Chorus in connection with the various loan agreements) controlled approximately 76% of the shares of Chorus's voting stock.

Balaban refused to sell the remaining 10% of his shares to LLCP because he did not want to give absolute control of the corporation, and its capital structure, to LLCP.[FN6] Rather, Balaban sold his remaining 10% to Sacks. As a result, Steinman and Sacks, voting as a block, collectively controlled more than 20% of Chorus's voting stock. Accordingly, LLCP did not have the authority to cause Chorus to amend or alter its capitalization without the approval of either Sacks or Steinman.

> FN6. Article TENTH of Chorus's Certificate of Incorporation contained a super-majority provision that provided, that without the "affirmative vote of the holders of at least eighty percent (80%) of the voting power of all the stock of [Chorus]," the Board did not have the authority to amend or alter the capitalization of Chorus. *Id.* at 24.

On June 21, 1999, the Board approved a merger between Chorus and S.S.B., Inc., a wholly owned subsidiary of Chorus. On August 8, 1999, Cohen filed with the Delaware Secretary of State a certificate of merger related to the S.S.B. transaction.

### D. *Chorus Pays Part Of Its Debt*

On September 30, 1999, Chorus provided August 1999 financial statements to its stockholders, which disclosed that during March 1999 Chorus paid $3,000,000 to LLCP (through Fund I) and ING in repayment of a portion of the Term A Note. Chorus also informed its stockholders that another payment of $1,500,000 was made to LLCP (through Fund I) and ING on August 31, 1999, in repayment of an additional portion of the Term A Note:
**\*6** While the Company's excess cash flow allowed for repayment of approximately $2.6M other restraints as they applied to minimum availability giving effect to repayment allowed the Company to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 6

Not Reported in A.2d, 2002 WL 31761252 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

only repay $1.5M on August 31, 1999. The maturity date of the remaining $4.5M of short term debt ... has been extended to November 2001. The Company will continue to make annual payments against the debt remaining based on excess cash flow calculations.

Furthermore, in a "Certificate of Compliance" accompanying the August 1999 financial statements, Chorus disclosed that "no Event of Default has occurred or is continuing under any working capital or other arrangement to which the Company is a party, nor has the Company received any notice of cancellation with respect to its insurance policies."

### E. *LLCP And ING Declare An Event Of Default*

On December 3, 1999, ING, LLCP and Fund I entered into an agreement appointing Fund I as ING's agent and permitting LLCP (through its control of Fund I) to exercise ING's rights (including voting rights) in connection with the 1997 Pledge Agreement. Also, on December 3, 1999, Fund I (at the direction of LLCP) forwarded a notice to Steinman, informing him that Chorus was in default of the March 1998 Agreement. Specifically, in a letter addressed to Chorus, Sacks and Steinman, LLCP (through Fund I) stated that " [y]ou are hereby notified that by [Chorus's] failure to observe the [various financial] covenants" set forth in the March 1998 Agreement with LLCP (through Fund I) and ING, an "Event of Default occurred and is continuing." [FN7] Such an "Event of Default" allowed ING to enforce its rights under the 1997 Pledge Agreement, including the right to vote the shares of Chorus stock owned by Sacks and Steinman. LLCP (through Fund I) notified Chorus, Sacks and Steinman that "all rights of [Sacks and Steinman] to exercise the voting rights with respect to their respective shares of common stock of [Chorus] shall hereby cease, and such rights are hereupon vested in" ING.[FN8]

FN7. *Id.* at 29.

FN8. *Id.*

In response to the notice that an Event of Default had occurred, on December 7, 1999 Steinman's attorneys forwarded a letter to Chorus's attorneys expressing surprise that an Event of Default occurred, and stated:
We note that prior to the December 3 LLCP letter (which our client did not receive until December 4) our client had not received any notice or communication of any kind from [Chorus] or any of its lenders regarding [Chorus's] alleged financial distress. We also note that the LLCP does not identify the alleged Event of Default with any particularity. The lack of any prior notice or communication to our client as well as this lack of specificity leads us to question the severity of [Chorus's] financial position as claimed by LLCP. If in fact [Chorus] has been in material breach of its various credit facilities for some time, then we believe that it was incumbent upon [Chorus] to have called a shareholders' meeting to address the matter.[FN9]

FN9. *Id.* at 30.

**\*7** On December 7, 1999, Cohen responded to Steinman's letter, and notified him for the first time that Chorus was experiencing significant financial difficulties that negatively affected Chorus's business:
[Chorus] has been in default to ... ING and LLCP since June 30, 1999 as a result of the difficult conditions that are currently present in the dress market. I also expect [Chorus] to be in default for the quarter ended December 31. As a result of these defaults, Heller Financial, [Chorus's] working capital lender, has refused to permit [Chorus] to full access of its overadvance facility. This has caused a liquidity crises at [Chorus] which is so severe that [Chorus] may not be able to meet its payroll on Friday December 10, 1999. In such a circumstance [Chorus] will have no choice but to file bankruptcy in which case your shares will be worthless.[FN10]

FN10. *Id.* at 30-31.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 7

Not Reported in A.2d, 2002 WL 31761252 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Cohen also sent along with the letter, a memorandum dated December 1, 1999, which was prepared for the Board by Cohen, that stated " [d]espite [Chorus's] ability to manage its working capital through smaller, more timely inventory, its poor sales performance in 1999 has caused violations of its financial covenants for the second and third quarter.... It is further projected that [Chorus] will be in violation of its fourth quarter 1999 financial covenants." [FN11] The memorandum further provided:

> FN11. *Id.* at 31.

In the declining sales and gross profit scenario that has been outlined above the Company was able to improve its use of working capital and reduce its long term debt through provisions of its working capital facility by \$4.5M in 1999. This repayment represents the first debt repayment from operations to be repaid since November 1997.[FN12]

> FN12. *Id.*

As was stated by LLCP (through Fund I) in the December 3, 1999 notice forwarded to Steinman, Fund I, individually and as agent of ING, voted the shares of Chorus stock owned by Sacks and Steinman. Specifically, on December 4, 1999, Fund I executed a written consent of the Chorus stockholders unanimously approving an amendment to Chorus's Certificate of Incorporation. The amendment increased the number of authorized shares and created a class of preferred stock. The amendment also altered the requirements for calling a special meeting of Chorus stockholders. On December 6, 1999, Fund I executed a written consent of the Chorus stockholders unanimously amending the capitalization of Chorus by creating a Series B redeemable and convertible preferred stock.

#### F. *Subsequent Events*

On or about November 14, 2000, three unsecured creditors of Chorus forced Chorus into an involuntary liquidation under Chapter 7 of the Bankruptcy Code. The involuntary liquidation under Chapter 7 was subsequently converted into a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The bankruptcy proceeding is still pending.

Finally, and significantly, on August 19, 1999, Steinman filed a complaint in the Superior Court of the State of California alleging that Chorus breached various provisions of the Separation Agreement discussed above. It is undisputed that Steinman filed his complaint, litigated and obtained a \$250,000 judgment against Chorus based on the occurrence of the exact same Event of Default that he now claims did not occur.[FN13] Due to Chorus's solvency issues the judgment remains unpaid.

> FN13. *See Steinman v. Chorus Line Corp.,* Reyburn Aff. Ex. E, at p. 1 (accepting Steinman's Statement of Undisputed Facts number 7 that "An Event of Default occurred by no later than September 30, 1999").

#### III.

**\*8** Steinman filed his complaint against the defendants on September 17, 2001. An amended complaint was filed on February 22, 2002. Steinman's amended complaint contains essentially two arguments. First, it alleges that "in connection with the manipulation of the loan and pledge agreements, the Chorus Defendants claimed a default of the March 1998 Agreement although no such Default occurred." [FN14] Second, the amended complaint alternatively alleges that Chorus was actually in default, but that "the Chorus Defendants engineered such default by causing Chorus to make principal payments to Fund I and ING in the amount of \$4,500,000 in accordance with the March 1998 Agreement." [FN15] According to Steinman, all the acts complained of were due to the "motivation of the Chorus Defendants to orchestrate such a scheme ... [because] LLCP (through its control of Fund I) initially wanted majority control of Chorus, and ultimately, wanted complete control of Chorus...." [FN16]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 8

Not Reported in A.2d, 2002 WL 31761252 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN14. Amend. Comp. at 38.

FN15. *Id.* at 39.

FN16. *Id.*

Count I of the amended complaint alleges a breach of the fiduciary duty of loyalty against certain Chorus directors as well as against Chorus's controlling stockholders. Specifically, Count I alleges a breach of the duty of loyalty with respect to Levine, Mickelson, Cohen, and Adeshak as directors. It also alleges a breach of the duty of loyalty against Fund I and LLCP as controlling stockholders. Count II alleges a breach of the duty of disclosure against Levine, Mickelson, Cohen and Adeshak as directors. Count III alleges ING aided and abetted the alleged breaches of fiduciary duty mentioned above. Count IV alleges common law fraud by LLCP, Fund I and ING to deprive Steinman of his equity interest in Chorus. Finally, Count V alleges negligent misrepresentation by Levine, Cohen, Mickelson, Adeshak, LLCP, and Fund I for failure to disclose certain material information.

On March 8, 2002, the defendants moved to dismiss all counts in the amended complaint for lack of personal jurisdiction with respect to LLCP and Fund I, as well as for failure to state a claim upon which relief can be granted with respect to all defendants.

IV.

A. *Personal Jurisdiction Standard Of Review*

When personal jurisdiction is challenged by a motion to dismiss pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the nonresident defendant. [FN17] Generally, the court will engage in a two-step analysis: first determining whether service of process on the nonresident is authorized by statute; and, second, considering whether the exercise of jurisdiction is, in the circumstances presented,

consistent with due process.[FN18]

FN17. *See Plummer & Co. Realtors v. Crisafi,* 533 A.2d 1242, 1244 (Del.Super.1987); *see also Finkbiner v. Mullins,* 532 A.2d 609, 617 (Del.Super.1987) (on a 12(b)(2) motion, " [t]he burden is on the plaintiff to make a specific showing that this Court has jurisdiction under a long-arm statute") (citing *Greenly v. Davis,* 486 A.2d 669 (Del.1984)).

FN18. *LaNuova D & B, S.P.A. v. Bowe Co.,* 513 A.2d 764, 768-69 (Del.1986).

B. *Rule 12(b)(6) Standard Of Review*

When considering a motion to dismiss a complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted, the court is to assume the truthfulness of all well-pleaded allegations of fact in the complaint. [FN19] Although "all facts of the pleadings and reasonable inferences to be drawn therefrom are accepted as true ... neither inferences nor conclusions of fact unsupported by allegations of specific facts ... are accepted as true." [FN20] That is, "[a] trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in Plaintiffs' favor unless they are reasonable inferences." [FN21] Additionally, the court may consider, for certain limited purposes, the content of documents that are integral to or are incorporated by reference into the complaint.[FN22] For example, the court will take judicial notice of the various loan agreements and the Separation Agreement in assessing the merits of the claims asserted against the defendants. Under Rule 12(b)(6), a complaint may, despite allegations to the contrary, be dismissed where the unambiguous language of documents upon which the claims are based contradict the complaint's allegations.[FN23]

FN19. *Grobow v. Perot,* 539 A.2d 180, 187 & n. 6 (Del.1988).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 9

Not Reported in A.2d, 2002 WL 31761252 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN20. *Id.*

FN21. *Id.*

FN22. *See In re Santa Fe Pac. Corp. S'holders Litig.,* 669 A.2d 59, 69-70 (Del.1995).

FN23. *See In re Wheelabrator Tech's, Inc. S'holders Litig.,* 1992 WL 212595 at *3 (Del.Ch. Sept.1, 1992) ("the Court is hardly bound to accept as true a demonstrable mischaracterization and the erroneous allegations that flow from it"); *See also Malpiede v. Townson,* 780 A.2d 1075, 1083 (Del.2001) ("a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law").

V.

A. *The Amended Complaint Must Be Dismissed Against LLCP And Fund I Because Delaware's Long-Arm Statute And Due Process Requirements Do Not Permit This Court To Exercise Jurisdiction Over These Entities*

**\*9** The court must first consider the defendants' motion to dismiss for lack of personal jurisdiction pursuant to Court of Chancery Rule 12(b)(2) before reaching the merits of their motion to dismiss under Court of Chancery Rule 12(b)(6).[FN24] LLCP and Fund I are both California entities, organized under the laws of the State of California, and are thus both nonresidents of Delaware. A two-step analysis is required to determine whether personal jurisdiction may be exercised over a nonresident defendant.[FN25] First, the court must consider whether Delaware's long-arm statute for service of process on nonresident defendants is applicable.[FN26] Second, the court must determine whether subjecting nonresident defendants to jurisdiction in Delaware violates the Due Process Clause of the Fourteenth Amendment.[FN27]

FN24. *See Branson v. Exide Elecs. Corp.,* 625 A.2d 267, 268-69 (Del.1993).

FN25. *See* note 18, *supra.*

FN26. *Id.*

FN27. *Id.*

1. *The Amended Complaint Fails To Provide A Statutory Basis Under Delaware's Long-Arm Statute For Asserting Personal Jurisdiction Over LLCP And Fund I*

Steinman alleges this court has personal jurisdiction over LLCP and Fund I based on an application of Section 3104(c)(1) of Delaware's long-arm statute. [FN28] Essentially, Steinman argues that "Levine and Mickelson ... in their capacity as directors of Chorus were agents of LLCP and Fund I." [FN29] Any acts that Levine and Mickelson undertook as directors of Chorus, the argument goes, were acts that should be attributed to LLCP and Fund I for purposes of establishing personal jurisdiction. Steinman claims certain events "affected Chorus and/or occurred within Delaware." [FN30] None of these acts, however, are sufficient to satisfy the requirements of 10 *Del. C.* § 3104(c)(1), and only two of the acts described actually occurred in Delaware.

FN28. The relevant portion of Delaware's general long-arm statute, 10 *Del. C.* § 3104(c), provides as follows:
As to a cause of action brought by a person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-resident, or his personal representative, who in person or through an agent: * * * (1) Transacts any business or performs any character of work or service in this state....

FN29. Pl. Ans. Br. at 27.

FN30. *Id.*

The first act that occurred in Delaware upon which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 10

Not Reported in A.2d, 2002 WL 31761252 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Steinman relies is Cohen's filing in August 1999, a certificate of merger with the Delaware Secretary of State regarding Chorus's merger with wholly owned subsidiary S.S.B. The second event that occurred in Delaware is Cohen's filing in December 1999 with the Secretary of State, an amendment to Chorus's certificate of incorporation increasing the number of authorized shares, creating a class of preferred stock, and altering the requirements for calling special meetings.[FN31] These acts are insufficient to satisfy 10 *Del. C.* § 3104(c)(1) because neither of the acts relate to Steinman's causes of action, namely breaches of fiduciary duties, fraud and negligent misrepresentation related to loan and pledge agreements executed between Steinman and certain defendants.

> FN31. Steinman claims that the December 1999 amendment was necessary for Chorus to consummate a June 2000 merger with California Fashions. This allegation, however, is irrelevant under Delaware's long-arm statute because Steinman does not challenge or assert any claims related to the June 2000 merger.

Steinman next argues that, "[u]nder Delaware law, a party that has not acted in or caused an effect within Delaware" may nonetheless be amenable to suit in Delaware under the conspiracy theory of jurisdiction.[FN32] To validly exercise jurisdiction under a conspiracy theory a court must find that a five-part test has been satisfied.[FN33] The test requires: (1) the existence of a conspiracy to defraud; (2) defendant must be a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occur in Delaware; (4) the defendant know or have reason to know of the act in Delaware or that acts outside Delaware would have an effect in Delaware; and (5) the act in or effect on Delaware is a direct and foreseeable result of the conduct in furtherance of the conspiracy.[FN34]

> FN32. Pl. Ans. Br. at 29.

> FN33. *See Istituto Bancario Italiano SpA*

*v. Hunter Eng'g. Co., Inc. .,* 449 A.2d 210, 225 (Del.1982).

> FN34. *See id.*

**\*10** Steinman concedes there is a question whether a substantial act or substantial effect in furtherance of the conspiracy occurred in Delaware.[FN35] He makes only the conclusory statement that, "upon examination of the conspiracy 'as a whole,' numerous actions occurred in furtherance of the conspiracy that affected Chorus and/or occurred in Delaware." [FN36] This reasoning fails for two reasons.

> FN35. Pl. Ans. Br. at 30.

> FN36. *Id.*

First, there is no allegation in the amended complaint of any "conspiracy," much less any alleged facts that support the unmentioned conspiracy theory. [FN37] Second, there is no allegation that a substantial act or substantial effect in furtherance of the conspiracy occurred in Delaware. The only reference in the amended complaint that has any relation to Delaware (by agent or otherwise) are two filings with the Secretary of State by Chorus, which are unrelated to Steinman's causes of action. Thus, Steinman has not satisfied the necessary elements of a jurisdiction by conspiracy argument, and this court cannot exercise personal jurisdiction over LLCP and Fund I based on such a theory.

> FN37. *Istituto,* 449 A.2d at 225. Steinman attempts to make some conclusory allegations that all of the actions complained of were part of some overarching attempt to wrest control of Chorus away from Steinman. These allegations are not enough to establish jurisdiction by conspiracy because none of those allegations relate to causes of action in the amended complaint. Steinman's amended complaint limits itself to actions related to the loan and pledge agreements,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 11

Not Reported in A.2d, 2002 WL 31761252 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

not an overarching plan to obtain control of Chorus.

### 2. The Exercise Of Personal Jurisdiction Over LLCP And Fund I Would Violate The Due Process Clause Of The United States Constitution

Fund I and LLCP do not have the requisite contacts with Delaware to allow this court to exercise personal jurisdiction consistent with due process. Due process in the exercise of personal jurisdiction requires a "minimum contacts" analysis, which seeks to determine the fairness of subjecting a nonresident defendant to suit in a distant forum by considering all of the connections among the defendant, the forum and the litigation.[FN38] The " minimum contacts" test protects a defendant against the burdens of litigating in a distant or inconvenient forum, and ensures that " 'the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." ' [FN39] A defendant's conduct and connection with the forum state should be such that she can reasonably anticipate being haled into court in her nonresident forum.[FN40]

FN38. *See International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Shaffer v. Heitner,* 433 U.S. 186, 212, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); *see also Sternberg v. O'Neil,* 550 A.2d 1105, 1116 (Del.1988).

FN39. *Newspan, Inc. v. Heathstone Funding Corp.,* 1994 WL 198721, at *5 (Del. Ch. May 10, 1994 (quoting *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

FN40. *Id.* A basic tenet of the due process analysis of a court's exercise of personal jurisdiction is whether the party "purposely availed" itself of the privilege of conducting activities within the forum state, thus, invoking the benefits and protections of its laws. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct.

2174, 85 L.Ed.2d 528 (1985) (This " purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person" ') (citations omitted).

LLCP and Fund I simply do not have enough contacts with Delaware to subject them to jurisdiction in this court. They have no office in Delaware. They do not conduct business in Delaware. They are not registered to do business in Delaware. Further, they have done no act in Delaware or any act outside of Delaware that has caused injury in this state. The loan agreements were signed in California. The pledge agreements were signed in California. Essentially every transaction in this lawsuit occurred in California.

The only connection to Delaware that Steinman alleges with respect to Fund I and LLCP is that they were controlling stockholders of Chorus, and that Chorus is a Delaware corporation. The general rule, however, is that ownership of stock in a Delaware corporation is not enough to satisfy the "minimum contacts" test that due process requires.[FN41] This allegation, therefore, is not sufficient to establish personal jurisdiction.

FN41. *Shaffer,* 433 U.S. 207-09.

**\*11** Finally, from a policy perspective, the State of Delaware does not have an interest in providing a forum for claims against Fund I and LLCP, where those claims involve events occurring out of state, caused no injury in Delaware, and involve a plaintiff and defendants who are not Delaware residents. Therefore, the court will dismiss Steinman's complaint against LLCP and Fund I for lack of personal jurisdiction.[FN42]

FN42. It should be noted that dismissal with respect to LLCP and Fund I makes Steinman's reliance on *Odyssey Partners, L.P. v. Fleming Cos., Inc.,* 1996 WL 422377 (Del.Ch. July 24, 1996),

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 12

Not Reported in A.2d, 2002 WL 31761252 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

inapplicable because none of the remaining defendants in the case occupy the position of being both a creditor and a fiduciary of Chorus. *Id.,* at *3-4.

B. *Steinman Is Estopped From Alleging That No " Event Of Default" Occurred*

The doctrine of collateral estoppel provides that a judgment in a prior suit " 'precludes the relitigation of a factual issue which was litigated and decided in the prior suit between the same parties or persons in privity with them." ' FN43 Also, the Delaware Supreme Court has stated, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." FN44 Finally, under the doctrine of judicial estoppel, " 'a party may be precluded from asserting in a legal proceeding, a position inconsistent with a position previously taken by him in the same or in an earlier legal proceeding." ' FN45

> FN43. *Kohls v. Kenetech Corp.,* 791 A.2d 763, 767 (Del.Ch.2000) (quoting *Foltz v. Pullman, Inc.,* 319 A.2d 38, 40 (Del.1974) ).

> FN44. *Hercules, Inc. v. AIU Ins. Co.,* 783 A.2d 1275, 1278 (Del.2000).

> FN45. *Seigman v. Palomar Med. Techs., Inc.,* 1998 WL 409352, at *2 (Del.Ch. July 13, 1998) (quoting *Coates Int'l, Ltd. v. DeMott,* 1994 WL 89018 at *5 (Del.Ch. Feb.4, 1994)).

Steinman obtained a $250,000 judgment in the California lawsuit based on his successful assertion that, as a matter of fact, an Event of Default occurred. Yet, in this court, Steinman's complaint seeks an additional recovery based on the factual assertion that the Event of Default did not occur. Because the remaining defendants in this case are sued in their capacities as directors of Chorus, they stand in privity with it for collateral estoppel purposes. Thus Steinman should be estopped from

relitigating the factual issues relating to the Event of Default. Indeed, Steinman makes no cogent argument as to why collateral estoppel does not bar his claims that depend on the contention that there was no Event of Default, apparently conceding the point.

With respect to judicial estoppel, Steinman does not dispute that he argued to the California court that an Event of Default occurred, and that the California court accepted that argument when it awarded a $250,000 judgment to him. FN46 Steinman's only response to this argument is that "Defendants did not change their position in this action" and cites *Norman v. Paco Pharm. Servs., Inc.*FN47 for the proposition that judicial estoppel requires detrimental reliance. This argument is not persuasive. First, the defendants suffered detriment as a result of Steinman's prior argument that there was an Event of Default. This is because Steinman obtained a judgment against Chorus and Chorus now has to deal with its implication in subsequent proceedings (including bankruptcy court). Second, more recent Delaware cases cite the elements of judicial estoppel similarly to *Siegman,* which does not require detrimental reliance.FN48 Finally, Steinman cites no case (and this court is aware of none) where a plaintiff obtains a judgment based on the assertion of the existence of a particular set of facts, and then is permitted by a second court to seek another judgment, against the same party and/or its privies, based on the exactly contradictory factual allegations. For all of these reasons, Steinman is estopped from arguing that no Event of Default occurred, and the court will dismiss all of his claims that depend on that factual assertion.

> FN46. *See Steinman v. Chorus Line Corp.,* Cal.Super. C.A. No. BC215508, Horwitz, J. (Oct. 3, 2000) (ORDER) at p. 5 of 9 ($250,000 judgment for Steinman under the Separation Agreement based on the holding that, "It is undisputed that LLCP voted Steinman's stock [on December 4, 1999]. This act constitutes the exercise by LLCP of 'any rights or remedies against any collateral security (including pledged stock) as a result of the occurrence of such

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                 Page 13

Not Reported in A.2d, 2002 WL 31761252 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Event of Default." ').

FN47. 1992 WL 301362, at *4 (Del.Ch. Oct.21, 1992).

FN48. *See Woodall v. Playtex Products, Inc.,* 2002 WL 749188, at *3 (Del.Super.Apr.26, 2002); *Steadfast Ins. Co. v. EON Labs Mfg. ., Inc.,* 1999 WL 743982, at *1 n. 6 (Del.Super.Aug.18, 1999).

### C. *Steinman's First Cause Of Action Must Be Dismissed*

#### 1. *Steinman's Duty Of Loyalty Claim Is Derivative And Must Be Dismissed Pursuant To Rule 23.1*

*12 Because, Steinman is precluded from asserting his claims relating to an Event of Default, his only claim remaining related to the duty of loyalty is a $4,500,000 payment made to Fund I and ING by Chorus pursuant to its loan agreements.[FN49] The defendants contend that such a claim is derivative in nature and must be dismissed due to Steinman's failure to comply with the demand and/or pleading requirements of Chancery Court Rule 23.1. Steinman argues his claim is individual because he eventually lost the value of his equity interest in Chorus. This argument is not persuasive, however, because it cannot be said that a loan payment made in accordance with a properly executed loan agreement results in an "individual" injury. Such an "individual" injury or loss is required to maintain an individual action under these circumstances. When Chorus repaid part of its debt obligation, the result was that every stockholder in the corporation was affected in the identical manner on a stock-for-stock basis. Thus, this type of claim falls squarely within the definition of a derivative action.[FN50]

FN49. To the extent Steinman alleges that the Defendant Directors breached their duty of loyalty by falsely claiming an Event of Default when no such default occurred, this allegation is precluded by the California litigation. *See* Section V:B, *supra.*

FN50. *See* Donald J. Wolfe, Jr. and Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 9-2[a]. p. 9-6 n. 18 (2001) (claims based on acts of waste or mismanagement arising from excessive payments of corporate assets or funds are derivative).

To maintain a derivative suit, a stockholder must allege either that the board rejected a demand that it assert the corporation's claim or allege with particularity why the stockholder was justified in not having made the effort to obtain board action. [FN51] Steinman has done neither. Because Steinman has not pled that demand was excused or that demand was wrongfully refused, his duty of loyalty claim must be dismissed.[FN52]

FN51. Ch. Ct. R. 23.1.

FN52. *See White v. Panic,* 783 A.2d 543, 550 (Del.2001) (affirming dismissal of plaintiff's complaint for failure to show that demand was excused); *Grimes v. Donald,* 673 A.2d 1207, 1219 (Del.1996) (dismissing derivative claim where demand was refused because the plaintiff failed to plead with particularity why the board's refusal to act on the derivative claims was wrongful).

#### 2. *Steinman Fails To State A Claim For Breach Of The Duty Of Loyalty*

Even were the court to consider the substantive nature of Steinman's duty of loyalty claim, it must fail as a matter of law. Steinman claims that when, pursuant to the March 1998 Agreement, Chorus made a $4,500,000 payment to ING and Fund I in August 1999, the Defendant Directors breached their duty of loyalty. Steinman alleges that this payment amounts to a breach of the duty of loyalty because it was a "self-dealing" transaction " approved by the Defendant Directors." [FN53] This argument is unavailing.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 14

Not Reported in A.2d, 2002 WL 31761252 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN53. Amend. Comp. at 39.

Steinman's duty of loyalty claim must fail because Chorus was merely paying money legally owed to ING and Fund I. Steinman does not claim that the $4,500,000 paid was not actually owed to Fund I and ING. He makes no claim for waste. He does not even claim that the repayment of the loan was not entirely fair.[FN54] Rather, Steinman claims that paying money legally owed was detrimental to stockholders because it transferred capital from Chorus to ING and Fund I.[FN55] Anytime a corporation pays a legal obligation, however, it may be argued that it decreases the value of stockholders' equity. Without more, there cannot be a cause of action for such a payment.[FN56]

FN54. *See Solomon v. Pathe Communications Corp.,* 1995 WL 250374, at *5 (Del.Ch. Apr.21, 1995) ("Even in a self-interested transaction in order to state a claim a shareholder must allege some facts that tend to show that the transaction was not fair"), *aff'd,* 672 A.2d 35 (Del.1996).

FN55. *See* Amend. Comp. at 39.

FN56. *See, e.g., Solomon,* 1995 WL 250374, at *5 ("Even if the consequences of that foreclosure [by creditor/stockholder] were, for example to render the value of the minority [ ] stock worthless, the secured creditor would have no obligation to forego or delay exercising its legal rights as a creditor. A controlling shareholder is not required to give up legal rights that it clearly possesses; this is certainly so when those legal rights arise in a non-stockholder capacity").

Finally, Steinman alleges that the $4,500,000 loan repayment "cause[d] Chorus to default on various provisions of the loan agreement." [FN57] However, Steinman has not alleged any facts to support such an allegation. In fact, Steinman's amended complaint essentially negates such an argument.[FN58] In that complaint, he quoted documents and

witnesses that stated the Event of Default was caused by "significant financial difficulties," [FN59] a "liquidity crisis," [FN60] and "significant financial difficulties that had a negative impact upon the fundamental business of Chorus," [FN61] and that Chorus has been in default "as a result of the difficult conditions that are currently present in the dress market." [FN62] In any event, there is a decided absurdity to Steinman's position because failure to make the payments would, itself, have resulted in default under the loan agreements. For all these reasons, therefore, this court will dismiss Steinman's duty of loyalty claim against the Defendant Directors.

FN57. Amend. Comp. at 39.

FN58. *See Malpiede,* 780 A.2d at 1083 ("a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law").

FN59. Amend. Comp. at 25.

FN60. *Id.*

FN61. *Id.* at 30.

FN62. *Id.*

D. *Steinman Has Failed To State A Claim For Breach Of The Fiduciary Duty Of Disclosure*

**\*13** The Delaware Supreme Court has held that claims for a breach of fiduciary duty of disclosure can only arise when the defendant has made statements to the corporation's stockholders in connection with a request for stockholder action. [FN63] A duty of disclosure claim that is based on a cause of action that occurs "without a request for stockholder action" does not properly state a claim for a breach of the fiduciary duty of disclosure. [FN64] It is undisputed that Steinman's disclosure claims arise in the absence of a request for stockholder action. Courts are willing, however, to allow a plaintiff to plead such arguments under the rubric of duty of loyalty. [FN65]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 15

Not Reported in A.2d, 2002 WL 31761252 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN63. *See Malone v. Brincat,* 722 A.2d 5, 10 (Del.1998) ("The duty of disclosure obligates directors to provide the stockholders with accurate and complete information material to a transaction or other corporate event that is being presented to them for action").

FN64. *Jackson Nat'l Life Ins. Co. v. Kennedy,* 741 A.2d 377, 389 (Del.Ch.1999) ("The duty of disclosure is merely a specific application of the more general fiduciary duty of loyalty that applies only in the setting of a transaction or other corporate event that is being presented to the stockholders for action").

FN65. *See id.,* at 390 ("Plaintiffs, who have sufficiently pleaded the claim and supporting facts that [defendant] owed [plaintiff] a fiduciary duty of loyalty, but have failed to establish the existence of a similar fiduciary duty of disclosure as a matter of law, shall have the opportunity to replead to assert an appropriate cause of action based upon a breach of the duty of loyalty").

Even if Steinman were allowed to replead his duty of disclosure claim as a duty of loyalty claim, the allegations in his amended complaint fail to state a claim upon which relief can be granted. To successfully state a duty of loyalty claim against directors for providing information in the absence of a request for stockholder action, a stockholder must allege he received "false communications" from directors who were "deliberately misinforming shareholders about the business of the corporation." [FN66] Steinman has failed to plead facts to satisfy this test.

FN66. *Malone,* 722 A.2d at 14; *see Jackson Nat'l Life Ins. Co.,* 741 A.2d at 389 (in the absence of a request for stockholder action, a duty of loyalty claim requires well pleaded allegations that directors "deliberately misinform[ed] stockholders through the dissemination of

false information").

Steinman alleges officers of Chorus forwarded a Certificate of Compliance to Chorus stockholders that provided (among other things) "no Event of Default has occurred or is continuing under any working capital or other arrangement to which [Chorus] is a party...." [FN67] Steinman's allegations do not satisfy the requirements of *Jackson National Life Ins. Co.* because they are not false communications from directors *who were deliberately misinforming shareholders.* This is especially true because the Certificates of Compliance were not prepared as disclosure documents intended for stockholder use. The Certificates of Compliance were actually detailed *contractual* obligations that Chorus owed to certain creditors pursuant to the various loan agreements it had executed. [FN68] Nothing obligated Chorus to supply these Certificates to its stockholders, and it cannot be said that they were prepared to deliberately misinform stockholders, when in reality they were never meant for stockholders at all.

FN67. Steinman also alleges that certain financial statements did not accurately reflect the deteriorating financial condition of Chorus. Yet, this allegation appears wholly conclusory. Steinman fails to point to a single flaw in the financial statements, other than to say that they never disclosed that an Event of Default occurred. Steinman fails to demonstrate where such disclosure should have appeared in the financial statements. Also, Steinman claims that the August 1999 financial statements he was provided stated that Chorus had satisfied its payment obligations. In fact, Chorus had satisfied its payment obligations. It had made all required payments up to that date. Steinman further alleges in his complaint that a statement made by Cohen on September 27, 1999 that Chorus was a solvent and viable corporation was false and misleading because Chorus had previously warranted that it was in default of certain loan covenants. This claim was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 16

**Not Reported in A.2d, 2002 WL 31761252 (Del.Ch.)**
**(Cite as: Not Reported in A.2d)**

refuted in defendant's opening brief, and Steinman failed to respond. Therefore, Steinman is deemed to have waived this aspect of his complaint. In any event, it should be noted that a company can be solvent and viable, yet still be in default of certain loan covenants.

FN68. It bears noting that nowhere in Steinman's amended complaint does he demonstrate how or why he relied on the disclosures provided in the Certificates of Compliance.

Finally, Steinman makes no allegations that he was not actually aware, or on notice, of the financial condition of Chorus. In fact, his complaint suggests that he was quite aware of what was going on or deliberately failed to avail himself of the tools at hand to find out. The Separation Agreement executed between Steinman and Chorus provided that Steinman "shall be granted access to all Company information and documentation that he may reasonably request." FN69 He apparently chose not to request any such information. Furthermore, Sacks, Steinman's co-founder, friend, fellow stockholder, and fellow pledgor was an independent director on the Chorus Board during all relevant times. Also, pursuant to the Pledge Agreement Steinman executed, he warranted that he "has adequate means to obtain information" from Chorus and that it is his "responsibility for being informed of the financial condition" of Chorus.FN70 For all these reasons, this court will dismiss Steinman's second cause of action.

FN69. Reyburn Aff. Ex. A.

FN70. Amend. Comp., Ex. B § 14(d).

*E. Steinman Has Failed To State A Claim Against ING For Aiding And Abetting Breaches Of Fiduciary Duties By The Director Defendants*

**\*14** In Count III of his amended complaint, Steinman alleges that ING aided and abetted the alleged breach of the duty of loyalty by the Director Defendants. The elements that Steinman must allege

to adequately plead an aiding and abetting claim are clear. Steinman must plead facts that support (1) the existence of a fiduciary relationship, (2) a breach of duty by the fiduciary, (3) ING's knowing participation in the breach, and (4) damages resulting from the concerting action of the fiduciary and ING.FN71 Steinman has not satisfied this standard. Specifically, as discussed above, this court has found no breaches of fiduciary duty.FN72 This finding is fatal to Steinman's aiding and abetting claim. Therefore, the court will dismiss Count III of Steinman's amended complaint.

FN71. *Malpiede,* 780 A.2d at 1096; *Goodwin v. Live Entm't, Inc.,* 1999 WL 64265, at \*28 (Del.Ch. Jan.25, 1999), *aff'd,* 741 A.2d 16 (Del.1999) (TABLE).

FN72. *See* Section V:C and V:D, *supra.*

*F. Steinman Has Failed To State A Claim For Common Law Fraud Or Negligent Representation Against The Defendant Directors Or ING*

1. *Common Law Fraud*

To state a cause of action for common law fraud under Delaware law, a plaintiff must allege (1) a false representation made by the defendant, (2) the defendant's knowledge of the falsity of the representation or reckless disregard for the truth, (3) the defendant's intent to induce the plaintiff to act or refrain from acting, (4) the plaintiff's justifiable reliance upon the representation, and (5) damage to the plaintiff as a result of such reliance. FN73 Further, when a complaint alleges fraud, "the circumstances constituting fraud ... [must] be stated with particularity." FN74 Without pleading such particularity, those claims will be dismissed.FN75 Steinman has failed to adequately allege his claim of fraud with particularity.

FN73. *See Parfi Holding AB v. Mirror Image Internet, Inc.,* 794 A.2d 1211, 1234 (Del.Ch.2001); *see also Stephenson v. Capano Dev. Inc.,* 462 A.2d 1069, 1074

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 17

Not Reported in A.2d, 2002 WL 31761252 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

(Del.1983).

FN74. Ct. Ch. R. 9(b).

FN75. *See Brown v. Robb,* 583 A.2d 949, 955 (Del.1990) (affirming lower court dismissal of complaint that failed to allege any factual bases to support a claim for fraud).

Steinman has only asserted fraud with respect to LLCP, Fund I and ING. As discussed in Section V:A, this court lacks personal jurisdiction over LLCP and Fund I to decide this claim. As to ING, Steinman only asserts:

ING intentionally disclosed misleading information and failed to disclose other material information to plaintiff, which resulted in plaintiff (in justifiable reliance upon such misleading information) failing to take reasonable action in connection with his investment in Chorus.

As a result of the unlawful conduct of ... ING, plaintiff unlawfully was deprived of his equity interest in Chorus for no consideration. Accordingly, as a result of the unlawful conduct of ... ING, plaintiff realized actual damages. [FN76]

FN76. Amend. Comp. at 43-44.

This allegation does not satisfy the strenuous pleading requirements that must be alleged when asserting fraud as a cause of action. Specifically, "a well pleaded fraud allegation must include at least ' the time, place and contents of the false representations ... and what [was] obtained thereby." ' [FN77] Steinman's fraud allegation has simply mirrored the language of the necessary fraud elements. Steinman's amended complaint contains no facts to support his conclusory allegations, as to the time, place or contents of the false representations. In fact he has failed to state what the false representations actually were. Therefore, the court will dismiss Count IV of Steinman's complaint against ING for failure to state a claim upon which relief can be granted.

FN77. *Crescent/Mach I Partners, L.P. v. Turner,* 2000 WL 1481002, at *18 (Del.Ch. Sep.29, 2000) (quotation omitted).

2. *Negligent Misrepresentation*

**\*15** Steinman has alleged a cause of action for negligent misrepresentation against all of the LLCP, Fund I and the Director Defendants. Since this court lacks personal jurisdiction over LLCP and Fund I, the court must only analyze this cause of action with respect to the Defendant Directors. To successfully assert a claim for negligent misrepresentation Steinman must adequately plead that (1) the defendant had a pecuniary duty to provide accurate information, (2) the defendant supplied false information, (3) the defendant failed to exercise reasonable care in obtaining or communicating the information, and (4) the plaintiff suffered a pecuniary loss caused by justifiable reliance upon the false information.[FN78] Steinman has failed to adequately plead facts supporting his claim of negligent misrepresentation.

FN78. *Sanders v. Devine,* 1997 WL 599539, at *6-7 (Del.Ch. Sept.24, 1997) (citing *Wolf v. Magness Constr. Co.,* 1995 WL 571896 (Del.Ch. Sept.11, 1995), *aff'd,* 676 A.2d 905 (Del.1996) (TABLE)).

Steinman has failed to demonstrate that the Defendant Directors had a pecuniary duty to provide information. Such a duty would have to be found in the various loan agreements or in the Pledge Agreement but, as discussed earlier, no affirmative duty to provide information existed. In fact, the Pledge Agreement specifically provided that Steinman was given the affirmative responsibility to keep informed of Chorus's financial condition.[FN79]

FN79. *See* Amend. Comp. Ex. B. § 14(d) (Steinman agrees that he "has adequate means to obtain information" from Chorus, that it is his "responsibility for being and keeping informed of the financial condition " of Chorus, and that he waives any duty

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 18

Not Reported in A.2d, 2002 WL 31761252 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

on the part of LLCP to disclose any information regarding Chorus); *see also* Section V:D, *supra.*

Another flaw in Steinman's complaint is his failure to assert with any specificity what false documents or false statements he relied upon in connection with his alleged injury or who produced them. Rather, Steinman only references certain "financial statements and other documents that contained material misrepresentations...." [FN80] Steinman does not even identify misrepresentations made by any particular individuals. He simply lumps all the Director Defendants together in this cause of action. Steinman is required to identify specific acts of individual defendants for his negligent misrepresentation claim to survive.[FN81] He has failed to do so. Therefore, this court will dismiss Steinman's negligent misrepresentation cause of action for failure to state a claim upon which relief can be granted.

FN80. Amend. Comp. at 44.

FN81. *See, e.g.,* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1248 (1990) ("in order to state a claim for relief, actions brought against multiple defendants must clearly specify the claims with which each particular defendants is charged"); *J. Royal Parker Assocs., Inc. v. Parco Brown & Root, Inc.,* 1984 WL 8255, at *5 (Del.Ch. Nov.30, 1984) (action against defendant parent corporation dismissed because plaintiff only alleged facts related to defendant subsidiary's tortious conduct).

VI.

For the foregoing reasons, the motion to dismiss for lack of personal jurisdiction is GRANTED as to LLCP and Fund I. The motion to dismiss for failure to state a claim is GRANTED as to Arthur Levine, Mark Mickelson, Andrew Cohen, Carol Adeshak, and ING. IT IS SO ORDERED.

Del.Ch.,2002.

Steinman v. Levine
Not Reported in A.2d, 2002 WL 31761252 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                       Page 1

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

C

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
TELCORDIA TECHNOLOGIES, INC., Plaintiff,
v.
ALCATEL S.A. and Alcatel USA, Inc., Defendants.
**No. Civ.A. 04-874 GMS.**

May 27, 2005.

Steven J. Balick, John G. Day, Ashby & Geddes, Wilmington, DE, for Plaintiff.
Josy W. Ingersoll, Young, Conaway, Stargatt & Taylor, Kevin M. Baird, Connolly Bove Lodge & Hutz, Wilmington, DE, for Defendants.

*MEMORANDUM*
SLEET, J.

### I. INTRODUCTION

**\*1** On July 16, 2004, the plaintiff, Telcordia Technologies, Inc. ("Telcordia"), filed this patent infringement action against Alcatel S.A. ("Alcatel S.A.") and Alcatel USA, Inc. ("Alcatel USA"). Presently before the court is Alcatel S.A.'s motion to dismiss for lack of personal jurisdiction. For the following reasons, the court will grant the motion.

### II. BACKGROUND

Alcatel S.A. is a French corporation with its principal place of business in Paris, France. Alcatel S.A. is the parent company of Alcatel USA, a Delaware corporation with its principal place of business in Plano, Texas. (D.I. 18 Ex. 2 ¶¶ 2-3.) It is a holding company that does not manufacture, sell, advertise, offer to sell, trade or import any goods or services in the United States or anywhere in the world. (*Id.* ¶¶ 3-5.) It does not maintain any offices or other facilities in Delaware, or the

United States. (*Id.* ¶ 7.) It neither owns nor leases any real property in Delaware or the United States, but it does own United States patents. (*Id.* ¶ 8.) Alcatel S.A. does not maintain any bank accounts in Delaware and has never contracted to supply services or things in Delaware or the United States. (*Id.* ¶¶ 9-10.)

Telcordia, a Delaware Corporation with its principal place of business in Piscataway, New Jersey, is the assignee and owner of the patent-in-suit, U.S. Patent No. 4,893,306 (the " '306 patent").[FN1] The '306 patent relates to a method and apparatus for multiplexing circuit and packet traffic. The patent discloses a data transmission technique, or Dynamic Time Division Multiplexing ("DTDM"), that is compatible with the digital circuit transmission format, as well as the packet transmission format, thereby providing "a flexible migration strategy between present circuit networks and future broadband packet networks." (U.S. Patent No. 4,893,306 Abstract.) The complaint alleges that Alcatel S.A. and Alcatel USA have infringed, induced infringement of, and/or contributorily infringed one or more claims of the '306 patent by making, using, offering for sale, selling and/or importing into the United States communication network products embodying the patented invention. (D.I. 1 ¶¶ 13-14.)

> FN1. The '306 patent was issued on January 9, 1990 and assigned to Bell Communications Research, Inc. ("Bellcore "), which became Telcordia in 1999.

### III. STANDARD OF REVIEW

Alcatel S.A. moves to dismiss the complaint for lack of personal jurisdiction over the defendant. " Rule 12(b)(2) of the Federal Rules of Civil Procedure requires a court to dismiss a case when the court lacks personal jurisdiction over the defendant[ ]." *E.I. DuPont de Nemours & Co. v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 2

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

*Rhodia Fiber & Resin Intermediates,* 197 F.R.D. 112, 119 (D.Del.2000). In determining whether personal jurisdiction exists, courts engage in a two step analysis. First, the court must decide whether jurisdiction is authorized by the long-arm statute of the state in which the court sits. *Transportes Aeros de Angola v. Ronair, Inc.,* 544 F.Supp. 864-65 (D.Del.1982). If jurisdiction is proper per the long-arm statute, the court must then determine whether exercising jurisdiction comports with the requirements of the Due Process Clause of the Fourteenth Amendment. *Id.* (noting, however, " intent of the legislature to exercise jurisdiction over non-residents whenever feasible"); *Compaq Computer Corp. v. Packard Bell Elec., Inc.,* 948 F.Supp. 338, 342 (D.Del.1996) (citation omitted). To satisfy the second prong of this analysis, the court must find the existence of "minimum contacts" between the defendant and the forum state, "such that the maintenance of the suit does not offend ' traditional notions of fair play and substantial justice." ' *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citation omitted). Specifically, Telcordia must show that Alcatel S.A. "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)); *see also Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 108-09, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Unless the contacts are continuous and systematic, they must be related to the present cause of action. *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414-15, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

**\*2** In determining the jurisdictional question, the court must accept as true the allegations in the complaint. *Altech Indus., Inc. v. Al Tech Specialty Steel Corp.,* 542 F.Supp. 53, 55 (D.Del.1982). However, Telcordia, the plaintiff, bears the burden of alleging facts sufficient to make a *prima facie* showing of personal jurisdiction over Alcatel S.A. *ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.,* 147 F.Supp.2d 268, 270-71 (D.Del.2001). To meet this burden, Telcordia must adduce facts which " 'establish with reasonable

particularity" ' that jurisdiction over Alcatel S.A. exists. *Id.* (quoting *Joint Stock Soc'y v. Heublein, Inc.,* 936 F.Supp. 177, 193 (D.Del.1996)).

IV. DISCUSSION

A. Delaware's Long-Arm Statute

The first step in the court's analysis is to determine whether any of the provisions of Delaware's long-arm statute, Del.Code Ann. tit. 10 § 3104, warrant the exercise of jurisdiction over Alcatel S.A. Alcatel S.A. contends that the court has no basis to assert jurisdiction, while Telcordia maintains that the conduct of Alcatel S.A. satisfies the requirements of subsections (c)(1) and (c)(3) of the long-arm statute.

Under subsection (c)(1), the court may exercise jurisdiction over a nonresident or agent of a nonresident who "transacts any business or performs any character of work or service in the State." Del.Code Ann. tit. 10 § 3104(c)(1). Subsection (c)(3) gives the court the authority to exercise jurisdiction over a nonresident or agent of a nonresident who "causes tortious injury in the State by an act or omission in this State." Del.Code Ann. tit. 10 § 3104(c)(3). Delaware courts construe the long-arm statute broadly to confer jurisdiction to the maximum extent possible so as to "provide residents a means of redress against those not subject to personal service within the state." *Boone v. Oy Partek Ab,* 724 A.2d 1150, 1156-57 (Del.Super.1997). The Delaware Supreme Court has interpreted subsections (c)(1) and (c)(3) as specific jurisdiction provisions that require a "nexus " between the plaintiff's cause of action and the conduct of the defendant that is used as a basis for jurisdiction. *See LaNuova D & B, S.p.A. v. Bowe Co.,* 513 A.2d 764, 768 (Del.1986). In order to meet the requirements of subsections (c)(1) and (c)(3), Alcatel S.A.'s actions must be directed at residents of Delaware and the protection of Delaware laws. *Thorn EMI N. Am. Inc. v. Micron Tech., Inc.,* 821 F.Supp. 272, 274 (D.Del.1993).

Telcordia asserts that the court should exercise

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

jurisdiction under § 3104(c)(1) and/or (c)(3) because Alcatel S.A.'s contacts with Delaware are attributable to its subsidiary, Alcatel USA, under the principles of agency. [FN2] The principles of agency allow a court to establish jurisdiction over the parent based upon its jurisdiction over a subsidiary. Under the agency theory, "the court may attribute the actions of a subsidiary company to its parent where the subsidiary acts on the parent's behalf or at the parent's direction." *C.R. Bard Inc. v. Guidant Corp.,* 997 F.Supp. 556, 559 (D.Del.1998) (citing *Mobil Oil Corp. v. Linear Films, Inc.,* 718 F.Supp. 260, 266 (D.Del.1989)). Thus, the agency theory "examines the degree of control which the parent exercises over the subsidiary." *Applied Biosystems, Inc. v. Cruachem, Ltd.,* 772 F.Supp. 1458, 1463 (D.Del.1991). The factors relevant to the court's examination include: (1) "the extent of overlap of officers and directors"; (2) "methods of financing"; (3) "the division of responsibility for day-to-day management"; and (4) "the process by which each corporation obtains its business. No one factor is either necessary or determinative; rather it is the specific combination of elements which is significant." *Id.* If the court determines that an agency relationship exists, it may attribute certain actions of the subsidiary, Alcatel USA, to the parent corporation, Alcatel S.A., in assessing whether Telcordia has satisfied the requirements of the long-arm statute. *See id.* However, the mere existence of an agency relationship is not sufficient to confer jurisdiction. The court must still apply the Delaware long-arm statute. *See id.* at 1455 ("[A] finding of agency does not render the long-arm statute inapplicable, but simply implicates its 'or through an agent' provision.")

> FN2. Delaware law provides two theories that allow a court to exercise jurisdiction over a parent corporation based on its jurisdiction over a subsidiary: the alter ego theory and the agency theory. *Applied Biosystems, Inc. v. Cruachem, Ltd.,* 772 F.Supp. 1458, 1463 (D.Del.1991). Under the alter ego theory, the party showing jurisdiction must show fraud or inequity in the use of the corporate form for a court to "pierce the corporate veil," or attribute the

actions of a subsidiary to the parent corporation. *Id.; see Mobile Oil Corp. v. Linear Films, Inc.,* 718 F.Supp. 260, 266 (D.Del.1989). Telcordia has neither asserted the existence of any fraud in the corporate structure of Alcatel S.A. and Alcatel USA nor introduced evidence that would support a finding of fraud. Accordingly, the court will not address this jurisdictional theory.

**\*3** Telcordia contends that Alcatel S.A. should be subject to jurisdiction under the agency theory because "Alcatel S.A. and Alcatel USA are closely knit together, effectively operating as one." (D.I. 20, at 10.) Telcordia alleges the following to support its contention of an agency theory of jurisdiction: (1) Alcatel S.A. makes it abundantly clear that the United States market is very important to it and raises funds in the United States; (2) it owns patents, *i.e.* property, in the United States; (3) it fails to distinguish among its multinational subsidiaries-that is, it consolidates descriptions of its activities with those of its subsidiaries; (4) it chose to incorporate Alcatel USA in Delaware; (5) its Senior Vice President, Mike Quigley ("Quigley" ) is the CEO of Alcatel USA; and (6) its website solicits requests for information concerning its products, including allegedly infringing products from Delaware residents. (*Id.* at 3-5, 10.) Telcordia further contends that, "at the very least," Alcatel USA has offered to sell in Delaware products accused of infringing the '306 patent and, therefore, transacts business in the state. In addition, because Alcatel USA committed these acts as Alcatel S.A.'s agent, they are attributable to Alcatel S.A. (D.I. 20, at 10.)

Before the court can determine whether it should attribute Alcatel USA's alleged acts in Delaware to Alcatel S.A., it must determine whether an agency relationship exists between the two corporations. As previously stated, in order to make this determination, the court must consider the extent of overlap of officers and directors between Alcatel USA and Alcatel S.A., the methods of financing with respect to the two corporations, the division of responsibility for day-to-day management between the two, and the process by which each corporation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

obtains its business. After having considered these factors, the court concludes that Telcordia has not ca rried its burden. As to the first factor, Telcordia points to one overlap in officers between the two corporations: Quigley is Senior Executive Vice President of Alcatel S.A. and CEO of Alcatel USA. According to Alcatel S.A., there is a second overlap between the two corporations: its President and COO, Philippe Germond, is a member of the Board of Directors of Alcatel USA. (D.I. 23, at 3; D.I. 22 ¶ 6.) This minor overlap, however, is not dispositive, as "it is entirely appropriate for directors of a parent corporation to serve as directors of a subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *United States v. Bestfoods,* 524 U.S. 51, 69, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (citations omitted) (noting that it is "well established principle ... that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership"). As such, this factor does not weigh in favor of a finding of agency.

*\*4* Likewise, the remaining factors do not weigh in favor of applying the agency theory in the present case. First, Alcatel S.A. is merely a holding company that does not manufacture, sell, or advertise in the United States, or anywhere in the world. (D.I. 18 ¶¶ 3-5.) Thus, this is not a case in which Alcatel S.A. manufactures a product and uses an independent distributor to sell its product. *Cf. C.R. Bard,* 997 F.Supp. at 561. In addition, Alcatel USA maintains its own executive team, which is responsible for the day-to-day management of Alcatel USA, and no employee of Alcatel S.A. is a member of the executive team of Alcatel USA. (D.I. 22 ¶ 5.) It also maintains its own financial statements, separate from those kept by Alcatel S.A. (D.I. 22 ¶ 10.) Alcatel USA files a consolidated United States federal income tax return that is separate from tax returns filed by Alcatel S.A. (*Id.* ¶ 12.) Alcatel USA finances its day-to-day activities through funds generated from its business activities, including the manufacture, marketing and distribution of the accused infringing products. (*See id.* ¶ 13.) Accordingly, the court finds that while there is a minor overlap of officers and directors

between the parent and subsidiary, Telcordia has not produced sufficient evidence for the court to conclude that the specific combination of agency factors militates in favor of a finding that Alcatel USA was acting as Alcatel S.A.'s agent. Thus, sections (c)(1) and (c)(3) do not warrant the exercise of jurisdiction over Alcatel S.A.[FN3]

> FN3. The court need not address whether jurisdiction in Delaware comports with the requirements of the Due Process Clause because it has no statutory authority under the Delaware long-arm statute to exercise jurisdiction over Alcatel S.A.

B. Federal Rule of Civil Procedure 4(k)(2)

Telcordia next asserts that, even if the Delaware long-arm statute does not apply in the present case, the court should not grant Alcatel S.A.'s motion to dismiss because it has the authority to exercise personal jurisdiction over Alcatel S.A. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure. Rule 4(k)(2) provides:
If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Fed. R. Civ. P. 4(k)(2). In order to establish jurisdiction pursuant to Rule 4(k)(2), (1) Telcordia's claim must arise under federal law; (2) Alcatel S.A. must lack sufficient contacts with any state to subject it to personal jurisdiction; and (3) Alcatel S.A. must have sufficient contacts with the United States as a whole to satisfy due process. *See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.,* 229 F.3d 254, 258-59 (3d Cir.2000). Telcordia contends that all three requirements of Rule 4(k)(2) are satisfied. The court disagrees.

First, the parties do not dispute, nor could they, that Telcordia's claims arise under federal law. The complaint alleges that Alcatel S.A. has infringed,

Not Reported in F.Supp.2d                                                              Page 5

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

induced infringement of, and/or contributorily infringed the '306 patent. Patents and the protection of patent rights are the subject of Title 35 of the United States Code. 35 U.S.C. § 271 specifically provides the elements of patent infringement. Additionally, 28 U.S.C. § 1338 gives district courts original jurisdiction over patent actions. A patent infringement action, therefore, is one that arises under federal law. Telcordia has thus satisfied the first requirement of Rule 4(k)(2).

**\*5** Having found that the first requirement of Rule 4(k)(2) is satisfied, the court next must determine whether Alcatel S.A. is not subject to jurisdiction in any state. *See United States v. Offshore Marine Ltd.,* 179 F.R.D. 156, 160 (D.Vi.1998); *Revak v. Locatum A.B.,* No. Civ. A. 03-4822, 2005 WL 1017771, at \*2 (E.D.Pa. Apr.28, 2005). As a preliminary matter, the court must determine whether Telcordia or Alcatel S.A. bears the burden of proving that Alcatel S.A. is not subject to the jurisdiction of any state. In *Offshore Marine Ltd.,* the United States District Court for the District of the Virgin Islands noted that "[t]he question [of] which party bears the burden of proving ... that the defendant is not subject to jurisdiction in any state appears to be an issue of first impression in this Court and in this Circuit, probably because it is generally the plaintiff's duty to allege and prove personal jurisdiction." *Offshore Marine Ltd.,* 179 F.R.D. at 160. Indeed, it appears that the Third Circuit has not yet addressed whether the plaintiff or defendant bears the burden of proving that the defendant is beyond the jurisdictional reach of any state court of general jurisdiction, or what is known as the negation requirement. *See Base Metal Trading Ltd. v. OJSC "Novokuzetsky Aluminum Factory",* 47 Fed. Appx. 73, 75 (3d Cir.2002) (unpublished) (determining that negation issues need not be reached because the Due Process requirement of Rule 4(k)(2) was not satisfied).[FN4] Various district courts of the Third Circuit, however, have addressed the negation requirement and concluded that the plaintiff bears the burden of demonstrating that the defendant is not subject to jurisdiction in any state. *See Offshore Marine Ltd.,* 179 F.R.D. at 160 ("Accordingly to survive a motion to dismiss for want of personal jurisdiction, the plaintiff bears the burden to prove that [the

defendant] is not otherwise subject to service of process in any state."); *see also Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.,* 293 F.Supp.2d 423, 430 (D.Del.2003), *vacated on other grounds by* 395 F.3d 1315 (Fed.Cir.2005) (issue abandoned on appeal) (" Plaintiffs must also demonstrate that defendant is ' not subject to the jurisdiction of *any* state' under Rule 4(k)(2). Therefore, Rule 4(k)(2) provides 'a narrow exception which may subject an alien defendant to a federal court's jurisdiction.' ') The court agrees with the Third Circuit district courts that have addressed the negation requirement and concludes that Telcordia bears the burden of demonstrating that Alcatel S.A. is not subject to jurisdiction in any state.

> FN4. Likewise, it appears that the Federal Circuit has not had occasion to address the negation issue.

Here, Telcordia addresses the negation requirement only by asserting that, based on the information provided by Alcatel S.A. in its opening brief and the publicly available information regarding Alcatel S.A., an analysis of whether any other state has personal jurisdiction over Alcatel S.A. would not be "significantly different" from the analysis regarding Alcatel S.A.'s personal jurisdiction under the Delaware long-arm statute. (D.I. 20, at 13.) According to Telcordia, if the court cannot exercise jurisdiction over Alcatel S.A. pursuant to the Delaware long-arm statute then Rule 4(k)(2) applies. (*Id.*) The court is not persuaded by this argument, however, and concludes that Telcordia's conclusory statement does not support a finding that Alcatel S.A. lacks sufficient contacts with any state to subject it to personal jurisdiction. Thus, Telcordia has not satisfied the second requirement of Rule 4(k)(2).

**\*6** Even assuming Telcordia was able to show that Alcatel S.A. was not subject to jurisdiction in any other state, it cannot satisfy the third requirement of Rule 4(k)(2) because the record evidence demonstrates that Alcatel S.A. lacks sufficient contacts with the United States as a whole to satisfy due process. The Due Process Clause requires that,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

in order to subject a defendant who is "not present within the territory of the forum" to personal jurisdiction, the court must first make sure that the party "ha[s] certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of justice and fair play.' ' *See International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citations omitted). In order for the court to find that Alcatel S.A. has "minimum contacts" with the United States, Telcordia must demonstrate either specific or general personal jurisdiction. *Helicopteros Nacionales de Columbia v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). The court can assert specific jurisdiction over a nonresident defendant that has "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or related to' those activities." *Burger King,* 471 U.S. at 472 (citations omitted). The court can assert general jurisdiction over a defendant when its contacts with the forum, regardless of their relation to the litigation, are "continuous and systematic." *Helicopteros Nacionales,* 466 U.S. at 416. The court will address the reasons it cannot exercise specific or general jurisdiction over Alcatel S.A. in turn.

When determining whether a defendant's contacts give rise to specific jurisdiction, "[i]t is essential in each case that there be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum ... thus invoking the benefits and protections of its laws." *BP Chems.,* 229 F.3d at 259 (quoting *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 475, 100 S.Ct. 559, 62 L.Ed.2d 490). In other words, the defendant's contact must be of the nature that would cause it to reasonably foresee that it might be "haled before a court" in the forum as a result of its conduct. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 580, 62 L.Ed.2d 490 (1980). Thus, a court usually must determine the character of the defendant's activity in the forum, and whether the plaintiff's claim arises out of or has a substantial connection with that activity. *See Burger King,* 471 U.S. at 475-76. In the present case, however, the court need not make this determination because Telcordia bases its

argument on the specific jurisdiction subsections of the Delaware long-arm statute which, as discussed in Section IV.A., *supra,* do not warrant the exercise of jurisdiction over Alcatel S.A. because Alcatel USA is not its United States agent.

The court also concludes that Alcatel S.A.'s contacts with the United States that are unrelated to the present litigation are not "continuous and systematic" so as to give rise to general jurisdiction. Telcordia contends that general jurisdiction exists because there is "ample evidence of Alcatel S.A.'s contacts with the United States." (D.I. 20, at 12.) According to Telcordia, this evidence includes the following: (1) Alcatel S.A. is listed on the New York Stock Exchange; (2) Alcatel S.A. owns property in the United States, specifically hundreds of patents; (3) Alcatel S.A.'s website fails to distinguish among its multinational subsidiaries and uses its name in the name of its subsidiaries; (4) Alcatel S.A.'s website describes its worldwide activities, including its activities in the United States, but never discloses that its United States activities are performed by one of its subsidiaries; and (5) Alcatel S.A. incorporated its subsidiary, Alcatel USA in Delaware. The court does not find the evidence sufficient to support Telcordia's assertion.

**\*7** First, as previously discussed, Alcatel S.A. is a French holding company that does not make, sell, export or import any products into the United States. Alcatel S.A. does not maintain any offices in the United States, or lease or own any real property in the United States. It does not maintain any bank accounts in Delaware and has never contracted to supply services or things in Delaware or the United States. Alcatel S.A.'s employees also all reside outside of the United States.

Moreover, while Alcatel S.A. is listed on the New York Stock Exchange as an American Depository Receipt ("ADR"), this factor alone does not justify the exercise of jurisdiction. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F.Supp.2d 289, 330 (S.D.N.Y.2003); *Doe v. Unocal Corp.,* 248 F.3d 915, 922 (9th Cir.2001) ("[T]he Court is not persuaded that Congress intended for the courts to assert jurisdiction under Rule

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 7

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

4(k)(2) whenever a corporation lists its stock on a United States exchange."). Likewise, "[o]wnership of a United States patent, without more, cannot support the assertion of personal jurisdiction over a foreign patentee in any state besides the District of Columbia." *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.,* No. C-95-3577 DLJ, 1996 WL 467293, at *6 n. 5 (N.D.Cal. July 24, 1996) (citing 35 U.S.C. § 293). Furthermore, incorporating a subsidiary in the United States does not give rise to jurisdiction unless the litigation is related to the act of incorporation and, here, it is not related. *See Applied Biosystems,* 772 F.Supp. at 1468. Additionally, "the mere operation of a commercially interactive web site should not subject the operator to jurisdiction anywhere in the world. Rather, there must be evidence that the defendant 'purposefully availed' itself of conduct activity in the forum, knowingly interacting with residents of the forum state via its web site." *Toys " R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 454 (3d Cir.2003). Here, Telcordia has not adduced evidence to support a finding that Alcatel S.A.'s web site was intended to reach customers in Delaware, or any other state in the United States. [FN5]

> FN5. Telcordia asserts that there can be " no question that Alcatel S.A.'s website solicits requests for information concerning its products (including allegedly infringing products) from Delaware residents, pointing to a "website page concerning the possible purchase of Alcatel products" with Delaware chosen as the potential buyer's state. (D.I. 20, at 5; Ex. 11.) Telcordia misses the point, however, as the record does not support any documented sales to persons in Delaware (or any other state in the United States). Nor does it support any interaction between Alcatel S.A. and Delaware residents, as the web site page, in Telcordia's own words, demonstrates only the *possible* purchase of Alcatel products.

The court also disagrees with Telcordia's assertion that Alcatel's website "never discloses that its U.S.

activities are performed by some entity (or entities) other than Alcatel S.A." (D.I. 20, at 4.) First, when one enters the Alcatel website and clicks on "United States" as its country/region the web address changes from "www.alcatel.com" to " www.usa.alcatel.com." Further, when one clicks on the "About Alcatel" dropdown menu and selects " Alcatel in the U.S.A.," he or she is provided with information regarding Alcatel USA, including its business locations. Moreover, the web page states " [i]t is the policy of *Alcatel USA* to satisfy the expectation of our customers." www.usa.alcatel .com/company/ausa_info.jhtml (last visited May 23, 2005) (emphasis added). Thus, the Alcatel web site does distinguish Alcatel S.A. from Alcatel USA. This fact does not support the exercise of jurisdiction over Alcatel S.A. Accordingly, Alcatel S.A.'s alleged contacts with the United States do not provide a basis for the court to conclude that it has a "continuous and systematic" presence in the United States.

**\*8** Nor does the combination of Alcatel S.A.'s alleged contacts with the United States provide the court with a sufficient basis to conclude that the requirements for general jurisdiction are met. *BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.,* 229 F.3d 254 (3d Cir.2000) is instructive on this point. In *BP Chemicals,* the Third Circuit found that a foreign defendant did not have sufficient contacts with the United States as a whole to justify the exercise of Rule 4(k)(2) jurisdiction, even though the defendant exported its products to the United States, held a small ownership interest in a Delaware corporation, and entered into contracts requiring its personnel to travel to the United States for training. *Id.* at 263. The Court of Appeals also found that the cumulative effect of the defendants contacts did not meet the requirements for general jurisdiction. In the present case, Alcatel S.A.'s alleged contacts fall short of those alleged by the plaintiff in *BP Chemicals.* As such, the court finds that there is no basis for exercising Rule 4(k)(2) jurisdiction over Alcatel S.A.

### C. Jurisdictional Discovery

Lastly, Telcordia asserts that if the court does not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 8

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

conclude that Alcatel S.A. "is subject to personal jurisdiction under the *Delaware long-arm statute*," it should permit limited jurisdictional discovery rather than granting Alcatel S.A.'s motion to dismiss. (D.I. 20, at 11) (emphasis added). Telcordia asserts that its claims against Alcatel S.A. are not clearly frivolous, and that discovery is necessary due to the "limited publicly available information" that it has gathered without discovery. (D.I. 20, at 11.) Telcordia further asserts that the case will not be delayed as a result of any discovery on the personal jurisdiction issue.

Conversely, Alcatel S.A. contends that Telcordia's claims against Alcatel S.A. are clearly frivolous, because Telcordia has not carried its burden of making "a *prima facie* showing that Alcatel S.A. is subject to personal jurisdiction in Delaware." (D.I. 23, at 17.) In addition, Alcatel S.A. contends that it "strains belief that Plaintiff (1) did not know which entities in the Alcatel Family to sue, and (2) that Alcatel S.A. was not one of them." (*Id.* at 17 .) According to Alcatel S.A., Telcordia has had prior business interactions with Alcatel entities regarding the patent-in-suit, as well as other communications technology. (*Id.* at 2.) Alcatel S.A. further contends that Telcordia is "arguably the most knowledgeable company in the telecommunications field with respect to what products are sold by the various players in the market." (*Id.* at 1.) Thus, it "is hard to believe that it [Telcordia] does not know exactly who the relevant players in the market are." (*Id.*) Lastly, Alcatel S.A. contends that Telcordia is engaging in a fishing expedition, noting that the United States Supreme Court has held that courts should "exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position." (*Id* at 18-19 (citing *Societe Nationale Industrielle Aerospatiale v. United States District Court for Southern Dist. Iowa,* 482 U.S. 522, 546, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987)). The court is persuaded by Alcatel S.A.'s argument.

**\*9** "Although the plaintiff bears the burden of demonstrating facts that support personal jurisdiction, courts are to assist the plaintiff by allowing jurisdictional discovery unless the

plaintiff's claim is 'clearly frivolous.' " *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 456 (3d Cir.2003) (internal citations omitted). Thus, resolution of Telcordia's request "begins with the presumption in favor of allowing discovery to establish personal jurisdiction." *Hansen v. Neumueller GmbH,* 163 F.R.D. 471, 474 (D.Del. Oct.5, 1995). However, "[t]he court must be satisfied that there is some indication that this particular defendant is amenable to suit in this forum." *Id.* at 475. For example, "a plaintiff may not rely on the bare allegations in his complaint to warrant further discovery." *Id.* at 476. Likewise, "a mere unsupported allegation that [a] defendant ' transacts business' in an area is 'clearly frivolous.' " *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,* 107 F.3d 1026, 1042 (3d Cir.1997); *see B.L. Poe v. Babcock Int'l,* 662 F.Supp. 4, 7 (M.D.Pa. Mar.14, 1985) ("Since plaintiff has met defendants' affidavit evidence with mere speculation, plaintiff's request for an opportunity to conduct discovery on the matter must be denied. It would be inappropriate for this court to allow plaintiff to conduct a fishing expedition in order to construct a basis for jurisdiction."). Rather, "there must be *some* competent evidence to demonstrate that personal jurisdiction over [a] defendant might exist before allowing discovery to proceed." *Hansen,* 163 F.R.D. at 475. Furthermore, "[w]hen the lack of personal jurisdiction is clear, ... further discovery serves no purpose and should be denied." *Hockerson-Halberstadt, Inc. v. Propet USA, Inc.,* 62 Fed. Appx. 322, 338 (Fed.Cir.2003) (unpublished).

Here, as previously discussed in Section IV.A., *supra,* the record evidence regarding Telcordia's agency theory of specific jurisdiction is insufficient to support the conclusion that Alcatel USA was acting as Alcatel S.A.'s agent. In addition, Telcordia did not assert that the court could exercise personal jurisdiction over Alcatel S.A. based on the general jurisdiction subsection of the Delaware long-arm statute. For these reasons, the court believes it is clear that it may not exercise personal jurisdiction over Alcatel S.A. pursuant to the Delaware long-arm statute. Thus, further discovery would not be worthwhile. In other words, granting Telcordia's request for jurisdictional discovery would amount

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 9

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

to allowing it to conduct a fishing expedition in order to form a basis for jurisdiction. The court, therefore, will deny Telcordia's request for jurisdictional discovery.

### ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:
1. Alcatel S.A.'s Motion to Dismiss for Lack of Personal Jurisdiction (D.I.17) is GRANTED.
2. Telcordia's request for jurisdictional discovery is DENIED.

D.Del.,2005.
Telcordia Technologies, Inc. v. Alcatel S.A.
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1182445 (Trial Motion, Memorandum and Affidavit) Plaintiff Telcordia Technologies, Inc.'s Objections to Defendant Alcatel USA, Inc.'s Second Notice of 30(b)(6) Deposition (Mar. 30, 2006) Original Image of this Document (PDF)
• 2006 WL 1182446 (Trial Motion, Memorandum and Affidavit) Plaintiff Telcordia Technologies, Inc.'s Objections to Defendant Alcatel USA, Inc.'s Third Notice of 30(b)(6) Deposition (Mar. 30, 2006) Original Image of this Document (PDF)
• 2006 WL 1182444 (Trial Pleading) Telcordia's Answering Claim Construction Brief Addressing Telcordia's '633 Patent and Alcatel's '052 Patent (Mar. 24, 2006) Original Image of this Document (PDF)
• 2006 WL 1204461 (Trial Pleading) Alcatel's Answering Claim Construction Brief for U.S. Patent No. 6,247,052 (Mar. 24, 2006) Original Image of this Document (PDF)
• 2006 WL 1182443 (Trial Motion, Memorandum and Affidavit) Plaintiff Telcordia Technologies, Inc.'s Objections to Defendant Alcatel USA, Inc.'s First Notice of 30(b)(6) Deposition (Mar. 10, 2006) Original Image of this Document (PDF)
• 2006 WL 1182441 (Trial Pleading) Alcatel's Opening Claim Construction Brief for U.S. Patent

Nos. 6,247,052 and Re. 36.633 (Mar. 3, 2006) Original Image of this Document (PDF)
• 2006 WL 1182442 (Trial Pleading) Telcordia's Opening Claim Construction Brief (Mar. 3, 2006) Original Image of this Document (PDF)
• 2005 WL 3666806 (Trial Motion, Memorandum and Affidavit) Telcordia's Reply Brief in Support of its Motion to Dismiss Or, in the Alternative, to Sever and Stay Alcatel Usa, Inc.'s Patent Infringement Counterclaim (Nov. 1, 2005)
• 2005 WL 2867944 (Trial Pleading) Telcordia's Reply to Alcatel USA, Inc.'s Amended Counterclaims and Demand for Jury Trial (Sep. 29, 2005)
• 2005 WL 2867947 (Trial Motion, Memorandum and Affidavit) Telcordia's Motion to Dismiss, or in the Alternative, to Sever and Stay Alcatel USA, Inc.'s Patent Infringement Counterclaim (Sep. 29, 2005)
• 2005 WL 2385505 (Trial Pleading) Alcatel Usa's Answer and Counterclaims to Plaintiff's First Amended Complaint and Demand for Jury Trial (Aug. 10, 2005)
• 1:04cv00874 (Docket) (Jul. 16, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.