IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRETT J. CORMICK, ELAN SUISSE | ) | C.A. No. 06-275-GMS |
| INTERNATIONAL HOLDINGS (USA) | ) | |
| LLC, ELAN SUISSE (PTY) LTD., | ) | |
| NICOGEL LTD., JOHN WALTERS, | ) | |
| DIANNE MARSHALL and MERCARI | ) | |
| FINANCIAL SERVICES (PTY) LTD., | ) | |
| | ) | |
| Defendants. | ) | |

### AFFIDAVIT OF ROBERT D. CHRIST

| | |
|---|---|
| STATE OF LOUISIANA | ) |
| | ) ss: |
| PARISH OF TANGIPAHOA | ) |

Robert D. Christ, being duly sworn, hereby deposes and says:

1.    I am the plaintiff in the above-captioned action and submit this affidavit in opposition to the defendants' Motions to Dismiss or Stay.

2.    I reviewed the allegations of my complaint prior to its filing and those allegations, to the best of my knowledge and belief, are true.

3.    While my business obligations require me to travel extensively, until recently my permanent residential and business address was in Pottstown, Pennsylvania.  Within the last month, I have relocated my residence to Abita Springs, Louisiana and my business to Hammond, Louisiana.

4.    This action represents simply the latest of my attempts to obtain relief from Brett Cormick and the other defendants in a forum where a tribunal can properly exercise personal

jurisdiction over all the relevant parties. Mr. Cormick, an Australian citizen, has intentionally structured his personal residences and business dealings across multiple countries and continents in order to maximize his ability to evade the jurisdiction of any one forum. For example, he has represented to me as well as others that he either lives or has lived in the following locations: Harare, Zimbabwe; Hermanus, South Africa; Gauteng, South Africa; and London, England.

5.      Mr. Cormick's various and constantly changing living and business arrangements allow him to pick and choose his place of residence in order to evade service of process and any judicial exercise of personal jurisdiction. For example, in response to the complaint I filed against him in the High Court of South Africa located in Johannesburg, Mr. Cormick alleged that he permanently resided in Zimbabwe but "temporarily resides from time to time in Hermanus, in the Western Cape Province." (This allegation is set forth at paragraph 1.3 of Exhibit A-2 to Mr. Cormick's declaration filed in this action.) Mr. Cormick similarly stated under oath, at paragraph 7.3 of an affidavit submitted to the South African court (a true and correct copy of which is attached hereto as Exhibit A), that his "presence is often required in South Africa, Europe, and the United States" but that he "often, temporarily, reside[s] in Hermanus." However, in support of his motion to dismiss in this Court Mr. Cormick now contends that he is a resident of both Zimbabwe and the United Kingdom.

6.      My complaint alleges that I wired $250,000 to Mr. Cormick in two separate payments in "March 2004" because, at Mr. Cormick's request, I provided him with the original confirmation of my wire transfer and, therefore, I cannot confirm with any specificity the day on which I first wired $125,000 to Mr. Cormick. I did, however, retain the confirmation of my subsequent wire transfer of $125,000, a true and correct copy of which is attached as Exhibit B. As that document reflects, I wired $125,000 to Mr. Cormick on March 16, 2004, after Mr.

- 2 -

Cormick formed Elan Suisse International Holdings (USA) LLC ("Elan Suisse USA"). A true and correct copy of the Certificate of Formation for Elan Suisse USA as filed with the Delaware Secretary of State is attached as Exhibit C. Additionally, a true and correct copy of two e-mails which I received from Mr. Cormick on February 17 and 18, 2004, in which Mr. Cormick expresses his intent to form Elan Suisse USA as a Delaware limited liability company, is attached as Exhibit D.

7.     In any event, the date on which Elan Suisse USA was formed is irrelevant because, prior to the formation of that entity, Mr. Cormick and I agreed that, in exchange for my "investment," I would receive 50% equity shares in Elan Suisse (Pty) Ltd. ("Elan Suisse"), a South African corporation, and a Delaware-based entity (ultimately to be formed as Elan Suisse USA) which would hold certain intellectual property rights. In addition, Mr. Cormick's misrepresentations and fraudulent activities continued well into the Summer of 2004, after the formation of Elan Suisse USA, as I continued to perform marketing and business development activities for the purported business venture in reliance upon Mr. Cormick's representations that he and I would execute a formal agreement concerning my investment in Elan Suisse and his representations concerning the validity of the business.

8.     It was not until September 2004, when Mr. Cormick still had not produced a written agreement relating to my investment and could not adequately account for the status of the as-yet non-operational Elan Suisse business venture, that I began to question the truthfulness of Mr. Cormick's claims and the soundness of my "investment." At that time, I requested that Mr. Cormick cooperate with an audit of Elan Suisse and Elan Suisse USA so as to account for the whereabouts of the $250,000 I had wired to him. Rather than cooperate with that audit, Mr.

Cormick offered to repay $250,000 to me, an offer which I accepted but which Mr. Cormick has not honored to this date.

9.    Prior to September 2004, I did not suspect, nor did I have reason to suspect, that Mr. Cormick had made repeated and fraudulent misstatements to me. Until that time, I had trusted Mr. Cormick as a friend whom I had known since 1996 (a trust which, in hindsight, had been sorely misplaced).

10.    In support of their motion to dismiss, Mr. Cormick's co-defendants argue that there are no facts which could establish that John Walters, Dianne Marshall and Nicogel Ltd. ("Nicogel") conspired with Mr. Cormick to defraud me and use the funds I provided to Mr. Cormick to capitalize Acquacine Ltd. ("Acquacine"), a start-up company which subsequently changed its name to Nicogel. To the contrary, there are a number of facts which establish the conspiracy between these parties:

a.    When Mr. Cormick was soliciting my investment in the Elan Suisse venture, and even after I wired $250,000 to Mr. Cormick, he stated repeatedly in e-mails to me that Elan Suisse was creating a biotechnology fund for potential South African investors. An example of these e-mails is attached as Exhibit E. In this e-mail, Mr. Cormick refers to the first "Private Equity" investment he intends to market to South African investors, a French company which purportedly had intellectual property rights to "the most important and revolutionary development in drug delivery systems in the last 20 years anywhere in the world."

b.    The company which Mr. Cormick purported to describe in Exhibit E was Acquacine. Attached as Exhibit F is a true and correct copy of promotional materials for Acquacine developed by Mr. Cormick and provided to me by Mr. Cormick. According to these

materials, Acquacine's core business was the research and development of medicines delivered in a ready-to-drink beverage format.

       c.     According to information I have gathered, Mr. Walters and Ms. Marshall (who lives with Mr. Walters as well as the couple's daughter) are both officers of Acquacine (subsequently renamed Nicogel in December 2005) and Ms. Marshall is a shareholder of the company. In addition, the Internet web domain names www.acquacine.com, www.acquacine.co.uk, and www.nicotea.co.uk (referring to one of Acquacine's purported products) are all registered to Ms. Marshall.

       d.     In April 2005, Elan Suisse continued to promote investment in Acquacine through the print advertisement attached as Exhibit G. As this advertisement reflects, both Mr. Cormick and Mr. Walters are identified as managers of the "Elan Suisse Capital Biopharma" investment vehicle. The advertisement further promotes Elan Suisse's investment in Acquacine and invites potential investors to contact Mr. Cormick or Mr. Walters for more information.

       e.     In May 2005, Ms. Marshall authored a Power Point presentation aimed at potential investors and promoting the Elan Suisse "Biopharma Investment Portfolio." This presentation touts, among other things, the prospects for the Nicotea product allegedly produced by Acquacine.

       f.     A subsequent advertisement published in June 2005 (and attached as Exhibit H) further promotes the Elan Suisse "Biopharma Investment Portfolio." According to this advertisement, one of the key products in this "portfolio" is the "Nicotea" product allegedly produced by Acquacine. Like the April 2005 advertisement, this document also touts Mr. Cormick and Mr. Walters as key members of Elan Suisse who promote the Elan Suisse "investment" vehicle.

g.    A July 12, 2005 article written by South African financial journalist Julius Cobbett (attached as Exhibit I) provides further details of the involvement of Mr. Walters and Nicogel (f/k/a Acquacine) with Elan Suisse and Mr. Cormick and highlights just a few of the dubious claims made by Mr. Cormick and Mr. Walters in Elan Suisse's promotional materials.

11.    Mr. Cormick's statement in his declaration that he is "currently waiting for Mr. Christ to apply to the African court for a trial date" does not accurately describe the status of the action I commenced in the High Court of South Africa in Johannesburg.  As indicated by the plea Mr. Cormick filed in response to my complaint in that action (Exhibit A-2 to Mr. Cormick's declaration) and the sworn statements in his affidavit attached hereto as Exhibit A, Mr. Cormick has challenged the personal jurisdiction of the Johannesburg court over him and asserted that he has no contacts with that forum.  I have not pursued my South African case against Mr. Cormick further because of my likely inability to secure jurisdiction over Mr. Cormick in that court.  I have not dismissed my South African case against Mr. Cormick voluntarily because, if I did so, I would forfeit a bond of approximately $15,000 which I was required under South African law to post with the court upon filing my complaint.

FURTHER AFFIANT SAYETH NOT.

Robert D. Christ

Subscribed and sworn to before me
this _33_ day of _June_____, 2006
My commission expires _____

Jennifer Oven Pe
Commission# 62892
Expires in death

Notary Public

- 6 -

# EXHIBIT A

# IN THE HIGH COURT OF SOUTH AFRICA

## (WITWATERSRAND LOCAL DIVISION)

CASE NO:  05/2033

In the matter between :

CHRIST:  ROBERT D                                                PLAINTIFF

AND

CORMICK:  JOHN BRETT                                           DEFENDANT

> GRIFFIER VAN DIE HOOGGEREGSHOF
> (WITWATERSRANDSE PLAASLIKE AFDELING)
> PRIVAATSAK/PRIVATE BAG X7
> 2005 -04- 1 5
> JOHANNESBURG 2000
> (WITWATERSRAND LOCAL DIVISION)
> REGISTRAR OF THE HIGH COURT

### FILING NOTICE

DOCUMENT:            DEFENDANT'S AFFIDAVIT OPPOSING
                     APPLICATION FOR SUMMARY JUDGMENT

DATED AT HALFWAY HOUSE this 15th DAY OF APRIL 2005.

(Get/Sgd) J.J. LOOTS

**J.J. LOOTS INCORPORATED**
Attorneys for Defendant
512 NUPEN CRESCENT
P O BOX 5143 - DOCEX 20
HALFWAY HOUSE,  1685
TEL:  (011) 805-5030
FAX:  (011) 805-4633
**C/o JOWELL GLYN & MARAIS INC**
4th FLOOR - 72 GRAYSTON DRIVE
SANDOWN
TEL:  (011) 292-6700
FAX:  (011) 784-4215

TO:     THE REGISTRAR OF THE
        ABOVE HONOURABLE COURT
        **JOHANNESBURG**


AND
TO:         ASSHETON-SMITH INC
            Attorneys for Plaintiff
            C/o CHRIS LEE ATTORNEY
            75 KING STREET – BERARIO
            JOHANNESBURG
            C/o **JAYS INCORPORATED**
            NO 9 ARNOLD ROAD
            ROSEBANK

                                    Received copy hereof
                                    this ___15___ day of
                                    APRIL 2005.

                                    _____

                                    Jay Incorporated
                                    Without prejudice
                                    Time: 11:00
                                    Date: 15/04/05

# IN THE HIGH COURT OF SOUTH AFRICA
## (WITWATERSRAND LOCAL DIVISION)

CASE NO: 05/2033

In the matter between:

**CHRIST: ROBERT D.**                                                **PLAINTIFF**

and

**CORMICK: BRETT JOHN**                                         **DEFENDANT**

### DEFENDANT'S OPPOSING AFFIDAVIT

I, the undersigned,

**BRETT JOHN CORMICK,**

do hereby make oath and state:

**1.**

1.1     I am an adult male director of companies, currently employed as such
        as a director of Elan Suisse (Pty) Limited ("Elan"). The registered
        adress of Elan is at Ground Floor, Oxford Gate, Hyde Park Lane, Hyde
        Park, Sandton, in the Gauteng Province.

J.P. VAN WYK

1.2    I currently reside in Hermanus in the Western Cape Province.

1.3    I conduct the business of Elan from its principal place of business in South Africa at 3rd Floor, Safmarine House, 22 Riebeeck Street, Cape Town, in the Western Cape Province.

1.4    I currently devote me time fully to the business of Elan.

## 2.

The facts contained in this affidavit are, except as far as the contrary may appear from the contents and context of this affidavit, within my personal knowledge, and are both true and correct.

## 3.

3.1    I am the Defendant in this matter, and as such I am duly authorised to depose to this affidavit.

3.2    I am also the sole director and shareholder of Elan.

J.F. VAN WYK

**4.**

I deny that I do not have a *bona fide* defence against the claim of the Plaintiff herein and that I have entered an appearance to the defend the Plaintiff's claim purely for the purposes of frustrating and delaying same.

**5.**

5.1     In fact, the Plaintiff brought an urgent application against Elan under case number 5401/2005 ("the liquidation application") in the above Honourable Court which, by the time that this application for summary judgment will be heard, has been finalised, on the basis that it, without prejudice to the parties' rights, became settled.

5.2     In the liquidation application I filed a comprehensive answering affidavit on behalf of Elan in which my defence herein as well as Elans' defence in the liquidation application is fully canvassed.

5.3     Notwithstanding, the Plaintiff persists in this application for summary judgment.

5.4     I am advised, which advise I accept, that, in the event that a Plaintiff is aware of the defence of a Defendant, and nonetheless persists with an application for summary judgment in respect thereof, the Plaintiff may be ordered to pay the costs thereof.

J430750-D.

J.F. VAN WYK

4

5.5    In the premises, I shall apply to the Honourable Court that the application for summary judgment herein be dismissed with costs in the event of the Plaintiff persisting in same.

**6.**

Before I outline my *bona fide* defence on the merits of the Plaintiffs' claim herein, I wish to point out to the Honourable Court, *in limine*, that the Honourable Court has no jurisdiction to entertain this action.

**7.**

**JURISDICTION:**

7.1    I am an Australian citizen.

7.2    My wife was born in Zimbabwe and I, my wife and our children reside in Zimbabwe.

7.3    By virtue of my business with Elan, my presence is often required in South Africa, Europe, and the United States (the"US"). For the purpose of visiting South Africa I often, temporarily, reside in Hermanus outside Cape Town in the Western Cape Province.

0430750-D
J.F. VAN WYK

7.4   From the particulars of claim filed by the Plaintiff herein it appears that:

7.4.1  the Plaintiff alleges that I carry on business at Ground Floor, Oxford Gate, High Park Lane, High Park, Johannesburg;

7.4.2  Certain discussions were held between me and the Plaintiff pertaining to an investment of US $ 350 000 to be made by the Plaintiff in Elan and another company. The place of these discussions is not divulged;

7.4.3  Pursuant to such discussions the Plaintiff deposited the amount of US $ 250 000 into my account during March 2004. The place of this deposit is not divulged;

7.4.4  On or about the 9th of September 2004, and in writing, I offered to refund the Plaintiff the sum paid to me of US $ 250 000; and

7.4.5  Such offer was accepted in writing by the Plaintiff on the 30th of November 2004 and, consequently, I am liable to repay the amount of US $ 250 000 to the Plaintiff. Again, the place of such offer and acceptance is not divulged in the Plaintiffs' Particulars of Claim. In fact, no specific allegation as to which fact the Plaintiff relies on for jurisdiction is made therein.

7.5   In this regard I wish to point out to the Honourable Court:

X430750-D
J.F. VAN WYK

7.5.1  I never "carried on business" at the address cited by the Plaintiff in this regard. This is the registered address of Elan, and the said premises is occupied by Elan from time to time. I carry on business, when I am in South Africa, which is rare, from Hermanus. I temporarily visit the offices of Elan in Johannesburg for the purposes of attending a meeting or opening mail but I am certainly never present in Johannesburg, from the 1st of December 2004, for more than one day a month on average;

7.5.2  Elan rents office space in Cape Town at the address set out therefore herein above, which is its principal place of business in South Africa. I spend most of my time on Elans' business there.

7.5.3  Before the 1st of December 2004, when Elans' business started taking more of my time, I certainly wasn't present in Johannesburg for more than one day every second or third month.

7.6  In the liquidation application, the Plaintiff declared under oath:

7.6.1  While the discussions alleged in the particulars of claim filed on behalf of the Plaintiff with reference to his investment in the relevant companies were held, the Plaintiff was in the United States of America;

7.6.2  At the same time, I was either abroad in Europe, in Zimbabwe, or in Hermanus;

430750-0
J.F. VAN WYK

7.6.3 I categorically state that I never held any discussions pertaining to the investment of the Plaintiff as alleged while in Johannesburg or anywhere in Gauteng for that matter;

7.6.4 The investment of US $ 250 000 by the Plaintiff was made by electronically transferring same to my personal bank account from the United States, where the Plaintiff was present at the time, held at National Westminster Bank and/or LLoyds TSB in London or the Isle of Man; and

7.6.5 While I wrote the e-mail of 9 September 2004 on which the Plaintiff relies for my undertaking to repay the said investment to him I was in Hermanus, in the Western Cape, and, on the Plaintiff's own version, he was in the United States when accepting same, alternatively same was accepted on his behalf by his attorney of record in Cape Town, and I received communication thereof in Cape Town.

7.7 Accordingly, without admitting any of the facts pleaded by the Plaintiff in this regard, it is clear that:

7.7.1 Neither myself nor the Plaintiff is usually resident within the area of jurisdiction of the Honourable Court;



J.F. VAN WYK

7.7.2  Neither myself nor the Plaintiff is usually employed or carries on business within the area of jurisdiction of the Honourable Court;

7.7.3  The agreement that led to the investment of the Plaintiff with me, which is not admitted, as alleged, was not concluded within the area of jurisdiction of the Honourable Court;

7.7.4  The relevant investment was not made within the area of jurisdiction of the Honourable Court;  and

7.7.5  The alleged agreement for repayment, which is denied as will be set out hereunder, was not concluded within the area of jurisdiction of the Honourable Court.

7.8    Full legal argument will be addressed to the Honourable Court at the hearing of this application in this regard.

## 8.

8.1    The Plaintiff, by virtue of the facts set out in the liquidation application, was aware of these facts, but nonetheless persisted in this application. It is, amongst others, on this basis that I pray for the Plaintiff to pay the costs of this application.



V430750-0  J. P. VAN WYK

8.2    Accordingly I respectfully submit that the abovementioned point of jurisdiction alone clearly illustrates that I have a *bona fide* defence against the Plaintiff's claim herein and pray that the Plaintiff's claim for summary judgment herein for this reason alone be dismissed with costs.

**9.**

### AD *BONA FIDE* DEFENCE:

9.1    I am a person with extensive experience and an excellent worldwide reputation in the financial services industry.

9.2    During the past fifteen years:

9.2.1    I was employed by some of the biggest financial services firms in the world;

9.2.2    I was a managing director ABN Amro, one of the biggest banks in the world, in Europe;

9.2.3    I was the director of corporate sales at Electra, one of the largest private equity firms in Europe;



9.2.4   I was the managing director of global sales at Mees Pierson, a boutique investment bank associated with ABN Amro;

9.2.5   I obtained my doctorate in economics; and

9.2.6   I lecture worldwide at business schools and universities on the financial services industry.

9.3   As such, I gained vast experience in the development and marketing of financial services products.

9.4   My wife is Zimbabwean, and our family resides there. As a consequence of my residence in Zimbabwe, I came into contact with the South African financial services industry.

9.5   One of the big difficulties in the South African economic environment, is the archaic system of exchange controls that is being kept in place by the South African government.

9.6   Approximately three years ago, I developed an investment product ("the product") that effectively provides:

9.6.1   a safe investment vehicle by investing in AAA bonds underwritten by the government of the USA, the investment with the lowest risk one can attain in the money market;



9.6.2  a tax effective investment vehicle in that the investment is held off-
       shore in a tax haven; and


9.6.3  an alternative investment vehicle which provides offshore returns in
       foreign currency. The investment is made for example in South African
       rands, but returns can be paid in pounds sterling or US dollars, as the
       case may be.


9.7    By virtue of the fact that the product is the trade secret of Elan and that
       the true nature of the product is not really at issue here, I would at this
       stage not elaborate further thereon. My rights in this regard are
       reserved.


9.8    Simultaneously, I noticed a trend in the South African financial services
       industry that foreign banks are having a tough time to enter the local
       market. Many foreign banks apply for licenses to operate in the South
       African market and establish offices here at great cost, only to return
       their licenses shortly thereafter because of their inability to generate
       profits for their shareholders.


9.9    In my view, the key to this market is access to the retail investment
       sector of the market. The foreign banks that did set up offices in South
       Africa to date has not been able to break the local banks' stranglehold
       on this market, purely by reason of the fact that they do not have the



necessary innovative products to entice the market to utilize their services.

9.10   I strongly believe that the product has this ability.

9.11   Accordingly, I set up the Elan Suisse Group ("the group") as a structure to facilitate the marketing and selling of the product.

9.12   The group consist, in chief, of Elan in South Africa, and similarly named private companies in the US and the Bahamas.

9.13   The structure of the group is:

9.13.1 Elan in South Africa will front the product. Thus, Elan will market the product to the retail investment market locally, and, as investors buy into the concept, will manage the fund so created;

9.13.2 Elan Suisse in the Bahamas, a tax haven, will act as custodian of the fund created by Elan in South Africa and, later, by similarly named entities worldwide. The fund so created will be administered there and returns will be paid there; and

9.13.3 The intellectual property of Elan, consisting in the main of the product and the customer data base built up from the sale of the product in the



0430750-0
J.P. VAN WYK

South African retail investment market, will be held by the entity registered therefore in the US.

9.14    I strongly believe that any good business plan also includes a exit strategy, being a way, after the business of Elan has been sufficiently built up to my satisfaction, and I want to move on to other pastures, to sell the said business for a profit in order to be rewarded for my input and to provide me with working capital for my next project.

9.15    The reason why the intellectual property of Elan would be held in the entity incorporated in the US is exactly such an exit strategy. The American banks who would like to enter the South African market, would pay dearly for the product and the said customer information, as a way into the South African retail investment market.

9.16    Consequently, the structure was designed so as to maximize the possible profit from the eventual sale of the Elans' intellectual property.

9.17    Accordingly, I proceeded to set up all the relevant entities.

9.18    The first step was to set up Elan, and to ensure that Elan comply with all the relevant statutory requirements necessary to operate as an investment vehicle and fund manager as is set out above.


J.F. VAN WYK

9.19  For this purpose, I contacted a friend of mine, Dirk Mostert ("Mostert"), in South Africa. Mostert is a director of a reputable company that mainly trades in money market instruments called Mercari (Pty) Limited ("Mercari").

9.20  Mercari has been trading as such for six years now, and Mostert has been a money market trader for more than ten years now. As such their clients include all of the major banks in South Africa, and especially FNB and Nedbank, the latter of which they trade with on an open account. This means that Nedbank| allows Mercari to settle contracts on its behalf in the latter's discretion, theirs being a relationship of the utmost trust.

9.21  In the financial services industry, a good reputation is of immense value. For this reason I always deal only with entities operating in the main stream of the industry with a good reputation.

9.22  Mostert was familiar with the requirements of setting up a private company in South Africa and assisted me in the incorporation of Elan. Mostert also referred me to his auditors, Leader, Arendse and Associates, whom I enrolled as Elans' auditors.

9.23  Accordingly, during or about July 2003, Elan was incorporated with me as the sole shareholder and director.



J430750-0                  J.F. VAN WYK

9.24   Elans' auditors was retained on Mosterts' recommendation, and, by virtue of the fact that Mostert and I became friends:

9.24.1 Mostert offered that Elan "incubates" in the offices of Mercari. To this end Elan had free use of the said offices, and Mostert offered his employees' labour free of charge to Elan. Mostert also dedicated one of the telephone lines allocated to Mercari to Elan, free of charge. It must be kept in mind that I started Elan from my own funds, and appreciated any opportunity to save costs; and

9.24.2 The offices of Mercari was also chosen to be the registered address of Elan.

9.25   As an aside, Mostert also asked me to become a non-executive director of Mercari, in order to contribute my insights and extensive experience in the money market and the financial services industry to Mercari's business. Naturally, I agreed.

9.26   Thus, Elan was set up and incorporated during or about July 2003.

9.27   I also started negotiations with the Financial Services Board ("the FSB") in order to ensure that Elan obtain the necessary statutory approval for its proposed activities.

1430750=0

F. VAN WYK

9.28   This approval was initially granted to myself on the 13th of May 2003 in my personal capacity, as appears from the letter from the FSB to myself attached as **Annexure "BC1"** hereto.

9.29   Later, during or about September 2004, the same approval was granted to Elan, as appears from an e-mail from the FSB attached hereto as **Annexure "BC2"**.

9.30.  The registration number of Elan with the FSB is 852. I constantly keep in contact with the FSB about the business of Elan. Recently, Norman Botha, a portfolio manager at Barnard Jacobs Malet ("BJM"), a major stock broking firm, joined Elan. I kept the FSB informed of this, and complied with all their requirements in this regard, as is evidenced by the e-mails attached hereto as **Annexure "BC3"**.

9.31   So, the business of Elan slowly took shape. One must with respect keep in mind that we have to do with a start up business here. It takes a long time to get the structure in place for such a business to operate. Since the incorporation of Elan I have worked eighteen hours a day in order to:

9.31.1 Set up a broker network for the marketing of the product. In this regard several major players in the financial services industry have expressed an interest to market the product, such as ABSA and RMB;



J.F. VAN WYK

9.31.2 Draft and create the standard forms and computer systems which will be utilized by Elan in the marketing and selling of the product;

9.31.3 Set up communications channels and systems with the relevant authorities such as the FSB, the Reserve Bank and the likes which will be crucial once the sales of the product commences;

9.31.4 Set up the other entities in the structure in the US and the Bahamas and the necessary structures there to ensure that the whole structure of the Elan Suisse Group is operational when sales of the product commence; and

9.31.5 Draft and create all the necessary agreements in order to turn Elan into an operational entity within the structure as is set out above.

9.32    This is an immense task, and takes a lot of time to accomplish. Several months of work just went into the finalization of the standard forms Elan intends to utilize once the sales of the product commence.

9.33    One must also, with respect, bear in mind that the product is unique to South African and the world financial services industry in many respects. This necessitates a lot of the work to be done from scratch, I can not simply use standard systems utilized before. All of this I did from Cape Town, with Botha being Elans' representative in Johannesburg.



9.34   Initially I funded the setting up of Elan within the structure as is set out above from my own pocket. By the beginning of 2004, this has cost me in the region of US$ 1.6. million.

9.35   Also, around this time, the time came to set up and incorporate the entity in the US as part of the structure set out above.

9.36   I was stretched thin on time and resources, and it became clear to me that I would need assistance in the US, both in terms of physical time and in terms of capital.

9.37   I knew the Plaintiff since 1996, and, in the normal course of correspondence between us, I informed him of the product and the structure for the sale thereof as is set out above.

9.38   From the beginning of 2004, several discussions ensued between me and the Plaintiff in this regard. The result was that, during or about February 2004, I agreed, orally, with the Plaintiff that:

9.38.1 An entity in the form of a corporation, would be incorporated in Delaware in the US;

9.38.2 The Plaintiff would invest US$ 350 000.00 in this entity;


0430750-0.   P. VAN WYK

9.38.3 In return for his said investment in the said entity the Plaintiff would receive 50% of the shareholding therein;

9.38.4 The Plaintiff would represent the said entity in the US and assist with the development thereof by attending to issues such as marketing and the likes;

9.38.5 The intellectual property of Elan and the product would be seated in the said entity as part of the exit strategy as is set out above; and

9.38.6 On the sale of Elan and the said entity in the US as is anticipated by the exit strategy as is set out above, the Plaintiff would receive a further amount equal to his initial investment.

9.39    These were the terms of the oral agreement concluded between myself and the Plaintiff. The Plaintiff specifically travelled to Stellenbosch, where we discussed this agreement.

9.40    During said discussion in Stellenbosch, approximately during January 2004, I specifically made it clear to the Plaintiff:

9.40.1 He **invests** his money. It is not a loan.

9.40.2 He invests his money in the entity incorporated in the US alone. He has nothing to do with Elan in its day to day activities, and he receives no

equity in Elan. His only link to Elan would be when it is sold, together with the entity incorporated in the US, as part of the aforesaid exit strategy; and

9.40.3 He is only authorized to, once his aforesaid investment is made, represent the entity incorporated in the US.

9.41 It is on the basis of this oral agreement that the Plaintiff invested US$ 250 000.00 in the entity that was incorporated in the US as Elan Suisse International Holdings ("Holdings").

9.42 Both Holdings and Elan are legitimate businesses. Their integrity as corporate entities is beyond question, the product real, and its potential substantial.

9.43 As I have set out above, I have been occupied with the business of Elan and Holdings for the past three years on a full time basis. The said business is about to be launched.

9.44 The Plaintiff, as will appear more fully hereunder, repeatedly confirmed his investment. His said investment was a repudiation of the aforesaid oral agreement in that he invested less than agreed. Nonetheless, I chose to hold the Plaintiff to our agreement, on the basis that he simply receive less equity in Holdings for his lower investment.



J. F. VAN WYK

9.45    The Plaintiff agreed to this.

## 10.

10.1    In a series of e-mails that passed between myself and the Plaintiff from the 28th of January 2004 to the 14th of February 2004, I advised the Plaintiff and represented to him that:

10.1.1 I have spent the previous two years in setting up Elan in South Africa as a financial engineering company, with a national network of independent financial advisors ("brokers") and institutions, through which certain United States based financial products would be sold to an investor base of some one million investors, accessed through such brokers and institutions, in South Africa;  and

10.1.2 I had already invested some US $ 1 600 000 in setting up the business of Elan;  and

10.1.3 I was looking for an investor to enable me to complete the project.

10.2    The discussion centered around an investment in Holdings, and I explained the entire structure and the exit strategy as is set out above to the Plaintiff. I emphasize that the discussion was not limited to the e-mails that passed between myself and the Plaintiff. It was supplemented by our



D430750-0    J.F. VAN WYK

oral conversations, resulting in the aforesaid agreement, for which the Plaintiff traveled to Stellenbosch specifically to discuss same with me.

10.3   I deny that any amount other than US$ 350 000 was ever discussed between me and the Plaintiff. With the substantial profits that the product will no doubt generate in Holdings through the intellectual property held there, I was loathe to allow the Plaintiff to invest in Holdings for a lesser sum.

10.4   The simple reason why the Plaintiff and his investment was necessary was that I needed both capital and labor in the US to assist in the activities of Holdings, which I could not handle myself. The Plaintiff is an accountant with "local knowledge", and I considered him a suitable person to assist in this regard.

10.5   Form our aforesaid discussions the Plaintiff decided to invest in holdings and did so by transferring the total of US $ 250 000 to my off shore bank account held in London, from the US.

**11.**

11.1   The Plaintiff invested in Holdings.

11.2   He simply had no contribution to make to Élan, whereas I needed him to assist with Holdings.

430750-0 / F VAN WYK

11.3  I have already set out the oral agreement between the Plaintiff and myself pertaining to his investment in Holdings herein above.

## 12.

12.1  The agreement pertaining to the intellectual property being held in Holdings and the incorporation of Holdings was reached before the Plaintiff transferred a cent to me. This was all agreed simultaneously as part of the agreement set out above.

12.2  At the time, Holdings was obviously not incorporated yet and had no banking facilities. Also, his investment was in Holdings, and it would defy logic to bring that money into South Africa. Holdings had nothing here.

12.3  As I have already pointed out, the Plaintiffs' investment was merely for the purpose of establishing and running Holdings. None of the funds were utilized in any other fashion.

12.4  This is the only reason why the funds were received in my offshore banking accounts.

12.5  The first year in which Holdings was incorporated had not run yet. At the end of the book year, the said funds shall be accounted for fully within Holdings as a capital investment.



12.6   By 15 September 2004, the Plaintiff had second thoughts about his investment. He now all of the sudden saw it as a loan, and wanted his money back. This appears fully from the e-mail from the Plaintiff attached hereto as **Annexure "BC4"**.

12.7   After I contacted the Plaintiff and reminded him of the terms of the agreement, he reconsidered and proposed that only a certain portion of his investment be refunded to him, but that the remaining portion of his investment remain in Holdings under certain conditions. I attach a copy of the relevant e-mail hereto as **Annexure "BC5"**.

12.8   From **Annexure "BC5"** hereto it is clear that the Plaintiff effectively attempts to renegotiate the agreement in terms far more favorable for him than what the agreement is.

12.9   The Plaintiff, as an accountant, is fully aware that, where an investor invests in a company, public or private (not a loan), it is not as simple as asking for your money back when one wants to liquidate such investment.

12.10  From the very beginning, I held out to the Plaintiff that his investment is governed by the articles of association of Holdings, and I supplied him with a copy of same.



12.11 The Plaintiff was aware of this, as appears from his later e-mail of 17 September 2004, a copy of which I attach hereto as **Annexure "BC6"** and his e-mail dated 18 September 2004, a copy of which I attach hereto as **Annexure "BC7"**, from which he clearly intimates that he knows his investment must be "liquidated" through the sale of his shares.

12.12 It is in this sense that I reply to the Plaintiffs' said e-mail on **Annexure "BC7"** hereto that "cash" is coming. It simply refers to my efforts that I shall find other investors in Holdings to replace him.

**12.13** However, the Plaintiff, on the 21st of September 2004, suddenly, without any warning, changed his mind and informed me by way of e-mail, a copy of which is attached hereto as **Annexure "BC8"**, that he no longer wishes to liquidate his position.

**12.14** Also, on the 21st of September 2004, the Plaintiff by way of e-mail confirmed that, to his mind, I was not a "scam artist". I attach a copy of said e-mail hereto as **Annexure "BC9"**.

**12.15** I was now under the impression that the Plaintiff is fully aware of the terms of the agreement and its nature and is satisfied with his investment. Moreover, it appeared that the Plaintiff was aware of the terms of the articles of association of Holdings, and that:

12.15.1     his investment was in Holdings; and



12.15.2      it can only be repaid to him by holdings upon the sale of his shares in holdings for the price he so obtains.

**12.16** It must also be borne in mind that I spoke to the Plaintiff continuously, and that e-mail was not our only form of communication. During our said conversations the Plaintiff also gave repeated indications that he is happy with his investment and understood the terms thereof.

12.17 The Plaintiff invested his money in accordance with the terms of the agreement. There was no written agreement contemplated between the parties. Certain paperwork, like share transfer forms, had to be concluded in order to fully implement the oral agreement, but no more than that.

12.18 I again point out that the Plaintiff invested less than what we agreed upon. This entitled him to less equity in Holdings, a fact to which I will show hereunder he agreed to.

12.19 I have spent many years working on this project, which the Plaintiff expects to make him rich in less than a year. The simple truth of the matter is that the Plaintiff had expectations of earlier returns, and now doesn't have the patience to wait for his returns as the prudent investor would do.

12.20 Moreover, while I have no problem that the Plaintiff liquidate his position by taking possession of his shares and selling same as he is



aware he must do, he clearly seems unable or unwilling to perform this step. I have, throughout, tendered delivery of the said shares to the Plaintiff, and I still do so.

12.21 It is clear from what I have set out herein above that my offer to repay the Plaintiff his investment was made in our mutual understanding that the only way of doing so would be to take possession of and sell his shares in Holdings.

12.22 I attach hereto, as **Annexure "BC10"**, a copy of my e-mail sent to the Plaintiff dated the 17th of February 2004 in which I clearly ask him if he is aware that he only buys into Holdings.

12.23 Further, it is clear from the full paper trail as I have set out above, that I never undertook to repay the investment of the Plaintiff personally. His shares in Holdings would have to be sold, and he would be paid from that. He knew this.

12.24 In any event, in **Annexure "BC8"** hereto, the Plaintiff changes his mind, and stands down from the position where he wanted to liquidate his position in Holdings. Even if I am wrong in my position that I never undertook personally to repay the Plaintiffs' investment to him, which I still deny, the Plaintiff clearly waived such payment, before the attempted "acceptance" thereof by the Plaintiffs' attorneys of record.



0430760-0    A.F. VAN WYK

12.25 Contrary to what the Plaintiff wants the Honourable Court to believe now, he actually agreed with me that he is only entitled to 35% of the shareholding in Holdings.

12.26 This is simply another of the blatant lies of the Plaintiff herein.

12.27 Also contained in **Annexure "BC11"** hereto, is an e-mail sent by the Plaintiff later on the same day, wherein he indicates that he is ready to proceed with the project again.

12.28 The only issue unresolved after my receipt of the e-mails contained in **Annexure "BC11"** hereto, was the issue of the Plaintiffs' alleged shareholding in the Elan.

12.29 In this regard I wrote to the Plaintiff as early as 17 February 2004 that he only buys into Holdings.

12.30 This issue again, as is set out above, cropped up during September 2004, when I fully set out the terms of the agreement, and the Plaintiff agreed with me.

12.31 I again reiterate that, in terms of the agreement, the Plaintiff would not receive any equity in Elan.



12.32 In the first instance I never offered to repay the Plaintiff in my personal capacity. I have explained the context of the said offer fully herein above, and stand by what I have declared in this regard.

12.33 Secondly, the Plaintiff waived any offer that was made in **Annexure "BC9"** hereto.

12.34 It is ironic that the whole basis of the Plaintiffs' claim is belied by contents of the Plaintiffs' own correspondence, all of which the Plaintiff deliberately and dishonestly withholds from the Honourable Court.

## 13.

From what I have set out above it is with respect clear that:

13.1    The Plaintiff invested in Holdings;

13.2    The Plaintiff's investment in Holdings can only be liquidated on the basis that his shares in Holdings are sold, be that for a profit, a loss, or the same amount of his investment, and the purchase price of the shares paid to him;

13.3    This is in accordance with the Articles of Association of Holdings of which the Plaintiff is aware and to which he bound himself;



13.4 I never personally undertook to repay the said amount of the investment to the Plaintiff; and

13.5 Even if I undertook to so repay the said investment, the Plaintiff, in writing, waved such undertaking.

## 14.

14.1 In the premises I submit that I clearly have a *bona fide* defence against the Plaintiff's claim herein, which, if proved at the trial, will constitute a good defence.

14.2 Furthermore, my defence as is set out above, was fully conveyed under oath in the liquidation application to the Plaintiff. I shall ensure that the full court file in the liquidation application is available for the Honourable Court's inspection and reference at the hearing of this application.

## 15.

15.1 In the circumstances, the Plaintiff's persistence in the application for summary judgment constitutes an abuse of process.

15.2 Full legal argument shall be addressed to the Honorable Court in this regard in due course.



16.

In the premises, I pray that the Plaintiff's application for summary judgment be dismissed with costs.

DEPONENT

SIGNED AND SWORN TO BY THE ABOVE DEPONENT BEFORE ME ON THE _15_ DAY OF _April_ 2005 AFTER THE SAID DEPONENT CONFIRMED THAT HE HAS READ THIS AFFIDAVIT, THAT HE UNDERSTANDS THE CONTENTS THEREOF, AND THAT SAME IS TRUE AND CORRECT, AFTER HE HAS TAKEN THE PRESCRIBED OATH, WHICH HE CONSIDERS BINDING ON HIS CONSCIENCE.

COMMISSIONER OF OATHS

SUID-AFRIKAANSE POLISIEDIENS
GEMEENSKAPDIENSESENTRUM

2005 -04- 1 5

KLEINMOND
COMMUNITY SERVICE CENTRE
SOUTH AFRICAN POLICE SERVICE

**EXHIBIT B**

CURRENT ACTIVITY                          03/23/04

KAREN E CHRIST                    ACCT NBR   1010084543624
ROBERT D CHRIST                   PROD DESC  HIGH PERFORMANCE MMT
2333 JONES ROAD
POTTSTOWN PA  19465               STMT DATE  03/12/2004
                                  STMT AMT          230618.73+

                                  DAILY BAL       230,618.73+
03/16/2004

        40.00-   FUNDS TRANSFER FEE   (ADVICE 040316009287)
    125,000.00-  INTL FUNDS TRANSFER  (ADVICE 040316009287)
                 SENT TO  WACHOVIA BANK NA /LLOYDS TSB ISLE O
                 BNF=DR BRETT CORMICK RFB=040316400085
                  AMT=       125000.00 CUR=USD RATE=
                 REF=040316400085      03/16/04  09:59AM
     6,000.00-   COUNTER WITHDRAWAL

                                  DAILY BAL        99,578.73+


     *** INCLUDES TRANSACTIONS POSTED FROM 03/13/2004 TO 03/22/2004 ***
        *** INFORMATIONAL COPY ONLY - NO ENCLOSURES ***

# EXHIBIT C

State of Delaware
Secretary of State
Division of Corporations
Delivered 12:37 PM 03/15/2004
FILED 11:47 AM 03/15/2004
SRV 040189312 - 3776919 FILE

# CERTIFICATE OF FORMATION

## OF

### Elan Suisse International Holdings (USA) LLC

FIRST:  The name of the limited liability company is
Elan Suisse International Holdings (USA) LLC.

SECOND:  The address of its registered office in the State of Delaware is 3422 Old Capitol Trail, Suite 700, Wilmington, DE  19808-6192, county of New Castle.  The name of its registered agent at such address is DELAWARE BUSINESS INCORPORATORS, INC.

THIRD:   The name and address of the initial member of this Limited Liability Company will be:
Dr. Brett Cormick
2 Lansdowne Row
Suite 334
Mayfair,  W1J -6HL England

FOURTH:  The initial member(s) of this Limited Liability Company has the authorization to lend money to, borrow money from, act as a surety, guarantor or endorser for, guarantee or assume one or more obligations of, provide collateral for, and transact other business.

FIFTH: The duration of this Limited Liability Company will be perpetual.

IN WITNESS WHEREOF, the undersigned Authorized Agent has executed this Certificate of Formation on this date of 03/15/2004

AUTHORIZED PERSON/AGENT:

AGENT - DELAWARE BUSINESS INCORPORATORS, INC.

By: _____
    RUSSELL D. MURRAY, V.P.

DBI: 15890

# EXHIBIT D

## Bracegirdle, Thad J.

**From:** Dr Brett Cormick [brettc@elan-capital.com]
**Sent:** Tuesday, February 17, 2004 2:05 AM
**To:** bob.christ@seatrepid.com
**Subject:** US Company

Bob

Just checking whether its better to be a straight Delaware LLC  or a Foreign Delaware LLC

Advantages of a Delaware Corporation or LLC

Over 50% of all companies on the NY Stock Exchange are Delaware corporations.

Delaware has a long heritage as a business-friendly state and may be a good choice if you intend to take your company public and offer publicly traded stock.

Delaware has many other advantages, including low incorporation fees, low annual franchise taxes, *and no state corporate income tax for corporations that operate outside of Delaware!!!!!!!!!!!*

(if you incorporate in Delaware while your business is located outside of Delaware, you may need to qualify to do business in your home jurisdiction. This may require an extra step in the home state)


Delaware Foreign LLC

A foreign limited liability company may register with the Secretary of State under any name (whether or not it is the name under which it is registered in the jurisdiction of its formation) that includes the words "Limited Liability Company" or the abbreviation "L.L.C." or the designation "LLC" and that could be registered by a domestic limited liability company; provided however, that a foreign limited liability company may register under any name which is not such as to distinguish it upon the records in the office of the Secretary of State from the name on such records of any domestic or foreign corporation, partnership, statutory trust, limited liability company or limited partnership reserved, registered, formed or organized under the laws of the State of Delaware with the written consent of the other corporation, partnership, statutory trust, limited liability company or limited partnership, which written consent shall be filed with the Secretary of State.

Before doing business in the State of Delaware, a foreign limited liability company shall register with the Secretary of State. In order to register, a foreign limited liability company shall submit to the Secretary of State: a copy executed by an authorized person of an application for registration as a foreign limited liability company, A fee as set forth in § 18-1105(a)(6) of this title shall be paid.

*A person shall not be deemed to be doing business in the State of Delaware solely by reason of being a member or manager of a domestic limited liability company or a foreign limited liability company.!!!!!!!!!*

**Bracegirdle, Thad J.**

| | |
|---|---|
| **From:** | Dr Brett Cormick [brettc@elan-capital.com] |
| **Sent:** | Wednesday, February 18, 2004 3:28 AM |
| **To:** | bob.christ@seatrepid.com |
| **Subject:** | Re: US Company |

Yes checked up, it looks like the straight Delaware LLC will do it

Then we do a simple assignment of intellectual property rights into this baby (I.e. the ownership of the 13,000 IFAs and 1 million investors dumb/happy enough to pay 5% to join a fund, 2.5% a year, and 1.25% to get out)

PLUS

the African Renaissance factor (We could even throw in the relationship with the big banks if we got more $$)..then we start grooming IMMEDIATELY to sell....
----- Original Message -----
From: <bob.christ@seatrepid.com>
To: "Dr Brett Cormick" <brettc@elan-capital.com>
Sent: Tuesday, February 17, 2004 6:35 PM
Subject: Re: US Company


> Yep, Wilmington is about 1 hour drive from my house.  I had several clients
> that were DE corporations.  It works for an international corporation,
> but doesn't have a big advantage for a local corp. since the states
> make you apportion the income anyway.  But it does make sense for an
> E.S.-type arrangement and that's what I was thinking as well.
>
> Dr Brett Cormick writes:
>
> > Bob
> >
> >
> >
> > Just checking whether its better to be a straight Delaware LLC  or a Foreign Delaware LLC
> >
> >
> >
> >
> >
> > Advantages of a Delaware Corporation or LLC
> >
> >
> > Over 50% of all companies on the NY Stock Exchange are Delaware corporations.
> >
> >
> >
> > Delaware has a long heritage as a business-friendly state and may be
> > a
> good choice if you intend to take your company public and offer publicly traded stock.
> >
> >
> >
> > Delaware has many other advantages, including low incorporation
> > fees,
> low annual franchise taxes, and no state corporate income tax for corporations that operate outside of Delaware!!!!!!!!!!!

1

> >
> >
> >
> > (if you incorporate in Delaware while your business is located
> > outside
of Delaware, you may need to qualify to do business in your home jurisdiction. This may require an extra step in the home state)
> >
> >
> >
> >
> >
> >
> >
> > Delaware Foreign LLC
> >
> >
> >
> >
> >
> > A foreign limited liability company may register with the Secretary
> > of
State under any name (whether or not it is the name under which it is registered in the jurisdiction of its formation) that includes the words "Limited Liability Company" or the abbreviation "L.L.C." or the designation "LLC" and that could be registered by a domestic limited liability company; provided however, that a foreign limited liability company may register under any name which is not such as to distinguish it upon the records in the office of the Secretary of State from the name on such records of any domestic or foreign corporation, partnership, statutory trust, limited liability company or limited partnership reserved, registered, formed or organized under the laws of the State of Delaware with the written consent of the other corporation, partnership, statutory trust, limited liability company or limited partnership, which written consent shall be filed with the Secretary of State.
> >
> > Before doing business in the State of Delaware, a foreign limited
liability company shall register with the Secretary of State. In order to register, a foreign limited liability company shall submit to the Secretary of State: a copy executed by an authorized person of an application for registration as a foreign limited liability company, A fee as set forth in §
18-1105(a)(6) of this title shall be paid.
> >
> > A person shall not be deemed to be doing business in the State of
Delaware solely by reason of being a member or manager of a domestic limited liability company or a foreign limited liability company.!!!!!!!!!
> >
> >
> >
> >
> >
>
>
>
> Bob Christ
> SeaTrepid
> 2333 Jones Road
> Pottstown, PA  19465
> Phone: +1(610)469-1730
> Cell: +1(610)547-4185
> http://www.seatrepid.com
>
>

# EXHIBIT E

**From:** Dr Brett Cormick
**Sent:** Saturday, July 31, 2004 3:56 AM
**To:** 'Bob Christ'
**Subject:** FW: Private Equity
Bob

Thoughts for you to give you a stiffy to get you through the day : - )

As you know our financial engineering product base is designed to dominate the 5 major investment categories, with better investment product, directly to the 1 million active South African investors, direct through the 12, 960 IFA's nationally with investment product better than anyone has ever seen before

Our investment product base is

Equity

Bonds

Cash

Real Estate

And Private equity


Attached is the first Private Equity transaction

It is the most important and revolutionary development in drug delivery systems in the last 20 years anywhere in the world

It is a French company.

The French government are so committed they gave this company free access to the Evian Water company aquifer for an indefinite period at no charge.

Amazing

It has just done a jv with Boots in the UK and the largest beer company in Japan...

It is fantastic in its implications for South Africa...everything from cheaper and more effective medicines to no calorie beers to appetite suppressing soft drinks

Brilliant

Every product that we do in its own way makes history as the most important innovation in its asset class.

In the private equity asset class, it's the underlying companies that we do that have these features.

This sort of thing will make us the standard by which the national IFA investment market judges everybody else

It will also make sure that our company value goes through the roof, because it basically guarantees our capture of the national retail market and sale to one of the giants

This could also be incredible for the ENTIRE US EH??????  Every hotel and bar selling appetite suppressing or no calorie beer

Drugs such as aspirin/Viagra/etc available in designer water bottles or soft drinks??

Mu hahahahahahahahahahahahahha



# AQUACINE

WATER + FUNCTIONALITY ➤ USP + CONVENIENCE + VALUE



*BEVERAGES - ALCOHOLIC AND NON*



*AQUACINE SAS researches, developments and will shortly manufacture ready to drink pharmaceutically active beverages*

The Aquacine Group is the world's first and only pharmaceutical company dedicated to the research, development and manufacture of ready to drink (RTD) single-dose medicines: medicines delivered in soft drinks' format. Soon medicines such as paracetamol and ibuprofen will be available in RTD format, e.g. 400mg of ibuprofen in a great tasting 200ml PET beverage serving.

One of Aquacine's core business units is the application of its proprietary technology and know-how to unlicensed products, such as functional beverages and alcoholic short and long serves.

Commercially, Aquacine's products meet the consumer's demands and, through good value at a premium price, delivers exceptional returns.

*AQUACINE's first plant is under construction in Lorraine, France, having raised >14m USD from a combination of private equity, French government and central EU funds.*



**AQUACINE**

Aquacine's 25 acre site, with its state-of-the-art 84,000 sqft R&D, clinical trials and manufacturing halls, allows the Group to deliver a combination of development and manufacture for a broad range of products, from functional beverages to prescription only medicines, along with innovative liquid products for animal healthcare.

Aquacine's partners include several of the world's biggest pharmas, and global players in food and beverage markets.

Aquacine's priorities naturally led it to Africa, where, with the widespread support of many global organisations, including the World Bank, the company will build its second plant, to deliver RTD medicines to places where the company's medicine format can deliver an immediate and pivotal benefit.

# *AQUACINE: technology snapshot*



**AQUACINE**

Aquacine has a large proprietary technology portfolio, which allow it to create and manufacture functional beverages where other companies can not.

In the soft drinks market a key example would be high catechin-containing green-tea based products. For example in Japan the leading brand can deliver 540mg in a 350ml serving, which is barely palatable, but maintains its market position because of its demonstrable functionality: the ability to promote increased burning of calories and thus underpins its position as a leading dietary aid.

Aquacine's technology and process delivers a:

- 2500mg catechin quantity in 250ml serving
- with no fobbing
- stable to flash pasteurisation
- negligible calorific content
- no increased viscosity
- using components permitted for use in foods

# AQUACINE: alcoholic beverages



**AQUACINE**

Our portfolio contains:

- beer supplemented with masked-catechins to provide a "calorie zero" beer
- short-serve carbonated vodka with masked-capsaicin as an appetite suppressant
- hangover-free beer
- long-serve whisky plus stimulants

The group is currently seeking manufacturing and distribution partners for Southern Africa.

The group's executives believe the African business will command a value of >£100m (sterling) within 36 months.

*For further details please contact Dr Brett Cormick, Elan Suisse*

# EXHIBIT G

# ELAN SUISSE

CAPITAL

# INVESTING IN RANDS
## – *for profit in pounds*

Elan Suisse Capital is bringing a truly unique and historic private investment opportunity to South Africa through its Elan Suisse Capital Biopharma investment vehicle. This will be the first Biopharma investment opportunity ever made available in South Africa and is the result of 10 years' combined financial and biochemical engineering.

## Key Features

The key features of this investment opportunity, *which is by invitation only*, and will not be made available to South African institutional investors are:

- Investors will participate locally in Rands, but will receive dividends in pounds and a hard currency exit
- Participation will be directly into the world's leading breakthrough operating Biopharma companies
- All Biopharma companies will be operationally reversed into the South African economy and headquartered in South Africa, with their international subsidiaries owned and controlled by the South African entity
- All technologies have billion dollar potential



Dr Brett Cormick, who has served as a Director and Managing Director of several of the largest banks in Europe, and is the founding director of the London School of Economics International Economic Development Group, said of the financial engineering of the investment opportunity: "Imagine going back in time and persuading Mark Shuttleworth to allow you to invest in his company in Rands, two weeks after it started operations, knowing fully what the outcome was going to be in hard currency ... we have engineered this ideal as a mechanism for all of our private Biopharma investments."

- International investors will not generally be admitted to the companies until South African investors have had an opportunity to achieve a significant capital appreciation, after which the participation of international investors will increase their returns exponentially
- Liquidity to be provided by secondary market mandates
- All companies are strictly private until exit

## Microsoft Equivalent

According to Norman Botha, previously a Portfolio Manager with Barnard Jacobs Mellet, who now represents Elan Suisse Capital in the Gauteng area "....this invitation only investment opportunity is the most exciting investment that I have ever seen..... it is to the pharmaceutical industry what Microsoft is to the IT industry"

## Elan Suisse Capital Biopharma Portfolio Operations include:

- Europe's largest analgesics brand distributed in over 142 countries worldwide
- The world's largest lozenge brand
- The world's largest prescription only non-steroidal anti-inflammatory drug
- The UK's largest health and beauty retailer
- The world's third largest brewer
- The French Government
- A European network of animal healthcare distributors in more than six countries



Dr John Walters, formerly of the University of Oxford and NASA, who heads up the international Elan Suisse Capital Biopharma operation said of Aquacine: "The beneficial impact on global health, social and economic welfare from delivering controlled doses of fast-acting and safe medicines, in combination with clean water in a soft drink format, cannot be over-estimated."

- Pan-Caribbean
- More than 8200 pharmacies across Southern Africa
- The top national retail and supermarket chains in Southern Africa
- Pharmaceutical distributors across South East Asia

## Elan Suisse Capital Biopharma operations from South Africa to the world

The first Biopharma operational launch in South Africa commences in June 2005. All products released will carry the "Elan Suisse Bio Capital" marque, making it a simple matter for all investors to walk into any pharmacy or major supermarket chain in South Africa (Europe, SEA, USA and Caribbean) and physically witness how their investment is growing in hard currencies internationally.



Dr Parashkev Nachev is Elan Suisse Capital's Head of Clinical Development. He is a member of the Royal College of Physicians, and studied Clinical Medicine at Christ Church College, Oxford University, where he received the Bristol Meyers Prize in Cardiology, and Downing College Cambridge University. He is the Clinical Research Fellow of the Department of Visual Neuroscience at Imperial College London.

Moneyweb editorial note: Parashkev Nachev wishes to point out that he was never formally appointed to this position and did not authorise or see this press release before publication.

"Poor compliance remains a key problem in pharmacotherapy. There is no doubt that the way in which a drug is presented and consumed is critical. For many patients, conventional tablet or capsule formulations present a barrier which may be difficult to overcome. This problem is likely to become more acute in the future as therapy shifts from disease treatment to disease prevention where the patient's motivation to take the drug is understandably weaker."

"The remarkable advances in drug development over the past 50 years have not been paralleled by commensurate improvements in drug delivery. Although liquid formulations are sometimes used, particularly in paediatric practice, there have been no serious attempts to introduce them across the spectrum of commonly used medications. The RTD technology presented here overcomes many of the difficulties associated with liquid formulations, especially drug stability and taste masking, and provides perhaps the first credible rival to tablets as the mainstream formulation for a range of commonly used drugs. As a means of improving patient compliance it represents a very signficiant advance," says Dr Parashkev Nachev.

### Elan Suisse Capital Biopharma RTD medicines from Aquacine: a £ billion global market and a world's first for South Africa

Too often people struggle to take the medicines they need in tablet form. There is a safer, more effective and maximally convenient alternative that will revolutionise the way we take medicines: ready to drink (RTDs) medicines from Aquacine.

### RTD Medicines

RTD medicines are medicines in water, served in a soft drinks format, that do away with the inherent difficulties of taking medicines in tablet form. Aquacine's proprietary patented technology and manufacturing processes allow a broad range of drugs to be stabilised in water, taste-masked and made bio-available to the body immediately after ingestion. Compared to tablets RTD medicines are faster acting; require a lower overage of medicines; avoid high local drug concentrations during absorptions and related problems; make abuse and overdose almost impossible; and allow many global block-buster drugs which are unstable in water, such as aspirin, to be stabilised for liquid delivery for the first time in history.

### RTD Markets

The market for any one of these RTDs is billions of USDs. The US analgesics market is more than 10 billion doses per year and the RTD format opportunity exceeds $10bn. The African market for anti-malarials exceeds $2bn per year. The SEA market for various CVD treatments exceeds $5bn.

### Elan Suisse Capital Biopharma first two portfolio companies: Smart Water Technologies (SMT) and Aquacine

SMT and Aquacine deliver pharmaceutically active substances in RTD formats; SMT's focus is unlicensed functional alcoholic and non-alcoholic beverages and Aquacine's is licensed RTD medicines.

SMT product portfolio include Nicotea – a tobacco-based iced tea for use in cessation of smoking, a multi-nutrient range for mums to be and young mums called BabySafe, a dieting aid that assists with weight control, as well as an immune booster that helps fight and prevent upper respiratory



Anthony Carter from Elan Suisse Corporate Services shakes hands with Des Magua the Chief Executive of Ino Asante on the initiative to create an Elan Suisse Capital Biopharma manufacturing park in the Western Cape for sale and distribution of Aquacine, Smart Water Technologies' and many other Elan Suisse Capital Biopharma products throughout the African continent and key hard currency export markets.

chest infection. The product launches commence in June 2005 in Africa, Europe and the Caribbean.

Aquacine's RTD medicines are planned for global launches in 2006 and 2007, targeting the largest volume medicines in the world. Included in the company's pipeline are RTD analgesics (paracetamol and ibuprofen), proton-inhibitors (e.g. ranitidine), treatments for malaria, contraception, antibiotics (erythromycin), anti-histamines (loratidine, cetrizidine) and various medicines for the treatment of CVD.

### Management

The management team has over 65 years combined experience in Biopharmaceutical corporate development and international investment finance throughout every country in Europe. There is no other management team in South Africa with this level of international experience.

### Information about Elan Suisse Capital Biopharma Private Investment Opportunities

For more information on participating in this *by invitation only* private investment opportunity, please contact **Dr Brett Cormick** of Elan Suisse Capital or **Dr John Walters** of Elan Suisse Biocapital on **+ 27 21 410 8786** or contact them at brett.cormick@elan-capital.com and john.walters@elan-biocapital.com.



**European manufacturing centre:** The world's first RTD medicines plant near Strasbourg in France, entirely funded by French Government Regional and Central EU Funds

# EXHIBIT H

# ELAN❷SUISSE
### CAPITAL

# BIOPHARMA
# INVESTMENT PORTFOLIO



Capitalising on the success of the launch of the historic Biopharma investment platform, which was first featured in the April 2005 edition of the FA News, Elan Suisse Capital is now launching the first **Biopharma Investment Portfolio** of its kind in the World.



**Dr Brett Cormick** says "The availability of this important new asset class to investors in South Africa for the first time, is a critical addition to any Financial Advisors investment portfolio. It provides access to a unique *Best in Class* private equity investment facility, that is not available to the institutional market."

First round investors, who were invited to participate in the initial Biopharma private round, achieved capital appreciation of their stock in excess of 80% in only 8 weeks.

This was specifically due to Elan Suisse Capital's international corporate engineering of the underlying private Biopharma companies. This included multiple JV's with major international European retail chains, major long haul airlines, European parastatial research institutions and Asian multi-channel distributors.

## The Portfolio
The key features of the Elan Suisse Capital Biopharma Investment Portfolio are:

### Biopharma Investment Portfolio – The Difference
- Proprietary deal flow of high-growth, near-market, global operating Biopharma companies, who have world renowned partners, no gearing and strong IPR
- A management team with over 65 years combined multinational operational experience
- Comprehensive exits, including Elan Suisse Capital engineered international trade sales



**Dr John Walters** head of Elan Suisse Capital's Biopharma Investment Portfolio operations says "The elegant fact that all products from our portfolio companies will carry the Elan Suisse Capital marque is great because it allows all portfolio investors to take delight in how their investment is growing from day to day on the retail shelves they know so well."

**Biopharma Investment Portfolio Unique Objectives & Features**
- Delivering significant capital gains with ongoing hard currency yield
- OTC liquidity facility
- International hard currency co-investors engineered to maximise local South African investors' returns
- Not available to institutional investors

### Biopharma Investment Portfolio Update



From more than 20 products from the Biopharma Investment Portfolio companies, **Nicotea®** is the world's first cigarette replacement product. **Nicotea®** provides a revolutionary nicotine drink which is the world's only alternative to smoking. **Nicotea®** makes it possible for the first time for smokers to enjoy the satisfaction of smoking in the ever-increasing

number of places where cigarettes are no longer allowed, such as in-flight, the work-place, restaurants, cinemas, schools and hospitals.

**Nicotea®** is the only product in the world that provides 0.8mg of naturally derived nicotine with the stimulatory benefits of 75mg of caffeine in a natural tobacco-derived peach flavoured iced tea. It has been specifically bio-pharmacologically engineered to meet the needs of those wishing to quit smoking, bridge the gap between cigarettes in the ever-increasing number of places where smoking is not allowed and as a healthier alternative to cigarettes.

In the first week of its launch **Nicotea®** was pre-sold to 22 long-haul airlines out of South East Asia, the largest health and beauty retailer in Europe and is expanding its third party distributor base exponentially.

As an unlicensed product **Nicotea®**'s channels to market exceed those of cigarettes and as such global revenue expectations are in line with a significant share of the current world-wide cigarette market.



Juzer Norman the CEO of Smart Water Technologies Asia, a portfolio spin-off company, based in Malaysia, said "It is always exciting launching new technologies, however the response from the SEA market for a share of **Nicotea®** distribution can only be described as extraordinary."

## Biopharma Investment Portfolio Companies' South East Asia (SEA) Expansion

Following detailed analysis and partner profiling, Malaysia has been selected as the SEA manufacturing hub for the Biopharma Investment Portfolio's RTD businesses. The combination of low-cost, high-margin and aggressive product demand makes this an exceptional fast-track environment for our companies to provide an outstanding share-holder return. Initial SEA product launches include **Nicotea®** and **Doc™** (drug-free alcoholic hangover preventative).

## Biopharma Investment Portfolio JVs

International JVs provide the quickest form of portfolio company valuation appreciation. Elan Suisse Capital specifically targets the largest most prestigious players in each market to achieve this. Examples include:

**MediVend™** – a JV with Europe's largest health and beauty retailer, making our RTD medicines available through vending point of sale in the work-place internationally. This new route to market delivers an excellent ROI within an exciting and innovative COD model



**National Garden of Wales IPR JV** – exploiting the proprietary drug-delivery technology of one of the Biopharma Investment Portfolio companies, together with European bio-pharmacological IPR that spans 700 years of history; Elan Suisse Capital intends to delivery 21st Century consumer health and cosmetics products. The core to these new brands will be anti-aging therapies

## Biopharma Investment Portfolio European R&D Head-quarters



The purpose-built 14,000 sqft cGLP facility meets the standards of the world's top research facilities. Located in the western UK, it will provide the global R&D resource for all of the Biopharma Investment Portfolio's companies.

## Biopharma Investment Portfolio

- Minimum investment 100,000 ZAR
- Segregated investor portfolios
- OTC Market Maker **Ino Asante (Nations Bank)**
- Custodian **Computershare**
- Administrator **Mercari Financial Services**
- Legal Advisors **Deneys Reitz**
- Participation in portfolio only available on approval following personal interview

## To Apply for a Personal Investment Interview

Please complete the on-line form at **www.elansuisse.com/bip/application.htm** or email your enquiry to **salome.engelbrecht@elan-capital.com** or **nadia.van.den.heever@elan-capital.com** or telephone **+27 21 410 8786**

# EXHIBIT I

Close Window | Print this story

80% in 8 weeks?
By: Julius Cobbett
Posted: 12-JUL-05

There appear to be a number of alarm bells ringing within Elan Suisse Capital, a private equity scheme currently soliciting funds from South African investors. Elan Suisse Capital was introduced to potential investors in the form of a **double page advertisement** placed in the April issue of FANews, a financial publication.

The ad markets two underlying private companies, Aquacine and Smart Water Technologies; readers are informed that investment is by invitation only. Two months later, those who hadn't cracked invites must have felt bleak: a **follow-up ad** placed in the June issue of FANews announced with fanfare that first round investors had achieved capital appreciation of their stock in excess of 80% in only 8 weeks.

Again, the ad appears to be soliciting funds for the portfolio of two stocks, with participation "only available on approval following a personal interview," and a minimum investment of R100 000 required. The second ad also makes reference to a number of entities apparently involved with the scheme: over-the-counter (OTC) market maker Ino Asante, custodian Computershare, administrator Mercari Financial Services, and legal advisors Deneys Reitz.

However, at least three of the above entities deny that they currently perform the functions mentioned. Ino Asante chief operating officer Des Magua says his company has been mandated by Elan Suisse to operate the OTC market, but to date has not been called upon to do so.

In an interview with *Moneyweb* last month, Elan Suisse Capital director John Walters enforced the OTC claim. According to Walters, the price of stock traded on the Ino Asante OTC market rose from £2,20 a share to £4,50 in a matter of weeks. By coincidence, Walters claimed that the prices quoted applied to both Smart Water Technologies and Aquacine.

With no OTC market in place, one wonders how Elan Suisse came up with the capital appreciation figure of 80% – unless, of course, the figure is a thumb suck.



**John Walters**

Mercari director Dirk Mostert says that his company has agreed to act as administrator to Elan Suisse Capital, pending the completion of a due diligence and the finalisation of some "legalities and fees." Walters, however, insists that Mercari currently acts as Elan Suisse's administrator.

Computershare denies any custodian function with respect to Elan Suisse Capital.

The structure of Elan Suisse Capital is also peculiar. According to Walters, investors who buy shares in South African-registered Aquacine and Smart Water Technologies are "gifted" shares in similar companies registered in England and Malaysia. With this corporate structure, explains Walters, shareholders can receive dividends in pounds sterling.

It is magnanimous of Elan Suisse Capital to provide this service to South African investors. But with a global portfolio, one wonders why the company didn't approach a more lucrative haven for private equity like, for example, the USA.

Another important question is why Elan Suisse Capital is bothering to raise funds at all. Its June advert claims that in its first week of its launch, Nicotea, a product apparently owned by Smart Water Technologies, "was pre-sold to 22 long-haul airlines out of South East Asia, the largest health and beauty retailer in Europe and is expanding its third party distributor base exponentially." Surely such deals would make a fund raising campaign unnecessary?

---

This article is a printout from Moneyweb Holding Ltd
Copyright © 2005

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-275-GMS |
| | ) | |
| BRETT J. CORMICK, ELAN SUISSE | ) | |
| INTERNATIONAL HOLDINGS (USA) | ) | |
| LLC, ELAN SUISSE (PTY) LTD., | ) | |
| NICOGEL LTD., JOHN WALTERS, | ) | |
| DIANNE MARSHALL and MERCARI | ) | |
| FINANCIAL SERVICES (PTY) LTD., | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I, Thad J. Bracegirdle, hereby certify that on the 26th day of June, 2006, I caused a true and correct copy of *Affidavit of Robert D. Christ* to be served on the counsel for defendants as listed below, via electronic CM-ECF:

*Attorneys for Defendants:*

David L. Finger, Esquire
Finger & Slanina, P.A.
One Commerce Center, Suite 725
1201 North Orange Street
Wilmington, DE 19801-1155

Dated: June 26, 2006

/s/ Thad J. Bracegirdle
Thad J. Bracegirdle (DE ID 3691)

WILLIB-49001.1-TJBRACEG 6/26/06 2:04 PM