# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRETT J. CORMICK, ELAN SUISSE | ) | C.A. No. 06-275-GMS |
| INTERNATIONAL HOLDINGS (USA) | ) | |
| LLC, ELAN SUISSE (PTY) LTD., | ) | |
| NICOGEL LTD., JOHN WALTERS, | ) | |
| DIANNE MARSHALL and MERCARI | ) | |
| FINANCIAL SERVICES (PTY) LTD., | ) | |
| | ) | |
| Defendants. | ) | |

## COMPENDIUM OF UNPUBLISHED CASES TO ACCOMPANY PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS OR STAY

REED SMITH LLP
Thad J. Bracegirdle (No. 3691)
1201 Market Street
Suite 1500
Wilmington, Delaware 19801
(302) 778-7500

Attorneys for Plaintiff

Dated: June 26, 2006

# INDEX OF CASES

## FEDERAL CASES

*Marino v. Cross Country Bank,*
    2003 WL 503257 (D. Del. Feb. 14, 2003) ........................................................1

*Telcordia Technologies, Inc. v. Alcatel S.A.,*
    2005 WL 1268061 (D. Del. May 27, 2005) ....................................................2

## STATE CASES

*Albert v. Alex. Brown Management Services,*
    2005 Del.Ch. LEXIS 133 (Aug. 26, 2005) .......................................................3

*Arnold v. Society for Savings Bancorp, Inc.,*
    1993 Del.Ch. LEXIS 275 (Dec. 15, 1993) .......................................................4

*Cairns v. Gelmon,*
    1998 Del.Ch. LEXIS 79 (May 21, 1998) .........................................................5

*Computer People, Inc. v. Best International Group, Inc.,*
    1999 WL 288119 (Del. Ch. Apr. 27, 1999) ....................................................6

*Cornerstone Technologies, LLC v. Conrad,*
    2003 Del.Ch. LEXIS 34 (Mar. 31, 2003) .......................................................7

*IOTEX Communications, Inc. v. Defries,*
    1998 WL 914265 (Del. Ch. Dec. 21, 1998) ...................................................8

*Kahn v. Lynch Communication Systems, Inc.,*
    1989 Del.Ch. LEXIS 102 (Aug. 24, 1989) ......................................................9

*Marketing Products Management, LLC v. HealthandBeautyDirect.com, Inc.,*
    2004 WL 249581 (Del. Super. Jan. 28, 2004) ...............................................10

*RJ Associates, Inc. v. Health Payors' Organization L.P.,*
    1999 Del.Ch. LEXIS 161 (July 16, 1999) .......................................................11

# CASE 1

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 503257 (D.Del.)

**(Cite as: Not Reported in F.Supp.2d)**

**C**

Only the Westlaw citation is currently available.

United States District Court,D. Delaware.

Kenneth J. MARINO, Plaintiff

v.

CROSS COUNTRY BANK, Applied Card Systems, Inc., and Rocco A. Abessinio, Defendants.

No. C.A.02-65-GMS.

Feb. 14, 2003.

*MEMORANDUM AND ORDER*

SLEET, J.

## I. INTRODUCTION

*1 The plaintiff, Kenneth J. Marino, filed the instant action on January 25, 2002, alleging various tort and contract claims arising from an employment agreement with the defendants, Cross Country Bank ("CCB"), Applied Card Systems, Inc. ("ACS"), and Rocco A. Abessinio (collectively "the defendants"). Abessinio is Chairman of both corporate defendants. The defendants move to dismiss several counts of the Amended Complaint (D.I.34) on various grounds. For the following reasons, the court will grant in part and deny in part the defendants' motion.

## II. BACKGROUND

The plaintiff is a lawyer. In September of 2000, he entered into a written employment agreement with CCB to serve as General Counsel for that corporation. After serving approximately eighteen weeks in that position, Marino was terminated. On July 11, 2001, following tensions between the parties, CCB filed a Demand for Arbitration pursuant to the employment agreement's arbitration provision. The plaintiff filed the present suit on January 25, 2002, alleging fraud, breach of the implied covenant of good faith and fair dealing, defamation, violation of the Delaware Wage Payment and Collection Law, interference with prospective business relations, injurious falsehood, and conspiracy. The defendants moved to dismiss the majority of the plaintiff's claims on April 18, 2002. Shortly thereafter, in June 2002, the parties abandoned arbitration and agreed to consolidate all of the claims, defenses, and counterclaims raised in the arbitration case into this

action. The defendants' motion to dismiss was therefore dismissed as moot, and the plaintiff amended his pleading. The defendants now move to dismiss several counts of the amended complaint.

## II. STANDARD OF REVIEW

The defendants move to dismiss Counts I, II, V, VII, and VIII as to the corporate defendants, and all counts as to Abessinio personally, pursuant to Federal Rule of Civil Procedure 12(b)(6). The role of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). Thus, in deciding a motion to dismiss, the court must "accept as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them." *Markowitz v. Northeast Land Co.,* 906 F .2d 100, 103 (3d Cir.1990). In particular, the court looks to 'whether sufficient facts are plead to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer.' *Colburn v. Upper Darby Township,* 838 F.2d 663, 666 (3d Cir.1988) (quoting *Frazier v. Southeastern Pa. Transp. Auth.,* 785 F.2d 65, 68 (3d Cir.1986)). In this analysis, however, the court should disregard a complaint's 'bald assertions' and 'legal conclusions.' *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1429-30 (3d Cir.1997) (quoting *Glassman v. Computervision Corp.,* 90 F.3d 617, 628 (1st Cir.1996). The court will dismiss a complaint only if the plaintiff can prove no set of facts, consistent with the allegations, upon which relief could be granted. *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249-50 (1989); *see also Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

## III. DISCUSSION

### A. Claims against CCB and ACS

*2 The defendants contend that Marino has failed to state a cause of action against the corporate defendants, CCB and ACS, for fraud (Count I), breach of the implied covenant of good faith and fair dealing (Count II), interference with prospective business relations (Count V), and conspiracy (Count

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 503257 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

VII). Additionally, the defendants contend that Marino's breach of contract claim (Count VIII) is time-barred under prior arbitration proceedings. The court will discuss each of the defendants' contentions in turn.

### 1. Fraud

In Count I of his amended complaint, Marino alleges that the defendants intentionally made false and misleading representations to him in connection with his employment contract and termination from CCB. Additionally, the plaintiff alleges that the defendants made misrepresentations of fact to Wilmington Trust, a third party, regarding Marino's lease of a vehicle pursuant to his employment contract. For the reasons discussed below, the court finds that Marino has sufficiently pled a cause of action for fraud.

Under Delaware law, a plaintiff claiming fraud must demonstrate:
(1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's actions or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.

*Brooks v. Fiore*, 2001 WL 1218448, at *7 (D.Del.2001) (citing *Stephenson v. Capano Dev. Inc.*, 462 A.2d 1069, 1074 (Del.1983)). In addition, Federal Rule of Civil Procedure 9(b) requires that a pleading of fraud or mistake "be stated with particularity." Fed. R. Civ. P. 9(b). Thus, in order to sufficiently plead a claim of fraud, Marino must "provide sufficient factual detail regarding the circumstances of the alleged fraud to place the defendants on notice of the precise misconduct charged." *Brug v. Enstar Group, Inc.*, 755 F.Supp. 1247, 1253 (D.Del.1991) (citing *Seville Indus. Machine Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir.1984)). Count I of the amended complaint meets this standard.

In his amended complaint, the plaintiff alleges that the "defendants committed fraud by intentionally misleading Marino with false material statements regarding the scope of the Contract which reasonably induced Marino to enter the Contract." Pl.'s An. Br. at 14. The plaintiff alleges that the defendants falsely told him he would: (1) be given full authority over their legal departments; (2) be encouraged to provide legal advice; (3) be considered senior management; (4) participate in management of the company; and (5) be allowed to make reforms. *See* Amended Compl. ¶ 33(a)-(e). Marino contends that these false and misleading statements fraudulently induced him to leave his position with Blank Rome and to enter into an employment contract with the corporate defendants. Clearly, the amended complaint states a claim for fraud.

*3 The defendants note that under Delaware law, however, allegations of fraud cannot be based upon statements of future results. *See Craft v. Bariglio*, 1984 WL 8207, at *8 (Del. Ch.1984) ("Mere expressions of opinion as to probabl[e] future results, when clearly made and understood as such, do not constitute false representation even though they may relate to material matters."). It is unknown at this point, however, whether the alleged representations of the defendants were clearly made and understood as mere expressions of opinion as to probable future results, or whether they were false representations intended to fraudulently induce the plaintiff into entering the employment contract. For purposes of this motion, the plaintiff's averments are sufficient to state a claim of fraud.

### 2. Breach of Implied Covenant of Good Faith and Fair Dealing

Under Delaware law, "every employment contract made under the laws of this State, consonant with general principles of contract law, includes an implied covenant of good faith and fair dealing." *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 101 (Del.1992). A cognizable action for breach of the implied covenant of good faith and fair dealing exists where the termination violates public policy. *See DuPont v. Pressman*, 679 A.2d 436, 441 (Del.1996) (noting recognized exceptions to employment at will). In such a case, the employee "must assert a public interest recognized by some legislative, administrative or judicial authority, and the employee must occupy a position with responsibility for that particular interest." *Shearin v. E.F. Hutton Group, Inc.*, 652 A .2d 578, 587-88 (Del. Ch.1994). Additionally, "Delaware will not invoke the public policy exception absent some illegal act by the employer." *Paolella v. Browning-Ferris, Inc.*, 158 F.3d 183, 191 (3d Cir.1998).

In Count II of his amended complaint, Marino alleges that the defendants' conduct constituted a breach of the implied covenant of good faith and fair dealing.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 503257 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Specifically, the plaintiff asserts:
Marino discovered that the mismanagement, misconduct and illegal activities conducted by ... [defendants] was far more extreme and pervasive than Marino had previously been led to believe. As Marino proceeded in his efforts to address and resolve those problems cost-effectively and expeditiously, Marino met with unanticipated and immovable resistance from ... [the defendants].

Amended Compl. ¶ 20. Further, the plaintiff alleges that "[a]s a result ... [the defendants] took measures to ensure that Marino would (1) not continue in his investigations; (2) not report the findings of those investigations; (3) lose his credibility and reputation with the appropriate governmental and law enforcement agencies...." *Id.* ¶ 22. Marino alleges that he "was wrongfully terminated for investigating and threatening to uncover unethical and illegal banking activities by the defendants." Pl.'s An. Br. at 16. Finally, Marino asserts that he was terminated, "though no termination notice compliant with the terms of the Contract was ever provided to Marino by either CCB or ACS." *Id.* ¶ 24.

*4 Accepting the plaintiff's allegations as true for purposes of this motion, Count II survives a motion to dismiss because Marino has sufficiently stated a cause of action for breach of the implied covenant of good faith and fair dealing. Retaliatory terminations violate public policy. Indeed, "the paradigmatic dismissal giving rise to a public policy cause of action is the termination of an employee in retaliation for the employee's refusal to act contrary to public policy." *Lawrence v. National Westminster Bank,* 98 F.3d 61, 73 (3d Cir.1996). Furthermore, to the extent the plaintiff's termination resulted from his attempt to uphold the code of ethics governing the legal profession, the termination may have been wrongful. *See, e.g., Shearin,* 652 A.2d at 587 ("[T]he law would protect to some extent an employee who upheld a legally significant professional standard against attempted invasion."). In short, the amended complaint suffices, for purposes of this motion, to state a claim of breach of the implied covenant of good faith and fair dealing.

3. Interference with Prospective Business Relations

In Count V of the amended complaint, Marino alleges that the defendants interfered with prospective business relations. Under Delaware law, to establish a claim for tortious interference with prospective business relations, the claimant must

show: "(1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference which induces or causes a breach or termination of the relationship or expectancy; and (4) resulting damages to the party whose relationship or expectancy has been disrupted." *Lucent Information Mgmt., Inc. v. Lucent Techs., Inc.,* 5 F.Supp.2d 238, 243 (D.Del.1998) (citing *Dionisi v. DeCampli,* 1995 WL 398536 (Del. Ch. June 28, 1995)). Additionally, "the plaintiff must be able to cite 'actual or potential contracts.' " *Id.* (citing *Kirkwood Kin Corp. v. Dunkin' Donuts, Inc.,* 1995 WL 411319 (Del.Super. Ct. June 30, 1995)).

Count V does not sufficiently plead a claim of interference with prospective business relations. Marino fails to allege an actual or potential contract with any identifiable entity. Naturally, because he names no valid contract or expectancy, the plaintiff also fails to allege a breach or termination of such a contract or expectancy. Marino alleges only that the defendants' conduct caused him to "lose the ability to earn a living as a banking lawyer to support his wife and children" and that the defendants "took actions which were designed to destroy Marino's reputation and ability to find employment in his profession." Amended Compl. ¶ ¶ 22, 27. This broad grievance which, at best, implies a loss of potential future employment contracts, is purely speculative and does not sufficiently state a claim for interference with prospective business relations. *See Lucent Information Mgmt.,* 5 F.Supp.2d at 243 (granting summary judgment to the defendant because plaintiff "only makes [a] broad claim [regarding] 'potential' customers, but does not cite any actual contract, or even contract discussions, with any of these parties."). Count V, therefore, is dismissed.

4. Conspiracy

*5 In Count VII of his amended complaint, Marino alleges that the "defendants conspired to cause harm to Marino and took action in furtherance of that conspiracy." Amended Compl. ¶ 53. Rule 8(a) of the Federal Rules of Civil Procedure governs allegations of civil conspiracy. Under the liberal pleading requirements of Rule 8(a), Delaware courts have required that the "allegations must be sufficient to 'describe the general composition of the conspiracy, some or all of its broad objectives, and the defendant's general role in the conspiracy.' " *China Resource Prods. (U.S.A.), Ltd. v. Fayda Int'l, Inc.,* 788 F.Supp. 815, 819 (D.Del.1992) (citing *Rose v.*

*Bartle, 871 F.2d 331, 366 (3d Cir.1989))*. Additionally, in order to plead a **civil conspiracy** under **Delaware law**, a plaintiff must allege: "(1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage." *Id.* at 820 (citing *Nicolet, Inc. v. Nutt,* 525 A.2d 146, 149-50 (Del.1987)). Moreover, Delaware courts have recognized that civil conspiracy is not a separate cause of action and "must arise from an underlying cause of action." *See Ramunno v. Cawley,* 705 A.2d 1029, 1039 (Del.1998) (discussing pleading standards for civil conspiracy). Finally, where the underlying cause of action is defamation, "[t]he complaint must set forth specific facts such as 'meetings, conferences, telephone calls or joint signatures on written recommendations to indicate a conspiracy." ' *Id.* (quoting *Petula v. Mellody,* 588 A.2d 103, 107 (Pa.Commw.Ct.1991)).

Count VII does not sufficiently allege a claim of conspiracy. Marino describes the general composition of the conspiracy as including CCB, ACS, Abessinio, Dougherty, "and others." The complaint states that these parties conspired "to fabricate false and/or wildly exaggerated grounds for the termination of Marino's employment at CCB and ACS." Although this may be viewed as stating the broad objective of the conspiracy, it does not allege an unlawful act done in furtherance thereof. Marino also alleges that the defendants "communicated false, defamatory and misleading statements to officials of Wilmington Trust Company that Marino was not authorized to enter into an automobile lease as part of his compensation from CCB and ACS and that Marino had in fact stolen the leased automobile" and that the defendants "took actions which were designed to destroy Marino's reputation and ability to find employment in his profession." Amended Compl. ¶ ¶ 25, 27. Although this language is sufficient to allege defamation as the unlawful act underlying the conspiracy, it does not provide specific facts to support a claim of conspiracy to defame. For example, the amended complaint fails to allege any meetings, phone calls, or other specific conduct that points to the existence of a conspiracy. In addition, the plaintiff fails to allege any actual damage arising from the conspiracy. *See Atlantis Plastics Corp. v. Sammons,* 558 A.2d 1062, 1066 (Del.Ch.1989) ( "Facts, not legal conclusions, must be pled, including facts showing damages.").

*6 In sum, Marino's allegations, even when viewed in a light most favorable to him, do not sufficiently plead a claim of conspiracy because they fail to meet the pleadings criteria for such a claim. Thus, the court will dismiss Count VII.

### 5. Breach of Contract

The plaintiff alleges a breach of contract claim in Count VIII; the defendants contend that the claim is time-barred. In support of their argument, the defendants cite Marino's failure to meet deadlines during the parties' prior arbitration proceedings. The defendants' basic contention is that the plaintiff's breach of contract claim is time-barred because Marino "flouted the deadlines imposed by the arbitrator" to such an extent that his claim in the arbitration proceeding became barred. Defs.' Opening Br. at 24. Therefore, the defendants argue, the plaintiff "should not ... be allowed to amend his pleadings here to asset a time-barred claim." *Id.*

The court finds this argument most unpersuasive. First, it is unclear whether the plaintiff's counterclaim would have been barred in the arbitration proceedings. This is so because counterclaims in the arbitration context are permissive and not mandatory. *See* Am. Arb. Ass'n. Comm. Arb. R. 4(b)(iii)(1) (providing for permissive counterclaims). Moreover, the arbitrators did not rule on the timeliness of Marino's counterclaims before the parties agreed to forego arbitration in June 2002. Pl.'s An. Br. at 19.

Second, and more importantly, the defendants have offered no caselaw, and the court can fathom none, for their position that relevant statutes of limitations and the rules of federal procedure and practice do not apply in federal court once parties have voluntarily abandoned the arbitration process and brought their dispute to federal court. Thus, the plaintiff's breach of contract claim is subject only to the three-year statute of limitations governing such claims. *See* 10 Del. C. § 8106 (setting three-year statute of limitations for suits "based upon alleged wrongful termination of [a] contract and seeks damages therefor"); *see also Goldman v. Braunstein's, Inc.,* 240 A.2d 577, 578 (Del.1968) (discussing statute of limitations governing actions for breach of contract based on wrongful termination). According to the amended complaint, Marino's breach of contract claim accrued on February 12, 2001, when the plaintiff was suspended from his employment with CCB and ACS. *See* Amended Com pl. ¶ 23-24. The present action was instituted on January 25, 2002. Clearly, Marino's claim is not time-barred. Therefore, the defendants' motion to dismiss the breach of contract claim is denied.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 503257 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

### B. Claims against Abessinio Individually

The defendants urge that Abessinio cannot be sued in his individual capacity for the present claims. They maintain that Abessinio, as Chairman of the Board of both CCB and ACS, is shielded from liability for actions performed in his corporate capacity and on behalf of the corporations. Because all of the claims at issue arise only from the defendants' employment relationship with the plaintiff, the defendants assert, and because all of Abessinio's dealings with Marino were performed in his capacity as an agent for the corporate defendants, Abessinio is protected from personal liability arising from these actions. In addition, the defendants note that Abessinio was not a signatory in his personal capacity to the employment agreement with the plaintiff. Nor can the conspiracy claim survive against Abessinio, they argue, because an officer or director acting in his or her corporate capacity can not conspire with the corporation. Because the court has dismissed the claims of tortious interference with prospective business relations and conspiracy, it need not address Abessinio's liability as to these claims. The remaining claims against Abessinio are: fraud; breach of the implied covenant of good faith and fair dealing; breach of contract; defamation; and injurious falsehood.[FN1]

> [FN1.](#) Count IV, alleging violations of the Delaware Wage Payment and Collection Act, implicates the corporate defendants only. Therefore, it is not addressed in the analysis of Abessinio's personal liability.

### 1. Breach of Contract and of Implied Covenant of Good Faith and Fair Dealing

*7 Abessinio cannot be held personally liable for these claims. It is well-established that directors and officers are not personally liable on contracts signed by them on behalf of the corporation unless they purport to bind themselves individually. *Wallace v. Wood,* 752 A.2d 1175, 1180 (Del. Ch.1999) ("Delaware law clearly holds that officers of a corporation are not liable on corporate contracts as long as they do not purport to bind themselves individually."); *see also International Ass'n of Heat & Frost Insulators & Asbestos Workers Local Union 42,* 814 F.Supp. 392, 400 ("[A]n officer or director may be held personally liable for tortious interference with a contract of the corporation if, and only if, said

officer or director exceeds the scope of his agency in so doing."). The plaintiff has not alleged that Abessinio purported to bind himself individually on the employment contract, or that he exceeded the scope of his agency with regard to the employment contract. Counts II and VIII are dismissed as to Abessinio personally.

### 2. Fraud, Defamation, and Injurious Falsehood

Abessinio may be held personally liable for fraud, defamation, and injurious falsehood. "Corporate officers are liable for their tortious conduct even if they were acting officially for the corporation in committing the tort. A corporate officer can be held personally liable for the torts he commits and cannot shield himself behind a corporation when he is a participant." *Stonington Partners, Inc. v. Lernout & Hauspie Speech Products, N.V.,* 2002 WL 31439767, at *8, n. 27 (citing cases). As stated above, the amended complaint suffices to state a claim for fraud. It also appears to allege all of the elements of the torts of defamation and injurious falsehood.[FN2] The plaintiff has sufficiently pled these claims. Thus, the defendant Abessinio is not entitled to immunity regarding these torts. Counts I, III, and VI survive the defendants' motion.

> [FN2.](#) The defendants did not challenge the sufficiency of the pleadings regarding these claims, nor have they moved to dismiss these claims regarding the corporate defendants.

### IV. CONCLUSION

For the aforementioned reasons, IT IS HEREBY ORDERED that:
1. The defendants' Motion to Dismiss the Amended Complaint (D.I.34) is GRANTED in part and DENIED in part.
2. Counts V (Interference with Prospective Business Relations) and VII (Conspiracy) are DISMISSED as to each defendant.
3. Counts II (Breach of the Implied Covenant of Good Faith and Fair Dealing) and VIII (Breach of Contract) are DISMISSED as to the defendant Rocco A. Abessinio.


D.Del.,2003.
Marino v. Cross Country Bank
Not Reported in F.Supp.2d, 2003 WL 503257

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 503257 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

(D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# CASE 2

Westlaw.

Not Reported in F.Supp.2d                                                                      Page 1
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: 2005 WL 1268061 (D.Del.))**

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
TELCORDIA TECHNOLOGIES, INC., Plaintiff,
v.
ALCATEL S.A. and Alcatel USA, Inc., Defendants.
**No. Civ.A. 04-874 GMS.**

May 27, 2005.
Steven J. Balick, John G. Day, Ashby & Geddes,
Wilmington, DE, for Plaintiff.

Josy W. Ingersoll, Young, Conaway, Stargatt &
Taylor, Kevin M. Baird, Connolly Bove Lodge &
Hutz, Wilmington, DE, for Defendants.

*MEMORANDUM*

SLEET, J.

I. INTRODUCTION

**\*1** On July 16, 2004, the plaintiff, Telcordia
Technologies, Inc. ("Telcordia"), filed this patent
infringement action against Alcatel S.A. ("Alcatel
S.A.") and Alcatel USA, Inc. ("Alcatel USA").
Presently before the court is Alcatel S.A.'s motion to
dismiss for lack of personal jurisdiction. For the
following reasons, the court will grant the motion.

II. BACKGROUND

Alcatel S.A. is a French corporation with its
principal place of business in Paris, France. Alcatel
S.A. is the parent company of Alcatel USA, a
Delaware corporation with its principal place of
business in Plano, Texas. (D.I. 18 Ex. 2 ¶¶ 2-3.) It is
a holding company that does not manufacture, sell,
advertise, offer to sell, trade or import any goods or
services in the United States or anywhere in the
world. (*Id.* ¶¶ 3-5.) It does not maintain any offices
or other facilities in Delaware, or the United States.
(*Id.* ¶ 7.) It neither owns nor leases any real property
in Delaware or the United States, but it does own
United States patents. (*Id.* ¶ 8.) Alcatel S.A. does not

maintain any bank accounts in Delaware and has
never contracted to supply services or things in
Delaware or the United States. (*Id.* ¶¶ 9-10.)

Telcordia, a Delaware Corporation with its principal
place of business in Piscataway, New Jersey, is the
assignee and owner of the patent-in-suit, U.S. Patent
No. 4,893,306 (the " '306 patent"). [FN1] The '306
patent relates to a method and apparatus for
multiplexing circuit and packet traffic. The patent
discloses a data transmission technique, or Dynamic
Time Division Multiplexing ("DTDM"), that is
compatible with the digital circuit transmission
format, as well as the packet transmission format,
thereby providing "a flexible migration strategy
between present circuit networks and future
broadband packet networks." (U.S. Patent No.
4,893,306 Abstract.) The complaint alleges that
Alcatel S.A. and Alcatel USA have infringed,
induced infringement of, and/or contributorily
infringed one or more claims of the ' 306 patent by
making, using, offering for sale, selling and/or
importing into the United States communication
network products embodying the patented invention.
(D.I. 1 ¶¶ 13-14.)

> FN1. The '306 patent was issued on January
> 9, 1990 and assigned to Bell
> Communications Research, Inc.
> ("Bellcore"), which became Telcordia in
> 1999.

III. STANDARD OF REVIEW

Alcatel S.A. moves to dismiss the complaint for lack
of personal jurisdiction over the defendant. "Rule
12(b)(2) of the Federal Rules of Civil Procedure
requires a court to dismiss a case when the court
lacks personal jurisdiction over the defendant[ ]." *E.I.
DuPont de Nemours & Co. v. Rhodia Fiber & Resin
Intermediates,* 197 F.R.D. 112, 119 (D.Del.2000). In
determining whether personal jurisdiction exists,
courts engage in a two step analysis. First, the court
must decide whether jurisdiction is authorized by the
long-arm statute of the state in which the court sits.
*Transportes Aeros de Angola v. Ronair, Inc.,* 544
F.Supp. 864-65 (D.Del.1982). If jurisdiction is proper
per the long-arm statute, the court must then
determine whether exercising jurisdiction comports
with the requirements of the Due Process Clause of
the Fourteenth Amendment. *Id.* (noting, however,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"intent of the legislature to exercise jurisdiction over non-residents whenever feasible"); *Compaq Computer Corp. v. Packard Bell Elec., Inc.,* 948 F.Supp. 338, 342 (D.Del.1996) (citation omitted). To satisfy the second prong of this analysis, the court must find the existence of "minimum contacts" between the defendant and the forum state, "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice." ' *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citation omitted). Specifically, Telcordia must show that Alcatel S.A. "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)); *see also Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 108-09, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Unless the contacts are continuous and systematic, they must be related to the present cause of action. *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414-15, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

   **\*2** In determining the jurisdictional question, the court must accept as true the allegations in the complaint. *Altech Indus., Inc. v. Al Tech Specialty Steel Corp.,* 542 F.Supp. 53, 55 (D.Del.1982). However, Telcordia, the plaintiff, bears the burden of alleging facts sufficient to make a *prima facie* showing of personal jurisdiction over Alcatel S.A. *ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.,* 147 F.Supp.2d 268, 270-71 (D.Del.2001). To meet this burden, Telcordia must adduce facts which " 'establish with reasonable particularity" ' that jurisdiction over Alcatel S.A. exists. *Id.* (quoting *Joint Stock Soc'y v. Heublein, Inc.,* 936 F.Supp. 177, 193 (D.Del.1996)).

IV. DISCUSSION

A. Delaware's Long-Arm Statute

   The first step in the court's analysis is to determine whether any of the provisions of Delaware's long-arm statute, Del.Code Ann. tit. 10 § 3104, warrant the exercise of jurisdiction over Alcatel S.A. Alcatel S.A. contends that the court has no basis to assert jurisdiction, while Telcordia maintains that the conduct of Alcatel S.A. satisfies the requirements of subsections (c)(1) and (c)(3) of the long-arm statute.

   Under subsection (c)(1), the court may exercise

jurisdiction over a nonresident or agent of a nonresident who "transacts any business or performs any character of work or service in the State." Del.Code Ann. tit. 10 § 3104(c)(1). Subsection (c)(3) gives the court the authority to exercise jurisdiction over a nonresident or agent of a nonresident who "causes tortious injury in the State by an act or omission in this State." Del.Code Ann. tit. 10 § 3104(c)(3). Delaware courts construe the long-arm statute broadly so as to confer jurisdiction to the maximum extent possible so as to "provide residents a means of redress against those not subject to personal service within the state." *Boone v. Oy Partek Ab,* 724 A.2d 1150, 1156-57 (Del.Super.1997). The Delaware Supreme Court has interpreted subsections (c)(1) and (c)(3) as specific jurisdiction provisions that require a "nexus" between the plaintiff's cause of action and the conduct of the defendant that is used as a basis for jurisdiction. *See LaNuova D & B, S.p.A. v. Bowe Co.,* 513 A.2d 764, 768 (Del.1986). In order to meet the requirements of subsections (c)(1) and (c)(3), Alcatel S.A.'s actions must be directed at residents of Delaware and the protection of Delaware laws. *Thorn EMI N. Am. Inc. v. Micron Tech., Inc.,* 821 F.Supp. 272, 274 (D.Del.1993).

   Telcordia asserts that the court should exercise jurisdiction under § 3104(c)(1) and/or (c)(3) because Alcatel S.A.'s contacts with Delaware are attributable to its subsidiary, Alcatel USA, under the principles of agency. [FN2] The principles of agency allow a court to establish jurisdiction over the parent based upon its jurisdiction over a subsidiary. Under the agency theory, "the court may attribute the actions of a subsidiary company to its parent where the subsidiary acts on the parent's behalf or at the parent's direction." *C.R. Bard Inc. v. Guidant Corp.,* 997 F.Supp. 556, 559 (D.Del.1998) (citing *Mobil Oil Corp. v. Linear Films, Inc.,* 718 F.Supp. 260, 266 (D.Del.1989)). Thus, the agency theory "examines the degree of control which the parent exercises over the subsidiary." *Applied Biosystems, Inc. v. Cruachem, Ltd.,* 772 F.Supp. 1458, 1463 (D.Del.1991). The factors relevant to the court's examination include: (1) "the extent of overlap of officers and directors"; (2) "methods of financing"; (3) "the division of responsibility for day-to-day management"; and (4) "the process by which each corporation obtains its business. No one factor is either necessary or determinative; rather it is the specific combination of elements which is significant." *Id.* If the court determines that an agency relationship exists, it may attribute certain actions of the subsidiary, Alcatel USA, to the parent corporation, Alcatel S.A., in assessing whether

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
(Cite as: 2005 WL 1268061 (D.Del.))

Telcordia has satisfied the requirements of the long-arm statute. *See id.* However, the mere existence of an agency relationship is not sufficient to confer jurisdiction. The court must still apply the Delaware long-arm statute. *See id.* at 1455 ("[A] finding of agency does not render the long-arm statute inapplicable, but simply implicates its 'or through an agent' provision.")

> FN2. Delaware law provides two theories that allow a court to exercise jurisdiction over a parent corporation based on its jurisdiction over a subsidiary: the alter ego theory and the agency theory. *Applied Biosystems, Inc. v. Cruachem, Ltd.,* 772 F.Supp. 1458, 1463 (D.Del.1991). Under the alter ego theory, the party showing jurisdiction must show fraud or inequity in the use of the corporate form for a court to "pierce the corporate veil," or attribute the actions of a subsidiary to the parent corporation. *Id.; see Mobile Oil Corp. v. Linear Films, Inc.,* 718 F.Supp. 260, 266 (D.Del.1989). Telcordia has neither asserted the existence of any fraud in the corporate structure of Alcatel S.A. and Alcatel USA nor introduced evidence that would support a finding of fraud. Accordingly, the court will not address this jurisdictional theory.

**\*3** Telcordia contends that Alcatel S.A. should be subject to jurisdiction under the agency theory because "Alcatel S.A. and Alcatel USA are closely knit together, effectively operating as one." (D.I. 20, at 10.) Telcordia alleges the following to support its contention of an agency theory of jurisdiction: (1) Alcatel S.A. makes it abundantly clear that the United States market is very important to it and raises funds in the United States; (2) it owns patents, *i.e.* property, in the United States; (3) it fails to distinguish among its multinational subsidiaries--that is, it consolidates descriptions of its activities with those of its subsidiaries; (4) it chose to incorporate Alcatel USA in Delaware; (5) its Senior Vice President, Mike Quigley ("Quigley") is the CEO of Alcatel USA; and (6) its website solicits requests for information concerning its products, including allegedly infringing products from Delaware residents. (*Id.* at 3-5, 10.) Telcordia further contends that, "at the very least," Alcatel USA has offered to sell in Delaware products accused of infringing the '306 patent and, therefore, transacts business in the state. In addition, because Alcatel USA committed these acts as Alcatel S.A.'s agent, they are attributable to Alcatel S.A. (D.I. 20, at 10.)

Before the court can determine whether it should attribute Alcatel USA's alleged acts in Delaware to Alcatel S.A., it must determine whether an agency relationship exists between the two corporations. As previously stated, in order to make this determination, the court must consider the extent of overlap of officers and directors between Alcatel USA and Alcatel S.A., the methods of financing with respect to the two corporations, the division of responsibility for day-to-day management between the two, and the process by which each corporation obtains its business. After having considered these factors, the court concludes that Telcordia has not carried its burden. As to the first factor, Telcordia points to one overlap in officers between the two corporations: Quigley is Senior Executive Vice President of Alcatel S.A. and CEO of Alcatel USA. According to Alcatel S.A., there is a second overlap between the two corporations: its President and COO, Philippe Germond, is a member of the Board of Directors of Alcatel USA. (D.I. 23, at 3; D.I. 22 ¶ 6.) This minor overlap, however, is not dispositive, as "it is entirely appropriate for directors of a parent corporation to serve as directors of a subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *United States v. Bestfoods,* 524 U.S. 51, 69, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (citations omitted) (noting that it is "well established principle ... that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership"). As such, this factor does not weigh in favor of a finding of agency.

**\*4** Likewise, the remaining factors do not weigh in favor of applying the agency theory in the present case. First, Alcatel S.A. is merely a holding company that does not manufacture, sell, or advertise in the United States, or anywhere in the world. (D.I. 18 ¶ ¶ 3-5.) Thus, this is not a case in which Alcatel S.A. manufactures a product and uses an independent distributor to sell its product. *Cf. C.R. Bard,* 997 F.Supp. at 561. In addition, Alcatel USA maintains its own executive team, which is responsible for the day-to-day management of Alcatel USA, and no employee of Alcatel S.A. is a member of the executive team of Alcatel USA. (D.I. 22 ¶ 5.) It also maintains its own financial statements, separate from those kept by Alcatel S.A. (D.I. 22 ¶ 10.) Alcatel USA files a consolidated United States federal income tax return that is separate from tax returns filed by Alcatel S.A. (*Id.* ¶ 12.) Alcatel USA finances its day-to-day activities through funds

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                            Page 4
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
(Cite as: 2005 WL 1268061 (D.Del.))

generated from its business activities, including the manufacture, marketing and distribution of the accused infringing products. (*See id.* ¶ 13.) Accordingly, the court finds that while there is a minor overlap of officers and directors between the parent and subsidiary, Telcordia has not produced sufficient evidence for the court to conclude that the specific combination of agency factors militates in favor of a finding that Alcatel USA was acting as Alcatel S.A.'s agent. Thus, sections (c)(1) and (c)(3) do not warrant the exercise of jurisdiction over Alcatel S.A. [FN3]

> FN3. The court need not address whether jurisdiction in Delaware comports with the requirements of the Due Process Clause because it has no statutory authority under the Delaware long-arm statute to exercise jurisdiction over Alcatel S.A.

B. Federal Rule of Civil Procedure 4(k)(2)

Telcordia next asserts that, even if the Delaware long-arm statute does not apply in the present case, the court should not grant Alcatel S.A.'s motion to dismiss because it has the authority to exercise personal jurisdiction over Alcatel S.A. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure. Rule 4(k)(2) provides:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Fed. R. Civ. P. 4(k)(2). In order to establish jurisdiction pursuant to Rule 4(k)(2), (1) Telcordia's claim must arise under federal law; (2) Alcatel S.A. must lack sufficient contacts with any state to subject it to personal jurisdiction; and (3) Alcatel S.A. must have sufficient contacts with the United States as a whole to satisfy due process. *See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.,* 229 F.3d 254, 258-59 (3d Cir.2000). Telcordia contends that all three requirements of Rule 4(k)(2) are satisfied. The court disagrees.

First, the parties do not dispute, nor could they, that Telcordia's claims arise under federal law. The complaint alleges that Alcatel S.A. has infringed, induced infringement of, and/or contributorily infringed the '306 patent. Patents and the protection of patent rights are the subject of Title 35 of the United States Code. 35 U.S.C. § 271 specifically provides the elements of patent infringement. Additionally, 28 U.S.C. § 1338 gives district courts original jurisdiction over patent actions. A patent infringement action, therefore, is one that arises under federal law. Telcordia has thus satisfied the first requirement of Rule 4(k)(2).

*5 Having found that the first requirement of Rule 4(k)(2) is satisfied, the court next must determine whether Alcatel S.A. is not subject to jurisdiction in any state. *See United States v. Offshore Marine Ltd.,* 179 F.R.D. 156, 160 (D.Vi.1998); *Revak v. Locatum A.B.,* No. Civ. A. 03-4822, 2005 WL 1017771, at *2 (E.D.Pa. Apr.28, 2005). As a preliminary matter, the court must determine whether Telcordia or Alcatel S.A. bears the burden of proving that Alcatel S.A. is not subject to the jurisdiction of any state. In *Offshore Marine Ltd.,* the United States District Court for the District of the Virgin Islands noted that "[t]he question [of] which party bears the burden of proving ... that the defendant is not subject to jurisdiction in any state appears to be an issue of first impression in this Court and in this Circuit, probably because it is generally the plaintiff's duty to allege and prove personal jurisdiction." *Offshore Marine Ltd.,* 179 F.R.D. at 160. Indeed, it appears that the Third Circuit has not yet addressed whether the plaintiff or defendant bears the burden of proving that the defendant is beyond the jurisdictional reach of any state court of general jurisdiction, or what is known as the negation requirement. *See Base Metal Trading Ltd. v. OJSC "Novokuzetsky Aluminum Factory",* 47 Fed. Appx. 73, 75 (3d Cir.2002) (unpublished) (determining that negation issues need not be reached because the Due Process requirement of Rule 4(k)(2) was not satisfied). [FN4] Various district courts of the Third Circuit, however, have addressed the negation requirement and concluded that the plaintiff bears the burden of demonstrating that the defendant is not subject to jurisdiction in any state. *See Offshore Marine Ltd.,* 179 F.R.D. at 160 ("Accordingly, to survive a motion to dismiss for want of personal jurisdiction, the plaintiff bears the burden to prove that [the defendant] is not otherwise subject to service of process in any state."); *see also Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.,* 293 F.Supp.2d 423, 430 (D.Del.2003), *vacated on other grounds by* 395 F.3d 1315 (Fed.Cir.2005) (issue abandoned on appeal) ("Plaintiffs must also demonstrate that defendant is 'not subject to the jurisdiction of *any* state' under Rule 4(k)(2). Therefore, Rule 4(k)(2) "provides 'a narrow exception which may subject an alien defendant to a federal court's jurisdiction.' ") The court agrees with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
(Cite as: 2005 WL 1268061 (D.Del.))

the Third Circuit district courts that have addressed the negation requirement and concludes that Telcordia bears the burden of demonstrating that Alcatel S.A. is not subject to jurisdiction in any state.

> FN4. Likewise, it appears that the Federal Circuit has not had occasion to address the negation issue.

Here, Telcordia addresses the negation requirement only by asserting that, based on the information provided by Alcatel S.A. in its opening brief and the publicly available information regarding Alcatel S.A., an analysis of whether any other state has personal jurisdiction over Alcatel S.A. would not be "significantly different" from the analysis regarding Alcatel S.A.'s personal jurisdiction under the Delaware long-arm statute. (D.I. 20, at 13.) According to Telcordia, if the court cannot exercise jurisdiction over Alcatel S.A. pursuant to the Delaware long-arm statute then Rule 4(k)(2) applies. (*Id.*) The court is not persuaded by this argument, however, and concludes that Telcordia's conclusory statement does not support a finding that Alcatel S.A. lacks sufficient contacts with any state to subject it to personal jurisdiction. Thus, Telcordia has not satisfied the second requirement of Rule 4(k)(2).

*6 Even assuming Telcordia was able to show that Alcatel S.A. was not subject to jurisdiction in any other state, it cannot satisfy the third requirement of Rule 4(k)(2) because the record evidence demonstrates that Alcatel S.A. lacks sufficient contacts with the United States as a whole to satisfy due process. The Due Process Clause requires that, in order to subject a defendant who is "not present within the territory of the forum" to personal jurisdiction, the court must first make sure that the party "ha[s] certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of justice and fair play." *See International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citations omitted). In order for the court to find that Alcatel S.A. has "minimum contacts" with the United States, Telcordia must demonstrate either specific or general personal jurisdiction. *Helicopteros Nacionales de Columbia v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). The court can assert specific jurisdiction over a nonresident defendant that has "purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or related to' those activities." *Burger King,* 471 U.S. at 472 (citations omitted). The court can assert general jurisdiction over a defendant

when its contacts with the forum, regardless of their relation to the litigation, are "continuous and systematic." *Helicopteros Nacionales,* 466 U.S. at 416. The court will address the reasons it cannot exercise specific or general jurisdiction over Alcatel S.A. in turn.

When determining whether a defendant's contacts give rise to specific jurisdiction, "[i]t is essential in each case that there be some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum ... thus invoking the benefits and protections of its laws." *BP Chems.,* 229 F.3d at 259 (quoting *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 475, 100 S.Ct. 559, 62 L.Ed.2d 490). In other words, the defendant's contact must be of the nature that would cause it to reasonably foresee that it might be "haled before a court" in the forum as a result of its conduct. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 580, 62 L.Ed.2d 490 (1980). Thus, a court usually must determine the character of the defendant's activity in the forum, and whether the plaintiff's claim arises out of or has a substantial connection with that activity. *See Burger King,* 471 U.S. at 475-76. In the present case, however, the court need not make this determination because Telcordia bases its argument on the specific jurisdiction subsections of the Delaware long-arm statute which, as discussed in Section IV.A., *supra,* do not warrant the exercise of jurisdiction over Alcatel S.A. because Alcatel USA is not its United States agent.

The court also concludes that Alcatel S.A.'s contacts with the United States that are unrelated to the present litigation are not "continuous and systematic" so as to give rise to general jurisdiction. Telcordia contends that general jurisdiction exists because there is "ample evidence of Alcatel S.A.'s contacts with the United States." (D.I. 20, at 12.) According to Telcordia, this evidence includes the following: (1) Alcatel S.A. is listed on the New York Stock Exchange; (2) Alcatel S.A. owns property in the United States, specifically hundreds of patents; (3) Alcatel S.A.'s website fails to distinguish among its multinational subsidiaries and uses its name in the name of its subsidiaries; (4) Alcatel S.A.'s website describes its worldwide activities, including its activities in the United States, but never discloses that its United States activities are performed by one of its subsidiaries; and (5) Alcatel S.A. incorporated its subsidiary, Alcatel USA in Delaware. The court does not find the evidence sufficient to support Telcordia's assertion.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                        Page 6
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: 2005 WL 1268061 (D.Del.))**

*7 First, as previously discussed, Alcatel S.A. is a French holding company that does not make, sell, export or import any products into the United States. Alcatel S.A. does not maintain any offices in the United States, or lease or own any real property in the United States. It does not maintain any bank accounts in Delaware and has never contracted to supply services or things in Delaware or the United States. Alcatel S.A.'s employees also all reside outside of the United States.

Moreover, while Alcatel S.A. is listed on the New York Stock Exchange as an American Depository Receipt ("ADR"), this factor alone does not justify the exercise of jurisdiction. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F.Supp.2d 289, 330 (S.D.N.Y.2003); *Doe v. Unocal Corp.,* 248 F.3d 915, 922 (9th Cir.2001)* ("[T]he Court is not persuaded that Congress intended for the courts to assert jurisdiction under *Rule 4(k)(2)* whenever a corporation lists its stock on a United States exchange."). Likewise, "[o]wnership of a United States patent, without more, cannot support the assertion of personal jurisdiction over a foreign patentee in any state besides the District of Columbia." *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.,* No. C-95-3577 DLJ, 1996 WL 467293, at *6 n. 5 (N.D.Cal. July 24, 1996) (citing *35 U.S.C. § 293*). Furthermore, incorporating a subsidiary in the United States does not give rise to jurisdiction unless the litigation is related to the act of incorporation and, here, it is not related. *See Applied Biosystems,* 772 F.Supp. at 1468. Additionally, "the mere operation of a commercially interactive web site should not subject the operator to jurisdiction anywhere in the world. Rather, there must be evidence that the defendant 'purposefully availed' itself of conduct activity in the forum, knowingly interacting with residents of the forum state via its web site." *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 454 (3d Cir.2003). Here, Telcordia has not adduced evidence to support a finding that Alcatel S.A.'s web site was intended to reach customers in Delaware, or any other state in the United States. [FN5]

FN5. Telcordia asserts that there can be "no question that Alcatel S.A.'s website solicits requests for information concerning its products (including allegedly infringing products) from Delaware residents, pointing to a "website page concerning the possible purchase of Alcatel products" with Delaware chosen as the potential buyer's state. (D.I.

20, at 5; Ex. 11.) Telcordia misses the point, however, as the record does not support any documented sales to persons in Delaware (or any other state in the United States). Nor does it support any interaction between Alcatel S.A. and Delaware residents, as the web site page, in Telcordia's own words, demonstrates only the *possible* purchase of Alcatel products.

The court also disagrees with Telcordia's assertion that Alcatel's website "never discloses that its U.S. activities are performed by some entity (or entities) other than Alcatel S.A." (D.I. 20, at 4.) First, when one enters the Alcatel website and clicks on "United States" as its country/region the web address changes from "www.alcatel.com" to "www.usa.alcatel.com." Further, when one clicks on the "About Alcatel" dropdown menu and selects "Alcatel in the U.S.A.," he or she is provided with information regarding Alcatel USA, including its business locations. Moreover, the web page states "[i]t is the policy of *Alcatel USA* to satisfy the expectation of our customers." www.usa.alcatel .com/company/ausa_info.jhtml (last visited May 23, 2005) (emphasis added). Thus, the Alcatel web site does distinguish Alcatel S.A. from Alcatel USA. This fact does not support the exercise of jurisdiction over Alcatel S.A. Accordingly, Alcatel S.A.'s alleged contacts with the United States do not provide a basis for the court to conclude that it has a "continuous and systematic" presence in the United States.

*8 Nor does the combination of Alcatel S.A.'s alleged contacts with the United States provide the court with a sufficient basis to conclude that the requirements for general jurisdiction are met. *BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.,* 229 F.3d 254 (3d Cir.2000) is instructive on this point. In *BP Chemicals,* the Third Circuit found that a foreign defendant did not have sufficient contacts with the United States as a whole to justify the exercise of *Rule 4(k)(2)* jurisdiction, even though the defendant exported its products to the United States, held a small ownership interest in a Delaware corporation, and entered into contracts requiring its personnel to travel to the United States for training. *Id.* at 263. The Court of Appeals also found that the cumulative effect of the defendants contacts did not meet the requirements for general jurisdiction. In the present case, Alcatel S.A.'s alleged contacts fall short of those alleged by the plaintiff in *BP Chemicals.* As such, the court finds that there is no basis for exercising *Rule 4(k)(2)* jurisdiction over Alcatel S.A.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 7
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: 2005 WL 1268061 (D.Del.))**

C. Jurisdictional Discovery

Lastly, Telcordia asserts that if the court does not conclude that Alcatel S.A. "is subject to personal jurisdiction under the *Delaware long-arm statute*," it should permit limited jurisdictional discovery rather than granting Alcatel S.A.'s motion to dismiss. (D.I. 20, at 11) (emphasis added). Telcordia asserts that its claims against Alcatel S.A. are not clearly frivolous, and that discovery is necessary due to the "limited publicly available information" that it has gathered without discovery. (D.I. 20, at 11.) Telcordia further asserts that the case will not be delayed as a result of any discovery on the personal jurisdiction issue.

Conversly, Alcatel S.A. contends that Telcordia's claims against it are clearly frivolous, because Telcordia has not carried its burden of making "a *prima facie* showing that Alcatel S.A. is subject to personal jurisdiction in Delaware." (D.I. 23, at 17.) In addition, Alcatel S.A. contends that it "strains belief that Plaintiff (1) did not know which entities in the Alcatel Family to sue, and (2) that Alcatel S.A. was not one of them." (*Id.* at 17 .) According to Alcatel S.A., Telcordia has had prior business interactions with Alcatel entities regarding the patent-in-suit, as well as other communications technology. (*Id.* at 2.) Alcatel S.A. further contends that Telcordia is "arguably the most knowledgeable company in the telecommunications field with respect to what products are sold by the various players in the market." (*Id.* at 1.) Thus, it "is hard to believe that it [Telcordia] does not know exactly who the relevant players in the market are." (*Id.*) Lastly, Alcatel S.A. contends that Telcordia is engaging in a fishing expedition, noting that the United States Supreme Court has held that courts should "exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position." (*Id* at 18-19 (citing *Societe Nationale Industrielle Aerospatiale v. United States District Court for Southern Dist. Iowa,* 482 U.S. 522, 546, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987)). The court is persuaded by Alcatel S.A.'s argument.

**\*9** "Although the plaintiff bears the burden of demonstrating facts that support personal jurisdiction, courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.' " *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 456 (3d Cir.2003) (internal citations omitted). Thus, resolution of Telcordia's request "begins with the presumption in favor of allowing discovery to establish personal jurisdiction."

*Hansen v. Neumueller GmbH,* 163 F.R.D. 471, 474 (D.Del. Oct.5, 1995). However, "[t]he court must be satisfied that there is some indication that this particular defendant is amenable to suit in this forum." *Id.* at 475. For example, "a plaintiff may not rely on the bare allegations in his complaint to warrant further discovery." *Id.* at 476. Likewise, "a mere unsupported allegation that [a] defendant 'transacts business' in an area is 'clearly frivolous.' " *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,* 107 F.3d 1026, 1042 (3d Cir.1997); *see B.L. Poe v. Babcock Int'l,* 662 F.Supp. 4, 7 (M.D.Pa. Mar.14, 1985) ("Since plaintiff has met defendants' affidavit evidence with mere speculation, plaintiff's request for an opportunity to conduct discovery on the matter must be denied. It would be inappropriate for this court to allow plaintiff to conduct a fishing expedition in order to construct a basis for jurisdiction."). Rather, "there must be *some* competent evidence to demonstrate that personal jurisdiction over [a] defendant might exist before allowing discovery to proceed." *Hansen,* 163 F.R.D. at 475. Furthermore, "[w]hen the lack of personal jurisdiction is clear, ... further discovery serves no purpose and should be denied." *Hockerson-Halberstadt, Inc. v. Propet USA, Inc.,* 62 Fed. Appx. 322, 338 (Fed.Cir.2003) (unpublished).

Here, as previously discussed in Section IV.A., *supra,* the record evidence regarding Telcordia's agency theory of specific jurisdiction is insufficient to support the conclusion that Alcatel USA was acting as Alcatel S.A.'s agent. In addition, Telcordia did not assert that the court could exercise personal jurisdiction over Alcatel S.A. based on the general jurisdiction subsection of the Delaware long-arm statute. For these reasons, the court believes it is clear that it may not exercise personal jurisdiction over Alcatel S.A. pursuant to the Delaware long-arm statute. Thus, further discovery would not be worthwhile. In other words, granting Telcordia's request for jurisdictional discovery would amount to allowing it to conduct a fishing expedition in order to form a basis for jurisdiction. The court, therefore, will deny Telcordia's request for jurisdictional discovery.

*ORDER*

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:
1. Alcatel S.A.'s Motion to Dismiss for Lack of Personal Jurisdiction (D.I.17) is GRANTED.
2. Telcordia's request for jurisdictional discovery is DENIED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)
**(Cite as: 2005 WL 1268061 (D.Del.))**

Not Reported in F.Supp.2d, 2005 WL 1268061 (D.Del.)

**Motions, Pleadings and Filings** (Back to top)

• 2006 WL 1182445 (Trial Motion, Memorandum and Affidavit) Plaintiff Telcordia Technologies, Inc.'s Objections to Defendant Alcatel USA, Inc.'s Second Notice of 30(b)(6) Deposition (Mar. 30, 2006)Original Image of this Document (PDF)

• 2006 WL 1182446 (Trial Motion, Memorandum and Affidavit) Plaintiff Telcordia Technologies, Inc.'s Objections to Defendant Alcatel USA, Inc.'s Third Notice of 30(b)(6) Deposition (Mar. 30, 2006)Original Image of this Document (PDF)

• 2006 WL 1182444 (Trial Pleading) Telcordia's Answering Claim Construction Brief Addressing Telcordia's '633 Patent and Alcatel's '052 Patent (Mar. 24, 2006)Original Image of this Document (PDF)

• 2006 WL 1204461 (Trial Pleading) Alcatel's Answering Claim Construction Brief for U.S. Patent No. 6,247,052 (Mar. 24, 2006)Original Image of this Document (PDF)

• 2006 WL 1182443 (Trial Motion, Memorandum and Affidavit) Plaintiff Telcordia Technologies, Inc.'s Objections to Defendant Alcatel USA, Inc.'s First Notice of 30(b)(6) Deposition (Mar. 10, 2006)Original Image of this Document (PDF)

• 2006 WL 1182441 (Trial Pleading) Alcatel's Opening Claim Construction Brief for U.S. Patent Nos. 6,247,052 and Re. 36.633 (Mar. 3, 2006)Original Image of this Document (PDF)

• 2006 WL 1182442 (Trial Pleading) Telcordia's Opening Claim Construction Brief (Mar. 3, 2006)Original Image of this Document (PDF)

• 2005 WL 3666806 (Trial Motion, Memorandum and Affidavit) Telcordia's Reply Brief in Support of its Motion to Dismiss Or, in the Alternative, to Sever and Stay Alcatel Usa, Inc.'s Patent Infringement Counterclaim (Nov. 1, 2005)

• 2005 WL 2867944 (Trial Pleading) Telcordia's Reply to Alcatel USA, Inc.'s Amended Counterclaims and Demand for Jury Trial (Sep. 29, 2005)

• 2005 WL 2867947 (Trial Motion, Memorandum

and Affidavit) Telcordia's Motion to Dismiss, or in the Alternative, to Sever and Stay Alcatel USA, Inc.'s Patent Infringement Counterclaim (Sep. 29, 2005)

• 2005 WL 2385505 (Trial Pleading) Alcatel Usa's Answer and Counterclaims to Plaintiff's First Amended Complaint and Demand for Jury Trial (Aug. 10, 2005)

• 1:04cv00874 (Docket) (Jul. 16, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# CASE 3

LEXSEE 2005 DEL. CH. LEXIS 133

TODD ALBERT, JOSEPH M. BRYAN, JR., KEVIN CALDERWOOD,
KATHERINE D. CROTHALL, SCOTT W. FRAZIER, FU FAMILY REVOCABLE
TRUST, ROBERT B. GOERGEN, SR., ROBERT G. GOERGEN, JR., TODD A.
GOERGEN, HASAN 1995 LIVING TRUST, WAI YAN HO, WILLIS JAMES
HINDMAN, JOHNSON FAMILY LIVING TRUST, MICHAEL R. KIDDER
REVOCABLE TRUST, MARK AND ANN KINGTON, JEFFREY A. KOSER,
MARLENKO INC., ELAINE MCKAY FAMILY, LP, DAVID MIXER, MRW
TRUST, JAMES MURRAY, JIM K. OMURA 1996 TRUST, JENNIFER OWEN
AND MICHAEL J. ROSS, NICHOLAS PEAY, DOUGLAS G. SMITH,
FREDERICK G. SMITH, JANE VEI-CHUN SUN, MARK WABSCHALL, KAREN
L. WALSH, WARMENHOVEN 1995 CHILDREN'S TRUST, YAN 1996
REVOCABLE TRUST, BARBARA J. ZALE, and CHARLES A. ZIERING, Plain-
tiffs, v. ALEX. BROWN MANAGEMENT SERVICES, INC.; DEUTSCHE BANK
SECURITIES, INC.; DEUTSCHE BANK, AG; RICHARD HALE; GARY
FEARNOW; BRUNS GRAYSON; E. ROBERT KENT, JR.; TRUMAN T.
SEMANS; DC INVESTMENT PARTNERS, LLC; DOCTOR ROBERT CANTS,
III; and MICHAEL W. DEVLIN, Defendants. ELIZABETH J. BAKER, BENDER
1996 REVOCABLE TRUST, DR. STEVEN J. BERLIN, ESTATE OF ROBERT B.
BLOW, LUTHER C. BOLIEK, STEPHEN E. COIT, SARA CROWDER, GERALD
K. AND TERESA K. FEHR, FU FAMILY REVOCABLE TRUST, RALPH
GLASGAL, ROBERT G. GOERGEN, JR. 1985 TRUST, TODD A. GOERGEN
1985 TRUST, PETER O. HAUSMANN, WILLIS JAMES HINDMAN, WILLIAM
F. KAISER, MARK AND ANN KINGTON, TIMOTHY K. KRAUSKOPF,
WILLIAM T. MCCONNELL, PHILIP R. MCKEE, DAVID MIXER, MRW
TRUST, JAMES MURRAY, PAUL D. AND JUDITH F. NEWMAN, W.L.
NORTON, GREGORY PACKER, HOWARD E. ROSE, RUBEN FAMILY
LIMITED PARTNERSHIP, 5 S TRUST, SALADRIGAS FAMILY LTD.
PARTNERSHIP, RICARDO A. SALAS, JOSE M SANCHEZ, SAMUEL SIEGEL,
SILVERMAN 1996 IRREVOCABLE TRUST, DOUGLAS G. SMITH,
FREDERICK G. SMITH, RONALD B. STAKLAND, STRAUCH KULHANJAIN
FAMILY TRUST, BRUCE E. TOLL, ALEXANDER R. AND MARJORIE L.
VACCARO, YANOVER FAMILY LTD. PARTNERSHIP, MICHAEL YOKELL,
and JUSTIN A. ZIVIN, Plaintiffs, v. ALEX. BROWN MANAGEMENT SERVICES;
DEUTSCHE BANK SECURITIES, INC.; DEUTSCHE BANK, AG; RICHARD
HALE; E. ROBERT KENT, JR.; TRUMAN T. SEMANS; DC INVESTMENT
PARTNERS, LLC; DOCTOR ROBERT CRANTS, III, and MICHAEL W.
DEVLIN, Defendants.

C.A. No. 762-N, C.A. No. 763-N

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2005 Del. Ch. LEXIS 133*

July 22, 2005, Submitted
August 26, 2005, Decided
August 26, 2005, Filed

**PRIOR HISTORY:** *Albert v. Alex. Brown Mgmt.
Servs., 2005 Del. Ch. LEXIS 100 (Del. Ch., June 29,
2005)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In an action by plaintiff investors in a Delaware limited partnership, nominal defendant partnership and defendant fund managers moved to dismiss for failure to state a claim and for lack of personal jurisdiction the investors' claims that included breach of fiduciary duty, fraud, civil conspiracy, breach of contract, breach of covenant of good faith and fair dealing, gross negligence, and unjust enrichment.

**OVERVIEW:** The investors in the limited partnership, which operated two high-tech investment funds, suffered enormous losses when the value of the funds tumbled. They alleged that the managers did not bother to properly monitor funds and, in an least some instances, failed to follow the funds' established hedging procedures as the investors had been promised. The court held that certain breach of fiduciary duty claims failed to show a fiduciary duty to the investors but that the investors had made out derivative claims that might survive if, after amendment, the pleadings adequately alleged a demand for action as required by *Del. Code Ann. tit. 6, § 17-1001*. The breach of contract claims were adequately alleged based on failure to disclose and providing misleading information. Although gross negligence, the only sort of negligence for which the managers could be liable, was hard to prove, the allegations of mismanagement and neglect were sufficient to survive a motion to dismiss. Finally, the court had jurisdiction under *Del. Code Ann. tit. 10, § 3104*, even though the managers were not Delaware residents, as they had taken advantage of Delaware laws in organizing their partnership.

**OUTCOME:** The court dismissed certain breach of fiduciary duty claims, the fraud claims, the conspiracy claims, the unjust enrichment claims, and certain agency liability claims against one defendant. The motions were denied as to all other claims, and the motion to dismiss for lack of jurisdiction was denied altogether.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN1] The determination of materiality is a mixed question of fact and law that generally cannot be resolved on the pleadings.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Business & Corporate Law > Limited Partnerships > Management Duties & Liabilities*
[HN2] For purposes of a derivative action alleging non-disclosure by management, an omitted fact is material if under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable investor. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of information made available.

*Contracts Law > Contract Interpretation > Fiduciary Responsibilities*
*Governments > Fiduciary Responsibilities*
*Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview*
[HN3] There is not, of course, any general duty on the part of managers to disclose information. To bring a nondisclosure claim, a party must allege either a fiduciary duty or a contractual duty to disclose.

*Contracts Law > Contract Interpretation > Fiduciary Responsibilities*
*Governments > Fiduciary Responsibilities*
*Torts > Intentional Torts > Breach of Fiduciary Duty > Elements*
[HN4] There is not a general fiduciary duty on the part of managers to provide financial statements.

*Business & Corporate Law > General Partnerships > Management Duties & Liabilities > Causes of Action > Negligent Acts of Partners*
*Torts > Negligence > Duty > General Overview*
*Torts > Negligence > Standards of Care > Reasonable Care > General Overview*
[HN5] Director liability for breaching the duty of care is predicated upon concepts of gross negligence. A court faced with an allegation of lack of due care should look for evidence of whether a board has acted in a deliberate and knowledgeable way in identifying and exploring alternatives. "Gross negligence" has a stringent meaning under Delaware corporate (and partnership) law, one that involves a devil-may-care attitude or indifference to duty amounting to recklessness. In the duty of care context with regard to corporate fiduciaries, gross negligence has been defined as a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions that are without the bounds of reason. In order to prevail

on a claim of gross negligence, a plaintiff must plead and prove that the defendant was reckless uninformed or acted outside the bounds of reason.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Business & Corporate Law > Limited Partnerships > Management Duties & Liabilities*
[HN6] Whether fund managers exercised the requisite amount of due care in managing the funds is a fact-sensitive inquiry.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Contracts Law > Breach > Causes of Action > General Overview*
[HN7] In order to survive a motion to dismiss for failure to state a breach of contract claim, a plaintiff must demonstrate: (i) the existence of a contract, (ii) a breach of an obligation imposed by that contract, and (iii) resultant damages to the plaintiff.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
*Criminal Law & Procedure > Accusatory Instruments > Informations*
[HN8] Concomitant to a contractual duty to provide information is the duty that such information not be false or misleading.

*Governments > Fiduciary Responsibilities*
*Torts > Business Torts > Fraud & Misrepresentation > Nondisclosure > General Overview*
[HN9] Common law fraud in Delaware requires that: (1) the defendant made a false representation, usually one of fact; (2) the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; (3) the defendant had the intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted or did not act in justifiable reliance on the representation; and (5) the plaintiff suffered damages as a result of such reliance. In addition to overt representations, where there is a fiduciary relationship, fraud may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN10] Fraud claims are subject to the heightened pleading standards of Del. Ch. Ct. R. 9(b). This means that the pleading must identify the time, place and contents of the false representations, the facts misrepresented, as well as the identity of the person making the misrepresentation and what he obtained thereby.

*Contracts Law > Types of Contracts > Express Contracts*
*Contracts Law > Types of Contracts > Implied-in-Fact Contracts*
*Contracts Law > Types of Contracts > Implied-in-Law Contracts*
[HN11] In some circumstances, alternative pleading allows a party to seek recovery under theories of contract or quasi-contract. This is generally so, however, only when there is doubt surrounding the enforceability or the existence of the contract. Courts generally dismiss claims for quantum meruit on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls.

*Business & Corporate Law > Agency Relationships > Agents Distinguished > Special Agents*
*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview*
*Torts > Vicarious Liability > Corporations > Subsidiary Corporations*
[HN12] A parent corporation can be held liable for the acts of its subsidiary under either of two theories of agency liability. The first is where piercing the corporate veil is appropriate. While many factors are considered in deciding whether to pierce the corporate veil, the concept of complete domination by the parent is decisive. Second, while one corporation whose shares are owned by a second corporation does not, by that fact alone, become the agent of the second company, a corporation--completely independent of a second corporation--may assume the role of the second corporation's agent in the course of one or more specific transactions. This restricted agency relationship may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside the limited agency setting. Under this second theory, total domination or general alter ego criteria need not be proven.

*Business & Corporate Law > Corporations > Share-holders > Disregard of Corporate Entity > General Overview*
*Torts > Vicarious Liability > Corporations > Subsidiary Corporations*
[HN13] Persuading a Delaware court to disregard the corporate entity is a difficult task. The legal entity of a corporation will not be disturbed until sufficient reason appears.

*Banking Law > National Banks > Affiliates & Subsidi-aries*
*Business & Corporate Law > Corporations > Share-holders > Disregard of Corporate Entity > General Overview*
*Torts > Vicarious Liability > Corporations > Subsidiary Corporations*
[HN14] Ownership alone is not sufficient proof of domi-nation or control for purposes of disregarding a corporate entity and imposing liability on a parent corporation.

*Business & Corporate Law > Agency Relationships > Authority to Act > Actual Authority > General Over-view*
[HN15] Actual authority is that authority which a princi-pal expressly or implicitly grants to an agent.

*Business & Corporate Law > Agency Relationships > Authority to Act > Apparent Authority > General Over-view*
*Business & Corporate Law > Agency Relationships > Duties & Liabilities > Negligent Acts of Agents > Li-ability of Principals*
[HN16] Apparent authority is that authority which, though not actually granted, a principal knowingly or negligently permits an agent to exercise, or which he holds him out as possessing. In order to hold a defendant liable under apparent authority, a plaintiff must show reliance on indicia of authority originated by principal, and such reliance must have been reasonable.

*Criminal Law & Procedure > Criminal Offenses > In-choate Crimes > Conspiracy > Elements*
*Torts > Intentional Torts > Breach of Fiduciary Duty > Elements*
*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > Elements*
[HN17] The elements for civil conspiracy under Dela-ware law are: (i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance

of the conspiracy; and (iii) damages resulting from the action of the conspiracy parties.

*Estate, Gift & Trust Law > Trusts > General Overview*
*Governments > Fiduciary Responsibilities*
*Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview*
[HN18] Claims for civil conspiracy to commit a breach of fiduciary duty are sometimes called aiding and abet-ting. However, the basis of such a claim, regardless of how it is captioned, is the idea that a third party who knowingly participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relation-ship.

*Governments > Fiduciary Responsibilities*
*Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview*
*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview*
[HN19] A claim of civil conspiracy to commit a breach of fiduciary duty involves vicarious liability. It holds a third party, not a fiduciary, responsible for a violation of fiduciary duty. Therefore, it does not apply to defen-dants that owe a direct fiduciary duty.

*Civil Procedure > Remedies > Equitable Accountings > General Overview*
[HN20] An accounting is an equitable remedy that con-sists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained to be due to either as a result.

*Business & Corporate Law > Corporations > Share-holders > Actions Against Corporations > General Overview*
*Business & Corporate Law > Limited Partnerships > Management Duties & Liabilities*
[HN21] See *Del. Code Ann. tit. 6, § 17-1001.*

*Business & Corporate Law > Corporations > Share-holders > Actions Against Corporations > General Overview*
*Business & Corporate Law > Limited Partnerships > General Overview*
*Governments > Courts > Judicial Precedents*
[HN22] The determination of whether a claim is deriva-tive or direct in nature is substantially the same for cor-porate cases as it is for limited partnership cases. Ac-cordingly, in deciding such issues, a Delaware court re-

lies on corporate as well as partnership case law for its determination of a lawsuit's nature.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > Direct Actions*
*Business & Corporate Law > Corporations > Shareholders > Shareholder Duties & Liabilities > General Overview*
*Civil Procedure > Class Actions > Derivative Actions > General Overview*
[HN23] The determination of whether a claim is direct or derivative turns solely on the following questions: (i) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (ii) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually). The duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint. Instead the court must look to all the facts of the complaint and determine for itself whether a direct claim exists.

*Business & Corporate Law > General Partnerships > Management Duties & Liabilities > Causes of Action > Negligent Acts of Partners*
*Business & Corporate Law > Limited Partnerships > Management Duties & Liabilities*
*Governments > Fiduciary Responsibilities*
[HN24] In order to show a direct injury under Tooley, an investor must demonstrate that the duty breached was owed to him or her and that he or she can prevail without showing an injury to the corporation or limited partnership. Generally, nondisclosure claims are direct claims.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > Direct Actions*
*Civil Procedure > Class Actions > Derivative Actions > General Overview*
[HN25] A claim of mismanagement represents a direct wrong to the corporation that is indirectly experienced by all shareholders. Any devaluation of stock is shared collectively by all the shareholders, rather than independently by the plaintiff or any other individual shareholder. Thus, the wrong alleged is entirely derivative in nature.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
[HN26] If a party brings derivative claims without first making demand, and demand is not excused, those claims must be dismissed.

*Business & Corporate Law > Limited Partnerships > Formation*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN27] As a matter of law, by accepting the position of general partner, a corporation consents to be subjected to a Delaware court's jurisdiction if the limited partnership has chosen to incorporate under Delaware law.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN28] Where the well-pleaded allegations in complaints are not rebutted by affidavit, a court will, for the purposes of a Del. Ch. Ct. R. Rule 12(b)(2) motion, assume the truthfulness of those allegations. A trial court is vested with broad discretion in shaping the procedure by which a motion under Rule 12(b)(2) is decided.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*
[HN29] When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the nonresident defendant. In determining whether it has personal jurisdiction over a nonresident defendant, the court will generally engage in a two-step analysis. First, was service of process on the nonresident authorized by statute? Second, does the exercise of jurisdiction, in the context presented, comport with due process?

*Civil Procedure > Jurisdiction > Jurisdictional Sources > Statutory Sources*

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Evidence > Procedural Considerations > Burdens of Proof > General Overview*
[HN30] On a Del. Ch. Ct. R. 12(b)(2) motion, the burden is on the plaintiff to make a specific showing that the court has jurisdiction under a long-arm statute.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN31] See *Del. Code Ann. tit. 10, § 3104.*

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
[HN32] *Del. Code Ann. tit. 10, § 3104* has been broadly construed to confer jurisdiction to the maximum extent possible under the due process clause.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Challenges*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Civil Procedure > Appeals > Standards of Review > General Overview*
[HN33] When in personam jurisdiction is challenged on a motion to dismiss, the record is construed most strongly against the moving party.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*
[HN34] The focus of a minimum contacts inquiry is whether a nonresident defendant engaged in sufficient minimum contacts with the State of Delaware to require it to defend itself in the courts of Delaware consistent with the traditional notions of fair play and justice. In order to establish jurisdiction over a nonresident defendant, the nonresident defendant's contacts with the forum must rise to such a level that it should reasonably anticipate being required to defend itself in Delaware's courts. The minimum contacts necessary to establish jurisdiction must relate to some act by which the defendant has deliberately created obligations between itself and the forum. Consequently, the defendant's activities are shielded by the benefits and protection of the forum's laws and it

is not unreasonable to require it to submit to the forum's jurisdiction.

*Business & Corporate Law > Limited Partnerships > Management Duties & Liabilities*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*
[HN35] In determining whether a business entity has sufficient minimal contacts with Delaware, case law recognizes the important state interest that Delaware has in regulating entities created under its laws, and that interest can only be served by exercising jurisdiction over those who manage a Delaware entity. When a person manages a Delaware entity and receives substantial benefit from doing so, he should reasonably expect to be held responsible for his wrongful acts relating to the Delaware entity in Delaware.

**COUNSEL:** [*1] Jeffrey S. Goddess, Esquire, Jessica Zeldin, Esquire, ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A., Wilmington, Delaware; Steven E. Fineman, Esquire, Hector D. Geribon, Esquire, Daniel P. Chiplock, Esquire, LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP, New York, New York, for Plaintiffs.

Michael D. Goldman, Esquire, Peter J. Walsh, Esquire, Melony R. Anderson, Esquire, POTTER, ANDERSON & CORROON LLP, Wilmington, Delaware; Christopher P. Hall, Esquire, Kevin Rover, Esquire, John Vassos, Esquire, Marilyn B. Ampolsk, Esquire, MORGAN, LEWIS & BOCKIUS,LLP, New York, New York, for Defendants Alex Brown Management Services, Inc., Deutsche Bank Securities, Inc. and Deutsche Bank A.G.

Daniel Griffith, Esquire, MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN, Wilmington, Delaware, for Defendants DC Investment Partners, LLC, Dr., Robert Crants, III and Michael W. Devlin.

Richard D. Allen, Esquire, Thomas W. Briggs, Jr., Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware, for Defendants Richard Hale, Gary Fearnow, Bruns Grayson, E. Robert Kent, Jr. and Truman T. Semans.

**JUDGES:** LAMB, Vice Chancellor.

**OPINIONBY:** LAMB

**OPINION:**

*MEMORANDUM OPINION*

LAMB, Vice Chancellor.

**I.** [*2]

In a recent opinion in these two related cases on the defendants' motion to dismiss under Court of Chancery Rule 12(b)(6), the court addressed the defendants' statute of limitations argument and concluded that any claims arising before November 11, 2000, the date upon which the parties entered into an agreement tolling the statute of limitations, were barred. n1 Because it was unclear which, if any, claims for relief set out in the complaints arise after that date, the court requested additional submissions from the parties.

> n1 The facts alleged in the complaints are recited in detail in the earlier opinion. *Albert v. Alex. Brown Mgmt. Servs., 2005 Del. Ch. LEXIS 100, at *43-58 (Del. Ch. June 29, 2005).* Reference is made to that opinion for a complete recitation of the facts and for the definition of terms used herein. However, to avoid confusion, the court refers in this opinion to Alex. Brown Management Services, Inc. as "AB Management." Unless otherwise noted, the facts recited in this opinion are taken from the well-pleaded allegations of the complaints.

[*3]

In this opinion, the court now addresses the issues raised in the additional submissions as well as the remaining issues raised by the defendants' motion to dismiss. Included among the latter are: (i) whether any surviving claims are derivative, rather than direct claims as to which demand was neither made nor excused; and (ii) whether the court can exercise personal jurisdiction over several defendants (the "DCIP Defendants") who served as agents, or employees of agents, of the partnerships.

**II.**

In the earlier opinion, the court noted that some of the factual allegations in the complaints occurred after November 11, 2000 and that, therefore, viable claims based on these factual allegations are not time-barred. n2 The Plaintiffs' Response Brief n3 identified five other factual allegations in the complaints (all involving allegedly material misrepresentations or non-disclosures) which, they contend, support viable claims for relief. These are: (i) the Managers' failure in the December 2000 semi-annual reports (dated on or about February 28, 2001) to inform the defendants that hedging was desirable, but the Funds could not afford to do so; (ii) the allegedly misleading statement [*4] in the December 31, 2000 report to the unitholders that the Managers remained "comfortable with the broad diversification

achieved by the Funds' portfolio of public securities and private investments. . . .;" (iii) the defendants' failure to inform the unitholders of the Funds' "liquidity issues," "steps that the management could take to improve liquidity," and "alternatives to raise additional liquidity," although these themes were the focus of the Management Committee meetings of October 3, 2000, March 23, 2001, and September 6, 2001; (iv) the defendants' failure to inform the unitholders that, in June of 2001, AmSouth Bank withdrew from the credit syndicates for the Funds, thereby leaving Bank of America as the only lender for the Funds; and (v) the defendants' failure to inform the unitholders of the Funds violation of their credit arrangements with their lenders, including their eventual defaults, on June 5, 2002 (for the Fund I loan), and June 28 and September 30, 2002 (for the Fund II loan).

> n2 The factual allegations specifically discussed in the earlier opinion are as follows: First, the Managers failed to provide financial statements and reports as they are required to under the Partnership Agreements and Delaware law. Second, the Managers wrongfully allowed certain withdrawals from the Funds, thereby causing or exacerbating a liquidity crisis. Specifically, the Fund II Complaint alleges that three withdrawals from Fund II occurred after November 11, 2000. These allegedly occurred on January 17, 2001, October 25, 2001, and December 31, 2001 (the "Fund II 2001 Withdrawals"). Additionally, the Fund I Complaint alleges approximately $ 8.0 million in withdrawals occurred in December of 2000 from Fund I (the "Fund I December 2000 Withdrawals"). Third, the Managers failed to provide active and competent management of the Funds. *Alex. Brown, 2005 Del. Ch. LEXIS 100, at *78-*79.*

[*5]

> n3 The Plaintiffs' Response Brief is titled "Plaintiffs' Brief In Response To The Court's Memorandum Opinion And Order Of June 29, 2005" and was filed on July 15, 2005.

All five of these factual allegations are found in the complaints. Furthermore, they allegedly occurred after November 11, 2000. Therefore, claims based on these allegations are timely. However, a threshold question is whether the information that the plaintiffs allege should have been disclosed, or was disclosed but was allegedly false and misleading, is material. If this information is not material as a matter of law, the allegations will not

support claims that the Managers violated their disclosure duties. whether, under the facts alleged in the complaints, these disclosure (or non-disclosure) allegations support a reasonable inference of materiality. If they do not, these factual allegations cannot support a claim for relief.

[HN1] The determination of materiality is a mixed question of fact and law that generally cannot be resolved on the pleadings. n4 Therefore, the court cannot (and does not) make any final findings on the [*6] materiality of these alleged disclosure allegations. However, on a Rule 12(b)(6) motion, the court must determine

n4 *O'Malley v. Boris, 742 A.2d 845, 850 (Del. 1999)*

[HN2] An omitted fact is material if "under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix' of information made available." n5

n5 *Rosenblatt v. Getty Oil Co., 493 A.2d 929, 944 (Del. 1985)* (quoting *TSC Indus. v. Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976))*.

The first alleged non-disclosure is that the Managers' failed in the December 2000 semi-annual reports [*7] to inform the unitholders that hedging was desirable, but the Funds could not afford to do so. This allegation of non-disclosure, viewed in the context of the allegations contained in the complaints, supports a reasonable inference that this information is material. According to the complaints, the defendants marketed the Funds as being actively managed by experienced, professional managers. Viewed in this context, a unitholder would likely find it important to know that the Managers could not manage the Funds in what they believed to be the Funds' best interests, because they were facing liquidity problems and could not afford to purchase collars.

The second alleged non-disclosure is that the defendants failed to inform the unitholders of the Funds' "liquidity issues," "steps that the management could take to improve liquidity," and "alternatives to raise additional liquidity." As alleged in the complaints, the real cause of

the Funds' losses was the lack of liquidity. The lack of liquidity allegedly prevented the Managers from properly hedging the Funds as they (allegedly) thought was best for the Funds. Viewed in that context, a reasonable investor would likely find it important [*8] to know such information.

The third alleged non-disclosure is that the defendants failed to inform the unitholders that, in June of 2001, AmSouth Bank withdrew from the credit syndicates for the Funds, thereby leaving Bank of America as the only lender for the Funds. Under the facts alleged, the court cannot reasonably infer that this information is material. The complaints allege that the unitholders understood from the very beginning that the Funds would have to borrow money. This is because the contributed securities were illiquid and the Funds needed cash to purchase collars. Given that fact, it is unlikely that a reasonable investor would find it important to know that the Funds were borrowing from one lender as opposed to multiple lenders. In fact, such information would likely only confuse an investor by giving him more information than is necessary to understand the Funds. Therefore, the plaintiffs cannot bring any claims based on this factual allegation.

The fourth alleged non-disclosure is that the defendants failed to inform the unitholders of the Funds' violations of the credit arrangements with their lenders, including the eventual defaults, on June 5, 2002 (for the [*9] Fund I loan), and June 28 and September 30, 2002 (for the Fund II loan). This allegation supports a reasonable inference of materiality. As opposed to the information about a bank withdrawing from the credit syndicate, the fact that the Funds were in default on their loans directly speaks to the financial condition of the Funds. A reasonable investor would want to know this information.

Finally, the plaintiffs allege that the claim in the December 31, 2000 report that the Managers remained "comfortable with the broad diversification achieved by the Funds' portfolio of public securities and private investments" was materially false and misleading. This allegation does *not* support a reasonable inference that this information is material. It is simply a statement of the Managers' opinion. Furthermore, there is no allegation in the complaints that this statement of opinion was not honestly held, i.e. false. Therefore, the plaintiffs cannot bring any claims based on this factual allegation.

The Non-Disclosure Allegations n6 relate to failures to disclose allegedly material information. [HN3] There is not, of course, any general duty to disclose information. To bring a non-disclosure claim, [*10] a party must allege either a fiduciary duty or a contractual duty to disclose. The plaintiffs have attempted to allege both.

Therefore, the court will address the Non-Disclosure Allegations in the context of the plaintiffs' claims for breach of fiduciary duty and breach of contract.

n6 Collectively, the court refers to the three remaining factual allegations of non-disclosure as the "Non-Disclosure Allegations."

## III.

The allegations set out in the two complaints are nearly identical and the complaints are both set out in eleven counts: breach of fiduciary duty (Count 1); aiding and abetting a breach of fiduciary duty (Count 2); common law fraud (Count 3); aiding and abetting common law fraud (Count 4); breach of contract against AB Management (with respect to Fund I) and breach of contract against DCIP (with respect to Fund II) (Count 5); breach of the covenant of good faith and fair dealing against AB Management (with respect to Fund I) and breach of the covenant of good faith and fair dealing against [*11] DCIP (with respect to Fund II) (Count 6); gross negligence (Count 7); unjust enrichment against all defendants (Count 8); conspiracy liability (Count 9); an accounting (Count 10); and agency liability against Deutsche Bank and DBSI (Count 11). The court first addresses each of the substantive claims (Counts 1, 3, 5-8, & 10). The court then considers the vicarious liability claims (Counts 2, 4, 9, & 11).

A. Breach Of Fiduciary Duty (Count 1)

1. Failure To Provide Financial Statements

The complaints allege that the Managers failed to provide the unitholders with the 2001 audited financial statements until 2003, and failed to provide any investor reports or audited financial statements for 2002. The plaintiffs argue that this amounted to a breach of the Managers' fiduciary duties.

[HN4] There is not, of course, a general fiduciary duty to provide financial statements. Instead, under the Partnership Agreements, the Managers had a contractual duty to provide the unitholders with such reports. n7 The plaintiffs have not articulated why the violation of this contractual right amounted to a breach of fiduciary duty. n8 Thus, this factual allegation does not state a claim for breach [*12] of fiduciary duty.

n7 Partnership Agreements § 11.2.

n8 In the Plaintiffs' Response Brief, the plaintiffs argue that the Managers failed to make material disclosures, when they had a fiduciary obligation to do so. They further outline specific factual allegations, the Non-Disclosure Allegations, they contend are material and should have been disclosed. The Non-Disclosure Allegations are discussed below.

2. Withdrawal Allegations

The plaintiffs argue that the Managers wrongfully allowed the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals. The plaintiffs contend that the defendants violated their fiduciary duties "by failing to ensure that the Funds had sufficient financial resources' to accomplish their investment objectives,' and failed to ensure that the Managers were providing professional and active supervision, oversight and management of the Funds." n9

n9 Pls.'s Resp. Br. at 7.

[*13]

From these factual allegations, the court cannot reasonably infer a breach of the fiduciary duty of loyalty. The complaints do not allege that the Managers benefited personally in any way by allowing the withdrawals. In fact, the amount of fees that the Managers received were based on the amount of money the Funds had under management. Therefore, if anything, the Managers had an incentive *not* to allow redemptions.

Likewise, the plaintiffs' allegations relating to the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals do not rise to the level of a breach of the duty of care. [HN5] Director liability for breaching the duty of care "is predicated upon concepts of gross negligence." n10 A court faced with an allegation of lack of due care should look for evidence of whether a board has acted in a deliberate and knowledgeable way in identifying and exploring alternatives. n11

n10 *Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984); accord Citron v. Fairchild Camera & Instrument Corp., 569 A.2d 53, 66 (Del. 1989).*

n11 *Citron, 569 A.2d at 66*

[*14]

Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one "which involves a devil-may-care attitude or indifference to duty amounting to recklessness." n12 "In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." n13 In order to prevail on a claim of gross negligence, a plaintiff must plead and prove that the defendant was "recklessly uninformed" or acted "outside the bounds of reason." n14

n12 William T. Allen, Jack B. Jacobs and Leo E. Strine, Jr., *Function over Form: A Reassessment of Standards of Review in Delaware Corporation Law, 56 BUS. LAW. 1287, 1300 (2001);accord Tomczak v. Morton Thiokol, Inc., 1990 Del. Ch. LEXIS 47, at *35 (Del. Ch. Apr. 5, 1990)* ("In the corporate context, gross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders' or actions which are without the bounds of reason.'") (citations omitted).

[*15]

n13 *In re Walt Disney Co. Derivative Litig., 2005 Del. Ch. LEXIS 113, at *162, A.2d. , (Del. Ch. Aug. 9, 2005)* (internal citations and quotations omitted).

n14 *Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc., 1996 Del. Ch. LEXIS 116, at *42 (Del. Ch. Sept. 3, 1996)* (citations omitted), *aff'd, 692 A.2d 411 (Del. 1997)* (TABLE); *see also Solash v. Telex Corp., 1988 Del. Ch. LEXIS 7, at *24-*25 (Del. Ch. Jan. 19, 1988)* (stating that the standard for gross negligence is a high one, requiring proof of "reckless indifference" or "gross abuse of discretion") (citations omitted).

The plaintiffs argue that the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals were actionably wrongful. Yet, the plaintiffs specifically allege in the complaints that the Partnership Agreements gave limited partners, in defined circumstances, the right to redeem. While the agreements also gave the Managers the power to delay or deny redemption requests "in [their] [*16] sole discretion," n15 it is difficult to read that discretionary power as imposing a positive duty to

exercise that power to prevent or delay a withdrawal in order "to ensure that the Funds had sufficient financial resources' to accomplish their investment objectives.'" Thus, while the redemptions may have exacerbated the Funds' liquidity crunch, this is not enough to say that the Managers' failure to delay or deny those redemptions can give rise to a duty of care claim.

n15 Fund I Compl. P82; Fund II Compl. P94.

Therefore, the factual allegation that the Managers wrongfully allowed the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals does not give rise to a claim for breach of fiduciary duty.

3. Active And Competent Management And Disclosure Allegations

First, the complaints allege that the Managers lacked the experience and expertise to manage the Funds. Second, the complaints allege that the Managers devoted inadequate time and attention to managing the Funds. The complaints also [*17] allege that the Managers failed to disclose material information, and made misleading disclosures.

The claim that the Managers lacked the experience and expertise to manage the Funds is completely without merit. The defendants disclosed the qualifications of the Funds' Management Committee in the Private Placement Memoranda (the "PPMs") that the defendants gave to all of the unitholders. The "Management" sections of the PPMs disclosed the names, titles, affiliations, ages, educations, and experience of the Management Committee members, DCIP's principals, and DCIP's degree of experience with exchange funds. n16 The unitholders received this information before they ever made their investment in the Funds. They, therefore, implicitly agreed that the Managers were sufficiently qualified to manage the Funds.

n16 *See* Fund I PPM at 27-29; Fund II PPM at 29-31.

However, the plaintiffs' other claim, that the Managers devoted inadequate time and attention to managing the Funds and committed disclosure violations, [*18] is more substantial. The complaints allege that the Managers made false and misleading statements to the unitholders, and failed to disclose material information. While many of the alleged misstatements took place be-

fore November 11, 2000, some (specifically, the Non-Disclosure Allegations) took place after this date.

The complaints allege that the Managers met only sporadically, less than once a year since the inception of the Funds. During this time, the Funds were facing difficult challenges. The Managers originally set up the Funds with collars, attempting to limit the upside and downside potential of the Funds. n17 The appreciation of certain contributed securities (especially Yahoo!) was causing the Funds to blow through the collars. The Managers then made the decision to remove the collars on the Funds, a decision that had beneficial effects in the short-term, but over the long-term, when the defendants failed to reinstate the collars, resulted in sharp losses.

n17 "Collaring" is financial jargon for purchasing offsetting calls and puts on a security to limit upside and downside exposure. At the inception of the Funds, the Managers attempted to limit upside and downside exposure to roughly 10%. *Alex. Brown, 2005 Del. Ch. LEXIS 100, at *9.*

[*19]

Viewed in the light most favorable to the plaintiffs, these alleged facts do (just barely) raise a duty of care claim. [HN6] Whether the Managers exercised the requisite amount of due care in managing the Funds is, of course, a fact sensitive inquiry. In certain circumstances, meeting once a year to manage an investment vehicle would be sufficient. This would be the case when the investment is relatively straight-forward, or where the complexity of the investment lies in its original design. In fact, a typical exchange fund could require less active management than other types of investments. These funds are often designed to avoid tax liability and to provide diversification, *not* to generate spectacular returns. Therefore, under normal circumstances, a properly hedged and diversified exchange fund might need less active management than, say, a typical mutual fund.

The facts alleged in the complaints, however, paint a picture of the Funds being faced with exceptional challenges, first by the sharply rising value of the securities that made up the Funds, and second by the rapid fall in value of those same securities. The response of the Managers was, allegedly, almost non-existent, [*20] meeting less than once a year.

Furthermore, the complaints allege that the Managers failed to disclose the challenges facing the Funds and the meager steps they were taking to meet those challenges. These alleged disclosure violations were poten-

tially material because, had the plaintiffs known the truth, they could have asked for withdrawals, or brought suit before the value of the Funds plummeted.

It is quite possible that the Managers acted appropriately in both the amount of time they spent managing the Funds and the disclosures they made. However, the complaints paint a picture of the Managers taking almost *no* action over the course of several years to protect the unitholders' investments, while the value of the Funds first skyrocketed and later plummeted. Under the circumstances, the plaintiffs should at least be allowed discovery to find out if, as the complaints imply, the Managers received millions of dollars in fees for doing almost nothing.

Therefore, for all of the above reasons, the court holds that the plaintiffs have plead sufficient facts to give rise to a duty of care claim.

B. Breach Of Contract And The Implied Covenant Of Good Faith And Fair Dealing [*21]  (Counts 5 & 6)

[HN7] In order to survive a motion to dismiss for failure to state a breach of contract claim, a plaintiff must demonstrate: (i) the existence of the contract, (ii) a breach of an obligation imposed by that contract, and (iii) resultant damages to the plaintiff. n18

n18 *VLIW Tech., L.L.C. v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003).*

1. Failure To Provide Financial Statements Allegations

The complaints allege that the Managers had a contractual duty under the Partnership Agreements to provide semi-annual unaudited financial statements reporting on the financial condition of the Funds, and an annual audited report. The complaint further alleges that the Managers did not provide the unitholders with these reports for 2002 and did not provide the 2001 audited financial statements until 2003. Further, the court reasonably infers from the facts alleged in the complaints that the plaintiffs were harmed by either not being able to ask for a redemption, or not being able to [*22] sue for rescission or a like remedy. Therefore, the plaintiffs have satisfied the pleading requirements for a breach of contract claim and this claim cannot be dismissed.

2. Withdrawal Allegations

The plaintiffs argue that the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals constituted a breach of contract. They argue that the withdrawals caused, or made worse, the Funds' liquidity crunch.

However, the Partnership Agreements gave the unitholders the right to withdraw their investments after two years. n19 As alleged in the complaints, the unitholders' right to withdraw was limited by the power of the Managers to delay or deny redemptions "in [their] sole discretion." n20

n19 See Partnership Agreements PP6.3.

n20 Fund I Compl. P82, Fund II Compl. P94.

This contractual provision did not create a duty for the Managers to individually assess the financial position of the Funds and the effect that such a withdrawal would have each time a unitholder requested a withdrawal. Instead, [*23] it placed a restriction on the unitholders' right to receive withdrawals. It gave the Managers the power to limit withdrawals, in their sole discretion. Therefore, the plaintiffs have not identified a contractual obligation that the Managers have violated and this claim must be dismissed. n21

n21 In the Plaintiffs' Response Brief, the plaintiffs implicitly admit that the Managers had the authority to allow the withdrawals. Instead of arguing this point, the plaintiffs argue that the Managers had a contractual obligation to report the withdrawals.

3. Active And Competent Management And Disclosure Allegations

The plaintiffs allege that the defendants owed them a contractual duty to provide active management and to disclose all material information. The complaints allege that the Managers made false and misleading statements to the unitholders, failed to disclose material information, and that the Managers met only sporadically, less than once a year since the inception of the Funds.

As stated above, the [*24] Managers are alleged to have owed the unitholders a contractual duty to provide regular financial reports. Of course, [HN8] concomitant to the duty to provide information is the duty that such information not be false or misleading. In other words, the defendants had a contractual duty to provide the information in good faith. The complaints allege that the Managers failed to provide reports when they were contractually obligated to do so, and that, when they did provide the reports, they were false and misleading. Specifically, the plaintiffs argue that the Managers failed to

disclose certain material information-the Non-Disclosure Allegations and the withdrawals.

These allegations, if proven, are sufficient to support a claim for breach of contract. Therefore, this claim survives the motion to dismiss.

C. Fraud (Count 3)

The plaintiffs' third claim is for fraud. [HN9] Common law fraud in Delaware requires that: (1) the defendant made a false representation, usually one of fact; (2) the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; (3) the defendant had the intent to induce the plaintiff to [*25] act or refrain from acting; (4) the plaintiff acted or did not act in justifiable reliance on the representation; and (5) the plaintiff suffered damages as a result of such reliance. n22 In addition to overt representations, where there is a fiduciary relationship, fraud may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak. n23 [HN10] Fraud claims are subject to the heightened pleading standards of Rule 9(b). This means that the pleading must identify the "time, place and contents of the false representations, the facts misrepresented, as well as the identity of the person making the misrepresentation and what he obtained thereby." n24

n22 Stephenson v. Capano Dev., Inc., 462 A.2d 1069, 1074 (Del. 1983).

n23 Id.

n24 York Linings v. Roach, 1999 Del. Ch. LEXIS 160, at *25 (Del. Ch. July 28, 1999). (internal quotations and citations omitted).

The plaintiffs argue that the defendants committed fraud by failing [*26] to disclose material information which they had a contractual and fiduciary duty to disclose, specifically the Non-Disclosure Allegations. Obviously, this claim (resting principally on alleged omissions) is merely a rehash of Count 1 s claim of breach of fiduciary duty and Count 5's claim for breach of contract. It does not independently support a claim for relief. Moreover, the plaintiffs fail to plead with particularity what the defendants obtained through their alleged fraud. The plaintiffs plead generally that the Managers received management fees based on the amount of money that the Funds had under management, thereby giving them an incentive to keep money in the Funds. But the plaintiffs' arguments on this score are inherently contradictory. While they argue that the defendants had an incentive to

keep money in the Funds to earn great management fees, they also argue that the Managers wrongfully allowed withdrawals, thereby reducing the amount of money they had under management. Are the withdrawals also part of the alleged fraud?

For the above reasons, the plaintiffs have failed to adequately state a claim for fraud. Therefore, Count 3 will be dismissed without prejudice to [*27] the claims asserted in Count 1 or Count 5.

### D. Gross Negligence (Count 7)

The plaintiffs' fourth claim is for gross negligence. Both of the Funds' Partnership Agreements contain an exculpatory provision, limiting the liability of the Managers for losses the unitholders incurred with respect to the Funds. Except for misrepresentation or breach of the Partnership Agreements, the General Partners of the Funds (AB Management for Fund I and DCIP for Fund II), and those who perform service on their behalf, are not liable to the unitholders, unless their conduct constituted "gross negligence or intentional misconduct." n25 As such, the unitholders are forced to argue that the Managers' alleged misconduct amounted to gross negligence.

n25 Partnership Agreements § 3.5.

First, as discussed above, the allegations of the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals do not state a claim for gross negligence. Second, also as stated above, claims for breach of the duty of care are predicated [*28] on concepts of gross negligence. The court has already found that the plaintiffs' claim for breach of the duty of care survive the motion to dismiss. Therefore, this claim survives as well.

### E. Unjust Enrichment (Count 8)

The plaintiffs, in the alternative, plead both a claim for breach of contract and a claim for unjust enrichment. [HN11] In some circumstances, alternative pleading allows a party to seek recovery under theories of contract or quasi-contract. This is generally so, however, only when there is doubt surrounding the enforceability or the existence of the contract. Courts generally dismiss claims for *quantum meruit* on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls. n26 It is undisputed that a written contract existed between the unitholders and the defendants. The Partnership Agreements for the Funds spelled out the relationship between the parties, and the

plaintiffs specifically brought claims based on these contracts.

n26 *Rossdeutscher v. Viacom, Inc.*, 768 A.2d 8, 24 (Del. 2001) (applying New York law); *ID Biomedical Corp. v. TM Tech., Inc.*, 1995 Del Ch. LEXIS 34, *39, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995) (applying Delaware law).

[*29]

Notwithstanding the existence of these contractual relationships, the plaintiffs make the bald claim that the Managers were unjustly enriched at the unitholders expense. This is insufficient to state a claim for unjust enrichment, when the existence of a contractual relationship is not controverted. Thus, this claim must be dismissed.

### F. Agency Liability (Count 11)

The plaintiffs also bring claims against Deustche Bank and DBSI (as controlling persons of AB Management) based on agency liability. [HN12] A parent corporation can be held liable for the acts of its subsidiary under either of two theories of agency liability. The first is where "piercing the corporate veil" is appropriate. While many factors are considered in deciding whether to pierce the corporate veil, "the concept of complete domination by the parent is decisive." n27

n27 *Phoenix Canada Oil Co. v. Texaco, Inc.*, 842 F.2d 1466, 1477 (3d Cir. 1988).

Second, while one corporation whose shares are owned by a second corporation [*30] does not, by that fact alone, become the agent of the second company, a corporation-completely independent of a second corporation-may assume the role of the second corporation's agent in the course of one or more specific transactions. This restricted agency relationship may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside the limited agency setting. Under this second theory, total domination or general alter ego criteria need not be proven. n28

n28 *Id.* (citing *RESTATEMENT (SECOND) OF AGENCY § 14M, cmt. (a)* (1958)).

With respect to DBSI, the plaintiffs argue that AB Management was dominated and controlled by DBSI. In essence, the plaintiffs ask the court to disregard AB Management's corporate form n29 and impose liability on DBSI. The complaints allege that: (i) DBSI and AB Management operate out of the same Maryland office; (ii) AB Management, although incorporated, has no functioning board of directors and [*31] no business other than the management of the Funds; (iii) AB Management is run by its Management Committee, which is comprised of employees and executives of DBSI; (iv) DBSI provided margin accounts for the Funds; and (v) DBSI served as the placement agent and custodian for the Funds' accounts. n30

n29 AB Management is a corporation, organized under the laws of Maryland.

n30 Fund I Compl. PP44, 45, 247, 250, 332, 334; Fund II Compl. PP54, 179, 253-259.

[HN13] "Persuading a Delaware Court to disregard the corporate entity is a difficult task. The legal entity of a corporation will not be disturbed until sufficient reason appears." n31 Allegations (i), (iv) and (v) above, while consistent with an obviously close relationship between DBSI and its wholly owned subsidiary, do not alone or together support any inference that would lead this court to disregard the separate legal existence of AB Management; nor does the allegation that AB Management's business is run by DBSI employees. However, the well pleaded factual [*32] allegation that AB Management has "no functioning board of directors," when viewed most favorably to the plaintiffs in light of the other facts alleged, if proven, could provide a basis to conclude that the corporate form should be ignored. The corporate veil may be pierced where a subsidiary is in fact a mere instrumentality or alter ego of its parent. n32 The complaints allege that AB Management does not have board meetings or follow other corporate formalities. Instead, employees of DBSI allegedly perform the activities that, in a properly functioning corporation, the board of directors would perform. If these facts are true and the other relationships are shown to exist, an adequate basis for piercing the corporate veil could be established. Therefore, this claim against DBSI cannot be dismissed.

n31 Mason v. Network of Wilmington, Inc., 2005 Del. Ch. LEXIS 99, at *9 (Del. Ch. July 1, 2005) (internal quotations omitted).

n32 Mabon, Nugent & Co. v. Texas Amer. Energy Corp., 1990 Del. Ch. LEXIS 46, at *14-*15 (Del. Ch. Apr. 12, 1990); Phoenix Canada Oil, 842 F.2d at 1477.

[*33]

The complaints make additional allegations as to why AB Management is a mere agent of Deutsche Bank. These are: (i) Deutsche Bank purchased Alex. Brown, Inc. (the parent company of AB Management) thereby acquiring 100% ownership of AB Management; (ii) Deutsche Bank changed the name of the Funds the reflect the "Deutsche Bank" name; (iii) when the liquidity crisis became acute, the Management Committee decided that it needed to alert officials at Deutsche Bank; and (iv) in July of 2002, Deutsche Bank fired all the members of the Management Committee. n33

n33 Fund I Compl. PP153, 163, 239-240; Fund II Compl. PP179, 253-259.

First, these factual allegations do not give rise a reasonable inference that Deutsche Bank dominated and controlled AB Management and the Management Committee. These factual allegations show little more than Deutsche Bank owned the parent company of AB Management and, indirectly, AB Management itself. [HN14] Ownership alone is not sufficient proof of domination or control. n34 The complaints [*34] allege that Deutsche Bank bought AB Management in June of 1999 and changed its name a few months later. The complaints do not allege any action by Deutsche Bank to influence or control the management of the Funds until July of 2002, when it fired the majority of the Management Committee. From these bare factual allegations, the court simply cannot infer domination or control.

n34 Aronson, 473 A.2d at 815; see also In re W. Nat'l S'holders Litig., 2000 Del. Ch. LEXIS 82, (Del. Ch. May 22, 2000) (holding that a 46% shareholder does not control or dominate the board due to stock ownership alone).

Second, these factual allegations do not give rise a reasonable inference that, in the managing and/or sale of the Funds, AB Management and the Management Committee were Deutsche Bank's agent. Under the rubric of agency liability, there are two main theories-actual authority and apparent authority. Because the plaintiffs do

not describe which theory of liability they assert, the court [*35] addresses both.

[HN15] Actual authority is that authority which a principal expressly or implicitly grants to an agent. n35 There is simply no allegation in the complaints that Deutsche Bank expressly gave either AB Management or the Management Committee the authority to bind it as its agent.

n35 *Billops v. Magness Constr. Co., 391 A.2d 196, 197 (Del. 1978).*

[HN16] Apparent authority is that authority which, though not actually granted, the principal knowingly or negligently permits an agent to exercise, or which he holds him out as possessing. n36 In order to hold a defendant liable under apparent authority, a plaintiff must show reliance on indicia of authority originated by principal, and such reliance must have been reasonable. n37 The plaintiffs have not alleged any facts showing that Deutsche Bank held out either AB Management or the Management Committee as its agent; nor have the plaintiffs alleged facts from which the court can reasonably infer reliance.

n36 *Henderson v. Chantry, 2002 Del. Ch. LEXIS 14, at *14 (Del. Ch. Feb. 5, 2002).* 2002). [*36]

n37 *Billops, 391 A.2d at 198.*

For the above reasons, the plaintiffs have failed to plead sufficient facts to support a claim for agency liability against Deutsche Bank and Count 11 against Deutsche Bank must be dismissed. However, the plaintiffs plead sufficient facts to support a claim for liability against DBSI. Therefore, Count 11 against DBSI will not be dismissed.

G. Conspiracy, Aiding And Abetting Fraud, And Breach Of Fiduciary Duty (Count 2, 4, & 9)

The plaintiffs allege that the defendants conspired to commit fraud and to commit a breach of fiduciary duty. [HN17] The elements for civil conspiracy under Delaware law are: (i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance of the conspiracy; and (iii) damages resulting from the

action of the conspiracy parties. n38 While the plaintiffs caption their claim as aiding and abetting breach of fiduciary duty, the court treats it as a claim for civil conspiracy. [HN18] Claims for civil conspiracy are sometimes called aiding and abetting. n39 However, the basis of such a claim, regardless [*37] of how it is captioned, is the idea that a third party who *knowingly* participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship. n40

n38 *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., 871 A.2d 428, 437 n.8 (Del. 2005); Nicolet, Inc. v. Nutt, 525 A.2d 146, 149-50 (Del. 1987).*

n39 *See Benihana of Tokyo, Inc. v. Benihana, Inc., 2005 Del. Ch. LEXIS 19, at *26 (Del. Ch. Feb. 28, 2005).*

n40 *Gilbert v. El Paso Co., 490 A.2d 1050, 1057 (Del. Ch. 1984), aff'd, 575 A.2d 1131 (Del. 1990).*

However captioned, [HN19] civil conspiracy is vicarious liability. n41 It holds a third party, not a fiduciary, responsible for a violation of fiduciary duty. n42 Therefore, it does not apply to the defendants which owe the unitholders a direct fiduciary duty. Instead, the plaintiffs attempt to hold Deustche Bank and DBSI responsible for the Managers' alleged breaches of fiduciary duty. [*38]

n41 *See, e.g., Parfi Holding AB v. Mirror Image Internet, Inc., 794 A.2d 1211, 1238 (Del. Ch. 2001)* ("Civil conspiracy thus provides a mechanism to impute liability to those not a direct party to the underlying tort."), *rev'd on other grounds, 817 A.2d 149 (Del. 2002).*

n42 *Gilbert, 490 A.2d at 1057.*

The defendants argue that the plaintiffs have not adequately alleged that Deustche Bank and DBSI had knowledge of the alleged wrongful acts, the breach of fiduciary duty and fraud. Where a complaint alleges fraud or conspiracy to commit fraud, the Rules of this court call for a higher pleading standard, requiring the circumstances constituting the fraud or conspiracy to "be pled with particularity." n43 While Rule 9(b) provides

that "knowledge . . . may be averred generally," where pleading a claim of fraud or breach of fiduciary duty that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts [*39] from which it can reasonably be inferred that this "something" was knowable and that the defendant was in a position to know it. n44

n43 *Atlantis Plastics Corp. v. Sammons, 558 A.2d 1062, 1066 (Del. Ch. 1989)* (citing Rule 9(b), which states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.").

n44 *IOTEX Communs., Inc. v. Defries, 1998 Del. Ch. LEXIS 236, at *12-*13 (Del. Ch. Dec. 21, 1998).*

Furthermore, Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal. n45 With respect to DBSI, the complaints allege repeatedly that its employees, acting within the scope of their employment, had knowledge of the underlying factual allegations. Specifically, the complaints allege that the Funds were run by the Management Committee, all the members of which were employees of DBSI. n46 This knowledge is thereby imputed to DBSI.

n45 *J.I. Kislak Mtg. Corp. v. William Matthews Bldr., Inc., 287 A.2d 686, 689 (Del. Super. 1972), aff'd, 303 A.2d 648 (Del. 1972).*

[*40]

n46 Fund I Compl. PP45, 47-51, 247-251; Fund II Compl. PP55, 57-61, 261-266.

With respect to Deutsche Bank, the plaintiffs allege that AB Management and the Management Committee are mere agents of Deutsche Bank. However, as discussed above, the factual allegations in the complaints are insufficient to infer that AB Management and the Management Committee are the agents of Deutsche Bank.

For the above reasons, the court holds that the plaintiffs have not adequately pleaded facts that, if proven, would support an inference that Deustche Bank had knowledge of the alleged wrongful acts, the breach of

fiduciary duty and fraud. The plaintiffs have adequately pleaded that DBSI had knowledge of the alleged wrongful acts. Therefore, with respect to Deutsche Bank, Counts 2, 4, and 9 must be dismissed. With respect to DBSI, these counts will not be dismissed.

H. Accounting (Count 10)

The plaintiffs' tenth claim is for an accounting. [HN20] An accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained to be [*41] due to either as a result. n47 As it is a remedy, should the plaintiffs ultimately be successful on one or more of their claims, the court will address their arguments for granting an accounting.

n47 *Jacobson v. Dryson Acceptance Corp., 2002 Del. Ch. LEXIS 4, at*12-*13 (Del. Ch. 2002).*

V.

The defendants argue that several of the claims in the complaints are derivative and that, since the plaintiffs did not make demand upon the Funds, and demand was not excused, these claims should be dismissed pursuant to Rule 23.1. n48

n48 The claims that the defendants contend are derivative are as follows: breach of fiduciary duty (Count 1), aiding and abetting breach of fiduciary duty (Count 2), breach of contract (Count 5), breach of the covenant of good faith (Count 6), gross negligence (Count 7), unjust enrichment (Count 8), accounting (Count 10), and agency liability (Count 11). As the court has already dismissed the claim for unjust enrichment (Count 8) and agency liability as to Deutsche Bank (Count 11), and deferred granting the equitable remedy of an accounting (Count 10), it will not discuss those claims here.

[*42]

The demand requirement in the limited partnership context is codified in *6 Del. C. § 17-1001.* That statute states:

[HN21] A limited partner or an assignee of a partnership interest may bring an ac-

tion in the Court of Chancery in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed.

Likewise,[HN22] the determination of whether a claim is derivative or direct in nature is substantially the same for corporate cases as it is for limited partnership cases. n49 Accordingly, throughout this decision, the court relies on corporate as well as partnership case law for its determination of this lawsuit's nature.

n49 *Litman v. Prudential-Bache Prop., Inc., 611 A.2d 12, 15 (Del. Ch. 1992).*

The Delaware Supreme Court's recent decision in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.* [*43] revised the standard for determining whether a claim is direct or derivative. Now, [HN23] the determination "turn[s] solely on the following questions: (i) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (ii) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" n50 "Under *Tooley*, the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint." n51 "Instead the court must look to all the facts of the complaint and determine for itself whether a direct claim exists." n52

n50 *845 A.2d 1031, 1033 (Del. 2004).*

n51 *In re Syncor Int'l Corp. S'holders Litig., 857 A.2d 994, 997 (Del. Ch. 2004).*

n52 *Dieterich v. Harrer, 857 A.2d 1017, 1027 (Del. Ch. 2004).*

As they are factually distinct, the court deals with the claims separately. First, the court addresses the claims for breach of contract [*44] and the breach of fiduciary duty based on the Non-Disclosure Allegations. Second, the court addresses the claims for gross negligence and failing to provide active and competent management, and the fiduciary duty claims based thereon.

A. Breach Of Contract And The Non-Disclosure Allegations

The claims for breach of contract and the claims for breach of fiduciary duty based on the Non-Disclosure Allegations are direct. First, the unitholders, not the partnerships, suffered the alleged harm. [HN24] In order to show a direct injury under *Tooley*, a unitholder "must demonstrate that the duty breached was owed to the [unitholder] and that he or she can prevail without showing an injury to the [partnership]." n53 The gravamen of these claims is that the Managers failed to disclose material information when they had a duty to disclose it and made other misleading or fraudulent statements, in violation of their contractual and fiduciary duties. Generally, non-disclosure claims are direct claims. n54 Moreover, the partnerships were not harmed by the alleged disclosure violations. Any harm was to the unitholders, who either lost their opportunity to request a withdrawal from the Funds [*45] from the Managers, or to bring suit to force the Managers to redeem their interests.

n53 *Tooley, 845 A.2d at 1039.*

n54 *See, e.g., Dieterich, 857 A.2d at 1029* (characterizing non-disclosure claims as direct claims); *Abajian v. Kennedy, 1992 Del. Ch. LEXIS 6, at *10 (Del. Ch. Jan. 17, 1992)* (same).

Second, the unitholders would receive any recovery, not the Funds. Under the second prong of *Tooley*, in order to maintain a direct claim, stockholders must show that they will receive the benefit of any remedy. n55 While the best remedy for a disclosure violation is to force the partnership to disclose the information, due to the passage of time since the alleged wrongdoing, that remedy would likely be inadequate. In order to compensate the unitholders for their alleged harm, the court may find it appropriate to grant monetary damages. Such damages would be awarded to the unitholders, and not the partnerships.

n55 *Tooley, 845 A.2d at 1033.*

[*46]

For all of the above reasons, the court concludes that the claims based on the Non-Disclosure Allegations and the alleged breach of contract are direct claims and, thus, demand was not required.

B. Gross Negligence And Failure To Provide Competent And Active Management

The claims for gross negligence and failure to provide competent and active management are clearly derivative. First, as stated above, in order to show a direct injury under *Tooley*, a unitholder "must demonstrate that the duty breached was owed to the [unitholder] and that he or she can prevail without showing an injury to the [partnership]." n56 The gravamen of these claims is that the Managers devoted inadequate time and effort to the management of the Funds, thereby causing their large losses. Essentially, this a claim for mismanagement, a paradigmatic derivative claim. n57 The Funds suffered any injury that resulted from the Managers' alleged inattention. Any injury that the unitholders suffered is derivative of the injury to the Funds.

n56 *Tooley, 845 A.2d at 1039.*

n57 *See, e.g., Kramer v. W. Pac. Indus., Inc., 546 A.2d 348, 353 (Del. 1988)* [HN25] ("A claim of mismanagement . . . represents a direct wrong to the corporation that is indirectly experienced by all shareholders. Any devaluation of stock is shared collectively by all the shareholders, rather than independently by the plaintiff or any other individual shareholder. Thus, the wrong alleged is entirely derivative in nature.").

[*47]

Second, the Funds, not the unitholders, would receive any recovery. Again, under the second prong of *Tooley*, in order to maintain a direct claim, stockholders must show that they will benefit from the remedy. n58 If the court finds that the Managers violated their fiduciary duties by failing to devote adequate time and effort to managing the Funds, any recovery would go to the party harmed, namely the Funds. Thus, these claims are derivative claims.

n58 *Tooley, 845 A.2d at 1033.*

[HN26] If a party brings derivative claims without first making demand, and demand is not excused, those claims must be dismissed. n59 In this case, the plaintiffs have not alleged that they made demand on the Fund, nor have they alleged why demand should be excused. Accordingly, the derivative claim must be dismissed. How-

ever, in the interest of justice, the court dismisses these claims with leave to replead. n60

n59 *Haber v. Bell, 465 A.2d 353, 357 (Del. Ch. 1983).*

[*48]

n60 In a letter to the court, the plaintiffs stated that AB Management sent letters to all the unitholders of the Funds (the "Redemption Letters"), stating that the Managers would allow the unitholders to redeem their units and that the Managers are pursuing the dissolution of the Partnerships. The plaintiffs argue that the Redemption Letters bolster their contention that their claims are direct, not derivative. However, the complaints do not contain the information in the Redemption Letters and the Redemption Letters are not referenced in the complaints. Therefore, these documents are not properly before the court on a Rule 12(b)(6) motion.

**VI.**

The DCIP Defendants argue that, with respect to the Fund I Complaint, this court lacks personal jurisdictions over them. With respect to the Fund II Complaint, they argue that this court lacks personal jurisdiction over Crants and Devlin. n61

n61 DCIP is the General Partner of Fund II. As such, there is no dispute that the court has personal jurisdiction over DCIP viz. Fund II. *See RJ Assocs. v. Health Payors' Org. Ltd. P'ship., 1999. Del. Ch. LEXIS 161, at *12 (Del. Ch. July 16, 1999)* (quoting *6 Del. C. § 17-109(a)* and holding that, [HN27] as a matter of law, by accepting the position of general partner, a corporation consents to be subjected to a Delaware court's jurisdiction if the limited partnership has chosen to incorporate under Delaware law).

[*49]

In support of their Rule 12(b)(2) motion, the DCIP Defendants adduced affidavits of both Devlin and Crants. The plaintiffs have not adduced any affidavits rebutting the Devlin and Crants affidavits, nor have they asked to take discovery. Instead, they have decided to rely on the well-pleaded allegations in their complaint.

Moreover, since they have not been rebutted, the court must take as true the facts contained in the Devlin and Crants affidavits. However, [HN28] where the well-pleaded allegations in the complaints are not rebutted by affidavit, the court will, for the purposes of this Rule 12(b)(2) motion, assume the truthfulness of those allegations. n62

n62 *See Hart Holding Co. v. Drexel Burnham Lambert, Inc., 593 A.2d 535, 539 (Del. Ch. 1991) (citing Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2nd Cir. 1981))* (stating that a trial court is vested with broad discretion in shaping the procedure by which a motion under Rule 12(b)(2) is resolved).

According to the [*50] Devlin and Crants affidavits, DCIP is a Tennessee limited liability company, with its principal place of business in Nashville, Tennessee. Both Crants and Devlin are residents of Tennessee and perform the vast majority of their duties from their office in Nashville. Neither Crants nor Devlin recall ever traveling to Delaware. None of the DCIP Defendants solicit any business in Delaware or engage in any regular conduct with Delaware.

[HN29] When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the nonresident defendant. n63 In determining whether it has personal jurisdiction over a nonresident defendant, the court will generally engage in a two-step analysis. First, was service of process on the nonresident authorized by statute? Second, does the exercise of jurisdiction, in the context presented, comport with due process? n64

n63 *See Plummer & Co. Realtors v. Crisafi, 533 A.2d 1242, 1244 (Del. Super. 1987); see also Finkbiner v. Mullins, 532 A.2d 609, 617 (Del. Super. 1987)* (stating that, [HN30] on a Rule 12(b)(2) motion, "the burden is on the plaintiff to make a specific showing that this Court has jurisdiction under a long-arm statute.") (citing *Greenly v. Davis, 486 A.2d 669 (Del. 1984)*).

[*51]

n64 *LaNuova D & B, S.P.A. v. Bowe Co., 513 A.2d 764, 768 (Del. 1986).*

A. The Long-Arm Statute

The plaintiffs argue that the court has personal jurisdiction over the DCIP Defendants under *10 Del. C. § 3104*, the Delaware long-arm statute. *Section 3104(c)* provides, in relevant part: [HN31] "As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident . . . who . . . (1) Transacts any business or performs any character of work or service in the State . . . [or] (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State. . . ." [HN32] *Section 3104* has been broadly construed to confer jurisdiction to the maximum extent possible under the *due process clause.* n65 Furthermore, [HN33] when *in personam* jurisdiction [*52] is challenged on a motion to dismiss, the record is construed most strongly against the moving party. n66

n65 *Id.*

n66 *RJ Assocs., 1999 Del. Ch. LEXIS 161, at *13.*

The complaints lay out detailed allegations of the connections between the DCIP Defendants and the Funds. The Funds were established as Delaware limited partnerships and are governed by Delaware law. DCIP is the Sub-Advisor of Fund I and the General Partner and Sub-Advisor of Fund II. Crants and Devlin are the managing members and owners of DCIP. DCIP acts principally through Crants and Devlin. The PPMs touted the DCIP Defendants' experience and qualifications in order to sell units in the Funds.

The PPMs also state that DCIP is responsible for the day-to-day management of the Funds. DCIP, in the persons of Crants and Devlin, attended every meeting of the Management Committee (none of which took place in Delaware). Also, DCIP, which acted through Crants and Devlin, was primarily responsible for choosing the securities [*53] included in the Funds.

In *RJ Associates*, Justice (then-Vice Chancellor) Jacobs held that this court could exercise personal jurisdiction over a limited partner in a Delaware limited partner-

ship under *Section 3104(c)(1)*. Justice Jacobs held that the following three contacts, taken together, were sufficient to constitute "transacting business" under the Delaware long-arm statute: (i) the limited partner participated in the formation of the limited partnership, (ii) the limited partnership indirectly participated in the limited partnership's management by controlling' the general partner, and (iii) the limited partner caused the Partnership Agreement to be amended to alter the method of distributions to the partners. n67

n67 *RJ Assocs., 1999 Del. Ch. LEXIS 161, at *18.*

The operative facts of this case, as alleged in the complaints, are similar to those in *RJ Associates*. First, DCIP participated in the formation of the Funds. In fact, DCIP was primarily responsible for selecting the initial [*54] securities accepted by the Funds. n68 Second, DCIP not only participated in the management of the Funds, DCIP was primarily responsible for the management of the Funds. The PPMs state that "the Sub-Advisor will provide day-to-day management and administration of the Fund and investment advisory services, including, among other matters, the screening of contributed securities, advice regarding the selection of the illiquid Assets and hedging and borrowing strategies." n69 Finally, DCIP received millions of dollars in fees to manage the two Delaware entities.

n68 *See* Fund I Compl. P71; Fund II Compl. PP82, 241.

n69 Fund I PPM at 3-4, Fund II PPM at 3.

With respect to Crants and Devlin, the complaints allege that they are the owners and managing partners of DCIP. The complaints further allege that DCIP only acts through Crants and Devlin. In essence, the complaints allege that it was Crants and Devlin who selected the securities for the Funds, and managed the Funds on a day-to-day basis.

The court [*55] finds that these contacts are sufficient to constitute "transacting business" under the long-arm statute.

B. Due Process

[HN34] The focus of a minimum contacts inquiry is whether a nonresident defendant engaged in sufficient minimum contacts with the State of Delaware to require

it to defend itself in the courts of the state consistent with the traditional notions of fair play and justice. n70 In order to establish jurisdiction over a nonresident defendant, the nonresident defendant's contacts with the forum must rise to such a level that it should reasonably anticipate being required to defend itself in Delaware's courts. n71 The minimum contacts which are necessary to establish jurisdiction must relate to some act by which the defendant has deliberately created obligations between itself and the forum. n72 Consequently, the defendant's activities are shielded by the benefits and protection of the forum's laws and it is not unreasonable to require it to submit to the forum's jurisdiction. n73

n70 *AeroGlobal, 871 A.2d at 440* (citing *Int'l Shoe Co. v. Washington, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945)).*

[*56]

n71 *Id.*

n72 *Sternberg v. O'Neil, 550 A.2d 1105, 1120 (Del. 1988).*

n73 *Id.; see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (U.S. 1985)* (requiring "purposeful availment" of the benefits of the state's laws to satisfy the minimum contacts test).

In addition to the contacts outlined above that the complaints allege between DCIP Defendants and the Funds, the plaintiffs also allege that the DCIP Defendants enjoyed the benefits of Delaware law. They claim that the DCIP Defendants have received millions of dollars in fees for managing the Delaware partnerships and are entitled to claim limited liability under the terms of the Partnership Agreements, which established the Funds and limit the DCIP Defendants' liability to cases of gross negligence. n74

n74 Partnership Agreements § 3.5.

In *RJ Associates*, Justice Jacobs found that the following contacts were sufficient [*57] to satisfy due process: (i) the limited partner took an active role in establishing the Delaware Partnership; (ii) the limited partner owned a 50% interest in the partnership's general

partner, and appointed four of the general partner's seven board members; (iii) the limited partner received 49.5% of the partnership's cash flow distributions; (iv) the limited partner allegedly controlled the partnership; (v) the limited partner allegedly caused the partnership agreement to be amended under Delaware law to change the agreed-upon cash flow distribution payments to the limited partners; and (vi) the limited partner agreed to a Delaware choice of law provision in the partnership agreement. n75

n75 *RJ Assocs., 1999 Del. Ch. LEXIS 161, at *19-*20.*

While not exactly the same, the contacts that DCIP has with Delaware are substantially similar to those in *RJ Associates.* DCIP took part in the formation of the Funds, two Delaware entities. DCIP managed the Funds on a day-to-day basis and received [*58] millions of dollars in fees for doing so. In addition, the Partnership Agreements which established the Funds limited the DCIP Defendants' liability to cases of gross negligence. n76 They have, thereby, benefited by expressly limiting their liability under Delaware law. Given all of these contacts, DCIP should have reasonably expected to be haled before the courts in Delaware.

n76 Partnership Agreements § 3.5.

Crants and Devlin also should have reasonably expected to be haled before the courts of this state. As stated above, the complaints allege that DCIP could only act through Crants and Devlin. All the actions attributed to DCIP were really performed by them. Moreover, in the case of Fund II, Crants and Devlin are alleged to be the managing partners of the general partner of a Delaware limited partnership. In the case of Fund I, Crants and Devlin are alleged to have managed a Delaware limited partnership, despite the fact that DCIP is not that entity's general partner.

In *In re USACafes,* former Chancellor [*59] Allen found that the directors of a corporation that was the general partner of a Delaware limited partnership were subject to the jurisdiction of this state's courts, due to their positions with the general partner. n77 Chancellor Allen focused on [HN35] the important state interest that Delaware has in regulating entities created under its laws, and how that interest could only be served by exercising jurisdiction over those who managed the Delaware entity.

n77 *600 A.2d 43, 52 (Del. Ch. 1991).*

The relationship between the General Partner and the limited partners was created by the law of Delaware. The state empowered defendants to act, and this state is obliged to govern the exercise of that power insofar as the issues of corporate power and fiduciary obligation are concerned. These factors bear importantly on the fairness of exercising supervisory jurisdiction at this point in the relationship of the various parties. The wrongs here alleged are not tort or contract claims unconnected with the [*60] internal affairs or corporate governance issues that Delaware law is especially concerned with. n78

n78 *Id.*

Likewise, the wrongs alleged in this case go essentially to the management of a Delaware limited partnership. The DCIP Defendants voluntarily undertook to mange the Funds and received millions of dollars in compensation for doing so. Now, limited partners in the Delaware entity seek to hold them accountable for alleged wrongs they committed. It is both necessary and proper for the courts of this state to ensure that the managers of a Delaware entity are held responsible for their actions in managing the Delaware entity. When a person manages a Delaware entity, and receives substantial benefit from doing so, he should reasonably expect to be held responsible for his wrongful acts relating to the Delaware entity in Delaware. n79

n79 *See Assist Stock Mgmt. L.L.C. v. Rosheim, 753 A.2d 974, 975 (Del. Ch. 2000)* ("When nonresidents agree to serve as directors or managers of Delaware entities, it is only reasonable that they anticipate that . . . they will be subject to personal jurisdiction in Delaware courts.").

[*61]

2005 Del. Ch. LEXIS 133, *

For the above reasons, the court concludes that it has personal jurisdiction over the DCIP Defendants in both cases. Therefore, the DCIP Defendants' motion to dismiss pursuant to Rule 12(b)(2) must be denied.

**VII.**

For the above reasons, the defendants' motion to dismiss is GRANTED in part and DENIED in part. The defendants are directed to submit a form of order, on notice, within 10 days.

1248G7

********** Print Completed **********

Time of Request:    June 05, 2006   03:17 PM EDT

Print Number:       1841:102053024
Number of Lines:    1041
Number of Pages:

Send To:  CASEPULL, REED
          REED SMITH - CUI
          1201 N MARKET ST STE 1500
          WILMINGTON, DE 19801-1163

# CASE 4

LEXSEE 1993 DEL. CH. LEXIS 275

**ROBERT H. ARNOLD, Plaintiff, v. SOCIETY FOR SAVINGS BANCORP, INC., a Delaware corporation, DAVID T. CHASE, SANFORD CLOUD, JR., LAWRENCE CONNELL, ROBERT E. GREEN, JEROME H. GROSSMAN, BETSY HENLEY-COHN, RONALD D. JARVIS, EDWARD W. LARGE, EDWARD J. OKAY, JOHN F. SHEA, JR., FLORIAN A. STANG, JERRY F. STONE, JR., BANK OF BOSTON CORPORATION, and BBC CONNECTICUT HOLDING CORPORATION, Defendants.**

C.A. No. 12883

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*1993 Del. Ch. LEXIS 275; Fed. Sec. L. Rep. (CCH) P98,006*

October 1, 1993, Submitted
December 15, 1993, Decided

**NOTICE:** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff shareholder filed a motion for summary judgment against defendants, a Delaware corporation and its directors, and an acquiring corporation. The shareholder's action asserted that the Delaware corporation's directors breached their fiduciary duty of full disclosure during the period surrounding the corporation's merger with the acquiring corporation, and violated their duty to obtain maximum shareholder value.

**OVERVIEW:** After a corporation merged with another corporation, a shareholder of the merged corporation claimed that the directors breached their fiduciary duty of candor by failing to disclose material information, and their duty to obtain maximum shareholder value. The corporation and the directors denied the breach, and the acquiring corporation, a Massachusetts corporation, contended that the chancery court did not have jurisdiction over it because it did not conduct business in Delaware. The court held that (1) the acquiring corporation's actions of voluntarily merging its subsidiary into the Delaware corporation and choosing to designate the Delaware corporation as the surviving entity constituted a transaction of business under *Del. Code Ann. tit. 10, § 3104*, which subjected the acquiring corporation to the personal jurisdiction of the chancery court, (2) the directors did not breach any duty of candor, and (3) the directors did not

breach their duty to obtain maximum shareholder value because that duty did not exist in the subject merger transaction because it did not contemplate the inevitable break-up of the Delaware corporation.

**OUTCOME:** The court granted summary judgment and dismissed the shareholder's claims that alleged a breach of the duty of candor on the part of the directors, and a breach of their duty to obtain maximum shareholder value.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN1] Whether Delaware has personal jurisdiction over a defendant served under its long-arm statute, *Del. Code Ann. tit. 10, § 3104* depends on: (i) whether the complaint provides a statutory basis under § 3104 for asserting personal jurisdiction; and (ii) whether subjecting the defendant to jurisdiction is fair under the Due Process Clause of the United States Constitution.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN2] A court may exercise personal jurisdiction over any non-resident who transacts any business or performs

1993 Del. Ch. LEXIS 275, *; Fed. Sec. L. Rep. (CCH) P98,006

any character of work or service in Delaware. Del. Code. Ann. tit. 19, § 3104(c)(1).

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN3] Section 3104, *Del Code Ann. tit. 10, § 3104*, is a "single act" statute such that one act may be enough to constitute "transacting business" under § 3104.

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN4] To prevail on a summary judgment motion, the moving party must establish that there is no genuine issue as to any material fact presented to the Court. Del. Ch. Ct. R. Civ. P. 56(c). Reasonable factual inferences will be drawn against the nonmoving party only if they are supported by evidence as opposed to mere assertions or allegations.

*Business & Corporate Law > Mergers & Acquisitions > Mergers > Duties & Liabilities of Directors & Officers*
*Governments > Fiduciary Responsibilities*
[HN5] Under Delaware law, one of a director's fiduciary duties in regard to a merger transaction is to disclose the material facts regarding that transaction to the shareholders. An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.

*Business & Corporate Law > Mergers & Acquisitions > Mergers > Duties & Liabilities of Directors & Officers*
[HN6] Under Delaware law, shareholders are not entitled to a "play-by-play" description of merger negotiations.

*Business & Corporate Law > Mergers & Acquisitions > Mergers > Duties & Liabilities of Directors & Officers*
[HN7] A proxy statement is not misleading when a vote, reported as unanimous, contains abstentions.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Business & Corporate Law > Mergers & Acquisitions > Mergers > Duties & Liabilities of Directors & Officers*

[HN8] When a break-up of a corporate entity becomes "inevitable", the duty owed by the board of directors of that company changes. No longer does the board have the duty to preserve the corporate entity; instead, it must maximize shareholder value.

*Business & Corporate Law > Mergers & Acquisitions > Mergers > Duties & Liabilities of Directors & Officers*
[HN9] The duty of the board of directors to maximize shareholder value when a break-up of a corporate entity becomes inevitable occurs: (1) when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company, and (2) where, in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the breakup of the company.

**COUNSEL:** [*1]

William Prickett, Esquire, Ronald A. Brown, Jr., Esquire, Jeen Kim, Esquire, Curtis C. Johnston, Esquire, and Thomas A. Mullen, Esquire, of PRICKETT, JONES, ELLIOTT, KRISTOL & SCHNEE, Wilmington, Delaware, Attorneys for Plaintiff.

Jesse A. Finkelstein, Esquire, of RICHARDS, LAYTON & FINGER, Wilmington, Delaware; OF COUNSEL: Richard F. Ziegler, Esquire, of CLEARY, GOTTLIEB, STEEN & HAMILTON, New York, New York, Attorneys for Defendants Society for Savings Bancorp, Inc., David T. Chase, Sanford Cloud, Jr., Lawrence Connell, Robert E. Green, Jerome H. Grossman, Betsy Henley-Cohn, Ronald D. Jarvis, Edward F. Large, Edward J. Okay, John F. Shea, Jr., Florian A. Stang and Jerry F. Stone, Jr.

A. Gilchrist Sparks, III, Esquire, and Seth D. Rigrodsky, Esquire, of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware; OF COUNSEL: Robert A. Buhlman, Esquire, of BINGHAM, DANA & GOULD, Boston, Massachusetts, Attorneys for Defendants Bank of Boston Corporation and BBC Connecticut Holding Corporation.

**JUDGES:** CHANDLER

**OPINIONBY:** CHANDLER

**OPINION:**

**MEMORANDUM OPINION**

CHANDLER, Vice Chancellor

1993 Del. Ch. LEXIS 275, *; Fed. Sec. L. Rep. (CCH) P98,006

Plaintiff is the owner of 300 shares of common stock of Society for Savings Bancorp, Inc. ("Bancorp"), a Delaware corporation. [*2] Plaintiff is suing Bancorp, certain directors of Bancorp, Bank of Boston Corporation ("BoB") and BBC Connecticut Holding Corporation ("BBC") (collectively "Defendants"). Plaintiff's cause of action against Defendants alleges that Defendants breached their fiduciary duty of full disclosure during the period surrounding the merger of Bancorp and BBC. Plaintiff also alleges that Defendants violated their Revlon duties during the consummation of the same merger.

## I. BACKGROUND

BoB is a bank holding company registered under Massachusetts law that provides banking services in the Northeastern United States. It owns several banking institutions, including BBC. BoB created BBC specifically for the purpose of merging it into Bancorp. Bancorp, a Delaware corporation, owns Fidelity Acceptance Corporation ("FAC"). Through the process described below, BoB agreed to merge its subsidiary, BBC, into Bancorp, and designate Bancorp the surviving entity (the "Merger"). This transaction was completed in July, 1993. As a result of the Merger, BoB owns one hundred percent of the stock of Bancorp.

The events leading up to the Merger are as follows. In 1991, Bancorp's Board of Directors (the "Bancorp [*3] Board") investigated options for enhancing shareholder value: in other words, it put Bancorp "in play". Bancorp retained Goldman Sachs to undertake and evaluate alternatives. Apparently, in late 1991, after presenting several options to the Bancorp Board, Goldman Sachs determined to acquire Bancorp for itself. Goldman Sachs developed a strategy whereby it would acquire a large part of Bancorp's assets, sell Bancorp's deposit base to another institution, sell FAC and create a stub entity to hold and liquidate any remaining assets (the "Proposed Goldman Transaction"). In order to quantify its strategy, Goldman Sachs sought to value the FAC component of the Proposed Goldman Transaction. It accomplished this by conducting an auction of FAC.

Nine companies submitted "serious" preliminary bids for FAC; Norwest submitted a high bid of $ 275 million. Goldman Sachs invited the five highest bidders to conduct due diligence of FAC, and after Norwest's completion of due diligence, it confirmed its offer to buy FAC for $ 275 million. In May 1992, contracts for the sale of FAC were drafted; the only steps remaining were for Bancorp and its shareholders to approve the Proposed Goldman Transaction [*4] and the parties to the sale to sign the agreements.

On May 28, 1992, Goldman Sachs presented the Proposed Goldman Transaction to the Bancorp Board. Goldman Sachs recommended it to the Bancorp Board

and placed a tentative value on the Proposed Goldman Transaction, as a whole, at $ 229.4 million or $ 19.26 per share. By a vote of 8 to 5, the Bancorp Board rejected the Proposed Goldman Transaction. In a press release issued a few days after this board meeting, Bancorp, through Lawrence Connell, stated that the board "'has determined that management should devote all its efforts to strengthening [Bancorp] as an independent public corporation . . .'"

During the year following Bancorp's rejection of the Proposed Goldman Transaction, the Bancorp Board continued negotiations with BoB. In late August, 1992, BoB submitted a written offer to the Bancorp Board to acquire all of Bancorp. BoB's offer consisted of a stock swap whereby the Bancorp shareholders would receive .8 shares of BoB common stock for each share of Bancorp common stock (the "BoB Offer"). At the time the board considered and voted on the BoB Offer, the exchange ratio translated into a per-share value of $ 17.30 for Bancorp's [*5] shareholders. Goldman Sachs made a presentation to the Bancorp Board, stating that the price to be received by the Bancorp shareholders was fair. Subsequently, the board voted on and approved the BoB Offer by a vote of 8 to 6 (including 5 abstentions). Shortly, thereafter, the board voted again, this time approving the BoB Offer by a vote of 13 to 0 (excluding one abstention).

On March 4, 1993, the Bancorp stockholders approved the Merger with 7,750,253 shareholders voting yes, 1,389,272 voting no, and 2,816,443 abstaining or not voting. Plaintiff moved for a preliminary injunction on May 5, 1993. I denied that motion on May 25, 1993. See *Arnold v. Society For Savings Bancorp, 1993 Del. Ch. LEXIS 85,* Del. Ch., C.A. No. 12883, Chandler, V.C. (May 25, 1993) ("Arnold I"). The Merger was consummated on July 9, 1993.

That same day, plaintiff filed this motion for partial summary judgment. Plaintiff alleges that (i) Defendants breached their duty of candor by failing to disclose material information to the shareholders; and (ii) Defendants violated their duties under *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., Del. Supr., 506 A.2d 173 (1986).* Defendants claim that, [*6] contrary to plaintiff's assertion, they are entitled to summary judgment on the claims asserted by plaintiff and argue, additionally, that as to BoB I should dismiss this action because this Court does not have personal jurisdiction. I will address each of these arguments in turn.

## II. PERSONAL JURISDICTION

BoB claims plaintiff's action against it should be dismissed for lack of personal jurisdiction. BoB asserts that prior "factual findings in Arnold regarding the total absence of any contact between BoB and Delaware . . .

prove that plaintiff cannot establish a prima facie case against BoB on personal jurisdiction." Defendants' Answering Brief at 41.

Plaintiff served BoB under Delaware's long-arm statute, *10 Del. C. § 3104*. [HN1] Whether Delaware has personal jurisdiction over a defendant served under *10 Del. C. § 3104* depends upon two factors: (i) whether the complaint provides a statutory basis under § 3104 for asserting personal jurisdiction; and (ii) whether subjecting the defendant to jurisdiction is fair under the Due Process Clause of the United States Constitution. *Hercules Inc. v. Leu Trust and Banking (Bahamas) Ltd., Del. Supr., 611 A.2d 476 (1992),* [*7] cert. dismissed, *507 U.S. 1025, 123 L. Ed. 2d 463, 113 S. Ct. 1836 (1993).* According to the United States Supreme Court's rulings in *International Shoe Co. v. Washington, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1985),* and its progeny, prong two of this test requires me to examine the relationship between the forum, the litigation and the defendant to determine whether a defendant can be subjected "fairly" to this Court's personal jurisdiction. See *Sternberg v. O'Neil, Del. Supr., 550 A.2d 1105, 1120 (1988).*

Plaintiff contends BoB is subject to personal jurisdiction under § 3104(c)(1). *10 Del. C. § 3104(c)(1)* provides that [HN2] a court may exercise personal jurisdiction over any non-resident who "transacts any business or performs any character of work or service in [Delaware]." Plaintiff asserts that BoB transacted business in Delaware for the purposes of § 3104 when it agreed to merge its subsidiary, BBC, into Bancorp by means of Delaware law. Specifically, plaintiff argues that BoB availed itself of Delaware law because the Merger could not have been completed but for *8 Del. C. § 252.* Plaintiff contends that BoB structured [*8] the transaction such that Bancorp, a Delaware corporation, would be the surviving entity. As a result, plaintiff asserts, BoB transacted business within the state of Delaware and is thus subject to the Delaware Courts' personal jurisdiction.

Based on the following, I find the relationship between BoB, BBC's merger into a Delaware corporation and plaintiff's cause of action is sufficient to subject BoB to this Court's personal jurisdiction.

BoB is a Massachusetts corporation. BoB voluntarily merged its subsidiary into a Delaware corporation by virtue of *8 Del. C. § 252,* and it chose to designate the Delaware corporation, Bancorp, as the surviving entity. I find that these actions constitute a transaction of business under § 3104(c)(1). [HN3] Section 3104 is a "single act" statute such that one act may be enough to constitute "transacting business" under § 3104. *Mid-Atlantic Machine v. Chesapeake Shipbldg., Del. Super., 492 A.2d 250 (1985).* As such, Delaware courts have previously

found that the act of forming a Delaware subsidiary constitutes a transaction of business in Delaware for the purposes of § 3104. See, e.g., *Red Sail Easter Limited Partners,* [*9] *L.P. v. Radio City Music Hall Productions, Inc., 1991 Del. Ch. LEXIS 113,* Del. Ch., C.A. No. 12306, Allen C. (July 10, 1991); *Rabkin v. Philip A. Hunt Chemical Corp., Del. Ch., 547 A.2d 963 (1986).* And, in the Supreme Court's recent discussion of personal jurisdiction in Sternberg, the Court found that "the difference between creating a wholly owned subsidiary in Delaware and purchasing a Delaware subsidiary is a distinction without significance," when the subsidiary is not thereafter reincorporated in another state. *Sternberg, 550 A.2d at 1121.* Although in that case the parent owned and operated a Delaware subsidiary for more than thirty years, and here BoB has owned Bancorp for less than one year, for the purposes of § 3104, the time period of ownership is irrelevant. It is the single act of merging into a Delaware corporation and voluntarily opting not to reincorporate that entity in another state that constitutes a transaction of business within the meaning of § 3104. As a result, I find that BoB's voluntary merger of its subsidiary into a Delaware corporation constitutes a transaction of business under § 3104.

BoB, however, contends [*10] that my prior findings in Arnold I preclude plaintiff from establishing a specific causal nexus between itself and Delaware. Specifically, BoB points to my findings in Arnold I that (i)BoB is a Massachusetts corporation that does no business in Delaware, (ii)BoB's holding company that merged into Bancorp is not a Delaware corporation, (iii)BoB did not negotiate, execute or perform any of the challenged transactions in this case in Delaware and (iv)BoB did not transact business in Delaware simply by agreeing to the Merger.

The findings in Arnold I pointed to by BoB relate to whether Defendant was subject to *8 Del. C. § 371.* These findings are inapposite here. "Transacting business" under § 371 means something different than doing so under § 3104. Under § 371, transacting business has a much broader meaning than under § 3104. Section 371 intends to encompass a course or practice of carrying on business whereas § 3104 is a "single act" statute. See e.g., *Mid-Atlantic Mach. v. Chesapeake Shipbldg., Del. Super., 492 A.2d 250 (1985)* (holding that the "transaction of business" language in Del. C. § 382 (the companion section to § 371) should [*11] be construed differently than the same language in § 3104). As a result, my findings in regard to whether BoB transacted business within Delaware under § 371 do not control whether BoB transacted business within Delaware for the purposes of this Court asserting personal jurisdiction.

I turn now to plaintiff's complaint. Plaintiff's complaint alleges that certain information provided Bancorp's

1993 Del. Ch. LEXIS 275, *; Fed. Sec. L. Rep. (CCH) P98,006

shareholders in connection with the Merger contained material omissions. It can be fairly said, then, that the events surrounding and encompassing the Merger form the basis of plaintiff's complaint. BoB argues, however, that there is no causal nexus between plaintiff's cause of action and BoB's ownership of a Delaware subsidiary, because BoB did not own the subsidiary until after plaintiff's cause of action accrued. n1 As a result, BoB asserts, it did not have a relationship with Delaware when the complained of events occurred. Plaintiff's cause of action did indeed occur prior to the technical consummation of the Merger in July 1993. It arises from the dissemination of information to the Bancorp stockholders that was intended to solicit the stockholders' approval of the Merger. Defendants' time [*12] distinction, however, is irrelevant, because the alleged omission of material statements is inextricably related to the actual consummation of the Merger in July. Indeed, the Merger could not have been effected and BoB could not own Bancorp but for the approval of the Bancorp stockholders. As a result, there is a causal nexus between plaintiff's cause of action and BoB's ownership of Bancorp, notwithstanding the fact that BoB did not technically own Bancorp until after plaintiff's cause of action accrued.

n1 BoB argues that it did not own the subsidiary until July, 1993, whereas the events complained of by plaintiff occurred prior to that time.

Because I find that BoB's act of merging into a Delaware corporation constitutes a transaction of business for purposes of § 3104 and because I find that plaintiff's complaint is inextricably related to this merger, I find that plaintiff's complaint provides a statutory basis under § 3104 for asserting personal jurisdiction.

In addition, I find that subjecting BoB to this Court's [*13] jurisdiction is fair under the Due Process clause of the United States Constitution. BoB's activities in regard to the operation of Bancorp are "shielded by the benefits and protection of [Delaware's] laws." BoB knew at the time it agreed to merge its subsidiary into Bancorp and designated Bancorp the surviving entity, that Bancorp was incorporated under Delaware law. Our Supreme Court has previously noted that "the decision to reincorporate or not to reincorporate in a particular jurisdiction is a deliberate one. The majority stockholders in a parent corporation can vote to change the state of incorporation of the parent, or of a subsidiary anytime there is a preference to be governed by the laws of another jurisdiction." *Sternberg, 550 A.2d at 1121.* n2 Here, BoB made a deliberate decision to designate Bancorp, a Delaware corporation, the surviving entity after it merged with BBC. Because of this designation, BoB's operation of Bancorp

will benefit from the protections of Delaware law. Thus, BoB purposefully availed itself of the benefits and protections of the laws of the State of Delaware for financial gain in activities related to the cause of action [*14] [here]. Therein lies the 'minimum contact' sufficient to sustain the jurisdiction of Delaware's courts over [BoB]." *Papendick v. Bosch, Del. Supr., 410 A.2d 148, 152 (1979).*

n2 In *Sternberg*, the Supreme Court noted that the defendant's knowledge that its target of acquisition was a Delaware corporation and its failure to reincorporate that target in another state is an important factor in determining whether defendant intentionally established minimum contacts in Delaware. *Id. 550 A.2d at 1121-22.*

## III. SUMMARY JUDGMENT MOTIONS

I turn now to plaintiff's summary judgment motions. [HN4] To prevail on a summary judgment motion, the moving party must establish that there is no genuine issue as to any material fact presented to the Court. Chancery Court Rule 56(c); *Gilbert v. El Paso Co., Del. Supr., 575 A.2d 1131 (1990).* Reasonable factual inferences will be drawn against the nonmoving party only if they are supported by evidence "as opposed to mere assertions or allegations." [*15] *In re Sea-Land Corp. Shareholders Lit., Del. Ch., 642 A.2d 792, 799* (Cons.), Jacobs, V.C., (Mar. 26, 1993). There being no issues of material fact, plaintiff's claims are appropriate for summary judgment resolution.

### A. Duty Of Candor

Plaintiff maintains that Defendants breached their fiduciary duty of candor by failing to disclose material facts to the Bancorp shareholders in connection with the Merger. Specifically, plaintiff asserts that Defendants' failure (i) to disclose the facts about the auction bids for FAC, (ii) to disclose the difference in consideration offered in the Proposed Goldman Transaction as compared to that offered in the Merger, (iii) to disclose the manner and conduct of negotiations with BoB, and (iv) to correctly disclose management's projections, amounted to a breach of Defendants' duty of candor. In addition, plaintiff asserts that BoB is liable for the Bancorp Board's alleged disclosure violations because BoB played a significant role in the preparation of those disclosure materials.

Defendants, on the other hand, assert that they did not violate any of their fiduciary duties because the information plaintiff alleges Defendants failed [*16] to disclose is not material. Moreover, Defendants allege that plaintiff is bound by my ruling in Arnold I because

plaintiff has presented no new facts or compelling legal arguments.

This Court has previously stated that it refuses to re-consider an issue it has already decided on a preliminary injunction motion when the moving party offers no new evidence or legal arguments that would persuade the Court that its prior holding was inaccurate. *Siegman v. Columbia Pictures Entertainment, Inc.*, *1993 Del. Ch. LEXIS 1*, Del. Ch., C.A. No. 11152, Hartnett, V.C., slip op. at 8 (Jan. 12, 1993). Here, plaintiff has not proffered any new evidence or legal arguments of any significance. However, it has presented some additional facts and, as such, I will reconsider my prior position as stated in Arnold I and fully treat plaintiff's arguments.

[HN5] Under Delaware law, one of a director's fidu-ciary duties in regard to a merger transaction is to dis-close the material facts regarding that transaction to the shareholders. *Rosenblatt v. Getty Oil Co., Del. Supr., 493 A.2d 929 (1985).* "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider [*17] it important in deciding how to vote. . . . [This standard] contemplate[s] . . . a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Industries, Inc. v. Northway, Inc., S.Ct., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976).* Thus, I must determine if the reasonable shareholder would view that Defendants' alleged omission of certain facts signifi-cantly altered the "total mix" of information made avail-able to her or him.

### 1. FAC Bids

Plaintiff first contends that the facts about the bids submitted for FAC should have been disclosed to the Bancorp shareholders. Plaintiff asserts that these bids (and the facts surrounding them) were reliable, important and non-speculative pieces of information the Bancorp shareholders were entitled to know. Defendants, on the other hand, argue that the omitted facts concerning the FAC bids were not material. They assert that, contrary to plaintiff's belief, the bids for FAC were speculative and contingent upon the occurrence of other events and as such were not material.

Plaintiff stresses that I must consider the [*18] facts surrounding the bids for FAC. According to plaintiff, I erroneously termed the FAC bids "hypothetical specula-tions of what the value of FAC might be" in Arnold I, rather than facts that established the market value of FAC. Plaintiff stresses that the bids submitted for FAC were not contingent or speculative in any way.

Plaintiff misses the point. It is true that several com-panies submitted bids for FAC, one of which was valued

at approximately $ 275 million. The bids for FAC were indeed submitted and were genuine offers to purchase FAC. However, these circumstances do not mean that FAC could be or was intended to be sold, in a stand-alone transaction, to the highest bidder. On the contrary, the record shows that the FAC bids were solicited as one part of the Proposed Goldman Transaction. FAC's sale was but one part of this complex transaction that in-cluded the sale of other Bancorp assets, the creation of a stub entity and the sale of Bancorp's deposit base. As a result, if any part of the Proposed Goldman Transaction was contingent or speculative in any way, the sale of FAC must have been contingent, too, because the sale of FAC was but a component of a larger transaction, [*19] the Proposed Goldman Transaction.

More importantly, the fact that several companies submitted bids for FAC, one of which was valued at $ 275 million, is immaterial. According to the Supreme Court of the United States, to determine materiality, I must consider whether, under all the circumstances, a fact would assume actual significance in the delibera-tions of a reasonable shareholder. Here, the circum-stances surrounding the bidding on FAC are important. First, regardless of the fact that several companies did bid on FAC, the sale of FAC was not an event that could occur under any scenario. It is apparent that the sale of FAC was an event that could occur only under certain circumstances (e.g., with regulatory approval, and/or concurrent with the sale of Bancorp). Moreover, as con-templated by Goldman Sachs, the solicitor of the FAC bids, the sale of FAC was but one component in a com-plicated transaction. Goldman did not solicit the FAC bids with the intention of selling FAC in an isolated transaction; rather, Goldman solicited the bids for FAC as part of a complicated transaction involving not only the sale of FAC but also the sale of other Bancorp assets and the creation of [*20] a stub entity. To consider the receipt of the FAC bids as an isolated event and com-pletely ignore these other circumstances, as plaintiff sug-gests I should do, would result in an overemphasis on the significance of the FAC bids. More importantly, it would run contrary to the Supreme Court's admonition that a court must determine materiality in light of all the sur-rounding circumstances.

Plaintiff also suggests that the circumstances sur-rounding the bids submitted for FAC are material be-cause they are relevant to the fairness of price received by the Bancorp shareholders in the Merger. In support of its materiality argument, plaintiff cites *Burlington Indus. v. Edelman, M.D.N.C., 666 F. Supp. 799, 816 (1987),* for the proposition that "the Court cannot assess the question of what information is material in a vacuum." But, when plaintiff asks me to find that the bids submitted for FAC are material because they go to fairness of price, plaintiff

1993 Del. Ch. LEXIS 275, *; Fed. Sec. L. Rep. (CCH) P98,006

is asking me to do exactly what it says I should not: assess the FAC bids in a vacuum. As stated above, the bids submitted for FAC were highly speculative and contingent. As a result, they in no way established a [*21] fair value of Bancorp. In addition, the bids submitted for FAC were just that; they were bids for FAC, not Bancorp. No reasonable shareholder could extrapolate the value of a parent company from the value of one of its subsidiaries. The shareholder would have no way of knowing if other subsidiaries owned by the parent had a negative value and the extent of that negative value, if any. As a result, I find that the bids submitted for FAC are not relevant to the fairness of price received by the Bancorp shareholders in the Merger and are therefore not material.

### 2. Consideration Offered In The Proposed Goldman Transaction

Plaintiff also asserts that Defendants' failure to disclose the difference in consideration offered in the Proposed Goldman Transaction as compared to that offered in the Merger was a violation of their duty of candor. Plaintiff maintains that the alleged value of the Proposed Goldman Transaction was material because it was relevant to a reasonable shareholder's assessment of the adequacy of the consideration to be received in the Merger. Plaintiff specifically asserts that the "valuation" of the Proposed Goldman Transaction was material because it was generated shortly [*22] before the Bancorp Board voted on the Merger, prepared by a highly qualified organization, intended to establish a valuation of Bancorp, highly relevant and unavailable to the Bancorp shareholders from another source.

Again, plaintiff's arguments miss the mark. I find, much like the FAC bids, that the alleged value of the consideration offered in the Proposed Goldman Transaction was too speculative to significantly alter the total mix of information considered by the Bancorp shareholders. Plaintiff is adamant that the value of the Proposed Goldman Transaction was fixed at $ 19.26 per share. However, no where do the facts establish that the value of the Proposed Goldman Transaction was fixed at this amount. On the contrary, uncontroverted deposition testimony shows that the value of the Proposed Goldman Transaction could not be designated with certainty because of the contingencies involved in the transaction. For example, Rudolph Arnold testified that the Proposed Goldman Transaction was "somewhat arbitrary . . . The set of numbers was very imprecise in terms of what actually would be obtained . . . There's a great deal of uncertainty whether these values would actually be recovered." [*23] And, David Chase, Bancorp's largest shareholder, testified that the value the Bancorp shareholders might have received in the Proposed Goldman Transaction could have been several dollars less than $

19.26 per share, if the value of the stub turned out to be negative. n3 Thus, the undisputed evidence shows that because of the contingencies involved in the Proposed Goldman Transaction and the uncertainty of the value of the stub, the value of the Proposed Goldman Transaction was in no way fixed at $ 19.26 per share or any other amount. Indeed, the value of the Proposed Goldman Transaction was so uncertain that it could in no way significantly alter the total mix of information considered by the Bancorp shareholders.

> n3 In the $ 19.26 per share valuation, the stub was valued at about $ 3.00 per share. If the stub, in fact, had a negative value, the value the Bancorp shareholders would have received in the Proposed Goldman Transaction could have been less than $ 15.00 per share.

### 3. The Manner And Conduct Of Negotiations [*24] With BoB

Plaintiff argues that Defendants breached their duty of candor by failing to disclose the manner and conduct of their negotiations with BoB. Plaintiff alleges that the Bancorp shareholders should have been made aware of the facts that (i) Bancorp's CEO negotiated the sale of Bancorp on his own, (ii) the maximum consideration initially proposed by Bancorp was based on what Bancorp's CEO thought was a fair price for Bancorp, (iii) the Bancorp Board's so-called unanimous approval of the Merger included abstentions; and (iv) Bancorp attempted to renegotiate the terms of the Merger with BoB.

Plaintiff's arguments are wrong as a matter of law. First, [HN6] under Delaware law, shareholders are not entitled to a "play-by-play" description of merger negotiations. *TCG Sec., Inc. v. Southern Union Co., 1990 Del. Ch. LEXIS 12,* Del. Ch., C.A. No. 11282, Chandler, V.C., slip op. at 17 (Jan. 31, 1990). The proxy statement fully discloses the date at which formal negotiations were entered into by the Bancorp Board of Directors. Second, according to *Cinerama, Inc. v. Technicolor, Inc., 1991 Del. Ch. LEXIS 105,* Del. Ch., C.A. No. 8358, Allen, C., slip op. at 56 (June 21, 1991), rev'd in part, *Cede & Co. v. Technicolor, Del. Supr.,* [*25] *634 A.2d 345,* Horsey, J. (Oct. 22, 1993), failure to disclose the initial price named by a seller acting without the benefit of an investment advisor is immaterial. As a result, the CEO of Bancorp's initial proposal of what he believed to be a fair price did not need to be disclosed. Third, Bancorp's characterization of the board of directors' approval of the Merger as unanimous is not misleading as a matter of law. The vote was unanimous with one director abstaining; according to *Weinberger v. UOP, Inc., Del. Ch., 426 A.2d 1333, 1353 (1981),* rev'd on other grounds, Del.

*Supr.*, 457 A.2d 701 (1983), [HN7] a proxy statement is not misleading when a vote, reported as unanimous, contains abstentions. Finally, the fact that Bancorp attempted to renegotiate with BoB shows only that Bancorp was attempting to get the best deal for its shareholders. It does not evidence that the original agreement reached by BoB and Bancorp was unfair or inadequate in any way. Based on the foregoing, I find that plaintiff's allegations that Defendants breached their duty of candor in these regards are meritless.

### 4. Management's Projections

Plaintiff [*26] argues that Defendants breached their duty of candor by misleading the Bancorp shareholders into believing that management's projections, as stated in the proxy statement, were inaccurate, speculative, and unreliable. Plaintiff asserts that the Bancorp shareholders should have been made aware of the fact Bancorp's CEO told the Bancorp Board that it could accomplish its projections in its best case scenario, because this would have affected the shareholders' perception of what was a fair price to be received in the Merger. Plaintiff's arguments are without merit and are unsupported by the record.

First, Bancorp's CEO made this statement to support his recommendation that the Merger be approved, not rejected. Moreover, after making the above statement, the CEO went on to say that, "management believes that risks associated with achieving the best case results outweigh the potential of actually attaining those results." See Affidavit of Ronald A. Brown, Jr., Ex. 10. In addition, the proxy statement was distributed close to a year after management made the projections included in the proxy statement. These projections were not updated. As a result, it would have been improper for [*27] the Bancorp shareholders to rely on or place too much weight on the projections. For the foregoing reasons, I find that Defendants did not breach their duty of candor insofar as their representations of management's projections are concerned.

### 5. Liability Of BoB

Because I find that Defendants have not breached their duty of candor with respect to disclosure of the FAC bids, the purported value of the Proposed Goldman Transaction, management's projections and the manner of negotiations with BoB, I need not reach plaintiff's assertion that BoB is liable for the Bancorp Board of Directors alleged disclosure violations.

### 6. Conclusion

In light of the fact that there are no issues of material fact and based on my finding that Defendants have not breached their duty of candor, summary judgment on this claim is granted in favor of Defendants.

### B. Revlon Duties

Plaintiff asserts that Defendants breached their Revlon duties. It claims that according to Revlon, when a Board of Directors decides to sell a company, it has a duty to obtain the highest price possible for its shareholders. Plaintiff alleges that Defendants breached this duty when they agreed to merge Bancorp into BBC. Moreover, [*28] plaintiff asserts that because Defendants committed numerous disclosure violations, the Bancorp shareholders' approval of the Merger could not amount to stockholder ratification of Defendants' Revlon violations. In the alternative, plaintiff submits that the Bancorp stockholders did not ratify Defendants' Revlon violations because such ratification could only occur by unanimous vote.

Defendants, on the other hand, contend that they are entitled to summary judgment on plaintiff's Revlon claim. They argue that Bancorp's Board of Directors was not under any Revlon duties because a break-up of Bancorp was not inevitable. Moreover, Defendants assert, the Bancorp shareholders ratified any Revlon violations the Board may have committed when a majority of fully informed Bancorp shareholders voted to approve the Merger.

Earlier in this opinion, I found that Defendants did not commit any disclosure violations. As a result, the Merger could be approved by a vote of the Bancorp shareholders. *In re Wheelabrator Technologies, Inc., 1990 Del. Ch. LEXIS 145,* Del. Ch., C.A. No. 11495, Jacobs, V.C., slip op. at 19 (Sept. 6, 1990). Plaintiff argues strenuously, however, that such a ratification could [*29] only occur by a unanimous vote because plaintiff raises allegations of corporate waste. In Arnold I, I declined to reach plaintiff's arguments because I found that plaintiff did not raise any allegations of corporate waste. Not surprisingly, plaintiff offers additional facts and arguments here to show that it did, indeed, raise allegations of corporate waste. In spite of the fact that plaintiff has introduced additional facts and arguments, I am doubtful that it has transformed its claim into one of corporate waste. I need not reach this issue, however, because I find that the enhanced duties implicated under Revlon are clearly inapplicable in this case.

According to Revlon, [HN8] when a break-up of a corporate entity becomes "inevitable", the duty owed by the board of directors of that company changes. No longer does the board have the duty to preserve the corporate entity; instead, it must maximize shareholder value. *Revlon 506 A.2d at 182.* It is important to note, however, that Revlon duties arise only in very specific instances. According to our Supreme Court, there are, generally speaking, only two instances that implicate Revlon duties: [HN9] [*30]

first . . . when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company . . . [and second,] where, in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the breakup of the company.

*Paramount Communications, Inc. v. Time Inc., Del. Supr., 571 A.2d 1140, 1150 (1989).* From this language, it is apparent that Revlon duties do not attach every time a company enters into a combination or acquisition agreement with another company. n4

> n4 For example, our Supreme Court refused to implicate Revlon duties in the merger of Time, Inc. and Warner Communications Inc., two companies engaged in similar businesses.

Bancorp's actions do not fall within the two categories expressly mentioned by our Supreme Court in Paramount where Revlon duties apply. It is clear from the facts presented that Bancorp did not initiate [*31] an active bidding process when it entered into negotiations with BoB. Regardless of who first approached whom regarding the possible merger of BBC and Bancorp, n5 Bancorp did not put itself on the auction block when it began negotiations with BoB in May 1992. True, Bancorp most likely was on the auction block in 1991 when it put itself in play. However, when the Bancorp Board rejected the Proposed Goldman Transaction in 1992 to focus its attention on Bancorp's long-term business and recovery, it immediately removed Bancorp from the auction block and abandoned its consideration of breaking up Bancorp. The Bancorp Board's rejection of the Proposed Goldman Transaction and its deliberate choice to pursue Bancorp's long-term business and recovery options removed it from the Revlon realm of fiduciary duty at that time. *Paramount, 571 A.2d at 1151-52.* And, after the board rejected the Proposed Goldman Transaction, Bancorp's Board did not initiate an active bidding process with BoB, and as such did not implicate itself under Revlon.

> n5 The parties vigorously dispute who first contacted whom regarding the possible merger of BBC and Bancorp. For the purposes of whether Revlon duties are implicated, however, this dis-

pute is meaningless. Revlon duties attach when a corporation initiates an active bidding process. Initiating contact with a prospective buyer, in itself, could hardly be considered initiating an active bidding process. At a minimum, some other facts must be present to show that the corporation is, indeed, placing itself on the auction block.

[*32]

Plaintiff argues, however, that "in selling the company, the Board had one overriding duty under Delaware law: to obtain the highest possible price for the shareholders." Plaintiff's Opening Brief at 45. Plaintiff then goes on to assert that because Bancorp only dealt with one bidder, it was required to "(i) have possessed a body of reliable evidence upon which to judge the adequacy of BoB's bid or ([ii]) have canvassed the market to determine whether greater value could have been obtained" pursuant to *Barkan v. Amsted Indus., Del. Supr., 567 A.2d 1279 (1989).* In Barkan, the Supreme Court opined that Revlon governed "this case and every case in which a fundamental change of corporate control occurs or is contemplated." *Id. at 1286.* Apparently, plaintiff asserts that BBC's merger into Bancorp implicates Revlon duties under Barkan because the BBC-Bancorp transaction involved a change of control. I find here that Revlon duties are not implicated because no change of control has occurred. In Paramount, Chancellor Allen reached a similar result. He stated:

> If the appropriate inquiry is whether a [*33] change in control is contemplated, the answer must be sought in the specific circumstances surrounding the transaction. Surely under some circumstances a stock for stock merger could reflect a transfer of corporate control. That would, for example, plainly be the case here if Warner were a private company. But where, as here, the shares of both constituent corporations are widely held, corporate control can be expected to remain unaffected by a stock for stock merger. . . . Control of both [companies] remain[s] in a large, fluid, changeable and changing market.

Paramount Communications Inc. v. Time Incorporated and Warner Communications Inc., C.A. No. 10866; In re Time Incorporated Shareholder Litigation, Cons. C.A. No. 10670; *Literary Partners, L.P. v. Time Incorporated and Warner Communications Inc., 1989 Del. Ch. LEXIS 77, *68, C.A. No. 10935, Del. Ch., Allen, C., (July 14,

1993 Del. Ch. LEXIS 275, *; Fed. Sec. L. Rep. (CCH) P98,006

1989). The Supreme Court expressly affirmed this rationale in *Paramount Communications, Inc. v. Time Inc., Del. Supr., 571 A.2d 1140, 1150 (1989)* ("The Chancellor's findings of fact are supported by the record and his conclusion is correct as a matter of law"). Thus, if control [*34] of Bancorp remained in a large, fluid market of disaggregated shareholders after the Merger, no change of control occurred and Revlon duties are not implicated.

This is indeed the case here. The Merger was effectuated through a stock swap: each Bancorp share was swapped for eight-tenths of a share of BoB stock. Nothing in the record indicates that the shareholders owning BoB and Bancorp stock were anything other than a fluid, changing market of shareholders. Both companies were publicly owned; neither company had a large controlling block of shares held by one individual or entity. In addition, there is nothing in the Merger's structure that suggests that the continuity of Bancorp's shareholders in the merged entity is threatened. Cf., *QVC Network, Inc. v. Paramount Communications Inc., Del. Ch., 635 A.2d 1245, 1267,* Jacobs, V.C. (Nov. 24, 1993) (where control of merged company will rest in one person and the board does not bargain for "any structural protections that would ensure the continuity of [the] current shareholders (or their successors) in [the] merged enterprise," the shareholders must be afforded the fiduciary protection mandated by Revlon and [*35] Unocal), aff'd, Del. Supr., *Paramount Comm. Inc. v. QVC Network Inc., 1993 Del. LEXIS 440,* Nos. 427, 1993 and 428, 1993 (Cons.), Veasey, C.J. (Dec. 9, 1993) (ORDER). As a result, the merger of BBC and Bancorp did not alter the corporate control of Bancorp and Revlon duties are not implicated.

Based on the foregoing, I find that the facts here do not implicate Revlon duties, and I therefore grant summary judgment in favor of Defendants on this claim. Because Revlon duties were not implicated, I decline to reach plaintiff's and Defendants' arguments regarding ratification of these duties. For the same reason, I decline to address plaintiff's arguments regarding the no-shop clause and lock-up option in the Merger agreement.

IV. CONCLUSION

For the reasons stated above, I find that this Court has personal jurisdiction over BoB and I decline to dismiss plaintiff's action as to BoB for lack of jurisdiction. In addition, I find that Defendants have not breached their duty of candor and are not subject to any Revlon duties. As a result, I grant summary judgment in favor of Defendants, and against plaintiff, on both of these claims.

IT IS SO ORDERED.   [*36]

# CASE 5

LEXSEE 1998 DEL. CH. LEXIS 79

**LEON G. CAIRNS, GERALD A. CAIRNS and STANLEY K. MABBOTT, Plaintiffs, v. MICHAEL J. GELMON, LEWIS GELMON, CORY H. GELMON, ALVIN D. GELMON and INSTANT VISION, INC., Defendants.**

**Civil Action No. 16062**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*1998 Del. Ch. LEXIS 79*

**May 1, 1998, Date Submitted**
**May 21, 1998, Date Decided**

**SUBSEQUENT HISTORY:** [*1]
    Released for Publication by the Court June 5, 1998.

**DISPOSITION:**
    Defendant's motions to dismiss denied except with respect to Cory Gelmon.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants filed a motion to dismiss plaintiffs' complaint, which alleged defendants caused plaintiffs to lose their equity in a corporation formed by defendants.

**OVERVIEW:** Plaintiffs filed suit alleging defendants caused plaintiffs to lose their equity in a corporation formed by defendants. The court granted one defendant's motion to dismiss for invalid service of process. The court held that plaintiffs failed to establish that they sent a second notice to that defendant no later than seven days after filing the first notice of suit. However, the court denied the remaining defendants' motion to dismiss plaintiffs' claims. The court held that it had personal jurisdiction over the remaining defendants because they purposely incorporated a business in Delaware, under Del. Code. Ann. tit. 10, § 3104(c)(1), and to satisfied the requirements of due process. The court also held that plaintiffs' allegations were sufficient to state a cognizable claim for relief.

**OUTCOME:** The court granted one defendant's motion to dismiss plaintiffs' complaint for invalid service of process. However, the court denied the remaining defen-

dants' motion to dismiss plaintiffs' claims because the court had personal jurisdiction over defendants.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN1] On a motion to dismiss for lack of personal jurisdiction, the plaintiffs have the burden to demonstrate that jurisdiction exists.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
[HN2] The incorporation of a company in Delaware in furtherance of a fraudulent scheme constitutes a contact sufficient to satisfy the requirements of the due process clause, particularly where the creation of the corporation is an integral part of the actions giving rise to the suit.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN3] See Del. Code. Ann. tit. 10, § 3104(c)(1).

*Civil Procedure > Pleading & Practice > Service of Process > General Overview*
[HN4] Noncompliance with the statutory requirement that a second notice be sent no later than seven days after

1998 Del. Ch. LEXIS 79, *

the filing of the first notice invalidates service of process under Del. Code. Ann. tit. 10, § 3104.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Dismissals > Involuntary Dismissals > Failures to State Claims*
[HN5] The legal standard on a Del. Ch. Ct. R. 12(b)(6) motion to dismiss is that the complaint may not be dismissed unless it appears to a reasonable certainty that the plaintiff would not be entitled to relief under any set of facts which could be proved in support of his claim.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pretrial Judgments > Judgment on the Pleadings*
[HN6] Del. Ch. Ct. R. 12(b)(6) states in part: A defense of failure to state a claim upon which relief can be granted may be made in any pleading permitted, or ordered under Del. Ch. Ct. R. 7(a), or by motion for judgment on the pleadings, or at the trial on the merits.

**COUNSEL:** Andre G. Bouchard and Joel Friedlander, Esquires, of BOUCHARD, FRIEDLANDER & MALONEYHUSS, Wilmington, Delaware; and Dale C. Lysak, Esquire of The DZIVI LAW FIRM, San Francisco, California; Attorneys for Plaintiffs.

Peter L. Tracey, Esquire, of POTTER, ANDERSON & CORROON, LLP, Wilmington, Delaware; and Debra A. Harrison, Esquire of KATTEN, MUCHIN & ZAVIS, Washington, DC; Attorneys for Defendants.

**JUDGES:** JACOBS, VICE CHANCELLOR.

**OPINIONBY:** JACOBS

**OPINION:**

MEMORANDUM OPINION

JACOBS, VICE CHANCELLOR

On November 26, 1997, Leon G. Cairns, Gerald A. Cairns, and Stanley K. Mabbott (the "plaintiffs" or the "Cairns Group") filed this action against Michael J. Gelmon, Lewis Gelmon, Cory Gelmon, and Alvin D. Gelmon (the "Individual defendants" or the "Gelmon Group"). The plaintiffs claim that the Gelmon Group wrongfully caused the Cairns Group to lose their equity in the corporate defendant Instant Vision, Inc. ("Instant Vision"), a Delaware corporation formed by the Gelmon Group.

The Complaint alleges five Counts: (i) breach of contract; (ii) unjust enrichment; [*2] (iii) breach of fiduciary duties; (iv) fraud; and (v) violation of *8 Del. C. § 242.* n1 The Gelmon Group has moved to dismiss the Complaint on the grounds of lack of personal jurisdiction and for failure to state a claim upon which relief can be granted. Defendant Cory Gelmon has moved separately for a dismissal as to himself on the ground of ineffective service of process, and Instant Vision has moved to dismiss as to it for failure to state a claim upon which relief can be granted. This is the Opinion of the Court on those motions, which are denied except with respect to Cory Gelmon.

n1 Section 242 is the section of the Delaware General Corporation Law that governs amendments to a certificate of incorporation.

I. FACTS

The Cairns Group obtained from Morrison International, Inc. ("Morrison") an exclusive license to develop in Canada a product known as "Instant Eyeglasses." Morrison then invited the Cairns Group to bid for the right to license the Instant Eyeglasses technology in the United States. [*3] To raise the necessary capital, the Cairns Group formed a joint venture with the Gelmon Group and introduced the Gelmon Group to Morrison. The Cairns Group and the Gelmon Group then entered into two letter agreements, the essential elements of which were that (i) the parties would form a corporation as a vehicle to acquire the United States license from Morrison, (ii) the parties would share equally in the equity of that corporation, and (iii) each group would have one director on the corporation's board of directors.

On January 28, 1997, the Gelmon Group incorporated Instant Vision. It is claimed that contrary to their agreements, the Gelmon Group issued all of the shares to themselves and placed four of its members -- but only one member of the Cairns Group -- on Instant Vision's board of directors. On June 25, 1997, the Gelmon Group announced that it exclusively would handle the license transaction with Morrison, and also declared unilaterally its entitlement to a 10% finder's fee. The Gelmon Group also caused Instant Vision to amend its Certificate of Incorporation to increase its authorized common stock from 3000 to 10,000,000 shares, even though Leon Cairns, the director who [*4] represented the Cairns Group, was never informed of the charter amendment in advance of its approval. This action followed.

After commencing this action, the plaintiffs served each member of the Gelmon Group under *10 Del. C. § 3104,* Delaware's long-arm statute, and *10 Del. C. §*

*3114*, Delaware's director-consent-to-service statute. The record reflects that no member of the Gelmon Group has ever been physically present, or ever conducted any business or performed any work relevant to the plaintiffs' claims in Delaware.

## II. THE PARTIES' CONTENTIONS

The defendants advance several grounds for dismissal. First, they contend that this Court lacks personal jurisdiction over all members of the Gelmon Group under § 3104, because (i) none of those defendants had the requisite minimum contacts with Delaware, (ii) § 3114 does not support personal jurisdiction over the Gelmon Group, and (iii) service of process was never validly effected upon Cory Gelmon. The defendants also urge that the Complaint should be dismissed as to Instant Vision, because no relief is sought against it and because the Complaint does not allege that any conduct of Instant Vision caused harm to the [*5] plaintiffs. Finally, the defendants argue that because the plaintiffs are not shareholders of Instant Vision, they have no standing to challenge the certificate amendment that increased the number of Instant Vision's authorized shares.

In response, the plaintiffs contend that Cory Gelmon was properly served and that the act of incorporating Instant Vision in Delaware is a sufficient statutory and constitutional basis to support in personam jurisdiction over the Gelmon Group. The plaintiffs further claim that the Gelmon Group has waived its right to argue that Counts I through V fail to state a claim upon which relief can be granted, because the Gelmon Group's opening brief does not specify in what respect those Counts fail to state a claim. The plaintiffs contend that Instant Vision is a proper defendant, because its presence is necessary to afford the plaintiffs a full and complete remedy. Finally, the plaintiffs urge that they have standing to challenge the amendment to the certificate of incorporation because they are equitable (as opposed to record) shareholders, and because Mr. Cairns was harmed as a result of being denied full and equal access to the certificate amendment-related [*6] information that had been furnished to Instant Vision's remaining directors.

## III. ANALYSIS

On these motions, the Court must decide five issues. Two of those issues are jurisdictional, namely, (i) whether the Gelmon Group's sole act of incorporating Instant Vision in Delaware, without more, is enough to sustain in personam jurisdiction over the Gelmon Group in Delaware, and (ii) whether Cory Gelmon was properly served. The remaining three issues relate to the legal sufficiency of the various Counts in the Complaint: specifically, (i) whether the Gelmon Group has waived its right to assert the defense that Counts I through V fail to state a claim upon which relief can be granted; (ii)

whether Instant Vision is a proper defendant; and (iii) whether the plaintiffs have standing to challenge the amendment to the certificate of incorporation.

### A. The Personal Jurisdictional Issues

1. Personal Jurisdiction Over the Gelmon Group

In determining whether it has personal jurisdiction over the Gelmon Group, this Court must employ a two-step inquiry: (i) whether personal jurisdiction has been established under the Long-Ann Statute, and (ii) if so, whether the assertion of personal [*7] jurisdiction in this specific instance would violate traditional notions of Due Process. n2 [HN1] On a motion to dismiss for lack of personal jurisdiction, the plaintiffs have the burden to demonstrate that jurisdiction exists. n3

> n2 *LaNuova D & B, S.P.A. v. Bowe Co., Del. Supr., 513 A.2d 764, 768 (1986).*
>
> n3 *Hart Holding Co. v Drexel Burnham Lambert Inc., Del. Ch., 593 A.2d 535, 539 (1991).*

The plaintiffs rely on Papendick v. Bosch n4 as on-point authority for their position that a single act of incorporation in Delaware, if done as part of a wrongful scheme, will suffice to confer in personam jurisdiction over the nonresident defendants responsible for the scheme. n5 In Papendick, the plaintiff sued the defendant for breach of a finder's fee agreement. The only contact between the nonresident defendant and the Delaware forum was that the defendant had formed a Delaware subsidiary to acquire stock in a third company. The Delaware Supreme Court determined that the defendants' purposeful availment [*8] "of the benefits and protections of the State of Delaware for financial gain" through the act of incorporating the Delaware subsidiary satisfied the "minimum contacts" requirement of International Shoe Co. v. Washington. n6

> n4 *Del. Supr., 410 A.2d 148 (1979)*, cert. denied, *446 U.S. 909, 100 S. Ct. 1837, 64 L. Ed. 2d 262 (1980).*
>
> n5 See *Newspan, Inc. v. Hearthstone Funding Corp., 1994 Del. Ch. LEXIS 52*, Del. Ch., C.A. No. 13304, Allen, C. (May 10, 1994) ("It is well accepted that [HN2] the incorporation of a company in Delaware in furtherance of a fraudulent scheme constitutes a contact with this jurisdiction sufficient to satisfy the requirements of the Due Process Clause, particularly where the

creation of the corporation is an integral part of the actions giving rise to the suit.").

   n6 *326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945).*

   The plaintiffs claim that here, as in Papendick, the act of incorporating Instant Vision in Delaware was an integral part of a fraudulent scheme, and is therefore sufficient to sustain personal jurisdiction under § 3114(c)(1). n7 Indeed, [*9] plaintiffs argue, the present facts are even more compelling than Papendick, because here the very act of incorporation is claimed to have caused the plaintiffs' injury.

   n7 [HN3] Sub-section (c)(1) provides: "As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent: (1) Transacts any business or performs any character of work or service in this State." It is claimed that the incorporation of Instant Vision falls within the scope of this provision.

   The defendants contend that Papendick is not controlling because in that case, service of process was accomplished by writ of foreign attachment under *10 Del. C. § 3507*, whereas in this case, service was accomplished under § 3104. The defendants fail to explain why this distinction is significant; moreover, their assertion that the plaintiffs have failed to make an adequate evidentiary [*10] showing to satisfy the requirements of § 3104 and the Due Process clause is at best conclusory. The defendants rely upon the identical recital(s), in affidavits filed by each member of the Gelmon Group, denying that "they have ... transacted business or performed any work or services from which plaintiffs' alleged causes of action against me arises in the State of Delaware, either in my individual capacity, or as a Director or officer of Instant Vision, Inc." The defendants argue that because the plaintiffs have failed to rebut that affidavit testimony, they have failed to carry their burden of proof.

   I cannot agree. Given the defendants' failure to distinguish Papendick, and because the incorporation of Instant Vision in Delaware is central to their claims of wrongdoing, I conclude that in these specific circumstances that single act suffices to constitute the "transaction of business" in Delaware under *10 Del. C. § 3104(c)(1)* and to satisfy the requirements of Due Process. n8 The defendant's contrary affidavits recite legal conclusions that are legally incorrect. The Court therefore rejects the Gelmon Group's motion to dismiss for lack of personal jurisdiction.

   n8 *Red Sail Easter Limited Partnership, L.P. v. Radio City Hall Productions, Inc., 1991 Del. Ch. LEXIS 113,* Del. Ch., C.A. No. 12036, Allen, C. (July 10, 1991).

[*11]

2. Sufficiency of Process on Cory Gelmon

   The defendants next argue that service of process was never validly effected on Cory Gelmon. The plaintiffs respond that process was sent by registered mail to Cory Gelmon's mailing address as set forth on the original certificate of incorporation, n9 and that such process was returned as undelivered on February 3, 1998. Accordingly, the plaintiffs conclude, service of process on Cory Gelmon was effective under § 3104(d) and (g).

   n9 Cory Gelmon was one of the Incorporators of Instant Vision.

   The defendants respond that although the plaintiffs filed proof of nonreceipt, § 3104(d) then required that they send Cory Gelmon a second registered notice by certified mail. Because the plaintiffs have not offered proof that they did this, defendants continue to argue that service of process on Cory Gelmon was ineffective.

   The Court finds that the plaintiffs have not carried their burden on this issue, as they have not established that they sent a second registered [*12] notice to Cory Gelmon. Our Supreme Court has held that [HN4] noncompliance with that statutory requirement (that a second notice be sent no later than seven days after the filing of the first notice) invalidates service of process under § 3104. n10 Because the plaintiffs have not established that they satisfied this requirement, the Complaint must be dismissed as against Cory Gelmon, unless the plaintiffs are able to show (by way of a supplemental affidavit) that a timely second registered notice was sent.

   n10 See *Greenly v. Davis,* Del. Supr., *486 A.2d 669, 671 (1984).*

B. The Rule 12(b)(6) Issues

   The defendants also contend that all Counts of the Complaint should be dismissed under Rule 12(b)(6) for failure to state a claim. [HN5] The legal standard on a

Rule 12(b)(6) motion to dismiss is that "the complaint may not be dismissed unless it appears to a reasonable certainty that the plaintiff would not be entitled to relief under any set of facts which could be proved in support of his claim." n11

n11 *Weinberger v. UOP, Inc., Del. Ch., 409 A.2d 1262, 1263-64 (1979).*

[*13]

1. The Waiver Argument

The plaintiffs respond that the defendants have waived their right to argue that those Counts should be dismissed under Rule 12(b)(6), because their opening brief contains no argument as to how Counts I-IV inclusive fail to state a claim.

The plaintiffs are mistaken. Court of Chancery Rule 12(h)(2) states that "[HN6] A defense of failure to state a claim upon which relief can be granted ... may be made in any pleading permitted or ordered under Rule 7(a), or by motion for judgment on the pleadings, or at the trial on the merits." Because Rule 12(h)(2) entitles the Gelmon Group to advance Rule 12(b)(6) arguments up to and including the trial, they have not waived their right to raise a 12(b)(6) defense as to Counts I through IV, inclusive.

2. The Claims Against Instant Vision

The defendants argue that Instant Vision should be dismissed: (i) as to Count I (breach of contract) because Instant Vision was not a party to the alleged contract(s) between the plaintiffs and the Gelmon Group; (ii) as to Count II (unjust enrichment) because the Complaint does not allege that Instant Vision was unjustly enriched; (iii) as to Count III (breach of fiduciary duty) because [*14] the Complaint does not allege that Instant Vision owed any fiduciary duties to the plaintiffs; (iv) as to Count IV (fraud) because the Complaint does not allege that Instant Vision misrepresented or failed to disclose any material fact to the plaintiffs; and (v) as to Count V (violation of § 242) because the Complaint fails to allege any action or inaction by Instant Vision that resulted in harm to the plaintiffs.

The plaintiffs respond that Instant Vision was properly joined as a defendant solely in order to ensure that full and complete relief can be granted. The relief that plaintiffs seek here is to recover 50% of Instant Vision's shares, dividends, and profits now held by the Gelmon Group. That being the case, the plaintiffs contend, Instant Vision must be made a defendant if only because they claim that certain stock, dividends, and profits were dis-

tributed to one member of the Gelmon Group, and were then returned to Instant Vision. To recover those monies from Instant Vision, plaintiffs argue, that entity must be joined as a party.

The plaintiffs also argue that Instant Vision is a proper defendant with respect to their claim that the defendants incorporated Instant Vision, [*15] and then wrongfully took control of its board of directors and caused to be issued to themselves all of its stock. The plaintiffs contend that because it may be impossible to distinguish the acts of Instant Vision from those of the Gelmon Group which controlled the corporation, any relief against the Individual defendants may have to run against Instant Vision as well.

The defendants respond that Instant Vision need not be made a party to afford the plaintiffs the specific relief they seek because the Complaint only seeks 50% of the stock held by the Gelmon Group. That argument incorrectly assumes that the only form of relief sought is a constructive trust. It ignores the fact that the Complaint also requests such other form of relief that the Court deems appropriate. At the oral argument on the pending motions, the defendants' counsel conceded that under at least one scenario relief against the corporation might be justified, viz., if the Court were to direct Instant Vision to recognize the plaintiffs as record owners of 50% of its stock. Because the Court finds that Instant Vision is a proper party, the defendants' motion to dismiss the Complaint as to it is denied.

3. [*16] The Standing Argument

The defendants argue that the Court must dismiss Count V because the plaintiffs are not record shareholders of Instant Vision, and therefore lack standing under *8 Del. C. § 242* to challenge the amendment to Instant Vision's corporate charter that increased its authorized stock from 3000 to 10,000,000 shares.

The plaintiffs counter that they have standing to challenge the charter amendment, because Mr. Cairns was a director of Instant Vision at the time the amendment was adopted, yet was not given advance notice of the proposed amendment, or any opportunity to vote on it. Plaintiffs also argue that they have standing by virtue of the Cairns Group's claimed equitable interest in the disputed shares of Instant Vision. For that reason, the plaintiffs argue, they should have the same standing as would any record holder of the corporation's shares, because had the Gelmon Group honored their agreement, the plaintiffs would be the record owners of one half of Instant Vision's equity. n12

n12 See *Shaev v. Wyly, 1998 Del. Ch. LEXIS 2,* Del. Ch., C.A. No 15559, Steele, V.C. (Jan. 6, 1998) (former shareholder of parent has standing to bring derivative action on behalf of subsidiary after spin-off); *International Equity Capital Growth Fund, L.P. v. Clegg, 1997 Del. Ch. LEXIS 59,* Del. Ch., C.A. No. 14995, Allen, C. (Apr. 21, 1997) (discussing exception to standing requirement for plaintiffs with a "substantial and continuing equity investment.").

[*17]

Defendants contend that Mr. Cairns does not have standing, even as a director, because the plaintiffs have not alleged how (if at all) he was harmed. Moreover, the defendants argue, if the plaintiffs have an equitable claim to shares held by the Gelmon Group, that claim is derivative yet Count V of the Complaint is not brought derivatively. Therefore, the defendants urge that Count V of the Complaint must be dismissed for failure to state a claim upon which relief can be granted.

I conclude that Count V states a claim upon which relief can be granted. First, there is no merit to the argument that the plaintiffs' claim as equitable owners of stock is derivative, because the alleged harm runs to the plaintiffs directly, not to the corporation. Second, Count V claims that Mr. Cairns was a director of Instant Vision at the time the amendment to the corporate charter was considered and voted upon, yet he was intentionally not given notice that this issue would be considered, and was deprived of the opportunity to join in the board's deliberations. These allegations are sufficient to state a cognizable claim for relief. In Moore Business Forms, Inc. v.

Cordant Holdings Corp., n13 [*18] this Court held that except where certain board governance procedures are established, a director has a right of access to whatever corporate information was given to its other directors during the director's tenure. Because Mr. Cairns is claimed to have been denied such access, Count V may be viewed as a claim to enforce that right, by invalidating a charter amendment that was the result of a defective board process. That claim, if meritorious, would afford the plaintiffs a basis for relief. n14 Accordingly, the motion to dismiss this Count must be denied.

n13 *1996 Del. Ch. LEXIS 56,* Del. Ch., C.A. Nos. 13911 & 14595, Jacobs, V.C. (June 4, 1996), appeal denied, *682 A.2d 625 (1996).*

n14 See, e.g., *Schroder v. Scotten, Dillon Company, Del. Ch., 299 A.2d 431, 435 (1972)* ("A special meeting held without notice to all directors as required by the by-laws is not lawful and all such acts done at such a meeting are void.").

IV. CONCLUSION

For the foregoing reasons, the Court denies the defendants' motions to dismiss, [*19] except that the claims against Cory Gelmon will be dismissed unless the plaintiffs are able to demonstrate, by the filing of appropriate proof within ten days of the date of this Opinion, that Mr. Gelmon was properly served in accordance with *10 Del. C. § 3104.* IT IS SO ORDERED.

# CASE 6



Not Reported in A.2d
Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)
**(Cite as: 1999 WL 288119 (Del.Ch.))**

Page 1

**C**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
COMPUTER PEOPLE, INC. Plaintiff,
v.
BEST INTERNATIONAL GROUP, INC., a
Delaware corporation, Best International
Group PLC, a foreign corporation, Best People
Limited, a foreign corporation,
and Raymond Arello, an individual, Defendants.
**No. CIV. A. 16648.**

April 27, 1999.

David C. Weiss and Richard S. Cobb, Esquires, of
Duane, Morris & Heckscher LLP, Wilmington,
Delaware; and Michael N. Sheetz and Peter M.
Coppinger, Esquires, of Gadsby & Hannah LLP,
Boston, Massachusetts, Attorneys for Plaintiff.

Robert J. Stearn Jr., Esquire, of Richards, Layton &
Finger, Wilmington, Delaware; and John M. Murphy
and Anthony G. Stamato, Esquires, of Baker &
McKenzie, Chicago, Illinois, Attorneys for the Best
Defendants.

R. Judson Scaggs, Jr. and William M. Lafferty,
Esquires, of Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware; and Bruce L. Atkins and
Christine M. Stevenson, Esquires, of Contant,
Scherby & Atkins, Hackensack, New Jersey,
Attorneys for Defendant Raymond Arello.

MEMORANDUM OPINION

JACOBS, Vice Chancellor.

*1 In this action, the plaintiff, Computer People, Inc.
("Computer People" or "the company"), claims that
the defendants have engaged in a conspiracy to
induce several of the company's managers and other
high level employees to leave Computer People and
join forces with the defendants. The named
defendants are Best International Group PLC ("Best
PLC") and Best People Limited ("Best Ltd."), both
United Kingdom corporations; Best International
Group, Inc., a Delaware corporation ("Best USA");

and Raymond Arello ("Arello"), a New Jersey
resident.

The defendants other than Best USA have moved to
dismiss the complaint as to them under Court of
Chancery Rule 12(b)(2) for lack of personal
jurisdiction. Additionally, all defendants have moved
to dismiss the action under Court of Chancery Rule
12(b)(6) for failure to state a claim upon which relief
can be granted.

For the following reasons, the Court determines that
it lacks personal jurisdiction over defendants Arello,
Best PLC, and Best Ltd ., and grants the motion to
dismiss the complaint as to those defendants. The
result is to leave Best USA as the sole remaining
defendant. Because neither side has adequately
briefed the 12(b)(6) motion with that contingency in
mind, the Court denies the Rule 12(b)(6) motion,
with leave to renew based on briefs that take into
account the procedural consequences of the
jurisdictional ruling made here.

I. BACKGROUND

The facts set forth below are derived from the
complaint and the affidavits filed in connection with
these motions.

A. The Parties

1. Computer People

Computer People, a Delaware corporation, is a
subsidiary of Delphi PLC, a British corporation with
branch offices throughout the United Kingdom.
Computer People provides specialized employment
staffing services on a contract basis within the
information technology ("IT") industry. The company
has 14 branch offices nationwide grouped into three
regions. [FN1] Its business is to hire IT professionals
("consultants") and then place those consultants with
commercial and governmental entities. In those
environments, the consultants perform tasks that
include programming, system administration,
applications development, system analysis and
design, and network administration and installation.

FN1. The Western region, which has its
headquarters in Los Angeles, includes
branch offices in Seattle, Portland, Dallas,
and Houston. The Midwest region, which is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)
(Cite as: 1999 WL 288119 (Del.Ch.))

Page 2

headquartered in King of Prussia, Pennsylvania, includes branch offices in Chicago, Detroit, Columbus, and Atlanta. The Mid-Atlantic region, which has its headquarters in Wilmington, Delaware, includes branch offices in New York City and King of Prussia, Pennsylvania.

Each Computer People branch office has a manager who is responsible for operating that office, and who has access to highly confidential and sensitive information, including a database containing detailed information about Computer People's consultants and clients. Because of the sensitive and confidential nature of this information, all managers are required to sign employment agreements that contain various restrictive covenants covering topics such as employee non-solicitation, customer non-solicitation, and confidentiality. Some Computer People employees are also required to include non-competition provisions in their employment agreements.

2. The Defendants

Best PLC, a British corporation, is the corporate parent of several IT placement subsidiaries throughout the world, including defendants Best USA and Best Ltd. Defendants Best PLC and Best Ltd. do not own any real estate, maintain any office, or conduct any business; and neither company is registered to do business in Delaware. Best PLC and Best Ltd. also have no Delaware mailing address, post office box, telephone number or listing; nor do they generate any substantial revenue from Delaware operations or have a designated agent for service of process in Delaware.

*2 Best PLC incorporated Best USA in Delaware on August 12, 1998 to take advantage of the administrative convenience and corporate tax considerations associated with being a Delaware corporation. Best USA, like Computer People, is in the business of placing consultants in the IT field on a contractual basis. Best USA's principal place of business is in Freehold, New Jersey, and it also maintains three branch offices outside New Jersey, none of which are located in Delaware. [FN2]

> FN2. The branches are located in Los Angeles, California; Dallas, Texas; and Seattle, Washington.

Raymond Arello worked for Computer People from May 22, 1989 through May 15, 1998. Originally hired as the New York branch manager, Arello served as Vice President and Regional Manager for Computer People's Northeast region from January 1, 1993 through March 1, 1998. On March 1, 1998, Arello was promoted to Senior Vice President for Computer People and Alpine Computer System (a separate operating division located in New York), [FN3] with oversight responsibility for profit improvement in New York and New Jersey.

> FN3. Alpine is involved in remote systems management, outsourcing, computer network design, and consulting services.

Although he was a New Jersey resident, Arello initially had many Delaware contacts as a Computer People employee. As a regional Vice President from 1993 to 1996, Arello was responsible for supervising Computer People's Delaware branch office; and in that role he had frequent contacts in Delaware with Michael Stanley, Computer People's Wilmington branch office manager. Arello visited the Delaware branch office weekly and communicated with that office almost daily by telephone and e-mail. He also frequently attended sales and staff meetings in Delaware and was available to answer operational and other questions for Stanley as needed. Arello never lived in Delaware, however, and after 1996 his Delaware contacts declined significantly.

In April 1998, Best Ltd. executives Susan E. Cuff ("Cuff") and Michael R. Bayfield ("Bayfield") contacted Arello and offered him a position with Best USA. In May 1998, Arello left Computer People after being terminated as part of the company's cost-reduction plan. Thereafter, Arello became Best USA's President and Chief Executive Officer, and presently works out of Best USA's Freehold, New Jersey headquarters. After he left Computer People, Arello's only Delaware contact occurred in 1998, when he had lunch with Stanley in Delaware and toured Computer People's new Wilmington, Delaware facility.

B. The Defendants' Alleged Solicitation of Computer People Employees

Computer People claims that the defendants have conspired to lure away five key Computer People employees (including 4 of its 14 branch managers) who had access to sensitive and confidential company information. These defecting employees included former branch managers Thomas P. Meola ("Meola"), William Kalinowski ("Kalinowski"), Jon Raymond ("Raymond"), and Brian Mitchell

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)
**(Cite as: 1999 WL 288119 (Del.Ch.))**

("Mitchell"), and former employee Chelsey D. English ("English"). What follows is a brief summary of the alleged wrongful acts committed by the defendants. None of those acts occurred in Delaware.

### 1. Meola

**\*3** From December 16, 1994 until he resigned on September 8, 1998, Meola was Computer People's New York branch manager. During the summer of 1998, Meola met twice with Bayfield, and he also met with Cuff on an unspecified number of occasions. According to the complaint, at these meetings Bayfield allegedly promised Meola that he would be the "number two" person in charge of Best USA, and he offered Meola a one-year guaranteed employment contract that promised yearly compensation of approximately $350,000.

On August 27, 1998, Meola gave Computer People notice of his resignation effective September 25, 1998. Over the Labor Day weekend, Arello, who had remained friends with Meola since he left Computer People, [FN4] contacted Meola and persuaded him to accept employment with Best USA, where Meola is now currently employed.

> FN4. Arello and Meola were colleagues working in the same region while both were employed at Computer People. Arello hired and managed Meola in the New York branch office for two years.

### 2. Kalinowski

From January 1, 1989 until September 30, 1993, Kalinowski was Computer People's Los Angeles branch manager; and from October 1, 1993, to September 30, 1997, he was its Atlanta branch manager. Kalinowski again served as Computer People's Los Angeles branch manager from October 1, 1997, until he resigned on September 4, 1998.

In July or August 1998, Bayfield and Cuff, acting on behalf of Best Ltd. and/or Best PLC, solicited Kalinowski to leave Computer People and join Best USA. On August 6, 1998, Kalinowski tendered his resignation and gave Computer People one month's notice. Kalinowski now works for Best USA in its Los Angeles branch office.

### 3. Raymond

From July 7, 1997, until February 2, 1998, Raymond was an account manager in Computer People's Seattle office. On February 2, 1998, Raymond became the Seattle branch office manager, where he remained until his resignation on May 26, 1998. Shortly thereafter, Bayfield and Cuff, acting on behalf of Best Ltd. and/or Best PLC, offered Raymond a position with Best USA. Raymond is now Best USA's Seattle office branch manager.

### 4. Mitchell

From July 1, 1987 until he resigned on July 28, 1998, Mitchell was employed by Computer People, first as a contract sales executive in its New York office, then as its Wilmington, Delaware branch manager, and finally as its Dallas, Texas branch manager. By letter dated June 29, 1998, Mitchell tendered his resignation, effective July 28, 1998. Sometime during the summer of 1998, the defendants, including Bayfield and Cuff acting on behalf of Best Ltd. and/or Best PLC, contacted Mitchell in an effort to recruit him for Best USA. It is unclear from the complaint whether this contact occurred during or after Mitchell's employment with Computer People; but in any event, Mitchell now works for Best USA as its Dallas branch manager.

### 5. English

On July 27, 1998, English resigned from Computer People's Dallas office, effective August 14, 1998. At some point, Mitchell allegedly contacted English to recruit her on behalf of Best USA for the Dallas office. It is unclear from the complaint whether this contact occurred before or after English terminated her employment with Computer People. In any event, English now works for Mitchell in Best USA's Dallas office.

### C. Other Alleged Solicitation Efforts

**\*4** The plaintiff also alleges that beginning in January or February 1998, Bayfield and Cuff (on behalf of Best Ltd. and Best PLC) began to solicit Computer People's Mid-Atlantic branch manager, Michael Stanley, who is based in Wilmington, Delaware. That is the only solicitation activity claimed to have occurred in Delaware. There were two other alleged telephone call solicitations by Bayfield from outside Delaware to Stanley's Delaware office, during which Bayfield allegedly informed Stanley that Best was "coming to the United States" and invited Stanley to join them. On May 21, Bayfield and Cuff met with Stanley at the Philadelphia Airport and again solicited him to join Best's "United States team." One month later, in June

Not Reported in A.2d                                                        Page 4
Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)
**(Cite as: 1999 WL 288119 (Del.Ch.))**

or July 1998, Stanley had a follow up meeting with Bayfield and Cuff in New York, and also received an e-mail from Bayfield at his Wilmington office. Ultimately, however, Stanley resisted these blandishments and decided to stay with Computer People.

In April 1998, Best Ltd. executives Cuff and Bayfield contacted Geoffrey Richardson, who at that time was Computer People's Senior Vice President of Recruiting and the Director of its National Resourcing Office. Cuff and Bayfield offered Richardson a position with Best USA. The complaint does not allege that Richardson presently works for the defendants or that he intends to work for the defendants in the future.

## II. THE CONTENTIONS

Computer People's complaint has six counts. Count One alleges that the defendants tortiously interfered with Computer People's contractual relationship with its employees through its various solicitations. Computer People contends that its former employees cannot perform similar services for Best USA without violating the express terms of their Computer People employment agreements, because those employees, once employed by Best USA, will inevitably: (i) solicit and/or disclose the names of the customers and consultants that are a part of Computer People's database and/or workforce; and (ii) use and disclose other confidential Computer People information in the course of performing their managerial duties.

Count Two alleges that the defendants have tortiously interfered with Computer People's business relations by intentionally recruiting Computer People's key managerial employees. This depletion of its upper-level employees, Computer People claims, has caused or will cause the termination of Computer People's present or prospective business relations with its clients.

Count Three alleges that Arello's solicitation of Computer People's employees (in particular Meola) violated his employment agreement with Computer People. Count Four contends that that same conduct breached Arello's common law fiduciary duty owed by him to Computer People. Count Five alleges that Best Ltd. and Best PLC, through Bayfield and Cuff, knowingly participated and assisted in Arello's breach of fiduciary duty to Computer People.

The final count, Count Six, alleges that the defendants are parties to a conspiracy to create and operate Best USA as the vehicle for defendants' efforts to interfere tortiously with Computer People's contractual and business relationships.

**\*5** Defendants Arello, Best PLC, and Best Ltd., have moved to dismiss this action under Court of Chancery Rule 12(b)(2) for lack of jurisdiction over the person. (The defendants concede that the Court has personal jurisdiction over Best USA, which is a Delaware corporation.). In addition, all four defendants have moved to dismiss the complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Only the first of these motions is addressed, for the reasons discussed later herein.

## III. ANALYSIS
### A. Applicable Legal Standards

To overcome a challenge to personal jurisdiction under Court of Chancery Rule 12(b)(2), a plaintiff must establish, *prima facie*, that this Court has personal jurisdiction over the moving defendant. [FN5] In that context all factual inferences are viewed in the light most favorable to the plaintiff. [FN6] Where, as here, the plaintiff attempts to effect service of process under the Delaware Long Arm Statute, 10 Del. C. § 3104, the plaintiff must prove that (i) the defendants' alleged conduct falls within one or more of the statutorily enumerated categories that confer jurisdiction and that (ii) the Court's exercise of personal jurisdiction satisfies the due process requirements of the Fourteenth Amendment of the United States Constitution. [FN7]

> FN5. *Newspan, Inc. v. Hearthstone Funding Corp.,* Del. Ch., C.A. No. 13304, mem. op. at 8, Allen, C. (May 10, 1994). The plaintiff bears the burden of showing by evidence that the fact finder could determine that the factual predicate for jurisdiction has been proven. *Id.* at 2 (citing *Hart Holding Co. v. Drexel Burnham Lambert, Inc.,* Del. Ch., 593 A.2d 535, 539 (1991)).

> FN6. *See Outokumpu Eng. Entrs., Inc. v. Kvaerner Enviropower, Inc.,* Del.Super., 685 A.2d 724, 727 (1996).

> FN7. *Hercules Inc. v. Leu Trust & Banking (Bahamas) Ltd.,* Del.Supr., 611 A.2d 476, 480 (1992), *cert. dismissed,* 507 U.S. 1025 (1993).

The pertinent provisions of Delaware's Long Arm

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)

**(Cite as: 1999 WL 288119 (Del.Ch.))**

Statute, 10 _Del. C._ § 3104(c), state:

(c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:

(1) Transacts any business or performs any character of work or service in the State;

* * *

(3) Causes tortious injury in the State by an act or omission in this State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State.

Subsections (c)(1) and (c)(3) authorize "transactional" or "specific" jurisdiction in cases where the cause of action arises out of the defendant's conduct in the State of Delaware. [FN8] Under those subsections a single act in Delaware will suffice. Subsection (c)(4), on the other hand, creates "general" jurisdiction in cases where the cause of action is unrelated to the relevant Delaware contacts. [FN9] General jurisdiction under subsection (c)(4) requires a greater, more continuous pattern of contacts with the forum than does "single act" jurisdiction under subsection (c)(1), (2), or (3). The "tradeoff" for this stricter requirement is that the activities which create that general presence need not be the basis for the plaintiff's cause of action.

FN8. _Sears, Roebuck & Co. v. Sears PLC,_ D. Del., 744 F.Supp. 1289, 1292 (1990).

FN9. _Id._

In narrowly defined circumstances, personal jurisdiction may also be established under a common law "conspiracy theory." The conspiracy theory of jurisdiction is not, strictly speaking, an independent jurisdictional basis, but rather, is a shorthand reference to an analytical framework where a defendant's conduct that either occurred or had a substantial effect in Delaware is attributed to a defendant who would not otherwise be amenable to jurisdiction in Delaware. [FN10]

FN10. _Newspan, supra_ note 5, at 19-20 (citing _Hercules Inc. v. Leu Trust & Banking,_ Del.Supr., 611 A.2d 476, 482 n. 6 (1992)).

B. The Jurisdictional Motion

**\*6** In opposition to the defendants Rule 12(b)(2) motion, Computer People has identified three categories of "Delaware contacts" that, it claims, support personal jurisdiction over the defendants. These contacts are: (i) Arello's continuing presence in Delaware as a Computer People employee from 1993 to 1996; (ii) two telephone calls and one e-mail made by Bayfield and Cuff to Stanley at his Delaware office; and (iii) the incorporation of Best USA in Delaware. These three sets of contacts, Computer People argues, are sufficient to establish personal jurisdiction (a) over Arello under 10 _Del. C._ § 3104(c)(1), (c)(3), (c)(4), and under the conspiracy theory; and (b) over Best PLC and Best Ltd. under 10 _Del. C._ § 3104(c)(1) and the conspiracy theory. I disagree, and conclude that the plaintiff has failed to establish that this Court has personal jurisdiction over any of these defendants. [FN11]

FN11. That finding makes it unnecessary to reach the due process component of the jurisdictional analysis.

1. The Conspiracy Theory

Computer People first attempts to support jurisdiction over Best Ltd., Best PLC, and Arello on the basis that Best USA was incorporated in Delaware and then was operated as part of a conspiracy among the non-Delaware defendants to interfere tortiously with Computer People's contractual and business relationships with employees, consultants, and customers. This alleged conspiracy forms the linchpin of Computer People's jurisdictional argument.

Under the "conspiracy theory" of jurisdiction, a plaintiff may establish personal jurisdiction over a nonresident only if it satisfies five elements, namely, by showing that:

(1) a conspiracy...existed; (2) the defendant was a member of the conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy. [FN12]

FN12. _Instituto Bancario Italiano SpA v._

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Hunter Eng'g Co.*, Del.Supr., 449 A.2d 210, 225 (1982); *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.*, Del. Ch., C.A. No. 13950, mem. op. at 29, Allen, C. (Nov. 21, 1995) (the "proper invocation of this basis of jurisdiction requires factual proof of each enumerated element."), *appeal refused,* Del.Supr., 676 A.2d 908 (Jan. 22, 1996); *Newspan, supra* note 5, at 18-19 ("all [five elements] must be satisfied before a Delaware court may exercise personal jurisdiction").

The test ultimately "turns on the imputation to the [alleged] conspirator of meaningful activity on behalf of the conspiracy *which occurred and caused effects in Delaware.*" [FN13]

FN13. *HMG/Courtland Properties, Inc. v. Gray,* Del. Ch., C.A. No. 15789, mem. op. at 15-16, Strine, V.C. (Jan. 13, 1999) (emphasis added).

The conspiracy theory of jurisdiction is narrowly and strictly construed; otherwise, that theory would become a facile way for a plaintiff to circumvent the minimum contacts requirement of *International Shoe Co. v. Washington.* [FN14] For that reason, where a conspiracy is alleged and the defendants submit factual evidence controverting personal jurisdiction as to them, the plaintiff may not rely upon conclusory allegations in his pleading that are unsupported by evidence. [FN15] Such allegations will not be sufficient to overcome a motion to dismiss for lack of personal jurisdiction.

FN14. 326 U.S. 310 (1945).

FN15. *See Newspan, supra* note 5, at 20-21; *Carlton Invs., supra* note 12, at 29; *Nartex Consulting Corp. v. Watt,* D.C.Cir., 722 F.2d 779, 787 (1983) (Wald, J.) ("[b]ald speculations that defendants are alleged co-conspirators do not constitute the threshold showing needed to carry the burden of establishing personal jurisdiction"), *cert. denied,* 467 U.S. 1210 (1984); *Jarmuth v. Turetsky,* D.D.C., 815 F.Supp. 4, 6 (1993) (noting that the " 'bare allegation' of conspiracy or agency is insufficient to establish personal jurisdiction"); *Hasenfus v. Corporate Air Servs.,* D.D.C., 700 F.Supp. 58, 62 (1988) (noting the insufficiency of an "argument...based solely on conclusory statements and allegations that the

nonresident defendants were co-conspirators.").

The Delaware contacts upon which Computer People relies to support its conspiracy theory of jurisdiction are (i) the two phone calls and one e-mail directed to Stanley at his Delaware office, and (ii) the incorporation of Best USA in Delaware. I find, for the reasons next discussed, that these contacts are insufficient to support personal jurisdiction in Delaware over Best PLC, Best Ltd., or Arello.

*7 First, assuming there was a conspiracy, there is no evidence (or even a claim) that any meaningful, "substantial act or effect" in furtherance of that conspiracy took place in Delaware. [FN16] As discussed below, the aforementioned Delaware contacts are insufficient to sustain personal jurisdiction over any of the defendants, because those contacts are not a sufficiently significant basis to support jurisdiction under § 3104(c). For this reason also, these contacts are also not "substantial acts or effects" in furtherance of the conspiracy that would support personal jurisdiction under the conspiracy theory.

FN16. *See Instituto Bancario,* 449 A.2d at 225 (requiring for jurisdiction that a "substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state"); *Abajian v. Kennedy,* Del. Ch., C.A. No. 11425, mem. op. at 27, Allen, C. (Jan. 17, 1992) ("[T]he conspiracy theory...requires that a substantial act or substantial effect [occur] in the forum state in furtherance of the alleged conspiracy.").

Second, Computer People has furnished the Court with only conclusory and unsupported allegations that there was a conspiracy. [FN17] In the face of the contrary evidence offered by the defendants, the plaintiff has failed factually to support the conclusory allegation in its complaint that the defendants conspired to interfere tortiously with Computer People's contractual and business relationships. That is, there is no record *evidence* of any conspiracy among Arello, Best PLC, and Best Ltd. (through Bayfield and Cuff) to solicit Computer People employees. Accordingly, the plaintiff has failed to satisfy the first of *Instituto Bancario* 's five elements.

FN17. In fact, many of the critical allegations in their complaint are based solely "upon information and belief."

Not Reported in A.2d                                                                          Page 7
Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)
**(Cite as: 1999 WL 288119 (Del.Ch.))**

2. Arello's Delaware Contacts as a Computer People
Employee

Despite the plaintiff's contrary argument, Arello's
Delaware contacts as a Computer People employee
between 1993 and 1996 are not sufficient to sustain
general personal jurisdiction over him under 10 Del.
C. § 3104(c)(4). That provision (to repeat) authorizes
jurisdiction in cases where the defendant (or the
defendant's agent) has a "general presence in the
State," even if both the tortious act and the injury
occur outside of Delaware. [FN18] The exercise of
"general" jurisdiction under § 3104(c)(4) requires a
higher level of activity within the forum state than
does the exercise of "specific" jurisdiction under
(c)(3). [FN19] Specifically, subsection (c)(4)
jurisdiction arises only "when a defendant has had
contacts with this state that are so extensive and
continuing that it is fair and consistent with state
policy to require that the defendant appear here and
defend a claim." [FN20]

> FN18. *Applied Biosystems, Inc. v. Cruachem
> Ltd., D. Del., 772 F.Supp. 1458, 1469
> (1991).*

> FN19. *United States v. Consolidated Rail
> Corp., D. Del., 674 F.Supp. 138, 145
> (1987).*

> FN20. *Red Sail Easter Ltd. Partners, L.P. v.
> Radio City Music Prods., Inc.,* Del. Ch.,
> C.A. No. 12036, mem. op. at 5-6, Allen, C.
> (July 10, 1991).

Computer People argues that Arello's extensive
Delaware contacts during the 1993 to 1996 period
while he was employed with Computer People, were
extensive and continuing. The difficulty, however, is
that to establish general jurisdiction under subsection
(c)(4), the defendant must have *current* contacts with
the forum state. [FN21] That Arello may have had
substantial contacts with Delaware from 1993 to
1996 is not probative of whether this Court has
general jurisdiction over him today, where (as here)
(i) the cause of action does not arise out of those
earlier contacts, and (ii) Arello's post-1996 Delaware
contacts are too attenuated to support personal
jurisdiction grounded upon his "general presence in
this state." [FN22]

> FN21. *See* § 3104(c)(4) (providing for
> jurisdiction when "person regularly *does* or
> *solicits* business, *engages* in any other
> persistent course of conduct in the State or

*derives* substantial revenue from services, or
things used or consumed in the State."
(italics added)).

> FN22. *Cf. J. Royal Parker Assocs. Inc. v.
> Parco Brown & Root, Inc.,* Del. Ch., C.A.
> No. 7013, mem. op. at 7, Berger, V.C. (Nov.
> 30, 1984) (finding that general jurisdiction
> was satisfied where defendant "regularly
> advertises in Delaware or carries on some
> other continuous course of activity in the
> state"); *Red Sail, supra* note 20, at 5-6
> (holding that statutory provision will only
> apply where defendant "has had contacts
> with [Delaware] that are so extensive and
> continuing that it is fair and consistent with
> state policy to require the defendant [to
> appear and] defend a claim.").

3. The Two Phone Calls and One E-mail to Stanley
at his Delaware Office

**\*8** Computer People next argues that the two
telephone calls and one e-mail directed to Stanley at
his Delaware office suffice to support personal
jurisdiction over Best PLC, Best Ltd., and Arello
under § 3104(c)(1). Again, I cannot agree.

Section 3104(c)(1) authorizes a court, in its
discretion, to exercise jurisdiction over a non-resident
defendant who "[t]ransacts any business or performs
any character of work or service in" Delaware and
whose cause of action arises from that transaction or
work. Under that subsection, an act or acts must have
occurred in Delaware, and the plaintiff's causes of
action must arise from that act or acts. [FN23] To
"transact business" in Delaware, a party must
purposefully avail itself of the privileges and benefits
of Delaware law. [FN24]

> FN23. *Applied Biosystems,* 772 F.Supp. at
> 1466.

> FN24. *Consolidated Rail Corp.,* 674 F.Supp.
> at 142; *Regency Housing & Drilling L.P.I. v.
> Cohen,* Del.Supr., C.A. No. 89C-DE-70,
> 1991 WL 190311, at *4, Gebelein, J. (Sept.
> 11, 1991).

As to Best PLC and Best Ltd., Computer People's
argument fails because as a general matter telephone
calls and an e-mail do not, in and of themselves,
automatically constitute "transact[ing] business"
within Delaware sufficient to invoke jurisdiction
under § 3104(c)(1). [FN25] Even when the argument

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)
**(Cite as: 1999 WL 288119 (Del.Ch.))**

is considered in this specific factual context it does not work, because the two telephone calls and one e-mail cannot be a basis for the plaintiff's causes of action for tortious interference. The company does not claim these Delaware contacts induced Stanley to leave Computer People to work for Best USA; indeed, plaintiff concedes that Stanley remained a Computer People employee. Nor are these "contacts" relevant as evidence of a conspiracy because, for the reasons earlier discussed, the plaintiff's conspiracy theory is legally deficient.

> FN25. *See Fischer v. Hilton,* D. Del., 549 F.Supp. 389, 390 (1982) (finding that mere "phone calls do not constitute a transacting of business within the State of Delaware for purposes of subsection (c)(1)."); *Koster v. Automark Indus., Inc.,* 7th Cir., 640 F.2d 77, 79 (1981) (discussing minimum contacts, court found that telephone calls, in and of themselves, could not confer personal jurisdiction).

Computer People next claims that Arello is subject to personal jurisdiction under § 3104(a)(1) because Bayfield and Cuff's solicitation of Stanley on behalf of Best USA may be attributed to Arello as the president and CEO of Best USA. Stated differently, Computer People argues that Bayfield and Cuff were Arello's agents, and that therefore Bayfield's two telephone calls to Stanley and the e-mail to Stanley's Delaware office should be attributed to Arello.

This argument also lacks merit. Under the agency theory of personal jurisdiction, only acts of the agent that are directed by the principal may serve as a basis to assert jurisdiction over the principal. [FN26] The complaint here does not allege, nor does the factual record show, that Arello directed anyone--Bayfield included--to contact Stanley in Delaware to induce him to join Best USA. Therefore, Bayfield and Cuff's Delaware contacts with Stanley may not be imputed to Arello to establish personal jurisdiction over him under § 3104(c)(1). [FN27]

> FN26. *Applied Biosystems,* 772 F.Supp. at 1465-66.

> FN27. Although the plaintiff in its complaint invokes jurisdiction under 10 *Del. C.* § 3104(c)(3), they do not make any argument based upon subsection (c)(3) in their brief. Accordingly, that argument is deemed to have been abandoned.

### 4. The Incorporation of Best USA in Delaware

Finally, the plaintiff asserts that the act of incorporating Best USA in Delaware is enough, in and of itself, to establish jurisdiction over Best PLC and Best Ltd. The plaintiff relies on a line of cases that raise the issue presented here: whether the creation, ownership, and operation of a Delaware subsidiary (Best USA) is sufficient to invoke personal jurisdiction over the foreign parent (Best PLC). [FN28]

> FN28. *Shaffer v. Heitner,* 433 U.S. 186 (1977); *Sternberg v. O'Neil,* Del.Supr., 550 A.2d 1105 (1988); *Papendick v. Robert Bosch GmbH,* Del.Supr., 410 A.2d 148 (1979).

**\*9** In *Shaffer v. Heitner* ("*Shaffer* "), [FN29] the United States Supreme Court held that the mere ownership of stock in a Delaware corporation is not a sufficient "minimum contact" with Delaware to permit a Delaware court to exercise personal jurisdiction over a nonresident defendant consistent with due process. Thereafter, in *Papendick v. Robert Bosch GmbH* ("*Papendick* "), [FN30] the Delaware Supreme Court confronted the issue of whether the "mere ownership" principle of *Shaffer* precluded a Delaware court from exercising jurisdiction over a foreign corporation in a case where the cause of action was related to and arose out of the foreign parent's creation and operation of a Delaware subsidiary. Later, in a somewhat different context, the Delaware Supreme Court revisited the *Shaffer* issue in *Sternberg v. O'Neil* ("*Sternberg* "). [FN31]

> FN29. 433 U.S. 186 (1977).

> FN30. Del.Supr., 410 A.2d 148 (1979).

> FN31. Del.Supr., 550 A.2d 1105 (1988).

In *Papendick,* a German corporation (Bosch) formed a Delaware subsidiary (RBNA) to serve as a vehicle to acquire the stock of another company. The plaintiff filed a breach of contract action in Delaware. The action arose out of that stock acquisition transaction. Bosch argued that because its sole Delaware contact was its "mere" ownership of RBNA stock, under *Shaffer* that was an insufficient basis to establish personal jurisdiction. The Delaware Supreme Court disagreed. It held that Delaware could exercise jurisdiction over Bosch because the formation of RBNA was an integral part of the scheme of wrongdoing challenged in the complaint, and because

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)
(Cite as: 1999 WL 288119 (Del.Ch.))

in forming RBNA, Bosch had purposefully utilized the benefits and protections of Delaware law in connection with the challenged stock acquisition transaction. [FN32]

FN32. *Papendick,* 410 A.2d at 152.

*Papendick* stands for the proposition that while the stock ownership of a Delaware subsidiary is not, without more, a sufficient contact upon which to predicate jurisdiction, that contact may be sufficient where the cause of action arises from the creation and operation of the Delaware subsidiary. In this case, Computer People alleges that the defendants incorporated Best USA in Delaware in furtherance of a conspiracy to cause key Computer People employees to desert the company. Accordingly, the plaintiff contends, the creation and operation of Best USA supports personal jurisdiction over Best USA for the same reason that the formation of RBNA supported jurisdiction over Bosch in *Papendick.*

I have already determined that the plaintiff's conspiracy theory argument fails, not as a matter of theory but as a matter of evidence. As earlier discussed, the plaintiff has not satisfied the conspiracy theory requirements for establishing jurisdiction, because there is no record evidence (save, perhaps, for Computer People's suppositions based on "information and belief") to support that conspiracy theory. Having rejected the conspiracy theory, the Court will not now reverse itself and permit plaintiff to use that theory to prop up its *Papendick* /*Sternberg* argument. The plaintiff has failed to show, in a procedurally proper way, that Best USA was created to further a conspiracy to steal Computer People's employees.

*\*10* Also misplaced is the plaintiff's reliance on *Sternberg.* There, a plaintiff brought a double derivative action against an Ohio corporation (GenCorp) and its wholly-owned Delaware subsidiary (RKO). Although no claim was alleged directly against the parent, GenCorp, the parent was named as a defendant because "in double derivative actions, both parent and subsidiary corporations are indispensable parties." [FN33] In upholding personal jurisdiction over GenCorp, the Supreme Court articulated two separate grounds for its decision. The first was that GenCorp had consented to general jurisdiction in the Delaware courts, because it had registered as a foreign corporation and had appointed a Delaware agent for service of process. [FN34] Second (and even though the Court could have ended its analysis at that point), it proceeded to uphold

personal jurisdiction over GenCorp on the ground that its ownership of RKO was a sufficient minimum contact, since the basis for the double derivative action was GenCorp's operation of RKO. [FN35]

FN33. *Sternberg,* 550 A.2d at 1124.

FN34. *Id.* at 1115-16. The same is not true of the defendants in the instant case.

FN35. *Id.* at 1116-26. Specifically, the Court held that "a foreign corporation cannot use the laws of this State to govern the operations of its subsidiary and then, in a suit relating to the operation of the subsidiary, claim that jurisdiction in Delaware offends traditional notions of fair play." *Id.* at 1121.

Commentators have interpreted *Sternberg* in two quite different ways. One interpretation views *Sternberg* as recognizing a narrow "double derivative suit exception" to the *Shaffer* rule. The other interpretation reads *Sternberg* more broadly, as expanding *Shaffer* to validate personal jurisdiction in Delaware over a majority stockholder of a Delaware subsidiary, in any suit "relating to the operation of the subsidiary." [FN36] In this case, the Court need not decide which interpretation is correct, because under either view the plaintiff's argument falls short.

FN36. *See* Donald J. Wolfe, Jr. and Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* (1998), at § 3- 5(c)(3); William A. Voxman, *Jurisdiction Over a Parent Corporation in its Subsidiary's State of Incorporation,* 141 U. Pa. L.Rev. 327, 363-66 (1992); *see also Outokumpu, supra* note 6, at 728 (rejecting the broad interpretation of *Sternberg* by stating that the decision "cannot mean that Delaware courts may always exercise personal jurisdiction over the foreign parent of a Delaware subsidiary or any cause of action arising out of the operation or acts of that subsidiary, regardless of where the operative facts transpired or the parent's contacts with Delaware. Otherwise, mere ownership of a Delaware subsidiary would in practice subject a foreign parent to our jurisdiction, a result inconsistent with due process.").

Under the narrow ("double derivative suit exception") reading of *Sternberg,* the plaintiff's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)
**(Cite as: 1999 WL 288119 (Del.Ch.))**

Page 10

argument fails because the plaintiff here has not brought a double derivative action. Under the broad interpretation, the argument falters because Computer People has failed to show in a factually sufficient way that its causes of action arise out of Best PLC's operation, control, or ownership of Best USA. Although the complaint alleges conclusorily that all four defendants were involved in incorporating Best USA for wrongful purposes, all that the undisputed *evidence* shows is that Best USA "was established as a subsidiary of [Best PLC]...in Delaware exclusively for reasons of administrative convenience and corporate tax considerations." [FN37] That, without more, does not support this conclusory allegation for purposes of sustaining jurisdiction over Best USA's foreign corporate parent, Best PLC. That evidence is also insufficient to establish personal jurisdiction over Best Ltd., a separate subsidiary of Best PLC (and sister corporation of Best USA), which is not alleged to have played any role in incorporating Best USA in Delaware.

      FN37. Bayfield Aff. at 8.

* * *

For the foregoing reasons, the Court determines that it lacks personal jurisdiction over defendants Arello, Best PLC, and Best Ltd ., and grants their motion to dismiss under Rule 12(b)(2). Because Best USA will remain in the case as the sole defendant, I deny the defendants' 12(b)(6) motion with leave to renew based on briefs that take into account the Court's jurisdictional ruling. IT IS SO ORDERED.

Not Reported in A.2d, 1999 WL 288119 (Del.Ch.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# CASE 7

LEXSEE 2003 DEL. CH. LEXIS 34

**CORNERSTONE TECHNOLOGIES, LLC, ARASTRA, LLC, KOR HOLDINGS, LLC, and PETER A. KANJORSKI, Plaintiffs, v. BRUCE E. CONRAD and THOMAS UNGER, Defendants.**

**C.A. No. 19712-NC**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*2003 Del. Ch. LEXIS 34*

**March 11, 2003, Submitted
March 31, 2003, Decided**

**SUBSEQUENT HISTORY:** Reargument denied by *Cornerstone Techs., LLC v. Conrad, 2003 Del. Ch. LEXIS 46 (Del. Ch., Apr. 22, 2003)*

**DISPOSITION:** [*1] Unger's motion to dismiss for lack of personal jurisdiction granted; Conrad's motion to dismiss for lack of personal jurisdiction denied; and Conrad's motion for a stay granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs were two limited liability companies (LLCs) and two of their unit holders. They had operations based in another state, but were domiciled in Delaware. Plaintiffs sued defendants, two individuals, in both states, seeking declaratory, injunctive, and monetary relief. Both defendants moved to dismiss for lack of personal jurisdiction. One defendant requested that the action be stayed or dismissed in favor of the other state's litigation.

**OVERVIEW:** Plaintiffs complained that defendants were making certain false claims of ownership in the companies. As a result, uncertainty existed about who could make company decisions. Plaintiffs relied solely on Delaware's long-arm statute, *Del. Code Ann. tit. 10, § 3104*, to support their claim of personal jurisdiction over one defendant. The court found that plaintiffs pointed to only two acts committed in Delaware that had any relevance to the instant litigation, which were the actions of forming each company as limited liability companies in Delaware. There was no indication whatsoever that the one defendant had any role in the founding or formation of either. Therefore, the court lacked personal jurisdiction. As to the other defendant, jurisdiction was proper as he was a founder, large unit holder, and top officer that had been voted off as a manager of both companies. *Del.*

*Code Ann. tit. 6, § § 18-110(a) and 18-109(a)* provided a basis for the exercise of personal jurisdiction and minimum contacts were shown. However, the court found it to be a mystery as to why plaintiffs had chosen to spread their claims over two states, and a stay of the Delaware action was appropriate.

**OUTCOME:** One defendant's motion to dismiss for lack of personal jurisdiction was granted, and the other's was denied. The other defendant's motion for a stay was granted, and the stay was to remain in effect indefinitely, but plaintiffs could perfect service of process on the other defendant and could move to lift the stay no earlier than a certain date, or on the date of the termination of the equity action in the other state.

**LexisNexis(R) Headnotes**

*Business & Corporate Law > Limited Liability Companies > Management Duties & Liabilities*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN1] *Del. Code Ann. tit. 6, § 18-109(a)* permits an exercise of personal jurisdiction over a manager, as that term is defined in § 18-109(a), in all civil actions or proceedings brought in the State of Delaware involving or relating to the business of the limited liability company.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*

[HN2] On a Del. Ch. Ct. R. 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery of record, and may even hold an evidentiary hearing. The burden of showing a basis for the court's exercise of personal jurisdiction over a nonresident defendant rests with the plaintiffs. In a case when no evidentiary hearing has been held, the plaintiffs' burden is a relatively light one-- i.e., they must only make a prima facie showing that the exercise of personal jurisdiction is appropriate. And, in such a case, the record is construed in the light most favorable to the plaintiff.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts*
[HN3] The Fourteenth Amendment requires that a nonresident defendant have certain "minimum contacts" with the forum jurisdiction such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN4] See *Del. Code Ann. tit. 10, § 3104(c)(1).*

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN5] *Del. Code Ann. tit. 10, § 3104(c)(1)* is a "single act" provision of the long-arm statute, *Del. Code Ann. tit. 10, § 3104*. As such, *Del. Code Ann. tit. 10, § 3104(c)(1)* supplies a basis for personal jurisdiction only with respect to claims that have a nexus to such forum-related conduct.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN6] *Del. Code Ann. tit. 10, § 3104(c)* is to be broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause.

*Business & Corporate Law > Limited Liability Companies > Management Duties & Liabilities*

*Business & Corporate Law > Limited Liability Companies > Members & Other Constituents*
*Civil Procedure > Pleading & Practice > Service of Process > General Overview*
[HN7] The Delaware Limited Liability Company Act, *Del. Code Ann. tit. 6, § 18-110(a)*, allows the Delaware Court of Chancery, upon the application of a member or manager of a limited liability company, to determine the validity of any admission, election, appointment, removal, or resignation of a manager and the right of any person to become or continue to be a manager and, in case the right to serve as a manager is claimed by more than one person, to determine the person or persons entitled to serve as managers.

*Business & Corporate Law > Limited Liability Companies > Management Duties & Liabilities*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > General Overview*
[HN8] See *Del. Code Ann. tit. 6, § 18-110(c).*

*Business & Corporate Law > Limited Liability Companies > Management Duties & Liabilities*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Governments > State & Territorial Governments > Elections*
[HN9] By the plain terms of *Del. Code Ann. tit. 6, § 18-110(a)*, the Delaware Court of Chancery may hear and determine the validity of any admission, election, appointment, removal, or resignation of a manager of a limited liability company.

*Business & Corporate Law > Limited Liability Companies > Management Duties & Liabilities*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN10] *Del. Code Ann. tit. 6, § 18-109(a)* permits an exercise of personal jurisdiction over a manager, as that term is defined in that subsection, in all civil actions or proceedings brought in the State of Delaware involving or relating to the business of the limited liability company or a violation by the manager of a duty to the limited liability company, or any member of the limited liability company.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > General Overview*

*Civil Procedure > Settlements > Settlement Agreements > General Overview*
[HN11] When a defendant is subject to personal jurisdiction under *Del. Code Ann. tit. 6, § 18-109* as to certain claims, the court may exercise personal jurisdiction over him as to other sufficiently related claims.

*Business & Corporate Law > Limited Liability Companies > Management Duties & Liabilities*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN12] Once jurisdiction is properly obtained over a non-resident director pursuant to *Del. Code Ann. tit. 10, § 3114*, such non-resident director is properly before the court for any claims that are sufficiently related to the cause of action asserted against such directors in their capacity as directors.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > Statutory Sources*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN13] Under *Del. Code Ann. tit. 10, § 3114*, the relief sought is not the guiding factor because if jurisdiction attaches at all under the statute, the nonresident is before the court for any and all relief that might be necessary to do justice between the parties by virtue of the fact that the jurisdiction conveyed by the statute is in personam jurisdiction.

*Business & Corporate Law > Limited Liability Companies > Management Duties & Liabilities*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN14] Once a nonresident director is properly before a Delaware court by reason of *Del. Code Ann. tit. 10, § 3114*, that director is properly before the court for any relief that the facts may require, even if such relief technically operates against the director in some other capacity, such as that of a stockholder.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts*
[HN15] The due process clause of the Fourteenth Amendment requires that a nonresident defendant have certain minimum contacts with the forum jurisdiction such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. When determining whether these "minimum contacts" are present, the court should inquire whether the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there. Once the defendant's minimum contacts with the forum have been established, the court should turn its analysis to issues of fairness and justice.

*Business & Corporate Law > Limited Liability Companies > Management Duties & Liabilities*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN16] Delaware has a strong interest in providing a forum for disputes relating to the ability of managers of a limited liability company formed under its law to properly discharge their respective managerial functions.

*Civil Procedure > Joinder of Claims & Remedies > General Overview*
*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Res Judicata*
*Criminal Law & Procedure > Double Jeopardy > Res Judicata*
[HN17] When a party can raise all claims it has against a defendant in one forum at one time, it is generally obligated to do so. The rule against claim splitting is an aspect of the doctrine of res judicata and is based on the belief that it is fairer to require a plaintiff to present in one action all of his theories of recovery relating to a transaction, and all of the evidence relating to those theories, than to permit him to prosecute overlapping or repetitive actions in different courts or at different times. The courts of Delaware have long adhered to the generally accepted view disfavoring the splitting of claims.

**COUNSEL:** Daniel L. McKenty, Esquire, Gerald J. Hager, Esquire, McCULLOUGH & McKENTY, P.A., Wilmington, Delaware; Richard A. Breuer, Esquire, Malvern, Pennsylvania, Attorneys for Plaintiffs.

John M. Bader, Esquire, THOMAS S. NEUBERGER, P.A., Wilmington, Delaware, Attorneys for Defendant, Thomas Unger.

Bruce E. Conrad, Weatherly, Pennsylvania, Pro se.

**JUDGES:** STRINE, Vice Chancellor.

**OPINIONBY:** STRINE

**OPINION:**

MEMORANDUM OPINION

**STRINE, Vice Chancellor**

This opinion resolves motions brought by the two defendants in this case, Thomas Unger and Bruce E. Conrad, to dismiss the complaint for lack of personal jurisdiction. n1 The opinion also addresses defendant Conrad's request that this action be stayed or dismissed in favor of litigation pending in the state courts of Pennsylvania. Candidly, the clarity of the factual record and of the parties' legal arguments is less than ideal, making summarization of this opinion difficult, and the body of the opinion more cumbersome and ambiguous.

n1 On January 9, 2003, the plaintiffs filed an amended complaint. The defendants' motions are technically directed at that earlier complaint, as opposed to the more recent -- and more important -- amended complaint. The plaintiffs point out that "defendants declined the opportunity to file new motions to the amended complaint and elected to treat the motions and briefs already filed as being addressed to the amended complaint." Pls.' Answering Br. at 2. In any event, the parties have proceeded on the understanding that the motions to dismiss (along with the associated briefs) are responsive to the amended complaint.

[*2]

In rough terms, this case involves an unwieldy dispute between the Kanjorski family and defendants Unger and Conrad, arising out of their involvement in two limited liability companies whose operations are based in Pennsylvania, but which are domiciled in Delaware. The names of those companies are Cornerstone Technologies, LLC and Arastra, LLC (collectively, the "LLCs" or the "Companies"); both are named plaintiffs. The other plaintiffs are Peter A. Kanjorski, who claims to own 20% of the units of the two LLCs, and Kor Holdings, LLC, a Kanjorski family holding entity, claiming to own 60% of the LLCs' units.

Defendant Unger joined the Companies as an employee sometime after their formation and is alleged by the plaintiffs to claim an ownership share in them.

Defendant Conrad (who is representing himself *pro se*) is alleged to have been one of the original members and managers of both of the LLCs, and to have been granted a 20% ownership interest in each.

In this case, the plaintiffs seek various forms of declaratory, injunctive, and monetary relief against Unger and Conrad.

As to Unger, the plaintiffs seek a declaration that he does not own any units of either LLC. The problem [*3] with this request is that the instrument upon which Unger supposedly bases his claim to units was executed entirely in Pennsylvania well after the LLCs were first formed and only references his possible receipt of units in another entity, not the two LLCs. n2 Thus, the sole theory that the plaintiffs press regarding the propriety of personal jurisdiction over Unger is that he is subject to jurisdiction under § 3104(c)(1) of the Delaware long-arm statute. The transactions of business in Delaware that the plaintiffs seek to attribute to Unger are the acts of the original founders of the LLCs in forming those entities in Delaware -- acts that occurred before Unger was even involved with the LLCs in any manner. The plaintiffs claim that these prior acts can be attributed to Unger because he allegedly claims to have become a member of the LLCs well after they were formed. As a factual matter, of course, this chain of inference is impossible without attributing supernatural powers to Unger and therefore § 3104(c)(1) is not satisfied. For that and other reasons, Unger's motion to dismiss is granted.

n2 As I shall also note later, Unger actually disclaims owning units in either of the Companies, and contends that he owns shares in another entity related to the Companies, which is not a party to this case.

[*4]

As to Conrad, the questions are a bit more difficult and numerous. The plaintiffs have made a *prima facie* showing that Conrad was a founding member, manager, and high-level officer of each of the LLCs. In two counts of their complaint, the plaintiffs seek a declaration that Conrad was properly removed as a manager of the two LLCs. Under 6 Del. C. § 18-110(a), Conrad may be served with process over these claims.

Somewhat more problematic are certain other claims against Conrad. Stated summarily, these allege that Conrad violated a provision of the LLCs' operating agreements that require their members, among other things, to offer their units to the other members before trying to sell them to third-parties. The plaintiffs seek various forms of relief tied to that central contention, the primary being declaratory relief clarifying exactly the ownership interests that Conrad (and impliedly others) hold or (the plaintiffs hope) do not hold in the LLCs.

Because there is *prima facie* evidence of Conrad's status as a manager of the LLCs, the plaintiffs argue that jurisdiction over him as to these counts exists under 6 Del. C. § 18-109(a) [*5] , [HN1] which permits an exercise of personal jurisdiction over a manager (as that

term is defined in that subsection) "in all civil actions or proceedings brought in the State of Delaware *involving or relating to the business of the limited liability company* . . ." n3 These counts seek to resolve disputes regarding the manner in and price at which units of the Companies can be transferred under the Buy-Out Provision. This Provision can be viewed as touching on important aspects of the Companies' governance and basic nature, reflecting as it does a commitment by the founding members -- of which Conrad was one -- that the original members should have the opportunity to buy the other members' units before they passed into the hands of strangers.

n3 Emphasis added.

Moreover, the (albeit confusing) record suggests that Conrad has in the past asserted that the Companies issued -- or committed to issue -- units to certain employees (including Unger), and that these units are therefore exempt from the reach of the Buy-Out [*6] Provision. Given the relation of all these issues to the business of the LLCs, *§ 18-109(a)* is a proper basis for the assertion of personal jurisdiction under the teaching of *Assist Stock Management L.L.C. v. Rosheim.* n4 Furthermore, as a founding manager, member, and top ranking officer of the two Delaware LLCs who personally participated in the choice to invoke the laws of this state to govern the internal affairs of those entities and the contractual duties running among their members, Conrad's constitutional right to due process is not offended by requiring him to face suit here on all the claims raised by the plaintiffs in this case.

n4 *753 A.2d 974 (Del. Ch. 2000).*

For these reasons, I therefore grant Unger's motion to dismiss but deny Conrad's.

In the last portion of the opinion, I address Conrad's motion to stay this litigation in favor of other litigation filed against him by Cornerstone in Pennsylvania. Although this motion has been briefed in a somewhat sketchy way, I am convinced [*7] that a stay is in order. At the same time it seeks to have Conrad answer substantial claims in this court, Cornerstone -- at the instance of the Kanjorskis -- has filed serious breaches of fiduciary duty claims against Conrad in Pennsylvania and has secured a trial date for later this year. No sensible reason suggests itself why Cornerstone has split its claims against Conrad in this way because the fiduciary duty claims could have obviously been filed here, and

there appears no obstacle to the claims filed here being asserted in the Pennsylvania action.

Furthermore, the Pennsylvania case has the added advantage that Unger is a party there and that others with a possible interest in the suit (*e.g.,* the other possible recipients of unit transfers from Conrad) can be joined to that action. The absence of Unger (and other possible transferees of units from Conrad) from this suit, moreover, has a possible effect none of the parties has addressed. To the extent the plaintiffs seek (in Count I of their complaint) to rescind supposed transfers to Unger and other persons not before the court, the important policy concerns of Court of Chancery Rule 19 will also be implicated.

Although [*8] I will not dismiss this action in favor of the Pennsylvania action at this time, it is inefficient and needlessly burdensome for this action to proceed against Conrad simultaneously with a Pennsylvania action that is on a fast track to trial before the end of this year. Although a plaintiff's choice of forum is to be respected, its choice to multiply forums for no apparent purpose need not be indulged at the expense of the defendant's interests and the interests of judicial economy.

I. Procedural Framework

As a preliminary matter, it is useful to set forth the procedural framework that governs this motion. [HN2] On a Rule 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery of record, and may even hold an evidentiary hearing. n5 The burden of showing a basis for the court's exercise of personal jurisdiction over a nonresident defendant rests with the plaintiffs. n6 In a case like this one, when no evidentiary hearing has been held, the plaintiffs' burden is a relatively light one -- *i.e.,* they must only make "a prima facie showing that the exercise of personal jurisdiction is appropriate." n7 And, in such a case, "the record is construed in the light [*9] most favorable to the plaintiff." n8

n5 *See* 1 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 3-3 (2003).

n6 *See id.*; 2 James Wm. Moore et al., *Moore's Federal Practice* § 12.31(4) (3d ed. 2002).

n7 1 Wolfe & Pittenger, § 3-3; *see Hart Holding Co. v. Drexel Burnham Lambert Inc.,* *593 A.2d 535, 539 (Del. Ch. 1991)*; *Francosteel Corp. v. M/V Charm, 19 F.3d 624, 626 (11th Cir. 1994)*; 2 *Moore, § 12.31(5).*

2003 Del. Ch. LEXIS 34, *

n8 1 Wolfe & Pittenger, § 3-3; *see Computer People, Inc. v. Best Int'l Group, Inc.,* 1999 *Del. Ch. LEXIS 96,* 1999 WL 288119, at *5 (Del. Ch. Apr. 27, 1999); 2 *Moore, § 12.31*(5).

A. The Facts

1. The Formation of the Companies and the Pertinent Features of their Operating Agreements

Cornerstone and Arastra were both formed by three original members -- plaintiff Kor Holdings, plaintiff Peter A. Kanjorski, and defendant Conrad. The plaintiffs have made a *prima facie* showing that [*10] each of these three members -- including Conrad -- signed the operating agreement for each Company. In one of many unusual aspects to this case, Conrad admits signing the Cornerstone operating agreement but claims that the signature that purports to be his on the Arasta agreement was forged. For purposes of this motion, however, I must draw the inference that the signature on the Arasta agreement was put there by Conrad's own hand.

According to each operating agreement, Kor Holdings has a sixty percent membership interest, while Peter A. Kanjorski and Conrad each hold a twenty percent membership interest. Each of the operating agreements has a provision that requires a member to offer his interest in the Company to the other members and, if they decline, to the Company itself before offering to transfer such an interest to any other person (collectively I refer to the two provisions singularly as the "Buy-Out Provision"). Under each of the operating agreements, a member who does not comply with the Buy-Out Provision

shall . . . indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that any such indemnified Persons may incur (including [*11] incremental tax liability and lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby. n9

n9 Cornerstone Operating Agreement § 6.5; Arastra Operating Agreement § 6.5.

Each operating agreement provides for a board of managers to manage or direct the management of the business and affairs of the Company. And each operating agreement establishes certain corporate offices, to be appointed by the board of managers. The Chief Executive Officer of each Company is the officer who is, under the operating agreements, responsible for the general management of the Company.

Finally, each operating agreement has a provision that authorizes the actions necessary to form each Company as a Delaware limited liability company. n10 In other words, the members of the Companies contemplated that certain steps (*e.g.,* a filing with the Delaware Secretary of State) would be necessary to formally form Cornerstone and Arastra as Delaware limited liability [*12] companies.

n10 Cornerstone Operating Agreement § 1.1; Arastra Operating Agreement § 1.1.

2. Conrad's Involvement with the Companies

At various points, Conrad served as President, Chief Executive Officer, and manager of Cornerstone and Arastra. The plaintiffs have produced evidence, in the form of a draft September 18, 2000 letter from Conrad to Richard M. Pell, to support their assertion that Conrad was formerly an officer of Cornerstone and Arastra. In that letter, Conrad claims to have been the President and Chief Executive Officer of Cornerstone, Arastra, and a related company. n11 And, according to the operating agreements, "the Chief Executive Officer shall serve as one of the Managers." n12

n11 *See* Am. Compl. Ex. D ("As you know, on August 4, 2000, you signed an Equity Agreement dated August 15, 2000, which I countersigned in my capacity as President and CEO of Arastra, LLC, Cornerstone Technologies LLC, and Pennsylvania Micronics, LLC . . .").
[*13]

n12 Cornerstone Operating Agreement § 3.3(b); Arastra Operating Agreement § 3.3(b).

3. Unger's Involvement with the Companies

Unger served as an employee of Cornerstone from December 1999 to May 2001. The plaintiffs allege that Unger claims to have come into possession of units in and thus become a member of the Companies. Unger allegedly came into possession of whatever units he owns by way of a September 18, 2000 purported assignment by Conrad to Unger and a May 20, 2001 purported assignment by David Carpenter to Unger.

In keeping with the odd nature of this record, Unger disclaims any ownership of units in either of the Companies. His co-defendant, Conrad, however, claims that Unger was promised a significant block of units to be issued to him once he became an employee.

4. The Chain of Events Leading to this Suit

There is little clarity about the precise nature of the disputes between the Kanjorskis and Unger and Conrad; what is relevant and can be discerned now follows.

It appears that at some point in time Conrad felt that certain employees of the Companies had been promised [*14] an equity stake of some kind in an August 15, 2000 agreement. I infer this from a September 18, 2000 letter attached to the complaint and a later letter. The September 18, 2000 letter purports to be from Conrad to Richard M. Pell, and states in pertinent part that:

> As you know, on August 4, 2000, you signed an Equity Agreement dated August 15, 2000, which I countersigned in my capacity as President and CEO of Arastra . . . [and] Cornerstone. . . . At that time it was understood by me that the majority shareholders of the Companies had fully authorized the execution of that Agreement. I have since been informed otherwise.
>
> If the majority shareholders do not ultimately authorize equity grants to you in an acceptable form, I am committed to making you whole for the commitment I made to each of you, Bob Marshall and Tom Unger, from equity which is totally in my control. If this document is accepted by you, I hereby cause to be assigned to you an undivided interest in my 20% holding in the Companies, such that you will have a call on the value of the 20% of the 20% held by me. While I cannot actually deliver shares to you, I intend to bind the value of this 4% equity interest [*15] to you as though it were formally held by you through the ownership of share certificates therefor. n13

That is, all told Conrad (going only by the draft letter) purports to have attempted to transfer three-fifths of his twenty percent portion, or twelve percent of the Companies. The letter does not reflect any mention of the Buy-Out Provision. Also relevant is the implicit suggestion that Pell, Marshall, and Unger had been promised units

in the Companies by Peter Kanjorski and Conrad, acting as Company managers. It is not clear from the record whether Pell, Marshall, or Unger accepted Conrad's offer.

n13 Am. Compl. Ex. D.

The record then fast-forwards to May 6, 2001. On that day, a number of important events occurred involving the governance of Cornerstone and Arastra. First, Kor Holdings and Peter A. Kanjorski (as purported holders of a total of eighty percent of the original membership units of Cornerstone and Arastra, respectively, in accordance with the literal terms of the operating agreements) [*16] executed written consents that (1) removed Conrad as manager of Cornerstone and Arastra; (2) increased the number of managers of each Company to four; and (3) installed Peter A. Kanjorski, Russell P. Kanjorski, Mark A. Kanjorski, and Paul Eric Kanjorski (the "Kanjorskis") as the new managers. Second, the newly constituted boards of managers (1) removed Conrad from his position as President of each Company; (2) removed him from any other position with the Companies; (3) terminated his employment with the Companies; and (4) ended Conrad's ability to act on behalf of the Companies. Third, the boards elected Peter A. Kanjorski to the offices of Chief Executive Officer and President and Paul Eric Kanjorski to the offices of Secretary and Treasurer.

As might be expected, this action triggered the likelihood of lawsuits. In anticipation of legal action, it appears that on May 20, 2001, an individual named David Carpenter executed an assignment that purported to transfer Carpenter's entire interest in Cornerstone and Arastra to Conrad and Unger. n14 According to the terms of the purported assignment, Conrad and Unger were each to receive fifty percent of Carpenter's (unspecified) holdings [*17] in the Companies. In exchange, Carpenter received one dollar and other "valuable consideration."

n14 See Am. Compl. Ex. A.

Also, in the May 20 document, Carpenter purported to "assign[] any rights he may have in litigation against Peter Kanjorski and others with respect to the [Companies]." n15 That assignment of litigation rights was to be equally divided between Conrad and Unger. Notably, the assignment letter purporting to assign Carpenter's ownership interest does not indicate any attempt to comply with the Buy-Out Provision. Nor does the document explain how Carpenter acquired his interests in the Compa-

nies or his causes of action against Kanjorski and certain unnamed others, except to reference a supposed May 15, 1997 agreement.

n15 *Id.*

In other litigation, Conrad has asserted that the May 15, 1997 agreement gave himself, [*18] Carpenter, and Unger nearly sixty percent of Cornerstone's equity -- and that the Kanjorski family was to own nearly 40%. Conrad implies that the equity allocation expressly set forth in the operating agreements is misleading, because Kor was only supposed to hold Unger's nearly twenty percent equity share until Unger became an employee. As indicated, consistent with the generally confusing nature of the record, Unger expressly disclaims any ownership interest in either of the Companies.

On May 30, 2001, Barry H. Dyller, who was then Conrad's lawyer, sent a letter to the plaintiffs' lawyer offering to sell to "the Kanjorski family or any member you designate" Conrad's twenty percent interest in Cornerstone for $ 3.9881 million. n16 This offer was expressly made as a confidential offer of settlement.

n16 Am. Compl. Ex. E.

Finally, on August 16, 2002, the members of each Company voted to ratify the earlier May 6 appointment of managers and to elect those persons appointed on May 6 to the board of managers. That [*19] is, the Kanjorskis were elected to the board. On all of the motions made at the members' meetings, Peter Kanjorski and Kor Holdings (as represented by Peter Kanjorski) voted "yes." Bruce Conrad was absent and therefore did not vote on each measure.

B. The Pennsylvania Actions

There are three Pennsylvania state court actions that relate to the dispute before me. The first is an action filed by defendant Unger on February 12, 2002 in the Court of Common Pleas of Northampton County (the "Employment Action") against Cornerstone. In his complaint, Unger claims that Cornerstone unlawfully terminated him from his position as an executive employee of the Company. Unger argues that this termination violated the provisions of (1) an employment contract between Unger and Cornerstone and (2) the *Pennsylvania Human Relations Act*, in that Unger's termination was supposedly motivated by Unger's age. In the Employment Action, Unger does not assert any ownership interest in either Cornerstone or Arastra. Unger and Cornerstone are the only parties to the Employment Action.

The second of the related actions was filed against Conrad by Cornerstone in the Court of Common Pleas of Carbon County on [*20] July 2, 2002. In that action, Cornerstone sought the return of a company computer (or damages equal to its value) allegedly retained by Conrad after his termination by Cornerstone (the "Replevin Action"), as well as compensatory damages, punitive damages, and an award of attorneys' fees.

In response to the complaint in the Replevin Action, Conrad raised a number of preliminary objections, including that: (1) the actual owners of Cornerstone had not authorized the Replevin Action because Cornerstone is "59.5% owned by Mr. Conrad, Mr. Unger and Dr. Carpenter" n17; (2) there were two prior-filed actions (namely, the "Employment Action" and this Delaware action); and that (3) Cornerstone had failed to join certain indispensable parties. On January 15, 2003, the Northampton County Court of Common Pleas denied Conrad's preliminary objections in the Replevin Action. n18 Cornerstone and Conrad are the only parties to the Replevin Action.

n17 Conrad's Prelim. Objections & Mot. for Summ. J. at 3 (capitalization and bold emphasis omitted).

n18 See *Cornerstone Techs., LLC. v. Conrad*, No. C0048CV20027475, order at 1 (Pa. Ct. Com. Pl. Jan. 15, 2003).

[*21]

The third action was filed by Cornerstone against Conrad and Unger on July 2, 2002 in the Court of Common Pleas of Carbon County (the "Equity Action"). In the Equity Action, Cornerstone complained that Conrad and Unger had breached their fiduciary duties, their duties as employees, and their obligations under certain confidentiality agreements, to Cornerstone, by, among other things, improperly disclosing Cornerstone trade secrets and engaging in illicit competition with the Company. Additionally, Cornerstone sought an injunction ordering Conrad and Unger to relinquish control over certain "tangible media" owned by Cornerstone, enjoining them from disclosing Cornerstone trade secrets, and requiring them to account to Cornerstone for any benefit they received as result of any improper disclosure of Cornerstone trade secrets. And, Cornerstone sought a judicial declaration that certain inventions are its property.

Conrad filed preliminary objections to the Equity Action that were identical to the preliminary objections he filed in the Replevin Action, and reiterated his contention that Conrad, Unger, and Carpenter own 59.5% of

Cornerstone's equity. On December 20, 2002, the Northampton [*22] County Court of Common Pleas overruled all of Conrad's (and Unger's separate) preliminary objections in the Equity Action. n19 In the Equity Action, Cornerstone is the only plaintiff, and Conrad and Unger are the only defendants.

> n19 See Cornerstone Techs., LLC v. Conrad, No. C0048CV2002-7475, slip op. at 5 (Pa. Ct. Com. Pl. Dec. 20, 2002).

On the same day that the judge overruled Conrad's and Unger's preliminary objections in the Equity Action, he entered an order coordinating that Action with the Employment Action and Replevin Action, with the result that all three Pennsylvania Actions will proceed in an essentially consolidated manner. That court, the Northampton County Court of Common Pleas, has set a schedule for the consolidated action that mandates that discovery be completed by July 1, 2003, that all dispositive motions be filed by July 15, 2003, and that trial begin on December 15, 2003. n20

> n20 See Cornerstone Techs., LLC v. Conrad, No. C0048CV2002007475, order at 2 (Pa. Ct. Com. Pl. Jan. 31, 2003).

[*23]

## C. The Counts of the Complaint

In summary, the plaintiffs complain that Conrad and Unger are making certain false claims of ownership in Cornerstone and Arastra and that, as a result, uncertainty exists about who can make decisions for the Companies, an uncertainty that supposedly hampers the Companies' ability to deal with third parties. While conceding that Conrad enjoys a twenty percent stake in Cornerstone and Arastra, the plaintiffs seek a judicial declaration that Conrad's interest in the Companies is no more (or less) than that twenty percent and that Unger has no interest at all in the Companies.

The precise counts of the complaint can be grouped as follows:

### 1. The Ownership Count

In Count I, the plaintiffs seek a judicial declaration that Conrad owns solely a twenty percent stake in each of the Companies and that Unger enjoys no such ownership stake whatsoever. The Ownership Count is linked in an important way to the Buy-Out Counts, which I next summarize. The reason is that it is the conduct that is alleged in the Buy-Out Counts that gives rise to the

plaintiffs' concern about the proportion of the Companies' equity that is owned by Conrad and Unger.

### 2. The [*24]  Buy-Out Counts

In Count II, the plaintiffs complain that Conrad's offer to transfer four percent interests in the Companies to each of Pell, Marshall, and Unger violated the Buy-Out Provision. In other words, Conrad should have made an offer to sell the interests to his fellow members and the Companies before making such offers to Pell, Marshall, and Unger.

It is not clear from the record whether the plaintiffs allege that any of Conrad's offers were accepted. To the extent that Pell, Marshall, and/or Unger accepted Conrad's offer, I read the complaint as requesting an invalidation of the transfer(s). Even if the offers were not accepted, the complaint seems to seek a mandatory injunction requiring Conrad to offer the units he offered to Pell, Marshall, and Unger to the other members and/or the Companies who have rights under the Buy-Out Provision at the price that the Provision would have dictated as of September 18, 2000. n21

> n21 Am. Compl. at 5.

In Count III, the plaintiffs argue that Conrad's settlement [*25] offer, by way of his attorney's letter, to sell his entire stake in Cornerstone to the Kanjorski family also violated the Buy-Out Provision of that Company's operating agreement. As in Count II, Count III seeks to require Conrad to put his equity to the parties having rights under the Buy-Out Provision in accordance with the terms that Provision would have dictated at the time Conrad made his settlement offer. n22

> n22 Am. Compl. at 6.

In Count IV, the plaintiffs request an award of attorneys' fees and other litigation expenses incurred in their attempt to enforce the Buy-Out Provision. The plaintiffs argue that the operating agreements require any party that violates the Buy-Out Provision to indemnify the members and the Companies for all costs associated with enforcing the Buy-Out Provision and the indemnity provisions.

### 3. The Removal Counts

In Counts V and VI, the plaintiffs seek judicial confirmation of Conrad's removal as a manager and officer of the Companies. Furthermore, the plaintiffs want me to [*26] approve the managers' subsequent appointment of

2003 Del. Ch. LEXIS 34, *

Peter Kanjorski as President and CEO and Paul Eric Kanjorski as Secretary and Treasurer of the Companies.

II. Analysis

To determine whether this court may exercise personal jurisdiction over Unger and Conrad, I must engage in a two-part analysis. n23 First, I must ask whether a statute of this state authorizes the exercise of personal jurisdiction over each of them. Second, I must determine whether such an exercise of jurisdiction would comport with the due process requirements of the *Fourteenth Amendment to the United States Constitution*. n24 [HN3] *The Fourteenth Amendment* requires that a nonresident defendant have certain "minimum contacts" with the forum jurisdiction "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" n25

n23 *See* 1 Wolfe & Pittenger, § 3-3.

n24 *See Hercules Inc. v. Leu Trust & Banking (Bahamas) Ltd.*, 611 A.2d 476, 480-81 (Del. 1992), cert. dismissed, 507 U.S. 1025, 123 L.Ed. 2d 463, 113 S. Ct. 1836 (1993).

n25 *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 85 L. Ed. 278, 61 S. Ct. 339 (1940)); see also La Nuova D & B, S.p.A. v. Bowe Co., 513 A.2d 764, 769-70 (Del. 1986) (applying *International Shoe*).

[*27]

I begin my analysis with defendant Unger.

A. Statutory Analysis

1. Unger

The plaintiffs rely solely on the provisions of Delaware's long-arm statute n26 to support their claim that this court has personal jurisdiction over Unger. The plaintiffs concede n27 that the only relevant part of the long-arm statute is *10 Del. C. § 3104(c)(1)*, which provides:

[HN4] (c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:

(1) Transacts any business or performs any character of work or service in the State . . .

n26 *10 Del. C. § 3104*.

n27 *See* Pls.' Answering Br. at 6.

*Section 3104(c)(1)* [HN5] is a "single act" provision of the long-arm statute. n28 As such, *§ 3104(c)(1)* supplies a basis for personal jurisdiction "only with respect to claims that have a nexus to such [*28] forum-related conduct." n29 The plaintiffs have only pointed to two acts committed in the State of Delaware that have any relevance to this litigation -- *i.e.*, the acts of forming (1) Cornerstone and (2) Arastra as Delaware limited liability companies.

n28 *See* 1 Wolfe & Pittenger, § 3-5(a)(1)(i).

n29 *Id.; see La Nuova*, 513 A.2d at 768.

But the plaintiffs have not even alleged that Unger committed or caused to be committed either of these acts in the State of Delaware. Unger's name is noticeably absent from the operating agreements. He did not sign those agreements. He is not listed as a member in either agreement. There is no indication whatsoever that he had any role in the founding and formation of either Cornerstone or Arastra. Undeterred by these facts, the plaintiffs advance a novel legal argument -- that because Unger allegedly became a member of the Companies *later*, he should be treated for jurisdictional purposes as if he had *earlier* authorized these acts.

I refuse [*29] to adopt the plaintiffs' invitation to engage in metaphysics. *Section 3104(c)(1)*, by its own terms, requires that the transaction of business in question be performed "in person or through an agent." n30 The plaintiffs have not produced any evidence showing that Unger had anything to do with the filing of the limited liability company documents for Cornerstone and Arastra. Therefore, the plaintiffs have not met their burden to show that Unger transacted any business (either personally or through an agent) in Delaware. *Section 3104(c)(1)* thus does not supply this court with personal jurisdiction over Unger and his motion must be granted.

n30 *10 Del. C. § 3104(c)*.

2. Conrad

I now turn to the plaintiffs' argument as to why personal jurisdiction exists over Conrad. As with Unger, the

plaintiffs initially rely upon § 3104(c)(1). The plaintiffs argue that Conrad, by signing the operating agreements, authorized an individual (i.e., an agent) to take certain actions in Delaware [*30] to effect the formation of Cornerstone and Arastra as Delaware LLCs. n31 The plaintiffs contend that these acts in Delaware are sufficient to bring Conrad within the scope of § 3104(c)(1). Unlike Unger, however, Conrad cannot as easily disclaim his connection to the acts in Delaware necessary to form the Companies as Delaware LLCs because he was a founding member and top manager of them -- i.e., he was an original joint venturer.

n31 See Cornerstone Operating Agreement § 1.1; Arastra Operating Agreement § 1.1.

Two questions emerge regarding the act of forming the LLCs in Delaware. First, is it a transaction of business to form two Delaware LLCs through the Secretary of State's office? Second, if it is, do the claims against Conrad have a sufficient nexus to those acts to satisfy § 3104(c)(1)?

I decline to reach either question, because I believe the plaintiffs have raised other more direct statutory grounds for the assertion of personal jurisdiction over Conrad. The second question is an important [*31] one and it is preferable to avoid addressing it without the necessity to do so, especially given the less than ideal state of the briefing. n32

n32 The reason the issues are important may be stated thusly. As to the first question, the Delaware Supreme Court's instruction that § 3104(c)(1) be read expansively would seem to counsel in favor of a conclusion that the actual formation of a Delaware entity, by way of a transaction with the Secretary of State, constitutes a transaction of business in Delaware. See Hercules, 611 A.2d at 480 ("[Section] 3104(c) [HN6] is to be broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause."). Certainly, such a reading does no great violence to the statutory text as an actual transaction has been consummated that involves the payment of money in exchange for the right to form a new legal entity.

The more knotty policy question then becomes one of nexus. Should any claim for a later breach of the terms of the governing instrument of an entity be deemed to have the required nexus to the original transaction in Delaware that gave legal life to that instrument as a legally viable

contract? If answered affirmatively, § 3104(c)(1) would operate -- subject to constitutional limitations -- to ensure service of process against any founder of a Delaware entity to whom the act of formation in Delaware can be attributed in any case involving the proper interpretation or possible breach of that entity's governing instrument. This broad sweep may possibly fulfill the our Supreme Court's command that the long-arm statute be construed liberally, but there is no reason to use this case to test that theoretical possibility.

[*32]

I find it unnecessary to explore the outer regions of § 3104(c)(1)'s reach because two separate provisions of Delaware's LLC statute provide a sufficient basis to exercise personal jurisdiction over Conrad and no constitutional problem arises with their use.

First, § 18-110(a) sustains jurisdiction over Conrad as to those parts of the Removal Counts relating to his alleged removal and replacement as a manager of the Companies. Second, § 18-109 provides a basis for jurisdiction against Conrad on the other counts of the complaint. I begin with the manager Removal Counts.

a. 6 Del. C. § 18-110 and the Manager Removal Counts

[HN7] The Delaware Limited Liability Company Act, 6 Del. C. § 18-110(a), allows this court, upon the application of a member or manager of a limited liability company, to

determine the validity of any admission, election, appointment, removal or resignation of a manager . . . and the right of any person to become or continue to be a manager . . . and, in case the right to serve as a manager is claimed by more than 1 person, [to] determine the person or persons entitled to serve as managers [*33] . . . . n33

Section 18-110(a) also provides for constructive service of process:

[HN8] In any such application, the limited liability company shall be named as a party and service of copies of the application upon the registered agent of the limited liability company shall be deemed to be service upon the limited liability com-

pany and upon *the person or persons whose right to serve as a manager is contested and upon the person or persons, if any, claiming to be a manager or claiming the right to be a manager . . . .* n34

n33 *6 Del. C. § 18-110(a).*

n34 Emphasis added.

Put simply, *§ 18-110(a)* provides a clear basis for jurisdiction over Conrad as to those parts of the Removal Counts relating to his alleged removal and replacement as a manager of the Companies. In attempting to resist jurisdiction pursuant to *§ 18-110*, Conrad makes an unusual argument. Namely he argues that he "cannot dispute [his removal as manager because] that has never occurred." Why [*34] was he never removed? Because Conrad claims that he "has never served as a manager of the companies nor has there ever been a board of managers [of the companies]." n35 As such, Conrad in essence argues that he does not fall within the ambit of *§ 18-110(a)* because he is not claiming to be a manager and his right to be a manager cannot be properly contested because the Companies have never had managers. And, indeed, with respect to Arastra, Conrad argues that its operating agreement is a forgery and therefore inoperative. n36

n35 Conrad's Answering Br. at 8.

n36 *See id.* at 8 & 10. I have inspected the copy of Arastra Operating Agreement submitted as an exhibit to the amended complaint and it appears that Conrad's signature is authentic. At this point in the proceedings, I therefore must conclude that the plaintiffs have met their *prima facie* burden of showing that Arastra has a valid operating agreement that Conrad signed.

If anything, Conrad's answering brief makes me more likely to believe there [*35] is a dispute regarding the governance and management of the Delaware LLCs at issue in this case. Conrad calls into question, among other matters, (1) his purported removal as manager and an officer of the Companies; (2) whether Arastra's operating agreement is valid; and (3) whether the Companies have boards of managers.

Moreover, Conrad's rather odd arguments do not suffice to defeat this court's jurisdiction over him. The plaintiffs have produced sufficient evidence to meet their *prima facie* burden to show that Conrad at one time

claimed to be a manager -- and CEO -- of Cornerstone and Arastra. By the literal terms of the operating agreements, the CEO of the Companies was also to be a manager. n37 Thus, it is not irrational for the plaintiffs to wish to have a judicial declaration of the validity of Conrad's removal as manager.

n37 This fact, coupled with Conrad's status as a founder, large unitholder, and top officer, as well as the reality that the Kanjorskis went to the trouble to vote Conrad off as a manager of both Companies, provides a sufficient factual foundation for me to assume that Conrad was a manager at all relevant times before his purported removal in May 2001.

[*36]

[HN9] By the plain terms of *§ 18-110(a)*, "the Court of Chancery may hear and determine the validity of any admission, election, appointment, *removal* or resignation of a manager of a limited liability company." n38 And, the plaintiffs may constructively serve Conrad under *§ 18-110(a)* because he is a "person . . . whose right to serve as a manager is contested." If, upon reflection, Conrad adheres to his view that he was never a manager of either Company, he is free to enter into a stipulated judgment to that effect. But his disclaimer of that status does not operate to divest this court of personal jurisdiction over him under *§ 18-110(a).*

n38 Emphasis added.

Furthermore, I conclude that because of Conrad's status as a manager, he can also be fairly asked to contest any question of his removal as President (and other offices, such as CEO) in this same action. As with § 3114 of the *Delaware General Corporation Law*, *§ 18-110(a)* ought to be read sensibly to sweep in sufficiently related claims against an LLC manager [*37] so long as there would be no constitutional offense. Conrad was purportedly removed as President of the Companies (and from all other offices at the Companies) on the same day as he was allegedly removed as a manager. There is thus a close nexus between these claims. And if there were any question on that score, it is obvious that another provision of our LLC statute subjects Conrad to this court's jurisdiction over his purported removal as CEO and President: *§ 18-109* of the LLC statute.

b. *§ 18-109* and the Removal, Ownership and Buy-Out Counts

*Section 18-109* provides a basis for this court's exercise of personal jurisdiction over Conrad with respect to all of the counts of the complaint. *Section 18-109(a)* [HN10] permits an exercise of personal jurisdiction over a manager (as that term is defined in that subsection) "in all civil actions or proceedings brought in the State of Delaware *involving or relating to the business of the limited liability company or a violation by the manager . . . of a duty to the limited liability company, or any member of the limited liability company.*" n39

n39 Emphasis added.

[*38]

Clearly, the question of whether Conrad was properly removed as a manager, CEO, and President of the Companies relates to the business of the Companies. Therefore, *§ 18-109(a)* covers the Removal Counts.

The broad scope of *§ 18-109(a)* also allows this court to exercise personal jurisdiction over Conrad with respect to the Ownership and Buy-Out Counts of the complaint. In this case, the issue as to who owns what part of Cornerstone and Arastra (*i.e.*, the issue in the Ownership Count) is "related in some respect" to the management disputes underlying this case -- *i.e.*, it relates to the business of the Companies. n40

n40 *See Assist Stock Mgmt. L.L.C. v. Rosheim*, 753 A.2d 974, 981 (Del. Ch. 2000).

What is alleged is that a small group of joint venturers formed two Delaware LLCs under a contract with strict controls on who could join the ranks of members. To control that membership right, they put in place a strict Buy-Out Provision that required that members wishing to sell first offer [*39] their units back to the other founders, and if they decline, to the Companies themselves.

The equity ownership of the Companies is allegedly clouded because of Conrad's purported failure to abide by that important term in the Companies' operating agreements. As critical, the debate about who owns what has its origins in a dispute about whether Conrad and Peter Kanjorski -- as managers and joint venturers -- agreed to issue equity in the Companies to Unger and the mysterious David Carpenter in 1997 as well as to certain employees in the year 2000.

In view of the importance of these issues to the capital structure and control of closely-held Delaware LLCs, they obviously relate to the business of those Companies and fall within the literal terms of *§ 18-109*. Put simply,

the confusion about ownership arises out of disputed managerial acts. Did the companies promise to issue units to Carpenter and Unger in 1997 and to Unger and certain other employees in 2000? That is, the question of who owns what units depends in a material way on actions Conrad and others took as managers of the Companies. Likewise, these issues also bear a relationship to the validity of the votes removing Conrad [*40] as a manager because they relate to the question of whether the plaintiffs had sufficient voting power to cast Conrad out. That is, all of these issues relate to the business of the Companies and therefore satisfy the literal terms of *§ 18-109(a)*.

In so concluding, I reach a conclusion consistent with this court's well-reasoned decision in *Assist Stock Management L.L.C. v. Rosheim*. n41 In that decision, Vice Chancellor Lamb respected the General Assembly's decision to write *§ 18-109* more broadly than *§ 3114 of the DGCL*, by investing this court with personal jurisdiction over managers in disputes "involving or relating to the business of" their LLCs. n42 He held that this language must be given effect and that protection against an unconstitutional application of the statute can be afforded by the minimum contacts analysis. n43

n41 *753 A.2d 974 (Del. Ch. 2000)*.

n42 In *Assist*, Vice Chancellor Lamb held that a dispute about the ownership interests a manager had in an LLC could be adjudicated when "the ownership question is related in some respect to the [management] matter" in dispute. *Id. at 981.*

[*41]

n43 *See Assist, 753 A.2d at 980.*

Here, I conclude that all of the Counts bear a clear relation to the business of the LLC and that *§ 18-109* is satisfied, subject to a minimum contacts analysis. n44

n44 I bear some concern about the Buy-Out Count dealing with Conrad's offer to sell his stake in Cornerstone to the Kanjorski family (Count III). As Conrad has noted, it is clear that Conrad's offer was part of a confidential settlement proposal, and, as such may be inadmissible under Delaware Uniform Rule of Evidence 408. Indeed, Conrad's attorney's letter is clearly marked "**FOR SETTLEMENT PURPOSES ONLY**." In other words, by making his settlement offer, Conrad

was attempting to terminate a dispute by offering to sell his interests to the Kanjorskis -- the functional equivalent of offering his units to Kor and Peter Kanjorski. Whether such an offer to settle can be conceived of as a breach of the Buy-Out Provision is obviously a matter of some doubt.

Notwithstanding any doubts about the ultimate sustainability of Count III, Conrad can be subjected to this court's personal jurisdiction as to that count. Although Conrad's offer to settle was made after his purported removal as manager of the Companies, Count III is sufficiently related to the other counts in the complaint such that an exercise of personal jurisdiction over Conrad with respect to Count III is proper. *Assist, 753 A.2d at 981* [HN11] (when a defendant is subject to personal jurisdiction under *§ 18-109* as to certain claims, the court may exercise personal jurisdiction over him as to other sufficiently related claims, and citing a *§ 3114* decision, *Manchester v. Narragansett Capital, Inc., 1989 Del. Ch. LEXIS 141, 1989 WL 125190 (Del. Ch. Oct. 18, 1989)*, in support of that proposition); *see also Infinity Investors Ltd. v. Takefman, 2000 Del. Ch. LEXIS 13, 2000 WL 130622*, at *6 (Del. Ch. Jan. 28, 2000) [HN12] ("Once jurisdiction is properly obtained over a non-resident director pursuant to § 3114, such non-resident director is properly before the Court for any claims that are *sufficiently related to the cause of action* asserted against such directors in their capacity as directors."), *clarified by, 2000 Del. Ch. LEXIS 39, 2000 WL 268302* (Del. Ch. Feb. 17, 2000); *Jaffe v. Regensberg, 1980 WL 3039*, at *2 (Del. Ch. Jan. 10, 1980) [HN13] ("under § 3114, the relief sought is not the guiding factor because if jurisdiction attaches at all under the statute, the nonresident is before the Court for any and all relief that might be necessary to do justice between the parties by virtue of the fact that the jurisdiction conveyed by the statute is in personam jurisdiction."); 1 Wolfe & Pittenger, § 3-5(a)(2)(iv) (discussing Delaware cases holding that [HN14] "once a nonresident director is properly before a Delaware court by reason of Section 3114, that director is properly before the court for any relief that the facts may require, even if such relief technically operates against the director in some other capacity, such as that of a stockholder.").

[*42]

B. Constitutional Analysis

Because *6 Del. C. §§ 18-109 and 18-110* provide statutory bases for an exercise of personal jurisdiction

with respect to Conrad, I briefly address the constitutional inquiry. As I noted earlier, [HN15] the due process clause of the *Fourteenth Amendment* requires that a nonresident defendant have certain "minimum contacts" with the forum jurisdiction "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." n45 When determining whether these "minimum contacts" are present, the court should inquire whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." n46 Once the defendant's minimum contacts with the forum have been established, the court should turn its analysis to issues of fairness and justice. n47

N45 *Int'l Shoe Co., 326 U.S. at 316* (citation and internal quotation marks omitted).

n46 *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980).*

[*43]

n47 *See Burger King Corp. v. Rudzewicz, 471 U.S. 462 at 476-77, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985).*

With respect to the "minimum contacts" analysis, it is clear that Conrad purposefully availed n48 himself of the benefits and protections of Delaware law and that he cannot be surprised to face this lawsuit here. Conrad and his co-venturers could have formed Cornerstone and Arastra as Pennsylvania entities. Instead, they purposely looked to a neighboring state as a place to domicile their Companies and to provide the governing law for their relations. Not only that, Conrad took on the position of manager, CEO, and President of these Delaware Companies, knowing that as a manager he would be subject to jurisdiction for disputes here relating to the business of the Companies.

n48 *See Burger King Corp., 471 U.S. 462 at 475.*

As such, Conrad should not be surprised that he has been haled into a Delaware court when disputes have arisen over the governance [*44] of those Delaware LLCs relating to such fundamental issues as whether he is still a manager or officer, whether he violated the Buy-Out Provision and what that Provision means, and

whether he, as manager, issued equity to certain individuals. n49

> n49 *See Burger King Corp., 471 U.S. 462 at 474*; *World-Wide Volkswagen Corp., 444 U.S. at 297.*

Nor is there is anything unfair or unjust about the exercise of personal jurisdiction over Conrad by this court. As a resident of a neighboring state who purposely participated in the founding of the LLCs in Delaware, Conrad will face only minimal inconvenience by having to respond to the claims made against him in this Delaware court action regarding those entities. Moreover, this state has a strong interest in resolving disputes regarding the internal affairs of LLCs formed under its laws. n50

> n50 *Cf. Assist, 753 A.2d at 981* [HN16] ("Delaware has a strong interest in providing a forum for disputes relating to the ability of managers of an LLC formed under its law to properly discharge their respective managerial functions.").

[*45]

Because personal jurisdiction over Conrad is authorized by Delaware statutory law and is not constitutionally infirm, his motion to dismiss for lack of personal jurisdiction will be denied.

### III. Service of Process

I recognize, as pointed out by Conrad, n51 that service of process on him was not properly effected pursuant to *6 Del. C. § 18-109*. Instead, the plaintiffs served the defendants under *10 Del. C. §§ 3104* and, inexplicably, 3114. Conrad never raised this issue by way of a formal motion. Given this fact, along with the fact that Conrad received *actual notice* of this suit, equity and common sense counsel in favor of giving the plaintiffs leave to properly serve defendant Conrad pursuant to *6 Del. C. § 18-109*. n52 Thus, the plaintiffs shall have leave until April 15, 2003 to effect proper service.

> n51 *See* Letter from Bruce Conrad to Vice Chancellor Leo E. Strine, Jr. 2 (Mar. 7, 2003).

> n52 *See Assist, 753 A.2d at 982* (permitting plaintiff to cure a technical defect in service of process when it appeared that proper service, if made, would be effective to invoke the court's personal jurisdiction over the defendant).

[*46]

### IV. Conrad's Motion to Dismiss or Stay this Action in Favor of the Pending Pennsylvania Consolidated Case

In various of his letters to the court, *pro se* defendant Conrad pointed to the inconvenience of facing litigation from Cornerstone in both this state and Pennsylvania. To surface the issue, the court asked the parties to file submissions relating to whether I should stay or dismiss this action pursuant to *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Engineering Co.* n53 or on other grounds.

> n53 *263 A.2d 281 (Del. 1970).*

Without burdening the reader with a fulsome explanation of the difficulty of applying *McWane* here, n54 I proceed to articulate why I believe that I should use my inherent discretion to control my docket and enter a stay. n55

> n54 One of the reasons it is awkward to shoe-horn this case under *McWane* is that none of the other actions were filed in the first instance by Conrad. Indeed, the two relevant Pennsylvania Actions were filed by Cornerstone and basically involve the Kanjorskis litigating (through Cornerstone) as plaintiffs against Conrad as a defendant.

[*47]

> n55 *See Joseph v. Shell Oil Co., 498 A.2d 1117, 1123 (Del. Ch. 1985).*

In the Equity Action, Cornerstone -- a key plaintiff here who is putatively controlled by the Kanjorskis through Kor -- seeks to litigate breach of fiduciary duty claims against Conrad. That action also involves defendant Unger, whom I have concluded is not subject to this court's personal jurisdiction. The Equity Action, and the other related Pennsylvania actions, are all set to go to trial as consolidated cases later this year.

It remains mysterious to me why the plaintiffs have chosen to spread their claims against Conrad over the court systems of two states. By all measures, it is (modestly) more geographically convenient to litigate this case in Pennsylvania for everyone concerned. Given Cornerstone's own choice to litigate certain Delaware claims -- *i.e.*, the fiduciary duty claims -- in Pennsylvania, its desire to have a Delaware court adjudicate its

other Delaware law claims is inexplicable. Furthermore, it is apparent that the Pennsylvania courts can exercise jurisdiction over Unger and the other [*48] parties to whom the plaintiffs believe Conrad either sold or offered to sell the Companies' units.

Given these realities, it is not at all apparent why commercially sensible litigants would engage in litigation tactics of the kind the plaintiffs here have. Whatever the motivation, proper or improper, this court need not indulge the plaintiffs' whim for simultaneous conflict in two different forums of its own choosing against one *pro se* defendant.

Instead, I will stay this action indefinitely, with a view towards permitting Cornerstone to complete its lawsuits against Conrad and Unger in Pennsylvania in accordance with the schedule already established in that case. This will conserve the parties' resources, as well as those of this court. If the plaintiffs are concerned about this method of proceeding, they might usefully consider whether they are actually permitted to split their claims in the fashion they have n56 and whether it might not be more sensible for them to raise all of their claims against Conrad, Unger, and related parties in one forum that is convenient. In this regard, it is noteworthy that the plaintiffs have failed to provide any reason to believe that the claims [*49] they plead here could not be asserted in the consolidated action pending in Pennsylvania. Put simply, any inconvenience to the plaintiffs of the method of proceeding I have imposed is self-inflicted and is outweighed by the burden to Conrad of fighting two battles on two separate fronts at once for no substantial reason.

---

n56 Both this state and Pennsylvania frown on claim splitting. [HN17] When a party can raise all claims it has against a defendant in one forum at one time, it is generally obligated to do so. *See, e.g., Maldonado v. Flynn, 417 A.2d 378, 382 (Del. Ch. 1980)* ("The rule against claim splitting is an aspect of the doctrine of res judicata and is based on the belief that it is fairer to require a plaintiff to present in one action all of his theories of recovery relating to a transaction, and all of the evidence relating to those theories, than to permit him to prosecute overlapping or repetitive actions in different courts or at different times."); *Coleman v. Coleman, 361 Pa. Super. 446, 522 A.2d 1115, 1120 (Pa. Super. Ct. 1987)* ("The courts of this Commonwealth have long adhered to the generally accepted view disfavoring the splitting of claims.").

[*50]

Therefore, I grant Conrad's motion for an indefinite stay.

V. Conclusion

For the reasons expressed, (1) Unger's motion to dismiss for lack of personal jurisdiction is granted; (2) Conrad's motion to dismiss for lack of personal jurisdiction is denied; and (3) Conrad's motion for a stay is granted. The stay shall remain in effect indefinitely, but the plaintiffs may perfect service of process on Conrad and may move to lift the stay no earlier than March 1, 2004 or the date of the final termination of the Pennsylvania Equity Action. n57 IT IS SO ORDERED.

---

n57 Of course, whatever actions the plaintiffs will need to take to effect proper service of process over Conrad by April 15, 2003 are exempt from the stay.

# CASE 8



Not Reported in A.2d                                                                              Page 1
Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: 1998 WL 914265 (Del.Ch.))**

**H**
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.


Court of Chancery of Delaware.
IOTEX COMMUNICATIONS, INC., a Delaware corporation, Plaintiff and Counterclaim Defendant,
v.
Anthony DEFRIES and David Bayendor, Defendants,
and
IOTA, INC., a Delaware corporation, Defendant and Counterclaim and Third-Party Plaintiff,
v.
ioWAVE, INC., Third-Party Defendant.
**No. 15817.**

Dec. 21, 1998.

Grover C. Brown, Esquire, Michael J. Maimone, Esquire and Joseph C. Schoell, Esquire, of Morris, James, Hitchens & Williams, Wilmington, Delaware, Attorneys for Plaintiff and Counterclaim Defendant Iotex Communications, Inc.

Iota, Inc., Defendant and Counterclaim and Third-Party Plaintiff ( C.A. No. 15817); Anthony Defries and David Bayendor, Defendants (C.A. No. 15817); Urs Maag, Plaintiff and Counterclaim Defendant (C.A. No. 16082); Neosoft, A.G., Plaintiff (C.A.16036). [FN*]

> FN* On December 18, 1998, an Order was entered permitting counsel for these parties to withdraw his representation and allowing 60 days for Iota, Inc. to secure new counsel.

Allen M. Terrell, Jr., Esquire and Srinivas M. Raju, Esquire, of Richards, Layton & Finger, P.A., Wilmington, Delaware; Of Counsel: Blair G. Brown, Esquire and Lynn F. Kaumann, Esquire, of Zuckerman, Spaeder, Goldstein, Taylor & Kolker, L.L.P., Washington, D.C., Attorneys for Counterclaim Defendant ioWave, Inc.

MEMORANDUM OPINION

LAMB, Vice Chancellor.

I. INTRODUCTION

*1 These motions arise out of a complex, multi-party, multi-suit [FN1] litigation begun in July 1997. Various motions to dismiss were filed by several of the parties and oral argument on these motions was held on November 10, 1998. At the conclusion of the hearing held in these consolidated matters, I reserved decision on the motion of David Bayendor to dismiss the complaint against him in C.A. No. 15817 for want of personal jurisdiction, the motions of David Bayendor ("Bayendor") and Anthony Defries ("Defries") to dismiss the Eighth Claim for Relief alleged by counterclaim in C.A. No. 15817 for failure to state a claim (as well as the motion of Defries to dismiss for lack of personal jurisdiction over the Eighth Claim for Relief), and the motion of Urs Maag ("Maag") to dismiss the counterclaims filed against him in C.A. No. 16082 for failure to state a claim upon which relief may be granted. For the reasons that follow, these motions will be granted.

> FN1. Three actions have been consolidated for all purposes, C.A. Nos. 15817-NC, 16036-NC, and 16082-NC.

A. Background [FN2]

> FN2. Except as otherwise noted, the facts recited herein are taken from the Amended Complaint in C.A. No. 15817 and the counterclaim in C.A. No. 16082.

In 1991, Defries caused the formation of Iota, Inc. ("Iota"), a Delaware corporation, to serve as a vehicle for continuing research into certain wireless communications technology ("Technology') under development since the late 1980s. In 1993, Iota succeeded in inventing the Technology and undertook further development work in order to create a commercially viable product. That same year, Defries caused Iota to transfer its rights to all of the intellectual property associated with the Technology to NeoSoft, A.G. ("Neosoft"), a Swiss company he created for that purpose.

In 1994, Defries entered into discussions with Peter Friedli ("Friedli") concerning a commitment to invest $5.4 million in the further development of the Technology. On July 22, 1994, a certificate of incorporation was filed with the Delaware Secretary of State organizing a corporation that is now known

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 2
Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: 1998 WL 914265 (Del.Ch.))**

as IOTEX COMMUNICATIONS, INC. ("IOTEX"). Defries and Maag were named as directors of IOTEX. It is not alleged that Defries, or persons or entities affiliated or associated with him, controlled IOTEX. Rather, it appears from one or more pleadings that a majority of the shares of IOTEX were issued to Friedli or persons associated with him.

In July 1994, IOTEX began negotiations over a License Agreement with NeoSoft whereby NeoSoft would grant IOTEX restricted rights to certain applications of the Technology in North America for a fifteen year term. In return, IOTEX would pay NeoSoft royalties based on a percentage of revenues from the use of these applications. As part of these discussions, IOTEX also negotiated a Project Management Agreement with Iota, whereby Iota would agree to act as project manager for IOTEX's research and development of the Technology licensed from NeoSoft.

Maag resigned as a director of IOTEX on October 24, 1994. There is no allegation of fact in the counterclaims filed in C.A. No. 16082 that Maag participated in the negotiation of either of these agreements. Nor is there any allegation that Maag did anything, while he was an IOTEX director or afterward, in furtherance of or in connection with either of them.

**\*2** The License Agreement and Project Management Agreement (collectively, the "Agreements") were executed on or about November 2, 1994. Under the terms of the Project Management Agreement, IOTEX agreed to fund the costs and expenses associated with the development of the Technology in accordance with a detailed, four-page document (the "Budget") establishing the amounts, timing and manner in which all of the money invested by IOTEX would be spent by Iota. Iota agreed to comply with the provisions of the Budget and further agreed that no material changes would be made to the Budget without first submitting a variance report and obtaining IOTEX's approval for the change. Iota was also required to submit written reports detailing its expenditures to IOTEX. The Budget provided for an 18-month development period that was to be continued only if the parties were satisfied with the progress in the development of the Technology.

In late 1995 and early 1996, IOTEX became concerned that Iota was not complying with the provisions of the Budget and was not developing the Technology as required under the Agreements. Allegedly having concluded that Iota breached the

Project Management Agreement, IOTEX stopped making payments to Iota in February 1996. Iota then terminated the Project Management Agreement. Thereafter, IOTEX transferred all of its employees and operations to ioWave, Inc. ("ioWave"), also a Delaware corporation.

On July 18, 1997, IOTEX filed C.A. No. 15817 against Defries, David Bayendor, [FN3] and Iota, alleging claims of breach of fiduciary duty, fraud, aiding and abetting and civil conspiracy arising out of the negotiation and performance of the Project Management Agreement. IOTEX amended its complaint on November 7, 1997, *inter alia,* to add claims against Defries and Bayendor under the federal Racketeer Influenced and Corrupt Organization Act (RICO"), 18 U.S.C. § 1961, *et seq.* Iota answered and counterclaimed against IOTEX on August 19, 1997. On October 27, 1997, Iota amended its counterclaims to assert claims against ioWave, as an additional third-party defendant.

> FN3. Bayendor is Defries' nephew. Bayendor was a former President of IOTEX, resigning his position on October 14, 1994, and a former director and Vice President of Iota. He resigned from these latter position on June 18, 1997.

On November 13, 1997, NeoSoft filed C.A. No. 16036 against IOTEX for failure to make payments as required by the License Agreement. On December 10, 1997, Maag, as a stockholder of IOTEX, filed C.A. No. 16082, a derivative suit on behalf of IOTEX against Friedli, alleged to be the sole director of IOTEX, Taher Behbehani, the former CEO of IOTEX, and ioWave, alleging that they wrongfully transferred the business of IOTEX to ioWave. In response, IOTEX brought five counterclaims against Maag, alleging essentially the same claims it set forth in its July 18, 1997 complaint against Defries, Bayendor and Iota.

## II. DISCUSSION

### A. Standard

A claim will be dismissed where it fails to allege facts that entitle plaintiff to relief. *See* Ch. Ct. R. 12(b)(6); *Rabkin v. Philip A. Hunt Chem. Corp.,* Del.Supr., 498 A.2d 1099, 1104 (1985). In evaluating a motion to dismiss, the allegations of fact must be construed in the light most favorable to the plaintiff and all well-pleaded facts must be accepted as true. *In re Tri-Star Pictures, Inc., Lit.,* Del.Supr., 634 A.2d 319, 326 (1993). Conclusions "will not be accepted

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 3
Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: 1998 WL 914265 (Del.Ch.))**

as true without specific allegations of fact to support them." *Id.*

**\*3** Where a complaint alleges fraud or conspiracy to commit fraud, the Rules of this Court call for a higher pleading standard, requiring the circumstances constituting the fraud or conspiracy to "be pled with particularity." *Atlantis Plastics Corp. v. Sammons, Del. Ch., 558 A.2d 1062, 1066 (1989)* (citing Court of Chancery Rule 9(b), which states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."). The particularity requirements will be met where the complaint "specif[ies] the time, place, speaker, and sometimes even the content of the alleged mi srepresentations...." *Luce v. Edelstein,* 2d Cir., 802 F.2d 49, 54 (1986).

B. The Maag Motion

In the counterclaim filed in C.A. No. 16082, IOTEX alleges that Maag (plaintiff in that derivative action), together with Defries, Bayendor, Iota and NeoSoft "devised, agreed upon and pursued a scheme" to defraud IOTEX and its stockholders that has resulted in a loss of over $5.2 million and forced IOTEX to abandon its operations. IOTEX alleges that Maag and the others fraudulently induced IOTEX to "(i) incur significant expenses in becoming a newly-created entity to invest funds in connection with the Technology, (ii) realize substantial costs in negotiating and entering into the License Agreement with NeoSoft and the Project Management Agreement with Iota, and operating as an on-going entity, and (iii) raise funds from individual investors and forward an amount greater that $5.2 million to Iota in accordance with the terms of the Budget." IOTEX's Answering Br. at 12 (citations omitted). IOTEX also alleges that monies contributed by IOTEX according to the Agreements have been misappropriated by various individuals associated with Iota and NeoSoft, including, "possibly" Maag.

In his Motion to Dismiss, Maag attacks each of the five counterclaim allegations alleged by IOTEX, which are: (1) breach of fiduciary duty, (2) breach of duty of disclosure, (3) aiding and abetting breach of another's fiduciary duty, (4) common law fraud and (5) civil conspiracy. I will address allegations (1), (2) and (3) together and will do the same for allegations (4) and (5).

*1. Breach of Fiduciary Duty, Duty of Disclosure and Aiding and Abetting Breach of Fiduciary Duty*

IOTEX claims Maag breached his fiduciary duties, owed in his capacity as an IOTEX director, by allowing IOTEX to negotiate and enter into the Agreements and further, to invest funds over the course of performance of the Project Management Agreement, *knowing* that NeoSoft and Iota "would not satisfy their respective contractual obligations" and would use the Agreements to "fraudulently induce IOTEX to forward funds to Iota," and in failing to inform the IOTEX board of directors of this knowledge. [FN4] Further, IOTEX claims that Maag aided and abetted a breach of Defries' fiduciary duties, owed by Defries in his capacity as an IOTEX director, by failing to prevent Defries from "causing and permitting" IOTEX to enter into the Agreements, when Maag *knew* that Iota and NeoSoft would not meet their contractual obligations. [FN5] In support of these claims, IOTEX alleges with particularity the following: (1) Maag was a director of IOTEX during the negotiation of the Agreements (but had resigned before the Agreements were approved), (2) Maag was a director of NeoSoft during the negotiation of the Agreements, (3) Maag was associated with Defries and (4) Iota, it is alleged, breached the Project Management Agreement.

> FN4. For the purpose of this motion, I accept as true IOTEX's averment that Maag was a director of IOTEX between July and October 1994. I do note, however, that this is a disputed fact.

> FN5. IOTEX contends that Maag's actions must be evaluated under the entire fairness standard, since he was a director of both IOTEX and NeoSoft between July 22, 1994 and October 24, 1994, the period in which the Agreements were negotiated. I do not reach this issue, as I find IOTEX's claims are not adequately substantiated by specific allegations of fact.

**\*4** Thus, a central element of the claims against Maag for breach of fiduciary duty rests on the general allegation that he "knew" as a "fact" (and failed to disclose) something about the state of mind of Defries and others during the period of negotiation of the Agreements. The "fact" that he is alleged to have known is not itself alleged with particularity but, rather, as a conclusion based on events which transpired during the course of performance of the Project Management Agreement. There are also no allegations of fact that Maag played any substantial role in the negotiation or execution of the Agreements, as a director of IOTEX or otherwise.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 4
Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: 1998 WL 914265 (Del.Ch.))**

[FN6] Finally, there is no allegation that he profited from the alleged misapplication of the development funds. The best IOTEX is able to say is that funds were transferred to a Swiss bank where it is "possible" that Maag has an account.

> FN6. IOTEX's only claim of Maag's participation in the negotiation or approval of the Agreements is made by reference to an October 27, 1994 letter from Defries, on behalf of Iota, addressed to Maag, which states: "Enclosed find three copies of the Project Management Agreement that we have signed on behalf of Iota Inc. Please have Peter Friedli sign and date yellow tabs where indicated on behalf of [IOTEX] retaining one copy for your records and returning one copy to us for our files." Of course, IOTEX concedes that Maag resigned as an IOTEX director on October 24, 1994. Moreover, it makes no allegation of fact that Maag either obtained Friedli's signature or otherwise participated in securing IOTEX's approval of the Project Management Agreement.

While recognizing that Court of Chancery Rule 9(b) provides that "knowledge ... may be averred generally," where pleading a claim of fraud or breach of fiduciary duty that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this "something" was knowable and that the defendant was in a position to know it. IOTEX contends the scant well-pleaded facts in its counterclaim support the conclusion that Maag knew that Defries and Iota were not acting in good faith in negotiating the Agreements. I cannot agree. Speculative conclusions unsupported by fact do not allege breaches of fiduciary duty. *See In re Tri-Star, Del.Supr., 634 A.2d at 326* (conclusions "will not be accepted as true without specific allegations of fact to support them."). For the same reasons, I reject IOTEX's argument that Maag aided and abetted Defries alleged breach of duty.

My decision in this regard is premised importantly on the general rule of law that one cannot "bootstrap" a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations. *See* discussion pages 11 to 12, *infra.* The same considerations lead me to conclude that one cannot, ordinarily, premise a claim for breach of fiduciary duty on the assertion that a director knew and failed to disclose that a party

negotiating a contractual arrangement with the corporation did not intend to perform its obligations under the contract. I do recognize that there are rare circumstances in which this general rule should not apply. This is not one of them. Here, there is no allegation that the Technology was not valuable at the time the Agreements were executed. Indeed, it is alleged that Defries had been working on the Technology for some years and it is clear from the positions of the parties that they all regard the Technology as having substantial value. There also is no allegation that Iota failed to begin its performance under the Project Management Agreement and continue rendering some performance for more than a year. In short, despite the conclusory allegations of fraud and breach of fiduciary duty, the dispute between the parties is essentially one for breach of contract, and the well-pleaded facts alleged in that regard do not support the inference that Defries and Iota did not intend to perform the Agreements. In the circumstances, the claims for breach of fiduciary duty against Maag must be dismissed.

*2. Fraud and Conspiracy to Commit Fraud*

*5 IOTEX's final two counterclaim allegations contend that Maag committed fraud and conspired to commit fraud. Again, these charges are predicated on the allegations that Maag *knew* that Defries and Iota did not intend to meet their contractual obligations and were "merely using the [Agreements] to fraudulently induce IOTEX to forward funds to Iota." In failing to disclose this *knowledge,* IOTEX argues, Maag participated in a scheme to defraud IOTEX, as it "would not have expended the time and resources negotiating, entering into and satisfying its obligations under the [Agreements] had it been aware of the actual intent of NeoSoft, Iota, Defries and Maag." Further, IOTEX argues that Maag's knowledge and participation in the scheme to defraud IOTEX makes him liable as a conspirator for any other wrongful acts committed in furtherance of the conspiracy.

Under New York law, [FN7] a scheme to defraud is shown where the complaint asserts facts that demonstrate: (1) a scheme, (2) involving defendants (3) directed against the interests of plaintiffs and (4) defendant's conduct in connection with the scheme. *See Shearson Lehman Bros. Inc. v. Bagley,* N.Y.App. Div., 614 N .Y.S.2d 5, 6 (1994). Fraudulent misrepresentation is shown where facts are alleged that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 5
Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: 1998 WL 914265 (Del.Ch.))**

relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 2d Cir., 57 F.3d 146, 153 (1995). The courts have noted that "[i]t is almost impossible to state in detail the circumstances constituting a fraud where those circumstances are peculiarly within the knowledge of the party against whom the (fraud) is being asserted." *CPC Int'l Inc. v. McKesson Corp.,* N .Y., 519 N.Y.S.2d 804, 812 (1987) (quoting *Jered Contracting Corp. v. New York City Transit Auth.,* N.Y., 292 N.Y.S.2d 98, 104 (1968)). However, a complaint must "allege the misconduct complained of in sufficient detail to inform the defendants of the substance of the claims." *Bernstein v. Kelso & Co., Inc.,* N.Y.App. Div., 659 N.Y.S.2d 276, 280 (1997).

> FN7. The parties are in agreement that New York law governs these claims for fraud.

IOTEX's fraud claims suffer from the same defect as its breach of fiduciary duty claims. Moreover, IOTEX has failed to allege sufficient facts to establish that, even if there was fraud, Maag participated in it. *See In re Tri-Star,* Del.Supr., 634 A.2d at 326 (Conclusions "will not be accepted as true without specific allegations of fact to support them.").

IOTEX does allege the elements of a claim for breach of contract against Iota. That claim, however, cannot be "bootstrapped" into a fraud claim merely by adding the words "fraudulently induced" or alleging that the contracting parties never intended to perform. *See Dann v. Chrysler Corp.,* Del. Ch., 174 A.2d 696, 700 (1961) ("Using the word 'fraud' or its equivalent in any form is just not a substitute for the statement of sufficient facts to make the basis of the charge reasonably apparent.").

**\*6** New York law is decisively to the same effect: "It is well settled under New York law that 'a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations." ' *International CableTel Inc. v. Le Group Videotron LTEE,* S.D.N.Y., 978 F.Supp. 483, 486 (1997) (quoting *Rocanova v. Equitable Life Assurance Soc'y of the U.S.,* N.Y., 612 N.YS.2d 339, 343 (1994)). New York law does recognize that a promise made "with a preconceived and undisclosed intention" of non-performance "constitutes a misrepresentation of a 'material existing fact.' " *Id.* at 487 (quoting *Sabo v. Delman,* N.Y., 164 N.Y.S.2d 714, 716 (1957). Nevertheless, this rule is limited by the requirement

that "a false promise can support a claim of fraud only where that promise was 'collateral or extraneous' to the terms [of] an enforceable agreement in place between the parties." *Id.* IOTEX has alleged no facts showing that Maag was aware or participated in a "false promise" that was "collateral or extraneous" to the terms of the Agreements. On the contrary, the false promise alleged by IOTEX goes to the heart of the Agreements. Therefore, I do not find IOTEX to have met the requirements for pleading a fraud claim where, as is true here, the underlying action is for breach of contract.

Since I find IOTEX has failed to meet the pleading requirements for fraud, I need not address the conspiracy claim, as there is no underlying independent claim of fraud sufficient to withstand a motion to dismiss. *See Demalco Ltd. v. Feltner,* S.D.N.Y., 588 F.Supp. 1277, 1278 (1984) ("It is well settled in New York that 'civil conspiracy to commit fraud, standing alone, is not actionable .' Instead, the gravamen of a claim of conspiracy is the underlying independent tort, and if the independent tort has not been adequately pleaded, the conspiracy claim will also fail." (quoting *Cullen v. BMW of North Am., Inc.,* E.D.N.Y., 490 F.Supp. 249, 254 (1980) and citing *Danahy v. Meese,* N.Y.App. Div., 446 N.Y.S .2d 611, 614 (1981))).

B. The Bayendor Motion

The complaint in C.A. No. 15817 was served on Bayendor in the manner described in 10 *Del. C.* § 3114, the Delaware director service statute. Apparently, IOTEX relied on that statute due to Bayendor's status as a director of Iota, his co-defendant. On August 19, 1997, Bayendor moved to dismiss for lack of personal jurisdiction and insufficiency of service of process, contending that Section 3114 was unavailable for use by IOTEX as its complaint was unrelated to Bayendor's fiduciary duties to Iota. In response, IOTEX served Bayendor again, this time under 10 *Del. C.* § 3104, the general long-arm service statute, and directed certain discovery at him in connection with his motion to dismiss. On November 21, 1997, IOTEX filed an amended complaint that added claims against Bayendor for civil conspiracy and violations of the federal Racketeer Influenced and Corrupt Organization Act ("RICO"). That amended complaint was served in reliance on Section 3104.

**\*7** As a result of the briefing on Bayendor's motion, the issue has narrowed to whether or not IOTEX is entitled to rely on the "civil conspiracy" theory of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 6
Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: 1998 WL 914265 (Del.Ch.))**

personal jurisdictional to obtain jurisdiction over Bayendor in Delaware. That is, I understand IOTEX fairly to concede that <u>Section 3114</u> has no application to its claim and that no other head of jurisdiction under <u>Section 3104</u> is available in this case.

The civil conspiracy theory of personal jurisdiction was recognized by the Delaware Supreme Court in *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, Del.Supr., 449 A.2d. 210, 225 (1982), but, because it affords "an easy technique to evade the thrust of the *International Shoe* holding," it has been narrowly construed by this Court. *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, Allen, C., slip op. at 29 (Nov. 21, 1995). In *Istituto Bancario,* the Supreme Court surveyed the law from other jurisdictions regarding the conspiracy theory of jurisdiction and determined to adopt what it characterized as the "strict test" requiring a plaintiff to satisfy each of five elements:

> (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

*Istituto Bancario,* Del.Supr., 449 A.2d at 225. While not conceding the existence of elements (1) and (2), Bayendor's argument focuses on the final three elements, and in particular on the absence of any allegation of an act or effect in Delaware in furtherance of the alleged conspiracy.

IOTEX cites three matters that it characterizes as "substantial acts and effects in the State of Delaware." None of these bear analysis.

IOTEX argues that the "principal effect involving Delaware" was "the use of a Delaware corporation--Iota--as the vehicle through which the fraud was committed." Mere use of a Delaware corporate entity in connection with a civil conspiracy has never been held to satisfy this element of the *Istituto Bancario* test. In support of this position, IOTEX cites to *Hercules, Inc. v. Leu Trust & Banking (Bahamas) Ltd.,* Del.Supr., 611 A.2d 476 (1992); *Istituto Bancario,* Del.Supr., 449 A.2d 210; and *Macklowe v. Planet Hollywood, Inc.,* Del. Ch., C.A. No. 13689, Steele, V.C. (Oct. 13, 1994). I do not read any of these cases to hold that "use" of a Delaware corporation in furtherance of a civil conspiracy can

alone be found to have a substantial effect in Delaware sufficient to satisfy the "strict" test of *Istituto Bancario.* In *Hercules,* of course, the plaintiff corporation was headquartered in Delaware. *Hercules,* Del.Supr., 611 A.2d at 478. Thus, the effect of the conspiracy was actually felt in this State. In *Istituto Bancario,* a substantial act in furtherance of the civil conspiracy--the filing of a certificate of amendment with the Delaware Secretary of State authorizing the issuance of the shares there in question--actually took place in the Delaware. *Istituto Bancario,* Del.Supr., 449 A.2d at 226-27.

**\*8** *Macklowe* held that personal jurisdiction over a Florida limited partnership could be obtained in Delaware by service on its Delaware incorporated general partner. *Macklowe,* Del. Ch., C.A. No. 13689, slip op. at 11. This result was not followed by Chancellor Allen in *Carlton* in relation to a New York limited partnership. *Carlton Invs.,* Del. Ch., C.A. No. 13950, slip op. at 27. Moreover, while *Macklowe* also discusses the applicability of the civil conspiracy of jurisdiction, nothing in that opinion suggests that persons affiliated with a Delaware corporation who are alleged to "use" that corporation to the injury of a third party by actions wholly outside of Delaware thereby subject themselves to the jurisdiction of our courts. *Macklowe,* Del. Ch., C.A. No. 13689, slip op. at 14-17.

The second and third arguments are that Defries' alleged breach of his fiduciary duties as one of IOTEX's directors caused a "substantial effect" in Delaware simply by virtue of IOTEX's incorporation in this State and that Bayendor's alleged breach of fiduciary while he was President of IOTEX's predecessor (Iotel, Inc.) caused injury in this State. Indeed, IOTEX goes so far as to describe Bayendor's alleged breach of fiduciary (which is not alleged to have happened physically in Delaware) as an "additional act in Delaware [that] supports the assertion of jurisdiction here." These alleged "effects" add nothing to the analysis because they have only a metaphysical connection with this jurisdiction. In my judgment, as a general rule, in the case of Delaware corporations having no substantial physical presence in this State, an allegation that a civil conspiracy caused injury to the corporation by actions wholly outside this States will not satisfy the requirement found in the Supreme Court's opinion in *Istituto Bancario* of a "substantial effect ... in the forum state. *Istituto Bancario,* Del.Supr., 449 A.2d at 225.

For these reasons, I conclude that IOTEX cannot satisfy elements (3), (4) or  (5) of the *Istituto*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 7
Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: 1998 WL 914265 (Del.Ch.))**

*Bancario* test for the assertion of personal jurisdiction over persons alleged to be participants in a civil conspiracy. Thus, service under 10 Del. C. § 3104 was improper and the amended complaint must be dismissed as to defendant Bayendor.

C. Defries and Bayendor's Motions to Dismiss the Eighth Claim for Relief (RICO)  [FN8]

>    FN8. Since I have dismissed the amended complaint as it pertains to defendant Bayendor, my discussion of the RICO claim applies only to defendant Defries.

In the amended complaint in C.A. No. 15817, IOTEX alleges that Defries and Bayendor engaged in a pattern of racketeering activity in violation of RICO. Specifically, Defries and Bayendor are alleged to have schemed (through Iota) "to defraud (among others) IOTEX and its stockholders of approximately [$5.2 million] and in devising, agreeing upon and pursuing such scheme to have: (i) misappropriated the approximately $5.2 million that IOTEX invested in connection with the Technology, (ii) forced IOTEX to abandon its operations, (iii) forced IOTEX to defend itself--and expend significant funds--in a recent action concerning the Technology brought against IOTEX by a former employee of Iota, and (iv) forced IOTEX to defend itself in connection with the unmeritorious counterclaim brought by Iota, and in the unmeritorious claims brought by another entity (Neosoft, A.G.) and individual (Urs Maag) controlled by Defries and Bayendor." IOTEX's Answering Br. at 3-4.

*9 The RICO statute provides for civil damages for any person or entity injured in his, her or its business or property by reason of a violation of 18 U.S.C. § 1962. *See* 18 U.S.C. § 1964(c). The statute is violated where the injured party demonstrates that defendants were engaged in a "pattern of racketeering activity." *See H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989).* A pattern is defined as "requiring 'at least two acts of racketeering activity within a ten year period.' " *Tabas v. Tabas,* 3d Cir., 47 F.3d 1280, 1290 (1995) (quoting 18 U.S.C. § 1961(5)). Racketeering activity is defined as, *inter alia,* any act that is indictable under 18 U.S.C. § 1961(1), and includes wire fraud and mail fraud, the specific acts alleged to have occurred by IOTEX. *See* 18 U.S.C. § § 1341 (mail), 1343 (wire), 1961(1)(B) (definition); *Tabas,* 47 F.3d at 1290.

Courts have held that a "pattern of racketeering activity" is shown where the plaintiff has alleged two

or more acts of an indictable offense and further shown "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity."  [FN9] *H.J. Inc., 492 U.S. at 239.* "[P]redicate acts are related if they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." ' *Tabas,* 47 F.3d at 1292 (quoting *H.J. Inc., 492 U.S. at 240).* Continued criminal activity, i.e., continuity, may be one of two types: closed-end, referring to "a closed period of repeated conduct"; or open-end, referring to "past conduct that by its nature projects into the future with a threat of repetition." *Id.* (quoting *H.J. Inc., 492 U.S. at 241).* Analysis of either of the two types is temporal, so "a party may establish continuity as a closed-ended concept by 'proving series of related predicates extending over a substantial period of time." ' *Id.* (quoting *H.J. Inc., 492 U .S. at 242).*

>    FN9. The pleading requirements to allege a violation of RICO are the same as previously discussed, see *supra,* p 5-6.

IOTEX contends that both items necessary to establish a pattern of racketeering activity have been met; pointing first to Defries and Bayendor's allegedly false statements made during the IOTEX/Iota negotiations concerning the Project Management Agreement and to Iota's allegedly false status reports as the related predicate acts; and second, to the fact that the conduct "intended to defraud IOTEX had occurred over several years, continues through the present, and represents the normal course of doing business for defendant Defries and defendant Bayendor," as evidence of a continued threat of criminal activity.

In addressing IOTEX's argument, I focus on the latter aspect of the United States Supreme Court's RICO analysis, that the defendants' acts "amount to or pose a threat of continued criminal activity." *H.J. Inc., 492 U.S. at 239.*  [FN10] IOTEX argues that both types of continuing criminal activity (open-ended and closed-ended) are present in the instant case.

>    FN10. Defendants apparently concede that IOTEX has plead sufficiently to meet the requirement that "the racketeering predicates are related," as they do not address this aspect of the *H.J. Inc.* test in their brief. *See H.J. Inc., 492 U.S. at 239.*

Not Reported in A.2d                                                                                                    Page 8
Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: 1998 WL 914265 (Del.Ch.))**

**\*10** Defendants contend that the allegedly criminal activities (if at all) could in no event have lasted past February 1996 (the last date that IOTEX made payments to Iota) thereby making an open-ended analysis inapplicable. In response, IOTEX cites three events alleged to meet the open-ended standard: (1) Iota's assertion of contract claims in this Court, (2) Iota's alleged refusal to provide an accounting of the funds IOTEX has paid to Iota and (3) Defries alleged grant of an option in IOTEX stock to a former Iota employee. [FN11] In my judgment, these mere conclusory allegations do not evidence continuing fraudulent conduct and require no further discussion. *See Continental Realty Corp. v. J.C. Penney Co., Inc.,* S.D.N.Y., 729 F.Supp. 1452, 1455 (1990) ("[The plaintiff's] conclusory allegations fail to satisfy Fed.R.Civ.P. 9(b)'s requirement that averments of fraud be stated with particularity and therefore cannot be relied upon to demonstrate a continuing pattern of fraudulent acts.").

> FN11. The option arises out of a Separation Agreement between Iota and Andrew Denis, which grants Denis the choice of either, "shares equal and equivalent to two hundred and fifty shares of Series A Preferred Stock in Iota, or: b) Shares in Iotex, Incorporated equal and equivalent to that percentage as may be represented by the like number and proportion of shares issued in Iota pursuant to paragraph 6.C.a above when calculated against the Iotex shares which Iota or its associates may hold or control following the initial public offering of Iotex as such offering is defined by the Securities and Exchange Commission.
> Defendants argue persuasively that the quoted provision obligates only Iota (and not IOTEX) to perform and, in any event, relates to shares of IOTEX owned or to be owned by Iota.

In the alternative, IOTEX contends that defendants' actions have met the closed-ended requirement of continuing criminal activity, i.e., a "series of related predicates extending over a substantial period of time." *H.J. Inc.,* 492 U.S. at 242. In making this determination, courts look to a number of factors, which can include: the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the number of schemes involved and the occurrence of distinct injuries. *Vicom, Inc. v. Harbridge Merchant Services,* 7th Cir., 20 F.3d 771, 781-82 "(1) the number of unlawful acts; (2) the length of time over which the

acts were committed; (3) the similarity of the acts; (4) the number of victims; (5) the number of perpetrators; and (6) the character of the unlawful activity." (citing *Barticheck v. Fidelity Union Bank/First Nat'l State,* 3d Cir., 832 F.2d 36 (1987))).

IOTEX relies primarily on the Third Circuit's decision in *Tabas* as support for its argument. In *Tabas,* the plaintiff alleged that two brothers formed a partnership to conduct real estate and other business ventures. *Id.* at 1282. In the event of the death of either partner, the partnership agreement provided that the surviving partner would distribute partnership income jointly to himself and the estate of the deceased partner. *Id.* One of the partners died, and the surviving partner began making partnership income payments to the deceased partner's estate. *Id.*

Some years thereafter, the estate filed a civil RICO claim, alleging misappropriation based on its contention that the surviving partner was not allocating an equal share to the deceased partner's estate, in violation of the partnership agreement. *Id.* at 1282-83. The Third Circuit agreed, reversing the district court and finding that the RICO continuity requirement was satisfied. *Id.* at 1281. In its assessment of whether or not continuing criminal activity was shown, the Court focused on "the duration of the underlying scheme," noting that plaintiffs had provided evidence tending to show that the alleged acts of mail fraud began on November 10, 1987 and ended in July 1991, a period of three and a half years. *Id.* at 1294. The Court found a three and a half year period constituted a "substantial" period of time, and comported with the type of "long-term criminal conduct that RICO was enacted to address." *Id.* [FN12]

> FN12. IOTEX makes further argument as evidence of the applicability of the closed-ended type by contending that defendants' criminal conduct "began on or before July 20, 1994 (the date IOTEX was formed for the sole purpose of investing capital in connection with the Technology)". Even if this were true, the resulting period is still substantially shorter than that addressed in *Tabas,* and the multi-factor analysis would lead me to conclude that the element of continuity is not present.

**\*11** *Tabas* is distinguishable from the instant case. While *Tabas* involved conduct occurring over a three and a half year period, the activities here lasted only 15 months, a decidedly shorter period, and one that,

Not Reported in A.2d                                                                                      Page 9
Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: 1998 WL 914265 (Del.Ch.))**

alone, will not satisfy the RICO continuity requirement. *See Vemco, Inc. v. Camardella,* 3d Cir., 23 F.3d 129, 135 (1994) ("We cannot conclude that [defendant's] alleged actions here, involving a single victim and single scheme for a single purpose over seventeen months, constitute the type of 'long-term criminal conduct' Congress sought to prohibit with RICO." (quoting *H.J. Inc.,* 492 U.S. at 241-42)). The other factors identified in the case law lead me to conclude that the RICO claim is not properly plead.

First, the predicate acts that IOTEX rely on all arise out of or are related to the same transaction, the Project Management Agreement. This Agreement required periodic status reports and such reports, while independent of each other, were all dependent on and related to the Agreement. Commonsense, which the Supreme Court mandates be used in a RICO analysis, requires a finding that these reports are not separate predicate acts as contemplated by the RICO statute, but are mutually dependent on the Agreement. *See H.J. Inc., 492 U.S. at 241* (promulgating an approach to analyzing the continuity requirement that is based on a "commonsense, everyday understanding of RICO's language and Congress' gloss on it"). As one court has stated, "courts must take care to ensure that the plaintiff is not artificially fragmenting a single act into multiple acts simply to invoke RICO." *Schlaifer Nance & Co. v. Estate of Andy Warhol,* 2d Cir., 119 F.3d 91, 98 (1997). [FN13]

> FN13. This same analysis applies to the other predicate acts attacked by IOTEX, that the defendants made fraudulent communications during the negotiation of the Project Management Agreement that led to IOTEX's payments to Iota. These payments were directly related to the Budget and are an integral part of the Project Management Agreement. They cannot be segmented to create the predicate acts necessary to meet the RICO continuity requirement.

Second, notwithstanding IOTEX's footnote argument to the contrary, the predicate acts allegedly injure only one party, IOTEX itself. IOTEX contends that in addition to itself, allegedly injured by defendants' misappropriation of its funds and fraudulent status reports, its stockholders have also been injured, since the corporation was formed specifically for the purpose of investing in the Technology and by misappropriating funds paid by IOTEX to Iota for the Technology, the defendants injured the stockholders

investing in IOTEX. I reject this argument because it would require me to disregard the existence of IOTEX as a legal entity. IOTEX alone experiences any effect of defendants' allegedly fraudulent acts. The shareholders do not suffer any injury separate from or unrelated to that alleged to be experienced by IOTEX. *See Kramer v. Western Pac. Indus., Inc.,* Del.Supr., 546 A.2d 348, 351 (1988) (by analogy in derivative standing cases, "[p]laintiff must allege more than an injury resulting from a wrong to the corporation").

Lastly, the alleged injury itself is a single injury. If defendants, through Iota, did breach the Project Management Agreement by sending false status reports and not complying with the Budget's directives regarding the allocation of the IOTEX funds, then the end result of Iota's noncompliance is a single injury to IOTEX, not multiple injuries based on each allegedly fraudulent communication. To find otherwise would fragment the Project Management Agreement, which is contrary to law and commonsense.

*12 For all of the foregoing reasons, I find that IOTEX has failed to meet the continuity requirement necessary to show a pattern of racketeering activity under the RICO statute. Therefore, defendant Defries and Bayendor's Motions to Dismiss the Eighth Claim for Relief are hereby granted. [FN14]

> FN14. Having reached this conclusion, I do not address Defries' argument that the consent to jurisdiction under 10 Del. C. § 3114 is not broad enough to subject him to the personal jurisdiction of this Court for the purpose of adjudicating the RICO claim.

III. CONCLUSION

For all of the foregoing reasons, the motions to dismiss addressed in this Memorandum Opinion, i.e., (1) Urs Maag's Motion to Dismiss for Failure to State a Claim upon which Relief can be Granted (C.A. No. 16082), (2) David Bayendor's Motion to Dismiss for Lack of Personal Jurisdiction (C.A. No. 15817), and (3) Anthony Defries and David Bayendor's Motions to Dismiss the Eighth Claim for Relief (C.A. No. 15817), are all GRANTED. IT IS SO ORDERED.

Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718

END OF DOCUMENT

# CASE 9

LEXSEE 1989 DEL. CH. LEXIS 102

**ALAN R. KAHN, as custodian for Amanda Kahn and Kimberly Kahn, Plaintiff,
v. LYNCH COMMUNICATION SYSTEMS, INC., COMPAGNIE GENERALE
D'ELECTRICITE, ALCATEL, ALCATEL, S.A., ALCATEL USA CORP., E. F. DERTINGER,
STUART M. BERINGER, FRANK M. DRENDEL, RAYMOND HONO, HUBERT
L. KERTZ, FRANCOIS H. de LAAGE de MEUX, JAMES B. SANDERS, JAMES
H. VOGT, PAUL B. WINEMAN, JOHN GAILEY and GILLES DuPAY-d'AGEAC,
Defendants**

**Civil Action No. 8748**

**Court of Chancery of Delaware, New Castle**

*1989 Del. Ch. LEXIS 102*

**Date Submitted: April 21, 1988
August 24, 1989, Decided**

**NOTICE:** THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**DISPOSITION:** [*1]

Based upon the foregoing, defendant CGE's motion to dismiss is granted and the motions to dismiss by the remaining defendants are denied. IT IS SO ORDERED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, telecommunications corporations and their directors, filed motions to dismiss a purported class action by plaintiff, a custodian for two shareholders, which claimed that the directors breached their fiduciary duties and challenged the merger of two of the corporations.

**OVERVIEW:** Plaintiff, a custodian for two shareholders, filed a purported class action against defendants, several telecommunications corporations and their directors, challenging a corporate merger. Defendant corporations filed a motion to dismiss based on *Del. Code Ann. tit. 8, § 262.* Also, two of defendant corporations who were incorporated in France filed a motion to dismiss based on lack of personal jurisdiction. The court held that the custodian's complaint stated a cause of action because the allegations suggested that one defendant corporation used another defendant corporation's assets for its own benefit, manipulated the form of the merger,

and failed to compensate the public stockholders of the corporation whose assets were improperly used. Second, the court held that one defendant French corporation should be dismissed because there were no allegations that that company was authorized to or did business in Delaware, and the mere allegation that it owned another French company with a Delaware subsidiary alleged to be involved in wrongful activity was not sufficient. The other French company, however, had minimum contacts due to its Delaware holding company.

**OUTCOME:** The court denied the motion to dismiss on the merits. However, the court granted the motion to dismiss of one of the French corporations due to lack of personal jurisdiction.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Governments > Fiduciary Responsibilities*
[HN1] Where allegations against corporate directors are of breach of fiduciary duty and import a form of overreaching, in the context of entire fairness, they deserve more considered analysis than can be accorded on a motion to dismiss.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Long-Arm Jurisdiction*
[HN2] The first step in analyzing questions of personal jurisdiction is to determine whether the long arm statute, specifically *Del. Code Ann. tit. 10, § 3104(c)*, purports to authorize the exercise of jurisdiction.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN3] A single transaction is sufficient to confer personal jurisdiction where the claim is based on that transaction.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Class Actions > Derivative Actions > Double Derivative Actions*
[HN4] In deciding whether a defendant's constitutional rights to due process are violated by subjecting it to jurisdiction in the state's courts, a court must ascertain whether certain minimum contacts with Delaware exist, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. The court must focus on the relationship between the defendants, the litigation, and the forum. These constitutional standards are satisfied in a case where suit is filed against a foreign corporation in connection with alleged wrongdoing by its wholly-owned Delaware subsidiary.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN5] The decision of a foreign parent corporation to maintain a direct and continuing connection between Delaware and itself, as the owner of a Delaware subsidiary, is a "minimum contact" of paramount importance in the specific jurisdictional analysis. A foreign corporation cannot use the laws of Delaware to govern the operations of its subsidiary and then, in a suit relating to the operation of the subsidiary, claim that jurisdiction in Delaware offends traditional notions of fair play. The fact that the parent did not form the subsidiary, but acquired it, has no bearing.

**COUNSEL:**

R. Bruce McNew, Esquire and Pamela S. Tikellis, Esquire of GREENFIELD & CHIMICLES, Wilmington,

Delaware and Sidney B. Silverman, Esquire of SILVERMAN & HARNES, New York, New York, Attorneys for Plaintiff.

Allen M. Terrell, Jr., Esquire, Nathan B. Ploener, Esquire and Robert J. Shaughnessy, Esquire of RICHARDS, LAYTON & FINGER, Wilmington, Delaware, Attorneys for Defendants.

**JUDGES:**

Before BERGER, Vice Chancellor

**OPINIONBY:**

BERGER

**OPINION:**

MEMORANDUM OPINION

BERGER, Vice Chancellor

This is the decision on a motion to dismiss a purported class action challenging the merger of Lynch Communications Systems, Inc. ("Lynch"), with a subsidiary of Alcatel USA Corp. ("Alcatel"). The remaining individual defendants n1, who are directors of Lynch, and the corporate defendants Lynch, Alcatel, Alcatel, S.A. and Compagnie Generale d'Electricite ("CGE"), seek dismissal on the ground that plaintiff's exclusive remedy is appraisal under *8 Del. C. § 262*. Alcatel is a subsidiary of Alcatel, S.A., a French corporation which in turn is a subsidiary of CGE, also a French [*2] corporation. Alcatel, S.A. and CGE seek dismissal on the alternative ground that this Court lacks personal jurisdiction over them.

n1 Three Lynch directors who served on the independent committee had been named as defendants but the claims against them were dismissed without prejudice by stipulation of the parties after those directors had briefed and argued their motion to dismiss.

The facts, as alleged in the Amended Complaint (hereafter the "complaint"), may be summarized as follows. Lynch is a Delaware corporation engaged in the business of designing, manufacturing and selling telecommunications equipment to telephone operating companies. At all relevant times, Alcatel owned slightly more than 3 million shares, or approximately 43% of Lynch's outstanding stock. All of Lynch's directors are allegedly either officers of Lynch or nominees or employees of Alcatel or its affiliates.

On August 1, 1986, at a Lynch board of directors meeting, Alcatel allegedly recommended that the board

1989 Del. Ch. LEXIS 102, *

spend $ 500,000 to study a possible business combination between Lynch and Celwave Systems, Inc. ("Celwave"), another wholly-owned subsidiary of CGE. On October 24, 1986, apparently after the study [*3] had been completed, Alcatel proposed a consolidation whereby Lynch's stockholders would become stockholders of a combined Lynch/Celwave entity. n2 That proposal, according to plaintiff, was unfair to Lynch and a counter-proposal was presented based upon a Lynch per share value of $ 15.88 to $ 17.50. Upon receipt of the counter-offer, Alcatel allegedly terminated negotiations on the proposed consolidation.

> n2 At some time, not identified in the complaint, Alcatel appointed the chief executive officer of Celwave to the Lynch board of directors and to the executive and compensation committees of the board. Plaintiff alleges that, as a result of this change on the Lynch board, Alcatel was in a position to "punish by reducing compensation, any acts of disloyalty to Alcatel undertaken by the Company's management." Amended Complaint, para. 7.

In November, 1986, defendants allegedly initiated a "series of proposals" that culminated in a tender offer and cash-out merger both at $ 15.50 per share. Plaintiff claims that Alcatel and CGE breached their fiduciary duties by causing the merger at an unfair price and for an improper purpose -- to acquire for themselves the benefit of a Lynch/Celwave [*4] consolidation. Plaintiff also alleges that the individual defendants breached their fiduciary duty by appointing an independent committee to respond to the merger proposal when, according to plaintiff, the director defendants should have resisted the merger and refused to establish a negotiating committee.

As noted at the outset, defendants maintain that the only claim stated in the complaint is one for unfair price and that plaintiff's only remedy is appraisal. At oral argument, counsel for plaintiff agreed that, if there had been no consolidation proposal and the complaint simply attacked the adequacy of the merger price in light of the company's recent growth and future prospects, appraisal would be plaintiff's sole remedy. The difference here, according to plaintiff, is that the public stockholders of Lynch were "offered" the opportunity to consolidate with Celwave and then deprived of that opportunity by the subsequent merger, which was controlled by Alcatel. Trans., p. 50. Plaintiff's theory was summarized as follows:

> We are saying that the Lynch-Celwave consolidation study, which we paid for, showed that there was wonderful opportunities here and that we are being deprived [*5] of those opportunities by the parent corporation,

who had determined that it was not going to use the Delaware procedure that it first invoked because it wasn't getting the results that it wanted to achieve.

> And that is our complaint. And it is different, I believe, from the usual complaint, that this is simply--we should continue with Lynch. And I do believe that it states a breach of fiduciary duty and that we would be entitled to damages based upon the lost opportunity and not on the value of Lynch at the time of the merger. And that's why I say it is taken out of the appraisal statute.

Id. at 51.

Plaintiff argues that this case is similar to *Rabkin v. Philip A. Hunt Chemical Corp., Del. Supr., 498 A.2d 1099 (1985)*, where the Delaware Supreme Court found that the plaintiffs had "[averred] specific acts of unfair dealing constituting breaches of fiduciary duties which if true may have substantially affected the offering price." *Id. at 1100*. In Rabkin, plaintiffs challenged a cash-out merger that was effected by the majority stockholder shortly after the expiration of its one year contractual obligation to pay $ 25 per share to acquire the publicly held stock. The [*6] alleged manipulation of the timing of the merger in order to avoid the contractual price commitment was found to state an entire fairness claim, as articulated in *Weinberger v. UOP, Inc., Del. Supr., 457 A.2d 701 (1983)*.

Here, according to plaintiff, Alcatel unfairly altered the structure of the transaction in order to avoid having to share with the public stockholders of Lynch the benefits of a Lynch/Celwave combination. In plaintiff's view, the Lynch/Celwave consolidation was in the nature of a corporate opportunity that Lynch was interested in pursuing. As I understand plaintiff's argument, Alcatel was under no obligation to propose the consolidation. However, having done so (after using Lynch's funds to study the matter) plaintiff says that Alcatel was obligated either to consummate a consolidation on fair terms or to refrain from taking the benefits of a consolidation for itself.

I cannot endorse any general statement that a controlling stockholder, having proposed one form of business combination, is precluded from proposing another type of transaction that is arguably less favorable to the minority stockholders. However, I need not adopt such a proposition in order to sustain [*7] plaintiff's complaint. The allegations, and the inferences that may be fairly drawn from them, suggest that Alcatel used Lynch's assets (the $ 500,000 spent on the Celwave study) for its own benefit and then, in order to reap the full advantage of a Lynch/Celwave combination, Alcatel manipulated the form of merger and failed to compensate the Lynch public stockholders either for the anticipated benefits of a Celwave combination or for the $ 500,000 Lynch had

spent studying the proposal. In the words of our Supreme Court, these [HN1] allegations "import a form of over-reaching, and in the context of entire fairness they deserve more considered analysis than can be accorded them on a motion to dismiss." *Rabkin, 498 A.2d at 1107.*

The remaining issue is whether CGE and Alcatel, S.A. are subject to personal jurisdiction in this Court. The complaint identifies both as French companies and there are no allegations that either company is authorized to do business in Delaware or, in fact, transacts business in this state. Nonetheless, plaintiff argues that the Delaware long-arm statute confers personal jurisdiction over these two companies and that the exercise of jurisdiction does not violate [*8] the defendant companies' due process rights.

[HN2] The first step in analyzing questions of personal jurisdiction is to determine whether the long arm statute purports to authorize the exercise of jurisdiction. Starting with the premise that the statute is to be construed as broadly as possible consistent with constitutional limitations, plaintiff contends that Alcatel, S.A. and CGE transacted business in Delaware, within the meaning of *10 Del. C. § 3104(c)(1),* when they caused Alcatel to merge with Lynch. Alternatively, plaintiff argues that the two French companies caused tortious injury in Delaware, within the meaning of § 3104(c)(3), because they caused the merger to take place, which allegedly injured plaintiff's stock interest in Lynch. Since the situs of the ownership of stock in Delaware corporations is deemed to be Delaware, see *8 Del. C. § 169,* plaintiff argues that the injury to that stock occurred in Delaware.

I find that the complaint does not adequately allege a prima facie basis on which to confer jurisdiction over CGE, but that it does with respect to Alcatel, S.A. Turning first to CGE, the only direct action allegedly undertaken by CGE was its notification [*9] to Lynch that it intended to propose a business combination between Lynch and Celwave. Alcatel, S.A. or its subsidiary apparently made the consolidation proposal, began the negotiations over the consolidation and then withdrew from those negotiations. The merger allegedly was "designed to place absolute control over the Company in the hands of Alcatel. . . ." Amended Complaint, para. 8. Reading the complaint as a whole, the only real link between CGE and the alleged wrong is its ownership of Alcatel, S.A. There is no allegation that Alcatel, S.A. is a mere agent or instrumentality of CGE and there is nothing in the complaint to suggest that the separate existence of the two French companies should be disregarded. Accordingly, even construing § 3104(c)(1) broadly, I cannot find that CGE, directly or through an agent, transacted any business in Delaware based upon the allegations in this complaint. Cf. *Dentsply Int'l, Inc. v. Pentron Corp.,*

*648 F. Supp. 856 (D. Del. 1986); Waters v. Deutz Corp., Del. Super., 460 A.2d 1332 (1983),* aff'd, *Del. Supr., 479 A.2d 273 (1984).*

Plaintiff's argument that CGE is subject to service under § 3104(c)(3), likewise, is unavailing. There [*10] is no allegation that CGE performed any act in Delaware that caused tortious injury in this State. Either Alcatel or Alcatel, S.A. took the formal steps necessary to accomplish the merger and, for the same reasons that applied to § 3104(c)(1), the actions of Alcatel or its parent cannot be imputed to CGE.

Alcatel, S.A. is in a different situation. Based upon the allegations in the complaint and the Offer to Purchase n3, Alcatel, S.A. was directly involved in the allegedly wrongful conduct that resulted in the merger. Alcatel, S.A. made the original consolidation proposal to the Lynch independent committee; Alcatel, S.A. made the decision to abandon the Celwave consolidation proposal; and Alcatel, S.A.'s representative negotiated the merger price. Other facts support this conclusion. Alcatel, S.A., not Alcatel, designated the five Alcatel directors on the Lynch board and Alcatel, a wholly-owned subsidiary of Alcatel, S.A., is a holding company. These facts and allegations are sufficient to establish that Alcatel, S.A. directly, or through its subsidiary, transacted business in Delaware by negotiating and consummating the merger at issue. Since [HN3] a single transaction is sufficient to [*11] confer jurisdiction where the claim is based on that transaction, *LaNuova D & B, S.p.A. v. Bowe Co., Inc., Del. Supr., 513 A.2d 764, 768 (1986),* I find that plaintiff has satisfied the requirements of § 3104(c)(1) with respect to Alcatel, S.A.

n3 The Offer to Purchase, dated November 26, 1986, was disseminated in connection with the tender offer that preceded the merger.

The remaining question is whether, by subjecting Alcatel, S.A. to jurisdiction in this Court, its constitutional rights to due process will be violated. In deciding this issue, the Court must determine whether Alcatel, S.A. has [HN4] "certain minimum contacts with [Delaware] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945),* quoting *Milliken v. Meyer, 311 U.S. 457, 463 (1940).* The Court must focus on the relationship between the defendants, the litigation and the forum. *Shaffer v. Heitner, 433 U.S. 186 (1977).*

Our Supreme Court recently held that these constitutional standards had been satisfied in a case where a foreign corporation was being sued in connection with alleged wrongdoing [*12] by its wholly-owned Delaware

subsidiary. See *Sternberg v. O'Neil, Del. Supr., 550 A.2d 1105 (1988).* Plaintiff in Sternberg brought a double derivative action alleging that the directors of both the parent and subsidiary had damaged the subsidiary in connection with its ability to obtain certain television and radio station licenses. Our Supreme Court held that the exercise of jurisdiction over the parent company was constitutionally permissible. The Court noted that in an earlier case, *Papendick v. Bosch, Del. Supr., 410 A.2d 148 (1979),* cert. denied, *446 U.S. 909 (1980),* [HN5] "[t]he decision of the foreign parent corporation to maintain a direct and continuing connection between Delaware and itself, as the owner of a Delaware subsidiary, was found to be a 'minimum contact' of paramount importance in the specific jurisdictional analysis. . . ." *Sternberg v. O'Neil, 550 A.2d at 1120.* The Court in Sternberg reaffirmed its holding in Papendick, stating that "a foreign corporation cannot use the laws of this State to govern the operations of its subsidiary and then, in a suit relating to the operation of the subsidiary, claim that jurisdiction in Delaware offends [*13] traditional notions of fair play." *Id. at 1121.* The fact that in Sternberg the parent did not form the subsidiary, but acquired it, was found to have no bearing on the Papendick analysis.

Applying the Sternberg analysis to the facts of this case, I conclude that the exercise of jurisdiction over Alcatel, S.A. satisfies due process. Alcatel, S.A. has purposely availed itself of the laws of the State of Delaware by creating Alcatel, a Delaware subsidiary, as a holding company. Plaintiff's claim attacking a merger between Alcatel and Lynch arises out of Alcatel, S.A.'s operation of its subsidiary. Thus, Alcatel, S.A. should reasonably expect to be brought before a court in Delaware to defend plaintiff's claim.

# CASE 10



Not Reported in A.2d
Not Reported in A.2d, 2004 WL 249581 (Del.Super.)
**(Cite as: 2004 WL 249581 (Del.Super.))**

C

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
MARKETING PRODUCTS MANAGEMENT, LLC
and Chris Lundin, Plaintiffs,
v.
HEALTHANDBEAUTYDIRECT.COM, INC., f/k/a
Health and Beauty Direct, Inc., and
Brian Fraidin, Defendants.
**No. 02C-04-256 CLS.**

Submitted Sept. 3, 2003.
Decided Jan. 28, 2004.

On Defendants' Motion to Dismiss Brian Fraidin on
Jurisdictional Grounds.  Granted.

Dennis B. Phifer, Dennis Bruce Phifer, P.A.,
Wilmington, Delaware;  Francis G.X. Pileggi, and
Sheldon K. Rennie, Fox Rothschild LLP,
Wilmington, Delaware, for Plaintiffs.

Philip Trainer, Jr., and Carolyn S. Hake, Ashby &
Geddes, Wilmington, Delaware; William C. Davis,
III, Shulman Rogers Gandal Porty & Ecker, P.A.,
Rockville, Maryland, for Defendants.

*MEMORANDUM OPINION*

SCOTT, J.

I. INTRODUCTION

**\*1** Defendant Brian Fraidin ("Fraidin") has filed a
Motion to Dismiss on Jurisdictional Grounds. Upon
consideration of the briefs submitted by the parties,
this court concludes Fraidin's motion should be
GRANTED.

II. BACKGROUND

This action arises from the alleged breach of a
contract between plaintiff Marketing Products
Management, Inc. ("MPM") and defendant
HealthandBeautyDirect.com, Inc. ("HBD"). MPM
disputes the calculation of the profit participation
under the contract upon which payments to MPM are
made. MPM also alleges fraudulent inducement of
the contract. The Second Amended Complaint added
Fraidin as a defendant, alleging he, individually and
through HBD, fraudulently induced MPM to enter
into the contract and fraudulently breached the
contract. Currently before the court is Fraidin's
Motion to Dismiss on Jurisdictional Grounds.

III. STANDARD OF REVIEW

Once a defendant challenges personal jurisdiction,
the plaintiff bears the burden of establishing a *prima
facie* case that the court has personal jurisdiction over
the defendant. [FN1] All factual inferences must be
viewed in a light most favorable to plaintiffs [FN2]
and all allegations of jurisdictional fact are presumed
to be true. [FN3] Delaware's Long Arm Statute is to
be construed to the maximum extent possible,
consistent with due process. [FN4] "Failure to make
an adequate evidentiary showing of facts sufficient to
satisfy the requirements of either component of the
personal jurisdiction test [is] fatal to plaintiffs'
defense of [a] motion [to dismiss for lack of personal
jurisdiction]. [FN5]

> FN1. *Wright v. American Home Products
> Corp.,* 768 A.2d 518, 526 (Del.Super.2000).

> FN2. *Id.*

> FN3. *Jeffreys v. Exten,* 784 F.Supp. 146, 151
> (D.Del.1992) (internal citation omitted).

> FN4. *Id.*

> FN5. *Newspan, Inc. v. Hearthstone Funding
> Corp.,* 1994 WL 198721 at \*4 (Del.Ch.)

IV. DISCUSSION

Fraidin states he is merely a stockholder and officer
and/or director of HBD. He has no other contacts
with the state of Delaware and the allegations in the
complaint do not relate to his status as officer or
director. He argues, therefore, this court has no
personal jurisdiction over him.

MPM counters that jurisdiction in Delaware is
proper over Fraidin under several theories. First, as a
director of HBD, Fraidin is subject to jurisdiction

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 249581 (Del.Super.)
(Cite as: 2004 WL 249581 (Del.Super.))

Page 2

under 10 Del. C. § 3114. Second, the act of incorporating HBD in Delaware constitutes a transaction sufficient to satisfy 10 Del. C. § 3104(c). Third, that HBD and other entities [FN6] were incorporated in Delaware, thereafter operated as part of a conspiracy to defraud MPM, and this conspiracy is a sufficient ground for asserting personal jurisdiction over Fraidin. Fourth, MPM alleges HBD is the mere alter ego of Fraidin and jurisdiction is proper by "piercing the corporate veil." Fifth, MPM attacks the fiduciary shield doctrine which otherwise would insulate Fraidin from being sued in Delaware where his sole contacts with Delaware have been on behalf of HBD.

> FN6. Plaintiffs are seeking to add these other entities as defendants in a Third Amended Complaint. That Motion to File a Third Amended Complaint remains pending before this court.

A. Jurisdiction under 10 Del. C. § 3114.

Section 3114 requires that, in order to obtain jurisdiction over corporate directors, the suit must concern acts performed in their directorial capacities. [FN7]

> FN7. Armstrong v. Pomerance, 423 A.2d 174, 175 (Del.1980).

The court finds in the case at bar, the allegedly fraudulent actions involved Fraidin acting as an individual and not in his directorial capacity. The allegedly fraudulent actions, therefore, are not related to his status as a director of HBD. Therefore, personal jurisdiction is improper under 10 Del. C. § 3114.

B. Jurisdiction under 10 Del. C. § 3104.

*2 Section 3104 provides personal jurisdiction in Delaware courts over nonresidents based on acts performed within the state. The analysis of whether jurisdiction is proper under § 3104 requires a two-part analysis. First, does § 3104 authorize service? Second, if service is authorized, are constitutional due process requirements satisfied? [FN8] These two tests are independent. [FN9] There must first be an analysis of whether service is authorized under § 3104 and then a due process analysis. [FN10]

> FN8. Wright, 768 A.2d at 527.

> FN9. Id.

> FN10. Id.

1. Whether service is authorized.

It is clear that mere ownership of stock in a Delaware corporation is insufficient to establish jurisdiction over a majority or sole shareholder. [FN11] The act of incorporation may constitute a transaction sufficient for the purposes of satisfying § 3104(c)(1). [FN12] The act of incorporation is sufficient to confer personal jurisdiction, however, only if the claims at issue are related to the act of incorporation [FN13] or are based upon Delaware corporate law. [FN14]

> FN11. Shaffer v. Heitner, 433 U.S. 186, 212, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).

> FN12. Papendick v. Bosch, 410 A.2d 148, 152 (Del.1979).

> FN13. Id.

> FN14. Outokumpu Engineering Enterprises. Inc. v. Kvaerner Enviropower, Inc., 685 A.2d 724, 728 (Del.Super.1996).

The court finds that HBD was incorporated in 1999. The contract under which MPM is suing was formed in 2001. The court finds no basis to support the contention HBD was incorporated with the intent to defraud MPM since it was formed nearly two years prior to the formation of the contract at issue. The court concludes there is no basis to authorize service upon Fraidin under § 3104.

2. Whether due process is violated.

Assuming arguendo that service was proper under § 3104 (based on the act of incorporation constituting a sufficient act to authorize service), MPM would still have to establish that the exercise of personal jurisdiction over Fraidin by this court would not offend "traditional notions of fair play and substantial justice." [FN15] MPM must show that Fraidin had such minimum contacts with Delaware that he can be shown to have "purposely availed" himself of the privilege of conducting activities in Delaware and reasonably should have anticipated being haled into a Delaware court. [FN16]

> FN15. Sternberg v. O'Neil, 550 A.2d 1105, 1109 (Del.1987) (internal citation omitted).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 249581 (Del.Super.)
(Cite as: 2004 WL 249581 (Del.Super.))

Page 3

FN16. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980).

The court finds there are insufficient contacts with Delaware by Fraidin to satisfy this requirement. The contract at issue was formed in Massachusetts, Fraidin lives in Maryland, HBD has its primary place of business in Maryland, and none of the allegedly fraudulent activity took place within Delaware. The court concludes Fraidin's due process rights would be violated by an assertion of personal jurisdiction over him by this court. The court thus finds MPM has met neither test under § 3104, and concludes there is no basis for asserting personal jurisdiction over Fraidin under 10 Del. C. § 3104.

C. Jurisdiction under a conspiracy theory.

Civil conspiracy can be a ground for asserting personal jurisdiction over a defendant who otherwise is not amenable to suit under § 3104. [FN17] In order to establish jurisdiction, the plaintiff must show that: (1) a conspiracy existed, (2) the defendant was a member of that conspiracy, (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state, (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state, and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy. [FN18] Delaware courts have consistently held that this five-part test is a strict one with a narrow scope. [FN19] Plaintiffs must assert specific factual evidence to show that the nonresident defendant was a conspirator and that a substantial wrongful act in furtherance of the conspiracy took place in Delaware in order to establish jurisdiction. [FN20]

FN17. *Instituto Bancario Italiano SpA v. Hunter Eng'g Co., Inc.,* 449 A.2d 210, 225 (Del.1982).

FN18. *Id.*

FN19. *Id., see also Hercules, Inc. v. Leu Trust & Banking (Bahamas) Ltd.,* 611 A.2d 476, 482 n. 6 (Del.1992); *HMG/Courtland Props. Inc. v. Gray,* 729 A.2d 300, 307 (Del.Ch.1999); *Computer People, Inc. v. Best Int'l Group, Inc.,* 1999 WL 28819 at *5 (Del. Ch.).

FN20. *Computer People,* 1999 WL 28819 at *7.

*3 While MPM alleges the incorporation of HBD was a sufficient "substantial act" in furtherance of a conspiracy, the court holds otherwise. For the same reasons the act of incorporation is not sufficient to establish jurisdiction under 10 Del. C. § 3104, [FN21] the act of incorporation of HBD is insufficient to be a "substantial act" in furtherance of a conspiracy. Having found no substantial act in furtherance of a conspiracy occurred in Delaware, the court finds no basis for establishing personal jurisdiction over Fraidin under a conspiracy theory.

FN21. See discussion at B, *supra.*

D. HBD as Fraidin's alter ego.

The alter ego theory of jurisdiction is based on the premise that the contacts of a Delaware entity may be attributed to another person or entity if the Delaware entity is the mere alter ego of such other person or entity. [FN22] This theory permits courts to ignore corporate boundaries where fraud or inequity in the use of the corporate form is found. [FN23] This is generally termed "piercing the corporate veil."

FN22. *Fitzgerald v. Cantor,* 1998 WL 842316 at *2 (Del.Ch.); *Sears, Roebuck & Co. v. Sears plc,* 744 F.Supp. 1297, 1304 (D.Del.1990); *Mobil Oil Corp. v. Linear Films, Inc.,* 718 F.Supp. 260, 266 (D.Del.1989).

FN23. *Id.*

This court finds it cannot establish jurisdiction over Fraidin under an alter ego theory because this court lacks jurisdiction to "pierce the corporate veil." [FN24] As an equitable remedy, Delaware Court of Chancery has sole jurisdiction over actions to "pierce the corporate veil." [FN25]

FN24. *John Julian Constr. Co. v. Monarch Builders, Inc.,* 324 A.2d 208, 210 n. 1 (Del.1974); *Sonne v. Sacks,* 314 A.2d 194, 197 (Del.1973).

FN25. *Id.*

Even if this court had jurisdiction to "pierce the corporate veil," the court finds the record shows HBD is a legitimate business and not merely the alter ego of Fraidin. The court, therefore, cannot assert personal jurisdiction over Fraidin under an alter ego theory.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 249581 (Del.Super.)
**(Cite as: 2004 WL 249581 (Del.Super.))**

E. Fiduciary shield doctrine.

The fiduciary shield doctrine prohibits acts performed by an individual, in his capacity as a corporate officer or employee, from serving as the basis for personal jurisdiction over that individual. [FN26] The "underpinning of this fiduciary shield doctrine is the notion that it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer." [FN27] There is an exception to the doctrine when the corporation is a mere shell for its owner. [FN28] The court in *Plummer* noted the standard for finding the corporation was a "mere shell" was more liberal than "normally applied in other contexts for piercing the corporate veil ." [FN29] However, the court in *Plummer* also noted the fiduciary shield doctrine was an *equitable* doctrine. [FN30]

> FN26. *Tristrata Technology, Inc. v. Neoteric Cosmetics, Inc., 961 F.Supp. 686, 690 (D.Del.1997).*

> FN27. *Plummer & Co. Realtors v. Crisafi, 533 A.2d 1242, 1246 (Del.Super.1987)* (internal citation omitted).

> FN28. *Id.*

> FN29. *Id.* at 1247.

> FN30. *Id.* at 1246 (emphasis supplied).

This court finds, under the facts in the case at bar, that finding an exception to the fiduciary shield doctrine is indistinguishable from "piercing the corporate veil." Therefore, as discussed above in part D, this court does not have jurisdiction to find an exception to the fiduciary shield doctrine, as Delaware Court of Chancery has sole jurisdiction over equitable doctrines. The court finds, as well, that HBD is a legitimate business and, as noted in part D, not the mere alter ego of Fraidin. This court, therefore, does not have jurisdiction over Fraidin under an exception to the fiduciary shield doctrine.

V. CONCLUSION

**\*4** For the above reasons, this court finds it cannot exercise personal jurisdiction over defendant Brian Fraidin. Therefore, Fraidin's Motion to Dismiss is GRANTED.

Not Reported in A.2d, 2004 WL 249581 (Del.Super.)

END OF DOCUMENT

# CASE 11

LEXSEE 1999 DEL. CH. LEXIS 161

**RJ ASSOCIATES, INC., Plaintiff, v. HEALTH PAYORS' ORGANIZATION LIMITED PARTNERSHIP, HPA, INC., and MIDWEST MEDICAL PREFERRED PROVIDES, INC., Defendants.**

**C.A. No. 16873**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*1999 Del. Ch. LEXIS 161*

**March 15, 1999, Date Submitted**
**July 16, 1999, Date Decided**

**SUBSEQUENT HISTORY:** [*1] Released for Publication by the Court August 27, 1999.

**DISPOSITION:**

Defendants' motions to dismiss denied, except that their Rule 12(b)(6) motion granted with respect to RJA's claim that this Court compel the production of HPA, MMPP, and the Partnership's books and records.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, a limited and general partner of a limited partnership, moved to dismiss plaintiff's complaint against them alleging breach of contract, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty, accounting, and civil conspiracy. Defendants claimed court did not have jurisdiction, plaintiff failed to join an indispensable party, and plaintiff was not be entitled to relief under any set of facts.

**OVERVIEW:** Plaintiff, member of a limited partnership, alleged defendant, other limited partner, controlled defendant general partner and that they acted together to breach contractual and fiduciary duties to plaintiff. Defendants moved to dismiss. Court denied defendants' Del. Chancery Ct. R. 12(b)(2) motion, concluding it had jurisdiction. Defendant general partner, by accepting its position, consented to court's jurisdiction and plaintiff's claims related directly to its actions as general partner. In addition, jurisdiction existed over defendant limited partner under Delaware long arm statute, Del. Code Ann. tit. 10 § 31004(c), where plaintiff alleged this defendant transacted business in Delaware from which its claims arose. Motion to dismiss under Rule 19 was denied because party that defendants claimed was necessary and indispensable did not fall within definition, and even if it had, its interests would have been adequately protected. Lastly, when viewed in light of the well-pleaded facts, all of plaintiff's claims would entitle it to relief, except its request for access to partnership books and records. With that one exception, defendants' Rule 12(b)(6) motion denied.

**OUTCOME:** Motion to dismiss plaintiff's complaint granted only on limited issue of plaintiff's request for access to partnership books and records; in all other respects it was denied. Court had jurisdiction over both defendants and party that defendants claimed to be necessary and indispensable did not meet Del. Chancery Ct. R. 19 definition. In addition, in light of the well-pleaded facts, plaintiff's claims would entitle it to relief.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Challenges*
[HN1] To overcome a challenge to personal jurisdiction, the plaintiff must establish, prima facie, that a court has personal jurisdiction over the objecting defendant.

*Business & Corporate Law > Limited Partnerships > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN2] By accepting the position of general partner, a corporation consents to be subjected to a Delaware court's jurisdiction if the limited partnership has chosen to incorporate under Delaware law a matter of law.

1999 Del. Ch. LEXIS 161, *

*Business & Corporate Law > General Partnerships > General Overview*
*Business & Corporate Law > Limited Partnerships > General Overview*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > Service Upon Agents*
[HN3] A general partner is properly served with process, if, under the Delaware Revised Uniform Limited Partnership Act, *Del. Code Ann. tit. 6 § 17-109(b)*, service of process is effected by serving the registered agent.

*Business & Corporate Law > Limited Partnerships > Management Duties & Liabilities*
*Civil Procedure > Pleading & Practice > Service of Process > General Overview*
[HN4] The Delaware Revised Uniform Limited Partnership Act, *Del. Code Ann. tit. 6 § 17-109(a)*, states that a general partner of a limited partnership may be served with process in the manner prescribed in this section in all civil actions or proceedings brought in the State of Delaware involving or relating to the business of the limited partnership or a violation by the general partner of a duty to the limited partnership, or any partner of the limited partnership, whether or not the general partner is a general partner at the time the suit is commenced.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Long-Arm Jurisdiction*
[HN5] Delaware's general long arm statute, *Del. Code Ann. tit. 10 § 3104*, requires a two-part analysis: (i) whether § 3104 applies in the specific circumstances; and (ii) if so, whether a Delaware court's exercise of jurisdiction over the defendant satisfies constitutional due process requirements.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Challenges*
[HN6] Where in personam jurisdiction is challenged on a motion to dismiss, the record is construed most strongly against the moving party.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > Statutory Sources*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*

[HN7] *Del. Code Ann. tit. 10 § 3104(c)(1)* authorizes the exercise of jurisdiction over a nonresident who in person or through an agent transacts any business or performs any character of work or service in Delaware.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN8] Under the Delaware long arm statute, *Del. Code Ann. tit. 10 § 3104*, the plaintiff's cause of action must have a nexus with the forum-related contact; that is the claim must arise from at least one act that legally constitutes the transacting of business in Delaware.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
[HN9] Before a court may assert jurisdiction over a non-domiciliary defendant based upon implied consent, the defendant must have certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN10] A defendant has created continuing obligations between itself and Delaware if it could reasonably expect to be haled before a Delaware court.

*Civil Procedure > Parties > Joinder > Necessary Parties*
[HN11] Del Chancery Ct. R. 19(a) pertinently states that it is "necessary" for a person to be joined where (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims and interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the claimed interest.

*Civil Procedure > Parties > Joinder > Necessary Parties*
[HN12] Under Del. Chancery Ct. R. 19(a), to qualify as "necessary," a party should have not only an interest in some part of the controversy but the interest must be such that a final decree cannot be made which will nei-

ther touch upon that party's interest nor leave the controversy in such a state that the final determination would be inconsistent with equity and good conscience.

*Civil Procedure > Parties > Joinder > Necessary Parties*
[HN13] Del. Chancery Ct. R. 19(a) requires that if a necessary party cannot feasibly be joined, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable.

*Civil Procedure > Parties > Joinder > Necessary Parties*
[HN14] In making a determination that an action should be dismissed because of infeasibility of joining a necessary party under Del. Chancery Ct. R. 19(a), a court must consider four factors: (i) the extent of prejudice to absent and existing parties, (ii) the possibility of shaping a judgment as to mitigate such prejudice, (iii) whether the remedy given without the party will be adequate or will instead create more lawsuits by parties involved in the same transaction or occurrence, and (iv) whether the plaintiff has available an alternative forum to hear and adjudicate the claim. These pragmatic considerations, are to be governed by practicality and flexibility rather than by idealistic and mechanical standards bottomed upon allegedly inseparable substantive rights.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN15] When deciding a motion under Del. Chancery Ct. R. 12(b)(6), a court must consider as true the well-pleaded facts in the complaint, and must view all inferences in the light most favorable to the plaintiff.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN16] A complaint will be dismissed under Del. Chancery Ct. R. 12(b)(6) only where it appears with reasonable certainty that the plaintiff would not be entitled to relief under any set of facts.

*Business & Corporate Law > Limited Partnerships > Formation*
*Business & Corporate Law > Limited Partnerships > Management Duties & Liabilities*
*Contracts Law > Types of Contracts > Partnership Agreements*

[HN17] A Delaware court may properly adjudicate a claim that a distribution payment methodology currently utilized by defendants is improper under the partnership agreement and is causing ongoing financial harm to plaintiff and in that context, declare the rights and obligations of parties to a Delaware limited partnership agreement.

*Business & Corporate Law > General Partnerships > Management Duties & Liabilities > Causes of Action > Partnership Liabilities*
*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
*Contracts Law > Types of Contracts > Covenants*
[HN18] A complaint's allegations that the defendants failed to adhere in good faith to the contractual obligations set forth in a partnership agreement, and failed to deal fairly with plaintiff, are sufficient to state a claim for breach of the implied covenant of good faith and fair dealing.

*Business & Corporate Law > General Partnerships > Management Duties & Liabilities > Causes of Action > Derivative Actions*
*Contracts Law > Contract Interpretation > Fiduciary Responsibilities*
*Governments > Fiduciary Responsibilities*
[HN19] Conduct by an entity that occupies a fiduciary position may form the basis of both a contract and a breach of fiduciary duty claim.

*Business & Corporate Law > General Partnerships > General Overview*
*Business & Corporate Law > Limited Partnerships > General Overview*
[HN20] In any case not provided for in this chapter the Delaware Uniform Partnership Law and the rules of law and equity shall govern. The Delaware Revised Uniform Limited Partnership Act, *Del. Code Ann. tit. 6 § 17-1105.*

*Business & Corporate Law > Limited Partnerships > Management Duties & Liabilities*
*Governments > Fiduciary Responsibilities*
*Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview*
[HN21] Because the Delaware Revised Uniform Limited Partnership Act contains no provision governing the accountability of limited partners for breaches of fiduciary duty, Delaware courts must look to the Delaware Uniform Partnership Law to determine what fiduciary duties

maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" n15 The specific inquiry here is [HN10] whether MMPP has created continuing obligations between itself and Delaware such that it could reasonably expect to be haled before a Delaware court. n16 That question must be answered in the affirmative.

n15 *326 U.S. at 316;* accord, *Sternberg v. O'Neil, Del. Supr., 550 A.2d 1105, 1118 (1998).*
[*19]

n16 *Shaffer, 433 U.S. 186, 216, 97 S. Ct. 2569, 53 L. Ed. 2d 683;* Sternberg, *550 A.2d at 1120* (recognizing that minimum contacts are established when a defendant has deliberately created a continuing obligation between itself and Delaware); *In re USA Cafes, L.P. Litig., Del. Ch., 600 A.2d 43, 50-51 (1991)* (asking "whether its should have been reasonably anticipated by [defendant] that his or her actions might result in the forum state asserting personal jurisdiction over him in order to adjudicate disputes arising from those actions.").

The record shows that MMPP has several Delaware contacts. To be specific, (a) it took an active role in establishing the Delaware Partnership; n17 (b) MMPP owns a 50 percent interest in HPA, the Partnership's General Partner, and appoints four of HPA's seven Board members; (c) MMPP receives 49.5% of the Cash Flow distributions from the Partnership, and it benefits directly from Delaware law through the operation of the Partnership's provider network; (d) MMPP (allegedly) controls HPA and, thereby controls the Partnership's management; (e) [*20] MMPP allegedly caused the Partnership Agreement to be amended under Delaware law to change the agreed-upon Cash Flow distribution payments to the limited partners; and (g) MMPP agreed to a Delaware choice of law provision in the Partnership Agreement. n18 These contacts are sufficient, in my view, to establish that MMPP should reasonably have anticipated being haled into a Delaware court. n19

n17 See *USA Cafes, 600 A.2d at 51* ("The creation of a legal entity creates a forum state public interest in the governance of that entity.").

n18 See *Haisfield, 1994 Del. Ch. LEXIS 155, *15* ("A choice of law clause, although insufficient standing alone to confer personal jurisdiction, 'reinforces [the defendant's] deliberate af-

filiation with the forum State and the reasonable foreseeability of possible litigation there.'") (quoting *Burger King v. Rudzewicz, 471 U.S. 462, 482, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985)).*

n19 See *World-Wide Volkswagen v. Woodson, 444 U.S. 286, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980)* (finding that defendant should have reasonably "anticipated being haled in to court" in the forum state).

[*21]

Subjecting MMPP to personal jurisdiction in Delaware is also "reasonable" because it comports with "traditional notions of fair play." The burden imposed upon MMPP to litigate in Delaware (particularly, for example, its travel costs and the cost of hiring local counsel) would not be significantly greater than they would be if MMPP litigated elsewhere. n20 Because the International Shoe criteria are satisfied, this Court is constitutionally empowered to exercise personal jurisdiction over MMPP in this case. n21

n20 *326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95.*

n21 The defendants also argue that this action should be dismissed on the basis of forum non conveniens. In considering a motion to dismiss on forum non conveniens grounds, this Court must weigh the six factors enumerated in *General Foods Corp. v. Cryo--Maid, Inc. ("Cryo-Maid"), Del. Supr., 41 Del. Ch. 474, 198 A.2d 681 (1964),* overruled in part on other grounds sub nom. *Pepsico, Inc. v. Pepsi-Cola Bottling Co., Del. Supr., 261 A.2d 520 (1969).* The key issue is, "whether any or all of the Cryo-Maid factors establish that defendant will suffer overwhelming hardship and inconvenience if forced to litigate in Delaware. Absent such a showing, plaintiff's choice of forum must be respected." *Chrysler First Business Credit Corp. v. 1500 Locust Ltd. Partnership, Del. Supr., 669 A.2d 104 (1995).*

The defendants have failed to establish that they would be subjected to overwhelming hardship and inconvenience if required to litigate in Delaware. A bare claim of inconvenience is an insufficient basis for dismissal absent a particularized showing of hardship. *Taylor v. LSI Logic, Del. Supr., 689 A.2d 1196, 1199 (1997); In re Will of Mansfield, 1990 Del. Ch. LEXIS 175, *22,* Del. Ch. C.A. No. 11340, Chandler, V.C. (Oct. 12, 1990). An analysis of the Cryo-Maid factors

also confirms that dismissal is not appropriate. First, Delaware law is applicable to this case. Section 11.4 of the Partnership Agreement expressly and unequivocally provides that the agreement and the rights of the parties thereunder are governed by Delaware law; moreover, the plaintiff's breach of fiduciary duty claims arise from the defendants' actions in their capacity as partners in a Delaware limited partnership and, thus, are governed by Delaware law. See *Hurst v. General Dynamics Corp., Del Ch., 583 A.2d 1334, 1339 (1990).*

Second, although none of the potential witnesses or relevant documents is located in Delaware, that is not dispositive because no showing is made that transporting witnesses or documents to Delaware would subject defendants or any potential witnesses to overwhelming hardship or inconvenience. Given the relative speed and efficiency of modern travel, Wilmington is easily accessible from either Ohio or Washington D.C., the locations from which the relevant witnesses would be traveling. Third, although some potential witnesses reside in Ohio, several of them are under the control of either HPA or the Partnership and could be compelled to testify in whatever forum where the disputes were litigated. Fourth, viewing the premises is irrelevant in these circumstances. Fifth, the dismissal of the Ohio lawsuit is a factor that favors the Delaware forum. Sixth, the argument that this Court lacks personal jurisdiction over HPA or MMPP has been rejected. For these reasons, the facts here fall far short of the Delaware standard for dismissal on forum non conveniens grounds.

[*22]

B. The Rule 19 Joinder Motion

The defendants next argue that this action should be dismissed under Court of Chancery Rule 19 because the plaintiff failed to join PHS, which is a necessary and indispensable party. I disagree. PHS does not fall within the definition of a "necessary" party under Rule 19(a). Moreover, even if PHS had an interest in this litigation sufficient to make it a necessary party, this action could proceed without PHS, because that interest would be adequately protected by the parties already joined.

RJA's claims all arise directly from HPA and MMPP's management and control of the Partnership's affairs. PHS is not alleged to be a partner in the Partnership or to have been involved in any of the Partnership's affairs, management, or operations.

Rule 19(a) "categorizes those persons whose joinder should be required to accord complete adjudication of claims at issue." n22 [HN11] That Rule pertinently states that it is "necessary" for a person to be joined where:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims and interest relating to the subject of the action and is so situated that the disposition [*23] of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the claimed interest.

n22 *Hughes Tool Co. v. Fawcett Publications, Inc., Del. Supr., 350 A.2d 341, 344 (1975).*

[HN12] To qualify as "necessary," a party:

> should have not only an interest in some part of the controversy but the interest must be such that a final decree cannot be made which will neither touch upon that party's interest nor leave the controversy in such a state that the final determination would be inconsistent with equity and good conscience. n23

n23 *Joseph v. Shell Oil Co., Del. Ch., 498 A.2d 1117, 1125 (1985)* (citing *Elster v. American Airlines, Del. Ch., 34 Del. Ch. 500, 106 A.2d 202, 203-04 (1954)* (quoting *Shields v. Barrow, 58 U.S. (17 How.) 130, 15 L. Ed. 158 (1854))).*

[*24]

PHS is not a necessary party under this definition. The plaintiff's claims do not prejudice or implicate the rights of PHS, because they arise from HPA's and MMPP's alleged breach of the Partnership and Master Agreements, specifically, their failure to distribute funds to RJA under those agreements. To the extent RJA's

claims a wrongful distribution by defendants of funds to PHS, the interests of PHS are only tangentially implicated, and would not be adversely affected by a favorable decision for RJA on that claim, because RJA does not seek rescission of any payments made to PHS or of any arrangement between PHS and the defendants. Moreover, any risk of inconsistent judgments or duplicate litigation has been greatly reduced by the dismissal of the Ohio action, which implicated no rights or interests of PHS. n24

n24 Although PHS was named as a plaintiff in the Ohio action, the complaint sought only a declaratory judgment that the actions of HPA and MMPP were correct and appropriate under the Partnership Agreement -- an agreement to which PHS was not a party. The Ohio action did not seek any adjudication that PHS was entitled to the payments it had received from HPA, or any relief that would be adverse to PHS. See Midwest Medical Preferred Providers, supra note 3, at 4 ("PHS has failed to state a claim against RJA in the Ohio Complaint....PHS's involvement in the case sub judice is insignificant and does not impact the Court's analysis.").

[*25]

But even if (arguendo) PHS were a necessary party, it is not "indispensable" under Court of Chancery Rule 19(b). [HN13] That Rule requires that if a necessary party cannot feasibly be joined, "the Court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." [HN14] In making that determination, the Court must consider four factors: (i) the extent of prejudice to absent and existing parties, (ii) the possibility of shaping a judgment as to mitigate such prejudice, (iii) whether the remedy given without the party will be adequate or will instead create more lawsuits by parties involved in the same transaction or occurrence, and (iv) whether the plaintiff has available an alternative forum to hear and adjudicate the claim. n25 These "pragmatic considerations," are to be "governed by practicality and flexibility rather than by idealistic and mechanical standards bottomed upon allegedly inseparable substantive rights." n26

n25 of Chancer Rule 19(b).

n26 *National Educ. Corp. v. Bell & Howell Co., 1983 Del. Ch. LEXIS 562, *8*, Del. Ch., C.A. No. 7278, Brown, C. (Dec. 13, 1983).

[*26]

It is settled law that an action may continue without an absent party if that party's interest is fully represented therein. n27 Here, PHS's interests will be adequately and fully protected by MMPP, of which PHS is an affiliate. MMPP has an economic interest in protecting any rights that PHS may have to any funds or opportunities that were (allegedly) wrongfully diverted to PHS by MMPP and HPA. MMPP thus has an undeniable stake in advancing the interests of PHS to the extent they may be implicated by this lawsuit. Any risk of inconsistent judgments has been minimized (if not eliminated) by the dismissal of the Ohio action in RJA's favor. For these reasons, this action may and should proceed in the absence of PHS.

n27 *Joyce v. Cuccia, 1997 Del. Ch. LEXIS 71*, Del. Ch., C.A. No. 14953, 24-26, Jacobs, V.C. (May 14, 1997); *Monsanto Co. v. Aetna Cas. & Sur. Co., Del. Super., 565 A.2d 268, 271 (1989)* (citing *Moran v. Household Int'l, Inc., Del. Ch., 490 A.2d 1059,* aff'd, *Del. Supr., 500 A.2d 1346 (1985)).*

[*27]

C. The Rule 12(b)(6) Motion to Dismiss

Lastly, the defendants seek dismissal of the complaint under Court of Chancery Rule 12(b)(6). The complaint sets forth five separate claims against HPA and MMPP, namely: (a) breach of contract, (b) breach of the implied covenant of good faith and fair dealing, (c) breach of fiduciary duty, (d) an accounting, and (e) civil conspiracy. The requested relief includes a declaration of each party's rights under the Partnership Agreement.

[HN15] When deciding a motion under Rule 12(b)(6), the Court must consider as true the well-pleaded facts in the complaint, and must view all inferences in the light most favorable to the plaintiff. n28 [HN16] A complaint will be dismissed only where it appears with reasonable certainty that the plaintiff would not be entitled to relief under any set of facts. n29 The Court now addresses RJA's claims within the framework of these well-established principles.

n28 *In re Tri-Star Pictures, Inc. Litig., Del. Supr., 634 A.2d 319, 326 (1993); Delaware State Troopers Lodge No. 6 v. O'Rourke, Del. Ch., 403 A.2d 1109, 1110 (1979); Penn Mart Realty Co. v. Becker, Del. Ch., 298 A.2d 349, 351 (1972).*

[*28]

n29 *Tri-Star, 634 A.2d at 326; O'Rourke, 403 A.2d at 1110, Penn Mart, 298 A.2d at 351.*

### 1. The Pivotal Underlying Allegations

RJA alleges that the Partnership Agreement expressly required distributions of Cash Flow "no less frequently than quarterly," and that historically HPA had distributed Cash Flow on a twice-monthly basis. The Partnership Agreement defined Cash Flow to mean gross cash receipts of the Partnership, reduced by (among other things) "all cash expenditures incurred incident to the operation of the Partnership's business..." RJA claims that deductions from Cash Flow for "cash expenditures" should not have included any expenses for marketing or development of the Partnership network performed by RJA or PHS, because in the Master Agreement those parties themselves contracted to absorb those costs. n30

n30 The Master Agreement requires RJA and PHS to provide, among other things, "existing contracts," "primary contracts," "physician contracts," and "secondary contracts." The only provision for the payment of expenses incurred in procuring those contracts is found in sections 3.1 and 4.1 of the Master Agreement, which authorize such payments only to RJA.

The Master Agreement also states that RJA, HPA, and PHS (not the Partnership) were responsible for marketing the network. The Master Agreement provides that "all travel, entertainment, and related expenses incurred in implementing the Marketing Plan shall be paid by RJA, PHS, and HPA for their respective agents and employees (emphasis added)." RJA alleges that all of the obligations, including the related expenses, for developing and implementing the marketing plan for the Partnership's network fell to RJA, PHS, and HPA. Therefore, RJA claims, distributions paid by the Partnership should not have been reduced to pay such expenses.

[*29]

RJA also alleges that in September 1998, MMPP and HPA offered to purchase RJA's interest in the Partnership. In October 1998, shortly after RJA declined that offer, Arthur Chandler (the owner of MMPP, PHS, and HPA's Chairman of the Board), together with MMPP's representatives on the HPA Board, altered the distribution schedule and formula, allegedly in violation of ex-

press language in the Partnership Agreement. Specifically, RJA claims that (a) the distributions were reduced from twice-monthly payments to quarterly payments; and (b) the gross cash receipts were reduced by expenses relating to network marketing and development, which PHS and RJA had contractually agreed to assume. n31 RJA also claims that at all relevant times MMPP exercised control over HPA's actions taken as general partner, because (i) MMPP nominated a majority of the representatives to the HPA Board, and (ii) Mr. Chandler manipulated the dates on which the HPA Board met to vote on the alterations to the distribution schedule and formula, so that no RJA representatives to the HPA Board would be present and only MMPP representatives would make those decisions.

n31 Specifically, these expenses related to "claims repricing," "network development," and "accounting."

[*30]

These allegations form the basis for the claims for relief, the legal sufficiency of which is next considered.

### 2. The Claims for Relief

#### a. Declaratory Judgment

RJA contends that this Court is the proper forum to declare the validity of HPA and MMPP's actions involving Partnership Cash Flow distributions under the Partnership Agreement. I concur. The claims that the distribution payment methodology currently utilized by HPA (and dictated by MMPP) is improper under the Partnership Agreement and is causing financial harm to RJA. [HN17] This Court may properly adjudicate that claim and in that context, declare the rights and obligations of parties to a Delaware limited partnership agreement. n32 Accordingly, the complaint states a claim upon which declaratory relief could be granted against HPA and MMPP.

n32 See Court of Chancery Rule 57; *10 Del. C. § 6501.*

#### b. Breach of Contract

Next, RJA claims that HPA -- which is a party to both the Partnership Agreement and the Master Agreement [*31] -- breached both by failing to properly distribute Cash Flow to RJA. RJA also contends that MMPP -- which allegedly controls HPA -- breached sec-

tion 6.2 of the Partnership Agreement, which precludes MMPP from "participating in the operation, management, or control of the Partnership's business." n33

n33 Because RJA's breach of contract claim against MMPP does not involve the Master Agreement, the complaint does not state a claim against MMPP for breach of that Agreement.

In support of its dismissal motion HPA argues that the complaint fails to state a claim against HPA upon which relief can be granted, because (a) under the definition of "Cash Flow," HPA was entitled to deduct marketing and network expenses from Cash Flow distributions, such as expenses paid to PHS for its various network marketing and development efforts; (b) HPA was not contractually required to cause the Partnership to make two distribution payments per month; and (c) PHS was not obligated under the Master Agreement to provide the Partnership [*32] with free marketing or development services. MMPP argues that RJA's breach of contract claim should be dismissed because MMPP is not a party to the Master Agreement and because MMPP is not obligated under the Partnership Agreement to "ensure distribution of funds" to RJA. I find that RJA has alleged a cognizable claim for breach of contract against both defendants.

RJA alleges that under the Master Agreement, RJA and PHS were required to absorb their respective costs for network development, and that those costs could not be deducted from Cash Flow distributions. HPA's October 1998 decision to alter the methodology by which distributions were made, sufficiently states a claim for violations of the Partnership and the Master Agreements.

As for MMPP, RJA alleges that because MMPP sought to be the purchaser of RJA's interest and controls HPA's board, MMPP caused HPA to engage in conduct that (RJA claims) constituted a breach of § 6.1 of the Partnership Agreement. Those allegations are sufficient to state a claim against MMPP for breach of the Partnership Agreement.

RJA's claim of breach of the implied duty to act in good faith and fair dealing against HPA and MMPP, properly falls [*33] within the scope of RJA's breach of contract claim. n34 [HN18] The complaint's allegations that the defendants failed to adhere in good faith to the contractual obligations set forth in the Partnership Agreement, and failed to deal fairly with RJA, are sufficient to state a claim for breach of the implied covenant of good faith and fair dealing.

n34 See e.g., *Gilbert v. El Paso Co., Del. Ch., 490 A.2d 1050, 1054-55 (1984),* aff'd, *Del. Supr., 575 A.2d 1131 (1990)* ("An implied covenant of good faith and fair dealings is engrafted upon every contract.").

c. Breach of Fiduciary Duty

The defendants also seek dismissal of RJA's claims that HPA and MMPP breached their fiduciary duties to RJA. The Partnership Agreement expressly states that HPA "shall be under a fiduciary duty to conduct and manage the affairs for the Partnership in a prudent, businesslike and lawful manner." That broad contractual undertaking incorporates and encompasses traditional fiduciary duties recognized under [*34] Delaware law n35 which, RJA contends, HPA breached by failing to adhere to the express contractual undertakings to RJA contained in the Partnership and Master Agreements.

n35 See *USA Cafes, 600 A.2d at 48-49.*

HPA contends that these claims are insufficient because RJA is "bootstrapping" what are really breach of contract claims into fiduciary duty claims, and also because the claims are derivative. I find these arguments unpersuasive. [HN19] Conduct by an entity that occupies a fiduciary position (here, HPA) may form the basis of both a contract and a breach of fiduciary duty claim. n36 Moreover, RJA's breach of fiduciary duty claims (wrongfully amending the Partnership Agreement formula for calculating distributions at an unfairly noticed directors meeting) are direct in nature. HPA has cited no authority that establishes that these are derivative claims for waste. RJA has stated a claim for breach of fiduciary duty against HPA.

n36 See *Cantor Fitzgerald, L.P. v. Cantor, Del. Ch., 724 A.2d 571 (1998); Universal Studios, Inc. v. Viacom, Inc., Del. Ch., 705 A.2d 579 (1997).* Indeed, the fact that HPA may have allegedly breached its fiduciary duty to RJA would actually constitute a breach of section 5.1 of the Partnership Agreement.

[*35]

With respect to MMPP, the situation is somewhat more complex, because MMPP is a limited, not a general, partner. The DRULPA expressly states that "[HN20] in any case not provided for in this chapter the Delaware Uniform Partnership Law [DUPL]...and the

rules of law and equity...shall govern." n37 [HN21] Because the DRULPA contains no provision governing the accountability of limited partners for breaches of fiduciary duty, the Court must look to the DUPL to determine what fiduciary duties are owed by and to the limited partners in a limited partnership. [HN22] Section 1521(a) of the DUPL provides that:

> Every partner must account to the partnership for any benefit, and hold as trustee for it any profits, derived by him without the consent of the other partners from any transaction connected with the...conduct...of the partnership or from any use by him of its property.

n 37 Del. C. 17-1105.

Unless expressly modified by the Partnership Agreement, the fiduciary duties set forth in § 1521 apply to MMPP. n38 [*36]

> n38 See *James River-Pennington, Inc. v. CRSS Capital, Inc.*, 1995 Del. Ch. LEXIS 22, *10, Del. Ch., C.A. No. 13870, Steele, V.C. (Mar. 6, 1995); *Sonet v. Plum Creek Timber Co. ("Sonet I")*, Del. Ch., 722 A.2d 319, 322 (1998) ("Principles of contract preempt fiduciary principles where the parties to a limited partnership have made their intentions to do so plain.").

The Partnership Agreement at issue here does not modify or preempt the fiduciary duties owed by the limited partners to a limited partnership. RJA alleges that MMPP, through its control of HPA, (a) unilaterally and improperly amended the Partnership Agreement formula so as no longer to distribute gross cash receipts as the Partnership Agreement prescribed; (b) paid excessive and unwarranted access fees to its affiliate, PHS; (c) permitted PHS's customers to have access to the Partnership's network without compensating the Partnership; and (d) established a competitive business that improperly solicited the Partnership's medical providers. [*37] n39 Each of these acts is claimed to have resulted in the diversion from the Partnership of revenue, at least a portion of which rightfully belonged to RJA. Individually or collectively, they would constitute an actionable breach of MMPP's fiduciary duty to RJA.

n39 MMPP's reliance on § 5.4 of the Partnership Agreement to justify its creation of a competitive network is, at least this stage of the proceedings, misplaced. The language of § 5.4 does permit MMPP to own an interest in, among other things, a competitive business. Its language does not, however, permit MMPP to utilize information gained from its control over the Partnership to begin soliciting the Partnership's customers to join MMPP's newly created competitive network. Given the fact that MMPP's owner and two employees are directly involved in the governance and operation of the Partnership, and would have access to information including the Partnership's customer lists and pricing information, discovery is needed to determine the full extent to which the Partnership's proprietary information was used by MMPP to further its competitive business objectives.

[*38]

#### d. Civil Conspiracy

RJA has also alleged facts that establish the elements of a claim of civil conspiracy cause of action, under Ohio law, against MMPP and HPA.

Drawing all inferences from the pleadings in favor of RJA, the complaint can fairly be read to allege that (a) MMPP participated in, and stood to benefit greatly from, the decisions made to alter the distributions from the Partnership to RJA; (b) MMPP had the power to elect, and has elected, four of the seven HPA Board members; (c) MMPP sought to purchase RJA's 49% interest in the Partnership in September 1998 and, after RJA rebuffed MMPP's offer, undertook (along with HPA) a course of conduct to place RJA in financial peril; (d) this course of conduct was implemented through hastily called HPA board meetings at which only MMPP representatives could be present and vote; (e) the actions taken at those meetings resulted in substantial monies being paid to PHS (MMPP's affiliate), caused a corresponding reduction in the distribution that RJA would have received, and resulted in the elimination of the twice-monthly distributions that historically had been made since the Partnership began.

RJA is entitled to the reasonable [*39] inference that this course of action -- undertaken by HPA after September 1998 immediately following RJA's rejection of MMPP's offer to purchase RJA's interest in the Partnership -- was orchestrated by (and for the benefit of) MMPP and PHS. These allegations are sufficient to state a claim for civil conspiracy. n40

n40 Under Ohio law, the element of "malice" required to establish a civil conspiracy is defined as, "that state of mind under which a person does a wrongful act properly, without a reasonable lawful excuse, to the injury of another." *Williams v. Aetna Fin. Co., 83 Ohio St. 3d 464, 700 N.E.2d 859, 868 (1998).* Whether or not the defendants in fact possessed the requisite mens rea is a question that must be resolved by the finder of fact at a later stage.

### e. Claim for Accounting and Access to Books and Records

Lastly, RJA seeks an accounting and access to the financial records of the Partnership, HPA, and MMPP. The defendants contend that RJA is not entitled to that relief [*40] as a matter of law.

RJA's claim of entitlement to an accounting from the Partnership rests upon Article 7 of the Partnership Agreement and 6 Del. C. § 1522. Article 7 expressly provides for a full accounting of the Partnership and access to the Partnership's financial records. The Partnership Agreement is silent, however, as to HPA's and MMPP's obligations (if any) in that regard. Thus, the Court must look to the DRULPA and DUPA to determine whether RJA also has a statutory right to a full accounting from HPA and/or MMPP.

The DRULPA also contains no provision that addresses whether there can be an accounting between limited partners where wrongful usurpation of partnership assets is alleged. [HN23] Section 1522 of the DUPA provides, however, that "any partner shall have the right to a formal account as to partnership affairs...if he is wrongfully excluded from the partnership business or possession of its property by his copartners" or "as pro-

vided by 1521 of this title." n41 [HN24] Section 1521 states that every partner is accountable as a fiduciary to the other partners and "must account to the partnership for any benefit..." Those two DUPA provisions, RJA argues, entitle RJA to an accounting [*41] from HPA and MMPP for breaching their fiduciary duties to RJA. I concur.

n41 6 Del. C. § 1522(1)&(3).

Because I have found that RJA has stated claims against both HPA and MMPP for breach of their fiduciary duties, it follows that RJA has also stated a claim for an accounting against the defendants.

RJA is not, however, presently entitled to access to Partnership books and records. [HN25] Under *6 Del.C. § 17-305*, a limited partner seeking access to Partnership records must make a written demand on the General Partner to inspect the information requested and the purpose for the demand. n42 RJA's request to compel access to Partnership books and records must fail, because the complaint does not allege that RJA made a written demand for books and records upon either of the defendants.

n42 *6 Del. C. § 17-305(d).*

## IV. CONCLUSION [*42]

For the foregoing reasons, the defendants' motions to dismiss are denied, except that their Rule 12(b)(6) motion is granted with respect to RJA's claim that this Court compel the production of HPA, MMPP, and the Partnership's books and records. IT IS SO ORDERED.