# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRETT J. CORMICK, ELAN SUISSE | ) | C.A. No. 06-275-GMS |
| INTERNATIONAL HOLDINGS (USA) | ) | |
| LLC, ELAN SUISSE (PTY) LTD., | ) | |
| NICOGEL LTD., JOHN WALTERS, | ) | |
| DIANNE MARSHALL and MERCARI | ) | |
| FINANCIAL SERVICES (PTY) LTD., | ) | |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT OF ROBERT D. CHRIST**

| | | |
|---|---|---|
| STATE OF LOUISIANA | ) | |
| | ) ss: | |
| PARISH OF TANGIPAHOA | ) | |

Robert D. Christ, being duly sworn, hereby deposes and says:

1.    I am the plaintiff in the above-captioned action and submit this affidavit in opposition to the defendants' Motions to Dismiss or Stay.

2.    I reviewed the allegations of my complaint prior to its filing and those allegations, to the best of my knowledge and belief, are true.

3.    While my business obligations require me to travel extensively, until recently my permanent residential and business address was in Pottstown, Pennsylvania. Within the last month, I have relocated my residence to Abita Springs, Louisiana and my business to Hammond, Louisiana.

4.    This action represents simply the latest of my attempts to obtain relief from Brett Cormick and the other defendants in a forum where a tribunal can properly exercise personal

DKT NO.: __22__

DT FILED: _6-26-06_

jurisdiction over all the relevant parties. Mr. Cormick, an Australian citizen, has intentionally structured his personal residences and business dealings across multiple countries and continents in order to maximize his ability to evade the jurisdiction of any one forum. For example, he has represented to me as well as others that he either lives or has lived in the following locations: Harare, Zimbabwe; Hermanus, South Africa; Gauteng, South Africa; and London, England.

5.     Mr. Cormick's various and constantly changing living and business arrangements allow him to pick and choose his place of residence in order to evade service of process and any judicial exercise of personal jurisdiction. For example, in response to the complaint I filed against him in the High Court of South Africa located in Johannesburg, Mr. Cormick alleged that he permanently resided in Zimbabwe but "temporarily resides from time to time in Hermanus, in the Western Cape Province." (This allegation is set forth at paragraph 1.3 of Exhibit A-2 to Mr. Cormick's declaration filed in this action.) Mr. Cormick similarly stated under oath, at paragraph 7.3 of an affidavit submitted to the South African court (a true and correct copy of which is attached hereto as Exhibit A), that his "presence is often required in South Africa, Europe, and the United States" but that he "often, temporarily, reside[s] in Hermanus." However, in support of his motion to dismiss in this Court Mr. Cormick now contends that he is a resident of both Zimbabwe and the United Kingdom.

6.     My complaint alleges that I wired $250,000 to Mr. Cormick in two separate payments in "March 2004" because, at Mr. Cormick's request, I provided him with the original confirmation of my wire transfer and, therefore, I cannot confirm with any specificity the day on which I first wired $125,000 to Mr. Cormick. I did, however, retain the confirmation of my subsequent wire transfer of $125,000, a true and correct copy of which is attached as Exhibit B. As that document reflects, I wired $125,000 to Mr. Cormick on March 16, 2004, after Mr.

Cormick formed Elan Suisse International Holdings (USA) LLC ("Elan Suisse USA"). A true and correct copy of the Certificate of Formation for Elan Suisse USA as filed with the Delaware Secretary of State is attached as Exhibit C. Additionally, a true and correct copy of two e-mails which I received from Mr. Cormick on February 17 and 18, 2004, in which Mr. Cormick expresses his intent to form Elan Suisse USA as a Delaware limited liability company, is attached as Exhibit D.

7.      In any event, the date on which Elan Suisse USA was formed is irrelevant because, prior to the formation of that entity, Mr. Cormick and I agreed that, in exchange for my "investment," I would receive 50% equity shares in Elan Suisse (Pty) Ltd. ("Elan Suisse"), a South African corporation, and a Delaware-based entity (ultimately to be formed as Elan Suisse USA) which would hold certain intellectual property rights. In addition, Mr. Cormick's misrepresentations and fraudulent activities continued well into the Summer of 2004, after the formation of Elan Suisse USA, as I continued to perform marketing and business development activities for the purported business venture in reliance upon Mr. Cormick's representations that he and I would execute a formal agreement concerning my investment in Elan Suisse and his representations concerning the validity of the business.

8.      It was not until September 2004, when Mr. Cormick still had not produced a written agreement relating to my investment and could not adequately account for the status of the as-yet non-operational Elan Suisse business venture, that I began to question the truthfulness of Mr. Cormick's claims and the soundness of my "investment." At that time, I requested that Mr. Cormick cooperate with an audit of Elan Suisse and Elan Suisse USA so as to account for the whereabouts of the $250,000 I had wired to him. Rather than cooperate with that audit, Mr.

Cormick offered to repay $250,000 to me, an offer which I accepted but which Mr. Cormick has not honored to this date.

9.     Prior to September 2004, I did not suspect, nor did I have reason to suspect, that Mr. Cormick had made repeated and fraudulent misstatements to me. Until that time, I had trusted Mr. Cormick as a friend whom I had known since 1996 (a trust which, in hindsight, had been sorely misplaced).

10.     In support of their motion to dismiss, Mr. Cormick's co-defendants argue that there are no facts which could establish that John Walters, Dianne Marshall and Nicogel Ltd. ("Nicogel") conspired with Mr. Cormick to defraud me and use the funds I provided to Mr. Cormick to capitalize Acquacine Ltd. ("Acquacine"), a start-up company which subsequently changed its name to Nicogel. To the contrary, there are a number of facts which establish the conspiracy between these parties:

a.     When Mr. Cormick was soliciting my investment in the Elan Suisse venture, and even after I wired $250,000 to Mr. Cormick, he stated repeatedly in e-mails to me that Elan Suisse was creating a biotechnology fund for potential South African investors. An example of these e-mails is attached as Exhibit E. In this e-mail, Mr. Cormick refers to the first "Private Equity" investment he intends to market to South African investors, a French company which purportedly had intellectual property rights to "the most important and revolutionary development in drug delivery systems in the last 20 years anywhere in the world."

b.     The company which Mr. Cormick purported to describe in Exhibit E was Acquacine. Attached as Exhibit F is a true and correct copy of promotional materials for Acquacine developed by Mr. Cormick and provided to me by Mr. Cormick. According to these

- 4 -

materials, Acquacine's core business was the research and development of medicines delivered in a ready-to-drink beverage format.

       c.     According to information I have gathered, Mr. Walters and Ms. Marshall (who lives with Mr. Walters as well as the couple's daughter) are both officers of Acquacine (subsequently renamed Nicogel in December 2005) and Ms. Marshall is a shareholder of the company. In addition, the Internet web domain names www.acquacine.com, www.acquacine.co.uk, and www.nicotea.co.uk (referring to one of Acquacine's purported products) are all registered to Ms. Marshall.

       d.     In April 2005, Elan Suisse continued to promote investment in Acquacine through the print advertisement attached as Exhibit G. As this advertisement reflects, both Mr. Cormick and Mr. Walters are identified as managers of the "Elan Suisse Capital Biopharma" investment vehicle. The advertisement further promotes Elan Suisse's investment in Acquacine and invites potential investors to contact Mr. Cormick or Mr. Walters for more information.

       e.     In May 2005, Ms. Marshall authored a Power Point presentation aimed at potential investors and promoting the Elan Suisse "Biopharma Investment Portfolio." This presentation touts, among other things, the prospects for the Nicotea product allegedly produced by Acquacine.

       f.     A subsequent advertisement published in June 2005 (and attached as Exhibit H) further promotes the Elan Suisse "Biopharma Investment Portfolio." According to this advertisement, one of the key products in this "portfolio" is the "Nicotea" product allegedly produced by Acquacine. Like the April 2005 advertisement, this document also touts Mr. Cormick and Mr. Walters as key members of Elan Suisse who promote the Elan Suisse "investment" vehicle.

g.    A July 12, 2005 article written by South African financial journalist Julius Cobbett (attached as Exhibit I) provides further details of the involvement of Mr. Walters and Nicogel (f/k/a Acquacine) with Elan Suisse and Mr. Cormick and highlights just a few of the dubious claims made by Mr. Cormick and Mr. Walters in Elan Suisse's promotional materials.

11.    Mr. Cormick's statement in his declaration that he is "currently waiting for Mr. Christ to apply to the African court for a trial date" does not accurately describe the status of the action I commenced in the High Court of South Africa in Johannesburg.  As indicated by the plea Mr. Cormick filed in response to my complaint in that action (Exhibit A-2 to Mr. Cormick's declaration) and the sworn statements in his affidavit attached hereto as Exhibit A, Mr. Cormick has challenged the personal jurisdiction of the Johannesburg court over him and asserted that he has no contacts with that forum.  I have not pursued my South African case against Mr. Cormick further because of my likely inability to secure jurisdiction over Mr. Cormick in that court.  I have not dismissed my South African case against Mr. Cormick voluntarily because, if I did so, I would forfeit a bond of approximately $15,000 which I was required under South African law to post with the court upon filing my complaint.

FURTHER AFFIANT SAYETH NOT.


Robert D. Christ


Subscribed and sworn to before me
this  23  day of  June        , 2006
My commission expires _____

                                        Jennifer Swen Or
                                        Commission# 628-52
                                        Expires on death

_____
Notary Public

- 6 -

# EXHIBIT A

# IN THE HIGH COURT OF SOUTH AFRICA

## (WITWATERSRAND LOCAL DIVISION)

CASE NO: 05/2033

In the matter between :

CHRIST: ROBERT D                                     PLAINTIFF

AND

CORMICK: JOHN BRETT                                  DEFENDANT

GRIFFIER VAN DIE HOOGGEREGSHOF
(WITWATERSRANDSE PLAASLIKE AFDELING)
PRIVAATSAK/PRIVATE BAG X7
2005 -04- 1 5
JOHANNESBURG 2000
(WITWATERSRAND LOCAL DIVISION)
REGISTRAR OF THE HIGH COURT

## FILING NOTICE

DOCUMENT:              DEFENDANT'S AFFIDAVIT OPPOSING
                       APPLICATION FOR SUMMARY JUDGMENT

DATED AT HALFWAY HOUSE this 15th DAY OF APRIL 2005.

(Get/Sgd) J.J. LOOTS

**J.J. LOOTS INCORPORATED**
Attorneys for Defendant
512 NUPEN CRESCENT
P O BOX 5143 – DOCEX 20
HALFWAY HOUSE, 1685
TEL: (011) 805-5030
FAX: (011) 805-4633
C/o **JOWELL GLYN & MARAIS INC**
4th FLOOR – 72 GRAYSTON DRIVE
SANDOWN
TEL: (011) 292-6700
FAX: (011) 784-4215

TO:    THE REGISTRAR OF THE
       ABOVE HONOURABLE COURT
       **JOHANNESBURG**


AND
TO:         ASSHETON-SMITH INC
            Attorneys for Plaintiff
            C/o CHRIS LEE ATTORNEY
            75 KING STREET – BERARIO
            JOHANNESBURG
            C/o **JAYS INCORPORATED**
            NO 9 ARNOLD ROAD
            ROSEBANK

                                      Received copy hereof
                                      this __ІЅ__ . __ day of
                                      APRIL 2005.

                                      _____

                                      Jay Muthibi Incorporated
                                      Without prejudice
                                      Time: 11 : 00
                                      Date: ІЅ/04/ᵒᵈ

# IN THE HIGH COURT OF SOUTH AFRICA
## (WITWATERSRAND LOCAL DIVISION)

CASE NO:  05/2033

In the matter between:

**CHRIST:  ROBERT D.**                                              **PLAINTIFF**

and

**CORMICK:  BRETT JOHN**                                          **DEFENDANT**

### DEFENDANT'S OPPOSING AFFIDAVIT

I, the undersigned,

### BRETT JOHN CORMICK,

do hereby make oath and state:

1.

1.1    I am an adult male director of companies, currently employed as such
       as a director of Elan Suisse (Pty) Limited ("Elan"). The registered
       adress of Elan is at Ground Floor, Oxford Gate, Hyde Park Lane, Hyde
       Park, Sandton, in the Gauteng Province.

2430750-0.
J.F. VAN WYK

1.2  I currently reside in Hermanus in the Western Cape Province.

1.3  I conduct the business of Elan from its principal place of business in South Africa at 3rd Floor, Safmarine House, 22 Riebeeck Street, Cape Town, in the Western Cape Province.

1.4  I currently devote me time fully to the business of Elan.

## 2.

The facts contained in this affidavit are, except as far as the contrary may appear from the contents and context of this affidavit, within my personal knowledge, and are both true and correct.

## 3.

3.1  I am the Defendant in this matter, and as such I am duly authorised to depose to this affidavit.

3.2  I am also the sole director and shareholder of Elan.

J.F. VAN WYK

3

**4.**

I deny that I do not have a *bona fide* defence against the claim of the Plaintiff herein and that I have entered an appearance to the defend the Plaintiff's claim purely for the purposes of frustrating and delaying same.

**5.**

5.1    In fact, the Plaintiff brought an urgent application against Elan under case number 5401/2005 ("the liquidation application") in the above Honourable Court which, by the time that this application for summary judgment will be heard, has been finalised, on the basis that it, without prejudice to the parties' rights, became settled.

5.2    In the liquidation application I filed a comprehensive answering affidavit on behalf of Elan in which my defence herein as well as Elans' defence in the liquidation application is fully canvassed.

5.3    Notwithstanding, the Plaintiff persists in this application for summary judgment.

5.4    I am advised, which advise I accept, that, in the event that a Plaintiff is aware of the defence of a Defendant, and nonetheless persists with an application for summary judgment in respect thereof, the Plaintiff may be ordered to pay the costs thereof.


J30750-D
J.F. VAN WYK

4

5.5    In the premises, I shall apply to the Honourable Court that the application for summary judgment herein be dismissed with costs in the event of the Plaintiff persisting in same.

**6.**

Before I outline my *bona fide* defence on the merits of the Plaintiffs' claim herein, I wish to point out to the Honourable Court, *in limine*, that the Honourable Court has no jurisdiction to entertain this action.

**7.**

## JURISDICTION:

7.1    I am an Australian citizen.

7.2    My wife was born in Zimbabwe and I, my wife and our children reside in Zimbabwe.

7.3    By virtue of my business with Elan, my presence is often required in South Africa, Europe, and the United States (the"US").    For the purpose of visiting South Africa I often, temporarily, reside in Hermanus outside Cape Town in the Western Cape Province.

0430750-D
J.F. VAN WYK

7.4    From the particulars of claim filed by the Plaintiff herein it appears that:

7.4.1    the Plaintiff alleges that I carry on business at Ground Floor, Oxford Gate, High Park Lane, High Park, Johannesburg;

7.4.2    Certain discussions were held between me and the Plaintiff pertaining to an investment of US $ 350 000 to be made by the Plaintiff in Elan and another company. The place of these discussions is not divulged;

7.4.3    Pursuant to such discussions the Plaintiff deposited the amount of US $ 250 000 into my account during March 2004. The place of this deposit is not divulged;

7.4.4    On or about the 9th of September 2004, and in writing, I offered to refund the Plaintiff the sum paid to me of US $ 250 000; and

7.4.5    Such offer was accepted in writing by the Plaintiff on the 30th of November 2004 and, consequently, I am liable to repay the amount of US $ 250 000 to the Plaintiff. Again, the place of such offer and acceptance is not divulged in the Plaintiffs' Particulars of Claim. In fact, no specific allegation as to which fact the Plaintiff relies on for jurisdiction is made therein.

7.5    In this regard I wish to point out to the Honourable Court:

X430750-0
J.F. VAN WYK

7.5.1 I never "carried on business" at the address cited by the Plaintiff in this regard. This is the registered address of Elan, and the said premises is occupied by Elan from time to time. I carry on business, when I am in South Africa, which is rare, from Hermanus. I temporarily visit the offices of Elan in Johannesburg for the purposes of attending a meeting or opening mail but I am certainly never present in Johannesburg, from the 1st of December 2004, for more than one day a month on average;

7.5.2 Elan rents office space in Cape Town at the address set out therefore herein above, which is its principal place of business in South Africa. I spend most of my time on Elans' business there.

7.5.3 Before the 1st of December 2004, when Elans' business started taking more of my time, I certainly wasn't present in Johannesburg for more than one day every second or third month.

7.6   In the liquidation application, the Plaintiff declared under oath:

7.6.1 While the discussions alleged in the particulars of claim filed on behalf of the Plaintiff with reference to his investment in the relevant companies were held, the Plaintiff was in the United States of America;

7.6.2 At the same time, I was either abroad in Europe, in Zimbabwe, or in Hermanus;

430750-0
J.F. VAN WYK

7.6.3 I categorically state that I never held any discussions pertaining to the investment of the Plaintiff as alleged while in Johannesburg or anywhere in Gauteng for that matter;

7.6.4 The investment of US $ 250 000 by the Plaintiff was made by electronically transferring same to my personal bank account from the United States, where the Plaintiff was present at the time, held at National Westminster Bank and/or LLoyds TSB in London or the Isle of Man; and

7.6.5 While I wrote the e-mail of 9 September 2004 on which the Plaintiff relies for my undertaking to repay the said investment to him I was in Hermanus, in the Western Cape, and, on the Plaintiff's own version, he was in the United States when accepting same, alternatively same was accepted on his behalf by his attorney of record in Cape Town, and I received communication thereof in Cape Town.

7.7 Accordingly, without admitting any of the facts pleaded by the Plaintiff in this regard, it is clear that:

7.7.1 Neither myself nor the Plaintiff is usually resident within the area of jurisdiction of the Honourable Court;



J.F. VAN WYK

7.7.2  Neither myself nor the Plaintiff is usually employed or carries on business within the area of jurisdiction of the Honourable Court;

7.7.3  The agreement that led to the investment of the Plaintiff with me, which is not admitted, as alleged, was not concluded within the area of jurisdiction of the Honourable Court;

7.7.4  The relevant investment was not made within the area of jurisdiction of the Honourable Court;  and

7.7.5  The alleged agreement for repayment, which is denied as will be set out hereunder, was not concluded within the area of jurisdiction of the Honourable Court.

7.8  Full legal argument will be addressed to the Honourable Court at the hearing of this application in this regard.

**8.**

8.1  The Plaintiff, by virtue of the facts set out in the liquidation application, was aware of these facts, but nonetheless persisted in this application. It is, amongst others, on this basis that I pray for the Plaintiff to pay the costs of this application.



M30750-0.

J. F. VAN WYK

8.2    Accordingly I respectfully submit that the abovementioned point of jurisdiction alone clearly illustrates that I have a *bona fide* defence against the Plaintiff's claim herein and pray that the Plaintiff's claim for summary judgment herein for this reason alone be dismissed with costs.

9.

## AD *BONA FIDE* DEFENCE:

9.1    I am a person with extensive experience and an excellent worldwide reputation in the financial services industry.

9.2    During the past fifteen years:

9.2.1  I was employed by some of the biggest financial services firms in the world;

9.2.2  I was a managing director ABN Amro, one of the biggest banks in the world, in Europe;

9.2.3  I was the director of corporate sales at Electra, one of the largest private equity firms in Europe;



9.2.4  I was the managing director of global sales at Mees Pierson, a boutique investment bank associated with ABN Amro;

9.2.5  I obtained my doctorate in economics; and

9.2.6  I lecture worldwide at business schools and universities on the financial services industry.

9.3  As such, I gained vast experience in the development and marketing of financial services products.

9.4  My wife is Zimbabwean, and our family resides there. As a consequence of my residence in Zimbabwe, I came into contact with the South African financial services industry.

9.5  One of the big difficulties in the South African economic environment, is the archaic system of exchange controls that is being kept in place by the South African government.

9.6  Approximately three years ago, I developed an investment product ("the product") that effectively provides:

9.6.1  a safe investment vehicle by investing in AAA bonds underwritten by the government of the USA, the investment with the lowest risk one can attain in the money market;

.5 Apr15.APR.2005 13:51 Dr BJJ LOUIS INC 805 4633    0282645906    NO.481    P.14

11

9.6.2   a tax effective investment vehicle in that the investment is held off-shore in a tax haven; and

9.6.3   an alternative investment vehicle which provides offshore returns in foreign currency. The investment is made for example in South African rands, but returns can be paid in pounds sterling or US dollars, as the case may be.

9.7   By virtue of the fact that the product is the trade secret of Elan and that the true nature of the product is not really at issue here, I would at this stage not elaborate further thereon. My rights in this regard are reserved.

9.8   Simultaneously, I noticed a trend in the South African financial services industry that foreign banks are having a tough time to enter the local market. Many foreign banks apply for licenses to operate in the South African market and establish offices here at great cost, only to return their licenses shortly thereafter because of their inability to generate profits for their shareholders.

9.9   In my view, the key to this market is access to the retail investment sector of the market. The foreign banks that did set up offices in South Africa to date has not been able to break the local banks' stranglehold on this market, purely by reason of the fact that they do not have the



1430750-0
J.F. VAN WYK

necessary innovative products to entice the market to utilize their services.

9.10    I strongly believe that the product has this ability.

9.11    Accordingly, I set up the Elan Suisse Group ("the group") as a structure to facilitate the marketing and selling of the product.

9.12    The group consist, in chief, of Elan in South Africa, and similarly named private companies in the US and the Bahamas.

9.13    The structure of the group is:

9.13.1 Elan in South Africa will front the product. Thus, Elan will market the product to the retail investment market locally, and, as investors buy into the concept, will manage the fund so created;

9.13.2 Elan Suisse in the Bahamas, a tax haven, will act as custodian of the fund created by Elan in South Africa and, later, by similarly named entities worldwide. The fund so created will be administered there and returns will be paid there; and

9.13.3 The intellectual property of Elan, consisting in the main of the product and the customer data base built up from the sale of the product in the



0430750-0
J.P. VAN WYK

South African retail investment market, will be held by the entity registered therefore in the US.

9.14    I strongly believe that any good business plan also includes a exit strategy, being a way, after the business of Elan has been sufficiently built up to my satisfaction, and I want to move on to other pastures, to sell the said business for a profit in order to be rewarded for my input and to provide me with working capital for my next project.

9.15    The reason why the intellectual property of Elan would be held in the entity incorporated in the US is exactly such an exit strategy. The American banks who would like to enter the South African market, would pay dearly for the product and the said customer information, as a way into the South African retail investment market.

9.16    Consequently, the structure was designed so as to maximize the possible profit from the eventual sale of the Elans' intellectual property.

9.17    Accordingly, I proceeded to set up all the relevant entities.

9.18    The first step was to set up Elan, and to ensure that Elan comply with all the relevant statutory requirements necessary to operate as an investment vehicle and fund manager as is set out above.



9.19    For this purpose, I contacted a friend of mine, Dirk Mostert ("Mostert"), in South Africa. Mostert is a director of a reputable company that mainly trades in money market instruments called Mercari (Pty) Limited ("Mercari").

9.20    Mercari has been trading as such for six years now, and Mostert has been a money market trader for more than ten years now. As such their clients include all of the major banks in South Africa, and especially FNB and Nedbank, the latter of which they trade with on an open account. This means that Nedbank allows Mercari to settle contracts on its behalf in the latter's discretion, theirs being a relationship of the utmost trust.

9.21    In the financial services industry, a good reputation is of immense value. For this reason I always deal only with entities operating in the main stream of the industry with a good reputation.

9.22    Mostert was familiar with the requirements of setting up a private company in South Africa and assisted me in the incorporation of Elan. Mostert also referred me to his auditors, Leader, Arendse and Associates, whom I enrolled as Elans' auditors.

9.23    Accordingly, during or about July 2003, Elan was incorporated with me as the sole shareholder and director.



X430750-0
I.F. VAN WYK

9.24    Elans' auditors was retained on Mosterts' recommendation, and, by virtue of the fact that Mostert and I became friends:

9.24.1 Mostert offered that Elan "incubates" in the offices of Mercari. To this end Elan had free use of the said offices, and Mostert offered his employees' labour free of charge to Elan. Mostert also dedicated one of the telephone lines allocated to Mercari to Elan, free of charge. It must be kept in mind that I started Elan from my own funds, and appreciated any opportunity to save costs; and

9.24.2 The offices of Mercari was also chosen to be the registered address of Elan.

9.25    As an aside, Mostert also asked me to become a non-executive director of Mercari, in order to contribute my insights and extensive experience in the money market and the financial services industry to Mercari's business. Naturally, I agreed.

9.26    Thus, Elan was set up and incorporated during or about July 2003.

9.27    I also started negotiations with the Financial Services Board ("the FSB") in order to ensure that Elan obtain the necessary statutory approval for its proposed activities.

1430750=0
F. VAN WYK

9.28  This approval was initially granted to myself on the 13th of May 2003 in my personal capacity, as appears from the letter from the FSB to myself attached as **Annexure "BC1"** hereto.

9.29  Later, during or about September 2004, the same approval was granted to Elan, as appears from an e-mail from the FSB attached hereto as **Annexure "BC2"**.

9.30.  The registration number of Elan with the FSB is 852. I constantly keep in contact with the FSB about the business of Elan. Recently, Norman Botha, a portfolio manager at Barnard Jacobs Malet ("BJM"), a major stock broking firm, joined Elan. I kept the FSB informed of this, and complied with all their requirements in this regard, as is evidenced by the e-mails attached hereto as **Annexure "BC3"**.

9.31  So, the business of Elan slowly took shape. One must with respect keep in mind that we have to do with a start up business here. It takes a long time to get the structure in place for such a business to operate. Since the incorporation of Elan I have worked eighteen hours a day in order to:

9.31.1 Set up a broker network for the marketing of the product. In this regard several major players in the financial services industry have expressed an interest to market the product, such as ABSA and RMB;



0430750-D
J.F. VAN WYK

9.31.2 Draft and create the standard forms and computer systems which will be utilized by Elan in the marketing and selling of the product;

9.31.3 Set up communications channels and systems with the relevant authorities such as the FSB, the Reserve Bank and the likes which will be crucial once the sales of the product commences;

9.31.4 Set up the other entities in the structure in the US and the Bahamas and the necessary structures there to ensure that the whole structure of the Elan Suisse Group is operational when sales of the product commence; and

9.31.5 Draft and create all the necessary agreements in order to turn Elan into an operational entity within the structure as is set out above.

9.32   This is an immense task, and takes a lot of time to accomplish. Several months of work just went into the finalization of the standard forms Elan intends to utilize once the sales of the product commence.

9.33   One must also, with respect, bear in mind that the product is unique to South African and the world financial services industry in many respects. This necessitates a lot of the work to be done from scratch, I can not simply use standard systems utilized before. All of this I did from Cape Town, with Botha being Elans' representative in Johannesburg.



9.34   Initially I funded the setting up of Elan within the structure as is set out above from my own pocket. By the beginning of 2004, this has cost me in the region of US$ 1.6. million.

9.35   Also, around this time, the time came to set up and incorporate the entity in the US as part of the structure set out above.

9.36   I was stretched thin on time and resources, and it became clear to me that I would need assistance in the US, both in terms of physical time and in terms of capital.

9.37   I knew the Plaintiff since 1996, and, in the normal course of correspondence between us, I informed him of the product and the structure for the sale thereof as is set out above.

9.38   From the beginning of 2004, several discussions ensued between me and the Plaintiff in this regard. The result was that, during or about February 2004, I agreed, orally, with the Plaintiff that:

9.38.1 An entity in the form of a corporation, would be incorporated in Delaware in the US;

9.38.2 The Plaintiff would invest US$ 350 000.00 in this entity;



9.38.3 In return for his said investment in the said entity the Plaintiff would receive 50% of the shareholding therein;

9.38.4 The Plaintiff would represent the said entity in the US and assist with the development thereof by attending to issues such as marketing and the likes;

9.38.5 The intellectual property of Elan and the product would be seated in the said entity as part of the exit strategy as is set out above; and

9.38.6 On the sale of Elan and the said entity in the US as is anticipated by the exit strategy as is set out above, the Plaintiff would receive a further amount equal to his initial investment.

9.39    These were the terms of the oral agreement concluded between myself and the Plaintiff. The Plaintiff specifically travelled to Stellenbosch, where we discussed this agreement.

9.40    During said discussion in Stellenbosch, approximately during January 2004, I specifically made it clear to the Plaintiff:

9.40.1 He **invests** his money. It is not a loan.

9.40.2 He invests his money in the entity incorporated in the US alone. He has nothing to do with Elan in its day to day activities, and he receives no

equity in Elan. His only link to Elan would be when it is sold, together with the entity incorporated in the US, as part of the aforesaid exit strategy; and

9.40.3 He is only authorized to, once his aforesaid investment is made, represent the entity incorporated in the US.

9.41   It is on the basis of this oral agreement that the Plaintiff invested US$ 250 000.00 in the entity that was incorporated in the US as Elan Suisse International Holdings ("Holdings").

9.42   Both Holdings and Elan are legitimate businesses. Their integrity as corporate entities is beyond question, the product real, and its potential substantial.

9.43   As I have set out above, I have been occupied with the business of Elan and Holdings for the past three years on a full time basis. The said business is about to be launched.

9.44   The Plaintiff, as will appear more fully hereunder, repeatedly confirmed his investment. His said investment was a repudiation of the aforesaid oral agreement in that he invested less than agreed. Nonetheless, I chose to hold the Plaintiff to our agreement, on the basis that he simply receive less equity in Holdings for his lower investment.



1430750-0    J.F. VAN WYK

9.45   The Plaintiff agreed to this.


## 10.


10.1   In a series of e-mails that passed between myself and the Plaintiff from the 28th of January 2004 to the 14th of February 2004, I advised the Plaintiff and represented to him that:


10.1.1 I have spent the previous two years in setting up Elan in South Africa as a financial engineering company, with a national network of independent financial advisors ("brokers") and institutions, through which certain United States based financial products would be sold to an investor base of some one million investors, accessed through such brokers and institutions, in South Africa; and


10.1.2 I had already invested some US $ 1 600 000 in setting up the business of Elan; and


10.1.3 I was looking for an investor to enable me to complete the project.


10.2   The discussion centered around an investment in Holdings, and I explained the entire structure and the exit strategy as is set out above to the Plaintiff. I emphasize that the discussion was not limited to the e-mails that passed between myself and the Plaintiff. It was supplemented by our

0430750-0

J.F. VAN WYK

oral conversations, resulting in the aforesaid agreement, for which the Plaintiff traveled to Stellenbosch specifically to discuss same with me.

10.3   I deny that any amount other than US$ 350 000 was ever discussed between me and the Plaintiff. With the substantial profits that the product will no doubt generate in Holdings through the intellectual property held there, I was loathe to allow the Plaintiff to invest in Holdings for a lesser sum.

10.4   The simple reason why the Plaintiff and his investment was necessary was that I needed both capital and labor in the US to assist in the activities of Holdings, which I could not handle myself. The Plaintiff is an accountant with "local knowledge", and I considered him a suitable person to assist in this regard.

10.5   Form our aforesaid discussions the Plaintiff decided to invest in holdings and did so by transferring the total of US $ 250 000 to my off shore bank account held in London, from the US.

**11.**

11.1   The Plaintiff invested in Holdings.

11.2   He simply had no contribution to make to Èlan, whereas I needed him to assist with Holdings.

11.3   I have already set out the oral agreement between the Plaintiff and myself pertaining to his investment in Holdings herein above.

**12.**

12.1   The agreement pertaining to the intellectual property being held in Holdings and the incorporation of Holdings was reached before the Plaintiff transferred a cent to me. This was all agreed simultaneously as part of the agreement set out above.

12.2   At the time, Holdings was obviously not incorporated yet and had no banking facilities. Also, his investment was in Holdings, and it would defy logic to bring that money into South Africa. Holdings had nothing here.

12.3   As I have already pointed out, the Plaintiffs' investment was merely for the purpose of establishing and running Holdings. None of the funds were utilized in any other fashion.

12.4   This is the only reason why the funds were received in my offshore banking accounts.

12.5   The first year in which Holdings was incorporated had not run yet. At the end of the book year, the said funds shall be accounted for fully within Holdings as a capital investment.



12.6   By 15 September 2004, the Plaintiff had second thoughts about his investment. He now all of the sudden saw it as a loan, and wanted his money back. This appears fully from the e-mail from the Plaintiff attached hereto as **Annexure "BC4"**.

12.7   After I contacted the Plaintiff and reminded him of the terms of the agreement, he reconsidered and proposed that only a certain portion of his investment be refunded to him, but that the remaining portion of his investment remain in Holdings under certain conditions. I attach a copy of the relevant e-mail hereto as **Annexure "BC5"**.

12.8   From **Annexure "BC5"** hereto it is clear that the Plaintiff effectively attempts to renegotiate the agreement in terms far more favorable for him than what the agreement is.

12.9   The Plaintiff, as an accountant, is fully aware that, where an investor invests in a company, public or private (not a loan), it is not as simple as asking for your money back when one wants to liquidate such investment.

12.10  From the very beginning, I held out to the Plaintiff that his investment is governed by the articles of association of Holdings, and I supplied him with a copy of same.



0430750-0    F. VAN WYK

12.11 The Plaintiff was aware of this, as appears from his later e-mail of 17 September 2004, a copy of which I attach hereto as Annexure "BC6" and his e-mail dated 18 September 2004, a copy of which I attach hereto as Annexure "BC7", from which he clearly intimates that he knows his investment must be "liquidated" through the sale of his shares.

12.12 It is in this sense that I reply to the Plaintiffs' said e-mail on Annexure "BC7" hereto that "cash" is coming. It simply refers to my efforts that I shall find other investors in Holdings to replace him.

12.13 However, the Plaintiff, on the 21st of September 2004, suddenly, without any warning, changed his mind and informed me by way of e-mail, a copy of which is attached hereto as Annexure "BC8", that he no longer wishes to liquidate his position.

12.14 Also, on the 21st of September 2004, the Plaintiff by way of e-mail confirmed that, to his mind, I was not a "scam artist". I attach a copy of said e-mail hereto as Annexure "BC9".

12.15 I was now under the impression that the Plaintiff is fully aware of the terms of the agreement and its nature and is satisfied with his investment. Moreover, it appeared that the Plaintiff was aware of the terms of the articles of association of Holdings, and that:

12.15.1     his investment was in Holdings; and

J.F. VAN WYK

12.15.2    it can only be repaid to him by holdings upon the sale of his shares in holdings for the price he so obtains.

**12.16** It must also be borne in mind that I spoke to the Plaintiff continuously, and that e-mail was not our only form of communication. During our said conversations the Plaintiff also gave repeated indications that he is happy with his investment and understood the terms thereof.

12.17 The Plaintiff invested his money in accordance with the terms of the agreement. There was no written agreement contemplated between the parties. Certain paperwork, like share transfer forms, had to be concluded in order to fully implement the oral agreement, but no more than that.

12.18 I again point out that the Plaintiff invested less than what we agreed upon. This entitled him to less equity in Holdings, a fact to which I will show hereunder he agreed to.

12.19 I have spent many years working on this project, which the Plaintiff expects to make him rich in less than a year. The simple truth of the matter is that the Plaintiff had expectations of earlier returns, and now doesn't have the patience to wait for his returns as the prudent investor would do.

12.20 Moreover, while I have no problem that the Plaintiff liquidate his position by taking possession of his shares and selling same as he is

27

aware he must do, he clearly seems unable or unwilling to perform this step. I have, throughout, tendered delivery of the said shares to the Plaintiff, and I still do so.

12.21 It is clear from what I have set out herein above that my offer to repay the Plaintiff his investment was made in our mutual understanding that the only way of doing so would be to take possession of and sell his shares in Holdings.

12.22 I attach hereto, as **Annexure "BC10"**, a copy of my e-mail sent to the Plaintiff dated the 17th of February 2004 in which I clearly ask him if he is aware that he only buys into Holdings.

12.23 Further, it is clear from the full paper trail as I have set out above, that I never undertook to repay the investment of the Plaintiff personally. His shares in Holdings would have to be sold, and he would be paid from that. He knew this.

12.24 In any event, in **Annexure "BC8"** hereto, the Plaintiff changes his mind, and stands down from the position where he wanted to liquidate his position in Holdings. Even if I am wrong in my position that I never undertook personally to repay the Plaintiffs' investment to him, which I still deny, the Plaintiff clearly waived such payment, before the attempted "acceptance" thereof by the Plaintiffs' attorneys of record.



A.F. VAN WYK