# EXHIBIT E

LEXSEE 2005 DEL. CH. LEXIS 133

TODD ALBERT, JOSEPH M. BRYAN, JR., KEVIN CALDERWOOD, KATHERINE D. CROTHALL, SCOTT W. FRAZIER, FU FAMILY REVOCABLE TRUST, ROBERT B. GOERGEN, SR., ROBERT G. GOERGEN, JR., TODD A. GOERGEN, HASAN 1995 LIVING TRUST, WAI YAN HO, WILLIS JAMES HINDMAN, JOHNSON FAMILY LIVING TRUST, MICHAEL R. KIDDER REVOCABLE TRUST, MARK AND ANN KINGTON, JEFFREY A. KOSER, MARLENKO INC., ELAINE MCKAY FAMILY, LP, DAVID MIXER, MRW TRUST, JAMES MURRAY, JIM K. OMURA 1996 TRUST, JENNIFER OWEN AND MICHAEL J. ROSS, NICHOLAS PEAY, DOUGLAS G. SMITH, FREDERICK G. SMITH, JANE VEI-CHUN SUN, MARK WABSCHALL, KAREN L. WALSH, WARMENHOVEN 1995 CHILDREN'S TRUST, YAN 1996 REVOCABLE TRUST, BARBARA J. ZALE, and CHARLES A. ZIERING, Plaintiffs, v. ALEX. BROWN MANAGEMENT SERVICES, INC.; DEUTSCHE BANK SECURITIES, INC.; DEUTSCHE BANK, AG; RICHARD HALE; GARY FEARNOW; BRUNS GRAYSON; E. ROBERT KENT, JR.; TRUMAN T. SEMANS; DC INVESTMENT PARTNERS, LLC; DOCTOR ROBERT CANTS, III; and MICHAEL W. DEVLIN, Defendants. ELIZABETH J. BAKER, BENDER 1996 REVOCABLE TRUST, DR. STEVEN J. BERLIN, ESTATE OF ROBERT B. BLOW, LUTHER C. BOLIEK, STEPHEN E. COIT, SARA CROWDER, GERALD K. AND TERESA K. FEHR, FU FAMILY REVOCABLE TRUST, RALPH GLASGAL, ROBERT G. GOERGEN, JR. 1985 TRUST, TODD A. GOERGEN 1985 TRUST, PETER O. HAUSMANN, WILLIS JAMES HINDMAN, WILLIAM F. KAISER, MARK AND ANN KINGTON, TIMOTHY K. KRAUSKOPF, WILLIAM T. MCCONNELL, PHILIP R. MCKEE, DAVID MIXER, MRW TRUST, JAMES MURRAY, PAUL D. AND JUDITH F. NEWMAN, W.L. NORTON, GREGORY PACKER, HOWARD E. ROSE, RUBEN FAMILY LIMITED PARTNERSHIP, 5 S TRUST, SALADRIGAS FAMILY LTD. PARTNERSHIP, RICARDO A. SALAS, JOSE M SANCHEZ, SAMUEL SIEGEL, SILVERMAN 1996 IRREVOCABLE TRUST, DOUGLAS G. SMITH, FREDERICK G. SMITH, RONALD B. STAKLAND, STRAUCH KULHANJAIN FAMILY TRUST, BRUCE E. TOLL, ALEXANDER R. AND MARJORIE L. VACCARO, YANOVER FAMILY LTD. PARTNERSHIP, MICHAEL YOKELL, and JUSTIN A. ZIVIN, Plaintiffs, v. ALEX. BROWN MANAGEMENT SERVICES; DEUTSCHE BANK SECURITIES, INC.; DEUTSCHE BANK, AG; RICHARD HALE; E. ROBERT KENT, JR.; TRUMAN T. SEMANS; DC INVESTMENT PARTNERS, LLC; DOCTOR ROBERT CRANTS, III, and MICHAEL W. DEVLIN, Defendants.

C.A. No. 762-N, C.A. No. 763-N

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2005 Del. Ch. LEXIS 133*

**July 22, 2005, Submitted**
**August 26, 2005, Decided**
**August 26, 2005, Filed**

**PRIOR HISTORY:** *Albert v. Alex. Brown Mgmt. Servs., 2005 Del. Ch. LEXIS 100 (Del. Ch., June 29, 2005)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In an action by plaintiff investors in a Delaware limited partnership, nominal defendant partnership and defendant fund managers moved to dismiss for failure to state a claim and for lack of personal jurisdiction the investors' claims that included breach of fiduciary duty, fraud, civil conspiracy, breach of contract, breach of covenant of good faith and fair dealing, gross negligence, and unjust enrichment.

**OVERVIEW:** The investors in the limited partnership, which operated two high-tech investment funds, suffered enormous losses when the value of the funds tumbled. They alleged that the managers did not bother to properly monitor funds and, in an least some instances, failed to follow the funds' established hedging procedures as the investors had been promised. The court held that certain breach of fiduciary duty claims failed to show a fiduciary duty to the investors but that the investors had made out derivative claims that might survive if, after amendment, the pleadings adequately alleged a demand for action as required by *Del. Code Ann. tit. 6, § 17-1001*. The breach of contract claims were adequately alleged based on failure to disclose and providing misleading information. Although gross negligence, the only sort of negligence for which the managers could be liable, was hard to prove, the allegations of mismanagement and neglect were sufficient to survive a motion to dismiss. Finally, the court had jurisdiction under *Del. Code Ann. tit. 10, § 3104*, even though the managers were not Delaware residents, as they had taken advantage of Delaware laws in organizing their partnership.

**OUTCOME:** The court dismissed certain breach of fiduciary duty claims, the fraud claims, the conspiracy claims, the unjust enrichment claims, and certain agency liability claims against one defendant. The motions were denied as to all other claims, and the motion to dismiss for lack of jurisdiction was denied altogether.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN1] The determination of materiality is a mixed question of fact and law that generally cannot be resolved on the pleadings.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Business & Corporate Law > Limited Partnerships > Management Duties & Liabilities*
[HN2] For purposes of a derivative action alleging non-disclosure by management, an omitted fact is material if under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable investor. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of information made available.

*Contracts Law > Contract Interpretation > Fiduciary Responsibilities*
*Governments > Fiduciary Responsibilities*
*Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview*
[HN3] There is not, of course, any general duty on the part of managers to disclose information. To bring a nondisclosure claim, a party must allege either a fiduciary duty or a contractual duty to disclose.

*Contracts Law > Contract Interpretation > Fiduciary Responsibilities*
*Governments > Fiduciary Responsibilities*
*Torts > Intentional Torts > Breach of Fiduciary Duty > Elements*
[HN4] There is not a general fiduciary duty on the part of managers to provide financial statements.

*Business & Corporate Law > General Partnerships > Management Duties & Liabilities > Causes of Action > Negligent Acts of Partners*
*Torts > Negligence > Duty > General Overview*
*Torts > Negligence > Standards of Care > Reasonable Care > General Overview*
[HN5] Director liability for breaching the duty of care is predicated upon concepts of gross negligence. A court faced with an allegation of lack of due care should look for evidence of whether a board has acted in a deliberate and knowledgeable way in identifying and exploring alternatives. "Gross negligence" has a stringent meaning under Delaware corporate (and partnership) law, one that involves a devil-may-care attitude or indifference to duty amounting to recklessness. In the duty of care context with regard to corporate fiduciaries, gross negligence has been defined as a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions that are without the bounds of reason. In order to prevail

on a claim of gross negligence, a plaintiff must plead and prove that the defendant was reckless uninformed or acted outside the bounds of reason.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Business & Corporate Law > Limited Partnerships > Management Duties & Liabilities*
[HN6] Whether fund managers exercised the requisite amount of due care in managing the funds is a fact-sensitive inquiry.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Contracts Law > Breach > Causes of Action > General Overview*
[HN7] In order to survive a motion to dismiss for failure to state a breach of contract claim, a plaintiff must demonstrate: (i) the existence of a contract, (ii) a breach of an obligation imposed by that contract, and (iii) resultant damages to the plaintiff.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
*Criminal Law & Procedure > Accusatory Instruments > Informations*
[HN8] Concomitant to a contractual duty to provide information is the duty that such information not be false or misleading.

*Governments > Fiduciary Responsibilities*
*Torts > Business Torts > Fraud & Misrepresentation > Nondisclosure > General Overview*
[HN9] Common law fraud in Delaware requires that: (1) the defendant made a false representation, usually one of fact; (2) the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; (3) the defendant had the intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted or did not act in justifiable reliance on the representation; and (5) the plaintiff suffered damages as a result of such reliance. In addition to overt representations, where there is a fiduciary relationship, fraud may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN10] Fraud claims are subject to the heightened pleading standards of Del. Ch. Ct. R. 9(b). This means that the pleading must identify the time, place and contents of the false representations, the facts misrepresented, as well as the identity of the person making the misrepresentation and what he obtained thereby.

*Contracts Law > Types of Contracts > Express Contracts*
*Contracts Law > Types of Contracts > Implied-in-Fact Contracts*
*Contracts Law > Types of Contracts > Implied-in-Law Contracts*
[HN11] In some circumstances, alternative pleading allows a party to seek recovery under theories of contract or quasi-contract. This is generally so, however, only when there is doubt surrounding the enforceability or the existence of the contract. Courts generally dismiss claims for quantum meruit on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls.

*Business & Corporate Law > Agency Relationships > Agents Distinguished > Special Agents*
*Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview*
*Torts > Vicarious Liability > Corporations > Subsidiary Corporations*
[HN12] A parent corporation can be held liable for the acts of its subsidiary under either of two theories of agency liability. The first is where piercing the corporate veil is appropriate. While many factors are considered in deciding whether to pierce the corporate veil, the concept of complete domination by the parent is decisive. Second, while one corporation whose shares are owned by a second corporation does not, by that fact alone, become the agent of the second company, a corporation-- completely independent of a second corporation--may assume the role of the second corporation's agent in the course of one or more specific transactions. This restricted agency relationship may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside the limited agency setting. Under this second theory, total domination or general alter ego criteria need not be proven.

2005 Del. Ch. LEXIS 133, *

*Business & Corporate Law > Corporations > Share-holders > Disregard of Corporate Entity > General Overview*
*Torts > Vicarious Liability > Corporations > Subsidiary Corporations*
[HN13] Persuading a Delaware court to disregard the corporate entity is a difficult task. The legal entity of a corporation will not be disturbed until sufficient reason appears.

*Banking Law > National Banks > Affiliates & Subsidiaries*
*Business & Corporate Law > Corporations > Share-holders > Disregard of Corporate Entity > General Overview*
*Torts > Vicarious Liability > Corporations > Subsidiary Corporations*
[HN14] Ownership alone is not sufficient proof of domination or control for purposes of disregarding a corporate entity and imposing liability on a parent corporation.

*Business & Corporate Law > Agency Relationships > Authority to Act > Actual Authority > General Overview*
[HN15] Actual authority is that authority which a principal expressly or implicitly grants to an agent.

*Business & Corporate Law > Agency Relationships > Authority to Act > Apparent Authority > General Overview*
*Business & Corporate Law > Agency Relationships > Duties & Liabilities > Negligent Acts of Agents > Liability of Principals*
[HN16] Apparent authority is that authority which, though not actually granted, a principal knowingly or negligently permits an agent to exercise, or which he holds him out as possessing. In order to hold a defendant liable under apparent authority, a plaintiff must show reliance on indicia of authority originated by principal, and such reliance must have been reasonable.

*Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements*
*Torts > Intentional Torts > Breach of Fiduciary Duty > Elements*
*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > Elements*
[HN17] The elements for civil conspiracy under Delaware law are: (i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance

of the conspiracy; and (iii) damages resulting from the action of the conspiracy parties.

*Estate, Gift & Trust Law > Trusts > General Overview*
*Governments > Fiduciary Responsibilities*
*Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview*
[HN18] Claims for civil conspiracy to commit a breach of fiduciary duty are sometimes called aiding and abetting. However, the basis of such a claim, regardless of how it is captioned, is the idea that a third party who knowingly participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship.

*Governments > Fiduciary Responsibilities*
*Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview*
*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview*
[HN19] A claim for civil conspiracy to commit a breach of fiduciary duty involves vicarious liability. It holds a third party, not a fiduciary, responsible for a violation of fiduciary duty. Therefore, it does not apply to defendants that owe a direct fiduciary duty.

*Civil Procedure > Remedies > Equitable Accountings > General Overview*
[HN20] An accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained to be due to either as a result.

*Business & Corporate Law > Corporations > Share-holders > Actions Against Corporations > General Overview*
*Business & Corporate Law > Limited Partnerships > Management Duties & Liabilities*
[HN21] See Del. Code Ann. tit. 6, § 17-1001.

*Business & Corporate Law > Corporations > Share-holders > Actions Against Corporations > General Overview*
*Business & Corporate Law > Limited Partnerships > General Overview*
*Governments > Courts > Judicial Precedents*
[HN22] The determination of whether a claim is derivative or direct in nature is substantially the same for corporate cases as it is for limited partnership cases. Accordingly, in deciding such issues, a Delaware court re-

lies on corporate as well as partnership case law for its determination of a lawsuit's nature.

*Business & Corporate Law > Corporations > Share-holders > Actions Against Corporations > Direct Actions*
*Business & Corporate Law > Corporations > Share-holders > Shareholder Duties & Liabilities > General Overview*
*Civil Procedure > Class Actions > Derivative Actions > General Overview*
[HN23] The determination of whether a claim is direct or derivative turns solely on the following questions: (i) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (ii) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually). The duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint. Instead the court must look to all the facts of the complaint and determine for itself whether a direct claim exists.

*Business & Corporate Law > General Partnerships > Management Duties & Liabilities > Causes of Action > Negligent Acts of Partners*
*Business & Corporate Law > Limited Partnerships > Management Duties & Liabilities*
*Governments > Fiduciary Responsibilities*
[HN24] In order to show a direct injury under Tooley, an investor must demonstrate that the duty breached was owed to him or her and that he or she can prevail without showing an injury to the corporation or limited partnership. Generally, nondisclosure claims are direct claims.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Business & Corporate Law > Corporations > Share-holders > Actions Against Corporations > Direct Actions*
*Civil Procedure > Class Actions > Derivative Actions > General Overview*
[HN25] A claim of mismanagement represents a direct wrong to the corporation that is indirectly experienced by all shareholders. Any devaluation of stock is shared collectively by all the shareholders, rather than independently by the plaintiff or any other individual shareholder. Thus, the wrong alleged is entirely derivative in nature.

*Business & Corporate Law > Corporations > Share-holders > Actions Against Corporations > General Overview*
*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
[HN26] If a party brings derivative claims without first making demand, and demand is not excused, those claims must be dismissed.

*Business & Corporate Law > Limited Partnerships > Formation*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN27] As a matter of law, by accepting the position of general partner, a corporation consents to be subjected to a Delaware court's jurisdiction if the limited partnership has chosen to incorporate under Delaware law.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN28] Where the well-pleaded allegations in complaints are not rebutted by affidavit, a court will, for the purposes of a Del. Ch. Ct. R. Rule 12(b)(2) motion, assume the truthfulness of those allegations. A trial court is vested with broad discretion in shaping the procedure by which a motion under Rule 12(b)(2) is decided.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*
[HN29] When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the nonresident defendant. In determining whether it has personal jurisdiction over a nonresident defendant, the court will generally engage in a two-step analysis. First, was service of process on the nonresident authorized by statute? Second, does the exercise of jurisdiction, in the context presented, comport with due process?

*Civil Procedure > Jurisdiction > Jurisdictional Sources > Statutory Sources*

2005 Del. Ch. LEXIS 133, *

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Evidence > Procedural Considerations > Burdens of Proof > General Overview*
[HN30] On a Del. Ch. Ct. R. 12(b)(2) motion, the burden is on the plaintiff to make a specific showing that the court has jurisdiction under a long-arm statute.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN31] See *Del. Code Ann. tit. 10, § 3104.*

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
[HN32] *Del. Code Ann. tit. 10, § 3104* has been broadly construed to confer jurisdiction to the maximum extent possible under the due process clause.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Challenges*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
*Civil Procedure > Appeals > Standards of Review > General Overview*
[HN33] When in personam jurisdiction is challenged on a motion to dismiss, the record is construed most strongly against the moving party.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*
[HN34] The focus of a minimum contacts inquiry is whether a nonresident defendant engaged in sufficient minimum contacts with the State of Delaware to require it to defend itself in the courts of Delaware consistent with the traditional notions of fair play and justice. In order to establish jurisdiction over a nonresident defendant, the nonresident defendant's contacts with the forum must rise to such a level that it should reasonably anticipate being required to defend itself in Delaware's courts. The minimum contacts necessary to establish jurisdiction must relate to some act by which the defendant has deliberately created obligations between itself and the forum. Consequently, the defendant's activities are shielded by the benefits and protection of the forum's laws and it

is not unreasonable to require it to submit to the forum's jurisdiction.

*Business & Corporate Law > Limited Partnerships > Management Duties & Liabilities*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*
[HN35] In determining whether a business entity has sufficient minimal contacts with Delaware, case law recognizes the important state interest that Delaware has in regulating entities created under its laws, and that interest can only be served by exercising jurisdiction over those who manage a Delaware entity. When a person manages a Delaware entity and receives substantial benefit from doing so, he should reasonably expect to be held responsible for his wrongful acts relating to the Delaware entity in Delaware.

**COUNSEL:** [*1] Jeffrey S. Goddess, Esquire, Jessica Zeldin, Esquire, ROSENTHAL, MONHAIT, GROSS & GODDESS, P.A., Wilmington, Delaware; Steven E. Fineman, Esquire, Hector D. Geribon, Esquire, Daniel P. Chiplock, Esquire, LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP, New York, New York, for Plaintiffs.

Michael D. Goldman, Esquire, Peter J. Walsh, Esquire, Melony R. Anderson, Esquire, POTTER, ANDERSON & CORROON LLP, Wilmington, Delaware; Christopher P. Hall, Esquire, Kevin Rover, Esquire, John Vassos, Esquire, Marilyn B. Ampolsk, Esquire, MORGAN, LEWIS & BOCKIUS,LLP, New York, New York, for Defendants Alex Brown Management Services, Inc., Deutsche Bank Securities, Inc. and Deutsche Bank A.G.

Daniel Griffith, Esquire, MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN, Wilmington, Delaware, for Defendants DC Investment Partners, LLC, Dr., Robert Crants, III and Michael W. Devlin.

Richard D. Allen, Esquire, Thomas W. Briggs, Jr., Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware, for Defendants Richard Hale, Gary Fearnow, Bruns Grayson, E. Robert Kent, Jr. and Truman T. Semans.

**JUDGES:** LAMB, Vice Chancellor.

**OPINIONBY:** LAMB

**OPINION:**

   *MEMORANDUM OPINION*

LAMB, Vice Chancellor.

### I. [*2]

In a recent opinion in these two related cases on the defendants' motion to dismiss under Court of Chancery Rule 12(b)(6), the court addressed the defendants' statute of limitations argument and concluded that any claims arising before November 11, 2000, the date upon which the parties entered into an agreement tolling the statute of limitations, were barred. n1 Because it was unclear which, if any, claims for relief set out in the complaints arise after that date, the court requested additional submissions from the parties.

> n1 The facts alleged in the complaints are recited in detail in the earlier opinion. *Albert v. Alex. Brown Mgmt. Servs., 2005 Del. Ch. LEXIS 100, at *43-58 (Del. Ch. June 29, 2005).* Reference is made to that opinion for a complete recitation of the facts and for the definition of terms used herein. However, to avoid confusion, the court refers in this opinion to Alex. Brown Management Services, Inc. as "AB Management." Unless otherwise noted, the facts recited in this opinion are taken from the well-pleaded allegations of the complaints.

[*3]

In this opinion, the court now addresses the issues raised in the additional submissions as well as the remaining issues raised by the defendants' motion to dismiss. Included among the latter are: (i) whether any surviving claims are derivative, rather than direct claims as to which demand was neither made nor excused; and (ii) whether the court can exercise personal jurisdiction over several defendants (the "DCIP Defendants") who served as agents, or employees of agents, of the partnerships.

### II.

In the earlier opinion, the court noted that some of the factual allegations in the complaints occurred after November 11, 2000 and that, therefore, viable claims based on these factual allegations are not time-barred. n2 The Plaintiffs' Response Brief n3 identified five other factual allegations in the complaints (all involving allegedly material misrepresentations or non-disclosures) which, they contend, support viable claims for relief. These are: (i) the Managers' failure in the December 2000 semi-annual reports (dated on or about February 28, 2001) to inform the defendants that hedging was desirable, but the Funds could not afford to do so; (ii) the allegedly misleading statement [*4] in the December 31, 2000 report to the unitholders that the Managers remained "comfortable with the broad diversification

achieved by the Funds' portfolio of public securities and private investments. . . .;" (iii) the defendants' failure to inform the unitholders of the Funds' "liquidity issues," "steps that the management could take to improve liquidity," and "alternatives to raise additional liquidity," although these themes were the focus of the Management Committee meetings of October 3, 2000, March 23, 2001, and September 6, 2001; (iv) the defendants' failure to inform the unitholders that, in June of 2001, AmSouth Bank withdrew from the credit syndicates for the Funds, thereby leaving Bank of America as the only lender for the Funds; and (v) the defendants' failure to inform the unitholders of the Funds violation of their credit arrangements with their lenders, including their eventual defaults, on June 5, 2002 (for the Fund I loan), and June 28 and September 30, 2002 (for the Fund II loan).

> n2 The factual allegations specifically discussed in the earlier opinion are as follows: First, the Managers failed to provide financial statements and reports as they are required to under the Partnership Agreements and Delaware law. Second, the Managers wrongfully allowed certain withdrawals from the Funds, thereby causing or exacerbating a liquidity crisis. Specifically, the Fund II Complaint alleges that three withdrawals from Fund II occurred after November 11, 2000. These allegedly occurred on January 17, 2001, October 25, 2001, and December 31, 2001 (the "Fund II 2001 Withdrawals"). Additionally, the Fund I Complaint alleges approximately $ 8.0 million in withdrawals occurred in December of 2000 from Fund I (the "Fund I December 2000 Withdrawals"). Third, the Managers failed to provide active and competent management of the Funds. *Alex. Brown, 2005 Del. Ch. LEXIS 100, at *78-*79.*

[*5]

> n3 The Plaintiffs' Response Brief is titled "Plaintiffs' Brief In Response To The Court's Memorandum Opinion And Order Of June 29, 2005" and was filed on July 15, 2005.

All five of these factual allegations are found in the complaints. Furthermore, they allegedly occurred after November 11, 2000. Therefore, claims based on these allegations are timely. However, a threshold question is whether the information that the plaintiffs allege should have been disclosed, or was disclosed but was allegedly false and misleading, is material. If this information is not material as a matter of law, the allegations will not

support claims that the Managers violated their disclosure duties. whether, under the facts alleged in the complaints, these disclosure (or non-disclosure) allegations support a reasonable inference of materiality. If they do not, these factual allegations cannot support a claim for relief.

[HN1] The determination of materiality is a mixed question of fact and law that generally cannot be resolved on the pleadings. n4 Therefore, the court cannot (and does not) make any final findings on the [*6] materiality of these alleged disclosure allegations. However, on a Rule 12(b)(6) motion, the court must determine

n4 *O'Malley v. Boris, 742 A.2d 845, 850 (Del. 1999)*

[HN2] An omitted fact is material if "under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix' of information made available." n5

n5 *Rosenblatt v. Getty Oil Co., 493 A.2d 929, 944 (Del. 1983)* (quoting *TSC Indus. v. Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976))*.

The first alleged non-disclosure is that the Managers' failed in the December 2000 semi-annual reports [*7] to inform the unitholders that hedging was desirable, but the Funds could not afford to do so. This allegation of non-disclosure, viewed in the context of the allegations contained in the complaints, supports a reasonable inference that this information is material. According to the complaints, the defendants marketed the Funds as being actively managed by experienced, professional managers. Viewed in this context, a unitholder would likely find it important to know that the Managers could not manage the Funds in what they believed to be the Funds' best interests, because they were facing liquidity problems and could not afford to purchase collars.

The second alleged non-disclosure is that the defendants failed to inform the unitholders of the Funds' "liquidity issues," "steps that the management could take to improve liquidity," and "alternatives to raise additional liquidity." As alleged in the complaints, the real cause of

the Funds' losses was the lack of liquidity. The lack of liquidity allegedly prevented the Managers from properly hedging the Funds as they (allegedly) thought was best for the Funds. Viewed in that context, a reasonable investor would likely find it important [*8] to know such information.

The third alleged non-disclosure is that the defendants failed to inform the unitholders that, in June of 2001, AmSouth Bank withdrew from the credit syndicates for the Funds, thereby leaving Bank of America as the only lender for the Funds. Under the facts alleged, the court cannot reasonably infer that this information is material. The complaints allege that the unitholders understood from the very beginning that the Funds would have to borrow money. This is because the contributed securities were illiquid and the Funds needed cash to purchase collars. Given that fact, it is unlikely that a reasonable investor would find it important to know that the Funds were borrowing from one lender as opposed to multiple lenders. In fact, such information would likely only confuse an investor by giving him more information than is necessary to understand the Funds. Therefore, the plaintiffs cannot bring any claims based on this factual allegation.

The fourth alleged non-disclosure is that the defendants failed to inform the unitholders of the Funds' violations of the credit arrangements with their lenders, including the eventual defaults, on June 5, 2002 (for the [*9] Fund I loan), and June 28 and September 30, 2002 (for the Fund II loan). This allegation supports a reasonable inference of materiality. As opposed to the information about a bank withdrawing from the credit syndicate, the fact that the Funds were in default on their loans directly speaks to the financial condition of the Funds. A reasonable investor would want to know this information.

Finally, the plaintiffs allege that the claim in the December 31, 2000 report that the Managers remained "comfortable with the broad diversification achieved by the Funds' portfolio of public securities and private investments" was materially false and misleading. This allegation does *not* support a reasonable inference that this information is material. It is simply a statement of the Managers' opinion. Furthermore, there is no allegation in the complaints that this statement of opinion was not honestly held, i.e. false. Therefore, the plaintiffs cannot bring any claims based on this factual allegation.

The Non-Disclosure Allegations n6 relate to failures to disclose allegedly material information. [HN3] There is not, of course, any general duty to disclose information. To bring a non-disclosure claim, [*10] a party must allege either a fiduciary duty or a contractual duty to disclose. The plaintiffs have attempted to allege both.

Therefore, the court will address the Non-Disclosure Allegations in the context of the plaintiffs' claims for breach of fiduciary duty and breach of contract.

n6 Collectively, the court refers to the three remaining factual allegations of non-disclosure as the "Non-Disclosure Allegations."

## III.

The allegations set out in the two complaints are nearly identical and the complaints are both set out in eleven counts: breach of fiduciary duty (Count 1); aiding and abetting a breach of fiduciary duty (Count 2); common law fraud (Count 3); aiding and abetting common law fraud (Count 4); breach of contract against AB Management (with respect to Fund I) and breach of contract against DCIP (with respect to Fund II) (Count 5); breach of the covenant of good faith and fair dealing against AB Management (with respect to Fund I) and breach of the covenant of good faith and fair dealing against [*11] DCIP (with respect to Fund II) (Count 6); gross negligence (Count 7); unjust enrichment against all defendants (Count 8); conspiracy liability (Count 9); an accounting (Count 10); and agency liability against Deutsche Bank and DBSI (Count 11). The court first addresses each of the substantive claims (Counts 1, 3, 5-8, & 10). The court then considers the vicarious liability claims (Counts 2, 4, 9, & 11).

A. Breach Of Fiduciary Duty (Count 1)

1. Failure To Provide Financial Statements

The complaints allege that the Managers failed to provide the unitholders with the 2001 audited financial statements until 2003, and failed to provide any investor reports or audited financial statements for 2002. The plaintiffs argue that this amounted to a breach of the Managers' fiduciary duties.

[HN4] There is not, of course, a general fiduciary duty to provide financial statements. Instead, under the Partnership Agreements, the Managers had a contractual duty to provide the unitholders with such reports. n7 The plaintiffs have not articulated why the violation of this contractual right amounted to a breach of fiduciary duty. n8 Thus, this factual allegation does not state a claim for breach [*12] of fiduciary duty.

n7 Partnership Agreements § 11.2.

n8 In the Plaintiffs' Response Brief, the plaintiffs argue that the Managers failed to make material disclosures, when they had a fiduciary obligation to do so. They further outline specific factual allegations, the Non-Disclosure Allegations, they contend are material and should have been disclosed. The Non-Disclosure Allegations are discussed below.

2. Withdrawal Allegations

The plaintiffs argue that the Managers wrongfully allowed the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals. The plaintiffs contend that the defendants violated their fiduciary duties "by failing to ensure that the Funds had sufficient financial resources' to accomplish their investment objectives,' and failed to ensure that the Managers were providing professional and active supervision, oversight and management of the Funds." n9

n9 Pls.'s Resp. Br. at 7.

[*13]

From these factual allegations, the court cannot reasonably infer a breach of the fiduciary duty of loyalty. The complaints do not allege that the Managers benefited personally in any way by allowing the withdrawals. In fact, the amount of fees that the Managers received were based on the amount of money the Funds had under management. Therefore, if anything, the Managers had an incentive *not* to allow redemptions.

Likewise, the plaintiffs' allegations relating to the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals do not rise to the level of a breach of the duty of care. [HN5] Director liability for breaching the duty of care "is predicated upon concepts of gross negligence." n10 A court faced with an allegation of lack of due care should look for evidence of whether a board has acted in a deliberate and knowledgeable way in identifying and exploring alternatives. n11

n10 *Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984); accord Citron v. Fairchild Camera & Instrument Corp., 569 A.2d 53, 66 (Del. 1989).*

n11 *Citron, 569 A.2d at 66*

[*14]

Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one "which involves a devil-may-care attitude or indifference to duty amounting to recklessness." n12 "In the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." n13 In order to prevail on a claim of gross negligence, a plaintiff must plead and prove that the defendant was "recklessly uninformed" or acted "outside the bounds of reason." n14

n12 William T. Allen, Jack B. Jacobs and Leo E. Strine, Jr., *Function over Form: A Reassessment of Standards of Review in Delaware Corporation Law*, 56 BUS. LAW. 1287, 1300 (2001);*accord Tomczak v. Morton Thiokol, Inc., 1990 Del. Ch. LEXIS 47, at *35 (Del. Ch. Apr. 5, 1990)* ("In the corporate context, gross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders' or actions which are without the bounds of reason.'") (citations omitted).

[*15]

n13 *In re Walt Disney Co. Derivative Litig., 2005 Del. Ch. LEXIS 113, at *162,    A.2d.    , (Del. Ch. Aug. 9, 2005)* (internal citations and quotations omitted).

n14 *Cincinnati Bell Cellular Sys. Co. v. Ameritech Mobile Phone Serv. of Cincinnati, Inc., 1996 Del. Ch. LEXIS 116, at *42 (Del. Ch. Sept. 3, 1996)* (citations omitted), *aff'd, 692 A.2d 411 (Del. 1997)* (TABLE); *see also Solash v. Telex Corp., 1988 Del. Ch. LEXIS 7, at *24-*25 (Del. Ch. Jan. 19, 1988)* (stating that the standard for gross negligence is a high one, requiring proof of "reckless indifference" or "gross abuse of discretion") (citations omitted).

The plaintiffs argue that the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals were actionably wrongful. Yet, the plaintiffs specifically allege in the complaints that the Partnership Agreements gave limited partners, in defined circumstances, the right to redeem. While the agreements also gave the Managers the power to delay or deny redemption requests "in [their] [*16] sole discretion," n15 it is difficult to read that discretionary power as imposing a positive duty to

exercise that power to prevent or delay a withdrawal in order "to ensure that the Funds had sufficient financial resources' to accomplish their investment objectives.'" Thus, while the redemptions may have exacerbated the Funds' liquidity crunch, this is not enough to say that the Managers' failure to delay or deny those redemptions can give rise to a duty of care claim.

n15 Fund I Compl. P82; Fund II Compl. P94.

Therefore, the factual allegation that the Managers wrongfully allowed the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals does not give rise to a claim for breach of fiduciary duty.

3. Active And Competent Management And Disclosure Allegations

First, the complaints allege that the Managers lacked the experience and expertise to manage the Funds. Second, the complaints allege that the Managers devoted inadequate time and attention to managing the Funds. The complaints also [*17] allege that the Managers failed to disclose material information, and made misleading disclosures.

The claim that the Managers lacked the experience and expertise to manage the Funds is completely without merit. The defendants disclosed the qualifications of the Funds' Management Committee in the Private Placement Memoranda (the "PPMs") that the defendants gave to all of the unitholders. The "Management" sections of the PPMs disclosed the names, titles, affiliations, ages, educations, and experience of the Management Committee members, DCIP's principals, and DCIP's degree of experience with exchange funds. n16 The unitholders received this information before they ever made their investment in the Funds. They, therefore, implicitly agreed that the Managers were sufficiently qualified to manage the Funds.

n16 *See* Fund I PPM at 27-29; Fund II PPM at 29-31.

However, the plaintiffs' other claim, that the Managers devoted inadequate time and attention to managing the Funds and committed disclosure violations, [*18] is more substantial. The complaints allege that the Managers made false and misleading statements to the unitholders, and failed to disclose material information. While many of the alleged misstatements took place be-

fore November 11, 2000, some (specifically, the Non-Disclosure Allegations) took place after this date.

The complaints allege that the Managers met only sporadically, less than once a year since the inception of the Funds. During this time, the Funds were facing difficult challenges. The Managers originally set up the Funds with collars, attempting to limit the upside and downside potential of the Funds. n17 The appreciation of certain contributed securities (especially Yahoo!) was causing the Funds to blow through the collars. The Managers then made the decision to remove the collars on the Funds, a decision that had beneficial effects in the short-term, but over the long-term, when the defendants failed to reinstate the collars, resulted in sharp losses.

n17 "Collaring" is financial jargon for purchasing offsetting calls and puts on a security to limit upside and downside exposure. At the inception of the Funds, the Managers attempted to limit upside and downside exposure to roughly 10%. *Alex. Brown, 2005 Del. Ch. LEXIS 100, at *9.*

[*19]

Viewed in the light most favorable to the plaintiffs, these alleged facts do (just barely) raise a duty of care claim. [HN6] Whether the Managers exercised the requisite amount of due care in managing the Funds is, of course, a fact sensitive inquiry. In certain circumstances, meeting once a year to manage an investment vehicle would be sufficient. This would be the case when the investment is relatively straight-forward, or where the complexity of the investment lies in its original design. In fact, a typical exchange fund could require less active management than other types of investments. These funds are often designed to avoid tax liability and to provide diversification, *not* to generate spectacular returns. Therefore, under normal circumstances, a properly hedged and diversified exchange fund might need less active management than, say, a typical mutual fund.

The facts alleged in the complaints, however, paint a picture of the Funds being faced with exceptional challenges, first by the sharply rising value of the securities that made up the Funds, and second by the rapid fall in value of those same securities. The response of the Managers was, allegedly, almost non-existent, [*20] meeting less than once a year.

Furthermore, the complaints allege that the Managers failed to disclose the challenges facing the Funds and the meager steps they were taking to meet those challenges. These alleged disclosure violations were poten-

tially material because, had the plaintiffs known the truth, they could have asked for withdrawals, or brought suit before the value of the Funds plummeted.

It is quite possible that the Managers acted appropriately in both the amount of time they spent managing the Funds and the disclosures they made. However, the complaints paint a picture of the Managers taking almost *no* action over the course of several years to protect the unitholders' investments, while the value of the Funds first skyrocketed and later plummeted. Under the circumstances, the plaintiffs should at least be allowed discovery to find out if, as the complaints imply, the Managers received millions of dollars in fees for doing almost nothing.

Therefore, for all of the above reasons, the court holds that the plaintiffs have plead sufficient facts to give rise to a duty of care claim.

B. Breach Of Contract And The Implied Covenant Of Good Faith And Fair Dealing [*21] (Counts 5 & 6)

[HN7] In order to survive a motion to dismiss for failure to state a breach of contract claim, a plaintiff must demonstrate: (i) the existence of the contract, (ii) a breach of an obligation imposed by that contract, and (iii) resultant damages to the plaintiff. n18

n18 *VLIW Tech., L.L.C. v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003).*

1. Failure To Provide Financial Statements Allegations

The complaints allege that the Managers had a contractual duty under the Partnership Agreements to provide semi-annual unaudited financial statements reporting on the financial condition of the Funds, and an annual audited report. The complaint further alleges that the Managers did not provide the unitholders with these reports for 2002 and did not provide the 2001 audited financial statements until 2003. Further, the court reasonably infers from the facts alleged in the complaints that the plaintiffs were harmed by either not being able to ask for a redemption, or not being able to [*22] sue for rescission or a like remedy. Therefore, the plaintiffs have satisfied the pleading requirements for a breach of contract claim and this claim cannot be dismissed.

2. Withdrawal Allegations

The plaintiffs argue that the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals constituted a breach of contract. They argue that the withdrawals caused, or made worse, the Funds' liquidity crunch.

However, the Partnership Agreements gave the unitholders the right to withdraw their investments after two years. n19 As alleged in the complaints, the unitholders' right to withdraw was limited by the power of the Managers to delay or deny redemptions "in [their] sole discretion." n20

n19 *See* Partnership Agreements PP6.3.

n20 Fund I Compl. P82, Fund II Compl. P94.

This contractual provision did not create a duty for the Managers to individually assess the financial position of the Funds and the effect that such a withdrawal would have each time a unitholder requested a withdrawal. Instead, [*23] it placed a restriction on the unitholders' right to receive withdrawals. It gave the Managers the power to limit withdrawals, in their sole discretion. Therefore, the plaintiffs have not identified a contractual obligation that the Managers have violated and this claim must be dismissed. n21

n21 In the Plaintiffs' Response Brief, the plaintiffs implicitly admit that the Managers had the authority to allow the withdrawals. Instead of arguing this point, the plaintiffs argue that the Managers had a contractual obligation to report the withdrawals.

3. Active And Competent Management And Disclosure Allegations

The plaintiffs allege that the defendants owed them a contractual duty to provide active management and to disclose all material information. The complaints allege that the Managers made false and misleading statements to the unitholders, failed to disclose material information, and that the Managers met only sporadically, less than once a year since the inception of the Funds.

As stated above, the [*24] Managers are alleged to have owed the unitholders a contractual duty to provide regular financial reports. Of course, [HN8] concomitant to the duty to provide information is the duty that such information not be false or misleading. In other words, the defendants had a contractual duty to provide the information in good faith. The complaints allege that the Managers failed to provide reports when they were contractually obligated to do so, and that, when they did provide the reports, they were false and misleading. Specifically, the plaintiffs argue that the Managers failed to disclose certain material information-the Non-Disclosure Allegations and the withdrawals.

These allegations, if proven, are sufficient to support a claim for breach of contract. Therefore, this claim survives the motion to dismiss.

C. Fraud (Count 3)

The plaintiffs' third claim is for fraud. [HN9] Common law fraud in Delaware requires that: (1) the defendant made a false representation, usually one of fact; (2) the defendant had knowledge or belief that the representation was false, or made the representation with requisite indifference to the truth; (3) the defendant had the intent to induce the plaintiff to [*25] act or refrain from acting; (4) the plaintiff acted or did not act in justifiable reliance on the representation; and (5) the plaintiff suffered damages as a result of such reliance. n22 In addition to overt representations, where there is a fiduciary relationship, fraud may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak. n23 [HN10] Fraud claims are subject to the heightened pleading standards of Rule 9(b). This means that the pleading must identify the "time, place and contents of the false representations, the facts misrepresented, as well as the identity of the person making the misrepresentation and what he obtained thereby." n24

n22 *Stephenson v. Capano Dev., Inc., 462 A.2d 1069, 1074 (Del. 1983).*

n23 *Id.*

n24 *York Linings v. Roach, 1999 Del. Ch. LEXIS 160, at *25 (Del. Ch. July 28, 1999).* (internal quotations and citations omitted).

The plaintiffs argue that the defendants committed fraud by failing [*26] to disclose material information which they had a contractual and fiduciary duty to disclose, specifically the Non-Disclosure Allegations. Obviously, this claim (resting principally on alleged omissions) is merely a rehash of Count 1 s claim of breach of fiduciary duty and Count 5's claim for breach of contract. It does not independently support a claim for relief. Moreover, the plaintiffs fail to plead with particularity what the defendants obtained through their alleged fraud. The plaintiffs plead generally that the Managers received management fees based on the amount of money that the Funds had under management, thereby giving them an incentive to keep money in the Funds. But the plaintiffs' arguments on this score are inherently contradictory. While they argue that the defendants had an incentive to

keep money in the Funds to earn great management fees, they also argue that the Managers wrongfully allowed withdrawals, thereby reducing the amount of money they had under management. Are the withdrawals also part of the alleged fraud?

For the above reasons, the plaintiffs have failed to adequately state a claim for fraud. Therefore, Count 3 will be dismissed without prejudice to [*27] the claims asserted in Count 1 or Count 5.

### D. Gross Negligence (Count 7)

The plaintiffs' fourth claim is for gross negligence. Both of the Funds' Partnership Agreements contain an exculpatory provision, limiting the liability of the Managers for losses the unitholders incurred with respect to the Funds. Except for misrepresentation or breach of the Partnership Agreements, the General Partners of the Funds (AB Management for Fund I and DCIP for Fund II), and those who perform service on their behalf, are not liable to the unitholders, unless their conduct constituted "gross negligence or intentional misconduct." n25 As such, the unitholders are forced to argue that the Managers' alleged misconduct amounted to gross negligence.

n25 Partnership Agreements § 3.5.

First, as discussed above, the allegations of the Fund I December 2000 Withdrawals and the Fund II 2001 Withdrawals do not state a claim for gross negligence. Second, also as stated above, claims for breach of the duty of care are predicated [*28] on concepts of gross negligence. The court has already found that the plaintiffs' claim for breach of the duty of care survive the motion to dismiss. Therefore, this claim survives as well.

### E. Unjust Enrichment (Count 8)

The plaintiffs, in the alternative, plead both a claim for breach of contract and a claim for unjust enrichment. [HN11] In some circumstances, alternative pleading allows a party to seek recovery under theories of contract or quasi-contract. This is generally so, however, only when there is doubt surrounding the enforceability or the existence of the contract. Courts generally dismiss claims for *quantum meruit* on the pleadings when it is clear from the face of the complaint that there exists an express contract that controls. n26 It is undisputed that a written contract existed between the unitholders and the defendants. The Partnership Agreements for the Funds spelled out the relationship between the parties, and the plaintiffs specifically brought claims based on these contracts.

n26 *Rossdeutscher v. Viacom, Inc., 768 A.2d 8, 24 (Del. 2001)* (applying New York law); *ID Biomedical Corp. v. TM Tech., Inc., 1995 Del Ch. LEXIS 34, *39, 1995 WL 130743, at *15 (Del. Ch. Mar. 16, 1995)* (applying Delaware law).

[*29]

Notwithstanding the existence of these contractual relationships, the plaintiffs make the bald claim that the Managers were unjustly enriched at the unitholders expense. This is insufficient to state a claim for unjust enrichment, when the existence of a contractual relationship is not controverted. Thus, this claim must be dismissed.

### F. Agency Liability (Count 11)

The plaintiffs also bring claims against Deustche Bank and DBSI (as controlling persons of AB Management) based on agency liability. [HN12] A parent corporation can be held liable for the acts of its subsidiary under either of two theories of agency liability. The first is where "piercing the corporate veil" is appropriate. While many factors are considered in deciding whether to pierce the corporate veil, "the concept of complete domination by the parent is decisive." n27

n27 *Phoenix Canada Oil Co. v. Texaco, Inc., 842 F.2d 1466, 1477 (3d Cir. 1988).*

Second, while one corporation whose shares are owned by a second corporation [*30] does not, by that fact alone, become the agent of the second company, a corporation-completely independent of a second corporation-may assume the role of the second corporation's agent in the course of one or more specific transactions. This restricted agency relationship may develop whether the two separate corporations are parent and subsidiary or are completely unrelated outside the limited agency setting. Under this second theory, total domination or general alter ego criteria need not be proven. n28

n28 *Id.* (citing RESTATEMENT (SECOND) OF AGENCY § 14M, cmt. (a) (1958)).

With respect to DBSI, the plaintiffs argue that AB Management was dominated and controlled by DBSI. In essence, the plaintiffs ask the court to disregard AB Management's corporate form n29 and impose liability on DBSI. The complaints allege that: (i) DBSI and AB Management operate out of the same Maryland office; (ii) AB Management, although incorporated, has no functioning board of directors and [*31] no business other than the management of the Funds; (iii) AB Management is run by its Management Committee, which is comprised of employees and executives of DBSI; (iv) DBSI provided margin accounts for the Funds; and (v) DBSI served as the placement agent and custodian for the Funds' accounts. n30

n29 AB Management is a corporation, organized under the laws of Maryland.

n30 Fund I Compl. PP44, 45, 247, 250, 332, 334; Fund II Compl. PP54, 179, 253-259.

[HN13] "Persuading a Delaware Court to disregard the corporate entity is a difficult task. The legal entity of a corporation will not be disturbed until sufficient reason appears." n31 Allegations (i), (iv) and (v) above, while consistent with an obviously close relationship between DBSI and its wholly owned subsidiary, do not alone or together support any inference that would lead this court to disregard the separate legal existence of AB Management; nor does the allegation that AB Management's business is run by DBSI employees. However, the well pleaded factual [*32] allegation that AB Management has "no functioning board of directors," when viewed most favorably to the plaintiffs in light of the other facts alleged, if proven, could provide a basis to conclude that the corporate form should be ignored. The corporate veil may be pierced where a subsidiary is in fact a mere instrumentality or alter ego of its parent. n32 The complaints allege that AB Management does not have board meetings or follow other corporate formalities. Instead, employees of DBSI allegedly perform the activities that, in a properly functioning corporation, the board of directors would perform. If these facts are true and the other relationships are shown to exist, an adequate basis for piercing the corporate veil could be established. Therefore, this claim against DBSI cannot be dismissed.

n31 Mason v. Network of Wilmington, Inc., 2005 Del. Ch. LEXIS 99, at *9 (Del. Ch. July 1, 2005) (internal quotations omitted).

n32 Mabon, Nugent & Co. v. Texas Amer. Energy Corp., 1990 Del. Ch. LEXIS 46, at *14-*15 (Del. Ch. Apr. 12, 1990); Phoenix Canada Oil, 842 F.2d at 1477.

[*33]

The complaints make additional allegations as to why AB Management is a mere agent of Deutsche Bank. These are: (i) Deutsche Bank purchased Alex. Brown, Inc. (the parent company of AB Management) thereby acquiring 100% ownership of AB Management; (ii) Deutsche Bank changed the name of the Funds the reflect the "Deutsche Bank" name; (iii) when the liquidity crisis became acute, the Management Committee decided that it needed to alert officials at Deutsche Bank; and (iv) in July of 2002, Deutsche Bank fired all the members of the Management Committee. n33

n33 Fund I Compl. PP153, 163, 239-240; Fund II Compl. PP179, 253-259.

First, these factual allegations do not give rise a reasonable inference that Deutsche Bank dominated and controlled AB Management and the Management Committee. These factual allegations show little more than Deutsche Bank owned the parent company of AB Management and, indirectly, AB Management itself. [HN14] Ownership alone is not sufficient proof of domination or control. n34 The complaints [*34] allege that Deutsche Bank bought AB Management in June of 1999 and changed its name a few months later. The complaints do not allege any action by Deutsche Bank to influence or control the management of the Funds until July of 2002, when it fired the majority of the Management Committee. From these bare factual allegations, the court simply cannot infer domination or control.

n34 Aronson, 473 A.2d at 815; see also In re W. Nat'l S'holders Litig., 2000 Del. Ch. LEXIS 82, (Del. Ch. May 22, 2000) (holding that a 46% shareholder does not control or dominate the board due to stock ownership alone).

Second, these factual allegations do not give rise a reasonable inference that, in the managing and/or sale of the Funds, AB Management and the Management Committee were Deutsche Bank's agent. Under the rubric of agency liability, there are two main theories-actual authority and apparent authority. Because the plaintiffs do

not describe which theory of liability they assert, the court [*35] addresses both.

[HN15] Actual authority is that authority which a principal expressly or implicitly grants to an agent. n35 There is simply no allegation in the complaints that Deutsche Bank expressly gave either AB Management or the Management Committee the authority to bind it as its agent.

n35 *Billops v. Magness Constr. Co., 391 A.2d 196, 197 (Del. 1978)*.

[HN16] Apparent authority is that authority which, though not actually granted, the principal knowingly or negligently permits an agent to exercise, or which he holds him out as possessing. n36 In order to hold a defendant liable under apparent authority, a plaintiff must show reliance on indicia of authority originated by principal, and such reliance must have been reasonable. n37 The plaintiffs have not alleged any facts showing that Deutsche Bank held out either AB Management or the Management Committee as its agent; nor have the plaintiffs alleged facts from which the court can reasonably infer reliance.

n36 *Henderson v. Chantry, 2002 Del. Ch. LEXIS 14, at *14 (Del. Ch. Feb. 5, 2002)*. 2002. [*36]

n37 *Billops, 391 A.2d at 198*.

For the above reasons, the plaintiffs have failed to plead sufficient facts to support a claim for agency liability against Deutsche Bank and Count 11 against Deutsche Bank must be dismissed. However, the plaintiffs plead sufficient facts to support a claim for liability against DBSI. Therefore, Count 11 against DBSI will not be dismissed.

G. Conspiracy, Aiding And Abetting Fraud, And Breach Of Fiduciary Duty (Count 2, 4, & 9)

The plaintiffs allege that the defendants conspired to commit fraud and to commit a breach of fiduciary duty. [HN17] The elements for civil conspiracy under Delaware law are: (i) a confederation or combination of two or more persons; (ii) an unlawful act done in furtherance of the conspiracy; and (iii) damages resulting from the

action of the conspiracy parties. n38 While the plaintiffs caption their claim as aiding and abetting breach of fiduciary duty, the court treats it as a claim for civil conspiracy. [HN18] Claims for civil conspiracy are sometimes called aiding and abetting. n39 However, the basis of such a claim, regardless [*37] of how it is captioned, is the idea that a third party who *knowingly* participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship. n40

n38 *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., 871 A.2d 428, 437 n.8 (Del. 2005)*; *Nicolet, Inc. v. Nutt, 525 A.2d 146, 149-50 (Del. 1987)*.

n39 *See Benihana of Tokyo, Inc. v. Benihana, Inc., 2005 Del. Ch. LEXIS 19, at *26 (Del. Ch. Feb. 28, 2005)*.

n40 *Gilbert v. El Paso Co., 490 A.2d 1050, 1057 (Del. Ch. 1984), aff'd, 575 A.2d 1131 (Del. 1990)*.

However captioned, [HN19] civil conspiracy is vicarious liability. n41 It holds a third party, not a fiduciary, responsible for a violation of fiduciary duty. n42 Therefore, it does not apply to the defendants which owe the unitholders a direct fiduciary duty. Instead, the plaintiffs attempt to hold Deustche Bank and DBSI responsible for the Managers' alleged breaches of fiduciary duty. [*38]

n41 *See, e.g., Parfi Holding AB v. Mirror Image Internet, Inc., 794 A.2d 1211, 1238 (Del. Ch. 2001)* ("Civil conspiracy thus provides a mechanism to impute liability to those not a direct party to the underlying tort."), *rev'd on other grounds, 817 A.2d 149 (Del. 2002)*.

n42 *Gilbert, 490 A.2d at 1057*.

The defendants argue that the plaintiffs have not adequately alleged that Deustche Bank and DBSI had knowledge of the alleged wrongful acts, the breach of fiduciary duty and fraud. Where a complaint alleges fraud or conspiracy to commit fraud, the Rules of this court call for a higher pleading standard, requiring the circumstances constituting the fraud or conspiracy to "be pled with particularity." n43 While Rule 9(b) provides

that "knowledge . . . may be averred generally," where pleading a claim of fraud or breach of fiduciary duty that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts [*39] from which it can reasonably be inferred that this "something" was knowable and that the defendant was in a position to know it. n44

n43 *Atlantis Plastics Corp. v. Sammons, 558 A.2d 1062, 1066 (Del. Ch. 1989)* (citing Rule 9(b), which states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.").

n44 *IOTEX Communs., Inc. v. Defries, 1998 Del. Ch. LEXIS 236, at \*12-\*13 (Del. Ch. Dec. 21, 1998).*

Furthermore, Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal. n45 With respect to DBSI, the complaints allege repeatedly that its employees, acting within the scope of their employment, had knowledge of the underlying factual allegations. Specifically, the complaints allege that the Funds were run by the Management Committee, all the members of which were employees of DBSI. n46 This knowledge is thereby imputed to DBSI.

n45 *J.I. Kislak Mtg. Corp. v. William Matthews Bldr., Inc., 287 A.2d 686, 689 (Del. Super. 1972), aff'd, 303 A.2d 648 (Del. 1972).*

[*40]

n46 Fund I Compl. PP45, 47-51, 247-251; Fund II Compl. PP55, 57-61, 261-266.

With respect to Deutsche Bank, the plaintiffs allege that AB Management and the Management Committee are mere agents of Deutsche Bank. However, as discussed above, the factual allegations in the complaints are insufficient to infer that AB Management and the Management Committee are the agents of Deutsche Bank.

For the above reasons, the court holds that the plaintiffs have not adequately pleaded facts that, if proven, would support an inference that Deustche Bank had knowledge of the alleged wrongful acts, the breach of

fiduciary duty and fraud. The plaintiffs have adequately pleaded that DBSI had knowledge of the alleged wrongful acts. Therefore, with respect to Deutsche Bank, Counts 2, 4, and 9 must be dismissed. With respect to DBSI, these counts will not be dismissed.

### H. Accounting (Count 10)

The plaintiffs' tenth claim is for an accounting. [HN20] An accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained to be [*41] due to either as a result. n47 As it is a remedy, should the plaintiffs ultimately be successful on one or more of their claims, the court will address their arguments for granting an accounting.

n47 *Jacobson v. Dryson Acceptance Corp., 2002 Del. Ch. LEXIS 4, at\*12-\*13 (Del. Ch. 2002).*

### V.

The defendants argue that several of the claims in the complaints are derivative and that, since the plaintiffs did not make demand upon the Funds, and demand was not excused, these claims should be dismissed pursuant to Rule 23.1. n48

n48 The claims that the defendants contend are derivative are as follows: breach of fiduciary duty (Count 1), aiding and abetting breach of fiduciary duty (Count 2), breach of contract (Count 5), breach of the covenant of good faith (Count 6), gross negligence (Count 7), unjust enrichment (Count 8), accounting (Count 10), and agency liability (Count 11). As the court has already dismissed the claim for unjust enrichment (Count 8) and agency liability as to Deutsche Bank (Count 11), and deferred granting the equitable remedy of an accounting (Count 10), it will not discuss those claims here.

[*42]

The demand requirement in the limited partnership context is codified in *6 Del. C. § 17-1001.* That statute states:

[HN21] A limited partner or an assignee of a partnership interest may bring an ac-

tion in the Court of Chancery in the right of a limited partnership to recover a judgment in its favor if general partners with authority to do so have refused to bring the action or if an effort to cause those general partners to bring the action is not likely to succeed.

Likewise, [HN22] the determination of whether a claim is derivative or direct in nature is substantially the same for corporate cases as it is for limited partnership cases. n49 Accordingly, throughout this decision, the court relies on corporate as well as partnership case law for its determination of this lawsuit's nature.

n49 *Litman v. Prudential-Bache Prop., Inc., 611 A.2d 12, 15 (Del. Ch. 1992).*

The Delaware Supreme Court's recent decision in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.* [*43] revised the standard for determining whether a claim is direct or derivative. Now, [HN23] the determination "turn[s] solely on the following questions: (i) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (ii) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" n50 "Under *Tooley*, the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint." n51 "Instead the court must look to all the facts of the complaint and determine for itself whether a direct claim exists." n52

n50 *845 A.2d 1031, 1033 (Del. 2004).*

n51 *In re Syncor Int'l Corp. S'holders Litig., 857 A.2d 994, 997 (Del. Ch. 2004).*

n52 *Dieterich v. Harrer, 857 A.2d 1017, 1027 (Del. Ch. 2004).*

As they are factually distinct, the court deals with the claims separately. First, the court addresses the claims for breach of contract [*44] and the breach of fiduciary duty based on the Non-Disclosure Allegations. Second, the court addresses the claims for gross negligence and failing to provide active and competent management, and the fiduciary duty claims based thereon.

A. Breach Of Contract And The Non-Disclosure Allegations

The claims for breach of contract and the claims for breach of fiduciary duty based on the Non-Disclosure Allegations are direct. First, the unitholders, not the partnerships, suffered the alleged harm. [HN24] In order to show a direct injury under *Tooley*, a unitholder "must demonstrate that the duty breached was owed to the [unitholder] and that he or she can prevail without showing an injury to the [partnership]." n53 The gravamen of these claims is that the Managers failed to disclose material information when they had a duty to disclose it and made other misleading or fraudulent statements, in violation of their contractual and fiduciary duties. Generally, non-disclosure claims are direct claims. n54 Moreover, the partnerships were not harmed by the alleged disclosure violations. Any harm was to the unitholders, who either lost their opportunity to request a withdrawal from the Funds [*45] from the Managers, or to bring suit to force the Managers to redeem their interests.

n53 *Tooley, 845 A.2d at 1039.*

n54 *See, e.g., Dieterich, 857 A.2d at 1029* (characterizing non-disclosure claims as direct claims); *Abajian v. Kennedy, 1992 Del. Ch. LEXIS 6, at *10 (Del. Ch. Jan. 17, 1992)* (same).

Second, the unitholders would receive any recovery, not the Funds. Under the second prong of *Tooley*, in order to maintain a direct claim, stockholders must show that they will receive the benefit of any remedy. n55 While the best remedy for a disclosure violation is to force the partnership to disclose the information, due to the passage of time since the alleged wrongdoing, that remedy would likely be inadequate. In order to compensate the unitholders for their alleged harm, the court may find it appropriate to grant monetary damages. Such damages would be awarded to the unitholders, and not the partnerships.

n55 *Tooley, 845 A.2d at 1033.*

[*46]

For all of the above reasons, the court concludes that the claims based on the Non-Disclosure Allegations and the alleged breach of contract are direct claims and, thus, demand was not required.

B. Gross Negligence And Failure To Provide Competent And Active Management

The claims for gross negligence and failure to provide competent and active management are clearly derivative. First, as stated above, in order to show a direct injury under *Tooley*, a unitholder "must demonstrate that the duty breached was owed to the [unitholder] and that he or she can prevail without showing an injury to the [partnership]." n56 The gravamen of these claims is that the Managers devoted inadequate time and effort to the management of the Funds, thereby causing their large losses. Essentially, this a claim for mismanagement, a paradigmatic derivative claim. n57 The Funds suffered any injury that resulted from the Managers' alleged inattention. Any injury that the unitholders suffered is derivative of the injury to the Funds.

n56 *Tooley, 845 A.2d at 1039.*

n57 *See, e.g., Kramer v. W. Pac. Indus., Inc., 546 A.2d 348, 353 (Del. 1988)* [HN25] ("A claim of mismanagement . . . represents a direct wrong to the corporation that is indirectly experienced by all shareholders. Any devaluation of stock is shared collectively by all the shareholders, rather than independently by the plaintiff or any other individual shareholder. Thus, the wrong alleged is entirely derivative in nature.").

[*47]

Second, the Funds, not the unitholders, would receive any recovery. Again, under the second prong of *Tooley*, in order to maintain a direct claim, stockholders must show that they will benefit from the remedy. n58 If the court finds that the Managers violated their fiduciary duties by failing to devote adequate time and effort to managing the Funds, any recovery would go to the party harmed, namely the Funds. Thus, these claims are derivative claims.

n58 *Tooley, 845 A.2d at 1033.*

[HN26] If a party brings derivative claims without first making demand, and demand is not excused, those claims must be dismissed. n59 In this case, the plaintiffs have not alleged that they made demand on the Fund, nor have they alleged why demand should be excused. Accordingly, the derivative claim must be dismissed. How-

ever, in the interest of justice, the court dismisses these claims with leave to replead. n60

n59 *Haber v. Bell, 465 A.2d 353, 357 (Del. Ch. 1983).*

[*48]

n60 In a letter to the court, the plaintiffs stated that AB Management sent letters to all the unitholders of the Funds (the "Redemption Letters"), stating that the Managers would allow the unitholders to redeem their units and that the Managers are pursuing the dissolution of the Partnerships. The plaintiffs argue that the Redemption Letters bolster their contention that their claims are direct, not derivative. However, the complaints do not contain the information in the Redemption Letters and the Redemption Letters are not referenced in the complaints. Therefore, these documents are not properly before the court on a Rule 12(b)(6) motion.

**VI.**

The DCIP Defendants argue that, with respect to the Fund I Complaint, this court lacks personal jurisdictions over them. With respect to the Fund II Complaint, they argue that this court lacks personal jurisdiction over Crants and Devlin. n61

n61 DCIP is the General Partner of Fund II. As such, there is no dispute that the court has personal jurisdiction over DCIP viz. Fund II. *See RJ Assocs. v. Health Payors' Org. Ltd. P'ship., 1999. Del. Ch. LEXIS 161, at *12 (Del. Ch. July 16, 1999)* (quoting *6 Del. C. § 17-109(a)* and holding that, [HN27] as a matter of law, by accepting the position of general partner, a corporation consents to be subjected to a Delaware court's jurisdiction if the limited partnership has chosen to incorporate under Delaware law).

[*49]

In support of their Rule 12(b)(2) motion, the DCIP Defendants adduced affidavits of both Devlin and Crants. The plaintiffs have not adduced any affidavits rebutting the Devlin and Crants affidavits, nor have they asked to take discovery. Instead, they have decided to rely on the well-pleaded allegations in their complaint.

2005 Del. Ch. LEXIS 133, *

Moreover, since they have not been rebutted, the court must take as true the facts contained in the Devlin and Crants affidavits. However, [HN28] where the well-pleaded allegations in the complaints are not rebutted by affidavit, the court will, for the purposes of this Rule 12(b)(2) motion, assume the truthfulness of those allegations. n62

n62 *See Hart Holding Co. v. Drexel Burnham Lambert, Inc., 593 A.2d 535, 539 (Del. Ch. 1991)* (citing *Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2nd Cir. 1981))* (stating that a trial court is vested with broad discretion in shaping the procedure by which a motion under Rule 12(b)(2) is resolved).

According to the [*50] Devlin and Crants affidavits, DCIP is a Tennessee limited liability company, with its principal place of business in Nashville, Tennessee. Both Crants and Devlin are residents of Tennessee and perform the vast majority of their duties from their office in Nashville. Neither Crants nor Devlin recall ever traveling to Delaware. None of the DCIP Defendants solicit any business in Delaware or engage in any regular conduct with Delaware.

[HN29] When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the nonresident defendant. n63 In determining whether it has personal jurisdiction over a nonresident defendant, the court will generally engage in a two-step analysis. First, was service of process on the nonresident authorized by statute? Second, does the exercise of jurisdiction, in the context presented, comport with due process? n64

n63 *See Plummer & Co. Realtors v. Crisafi, 533 A.2d 1242, 1244 (Del. Super. 1987); see also Finkbiner v. Mullins, 532 A.2d 609, 617 (Del. Super. 1987)* (stating that, [HN30] on a Rule 12(b)(2) motion, "the burden is on the plaintiff to make a specific showing that this Court has jurisdiction under a long-arm statute.") (citing *Greenly v. Davis, 486 A.2d 669 (Del. 1984))*. [*51]

n64 *LaNuova D & B, S.P.A. v. Bowe Co., 513 A.2d 764, 768 (Del. 1986).*

A. The Long-Arm Statute

The plaintiffs argue that the court has personal jurisdiction over the DCIP Defendants under *10 Del. C. § 3104*, the Delaware long-arm statute. *Section 3104(c)* provides, in relevant part: [HN31] "As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident . . . who . . . (1) Transacts any business or performs any character of work or service in the State . . . [or] (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State. . . ." [HN32] *Section 3104* has been broadly construed to confer jurisdiction to the maximum extent possible under the *due process clause.* n65 Furthermore, [HN33] when *in personam* jurisdiction [*52] is challenged on a motion to dismiss, the record is construed most strongly against the moving party. n66

n65 *Id.*

n66 *RJ Assocs.*, 1999 Del. Ch. LEXIS 161, at *13.*

The complaints lay out detailed allegations of the connections between the DCIP Defendants and the Funds. The Funds were established as Delaware limited partnerships and are governed by Delaware law. DCIP is the Sub-Advisor of Fund I and the General Partner and Sub-Advisor of Fund II. Crants and Devlin are the managing members and owners of DCIP. DCIP acts principally through Crants and Devlin. The PPMs touted the DCIP Defendants' experience and qualifications in order to sell units in the Funds.

The PPMs also state that DCIP is responsible for the day-to-day management of the Funds. DCIP, in the persons of Crants and Devlin, attended every meeting of the Management Committee (none of which took place in Delaware). Also, DCIP, which acted through Crants and Devlin, was primarily responsible for choosing the securities [*53] included in the Funds.

In *RJ Associates*, Justice (then-Vice Chancellor) Jacobs held that this court could exercise personal jurisdiction over a limited partner in a Delaware limited partner-

ship under *Section 3104(c)(1)*. Justice Jacobs held that the following three contacts, taken together, were sufficient to constitute "transacting business" under the Delaware long-arm statute: (i) the limited partner participated in the formation of the limited partnership, (ii) the limited partnership indirectly participated in the limited partnership's management by controlling' the general partner, and (iii) the limited partner caused the Partnership Agreement to be amended to alter the method of distributions to the partners. n67

n67 *RJ Assocs., 1999 Del. Ch. LEXIS 161, at *18.*

The operative facts of this case, as alleged in the complaints, are similar to those in *RJ Associates*. First, DCIP participated in the formation of the Funds. In fact, DCIP was primarily responsible for selecting the initial [*54] securities accepted by the Funds. n68 Second, DCIP not only participated in the management of the Funds, DCIP was primarily responsible for the management of the Funds. The PPMs state that "the Sub-Advisor will provide day-to-day management and administration of the Fund and investment advisory services, including, among other matters, the screening of contributed securities, advice regarding the selection of the illiquid Assets and hedging and borrowing strategies." n69 Finally, DCIP received millions of dollars in fees to manage the two Delaware entities.

n68 *See* Fund I Compl. P71; Fund II Compl. PP82, 241.

n69 Fund I PPM at 3-4, Fund II PPM at 3.

With respect to Crants and Devlin, the complaints allege that they are the owners and managing partners of DCIP. The complaints further allege that DCIP only acts through Crants and Devlin. In essence, the complaints allege that it was Crants and Devlin who selected the securities for the Funds, and managed the Funds on a day-to-day basis.

The court [*55] finds that these contacts are sufficient to constitute "transacting business" under the long-arm statute.

B. Due Process

[HN34] The focus of a minimum contacts inquiry is whether a nonresident defendant engaged in sufficient minimum contacts with the State of Delaware to require

it to defend itself in the courts of the state consistent with the traditional notions of fair play and justice. n70 In order to establish jurisdiction over a nonresident defendant, the nonresident defendant's contacts with the forum must rise to such a level that it should reasonably anticipate being required to defend itself in Delaware's courts. n71 The minimum contacts which are necessary to establish jurisdiction must relate to some act by which the defendant has deliberately created obligations between itself and the forum. n72 Consequently, the defendant's activities are shielded by the benefits and protection of the forum's laws and it is not unreasonable to require it to submit to the forum's jurisdiction. n73

n70 *AeroGlobal, 871 A.2d at 440* (citing *Int'l Shoe Co. v. Washington, 326 U.S. 310, 90 L. Ed. 95, 66 S. Ct. 154 (1945)).*

[*56]

n71 *Id.*

n72 *Sternberg v. O'Neil, 550 A.2d 1105, 1120 (Del. 1988).*

n73 *Id.; see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (U.S. 1985)* (requiring "purposeful availment" of the benefits of the state's laws to satisfy the minimum contacts test).

In addition to the contacts outlined above that the complaints allege between DCIP Defendants and the Funds, the plaintiffs also allege that the DCIP Defendants enjoyed the benefits of Delaware law. They claim that the DCIP Defendants have received millions of dollars in fees for managing the Delaware partnerships and are entitled to claim limited liability under the terms of the Partnership Agreements, which established the Funds and limit the DCIP Defendants' liability to cases of gross negligence. n74

n74 Partnership Agreements § 3.5.

In *RJ Associates*, Justice Jacobs found that the following contacts were sufficient [*57] to satisfy due process: (i) the limited partner took an active role in establishing the Delaware Partnership; (ii) the limited partner owned a 50% interest in the partnership's general

partner, and appointed four of the general partner's seven board members; (iii) the limited partner received 49.5% of the partnership's cash flow distributions; (iv) the limited partner allegedly controlled the partnership; (v) the limited partner allegedly caused the partnership agreement to be amended under Delaware law to change the agreed-upon cash flow distribution payments to the limited partners; and (vi) the limited partner agreed to a Delaware choice of law provision in the partnership agreement. n75

n75 RJ Assocs., 1999 Del. Ch. LEXIS 161, at *19-*20.

While not exactly the same, the contacts that DCIP has with Delaware are substantially similar to those in *RJ Associates*. DCIP took part in the formation of the Funds, two Delaware entities. DCIP managed the Funds on a day-to-day basis and received [*58] millions of dollars in fees for doing so. In addition, the Partnership Agreements which established the Funds limited the DCIP Defendants' liability to cases of gross negligence. n76 They have, thereby, benefited by expressly limiting their liability under Delaware law. Given all of these contacts, DCIP should have reasonably expected to be haled before the courts in Delaware.

n76 Partnership Agreements § 3.5.

Crants and Devlin also should have reasonably expected to be haled before the courts of this state. As stated above, the complaints allege that DCIP could only act through Crants and Devlin. All the actions attributed to DCIP were really performed by them. Moreover, in the case of Fund II, Crants and Devlin are alleged to be the managing partners of the general partner of a Delaware limited partnership. In the case of Fund I, Crants and Devlin are alleged to have managed a Delaware limited partnership, despite the fact that DCIP is not that entity's general partner.

In *In re USACafes*, former Chancellor [*59] Allen found that the directors of a corporation that was the general partner of a Delaware limited partnership were subject to the jurisdiction of this state's courts, due to their positions with the general partner. n77 Chancellor Allen focused on [HN35] the important state interest that Delaware has in regulating entities created under its laws, and how that interest could only be served by exercising jurisdiction over those who managed the Delaware entity.

n77 600 A.2d 43, 52 (Del. Ch. 1991).

The relationship between the General Partner and the limited partners was created by the law of Delaware. The state empowered defendants to act, and this state is obliged to govern the exercise of that power insofar as the issues of corporate power and fiduciary obligation are concerned. These factors bear importantly on the fairness of exercising supervisory jurisdiction at this point in the relationship of the various parties. The wrongs here alleged are not tort or contract claims unconnected with the [*60] internal affairs or corporate governance issues that Delaware law is especially concerned with. n78

n78 *Id.*

Likewise, the wrongs alleged in this case go essentially to the management of a Delaware limited partnership. The DCIP Defendants voluntarily undertook to mange the Funds and received millions of dollars in compensation for doing so. Now, limited partners in the Delaware entity seek to hold them accountable for alleged wrongs they committed. It is both necessary and proper for the courts of this state to ensure that the managers of a Delaware entity are held responsible for their actions in managing the Delaware entity. When a person manages a Delaware entity, and receives substantial benefit from doing so, he should reasonably expect to be held responsible for his wrongful acts relating to the Delaware entity in Delaware. n79

n79 *See Assist Stock Mgmt. L.L.C. v. Rosheim*, 753 A.2d 974, 975 (Del. Ch. 2000) ("When nonresidents agree to serve as directors or managers of Delaware entities, it is only reasonable that they anticipate that . . . they will be subject to personal jurisdiction in Delaware courts.").

[*61]

2005 Del. Ch. LEXIS 133, *

For the above reasons, the court concludes that it has personal jurisdiction over the DCIP Defendants in both cases. Therefore, the DCIP Defendants' motion to dismiss pursuant to Rule 12(b)(2) must be denied.

**VII.**

For the above reasons, the defendants' motion to dismiss is GRANTED in part and DENIED in part. The defendants are directed to submit a form of order, on notice, within 10 days.