# EXHIBIT I

LEXSEE 2003 DEL. CH. LEXIS 34

CORNERSTONE TECHNOLOGIES, LLC, ARASTRA, LLC, KOR HOLDINGS, LLC, and PETER A. KANJORSKI, Plaintiffs, v. BRUCE E. CONRAD and THOMAS UNGER, Defendants.

C.A. No. 19712-NC

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*2003 Del. Ch. LEXIS 34*

March 11, 2003, Submitted
March 31, 2003, Decided

**SUBSEQUENT HISTORY:** Reargument denied by *Cornerstone Techs., LLC v. Conrad, 2003 Del. Ch. LEXIS 46 (Del. Ch., Apr. 22, 2003)*

**DISPOSITION:** [*1] Unger's motion to dismiss for lack of personal jurisdiction granted; Conrad's motion to dismiss for lack of personal jurisdiction denied; and Conrad's motion for a stay granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs were two limited liability companies (LLCs) and two of their unit holders. They had operations based in another state, but were domiciled in Delaware. Plaintiffs sued defendants, two individuals, in both states, seeking declaratory, injunctive, and monetary relief. Both defendants moved to dismiss for lack of personal jurisdiction. One defendant requested that the action be stayed or dismissed in favor of the other state's litigation.

**OVERVIEW:** Plaintiffs complained that defendants were making certain false claims of ownership in the companies. As a result, uncertainty existed about who could make company decisions. Plaintiffs relied solely on Delaware's long-arm statute, *Del. Code Ann. tit. 10, § 3104*, to support their claim of personal jurisdiction over one defendant. The court found that plaintiffs pointed to only two acts committed in Delaware that had any relevance to the instant litigation, which were the actions of forming each company as limited liability companies in Delaware. There was no indication whatsoever that the one defendant had any role in the founding or formation of either. Therefore, the court lacked personal jurisdiction. As to the other defendant, jurisdiction was proper as he was a founder, large unit holder, and top officer that had been voted off as a manager of both companies. *Del. Code Ann. tit. 6, § § 18-110(a)* and *18-109(a)* provided a basis for the exercise of personal jurisdiction and minimum contacts were shown. However, the court found it to be a mystery as to why plaintiffs had chosen to spread their claims over two states, and a stay of the Delaware action was appropriate.

**OUTCOME:** One defendant's motion to dismiss for lack of personal jurisdiction was granted, and the other's was denied. The other defendant's motion for a stay was granted, and the stay was to remain in effect indefinitely, but plaintiffs could perfect service of process on the other defendant and could move to lift the stay no earlier than a certain date, or on the date of the termination of the equity action in the other state.

**LexisNexis(R) Headnotes**

*Business & Corporate Law > Limited Liability Companies > Management Duties & Liabilities*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN1] *Del. Code Ann. tit. 6, § 18-109(a)* permits an exercise of personal jurisdiction over a manager, as that term is defined in § 18-109(a), in all civil actions or proceedings brought in the State of Delaware involving or relating to the business of the limited liability company.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*

[HN2] On a Del. Ch. Ct. R. 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery of record, and may even hold an evidentiary hearing. The burden of showing a basis for the court's exercise of personal jurisdiction over a nonresident defendant rests with the plaintiffs. In a case when no evidentiary hearing has been held, the plaintiffs' burden is a relatively light one--i.e., they must only make a prima facie showing that the exercise of personal jurisdiction is appropriate. And, in such a case, the record is construed in the light most favorable to the plaintiff.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts*
[HN3] The Fourteenth Amendment requires that a nonresident defendant have certain "minimum contacts" with the forum jurisdiction such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN4] See *Del. Code Ann. tit. 10, § 3104(c)(1)*.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN5] *Del. Code Ann. tit. 10, § 3104(c)(1)* is a "single act" provision of the long-arm statute, *Del. Code Ann. tit. 10, § 3104*. As such, *Del. Code Ann. tit. 10, § 3104(c)(1)* supplies a basis for personal jurisdiction only with respect to claims that have a nexus to such forum-related conduct.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN6] *Del. Code Ann. tit. 10, § 3104(c)* is to be broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause.

*Business & Corporate Law > Limited Liability Companies > Management Duties & Liabilities*

*Business & Corporate Law > Limited Liability Companies > Members & Other Constituents*
*Civil Procedure > Pleading & Practice > Service of Process > General Overview*
[HN7] The Delaware Limited Liability Company Act, *Del. Code Ann. tit. 6, § 18-110(a)*, allows the Delaware Court of Chancery, upon the application of a member or manager of a limited liability company, to determine the validity of any admission, election, appointment, removal, or resignation of a manager and the right of any person to become or continue to be a manager and, in case the right to serve as a manager is claimed by more than one person, to determine the person or persons entitled to serve as managers.

*Business & Corporate Law > Limited Liability Companies > Management Duties & Liabilities*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > General Overview*
[HN8] See *Del. Code Ann. tit. 6, § 18-110(c)*.

*Business & Corporate Law > Limited Liability Companies > Management Duties & Liabilities*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Governments > State & Territorial Governments > Elections*
[HN9] By the plain terms of *Del. Code Ann. tit. 6, § 18-110(a)*, the Delaware Court of Chancery may hear and determine the validity of any admission, election, appointment, removal, or resignation of a manager of a limited liability company.

*Business & Corporate Law > Limited Liability Companies > Management Duties & Liabilities*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN10] *Del. Code Ann. tit. 6, § 18-109(a)* permits an exercise of personal jurisdiction over a manager, as that term is defined in that subsection, in all civil actions or proceedings brought in the State of Delaware involving or relating to the business of the limited liability company or a violation by the manager of a duty to the limited liability company, or any member of the limited liability company.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > General Overview*

*Civil Procedure > Settlements > Settlement Agreements > General Overview*
[HN11] When a defendant is subject to personal jurisdiction under *Del. Code Ann. tit. 6, § 18-109* as to certain claims, the court may exercise personal jurisdiction over him as to other sufficiently related claims.

*Business & Corporate Law > Limited Liability Companies > Management Duties & Liabilities*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN12] Once jurisdiction is properly obtained over a non-resident director pursuant to *Del. Code Ann. tit. 10, § 3114*, such non-resident director is properly before the court for any claims that are sufficiently related to the cause of action asserted against such directors in their capacity as directors.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > Statutory Sources*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN13] Under *Del. Code Ann. tit. 10, § 3114*, the relief sought is not the guiding factor because if jurisdiction attaches at all under the statute, the nonresident is before the court for any and all relief that might be necessary to do justice between the parties by virtue of the fact that the jurisdiction conveyed by the statute is in personam jurisdiction.

*Business & Corporate Law > Limited Liability Companies > Management Duties & Liabilities*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN14] Once a nonresident director is properly before a Delaware court by reason of *Del. Code Ann. tit. 10, § 3114*, that director is properly before the court for any relief that the facts may require, even if such relief technically operates against the director in some other capacity, such as that of a stockholder.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Minimum Contacts*
[HN15] The due process clause of the Fourteenth Amendment requires that a nonresident defendant have certain minimum contacts with the forum jurisdiction such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. When determining whether these "minimum contacts" are present, the court should inquire whether the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there. Once the defendant's minimum contacts with the forum have been established, the court should turn its analysis to issues of fairness and justice.

*Business & Corporate Law > Limited Liability Companies > Management Duties & Liabilities*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN16] Delaware has a strong interest in providing a forum for disputes relating to the ability of managers of a limited liability company formed under its law to properly discharge their respective managerial functions.

*Civil Procedure > Joinder of Claims & Remedies > General Overview*
*Civil Procedure > Judgments > Preclusion & Effect of Judgments > Res Judicata*
*Criminal Law & Procedure > Double Jeopardy > Res Judicata*
[HN17] When a party can raise all claims it has against a defendant in one forum at one time, it is generally obligated to do so. The rule against claim splitting is an aspect of the doctrine of res judicata and is based on the belief that it is fairer to require a plaintiff to present in one action all of his theories of recovery relating to a transaction, and all of the evidence relating to those theories, than to permit him to prosecute overlapping or repetitive actions in different courts or at different times. The courts of Delaware have long adhered to the generally accepted view disfavoring the splitting of claims.

**COUNSEL:** Daniel L. McKenty, Esquire, Gerald J. Hager, Esquire, McCULLOUGH & McKENTY, P.A., Wilmington, Delaware; Richard A. Breuer, Esquire, Malvern, Pennsylvania, Attorneys for Plaintiffs.

John M. Bader, Esquire, THOMAS S. NEUBERGER, P.A., Wilmington, Delaware, Attorneys for Defendant, Thomas Unger.

Bruce E. Conrad, Weatherly, Pennsylvania, Pro se.

**JUDGES:** STRINE, Vice Chancellor.

**OPINIONBY:** STRINE

**OPINION:**

# MEMORANDUM OPINION

**STRINE, Vice Chancellor**

This opinion resolves motions brought by the two defendants in this case, Thomas Unger and Bruce E. Conrad, to dismiss the complaint for lack of personal jurisdiction. n1 The opinion also addresses defendant Conrad's request that this action be stayed or dismissed in favor of litigation pending in the state courts of Pennsylvania. Candidly, the clarity of the factual record and of the parties' legal arguments is less than ideal, making summarization of this opinion difficult, and the body of the opinion more cumbersome and ambiguous.

n1 On January 9, 2003, the plaintiffs filed an amended complaint. The defendants' motions are technically directed at that earlier complaint, as opposed to the more recent -- and more important -- amended complaint. The plaintiffs point out that "defendants declined the opportunity to file new motions to the amended complaint and elected to treat the motions and briefs already filed as being addressed to the amended complaint." Pls.' Answering Br. at 2. In any event, the parties have proceeded on the understanding that the motions to dismiss (along with the associated briefs) are responsive to the amended complaint.

[*2]

In rough terms, this case involves an unwieldy dispute between the Kanjorski family and defendants Unger and Conrad, arising out of their involvement in two limited liability companies whose operations are based in Pennsylvania, but which are domiciled in Delaware. The names of those companies are Cornerstone Technologies, LLC and Arastra, LLC (collectively, the "LLCs" or the "Companies"); both are named plaintiffs. The other plaintiffs are Peter A. Kanjorski, who claims to own 20% of the units of the two LLCs, and Kor Holdings, LLC, a Kanjorski family holding entity, claiming to own 60% of the LLCs' units.

Defendant Unger joined the Companies as an employee sometime after their formation and is alleged by the plaintiffs to claim an ownership share in them.

Defendant Conrad (who is representing himself *pro se*) is alleged to have been one of the original members and managers of both of the LLCs, and to have been granted a 20% ownership interest in each.

In this case, the plaintiffs seek various forms of declaratory, injunctive, and monetary relief against Unger and Conrad.

As to Unger, the plaintiffs seek a declaration that he does not own any units of either LLC. The problem [*3] with this request is that the instrument upon which Unger supposedly bases his claim to units was executed entirely in Pennsylvania well after the LLCs were first formed and only references his possible receipt of units in another entity, not the two LLCs. n2 Thus, the sole theory that the plaintiffs press regarding the propriety of personal jurisdiction over Unger is that he is subject to jurisdiction under § *3104(c)(1)* of the Delaware long-arm statute. The transactions of business in Delaware that the plaintiffs seek to attribute to Unger are the acts of the original founders of the LLCs in forming those entities in Delaware -- acts that occurred before Unger was even involved with the LLCs in any manner. The plaintiffs claim that these prior acts can be attributed to Unger because he allegedly claims to have become a member of the LLCs well after they were formed. As a factual matter, of course, this chain of inference is impossible without attributing supernatural powers to Unger and therefore § *3104(c)(1)* is not satisfied. For that and other reasons, Unger's motion to dismiss is granted.

n2 As I shall also note later, Unger actually disclaims owning units in either of the Companies, and contends that he owns shares in another entity related to the Companies, which is not a party to this case.

[*4]

As to Conrad, the questions are a bit more difficult and numerous. The plaintiffs have made a *prima facie* showing that Conrad was a founding member, manager, and high-level officer of each of the LLCs. In two counts of their complaint, the plaintiffs seek a declaration that Conrad was properly removed as a manager of the two LLCs. Under *6 Del. C. § 18-110(a)*, Conrad may be served with process over these claims.

Somewhat more problematic are certain other claims against Conrad. Stated summarily, these allege that Conrad violated a provision of the LLCs' operating agreements that require their members, among other things, to offer their units to the other members before trying to sell them to third-parties. The plaintiffs seek various forms of relief tied to that central contention, the primary being declaratory relief clarifying exactly the ownership interests that Conrad (and impliedly others) hold or (the plaintiffs hope) do not hold in the LLCs.

Because there is *prima facie* evidence of Conrad's status as a manager of the LLCs, the plaintiffs argue that jurisdiction over him as to these counts exists under *6 Del. C. § 18-109(a)* [*5] , [HN1] which permits an exercise of personal jurisdiction over a manager (as that

term is defined in that subsection) "in all civil actions or proceedings brought in the State of Delaware *involving or relating to the business of the limited liability company . . . .*" n3 These counts seek to resolve disputes regarding the manner in and price at which units of the Companies can be transferred under the Buy-Out Provision. This Provision can be viewed as touching on important aspects of the Companies' governance and basic nature, reflecting as it does a commitment by the founding members -- of which Conrad was one -- that the original members should have the opportunity to buy the other members' units before they passed into the hands of strangers.

n3 Emphasis added.

Moreover, the (albeit confusing) record suggests that Conrad has in the past asserted that the Companies issued -- or committed to issue -- units to certain employees (including Unger), and that these units are therefore exempt from the reach of the Buy-Out [*6] Provision. Given the relation of all these issues to the business of the LLCs, *§ 18-109(a)* is a proper basis for the assertion of personal jurisdiction under the teaching of *Assist Stock Management L.L.C. v. Rosheim.* n4 Furthermore, as a founding manager, member, and top ranking officer of the two Delaware LLCs who personally participated in the choice to invoke the laws of this state to govern the internal affairs of those entities and the contractual duties running among their members, Conrad's constitutional right to due process is not offended by requiring him to face suit here on all the claims raised by the plaintiffs in this case.

n4 *753 A.2d 974 (Del. Ch. 2000).*

For these reasons, I therefore grant Unger's motion to dismiss but deny Conrad's.

In the last portion of the opinion, I address Conrad's motion to stay this litigation in favor of other litigation filed against him by Cornerstone in Pennsylvania. Although this motion has been briefed in a somewhat sketchy way, I am convinced [*7] that a stay is in order. At the same time it seeks to have Conrad answer substantial claims in this court, Cornerstone -- at the instance of the Kanjorskis -- has filed serious breaches of fiduciary duty claims against Conrad in Pennsylvania and has secured a trial date for later this year. No sensible reason suggests itself why Cornerstone has split its claims against Conrad in this way because the fiduciary duty claims could have obviously been filed here, and there appears no obstacle to the claims filed here being asserted in the Pennsylvania action.

Furthermore, the Pennsylvania case has the added advantage that Unger is a party there and that others with a possible interest in the suit (*e.g.*, the other possible recipients of unit transfers from Conrad) can be joined to that action. The absence of Unger (and other possible transferees of units from Conrad) from this suit, moreover, has a possible effect none of the parties has addressed. To the extent the plaintiffs seek (in Count I of their complaint) to rescind supposed transfers to Unger and other persons not before the court, the important policy concerns of Court of Chancery Rule 19 will also be implicated.

Although [*8] I will not dismiss this action in favor of the Pennsylvania action at this time, it is inefficient and needlessly burdensome for this action to proceed against Conrad simultaneously with a Pennsylvania action that is on a fast track to trial before the end of this year. Although a plaintiff's choice of forum is to be respected, its choice to multiply forums for no apparent purpose need not be indulged at the expense of the defendant's interests and the interests of judicial economy.

I. Procedural Framework

As a preliminary matter, it is useful to set forth the procedural framework that governs this motion. [HN2] On a Rule 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery of record, and may even hold an evidentiary hearing. n5 The burden of showing a basis for the court's exercise of personal jurisdiction over a nonresident defendant rests with the plaintiffs. n6 In a case like this one, when no evidentiary hearing has been held, the plaintiffs' burden is a relatively light one -- *i.e.*, they must only make "a prima facie showing that the exercise of personal jurisdiction is appropriate." n7 And, in such a case, "the record is construed in the light [*9] most favorable to the plaintiff." n8

n5 *See* 1 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 3-3 (2003).

n6 *See id.*; 2 James Wm. Moore et al., *Moore's Federal Practice* § 12.31(4) (3d ed. 2002).

n7 1 Wolfe & Pittenger, § 3-3; *see Hart Holding Co. v. Drexel Burnham Lambert Inc., 593 A.2d 535, 539 (Del. Ch. 1991); Francosteel Corp. v. M/V Charm, 19 F.3d 624, 626 (11th Cir. 1994);* 2 *Moore,* § 12.31(5).

n8 1 Wolfe & Pittenger, § 3-3; see *Computer People, Inc. v. Best Int'l Group, Inc.*, 1999 Del. Ch. LEXIS 96, 1999 WL 288119, at *5 (Del. Ch. Apr. 27, 1999); 2 *Moore*, § 12.31(5).

A. The Facts

1. The Formation of the Companies and the Pertinent Features of their Operating Agreements

Cornerstone and Arastra were both formed by three original members -- plaintiff Kor Holdings, plaintiff Peter A. Kanjorski, and defendant Conrad. The plaintiffs have made a *prima facie* showing that [*10] each of these three members -- including Conrad -- signed the operating agreement for each Company. In one of many unusual aspects to this case, Conrad admits signing the Cornerstone operating agreement but claims that the signature that purports to be his on the Arasta agreement was forged. For purposes of this motion, however, I must draw the inference that the signature on the Arasta agreement was put there by Conrad's own hand.

According to each operating agreement, Kor Holdings has a sixty percent membership interest, while Peter A. Kanjorski and Conrad each hold a twenty percent membership interest. Each of the operating agreements has a provision that requires a member to offer his interest in the Company to the other members and, if they decline, to the Company itself before offering to transfer such an interest to any other person (collectively I refer to the two provisions singularly as the "Buy-Out Provision"). Under each of the operating agreements, a member who does not comply with the Buy-Out Provision

> shall . . . indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that any such indemnified Persons may incur (including [*11] incremental tax liability and lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby. n9

n9 Cornerstone Operating Agreement § 6.5; Arastra Operating Agreement § 6.5.

Each operating agreement provides for a board of managers to manage or direct the management of the business and affairs of the Company. And each operating agreement establishes certain corporate offices, to be appointed by the board of managers. The Chief Executive Officer of each Company is the officer who is, under the operating agreements, responsible for the general management of the Company.

Finally, each operating agreement has a provision that authorizes the actions necessary to form each Company as a Delaware limited liability company. n10 In other words, the members of the Companies contemplated that certain steps (*e.g.*, a filing with the Delaware Secretary of State) would be necessary to formally form Cornerstone and Arastra as Delaware limited liability [*12] companies.

n10 Cornerstone Operating Agreement § 1.1; Arastra Operating Agreement § 1.1.

2. Conrad's Involvement with the Companies

At various points, Conrad served as President, Chief Executive Officer, and manager of Cornerstone and Arastra. The plaintiffs have produced evidence, in the form of a draft September 18, 2000 letter from Conrad to Richard M. Pell, to support their assertion that Conrad was formerly an officer of Cornerstone and Arastra. In that letter, Conrad claims to have been the President and Chief Executive Officer of Cornerstone, Arastra, and a related company. n11 And, according to the operating agreements, "the Chief Executive Officer shall serve as one of the Managers." n12

n11 *See* Am. Compl. Ex. D ("As you know, on August 4, 2000, you signed an Equity Agreement dated August 15, 2000, which I countersigned in my capacity as President and CEO of Arastra, LLC, Cornerstone Technologies LLC, and Pennsylvania Micronics, LLC . . .").

[*13]

n12 Cornerstone Operating Agreement § 3.3(b); Arastra Operating Agreement § 3.3(b).

3. Unger's Involvement with the Companies

Unger served as an employee of Cornerstone from December 1999 to May 2001. The plaintiffs allege that Unger claims to have come into possession of units in and thus become a member of the Companies. Unger allegedly came into possession of whatever units he owns by way of a September 18, 2000 purported assignment by Conrad to Unger and a May 20, 2001 purported assignment by David Carpenter to Unger.

2003 Del. Ch. LEXIS 34, *

In keeping with the odd nature of this record, Unger disclaims any ownership of units in either of the Companies. His co-defendant, Conrad, however, claims that Unger was promised a significant block of units to be issued to him once he became an employee.

4. The Chain of Events Leading to this Suit

There is little clarity about the precise nature of the disputes between the Kanjorskis and Unger and Conrad; what is relevant and can be discerned now follows.

It appears that at some point in time Conrad felt that certain employees of the Companies had been promised [*14] an equity stake of some kind in an August 15, 2000 agreement. I infer this from a September 18, 2000 letter attached to the complaint and a later letter. The September 18, 2000 letter purports to be from Conrad to Richard M. Pell, and states in pertinent part that:

> As you know, on August 4, 2000, you signed an Equity Agreement dated August 15, 2000, which I countersigned in my capacity as President and CEO of Arastra . . . [and] Cornerstone. . . . At that time it was understood by me that the majority shareholders of the Companies had fully authorized the execution of that Agreement. I have since been informed otherwise.
>
> If the majority shareholders do not ultimately authorize equity grants to you in an acceptable form, I am committed to making you whole for the commitment I made to each of you, Bob Marshall and Tom Unger, from equity which is totally in my control. If this document is accepted by you, I hereby cause to be assigned to you an undivided interest in my 20% holding in the Companies, such that you will have a call on the value of the 20% of the 20% held by me. While I cannot actually deliver shares to you, I intend to bind the value of this 4% equity interest [*15] to you as though it were formally held by you through the ownership of share certificates therefor. n13

That is, all told Conrad (going only by the draft letter) purports to have attempted to transfer three-fifths of his twenty percent portion, or twelve percent of the Companies. The letter does not reflect any mention of the Buy-Out Provision. Also relevant is the implicit suggestion that Pell, Marshall, and Unger had been promised units in the Companies by Peter Kanjorski and Conrad, acting as Company managers. It is not clear from the record whether Pell, Marshall, or Unger accepted Conrad's offer.

n13 Am. Compl. Ex. D.

The record then fast-forwards to May 6, 2001. On that day, a number of important events occurred involving the governance of Cornerstone and Arastra. First, Kor Holdings and Peter A. Kanjorski (as purported holders of a total of eighty percent of the original membership units of Cornerstone and Arastra, respectively, in accordance with the literal terms of the operating agreements) [*16] executed written consents that (1) removed Conrad as manager of Cornerstone and Arastra; (2) increased the number of managers of each Company to four; and (3) installed Peter A. Kanjorski, Russell P. Kanjorski, Mark A. Kanjorski, and Paul Eric Kanjorski (the "Kanjorskis") as the new managers. Second, the newly constituted boards of managers (1) removed Conrad from his position as President of each Company; (2) removed him from any other position with the Companies; (3) terminated his employment with the Companies; and (4) ended Conrad's ability to act on behalf of the Companies. Third, the boards elected Peter A. Kanjorski to the offices of Chief Executive Officer and President and Paul Eric Kanjorski to the offices of Secretary and Treasurer.

As might be expected, this action triggered the likelihood of lawsuits. In anticipation of legal action, it appears that on May 20, 2001, an individual named David Carpenter executed an assignment that purported to transfer Carpenter's entire interest in Cornerstone and Arastra to Conrad and Unger. n14 According to the terms of the purported assignment, Conrad and Unger were each to receive fifty percent of Carpenter's (unspecified) holdings [*17] in the Companies. In exchange, Carpenter received one dollar and other "valuable consideration."

n14 See Am. Compl. Ex. A.

Also, in the May 20 document, Carpenter purported to "assign[] any rights he may have in litigation against Peter Kanjorski and others with respect to the [Companies]." n15 That assignment of litigation rights was to be equally divided between Conrad and Unger. Notably, the assignment letter purporting to assign Carpenter's ownership interest does not indicate any attempt to comply with the Buy-Out Provision. Nor does the document explain how Carpenter acquired his interests in the Compa-

nies or his causes of action against Kanjorski and certain unnamed others, except to reference a supposed May 15, 1997 agreement.

n15 *Id.*

In other litigation, Conrad has asserted that the May 15, 1997 agreement gave himself, [*18] Carpenter, and Unger nearly sixty percent of Cornerstone's equity -- and that the Kanjorski family was to own nearly 40%. Conrad implies that the equity allocation expressly set forth in the operating agreements is misleading, because Kor was only supposed to hold Unger's nearly twenty percent equity share until Unger became an employee. As indicated, consistent with the generally confusing nature of the record, Unger expressly disclaims any ownership interest in either of the Companies.

On May 30, 2001, Barry H. Dyller, who was then Conrad's lawyer, sent a letter to the plaintiffs' lawyer offering to sell to "the Kanjorski family or any member you designate" Conrad's twenty percent interest in Cornerstone for $ 3.9881 million. n16 This offer was expressly made as a confidential offer of settlement.

n16 Am. Compl. Ex. E.

Finally, on August 16, 2002, the members of each Company voted to ratify the earlier May 6 appointment of managers and to elect those persons appointed on May 6 to the board of managers. That [*19] is, the Kanjorskis were elected to the board. On all of the motions made at the members' meetings, Peter Kanjorski and Kor Holdings (as represented by Peter Kanjorski) voted "yes." Bruce Conrad was absent and therefore did not vote on each measure.

B. The Pennsylvania Actions

There are three Pennsylvania state court actions that relate to the dispute before me. The first is an action filed by defendant Unger on February 12, 2002 in the Court of Common Pleas of Northampton County (the "Employment Action") against Cornerstone. In his complaint, Unger claims that Cornerstone unlawfully terminated him from his position as an executive employee of the Company. Unger argues that this termination violated the provisions of (1) an employment contract between Unger and Cornerstone and (2) the *Pennsylvania Human Relations Act*, in that Unger's termination was supposedly motivated by Unger's age. In the Employment Action, Unger does not assert any ownership interest in either Cornerstone or Arastra. Unger and Cornerstone are the only parties to the Employment Action.

The second of the related actions was filed against Conrad by Cornerstone in the Court of Common Pleas of Carbon County on [*20] July 2, 2002. In that action, Cornerstone sought the return of a company computer (or damages equal to its value) allegedly retained by Conrad after his termination by Cornerstone (the "Replevin Action"), as well as compensatory damages, punitive damages, and an award of attorneys' fees.

In response to the complaint in the Replevin Action, Conrad raised a number of preliminary objections, including that: (1) the actual owners of Cornerstone had not authorized the Replevin Action because Cornerstone is "59.5% owned by Mr. Conrad, Mr. Unger and Dr. Carpenter" n17; (2) there were two prior-filed actions (namely, the "Employment Action" and this Delaware action); and that (3) Cornerstone had failed to join certain indispensable parties. On January 15, 2003, the Northampton County Court of Common Pleas denied Conrad's preliminary objections in the Replevin Action. n18 Cornerstone and Conrad are the only parties to the Replevin Action.

n17 Conrad's Prelim. Objections & Mot. for Summ. J. at 3 (capitalization and bold emphasis omitted).

n18 See *Cornerstone Techs., LLC. v. Conrad*, No. C0048CV20027475, order at 1 (Pa. Ct. Com. Pl. Jan. 15, 2003).

[*21]

The third action was filed by Cornerstone against Conrad and Unger on July 2, 2002 in the Court of Common Pleas of Carbon County (the "Equity Action"). In the Equity Action, Cornerstone complained that Conrad and Unger had breached their fiduciary duties, their duties as employees, and their obligations under certain confidentiality agreements, to Cornerstone, by, among other things, improperly disclosing Cornerstone trade secrets and engaging in illicit competition with the Company. Additionally, Cornerstone sought an injunction ordering Conrad and Unger to relinquish control over certain "tangible media" owned by Cornerstone, enjoining them from disclosing Cornerstone trade secrets, and requiring them to account to Cornerstone for any benefit they received as result of any improper disclosure of Cornerstone trade secrets. And, Cornerstone sought a judicial declaration that certain inventions are its property.

Conrad filed preliminary objections to the Equity Action that were identical to the preliminary objections he filed in the Replevin Action, and reiterated his contention that Conrad, Unger, and Carpenter own 59.5% of

Cornerstone's equity. On December 20, 2002, the Northampton [*22] County Court of Common Pleas overruled all of Conrad's (and Unger's separate) preliminary objections in the Equity Action. n19 In the Equity Action, Cornerstone is the only plaintiff, and Conrad and Unger are the only defendants.

n19 *See Cornerstone Techs., LLC v. Conrad*, No. C0048CV2002-7475, slip op. at 5 (Pa. Ct. Com. Pl. Dec. 20, 2002).

On the same day that the judge overruled Conrad's and Unger's preliminary objections in the Equity Action, he entered an order coordinating that Action with the Employment Action and Replevin Action, with the result that all three Pennsylvania Actions will proceed in an essentially consolidated manner. That court, the Northampton County Court of Common Pleas, has set a schedule for the consolidated action that mandates that discovery be completed by July 1, 2003, that all dispositive motions be filed by July 15, 2003, and that trial begin on December 15, 2003. n20

n20 *See Cornerstone Techs., LLC v. Conrad*, No. C0048CV2002007475, order at 2 (Pa. Ct. Com. Pl. Jan. 31, 2003).

[*23]

C. The Counts of the Complaint

In summary, the plaintiffs complain that Conrad and Unger are making certain false claims of ownership in Cornerstone and Arastra and that, as a result, uncertainty exists about who can make decisions for the Companies, an uncertainty that supposedly hampers the Companies' ability to deal with third parties. While conceding that Conrad enjoys a twenty percent stake in Cornerstone and Arastra, the plaintiffs seek a judicial declaration that Conrad's interest in the Companies is no more (or less) than that twenty percent and that Unger has no interest at all in the Companies.

The precise counts of the complaint can be grouped as follows:

1. The Ownership Count

In Count I, the plaintiffs seek a judicial declaration that Conrad owns solely a twenty percent stake in each of the Companies and that Unger enjoys no such ownership stake whatsoever. The Ownership Count is linked in an important way to the Buy-Out Counts, which I next summarize. The reason is that it is the conduct that is alleged in the Buy-Out Counts that gives rise to the plaintiffs' concern about the proportion of the Companies' equity that is owned by Conrad and Unger.

2. The [*24] Buy-Out Counts

In Count II, the plaintiffs complain that Conrad's offer to transfer four percent interests in the Companies to each of Pell, Marshall, and Unger violated the Buy-Out Provision. In other words, Conrad should have made an offer to sell the interests to his fellow members and the Companies before making such offers to Pell, Marshall, and Unger.

It is not clear from the record whether the plaintiffs allege that any of Conrad's offers were accepted. To the extent that Pell, Marshall, and/or Unger accepted Conrad's offer, I read the complaint as requesting an invalidation of the transfer(s). Even if the offers were not accepted, the complaint seems to seek a mandatory injunction requiring Conrad to offer the units he offered to Pell, Marshall, and Unger to the other members and/or the Companies who have rights under the Buy-Out Provision at the price that the Provision would have dictated as of September 18, 2000. n21

n21 Am. Compl. at 5.

In Count III, the plaintiffs argue that Conrad's settlement [*25] offer, by way of his attorney's letter, to sell his entire stake in Cornerstone to the Kanjorski family also violated the Buy-Out Provision of that Company's operating agreement. As in Count II, Count III seeks to require Conrad to put his equity to the parties having rights under the Buy-Out Provision in accordance with the terms that Provision would have dictated at the time Conrad made his settlement offer. n22

n22 Am. Compl. at 6.

In Count IV, the plaintiffs request an award of attorneys' fees and other litigation expenses incurred in their attempt to enforce the Buy-Out Provision. The plaintiffs argue that the operating agreements require any party that violates the Buy-Out Provision to indemnify the members and the Companies for all costs associated with enforcing the Buy-Out Provision and the indemnity provisions.

3. The Removal Counts

In Counts V and VI, the plaintiffs seek judicial confirmation of Conrad's removal as a manager and officer of the Companies. Furthermore, the plaintiffs want me to [*26] approve the managers' subsequent appointment of

Peter Kanjorski as President and CEO and Paul Eric Kanjorski as Secretary and Treasurer of the Companies.

## II. Analysis

To determine whether this court may exercise personal jurisdiction over Unger and Conrad, I must engage in a two-part analysis. n23 First, I must ask whether a statute of this state authorizes the exercise of personal jurisdiction over each of them. Second, I must determine whether such an exercise of jurisdiction would comport with the due process requirements of the *Fourteenth Amendment to the United States Constitution*. n24 [HN3] *The Fourteenth Amendment* requires that a nonresident defendant have certain "minimum contacts" with the forum jurisdiction "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" n25

n23 *See* 1 Wolfe & Pittenger, § 3-3.

n24 *See Hercules Inc. v. Leu Trust & Banking (Bahamas) Ltd., 611 A.2d 476, 480-81 (Del. 1992), cert. dismissed, 507 U.S. 1025, 123 L.Ed. 2d 463, 113 S. Ct. 1836 (1993)*.

n25 *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945)* (quoting *Milliken v. Meyer, 311 U.S. 457, 463, 85 L. Ed. 278, 61 S. Ct. 339 (1940))*; *see also La Nuova D & B, S.p.A. v. Bowe Co., 513 A.2d 764, 769-70 (Del. 1986)* (applying *International Shoe*).

[*27]

I begin my analysis with defendant Unger.

### A. Statutory Analysis

#### 1. Unger

The plaintiffs rely solely on the provisions of Delaware's long-arm statute n26 to support their claim that this court has personal jurisdiction over Unger. The plaintiffs concede n27 that the only relevant part of the long-arm statute is *10 Del. C. § 3104(c)(1)*, which provides:

> [HN4] (c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
>
> (1) Transacts any business or performs any character of work or service in the State . . .

n26 *10 Del. C. § 3104*.

n27 *See* Pls.' Answering Br. at 6.

*Section 3104(c)(1)* [HN5] is a "single act" provision of the long-arm statute. n28 As such, *§ 3104(c)(1)* supplies a basis for personal jurisdiction "only with respect to claims that have a nexus to such [*28] forum-related conduct." n29 The plaintiffs have only pointed to two acts committed in the State of Delaware that have any relevance to this litigation -- *i.e.*, the acts of forming (1) Cornerstone and (2) Arastra as Delaware limited liability companies.

n28 *See* 1 Wolfe & Pittenger, § 3-5(a)(1)(i).

n29 *Id.; see La Nuova, 513 A.2d at 768*.

But the plaintiffs have not even alleged that Unger committed or caused to be committed either of these acts in the State of Delaware. Unger's name is noticeably absent from the operating agreements. He did not sign those agreements. He is not listed as a member in either agreement. There is no indication whatsoever that he had any role in the founding and formation of either Cornerstone or Arastra. Undeterred by these facts, the plaintiffs advance a novel legal argument -- that because Unger allegedly became a member of the Companies *later*, he should be treated for jurisdictional purposes as if he had *earlier* authorized these acts.

I refuse [*29] to adopt the plaintiffs' invitation to engage in metaphysics. *Section 3104(c)(1)*, by its own terms, requires that the transaction of business in question be performed "in person or through an agent." n30 The plaintiffs have not produced any evidence showing that Unger had anything to do with the filing of the limited liability company documents for Cornerstone and Arastra. Therefore, the plaintiffs have not met their burden to show that Unger transacted any business (either personally or through an agent) in Delaware. *Section 3104(c)(1)* thus does not supply this court with personal jurisdiction over Unger and his motion must be granted.

n30 *10 Del. C. § 3104(c)*.

#### 2. Conrad

I now turn to the plaintiffs' argument as to why personal jurisdiction exists over Conrad. As with Unger, the

plaintiffs initially rely upon § *3104(c)(1)*. The plaintiffs argue that Conrad, by signing the operating agreements, authorized an individual (*i.e.*, an agent) to take certain actions in Delaware [*30] to effect the formation of Cornerstone and Arastra as Delaware LLCs. n31 The plaintiffs contend that these acts in Delaware are sufficient to bring Conrad within the scope of § *3104(c)(1)*. Unlike Unger, however, Conrad cannot as easily disclaim his connection to the acts in Delaware necessary to form the Companies as Delaware LLCs because he was a founding member and top manager of them -- *i.e.*, he was an original joint venturer.

> n31 *See* Cornerstone Operating Agreement § 1.1; Arastra Operating Agreement § 1.1.

Two questions emerge regarding the act of forming the LLCs in Delaware. First, is it a transaction of business to form two Delaware LLCs through the Secretary of State's office? Second, if it is, do the claims against Conrad have a sufficient nexus to those acts to satisfy § *3104(c)(1)*?

I decline to reach either question, because I believe the plaintiffs have raised other more direct statutory grounds for the assertion of personal jurisdiction over Conrad. The second question is an important [*31] one and it is preferable to avoid addressing it without the necessity to do so, especially given the less than ideal state of the briefing. n32

> n32 The reason the issues are important may be stated thusly. As to the first question, the Delaware Supreme Court's instruction that § *3104(c)(1)* be read expansively would seem to counsel in favor of a conclusion that the actual formation of a Delaware entity, by way of a transaction with the Secretary of State, constitutes a transaction of business in Delaware. *See Hercules, 611 A.2d at 480* ("*[Section] 3104(c)* [HN6] is to be broadly construed to confer jurisdiction to the maximum extent possible under the *Due Process Clause*."). Certainly, such a reading does no great violence to the statutory text as an actual transaction has been consummated that involves the payment of money in exchange for the right to form a new legal entity.
>
> The more knotty policy question then becomes one of nexus. Should any claim for a later breach of the terms of the governing instrument of an entity be deemed to have the required nexus to the original transaction in Delaware that gave legal life to that instrument as a legally viable contract? If answered affirmatively, § *3104(c)(1)* would operate -- subject to constitutional limitations -- to ensure service of process against any founder of a Delaware entity to whom the act of formation in Delaware can be attributed in any case involving the proper interpretation or possible breach of that entity's governing instrument. This broad sweep may possibly fulfill the our Supreme Court's command that the long-arm statute be construed liberally, but there is no reason to use this case to test that theoretical possibility.

[*32]

I find it unnecessary to explore the outer regions of § *3104(c)(1)*'s reach because two separate provisions of Delaware's LLC statute provide a sufficient basis to exercise personal jurisdiction over Conrad and no constitutional problem arises with their use.

First, § *18-110(a)* sustains jurisdiction over Conrad as to those parts of the Removal Counts relating to his alleged removal and replacement as a manager of the Companies. Second, § 18-109 provides a basis for jurisdiction against Conrad on the other counts of the complaint. I begin with the manager Removal Counts.

a. *6 Del. C. § 18-110* and the Manager Removal Counts

[HN7] The Delaware Limited Liability Company Act, *6 Del. C. § 18-110(a)*, allows this court, upon the application of a member or manager of a limited liability company, to

> determine the validity of any admission, election, appointment, removal or resignation of a manager . . . and the right of any person to become or continue to be a manager . . . and, in case the right to serve as a manager is claimed by more than 1 person, [to] determine the person or persons entitled to serve as managers [*33] . . . . n33

Section *18-110(a)* also provides for constructive service of process:

> [HN8] In any such application, the limited liability company shall be named as a party and service of copies of the application upon the registered agent of the limited liability company shall be deemed to be service upon the limited liability com-

> pany and upon *the person or persons whose right to serve as a manager is contested and upon the person or persons, if any, claiming to be a manager or claiming the right to be a manager* .... n34

---

n33 6 Del. C. § 18-110(a).

n34 Emphasis added.

---

Put simply, § 18-110(a) provides a clear basis for jurisdiction over Conrad as to those parts of the Removal Counts relating to his alleged removal and replacement as a manager of the Companies. In attempting to resist jurisdiction pursuant to § 18-110, Conrad makes an unusual argument. Namely he argues that he "cannot dispute [his removal as manager because] that has never occurred." Why [*34] was he never removed? Because Conrad claims that he "has never served as a manager of the companies nor has there ever been a board of managers [of the companies]." n35 As such, Conrad in essence argues that he does not fall within the ambit of § 18-110(a) because he is not claiming to be a manager and his right to be a manager cannot be properly contested because the Companies have never had managers. And, indeed, with respect to Arastra, Conrad argues that its operating agreement is a forgery and therefore inoperative. n36

---

n35 Conrad's Answering Br. at 8.

n36 *See id.* at 8 & 10. I have inspected the copy of Arastra Operating Agreement submitted as an exhibit to the amended complaint and it appears that Conrad's signature is authentic. At this point in the proceedings, I therefore must conclude that the plaintiffs have met their *prima facie* burden of showing that Arastra has a valid operating agreement that Conrad signed.

---

If anything, Conrad's answering brief makes me more likely to believe there [*35] is a dispute regarding the governance and management of the Delaware LLCs at issue in this case. Conrad calls into question, among other matters, (1) his purported removal as manager and an officer of the Companies; (2) whether Arastra's operating agreement is valid; and (3) whether the Companies have boards of managers.

Moreover, Conrad's rather odd arguments do not suffice to defeat this court's jurisdiction over him. The plaintiffs have produced sufficient evidence to meet their *prima facie* burden to show that Conrad at one time claimed to be a manager -- and CEO -- of Cornerstone and Arastra. By the literal terms of the operating agreements, the CEO of the Companies was also to be a manager. n37 Thus, it is not irrational for the plaintiffs to wish to have a judicial declaration of the validity of Conrad's removal as manager.

---

n37 This fact, coupled with Conrad's status as a founder, large unitholder, and top officer, as well as the reality that the Kanjorskis went to the trouble to vote Conrad off as a manager of both Companies, provides a sufficient factual foundation for me to assume that Conrad was a manager at all relevant times before his purported removal in May 2001.

---

[*36]

[HN9] By the plain terms of § 18-110(a), "the Court of Chancery may hear and determine the validity of any admission, election, appointment, *removal* or resignation of a manager of a limited liability company." n38 And, the plaintiffs may constructively serve Conrad under § 18-110(a) because he is a "person . . . whose right to serve as a manager is contested." If, upon reflection, Conrad adheres to his view that he was never a manager of either Company, he is free to enter into a stipulated judgment to that effect. But his disclaimer of that status does not operate to divest this court of personal jurisdiction over him under § 18-110(a).

---

n38 Emphasis added.

---

Furthermore, I conclude that because of Conrad's status as a manager, he can also be fairly asked to contest any question of his removal as President (and other offices, such as CEO) in this same action. As with § 3114 of the *Delaware General Corporation Law*, § 18-110(a) ought to be read sensibly to sweep in sufficiently related claims against an LLC manager [*37] so long as there would be no constitutional offense. Conrad was purportedly removed as President of the Companies (and from all other offices at the Companies) on the same day as he was allegedly removed as a manager. There is thus a close nexus between these claims. And if there were any question on that score, it is obvious that another provision of our LLC statute subjects Conrad to this court's jurisdiction over his purported removal as CEO and President: § 18-109 of the LLC statute.

b. § 18-109 and the Removal, Ownership and Buy-Out Counts

*Section 18-109* provides a basis for this court's exercise of personal jurisdiction over Conrad with respect to all of the counts of the complaint. *Section 18-109(a)* [HN10] permits an exercise of personal jurisdiction over a manager (as that term is defined in that subsection) "in all civil actions or proceedings brought in the State of Delaware *involving or relating to the business of the limited liability company or a violation by the manager . . . of a duty to the limited liability company, or any member of the limited liability company*." n39

n39 Emphasis added.

[*38]

Clearly, the question of whether Conrad was properly removed as a manager, CEO, and President of the Companies relates to the business of the Companies. Therefore, *§ 18-109(a)* covers the Removal Counts.

The broad scope of *§ 18-109(a)* also allows this court to exercise personal jurisdiction over Conrad with respect to the Ownership and Buy-Out Counts of the complaint. In this case, the issue as to who owns what part of Cornerstone and Arastra (*i.e.*, the issue in the Ownership Count) is "related in some respect" to the management disputes underlying this case -- *i.e.*, it relates to the business of the Companies. n40

n40 *See Assist Stock Mgmt. L.L.C. v. Rosheim*, 753 A.2d 974, 981 (Del. Ch. 2000).

What is alleged is that a small group of joint venturers formed two Delaware LLCs under a contract with strict controls on who could join the ranks of members. To control that membership right, they put in place a strict Buy-Out Provision that required that members wishing to sell first offer [*39] their units back to the other founders, and if they decline, to the Companies themselves.

The equity ownership of the Companies is allegedly clouded because of Conrad's purported failure to abide by that important term in the Companies' operating agreements. As critical, the debate about who owns what has its origins in a dispute about whether Conrad and Peter Kanjorski -- as managers and joint venturers -- agreed to issue equity in the Companies to Unger and the mysterious David Carpenter in 1997 as well as to certain employees in the year 2000.

In view of the importance of these issues to the capital structure and control of closely-held Delaware LLCs, they obviously relate to the business of those Companies and fall within the literal terms of *§ 18-109*. Put simply, the confusion about ownership arises out of disputed managerial acts. Did the companies promise to issue units to Carpenter and Unger in 1997 and to Unger and certain other employees in 2000? That is, the question of who owns what units depends in a material way on actions Conrad and others took as managers of the Companies. Likewise, these issues also bear a relationship to the validity of the votes removing Conrad [*40] as a manager because they relate to the question of whether the plaintiffs had sufficient voting power to cast Conrad out. That is, all of these issues relate to the business of the Companies and therefore satisfy the literal terms of *§ 18-109(a)*.

In so concluding, I reach a conclusion consistent with this court's well-reasoned decision in *Assist Stock Management L.L.C. v. Rosheim*. n41 In that decision, Vice Chancellor Lamb respected the General Assembly's decision to write *§ 18-109* more broadly than *§ 3114 of the DGCL*, by investing this court with personal jurisdiction over managers in disputes "involving or relating to the business of" their LLCs. n42 He held that this language must be given effect and that protection against an unconstitutional application of the statute can be afforded by the minimum contacts analysis. n43

n41 *753 A.2d 974 (Del. Ch. 2000)*.

n42 In *Assist*, Vice Chancellor Lamb held that a dispute about the ownership interests a manager had in an LLC could be adjudicated when "the ownership question is related in some respect to the [management] matter" in dispute. *Id. at 981*.

[*41]

n43 *See Assist, 753 A.2d at 980*.

Here, I conclude that all of the Counts bear a clear relation to the business of the LLC and that *§ 18-109* is satisfied, subject to a minimum contacts analysis. n44

n44 I bear some concern about the Buy-Out Count dealing with Conrad's offer to sell his stake in Cornerstone to the Kanjorski family (Count III). As Conrad has noted, it is clear that Conrad's offer was part of a confidential settlement proposal, and, as such may be inadmissible under Delaware Uniform Rule of Evidence 408. Indeed, Conrad's attorney's letter is clearly marked "**FOR SETTLEMENT PURPOSES ONLY**." In other words, by making his settlement offer, Conrad

was attempting to terminate a dispute by offering to sell his interests to the Kanjorskis -- the functional equivalent of offering his units to Kor and Peter Kanjorski. Whether such an offer to settle can be conceived of as a breach of the Buy-Out Provision is obviously a matter of some doubt.

Notwithstanding any doubts about the ultimate sustainability of Count III, Conrad can be subjected to this court's personal jurisdiction as to that count. Although Conrad's offer to settle was made after his purported removal as manager of the Companies, Count III is sufficiently related to the other counts in the complaint such that an exercise of personal jurisdiction over Conrad with respect to Count III is proper. *Assist*, 753 A.2d at 981 [HN11] (when a defendant is subject to personal jurisdiction under § 18-109 as to certain claims, the court may exercise personal jurisdiction over him as to other sufficiently related claims, and citing a § 3114 decision, *Manchester v. Narragansett Capital, Inc.*, 1989 Del. Ch. LEXIS 141, 1989 WL 125190 (Del. Ch. Oct. 18, 1989), in support of that proposition); *see also Infinity Investors Ltd. v. Takefman*, 2000 Del. Ch. LEXIS 13, 2000 WL 130622, at *6 (Del. Ch. Jan. 28, 2000) [HN12] ("Once jurisdiction is properly obtained over a non-resident director pursuant to § 3114, such non-resident director is properly before the Court for any claims that are *sufficiently related to the cause of action* asserted against such directors in their capacity as directors."), *clarified by*, 2000 Del. Ch. LEXIS 39, 2000 WL 268302 (Del. Ch. Feb. 17, 2000); *Jaffe v. Regensberg*, 1980 WL 3039, at *2 (Del. Ch. Jan. 10, 1980) [HN13] ("under § 3114, the relief sought is not the guiding factor because if jurisdiction attaches at all under the statute, the nonresident is before the Court for any and all relief that might be necessary to do justice between the parties by virtue of the fact that the jurisdiction conveyed by the statute is in personam jurisdiction."); 1 Wolfe & Pittenger, § 3-5(a)(2)(iv) (discussing Delaware cases holding that [HN14] "once a nonresident director is properly before a Delaware court by reason of Section 3114, that director is properly before the court for any relief that the facts may require, even if such relief technically operates against the director in some other capacity, such as that of a stockholder.").

[*42]

B. Constitutional Analysis

Because *6 Del. C. §§ 18-109 and 18-110* provide statutory bases for an exercise of personal jurisdiction with respect to Conrad, I briefly address the constitutional inquiry. As I noted earlier, [HN15] the due process clause of the *Fourteenth Amendment* requires that a non-resident defendant have certain "minimum contacts" with the forum jurisdiction "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." n45 When determining whether these "minimum contacts" are present, the court should inquire whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." n46 Once the defendant's minimum contacts with the forum have been established, the court should turn its analysis to issues of fairness and justice. n47

N45 *Int'l Shoe Co.*, 326 U.S. at 316 (citation and internal quotation marks omitted).

n46 *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980).

[*43]

n47 *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462 at 476-77, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985).

With respect to the "minimum contacts" analysis, it is clear that Conrad purposefully availed n48 himself of the benefits and protections of Delaware law and that he cannot be surprised to face this lawsuit here. Conrad and his co-venturers could have formed Cornerstone and Arastra as Pennsylvania entities. Instead, they purposely looked to a neighboring state as a place to domicile their Companies and to provide the governing law for their relations. Not only that, Conrad took on the position of manager, CEO, and President of these Delaware Companies, knowing that as a manager he would be subject to jurisdiction for disputes here relating to the business of the Companies.

n48 *See Burger King Corp.*, 471 U.S. 462 at 475.

As such, Conrad should not be surprised that he has been haled into a Delaware court when disputes have arisen over the governance [*44] of those Delaware LLCs relating to such fundamental issues as whether he is still a manager or officer, whether he violated the Buy-Out Provision and what that Provision means, and

whether he, as manager, issued equity to certain individuals. n49

n49 *See Burger King Corp.*, 471 U.S. 462 at 474; *World-Wide Volkswagen Corp.*, 444 U.S. at 297.

Nor is there is anything unfair or unjust about the exercise of personal jurisdiction over Conrad by this court. As a resident of a neighboring state who purposely participated in the founding of the LLCs in Delaware, Conrad will face only minimal inconvenience by having to respond to the claims made against him in this Delaware court action regarding those entities. Moreover, this state has a strong interest in resolving disputes regarding the internal affairs of LLCs formed under its laws. n50

n50 *Cf. Assist*, 753 A.2d at 981 [HN16] ("Delaware has a strong interest in providing a forum for disputes relating to the ability of managers of an LLC formed under its law to properly discharge their respective managerial functions.").

[*45]

Because personal jurisdiction over Conrad is authorized by Delaware statutory law and is not constitutionally infirm, his motion to dismiss for lack of personal jurisdiction will be denied.

III. Service of Process

I recognize, as pointed out by Conrad, n51 that service of process on him was not properly effected pursuant to *6 Del. C. § 18-109*. Instead, the plaintiffs served the defendants under *10 Del. C. §§ 3104* and, inexplicably, 3114. Conrad never raised this issue by way of a formal motion. Given this fact, along with the fact that Conrad received *actual notice* of this suit, equity and common sense counsel in favor of giving the plaintiffs leave to properly serve defendant Conrad pursuant to *6 Del. C. § 18-109*. n52 Thus, the plaintiffs shall have leave until April 15, 2003 to effect proper service.

n51 *See* Letter from Bruce Conrad to Vice Chancellor Leo E. Strine, Jr. 2 (Mar. 7, 2003).

n52 *See Assist*, 753 A.2d at 982 (permitting plaintiff to cure a technical defect in service of process when it appeared that proper service, if made, would be effective to invoke the court's personal jurisdiction over the defendant).

[*46]

IV. Conrad's Motion to Dismiss or Stay this Action in Favor of the Pending Pennsylvania Consolidated Case

In various of his letters to the court, *pro se* defendant Conrad pointed to the inconvenience of facing litigation from Cornerstone in both this state and Pennsylvania. To surface the issue, the court asked the parties to file submissions relating to whether I should stay or dismiss this action pursuant to *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Engineering Co.* n53 or on other grounds.

n53 263 A.2d 281 (Del. 1970).

Without burdening the reader with a fulsome explanation of the difficulty of applying *McWane* here, n54 I proceed to articulate why I believe that I should use my inherent discretion to control my docket and enter a stay. n55

n54 One of the reasons it is awkward to shoe-horn this case under *McWane* is that none of the other actions were filed in the first instance by Conrad. Indeed, the two relevant Pennsylvania Actions were filed by Cornerstone and basically involve the Kanjorskis litigating (through Cornerstone) as plaintiffs against Conrad as a defendant.

[*47]

n55 *See Joseph v. Shell Oil Co.*, 498 A.2d 1117, 1123 (Del. Ch. 1985).

In the Equity Action, Cornerstone -- a key plaintiff here who is putatively controlled by the Kanjorskis through Kor -- seeks to litigate breach of fiduciary duty claims against Conrad. That action also involves defendant Unger, whom I have concluded is not subject to this court's personal jurisdiction. The Equity Action, and the other related Pennsylvania actions, are all set to go to trial as consolidated cases later this year.

It remains mysterious to me why the plaintiffs have chosen to spread their claims against Conrad over the court systems of two states. By all measures, it is (modestly) more geographically convenient to litigate this case in Pennsylvania for everyone concerned. Given Cornerstone's own choice to litigate certain Delaware claims -- *i.e.*, the fiduciary duty claims -- in Pennsylvania, its desire to have a Delaware court adjudicate its

other Delaware law claims is inexplicable. Furthermore, it is apparent that the Pennsylvania courts can exercise jurisdiction over Unger and the other [*48] parties to whom the plaintiffs believe Conrad either sold or offered to sell the Companies' units.

Given these realities, it is not at all apparent why commercially sensible litigants would engage in litigation tactics of the kind the plaintiffs here have. Whatever the motivation, proper or improper, this court need not indulge the plaintiffs' whim for simultaneous conflict in two different forums of its own choosing against one *pro se* defendant.

Instead, I will stay this action indefinitely, with a view towards permitting Cornerstone to complete its lawsuits against Conrad and Unger in Pennsylvania in accordance with the schedule already established in that case. This will conserve the parties' resources, as well as those of this court. If the plaintiffs are concerned about this method of proceeding, they might usefully consider whether they are actually permitted to split their claims in the fashion they have n56 and whether it might not be more sensible for them to raise all of their claims against Conrad, Unger, and related parties in one forum that is convenient. In this regard, it is noteworthy that the plaintiffs have failed to provide any reason to believe that the claims [*49] they plead here could not be asserted in the consolidated action pending in Pennsylvania. Put simply, any inconvenience to the plaintiffs of the method of proceeding I have imposed is self-inflicted and is outweighed by the burden to Conrad of fighting two battles on two separate fronts at once for no substantial reason.

---

n56 Both this state and Pennsylvania frown on claim splitting. [HN17] When a party can raise all claims it has against a defendant in one forum at one time, it is generally obligated to do so. *See, e.g., Maldonado v. Flynn, 417 A.2d 378, 382 (Del. Ch. 1980)* ("The rule against claim splitting is an aspect of the doctrine of res judicata and is based on the belief that it is fairer to require a plaintiff to present in one action all of his theories of recovery relating to a transaction, and all of the evidence relating to those theories, than to permit him to prosecute overlapping or repetitive actions in different courts or at different times."); *Coleman v. Coleman, 361 Pa. Super. 446, 522 A.2d 1115, 1120 (Pa. Super. Ct. 1987)* ("The courts of this Commonwealth have long adhered to the generally accepted view disfavoring the splitting of claims.").

[*50]

Therefore, I grant Conrad's motion for an indefinite stay.

V. Conclusion

For the reasons expressed, (1) Unger's motion to dismiss for lack of personal jurisdiction is granted; (2) Conrad's motion to dismiss for lack of personal jurisdiction is denied; and (3) Conrad's motion for a stay is granted. The stay shall remain in effect indefinitely, but the plaintiffs may perfect service of process on Conrad and may move to lift the stay no earlier than March 1, 2004 or the date of the final termination of the Pennsylvania Equity Action. n57 IT IS SO ORDERED.

---

n57 Of course, whatever actions the plaintiffs will need to take to effect proper service of process over Conrad by April 15, 2003 are exempt from the stay.