# EXHIBIT K



Not Reported in A.2d                                                                                                         Page 1
Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
(Cite as: 1998 WL 914265 (Del.Ch.))

**H**
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
IOTEX COMMUNICATIONS, INC., a Delaware corporation, Plaintiff and Counterclaim Defendant,
v.
Anthony DEFRIES and David Bayendor, Defendants,
and
IOTA, INC., a Delaware corporation, Defendant and Counterclaim and Third-Party Plaintiff,
v.
ioWAVE, INC., Third-Party Defendant.
No. 15817.

Dec. 21, 1998.

Grover C. Brown, Esquire, Michael J. Maimone, Esquire and Joseph C. Schoell, Esquire, of Morris, James, Hitchens & Williams, Wilmington, Delaware, Attorneys for Plaintiff and Counterclaim Defendant Iotex Communications, Inc.

Iota, Inc., Defendant and Counterclaim and Third-Party Plaintiff ( C.A. No. 15817); Anthony Defries and David Bayendor, Defendants (C.A. No. 15817); Urs Maag, Plaintiff and Counterclaim Defendant (C.A. No. 16082); Neosoft, A.G., Plaintiff (C.A.16036). [FN*]

> FN* On December 18, 1998, an Order was entered permitting counsel for these parties to withdraw his representation and allowing 60 days for Iota, Inc. to secure new counsel.

Allen M. Terrell, Jr., Esquire and Srinivas M. Raju, Esquire, of Richards, Layton & Finger, P.A., Wilmington, Delaware; Of Counsel: Blair G. Brown, Esquire and Lynn F. Kaumann, Esquire, of Zuckerman, Spaeder, Goldstein, Taylor & Kolker, L.L.P., Washington, D.C., Attorneys for Counterclaim Defendant ioWave, Inc.

MEMORANDUM OPINION

LAMB, Vice Chancellor.

I. INTRODUCTION
*1 These motions arise out of a complex, multi-party, multi-suit [FN1] litigation begun in July 1997. Various motions to dismiss were filed by several of the parties and oral argument on these motions was held on November 10, 1998. At the conclusion of the hearing held in these consolidated matters, I reserved decision on the motion of David Bayendor to dismiss the complaint against him in C.A. No. 15817 for want of personal jurisdiction, the motions of David Bayendor ("Bayendor") and Anthony Defries ("Defries") to dismiss the Eighth Claim for Relief alleged by counterclaim in C.A. No. 15817 for failure to state a claim (as well as the motion of Defries to dismiss for lack of personal jurisdiction over the Eighth Claim for Relief), and the motion of Urs Maag ("Maag") to dismiss the counterclaims filed against him in C.A. No. 16082 for failure to state a claim upon which relief may be granted. For the reasons that follow, these motions will be granted.

> FN1. Three actions have been consolidated for all purposes, C.A. Nos. 15817-NC, 16036-NC, and 16082-NC.

A. Background [FN2]

> FN2. Except as otherwise noted, the facts recited herein are taken from the Amended Complaint in C.A. No. 15817 and the counterclaim in C.A. No. 16082.

In 1991, Defries caused the formation of Iota, Inc. ("Iota"), a Delaware corporation, to serve as a vehicle for continuing research into certain wireless communications technology ("Technology') under development since the late 1980s. In 1993, Iota succeeded in inventing the Technology and undertook further development work in order to create a commercially viable product. That same year, Defries caused Iota to transfer its rights to all of the intellectual property associated with the Technology to NeoSoft, A.G. ("Neosoft"), a Swiss company he created for that purpose.

In 1994, Defries entered into discussions with Peter Friedli ("Friedli") concerning a commitment to invest $5.4 million in the further development of the Technology. On July 22, 1994, a certificate of incorporation was filed with the Delaware Secretary of State organizing a corporation that is now known

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                  Page 2
Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: 1998 WL 914265 (Del.Ch.))**

as IOTEX COMMUNICATIONS, INC. ("IOTEX"). Defries and Maag were named as directors of IOTEX. It is not alleged that Defries, or persons or entities affiliated or associated with him, controlled IOTEX. Rather, it appears from one or more pleadings that a majority of the shares of IOTEX were issued to Friedli or persons associated with him.

In July 1994, IOTEX began negotiations over a License Agreement with NeoSoft whereby NeoSoft would grant IOTEX restricted rights to certain applications of the Technology in North America for a fifteen year term. In return, IOTEX would pay NeoSoft royalties based on a percentage of revenues from the use of these applications. As part of these discussions, IOTEX also negotiated a Project Management Agreement with Iota, whereby Iota would agree to act as project manager for IOTEX's research and development of the Technology licensed from NeoSoft.

Maag resigned as a director of IOTEX on October 24, 1994. There is no allegation of fact in the counterclaims filed in C.A. No. 16082 that Maag participated in the negotiation of either of these agreements. Nor is there any allegation that Maag did anything, while he was an IOTEX director or afterward, in furtherance of or in connection with either of them.

*2 The License Agreement and Project Management Agreement (collectively, the "Agreements") were executed on or about November 2, 1994. Under the terms of the Project Management Agreement, IOTEX agreed to fund the costs and expenses associated with the development of the Technology in accordance with a detailed, four-page document (the "Budget") establishing the amounts, timing and manner in which all of the money invested by IOTEX would be spent by Iota. Iota agreed to comply with the provisions of the Budget and further agreed that no material changes would be made to the Budget without first submitting a variance report and obtaining IOTEX's approval for the change. Iota was also required to submit written reports detailing its expenditures to IOTEX. The Budget provided for an 18-month development period that was to be continued only if the parties were satisfied with the progress in the development of the Technology.

In late 1995 and early 1996, IOTEX became concerned that Iota was not complying with the provisions of the Budget and was not developing the Technology as required under the Agreements. Allegedly having concluded that Iota breached the Project Management Agreement, IOTEX stopped making payments to Iota in February 1996. Iota then terminated the Project Management Agreement. Thereafter, IOTEX transferred all of its employees and operations to ioWave, Inc. ("ioWave"), also a Delaware corporation.

On July 18, 1997, IOTEX filed C.A. No. 15817 against Defries, David Bayendor, [FN3] and Iota, alleging claims of breach of fiduciary duty, fraud, aiding and abetting and civil conspiracy arising out of the negotiation and performance of the Project Management Agreement. IOTEX amended its complaint on November 7, 1997, *inter alia,* to add claims against Defries and Bayendor under the federal Racketeer Influenced and Corrupt Organization Act (RICO"), 18 U.S.C. § 1961, *et seq.* Iota answered and counterclaimed against IOTEX on August 19, 1997. On October 27, 1997, Iota amended its counterclaims to assert claims against ioWave, as an additional third-party defendant.

> FN3. Bayendor is Defries' nephew. Bayendor was a former President of IOTEX, resigning his position on October 14, 1994, and a former director and Vice President of Iota. He resigned from these latter position on June 18, 1997.

On November 13, 1997, NeoSoft filed C.A. No. 16036 against IOTEX for failure to make payments as required by the License Agreement. On December 10, 1997, Maag, as a stockholder of IOTEX, filed C.A. No. 16082, a derivative suit on behalf of IOTEX against Friedli, alleged to be the sole director of IOTEX, Taher Behbehani, the former CEO of IOTEX, and ioWave, alleging that they wrongfully transferred the business of IOTEX to ioWave. In response, IOTEX brought five counterclaims against Maag, alleging essentially the same claims it set forth in its July 18, 1997 complaint against Defries, Bayendor and Iota.

## II. DISCUSSION
### A. Standard

A claim will be dismissed where it fails to allege facts that entitle plaintiff to relief. *See* Ch. Ct. R. 12(b)(6); *Rabkin v. Philip A. Hunt Chem. Corp.,* Del.Supr., 498 A.2d 1099, 1104 (1985). In evaluating a motion to dismiss, the allegations of fact must be construed in the light most favorable to the plaintiff and all well-pleaded facts must be accepted as true. *In re Tri-Star Pictures, Inc., Lit.,* Del.Supr., 634 A.2d 319, 326 (1993). Conclusions "will not be accepted

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
(Cite as: 1998 WL 914265 (Del.Ch.))

Page 3

as true without specific allegations of fact to support them." *Id.*

*3 Where a complaint alleges fraud or conspiracy to commit fraud, the Rules of this Court call for a higher pleading standard, requiring the circumstances constituting the fraud or conspiracy to "be pled with particularity." *Atlantis Plastics Corp. v. Sammons, Del. Ch., 558 A.2d 1062, 1066 (1989)* (citing Court of Chancery Rule 9(b), which states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."). The particularity requirements will be met where the complaint "specif[ies] the time, place, speaker, and sometimes even the content of the alleged misrepresentations...." *Luce v. Edelstein, 2d Cir., 802 F.2d 49, 54 (1986)*.

B. The Maag Motion

In the counterclaim filed in C.A. No. 16082, IOTEX alleges that Maag (plaintiff in that derivative action), together with Defries, Bayendor, Iota and NeoSoft "devised, agreed upon and pursued a scheme" to defraud IOTEX and its stockholders that has resulted in a loss of over $5.2 million and forced IOTEX to abandon its operations. IOTEX alleges that Maag and the others fraudulently induced IOTEX to "(i) incur significant expenses in becoming a newly-created entity to invest funds in connection with the Technology, (ii) realize substantial costs in negotiating and entering into the License Agreement with NeoSoft and the Project Management Agreement with Iota, and operating as an on-going entity, and (iii) raise funds from individual investors and forward an amount greater that $5.2 million to Iota in accordance with the terms of the Budget." IOTEX's Answering Br. at 12 (citations omitted). IOTEX also alleges that monies contributed by IOTEX according to the Agreements have been misappropriated by various individuals associated with Iota and NeoSoft, including, "possibly" Maag.

In his Motion to Dismiss, Maag attacks each of the five counterclaim allegations alleged by IOTEX, which are: (1) breach of fiduciary duty, (2) breach of duty of disclosure, (3) aiding and abetting breach of another's fiduciary duty, (4) common law fraud and (5) civil conspiracy. I will address allegations (1), (2) and (3) together and will do the same for allegations (4) and (5).

*1. Breach of Fiduciary Duty, Duty of Disclosure and Aiding and Abetting Breach of Fiduciary Duty*

IOTEX claims Maag breached his fiduciary duties, owed in his capacity as an IOTEX director, by allowing IOTEX to negotiate and enter into the Agreements and further, to invest funds over the course of performance of the Project Management Agreement, *knowing* that NeoSoft and Iota "would not satisfy their respective contractual obligations" and would use the Agreements to "fraudulently induce IOTEX to forward funds to Iota," and in failing to inform the IOTEX board of directors of this knowledge. [FN4] Further, IOTEX claims that Maag aided and abetted a breach of Defries' fiduciary duties, owed by Defries in his capacity as an IOTEX director, by failing to prevent Defries from "causing and permitting" IOTEX to enter into the Agreements, when Maag *knew* that Iota and NeoSoft would not meet their contractual obligations. [FN5] In support of these claims, IOTEX alleges with particularity the following: (1) Maag was a director of IOTEX during the negotiation of the Agreements (but had resigned before the Agreements were approved), (2) Maag was a director of NeoSoft during the negotiation of the Agreements, (3) Maag was associated with Defries and (4) Iota, it is alleged, breached the Project Management Agreement.

> FN4. For the purpose of this motion, I accept as true IOTEX's averment that Maag was a director of IOTEX between July and October 1994. I do note, however, that this is a disputed fact.
>
> FN5. IOTEX contends that Maag's actions must be evaluated under the entire fairness standard, since he was a director of both IOTEX and NeoSoft between July 22, 1994 and October 24, 1994, the period in which the Agreements were negotiated. I do not reach this issue, as I find IOTEX's claims are not adequately substantiated by specific allegations of fact.

*4 Thus, a central element of the claims against Maag for breach of fiduciary duty rests on the general allegation that he "knew" as a "fact" (and failed to disclose) something about the state of mind of Defries and others during the period of negotiation of the Agreements. The "fact" that he is alleged to have known is not itself alleged with particularity but, rather, as a conclusion based on events which transpired during the course of performance of the Project Management Agreement. There are also no allegations of fact that Maag played any substantial role in the negotiation or execution of the Agreements, as a director of IOTEX or otherwise.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00275-GMS    Document 32-14    Filed 04/02/2007    Page 5 of 10

Not Reported in A.2d                                                                                   Page 4
Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: 1998 WL 914265 (Del.Ch.))**

[FN6] Finally, there is no allegation that he profited from the alleged misapplication of the development funds. The best IOTEX is able to say is that funds were transferred to a Swiss bank where it is "possible" that Maag has an account.

> FN6. IOTEX's only claim of Maag's participation in the negotiation or approval of the Agreements is made by reference to an October 27, 1994 letter from Defries, on behalf of Iota, addressed to Maag, which states: "Enclosed find three copies of the Project Management Agreement that we have signed on behalf of Iota Inc. Please have Peter Friedli sign and date yellow tabs where indicated on behalf of [IOTEX] retaining one copy for your records and returning one copy to us for our files." Of course, IOTEX concedes that Maag resigned as an IOTEX director on October 24, 1994. Moreover, it makes no allegation of fact that Maag either obtained Friedli's signature or otherwise participated in securing IOTEX's approval of the Project Management Agreement.

While recognizing that Court of Chancery Rule 9(b) provides that "knowledge ... may be averred generally," where pleading a claim of fraud or breach of fiduciary duty that has at its core the charge that the defendant knew something, there must, at least, be sufficient well-pleaded facts from which it can reasonably be inferred that this "something" was knowable and that the defendant was in a position to know it. IOTEX contends the scant well-pleaded facts in its counterclaim support the conclusion that Maag knew that Defries and Iota were not acting in good faith in negotiating the Agreements. I cannot agree. Speculative conclusions unsupported by fact do not allege breaches of fiduciary duty. See In re Tri-Star, Del.Supr., 634 A.2d at 326 (conclusions "will not be accepted as true without specific allegations of fact to support them."). For the same reasons, I reject IOTEX's argument that Maag aided and abetted Defries alleged breach of duty.

My decision in this regard is premised importantly on the general rule of law that one cannot "bootstrap" a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations. See discussion pages 11 to 12, *infra*. The same considerations lead me to conclude that one cannot, ordinarily, premise a claim for breach of fiduciary duty on the assertion that a director knew and failed to disclose that a party negotiating a contractual arrangement with the corporation did not intend to perform its obligations under the contract. I do recognize that there are rare circumstances in which this general rule should not apply. This is not one of them. Here, there is no allegation that the Technology was not valuable at the time the Agreements were executed. Indeed, it is alleged that Defries had been working on the Technology for some years and it is clear from the positions of the parties that they all regard the Technology as having substantial value. There also is no allegation that Iota failed to begin its performance under the Project Management Agreement and continue rendering some performance for more than a year. In short, despite the conclusory allegations of fraud and breach of fiduciary duty, the dispute between the parties is essentially one for breach of contract, and the well-pleaded facts alleged in that regard do not support the inference that Defries and Iota did not intend to perform the Agreements. In the circumstances, the claims for breach of fiduciary duty against Maag must be dismissed.

### 2. Fraud and Conspiracy to Commit Fraud

*5 IOTEX's final two counterclaim allegations contend that Maag committed fraud and conspired to commit fraud. Again, these charges are predicated on the allegations that Maag *knew* that Defries and Iota did not intend to meet their contractual obligations and were "merely using the [Agreements] to fraudulently induce IOTEX to forward funds to Iota." In failing to disclose this *knowledge,* IOTEX argues, Maag participated in a scheme to defraud IOTEX, as it "would not have expended the time and resources negotiating, entering into and satisfying its obligations under the [Agreements] had it been aware of the actual intent of NeoSoft, Iota, Defries and Maag." Further, IOTEX argues that Maag's knowledge and participation in the scheme to defraud IOTEX makes him liable as a conspirator for any other wrongful acts committed in furtherance of the conspiracy.

Under New York law, [FN7] a scheme to defraud is shown where the complaint asserts facts that demonstrate: (1) a scheme, (2) involving defendants (3) directed against the interests of plaintiffs and (4) defendant's conduct in connection with the scheme. See Shearson Lehman Bros. Inc. v. Bagley, N.Y.App. Div., 614 N.Y.S.2d 5, 6 (1994). Fraudulent misrepresentation is shown where facts are alleged that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00275-GMS    Document 32-14    Filed 04/02/2007    Page 6 of 10

Not Reported in A.2d                                                                 Page 5
Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: 1998 WL 914265 (Del.Ch.))**

relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." _Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank_, 2d Cir., 57 F.3d 146, 153 (1995). The courts have noted that "[i]t is almost impossible to state in detail the circumstances constituting a fraud where those circumstances are peculiarly within the knowledge of the party against whom the (fraud) is being asserted." _CPC Int'l Inc. v. McKesson Corp._, N.Y., 519 N.Y.S.2d 804, 812 (1987) (quoting _Jered Contracting Corp. v. New York City Transit Auth._, N.Y., 292 N.Y.S.2d 98, 104 (1968)). However, a complaint must "allege the misconduct complained of in sufficient detail to inform the defendants of the substance of the claims." _Bernstein v. Kelso & Co., Inc._, N.Y.App. Div., 659 N.Y.S.2d 276, 280 (1997).

> FN7. The parties are in agreement that New York law governs these claims for fraud.

IOTEX's fraud claims suffer from the same defect as its breach of fiduciary duty claims. Moreover, IOTEX has failed to allege sufficient facts to establish that, even if there was fraud, Maag participated in it. See _In re Tri-Star_, Del.Supr., 634 A.2d at 326 (Conclusions "will not be accepted as true without specific allegations of fact to support them.").

IOTEX does allege the elements of a claim for breach of contract against Iota. That claim, however, cannot be "bootstrapped" into a fraud claim merely by adding the words "fraudulently induced" or alleging that the contracting parties never intended to perform. See _Dann v. Chrysler Corp._, Del. Ch., 174 A.2d 696, 700 (1961) ("Using the word 'fraud' or its equivalent in any form is just not a substitute for the statement of sufficient facts to make the basis of the charge reasonably apparent.").

*6 New York law is decisively to the same effect: "It is well settled under New York law that 'a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations." ' _International CableTel Inc. v. Le Group Videotron LTEE_, S.D.N.Y., 978 F.Supp. 483, 486 (1997) (quoting _Rocanova v. Equitable Life Assurance Soc'y of the U.S._, N.Y., 612 N.YS.2d 339, 343 (1994)). New York law does recognize that a promise made "with a preconceived and undisclosed intention" of non-performance "constitutes a misrepresentation of a 'material existing fact." ' _Id._ at 487 (quoting _Sabo v. Delman_, N.Y., 164 N.Y.S.2d 714, 716 (1957). Nevertheless, this rule is limited by the requirement that "a false promise can support a claim of fraud only where that promise was 'collateral or extraneous' to the terms [of] an enforceable agreement in place between the parties." _Id._ IOTEX has alleged no facts showing that Maag was aware or participated in a "false promise" that was "collateral or extraneous" to the terms of the Agreements. On the contrary, the false promise alleged by IOTEX goes to the heart of the Agreements. Therefore, I do not find IOTEX to have met the requirements for pleading a fraud claim where, as is true here, the underlying action is for breach of contract.

Since I find IOTEX has failed to meet the pleading requirements for fraud, I need not address the conspiracy claim, as there is no underlying independent claim of fraud sufficient to withstand a motion to dismiss. See _Demalco Ltd. v. Feltner_, S.D.N.Y., 588 F.Supp. 1277, 1278 (1984) ("It is well settled in New York that 'civil conspiracy to commit fraud, standing alone, is not actionable .' Instead, the gravamen of a claim of conspiracy is the underlying independent tort, and if the independent tort has not been adequately pleaded, the conspiracy claim will also fail." (quoting _Cullen v. BMW of North Am., Inc._, E.D.N.Y., 490 F.Supp. 249, 254 (1980) and citing _Danahy v. Meese_, N.Y.App. Div., 446 N.Y.S .2d 611, 614 (1981))).

B. The Bayendor Motion

The complaint in C.A. No. 15817 was served on Bayendor in the manner described in 10 _Del. C._ § 3114, the Delaware director service statute. Apparently, IOTEX relied on that statute due to Bayendor's status as a director of Iota, his co-defendant. On August 19, 1997, Bayendor moved to dismiss for lack of personal jurisdiction and insufficiency of service of process, contending that Section 3114 was unavailable for use by IOTEX as its complaint was unrelated to Bayendor's fiduciary duties to Iota. In response, IOTEX served Bayendor again, this time under 10 _Del. C._ § 3104, the general long-arm service statute, and directed certain discovery at him in connection with his motion to dismiss. On November 21, 1997, IOTEX filed an amended complaint that added claims against Bayendor for civil conspiracy and violations of the federal Racketeer Influenced and Corrupt Organization Act ("RICO"). That amended complaint was served in reliance on Section 3104.

*7 As a result of the briefing on Bayendor's motion, the issue has narrowed to whether or not IOTEX is entitled to rely on the "civil conspiracy" theory of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d  Page 6
Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: 1998 WL 914265 (Del.Ch.))**

personal jurisdictional to obtain jurisdiction over Bayendor in Delaware. That is, I understand IOTEX fairly to concede that Section 3114 has no application to its claim and that no other head of jurisdiction under Section 3104 is available in this case.

The civil conspiracy theory of personal jurisdiction was recognized by the Delaware Supreme Court in *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, Del.Supr., 449 A.2d. 210, 225 (1982), but, because it affords "an easy technique to evade the thrust of the *International Shoe* holding," it has been narrowly construed by this Court. *Carlton Invs. v. TLC Beatrice Int'l Holdings, Inc.*, Del. Ch., C.A. No. 13950, Allen, C., slip op. at 29 (Nov. 21, 1995). In *Istituto Bancario*, the Supreme Court surveyed the law from other jurisdictions regarding the conspiracy theory of jurisdiction and determined to adopt what it characterized as the "strict test" requiring a plaintiff to satisfy each of five elements:
> (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.

*Istituto Bancario*, Del.Supr., 449 A.2d at 225. While not conceding the existence of elements (1) and (2), Bayendor's argument focuses on the final three elements, and in particular on the absence of any allegation of an act or effect in Delaware in furtherance of the alleged conspiracy.

IOTEX cites three matters that it characterizes as "substantial acts and effects in the State of Delaware." None of these bear analysis.

IOTEX argues that the "principal effect involving Delaware" was "the use of a Delaware corporation--Iota--as the vehicle through which the fraud was committed." Mere use of a Delaware corporate entity in connection with a civil conspiracy has never been held to satisfy this element of the *Istituto Bancario* test. In support of this position, IOTEX cites to *Hercules, Inc. v. Leu Trust & Banking (Bahamas) Ltd.*, Del.Supr., 611 A.2d 476 (1992); *Istituto Bancario*, Del.Supr., 449 A.2d 210; and *Macklowe v. Planet Hollywood, Inc.*, Del. Ch., C.A. No. 13689, Steele, V.C. (Oct. 13, 1994). I do not read any of these cases to hold that "use" of a Delaware corporation in furtherance of a civil conspiracy can alone be found to have a substantial effect in Delaware sufficient to satisfy the "strict" test of *Istituto Bancario*. In *Hercules*, of course, the plaintiff corporation was headquartered in Delaware. *Hercules*, Del.Supr., 611 A.2d at 478. Thus, the effect of the conspiracy was actually felt in this State. In *Istituto Bancario*, a substantial act in furtherance of the civil conspiracy--the filing of a certificate of amendment with the Delaware Secretary of State authorizing the issuance of the shares there in question--actually took place in the Delaware. *Istituto Bancario*, Del.Supr., 449 A.2d at 226-27.

*8 *Macklowe* held that personal jurisdiction over a Florida limited partnership could be obtained in Delaware by service on its Delaware incorporated general partner. *Macklowe*, Del. Ch., C.A. No. 13689, slip op. at 11. This result was not followed by Chancellor Allen in *Carlton* in relation to a New York limited partnership. *Carlton Invs.*, Del. Ch., C.A. No. 13950, slip op. at 27. Moreover, while *Macklowe* also discusses the applicability of the civil conspiracy of jurisdiction, nothing in that opinion suggests that persons affiliated with a Delaware corporation who are alleged to "use" that corporation to the injury of a third party by actions wholly outside of Delaware thereby subject themselves to the jurisdiction of our courts. *Macklowe*, Del. Ch., C.A. No. 13689, slip op. at 14-17.

The second and third arguments are that Defries' alleged breach of his fiduciary duties as one of IOTEX's directors caused a "substantial effect" in Delaware simply by virtue of IOTEX's incorporation in this State and that Bayendor's alleged breach of fiduciary while he was President of IOTEX's predecessor (Iotel, Inc.) caused injury in this State. Indeed, IOTEX goes so far as to describe Bayendor's alleged breach of fiduciary (which is not alleged to have happened physically in Delaware) as an "additional act in Delaware [that] supports the assertion of jurisdiction here." These alleged "effects" add nothing to the analysis because they have only a metaphysical connection with this jurisdiction. In my judgment, as a general rule, in the case of Delaware corporations having no substantial physical presence in this State, an allegation that a civil conspiracy caused injury to the corporation by actions wholly outside this States will not satisfy the requirement found in the Supreme Court's opinion in *Istituto Bancario* of a "substantial effect ... in the forum state. *Istituto Bancario*, Del.Supr., 449 A.2d at 225.

For these reasons, I conclude that IOTEX cannot satisfy elements (3), (4) or (5) of the *Istituto*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                                Page 7
Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: 1998 WL 914265 (Del.Ch.))**

*Bancario* test for the assertion of personal jurisdiction over persons alleged to be participants in a civil conspiracy. Thus, service under 10 *Del. C.* § 3104 was improper and the amended complaint must be dismissed as to defendant Bayendor.

C. Defries and Bayendor's Motions to Dismiss the Eighth Claim for Relief (RICO) [FN8]

> FN8. Since I have dismissed the amended complaint as it pertains to defendant Bayendor, my discussion of the RICO claim applies only to defendant Defries.

In the amended complaint in C.A. No. 15817, IOTEX alleges that Defries and Bayendor engaged in a pattern of racketeering activity in violation of RICO. Specifically, Defries and Bayendor are alleged to have schemed (through Iota) "to defraud (among others) IOTEX and its stockholders of approximately [$5.2 million] and in devising, agreeing upon and pursuing such scheme to have: (i) misappropriated the approximately $5.2 million that IOTEX invested in connection with the Technology, (ii) forced IOTEX to abandon its operations, (iii) forced IOTEX to defend itself--and expend significant funds--in a recent action concerning the Technology brought against IOTEX by a former employee of Iota, and (iv) forced IOTEX to defend itself in connection with the unmeritorious counterclaim brought by Iota, and in the unmeritorious claims brought by another entity (Neosoft, A.G.) and individual (Urs Maag) controlled by Defries and Bayendor." IOTEX's Answering Br. at 3-4.

*9 The RICO statute provides for civil damages for any person or entity injured in his, her or its business or property by reason of a violation of 18 U.S.C. § 1962. See 18 U.S.C. § 1964(c). The statute is violated where the injured party demonstrates that defendants are engaged in a "pattern of racketeering activity." See *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229 (1989). A pattern is defined as "requiring 'at least two acts of racketeering activity within a ten year period." ' *Tabas v. Tabas,* 3d Cir., 47 F.3d 1280, 1290 (1995) (quoting 18 U.S.C. § 1961(5)). Racketeering activity is defined as, *inter alia,* any act that is indictable under 18 U.S.C. § 1961(1), and includes wire fraud and mail fraud, the specific acts alleged to have occurred by IOTEX. See 18 U.S.C. § § 1341 (mail), 1343 (wire), 1961(1)(B) (definition); *Tabas,* 47 F.3d at 1290.

Courts have held that a "pattern of racketeering activity" is shown where the plaintiff has alleged two or more acts of an indictable offense and further shown "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." [FN9] *H.J. Inc.,* 492 U.S. at 239. "[P]redicate acts are related if they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." ' *Tabas,* 47 F.3d at 1292 (quoting *H.J. Inc.,* 492 U.S. at 240). Continued criminal activity, i.e., continuity, may be one of two types: closed-end, referring to "a closed period of repeated conduct"; or open-ended, referring to "past conduct that by its nature projects into the future with a threat of repetition." *Id.* (quoting *H.J. Inc.,* 492 U.S. at 241). Analysis of either of the two types is temporal, so "a party may establish continuity as a closed-ended concept by 'proving series of related predicates extending over a substantial period of time." ' *Id.* (quoting *H.J. Inc.,* 492 U.S. at 242).

> FN9. The pleading requirements to allege a violation of RICO are the same as previously discussed, see *supra,* p 5-6.

IOTEX contends that both items necessary to establish a pattern of racketeering activity have been met; pointing first to Defries and Bayendor's allegedly false statements made during the IOTEX/Iota negotiations concerning the Project Management Agreement and to Iota's allegedly false status reports as the related predicate acts; and second, to the fact that the conduct "intended to defraud IOTEX had occurred over several years, continues through the present, and represents the normal course of doing business for defendant Defries and defendant Bayendor," as evidence of a continued threat of criminal activity.

In addressing IOTEX's argument, I focus on the latter aspect of the United States Supreme Court's RICO analysis, that the defendants' acts "amount to or pose a threat of continued criminal activity." *H.J. Inc.,* 492 U.S. at 239. [FN10] IOTEX argues that both types of continuing criminal activity (open-ended and closed-ended) are present in the instant case.

> FN10. Defendants apparently concede that IOTEX has plead sufficiently to meet the requirement that "the racketeering predicates are related," as they do not address this aspect of the *H.J. Inc.* test in their brief. See *H.J. Inc.,* 492 U.S. at 239.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00275-GMS    Document 32-14    Filed 04/02/2007    Page 9 of 10

Not Reported in A.2d                                                                                          Page 8
Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: 1998 WL 914265 (Del.Ch.))**

*10 Defendants contend that the allegedly criminal activities (if at all) could in no event have lasted past February 1996 (the last date that IOTEX made payments to Iota) thereby making an open-ended analysis inapplicable. In response, IOTEX cites three events alleged to meet the open-ended standard: (1) Iota's assertion of contract claims in this Court, (2) Iota's alleged refusal to provide an accounting of the funds IOTEX has paid to Iota and (3) Defries alleged grant of an option in IOTEX stock to a former Iota employee. [FN11] In my judgment, these mere conclusory allegations do not evidence continuing fraudulent conduct and require no further discussion. See Continental Realty Corp. v. J.C. Penney Co., Inc., S.D.N.Y., 729 F.Supp. 1452, 1455 (1990) ("[The plaintiffs] conclusory allegations fail to satisfy Fed.R.Civ.P. 9(b)'s requirement that averments of fraud be stated with particularity and therefore cannot be relied upon to demonstrate a continuing pattern of fraudulent acts.").

>FN11. The option arises out of a Separation Agreement between Iota and Andrew Denis, which grants Denis the choice of either, "shares equal and equivalent to two hundred and fifty shares of Series A Preferred Stock in Iota; or: b) Shares in Iotex, Incorporated equal and equivalent to that percentage as may be represented by the like number and proportion of shares issued in Iota pursuant to paragraph 6.C.a above when calculated against the Iotex shares which Iota or its associates may hold or control following the initial public offering of Iotex as such offering is defined by the Securities and Exchange Commission.
>Defendants argue persuasively that the quoted provision obligates only Iota (and not IOTEX) to perform and, in any event, relates to shares of IOTEX owned or to be owned by Iota.

In the alternative, IOTEX contends that defendants' actions have met the closed-ended requirement of continuing criminal activity, i.e., a "series of related predicates extending over a substantial period of time." H.J. Inc., 492 U.S. at 242. In making this determination, courts look to a number of factors, which can include: the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the number of schemes involved and the occurrence of distinct injuries. Vicom, Inc. v. Harbridge Merchant Services, 7th Cir., 20 F.3d 771, 781-82 "(1) the number of unlawful acts; (2) the length of time over which the acts were committed; (3) the similarity of the acts; (4) the number of victims; (5) the number of perpetrators; and (6) the character of the unlawful activity." (citing Barticheck v. Fidelity Union Bank/First Nat'l State, 3d Cir., 832 F.2d 36 (1987))).

IOTEX relies primarily on the Third Circuit's decision in Tabas as support for its argument. In Tabas, the plaintiff alleged that two brothers formed a partnership to conduct real estate and other business ventures. Id. at 1282. In the event of the death of either partner, the partnership agreement provided that the surviving partner would distribute partnership income jointly to himself and the estate of the deceased partner. Id. One of the partners died, and the surviving partner began making partnership income payments to the deceased partner's estate. Id.

Some years thereafter, the estate filed a civil RICO claim, alleging misappropriation based on its contention that the surviving partner was not allocating an equal share to the deceased partner's estate, in violation of the partnership agreement. Id. at 1282-83. The Third Circuit agreed, reversing the district court and finding that the RICO continuity requirement was satisfied. Id. at 1281. In its assessment of whether or not continuing criminal activity was shown, the Court focused on "the duration of the underlying scheme," noting that plaintiffs had provided evidence tending to show that the alleged acts of mail fraud began on November 10, 1987 and ended in July 1991, a period of three and a half years. Id. at 1294. The Court found a three and a half year period constituted a "substantial" period of time, and comported with the type of "long-term criminal conduct that RICO was enacted to address." Id. [FN12]

>FN12. IOTEX makes further argument as evidence of the applicability of the closed-ended type by contending that defendants' criminal conduct "began on or before July 20, 1994 (the date IOTEX was formed for the sole purpose of investing capital in connection with the Technology)". Even if this were true, the resulting period is still substantially shorter than that addressed in Tabas, and the multi-factor analysis would lead me to conclude that the element of continuity is not present.

*11 Tabas is distinguishable from the instant case. While Tabas involved conduct occurring over a three and a half year period, the activities here lasted only 15 months, a decidedly shorter period, and one that,

Not Reported in A.2d                                                                                                                                              Page 9
Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718
**(Cite as: 1998 WL 914265 (Del.Ch.))**

alone, will not satisfy the RICO continuity requirement. See *Vemco, Inc. v. Camardella,* 3d Cir., 23 F.3d 129, 135 (1994) ("We cannot conclude that [defendant's] alleged actions here, involving a single victim and single scheme for a single purpose over seventeen months, constitute the type of 'long-term criminal conduct' Congress sought to prohibit with RICO." (quoting *H.J. Inc.,* 492 U.S. at 241-42)). The other factors identified in the case law lead me to conclude that the RICO claim is not properly plead.

First, the predicate acts that IOTEX rely on all arise out of or are related to the same transaction, the Project Management Agreement. This Agreement required periodic status reports and such reports, while independent of each other, were all dependent on and related to the Agreement. Commonsense, which the Supreme Court mandates be used in a RICO analysis, requires a finding that these reports are not separate predicate acts as contemplated by the RICO statute, but are mutually dependent on the Agreement. See *H.J. Inc .,* 492 U.S. at 241 (promulgating an approach to analyzing the continuity requirement that is based on a "commonsense, everyday understanding of RICO's language and Congress' gloss on it"). As one court has stated, "courts must take care to ensure that the plaintiff is not artificially fragmenting a single act into multiple acts simply to invoke RICO." *Schlaifer Nance & Co. v. Estate of Andy Warhol,* 2d Cir., 119 F.3d 91, 98 (1997). [FN13]

> FN13. This same analysis applies to the other predicate acts attacked by IOTEX, that the defendants made fraudulent communications during the negotiation of the Project Management Agreement that led to IOTEX's payments to Iota. These payments were directly related to the Budget and are an integral part of the Project Management Agreement. They cannot be segmented to create the predicate acts necessary to meet the RICO continuity requirement.

Second, notwithstanding IOTEX's footnote argument to the contrary, the predicate acts allegedly injure only one party, IOTEX itself. IOTEX contends that in addition to itself, allegedly injured by defendants' misappropriation of its funds and fraudulent status reports, its stockholders have also been injured, since the corporation was formed specifically for the purpose of investing in the Technology and by misappropriating funds paid by IOTEX to Iota for the Technology, the defendants injured the stockholders investing in IOTEX. I reject this argument because it would require me to disregard the existence of IOTEX as a legal entity. IOTEX alone experiences any effect of defendants' allegedly fraudulent acts. The shareholders do not suffer any injury separate from or unrelated to that alleged to be experienced by IOTEX. See *Kramer v. Western Pac. Indus., Inc.,* Del.Supr., 546 A.2d 348, 351 (1988) (by analogy in derivative standing cases, "[p]laintiff must allege more than an injury resulting from a wrong to the corporation").

Lastly, the alleged injury itself is a single injury. If defendants, through Iota, did breach the Project Management Agreement by sending false status reports and not complying with the Budget's directives regarding the allocation of the IOTEX funds, then the end result of Iota's noncompliance is a single injury to IOTEX, not multiple injuries based on each allegedly fraudulent communication. To find otherwise would fragment the Project Management Agreement, which is contrary to law and commonsense.

*12 For all of the foregoing reasons, I find that IOTEX has failed to meet the continuity requirement necessary to show a pattern of racketeering activity under the RICO statute. Therefore, defendant Defries and Bayendor's Motions to Dismiss the Eighth Claim for Relief are hereby granted. [FN14]

> FN14. Having reached this conclusion, I do not address Defries' argument that the consent to jurisdiction under 10 *Del. C.* § 3114 is not broad enough to subject him to the personal jurisdiction of this Court for the purpose of adjudicating the RICO claim.

III. CONCLUSION

For all of the foregoing reasons, the motions to dismiss addressed in this Memorandum Opinion, i.e., (1) Urs Maag's Motion to Dismiss for Failure to State a Claim upon which Relief can be Granted (C.A. No. 16082), (2) David Bayendor's Motion to Dismiss for Lack of Personal Jurisdiction (C.A. No. 15817), and (3) Anthony Defries and David Bayendor's Motions to Dismiss the Eighth Claim for Relief (C.A. No. 15817), are all GRANTED. IT IS SO ORDERED.

Not Reported in A.2d, 1998 WL 914265 (Del.Ch.), RICO Bus.Disp.Guide 9699, 24 Del. J. Corp. L. 718

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.