# EXHIBIT O

LEXSEE 1999 DEL. CH. LEXIS 161

**RJ ASSOCIATES, INC., Plaintiff, v. HEALTH PAYORS' ORGANIZATION LIMITED PARTNERSHIP, HPA, INC., and MIDWEST MEDICAL PREFERRED PROVIDES, INC., Defendants.**

C.A. No. 16873

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1999 Del. Ch. LEXIS 161*

**March 15, 1999, Date Submitted
July 16, 1999, Date Decided**

**SUBSEQUENT HISTORY:** [*1] Released for Publication by the Court August 27, 1999.

**DISPOSITION:**

Defendants' motions to dismiss denied, except that their Rule 12(b)(6) motion granted with respect to RJA's claim that this Court compel the production of HPA, MMPP, and the Partnership's books and records.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants, a limited and general partner of a limited partnership, moved to dismiss plaintiff's complaint against them alleging breach of contract, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty, accounting, and civil conspiracy. Defendants claimed court did not have jurisdiction, plaintiff failed to join an indispensable party, and plaintiff was not be entitled to relief under any set of facts.

**OVERVIEW:** Plaintiff, member of a limited partnership, alleged defendant, other limited partner, controlled defendant general partner and that they acted together to breach contractual and fiduciary duties to plaintiff. Defendants moved to dismiss. Court denied defendants' Del. Chancery Ct. R. 12(b)(2) motion, concluding it had jurisdiction. Defendant general partner, by accepting its position, consented to court's jurisdiction and plaintiff's claims related directly to its actions as general partner. In addition, jurisdiction existed over defendant limited partner under Delaware long arm statute, Del. Code Ann. tit. 10 § 31004(c), where plaintiff alleged this defendant transacted business in Delaware from which its claims arose. Motion to dismiss under Rule 19 was denied because party that defendants claimed was necessary and indispensable did not fall within definition, and even if it had, its interests would have been adequately protected. Lastly, when viewed in light of the well-pleaded facts, all of plaintiff's claims would entitle it to relief, except its request for access to partnership books and records. With that one exception, defendants' Rule 12(b)(6) motion denied.

**OUTCOME:** Motion to dismiss plaintiff's complaint granted only on limited issue of plaintiff's request for access to partnership books and records; in all other respects it was denied. Court had jurisdiction over both defendants and party that defendants claimed to be necessary and indispensable did not meet Del. Chancery Ct. R. 19 definition. In addition, in light of the well-pleaded facts, plaintiff's claims would entitle it to relief.

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Challenges*
[HN1] To overcome a challenge to personal jurisdiction, the plaintiff must establish, prima facie, that a court has personal jurisdiction over the objecting defendant.

*Business & Corporate Law > Limited Partnerships > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN2] By accepting the position of general partner, a corporation consents to be subjected to a Delaware court's jurisdiction if the limited partnership has chosen to incorporate under Delaware law a matter of law.

*Business & Corporate Law > General Partnerships > General Overview*
*Business & Corporate Law > Limited Partnerships > General Overview*
*Civil Procedure > Pleading & Practice > Service of Process > Methods > Service Upon Agents*

[HN3] A general partner is properly served with process, if, under the Delaware Revised Uniform Limited Partnership Act, *Del. Code Ann. tit. 6 § 17-109(b)*, service of process is effected by serving the registered agent.

*Business & Corporate Law > Limited Partnerships > Management Duties & Liabilities*
*Civil Procedure > Pleading & Practice > Service of Process > General Overview*

[HN4] The Delaware Revised Uniform Limited Partnership Act, *Del. Code Ann. tit. 6 § 17-109(a)*, states that a general partner of a limited partnership may be served with process in the manner prescribed in this section in all civil actions or proceedings brought in the State of Delaware involving or relating to the business of the limited partnership or a violation by the general partner of a duty to the limited partnership, or any partner of the limited partnership, whether or not the general partner is a general partner at the time the suit is commenced.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Long-Arm Jurisdiction*

[HN5] Delaware's general long arm statute, *Del. Code Ann. tit. 10 § 3104*, requires a two-part analysis: (i) whether § 3104 applies in the specific circumstances; and (ii) if so, whether a Delaware court's exercise of jurisdiction over the defendant satisfies constitutional due process requirements.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > Challenges*

[HN6] Where in personam jurisdiction is challenged on a motion to dismiss, the record is construed most strongly against the moving party.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > Statutory Sources*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*

[HN7] *Del. Code Ann. tit. 10 § 3104(c)(1)* authorizes the exercise of jurisdiction over a nonresident who in person or through an agent transacts any business or performs any character of work or service in Delaware.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*

[HN8] Under the Delaware long arm statute, *Del. Code Ann. tit. 10 § 3104*, the plaintiff's cause of action must have a nexus with the forum-related contact; that is the claim must arise from at least one act that legally constitutes the transacting of business in Delaware.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*

[HN9] Before a court may assert jurisdiction over a nondomiciliary defendant based upon implied consent, the defendant must have certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*

[HN10] A defendant has created continuing obligations between itself and Delaware if it could reasonably expect to be haled before a Delaware court.

*Civil Procedure > Parties > Joinder > Necessary Parties*

[HN11] Del Chancery Ct. R. 19(a) pertinently states that it is "necessary" for a person to be joined where (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims and interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the claimed interest.

*Civil Procedure > Parties > Joinder > Necessary Parties*

[HN12] Under Del. Chancery Ct. R. 19(a), to qualify as "necessary," a party should have not only an interest in some part of the controversy but the interest must be such that a final decree cannot be made which will nei-

ther touch upon that party's interest nor leave the controversy in such a state that the final determination would be inconsistent with equity and good conscience.

*Civil Procedure > Parties > Joinder > Necessary Parties*
[HN13] Del. Chancery Ct. R. 19(a) requires that if a necessary party cannot feasibly be joined, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable.

*Civil Procedure > Parties > Joinder > Necessary Parties*
[HN14] In making a determination that an action should be dismissed because of infeasibility of joining a necessary party under Del. Chancery Ct. R. 19(a), a court must consider four factors: (i) the extent of prejudice to absent and existing parties, (ii) the possibility of shaping a judgment as to mitigate such prejudice, (iii) whether the remedy given without the party will be adequate or will instead create more lawsuits by parties involved in the same transaction or occurrence, and (iv) whether the plaintiff has available an alternative forum to hear and adjudicate the claim. These pragmatic considerations, are to be governed by practicality and flexibility rather than by idealistic and mechanical standards bottomed upon allegedly inseparable substantive rights.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN15] When deciding a motion under Del. Chancery Ct. R. 12(b)(6), a court must consider as true the well-pleaded facts in the complaint, and must view all inferences in the light most favorable to the plaintiff.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN16] A complaint will be dismissed under Del. Chancery Ct. R. 12(b)(6) only where it appears with reasonable certainty that the plaintiff would not be entitled to relief under any set of facts.

*Business & Corporate Law > Limited Partnerships > Formation*
*Business & Corporate Law > Limited Partnerships > Management Duties & Liabilities*
*Contracts Law > Types of Contracts > Partnership Agreements*

[HN17] A Delaware court may properly adjudicate a claim that a distribution payment methodology currently utilized by defendants is improper under the partnership agreement and is causing ongoing financial harm to plaintiff and in that context, declare the rights and obligations of parties to a Delaware limited partnership agreement.

*Business & Corporate Law > General Partnerships > Management Duties & Liabilities > Causes of Action > Partnership Liabilities*
*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
*Contracts Law > Types of Contracts > Covenants*
[HN18] A complaint's allegations that the defendants failed to adhere in good faith to the contractual obligations set forth in a partnership agreement, and failed to deal fairly with plaintiff, are sufficient to state a claim for breach of the implied covenant of good faith and fair dealing.

*Business & Corporate Law > General Partnerships > Management Duties & Liabilities > Causes of Action > Derivative Actions*
*Contracts Law > Contract Interpretation > Fiduciary Responsibilities*
*Governments > Fiduciary Responsibilities*
[HN19] Conduct by an entity that occupies a fiduciary position may form the basis of both a contract and a breach of fiduciary duty claim.

*Business & Corporate Law > General Partnerships > General Overview*
*Business & Corporate Law > Limited Partnerships > General Overview*
[HN20] In any case not provided for in this chapter the Delaware Uniform Partnership Law and the rules of law and equity shall govern. The Delaware Revised Uniform Limited Partnership Act, Del. Code Ann. tit. 6 § 17-1105.

*Business & Corporate Law > Limited Partnerships > Management Duties & Liabilities*
*Governments > Fiduciary Responsibilities*
*Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview*
[HN21] Because the Delaware Revised Uniform Limited Partnership Act contains no provision governing the accountability of limited partners for breaches of fiduciary duty, Delaware courts must look to the Delaware Uniform Partnership Law to determine what fiduciary duties

are owed by and to the limited partners in a limited partnership.

*Business & Corporate Law > General Partnerships > General Overview*
*Business & Corporate Law > Limited Partnerships > General Overview*
[HN22] The Delaware Uniform Partnership Law, Del. Code Ann. tit. 6 § 1521(a), provides that every partner must account to the partnership for any benefit, and hold as trustee for it any profits, derived by him without the consent of the other partners from any transaction connected with the conduct of the partnership or from any use by him of its property.

*Business & Corporate Law > General Partnerships > Management Duties & Liabilities > Rights of Partners > Partnership Property*
*Business & Corporate Law > Limited Partnerships > Management Duties & Liabilities*
[HN23] The Delaware Uniform Partnership Act, Del. Code Ann. tit. 6 §§ 1522(1) and 1522(3), provide that any partner shall have the right to a formal account as to partnership affairs if he is wrongfully excluded from the partnership business of possession of its property by his copartners or as provided by 1521 of this title.

*Business & Corporate Law > General Partnerships > Management Duties & Liabilities > Fiduciary Responsibilities > General Overview*
*Governments > Fiduciary Responsibilities*
*Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview*
[HN24] The Delaware Uniform Partnership Act, Del. Code Ann. tit. 6 § 1521, states that every partner is accountable as a fiduciary to the other partners and must account to the partnership for any benefit.

*Business & Corporate Law > Limited Partnerships > General Overview*
[HN25] Under *Del. Code Ann. tit. 6 § 17-305*, a limited partner seeking access to partnership records must make a written demand on the general partner to inspect the information requested and the purpose for the demand.

**COUNSEL:** Anne C. Foster and Thad J. Bracegirdle, Esquires, of RICHARDS, LAYTON & FINGER, Wilmington, Delaware; and J. Stephen McAuliffe, III, Esquire, of MILES & STOCKBRIDGE, PC, Rockville, Maryland; and Matthew S. Sturtz, Esquire, of MILES & STOCKBRIDGE, PC, Baltimore, Maryland; and Lisa C. Wood, Esquire, of NUTTER, McCLENNEN & FISH, LLP, Boston, Massachusetts; Attorneys for Plaintiff.

Stephen E. Jenkins and Richard D. Heins, Esquires, of ASHBY & GEDDES, Wilmington, Delaware; and Paul J. Jackson, Esquire, of ROETZEL & ANDRESS, Akron, Ohio; Attorneys for Defendants.

**JUDGES:** JACOBS, VICE CHANCELLOR.

**OPINIONBY:** JACOBS

**OPINION:** MEMORANDUM OPINION

JACOBS, VICE CHANCELLOR.

Pending are motions to dismiss the complaint in this action brought by a limited partner of a Delaware limited partnership. The defendants are the limited partnership's only other limited partner and its General Partner. The plaintiff charges that the other limited partner controls the General Partner, and that both defendants, acting together, breached their contractual and fiduciary [*2] duties to the plaintiff by causing the Partnership to make improper deductions for certain expenses from the plaintiff's partnership distributions.

The defendants have moved to dismiss the complaint: (i) for lack of personal jurisdiction over the defendants under Rule 12(b)(2); (ii) for failure to join persons needed for just adjudication under Rule 19; and (iii) for failure to state a claim upon which relief can be granted under Rule 12(b)(6). For the reasons that follow, the Court concludes that with one exception, these motions must be denied.

I. BACKGROUND

The following facts appear from the allegations of the complaint.

A. The Parties

The plaintiff, RJA Associates, Inc. ("RJA"), is a Delaware corporation with its principal place of business in Bethesda, Maryland.

Co-defendant Midwest Medical Preferred Providers, Inc. ("MMPP") is an Ohio corporation with its principal place of business in Ohio. In April 1994, MMPP and RJA (each as 50% owners) formed co-defendant HPA, Inc. ("HPA"), which also is an Ohio corporation with its principal place of business in Ohio, to create a national network of health care providers. To further that purpose, in April 1994, HPA, MMPP, and [*3] RJA then formed defendant Health Payor's Organization L.P. (the "Partnership"), a Delaware limited partnership with its principal place of business in Ohio. HPA became the General

Partner, and MMPP and RJA became the two limited partners, of the Partnership.

B. The Three Agreements

Three agreements are relevant to this case: (a) the "Close Corporation and Shareholders Agreement" ("Shareholders Agreement"); (b) the Health Payors' Organization Limited Partnership Agreement ("Partnership Agreement"); and (c) the "Master Agreement." These agreements are now described.

1. The Shareholders Agreement

The Shareholders Agreement, which RJA and MMPP entered into when they incorporated HPA, entitles MMPP to designate a majority (four) of HPA's Board of Directors, including its Chairman. That Agreement also entitles RJA to name the remaining three directors, and further provides that RJA representatives would be named permanent managing partners for provider network development and client marketing. The Shareholders Agreement expressly provides that it is to be governed by Ohio law.

2. The Partnership Agreement

The Partnership Agreement is intended to govern the Partnership's affairs [*4] and the relations between HPA (as the General Partner) and MMPP and RJA (as the limited partners). That Agreement entitles each partner to receive, at least quarterly, a "Cash Flow" distribution to compensate them for their time and expenses devoted to the Partnership. "Cash Flow" is defined in the Partnership Agreement as:

> the gross cash receipts of the Partnership from all sources reduced by the following: (a) all principal and interest payments and other sums paid on or with respect to any indebtedness of the Partnership; and (b) all cash expenditures incurred incident to the operation of the Partnership's business, including all payments to RJA pursuant to Section 4.1 of the Master Agreement."

The Partnership Agreement requires Cash Flow to be distributed as follows: HPA (1%), RJA (49.5%), and MMPP (49.5%).

3. The Master Agreement

The parties to the Master Agreement were the Partnership, RJA, and Primary Health Services, Inc. ("PHS"), an Ohio corporation and affiliate of MMPP. Under the Master Agreement, those parties agreed to give the Partnership's payor clients access to PHS's and RJA's respective provider network contracts without cost to the Partnership. PHS [*5] and RJA also agreed to contract with additional providers, on the Partnership's behalf, to join the Partnership's network. RJA alleges in its complaint that (i) under the Master Agreement RJA, PHS, and HPA were to jointly market the Partnership's provider network to their various payor clients, and that (ii) each of these parties would be responsible for its own costs and expenses in connection with its development and marketing efforts, and would be compensated only by Cash Flow distributions. For that reason, RJA claims, HPA was not entitled to deduct from Cash Flow distributions to partners any amounts that RJA or PHS incurred for marketing and development expenses.

C. The Alleged Unlawful and Fraudulent Actions

Between Fall 1994 and September 1998, the Partnership made distributions of gross cash receipts to all partners, including RJA, on a twice-monthly basis. From those distributions RJA paid its operating costs and expenses associated with the performance of its obligations under the Partnership Agreement and the Master Agreement.

In September 1998, MMPP and HPA offered to purchase RJA's interest in the Partnership. RJA declined that offer. Shortly thereafter, Mr. Arthur [*6] Chandler, the Chairman of the HPA Board and the owner of MMPP and PHS, told RJA that the method of Cash Flow distributions prescribed by the Partnership Agreement would be altered. Specifically, distributions would be changed from a bi-monthly to a quarterly distribution of net cash receipts. n1 Mr. Chandler also informed RJA that RJA would no longer function as the managing partner for provider network development or as the managing partner for client marketing for the Partnership. RJA claims that this change of status constituted a breach of the Shareholders Agreement. n2

---

n1 This new Cash Flow structure would reduce the distributions, because "net cash receipts" involved additional deductions from gross cash receipts, that (plaintiffs claim) are not proper under the definition of "Cash Flow." Historically, distributions made by the Partnership were not reduced by "network development" expenses because RJA and PHS (not the Partnership) were financially responsible for the costs of developing of the network.

n2 Shareholders Agreement, at 3 ("Individuals designated as directors by RJA must include those individuals designated as the Managing Partner for Provider Network Development and the Managing Partner for Client Marketing for

the Partnership... until such time as MMPP requests from RJA a change in Managing Partners for the Partnership.").

[*7]

RJA immediately objected to those actions. In response, HPA noticed a board meeting to be held in Cleveland, Ohio on October 27, 1998. The proposed changes to the distribution schedule were not discussed at that meeting. Instead, MMPP and HPA again offered to buy out RJA, and then recessed the meeting to permit RJA an opportunity to consider the offer, which RJA later rejected.

On the morning of November 2, 1998, after it learned that RJA had rejected its second offer, HPA sent notice by fax that it was reconvening the October 27 meeting later that same day. Because of the shortness of notice, no RJA representatives could be present. At that meeting MMPP's designees to the HPA Board announced that they were unilaterally voting to amend the Partnership Agreement so that the funds to be distributed from gross cash receipts would now be equal to "net revenue." As a result of that change, RJA has been unable to remain current in its monthly expenses of approximately $ 20,000 to $ 25,000.

Thereafter, without notice or explanation, HPA deducted approximately $ 138,000 from distributions that (RJA claims) were otherwise due to RJA. HPA then paid that $ 138,000 to PHS, despite provisions [*8] in the Master Agreement mandating that the Partnership would have free access to the PHS network.

Although the Partnership Agreement provided that each limited partner would be responsible for its own costs and expenses in developing and marketing the Partnership provider network, HPA and MMPP unilaterally decided that (i) those functions would be exercised solely by them and (ii) the Partnership would deduct arbitrary percentages from gross revenue for accounting, claim repricing, and network development and similar functions. In its complaint, the plaintiff claims that this new methodology for calculating these deductions was not disclosed, and that those deducted percentages bore no relation to the actual costs and expenses of carrying out those functions.

The plaintiff further alleges that in late 1995 or early 1996, MMPP established a new provider network known as Direct Care America ("DCA") as a vehicle to divert to DCA and its affiliated entities -- including MMPP -- business and revenues from the Partnership and RJA. Moreover, in 1995 MMPP allegedly began giving PHS and its clients free access to the Partnership network without any contract that would permit such access. [*9] Finally, the plaintiff claims that PHS, in violation of the Master Agreement, began charging the Partnership a fee for providing Partnership clients access to PHS's provider network, and did not disclose that those fees were ultimately paid to RJA.

D. RJA Commences Two Actions

Thereafter, two lawsuits were filed. RJA filed this Delaware action on December 30, 1998, and served the Partnership and HPA (as general partner) with process through the Partnership's registered agent under *6 Del. C. § § 17-105* and *17-109*, respectively. MMPP was served with process through the Secretary of State of the State of Delaware under *10 Del. C. § 3104*.

On January 25, 1999 -- one month after the plaintiff initiated this Delaware action -- HPA, MMPP, and PHS commenced a lawsuit in the Court of Common Pleas of Summit County, Ohio (the "Ohio action"), for a judgment declaring that MMPP, HPA, and PHS had fulfilled all contractual duties owed to RJA Associates under the Partnership, Shareholders, and Master Agreements. In March 1999, RJA removed the Ohio action to the United States District Court for the Northern District of Ohio Eastern Division. One month later, the District Court dismissed [*10] the action for lack of subject matter jurisdiction. n3

---

n3 Midwest Medical Preferred Providers, Inc. v. R.J. Associates, Inc., Case No. 5:99CV478 (D. Ohio E.D. 1999).

---

II. THE CONTENTIONS

The defendants first argue that the complaint should be dismissed because under Rule 12(b)(2), because this Court lacks personal jurisdiction over MMPP and HPA, which are Ohio corporations that do not have sufficient Delaware contacts to support jurisdiction; the plaintiffs did not properly serve HPA; and the Delaware forum is inconvenient. Second, the defendants contend that the action must be dismissed under Rule 19, because the plaintiff's failed to join PHS, which is a necessary and indispensable party. Finally, the defendants urge that the complaint should be dismissed under Rule 12(b)(6), because none of its allegations states a claim upon which relief could be granted.

These contentions are now addressed.

III. ANALYSIS

A. The Personal Jurisdiction Motion

The defendants challenge this Court's personal jurisdiction [*11] over them under Court of Chancery Rule 12(b)(2). [HN1] To overcome a challenge to personal

jurisdiction, the plaintiff must establish, prima facie, that this Court has personal jurisdiction over the objecting defendant. n4

> n4 *Newspan, Inc. v. Hearthstone Funding Corp.*, 1994 Del. Ch. LEXIS 52, *11, Del. Ch., C.A. No. 13304, Allen, C. (May 10, 1994). The plaintiff bears the burden of showing that a fact finder could determine that the factual basis for personal jurisdiction has been established. *1994 Del. Ch. LEXIS 52, *3* (citing *Hart Holding Co. v. Drexel Burnham Lambert, Inc.*, Del. Ch., 593 A.2d 535, 539 (1991)).

1. As to HPA

The defendants first argue that the Court lacks personal jurisdiction over HPA because it was not properly served with process. Alternatively, they contend that at most, this Court has personal jurisdiction over HPA only as to claims that relate to the "business of the limited partnership," which does not include any claims based upon the Master Agreement or Shareholders Agreement. I disagree, [*12] and conclude that HPA is subject to personal jurisdiction in Delaware.

[HN2] By accepting the position of General Partner, HPA consented to be subjected to this Court's jurisdiction as a matter of law. n5 Moreover, and contrary to the defendants' position, the plaintiff's claims against HPA relate directly to HPA's actions as general partner and to "the business of the limited partnership." [HN3] HPA was also properly served with process, because under the Partnership Act "service of process shall be effected by serving the registered agent." n6 HPA served the Partnership's registered agent on December 30, 1998.

> n5 6 [HN4] Del. C. 17-109(a) (the Delaware Revised Uniform Limited Partnership Act ("DRULPA")) states: "A general partner... of a limited partnership may be served with process in the manner prescribed in this section in all civil actions or proceedings brought in the State of Delaware involving or relating to the business of the limited partnership or a violation by the general partner... of a duty to the limited partnership, or any partner of the limited partnership, whether or not the general partner... is a general partner... at the time the suit is commenced."

[*13]

> n6 6 Del. C. § 17-109(b).

2. As to MMPP

The plaintiff claims that this Court has in, personam jurisdiction over MMPP by virtue of [HN5] Delaware's general long arm statute, *10 Del. C. § 3104*. That claim requires a two-part analysis: (i) whether § 3104 applies in these specific circumstances; and (ii) if so, whether this Court's exercise of jurisdiction over MMPP satisfies constitutional due process requirements. n7 [HN6] Where in personam jurisdiction is challenged on a motion to dismiss, the record is construed most strongly against the moving party (here, the defendants). n8

> n7 *Hercules Inc. v. Leu Trust and Banking (Bahamas), Ltd.*, Del. Supr., 611 A.2d 476, 480-81 (1992).
>
> n8 *Leach v. Solar Bldg. Sys., Inc.*, 1998 Del. Ch. LEXIS 16, *4 Del. Ch., C.A. No. 15673, Jacobs, V.C. (Feb. 13, 1998).

a) Jurisdiction under *10 Del. C. § 3104(c)(1)*

RJA claims that personal jurisdiction over MMPP exists [*14] under *10 Del. C. § 3104(c)(1)*, which is a "single act statute" that enables the Court to exercise jurisdiction over nonresidents "on the basis of a single act done or transaction engaged in by the nonresident within the State." n9 [HN7] Section 3104(c)(1) authorizes the exercise of jurisdiction over a nonresident "who in person or through an agent... transacts any business or performs any character of work or service" in Delaware. [HN8] Under that Section, however, the plaintiff's cause of action must have a nexus with the forum-related contact; that is the claim must arise from at least one act that legally constitutes the transacting of business in Delaware. n10

> n9 *Eudaily v. Harmon*, Del. Supr., 420 A.2d 1175, 1180 (1980).
>
> n10 *Haisfield v. Cruver*, 1994 Del. Ch. LEXIS 155, *14, Del. Ch., C.A. No. 12430, Steele, V.C., (Aug. 25, 1994); *Arnold v. Society for Savings Bancorp*, 1993 Del. Ch. LEXIS 275, *8, Del. Ch., C.A. No. 12883, Chandler, V.C. (Dec. 17, 1993), aff'd in part, rev'd in part on other grounds, Del. Supr., 650 A.2d 1270 (1994).

[*15]

RJA points to three contacts that, when taken together, establish that MMPP was "transacting business"

in Delaware: (i) MMPP participated in the formation of the Partnership in 1994, (ii) MMPP indirectly participated in the Partnership's management by "controlling" HPA, and (iii) MMPP caused the Partnership Agreement to be amended to alter the method of distributions to the partners. RJA claims that its claims against MMPP arise from one or more of these Delaware contacts.

MMPP responds that those contacts are insufficient to establish personal jurisdiction both as a matter of fact and law. MMPP contends that RJA's claims that MMPP managed the Partnership through its "control" of HPA and that MMPP caused the Partnership Agreement to be "amended," are not alleged in the complaint and therefore cannot be considered. That is not correct. These disputed allegations do appear in the complaint. n11

   n11 The plaintiff alleges that none of the three RJA representatives on the HPA Board was present at the meeting where the HPA Board "amended" the Partnership Agreement, creating the inference that only the four MMPP representatives on the HPA Board made that decision. Although MMPP and RJA are equal HPA Shareholders, MMPP has control of HPA's board by virtue of the Shareholders Agreement, which authorizes MMPP to nominate 4 of the 7 directors. See Complaint Ex. A. P 3, at 3. Thus, I conclude for purposes of this motion -- where the record must be construed most strongly against the defendants -- that the complaint's allegations are sufficient to show that MMPP controlled HPA (at least indirectly), especially in relation to the HPA Board decisions that gave rise to this lawsuit.

Second, the plaintiff alleges that at the November 2, 1998 meeting, "the MMPP representatives on the [HPA] Board announced that they were unilaterally amending the Partnership Agreement so as no longer to distribute gross cash receipts." Although the plaintiff does not allege that the MMPP representatives on the HPA Board literally amended the Partnership Agreement document, it may be inferred that the directors who voted upon the amendment intended and agreed to do so.

[*16]

The defendants' legal argument appears to assume that MMPP's only Delaware contact was its participation in forming the Partnership as a Delaware entity. Proceeding from that assumption, MMPP then concludes that the mere participation in the formation of a Delaware entity is not sufficient to confer jurisdiction under § 3104(c)(1), because where the formation of a Delaware entity is the defendant's only Delaware contact, the entity formation must be an integral part of the alleged wrongdoing. n12

   n12 See *Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Productions, Inc.*, Del. Ch., C.A. No. 12306, 1991 Del. Ch. LEXIS 113, Allen, C. (July 10, 1991).

In the abstract, MMPP's statement of the law appears to be correct; that is, RJA's claim must arise from (inter alia) the formation of the Partnership. But that principle is misapplied in this case, because MMPP's assumption is incorrect: RJA alleges more than the mere formation of the Partnership as the basis for asserting in [*17] personam jurisdiction over MMPP. RJA also alleges that MMPP, although a limited partner, was more than just a passive investor, and indeed had at least indirect control over the Partnership's general partner, HPA. The plaintiff further claims that MMPP unilaterally caused the Partnership Agreement to be amended to alter the Cash Flow distributions to the plaintiff's detriment. n13 In the aggregate these allegations are sufficient to establish (for personal jurisdiction purposes) that MMPP transacted business in Delaware and that RJA's claims against MMPP arise from these alleged transactions.

   n13 See e.g., *Hart Holding Co. v. Drexel Burnham Lambert, Inc.*, Del. Ch., 593 A.2d 535, 541-42 (1991) (filing certificate of merger and amendment of charter in furtherance of unlawful conspiracy constituted business in Delaware for long-arm jurisdiction purposes).

b) The Constitutional Minimum Contacts Issue

Having determined that § 3104 applies to MMPP, I must next consider whether subjecting MMPP [*18] to in personam jurisdiction in Delaware is consistent with due process. I am satisfied that MMPP has sufficient contacts with Delaware to satisfy the due process standards of International Shoe Co. v. Washington n14 and its progeny.

   n14 *326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95 (1945)*.

International Shoe holds that [HN9] before a court may assert jurisdiction over a non-domiciliary defendant based upon implied consent, the defendant must have "certain minimum contacts with [the forum] such that the

maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" n15 The specific inquiry here is [HN10] whether MMPP has created continuing obligations between itself and Delaware such that it could reasonably expect to be haled before a Delaware court. n16 That question must be answered in the affirmative.

n15 *326 U.S. at 316;* accord, *Sternberg v. O'Neil*, Del. Supr., 550 A.2d 1105, 1118 (1998).

[*19]

n16 *Shaffer, 433 U.S. 186, 216, 97 S. Ct. 2569, 53 L. Ed. 2d 683;* Sternberg, *550 A.2d at 1120* (recognizing that minimum contacts are established when a defendant has deliberately created a continuing obligation between itself and Delaware); *In re USA Cafes, L.P. Litig.*, Del. Ch., 600 A.2d 43, 50-51 (1991) (asking "whether its should have been reasonably anticipated by [defendant] that his or her actions might result in the forum state asserting personal jurisdiction over him in order to adjudicate disputes arising from those actions.").

The record shows that MMPP has several Delaware contacts. To be specific, (a) it took an active role in establishing the Delaware Partnership; n17 (b) MMPP owns a 50 percent interest in HPA, the Partnership's General Partner, and appoints four of HPA's seven Board members; (c) MMPP receives 49.5% of the Cash Flow distributions from the Partnership, and it benefits directly from Delaware law through the operation of the Partnership's provider network; (d) MMPP (allegedly) controls HPA and, thereby controls the Partnership's management; (e) [*20] MMPP allegedly caused the Partnership Agreement to be amended under Delaware law to change the agreed-upon Cash Flow distribution payments to the limited partners; and (g) MMPP agreed to a Delaware choice of law provision in the Partnership Agreement. n18 These contacts are sufficient, in my view, to establish that MMPP should reasonably have anticipated being haled into a Delaware court. n19

n17 See *USA Cafes, 600 A.2d at 51* ("The creation of a legal entity creates a forum state public interest in the governance of that entity.").

n18 See *Haisfield, 1994 Del. Ch. LEXIS 155,* *15 ("A choice of law clause, although insufficient standing alone to confer personal jurisdiction, 'reinforces [the defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there.'") (quoting *Burger King v. Rudzewicz, 471 U.S. 462, 482, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985)).*

n19 See *World-Wide Volkswagen v. Woodson, 444 U.S. 286, 62 L. Ed. 2d 490, 100 S. Ct. 559 (1980)* (finding that defendant should have reasonably "anticipated being haled in to court" in the forum state).

[*21]

Subjecting MMPP to personal jurisdiction in Delaware is also "reasonable" because it comports with "traditional notions of fair play." The burden imposed upon MMPP to litigate in Delaware (particularly, for example, its travel costs and the cost of hiring local counsel) would not be significantly greater than they would be if MMPP litigated elsewhere. n20 Because the International Shoe criteria are satisfied, this Court is constitutionally empowered to exercise personal jurisdiction over MMPP in this case. n21

n20 *326 U.S. 310, 66 S. Ct. 154, 90 L. Ed. 95.*

n21 The defendants also argue that this action should be dismissed on the basis of forum non conveniens. In considering a motion to dismiss on forum non conveniens grounds, this Court must weigh the six factors enumerated in *General Foods Corp. v. Cryo--Maid, Inc.* ("Cryo-Maid"), Del. Supr., 41 Del. Ch. 474, 198 A.2d 681 (1964), overruled in part on other grounds sub nom. *Pepsico, Inc. v. Pepsi-Cola Bottling Co.*, Del. Supr., 261 A.2d 520 (1969). The key issue is, "whether any or all of the Cryo-Maid factors establish that defendant will suffer overwhelming hardship and inconvenience if forced to litigate in Delaware. Absent such a showing, plaintiff's choice of forum must be respected." *Chrysler First Business Credit Corp. v. 1500 Locust Ltd. Partnership*, Del. Supr., 669 A.2d 104 (1995).

The defendants have failed to establish that they would be subjected to overwhelming hardship and inconvenience if required to litigate in Delaware. A bare claim of inconvenience is an insufficient basis for dismissal absent a particularized showing of hardship. *Taylor v. LSI Logic*, Del. Supr., 689 A.2d 1196, 1199 (1997); *In re Will of Mansfield, 1990 Del. Ch. LEXIS 175, *22,* Del. Ch. C.A. No. 11340, Chandler, V.C. (Oct. 12, 1990). An analysis of the Cryo-Maid factors

also confirms that dismissal is not appropriate. First, Delaware law is applicable to this case. Section 11.4 of the Partnership Agreement expressly and unequivocally provides that the agreement and the rights of the parties thereunder are governed by Delaware law; moreover, the plaintiff's breach of fiduciary duty claims arise from the defendants' actions in their capacity as partners in a Delaware limited partnership and, thus, are governed by Delaware law. See *Hurst v. General Dynamics Corp.*, Del Ch., 583 A.2d 1334, 1339 (1990).

Second, although none of the potential witnesses or relevant documents is located in Delaware, that is not dispositive because no showing is made that transporting witnesses or documents to Delaware would subject defendants or any potential witnesses to overwhelming hardship or inconvenience. Given the relative speed and efficiency of modern travel, Wilmington is easily accessible from either Ohio or Washington D.C., the locations from which the relevant witnesses would be traveling. Third, although some potential witnesses reside in Ohio, several of them are under the control of either HPA or the Partnership and could be compelled to testify in whatever forum where the disputes were litigated. Fourth, viewing the premises is irrelevant in these circumstances. Fifth, the dismissal of the Ohio lawsuit is a factor that favors the Delaware forum. Sixth, the argument that this Court lacks personal jurisdiction over HPA or MMPP has been rejected. For these reasons, the facts here fall far short of the Delaware standard for dismissal on forum non conveniens grounds.

[*22]

B. The Rule 19 Joinder Motion

The defendants next argue that this action should be dismissed under Court of Chancery Rule 19 because the plaintiff failed to join PHS, which is a necessary and indispensable party. I disagree. PHS does not fall within the definition of a "necessary" party under Rule 19(a). Moreover, even if PHS had an interest in this litigation sufficient to make it a necessary party, this action could proceed without PHS, because that interest would be adequately protected by the parties already joined.

RJA's claims all arise directly from HPA and MMPP's management and control of the Partnership's affairs. PHS is not alleged to be a partner in the Partnership or to have been involved in any of the Partnership's affairs, management, or operations.

Rule 19(a) "categorizes those persons whose joinder should be required to accord complete adjudication of claims at issue." n22 [HN11] That Rule pertinently states that it is "necessary" for a person to be joined where:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims and interest relating to the subject of the action and is so situated that the disposition [*23] of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the claimed interest.

n22 *Hughes Tool Co. v. Fawcett Publications, Inc.*, Del. Supr., 350 A.2d 341, 344 (1975).

[HN12] To qualify as "necessary," a party:

> should have not only an interest in some part of the controversy but the interest must be such that a final decree cannot be made which will neither touch upon that party's interest nor leave the controversy in such a state that the final determination would be inconsistent with equity and good conscience. n23

n23 *Joseph v. Shell Oil Co.*, Del. Ch., 498 A.2d 1117, 1125 (1985) (citing *Elster v. American Airlines*, Del. Ch., 34 Del. Ch. 500, 106 A.2d 202, 203-04 (1954) (quoting *Shields v. Barrow*, 58 U.S. (17 How.) 130, 15 L. Ed. 158 (1854))).

[*24]

PHS is not a necessary party under this definition. The plaintiff's claims do not prejudice or implicate the rights of PHS, because they arise from HPA's and MMPP's alleged breach of the Partnership and Master Agreements, specifically, their failure to distribute funds to RJA under those agreements. To the extent RJA's

claims a wrongful distribution by defendants of funds to PHS, the interests of PHS are only tangentially implicated, and would not be adversely affected by a favorable decision for RJA on that claim, because RJA does not seek rescission of any payments made to PHS or of any arrangement between PHS and the defendants. Moreover, any risk of inconsistent judgments or duplicate litigation has been greatly reduced by the dismissal of the Ohio action, which implicated no rights or interests of PHS. n24

n24 Although PHS was named as a plaintiff in the Ohio action, the complaint sought only a declaratory judgment that the actions of HPA and MMPP were correct and appropriate under the Partnership Agreement -- an agreement to which PHS was not a party. The Ohio action did not seek any adjudication that PHS was entitled to the payments it had received from HPA, or any relief that would be adverse to PHS. See Midwest Medical Preferred Providers, supra note 3, at 4 ("PHS has failed to state a claim against RJA in the Ohio Complaint....PHS's involvement in the case sub judice is insignificant and does not impact the Court's analysis.").

[*25]

But even if (arguendo) PHS were a necessary party, it is not "indispensable" under Court of Chancery Rule 19(b). [HN13] That Rule requires that if a necessary party cannot feasibly be joined, "the Court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." [HN14] In making that determination, the Court must consider four factors: (i) the extent of prejudice to absent and existing parties, (ii) the possibility of shaping a judgment as to mitigate such prejudice, (iii) whether the remedy given without the party will be adequate or will instead create more lawsuits by parties involved in the same transaction or occurrence, and (iv) whether the plaintiff has available an alternative forum to hear and adjudicate the claim. n25 These "pragmatic considerations," are to be "governed by practicality and flexibility rather than by idealistic and mechanical standards bottomed upon allegedly inseparable substantive rights." n26

n25 of Chancer Rule 19(b).

n26 National Educ. Corp. v. Bell & Howell Co., 1983 Del. Ch. LEXIS 562, *8, Del. Ch., C.A. No. 7278, Brown, C. (Dec. 13, 1983).

[*26]

It is settled law that an action may continue without an absent party if that party's interest is fully represented therein. n27 Here, PHS's interests will be adequately and fully protected by MMPP, of which PHS is an affiliate. MMPP has an economic interest in protecting any rights that PHS may have to any funds or opportunities that were (allegedly) wrongfully diverted to PHS by MMPP and HPA. MMPP thus has an undeniable stake in advancing the interests of PHS to the extent they may be implicated by this lawsuit. Any risk of inconsistent judgments has been minimized (if not eliminated) by the dismissal of the Ohio action in RJA's favor. For these reasons, this action may and should proceed in the absence of PHS.

n27 Joyce v. Cuccia, 1997 Del. Ch. LEXIS 71, Del. Ch., C.A. No. 14953, 24-26, Jacobs, V.C. (May 14, 1997); Monsanto Co. v. Aetna Cas. & Sur. Co., Del. Super., 565 A.2d 268, 271 (1989) (citing Moran v. Household Int'l, Inc., Del. Ch., 490 A.2d 1059, aff'd, Del. Supr., 500 A.2d 1346 (1985)).

[*27]

C. The Rule 12(b)(6) Motion to Dismiss

Lastly, the defendants seek dismissal of the complaint under Court of Chancery Rule 12(b)(6). The complaint sets forth five separate claims against HPA and MMPP, namely: (a) breach of contract, (b) breach of the implied covenant of good faith and fair dealing, (c) breach of fiduciary duty, (d) an accounting, and (e) civil conspiracy. The requested relief includes a declaration of each party's rights under the Partnership Agreement.

[HN15] When deciding a motion under Rule 12(b)(6), the Court must consider as true the well-pleaded facts in the complaint, and must view all inferences in the light most favorable to the plaintiff. n28 [HN16] A complaint will be dismissed only where it appears with reasonable certainty that the plaintiff would not be entitled to relief under any set of facts. n29 The Court now addresses RJA's claims within the framework of these well-established principles.

n28 In re Tri-Star Pictures, Inc. Litig., Del. Supr., 634 A.2d 319, 326 (1993); Delaware State Troopers Lodge No. 6 v. O'Rourke, Del. Ch., 403 A.2d 1109, 1110 (1979); Penn Mart Realty Co. v. Becker, Del. Ch., 298 A.2d 349, 351 (1972).

[*28]

n29 *Tri-Star*, 634 A.2d at 326; *O'Rourke*, 403 A.2d at 1110, *Penn Mart*, 298 A.2d at 351.

1. The Pivotal Underlying Allegations

RJA alleges that the Partnership Agreement expressly required distributions of Cash Flow "no less frequently than quarterly," and that historically HPA had distributed Cash Flow on a twice-monthly basis. The Partnership Agreement defined Cash Flow to mean gross cash receipts of the Partnership, reduced by (among other things) "all cash expenditures incurred incident to the operation of the Partnership's business..." RJA claims that deductions from Cash Flow for "cash expenditures" should not have included any expenses for marketing or development of the Partnership network performed by RJA or PHS, because in the Master Agreement those parties themselves contracted to absorb those costs. n30

n30 The Master Agreement requires RJA and PHS to provide, among other things, "existing contracts," "primary contracts," "physician contracts," and "secondary contracts." The only provision for the payment of expenses incurred in procuring those contracts is found in sections 3.1 and 4.1 of the Master Agreement, which authorize such payments only to RJA.

The Master Agreement also states that RJA, HPA, and PHS (not the Partnership) were responsible for marketing the network. The Master Agreement provides that "all travel, entertainment, and related expenses incurred in implementing the Marketing Plan shall be paid by RJA, PHS, and HPA for their respective agents and employees (emphasis added)." RJA alleges that all of the obligations, including the related expenses, for developing and implementing the marketing plan for the Partnership's network fell to RJA, PHS, and HPA. Therefore, RJA claims, distributions paid by the Partnership should not have been reduced to pay such expenses.

[*29]

RJA also alleges that in September 1998, MMPP and HPA offered to purchase RJA's interest in the Partnership. In October 1998, shortly after RJA declined that offer, Arthur Chandler (the owner of MMPP, PHS, and HPA's Chairman of the Board), together with MMPP's representatives on the HPA Board, altered the distribution schedule and formula, allegedly in violation of express language in the Partnership Agreement. Specifically, RJA claims that (a) the distributions were reduced from twice-monthly payments to quarterly payments; and (b) the gross cash receipts were reduced by expenses relating to network marketing and development, which PHS and RJA had contractually agreed to assume. n31 RJA also claims that at all relevant times MMPP exercised control over HPA's actions taken as general partner, because (i) MMPP nominated a majority of the representatives to the HPA Board, and (ii) Mr. Chandler manipulated the dates on which the HPA Board met to vote on the alterations to the distribution schedule and formula, so that no RJA representatives to the HPA Board would be present and only MMPP representatives would make those decisions.

n31 Specifically, these expenses related to "claims repricing," "network development," and "accounting."

[*30]

These allegations form the basis for the claims for relief, the legal sufficiency of which is next considered.

2. The Claims for Relief

a. Declaratory Judgment

RJA contends that this Court is the proper forum to declare the validity of HPA and MMPP's actions involving Partnership Cash Flow distributions under the Partnership Agreement. I concur. The claims that the distribution payment methodology currently utilized by HPA (and dictated by MMPP) is improper under the Partnership Agreement and is causing ongoing financial harm to RJA. [HN17] This Court may properly adjudicate that claim and in that context, declare the rights and obligations of parties to a Delaware limited partnership agreement. n32 Accordingly, the complaint states a claim upon which declaratory relief could be granted against HPA and MMPP.

n32 See Court of Chancery Rule 57; *10 Del. C. § 6501*.

b. Breach of Contract

Next, RJA claims that HPA -- which is a party to both the Partnership Agreement and the Master Agreement [*31] -- breached both by failing to properly distribute Cash Flow to RJA. RJA also contends that MMPP -- which allegedly controls HPA -- breached sec-

tion 6.2 of the Partnership Agreement, which precludes MMPP from "participating in the operation, management, or control of the Partnership's business." n33

n33 Because RJA's breach of contract claim against MMPP does not involve the Master Agreement, the complaint does not state a claim against MMPP for breach of that Agreement.

In support of its dismissal motion HPA argues that the complaint fails to state a claim against HPA upon which relief can be granted, because (a) under the definition of "Cash Flow," HPA was entitled to deduct marketing and network expenses from Cash Flow distributions, such as expenses paid to PHS for its various network marketing and development efforts; (b) HPA was not contractually required to cause the Partnership to make two distribution payments per month; and (c) PHS was not obligated under the Master Agreement to provide the Partnership [*32] with free marketing or development services. MMPP argues that RJA's breach of contract claim should be dismissed because MMPP is not a party to the Master Agreement and because MMPP is not obligated under the Partnership Agreement to "ensure distribution of funds" to RJA. I find that RJA has alleged a cognizable claim for breach of contract against both defendants.

RJA alleges that under the Master Agreement, RJA and PHS were required to absorb their respective costs for network development, and that those costs could not be deducted from Cash Flow distributions. HPA's October 1998 decision to alter the methodology by which distributions were made, sufficiently states a claim for violations of the Partnership and the Master Agreements.

As for MMPP, RJA alleges that because MMPP sought to be the purchaser of RJA's interest and controls HPA's board, MMPP caused HPA to engage in conduct that (RJA claims) constituted a breach of § 6.1 of the Partnership Agreement. Those allegations are sufficient to state a claim against MMPP for breach of the Partnership Agreement.

RJA's claim of breach of the implied duty to act in good faith and fair dealing against HPA and MMPP, properly falls [*33] within the scope of RJA's breach of contract claim. n34 [HN18] The complaint's allegations that the defendants failed to adhere in good faith to the contractual obligations set forth in the Partnership Agreement, and failed to deal fairly with RJA, are sufficient to state a claim for breach of the implied covenant of good faith and fair dealing.

n34 See e.g., *Gilbert v. El Paso Co.*, Del. Ch., 490 A.2d 1050, 1054-55 (1984), aff'd, Del. Supr., 575 A.2d 1131 (1990) ("An implied covenant of good faith and fair dealings is engrafted upon every contract.").

c. Breach of Fiduciary Duty

The defendants also seek dismissal of RJA's claims that HPA and MMPP breached their fiduciary duties to RJA. The Partnership Agreement expressly states that HPA "shall be under a fiduciary duty to conduct and manage the affairs for the Partnership in a prudent, businesslike and lawful manner." That broad contractual undertaking incorporates and encompasses traditional fiduciary duties recognized under [*34] Delaware law n35 which, RJA contends, HPA breached by failing to adhere to the express contractual undertakings to RJA contained in the Partnership and Master Agreements.

n35 See *USA Cafes*, 600 A.2d at 48-49.

HPA contends that these claims are insufficient because RJA is "bootstrapping" what are really breach of contract claims into fiduciary duty claims, and also because the claims are derivative. I find these arguments unpersuasive. [HN19] Conduct by an entity that occupies a fiduciary position (here, HPA) may form the basis of both a contract and a breach of fiduciary duty claim. n36 Moreover, RJA's breach of fiduciary duty claims (wrongfully amending the Partnership Agreement formula for calculating distributions at an unfairly noticed directors meeting) are direct in nature. HPA has cited no authority that establishes that these are derivative claims for waste. RJA has stated a claim for breach of fiduciary duty against HPA.

n36 See *Cantor Fitzgerald, L.P. v. Cantor*, Del. Ch., 724 A.2d 571 (1998); *Universal Studios, Inc. v. Viacom, Inc.*, Del. Ch., 705 A.2d 579 (1997). Indeed, the fact that HPA may have allegedly breached its fiduciary duty to RJA would actually constitute a breach of section 5.1 of the Partnership Agreement.

[*35]

With respect to MMPP, the situation is somewhat more complex, because MMPP is a limited, not a general, partner. The DRULPA expressly states that "[HN20] in any case not provided for in this chapter the Delaware Uniform Partnership Law [DUPL]...and the

rules of law and equity...shall govern." n37 [HN21] Because the DRULPA contains no provision governing the accountability of limited partners for breaches of fiduciary duty, the Court must look to the DUPL to determine what fiduciary duties are owed by and to the limited partners in a limited partnership. [HN22] Section 1521(a) of the DUPL provides that:

> Every partner must account to the partnership for any benefit, and hold as trustee for it any profits, derived by him without the consent of the other partners from any transaction connected with the...conduct...of the partnership or from any use by him of its property.

n 37 Del. C. 17-1105.

Unless expressly modified by the Partnership Agreement, the fiduciary duties set forth in § 1521 apply to MMPP. n38 [*36]

> n38 See *James River-Pennington, Inc. v. CRSS Capital, Inc.*, 1995 Del. Ch. LEXIS 22, *10, Del. Ch., C.A. No. 13870, Steele, V.C. (Mar. 6, 1995); *Sonet v. Plum Creek Timber Co.* ("Sonet I"), Del. Ch., 722 A.2d 319, 322 (1998) ("Principles of contract preempt fiduciary principles where the parties to a limited partnership have made their intentions to do so plain.").

The Partnership Agreement at issue here does not modify or preempt the fiduciary duties owed by the limited partners to a limited partnership. RJA alleges that MMPP, through its control of HPA, (a) unilaterally and improperly amended the Partnership Agreement formula so as no longer to distribute gross cash receipts as the Partnership Agreement prescribed; (b) paid excessive and unwarranted access fees to its affiliate, PHS; (c) permitted PHS's customers to have access to the Partnership's network without compensating the Partnership; and (d) established a competitive business that improperly solicited the Partnership's medical providers. [*37] n39 Each of these acts is claimed to have resulted in the diversion from the Partnership of revenue, at least a portion of which rightfully belonged to RJA. Individually or collectively, they would constitute an actionable breach of MMPP's fiduciary duty to RJA.

n39 MMPP's reliance on § 5.4 of the Partnership Agreement to justify its creation of a competitive network is, at least this stage of the proceedings, misplaced. The language of § 5.4 does permit MMPP to own an interest in, among other things, a competitive business. Its language does not, however, permit MMPP to utilize information gained from its control over the Partnership to begin soliciting the Partnership's customers to join MMPP's newly created competitive network. Given the fact that MMPP's owner and two employees are directly involved in the governance and operation of the Partnership, and would have access to information including the Partnership's customer lists and pricing information, discovery is needed to determine the full extent to which the Partnership's proprietary information was used by MMPP to further its competitive business objectives.

[*38]

d. Civil Conspiracy

RJA has also alleged facts that establish the elements of a claim of civil conspiracy cause of action, under Ohio law, against MMPP and HPA.

Drawing all inferences from the pleadings in favor of RJA, the complaint can fairly be read to allege that (a) MMPP participated in, and stood to benefit greatly from, the decisions made to alter the distributions from the Partnership to RJA; (b) MMPP had the power to elect, and has elected, four of the seven HPA Board members; (c) MMPP sought to purchase RJA's 49% interest in the Partnership in September 1998 and, after RJA rebuffed MMPP's offer, undertook (along with HPA) a course of conduct to place RJA in financial peril; (d) this course of conduct was implemented through hastily called HPA board meetings at which only MMPP representatives could be present and vote; (e) the actions taken at those meetings resulted in substantial monies being paid to PHS (MMPP's affiliate), caused a corresponding reduction in the distribution that RJA would have received, and resulted in the elimination of the twice-monthly distributions that historically had been made since the Partnership began.

RJA is entitled to the reasonable [*39] inference that this course of action -- undertaken by HPA after September 1998 immediately following RJA's rejection of MMPP's offer to purchase RJA's interest in the Partnership -- was orchestrated by (and for the benefit of) MMPP and PHS. These allegations are sufficient to state a claim for civil conspiracy. n40

n40 Under Ohio law, the element of "malice" required to establish a civil conspiracy is defined as, "that state of mind under which a person does a wrongful act properly, without a reasonable lawful excuse, to the injury of another." *Williams v. Aetna Fin. Co., 83 Ohio St. 3d 464, 700 N.E.2d 859, 868 (1998).* Whether or not the defendants in fact possessed the requisite mens rea is a question that must be resolved by the finder of fact at a later stage.

### e. Claim for Accounting and Access to Books and Records

Lastly, RJA seeks an accounting and access to the financial records of the Partnership, HPA, and MMPP. The defendants contend that RJA is not entitled to that relief [*40] as a matter of law.

RJA's claim of entitlement to an accounting from the Partnership rests upon Article 7 of the Partnership Agreement and 6 Del. C. § 1522. Article 7 expressly provides for a full accounting of the Partnership and access to the Partnership's financial records. The Partnership Agreement is silent, however, as to HPA's and MMPP's obligations (if any) in that regard. Thus, the Court must look to the DRULPA and DUPA to determine whether RJA also has a statutory right to a full accounting from HPA and/or MMPP.

The DRULPA also contains no provision that addresses whether there can be an accounting between limited partners where wrongful usurpation of partnership assets is alleged. [HN23] Section 1522 of the DUPA provides, however, that "any partner shall have the right to a formal account as to partnership affairs...if he is wrongfully excluded from the partnership business of possession of its property by his copartners" or "as provided by 1521 of this title." n41 [HN24] Section 1521 states that every partner is accountable as a fiduciary to the other partners and "must account to the partnership for any benefit..." Those two DUPA provisions, RJA argues, entitle RJA to an accounting [*41] from HPA and MMPP for breaching their fiduciary duties to RJA. I concur.

n41 6 Del. C. § 1522(1)&(3).

Because I have found that RJA has stated claims against both HPA and MMPP for breach of their fiduciary duties, it follows that RJA has also stated a claim for an accounting against the defendants.

RJA is not, however, presently entitled to access to Partnership books and records. [HN25] Under *6 Del.C. § 17-305*, a limited partner seeking access to Partnership records must make a written demand on the General Partner to inspect the information requested and the purpose for the demand. n42 RJA's request to compel access to Partnership books and records must fail, because the complaint does not allege that RJA made a written demand for books and records upon either of the defendants.

n42 *6 Del. C. § 17-305(d).*

### IV. CONCLUSION [*42]

For the foregoing reasons, the defendants' motions to dismiss are denied, except that their Rule 12(b)(6) motion is granted with respect to RJA's claim that this Court compel the production of HPA, MMPP, and the Partnership's books and records. IT IS SO ORDERED.