IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRETT J. CORMICK and ELAN SUISSE | ) | C.A. No. 06-275-GMS |
| INTERNATIONAL HOLDINGS (USA) | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| ELAN SUISSE, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-60-GMS |
| | ) | |
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**OPENING MEMORANDUM OF BRETT J. CORMICK, ELAN SUISSE
INTERNATIONAL HOLDINGS (USA) LLC AND ELAN SUISSE LTD,.
IN SUPPORT OF THEIR MOTION TO DETERMINE APPLICABLE  LAW**

Brett J. Cormick and Elan Suisse International Holdings (USA) LLC, defendants in Civil

Action No. 06-275-GMS, and Elan Suisse, Ltd., plaintiff in Civil Action No. 07-60-GMS,

respectfully submit this opening memorandum in support of their Motion to Determine Applicable

Law, in accordance with paragraph 7 of the Scheduling Order in the above-caption actions, and state

as follows:

## I.    INTRODUCTION.

Robert D. Christ ("Christ"), plaintiff in Civil Action No. 06-265-GMS, and defendant in Civil Action No. 07-60-GMS, was, at the time of the actions complained of, a resident of Pennsylvania. After filing suit, Christ moved to Louisiana.

Dr. Brett J. Cormick ("Cormick") is a citizen of Australia whose legal residence is Zimbabwe.  Elan Suisse International Holdings (USA) LLC ("ESUSA") is a Delaware limited liability company.  Elan Suisse, Ltd. ("ESRSA") is a South African business entity.

Christ has asserted two contract claims (promissory estoppel and breach of contract) and one tort claim (fraud). Cormick has asserted several tort claims (defamation, false imprisonment/false institution of legal proceedings, intentional infliction of emotional distress), one federal statutory claim (the Alien Tort Claims Act), and a claim for breach of contract/declaratory relief.

As this Court has recognized, a federal court, sitting in diversity, follow's the forum state's choice of law rules to determine which jurisdiction's rules apply to a given claim. *Christ v. Cormick*, C.A. No. 06-275, 2007 WL 2022053, WL Op. at *6, Sleet, J. (D. Del. July 10, 2007).

For contract-based causes of action:

> Delaware courts follow the 'most significant relationship" approach of the Restatement (Second) of Conflict of Laws. Under Restatement section 188, the rights and duties of the parties with respect to an issue in contract are determined by the local law of the state with the most significant relationship to the transaction and the parties by reference to the following principles: a) the place of contracting, b) the place of negotiation of the contract, c) the place of performance, d) the location of the subject matter of the contract, and e) the domicile, residence, or place of incorporation and place of business of the parties.

*Nagihu v. Inter-Continental Hotels Group, Inc.*, 165 F.R.D. 413, 419-20 (D. Del. 1996) (citations omitted).

> For tort claims:
>
>> Delaware courts have followed "the principle of *lex loci delicti,* and [have] appl[ied] the law of the place of the injury." However, "[i]n the case of intentional torts, such as fraud, the *lex loci deliciti* rule requires a court to apply the substantive law of the state or, in this case, country where the defendant's wrongful conduct primarily occurred." The rationale follows that, where there is an action based upon an intentional tort, "the punitive element is dominant, [and the] state finds [the] conduct wrongful because its people regard it as sinful or offensive to public morals and the conduct, not the injury, is critical for applying the applicable law. The aforementioned policy appears to be in accord with the Delaware Supreme Court's adoption of the most significant relationship test, "set forth in the Restatement (Second) of Conflict of Law § 145(1) (1971) for analyzing choice of law questions relating to tort claims."

*Christ*, WL Op. at * 6 (citations omitted).  In making that determination, however, where, as here, the injury claimed is purely financial, the law of the state where the economic injury is felt applies. *Deutschman v. Beneficial Corp.*, 132 F.R.D. 359, 379 (D. Del. 1990), *recons. denied*, 761 F.Supp. 1080 (D. Del. 1991) (negligent misrepresentation).

## II.  CHRIST'S CLAIMS.

### A.  CONTRACT CLAIMS.

Christ has asserted two contract claims: (i) promissory estoppel, claiming that he was not given an equity interest in ESUSA and written confirmation of such interest, as he claims was promised in exchange for his contribution of $250,000 (Am. Compl. ¶¶22-24), and (ii) breach of a promise to liquidate Christ's investment and return the $250,000. (*Id.* ¶¶26-28).

1.     **Promissory Estoppel.**

In applying the *Restatement* factors, although there were preliminary discussions about Christ's possible investment in ESUSA via e-mail between Cormick in Zimbabwe and Christ in Pennsylvania, the actual terms of the investment were negotiated at multiple in-person meetings over several days between the two of them in South Africa. (Cormick Decl. ¶¶2-3).

The place of "performance" can be seen as Pennsylvania (from where Christ wired the money) or London (to where the money was wired). (Cormick Decl. ¶4). As Christ obtained his equity interest (which is incorporeal property) automatically as a matter of law upon payment, there was no place of "performance" in that regard.[1] However, Christ assumed the title of Vice President and began developing a website for Elan Suisse from Pennsylvania. (Cormick Decl. ¶12 & Ex. 6).

The location of the subject matter of the lawsuit is complicated by the different views of the parties as to what exactly was the subject matter. Christ's view is that he was purchasing equity in both ESUSA (a Delaware limited liability company) and Elan Suisse, Ltd., a South African entity ("ESRSA"). (Am. Compl. ¶22). Cormick's position is that Christ was purchasing an equity position in ESUSA, with the right to receive a share of the money obtained upon the sale or liquidation of ESRSA, but without any actual ownership interest in ESRSA. (Counterclaim ¶¶41, 43-46).

Also relevant is the fact that the Elan Suisse business was all related to the sale of investment products in South Africa (with ESUSA holding the U.S. product based intellectual property and managing the U.S. investment products). (Counterclaim ¶¶21-23; Cormick Decl. ¶8).

---

[1]

Under Delaware corporate law, shares of stock of a Delaware corporation are deemed to have a situs in Delaware. 8 *Del. C.* §169. Delaware's Limited Liability Company Act, by contrast, does not affix ownership to any situs, and, indeed, does not even contemplate issuing certificates demonstrating ownership.

Given the numerous locales involved, Cormick and ESUSA respectfully submit that since the investment was negotiated in South Africa and the business was to be marketed and conducted in South Africa, with revenues to be derived from South Africa, and given that Christ claims (albeit incorrectly) that he was promised an equity interest in ESRSA, the South African entity, South African law should apply to the promissory estoppel claim.

2.    **Breach of Contract.**

Christ's breach of contract claim is that Cormick agreed to liquidate Christ's position[2] and return his money, and failed to do so.   The parties apparently agree that this agreement took place in e-mails between Cormick in Zimbabwe and Christ in Pennsylvania.  If, as Christ suggests, he asked Cormick to liquidate his position (Cormick Decl. ¶5 & Ex. 2), and Cormick agreed, then the contract was formed in Zimbabwe, where Cormick allegedly accepted the offer.  *Restatement (Second) of Conflicts of Law* §188, comment e ("the place of contracting is the place where occurred the last act necessary , under the forum's rules of offer and acceptance , to give the contract binding effect..."); *Century Industries, Inc. v. Benoit*, C.A. No. 5964, 1979 WL 174445, WL Op. at *2, Hartnett, V.C. (Del. Ch. Aug. 29, 1979) (acceptance is last act forming a contract, and law of forum from which acceptance is sent is the applicable law, whether or not such acceptance was received).

Under these authorities, therefore, the breach of contract claim should be governed by Zimbabwe law.

---

[2]

It appears that the promissory estoppel claim and the breach of contract claim are inconsistent with one another.  If Christ requested, and Cormick offered, to liquidate Christ's interest, that means Christ had received an interest in ESUSA which he was now seeking to liquidate, and so there was no failure of performance permitting the estoppel claim.

**B.    FRAUD CLAIM .**

What law governs Christ's fraud claim is somewhat muddied by the fact that Christ has not been forthcoming about the details of the alleged fraud. In interrogatories, Cormick asked Christ to (i) identify the fraudulent statements upon which he claims to have relied, and (ii) identify the location(s) where such statements were allegedly made. Christ's response was to invoke Federal Rule of Civil Procedure 33(d), and refer Cormick to documents Christ had produced. (Cormick Decl. ¶6 & Ex. 3). To date, Christ has produced three disks containing 12,946 pages.

Through counsel, Cormick requested that, as to each of the interrogatories Christ responded by relying on Rule 33(d), that he specify which documents respond to each such interrogatory, as is required by Rule 33(d). (Cormick Decl. ¶6 & Ex. 4). As of the date of filing of this memorandum, Christ has not done so, but has merely stated that he would "consider" doing do after he finished producing documents (with no assurance of when that would be). (Cormick Decl. ¶6 & Ex. 5).

In light of Christ's failure to cooperate in discovery, Cormick can only speculate that, in referring to documents, Christ is relying on statements in e-mails sent by Cormick in Zimbabwe to Christ in Pennsylvania.

Where the tort claim involves allegations of false statements, the place where the false statements operated to cause reliance by the recipient is more important than the location from whence the statements were sent. *Autrey v. Chemtrust Industries Corp.*, 362 F.Supp. 1085, 1090 (D. Del. 1973); *Restatement (Second) of Torts* §148, comment g ("the place where a plaintiff acted in reliance on defendant's representation is more important than the place where the defendant made or the plaintiff received the representations").

6

Christ appears to claim that he received false statements in e-mails from Cormick. Those e-mails would appear to be received in Pennsylvania, Christ's state of residence. Christ claims that he relied on such statements in that he caused $250,000 to be sent to Cormick. Presumably, Christ acted in Pennsylvania to cause such transfer. Christ's alleged economic injury is based in Pennsylvania, where Christ resided at the time. All of these factors support applying Pennsylvania law to the fraud claim.

## III.    CLAIMS OF CORMICK AND ESRSA.

The parties agree that Cormick's claim for false imprisonment and infliction of emotional distress arise under Zimbabwean law, as they relate to his arrest and torture in Zimbabwe. The parties also agree that the federal statutory claim, the Alien Tort Claims Act, is governed by the "law of nations." 28 U.S.C. §1350. This leaves the defamation claims and the declaratory judgment claim.

### A.    DEFAMATION.

Although Cormick is a legal resident of Zimbabwe (although since his wrongful arrest and torture he has had to seek residence outside of Zimbabwe for the time being), the damage to his reputation was most affected outside of Zimbabwe, in the Republic of South Africa. First, although Cormick started Elan Suisse in Zimbabwe as a Zimbabwean entity for the purpose of testing the concept, the primary target market for the Elan Suisse business was always South Africa. Following a successful operational text in Zimbabwe, Cormick incorporated ESRSA in South Africa, and began recruiting financial organizations throughout South Africa and neighboring countries. Cormick was the sole individual making contacts with banks, brokerages and investors in these countries, and the

success of Elan Suisse depended on the soundness of Cormick's professional reputation. (Cormick Decl. ¶¶8-9).

Prior to Christ's destructive actions, Cormick had built up a network of financial institutions throughout South Africa, based on the soundness of his business plan and his good name. As a consequence of Christ's conduct of (i) publicly and wrongfully suggesting that Cormick was involved in a Zimbabwean financial scandal, (ii) filing suit against Cormick in South Africa (thereby showing Christ's belief that South Africa was the most relevant jurisdiction), and (iii) publishing numerous false and defamatory statements on his website about Cormick and the Elan Suisse project, Cormick's reputation throughout the African continent was shattered. His connections refused to deal with Elan Suisse or him, and his ability to do business in South Africa (or indeed anywhere in the world) has been destroyed. (Cormick Decl. ¶10).

Because ESRSA was incorporated in South Africa, and because that was the center of and primary market for the Elan Suisse project, and because Cormick was the "face" of Elan Suisse in Africa, and because the largest percentage of Elan Suisse's target market would have been located in South Africa, the central locus of injury to Cormick's professional reputation and the reputation of Elan Suisse, is South Africa. (Cormick Decl. ¶11).

As such, South African law should govern the defamation claims of Cormick and ESRSA. *See Abadian v. Lee*, 117 F.Supp. 481, 485-86 (D. Md. 2000) (law of forum where business opportunities were lost as a result of defamation governs); *Osby v. A&E Television Networks*, C.A. No. 96-7347, 1997 WL 338855, WL Op. at *3, Shapiro, J. (E.D. Pa. June 17, 1997) (law of forum where business reputation suffered governs).

**B.    BREACH OF CONTRACT/DECLARATORY JUDGMENT CLAIM.**

Count V of the Counterclaim asserts that Christ, by his actions, violated the terms of the Articles of Association[3], and is therefore subject to the forfeiture provisions thereof. (Counterclaim ¶¶146-53).

Christ has indicated that he will deny ever having agreed to the terms of the Articles of Association. That is a fact question not implicating any choice of law issue. To the extent it does implicate a choice of law question, it would be under South African law, as that is where Cormick claims that Christ reviewed and approved the terms. (Cormick Decl. ¶3).

If a jury determines that the parties agreed upon the terms of the Articles of Association, then enforcement of its terms should be governed by Zimbabwe law, as that is the law provided for in the Articles of Association. (Cormick Decl. Ex. 7), except to the extent that Christ claims that enforcement of the Articles of Association are for some other reason prohibited by the terms of the Delaware Limited Liability Act. *See* 6 *Del. C.* §18-1104 ("[i]n any case not provided for in this chapter, the rules of law and equity, including the law merchant, shall govern").

---

[3]    The operating agreement of a limited liability company may go by any name. 6 *Del. C.* §18-101(7).

## <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, Brett J. Cormick, Elan Suisse International Holdings (USA), LLC and Elan Suisse Ltd. respectfully request that the Court enter an Order holding that"

1.     Christ's promissory estoppel claim is governed by South African law;

2.     Christ's breach of contract claim is governed by Zimbabwe law;

3.     Christ's fraud claim is governed by Pennsylvania law;

4.     Cormick's and ESRSA's defamation claims are governed by South African law; and

5.     Cormick's breach of contract law, to the extent it is not governed by Delaware's Limited Liability Company Act, is governed by Zimbabwe law.

Dated: August 21, 2007

Respectfully submitted,

/s/ David L. Finger
David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155
(302) 884-6766
Attorney for Brett J. Cormick, Elan Suisse International Holdings (USA) LLC, and Elan Suisse Ltd.

10

## <u>CERTIFICATE OF SERVICE</u>

I, David L. Finger, hereby certify that on this 21st day of August, 2007, I electronically filed

the foregoing document with the Clerk of the Court using CM/ECF which will send electronic

notification to the following counsel of record:

        Thad J. Bracegirdle, Esq.
        Reed Smith LLP
        1201 Market Street, Suite 1500
        Wilmington, DE 19801

        /s/ David L. Finger
        David L. Finger (DE Bar ID #2556)
        Finger & Slanina, LLC
        One Commerce Center
        1201 Orange Street, Suite 725
        Wilmington, DE 19801-1155
        (302) 884-6766

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-00275 GMS |
| | ) | |
| BRETT J. CORMICK, ELAN SUISSE | ) | |
| INTERNATIONAL HOLDINGS (USA) | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF DR. BRETT J. CORMICK

1.      My name is Dr. Brett J. Cormick. I make this declaration in support of my Motion to Determine Applicable Law.

2.      The idea of Mr. Christ purchasing an interest in Elan Suisse International Holdings (USA) LLC ("ESUSA") had been discussed informally in e-mails between Mr. Christ from Pennsylvania and me from Zimbabwe.  However, as evidenced by an e-mail I sent to Mr. Christ on March 1, 2004, attached hereto as Exhibit 1, I was not going to allow Mr. Christ to invest in Elan Suisse until he attended the meeting in London with PNB Paribas Fund ("BNP"), which was interested in partnering with Elan Suisse, so he could see that the proposed business was legitimate.

3.      Prior to the meeting with BNP, Mr. Christ met me in South Africa in 2004, where we worked out the terms of his investment.  However, his actual investment did not occur until after he engaged in thorough due diligence in South Africa and London in 2004, including reviewing the paperwork, investigating my credentials, meeting with BNP, approving the terms of the operating agreement (called the Articles of Association), etc.

4.    Mr. Christ wired his payments to London.

5.    In e-mails between me (in Zimbabwe) and Mr. Christ (in Pennsylvania), I agreed to liquidate his position in ESUSA (as he requested in an e-mail date September 17, 2004, appended hereto as Exhibit 2).

6.    Of course, I deny all of Mr. Christ's claims of fraud.  By interrogatories, I asked Mr. Christ to identify the specific statements he claims to be false and upon which he claims to have relief, and to identify the location where the alleged statements were made.  He responded only by citing Federal Rule of Civil Procedure 33(d) and referring to documents he has produced in discovery.  (Exhibit 3 at 5).  Although, as of the date this brief was filed, he has indicated through his counsel that production is not yet completed (Exhibit 4), he has to date produced 12,946 pages of documents (including duplicates and spam e-mails).  When my counsel asked Mr. Christ's counsel to specify which documents respond to the Interrogatory, as required by Rule 33(d) (Ex. 5), Mr. Christ's counsel said that he would "consider the request" after production was completed.

7.    As such, I cannot state at this point with any assurance that any of the statements which Mr. Christ purports to claim as the basis for his fraud claim were in any e-mails or other documents.  If they were, however, they would have been sent from Zimbabwe to Pennsylvania.  Otherwise, any claimed oral statements from me to Mr. Christ would have occurred in South Africa or London.

8.    As for the defamation claim, although I am a legal resident of Zimbabwe (although since my wrongful arrest and torture I have had to seek residence outside of Zimbabwe), the damage to my reputation was most affected outside of Zimbabwe.  First,

although I started Elan Suisse as a test of concept in Zimbabwe as a Zimbabwean entity, the primary target market for the project was always South Africa, due to the fact that the isolation from the apartheid era had left South Africa with a shortage of financial services products that are taken for granted in the rest of the world.

9.      Following a successful test launch in Zimbabwe, I incorporated Elan Suisse (Pty) Ltd. in South Africa, and began recruiting financial organizations throughout South Africa.  I was the sole individual making contacts with banks, brokerages and investors in these countries, and the success of Elan Suisse depended on the soundness of my professional reputation.

10.      Prior to the destructive actions of Mr. Christ, I had built up a network of financial institutions throughout these countries, based on the soundness of my business plan and my good name.  As a consequence of Mr. Christ's conduct of (i) publicly and wrongfully suggesting that I was involved in a Zimbabwean financial scandal, (ii) filing suit against me in South Africa, and (iii) publishing numerous false and defamatory statements on his website about me and the Elan Suisse project, my reputation throughout the African continent was shattered, my connections refused to deal with Elan Suisse or me, and my ability to do business on the African continent (or indeed anywhere in the world) has been destroyed.

11.      Because Elan Suisse was incorporated in South Africa, and because that was the center of the Elan Suisse project, and because I was the "face" of Elan Suisse in Africa, and because the largest percentage of Elan Suisse's target market would have been located in South Africa, the central locus of injury to my reputation and the reputation of Elan Suisse, is South Africa.

12.     Attached hereto as Exhibit 6 is an e-mail from Mr. Christ to David Batzner dated March 26, 2004, where Mr. Christ identifies himself as Vice President of Elan Suisse.

13.     Attached hereto as Exhibit 7 are the Articles of Association of Elan Suisse International Holdings (USA) LLC and Elan Suisse (Pty) Ltd.

14.     I declare, under penalty of perjury under the laws of the United States and of Delaware, pursuant to 28 U.S.C. § 1748, that the foregoing is true and correct. Executed on this 20th day of August, 2007.

_____
Dr. Brett J. Cormick

# Exhibit 1

| | |
|---|---|
| **From:** | Dr Brett Cormick [brettc@elan-capital.com] |
| **Sent:** | Monday, March 01, 2004 3:15 AM |
| **To:** | Bob Christ |
| **Subject:** | Re: "The Open Komono Agreement" |

Bob

We are mates

We look after each other

I am not even letting you anywhere near the company until you walk out of BNP going..

"erh........OK you know what.....this could just be real"

; -)

Brett

---- Original message ----
>Date: Sun, 29 Feb 2004 13:48:10 -0500
>From: "Bob Christ" <bob.christ@seatrepid.com>
>Subject: "The Open Komono Agreement"
>To: "Brett Cormick" <brettc@elan-capital.com>
>
>You've heard of Open Skies?  Well...
>
>I'm thinking we can just sign the e-mail, but I think a simple one page
>document will do the job.  I just want something in writing in case Mr.
>IRS man comes a-knockin' at my door and asked why I was trying to
>launder all that money.
>
>Let me know your feedback asap.  I'm ready to roll.  I'll send over
>money to the appointed accounts this week (as soon as I can find where
>the fuck MetLife put my $200k).
>
>If this thing takes off, it is because of you.  I could never have
>pulled this off.  If it tanks, well, then I have only myself to blame.
>I know the risks.  With that said, let's rock-n-roll.  I got some
>mountains to climb, some Poles to jump and some money to make.  This is gonna be fun!
>
>
>Dr Brett Cormick
>elan capital
>2 Lansdowne Row
>Berkely Square
>Mayfair
>London W1J 6HL
>
>Tel: +44 (0) 20 691 7890
>Fax: +44 (0)20 7493 4935
>Email: brettc@elan-capital.com


"The contents of this electronic message and any attachments relating to the official
business of elan capital  and subsidiaries ("elan capital") are proprietary to elan
capital. They are confidential, legally privileged and protected by law. Views and
opinions are those of the sender and do not represent elan capital's views and opinions
nor constitute any commitment by or obligation on elan capital unless otherwise stated or
agreed to in writing by elan capital.

1

RDC 07378

# Exhibit 2

Its just comms & different impressions of whats going on I guess

Better that we get you the whole lot back so that you can sleep more soundly

It will not be a problem

I have over $2m "at risk" now...but for me its not at risk, its pre sold, best product, got the biggest banks in the world in and the whole thing just got bigger than even I dared hope in such a short time.

But this stuff is not for everyone

Once you are cash back you can sleep soundly again

That's the best thing

7. Still sticking to the passive investor line now (not loan) and oblivious to the reality that he is still entirely responsible for the company web site, US presence, all design work for fund logos etc and will get off the cash back agenda if he can be a more active investor (i.e. he can get his hands on Elan Suisse PTY Ltd I guess). More importantly confirms his understanding of the articles by telling me to liquidate his position in Elan Suisse

**From:** Bob Christ [mailto:bobc@elan-capital.com]
**Sent:** 17 September 2004 20:53
**To:** Brett Cormick
**Subject:** Wrap Up

1

It's generally considered poor form to leave right in the middle of an op. But my form is usually lacking anyway.

We started this in RSA after Graham bit the big one. And you pretty much warned me that this would take a while. And, of course, I wasn't listening.

So when this drug on through the summer (and me expecting it any day to go live), I intuitively suspected that there was some type of control document/agreement in on this scheme. You sent to me the old one which showed the extent of the work left to be done and how far out any operational status loomed.

Anyway, Karen asked at the beginning of this "How well do you really know Brett?". I'm black and white on most things and repeatedly dismissed her argument. But when it appeared the money was gone and the work was no where near complete, we assumed the worst [which was the last thing I anticipated].

What has come from this after all of the dust has settled is what I said up front. I am not interested in a passive investment of all of our savings in one place outside of our control. I thought I could, but I can not. So I'm sorry to have to bail when the op is underway, but I'm spooked and my feet are frozen. It's not your fault.

I appreciate you bringing me into your organization and your confidence. I consider it an honor. I would consider it again if I am a part of it and can watch it daily as an active investment. I'm sure it will be a raging success. But the current arrangement does not work for me and my family.

So please liquidate my position in Elan Suisse and place the funds back into my account. I will help in any other way that I can [subject to the above]. And I hope the new investor is easier to deal with than me.

Please put some time in with Julee to finish up the web site and let me know when this e-mail address is going to be shut down so that I can move everything back over to SeaTrepid.

L&K

Exhibit 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRETT J. CORMICK, ELAN SUISSE | ) | C.A. No. 06-275-GMS |
| INTERNATIONAL HOLDINGS (USA) | ) | |
| LLC, ELAN SUISSE (PTY) LTD., | ) | |
| NICOGEL LTD., JOHN WALTERS, | ) | |
| DIANNE MARSHALL and MERCARI | ) | |
| FINANCIAL SERVICES (PTY) LTD., | ) | |
| | ) | |
| Defendants. | ) | |
| ELAN SUISSE LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 07-60-GMS |
| v. | ) | |
| | ) | |
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Defendant. | ) | |

**ROBERT D. CHRIST'S RESPONSES TO FIRST SET OF INTERROGATORIES
AND FIRST REQUEST FOR PRODUCTION OF DOCUMENTS PROPOUNDED
BY BRETT J. CORMICK, ELAN SUISSE INTERNATIONAL HOLDINGS (USA) LLC,
ELAN SUISSE (PTY) LTD., AND ELAN SUISSE, LTD.**

Pursuant to Federal Rules of Civil Procedure 26, 33 and 34, plaintiff Robert D. Christ

("Plaintiff"), by his undersigned attorneys, hereby objects and responds to the First Set of

Interrogatories (the "Interrogatories") and First Request for Production of Documents (the

"Request") propounded by Brett J. Cormick, Elan Suisse International Holdings (USA) LLC,

Elan Suisse (Pty) Ltd and Elan Suisse Ltd:

**General Objections**

1.      Plaintiff objects to the Interrogatories and the Request to the extent they seek to

impose requirements that are greater than or different from those imposed by the Federal Rules

**RESPONSE:** In addition to the foregoing General Objections, Plaintiff objects to this interrogatory on the grounds that it seeks information that is neither relevant to these actions nor reasonably calculated to lead to the discovery of admissible evidence in these actions.

8.    State each specific false statement you claim Cormick made and upon which you claim you relied in delivering $250,000 to Cormick.

**RESPONSE:** Subject to and without waiving the foregoing General Objections, and pursuant to Federal Rule of Civil Procedure 33(d), Plaintiff hereby refers to the documents produced in response to the Request.

9.    As to each statement identified in response to Interrogatory 8, state the date(s) each such representation was made, the location(s) where each such representation was made, and the name and last know address, e-mail address and telephone number of any person who was present when any such statement was made.

**RESPONSE:** Subject to and without waiving the foregoing General Objections, and pursuant to Federal Rule of Civil Procedure 33(d), Plaintiff hereby refers to the documents produced in response to the Request.

10.    List any and all investments you have made prior to sending $250,000 to Cormick, and as to each state specifically the nature and degree of investigation you undertook before making each such investment.

**RESPONSE:** In addition to the foregoing General Objections, Plaintiff objects to this interrogatory on the grounds that it seeks information that is neither relevant to these actions nor reasonably calculated to lead to the discovery of admissible evidence in these actions.

11.    As to the statement on your website, "From discussions with people close to Brett, I understand that this incident ruined his business operations and caused him to move to

**RESPONSE:** In addition to the foregoing General Objections, Plaintiff objects to this request to the extent it seeks the production of documents and information protected by the attorney-client privilege and/or the work product doctrine. Subject to and without waiver of the foregoing objections, Plaintiff will produce all non-privileged documents responsive to this request within his possession, custody or control.

8.     All documents provided to you by Alan and/or Allyson Dean, as referred to in your e-mail to Cormick dated June 28, 2007.

**RESPONSE:** In addition to the foregoing General Objections, Plaintiff objects to this request on the grounds that it seeks the production of documents that are neither relevant to these actions nor reasonably calculated to lead to the discovery of admissible evidence in these actions.

AS TO OBJECTIONS TO INTERROGATORIES AND RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS:

REED SMITH LLP

Thad J. Bradegirdle (No. 3691)
1201 Market Street
Suite 1500
Wilmington, Delaware 19801
(302) 778-7500

Attorneys for Robert D. Christ

Dated: August 6, 2007

- 45 -

**VERIFICATION**

STATE OF LOUISIANA )
                                        ) ss:
PARISH OF TANGIPAHOA )

Robert D. Christ, being duly sworn, hereby deposes and says:

I am the plaintiff in this action. I have reviewed the foregoing *RESPONSES TO FIRST*

*SET OF INTERROGATORIES AND FIRST REQUEST FOR PRODUCTION OF DOCUMENTS*

*PROPOUNDED BY BRETT J. CORMICK, ELAN SUISSE INTERNATIONAL HOLDINGS*

*(USA) LLC, ELAN SUISSE (PTY) LTD., AND ELAN SUISSE, LTD.* and the responses to

interrogatories set forth therein are true and correct to the best of my knowledge, information and

belief.

_____
Robert D. Christ

Subscribed and sworn to before me
this 6TH day of August, 2007
My commission expires _at death_

_____
Notary Public
*Brenda Dunn Miller #67656*

Exhibit 4



FINGER & SLANINA, LLC

ATTORNEYS AT LAW

David L. Finger, Resident, Wilmington Office:
One Commerce Center, 1201 Orange St., Suite 725
Wilmington, Delaware 19801-1155
Ph: (302) 884-6766 | Fax: (302) 984-1294
E-mail: dfinger@delawgroup.com
www.delawgroup.com

August 8, 2007

**Via fax and first class mail**
Thad J. Bracegirdle, Esq.
Reed Smith LLP
1201 N. Market St., Ste. 1500
Wilmington, DE 19801

Re:    **Christ v. Cormick**

Dear Thad:

This letter sets forth Dr. Cormick's objection to Mr. Christ's responses to the Interrogatories:

1.    As to Interrogatories 1, 2, 3, 4, 5, 6, 7, 11, 12, 14, 15, 17, 18, 19, 20, 21, 22, 23, 24 (first and second), 25 (first and second), 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 40, 43, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 59, 60, 68, 69, 75, 76, 77, 78, 79, please advise if Mr. Christ will stipulate to the following points:

      a.    Mr. Christ agrees to subject himself to a "strict liability" standard for Dr. Cormick's defamation claims;

      b.    The burden is on Mr. Christ to prove the truth of the statements;

      c.    Mr. Christ in reality has no basis in fact for the information posted on his website;

      d.    Mr. Christ knows that anyone who claimed to be a source of any such information had no first hand knowledge, was not an eye-witness and lacks any basis for knowledge of the true facts;

      e.    Mr. Christ knowingly, falsely, maliciously and in bad fath attributed the statements published on his website to non-existent or unreliable sources for the purpose of misleading readers into believing that there were reliable sources for his information about Dr. Cormick, when such was not the case.

Thad J. Bracegirdle, Esq.
August 8, 2007
2

If Mr. Christ is willing to stipulate to these points on the record, then his objections may have merit. If not, then the information requested is material and relevant to Dr. Cormick's claims, and Dr. Cormick is entitled to full and complete responses to these interrogatories.

2.      As to any interrogatories Mr. Christ answered by referencing Federal Rule of Civil Procedure 33(d), such reference is insufficient. The rule requires that Mr. Christ provide a "specification ... in sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained." As such, any response relying on Rule 33(d) must identify with specificity which documents contain the answers to the interrogatory in question." Please amend the responses to provide such specification. Additionally, as to any documents for which you rely on Rule 33(d), to the extent that the documents do not answer the interrogatories in full (for example, they fail to provide all known contact information, actions Mr. Christ took to verify the truth of the statements in the documents, etc.), please amend the answers to provide complete responses.

3.      Interrogatory 10 asks Mr. Christ to list his investment history and what related due diligence he undertook. Although Mr. Christ is a CPA with Big 8 experience, on his website and in e-mails he represents himself as a "dumb redneck." He is claiming fraud in connection with this investment, and so what he did or knew he should have done in terms of due diligence, and his degree of financial sophistication, are clearly at issue. Please answer this question.

4.      Your objection to producing documents available on the website www.elansuisse.co.za, is without merit, unless Mr. Christ is willing to provide a sworn statement that the documents posted on his website are complete and unedited, unaltered and unredacted (which he cannot do, as clearly some of the documents are redacted). Please produce these documents.

5.      As to Interrogatories 2, 69, 70, 71 and 74, Dr. Cormick has the right to know the identity of any investigator, as well as anyone else who has knowledge of facts relevant to this lawsuit. *E.g., FDIC v. St. Paul Fire & Marine Ins. Co.*, 53 F.R.D. 260 (W.D. Okla. 1971). Please amend the response to this interrogatory.

6.      As to Interrogatory 7, Mr. Christ has stated on his website that he has traveled to other countries gathering information for his website. Therefore, the statement that information about such trips is not relevant is false and made in bad faith. Please amend the response to this interrogatory.

7.      The response to Interrogatory 25 (the first) is incomplete, as it provides no contact information, and no response to sections (b) and (c). Please provide a complete and thorough response.

Thad J. Bracegirdle, Esq.
August 8, 2007
3

       8.     The response to Interrogatory 53 is incomplete, as it does not contain any responses to parts (b) and (c).  Please amend it to provide a complete response.

       9.     Request for Production No. 6 is clearly relevant, as there is a claim of false imprisonment, and false statements made to police authorities. Mr. Christ's objection is frivolous, dilatory and made in bad faith. Please produce these documents.

       10.     Request for Production No. 8 is clearly relevant, as (i) Mr. Christ has posted false and defamatory statements regarding Mr. Dean's dealings with Dr. Cormick, and (ii) Mr. Christ has indicated that Mr. and Mrs. Dean have offered to come to the trial to testify.  Mr. Christ's objection is frivolous, dilatory and made in bad faith. Please produce these documents.

     As the responsive documents have not yet been produced, Dr. Cormick reserves the right to supplement his objections depending on the review of the produced documents. Dr. Cormick also reserves the right to tender additional objections to the interrogatory responses.

     Please let me know by noon on Monday, August 13, whether Mr. Christ will be amending his responses to provide the information requested.  Otherwise, I will have to seek assistance from the Court.

                Very truly yours,

                David L. Finger

# Exhibit 5

# ReedSmith

Reed Smith LLP
1201 Market Street
Suite 1500
Wilmington, DE 19801-1163
+1 302 778 7500
Fax +1 302 778 7575

**Thad J. Bracegirdle**
Direct Phone: +1 302 778 7571
Email: TBracegirdle@reedsmith.com

August 15, 2007

**VIA E-MAIL AND U.S. MAIL**

David L. Finger, Esquire
Finger & Slanina, LLC
Once Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801

Re:    *Christ v. Cormick, et al.*, C.A. No. 06-275-GMS

Dear David:

I write in response to your letter dated August 8, 2007 concerning Mr. Christ's responses and objections to your clients' interrogatories and request for production of documents. I address below each point raised in your letter:

1.    Count IV of Mr. Cormick's counterclaim alleges a claim for defamation based on 26 specific statements from the www.elansuisse.co.za website (defined as the "Defamatory Statements") as identified in paragraph 95 of the counterclaim. *See* Counterclaim ¶¶ 139-144. As to those interrogatories which seek information relating to those specific statements forming the basis for Mr. Cormick's claim, we provided responses. As to those interrogatories which seek information unrelated to the statements which upon which Mr. Cormick's defamation claim is based, we rightfully objected and stand by those objections. Mr. Christ also declines to enter into the stipulation proposed in your letter.

2.    Once Mr. Christ's document production is complete, we will consider in good faith your request that we identify with specificity those documents from which the requested information can be ascertained.

3.    While Mr. Christ's "degree of financial sophistication" as of the time of the transactions in question (i.e., in 2004) may be relevant to this action, his conduct in any prior investments has no bearing on what due diligence he did or did not pursue concerning Elan Suisse. As such, Interrogatory No. 10 is overbroad and does not seek information relevant to this action or reasonably calculated to lead to the discovery of admissible evidence. As an aside, while you repeatedly refer to Mr. Christ in letters and pleadings as "a CPA," his certification expired well before his dealings with Mr. Cormick in 2004, a fact of which Mr. Cormick was aware at the time.

NEW YORK ♦ LONDON ♦ CHICAGO ♦ PARIS ♦ LOS ANGELES ♦ WASHINGTON, D.C. ♦ SAN FRANCISCO ♦ PHILADELPHIA ♦ PITTSBURGH ♦ OAKLAND

MUNICH ♦ ABU DHABI ♦ PRINCETON ♦ NORTHERN VIRGINIA ♦ WILMINGTON ♦ BIRMINGHAM ♦ DUBAI ♦ CENTURY CITY ♦ RICHMOND ♦ GREECE

r e e d s m i t h . c o m

WILLIB-55105.1

David L. Finger, Esquire
August 15, 2007
Page 2

**ReedSmith**

4.      The objection to which you refer was lodged in response to those interrogatories seeking information that is readily and publicly available (in unredacted form) from the www.elansuisse.co.za website.  To the extent any documents cited on the website have been redacted, those documents will be produced in response to Document Request No. 4.

5.      With respect to Interrogatory No. 2, it is not evident that the so-called "UK Sleuth" has knowledge of facts relevant to this action and, thus, his identity is not relevant.  As for Interrogatories No. 69, 70 and 71, any statements, reports or photographs which those interrogatories seek to identify will be produced (subject to Mr. Christ's objections).  Finally, Interrogatory No. 74 seeks the identity of all investigators, regardless of whether or not they possess knowledge of relevant information, and thus Mr. Christ's objection is proper.  Nonetheless, we will consider your request to the extent there may be any individuals who fit the description of Interrogatory No. 74 *and* possess knowledge of facts relevant to this action.

6.      Despite your letter's claims, Interrogatory No. 7 seeks information relating to trips taken by Mr. Christ "relating to any facts alleged in [his] Amended Complaint" or "in furtherance of pursuit of [his] claims."  By its own terms, therefore, Interrogatory No. 7 has no relevance to Mr. Christ's website and is not reasonably calculated to lead to the discovery of admissible evidence in this action.  Moreover, I fail to see the relevance of such insignificant information as the dates and airlines for flights taken by Mr. Christ.

7-8.    I will consult with Mr. Christ and determine whether any additional information is available to supplement his answers to Interrogatories No. 25 and 53.  In any event, I anticipate that most, if not all, of the information sought by these interrogatories will be provided by Mr. Christ's document production.

9.      Document Request No. 6 is not "clearly relevant" since it seeks the production of "*[a]ll* documents … which were given to *any* law enforcement authorities in *any* jurisdiction" and, as such, is overbroad.  The allegations of Mr. Cormick's counterclaim relate to only one occasion on which he was incarcerated, and, subject to his objections and to the extent such documents exist, Mr. Christ will produce documents provided to authorities in Zimbabwe which relate to the facts alleged in Mr. Cormick's counterclaim.

10.     Mr. Cormick's counterclaim does not include among the "Defamatory Statements" as defined in paragraph 139 any statements concerning Mr. Dean and, accordingly, any communications between Mr. Christ and Mr. Dean are not relevant to this action.  However, even if Mr. Cormick's defamation claim was based on statements concerning Mr. Dean, any documents provided *to* Mr. or Mrs. Dean by Mr. Christ have no relevance to that claim.  To the extent Mr. or Mrs. Dean will appear as witnesses at trial in this action (a decision which has not yet been made), you will be notified appropriately in accordance with the Federal Rules.

David L. Finger, Esquire
August 15, 2007
Page 3

**ReedSmith**

If you have any further questions concerning these issues, please do not hesitate to contact me.

Very truly yours,

Thad J. Bracegirdle

Exhibit 6

**David L. Finger**

| | |
|---|---|
| **From:** | "Dr Brett Cormick" <brett.cormick@elan-capital.com> |
| **To:** | "'David L. Finger'" <dfinger@delawgroup.com> |
| **Sent:** | Sunday, August 19, 2007 6:19 PM |
| **Subject:** | RE: Christ |

```
-----Original Message-----
From: Bob Christ [mailto:bob.christ@seatrepid.com]
Sent: 26 March 2004 17:36
To: David Batzner
Cc: Brett Cormick
Subject: RE: Price Quote for Graphics
```

David,


This is going to be a long and involved process since I have to pick out a
whole bunch then forward the low-res jpg's to South Africa then they pick a
few.  Of the 100+ sent yesterday, they picked 5.  I need a total of 21.  The
ones that they are picking are the artwork stuff instead of pictures.  That
is pretty much how I expect this to go.  I think it will be a waste of time
to price these out at this point until the list is complete.  I did talk to
several of the artist companies on the West Coast last night to get a
feeling of pricing.  It seems that they all charge about $70 with the price
break at about 24-25.


These graphics are for 1 project and one company.  I am the senior vice
president for that company (Elan Suisse) and am able to commit the company.
These graphics, when chosen, will represent the marketing of each of these
products.  So this will be an integral part of a larger marketing campaign.


Give me some time to lock in the exact graphics.  I didn't know it was going
to take this turn when I started.

Thanks for your patience on this.  I'll have exact graphics some time over
the next few days.

Bob


```
-----Original Message-----
```

From: David Batzner [mailto:david.batzner@perfection.com]
Sent: Friday, March 26, 2004 10:27 AM
To: Bob Christ
Subject: Re: Price Quote for Graphics


Hey Bob, I have access to the images.  There are around 75 or more listed,
which 21 are you interested in?  I have priced out the first 25...David

8/19/2007

Exhibit 7

# ARTICLES OF ASSOCIATION

## OF

## ELAN SUISSE INTERNATIONAL HOLDINGS USA LLC

### PRIVATE COMPANY

1. The Company is a private company.

### SHARES

2. The share capital of the Company is $US100 divided into 100 Ordinary Shares of $US1 each. The Director(s) are authorised to exercise any power of the Company to allot, grant options over or otherwise dispose of shares in the capital of the Company for such consideration and upon such terms and conditions as the Director(s) may determine, unless revoked or varied by Ordinary Resolution of the Company in a General Meeting.

### LIEN

3. A lien shall attach to all shares whether fully paid or not and to all shares registered in the name of any person indebted or under liability to the Company for all moneys called or payable at a fixed time by a member or his estate to the Company whether he be the sole registered holder thereof or one of two or more joint holders. The Company's lien on a share shall extend to any expenses incurred by the Company in respect of such non-payment, and to interest on the amount unpaid from the day it became due and payable until it is paid.

### PARTICIPATION

4. An investor shall be considered to be a full member and shareholder in the Company from the date of the receipt of his investment capital in any designated account. No other confirmation of his standing is necessary. He shall be required from this date, to comply fully with all of the Articles of Association and Memorandums of Association of the Company from this time, and is subject fully to the requirements therein including all conduct and penalty clauses. This condition exists irrespective of pending or completed documentation including subscription agreements, stock purchase agreements, or bank account facilities employed.

### THRESHOLD

5. Any person or entity acquiring a ten percent stake in the Company or more, will become responsible from the point of claim for a direct percentage, proportional to their share holding, of all ongoing costs relating to product financial engineering, architecture, structuring, development, listing, promoting, administration, servicing, regulatory, legal, accounting, statutory, compliance and any other cost associated with all aspects of product creation, distribution and management. The person or entity will be required to prove that these costs are able to be met from their own specific resources. Failure to meet these costs, or to prove adequate source of resources to do

share entitlements being permanently revoked and returned to the Company without financial compensation.

## CONDUCT

6. Any action by any member who is deemed by the Director(s) to have made a false, misleading or orchestrated financial or other claim against the Company or any of its Director(s) shall have his shares or share entitlements permanently revoked and returned to the Company without financial compensation. The Company will then be paid within seven days a penalty from the member equal to the amount of his full investment. This penalty will also apply with respect to multiple infringements, where the respective penalties will be added together to create a final lump sum due the company.

6.1 Any member who instigates legal action of any nature against the Company or any of its Director(s) shall have his shares or share entitlements permanently revoked and returned to the Company without financial compensation. The Company will then be paid within seven days a penalty from the member equal to the amount of his full investment. This penalty will also apply with respect to multiple infringements, where the respective penalties will be added together to create a final lump sum due the company.

6.2 Any member who through any action causes a loss of business, capital, reputation, income, revenues, or any other benefit to the Company or its Director(s) shall have his shares or share entitlements permanently revoked and returned to the Company without financial compensation. The Company will then be paid within seven days a penalty from the member equal to the amount of his full investment plus any losses incurred as a result of the members actions. This penalty will also apply with respect to multiple infringements, where the respective penalties and losses will be added together to create a final lump sum due the company.

6.3 Any member who through any action or inference, be it written or verbal which impugns the professional or personal reputation of the Company or its Director(s) shall have his shares or share entitlements permanently revoked and returned to the Company without financial compensation. The Company will then be paid within seven days a penalty from the member equal to the amount of his full investment. This penalty will also apply with respect to multiple infringements, where the respective penalties will be added together to create a final lump sum due the company.

6.4 Any member who makes misleading, selective, contradictory, inflammatory, deceptive, ambiguous or disingenuous claims or statements to third parties concerning the Company or its Director(s) shall have his shares or share entitlements permanently revoked and returned to the Company without financial compensation. The Company will then be paid within seven days a penalty from the member equal to the amount of his full investment. This penalty will also apply with respect to multiple infringements, where the respective penalties will be added together to create a final lump sum due the company.

6.5 Any member involved in any legal dispute with the Company or its Director(s) will be required to cover the Companies or Director(s) legal costs. Not withstanding section 5.1 which will additionally result in the permanent revocation of shares and share entitlements, as well as the requirement to pay within seven days a penalty from the member equal to the amount of his full investment.

7. A member wishing to liquidate some or all of his shares, or to seek a return of his investment capital, after he has deposited his investment capital in a designated account, and thus qualifies as a  full member and shareholder in the Company, notwithstanding any subsequent  execution of subscription agreements, stock purchase agreements, and any other forms, and irrespective of the designated bank account facilities,  shall give written notice to the Directors of his desire to sell his shares and such notice shall constitute the Company as agent of the transferor member.

Unless the Company in General Meeting shall otherwise direct, all such shares authorised shall be offered to the remaining members in proportion to their existing holdings at the date of the offer and such offer is to be made in writing specifying the number of shares to which the member is entitled and limiting the period within which the offer, if not accepted, will be deemed to be declined. After the expiration of that period those shares so deemed to be declined shall be offered in the aforesaid proportions to those members who have accepted all the shares offered to them.

 The Directors may, at their discretion allot, or otherwise dispose of any such shares not accepted pursuant to such offer or further offers as they think fit. In the event that none of the shares are subscribed to, the member may retain his share holding, save that he has breached a Conduct requirement, in which case his shares or share entitlements will be permanently revoked and returned to the Company without financial compensation and the appropriate financial penalty will apply.


**SERVICES**

8. Any member of the company providing approved and authorised services to the company of a professional, consulting or administrative function, or sub contracting to outside third parties these functions, including but not restricted to design, marketing, internet design, information, communication or any other service or function on behalf of the Company, shall be compensated for their cash expenditure in Company shares, with a maximum cash compensation of 10% of the members cash expenditure, at the Director(s) discretion.

**NOTICES OF MEETINGS**

9. Every notice calling a General meeting shall comply with the provisions of the Companies Act of South Africa as to giving information to members in regard to their right to appoint proxies to attend and vote on their behalf and that such proxy need not be a member of the Company. Notices and other communications relating to any General Meeting which any member is entitled to receive shall be sent to the Directors and Auditors of the Company


**PROCEEDINGS AT GENERAL MEETINGS**

10.  All business at a General meeting shall be deemed to be special business and shall be notified in the notice convening the meeting.

11. Unless and until otherwise determined by special resolution of the Company in a General Meeting, there shall be no more than three directors and the minimum number shall be one.

The appointment of the additional two directors shall be optional

A sole Director shall have authority to exercise all the powers and authorities vested in the Directors by these Articles and Regulations.

With the exception of the founding member, who will hold a permanent Directorship, the additional two Directors, if appointed, will retire by rotation every twelve months. New appointees, if recommended not less than fourteen or more than thirty five clear days before the date of a meeting, notice signed by a member qualified to vote at that meeting has been given to the company of the intention to propose that person for appointment, together with a notice signed by that person of his willingness to be appointed.

Not less than fourteen days notice of meetings of the Directors shall be given to each of the Directors at their address.

A Director need not hold any shares of the company to qualify him as a Director but he shall be entitled to receive notice of and attend and speak at all general meetings of the Company.

The Directors may exercise all the powers of the Company to borrow money as to amount and upon such terms and in such a manner as they think fit and to grant any mortgage, charge or standard security over its undertaking, property, and uncalled capital and to issue debenture stock and other securities whether outright or as security for any debt, liability or obligation of the Company or of any third party.

A Director may vote at a meeting, on any resolution, in respect of any matter in which he has, directly or indirectly, any kind of interest and if he shall do so his vote shall be counted, and he may form part of a quorum for any meeting at which such voting occurs.

**VOTING**

12. All voting on all matters at the Company General Meetings, Directors Meetings and any other meetings will be counted in relation to the percentage of shares held in the Company by the eligible member or by his designated proxy.

A minimum of fifty one percent of the percentage of the shares held in the Company when voting is required to pass any resolution, proposal, amendment, alteration to Memorandum and Articles, company name, accounting reference data, change of objects, adoption of new articles and re – registration as a public limited company, board meeting proposals and resolutions, appointment and removal of Directors, Officers of the Company, Company Secretary, Auditors and Bankers, issue and transfer and disposal of shares, bonus shares, debentures, vary classes of shares, sale of the Company, increase or reduction in share capital, purchase own shares, proposal and payment of dividends, pre emption deeds and shareholder deeds of agreement, shareholder resolutions, and elective resolutions

**INDEMNITY**

13. Every Director, Secretary or other officer of the Company shall be indemnified out of the assets of the Company against all losses or liabilities incurred by him in the execution of the duties of his office

**LAW**

14. These articles are governed by the law of The Republic of Zimbabwe


**Dr Brett Cormick**
**2 Lansdowne Row**
**Berkeley Square**
**Mayfair**
**London**
**W1J 6HL**
**UK**

**Dated this 22nd day of March 2004**

# THE COMPANIES ACT OF SOUTH AFRICA

## COMPANY LIMITED BY SHARES

## ARTICLES OF ASSOCIATION

## OF

## ELAN SUISSE (PTY) LTD

**PRIVATE COMPANY**

1. The Company is a private company.

**SHARES**

2. The share capital of the Company is R100 divided into 100 Ordinary Shares of R1 each. The Director(s) are authorised to exercise any power of the Company to allot, grant options over or otherwise dispose of shares in the capital of the Company for such consideration and upon such terms and conditions as the Director(s) may determine, unless revoked or varied by Ordinary Resolution of the Company in a General Meeting.

**LIEN**

3. A lien shall attach to all shares whether fully paid or not and to all shares registered in the name of any person indebted or under liability to the Company for all moneys called or payable at a fixed time by a member or his estate to the Company whether he be the sole registered holder thereof or one of two or more joint holders. The Company's lien on a share shall extend to any expenses incurred by the Company in respect of such non-payment, and to interest on the amount unpaid from the day it became due and payable until it is paid.

**PARTICIPATION**

4. An investor shall be considered to be a full member and shareholder in the Company from the date of the receipt of his investment capital in any designated account. No other confirmation of his standing is necessary. He shall be required from this date, to comply fully with all of the Articles of Association and Memorandums of Association of the Company from this time, and is subject fully to the requirements therein including all conduct and penalty clauses. This condition exists irrespective of pending or completed documentation including subscription agreements, stock purchase agreements, or bank account facilities employed.

**THRESHOLD**

5. Any person or entity acquiring a ten percent stake in the Company or more, will become responsible from the point of claim for a direct percentage, proportional to their share holding, of all ongoing costs relating to product financial engineering, architecture, structuring, development, listing, promoting, administration, servicing,

1

regulatory, legal, accounting, statutory, compliance and any other cost associated with all aspects of product creation, distribution and management. The person or entity will be required to prove that these costs are able to be met from their own specific resources. Failure to meet these costs, or to prove adequate source of resources to do so, from the time of the claim on shares, within seven days will result in the shares or share entitlements being permanently revoked and returned to the Company without financial compensation.

## CONDUCT

6. Any action by any member who is deemed by the Director(s) to have made a false, misleading or orchestrated financial or other claim against the Company or any of its Director(s) shall have his shares or share entitlements permanently revoked and returned to the Company without financial compensation. The Company will then be paid within seven days a penalty from the member equal to the amount of his full investment. This penalty will also apply with respect to multiple infringements, where the respective penalties will be added together to create a final lump sum due the company.

6.1 Any member who instigates legal action of any nature against the Company or any of its Director(s) shall have his shares or share entitlements permanently revoked and returned to the Company without financial compensation. The Company will then be paid within seven days a penalty from the member equal to the amount of his full investment. This penalty will also apply with respect to multiple infringements, where the respective penalties will be added together to create a final lump sum due the company.

6.2 Any member who through any action causes a loss of business, capital, reputation, income, revenues, or any other benefit to the Company or its Director(s) shall have his shares or share entitlements permanently revoked and returned to the Company without financial compensation. The Company will then be paid within seven days a penalty from the member equal to the amount of his full investment plus any losses incurred as a result of the members actions. This penalty will also apply with respect to multiple infringements, where the respective penalties and losses will be added together to create a final lump sum due the company.

6.3 Any member who through any action or inference, be it written or verbal which impugns the professional or personal reputation of the Company or its Director(s) shall have his shares or share entitlements permanently revoked and returned to the Company without financial compensation. The Company will then be paid within seven days a penalty from the member equal to the amount of his full investment. This penalty will also apply with respect to multiple infringements, where the respective penalties will be added together to create a final lump sum due the company.

6.4 Any member who makes misleading, selective, contradictory, inflammatory, deceptive, ambiguous or disingenuous claims or statements to third parties concerning the Company or its Director(s) shall have his shares or share entitlements permanently revoked and returned to the Company without financial compensation. The Company will then be paid within seven days a penalty from the member equal to the amount of his full investment. This penalty will also apply with respect to multiple infringements, where the respective penalties will be added together to create a final lump sum due the company.

6.5 Any member involved in any legal dispute with the Company or its Director(s) will be required to cover the Companies or Director(s) legal costs. Not withstanding section 5.1 which will additionally result in the permanent revocation of shares and share entitlements, as well as the requirement to pay within seven days a penalty from the member equal to the amount of his full investment.

## PRE EMPTION

7. A member wishing to liquidate some or all of his shares, or to seek a return of his investment capital, after he has deposited his investment capital in a designated account, and thus qualifies as a full member and shareholder in the Company, notwithstanding any subsequent execution of subscription agreements, stock purchase agreements, and any other forms, and irrespective of the designated bank account facilities, shall give written notice to the Directors of his desire to sell his shares and such notice shall constitute the Company as agent of the transferor member.

Unless the Company in General Meeting shall otherwise direct, all such shares authorised shall be offered to the remaining members in proportion to their existing holdings at the date of the offer and such offer is to be made in writing specifying the number of shares to which the member is entitled and limiting the period within which the offer, if not accepted, will be deemed to be declined. After the expiration of that period those shares so deemed to be declined shall be offered in the aforesaid proportions to those members who have accepted all the shares offered to them.

The Directors may, at their discretion allot, or otherwise dispose of any such shares not accepted pursuant to such offer or further offers as they think fit. In the event that none of the shares are subscribed to, the member may retain his share holding, save that he has breached a Conduct requirement, in which case his shares or share entitlements will be permanently revoked and returned to the Company without financial compensation and the appropriate financial penalty will apply.

## SERVICES

8. Any member of the company providing approved and authorised services to the company of a professional, consulting or administrative function, or sub contracting to outside third parties these functions, including but not restricted to design, marketing, internet design, information, communication or any other service or function on behalf of the Company, shall be compensated for their cash expenditure in Company shares, with a maximum cash compensation of 10% of the members cash expenditure, at the Director(s) discretion.

## NOTICES OF MEETINGS

9. Every notice calling a General meeting shall comply with the provisions of the Companies Act of South Africa as to giving information to members in regard to their right to appoint proxies to attend and vote on their behalf and that such proxy need not be a member of the Company. Notices and other communications relating to any General Meeting which any member is entitled to receive shall be sent to the Directors and Auditors of the Company

## PROCEEDINGS AT GENERAL MEETINGS

10. All business at a General meeting shall be deemed to be special business and shall be notified in the notice convening the meeting.

## DIRECTORS

11. Unless and until otherwise determined by special resolution of the Company in a General Meeting, there shall be no more than three directors and the minimum number shall be one.

The appointment of the additional two directors shall be optional

A sole Director shall have authority to exercise all the powers and authorities vested in the Directors by these Articles and Regulations.

With the exception of the founding member, who will hold a permanent Directorship, the additional two Directors, if appointed, will retire by rotation every twelve months. New appointees, if recommended not less than fourteen or more than thirty five clear days before the date of a meeting, notice signed by a member qualified to vote at that meeting has been given to the company of the intention to propose that person for appointment, together with a notice signed by that person of his willingness to be appointed.

Not less than fourteen days notice of meetings of the Directors shall be given to each of the Directors at their address.

A Director need not hold any shares of the company to qualify him as a Director but he shall be entitled to receive notice of and attend and speak at all general meetings of the Company.

The Directors may exercise all the powers of the Company to borrow money as to amount and upon such terms and in such manner as they think fit and to grant any mortgage, charge or standard security over its undertaking, property, and uncalled capital and to issue debenture stock and other securities whether outright or as security for any debt, liability or obligation of the Company or of any third party.

A Director may vote at a meeting, on any resolution, in respect of any matter in which he has, directly or indirectly, any kind of interest and if he shall do so his vote shall be counted, and he may form part of a quorum for any meeting at which such voting occurs.

## VOTING

12. All voting on all matters at the Company General Meetings, Directors Meetings and any other meetings will be counted in relation to the percentage of shares held in the Company by the eligible member or by his designated proxy.

A minimum of fifty one percent of the percentage of the shares held in the Company when voting is required to pass any resolution, proposal, amendment, alteration to Memorandum and Articles, company name, accounting reference data, change of objects, adoption of new articles and re – registration as a public limited company,

4

Officers of the Company, Company Secretary, Auditors and Bankers, issue and
transfer and disposal of shares, bonus shares, debentures, vary classes of shares, sale
of the Company, increase or reduction in share capital, purchase own shares, proposal
and payment of dividends, pre emption deeds and shareholder deeds of agreement,
shareholder resolutions, and elective resolutions

**INDEMNITY**

13. Every Director, Secretary or other officer of the Company shall be indemnified
out of the assets of the Company against all losses or liabilities incurred by him in the
execution of the duties of his office

**LAW**

14. These articles are governed by the Law of The Republic of Zimbabwe

**Dr Brett Cormick**
**44 Orange Grove Drive**
**Harare**
**Zimbabwe**

**Dated this 11th day of August 2003**

5



Slip Copy                                                                                                  Page 1

Slip Copy, 2007 WL 2022053 (D.Del.)
**(Cite as: Slip Copy)**

**Christ** v. **Cormick**
D.Del.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Robert D. **CHRIST**, Plaintiff,
v.
Brett J. **CORMICK**, Elan Suisse International
Holdings (USA) LLC, Elan Suisse (PTY) Ltd.,
Nicogel Ltd., John Walters, Dianne Marshall and
Mercari Financial Services (PTY) Ltd., Defendants.
**C.A. No. 06-275-GMS.**

July 10, 2007.

Thad J. Bracegirdle, Reed Smith LLP, Wilmington,
DE, for Plaintiff.
David L. Finger, Finger & Slanina, LLC,
Wilmington, DE, for Defendants.

### *MEMORANDUM*
GREGORY M. SLEET, United States District
Judge.

### I. INTRODUCTION

**\*1** On April 27, 2006, the plaintiff, Robert D. Christ
("Christ") filed suit against the defendants, Brett J.
Cormick ("Cormick"), Elan Suisse International
Holdings (USA) LLC ("Elan Suisse"), Elan
Suisse (PTY) LTD. ("Elan Suisse"), Nicogel LTD. (
"Nicogel"), John A. Walters ("Walters"), Dianne E.
Marshall ("Marshall"), and Mercari Financial
Services (PTY) LTD. ("Mercari"), (collectively, "
the defendants") alleging promissory estoppel
(Count 1), breach of contract (Count II), fraud
(Count III), and civil conspiracy (Count IV).
(D.I.1.) On May 22, 2006, all of the defendants,
except Mercari, filed a Motion To Dismiss Or Stay
asking the court to: (1) dismiss the action pursuant
to Fed.R.Civ.P. 12(b)(2) for lack of personal
jurisdiction; (2) dismiss the conspiracy count
pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state

a claim; (3) dismiss the fraud and conspiracy counts
as being outside the statute of limitations; (4) stay
this action pursuant to principles of international
comity pending resolution of an action filed by the
plaintiff in 2005, which is presently pending in
South Africa; and (5) for sanctions. (D.I.16.) On
June 16, 2006, the defendant Mercari also moved to
dismiss, and joined in the brief of the other
defendants for the reasons supporting its motion.
(D.I.19.)

During the pendency of the defendants' motions,
Christ amended his complaint. (D.I.29.) Thereafter,
the defendants filed a joint motion to dismiss on
March 15, 2007, requesting the same relief sought
in their previously mooted motions. (D.I.30.) For
the reasons that follow, the court will grant in part
and deny in part the defendants' renewed motion.

### II. BACKGROUND

The court accepts the following background recited
in the amended complaint as true for the purpose of
this motion only. At the time the amended
complaint was filed, Christ was a resident of Abita
Springs, Louisiana and Cormick was a citizen of
Australia, but resided in the United Kingdom and
the Republic of Zimbabwe. (D.I. 29, at 1.) Christ
and Cormick became acquainted in April of 1996,
while Christ was operating a tour company,
specializing in expeditions to the geographic North
and South Poles. (*Id.* at 3.) In January of 2004,
Cormick met Christ in Cape Town, South Africa,
during which time the two parties discussed a "
potential investment in a purported business
opportunity devised by Cormick." (*Id.*) Cormick
suggested that Christ "invest in a holding company
that would promote and sell United
States-based financial products and investment
vehicles to investors located in South Africa." (*Id.*
at 4.) After making various representations to
Christ, [FN1] Cormick asked for an initial investment
from Christ to "launch the venture." (*Id.*)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                         Page 2

Slip Copy, 2007 WL 2022053 (D.Del.)
**(Cite as: Slip Copy)**

> FN1. Christ alleges that Cormick misrepresented that he had (1) access to 8,000 brokers and financial advisors in South Africa who represented one million potential investors in that country, and (2) relationships with investors who intended immediately to invest $28.5 million through his proposed business. (D.I. 1, at 4.)

The terms of the investment were negotiated through email, culminating in a written proposal by Cormick on February 15, 2004. (*Id.* at 4.) According to Christ, the terms were that "plaintiff would invest $350,000 in exchange for a 50% equity interest in two entities: (i) Elan Suisse, a South African corporation which would manage the investment operations [of which Cormick was a director and officer]; and (ii) Elan Suisse USA, a Delaware limited liability company which would own certain intellectual property rights." (*Id.* at 4.) Further discussions ensued and the parties agreed to memorialize the terms of the investment in a written agreement in the future. (*Id.* at 5.)

**\*2** In March 2004, Christ wired two separate payments of $125,000 each to Cormick's personal bank account in London. (D.I. 1, at 5.) Cormick caused Elan Suisse USA to be formed on March 15, 2004; however, no written agreement was ever executed, nor did Christ receive equity shares of Elan Suisse or Elan Suisse USA. (*Id.* at 5.) In September 2004, Christ requested an audit of both Elan Suisse and Elan Suisse USA. (*Id.*) On September 9, 2004 Cormick offered to repay Christ the $250,000 investment and Christ accepted the offer in writing on November 30, 2004. (*Id.*) Christ has yet to receive payment. (D.I. 1, at 5.)

The remainder of Christ's allegations focus upon a conspiracy between the remainder of the defendants and Cormick. The facts alleged are as follows. Cormick was both a director of Mercari and Elan Suisse. (*Id.* at 8.) Cormick operated Elan Suisse out of Mercari's offices while at the same time communicating with Christ. (*Id.*) Christ alleges that the money he invested in Elan Suisse and Elan Suisse USA was diverted to Acquacine (renamed Nicogel in December 2005) through the efforts of

Walters, (Nicogel's Chief Executive Officer), Marshall (Nicogel's officer and shareholder), and Cormick. (*Id.*) Elan Suisse promoted investment in Acquacine through print advertisement, and identified Cormick and Walters as managers of the " Elan Suisse Capital Biopharma" investment vehicle. (*Id.* at 9.) To promote Elan Suisse Biopharma Investment Portfolio, Marshall developed a PowerPoint presentation aimed at potential investors. (D.I. 32, at 5.) A key product in the portfolio of the Elan Suisse Capital Biopharma investment portfolio was Nicotea, a product produced by Acquacine. (*Id.*)

In February of 2005, Christ filed suit in the High Court of South Africa, Witwatersrand Local Division, Case No: 05-2033, naming Cormick as the sole defendant and alleging similar facts to the present action. (D.I.31, Ex. A-1.) In response to the suit, Cormick disputes the South African court's jurisdiction, alleging that "[n]either the Plaintiff nor the Defendant is ordinarily resident or carries on business within the area of jurisdiction of the Honourable Court ... and [t]he cause of action herein did not arise within the area of jurisdiction of the Honourable Court ... and the Honourable Court consequently has no jurisdiction to entertain this action." (*Id.* at Ex. A-2.) Christ represents that he has not pursued the South African case against Cormick due to his likely inability to secure jurisdiction over Cormick in that court. (D.I. 32-2, Ex. A, at 6.)

### III. STANDARDS OF REVIEW

#### A. Rule 12(b)(2)

The defendants move to dismiss for lack of personal jurisdiction. "Rule 12(b)(2) of the Federal Rules of Civil Procedure requires a court to dismiss a case when the court lacks personal jurisdiction over the defendants." *E.I. duPont de Nemours & Co. v. Rhodia Fiber & Resin Intermediates, S.A.S.,* 197 F.R.D. 112, 119 (D.Del.2000). "Once the defense has been raised, then the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Slip Copy, 2007 WL 2022053 (D.Del.)**
**(Cite as: Slip Copy)**

evidence." *Patterson by Patterson v. F.B.I.,* 893 F.2d 595, 603-04 (3d Cir.1990), *cert. denied,* 498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990). Plaintiff may not rely upon the bare pleadings in order to withstand the motion to dismiss for lack of *in personam* jurisdiction. *Id.* at 604.

**\*3** The determination of whether personal jurisdiction exists requires a two-step analysis. First, the court must decide whether jurisdiction is authorized by the long-arm statute of the state in which the court sits. *Transportes Aereos de Angola v. Ronair, Inc.,* 544 F.Supp. 858, 864 (D.Del.1982). If jurisdiction is proper per the long-arm statute, the court must then determine whether exercising jurisdiction comports with the requirements of the Due Process Clause of the Fourteenth Amendment. *Id.* at 864-65 (noting the "intent of the legislature to exercise jurisdiction over non-residents whenever feasible"); *see also, Compaq Computer Corp. v. Packard Bell Elecs., Inc.,* 948 F.Supp. 338, 342 (D.Del.1996).

To satisfy the second prong of this analysis, the court must find the existence of "minimum contacts" between the defendant and the forum state, "such that the maintenance of the suit does not offend ' traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citation omitted). In this case, Christ must show that each of the defendants purposefully availed itself of the privilege of conducting activities within Delaware. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (citation omitted); *see also, Asahi Metal Indus. Co., Ltd. v. Superior Court of California,* 480 U.S. 102, 108-09, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

When reviewing this motion, the "court must accept as true all allegations of jurisdictional fact made by the plaintiff and resolve all factual disputes in the plaintiff's favor." *Shamrock Holdings of California, Inc. v. Arenson,* 421 F.Supp.2d 800, 803 (D.Del.2006). Christ, however, bears the burden of alleging facts sufficient to make a *prima facie* showing of personal jurisdiction over the defendants. *ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.,* 147 F.Supp.2d 268,

270-71 (D.Del.2001). To meet this burden, Christ must adduce facts which " 'establish with reasonable particularity' " that jurisdiction over the defendants exists. *Id.* at 271 (citation omitted).

### B. Rule 12(b)(6)

The defendants also move to dismiss Count IV (Civil Conspiracy) for failure to state a claim. Under the Rule 12 pleading standard, the court must "view the complaint as a whole and [ ] base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable." *City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 263 (3d Cir.1998). The court is not obligated to accept as true "unsupported conclusions," *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.,* 113 F.3d 405, 417 (3d Cir.1997), "bald assertions," *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997), or allegations that are "self-evidently false." *Nami v. Fauver,* 82 F.3d 63, 69 (3d Cir.1996). "Similarly, legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 216 (3d Cir.2002). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Eames v. Nationwide Mut. Ins. Co.,* 412 F.Supp.2d 431, 435 (D.Del.2006) (citation omitted). The moving party bears the burden of persuasion. *Id.*

### IV. DISCUSSION

### A. Personal Jurisdiction Pursuant To 6 Del. C. § 18-109(a)

**\*4** The defendants contend that there is no basis " for exercising personal jurisdiction over the non-Delaware defendants (i.e., all defendants other than Elan Suisse USA), much less justification under the Due Process Clause." (D.I. 31, at 8.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 4

Slip Copy, 2007 WL 2022053 (D.Del.)
**(Cite as: Slip Copy)**

Christ asserts that Cormick is subject to personal jurisdiction in Delaware pursuant to 6 Del. C. § 18-109(a) because he is "a person who participates materially in the management of Elan Suisse USA." (D.I. 29, at 3.) Under the first step of this analysis, the court must determine if this section of the Delaware long-arm statute "warrant[s] the exercise of jurisdiction over" Cormick. *Telcordia Techs., Inc. v. Alcatel S.A.,* C.A. No. 04-874 GMS, 2005 WL 1268061, *2 (D.Del. May 27, 2005). Section 18-109(a) provides in pertinent part that: "[a] manager ... of a limited liability company may be served with process ... in all civil actions or proceedings brought in the State of Delaware *involving or relating to the business of the limited liability company or a violation by the manager ... of a duty to the limited liability company.*" (emphasis added)

The statute contemplates the exercise of jurisdiction over Cormick if he breached a fiduciary duty in a managerial capacity. *See, e.g., Assist Stock Mgmt. L.L.C. v. Rosheim,* 753 A.2d 974, 978 (Del.Ch.2000). In this case, however, there is no allegation of a breach of fiduciary duty. In *Rosheim,* "Vice Chancellor Lamb respected the General Assembly's decision to write § 18-109 more broadly ..., by investing th[e] court with personal jurisdiction over managers in disputes 'involving or relating to the business of' their LLCs." *Cornerstone Techs., LLC v. Conrad,* 2003 WL 1787959, *12 (Del.Ch. Mar.31, 2003) (citations omitted). While § 18-109 may be "susceptible to too broad an application, ... [p]rotection against unconstitutional application of [the] statute [ ][may] be provided on a case-by-case basis by applying the minimum-contacts analysis mandated by due process." *Rosheim,* 753 A.2d at 980 (citation and internal quotations omitted).

The Vice Chancellor concluded in *Rosheim* that *in personum* jurisdiction was proper over the defendant-who had no Delaware contact beyond his involvement as founder and manager of AIT, a Delaware corporation-"to adjudicate the matter because: (1) the allegations against Rosheim focus[ed] centrally on his 'rights, duties and obligations' as a manager of a Delaware LLC; (2) the resolution of this matter [was] 'inextricably

bound up in Delaware law;' and (3) Delaware [had] a strong interest in providing a forum for disputes relating to the ability of managers of an LLC formed under its law to properly discharge their respective managerial functions." *Id.* at 981.

Under the facts alleged, Cormick meets the definition of manager found in § 18-109(a) and is subject to personal jurisdiction under Delaware's long-arm statute. As defined in § 18-109(a), the term manager refers to (i) a person who is a manager as defined in § 18-101(10)[FN2] of this title and (ii) a person, whether or not a member of a limited liability company, who although not a manager as defined in § 18-101(10) of this title, participates materially in the management of the limited liability company. Christ has set forth enough facts in his complaint to satisfy the latter definition of manager, as provided in § 18-109(a). According to Christ's amended complaint, Cormick caused Elan Suisse USA to be formed as a limited liability company in Delaware on March 15, 2004. (D.I. 29, at 5.) As the "sole initial member of the limited liability company," Cormick was the only person capable of managing the affairs of Elan Suisse USA. (*Id.*) Likewise, Cormick participated materially in the formation and management of Elan Suisse USA, a limited liability company.

> FN2. Pursuant to 6 Del. C. § 18-101(10), " manager" is defined as "a person who is named as a manager of a limited liability company in, or designated as a manager of a limited liability company pursuant to, a limited liability company agreement or similar instrument under which the limited liability company is formed."

**\*5** Christ also sets forth facts showing that Cormick "purposefully availed [himself] of the privilege of conducting activities within the state of Delaware." *See Burger King,* 471 U.S. at 475. Cormick's contacts fall short of continuous and systematic given that the only alleged contact with Delaware is Cormick's formation of Elan Suisse USA. This district has held, however, that "[a] single act of incorporation in Delaware will suffice to confer personal jurisdiction over a nonresident defendant if

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Slip Copy, 2007 WL 2022053 (D.Del.)**
**(Cite as: Slip Copy)**

such purposeful activity in Delaware is an integral component of the total transaction to which plaintiff's cause of action relates." *Arenson*, 421 F.Supp.2d at 804 (*citing Cairns v. Gelmon*, 1998 WL 276226, *3 (Del.Ch.1998)). Cormick's single contact with Delaware is directly related to the cause of action before the court, if it accepts as true as it must, that the formation of Elan Suisse USA was part of a scheme to defraud Christ.[FN3] Christ further alleges that "Cormick offered to repay plaintiff the $250,000 Christ had wired previously to Cormick." (D.I. 29, at 5.) Accepting these allegations as true, like *Rosheim*, one aspect of this case will fall upon the "rights, duties and obligations " of Cormick as sole founder and manager of Elan Suisse USA to perform on this obligation to repay Christ. Finally, like *Rosheim*, the state of Delaware has a strong interest in providing a forum for the resolution of disputes relating to not only the discharge of managerial functions within an LLC formed in Delaware but also relating to the use of the laws of incorporation of a limited liability company.

> FN3. The record reflects that Christ transferred funds to Cormick both before and after the formation of Elan Suisse USA as a Delaware limited liability company. (*See* D.I. 32-2, Christ Aff., Ex. A.)

Given Cormick's managerial duties over Elan Suisse USA, the long arm statute will operate to bring Cormick within the court's jurisdiction. As Christ's allegations relate to Cormick's act of founding Elan Suisse USA under the limited liability corporate law of Delaware, the maintenance of this suit will not offend traditional notions of fair play and substantial justice.

**B. Personal Jurisdiction Pursuant To 10 Del. C. § 3104**

Christ alleges that Elan Suisse, Elan Suisse USA, Nicogel, Marshall, Walters, and Mercari conspired with Cormick to perpetrate a fraud; therefore, the defendants are subject to personal jurisdiction

pursuant to 10 Del. C. § 3104.[FN4] (D.I. 29, at 9.) The statute provides in pertinent part:

> FN4. Under 10 Del. C. § 3104(a), the term "person" includes any natural person, association, partnership or corporation.

(c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent: (1) Transacts any business or performs any character of work or service in the State; ... (3) Causes tortious injury in the State by an act or omission in this State;

§ 3104(c). The Delaware Supreme Court, in *Istituto Bancario Italiano SpA v. Hunter Eng'g Co., Inc.,* 449 A.2d 210, 225 (Del.1982), held that "a conspirator who is absent from the forum state is subject to the jurisdiction of the court, assuming he is properly served under state law, if the plaintiff can make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy." *See also Resource Ventures, Inc. v. Resources Mgmt. Int'l, Inc.,* 42 F.Supp.2d 423, 434 (D.Del.1999).

**\*6** In short, when a defendant voluntarily participates in a conspiracy with knowledge of its acts in or effects in the forum state, he "can be said to have purposefully availed himself of the privilege of conducting activities in the forum state, thereby fairly invoking the benefits and burdens of its laws." *Istituto Bancario,* 449 A.2d at 225. This participation qualifies as substantial contact with the jurisdiction such that it would be reasonable to require the defendant to defend an action there. *Id* .

Christ fails to allege facts sufficient to establish that defendants Marshall, Walters, Nicogel, Mercari, and Elan Suisse are subject to personal jurisdiction

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 6

**Slip Copy, 2007 WL 2022053 (D.Del.)**
**(Cite as: Slip Copy)**

in Delaware. Christ's amended complaint and associated pleadings do not present facts that establish the existence of a conspiracy, let alone that any of these non-Delaware defendants were participants in or knew of a conspiracy to defraud Christ. The amended complaint merely pleads the existence of relationships and contacts among the defendants. Based on these connections and assumptions, Christ invites the court to speculate as to the defendants' knowledge and participation in an alleged conspiracy for purposes of justifying the court's exercise of jurisdiction over them. While the court must accept all well-pleaded facts as true, the court need not credit bald assertions and speculation in a complaint. As such, the court finds that, based on the *facts* alleged, the court lacks personal jurisdiction over Marshall, Walters, Nicogel, Mercari, and Elan Suisse.[FN5]

> FN5. While the court would ordinarily entertain a request for leave to amend an insufficiently pled claim, the court notes that Christ made such an attempt almost a year after filing its initial complaint. (*See* D.I. 29.) Christ's amended complaint, however, falls substantially short of the standard necessary to state a *prima facie* claim for civil conspiracy. Accordingly, the court will deny Christ's request for leave to amend his conspiracy claim.

**C. Motion to Dismiss for Failure to State Claim of Civil Conspiracy**

The court finds that Christ fails to allege sufficient facts to claim a civil conspiracy among the defendants. To state a claim of civil conspiracy, in Delaware, the plaintiff must show: "(1) a combination of two or more persons; (2) an unlawful act done to further the conspiracy; and (3) damages." *Eames,* 412 F.Supp.2d at 438. The Pennsylvania standard is similar, requiring the plaintiff to allege: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage ." *In re Student Finance Corp.,*

335 B.R. 539, 552 (D.Del.2005) (citation omitted).

Christ alleges that "Cormick formed Elan Suisse USA in connection with and in furtherance of his unlawful scheme to defraud plaintiff and induce plaintiff to pay Cormick $250,000." (D.I. 29, at 8.) Christ's claim lacks any facts or indication that there was a combination or agreement to perpetrate fraud between Cormick, Elan Suisse USA, and Elan Suisse. Christ's conclusory allegations do not satisfy the pleading requirement.

**D. Statute of Limitations**

The defendants have failed to meet their burden to show why Christ's fraud claim should be dismissed. "[A] federal court, sitting in diversity, follows the forum's choice of law rules to determine the applicable statute of limitations." *David B. Lilly Co., Inc. v. Fisher,* 18 F.3d 1112, 1117 (3d Cir.1994) (citations omitted). The court must use the same choice of law rules to determine which jurisdiction's law should be applied to the claim. *Deutschman v. Beneficial Corp.,* 132 F.R.D. 359, 379 (D.Del.1990) (citation omitted). Generally in tort cases, Delaware courts have followed "the principle of *lex loci delicti,* and [have] appl[ied] the law of the place of the injury." *Id.* (citation omitted). However, "[i]n the case of intentional torts, such as fraud, the *lex loci deliciti* rule requires a court to apply the substantive law of the state or, in this case, country where the defendant's wrongful conduct primarily occurred." *Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.,* 576 F.Supp. 107, 127-28 (D.Del.1983) (citing *Johnston Assocs., Inc. v. Rohm & Haas Co.,* 560 F.Supp. 916, 918 (D.Del.1983)). The rationale follows that, where there is an action based upon an intentional tort, "the punitive element is dominant, [and the] state finds [the] conduct wrongful because its people regard it as sinful or offensive to public morals and the conduct, not the injury, is critical for applying the applicable law." *Johnston Assocs.,* 560 F.Supp. at 918 (D.Del.1983) (citation and internal quotations omitted). The aforementioned policy appears to be in accord with the Delaware Supreme Court's adoption of the most significant relationship test, "set forth in the Restatement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2022053 (D.Del.)
**(Cite as: Slip Copy)**

(Second) of Conflict of Law § 145(1) (1971) for analyzing choice of law questions relating to tort claims." *Lilly,* 18 F.3d at 1117; *see also, Johnston Assocs.,* 560 F.Supp. at 918 (noting that the Restatement stands for the proposition that "rights and liabilities of parties with respect to tort action are determined by local law of [the] state which has the most significant relationship to the occurrence").

**\*7** To address the statute of limitations, this court must first discern which forum's laws apply and specifically where Cormick's acts giving rise to this claim occurred. Given Christ's present allegations, it is difficult to determine exactly where Cormick's conduct occurred. Cormick may have caused the formation of Elan Suisse USA in a remote corner of the world, without ever setting foot in Delaware. It is also difficult to locate the origin of emails and phone calls used to negotiate the allegedly fraudulent deal. For the purposes of this motion, however, the defendants have failed to show why this court should not consider the act of incorporation under the laws of Delaware as an act that has one of the most, if not the most, significant relationship to the alleged fraud upon Christ in Delaware. This act brings Christ's claim of fraud under Delaware law and, therefore, under Delaware's three year statute of limitations. At this stage of the proceedings, in the absence of a clearer and more thorough illumination of the issues by the parties' briefs, the court finds it prudent to allow the claim of fraud to proceed.

### E. Motion to Stay Pending Resolution of Parallel Action in South Africa

International comity has been defined as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to the international duty and convenience." *Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.,* 466 F.3d 88, 92 (2d Cir .2006) (*citing Hilton v. Guyot,* 159 U.S. 113, 163-64, 16 S.Ct. 139, 40 L.Ed. 95 (1895)). While the federal courts have a " virtually unflagging obligation to exercise the jurisdiction conferred on them by Congress, in exceptional cases, a federal court should stay a suit

and await the outcome of parallel proceedings as a matter of wise judicial administration, giving regard to the conservation of judicial resources and comprehensive disposition of litigation." *Finova Capital Corp. v. Ryan Helicopters U.S.A., Inc.,* 180 F.3d 896, 898 (7th Cir.1999) (*citing Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) (internal quotations omitted)). Ordinarily, "a party invoking the doctrine of international comity seeks the recognition of a foreign judgment." *Royal & Sun,* 466 F.3d at 92. In the present case, the defendants contend that this court should stay the present action in favor of a similar pending action in South Africa, (D.I. 31, at 29,) an "alternate forum [that] is not the tribunal of a state of the federal union to which, under our Constitution, we owe a special obligation of comity." *Finova Capital Corp.,* 180 F.3d at 898 (citation omitted).

For the most part, "federal courts are reluctant to decline jurisdiction solely on the basis of concurrent proceedings in another jurisdiction." *Evergreen Marine Corp. v. Welgrow Int'l Inc.,* 942 F.Supp. 201, 207 (S.D.N.Y.1996). "[P]arallel proceedings on the same in personam claim should ordinarily be allowed to proceed simultaneously." *China Trade & Dev. Corp. v. M .V. Choong Yong,* 837 F.3d 33, 36 (2d Cir.1987) (quoting *Laker Airways Ltd. v. Sabena, Belgian World Airlines,* 731 F.2d 909, 926 (D.C.Cir.1984)) (internal quotations omitted).

**\*8** The decision, whether to stay a proceeding based upon the existence of parallel litigation in a foreign forum "does not rest on a mechanical checklist, but on a careful balancing of the important factors ... as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Royal & Sun,* 466 F.3d at 94 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 16, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). "[A] district court should be guided by the principles upon which international comity is based: the proper respect for litigation in and the courts of a sovereign nation, fairness to litigants, and judicial efficiency." *Royal & Sun,* 466 F.3d at 94. To address these principles, courts have considered a litany of factors under the guidance of the Supreme Court, including but not limited to: "the similarity

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 8

Slip Copy, 2007 WL 2022053 (D.Del.)
**(Cite as: Slip Copy)**

of the issues, the order in which the actions were filed, the adequacy of the alternate forum, the potential prejudice to either party, the convenience of the parties, the connection between the litigation and the United States, and the connection between the litigation and the foreign jurisdiction." *Royal & Sun,* 466 F.3d at 94; *see also Finova Capital Corp.,* 180 F.3d at 898-99.

One factor that weighs heavily in favor of a stay pending the resolution of the South African proceedings is that the High Court of South Africa was first to exercise jurisdiction over the subject matter of the current dispute. In addition, the proceedings are parallel, as the main parties, Christ and Cormick, are included in both actions. The actions seek the same relief-the return of the $250,000 investment and other damages related thereto. There is, however, a high risk of inadequate relief in the South African court, given Cormick's decision to dispute personal jurisdiction. As Christ contends, it is unlikely that the South African court will exercise jurisdiction over Cormick. Given the aforementioned precedent that parallel proceedings in such an instance are ordinarily allowed to proceed simultaneously, the court will allow Christ's claim to proceed despite the prior-filed action in South Africa.

### F. Motion for Sanctions

The defendants request that the court sanction Christ for: (1) maintaining a prior-filed action alleging the same facts and seeking the same relief against Cormick in South Africa; (2) impleading Cormick, Elan Suisse, Nicogel, Marshall, and Walters; and (3) making false accusations. (D.I. 31, at 32.) The Third Circuit recognizes that the " [i]mposition of attorney's fees and costs ... is reserved for behavior of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation." *In Re: Orthopedic Bone Screw Prods. Liab. Litig.,* 193 F.3d 781, 795 (3d Cir.1999) (internal quotations and citations omitted); *see also, Chambers v. NASCO, Inc.,* 501 U.S. 32, 45-46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (cited for the proposition that a court may assess fees under inherent powers

when a party has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons") (internal citations omitted). The defendants have not persuaded the court that sanctions against Christ are warranted.

### V. CONCLUSION

**\*9** The court will dismiss Elan Suisse, Nicogel, Walters, Marshall, and Mercari for lack of personal jurisdiction, thus retaining jurisdiction over Cormick and Elan Suisse USA. Further, the court will dismiss Christ's civil conspiracy claim for failure to state a claim. The defendants' motion to dismiss Christ's fraud claim as time-barred under the statute of limitations will be denied. The defendants' motion to stay pending resolution of the parallel action in South Africa will be denied. Last, the defendants' request for sanctions will be denied.

### ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:

1. The Defendants' Motion to Dismiss for Lack of Personal Jurisdiction (D.I.30) is GRANTED in part and DENIED in part.
a. The motion is GRANTED as to defendants Elan Suisse, Nicogel, Marshall, Walters, and Mercari.
b. The motion is DENIED as to defendants Cormick and Elan Suisse USA.

2. The Defendants' Motion to Dismiss for Failure to State a Claim for Conspiracy (D.I.30) is GRANTED.

3. The Plaintiff's request for leave to amend his claim for civil conspiracy (D.I. 32, at 29) is DENIED.

4. The Defendants' Motion to Dismiss the Fraud and Conspiracy Claims for Failure to Satisfy the Statute of Limitations (D.I.30) is DENIED.

5. The Defendants' Alternative Motion to Stay

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                            Page 9

Slip Copy, 2007 WL 2022053 (D.Del.)
**(Cite as: Slip Copy)**


Pending Resolution of Prior-Filed Action in South
Africa (D.I.30) is DENIED.

6. The Defendants' Motion for Sanctions (D.I.30) is
DENIED.

D.Del.,2007.
Christ v. Cormick
Slip Copy, 2007 WL 2022053 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                          Page 1

Not Reported in A.2d, 1979 WL 174445 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

C
Century industries, Inc. v. Benoit
Del.Ch.,1979.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
CENTURY INDUSTRIES, INC.
v.
Paul H. BENOIT and B & D Supply Company of
Arizona, Inc.
**No. CIV.A.5964.**

Submitted: Aug. 29, 1979.
Sept. 5, 1979.


Application for Injunctive Relief: Denied.

H. James Conaway, Jr., Esquire, Edward B.
Maxwell, II, Esquire, Richard A. Levine, Esquire,
Young, Conaway, Stargatt & Taylor, Wilmington.
Stephen E. Herrmann, Esquire, Richards, Layton &
Finger, Wilmington.
HARTNETT, Vice-Chancellor.
**\*1** Gentlemen:

Plaintiff, Century Industries, Inc. ("Century"), seeks
interim relief enjoining defendant Paul H. Benoit ("
Benoit") from breaching a covenant not to compete
contained in a contract entered into between Benoit
and Century on May 29, 1979. Century also seeks
to enjoin Benoit's present employer, B & D Supply
Company of Arizona, Inc. ("B & D") from
employing Benoit in a manner violative of the
covenant not to compete, including the acquisition
of plaintiff's trade secrets from Benoit, damages,
disgorgement of profits earned by defendants in the
course of their violation of the covenant, and
counsel fees. At the hearing on the interim relief,
defendants appeared and opposed the granting of an
injunction. As will be discussed, Century has not
borne, at this time, its burden of showing that it has
a reasonable probability of ultimate success on the

merits, and therefore its application for interim
relief must be denied.

Interim relief is extraordinary and the consideration
of applications for such relief is always difficult
because the application must be considered on a
very sparse record.

The facts here apparently show that Benoit was
formerly employed by Century as the California
Regional Manager for Century's Contractor
Operated Civil Engineer Supply Stores (COCESS),
which operate as privately-owned wholesale outlets
on certain United States military bases. In this
capacity he operated COCESS concessions at
Travis Air Force Base, Castle Air Force Base, and
George Air Force Base, all of which are located in
the State of California.

In May, 1979, Benoit became dissatisfied with his
salary and informed Century that he would resign
and enter into employment with B & D, one of
Century's competitors, unless he was given a salary
increase. By telephone conversations evidently
carried on between the home office of Century in
Wisconsin and Benoit in California, it was agreed
that, in exchange for a higher salary, Benoit would
remain as an employee of Century and would sign
an agreement containing a covenant not to compete
with Century. Century sent Benoit the agreement
containing the covenant which Benoit then signed
and deposited in the mails in California on May 29,
1979.

The covenant provides in pertinent part:
"2. *Covenant Not to Compete.* Employee covenants
that for a period of two (2) years commencing with
the date of termination, for any reason, of his
employment with Century, Employee will not
engage, directly or indirectly (whether as
consultant, partner, officer, employee or otherwise)
in the operation of any form of enterprise engaged
in a business that is competitive with the business,
as hereinafter defined, conducted by Century, in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 2

Not Reported in A.2d, 1979 WL 174445 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

states of Wisconsin, Indiana, Illinois, Iowa, Minnesota or Michigan and with respect to COFESS and COCESS, as hereinafter defined, the entire United States of America. Employee further covenants that he shall not, directly or indirectly, own or have a proprietary interest of any kind in any such competitor except through ownership of securities listed on a national security exchange."

**\*2** The agreement does not set forth that the law of any particular jurisdiction will control its interpretation or enforcement.

On July 30, 1979, Benoit terminated his employment with Century and entered into employment with B & D. He was transferred from the West Coast to the East Coast and placed in charge of B & D's COCESS concessions at Dover Air Force Base in Delaware, Andrews and Bolling Air Force Bases in Washington, D.C., and Langley Air Force Base in Virginia. Century then filed this action to prevent Benoit from operating any such concession in the United States.

In order for this Court to grant a preliminary injunction, the party seeking the relief must show both a threat of immediate irreparable harm in the event the injunction is not issued and a reasonable probability of success on the merits at the hearing for a permanent injunction. *Sandler v. Schenley Indus., Inc.,* Del. Ch., 79 A.2d 606 (1951); *Bayard v. Martin,* Del.Supr., 101 A.2d 329, 333, *Cert. Denied,* 347 U.S. 944, 74 S.Ct. 639, 98 L.Ed. 1092 (1953); *Muschel v. Western Union Corp.,* Del. Ch., 310 A.2d 904, 909 (1973); *Arbour Park Civic Ass'n v. City of Newark,* Del. Ch., 267 A.2d 904, 906 (1970). The rule applies whether the probability of success on the merits is a question of law or of fact. *Gropper v. No. Cent. Tex. Oil Co.,* Del. Ch., 114 A.2d 231, 237 (1955).

A central issue relating to Century's probability of ultimate success on the merits of this case is a question of conflicts of law. Specifically, it is a question of whether the covenant not to compete is enforceable under the applicable conflict of laws rules. The jurisdictions involved in this case are Delaware, where Benoit is now employed and

where he now resides, Wisconsin, where Century maintains its home office of its nationwide business, and California, where Century does business and where Benoit resided at the time he signed the covenant and where he executed and mailed it. Covenants not to compete are enforceable to some extent in Delaware and Wisconsin but are specifically made unenforceable by statute in California. *Cal. Bus. & Prof.Code,* § 16600.

In Delaware, the law of the place where the contract was made determines its validity, *Norse Petroleum A/S v. LVO Intern., Inc.,* Del.Supr., 389 A.2d 771, 773 (1978); *Wilmington Trust Co. v. Pennsylvania Co.,* Del.Supr., 172 A.2d 63, 66 (1961), unless the public policy of Delaware precludes enforcement or recognition of a contract found to be valid under the law of some other state. *Scott-Douglas v. Greyhound Corp.,* Del.Super., 304 A.2d 309, 315 (1973). It is therefore necessary to consider where the contract in question was made.

A contract first exists where the last act necessary for its formation takes place. *Norse Petroleum A/S v. LVO Intern., Inc.,* supra, and authorities cited therein. In a case where an offer is made and an acceptance by the offeree is expected, the acceptance will create a valid and binding contract. Acceptance is an expression of assent to the terms of the offer made in a manner authorized by the offeror. Restatement, *Contracts,* § 52 (1932). An acceptance is made when it is transmitted to the offeror, regardless of whether it reaches him or where it happens to do so. *Norse Petroleum A/S v. LVO Intern., Inc.,* supra; Restatement, *Contracts,* §§ 64, 66 (1932); Restatement, Second, *Contracts,* § 64 (Tent. Drafts 1-7, 1973).

**\*3** In the present case, Century apparently offered Benoit an increase in salary conditioned upon his signing and mailing the covenant not to compete. Benoit apparently accepted the offer without altering its terms by signing and mailing the covenant. Inasmuch as the signing and the dispatch of the covenant by means of its deposit in the mails was done in California, it appears, at least preliminarily, that California is the place of the making of the contract and that California law therefore governs the contract. *Cal. Bus. &*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 3

Not Reported in A.2d, 1979 WL 174445 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**


*Prof.Code,* § 16600, provides:
*Invalidity of Contracts.* Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void.

It further appears that none of the exceptions set forth in the California Code apply in the present case and therefore the covenant not to compete executed by Benoit would appear, at least at this preliminary stage of the proceedings, to be void and therefore unenforceable.

Accordingly Century has not satisfied the burden imposed on it that it show a reasonable probability of ultimate success on the merits. Century's application for a temporary restraining order is therefore denied. So ordered.

Del.Ch.,1979.
Century Industries, Inc. v. Benoit
Not Reported in A.2d, 1979 WL 174445 (Del.Ch.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.

Not Reported in F.Supp., 1997 WL 338855 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

**C**
Osby v. APE Television Networks
E.D.Pa.,1997.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Gregory OSBY and Kay A. Vaughn
v.
A & E TELEVISION NETWORKS AND KURTIS
PRODUCTIONS, LTD.
**No. CIV. A. 96-7347.**

June 17, 1997.

*MEMORANDUM AND ORDER*
SHAPIRO, NORMA L., J.
**\*1** Plaintiffs filed this action for defamation, false light, emotional distress, and loss of consortium. Defendants removed the action from Philadelphia Court of Common Pleas on the basis of complete diversity between the plaintiffs and all defendants.[FN1] Defendants moved to dismiss under F.R.Civ.P. 12(b)(6) or, in the alternative, for summary judgment under Rule 56. At a pretrial hearing on the motion to dismiss, plaintiffs withdrew their claim for emotional distress. Defendants' motion to dismiss will be denied; summary judgment will be granted as to all remaining claims.

> FN1. The plaintiffs Osby and Vaughn, husband and wife, live in Cinnaminson, New Jersey. Defendant Kurtis Productions, Ltd. ("Kurtis") is an Illinois corporation. Defendant A & E Television Networks ("A & E") is a joint venture with its principal place of business in New York. The partners in a joint venture must all be diverse from the plaintiff. *Kooperman v. Village One Assoc. Ltd. Partnership,* 1989 WL 71299 \*1 (E.D.Pa.1989) (*citing Stuart v. Al Johnson Construction Co.,* 236 F.Supp. 126

(W.D.Pa.1964)). The partners in A & E are: Disney/ABC International Television, Inc., a Delaware corporation with its principal place of business in New York; the Hearst Corporation, a Delaware corporation with its principal place of business in New York; and RCA Cable, Inc., a Delaware corporation with its principal place of business in New York. Plaintiffs alleged damages greater than $50,000, the statutory minimum at the time the action was removed to federal court. 28 U.S.C. § 1332.

I. FACTS

Kurtis produced a television program, "Seized by Law," (the "program") for A & E's series, " Investigative Reports." The program, aired April 17, 1996, featured specific instances of law enforcement officers seizing personal property of people suspected of drug trafficking. The program's direction was that such seizures could be legal, but not fair or just. One segment of the program focused on Willie Jones, an African-American contractor traveling from Nashville to Houston on business. He was carrying a large amount of cash, paid for his tickets with cash, and had scheduled a short trip. According to the narrative of the program, that made him a suspicious person. "[Jones' attorney,] E.E. 'BO' EDWARDS: The federal agencies involved in forfeiture frequently, and in fact, routinely, pay rewards in airports, for example. Uh, they pay airline ticket agents to give them tips on someone who looks, quote, 'suspicious.' " "Seizures" final script, Defs' Mot. to Dismiss, Ex. B at 16.

The program emphasizes that men of color are more likely to be detained by law enforcement agents than white men.
BILL KURTIS: According to Edwards, Willie Jones was the victim of an airport profile stop. He'd paid cash for his ticket, was traveling to a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 2

Not Reported in F.Supp., 1997 WL 338855 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

so-called drug city, planned a very short stay, and most importantly, was a person of color.

E.E. "BO" EDWARDS: Had I with my white skin and my business suit on done exactly the same thing that Willie Jones did that day, I seriously doubt that I would have been bothered.

WILLIE JONES: I showed them who I was, I showed them my business card. I showed them my checkbook, no story was-was good enough.

BILL KURTIS: Jones' money was taken from him, no arrest made, no decision. Jones was told to board his flight. Instead, he went to court. After more than two years, Jones got his money back, the stop deemed unconstitutional, the federal government chastised. To some, however, Jones merely represents the tip of the iceberg.

E.E. "BO" EDWARDS: If a minority citizen of this country is traveling through an airport or traveling on an interstate highway, they are probably 10 times or 15 times, maybe even 20 times more likely to be stopped for the sole purpose of a law enforcement agent trying to get permission to search them to see if they have money.

"Seizures" final script, Defs' Mot. to Dismiss, Ex. B at 16-17.

**\*2** The narration, including the quotes from Willie Jones and his attorney, was a voice-over accompanying pictures of an airport ticket counter, Jones' business card, newspaper headlines, and a courtroom. There were two airport crowd scenes, both showing plaintiff Osby and other people walking across an open space in an airport. The first shot of Osby appeared when Bill Kurtis said, ".. . most importantly, was a person of color." The second scene, showing Osby walking behind another African American man and an older African American woman, appeared as E.E. Edwards said, " If a minority citizen of this country is traveling through an airport ..."

Plaintiff, filing this action in Philadelphia Court of Common Pleas on October 4, 1996, alleged the program depicted him as involved in criminal activity and damaged his reputation. After defendants removed the action to federal court, this court heard oral argument on defendants' motion to dismiss or, in the alternative, for summary judgment.

## II. DISCUSSION

A court should grant a motion to dismiss for failure to state a claim upon which relief may be granted only if " 'it appears to a certainty that no relief could be granted under any set of facts which could be proved.' " *Schrob v. Catterson,* 948 F.2d 1402, 1408 (3d Cir.1991) (quoting *D.P. Enterprises, Inc. v. Bucks County Community College,* 725 F.2d 943, 944 (3d Cir.1984)), *reh'g denied* (Dec. 24, 1991). In deciding a motion to dismiss under F.R.C.P. 12(b)(6), "all allegations in the pleadings must be accepted as true and the plaintiff ... must be given the benefit of every favorable inference that can be drawn from those allegations." *Id.* at 1405 (citations omitted).

A motion to dismiss relying on matters outside the pleadings may be treated as a motion for summary judgment under Rule 56, provided all parties have had an opportunity to present pertinent material. Fed.R.Civ.P. 12(b). Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A defendant moving for summary judgment bears the initial burden of demonstrating there are no facts supporting the plaintiff's claim; then the plaintiff must introduce specific, affirmative evidence that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must draw all justifiable inferences in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Defendants Kurtis and A & E submitted a videotape of the "Seized by Law" television program and a transcript of the program's narration and interviews. Defendants provided sworn affidavits verifying the videotape and transcript are accurate; plaintiffs do not dispute the accuracy of the videotape and transcript. Defendants argue the videotape and transcript may be considered by the court in deciding the motion to dismiss since plaintiffs' complaint describes the program. The videotape

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3

Not Reported in F.Supp., 1997 WL 338855 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

and transcript are matters outside the pleadings, so the court will consider only defendants' motion for summary judgment. *See In re Medical Lab. Management Consultants,* 931 F.Supp. 1487, 1491 (D.Ariz.1996) (motion to dismiss in a defamation action converted to summary judgment when defendants submitted a videotape and affidavit).

### A. Applicable Law

**\*3** Both parties assume without argument that Pennsylvania law applies to this action. Plaintiffs are residents of New Jersey, but Osby is "an international jazz recording artist who for many years has conducted business in the Philadelphia area and throughout the world as a recording artist and performer." Pl. Compl. ¶ 9. Osby has friends and business associates in Philadelphia, and was "enjoying a good name and reputation in the Philadelphia community" when the program aired in April, 1996. Pl. Compl. ¶ 10. Vaughn has " family, friends and business associates in the Philadelphia area ..." Pl. Compl. ¶ 11. The plaintiffs allege their reputation among their friends, family and business associates was damaged by defendants' airing the program.

Under a traditional choice of law analysis, the state where the plaintiff is domiciled generally, but not always, has the greater interest in a defamation case. *See Restatement (Second) of Conflict of Laws* § 150(2), "When a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state where the person was domiciled at the time ..." In Comment e, "Multistate communication involving a natural person," the Restatement notes:
Rules of defamation are designed to protect a person's interest in his reputation. When there has been publication in two or more states of an aggregate communication claimed to be defamatory, at least most issues involving the tort should be determined,
... by the local law of the state where the plaintiff has suffered the greatest injury by reason of his loss of reputation.

\* \* \* \* \*

A state, which is not the state of the plaintiff's domicil, may be that of most significant relationship if it is the state where the defamatory communication caused the plaintiff the greatest injury to his reputation. This may be so, for example, in situations where (a) the plaintiff is better known in this state that in the state of his domicil ...
*Restatement (Second) of Conflict of Laws* § 150(2) cmt e (1971).

Plaintiffs' complaint suggests, but does not state explicitly, that their reputations are based more in Philadelphia than in the New Jersey community where they live. Based on the pleadings, Pennsylvania has an interest in the outcome of this litigation, since Osby works here and his professional reputation is based here. Where the parties have agreed to apply Pennsylvania law and Pennsylvania has an interest in the outcome of the litigation, there is no reason for the court, "sua sponte, to challenge the parties' consensual choice of law." *Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 269-70 (3d Cir.1980). The court will apply Pennsylvania law to this action.

### B. Plaintiffs' Defamation Claim

Osby alleges the program, by suggesting he was involved in criminal activity, made false and defamatory statements about him that "serve to disparage Plaintiff's good name, credit reputation both in his professional life as a musician and recording artist and in his private life, all of which brought Plaintiff into public ridicule and disgrace." Pl. Compl. ¶ 27. Defendants argue that the two scenes of Osby walking through an airport cannot support the meaning Osby alleges, and the program's depiction of him is not defamatory.

**\*4** Plaintiff bears the burden of establishing the program is defamatory. *Thomas Merton Center v. Rockwell Intern'l Corp.,* 497 Pa. 460, 442 A.2d 213, 215-16 (Pa.1981) *cert. denied,* 457 U.S. 1134, 102 S.Ct. 2961, 73 L.Ed.2d 1351 (1982) (article that implied plaintiff organization was unknowing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1997 WL 338855 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

recipient of Soviet funding was not libelous). "It is the function of the court to determine whether the challenged publication is capable of a defamatory meaning. If the court determines that the challenged publication is not capable of a defamatory meaning, there is no basis for the matter to proceed to trial." *Id. citing Restatement (Second) of Torts, § 614(1) (1977).* "A communication is defamatory if it tends to so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from dealing with him." *Franklin Music Co. v. American Broadcasting Co.,* 616 F.2d 528, 541 (3d Cir.1979) . *See also, Thomas Merton Center,* 442 A.2d at 215; *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 273 A.2d 899, 904 (Pa.1971); *Cosgrove Studio and Camera Shop, Inc. v. Pane,* 408 Pa. 314, 182 A.2d 751, 753 (Pa.1962); *Restatement (Second) of Torts* § 559 (1977). Communications must be evaluated to determine " 'the effect the [communication] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.' " *Baker v. Layfayette College,* 516 Pa. 291, 532 A.2d 399, 402 (Pa.1987) *quoting Corabi,* 273 A.2d at 907.

Osby contends the two scenes showing him walking through an airport are defamatory because the context of the program suggests he is suspicious and involved in criminal activity. On the contrary, the program's narrative emphasizes that average African American men who were not suspicious have been at risk of being stopped and searched because of their race. In the first scene, he was one of three African American men shown walking through the airport. He was not doing anything special to single him out from the other travelers. He appeared after the narrative stated that Willie Jones was stopped in part because he was a "person of color."

In the second scene, Osby was on screen longer, but he was seen behind another African American male and an older African American female. Osby did not appear to be travelling with the other couple; he was simply walking behind them. Edwards' voice-over explained that minority persons in an airport were at a greater risk of being stopped by

law enforcement without probable cause to see if they have money.

No reasonable viewer watching the segment profiling Willie Jones and the federal agents' unconstitutional seizure of his money could have concluded Osby, or any of the four other African American men seen in the airport, was involved in criminal activity, or was suspected of criminal activity. At most, a reasonable viewer could have concluded that Osby was at greater risk of being an object of law enforcement discrimination on the basis of race.

**\*5** Even if, as plaintiffs contend, the program suggested some African Americans are drug traffickers, there was nothing to connect Osby to criminal activity, or allegations of criminal activity. This action is remarkably similar to *Fogel v. Forbes, Inc.,* 500 F.Supp. 1081 (E.D.Pa.1980). In *Fogel,* Forbes Magazine ran an article on the financial benefit of increased investments and purchases by Latin Americans in the Miami area. The article stated some Latin Americans were buying goods in Florida and selling them on their return to South America. Including in the article was a photograph of plaintiffs, husband and wife, standing next to a large pile of boxes at an airport ticket counter. The caption read, "The Load: Some Latins buy so much in Miami they've been known to rent an extra hotel room just to store their purchases." *Id.* at 1084. There are other people in the photograph; the plaintiffs are not identified in the caption or the article. *Id.* Plaintiffs contended their appearance in the photograph implied they engaged in buying merchandise in Miami for resale in Latin America. Dr. Fogel admitted in his deposition that no one had been deterred from dealing with them, or that their private or professional reputations had been injured by the Forbes Magazine article. *Fogel,* at 1086.

The *Fogel* court noted, "The caption to the photograph in question focuses the readers' attention to the boxes of merchandise in the photograph. The plaintiffs' appearance in the photograph is obviously incidental and does not in any manner imply that they are participating in the activity discussed in the article ..." *Id.* at 1085.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 5

Not Reported in F.Supp., 1997 WL 338855 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

The court finds that the picture and the article are not reasonably capable of conveying the meaning or innuendo ascribed by the plaintiffs. As the Supreme Court of Pennsylvania has said on numerous occasions, if the publication is not in fact libelous, it cannot be read by innuendo which puts an unfair and forced construction on the interpretation of the communication.

*Id.* (*citing Bogash v. Elkins,* 405 Pa. 437, 176 A.2d 677 (Pa.1962); Sarkees v. Warner-West Corp., 349 Pa. 365, 37 A.2d 544 (Pa.1944)). "Furthermore, assuming that the article and the picture were reasonably capable of conveying the meaning and innuendo ascribed by the plaintiffs, the Court finds that such meaning is not defamatory" to the Fogels since they were not buying and selling merchandise.

Here, plaintiffs' claim regarding Osby's appearance in the "Seized By Law" program is less plausible than the Fogels' claim regarding the Forbes photograph. There was nothing to connect Osby with Willie Jones or any of the individuals portrayed in the program as stopped by law enforcement agents on suspicion of criminal activities. Osby is portrayed, accurately, as an African American male using an airport. The reasonable viewer would recognize that the producers had no particular reason for videotaping Osby, other than to show an innocent citizen potentially at risk of an unconstitutional seizure of his money because of his race. Osby's depiction in the program was not capable of defamatory meaning.

### C. Plaintiffs' False Light Claim

**\*6** Pennsylvania has adopted the Restatement (Second) of Torts § 652E governing the tort of portraying someone in a "false light":
One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of privacy, if
(a) the false light in which the other was placed would be highly offensive to a reasonable person, and
(b) the actor had knowledge of or acted in reckless

disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Weinstein v. Bullick,* 827 F.Supp. 1193, 1202 (E.D.Pa.1993), *citing Restatement (Second) of Torts* § 652E (1977). The "false light" cause of action differs slightly from defamation; it involves a false statement that is not necessarily defamatory. *Id.*

Plaintiffs allege the program depicted Osby as involved or suspected of criminal activity, and that " false and defamatory" depiction "created a highly offensive, objectionable and false public impression of [Osby] and placed him in a false light in the public eye." Pl. Compl. ¶ 36. Plaintiffs contend that the depiction of Osby "would be highly offensive to a reasonable person ..." Pl. Compl. ¶ 37.

To survive summary judgment, plaintiffs must show that "the publicity forming the basis for the false light claim be reasonably capable of being understood as singling out, or pointing to, the plaintiff." *Weinstein,* 827 F.Supp. at 1202. The publicity must also be untrue. *Fogel,* 500 F.Supp. at 1088. As in *Fogel,* plaintiffs here place the same interpretation on the program as they did in the defamation claim, that is, that Osby was depicted as involved in criminal activity.

The defects in the defamation claim are defects in the false light claim: 1) plaintiffs' interpretation of how Osby was depicted is not reasonable; 2) defendants' program did not portray Osby as involved in criminal activity; and 3) a reasonable person could not find the two scenes of Osby walking in an airport "highly offensive."

### D. Vaughn's Consortium Claim

Vaughn's loss of consortium claim relies on injuries sustained by Osby. As Osby's claims of defamation and false publicity have not survived summary judgment, Vaughn's consortium claim cannot survive either. An appropriate order follows.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 6

Not Reported in F.Supp., 1997 WL 338855 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**


*ORDER*

AND NOW, this 12th day of June, 1997, upon
consideration of defendants' motion to dismiss or, in
the alternative, for summary judgment and
plaintiffs' memorandums in opposition, it is
ORDERED that:

1. Defendants' motion to dismiss is DENIED;

2. Defendants' motion for summary judgment is
GRANTED;

3. The Clerk of the Court is directed to enter
judgment for defendants on all counts.

E.D.Pa.,1997.
Osby v. A&E Television Networks
Not Reported in F.Supp., 1997 WL 338855
(E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.