IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-275-GMS |
| | ) | |
| BRETT J. CORMICK and ELAN SUISSE | ) | |
| INTERNATIONAL HOLDINGS (USA) LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| ELAN SUISSE LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-60-GMS |
| | ) | |
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Defendant. | ) | |

## ROBERT D. CHRIST'S OPENING BRIEF IN SUPPORT OF HIS MOTION FOR JUDGMENT ON THE PLEADINGS

REED SMITH LLP

Thad J. Bracegirdle (No. 3691)
1201 Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 778-7500

Attorneys for Robert D. Christ

Dated: October 16, 2007

# TABLE OF CONTENTS

Page

NATURE AND STAGE OF THE PROCEEDINGS ................................................................1

    Civil Action No. 06-275-GMS ....................................................................1

    Civil Action No. 07-60-GMS ......................................................................1

SUMMARY OF ARGUMENT ....................................................................3

STATEMENT OF FACTS ....................................................................5

I.     THE PARTIES ....................................................................5

II.    BACKGROUND ....................................................................5

    A.    Mr. Cormick Defrauds Mr. Christ and Misappropriates $250,000..............................5

    B.    Mr. Christ Launches and Maintains the *www.elansuisse.co.za* Website......................8

    C.    Zimbabwean Authorities Arrest Mr. Cormick ................................................9

ARGUMENT ....................................................................11

I.     MR. CORMICK'S CLAIM UNDER THE ALIEN TORT CLAIMS ACT FAILS
     TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED..........................11

II.    MR. CORMICK'S CLAIMS FOR FALSE IMPRISONMENT AND
    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS HAVE NO
    MERIT UNDER ZIMBABWEAN LAW ....................................................16

III.   MR. CORMICK'S AND ELAN SUISSE'S CLAIMS FOR DEFAMATION
    SHOULD BE DISMISSED FOR LACK OF ANY COGNIZABLE DAMAGES..........18

IV.   ELAN SUISSE'S CLAIMS UNDER THE LANHAM ACT FAIL TO STATE A
    CLAIM UPON WHICH RELIEF CAN BE GRANTED ................................................21

CONCLUSION ....................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Almog v. Arab Bank, PLC*
   471 F. Supp.2d 257 (E.D.N.Y. 2007) ............................................................ 16

*Ameritech, Inc. v. American Information Technologies Corp.*
   811 F.2d 960 (6th Cir. 1987) ...................................................................... 22

*Bande v. Muchinguri*
   1999 Z.L.R. 476 (High Court, Bulawayo) ...................................................... 16

*Bird v. Parsons*
   289 F.3d 865 (6th Cir. 2002) ...................................................................... 22

*Bowoto v. Chevron Corp.*
   2006 WL 2455752 (N.D. Cal. Aug. 22, 2006) ................................... 13, 14, 15

*Chambers v. NASCO, Inc.*
   501 U.S. 32 (1991) .................................................................................. 21

*Corrie v. Caterpillar, Inc.*
   403 F. Supp.2d 1019 (W.D. Wash. 2005) ...................................................... 14

*Doe v. Saravia*
   348 F. Supp.2d 1112 (E.D. Cal. 2004) ........................................................ 16

*Doe v. Unocal Corp.*
   110 F. Supp.2d 1294 (C.D. Cal. 2000) ........................................................ 13

*Filartiga v. Pena-Irala*
   630 F.2d 876 (2d Cir. 1980) ...................................................................... 12

*Gannett Co., Inc. v. Kanaga*
   750 A.2d 1174 (Del. 2000) ................................................................... 18, 20

*Ibrahim v. Titan Corp.*
   391 F. Supp.2d 10 (D.D.C. 2005) ............................................................... 13

*In re Agent Orange Prod. Liab. Litig.*
   373 F. Supp.2d 7 (E.D.N.Y. 2005) .............................................................. 15

*In re Burlington Coat Factory Sec. Litig.*
   114 F.3d 1410 (3d Cir. 1997) ..................................................................... 11

*In re South African Apartheid Litig.*
   346 F. Supp.2d 538 (S.D.N.Y. 2004) ........................................................ 13

*Independent Newspapers Holdings Ltd. v. Suliman*
   [2004] ZASCA 57 (South Africa Supreme Court of Appeal, May 28, 2004) ............. 19

*Kadic v. Karadzic*
   70 F.3d 232 (2d Cir. 1995) ...................................................................... 13

*Kost v. Kozakiewicz*
   1 F.3d 176 (3d Cir. 1993) ........................................................................ 11

*Lamparello v. Falwell*
   420 F.3d 309 (4th Cir. 2005) ................................................................... 23

*Lucas Nursery & Landscaping, Inc. v. Grosse*
   359 F.3d 806 (6th Cir. 2004) .............................................................. 23, 24

*Mayflower Transit, LLC v. Prince*
   314 F. Supp.2d 362 (D.N.J. 2004) ........................................................... 24

*Mehinovic v. Vuckovic*
   198 F. Supp.2d 1322 (N.D. Ga. 2002) ...................................................... 16

*Mele v. Federal Reserve Bank of New York*
   359 F.3d 251 (3d Cir. 2004) .................................................................... 11

*Mujica v. Occidental Petroleum Corp.*
   381 F. Supp.2d 1164 (C.D. Cal. 2005) ..................................................... 12

*Pfizer Inc. v. Ranbaxy Laboratories Ltd.*
   321 F. Supp.2d 612 (D. Del. 2004) .......................................................... 11

*Savannah College of Art & Design v. Houeix*
   369 F. Supp.2d 929 (S.D. Ohio 2004) .................................................. 21, 23

*Sosa v. Alvarez-Machain*
   542 U.S. 692 (2004) .............................................................................. 12

*Southmark Prime Plus, L.P. v. Falzone*
   776 F. Supp. 888 (D. Del. 1991) ............................................................. 19

*Taubman Co. v. Webfeats*
   319 F.3d 770 (6th Cir. 2003) ................................................................... 22

*Turbe v. Government of the Virgin Islands*
   938 F.2d 427 (3d Cir. 1991) .................................................................... 11

**Statutes**

15 U.S.C. §§ 1125 ................................................................................ 2, 3, 21, 23

28 U.S.C. § 1350 ..................................................................................... 1, 3, 11

Companies Act, 2006, c. 46, § 1012 ............................................................ 20

**Other Authorities**

Restatement (Second) Torts ........................................................................ 17, 18

## NATURE AND STAGE OF THE PROCEEDINGS

### Civil Action No. 06-275-GMS

On April 27, 2006, plaintiff Robert D. Christ initiated this litigation by filing the complaint in C.A. No. 06-275-GMS alleging claims of fraud, promissory estoppel, breach of contract and civil conspiracy against defendants Brett J. Cormick, Elan Suisse International Holdings (USA) LLC ("Elan Suisse USA"), Elan Suisse (Pty) Ltd., Nicogel Ltd. ("Nicogel"), John Walters, Dianne Marshall and Mercari Financial Services (Pty) Ltd. ("Mercari"). *See* D.I. 1. Defendants moved to dismiss Mr. Christ's complaint on May 22, 2006. *See* D.I. 16. Mr. Christ subsequently filed an amended complaint on March 2, 2007 (D.I. 29), which defendants moved to dismiss on March 15, 2007 (D.I. 30). On July 10, 2007, the Court granted in part defendants' motion, dismissing Mr. Christ's claim for civil conspiracy and holding that Elan Suisse (Pty) Ltd., Nicogel, Mr. Walters, Ms. Marshall and Mercari were not subject to the Court's personal jurisdiction. *See* D.I. 46.

On July 20, 2007, Mr. Cormick and Elan Suisse USA answered Mr. Christ's amended complaint and asserted counterclaims against Mr. Christ. *See* D.I. 47. Specifically, Mr. Cormick seeks damages from Mr. Christ arising from alleged violations of the Alien Tort Claims Act, 28 U.S.C. § 1350 (Count I), false imprisonment (Count II), intentional infliction of emotional distress (Count III) and defamation (Count IV). *See id.* In addition, Elan Suisse USA has alleged against Mr. Christ a breach of contract claim relating to that entity's purported operating agreement (Count V). *See id.*

### Civil Action No. 07-60-GMS

On June 23, 2006, Elan Suisse Ltd. ("Elan Suisse") filed a complaint against Mr. Christ in the Court of Common Pleas of Montgomery County, Pennsylvania alleging

claims of defamation and violation of the Lanham Act, 15 U.S.C. §§ 1125 (a)(1)(A) and 1125(d)(1)(A). *See* D.I. 1. On September 1, 2006 Mr. Christ removed the case to the U.S. District Court for the Eastern District of Pennsylvania (*see id.*) and subsequently moved to dismiss the action for lack of personal jurisdiction or, alternatively, to transfer the action to this Court or the U.S. District Court for the Eastern District of Louisiana (see D.I. 2). Following briefing and oral argument, on December 26, 2006 the U.S. District Court for the Eastern District of Pennsylvania granted Mr. Christ's motion and transferred Elan Suisse's action to this Court for the purpose of consolidating it with C.A. No. 06-275-GMS. *See* D.I. 11. The case was transferred to this Court on January 30, 2007 and assigned Civil Action No. 07-60-GMS.

In accordance with the U.S. District Court for the Eastern District of Pennsylvania's order, on February 19, 2007 Mr. Christ moved to consolidate C.A. No. 06-275-GMS and C.A. No. 07-60-GMS. *See* D.I. 19. Following Mr. Christ's motion, the Court held a Local Rule 16.2 Scheduling Conference on April 27, 2007. *See* D.I. 23. At that conference, the Court, among other things, consolidated the two actions for the purposes of discovery and set trial in both actions to commence on May 27, 2008. *See* D.I. 25.

Mr. Christ today is moving for judgment on the pleadings with respect to certain counterclaims alleged in C.A. 06-275-GMS and all claims alleged in C.A. No. 07-60-GMS. Mr. Christ hereby respectfully submits his opening brief in support of that motion.

## SUMMARY OF ARGUMENT

1.    This Court lacks jurisdiction under the Alien Tort Claims Act, 28 U.S.C. § 1350, to adjudicate claims against Mr. Christ relating to the alleged incarceration and torture of Mr. Cormick by Zimbabwean authorities.  Mr. Cormick's inability to allege facts demonstrating that Mr. Christ collaborated with or exercised any control over the alleged tortfeasors merits dismissal of his claim that Mr. Christ aided and abetted such conduct.

2.    Mr. Cormick similarly does not and cannot allege any facts establishing that Mr. Christ's actions proximately caused the torture and other harm from which Mr. Cormick complains.  Accordingly, to the extent the law of Zimbabwe recognizes Mr. Cormick's claims at all, those claims fail to state a cause of action for false imprisonment or intentional infliction of emotional distress.

3.    While Mr. Cormick and Elan Suisse allegedly have been defamed by statements made by Mr. Christ on an Internet website hosted on a server located in South Africa, neither party can demonstrate that it has been harmed by such statements.  First, Mr. Cormick's allegations that Mr. Christ's Internet postings have cost him his career and livelihood are directly contradicted by sworn statements Mr. Cormick has made to courts in Zimbabwe which prove that Mr. Cormick was unemployed and destitute *before* Mr. Christ created his website.  Elan Suisse similarly cannot prove that it suffered damages because it is a dormant entity which Mr. Cormick is seeking to dissolve.

4.    Elan Suisse's claims under the Lanham Act, 15 U.S.C. § 1125, are entirely devoid of merit because Mr. Christ does not use and never has used his Internet website for commercial purposes or to compete with Elan Suisse.  Similarly, Mr. Christ is not liable for "cybersquatting" because his website indicates clearly on its face that Mr.

Christ did not register the *www.elansuisse.co.za* domain to profit from the "Elan Suisse" name or with the intent to sell the domain to Elan Suisse.

## STATEMENT OF FACTS

### I.  THE PARTIES.

Robert D. Christ is a citizen of Louisiana who resides in Abita Springs, Louisiana.

Plaintiff's Amended Complaint, C.A. No. 06-275-GMS ("Am. Compl.") ¶ 1.

Brett J. Cormick is a citizen of Australia who, according to statements he has

made to Mr. Christ and others, resides alternatively in the United Kingdom and in the

Republic of Zimbabwe.  Am. Compl. ¶ 2.

Elan Suisse USA is a limited liability company formed and organized under the

laws of Delaware.  Am. Compl. ¶ 3.  Mr. Cormick is the sole member of Elan Suisse

USA.  *Id.*

Elan Suisse Ltd. is, according to sworn statements made by Mr. Cormick to this

Court, "a private limited company organized and existing under the laws of England."

Declaration of Brett J. Cormick dated March 2, 2007 ¶ 3 (D.I. 20-1, C.A. No. 06-275-

GMS).

### II.  BACKGROUND.

#### A.  Mr. Cormick Defrauds Mr. Christ and Misappropriates $250,000.

In the mid- to late 1990's, Mr. Christ operated a tour company specializing in

expeditions to the geographic North and South Poles.  Am. Compl. ¶ 14.  Mr. Christ first

met Mr. Cormick in April 1996, when Mr. Cormick participated in one of Mr. Christ's

expeditions, after which time the two men maintained a friendship.  *Id.*

In January 2004, Mr. Christ traveled to Cape Town, South Africa to attend to the

affairs of a close friend who had died suddenly in an accident.  Am. Compl. ¶ 15.  While

Mr. Christ was in South Africa, Mr. Cormick traveled to Cape Town from his residence

in Harare, Zimbabwe to meet with Mr. Christ.  *Id.*  During these meetings, Mr. Cormick

discussed with Mr. Christ his potential investment in a purported business opportunity devised by Mr. Cormick. *Id.* On January 28, 2004, Mr. Cormick proposed that Mr. Christ invest in a holding company that would operate to promote and sell United States-based financial products and investment vehicles to investors located in South Africa. Am. Compl. ¶ 16. In connection with this proposal, Mr. Cormick intentionally misrepresented to Mr. Christ, among other things, that he had access to 8,000 brokers and financial advisors in South Africa who represented one million potential investors in that country. *Id.* Mr. Cormick further misrepresented to Mr. Christ that he had relationships with investors who intended immediately to invest $28.5 million through his proposed business. *Id.* However, Mr. Cormick informed Mr. Christ, he required an initial infusion of capital in order to launch the venture.

During late January and early February 2004, Mr. Christ and Mr. Cormick exchanged multiple e-mails in which they negotiated the terms of Mr. Christ's "investment" in Cormick's alleged business venture. Am. Compl. ¶ 17. Over the course of these e-mails, in response to concerns raised by Mr. Christ and in an effort to persuade Mr. Christ to invest in his purported business, Mr. Cormick intentionally misrepresented to Mr. Christ that the infrastructure to begin operations already was in place and that he only needed Mr. Christ's investment in order to get his business off the ground. *Id.* These negotiations culminated in a written proposal by Mr. Cormick on February 15, 2004 pursuant to which Mr. Christ would invest $350,000 in exchange for a 50% equity interest in two entities: (i) Elan Suisse (Pty) Ltd., a South African corporation which would manage the investment operations; and (ii) Elan Suisse USA, a Delaware limited liability company which would own certain intellectual property rights. Am. Compl. ¶

18. In subsequent e-mails in late February 2004, and during a face-to-face meeting in London, England in early March 2004, Mr. Christ and Mr. Cormick further discussed the details of Mr. Christ's investment. *Id.* During this time, Mr. Cormick emphasized to Mr. Christ repeatedly that he required Mr. Christ's investment as soon as possible. *Id.*

During the course of these discussions, Mr. Christ and Mr. Cormick agreed to memorialize the terms of Mr. Christ's investment in a written agreement at a future date. Am. Compl. ¶ 19. In March 2004, in reliance upon Mr. Cormick's promise that he and Mr. Christ would draft and execute promptly a written agreement documenting Mr. Christ's investment in Elan Suisse (Pty) Ltd. and Elan Suisse USA, and in reliance upon multiple misstatements by Mr. Cormick concerning his personal credentials, his purported relationships with South African investors and the validity of his proposed business venture, Mr. Christ wired an initial investment of $250,000 (in two separate payments of $125,000 each) to Mr. Cormick's personal bank account in London pursuant to Mr. Cormick's instructions. *Id.* Mr. Christ withheld the remaining $100,000 of his proposed investment pending execution of a written agreement. *Id.*

However, despite Mr. Cormick's representations that he and Mr. Christ would execute a written agreement, no such contract was ever prepared or signed, nor did Mr. Christ ever receive equity shares of Elan Suisse (Pty) Ltd. or Elan Suisse USA in exchange for his $250,000 investment. Am. Compl. ¶ 20. In September 2004, at which time Mr. Cormick's business had yet to commence operations, Mr. Christ sent e-mails to Mr. Cormick inquiring as to the status of his investment and requesting an audit of Elan Suisse (Pty) Ltd. and Elan Suisse USA. *Id.* Rather than undertake the audit requested by Mr. Christ, in an e-mail dated September 9, 2004, Mr. Cormick offered to repay Mr.

Christ the $250,000 he had wired previously to Mr. Cormick. Mr. Christ accepted Mr.

Cormick's offer in writing on November 30, 2004. *Id.* To date, however, in direct

breach of their agreement, Mr. Christ has not received repayment of his $250,000

payment from Mr. Cormick.

**B.    Mr. Christ Launches and Maintains the *www.elansuisse.co.za* Website.**

Following his discovery of Mr. Cormick's fraudulent scheme, Mr. Christ began to

investigate the veracity of Mr. Cormick's claims concerning his personal credentials and

the Elan Suisse business venture. *See* Christ Aff. dated Sept. 11, 2006 ¶ 5 (D.I. 2-3, C.A.

No. 07-60-GMS). As a result of that investigation, Mr. Christ learned that Mr. Cormick

was a well-traveled and sophisticated con artist who had fabricated virtually all of his

academic and professional credentials and had defrauded numerous other individuals

through similar "investment" schemes. *See id.* In order to notify the public of Mr.

Cormick's misdeeds and prevent others from being misled as he had been, in October

2005 Mr. Christ began publishing his findings on a website at the domain name

*www.elansuisse.co.za* (the "Website"). *See id.* ¶¶ 4, 6-7; Complaint, C.A. No. 07-60-

GMS ("Elan Suisse Compl.") ¶¶ 9-10. Mr. Christ has never represented or implied that

the Website is authorized by, affiliated with or operated on behalf of Elan Suisse or any

other entity affiliated with Mr. Cormick. *See* Christ Aff. ¶ 7. Nor does Mr. Christ

conduct any commercial activity through the Website (*see id.*); even a cursory review of

the Website reveals that it is intended solely for the pubic dissemination of information.[1]

---

[1] The full content of Mr. Christ's website is attached as an exhibit to Elan Suisse's
original complaint in Civil Action No. 07-60 (*see* D.I. 1). As a document incorporated by

*(Continued on following page)*

- 8 -

Not surprisingly, Mr. Cormick took issue with Mr. Christ publicly revealing his and Elan Suisse's fraudulent schemes and, in retaliation, both brought claims of defamation against Mr. Christ. In its complaint, Elan Suisse alleges that Mr. Christ "has posted defamatory statements on his Website regarding Elan Suisse, associated companies, their investors and employees." Elan Suisse Compl. ¶ 10. Elan Suisse contends that the Website has caused Elan Suisse "to lose investors and make[s] it difficult to attract any investors." *Id.* ¶ 12. Mr. Cormick similarly alleges in his counterclaims that the posting of 26 purportedly defamatory statements "did immeasurable damage to [his] reputation, credibility and professional standing, and destroyed his ability to practice his profession or earn a living." Answer and Counterclaims, C.A. No. 06-275-GMS ("Counterclaims") ¶ 142. As discussed more fully below, Mr. Cormick's and Elan Suisse's claims of harm from the Website have absolutely no basis in fact.

C.    **Zimbabwean Authorities Arrest Mr. Cormick.**

On or about August 23, 2006, Mr. Cormick was apprehended by police in Harare, Zimbabwe, where he resides. *See* Counterclaims ¶ 100. In his counterclaims, Mr. Cormick alleges that, before he was released on August 28, 2006, he was subjected to various forms of torture and inhumane treatment at the hands of Zimbabwean authorities. *See id.* ¶¶ 101-18.[2] Mr. Cormick further contends that, as a result of the actions taken by

---

*(Continued from previous page)*

reference in Elan Suisse's complaint, the Court properly may consider its contents in evaluating Mr. Christ's motion for judgment on the pleadings. *See* p. 11 *infra.*

[2] It is important to note that on August 30, 2006 – mere days after his arrest – Mr. Cormick submitted an affidavit to the High Court of Zimbabwe in connection with his

*(Continued on following page)*

the Zimbabwean police, he has suffered a host of physical and mental ailments, including (i) "shock and nervous reaction," (ii) "great fear and apprehension," (iii) post-traumatic stress disorder, (iv) pneumonia, (v) malaria, (vi) a broken nose, (vii) "long-term impairment" of hearing and vision, (viii) "soft tissue damage in the kidney region," and (ix) "extreme and permanent psychological damage and distress." *Id.* ¶ 119.

Without any factual support, Mr. Cormick alleges that his detention in Zimbabwe was the direct result of a false affidavit provided by Mr. Christ to Zimbabwean officials. *See id.* ¶ 97. Even more astonishing are Mr. Cormick's allegations that Mr. Christ "knew or should have known that … by reason of the political climate in Zimbabwe at the time, that it was reasonably probable that Cormick would be subject to confinement that violated specific, universal, and obligatory international norms including but not limited to inhumane conditions as well as psychological and physical torture." *Id.* ¶ 99; *see also id.* ¶ 128. Notably, Mr. Cormick's counterclaims contain no allegations concerning any communications between Mr. Christ and authorities in Zimbabwe, other than the allegedly false affidavit. Mr. Cormick also does not allege, because he cannot, that Mr. Christ had any ability or authority to direct or influence agents of the Zimbabwean government.

---

*(Continued from previous page)*

divorce in which he stated unequivocally that he was released "late on Friday evening 25th August." Ex. A ¶ 14. Additionally, even though Mr. Cormick was attempting through the affidavit to explain to the Zimbabwean court why he intended to leave the country, *nowhere* in the document does he state or suggest that he was tortured or otherwise mistreated. *See id.*

## ARGUMENT

A motion for judgment on the pleadings pursuant to Rule 12(c) is reviewed under the same standard as a motion to dismiss under Rule 12(b)(6). *Pfizer Inc. v. Ranbaxy Laboratories Ltd.*, 321 F. Supp.2d 612, 614 (D. Del. 2004) (citing *Turbe v. Government of the Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991)). Thus, for the purpose of considering Mr. Christ's motion, the Court must accept as true the allegations of defendants' counterclaims and draw all reasonable inferences in defendants' favor. *See id.* at 614-15. However, the Court need not accept "legal conclusions either alleged or inferred from the pleaded facts." *Id.* at 615 (quoting *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993)). In addition to the allegations of the pleadings, the Court may consider documents which are "integral to or explicitly relied upon in the complaint." *Mele v. Federal Reserve Bank of New York*, 359 F.3d 251, 256 n.5 (3d Cir. 2004) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)). Taking these sources into account, and even assuming the truth of defendants' allegations, their claims do not state a cause of action for the reasons stated below.

## I.    MR. CORMICK'S CLAIM UNDER THE ALIEN TORT CLAIMS ACT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

In his counterclaims, Mr. Cormick purports to allege a claim against Mr. Christ pursuant to the Alien Tort Claims Act ("ATCA"), which provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. As recently interpreted by the U.S. Supreme Court, the ATCA does not create an independent private cause of action for torts in violation of international law, but rather grants federal courts jurisdiction to "hear claims in a very limited category defined by the

law of nations and recognized at common law." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 (2004). Since federal courts should exercise "great caution in adapting the law of nations to private rights," jurisdiction under the ATCA is limited "to a narrow class of international norms today." *Id.* at 728-29. In other words, "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted [in 1789]." *Id.* at 732. It is against these highly restrictive standards that the Court should analyze the merits of Mr. Cormick's claim under the ATCA.

There can be no question that state-sanctioned torture violates universally accepted international norms. *See Filartiga v. Pena-Irala*, 630 F.2d 876, 884 (2d Cir. 1980) ("Having examined the sources from which customary international law is derived … we conclude that official torture is now prohibited by the law of nations."); *but see Mujica v. Occidental Petroleum Corp.*, 381 F. Supp.2d 1164, 1183 (C.D. Cal. 2005) (dismissing claims under the ATCA for cruel, inhuman and degrading treatment allegedly resulting in "gross humiliation, fear and anguish"). As pled, however, Mr. Cormick's counterclaim fails to allege that he was the victim of torture or any other acts at the hands of the Zimbabwean government. First, Mr. Cormick alleges that, on August 23, 2006, "he was apprehended by unidentified individuals … in an unidentified vehicle." Counterclaims ¶¶ 100-01. Mr. Cormick then alleges that he "was taken to an unknown location where there were no officials in police uniform or otherwise identifiable public officials." *Id.* ¶ 102. In fact, nowhere in his counterclaims does Mr. Cormick affirmatively plead knowledge that his abductors or torturers were agents of the

Zimbabwean government, alleging only that he "*believed* [them] to be Zimbabwean officials." *Id.* (emphasis added). In the absence of state action, this Court has no jurisdiction to hear Mr. Cormick's claim under the ATCA. *See Ibrahim v. Titan Corp.*, 391 F. Supp.2d 10, 14 (D.D.C. 2005) (alleged torture by private actors not actionable under ATCA's grant of jurisdiction); *Doe v. Unocal Corp.*, 110 F. Supp.2d 1294, 1305 (C.D. Cal. 2000) ("[C]rimes such as torture and summary execution are proscribed by international law only when committed by state officials or under color of law ....") (citing *Kadic v. Karadzic*, 70 F.3d 232, 243 (2d Cir. 1995)).

However, even if the Court were to infer from Mr. Cormick's allegations that he was tortured by Zimbabwean officials, Mr. Cormick still fails to allege a cause of action against Mr. Christ. At most, Mr. Cormick alleges that Mr. Christ aided and abetted "human rights abuses carried out by a foreign government" by supplying Zimbabwean authorities with an allegedly false affidavit which, in turn, prompted Mr. Cormick's arrest. Counterclaims ¶ 125. As a preliminary matter, at least one district court has held that the ATCA does not authorize federal courts to hear claims for aiding and abetting violations of international law. *See In re South African Apartheid Litig.*, 346 F. Supp.2d 538, 549-51 (S.D.N.Y. 2004); *but see Bowoto v. Chevron Corp.*, 2006 WL 2455752, at *3-4 (N.D. Cal. Aug. 22, 2006) (disagreeing with *South African Apartheid Litig.* and holding that a claim for aiding and abetting violations of international law is actionable under the ATCA). Nonetheless, even assuming that the ATCA authorizes the Court to hear Mr. Cormick's claim, the counterclaim fails to allege facts establishing a cause of action against Mr. Christ.

Mr. Cormick does not and cannot allege that Mr. Christ either participated in or had the right or ability to control the conduct of Zimbabwean authorities. *See Corrie v. Caterpillar, Inc.*, 403 F. Supp.2d 1019, 1026-27 (W.D. Wash. 2005) (dismissing claims of aiding and abetting violation of international law in the absence of allegations that defendant had right or ability to control foreign government's conduct). In addition, Mr. Cormick alleges no facts from which the Court reasonably could infer that Mr. Christ either (1) provided practical assistance, encouragement, or moral support which had a substantial effect on the perpetration of Zimbabwe's alleged crimes, or (2) knew that Zimbabwean authorities intended to commit the alleged crimes. *See Bowoto*, 2006 WL 2455752, at *4 (setting forth the elements of a claim for aiding and abetting under the ATCA).

Mr. Cormick's claim is based entirely upon his supposition that Mr. Christ's submission of an allegedly false affidavit to Zimbabwean authorities was the proximate cause of his detention. Mr. Cormick does not, however, allege any facts supporting a causal link between the allegedly false affidavit and the actions of Zimbabwean authorities, instead pleading in wholly conclusory fashion that "[a]t the time Christ executed the false affidavit he knew or should have reasonably known that his conduct would assist or encourage Zimbabwean officials to incarcerate Cormick." Counterclaims ¶ 98. Nor *can* Mr. Cormick establish a causal link between Mr. Christ's affidavit and the alleged actions of Zimbabwean officials, since the only affidavit Mr. Christ provided to those officials was furnished *after* Mr. Cormick was detained. Specifically, the affidavit

that Mr. Christ submitted to authorities in Zimbabwe (*see* Ex. B)[3] indicates clearly on its face that Mr. Christ did not execute it or fax it to authorities in Zimbabwe until September 6, 2006 – more than one week *after* Mr. Cormick's detention.

It also defies reason for Mr. Cormick to allege that Mr. Christ "knew or should have known … by reason of the political climate in Zimbabwe at the time, that it was reasonably probable that Cormick would be subject to confinement that violated specific, universal, and obligatory international norms including but not limited to inhumane conditions as well as psychological and physical torture." Counterclaims ¶ 99. In other words, Mr. Cormick alleges that Mr. Christ *intentionally* submitted a false affidavit to Zimbabwean authorities with the *knowledge* that it would cause those authorities to torture Mr. Cormick. However, instead of basing this remarkable allegation upon facts (because he cannot), Mr. Cormick infers that Mr. Christ *should have known* that Mr. Cormick *probably* would be tortured based solely upon "the political climate in Zimbabwe." *Id.* Plainly, this inference is unreasonable, unsupported by factual allegations and cannot establish either the requisite proximate cause or intent necessary to state a claim for aiding and abetting under the ATCA. *See Bowoto*, 2006 WL 2455752, at *4; *In re Agent Orange Prod. Liab. Litig.*, 373 F. Supp.2d 7, 54 (E.D.N.Y. 2005) (recognizing that "the mens rea required [for aiding and abetting a violation of international law under the ATCA] is the knowledge that [the defendant's] acts assist the commission of the offence"); *Doe v. Saravia*, 348 F. Supp.2d 1112, 1148-49 (E.D. Cal.

---

[3] As discussed above (*see* p. 11 *supra*), the Court properly may consider this document for the purposes of Mr. Christ's motion since Mr. Cormick's claim explicitly relies upon it.

2004) ("[T]hose who assist in the commission of acts prohibited by international law may be held individually responsible ... [if] the accomplice knows that his or her actions will assist the perpetrator in the commission of the crime.") (quoting *Mehinovic v. Vuckovic*, 198 F. Supp.2d 1322, 1355-56 (N.D. Ga. 2002)). Simply put, since Mr. Cormick cannot allege that Mr. Christ knowingly assisted Zimbabwean authorities in their arrest and alleged torture of Mr. Cormick, this Court has no authority to adjudicate Mr. Cormick's claim under the ATCA. *Cf. Almog v. Arab Bank, PLC*, 471 F. Supp.2d 257, 290-91 (E.D.N.Y. 2007) (allegations that bank knowingly provided financial services to terrorist organization stated claim against bank under ACTA for aiding and abetting organization's terrorist activities).

## II.    MR. CORMICK'S CLAIMS FOR FALSE IMPRISONMENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS HAVE NO MERIT UNDER ZIMBABWEAN LAW.

The parties have stipulated that Zimbabwean law governs Mr. Cormick's claims for false imprisonment and intentional infliction of emotional distress. Counsel for Mr. Christ has been advised by counsel in Zimbabwe, however, that Zimbabwean law does not recognize these torts *per se*. Instead, the most that Mr. Cormick could allege against Mr. Christ concerning his imprisonment by Zimbabwean authorities is malicious prosecution, which requires that Mr. Cormick prove, among other things, that Mr. Christ "set the law in motion (instigated or instituted the prosecution) against [Mr. Cormick]." *Bande v. Muchinguri*, 1999 Z.L.R. 476, 478 (High Court, Bulawayo).[4] Under Zimbabwe law, a defendant cannot be held liable for "instigating a prosecution" merely by providing

---

[4] This opinion, as well as other unreported opinions and statutes cited in this brief, are attached as exhibits hereto.

a factual statement to the police. *See id.* at 484. Mr. Cormick does not allege, because he cannot, that Mr. Christ initiated charges against Mr. Cormick or did anything more than provide a factual statement to Zimbabwean authorities which, in turn, those authorities determined gave them probable cause to detain Mr. Cormick. Therefore, even assuming the truth of Mr. Cormick's allegations, Mr. Christ cannot face any liability under Zimbabwean law for harm suffered by Mr. Cormick as a result of his arrest.

The Zimbabwean authority cited above further illustrates the complete lack of proximate causation between any statements made by Mr. Christ to Zimbabwean police and the harm allegedly suffered by Mr. Cormick from his arrest. Even assuming that Zimbabwe recognizes the tort of false imprisonment, at common law a claim for false imprisonment requires that a defendant "acts intending to confine the other or a third person within boundaries fixed by the actor," and that "his act directly or indirectly results in such a confinement of the other." Restatement (Second) Torts § 35 (1965). As discussed above (*see* pp. 15-16 *supra*), Mr. Cormick's counterclaims fall far short of alleging that Mr. Christ acted with the knowledge that his conduct would lead inevitably to Mr. Cormick's arrest. As such, Mr. Christ cannot be held liable for false imprisonment. *See* Restatement (Second) Torts § 35 cmt. h ("Under this section the actor is not liable unless his act is done ... with the knowledge that such a confinement will, to a substantial certainty, result from it. It is not enough that the actor realizes or should realize that his actions involve a risk of causing a confinement, so long as the likelihood that it will do so falls short of a substantial certainty."). Moreover, where – as here – the allegedly false imprisonment results from criminal proceedings, a private actor such as Mr. Christ is liable only if he "takes an active part in the service of a warrant issued in the

criminal prosecution which he has instituted." *Id.* § 37 cmt. b.  Mr. Cormick's counterclaims plainly do not allege such a cause of action.

Nor is Mr. Cormick's claim for intentional infliction of emotional distress cognizable at common law.  In order to state a cause of action, Mr. Cormick must establish that Mr. Christ "by extreme and outrageous conduct *intentionally or recklessly* cause[d] severe emotional distress" or "bodily harm."  Restatement (Second) Torts § 46 (emphasis added).  However, like Mr. Cormick's claims for false imprisonment and violation of the ATCA, this claim similarly fails to allege facts showing that Mr. Christ took any actions – intentionally, recklessly or otherwise – that proximately caused harm to Mr. Cormick.  Moreover, a defendant cannot be liable for intentional infliction of emotional distress where the defendant, as Mr. Christ did here, "has done no more than insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress."  *Id.* § 46 cmt. g.  In short, Mr. Cormick's sparse allegations that Mr. Christ "knew or should have known" that, as a result of the political climate in Zimbabwe, his statement to Zimbabwean authorities would have led to Mr. Cormick's arrest and torture fall far short of establishing that Mr. Christ acted with the requisite intent to cause emotional distress.

## III.  MR. CORMICK'S AND ELAN SUISSE'S CLAIMS FOR DEFAMATION SHOULD BE DISMISSED FOR LACK OF ANY COGNIZABLE DAMAGES.

Regardless of whether Mr. Cormick's and Elan Suisse's claims for defamation are analyzed under Delaware or South African law, those parties will be required to prove that they suffered damages as a result of Mr. Christ's alleged conduct.  *See, e.g., Gannett Co., Inc. v. Kanaga*, 750 A.2d 1174, 1192 n.16 (Del. 2000) (Chandler, C., dissenting); *Independent Newspapers Holdings Ltd. v. Suliman*, [2004] ZASCA 57 (South Africa

Supreme Court of Appeal, May 28, 2004). Even accepting their allegations as true, neither Mr. Cormick nor Elan Suisse can establish the requisite damages and, accordingly, their defamation claims should be dismissed.

In his counterclaim, Mr. Cormick alleges that the purportedly defamatory statements on Mr. Christ's Website caused "destruction of personal and professional reputations ... [and] potential future employment possibilities." Counterclaims ¶ 122. *See also id.* ¶ 142 ("The publication of the Defamatory Statements ... destroyed [Mr. Cormick's] ability to practice his profession or earn a living."). However, in June 2005 – months *before* Mr. Christ began publishing the Website – Mr. Cormick, in an effort to avoid paying child support in connection with the divorce from his second wife, stated in a Consent Paper filed in the High Court of Zimbabwe that he "is currently in strained adverse financial circumstances, is currently unemployed and is bereft of any savings or capital such that he is unable to pay any form of maintenance or other financial contribution to the living requirements of the minor children." Ex. C ¶ 4.1.[5] In an affidavit dated August 30, 2006, Mr. Cormick confirmed to the same court that the Consent Paper "correctly stated my financial and proprietary circumstances at the time of my divorce and still correctly reflect my financial and proprietary circumstances and correctly reflect that I am unemployed." Ex. A ¶ 1. Therefore, by Mr. Cormick's own admission, he was destitute, unemployed and had no future prospects *before* Mr. Christ

---

[5] In considering Mr. Christ's motion, the Court properly may take judicial notice of documents filed publicly with the High Court of Zimbabwe. *See Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888, 892 (D. Del. 1991) (court may consider judicially noticed facts of public record without converting motion for judgment on the pleadings under Rule 12(c) into Rule 56 motion for summary judgment).

posted one word to his Website. As such, Mr. Cormick cannot possibly prove that Mr.

Christ's allegedly defamatory postings caused any of the damages for which Mr.

Cormick seeks relief. *See Kanaga*, 750 A.2d at 1188 ("Once liability is established, a

plaintiff seeking recovery of damages in a tort action must establish causation and

consequential damage.").

The same is true with respect to Elan Suisse. On August 13, 2007, Mr. Cormick

filed with the Register of Companies for England and Wales (the equivalent of

Delaware's Secretary of State) an application to "strike off," or dissolve, Elan Suisse.

*See* Ex. D. In this application, Mr. Cormick affirmed that Elan Suisse, in the previous

three months, had not (i) "traded or otherwise carried on business," (ii) "disposed of for

value any property or rights which it would have disposed of for value in the normal

course of trading or carrying on business," or (iii) "engaged in any other activity except

for the purpose of making this application." *Id.* Once Elan Suisse is dissolved, it cannot

maintain its claim against Mr. Christ. *See* Companies Act, 2006, c. 46, § 1012 (U.K.)

(under British law, "[w]hen a company is dissolved, all property and rights whatsoever

vested in or held on trust for the company immediately before its dissolution ... are

deemed to be bona vacantia"). Moreover, the fact that Mr. Cormick has now sought to

dissolve Elan Suisse during the pendency of this litigation demonstrates that Elan Suisse

– a dormant and defunct entity – never suffered any harm and did not possess any valid

claims against Mr. Christ. Accordingly, Mr. Christ is entitled to an award of costs and

fees to reimburse him for his expenses incurred in defending against Elan Suisse's

frivolous and baseless claims (which, as the U.S. District Court for the Eastern District of

Pennsylvania found previously, originally had been brought in the wrong jurisdiction in a

bad faith attempt to avoid this Court's jurisdiction).  *See Chambers v. NASCO, Inc.*, 501

U.S. 32, 45 (1991) (Court's inherent judicial powers authorize it to award attorneys' fees

in "cases where a party has acted in bad faith, vexatiously, wantonly, or for oppressive

reasons").

## IV.    ELAN SUISSE'S CLAIMS UNDER THE LANHAM ACT FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

In its complaint in Civil Action No. 07-60-GMS, Elan Suisse asserts two claims

against Mr. Christ pursuant to Section 43 of the Lanham Act, 15 U.S.C. § 1125.

Specifically, Elan Suisse alleges that Mr. Christ's use of the *www.elansuisse.co.za*

website (1) constitutes unfair competition that is prohibited by 15 U.S.C. § 1125

(a)(1)(A) (*see* Elan Suisse Compl. ¶¶ 20-21), and (2) violates the Anticybersquatting

Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125 (d) (*see id.* ¶¶ 23-24).  For the

reasons discussed below, neither claim has merit.

Section 43(a)(1) of the Lanham Act imposes civil liability upon

> [a]ny person who, on or in connection with any goods or services … uses in commerce any word, term, name, symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, which … is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ….

11 U.S.C. § 1125 (a)(1)(A).  To prevail upon its claim of unfair competition under this

section, Elan Suisse must establish, among other things, that (1) Mr. Christ uses the "Elan

Suisse" name in connection with the sale, offering for sale, distribution or advertising of

goods or services, and (2) Mr. Christ uses the "Elan Suisse" name in a manner that is

likely to confuse consumers.  *Savannah College of Art & Design v. Houeix*, 369 F.

Supp.2d 929, 941 (S.D. Ohio 2004).  The mere use of "Elan Suisse" in the Website's

domain name does not, without more, violate the Lanham Act. *Id.* at 941-42 (citing *Bird v. Parsons*, 289 F.3d 865 (6th Cir. 2002)).

Even the most cursory review of *www.elansuisse.co.za* reveals to anyone viewing the Website that Mr. Christ does not use the Website to sell, distribute or advertise goods or services. Quite clearly, the Website is intended solely to convey information and has no commercial purpose whatsoever. Mr. Christ likewise does not post advertisements on the Website or otherwise promote goods or services for others. As such, there is no basis for any claim against Mr. Christ under the Lanham Act, which is intended "to prevent the defendant from unfairly profiting or capitalizing on the plaintiff's goodwill and established reputation through the unauthorized use of a trademark." *Id.* at 945 (citing *Ameritech, Inc. v. American Information Technologies Corp.*, 811 F.2d 960, 964 (6th Cir. 1987)). Plainly, Mr. Christ's posting of information and commentary concerning Elan Suisse on his Website does not threaten unfair competition or violate the Lanham Act. *See id.* at 942-46 (holding that a former college employee's use of college's trademarked acronym in domain names of web sites criticizing college did not constitute "commercial use" of trademark and, thus, did not violate Lanham Act).

Since Mr. Christ does not utilize the Website for commercial purposes, the Court need not consider whether or not his use of "Elan Suisse" is likely to confuse consumers. *See Taubman Co. v. Webfeats*, 319 F.3d 770, 774 (6th Cir. 2003) ("If [the defendant's] use is commercial, then, and only then, do we analyze his use for a likelihood of confusion."). Nonetheless, there can be no question that any Internet user who views Mr. Christ's Website will know almost immediately that it is not sponsored by or affiliated with Elan Suisse. The Website explains clearly that it is not affiliated with Elan Suisse

and its highly critical content leaves no doubt that it is not intended to capitalize on the "Elan Suisse" name or create consumer confusion. As such, Elan Suisse's claim of unfair competition is wholly devoid of any merit. *See Savannah College*, 369 F. Supp.2d at 951 (finding no likelihood of confusion where "[a] reasonable internet user would know by perusing the content of [defendant's website] that [plaintiff] is not the source of the information contained therein").

Elan Suisse's claim under the ACPA is similarly deficient. The ACPA was enacted to prevent "the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark." *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 810 (6th Cir. 2004). Accordingly, the use of a trademark in the domain name for a website used for non-commercial purposes such as comment, criticism and parody are "beyond the scope" of the ACPA. *Lamparello v. Falwell*, 420 F.3d 309, 318-19 (4th Cir. 2005) (quoting S. Rep. No. 106-140, 1999 WL 594571, at *9). As discussed above, any use of "Elan Suisse" in the Website is for non-commercial purposes and, accordingly, cannot form the basis for any claim under the ACPA.

In addition, there can no liability under the ACPA unless the defendant registers a domain name using a trademark with "a bad faith intent to profit from [the] mark." 15 U.S.C. § 1125 (d)(1)(A)(i). The statute further provides nine factors to consider in determining whether a person has such a "bad faith intent," including "the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name." *Id.* § 1125(d)(1)(B)(i)(IV). The Website itself makes clear that Mr. Christ registered and uses the *www.elansuisse.co.za* domain not to profit from the "Elan Suisse" name or sell

- 23 -

the domain name to Elan Suisse, but rather to disseminate information concerning Elan Suisse and Mr. Cormick.  Therefore, Elan Suisse cannot demonstrate the "bad faith intent" required under the ACPA and its claim must be dismissed.  *See Lucas Nursery*, 359 F.3d at 810 (finding no bad faith under ACPA where corporation's former customer created website detailing customer's complaints about corporation's service); *Mayflower Transit, LLC v. Prince*, 314 F. Supp.2d 362, 368-72 (D.N.J. 2004) (disgruntled customer's "gripe site" did not establish bad faith required by ACPA because defendant's motive was unhappiness with plaintiff's service, not intent to register domain names for sale to trademark holders).

## **CONCLUSION**

For the foregoing reasons, Mr. Christ respectfully requests that the Court enter

judgment in his favor and dismiss in their entirety all claims alleged in Civil Action No.

07-60-GMS and Counts I, II, III and IV of the counterclaims alleged in Civil Action No.

06-275-GMS.

REED SMITH LLP


/s/ Thad J. Bracegirdle
Thad J. Bracegirdle (No. 3691)
1201 Market Street
Suite 1500
Wilmington, Delaware 19801
(302) 778-7500

Attorneys for Robert D. Christ

Dated:  October 16, 2007

# EXHIBIT A

34

IN THE HIGH COURT OF ZIMBABWE

HELD AT HARARE

in the matter between:

JENNIFER ANNE CORMICK                    **Applicant**

and

BRETT JOHN CORMICK                       **Respondent**

---

### RESPONDENT'S OPPOSING AFFIDAVIT

---

I, **BRETT JOHN CORMICK**, the abovementioned Respondent, do hereby make oath and state that I have read the founding affidavit of the Applicant in this matter and I wish to respond thereto as follows:

1.   At the outset I state clearly and categorically that my circumstances as pertained on the date of the divorce, 24th November 2005, have not changed in any material way other than that I owe significantly more money to dear friends who had made loans to me to facilitate the access between my children and myself, and to enhance the quality and enjoyment of such access between us.

   At the time of the divorce it is true, and this is well known to my former wife, that I was unemployed.

   I am still unemployed and I verily believe that my former wife is fully aware of that fact.

   Furthermore I currently do not earn income, I have no savings either in Zimbabwe, or England, or indeed any other part of the world and I do not have any fixed or regular place of residence either in Zimbabwe or in any other part of the world.

   In other words the provisions of subparagraph 4.1 of annexure "A" to Applicant's founding affidavit, being the Consent Paper, correctly stated my financial and proprietary circumstances at the time of my divorce and still correctly reflect my financial and proprietary circumstances and correctly reflect that I am unemployed.

2.   **Ad Paragraphs 1 – 4**

   No issues arise within these paragraphs.

.....2

-2-

3.      **Ad Paragraphs 5 and 6**

3.1     It is correct that the children were with me on holiday as stated in these paragraphs, the bulk of the time being spent sight seeing, skiing and generally enjoying time together at the destinations stated.

The "shopping and going to shows" was insignificant by comparison.

3.2     As I believe my former wife is fully aware, the travel, shows, shopping and accommodation was all provided for me and the children by concerned friends, much of the accommodation and travel being donated although, again as my former wife is aware, I did also need to borrow some of the funds necessary to enable me to take the children on what I understand from their perspective to have been a very much enjoyed and beneficial holiday for them.

4.      **Ad Paragraphs 7, 8 and 9**

4.1     I fully understand the apparent inconsistency adverted to by the Applicant but the fact is that, as indicated above, some of the accommodation and travel was donated and some of it was loaned to me by friends.

4.2     I am not at liberty to divulge the identities of the friends whose generosity and concern for myself and my relationship with my children, and of course their relationship with me, has enabled these holidays, and would, in any event, find it distasteful to have to do so.

I firmly believe, in any event, that my former wife is aware firstly that I have no employment, secondly that I do not have fixed and regular accommodation and thirdly that I have had to borrow not only for the holiday but indeed for other aspects of my daily living.

4.3     As far as the aspect raised in paragraph 9 of the Applicant's affidavit is concerned, it would obviously be anomalous and most unusual for one or more of my friends to commit themselves to a regular monthly maintenance programme for my children in circumstances where my inability to obtain employment arises almost entirely in consequence of my name effectively being "black listed" arising from false and seriously defamatory allegations made against me on an internet site by my former wife and by seriously adverse stories she has circulated within the financial and economic community in which I hitherto operated.          ...../3

-3-

It is one thing to lend or donate accommodation and/or travel for children to enjoy a carefree, beneficial and enriching holiday experience with their father and quite another to commit to regular monthly payments to be remitted externally for obligations to be met by the parents of those children to the extent that they are able financially to do so.

5.   **Ad Paragraph 10**

Whilst the children did enjoy the holiday with their father in England over the periods stated and during which time we were accommodated at an apartment owned by a dear friend of mine, I certainly would not describe the holiday as "luxurious".

Again I believe my children enjoyed the holiday and the "bonding" between themselves and their father.

6.   **Ad Paragraph 11**

I attach hereto, marked annexure "OA1" a copy of the letter addressed by my legal practitioners, Atherstone & Cook, to Gill, Godlonton & Gerrans dated 27th June and which is mentioned by the Applicant in this paragraph.

The contents thereof vis-à-vis my personal circumstances and indeed concerns are true and correct in every particular.

7.   **Ad Paragraph 12**

As I have indicated above in paragraph 4, through my friends I have had access to accommodation which in some instances on a general basis I can occupy together with my children at no cost, and in other instances I have access to accommodation provided by friends for the specific purpose of a father and his children enjoying a holiday together in circumstances where I have very little other opportunity than school holiday periods to see the children.

The donated and/or loaned accommodation, monies and travel are for the specific purpose of such holiday times on a "one off" basis on each occasion.

......./4

-4-

Much of what is provided in the way of accommodation and travel can be furnished by my friends at no actual monetary outlay by them where, for example, the accommodation is owned by them and much of the travel tickets are allocated to them at no cost and simply then donated to me for myself and the children.

8.  **Ad Paragraph 13**

This is correct and on each occasion the trips were facilitated by the donation to me of "travel miles" accrued by a friend of mine thereby obviating any financial outlay.

9.  **Ad Paragraph 14**

I fully accept the obligation on the part of both parents to provide for their children's upbringing and daily living costs.

It is correct that in consequence of my circumstances as pertained at the date of divorce and as continue to pertain I am not financially in a position to contribute.

I have tried to obtain employment in England and I annex hereto, marked annexures "OA2 and OA3" respectively examples of the occupations for which I have applied, thus far with no success whatsoever.

My efforts in that field continue, but, as I have indicated briefly in this opposing affidavit and as appears in annexure "G" attached to Applicant's founding affidavit, the Applicant's defamatory and false allegations against me have undoubtedly very adversely affected my ability to obtain employment in any meaningful capacity.

Clearly my friends will not be regularly using their own monies to send to Zimbabwe to pay for the living costs of my children.

Their concern is for a meaningful and beneficial paternal relationship between father and children and to that extent their generosity and kindness and concern in facilitating such will always be hugely appreciated and admired.

My hope is that I will, in time, be able to repay that kindness and generosity, and indeed some of the loans that I have taken as well and which were only made on the strict understanding of being applied for the purposes referred to herein.

......./5

38

-5-

10. **Ad Paragraph 15**

I have noted what is reflected on annexure "N", but do not admit the content thereof and put the Applicant to the proof thereof.

I am aware that it is expensive to live in Zimbabwe, but the numbers reflected on annexure "N" appear to represent to me a very expensive lifestyle.

11. **Ad Paragraph 16**

It is clear that I am utterly unable to make a contribution in regard to any of the aspects reflected in this paragraph for reasons which are self evident by reference to what has been stated above in this affidavit.

I am satisfied that my former wife is well aware that I am unable to make a contribution as sought by her and that this application is simply an unfair and spiteful way of trying to adversely affect my relationship with my children.

In the event that this Honourable Court should make an order against me to make a contribution in regard to any of the sub-heads in this paragraph the only effect will be, by reference to the relief sought by my former wife, that I will not be able to enjoy access to my children in any country other than Zimbabwe and the children, therefore, will no longer benefit from the enjoyable and beneficial holidays that I have enjoyed with them hitherto.

It does seem to me that this would be unfair on the children.

It is clear, in any event, that the Applicant's entire case in this matter is based upon an inference of inconsistency (ie the holidays that I and the children have enjoyed since the divorce are inconsistent with my being unemployed and not in a position to contribute financially to the children's education and other living costs) – all of which is, of course, explained in the body of this affidavit.

Furthermore of course, it is illogical and invalid legally to make access conditional upon payment of maintenance.

12. The financial and proprietary circumstances of the Applicant are vastly superior to my own, and to my knowledge she has significant assets and of course a regular monthly income from her employment in Mutare where, to the best of my belief, she works in her brother's agricultural and farming supplies business.

......./6

-6-

She occupies a large 4 bedroomed home with the children, and which is, I understand, well appointed and includes a swimming pool.

She drives a twincab motor vehicle, having kept this particular vehicle as well as all the household furniture and contents as part of her proprietary award upon her divorce from me.

13. I am currently temporarily resident in Zimbabwe partly to enjoy a period of access with the children.

My circumstances are such that I am staying with a good friend, Mr Richard Crook, who is a school headmaster, in a cottage to which he has access, and my food, shelter and other living requirements are to a large extent funded by him.

I have no vehicle of my own but have managed to borrow an old vehicle from another local friend.

Whilst this will not take me very far out of Harare, it does get me from A to B within the city as and when I do travel within Harare from time to time.

My worldly possessions effectively comprise the contents of my 2 suitcases that I arrived with in Zimbabwe from England recently in order to visit my children.

I attach hereto, marked annexure "OA4" an affidavit by Mr Crook the contents of which are self explanatory.

14. On the morning of Wednesday 23rd August I was arrested by officers from the CID Fraud Squad on false allegations allegedly emanating from a Mr Christ in America that I am wanted by Interpol, that I am a fraudster and that I have wrongfully externalised foreign currency from Zimbabwe,

I was interrogated extensively, and held in police custody for a period of 60 hours until being released without charge late on Friday evening 25th August, though the police still hold my passport.

I have been strongly advised by the legal practitioner acting on my behalf in regard to my arrest and detention that it would be unwise, certainly for the foreseeable future, for me to remain in Zimbabwe any longer than necessary as it seems from information disclosed to him that whilst the heat is off for now, the matter may not yet be dead and buried. I am not guilty of any criminality, and I envisage that my passport will be returned imminently to me.

......./7

-7-

I respectfully submit that this Honourable Court can take judicial notice of the fact of many persons in Zimbabwe being arrested over the last 5 years or so, lingering in custody ...... ..........and ultimately not being brought to trial on any charge.

There is also the fairly recent example of some top bankers fleeing imminent arrest and incarceration in Zimbabwe who have now seemingly been advised that there is no case against them so they can safely return.

I certainly do not want to remain in Zimbabwe indefinitely in circumstances where I may be at risk of further arrest and detention whilst the investigation authorities then proceed on an extended, and what will ultimately proved to be futile, fishing expedition, as such a result would be devastating not only to me but also to my children.

Consequently, should this Honourable Court make an order as sought by the Applicant in this proceeding, the children would, effectively, be deprived of access to their father entirely whilst I were not resident in or realistically able and willing to travel to Zimbabwe for a visit.

15. I conclude this opposing affidavit by reiterating that my financial and proprietary and personal circumstances have only changed for the worse since the grant of the divorce and I believe my former wife is aware of this.

I have no source of regular income either in Zimbabwe or elsewhere and I do not have any liquid savings or monies available to me nor any assets of any substance other than my personal possessions.

I would certainly not be able, therefore, to contribute any of the requirements set out in paragraph 16 of the Applicant's affidavit and in the event that this Honourable Court made an order in terms of the Draft Order attached to the Applicant's papers I would not be able to implement that Order and the persons who would be disadvantaged to the greatest extent in consequence thereof would inevitably be the children.

It is a matter of great regret to me that I am not in a position to contribute substantively to the children's living costs at present, and as and when my circumstances financially may change so as to permit me to make meaningful contributions I will certainly be very glad to be able to do that.

......./8

-8-

16. In the premises, I respectfully pray for an order dismissing with costs the Applicant's claim.


SWORN at HARARE this 30th day of AUGUST 2006

...................................................

**B. J. CORMICK**

Before me:

...................................................

**COMMISSIONER OF OATHS**

P.W.R. WOODS
COMMISSIONER OF OATHS

# EXHIBIT B

# FAX

## Cover Sheet

**To:** Raphael Tsivama

**From:** Bob Christ

**Date:** September 6, 2006

**Receiving Fax #:** + 263 4 792 246

**# Of Pages Including Cover Sheet:** 4

**Re:** Brett John Cormick

**Comments:** Please call or e-mail with any comments.

## Confidentiality Statement

The information contained in this electronic message is confidential information intended only for the use of the owner of the email address listed as the recipient of this message. If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately notify us by telephone at (985) 419-9318 and return the original message to us at Capital Consultants, Inc. P.O. Box 518/ Hammond, LA 70401 via the United States Postal Service.

******** -9E01914S86    - **** -    IOO - ****************************************** **
-CAPITAL-CONSULTANTS-INC. -

13:10:00 00/004    9465294753110 ☎    XO    100
DURATION    PAGES    COMM. STATION NAME TEL. NO.    COMM.    STN NO.

FILE NO.=878

END=SEP-06 13:29    START=SEP-06 13:23    MODE = MEMORY TRANSMISSION

**********    ***********    TIME 13:23  2006-90-SEP ETAD ******************    -JOURNAL. COMM- ***********

RDC 18266
CONFIDENTIAL

## AFFIDAVIT

I, the undersigned,

## ROBERT DOUGLAS CHRIST

do hereby make oath and say that:-

1.     I am the Deponent to the Affidavit in this matter.

2.     The facts and allegations herein contained, unless the context indicates otherwise, are within my own personal knowledge and belief and are true and correct.

3.     In February 2004, Brett John Cormick requested that I wire to his personal bank account in the UK US$250 000.00 in order to fund a business venture through his companies, Elan Suisse International Holdings LLC and Elan Suisse (Private) Limited with business interests in the United States, South Africa and also Zimbabwe where he claimed to have acquired invaluable experience and expertise in the banking or financial services field.  He claimed that there were even plans to make it a worldwide investment and it is on this understanding that I wired the money as per his instructions from Zimbabwe. He has admitted repeatedly to having received these funds from me into his personal bank account and has never denied receiving same. Therefore, the fact that I wired to him US$250 000 on his instructions to his personal account in the UK is not in question. Attached to this affidavit are his wiring instructions to me and which I have since established were sent from Zimbabwe.

4.     I wired to Cormick these funds based upon his gross misrepresentations to fund a sham business. These funds instead of being used to fund a business venture, were used personally to fund his extravagant lifestyle. To the best of my

2

knowledge there was never any anticipated business venture nor was there any agreement as to the personal application of these funds. For instance although there is a registered company in Zimbabwe called Elan Suisse it has no links with the accused; Elan Suisse has no meaningful assets both in South Africa and the United States despite my so called investment and there is nothing to suggest that my money was used for the purported business venture. Before the accused went into hiding in Zimbabwe, I demanded from him that he account for the money I had paid - but he refused. Instead, he purported to deliver some worthless share certificates in terms of which I was supposed to have acquired 36% of a shelf company he had caused to be formed in the United States. Cormick's intention from the beginning was to fraudulently entice me into sending him funds then to use the lack of personal jurisdiction within the international court system (he has stated at various times during this investigation to live in the UK, in Gauteng near Johannesburg, in Hermanus near Cape Town and in Zimbabwe) in order to avoid ever having to be drawn into court for return of my money. He has used Zimbabwe as a refuge from which to base his numerous scams and this has been confirmed through inquiries with M-Web, an internet Service Provider in Zimbabwe. The accused is permanently resident in Zimbabwe where his children and ex-wife also reside.

5.    I forwarded to Brett Cormick US$250,000 to start an international business. Once Cormick received the funds, he offered to deliver to me 36% of an empty Delware shell corporation which he claimed was in possession of some "Valuable Intellectual Property" [which is rubbish]. He is now taking refuge in Zimbabwe, but is deliberately of no fixed abode to make it almost impossible to locate him. He is currently staying with a friend at Bishopslea School in Belvedere where he keeps a very low profile. His children now reside with his ex-wife in Mutare and this makes it easy for him to move without leaving a trail behind him.

Brett John Cormick has eluded the law in Europe, RSA and the USA and is currently in Zimbabwe. His defence so far has been that he is Australian born and permanently resident in Zimbabwe such that Europe or South Africa or the US would have no jurisdiction to deal with him. I place this criminal complaint



RDC 18268
CONFIDENTIAL

3

with the Zimbabwean Police since Cormick is a Zimbabwe resident and was in Zimbabwe when he caused me to wire the money into his personal bank account in the United Kingdom and is obviously living off some of my money whilst in Zimbabwe since he is not gainfully employed.

I submit that the accused should be brought to justice and ordered to restitute me for the loss I have suffered. I place this criminal complaint with the Zimbabwean Police since Cormick is reported to be a Zimbabwean resident.

SWORN TO AT HAMMOND, LOUISANA USA this 6th day of September 2006.

ROBERT DOUGLAS CHRIST, COMPLAINTANT

Before me

NOTARY PUBLIC

# EXHIBIT C

Annexure "B"



CASE NO HC4924/2005

IN THE HIGH COURT OF ZIMBABWE

HELD AT HARARE

in the matter between:

**BRETT CORMICK**                                    **Plaintiff**

and

**JENNIFER ANNE CORMICK**                     **Defendant**

## CONSENT PAPER

**WHEREAS:**

A.    The parties are spouses married to each other and from which union there are 3 minor children;

B.    The marriage relationship subsisting between the parties has irretrievably broken down and the parties agree that there is no prospect of a reconciliation and that they should become divorced from one another;

C.    The Plaintiff intends to institute proceedings against the Defendant claiming a decree of divorce and certain ancillary relief, all of which ancillary relief has been agreed between the parties;

D.    The parties wish to record the terms of the agreement in regard to ancillary relief.


**NOW THEREFORE THE AGREEMENT IS RECORDED AS FOLLOWS:**

1.    **DIVORCE**

Plaintiff will institute proceedings against Defendant claiming a decree of divorce and, subject to the terms of this Consent Paper being incorporated within such order of divorce as this Honourable Court may grant, Defendant will not oppose Plaintiff's claim.


2.    **CUSTODY**

Defendant shall be custodian of the 3 minor children, namely

        Jordan Grace Cormick (born on 11 October 1992);

        Joshua John Cormick (born on 2 February 1996);

        Jessica Jane Cormick (born on 7 September 2000).                ......./2

Case 1:06-cv-00275-GMS    Document 61-6    Filed 10/16/2007    Page 3 of 4

-2-

3.  **ACCESS**

3.1  Plaintiff shall be entitled to exercise access at all reasonable times to the minor children, such access entitlement to include the following:

(a)  All school holidays save that the Christmas school holiday shall be equally shared by the parties, (that is to say that in one year Plaintiff will have the first half of the Christmas school holiday period encompassing the Christmas and Boxing Day holiday, and Defendant will have the second half of that period, encompassing New Year's day, and the following year Defendant will have the first half aforesaid and Plaintiff the second half aforesaid, and so on thereafter from year to year).

For the year 2005, Plaintiff will have the first half of the Christmas school holiday period and Defendant the second half.

(b)  All school exeat weekends, and alternate ordinary weekends;

(c)  Alternate public holidays (subject to subparagraph (b) supra;

(d)  Alternative birthdays (where, as may be necessary, the parties agree to re-arrange their weekend entitlement so as to procure that each will have the children on alternate birthdays);

(e)  Such additional access as the parties may, by mutually convenient arrangement, agree;

(f)  The entitlement to telephone/email the children, in the case of the former at pre-arranged times.

3.2  Plaintiff shall be entitled to determine, in his sole discretion, subject to mutually convenient arrangements being made with Defendant, where he and the children will enjoy their access periods.

3.3  The parties acknowledge the benefit to the children of a meaningful and regular paternal access arrangement, in order to foster and nurture an ongoing substantive paternal relationship, and both parties undertake to use their best endeavours to encourage and implement such paternal access regime.

4.  **MAINTENANCE**

4.1  The parties record that Plaintiff is currently in strained adverse financial circumstances, is currently unemployed and is bereft of any savings or capital such that he is unable to pay any form of maintenance or other financial contribution to the living requirements of the minor children;    ......./3

-3-

4.2  The parties further record, and Plaintiff formally undertakes, that as and when Plaintiff's circumstances materially improve, and in any event when he secures meaningfully remunerative employment, Plaintiff shall pay monthly maintenance to Defendant, for the minor children, to the fullest extent that he is financially able subject to the requirements of the children.

5.  **PROPERTY**

Defendant shall retain, as her sole and exclusive property, all the household contents, fixtures, fittings and effects and any other marital assets in her possession as at the date of the divorce provided that, by prior mutually satisfactory arrangement, Plaintiff shall be able to collect or accept delivery from Defendant of such of his personal items as are possessed by Defendant at the date of the divorce.

6.  **LEGAL COSTS**

Each party hereto will bear their respective legal costs incurred with their respective legal practitioners.

SIGNED by PLAINTIFF at                    REPUBLIC OF SOUTH AFRICA on this

day of JUNE 2005

AS WITNESSES:

1.

2.

**B. CORMICK**

SIGNED by DEFENDANT at HARARE, ZIMBABWE, this        day of JUNE 2005

AS WITNESSES:

1.

2.

**J. A. CORMICK**

# EXHIBIT D

000707/40



**Companies House**
*— for the record —*

# 652a

## Application for striking off

*Please complete in typescript,*
*or in bold black capitals*
CHWP000

**Company Number** 499 8672

**Company Name In Full** ELAN SUISSE LTD

I/We as DIRECTOR(S) apply for this company to be struck off the register

In the past three months the company has not

**WARNING TO ALL APPLICANTS**

IT IS AN OFFENCE KNOWINGLY OR RECKLESSLY TO PROVIDE FALSE OR MISLEADING INFORMATION ON THIS APPLICATION YOU ARE ADVISED TO READ THE NOTES OVERLEAF AND TO CONSULT THE GUIDANCE NOTES AVAILABLE FROM COMPANIES HOUSE BEFORE COMPLETING THIS FORM IF IN DOUBT SEEK PROFESSIONAL ADVICE

- traded or otherwise carried on business, or changed its name,
- disposed of for value any property or rights which it would have disposed of for value in the normal course of trading or carrying on business, or
- engaged in any other activity except for the purpose of making this application, settling its affairs or meeting a statutory requirement

This company is not the subject of, nor the proposed subject of, insolvency proceedings or a section 425 scheme

I/We enclose the fee of £10 (made payable to Companies House)

Director signatures (use continuation sheet if necessary)

**WARNING TO ALL INTERESTED PARTIES**

THIS IS AN IMPORTANT NOTICE AND SHOULD NOT BE IGNORED THE COMPANY NAMED HAS APPLIED TO THE REGISTRAR TO BE STRUCK OFF THE REGISTER AND DISSOLVED ON DISSOLUTION ANY REMAINING ASSETS WILL PASS TO THE CROWN THE REGISTRAR WILL STRIKE THE COMPANY OFF THE REGISTER UNLESS HE HAS REASONABLE CAUSE NOT TO DO SO GUIDANCE NOTES ARE AVAILABLE ON GROUNDS FOR OBJECTION IF IN DOUBT SEEK PROFESSIONAL ADVICE

Name of Director: DR BRETT CORMICK

Signed: *[signature]*  Date: 13 AUG 2007

Name of Director:

Signed:   Date:

Name of Director:

Signed:   Date:

You do not have to give any contact information in the box opposite but if you do, it will help Companies House to contact you if there is a query on the form The contact information that you give will be

Tel
DX number        DX exchange

When you have signed the form send it with the fee to the Registrar of Companies at

Companies House, Crown Way, Cardiff, CF14 3UZ    DX 33050 Cardiff
for companies registered in England and Wales
or
Companies House, 37 Castle Terrace Edinburgh, EH1 2EB
for companies registered in Scotland         DX 235 Edinburgh
                                              or LP - 4 Edinburgh 2

# EXHIBIT E



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
**(Cite as: 2006 WL 2455752 (N.D.Cal.))**

Page 1

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
Larry BOWOTO, et al., Plaintiffs,
v.
CHEVRON CORP., et al., Defendants.
No. C 99-02506 SI.

Aug. 22, 2006.

Michael S. Sorgen, Joshua Nathan Sondheimer, Law Offices of Michael Sorgen, Cindy Ann Cohn, Electronic Frontier Foundation, San Francisco, CA, Anne K. Richardson, Lauren Teukolsky, Hadsell & Stormer, Inc., Barbara Enloe Hadsell, Patrick Mark Dunlevy, Law Office of Hadsell & Stormer, Inc, Bert Voorhees, Jocelyn Sperling, Theresa M. Traber, Esq., Traber & Voorhees, Pasadena, CA, Jennifer M. Green, New York, NY, Jose Luis Fuentes, Siegel & Yee, Oakland, CA, Judith Brown Chomsky, Law Offices of Judith Brown Chomsky, Elkins Park, PA, Marco Simons, Richard Lawrence Herz, Earthrights International, Washington, DC, Robert Dexter Newman, Law Office of Robert D. Newman, Los Angeles, CA, for Plaintiffs.

Caroline N. Mitchell, Robert A. Mittelstaedt, Adam Richard Sand, Esq., David L. Wallach, Elaine Wallace, Katherine S. Ritchey, Natausha A. Wilson, Jones Day, Eric Danoff, Emard Danoff Port Tamulski & Paetzold LLP, Jordan Cunningham, Martha A. Boersch, San Francisco, CA, David M. Bays, Huston, TX, Joseph P. Shereda, Chicago, IL, Lucas W. Andrews, Atlanta, GA, for Defendants.

**ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS**

SUSAN ILLSTON, District Judge.

**\*1** On March 24, 2006, the Court heard argument on defendants' motion to dismiss plaintiffs' claims under the Torture Victim Protection Act, 28 U.S.C. § 1350, note ("TVPA"), and the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"). Having considered the arguments of counsel and the papers submitted, and for good cause appearing, the Court hereby GRANTS IN PART defendants' motion.

**BACKGROUND**

Defendant Chevron Corporation ("Chevron") is a corporation organized under the laws of Delaware and headquartered in San Francisco, California. [FN1] Seventh Am. Compl., ¶ 28. Through its wholly owned subsidiary, defendant Chevron Investments, Inc., Chevron owns a Nigerian subsidiary, Chevron Nigeria Limited ("CNL"). *Id.* at ¶ 29. CNL operates a joint venture with the Nigerian National Petroleum Company, an entity owned by the Nigerian government, to exploit oil and gas reserves in the Niger delta region of Nigeria. *Id.* at ¶ 28. In connection with this joint venture, CNL hires Nigerian government security forces to protect its installations. *Id.* at ¶ 40. One such installation was the "Parabe platform," an oil platform located off the coast of Nigeria. *Id.* at ¶ 47.

> FN1. Because this is a motion to dismiss, the factual allegations from plaintiffs' complaint are taken as true and are construed in the light most favorable to the nonmoving party. *Watson v. Weeks,* 436 F.3d 1152, 1157 (9th Cir.2006).

On May 25, 1998, approximately 100 residents of nearby communities traveled to the Parabe platform to protest the environmental impact of Chevron's oil operations. *Id.* After the protesters had occupied the platform for two days, Chevron contacted the Nigerian military and requested that it intervene. *Id.* at ¶ ¶ 50-51. Chevron provided helicopters to transport its own security personnel and Nigerian government security forces to the platform. *Id.* When the security forces reached the platform, they began firing on the protestors, killing two and injuring others. *Id.* at ¶ 52. After the forces secured the platform, they seized a number of the protestors. *Id.* at 54. The complaint alleges that the security forces later tortured Bola Oyinbo by hanging him by his wrists from a ceiling fan. *Id.*

Approximately seven months after this incident, on January 4, 1999, Nigerian military forces attacked two small communities in the Niger delta located near Chevron's oil and gas operations. *Id.* at ¶ 56. The complaint alleges that Chevron provided the military forces with helicopters, sea trucks, pilots and other crew members that were used in the attacks. *Id.* at ¶ 57. At least four people were killed in the attacks, and the villages were burnt to the ground. *Id.*

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
**(Cite as: 2006 WL 2455752 (N.D.Cal.))**

Page 2

at ¶¶ 56, 60-64.

On May 27, 1999, individuals injured or killed in the incidents described above filed this lawsuit, seeking to hold Chevron liable for the actions of CNL and the Nigerian military. The original complaint included causes of action under the ATS for numerous violations of international law, including summary execution, crimes against humanity, and torture. [FN2] In 2001, Chevron moved to dismiss plaintiffs' second amended complaint, based in part on its assertion that it could not be held liable under the ATS for the international law violations that plaintiffs alleged. Then-presiding Judge Legge denied the motion. He found that the international law violations at issue only applied to official conduct, but that plaintiffs had adequately alleged that Chevron acted under color of law, and that it could therefore be held liable for the violations. Based on the Supreme Court's decision in *Sosa v. Alvarez-Machain,* 542 U.S. 692 (2004), defendants now request that the Court revisit this holding. [FN3]

> FN2. The complete list of plaintiffs' ATS claims now includes: summary execution; crimes against humanity; torture; cruel, inhuman, or degrading treatment; violation of the rights to life, liberty and security of person and peaceful assembly and association; and consistent pattern of gross violations of human rights.

> FN3. Chevron's prior argument was somewhat different from the argument presented here. Before Judge Legge, Chevron characterized plaintiffs' ATS claims as "excessive force" claims, and argued that there was no universally accepted international norm that prohibited the use of excessive force by government security personnel. Here, in contrast, defendants accept the characterization of plaintiffs' ATS claims as claims for torture and summary execution, but argue that they may not be held liable under a color of law analysis.

*2 Defendants move to dismiss plaintiffs' claims under the TVPA and ATS. This Court has already decided that plaintiffs' TVPA claims are barred because the TVPA applies only to natural persons, not corporations. Accordingly, the Court considers only whether plaintiffs' ATS claims must be dismissed.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). In answering this question, "[a]ll allegations of material fact in the complaint are taken as true and construed in the light most favorable to the plaintiff." *McGary v. City of Portland,* 386 F.3d 1259, 1261 (9th Cir.2004). "Dismissal of the complaint is appropriate only if it appears beyond doubt that the claimant can prove no set of facts in support of the claim which would entitle him to relief." *ARC Ecology v. United States Dept. of the Air Force,* 411 F.3d 1092, 1096 (9th Cir.2005).

## DISCUSSION [FN4]

> FN4. Plaintiffs have moved to strike portions of the declaration of David Wallach, arguing that the declaration provides factual evidence that is inappropriate on a motion to dismiss. Defendants oppose this request, but acknowledge that their motion does not rely on the factual evidence in any way. Thus, the Court GRANTS plaintiffs' motion to strike and will not consider Exhibits 1, 2, 4-10, 14, and 26-34 of Wallach's declaration. Defendants have requested that the Court take judicial notice of *amicus* briefs filed by the United States government in cases involving the ATS. The Court GRANTS that request.

The ATS gives aliens a federal cause of action for violations of international law. *See Kadic,* 70 F.3d 232, 238 (2d Cir.1995) ("[The ATS] confers federal subject-matter jurisdiction when the following three conditions are satisfied: (1) an alien sues (2) for a tort (3) committed in violation of the law of nations (i.e., international law)."). Not all violations of international law are actionable under the ATS, however; in order to state a claim under the ATS, a party must allege a violation of a definite and accepted norm of international law. *See Sosa v. Alvarez-Machain,* 542 U.S. 692, 732, 738, 124 S.Ct. 2739 (2004) ("[W]e are persuaded that federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                          Page 3
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
**(Cite as: 2006 WL 2455752 (N.D.Cal.))**

familiar when § 1350 was enacted."); *see also Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 781 (D.C.Cir.1984) (Edwards, J., concurring). Thus, courts have rejected claims brought under the ATS involving allegations that a defendant violated such norms as "right to life," "right to health," or "intranational pollution." *See Flores v. S. Peru Copper Corp.,* 414 F.3d 233, 254-65 (2d Cir.2003); *see also Sosa,* 542 U.S. at 735-38 (finding that arbitrary arrest and detention was not an actionable international norm). Courts have recognized causes of action under the ATS, however, for "definite and accepted" violations of international law such as genocide and war crimes. *See, e.g., Kadic,* 70 F.3d at 241-43.

In addition to the requirement that an ATS suit must be based on a sufficiently well-defined norm of international law, parties suing under the ATS must also bring their suit against a proper defendant. *See Sosa,* 542 U.S. at 732 n. 20 ("A related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual."). Indeed, because of the peculiar underpinnings of international law, who an ATS claim may be brought against is almost as important a question as what international norm the claim is based on. Customary international law has historically only applied to states, *see Kadic,* 70 F.3d at 240, but over the past half century it has evolved to place liability on private parties for violations of the most serious international norms. *See id.* at 241-244. These extensions cover such crimes as slave trading, war crimes, and genocide. *Id.* at 239 ("[W]e hold that certain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals."); *Tel-Oren,* 726 F.2d at 795 (Edwards, J., concurring) (stating that there exists a "handful of crimes to which the law of nations attributes individual responsibility"); *see also Restatement (Third) of Foreign Relations § 404* (identifying "certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism").

**\*3** With these principles in mind, the Court turns to the specific violations of international law that plaintiffs have alleged: crimes against humanity; summary execution; torture; cruel, inhuman, or degrading treatment; violation of the rights to life, liberty, and security of person and peaceful assembly and association; and consistent pattern of gross violations of human rights.

**I. Crimes Against Humanity**

The only international law norm included in plaintiffs' complaint that is applicable to private actors is crimes against humanity. [FN5] *See Kadic,* 70 F.3d at 236 ("[W]e hold that ... Karadzic may be found liable for genocide, war crimes, and crimes against humanity in his private capacity."); *see also United States v. Yousef,* 327 F.3d 56, 105 & n. 40 (2d Cir.2003) ("Following the Second World War, the United States and other nations recognized 'war crimes' and 'crimes against humanity,' including 'genocide,' as crimes for which international law permits the exercise of universal jurisdiction."); *Flores,* 414 F.3d 233, 244 n. 18 ("Customary international law rules proscribing crimes against humanity, including genocide, and war crimes, have been enforceable against individuals since World War II."). Plaintiffs allege that the crimes against humanity here were committed by the Nigerian military, but argue that defendants may be held liable under a number of theories of indirect liability.

> FN5. Neither party has provided the Court with the definition of "crimes against humanity," although other courts have found that such a cause of action requires proof of "a widespread or systematic attack directed against any civilian population." *See Cabello v. Fernandez-Larios,* 402 F.3d 1148, 1161 (11th Cir.2005); *see also Aldana v. Del Monte Fresh Produce, N.A., Inc.,* 416 F.3d 1242, 1247 (11th Cir.2005); Statute of the International Tribunal for Rwanda (adopted November 8, 1994, by United Nations Resolution 955) ("The International Tribunal for Rwanda shall have the power to prosecute persons responsible for [crimes including murder, enslavement, deportation, imprisonment, torture, and rape] when committed as part of a widespread or systematic attack against any civilian population on national, political, ethnic, racial or religious grounds."). *But see* Statute of the International Criminal Tribunal for the Former Yugoslavia (adopted May 25, 1993, by United Nations Resolution 827) (no "widespread or systematic" requirement, but requiring crimes to be committed "in armed conflict"). While the Court questions whether plaintiffs' complaint alleges a "widespread and systematic attack" by the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
(Cite as: 2006 WL 2455752 (N.D.Cal.))

Page 4

Nigerian military, defendants have not provided any argument on the subject and have therefore failed to meet their burden.

Defendants challenge plaintiffs' ability to impose liability based upon an aiding and abetting theory, arguing that they may not be held liable under an aiding and abetting theory because such liability is not available under customary international law. [FN6] The Court disagrees. Since the early days of this country, courts have recognized that private individuals may be held liable for aiding and abetting violations of international law. *See Breach of Neutrality,* 1 Op. Att'y Gen. 57, 59 (1795) (finding that individuals could be liable under international law for "committing, aiding, or abetting" violations of the laws of war); *Talbot v. Jansen,* 3 U.S. (3 Dall.) 133 (1795) (holding that French citizen who aided U.S. citizen in unlawfully capturing Dutch ship was civilly liable for the value of the captured assets). This international law principle has continued through modern times. In the criminal context, private persons can be held liable for aiding and abetting, as demonstrated by the International Criminal Tribunal for the Former Yugoslavia ("ICTY") and the International Criminal Tribunal for Rwanda ("ICTR"). *See* Steinhardt Decl., ¶ 24. Further, legal systems around the world recognize civil aiding and abetting liability. *Id.* at ¶¶ 30-31.

> FN6. Defendants do not discuss plaintiffs' other theories of liability, which include agency, ratification, and conspiracy. Because plaintiffs seek to hold defendants liable for crimes against humanity, a violation of an international law norm that is binding on private parties, their other theories of liability also survive defendants' challenge. *See Sarei v. Rio Tinto, PLC,* 456 F.3d 1069, 2006 WL 2242146 (9th Cir. Aug. 7, 2006) ("Courts applying the [ATS] draw on federal common law, and there are well settled theories of vicarious liability under federal common law.").

Indeed, the vast majority of courts to have considered the issue have found that aiding and abetting liability is available under the ATS. *See, e.g., Hilao v. Estate of Marcos,* 103 F.3d 767 (9th Cir.1996) (affirming aiding and abetting jury instruction); *Presbyterian Church of Sudan v. Talisman Energy,* 244 F.Supp.2d 289, 321-24 (S.D.N.Y.2003) (*"Presbyterian Church I"* ) (finding that corporation could be held liable for aiding and abetting foreign government); *Burnett v. Al Baraka*

*Inv. & Dev. Corp.,* 274 F.Supp.2d 86, 100 (D.D.C.2003) (allowing aiding and abetting liability for airplane hijacking); *Cabello v. Fernandez-Larios,* 402 F.3d 1148 (11th Cir.2005). This trend has survived *Sosa.* Since *Sosa* was decided, at least three district courts have discussed whether aiding and abetting liability is available under the ATS. Two have concluded that aiding and abetting liability was sufficiently well established in international law to apply in suits under the ATS. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 374 F.Supp.2d 331, 341 (S.D.N.Y.2005) (*"Presbyterian Church II"* ) (finding that aiding and abetting was one of the "core principles that form the foundation of customary international legal norms--principles about which there is no disagreement"); *In re Agent Orange Product Liability Litig.,* 373 F.Supp.2d 7, 53 (E.D.N.Y 2005) (agreeing with plaintiffs that "[t]here is simply no question that the ATS provides for aiding and abetting liability").

*4 The final case disagreed with the previous two. The court in *In re South African Apartheid Litig.,* 346 F.Supp.2d 538 (S.D.N .Y.2004), concluded that aiding and abetting liability was not available under international law. In reaching this conclusion, the court found that the international authority other cases had relied on was taken from the criminal, not the civil, context. In the civil context, the court believed that the Supreme Court's holding in *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164 (1994), demonstrated that civil aiding and abetting liability was "at best uncertain in application." *Id.* at 181; *see also In re South African Apartheid Litig.,* 346 F.Supp.2d at 550 ("[In *Central Bank* ] the Court held that where Congress has not explicitly provided for aider and abettor liability in civil causes of action, it should not be inferred.").

The Court finds the former two cases more convincing. *Central Bank* concerned whether aiding and abetting was available for a violation of § 10(b) of the Securities Exchange Act, and the Supreme Court's decision was based upon the specific language of the act. *See Central Bank,* 511 U.S. at 173 ("With respect, however, to the first issue, the scope of conduct prohibited by § 10(b), the text of the statute controls our decision."). Indeed, the Court specifically noted that its discussion applied to statutorily created remedies. *Id.* at 182 ("[W]hen Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors."). Because the ATS

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                      Page 5
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
**(Cite as: 2006 WL 2455752 (N.D.Cal.))**

specifically invokes international common law, *Central Bank* is not particularly persuasive. *Cf. Sosa,* 542 U.S. at 732 n. 20 ("A related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued....").

Thus, the Court concludes that defendants may be held liable under international law for aiding and abetting the Nigerian military in the commission of "crimes against humanity." In order to be held liable, plaintiffs must show 1) that defendants provided "practical assistance, encouragement, or moral support which ha[d] a substantial effect on the perpetration of the crime," *see* Wallach Decl., Exh. 39 (*Aleksovski,* IT-95-14/1 -A (March 24, 2000)), and 2) that defendants knew that the Nigerian military intended to commit the crime, *see id;* Wallach Decl., Exh. 38 (*Prosecutor v. Semanza,* Case No. ICTR-97-20-T (May 15, 2003)); *see also Presbyterian Church II,* 374 F.Supp.2d at 340 (referencing "settled, core notion of aider and abettor liability in international law 'for knowing practical assistance or encouragement which has a substantial effect on the perpetration of the crime' ") (quoting *Doe v. Unocal,* 395 F.3d 932, 951 (9th Cir.2002), *vacated by* 395 F.3d 978 (9th Cir.2003)); *In re Agent Orange Product Liability Litig.,* 373 F.Supp.2d 7, 54 (E.D.N.Y.2005) (concluding that "the actus reas of aiding and abetting consists of 'practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime,' and that the mens rea required is the knowledge that these acts assist the commission of the offence; the accomplice need not share the principal's wrongful intent"); *Doe v. Saravia,* 348 F.Supp.2d 1112, 1148-49 (E.D.Cal.2004) (finding that "those who assist in the commission of acts prohibited by international law may be held individually responsible" where they know[ ] that [their] actions will assist the perpetrator in the commission of the crime").

## II. Remaining International Law Violations

**\*5** The remaining violations of international law alleged in plaintiffs' complaint do not involve those norms of customary international law that apply to private parties. [FN7] *See, e.g.,* Restatement (Third) of Foreign Relations § 404. Thus, state action is required for plaintiffs to pursue those claims under the ATS. *See Kadic,* 70 F.3d at 243 ("[T]orture and summary execution--when not perpetrated in the course of genocide or war crimes--are proscribed by international law only when committed by state officials or under color of law."); *Tel-Oren,* 726 F.2d

at 795 (Edwards, J., concurring) (declining to read "section 1350 to cover torture by non-state actors"). As above, plaintiffs seek to hold defendants liable for the acts of the Nigerian military, either directly under a "color of law" analysis or indirectly under a number of theories, including aiding and abetting. The Court does not believe that defendants can be held liable either directly or indirectly.

> FN7. The parties agree that at least two of these norms, torture and extrajudicial killing, are sufficiently well-defined to support a cause of action under the ATS. *See Kadic,* 70 F.3d at 243.

### A. Direct Liability

Prior to the Supreme Court's decision in *Sosa,* there was a general consensus among courts that color of law jurisprudence derived from 42 U.S.C. § 1983 could be used to hold a private party liable under the ATS. *See, e.g., Kadic,* 70 F.3d at 245 ("The 'color of law' jurisprudence of 42 U.S.C. § 1983 is a relevant guide to whether a defendant has engaged in official action for purposes of jurisdiction under the Alien Tort Act."); *Estate of Rodriguez v. Drummond Co., Inc.,* 256 F.Supp.2d 1250, 1264 (N.D.Ala.2003) ("In assessing whether a plaintiff has adequately alleged state action, courts generally look to the standards developed under 42 U.S.C. § 1983."); *Sinitrainal v. Coca-Cola Co.,* 256 F.Supp.2d 1345, 1353 (S.D.Fla.2003) ("[I]f the complaint alleges that the Defendants murdered Gil by acting together with the paramilitary unit who acted under color of law by acting in concert with Colombian officials or with significant aid from the Colombian government, then an international law violation is sufficiently stated for purposes of subject matter jurisdiction."). [FN8] Based on the Supreme Court's interpretation of the ATS in *Sosa,* however, defendants argue that these decisions must be reexamined.

> FN8. The Ninth Circuit also adopted this view in *Doe v. Unocal Corp.,* 395 F.3d 932 (9th Cir.2002), although technically "color of law" was unnecessary to its holding because the acts alleged were committed in furtherance of forced labor, which is an international law violation that can be committed by private parties. *See id. at* 954 ("[U]nder *Kadic,* state action is also not required for the acts of murder, rape, and torture which allegedly occurred in furtherance of the forced labor program."); *see also Kadic,* 70 F.3d at 243-44 (torture

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                                Page 6
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
(Cite as: 2006 WL 2455752 (N.D.Cal.))

and summary execution were actionable under ATS "to the extent they were committed in pursuit of genocide or war crimes"). The Ninth Circuit's opinion in *Doe* was later vacated when the court took the case *en banc*. *See Doe v. Unocal Corp.*, 395 F.3d 978 (9th Cir.2003). The case later settled, so no *en banc* opinion was ever produced. *Doe v.. Unocal Corp.*, 403 F.3d 708 (9th Cir.2005).

At least three courts have continued to apply "color of law" jurisprudence following *Sosa*, although none have considered the impact of *Sosa* on the viability of the practice. *See Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247 (11th Cir.2005) ("In construing this state action requirement, we look to the principles of agency law and to jurisprudence under 42 U.S.C. § 1983."); *Chavez v. Carranza*, 413 F.Supp.2d 891, 899 (W.D.Tenn.2005) ("When persons who are not government officials 'act[ ] together with state officials' or act with 'significant state aid[,]' they are deemed governmental actors for the purposes of the state action requirement under the TVPA and the ATCA."); *Doe v. Saravia*, 348 F.Supp.2d 1112, 1150 (E.D.Cal.2004) (In bench trial following entry of default against individual defendants: "Courts have looked to the jurisprudence of 42 U.S.C. § 1983 as a guide to determine when persons who are not themselves government officials, nonetheless act under apparent authority or color of law."); *but see Doe v. Exxon Mobil*, 393 F.Supp.2d 20, 26 (D.D .C.2005) ("Grafting § 1983 color of law analysis onto international law claims would be an end-run around the accepted principle that most violations of international law can be committed only by states .").

In *Sosa*, the Supreme Court engaged in a comprehensive examination of the ATS in an effort to determine the statute's reach. The Court first considered two competing visions of the statute: whether the ATS "does no more than vest federal courts with jurisdiction, neither creating nor authorizing the courts to recognize any particular right of action without further congressional action," *Sosa*, 542 U.S. at 712; or whether the ATS allows courts to hear "claims in a very limited category defined by the law of nations and recognized at common law." *Id.*; *see also Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C.Cir.1984) (opinions of

Edwards, J., concurring, and Bork, J., dissenting). The Court found the latter approach to be more sensible. In doing so, however, the Court was careful to narrowly circumscribe the limits of the ATS:

*6 [T]here are good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind. Accordingly, we think courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized.
*Sosa*, 542 U.S. at 725.

The Supreme Court articulated five reasons for the "judicial caution" that it found appropriate. The first reason was a desire to limit judicial discretion. Second, in light of federal courts' "general practice" of looking "for legislative guidance before exercising innovative authority over substantive law," the Court found that "[i]t would be remarkable to take a more aggressive role in exercising a jurisdiction that remained largely in the shadow for much of the prior two centuries." *Id.* at 726. Third, the Court believed that "a decision to create a private right of action is one better left to legislative judgment in the great majority of cases." *Id.* at 727. Fourth, the Court cited concerns over the impact on foreign relations of expanding the reach of the ATS. *Id.* ("[T]he potential implications for the foreign relations of the United States of recognizing such causes of action should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs."). The final reason was the lack of a "congressional mandate to seek out and define new and debatable violations of the law of nations...." *Id.* at 728.

After discussing the above reasons for judicial restraint, the Supreme Court held that courts could recognize civil actions based upon violations of recognized international norms, provided that the exercise of judicial authority was "subject to vigilant doorkeeping ." *Id.* at 729. It concluded that "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted." *Id.* at 732.

Based on the Supreme Court's restrictive view of the ATS, defendants argue that it would be inappropriate to import "color of law" jurisprudence from § 1983

to expand the statute's reach. The Court agrees. *Sosa* requires that an international law norm be definite and accepted before a court may recognize a cause of action under the ATS. Because an integral feature of international law is that it is only binding on specific defendants, allowing a private party to be held liable based upon notions of "color of law" developed in this country would blur the applicability of the obligations that international law imposes. Expanding the reach of the ATS in this way would be inconsistent with the Supreme Court's repeated calls for judicial restraint. *See Doe v. Exxon Mobil Corp., 393 F.Supp.2d 20, 26 (D.D.C.2005)* ("Grafting § 1983 color of law analysis onto international law claims would be an end-run around the accepted principle that most violations of international law can be committed only by states."). Indeed, the Supreme Court appears to have endorsed this view by stating that the determination whether liability extends to private actors is a factor of international law:

> *7 A related consideration is *whether international law* extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual. Compare *Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 791-795 (C.A.D.C.1984)* (Edwards, J., concurring) (insufficient consensus in 1984 that torture by private actors violates international law), with *Kadic v. Karadzic, 70 F.3d 232, 239-241 (C.A.2 1995)* (sufficient consensus in 1995 that genocide by private actors violates international law).

*Sosa, 542 U.S. at 732 n. 20* (emphasis added); *cf. Presbyterian Church I, 244 F.Supp.2d at 320* ("Thus, whether or not aiding and abetting and complicity are recognized with respect to charges of genocide, enslavement, war crimes, and the like is a question that *must be answered by consulting international law.*") (emphasis added).

In this case, the "color of law" jurisprudence developed under § 1983 is not a well developed international norm. Indeed, plaintiffs cite no authority for their assertion that a private party may be held liable for conduct "sufficiently infused with or related to state action as to engage international standards." *See* Decl. of Prof. Ralph G. Steinhardt in Support of Pl. Oppo. Br., ¶ 14. Further, in their entire discussion about the propriety of importing § 1983 standards into the ATS, plaintiffs cite only to American cases that predate *Sosa.* In short, plaintiffs have not provided any international authority for the prospect that a private actor may be found to have acted "under color of law" in cases involving violations of international law norms. [FN9]

FN9. Of course, to a certain degree, both international law and § 1983 have aspects of "color of law" jurisprudence in common; there is no dispute that foreign officials may be held individually liable for their official actions. *See Sosa, 542 U.S. at 727* (stating that violations of international law are cognizable against "a foreign government or its agent"). But placing liability on an individual operating as the agent of a foreign government is a far cry from finding a private party liable for participating in or conducting a violation of an international law norm that only applies to states. Indeed, plaintiffs' theory of the case is unique in that it does not allege that defendants acted as agents of the Nigerian government; to the contrary, it alleges that the Nigerian military acted as defendants' agent.

The rarity with which this color of law theory has occurred under § 1983 further convinces the Court that it would be inappropriate to apply it to the international realm. That plaintiffs' case lies at the fringe of § 1983 color of law jurisprudence is evidenced by the fact that plaintiffs cite only a single case in which a private actor has been held liable in similar circumstances under U.S. law. In *Groom v. Safeway, Inc., 973 F.Supp. 987 (W.D.Wash.1997),* the court held that a Safeway store could be held liable under § 1983 for the conduct of an off-duty police officer that it hired for store security based on a theory of inadequate training. *Id.* at 992. Other courts in analogous circumstances have recognized the possibility of § 1983 liability if a private defendant controlled state authority, but have not actually found liability. *See, e.g., Arnold v. Int'l Bus. Machines Corp., 637 F.2d 1350, 1356 (9th Cir.1981)* ("If Arnold could point to any fact that would tend to show that defendants had some control or power over the Task Force, and that defendants directed the Task Force to take action against Arnold, there would certainly be a dispute of material fact on the issue of proximate cause sufficient to reverse the summary judgment."); *Mann v. City of Tucson, 782 F.2d 790 (9th Cir.1985)* ("[I]n order to establish the requisite proximate cause between the conduct of private persons and searches in violation of section 1983, a plaintiff must prove the private

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                Page 8
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
(Cite as: 2006 WL 2455752 (N.D.Cal.))

individuals exercised control over the decision making in a police investigation."); *Alexis v. McDonald's Restaurants of Mass., Inc.,* 67 F.3d 341, 351-52 (1st Cir.1995) (stating that to find private party liable plaintiff would have to establish "concerted action tantamount to substituting the judgment of a private party for that of the police or allowing the private party to exercise state power").

Plaintiffs' primary argument in support of applying § 1983 color of law jurisprudence to this case is that *Sosa* stands for the proposition that the "ATS requires only that the tort be committed in violation of a specific, universal, and obligatory norm of international law," and that federal common law thereafter governs ancillary legal issues. [FN10] Pl. Oppo. Br. at 3. Plaintiffs base this argument on the following sentence from *Sosa:* "The jurisdictional grant is best read as having been enacted on the understanding that *the common law* would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time." *Sosa,* 542 U.S. at 724 (emphasis added). [FN11] Thus, plaintiffs argue, because international law recognizes their claims for official torture, American common law principles of liability derived from § 1983 determine the reach of those claims.

FN10. This is the view advanced by Judge Reinhardt in his *Doe* concurrence. *See Doe v. Unocal,* 395 F.3d 932, 963-78 (9th Cir.2002) (Reinhardt, J., concurring), *vacated on rehearing en banc by Doe v. Unocal,* 395 F.3d 978 (9th Cir.2003).

FN11. Plaintiffs also base their argument on a statement from a footnote in the Supreme Court's recent decision in *Hamdan v. Rumsfeld,* 548 U.S.---, 126 S.Ct. 2749 (2006). The footnote plaintiffs rely on is found in a discussion in Justice Stevens' opinion of whether "conspiracy to commit war crimes" is a violation of the laws of war. *Id.* at 2784-85. The footnote distinguishes conspiracy, which is "a crime on its own," from aiding and abetting, which it describes as a "theory of liability." *Id.* at 2785 n. 40. Plaintiffs argue that this brief footnote supports their argument that theories of liability under the ATS are determined by federal common law. The Court finds no such support in the

footnote plaintiffs cite. As an initial matter, the footnote is found in a section of Justice Stevens' opinion in which only three other justices joined, and is therefore not part of the majority opinion. More importantly, while the footnote is consistent with plaintiffs' theory, it contains no language, either express or implicit, that affirmatively supports plaintiffs' interpretation of the ATS.

The Court does not find this argument convincing. As discussed above, the Supreme Court clearly stated that the scope of liability under the ATS was to be decided by international law. *Sosa,* 542 U.S. at 732 n. 20 ("A related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual."). This view makes sense; given that international law norms are only binding on specific entities, the applicability of the international law norm can hardly be deemed ancillary. Thus, while American common law may play some role in determining the contours of an ATS claim, the Court believes that international law should determine whether a given defendant may be held liable for a particular international law violation. *Cf. Presbyterian Church I,* 244 F.Supp.2d at 320 ("In order to determine whether a cause of action exists under the ATCA, courts must look to international law.").

**\*8** The Ninth Circuit's recent decision in *Sarei v. Rio Tinto, PLC,* 456 F.3d 1069, 2006 WL 2242146 (9th Cir. Aug. 7, 2006), does not change this analysis. There, the Ninth Circuit briefly considered whether Rio Tinto, a private mining group, could be held vicariously liable for "alleged war crimes and crimes against humanity committed at its behest by the [Papua New Guinea] army." *Id.* at \*5. In a short paragraph, the court concluded that Rio Tinto could be held vicariously liable for the army's actions: "A predicate question is whether, post *Sosa,* claims for *vicarious liability* for violations of jus cogens [FN12] norms are actionable under the [ATS]. We conclude that they are. Courts applying the [ATS] draw on federal common law, and there are well settled theories of vicarious liability under federal common law." *Id.* (emphasis in original). While the Ninth Circuit's statement provides some support for plaintiffs' argument, it is far too brief to be of much use. Indeed, the Ninth Circuit's opinion does not discuss color of law jurisprudence, and certainly does not consider importing color of law jurisprudence

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
(Cite as: 2006 WL 2455752 (N.D.Cal.))

into ATS claims. More importantly, the only norms that the plaintiffs sought to enforce against Rio Tinto were war crimes and crimes against humanity, international law norms that are binding on private actors. *Id.* Thus, the Ninth Circuit did not address the question whether federal common law could be used to "bootstrap" a claim that is only actionable against government actors into a claim against private parties.

> FN12. "As defined in the Vienna Convention on the Law of Treaties, a jus cogens norm, also known as a 'peremptory norm' of international law, 'is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.' " *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 714 (9th Cir.1992) (quoting Vienna Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679).

Plaintiffs' theory of liability is far removed from the core of color of law jurisprudence. Without evidence from the international arena that demonstrates that defendants may be considered state actors by hiring Nigerian government security forces, the Court believes it inappropriate to apply American color of law principles to the case at hand. Accordingly, the Court finds that plaintiffs may not proceed with their theory that defendants can be held liable because they acted under color of law.

**B. Indirect Liability**

As discussed above, based upon its review of the materials, the Court agrees with plaintiffs that aiding and abetting liability is generally available under international law. [FN13] It cannot agree, however, that such liability is appropriate here. The problem with plaintiffs' argument is that it attempts to hold defendants, who are private actors, accountable for aiding and abetting violations of international law that can only be committed by state officials. Because the international law norms that plaintiffs invoke place no obligation on the defendants, allowing aiding and abetting liability would be inappropriate. Defendants could not be held liable for directly committing the offenses; it therefore makes little sense to find them liable for lesser conduct.

> FN13. The discussion below addresses only

plaintiffs' aiding and abetting theory of liability. The Court believes, however, that it applies with equal force to all of plaintiffs' theories of liability that would expose a private party to liability for the violation of an international law norm that is only binding on state actors, including the "joint criminal enterprise" liability that plaintiffs reference in a recent letter brief.

The history of aiding and abetting liability supports this analysis. Plaintiffs seek to incorporate aiding and abetting liability from international criminal law norms. From Blackstone's time, however, courts have treated those guilty of aiding and abetting a crime as a principal. *See* William Blackstone, Commentaries on the Laws of England, Book IV, Chap. 5 (1769) ("[A]nd all accessories to piracy, are declared to be principal pirates ...."); *see also* 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."); U.S. Dep't of Defense, *Military Commission Instruction No. 2,* Art. 6(c), at 16 (April 30, 2003) ("A person is criminally liable as a principal for a completed substantive offense if that person ... aids or abets the commission of the offense."); Allied Control Council Law No. 10, Punishment of Persons Guilty of War Crimes, Crimes Against Peace and Against Humanity, 20 Dec. 1945, Art. II.2 ("Any person without regard to nationality or the capacity in which he acted, is deemed to have committed [crimes against peace, war crimes, crimes against humanity, or membership in a criminal group], if he was ... (b) was an accessory to the commission of any such crime or ordered or abetted the same."). Defendants, however, cannot be held liable as a principal for the offenses in question.

*9 Indeed, none of the authorities plaintiffs cite involve a private party being held liable for aiding and abetting conduct that violates an international law norm that only applies to states. For example, plaintiffs rely on the recognition of aiding and abetting liability in the International Criminal Tribunal for the former Yugoslavia ("ICTY"). That tribunal, however, prosecuted war crimes and genocide, crimes for which individuals may be held liable. *See* Statute of the International Criminal Tribunal for the Former Yugoslavia (adopted May 25, 1993, by United Nations Resolution 827); *see also* Statute of the International Tribunal for Rwanda (adopted November 8, 1994, by United Nations Resolution 955). Other authorities plaintiffs rely on similarly involve aiding and abetting liability for

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                          Page 10
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
(Cite as: 2006 WL 2455752 (N.D.Cal.))

private parties where private parties could be held liable for the underlying conduct. *See, e.g., The Amiable Nancy,* 16 U.S. 546, 559 (1818) (shipowners could be held liable for piracy committed by officers and crew). [FN14]

FN14. The cases from this country that plaintiffs cite similarly either involve aiding and abetting by government officials or by private parties for crimes for which private parties may be held liable. *See, e.g., Hilao v. Estate of Marcos,* 103 F.3d 767 (9th Cir.1996) (affirming aiding and abetting jury instruction for torture and summary execution in case against former government official); *Presbyterian Church I,* 244 F.Supp.2d at 321-24 (finding that corporation could be held liable for aiding and abetting foreign government with enslavement, war crimes, and genocide); *Presbyterian Church II,* 374 F.Supp.2d at 337-41 (same); *Mehinovic v. Vuckovic,* 198 F.Supp.2d 1322 (N.D.Ga.2002) (finding that defendant could be held liable for aiding and abetting genocide, war crimes, and torture); *Burnett v. Al Baraka Inv. & Dev. Corp.,* 274 F.Supp.2d 86, 100 (D.D.C.2003) (allowing aiding and abetting liability for airplane hijacking, which is "generally recognized as a violation of international law of the type that gives rise to individual liability"); *Bodner v. Banque Paribas,* 114 F.Supp.2d 117 (E.D.N.Y.2000) (allowing aiding and abetting liability for facilitating Nazi genocide); *Cabello v. Fernandez-Larios,* 402 F.3d 1148 (11th Cir.2005) (allowing aiding and abetting liability for acts of Chilean military officer); *Doe v. Saravia,* 348 F.Supp.2d 1112 (E.D.Cal.2004) (finding that head of former paramilitary group constituted a state official and could be held liable for aiding and abetting an assassination); *Doe v. Qi,* 349 F.Supp.2d 1258 (N.D.Cal.2004) (finding that local government officials of the People's Republic of China could be held liable for aiding and abetting torture); *but see Aldana v. Fresh Del Monte Produce, N.A., Inc.,* 416 F.3d 1242 (11th Cir.2005) (finding that corporation could be held liable for torture by its private security force if government official's participation in torture was sufficient to create state action); *Mujica v. Occidental Petroleum Corp.,* 381 F.Supp.2d 1164, 1173 n. 6 (C.D.Cal.2005) (stating in

dicta that ATS allows for aiding and abetting liability in claims for torture against private party).

Because defendants are private actors, they may not be held liable for aiding and abetting violations of international law that only apply to official conduct. Accordingly, defendants' motion to dismiss is GRANTED with respect to plaintiffs' theories of aiding and abetting liability as to the claimed violations of international law, with the exception of crimes against humanity, discussed above in Part I.

**III. Corporate Liability**

Defendants' final argument is that international law does not extend to corporations, and that corporations therefore cannot be held liable under the ATS. The Court disagrees. The dividing line for international law has traditionally fallen between states and private actors. Once this line has been crossed and an international norm has become sufficiently well established to reach private actors, there is very little reason to differentiate between corporations and individuals. Defendants certainly provide no such reason in their briefs.

Both before and after *Sosa,* courts have concluded that corporations may be held liable under the ATS. *See, e.g., Iwanowa v. Ford Motor Co.,* 67 F.Supp.2d 424 (D.N.J.1999) (finding that private individuals and corporations could be held liable for use of slave labor); *Presbyterian Church I,* 244 F.Supp.2d at 308-319 ("Given that private individuals are liable for violations of international law in certain circumstances, there is no logical reason why corporations should not be held liable, at least in cases of *jus cogens* violations."); *In re Agent Orange Product Liability Litig.,* 373 F.Supp.2d at 58 ("Limiting civil liability to individuals while exonerating the corporation directing the individual's action through its complex operations and changing personnel makes little sense in today's world."); *Presbyterian Church II,* 374 F.Supp.2d at 339. The Court agrees with these decisions, and therefore holds that defendants may be held liable for the violation of any international law norm that is binding on private entities.

**CONCLUSION**

*10 For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART defendants' motion to dismiss (Docket No. 1072).

**IT IS SO ORDERED.**

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
**(Cite as: 2006 WL 2455752 (N.D.Cal.))**

Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT F

A    BANDE v MUCHINGURI

High Court, Bulawayo

Malaba J

B    Civil action

9 & 10 February; 3 June 1999                    Judgment No. HB-37-99

C    *Court — contempt of — contempt in facie curiae — what is — requirement that act or words complained of must have been committed in court and that judicial officer be acting in judicial capacity — prison officer speaking insolently to magistrate in office at hospital when magistrate carrying out informal investigation — not contempt of court*

D    *Damages — amount — actio injuriarum — malicious prosecution — magistrate wrongfully causing prison officer to be prosecuted for contempt of court after prison officer had spoken insolently to him*

E    *Delict — actio injuriarum — malicious prosecution — requirements to establish — giving of information and laying of charge — malice — what must be shown to establish malice*

The plaintiff was a prison officer stationed at Hwange. He and another prison officer had to escort an unconvicted prisoner to the Colliery Hospital for treatment for a black eye. When the doctor asked the prisoner what had caused the injury, the prisoner replied that he had been assaulted by a prison officer. The doctor, disturbed at this report, telephoned the defendant, who was the local magistrate. He came to the hospital and there saw the prisoner and the plaintiff in an office. A discussion with the prisoner took F    place. At some stage during these proceedings, the plaintiff queried the defendant's right to conduct the inquiry. The defendant took exception to this query and said that he was going to charge the plaintiff with contempt of court. Some days later, the plaintiff was questioned by the police on an allegation of contempt of court. A charge was preferred and he was brought to trial about 6 months after the alleged incident. The trial began; the plaintiff pleaded not guilty. The trial was then postponed at the request G    of the plaintiff. Meanwhile, the defendant had been promoted and transferred to Bulawayo. Some time later, while on a visit to Hwange, he approached the local public prosecutor and prevailed on him to withdraw the charge. This the prosecutor did when the trial resumed, and the plaintiff was acquitted. The plaintiff then brought an action for malicious prosecution.

*Held*, that for the action to succeed, it had to be shown that the defendant actively set the law in motion. Simply giving a statement to the police is not the same as launching a prosecution; H    but the defendant did more than that. He told the police the specific crime with which he

BANDE v MUCHINGURI

1999 (1) ZLR 476 (H)                        477

said the plaintiff should be charged. He must have known that the police would entertain the charge. **A**

*Held*, further, that the plaintiff had to show that the defendant acted without reasonable and probable cause. For the defendant to have had reasonable and probable cause he would have to understand the offence as defined and to have reasonable and probable cause to believe that the plaintiff had committed it. The crime of contempt of court protects justice in the particular proceedings in a court of law from being violated; it does not concern itself with conduct which violates the personal repute and dignity of the particular judicial officer. It is not contempt of court to violate the dignity, prestige and authority of an entity which is not a judicial body. **B**

*Held*, further, that the facts showed that what was said by the plaintiff constituted information seeking; it was not derogatory of the defendant's performance of his judicial duties. The defendant was not in court; he was in a private office at the hospital, which had not been appointed as a place where a magistrate's court could be held. A reasonable man in the defendant's position could not have believed that the plaintiff was probably guilty of contempt of court, since there was no court and the defendant was not acting in a judicial capacity. Even if he was purporting to be acting as a visiting justice, he would have been performing an administrative, not a judicial, function. **C**

*Held*, further, that the reasons the defendant gave for withdrawing the charge showed a lack of honest belief in the probable guilt of the plaintiff.

*Held*, further, that "malice" did not here mean spite or ill-will or a spirit of vengeance; it had a wider connotation. It included any motive different from that which is proper for the institution of criminal proceedings, which is to bring an offender to justice and thereby aid in the enforcement of the law. The facts showed that the defendant thought that the plaintiff had not shown him proper respect and that he wanted to punish him for that perceived transgression. This was an improper motive. **D**

*Held*, further, that the plaintiff was entitled to damages for the injury to his personality and for pecuniary loss suffered. He had not, however, suffered loss of liberty, and the charge was ultimately withdrawn, which saved the further humiliation and anxiety that would have been caused had the plaintiff been convicted. Damages in the sum of $7 000 would therefore be adequate. **E**

Cases cited:

*Baker* v *Christiane* 1920 WLD 14

*Brown* v *Hawkes* [1891] AC 718   **F**

*Hick* v *Faulkner* (1881) 8 QBD 167

*Madnitsky* v *Rosenberg* 1949 (1) PH J5

*Ndlovu* v *Sibanda* 1968 (2) RLR 113 (G)

*Ochse* v *King William's Town Municipality* 1990 (2) SA 855 (E)

*Prinsloo & Anor* v *Newman* 1975 (1) SA 481 (A)

*S* v *Thooe* 1973 (1) SA 179 (O)

*Waterhouse* v *Shields* 1924 CPD 155   **G**

Legislation considered:

Prisons Act [*Chapter 7:11*], s 46

*J K H Stirling*, for the plaintiff

*L Tshuma*, for the defendant   **H**

**A**   **MALABA J:** This is an action for $20 000 damages for malicious prosecution. The declaration states that on 24 February 1994 the defendant (to whom I shall refer as "Mr Muchinguri" or "the defendant" as contextual clarity may require) maliciously and without reasonable and probable cause set the law in motion against the plaintiff ("Mr Bande") on a charge of contempt of court of which he was subsequently found not guilty and acquitted.

**B**   In his plea, Mr Muchinguri did not deny that criminal proceedings were instituted against Mr Bande. He denied that he was responsible for the institution of the prosecution, alleging that that was done by the public prosecutor in the exercise of his own discretion. The defendant said all he did was to give the police information on which they decided on the charge of contempt of court. He denied that he acted maliciously and without reasonable

**C**   and probable cause.

The onus is on Mr Bande to prove on a balance of probabilities the following requirements:

    (a)  that the defendant set the law in motion (instigated or instituted the prosecution) against him;

**D**   (b)  that at the time he instigated or instituted the legal proceedings the defendant was without any reasonable and probable cause to do so;

    (c)  that the defendant was actuated by express or implied malice (any indirect and improper motive) to set the law in motion against him;

    (d)  that the prosecution terminated in his favour; and

    (e)  that he suffered damages as a result of the prosecution: *Nyawo* v *Kadada*

**E**   S-45-92.

I shall set out the facts that are common cause before proceeding to consider the evidence led by the parties on those in dispute. In January 1994, Mr Bande was a grade 2 prison officer stationed in Hwange where the defendant worked as a provincial magistrate. He is now a grade 1 prison officer stationed in Marondera, whilst Mr Muchinguri is now a legal

**F**   practitioner in private practice.

At about 10.30 am on 24 January 1994, Mr Bande and the late Mr Gwanunga, a medical prison officer, escorted an unconvicted prisoner, Mr Fisher Sibanda, to Hwange Colliery Hospital for medical treatment. The prisoner was suffering from a black eye. At the hospital, he was attended to

**G**   by Dr Nylander who in the course of examining the black eye asked the prisoner what had happened to it. The prisoner told the doctor, in the presence of the two prison officers, that he had been assaulted by a prison officer at prison.

The doctor was disturbed by what she heard. She asked the prison officers for the Officer-in-Charge of Hwange prison's telephone number. Mr Bande

**H**   gave it to her. She asked the prison officers and the prisoner to leave the

treatment room and wait outside whilst she contacted the Officer-in-Charge. **A**
The doctor phoned the defendant instead at Hwange Magistrates Court. They
were social friends.

Dr Nylander reported to Mr Muchinguri what the prisoner had said about
the cause of the black eye. She asked him to come to the hospital and meet
the prisoner. He agreed. It was agreed that an office would be made available **B**
at the hospital in which the defendant would meet the prisoner. He went to
the hospital alone and on arrival was shown into the office by a nurse.

In the meantime, the prison officers and prisoner were called back into the
treatment room. The prisoner received treatment. The doctor then instructed
the prison officers to take the prisoner to the office next door where he was
to meet the defendant. Mr Bande's evidence on what happened in the office **C**
is to this effect.

Before they left the treatment room, the doctor gave him a letter in a brown
envelope to give to the defendant. They found him seated on a chair. He asked
the prisoner to sit on a bench and left the prison officers standing. Mr
Muchinguri asked for the letter from Dr Nylander and Mr Bande gave it to
him. He took the envelope and put it into a coat pocket without opening it. **D**
Mr Muchinguri did not deny that this incident happened. He said he could not
remember receiving the letter. The evidence remained unchallenged.

Mr Bande said the defendant proceeded to ask the prisoner in SiNdebele
what had happened to his eye. There was no interpreter. The prisoner
answered in SiNdebele saying that he was assaulted by a prison officer called
Ndlovu. The exchanges between the prisoner and Mr Muchinguri went on for **E**
quite sometime whilst the prison officers remained silent in standing positions.
Mr Bande said when he had finished interviewing the prisoner the defendant
asked Mr Gwanunga whether the alleged assault had been reported to him.
Mr Gwanunga said the prisoner had not reported the assault. Mr Muchinguri
wondered whether Mr Gwanunga would have taken down in writing a report **F**
of an assault on a prisoner by another prison officer.

He then asked Mr Bande for an opinion on the allegations of assault made
by the prisoner. Mr Bande said he told the defendant that prisoners often
made false allegations of assault against prison officers. He made the
comment that the prisoner would have reported the assault to the magistrate
before whom he had appeared in court on remand. **G**

Mr Bande said he then asked Mr Muchinguri for permission to put a
question. The permission was duly granted. He asked the defendant whether
it was proper to interview a prisoner at a hospital on a matter concerning his
stay in prison without the knowledge of the Officer-in-Charge of the prison.
The question did not go down well with Mr Muchinguri. He became visibly
angry and stood up from where he had been seated. With a finger pointed at **H**

**A**  Mr Bande the defendant asked him whether he was challenging his authority. Mr Bande said he answered politely in words to the effect,

"No Sir! I was merely asking whether this was the right procedure of holding an inquiry."

He said Mr Muchinguri said he was to charge him with contempt of court. The defendant picked up papers from the table and rushed out of the office leaving them behind.

**B**  I pause for a moment to consider Mr Muchinguri's evidence of what he said transpired in the office after Mr Gwanunga had said the prisoner had not reported the alleged assault to him. He agreed with Mr Bande on what happened up to the time when he wondered whether Mr Gwanunga would have recorded a complaint by a prisoner against a prison officer.

**C**  He said he continued to ask the prisoner questions. Mr Bande then asked for permission to ask a question. He gave him the permission. Mr Bande asked the prisoner why he had not reported the alleged assault to the magistrate before whom he had appeared on remand. Mr Muchinguri said he told the plaintiff not to ask that question because he intended to ask it himself. After that he went on with the interview of the prisoner. It was when the

**D**  prisoner was saying he could not report the assault to prison authorities for fear of being victimised that Mr Bande barged in again and asked for permission to put another question. The permission was granted. He said Mr Bande asked him in a disparaging manner a question in these terms:

"Do you not know the correct channels? Why do you put prisons into disrepute by having an investigation of a prisoner in a private hospital? Do you not know that prisons are

**E**  constituted by an Act of Parliament?"

Mr Muchinguri said he asked Mr Bande whether he doubted the propriety of the proceedings. Before Mr Bande could answer he warned him that he risked being in contempt of court. Mr Bande looked up as if to show that the building in which they were was not a courtroom and exclaimed:

**F**  "What court? You are not wearing robes."

The defendant said at the time he believed that he did not have to be in court or to be putting on a magisterial gown for contempt of court to be committed. He said he told Mr Bande that he was performing a judicial function and that he was going to prefer a charge of contempt of court against him. The plaintiff retorted:

**G**  "Charge me! Charge me. I don't care."

Mr Muchinguri said he felt extremely humiliated and embarrassed. He picked up his papers from the table and unceremoniously left the office. At his office he reduced to writing what had happened at the hospital.

I pause again to make a finding of facts. On Mr Muchinguri's evidence, Mr

**H**  Bande asked for permission to ask a question on two occasions in the course

BANDE v MUCHINGURI

Malaba J          1999 (1) ZLR 476 (H)          481

of the interview of the prisoner. I however found Mr Bande's version of    **A**
events the more probable. In his statement to the police, Mr Gwanunga states
that Mr Bande asked for permission to ask a question once. The statement
which was produced in evidence with the consent of the defendant supports
Mr Bande's version of events. One would expect the prisoner to mention in
his statement that Mr Bande asked him directly why he had not reported the
alleged assault to the magistrate before whom he appeared on remand. The    **B**
prisoner's statement makes no mention of Mr Bande asking him the question.
Mr Bande's version of events is therefore also supported by the prisoner in
his statement to the police.

Mr Muchinguri said he immediately reacted to Mr Bande's question
directed at him by asking the latter whether he doubted the propriety of the    **C**
proceedings. In my view, the evidence corroborates Mr Bande's evidence.
Answering a question by a question suggests confrontation. Mr Bande said
Mr Muchinguri was visibly angry when he asked him the question whether
he was challenging his authority. Mr Muchinguri himself said he was
offended by the suggestion in the question asked by Mr Bande that he did not
know the provisions of the Prisons Act. In saying he was "offended", the    **D**
defendant supports Mr Bande's evidence that he became visibly angry.

The evidence given by Mr Muchinguri sought to create the impression of
Mr Bande being rude, abrasive and disrespectful to the extent of attracting a
warning that he was risking being held in contempt of court. The inherent
improbabilities discredit the evidence. Why would the defendant contemplate
a possible charge of contempt of court against Mr Bande before hearing what    **E**
the latter had to say? The view that Mr Bande was disrespectful emanated
from the interpretation the defendant placed on the question asked of him by
the former. In other words, it was a view reached by an inference not borne
out by the facts.

Had the plaintiff behaved in the obtuse manner described by the defendant    **F**
in his evidence, Mr Gwanunga and the prisoner would probably have
mentioned the same facts in their respective statements to the police. The fact
that both of them do not mention the kind of behaviour described by Mr
Muchinguri suggests that it did not happen. I accept the facts contained in Mr
Bande's evidence where it is in conflict with that of the defendant.

I continue. On 4 February 1994, Mr Bande was questioned by the police    **G**
on allegations of contempt of court. Mr Muchinguri had reported the matter
to the police. Statements were recorded from Mr Gwanunga and the prisoner.
Mr Bande was charged with contempt of court, the allegations being that after
the defendant had conducted an inquiry into an allegation of assault by a
prison officer on the prisoner he violated the dignity, repute and authority of
the magistrate in his capacity as a judicial officer by accusing him of bringing    **H**

A   prisons into disrepute by interviewing a prisoner at a hospital without going through the officer-in-charge of the prison.

The trial commenced before a provincial magistrate in Bulawayo on 21 July 1994. Mr Bande pleaded not guilty. He applied for the postponement of the trial to give him time to seek legal representation from the Civil Division of the Attorney-General's Office. The application was granted. On the next

B   remand date, the matter was again postponed because he had not received communication from the Attorney-General's office.

Mr Muchinguri was, in the meantime, promoted to regional magistrate and transferred to Bulawayo. The evidence shows that it was during this time that he decided to withdraw the charge against Mr Bande. He said he was

C   influenced in his decision by a request he said Mr Denya made to him to forgive the accused. Mr Denya, the Officer-in-Charge of Hwange Prison, vehemently denied making the request. His denial was not disproved because the defendant could not say where and when the request was made. Mr Muchinguri further discredited himself when he said he also decided to withdraw the charge because he believed that Mr Bande was sorry for what

D   he had done at the same time admitting the fact that the plaintiff did not express contrition to him. He said on some unspecified occasion he met Mr Bande in a car park at Bulawayo magistrates court. He said Mr Bande showed him the respect he expected from a prison officer. Mr Bande denied meeting the defendant as alleged. Mr Muchinguri could not say when the alleged meeting took place. Even if they met there was nothing to lead him to decide

E   to withdraw a charge against a person he believed was guilty of the crime charged.

Be that as it may, the defendant waited for an opportunity to disclose to Mr Bande his intention to withdraw the charge against him. The opportunity came his way when there was a regional court circuit in Hwange over which he presided. When in Hwange Mr Muchinguri phoned Mr Denya and invited

F   him to his office at Hwange magistrates court. Mr Denya said the defendant told him over the phone that he intended to withdraw the charge against Mr Bande. He told Mr Muchinguri that the criminal proceedings had reached an advanced stage for the charge to be withdrawn. The defendant told him to come to the office with Mr Bande.

G   Mr Bande corroborated Mr Denya's evidence in that he confirmed that the latter told him about the conversation he had had with the defendant. They both went to the office where they met with Mr Muchinguri who told him that he wanted to withdraw the charge against him. Mr Bande said he told the defendant in no uncertain terms not to withdraw the charge as the criminal proceedings had reached an advanced stage.

H   Mr Muchinguri admitted meeting Mr Denya in the office at Hwange

magistrates court. He surprisingly claimed that he could not remember     **A**
whether Mr Bande was at that meeting. He was clearly being mendacious in
claiming loss of memory of such a remarkable encounter with the man he had
accused of committing contempt *in facie curiae* (in face of court). The
defendant could not afford to forget that Mr Bande was at the meeting. If he
honestly believed that the plaintiff was probably guilty of contempt of court   **B**
he would not withdraw the charge when the accused himself insisted on being
tried.

By claiming loss of memory of the presence of Mr Bande in the meeting
with Mr Denya, the defendant sought to avoid an adverse inference being
drawn from his subsequent withdrawal of the charge.

An accuser who withdraws a charge against an accused against a challenge   **C**
from the latter that he should prove his guilt exposes himself to an inference
that he did not hold an honest belief in the probable guilt of the accused.

Despite the warning not to withdraw the charge, Mr Muchinguri approached
Mr Sibanda the senior public prosecutor and told him that he wanted the
charge against Mr Bande withdrawn after plea. Mr Sibanda said he was
reluctant to have the charge withdrawn, but Mr Muchinguri insisted upon the   **D**
withdrawal. He said he acceded to the withdrawal of the charge when the
defendant told him that Mr Bande had apologised to him for the wrong he was
alleged to have committed. Mr Sibanda was called as a witness by the
defendant. He had no reason to lie against him. His evidence, once again,
shows the mendacity in Mr Muchinguri because it is common cause that Mr
Bande had not expressed any contrition to him in respect of the charge.   **E**

Mr Bande said he was shocked when the public prosecutor announced in
court on 2 November 1994 that the State was withdrawing the charge
against him after plea. He had gone to court prepared to defend his
innocence. He was nonetheless found not guilty and acquitted of the charge
of contempt of court.                                                      **F**

It was his turn to attack. On 8 February 1996, Mr Bande instituted action
for damages for malicious prosecution. He said the criminal proceedings
injured him in his reputation and dignity. He was viewed by the superiors at
work as an insubordinate officer who was disrespectful of the courts.

Promotion to grade 1 prison officer eluded him until after the termination
of the criminal proceedings. The reports on the incident were filed and remain   **G**
part of his service record. He said he felt humiliated and embarrassed when
made to stand in the dock used by the prisoners he guarded.

I now decide whether Mr Bande has established on a balance of probabilities
the elements of the delict of malicious prosecution. A prosecution was of
course instituted against Mr Bande which terminated in his favour. The
criminal proceedings were instituted by the public prosecutor in the exercise   **H**

A   of the delegated powers of the Attorney-General contained in s 76(4)(a) of the Constitution of Zimbabwe.

The question is whether Mr Muchinguri instigated the institution of the prosecution against the plaintiff.

J G Fleming *The Law of Torts* 7 ed at p 582 states that:

B   "The defendant must have been actively instrumental in setting the law in motion. Simply giving a candid, account however incriminating, to the police ... is not the equivalent of launching a prosecution: the critical decision to prosecute not being his 'the stone set rolling [is] a stone of suspicion only'. *But if besides giving information he proceeds to lay a charge, this amounts to an active instigation of proceedings which he cannot shrug off by saying that they were in the last resort initiated at the discretion of the public authority*" (the emphasis is mine).

C   In *Baker* v *Christine* 1920 WLD 14, BRISTOWE J said the "test" "is whether the defendant did more than tell the detective the facts and leave him act on his own judgment". The principle that giving an honest statement of fact to the police on which the prosecution is then instituted is not "instigating" a prosecution was referred to with approval by PRICE J in *Madnitsky* v *Rosenberg* 1949 (1) PH J5 at pp 15-16. See also *Waterhouse* v *Shields* 1924

D   CPD 155 at 160; *Prinsloo & Anor* v *Newman* 1975 (1) SA 481 (A).

The defendant in this case, did not confine his contribution to the institution of the prosecution against Mr Bande to giving to the police information on what transpired in the office at the hospital. He went on to tell them the specific crime he alleged the plaintiff should be changed with. In his

E   statement to the police he said:

"I said, officer I am charging you with contempt of court."

The police did not have to act on their own judgment to appreciate that the offence revealed by the facts was contempt of court. Mr Muchinguri impressed upon the police how desirable it was that the plaintiff should be charged with contempt of court. He told them that if he did not get Mr Bande

F   charged the prisoner would be left with the impression that even magistrates could not "correct a wrong done by a prison officer, thus further putting his office into disrepute". He was telling the police that they had no option but to charge the plaintiff with contempt of court.

The defendant must have known that the police would take immediate

G   action which would result in the prosecution of Mr Bande. His intention was clearly that the police should entertain the charge in respect of which prosecution was to be instituted. The plaintiff has, in my view, proved that the defendant instigated his prosecution.

The next question is whether Mr Bande has adduced evidence which proves that in setting the law in motion the defendant was acting without

H   reasonable and probable cause. The question is a question of fact dependent

BANDE v MUCHINGURI

Malaba J                1999 (1) ZLR 476 (H)                485

upon the circumstances peculiar to each case. There is no precedent upon    **A**
which a court may rely for guidance. The facts which it has to deal with are
nearly always materially different from those which it may find recorded
elsewhere. The plaintiff must prove a negative in the sense that he has to give
some evidence tending to establish an absence of reasonable and probable
cause operating on the mind of the defendant at the time he set the law in    **B**
motion against him. To do this he must show the circumstances in which the
prosecution was instituted. It is not enough to prove that the real facts
established no criminal liability against him unless it also appears that those
facts were within the personal knowledge of the defendant. If they were not
it must be shown what was the information on which the defendant acted.

In *Hick* v *Faulker* (1881) 8 QBD 167 at 171, HAWKINS J defined    **C**
"reasonable and probable cause" to be:

"... an honest belief in the guilt of the accused based upon a full conviction founded upon
reasonable grounds of the existence of a state of circumstances which assuming them to
be true would reasonably lead any ordinarily prudent and cautious man placed in the
position of the accuser to the conclusion that the person charged was probably guilty of the
crime imputed."    **D**

One of the facts the court must assume is that, the accuser understood the
offence charged as defined in law. In this case, the definition of the crime of
contempt of court which the defendant must be assumed to have had in mind,
if he had a reasonable and probable cause to believe that the plaintiff had
committed it, is set out in Hunt *SA Criminal Law and Procedure* Vol II
Common Law Crimes 2 ed p 185. Contempt of court is said to consist of    **E**
"unlawfully and intentionally violating the dignity, repute or authority of a
judicial body or interfering in the administration of justice in a matter
pending before it." It is stated further in the same work at p 193 that the
offence "concerns itself *only with the conduct which impinges upon the
administration of justice in or by the courts*" (the emphasis is mine).    **F**

The first requirement is that the facts known to the defendant must show
that the conduct complained of was capable of falling within the category of
contempts. The facts found proved show that the plaintiff asked a question
which was information seeking. It was not insultive or derogatory of the
defendant's performance of his duties at the time or at any other time. The
plaintiff has shown that the objective view of the question asked of the    **G**
defendant shows that it was not inherently offensive but that in his subjective
interpretation the defendant concluded that it was disrespectful of his repute,
dignity and authority. The relevant view of what is a contempt being that of
a reasonable man the subjective view of the defendant becomes unreasonable.

Mr Muchinguri knew of the facts that showed that he was not in court. He
was in a private office at the hospital. The office had not been appointed in    **H**

**A**   terms of s 4 of the Magistrates Court Act [*Chapter 7:10*] as a place where a court of a magistrate could be held. In *Ndlovu* v *Sibanda* 1968 (2) RLR 113 at p 115 YOUNG J said:

> "A court should be properly constituted, formally conducted and any issue before it should be regularly initiated."

**B**   In view of the fact that contempt of court protects the justice in the particular proceedings in a court of law from being violated and does not concern itself with conduct which violates the personal repute and dignity of the individual magistrate or judge, the facts had to show that what Mr Muchinguri was doing at the time was being done in or by a court. As the defendant acknowledged in evidence that he was not in court, one essential **C**   element of contempt *in facie curiae* (contempt in the face of court) was missing.

A reasonable man in Mr Muchinguri's position could not believe that the plaintiff was probably guilty of contempt of court when it was clear from the facts that there was no court whose repute, dignity and authority could have been violated. For the defendant to say he did not believe it was necessary for **D**   him to be in court or to be putting on a magisterial robe for contempt of court to be committed is to personalise the crime.

The facts also show that the defendant was not acting in a judicial capacity. The interview he was conducting of the prisoner was not anything approximating a judicial proceeding. There was no case before him involving two parties to hear and try. He was conducting the interview himself. He was **E**   not enjoined to make a final and definite decision on any question.

He said that the object of the interview was to get information from the prisoner which he intended to use to persuade the doctor to administer treatment to the latter's black eye. If the defendant was performing a judicial function he would have been bound by the provisions of s 5(2) of the Magistrates Court Act which requires that the proceedings in all cases in a **F**   court of a magistrate shall be in the English language and shall be carried out in open court. Not only was the interview held in a private office, the medium of communication between the defendant and the prisoner was Ndebele.

It is illuminating that Mr Muchinguri said he understood himself to be performing a function similar to that which he performed in the capacity of **G**   a visiting justice in terms of s 46 of the Prisons Act [*Chapter 7:11*]. When acting in the capacity of a visiting justice a magistrate has the power to inquire into a complaint or request made to him by a prisoner during his visit to prison. The inquiry must, however, be held in prison. A magistrate is in fact not performing a judicial function when he conducts an inquiry into a prisoner's complaint under the provisions of s 46 of the Prisons Act. He will **H**   be performing an administrative function.

In *S v Thooe* 1973 (1) SA 179, Smit JP said at p 180B-H:                    **A**

"It is not contempt of court to violate the dignity, prestige and authority of an entity which is not a judicial body ... It must be a court which is held in contempt and not an administrative proceeding before there can be contempt of court ... It is acknowledged in decided cases that an official like, for example, a magistrate performs judicial as well as administrative work and that it is not contempt of court if he is held in contempt in his administrative capacity" (official translation, p 63).                    **B**

It is clear from the facts that the defendant failed to act upon those facts that indicated that the charge of contempt of court was inappropriate. He had no right to presume the existence of those facts. He did not therefore have a reasonable and probable cause. Where on the facts a magistrate has no competence to charge a person with contempt of court and nevertheless does so, as the defendant did in this case, he acts without reasonable and probable cause.                    **C**

It is also stated in *Addison's Law of Torts* 8 ed at p 247 that:

"though abandoning a prosecution is not of itself proof of want of probable cause yet where the prosecution is persisted in and then dropped at the very hour of trial there is strong ground for supposing that the prosecutor had no justifiable reason for commencing it."                    **D**

Mr Muchinguri had persisted in the prosecution of the plaintiff until at the very hour of trial when he withdrew the charge. The reasons he gave for the decision leave one in no doubt that he withdrew the charge because of lack of an honest belief in the probable guilt of the plaintiff. The prosecution was therefore wrongful.

Has the plaintiff proved that the defendant was actuated by malice? The plaintiff does not have to prove spite or ill-will on the part of the defendant. The fact that the defendant had no reasonable and probable cause for the prosecution may, in an appropriate case, justify an inference that he was actuated by malice in the sense of being driven by an improper or indirect motive.                    **E**

Fleming *op cit* at p 590 states that:                    **F**

"At the root of it (malice) is the notion that the only proper purpose for the institution of criminal proceedings is to bring an offender to justice and thereby aid in the enforcement of the law and that a prosecutor who is primarily animated by a different aim steps outside the pale if the proceedings also happen to be destitute of reasonable cause. 'Malice' has therefore a wider meaning than spite, ill-will or a spirit of vengeance and includes any other improper purpose, such as to gain a private collateral advantage."                    **G**

In *Brown v Hawkes* [1891] AC 718 at p 722 Cave J said:

"Now malice, in its widest and vaguest sense, has been said to mean any wrong or indirect motive and malice can be proved, either by showing what the motive was and that it was wrong, or by showing that the circumstances were such that the prosecution can only be accounted for by imputing some wrong or indirect motive to the prosecutor."

The motive for the prosecution of the plaintiff is revealed by the defendant's          **H**

Case 1:06-cv-00275-GMS    Document 61-9    Filed 10/16/2007    Page 14 of 15

A    own evidence and conduct. He said he felt humiliated and embarrassed by the
question asked by plaintiff. In his interpretation, the question implied that he
did not know the provisions of the Prisons Act. As he was aware that there
was no court of law, the repute, dignity and authority of which he needed
to protect, the prosecution was instigated in order to avenge the personal
humiliation and embarrassment he said he felt.

B        It is clear that at the time the defendant decided to withdraw the charge he
did not care whether the plaintiff was guilty of contempt of court. He felt
satisfied that the criminal proceedings had achieved the purpose for which he
had them instituted. He said he withdrew the charge because he felt that Mr
Bande now showed him the respect he expected a prison officer to accord
C    him. This suggests that, at the time he set the law in motion against Mr
Bande, he was of the view that the latter had not accorded him due respect
and wanted to punish him for that perceived transgression. That, in my view,
was an improper motive for instigating the prosecution.

        I turn now to assess the damages claimed by Mr Bande. The charge of
contempt of court made against the plaintiff was a pure delict committed
D    under the colour of judicial authority. It is stated in Joubert *The Law of South
Africa* Vol 15 para 617 that:

> "The successful plaintiff in an action for malicious prosecution is entitled to damages for
> both injury to personality and pecuniary loss suffered. The former are awarded as a
> *solatium* under the *actio iniuriarum* while the latter constitute compensation under the
> *actio legis Aquilia.*"

E        The damages claimed here are for the infringement of personality rights in
unimpaired reputation and dignity. The charge of contempt of court was
scandalous of the plaintiff's fair name as a prison officer. Without any
reasonable cause he was accused of being disrespectful of the very institution
the orders of which it was his duty as prison officer to enforce.

F        The criminal proceedings affected his chances of early promotion. He said
the promotion to grade 1 prison officer was delayed until after he was
acquitted of the charge. The charge hung over his head for eight months,
during which period he suffered anxiety over the damage it was causing to
his reputation.

G        Mr Bande said he felt humiliated and embarrassed when on three
occasions he was made to stand in the dock used by the prisoners he guarded.
His dignity was violated when he was publicly subjected to degrading
treatment and exposed to disesteem. He also suffered the indignity of having
to give a warned and cautioned statement to the police in the reception office
of his own prison in the presence of prisoners and other prison officers.

H        I am, however, of the view that $20 000 damages would, in the
circumstances, be excessive compensation for the injury the plaintiff suffered.

Malaba J                1999 (1) ZLR 476 (H)                **489**

The figure does not sufficiently take into account the fact that the institution **A**
of the criminal proceedings was not accompanied by a serious denial to Mr
Bande of rights to personal liberty. He was not, for example, arrested and
detained. In *Nheta v Fernades* HB-29-94 two policemen who had been
charged with extortion were awarded $10 000 damages for malicious
prosecution. They had been arrested before being charged.                        **B**

The figure of $20 000 damages claimed by the plaintiff does not also take
into account the withdrawal of the charge by Mr Muchinguri. The prosecution
was, of course, without reasonable and probable cause, but cases of people
being convicted and sentenced for crimes they never committed are not
unknown. The case of *Ochse* v *King William's Town Municipality* 1990 (2)
SA 855 (E), cited by Mr *Stirling* in argument, is a good example. The plaintiff **C**
in that case was initially convicted and sentenced for malicious injury to
property. On appeal, the conviction and sentence were set aside. Awarding
R7 500 damages for malicious prosecution to the plaintiff, VAN RENSBERG
J said at p 860G-H:

"What is more, the plaintiff was subsequently maliciously subjected to the embarrassment
of a criminal trial on a charge of malicious damage to property which was followed by the **D**
indignity and humiliation of a conviction and being sentenced for a crime in respect of
which he should never have been charged. Thereafter, the plaintiff had the further anxiety
of having to take the matter on appeal in order to have the conviction and sentence set
aside."

The withdrawal of the charge by the defendant saved the plaintiff the
further indignity, humiliation and anxiety epitomised by the circumstances **E**
of *Ochse's* case *supra*. An amount of $7 000, would in my view, provide an
adequate award for the injury suffered by the plaintiff to his reputation and
dignity.

Judgment is granted to the plaintiff and it is ordered that the defendant shall
pay to the plaintiff the sum of $7 000 with interest thereon at the prescribed
rate from the date of service of summons until the date of final payment. The **F**
defendant is to pay the costs of suit.

*Coghlan & Welsh*, plaintiff's legal practitioners
*Webb, Low & Barry*, defendant's legal practitioners                              **G**

**H**

# EXHIBIT G

[Home] [Databases] [WorldLII] [Search] [Feedback]

**SAFLII**

# South Africa: Supreme Court of Appeal

**You are here:** SAFLII >> Databases >> South Africa: Supreme Court of Appeal >> 2004 >> **[2004] ZASCA 57**

[Database Search] [Name Search] [Recent Decisions] [Noteup] [Download] [Help] [Context↩] [Hide Context]

---

# Independent Newspapers Holdingsss Ltd and Others v Suliman (49/2003) [2004] ZASCA 57 (28 May 2004)

Last Updated: 4 September 2004

## IN THE SUPREME COURT OF APPEAL

## OF SOUTH AFRICA

CASE NO: 49/2003
In the matter between :

**INDEPENDENT NEWSPAPERS HOLDINGS LTD First Appellant**

**RYLAND FISHER Second Appellant**
**INDEPENDENT NEWSPAPERS CAPE LTD Third Appellant**
**ALLIED MEDIA DISTRIBUTORS (PTY) LTD Fourth Appellant**

and

**WALLEED SULIMAN Respondent**

> Coram: MARAIS, SCOTT, MTHIYANE, NUGENT JJA *et*
> PONNAN AJA
> Heard: 1 MARCH 2004
> Delivered: 28 MAY 2004

**Summary:** ↳Defamation↴ – newspaper reports that plaintiff arrested as suspect in bombing of restaurant – defamatory but substantially true – publication of plaintiff's identity and photograph prior to appearance in court not in public interest in particular circumstances – concurrent claims for impairment of dignity and violation of privacy – measure of ↳damages↴. The order will be found in para [67].

**J U D G M E N T**

**MARAIS JA:**

[1] On Tuesday 25 August 1998 the city of Cape Town was, metaphorically speaking, rocked to the foundations when a bomb planted in a recently opened restaurant, Planet Hollywood, at the Victoria and Alfred Waterfront exploded. Two lives were lost and many were seriously injured. Considerable damage was done to the building in which the restaurant was situated. Understandably, there was immense public outrage and intense speculation about which persons or organizations might be responsible for the bombing.

[2] On Friday 28 August 1998 the Cape Times newspaper published two articles, one in its early edition ('the country edition') intended for delivery to outlying areas and one in its later edition intended for delivery to subscribers and sale to purchasers in the Cape peninsula ('the peninsula edition'). These articles gave rise to the successful action for ⭢**damages for defamation**⭠, impairment of dignity, and invasion of privacy which is before us on appeal with leave granted by this court. I shall refer to the parties as they were referred to in the action.

[3] The plaintiff is Mr Walleed Suliman, a Muslim man who lives in Kenwyn, a suburb of Cape Town. The defendants were Independent Newspapers Holdings Limited (the proprietor of the Cape Times); Mr Ryland Fisher (editor); Independent Newspapers Cape Limited (publisher); and Allied Media Distributors (Pty) Limited (the newspaper distributor). I reproduce the text of the articles in the sequence in which the two editions appeared, first the country edition and then the peninsula edition. I shall also append to this judgment photocopies of the articles as they were published. The plaintiff is the person who features in the photograph, is referred to in the articles by his name, and is referred to in the statement as the 'male suspect' being held for further questioning.

[4] The country edition:
'PULLED OFF PLANE'
**Bomb: Pagad trio**
**Held at airport**

**DETECTIVES PROBING** Tuesday's horrific Waterfront blast yesterday arrested three Capetonians about to board an Egypt-bound flight at Cape Town International Airport.
**CHRIS BATEMAN, RHODA DAVIDS** and **WILLEM STEENKAMP** report.

'POLICE made the arrests after receiving an anonymous tip-off. The three were being held overnight. It was reliably learnt that the tip-off included information that the trio – Walied Suleiman (*sic*), 32, his wife Gouwa Suleiman (*sic*), 31, both of Kenwyn, and their cousin Shanaaz Bayat, 30 of Belgravia – were bound for Egypt and that they might be linked to the bombing.
Western Cape police spokesperson John Sterrenberg confirmed late last night that the two women would be charged under the Aliens Control Act in connection with passport offences.
The "male suspect" was being held for further questioning, he added.
The country's police operations chief, commissioner Andre Pruiss told the *Cape Times*: "There is the possibility that they could be involved in the blast, but at this stage there is no evidence pointing to this."
People Against Gangsterism and Drugs (Pagad) last night issued a press alert saying: "Pagad members pulled off the plane from pilgrimage and arrested."
Furious Pagad lawyer Adiel Theunissen accused the police of blatant harassment and of "a witch-hunt targeting Muslims".
Sterrenberg said the trio was stopped by the Aliens Control Unit at the airport after fault was found with one of their passports. The claim was strongly denied by Freeza Ryland, the mother of Shanaaz Bayat, who said her daughter had been oversees "many times before with no passport problems".
More than 20 angry family members were seen railing against the arresting police at the airport, shouting that "this is unfair and against Muslims".

Pruiss said there was "no question of harassment of Muslims" and that police were merely following all possible leads – which included questioning all possible suspects.

The three were taken to the Parow police station by, among others, Waterfront bombing investigating officer Mike Barkhuizen.

Pruiss and national Police Commissioner George Fivaz have remained in Cape Town to oversee the latest developments. Early last night they were receiving reports from the investigating team every 30 minutes.

Meanwhile, two agents from the US Federal Bureau of Investigation (FBI) arrived in here early yesterday from Nairobi at the invitation of Fivaz to assist in the bombing probe.

That brought the number of FBI personnel involved in the Waterfront investigation to four.

The others are an agent stationed in South Africa and a legal expert flown in from the US.

South African Interpol head David Bruce, who flew to Nairobi in a Lear Jet to fetch the two agents on Wednesday, said their arrival back in South Africa had been delayed by overflight problems in Zimbabwe and Botswana.

He had been forced to contact the police commissioner in Botswana to arrange overflight rights, he said.

The FBI agents visited the scene of the bombing yesterday morning, along with senior police officers and detectives.

Police refused to name the agents or grant interviews with them, but the locally based agent told journalists at the Waterfront that their presence had been requested in the spirit of international co-operation – something which would benefit both South Africa and the United States, and without which "the winners are the bad guys".

He said also that the South African investigation team was doing "a very fine job".

Sterrenberg yesterday said police were still trying to reconstruct the bomb, but that it had already been firmly established that it had been a home-made device.

Theunissen yesterday claimed that Pagad members being held at Pollsmoor Prison were being interrogated and tortured by police and the FBI agents.

He said one Pagad member was booked out of the prison on Wednesday and apparently "interrogated and tortured" before being returned to the jail, and that the others were booked out by Peninsula Murder and Robbery Unit detectives yesterday.

Theunissen, who did not want to name the prisoners, said the fact that their legal counsel was not informed of the questioning suggested foul play.

"I find it strange that people who have lawyers are being taken out (of jail) without the lawyers being informed."

However, Sterrenberg said last night that only two prisoners – Mogomat Anwar Francis and Yusuf Salie, arrested following a pipe-bomb explosion in a bakkie late last month, which killed two other Pagad members – had been booked out yesterday for routine questioning in connection with that incident.

The prisoners were welcome to lay charges if they had been mistreated, he said.'

[5] The peninsula edition:

DEMO AT OMAR'S HOME

**Pagad outrage**
**over bomb arrest**

**DETECTIVES PROBING** Tuesday's horrific blast yesterday arrested three Capetonians about to board an Egypt-bound flight at Cape Town International Airport.
**CHRIS BATEMAN, RHODA DAVIDS, WILLIAM STEENKAMP** and **JUDY DAMON** report.

'Angry Pagad supporters gathered outside the Rylands home of justice Minister Dullah Omar late last night to protest against the arrests of three of their members.

"If the community reacts, do not blame us

If there's going to be a war out there, we are not going to take responsibility".

"You must take responsibility" one man shouted.

About 100 people, including G-force members, said that Omar had refused "to see justice done" and that he should stop interrogating innocent people.

A helicopter hovered above, but there were no incidents of violence.

Early this morning, Omar told the "*Cape Times*" that "I've completed my work and I won't allow this to bother me.

He said he viewed the Planet Hollywood attacks as a "very, very, serious matter" and said he hoped police would leave no stone unturned in the investigations.

After receiving an anonymous tip-off, police arrested Walied Suleiman (*sic*), 32, his wife Gouwa Suleiman (*sic*), 31, both of Kenwyn, and their cousin Shanaaz Bayat, 30, of Belgravia as they were about to board a flight to Egypt.

The three were held overnight.

Western Cape police spokesperson John Sterrenberg confirmed late last night that the two women would be charged under the Aliens Control Act in connection with passport offences.

The "male suspect" was being held for further questioning, he added.

The country's police operations chief, commissioner Andre Pruiss told the *Cape Times*: "There is the possibility that they could be involved in the blast, but at this stage there is no evidence pointing to this".

Furious Pagad lawyer Adiel Theunissen accused the police of blatant harassment and of "a witch-hunt targeting Muslims".

Pruiss said there was "no question of harassment of Muslims" and that police were merely following all possible leads – which included questioning all possible suspects.

The three were taken to the Parow police station by, among others, Waterfront bombing investigating officer Mike Barkhuizen.

Pruiss and national Police Commissioner George Fivaz have remained in Cape Town to oversee the latest developments. Last night they were receiving reports from the investigating team every thirty minutes.

Meanwhile, two agents from the US Federal Bureau of Investigation (FBI) arrived in here early yesterday from Nairobi at the invitation of Fivaz to assist in the bombing probe.

South African Interpol head David Bruce, who flew to Nairobi in a Lear jet to fetch the two agents on Wednesday, said their arrival back in South Africa had been delayed by overflight problems with Zimbabwe and Botswana.

He had been forced to contact the police commissioner in Botswana to arrange overflight rights, he said.

The FBI agents visited the scene of the bombing yesterday morning, along with senior police officers and detectives.

Police refused to name the agents or grant interviews with them, but the locally based agent told journalists at the Waterfront that their presence had been requested in the spirit of international co-operation – something which would benefit both South Africa and the United States, and without which "the winners are the bad guys".

He said also that the South African investigation team was doing "a very fine job".

Sterrenberg yesterday said police was still trying to reconstruct the bomb, but that it had already been firmly established that it had been a home-made device.

Theunissen yesterday claimed that Pagad members being held at Pollsmoor Prison were being interrogated and tortured by police and the FBI agents.

He said one Pagad member was booked out of the prison on Wednesday and apparently "interrogated and tortured" before being returned to the jail.

Others, he said, were booked out by Peninsula Murder and Robbery Unit detectives yesterday.

Theunissen, who did not want to name the prisoners, said the fact that their legal counsel was not informed of the questioning suggested foul play.

"I find it strange that people who have lawyers are being taken out (of jail) without the lawyers being informed."

However, Sterrenberg said last night that only two prisoners – Mogomat Anwar Francis and Yusuf

Salie, arrested following a pipe-bomb explosion in a bakkie late last month which killed two other Pagad members – had been booked out yesterday for routine questioning in connection with that incident. The prisoners were welcome to lay charges if they had been mistreated, he said.'

[6] The plaintiff's particulars of claim as originally drawn on 9 June 1999 when he was not aware of the publication of the country edition contained the following allegations:

'7 On 27 August 1998, and at Cape Town International Airport, Plaintiff, who was about to depart on a holiday to Egypt with his family, was arrested and detained by members of the South African Police Services, purportedly in connection with the explosion at the restaurant.

**THE REPORT**

8. On 28 August 1998, and at Cape Town, within the area of jurisdiction of this Honourable Court:

8.1 A colour photograph of Plaintiff was published prominently and on the front page of the newspaper ("the photograph"),

8.2 The photograph, which spans four columns across and is nine column inches deep, depicts Plaintiff with his hands cuffed behind his back, and was accompanied by the following caption:

"**SUSPECT HELD:** Walied Suleiman is led away by a policeman at Cape Town International Airport." ("the caption");

8.3 Prominently juxtaposed with the photograph on the front page, above the fold, an article was published as the main lead ("the article") under the headline:

**"Pagad outrage over bomb arrests"** ("the headline");

8.4 The introductory paragraph to the article reads as follows:

"**DETECTIVES PROBING** Tuesday's horrific Waterfront blast yesterday arrested three Capetonians about to board an Egypt-bound flight at Cape Town international Airport";

8.5 Midway through the article, and above the fold, a shaded box ("the box") was published containing the following words:

> "**INSIDE**
> **Blast a terrorist attack –Qibla**
> **page 3**
> **Support for bomb victims**
> **page 3**
> **Political parties condemn blast**
>
> **page 5**
> **Damage that's difficult to repair**
> **page 19**"

9. In addition to the aforegoing, the article contained the following statements:

9.1 "He [the minister of Justice] said he viewed the Planet Hollywood attack as a 'very, very, serious matter' and said he hoped police would leave no stone unturned in the investigations.";

9.2 "After receiving an anonymous tip-off, police arrested Walied Suleiman, 32, his wife Gouwa Suleiman, 31 both of Kenwyn, and their cousin Shanaaz

Bayat, 30, of Belgravia as they were about to board a flight to Egypt.";
9.3 "The three were held overnight.";
9.4 The 'male suspect' was being held for further questioning ...;
9.5 "[Commissioner Andrè] Pruiss said there was 'no question of harassment of Muslims' and that police were merely following all possible leads – which included questioning all possible suspects.";
9.6 "The three were taken to the Parow Police Station by, among others, Waterfront bombing investigating officer Mike Barkhuizen.'"

10. ...
11. ...

## PLAINTIFF'S FIRST CLAIM

12. The report and its various components referred to Plaintiff and were individually and/or collectively per se defamatory of Plaintiff, alternatively, were intended by Defendants and were understood by readers of the newspaper to mean that Plaintiff;

12.1 had been arrested for causing the explosion at the restaurant;

12.2 was being investigated for causing the explosion at the restaurant;

12.3 was responsible for a terrorist attack on the restaurant;

12.4 was a suspected criminal and/or terrorist who may have caused a horrific blast in a public restaurant;

12.5 was about to flee the country in consequence of his commission of the said crime;

12.6 was a danger to the public and/or a flight risk, which necessitated him being handcuffed.

13. Publication and distribution of the report as aforesaid was unlawful and was intended by Defendants to defame Plaintiff and to injure him in his good name and reputation.

14. As a consequence of the aforesaid ↤defamation↦ Plaintiff has been injured in his good name and reputation and has suffered ↤damages↦ in the sum of R1 000 000,00.

## PLAINTIFF'S SECOND CLAIM

15. The report, in describing and identifying Plaintiff as a person who had been arrested by members of the South African Police Services in connection with the explosion at the restaurant and carrying the further imputation that Plaintiff was responsible for such explosion, as set out hereinabove, has embarrassed, humiliated and degraded Plaintiff, lowered his self-esteem, impaired his dignity and mental tranquillity, and has, in addition, jeopardised Plaintiff's safety and livelihood and led to plaintiff's being socially ostracised by members of his community.

16. The report was published and distributed unlawfully and with the intention so to injure Plaintiff

17. As a direct consequence of Defendants' aforesaid conduct and the impairment of his dignitas, Plaintiff has suffered ↤damages↦ in the sum of R1 000 000,00.

**PLAINTIFF'S THIRD CLAIM**

18. Publication of the report, and distribution of the newspaper containing it, widely publicised the following private facts regarding Plaintiff and his private life, without Plaintiff's consent.

18.1 The South African Police Services regarded him as a suspect in connection with the explosion at the restaurant;
18.2 He had been arrested, handcuffed and detained overnight by the police;
18.3 The police intended to detain him for further questioning;
18.4 He was about to depart Cape Town for Egypt;
18.5 He was a member of Pagad, an organisation which the newspaper in its articles and commentaries frequently associated with bomb explosions in the Western Cape;
18.6 His photographic image.

19. In consequence of the said publication of the report the public became acquainted with the aforementioned private facts and concerning Plaintiff and was in addition able to identify Plaintiff by name as well as by sight.

20. As a result, Plaintiff's privacy and seclusion in his private life were infringed and his mental tranquillity was disturbed.

21. In publishing and distributing the report, Defendants acted unlawfully and with the intention that publication would have the aforesaid injurious consequences for Plaintiff.

22. As a direct consequence of Defendant's aforesaid conduct and the infringement of Plaintiff's privacy and seclusion in his private life and the disturbance of his mental tranquillity, Plaintiff has suffered **damages** in the sum of R1 000 000,00.

23. In the premises, Defendants are liable to pay to plaintiff the sum of R3 000 000,00 which, despite demand, they have failed to do.'

[7] To this the defendants pleaded as follows: To the **defamation** claim, first a denial that the article was defamatory; (presumably alternatively) secondly, truth and public interest; thirdly, what has come to be known as the *Bogoshi*[1] defence; and fourthly, the protection of the right of free speech and the right to impart information conferred by s 16 of the Constitution. To the impairment of dignity claim, there was a general denial. To the invasion of privacy claim, there was a general denial coupled with an allegation that none of the facts allegedly wrongly disclosed in the article were private at the time of their publication.

[8] Trial particulars were sought and furnished. Of particular relevance is the plaintiff's reply to the question whether any particular material portion of the article was false, and if so, which. The answer given was that it was not the plaintiff's case that any material portion of the article was false. To the question whether the defendants are alleged to have negligently and/or recklessly failed to take any reasonable steps prior to publishing the article and, if so, which, the

reply was that the defendants unreasonably published details of and concerning the plaintiff and which identified him, viz his name, his age, his place of residence, and his photographic image.

[9] Some two weeks later the plaintiff withdrew his previous answer to the first question referred to in para [8] and substituted for it the word 'no'. This was a somewhat enigmatic response for it was the plaintiff's answer to two separate questions. The first was whether any material portion of the article was false, and if so, which. The second was whether it was admitted that any material portions were true, and if so, which. I can only construe the reply 'no' to mean that the plaintiff was not positively alleging any falsity in the article but that he was not going so far as to admit its truth because it was for the defendant to prove the truth of the contents of the article. However, the additional particulars furnished did acknowledge the truthfulness of some parts of the articles, namely, 'that he, his wife Gouwa Suleiman and their cousin Shanaaz Bayat, were arrested by the police as they were about to board a flight to Egypt, and that they were detained in police custody overnight'.

[10] On 10 August 2001, after learning of the existence of the country edition, the plaintiff gave notice of his intention to amend his particulars of claim. Apart from the consequential amendments resulting from the introduction of the publication of the country edition as a further ground of complaint, some other amendments to the particulars of claim were effected. The allegation that the plaintiff 'was arrested and detained by members of the South African Police Services, purportedly in connection with the explosion at the restaurant' was deleted and substituted for it was the allegation that the plaintiff 'was arrested and detained by a member of the South African Police Services for allegedly having contravened the Identification Act, 72 of 1986, and the Aliens Control Act, 96 of 1991'. For convenience sake I shall refer to the alleged contravention of those two Acts as passport contraventions.

[11] Amendments to the plaintiff's reply to the defendant's request for trial particulars were also effected. The enigmatic 'no' given in answer to the two questions referred to in para [9] was deleted and substituted for it were the following allegations:

"6.1 The first and second articles are false in the following material respects:

6.1.1 Neither Plaintiff nor his wife nor Shanaaz Bayat were arrested by detectives probing the explosion at 'Planet Hollywood';

6.1.2 The three were not arrested in connection with the explosion; and

6.1.3 None of the three were taken to the Parow police station by 'Waterfront bombing investigating officer Mike Barkhuizen'.

6.2 The true facts are that Plaintiff, his wife, and Shanaaz Bayat, were arrested by a member of the South African Police Services, Border Control Unit, in respect of alleged passport irregularities and the aforementioned Barkhuizen was not present when the three were taken to Parow police Station."

[12] In their amended plea to the plaintiff's amended particulars of claim the defendants 'admitted that the reports were defamatory of the plaintiff' but did not say in what particular respect.

[13] In further trial particulars provided by the plaintiff, he alleged that he was not informed at the time of his arrest that the reason for his arrest was his contravention of the two Acts referred to earlier and was told simply that he was being arrested for irregularities in his passport. He denied that the police had at some time prior to his arrest received an anonymous report that he was somehow linked to the explosion and that he, his wife, and Shanaaz Bayat were leaving the country for Egypt. He admitted only that the police had at some time prior to his arrest received an anonymous report that he might be linked to the explosion and that he was leaving the country.

[14] After hearing the evidence adduced by the parties at the trial Selikowitz J upheld the plaintiff's claims and awarded him ✱damages✱ of R90 000,00 for the ✱defamation✱ and impairment of dignity combined and R10 00,00 for the invasion of privacy. The factual conclusions upon which the awards were based were broadly these. The learned judge was satisfied that the reasonable reader would have concluded that the plaintiff was arrested as a suspect in the Planet Hollywood bombing. He acknowledged that a reasonable reader would have appreciated that the plaintiff was only a suspect and had not been proved to have been the perpetrator of the crime and that many suspects who become accused are thereafter acquitted, but considered that "the mere fact of being arrested as a suspect carries a stigma and the acquittal is often perceived to be for 'technical reasons rather than for innocence'" and that the more serious the crime, the heavier the stigma.

[15] As to the truth or untruth of the defamatory allegation, namely, that the plaintiff was arrested as a suspect in the bombing, he concluded that the defendants had 'failed to establish the truth of the reports that the plaintiff was arrested as a suspect in the Planet Hollywood bombing' and that '*per contra*, the evidence establishes that the objective truth remains that plaintiff was arrested for passport irregularities and not in connection with the Planet Hollywood bombing'. Furthermore, he found that the uncontroverted evidence was that the plaintiff was arrested by members of the border police and not by detectives probing the bombing. He found too that the plaintiff was not taken to the Parow Police Station by the bombing investigation officer, Mike Barkhuizen, but by the border police. All three of the allegations were therefore found to be false. The ultimate conclusion was that the defendants had 'failed to prove, on a balance of probability, that the material defamatory allegations were substantially true'. That obviated, so the learned judge thought, the need to consider whether publication was in the public interest.

[16] Turning to the *Bogoshi* defence, he found that the defendants did not act unreasonably in relating the plaintiff's arrest to the bombing but that neither the statement that the plaintiff was a suspect in the bombing, nor that detectives probing the bombing had arrested the plaintiff, nor the statement that Barkhuizen had accompanied the plaintiff to the Parow police station were reasonably justified. However, he did not regard the use of the word 'arrest' rather than 'detain' to have been unreasonable. He said, correctly, in my view, 'when the police are seen to detain a person, handcuff him and remove him then it seems to me – in the context of the reports here – to be splitting hairs to ask whether he has been properly described as having been detained or arrested'.

[17] Holding that it was inherent in the *Bogoshi* defence that it would still have to be shown that publication of the defamatory material, if it had been true, would have been in the public interest, he concluded that it would not have been in the public interest to reveal the identity of the plaintiff at a time when he had not yet been charged or brought before a court. He said: 'In weighing the harm which can result from the premature disclosure of the detainee's identity in a case such as this as against a delay in informing the public of the detainee's identity until he is brought before a court, there seems to me to be an overwhelming tilt in favour of the individual.' The *Bogoshi* defence was therefore rejected.

[18] The claim for impairment of dignity was dealt with by holding that although there was overlapping of the claim with the claim for ✱defamation✱, the former claim could be maintained but had to be limited to the harm caused by the peninsula edition because the plaintiff had never been aware of the country edition until nearly three years after the event. The defences of truth and public benefit and the *Bogoshi* defence, in so far as they might be applicable to this claim, were rejected for the same reasons as they were rejected when considering the claim for ✱defamation. When awarding damages✱ for this impairment of dignity the learned judge merged the award with his award for ✱defamation✱ and it is not possible to isolate to what extent the ultimate award was increased by doing so. The invasion of privacy claim was upheld.

[19] In any **defamation** suit the logical starting point is what the words complained of mean, more particularly, whether they convey the defamatory meaning which the plaintiff seeks to place upon them. In answering that question a court discards its judicial robes and the professional habit of analysing and interpreting statutes and contracts in accordance with long established principles. Instead it dons the garb and adopts the mindset of the reasonable lay citizen and interprets the words, and draws the inferences which they suggest, as such a person would do. It follows that meticulous attention to detail, an alertness to and awareness of the subtle nuances in meaning of words, a full appreciation of the influence of context, and a reluctance to draw inferences when they are not soundly based and fully justifiable and amount to no more than speculation, cannot be expected. The law reports are replete with reminders of the looseness of thought and low level of concentration with which even an eminently reasonable member of society may read newspaper reports.

[20] Yet there must be a limit to the allowances which a court should make in a claimant's favour when engaged in the notional exercise postulated. A defamatory meaning should not be attributed to an isolated part of a newspaper report if the rest of the report would show that it is not justified. A claimant should not be permitted to base his case upon the reaction of readers who do not bother to read the whole of the article even although a part of it has attracted their attention precisely because of its potential to lower the esteem in which society holds him. In saying this I am aware that judges have drawn attention to the propensity of readers to 'skim' reports in newspapers but I do not understand that to mean that they must be taken to have entirely ignored everything in a report which they skim, other than that part or those parts of it which, if viewed in isolation, would constitute defamatory material. Why should the writer or publisher of an article the whole of which is intended to be read and, if read, would plainly not be defamatory be held liable for **defamation** because there may have been lazy or careless readers who chose to focus only upon a particular sentence in it. I am also aware that headlines are what attract readers to an article but that does not mean that one may ignore an accompanying headline. However, 'those who print defamatory headlines are playing with fire'.[2]

[21] I approach the question of what the articles and the photo and the caption conveyed having read them in their entirety. In providing the answer I shall confine myself to the meaning of those parts of the articles which are potentially defamatory or relevant to the question of whether they are defamatory.

[22] The country edition:

It conveyed:

1. That detectives engaged in investigating the bombing arrested the plaintiff, his wife and his cousin (all of whom were named) on Thursday 27 August 1998 when they were about to board a flight bound for Egypt, and they were being held overnight by the police;

2. That they were associated with Pagad and that the arrests were made after an anonymous tip-off to the police that they were bound for Egypt and that they might be linked to the bombing;

3. That the two women would be charged with passport offences;

4. That the plaintiff (the 'male suspect') was being held for further questioning, as a suspect in the bombing;

5. That all three were taken to Parow police Station by, inter alia, Mike Barkhuizen, the Waterfront bombing investigating officer;

6. That South Africa's police operations chief, Commissioner André Pruiss, told the Cape Times that there was a possibility that they could have been involved in the blast but that, at that stage, there was no evidence pointing to that.

7. That the plaintiff and his companions had been stopped by the Aliens Control Unit at the airport after fault was found with one of their passports;

8. That the mother of Shanaaz Bayat (the plaintiff's cousin) denied that her daughter's passport was not in order and that she had travelled overseas many times before without experiencing problems with her passport;

9. That a large number (20) of family members at the airport had angrily protested at the arrests and alleged that it was unfair and discriminating against Muslims;

10. That Commissioner Pruiss had responded by saying that there was no intention of harassing Muslims and that the police were merely following all possible leads which included the questioning of all possible suspects.

11. That Commissioner Pruiss and National Police Commissioner George Fivaz had remained in Cape Town to oversee the latest developments and that since early the previous evening they had been receiving reports from the investigating team every 30 minutes.

I do not regard the headings to the article, namely, '"Pulled off plane"' and 'Bomb: Pagad trio held at airport' as conveying anything different from the meaning conveyed by the body of the article.

[23] The peninsula edition:

With minor exceptions (the omission of the content of the 'tip-off'; the reaction of the 20 family members at the airport; and the denial by the mother of Shanaaz Bayat that her passport was not in order) the article conveyed the same information and meaning as that I have attributed to the country edition. However, there was prominence given to the attitude of Pagad to the arrests and it was made clear that Pagad regarded the trio as innocent and the arrests as nothing more than blatant harassment and indicative of a witch-hunt targeting Muslims.

[24] The next question which needs addressing is which, if any, aspects of the articles and photo are defamatory according to the plaintiff, and whether they are indeed defamatory in the light of the meaning which the court has found has to be given to the articles. The plaintiff's first submission is that the articles convey to the public that he is indeed the bomber or responsible for the bombing. That submission is, in my view, untenable. It was also correctly so regarded by the learned judge *a quo*. The articles make it quite plain that the plaintiff is no more than a suspect and that the basis for his status as such was only an anonymous 'tip-off' to the police that he 'might' be involved in the bombing and was on the point of leaving the country. Indeed the articles expressly state that Commissioner Pruiss had said that while the possibility existed that the plaintiff could have been involved in the blast, there was no evidence that he had been involved. Any suggestion that the possible readiness of readers to draw inferences of actual guilt because of a belief that the police do not arrest for questioning people on suspicion of involvement in crime unless there is evidence sufficient to warrant prosecution and conviction (in itself an unsustainable proposition which, if true, would always result in the equating of a statement that a person is suspected by the police of committing a crime with a statement that the person has committed the crime) would be misplaced in the light of what was actually published in these articles. It was made abundantly clear that although the plaintiff was viewed as a suspect by the police,

there was no evidence linking him to the blast.

[25] The trial judge found that the reasonable reader would expect and believe that the police would not have arrested a person whom they did not 'seriously and upon reasonable grounds consider to have played a part' in the bombing. That is of course still not the equivalent of saying that he had committed the crime. Moreover, while the existence of suspicion on the part of the police is an entirely subjective matter, the grounds for their suspicion are objective in their nature and may vary from slender grounds through many gradations to the status of cast-iron grounds. A 'tip-off' from a source objectively well-placed to have access to the information supplied and which has proved to be consistently reliable in the past may be the only ground for the suspicion but it would still rank as a reasonable ground for suspicion even although no evidence, or no admissible evidence, was available to prove guilt. Sight should not be lost of the fact that the grounds for arrest for questioning as a suspect are often less cogent than grounds for a successful prosecution and a reasonably well-informed reader should be alive to the distinction. Such a reader is not entitled to assume that the grounds upon which a suspect has been held by the police for questioning are so strong that an inference of guilt is justified. Comparison with the facts and the approach of the different law lords who participated in the hearing of *Lewis and Another v Daily Telegraph Ltd and Associated Newspapers Ltd*[3] is instructive.

[26] The issue was whether publication of a statement that officers of the City of London Fraud Squad were 'inquiring into the affairs of the [R. Co.] and its subsidiary companies' was libellous. The plaintiff (the chairman of the R. Co.) pleaded that the statement meant that he had been guilty of fraud or was suspected by the police of having been guilty of fraud or dishonesty in connection with R. Co's affairs. The majority of the learned law lords held that the statement was not capable of conveying that the plaintiff was guilty of fraud or dishonesty but that suspicion could be inferred from the fact of the inquiry being held. Lord Hodson said: 'It may be defamatory to say that someone is suspected of an offence, but it does not carry with it that that person has committed the offence, for this must surely offend against the ideas of justice, which reasonable persons are supposed to entertain.[4] Lord Reid, after remarking that some people are unusually suspicious and some are unusually naïve and that one has to try to envisage people between those two extremes and see what is the most damaging meaning that they would put upon the words in question, said: 'What the ordinary man, not avid for scandal, would read into the words complained of must be a matter of impression. I can only say that I do not think he would infer guilt of fraud merely because an inquiry is on foot.'[5]

[27] Lord Devlin was at pains to emphasise that while it is not correct to say as a matter of law that a statement of suspicion imputes guilt, it can be said as a matter of practice that it very often does so because although suspicion of guilt is something different from proof of guilt, it is the broad impression conveyed by the libel that has to be considered and not the meaning of each word under analysis.[6] Implicit in this is that there can be no rule of law about this and that it is a question of fact whether the statement conveys more than a mere suspicion. He also said: 'When an imputation is made in a general way, the ordinary man is not likely to distinguish between hints and allegations, suspicion and guilt. It is the broad effect that counts and it is no use submitting to the judge that he ought to dissect the statement before he submits it to the jury. But if, on the other hand, the *distinction clearly emerges from the words used, it cannot be ignored.*'[7] [My emphasis] He too held that the statement complained of was not capable of meaning that the plaintiff had been guilty of fraud or dishonesty. Lord Jenkins concurred with Lord Reid.[8]

[28] Lord Morris of Borthy-Y-Gest differed. He considered that the statement was capable of meaning that the plaintiff had been guilty of fraud or dishonesty and that the trial judge was right in leaving it to the jury to decide whether that was indeed the meaning which the ordinary reader would have attributed

to the statement.[9] In my respectful view, the learned law lord took too indulgent an approach to the question of what possible meanings could *reasonably* be placed upon the statement and the justification given by him for that approach is unsound.[10] Speculation about why a newspaper chooses to publish a particular statement is of little, if any, help in deciding what the statement means. To speculate yet again about the reader's speculations as to what lay behind the decision to publish the statement and then to use the results of that speculation to justify placing a particular meaning upon the words used is, in my opinion, a futile and impermissible approach which is potentially productive of random and irrational results.

[29] Whether the reasonable reader postulated by English law is the same kind of reader which the law of South Africa postulates remains a question. The adoption by many South African courts[11] over the years of the test propounded by Lord Atkin in *Sim v Stretch*,[12] namely, 'Would the words tend to lower the plaintiff in the estimation of right-thinking members of society generally',[13] indicates that he is. Some controversy exists about the attributes of a 'right-thinking' person. Some might regard them as superior to those of the notional reasonable person so familiar in our jurisprudence.[14] For myself, I have no doubt that sound legal policy should not require a court hearing a ꝏdefamation꜀ suit to ascertain the meaning and effect of words by reference to the meaning and effect that would be attributed to them by anyone other than the well-known notional reasonable person in the particular circumstances. Anything less would be unfair to the publisher of the statement who is sought to be held liable; anything more would be unfair to a plaintiff who bears the onus of establishing both the meaning of the words used and the defamatory nature of that meaning. In the former case it would subject the publisher to liability for less than reasonable interpretations of published matter; in the latter case it would require a plaintiff to establish more than that reasonable readers would attribute a particular meaning of a defamatory nature to the matter. The same considerations apply, so it seems to me, to the suggestion[15] that one test should be applied when ascertaining the meaning of the words used and another more intellectually and ethically rigorous test when deciding whether the ascertained meaning is indeed defamatory. In my view, neither logic nor sound legal policy requires the application of two different criteria to these questions.

[30] Applying that test, the answer seems plain. The meaning of the articles, in broad, was that the plaintiff was associated with Pagad; that he was suspected by the police investigating the bombing of being implicated in the bombing because of an anonymous tip-off that he might be so implicated and was about to leave the country; that he had been arrested at the airport for that reason and was detained overnight for questioning by the police investigating the bombing after being taken to the Parow police cells by the investigating officer; that Commissioner Pruiss had said that while there was a possibility that he might be involved in the bombing, there was no evidence pointing to that; and that he had been stopped at the airport by the Aliens Control Unit after fault was found with one of the passports of the trio named in the articles.

[31] As to the sting of the articles or, in other words, their defamatory nature, I have no doubt that it lies in the allegation that the plaintiff, a Pagad associate, had been arrested and so prevented from flying out of South Africa for Egypt because, as a result of a tip-off, he was suspected of complicity in the bombing. To say of a man that he has been arrested and detained in custody by the police for questioning as a suspect in the commission of a serious crime is, in my view, defamatory. It remains so despite an accompanying statement that the police regard him as a suspect only because of an anonymous tip-off that he, an associate of Pagad, might be involved in the bombing and was about to leave the country for Egypt, and that there was no evidence pointing to his involvement.

[32] ꝏDefamation꜀ is of course an *injuria* to one's *fama* or reputation. I think that it is inevitable that

some damage is done to the reputation of a person when the public is told, before a decision to charge him with a serious crime has been taken and before he has appeared in court, that he is under arrest on suspicion of committing that crime. It is true that in South Africa there is a constitutionally entrenched presumption of innocence until the contrary is proved. However, the harsh reality of the situation is that even mere suspicion, to put it at its lowest, raises doubts in the mind of those to whom it is communicated as to whether the hitherto unsullied reputation which the person enjoyed continues to be deserved or whether it should now be regarded as undeserved. To say that which imperils the continued existence of a person's good reputation and causes people generally to doubt the integrity of that person even though they may not be certain the doubt is justified, is to adversely affect to at least some degree his or her reputation. That the doubt may be temporary and ultimately transient because of the subsequently established innocence of the person concerned cannot cure the loss of esteem which that person endures pending the establishment of his or her innocence.

[33] In the case of Lewis[16] the House of Lords appears to have accepted that it is defamatory to say that a person is suspected by the police of fraud and dishonesty. In the same case in the Court of Appeal it was explicitly so held by Holroyd Pearce L J.[17]

[34] Truth and public benefit:

The plaintiff's approach to the question of truth was to isolate certain of the statements made in the articles and to argue that, because the evidence showed them to be false, it followed that the defendants had failed to prove that the defamatory statements published by the defendants were true or substantially true. The approach would have been understandable if each of the isolated statements said to be false constituted a separate, distinct, and different defamatory allegation against the plaintiff. But I fail to understand how that approach can be appropriate when the isolated statements are not separate and distinct defamatory statements each conveying a different defamatory meaning, but simply elaborations of fact designed to bring home the one and only defamatory meaning of which the articles read as a whole are capable.

[35] To illustrate: If it is said in a letter to the press that a person committed rape in 2003, murder in 1975 and theft in 1970, and when sued, the publisher fails to prove that murder and rape were committed but does prove that theft was committed, the plaintiff is entitled to say that while the allegation that he committed theft is true, the allegation that he committed the other two crimes of violence is untrue and he should be compensated for those unjustifiable defamatory allegations. But where the complaint is that it was falsely alleged that the plaintiff had been arrested upon a charge of murder and that the arresting officer was a member of the murder and robbery unit of the police it cannot avail the plaintiff, if it is established that he was arrested for murder, to say that the evidence shows that he was not arrested by a member of that squad but by a member of the dog unit; that the report is therefore false in that respect; and that therefore the defendant has failed to prove the truth or substantial truth of the report of which the plaintiff complains.

[36] It seems quite obvious in the latter example that whoever arrested the plaintiff is irrelevant to the defamatory sting of the article. It is a peripheral fact which, even if it had been left out, or even if it had been corrected, would have made no difference whatever to the defamatory import of that part of the article which was true.

[37] In the present case, as I have already said, the defamatory aspect of the articles is that the plaintiff was regarded by the police as a suspect in the bombing, was prevented from leaving South Africa and was held for questioning in that regard by police investigating the bombing. The answers to such questions as whether he was formally arrested initially on passport charges; whether, if he was, that was

merely a pretext resorted to to ensure that he would not be able to complain if questioning of him as a suspect in the bombing led to a conclusion that he was innocent and should be released; and whether it was Barkhuizen, the officer investigating the bombing, who took him to Parow Police cells, add nothing to nor subtract anything from the defamatory allegations which exist in the articles. The truth or falsity of these statements is wholly peripheral to the question whether or not the defamatory allegations were true or untrue.

[38] I have no hesitation in finding that the defamatory aspects of the articles were true. The following facts are substantiated by overwhelming evidence. The police investigating the bombing set out to apprehend the plaintiff as a suspect as a result of a 'tip-off' from a source who had proved to be reliable in the past. The suspicion was genuine and not feigned. The border police at the airport were advised of the desire of the police investigating the bombing to apprehend the plaintiff and prevent him from leaving South Africa for Egypt. They were prepared to assist in achieving that objective. They did in fact do so, first, by detaining him and secondly, by taking advantage of a subsequently appearing ground (passport irregularities) for arresting him. Despite Barkhuizen's own doubts about the existence of sufficient evidence to justify an arrest, he continued to regard him as a suspect on the strength of the 'tip-off' communicated to him by Director Knipe. Indeed, Barkhuizen procured his removal from Parow Police cells to the Bellville South Police cells for the express purpose of questioning him as a suspect in the bombing. He exploited the arrest of the plaintiff by the border police by using their detention of the plaintiff to achieve the very purpose which those investigating the bombing had set out to achieve, namely, to prevent the plaintiff from leaving South Africa and to detain him in custody for interrogation as a suspect in the bombing.

[39] It is equally clear that the whole aim of the police was to let it be known to the public, first, that they were not sleeping on the job and were making progress in the investigation; secondly, that they had apprehended a suspect in the bombing and prevented his departure from South Africa on a flight to Egypt; and, thirdly, that he was being held in custody for interrogation as a suspect in the bombing. To that end, the police advised the media of an imminent arrest for that specific purpose so that publicity would be given to the arrest.
They subsequently confirmed, when asked for confirmation, that the plaintiff was being held and interrogated as a suspect in the bombing. They released his name and downplayed the passport offences.
[40] The arrests for alleged passport offences were quite adventitious and were obviously intended to achieve two purposes: first, to enable the border police to check the passports; secondly, to enable the police investigating the bombing to question the plaintiff while he was in custody in his capacity as a suspect in the bombing. It is quite plain that the arrest in the sense of taking him into police custody was as much for the one purpose as the other. That is borne out by the failure of the border police to use immediately their computer link in order to check the passports (as they could have done) and by the utterance of one of the border policemen, 'Ons het hom' when the plaintiff was arrested. He was arrested before anything was known about possible passport irregularities.
[41] The plaintiff too regarded himself as having been detained (arrested) for the bombing and continued to believe it right up to the amendment of his pleadings shortly before the trial commenced. Director Knipe's evidence was unequivocal: if Barkhuizen had not seen to it that the plaintiff was prevented from leaving South Africa that night he (Knipe) would have proceeded to the airport and, come what may, arrested him on suspicion of involvement in the bombing. In the light of all this it cannot be said that the defamatory aspect of the articles was untrue. It was proved on a balance of probability to be true and the learned trial judge was wrong in coming to a contrary conclusion. Reliance on the *Bogoshi* defence is therefore in relation to this particular aspect of the case unnecessary.
[42] That brings me to the question of public benefit or interest – a troublesome aspect of the case. The criterion allows for considerable elasticity in its application and is woefully unhelpful in failing to provide any indication of what is meant by public benefit or interest. It is true that what is interesting to the public is not necessarily the same as what it is in the public interest for the public to know but that

leaves unanswered how to distinguish the two. It seems obvious that what it is in the public interest for the public to know may not in fact be interesting to the public and that what the public finds interesting it may not be in the public interest for the public to know.

[43] Prurient or morbid public curiosity, no matter how widespread, about things which are ordinarily regarded as private or do not really concern the public cannot be the test. Nor can the fact that there is a legitimate public interest in a particular topic such as the prevention of crime and the apprehension of offenders mean that any information of any kind which is relevant to that topic may be published with impunity.

[44] In considering the question of public benefit or interest there is obviously a potential clash between constitutionally entrenched rights: the rights to dignity and privacy on the one hand and, on the other, the right of freedom of the press, of expression, and of receiving or imparting information. None of these rights should be regarded as permanently trumping the others in the sense that there is a pre-ordained and never shifting order of priority to be assigned to each of them. The weight to be assigned to each of them in a given situation will vary according to the circumstances attending the situation. It is not a question of 'balancing' the conflicting rights in order to achieve equilibrium between them; it is a matter of *ad hoc* assessment of what weight should be assigned to the respective rights in the particular circumstances of the case and giving precedence and effect to the right which weighs most heavily in such a manner as will impair the countervailing right as little as reasonably possible. It is important to appreciate the distinction between a case such as this in which the two rights under consideration are both equally constitutionally entrenched rights and a case in which only one of the two rights is so entrenched. It is in the latter class of case, not the former, in which s 36(1) of the constitution becomes relevant. However, in the former class of case difficult questions of proportionality arise.[18]

[45] I doubt that it can *never* be in the public interest or for the public benefit for the media to name a suspect and publish a photograph of him or her before any court appearance. The crime or offence of which the person is suspected may be of such a kind that the public may be entitled to be informed of his or her identity even before any appearance in court so that they can steer clear immediately of the person until guilt or innocence has been established, or so that the person's continued discharge of a high profile public office which requires the encumbent to be, like Caesar's wife, above even suspicion, may be temporarily suspended pending the outcome of an investigation.

[46] Some examples of offences I have in mind are a person who practises as a medical doctor but who is suspected of not being qualified or registered to do so as the law requires or a judicial officer who is suspected of serious crime. There is danger to the public at large inherent in the first example and persons who consult that person or who may be minded to do so should perhaps be alerted to that so that they can make up their own minds whether or not they wish to steer clear of the person until the question is resolved. In the second example there may be no more danger to the public than exists in the case of any other person suspected of a similar crime but the nature of the public office which the person is required to discharge is such that public confidence in its discharge will be undermined if the person continues to discharge it while under a cloud of suspicion of having done that which the State has empowered him or her to punish others for doing. I wish to make it quite clear that in posing these examples I am not deciding that it would be in the public interest to name the suspects in these examples before a formal charge has been laid and an appearance in court has occurred. I mention them only to point to some distinctions which differentiate one type of case from another and *may* (I put it no higher) result in different conclusions as to whether or not an early disclosure of the identity of the suspect is in the public interest. There are also of course cases in which the police specifically enlist the aid of the media in tracking down a suspect whose whereabouts are unknown.

[47] That said, I think that the consequences of a premature disclosure of the identity of a suspect can be so traumatic for and detrimental to the person concerned when he or she may never be charged or appear in court and is, in fact, innocent, that greater weight should be assigned to the protection of the constitutional right to dignity and privacy and the common law right of reputation, than to the right of the press to freely impart information to the public. It is not as if the press will be permanently deprived of the right to identify the suspect. Once he or she appears in court his or her identity may be disclosed

with impunity. In the meantime the press are at liberty to inform the public of what it is clearly in the public interest to know, namely, that an unnamed suspect has been arrested and questioned by the police in connection with the commission of a crime. But, generally speaking, and subject to the considerations I have mentioned in paras [45] and [46], I do not believe it is in the public interest or for the public benefit that the identity of a suspect be made known prematurely.

[48] It is so that in this particular case a horrendous crime which created huge public alarm had been committed. But the seriousness of the crime alone cannot be the touchstone as to whether or not it is in the public interest to prematurely name a suspect. Nor is there anything in the nature of the crime other than the apparent unconcern of the perpetrators about who might be killed or injured by the bombing which takes the matter any further. It is true that these factors certainly heighten the legitimate public interest which will exist in knowing whether progress has been made in the investigation by the police and whether any arrests have been made. But they do not create or heighten a need for the public to know the identity of any suspects whom the police may decide to question.

[49] The plaintiff was not a person with a high public profile. He did not hold a public office of any kind. He was merely another citizen. There was no evidence linking him with the blast. He was only being questioned about the matter and no decision had been taken to charge him with the bombing. As a fact, the decision to reveal his identity was not made because those responsible for the decision considered it to be in the public interest in the legal sense but because his identity had already been disclosed in television news reports and was therefore thought to be in the public domain. However, that subjective belief is not relevant. The test of public interest or benefit is objective.

[50] The photograph of the plaintiff requires special consideration in this context. It is a criminal offence under s 69 of the South African Police Services Act 68 of 1995 for any person to publish, without the written permission of the National or Provincial Commissioner, a photograph of any person who, *inter alia*, is suspected of committing an offence and who is in custody pending a decision to institute criminal proceedings against him or her. The object of the prohibition is manifest: it is to avoid any subsequent trial of that person being compromised or prejudiced by a premature photographic disclosure of the identity of the suspect. If that is regarded as an important enough interest to warrant parliament providing statutory protection of it, it leaves little, if any, room for the conclusion that it is in the public interest to publish such a picture without such permission and at a time when the person concerned is no more than a suspect and has neither been charged nor appeared before a court.

[51] It is not necessary to consider whether there is any scope for the application of the principles laid down in the case of *Bogoshi* to the requirement that public interest or benefit exist. A bona fide subjective belief in the existence of public interest or benefit without reasonable grounds for the belief could obviously not avail a defendant. But what the position would be if there was much to be said for a conclusion that publication would be in the public interest but not quite enough to justify the conclusion, it is not necessary to decide because the decision to publish the plaintiff's identity was not based on a belief that it was in the public interest to do so. In any event, I am not convinced that the *Bogoshi* principles are of any application to the public interest or benefit aspect of the defence of truth and public benefit. *Prima facie*, they are not. None of the defences to the claim for **⬥damages for defamation⬥** have been made out and the plaintiff is entitled to appropriate **⬥damages⬥**. To that subject I shall return.

[52] Impairment of dignity:

Whatever doubt may have existed in the past as to whether *dignitas* was a separate and distinct right of personality which merited independent recognition and protection, there is no longer any doubt. The matter is now placed beyond contention by virtue of the constitutional entrenchment of a right to dignity which inheres in every person.[19] Overlapping is bound to occur whenever a defamatory statement is made which is at one and the same time an affront to the person's dignity. Some maintain that every *injuria* (including those relating to *corpus* and *fama*) adversely affects *dignitas*. It is not necessary to decide whether that is always so; it is sufficient to acknowledge that it will often be so.

[53] In many ways the problems which arise in deciding whether separate awards of compensation for **⬥defamation⬥** and affront to dignity should be made are similar to those which arise in the criminal law in relation to the splitting of charges. In the present case it is inappropriate to attempt to assess in

monetary terms what *solatium* should be given for the affront to *dignitas* and what should be given for the damage to *fama*. The learned judge exercised a proper discretion in awarding a lump sum to cover both. The infractions of those two rights were so intertwined that any attempt to compensate for each of them separately would have been attended by a substantial risk of compensating twice for what was essentially one delictual act, namely, the unlawful publication of the plaintiff's identity in articles defamatory of him. To the appropriateness of the *quantum* of the award I shall revert.

[54] It is necessary to correct an observation made by the learned judge in dealing with the claim for impairment of dignity. He said that publication of the country edition had to be ignored because the plaintiff never knew of its publication until three years later. That does not derogate from the fact that he ultimately came to know that three years before a large number of people who read that edition suspected him of being the sort of person who had no claim to any dignity, namely, a common murderer. That he did not know that at the time does not mean that, objectively regarded, he was not subjected to indignity in the eyes of the public. He was. That he only learnt of it *ex post facto* and suffered from the knowledge then does not deprive him of a remedy.

[55] Invasion of privacy:

It is also no longer open to doubt that an action for **damages** for invasion of privacy exists in our law. Whether it is really an independently existing *injuria* in its own right or whether it is a species of affront to *dignitas* is of little importance. The point is that invasions of privacy are forbidden by the Constitution and the common law and are actionable.[20]

[56] Here again there may be overlapping of *injuriae*. Invasion of privacy can take many forms. Some may involve no publication of defamatory statements or material, such as, for instance, 'peeping Tom' cases. Others may be part and parcel of a defamatory publication as, for example, a statement that a person has blackmailed a medical practitioner because he failed to diagnose timeously that the person was suffering from cancer. The allegation of blackmail is destructive of *fama*; the allegation that the person suffers from cancer is not but it is an intrusion upon the right of privacy. In this example, there is no overlapping of the two *injuriae*. But where a published statement accuses a person of being addicted to pornography (a defamatory statement) the invasion of privacy is so inextricably enmeshed with the assault upon *fama* that the assessment of compensation for the assault upon *fama* will necessarily entail an evaluation of the impact upon both the public and the plaintiff of the publication of the fact (if it is true) that the person is addicted to pornography. To treat the invasion of privacy as a separately actionable delict in such a situation is akin to what would be an impermissible splitting of charges in the criminal law.

[57] It is not necessary to decide whether the very institution of a separate claim for **damages** for invasion of privacy in circumstances such as those in the last-mentioned example is permissible. It is sufficient to say that where such a situation arises, it will seldom, if ever, be possible to quantify separately from the **damages which ought to be awarded for the defamation, the damages** which ought to be awarded for the concomitant invasion of privacy and, generally speaking, no such attempt should be made. Just as in the case of a concomitant affront to dignity, the **damages** (if any) should be merged into one globular amount.

[58] In the present case the most serious invasion of privacy complained of is the publication of the facts and circumstances of the plaintiff's arrest as a suspect. Those are not, in my opinion, private matters. It was a publicly performed arrest in a crowded airport. The fact that he was suspected by the police of involvement in the explosion and was detained for questioning in that connection is not information which was intrinsically private to him.

[59] The remaining disclosures of allegedly private matters of which the plaintiff complains are the publication of his name and photograph, that he was a member of Pagad, and that he was about to depart from Cape Town to Egypt. The publication of his name and photograph and that he was a member of Pagad is so inextricably part of the facts which are relied upon to support the claim for **defamation** that no additional actionable breach of the plaintiff's rights can be said to have occurred. The same applies to the disclosure of the intended flight to Egypt, if it is to be given a sinister connotation. If it is

not, then it is not, in my opinion, private information of a kind which the law should regard as worthy of protection. As Prosser puts it: 'The ordinary reasonable man does not take offence at mention in a newspaper of the fact that he has returned home from a visit or gone camping in the woods, or given a party at his house for his friends.'[21] In my view, this claim should have failed.

[60] To sum up on the merits of the claims, **defamation** was established in the sense set out in para [30] of this judgment, so was the affront to dignity inherent in the **defamation**; the claim for invasion of privacy was not made out. Contrary to the finding of the learned trial judge, the truth of the defamatory aspect of the articles was proved and there was no recklessness on the part of those responsible for the publication.

[61] **Damages**:

In the light of these findings the **damages** awarded require reassessment. The trial judge's finding that aspects of the defamatory parts of the articles were not true and were recklessly made, would obviously have influenced his assessment of the **damages**. Moreover the third claim should not have been upheld. This court is therefore at large to reassess the **damages to be awarded for the defamation** and accompanying affront to dignity.

[62] That it was a serious case of **defamation** and affront to dignity I have no doubt. But the case is complicated by the fact that by the time the articles appeared the plaintiff had already been named in national television broadcasts as having been arrested as a suspect in the bombing. While that does not render lawful the repeated publication of that defamatory statement by the defendants, one must bear in mind that publication took place only to the readers of the Cape Times and that many of them are likely to have already been aware of the television broadcasts. The additional damage done to the plaintiff's reputation by the republication is what must be compensated for. To quantify the **damages** as if the Cape Times had been the first offender and therefore responsible for all the harm caused countrywide to the plaintiff's reputation would be unrealistic and amount to making it pay for the sins of others. Nor can one ignore the fact that many readers of the Cape Times were probably already aware of the facts published by it. Some allowance, however difficult its quantification may be, has to be made for that.

[63] I think it is also relevant that the context in which that part of the articles which has been found to be defamatory appears is strongly sympathetic to the plaintiff, expresses the outrage at his arrest of a significant sector of the public and, most importantly, reveals that, objectively regarded, there was no evidence linking him to the bombing. These are mitigating factors.

[64] Having regard to the general level of awards of **damages for defamation** and associated *injuriae* in South Africa over the years and taking into account the concomitant diminution in the value of money, I consider that an award of R50 000,00 as combined compensation for the claims for **defamation** and affront to dignity would be appropriate.

[65] Costs:

The defendants have achieved some success on appeal. It cannot be described as insubstantial. The plaintiff could have abandoned a part of the award for claims 1 and 2 and the whole of the award for claim 3. It did not and that obliged the defendants to appeal even if only to achieve that partial success. On the other hand, the defendants sought on appeal to deprive the plaintiff of the whole of the judgment in its favour including the favourable costs order. The plaintiff was obliged to oppose the appeal to prevent that happening and has succeeded to a substantial extent in doing so. In these circumstances it would not be fair to dub either the plaintiff or the defendants as the losers in the appeal. They have all achieved substantial success. To order one side to pay the costs of the other would not be appropriate. It would be fairer to order them each to pay their own costs of appeal.

[66] There is no reason to interfere with the order made in respect of the trial costs. The costs of the applications for leave to appeal are another matter. There is no good reason why the plaintiff, having unsuccessfully resisted the applications, should not bear the costs of the applications.

[67] It is ordered:

(a) That the appeal is upheld and that the order of the court *a quo* is set aside and substituted by the following order:

'Judgment for the Plaintiff against Second, Third and Fourth Defendants jointly and severally, the one

paying the other to be absolved, on claims 1 and 2 in the sum of R50 000,00 with *mora* interest on such sum at the rate of 15,5 *per centum per annum* from 15 June 1999 to date of payment, and costs of suit which shall include the costs of two counsel but shall exclude the costs of counsels' appearance and the attorneys' attendance at court on one day of the trial. Each of the parties shall bear his/its own costs of such day. Claim 3 is dismissed. No order as to costs is made in respect of Claim 3.'

(b) That the court *a quo's* order that the appellants pay the costs of the application made to it for leave to appeal is set aside and that the respondent pay the costs of both the application for leave to appeal in the court *a quo* including the costs of two counsel and the application to this court for leave to appeal.

(c) That each of the parties pay his/its own costs of appeal.

_____

**R M MARAIS JUDGE OF APPEAL**

**SCOTT JA )**
**MTHIYANE JA ) CONCUR**

**NUGENT JA:**

[68] I agree with the order that is proposed by Marais JA but I regret that I do not agree with all the reasons for his conclusion.

[69] The freedom of the press is protected by s 16(a) of the Bill of Rights, which comes against the background of a considerable history in this country of the suppression of the truth. Consistent with venerable democratic traditions the protection of press freedom recognises that society is generally best served by having access to information rather than by having it concealed.[22] Any inroad upon that protection will be countenanced by law only if, and to the extent that, the inroad is both reasonable and justifiable in an open and democratic society based upon human dignity, equality, and freedom, values that are themselves protected,[23] taking into account the factors that are referred to in s 36(1) of the Bill of Rights.

[70] The traditional requirement of our law that the publication of substantially true defamatory matter is lawful only if its publication is in the public interest falls to be applied in that context for the Bill of Rights embodies a system of objective, normative values for legal purposes.[24] In my view the protection that is afforded to press freedom must mean that it will generally be in the public interest for truthful matter to be published except where its suppression is justified by the considerations referred to in s 36(1).

[71] That also accords with the approach that has been taken under the common law. In *Graham v Ker* (1892) 9 SC 185 at 187 De Villiers CJ said that

'[a]s a general principle, I take it to be for the public benefit that the truth as to the character or conduct of individuals should be known.'

The learned chief justice went on to qualify that general statement by excluding from its ambit the publication of material that serves no purpose but to rake up old scandals,[25] and it has also been qualified to exclude material that is essentially private.[26] I have little doubt that those limitations receive further support today from the protection that is accorded to dignity and to privacy – though we are reminded by s 36(1) that any limitation must be confined to what is reasonable and justifiable for the protection of other protected rights – but in my view the general principle that he enunciated is a salutary starting point for the enquiry.

[72] If the defamatory material that is in issue in this appeal was indeed substantially true then I can see no proper grounds upon which the appellants were precluded from publishing a part of it, namely, the respondent's identity. (I am not referring to the publication of the respondent's image, which is prohibited by s 69 of the South African Police Services Act 68 of 1995, but to the identification of the respondent by name). The arrest of a person, particularly on a serious charge, is always a matter of public concern, and in my view that applies no less to the identity of the person who is the subject of the

arrest. No doubt a person who is placed under arrest might feel that his or her dignity and privacy has been invaded when the arrest is made known but that occurs whenever an unsavory truth concerning a person is published. I do not think that the protection that is afforded to dignity or privacy – which are themselves capable of being limited – constitutes reasonable and justifiable grounds for suppressing the truth in such circumstances. As pointed out by Wessels JA in *Johnson v Rand Daily Mails*:[27]

'Why do we allow a defendant to justify at all, "Because," in the words of LITTLEDALE, J., in *McPherson v Daniels* (10 B. & C. p. 272), "it shows that the plaintiff is not entitled to recover ✦damages✦; for the law will not permit a man to recover ✦damages✦ in respect of an injury to a character which he either does not or ought not to possess."'

To say of a person that he or she has been arrested does not generally amount to an imputation of guilt, and I do not see that the doubt that is thereby cast upon his or her reputation is premature: the statement does no more than to reflect the temporary but contemporaneous state of that reputation.[28] And while it is true that a newspaper may with impunity disclose the identity of an arrested person once that person has appeared in court (because it is then protected by the privilege that attaches to reports of court proceedings) I do not think that assists to resolve the anterior question whether it is in the public interest to make the disclosure in the absence of that special protection.

[73] The position is quite different where the defamatory material is not true. As pointed out by Cory J in *Hill v Church of Scientology of Toronto* (1995) 126 DLR 4th 129 (SCC) 159-60 (cited with approval in *National Media Ltd & Others v Bogoshi*[29] and *Khumalo v Holomisa*:[30]

'False and injurious statements cannot enhance self-development. Nor can it ever be said that they lead to the healthy participation in the affairs of the community. Indeed they are detrimental to the advancement of these values and harmful to the interests of a free and democratic society. . .'

That is also consistent with the common law in this country. There are nevertheless circumstances in which even untrue defamatory matter is protected but in my view none of those circumstances arise in the present case.

[74] In my view the defamatory matter that is in issue in this case was indeed untrue and it is for that reason that its publication was unlawful. The material was published the morning after the respondent was arrested. The article that was published in the early (country) edition concerned the circumstances of the arrest. By the time the later (peninsula) edition was published the story had moved on: the arrest of the respondent provided the foundation for an article that was directed to the reaction to the respondent's arrest. What was central to both articles, however, was the statement that the respondent had been arrested.

[75] The cause of the respondent's arrest was not expressly stated in either of the articles. However, the juxtaposition of the photograph of the respondent being led away in handcuffs with the caption 'SUSPECT HELD', the byline reading 'DETECTIVES PROBING Tuesday's horrific Waterfront blast yesterday arrested three Capetonians about to board an Egypt-bound flight at Cape Town International Airport', the box referring to other stories relating to the bombing, and the headlines (in the country edition the headline was 'BOMB: PAGAD TRIO HELD AT AIRPORT' while in the peninsula edition the headline was 'PAGAD OUTRAGE OVER BOMB ARRESTS'), when read together with the text in each case, would have left the reasonable reader of ordinary intelligence in no doubt that the respondent was arrested in connection with the bombing.

[76] When it is said of a person that he or she has been arrested in connection with a particularly odious bombing I do not think that the statement is justified by proof that the person was indeed arrested, but only in connection with a passport irregularity, and that the police then exploited the opportunity to question the person because they suspected that he or she might possibly have been involved in the bombing (which is what the truth was in the present case). Proof of those facts, whether viewed separately or together, does not seem to me to meet the sting of the defamatory allegation. The ordinary meaning of the language that is used in a publication includes what the reader would infer from it. In *Argus Printing & Publishing Co Ltd and Others v Esselen's Estate* 1994 (2) SA 1 (A) 20F-J Corbett CJ said the following:

'... [T]he reasonable person of ordinary intelligence is taken to understand the words alleged to be defamatory in their natural and ordinary meaning. In determining this natural and ordinary meaning the Court must take account not only of what the words expressly say, but also of what they imply. As it was put by Lord Reid in *Lewis and Another v Daily Telegraph Ltd; Same v Associated Newspapers Ltd* [1963] 2 All ER 151 (HL) at 154E-F:

'What the ordinary man would infer without special knowledge has generally been called the natural and ordinary meaning of the words. But that expression is rather misleading in that it conceals the fact that there are two elements in it. Sometimes it is not necessary to go beyond the words themselves as where the plaintiff has been called a thief or a murderer. But more often the sting is not so much in the words themselves as in what the ordinary man will infer from them and that is also regarded as part of their natural and ordinary meaning.'

And in *Jones v Skelton* [1963] 3 All ER 952 (PC) Lord Morris of Borth-y-Gest, citing *Lewis's* case, stated (at 958F-G):

'The ordinary and natural meaning of words may be either the literal meaning or it may be an implied or inferred or an indirect meaning: any meaning that does not require the support of extrinsic facts passing beyond general knowledge but is a meaning which is capable of being detected in the language used can be a part of the ordinary and natural meaning of words. . . .'''

[77] The inference that a reasonable reader would draw from the statement that a person has been arrested in connection with an offence will necessarily depend upon the context in which it is made.[31] I agree with Marais JA (and the learned judge in the court *a quo*) that such a statement, without more, does not ordinarily carry the imputation that the arrested person is guilty of the offence. As pointed out by Mason J in the High Court of Australia in *Mirror Newspapers Ltd v Harrison* (1982) 42 ALR 487 (HC of A) 492:

'As we have seen, there is now a strong current of authority supporting the view that a report which does no more than state that a person has been arrested and has been charged with a criminal offence is incapable of bearing the imputation that he is guilty or probably guilty of that offence. The decisions are, I think, soundly based, even if we put aside the emphasis that has been given to the process of inference on inference that is involved in reaching a contrary conclusion. The ordinary reasonable reader is mindful of the principle that a person charged with a crime is presumed innocent until it is proved that he is guilty. Although he knows that many persons charged with a criminal offence are ultimately convicted, he is also aware that guilt or innocence is a question to be determined by a court, generally by a jury, and that not infrequently the person charged is acquitted.' [32]

But I agree with the learned judge in the court *a quo* that the reasonable reader would infer at least that the police believe that reasonable grounds exist for suspecting that the arrested person committed the offence for which he or she was arrested. Not since the repeal of s 29 of the Internal Security Act 74 of 1982 in 1993[33] has it been the law in this country that the police may arrest a person for no reason but to question him or her in connection with an offence. A person may ordinarily be arrested by the police only if he or she is suspected, on reasonable grounds, to have committed an offence,[34] and a person's freedom from arrest without just cause is also protected by s 12(1) of the Bill of Rights. I think that the reasonable reader can be taken to know that, and will construe the statement accordingly.[35] The assertion in the body of each of the articles (the fifth paragraph of the country edition and the thirteenth paragraph of the peninsula edition) that Commissioner Pruiss had said that '[t]here is the possibility that they could be involved in the blast, but at this stage there is no evidence pointing to this' does not seem to me to negate the effect of what was proclaimed so loudly in the material that preceded it. The absence of actual evidence is not inconsistent with the existence of reasonable grounds for suspecting that a person has committed an offence.[36] But in any event I do not think that the average reader would have understood the statement by Pruiss (assuming that the reader ever reached it) to negate the unambiguous inference in the introductory portions of the articles, for they would surely have asked why the respondent was then arrested if the police did not believe that reasonable grounds existed for doing so. I do not think that liability for a defamatory assertion can ordinarily be escaped merely by also making a

contradicting assertion (if it was contradicting in this case) somewhere else in the publication. Naturally, a newspaper article must be read as a whole, but that is because words often take their meaning from the context. I do not think that means that a defamatory statement that requires no contextual setting to be given its proper meaning is necessarily negated by also asserting the contrary. In my view the dominant impression that readers would have been left with after reading both articles, notwithstanding what was reported to have been said by Pruiss, was that the respondent was arrested in connection with the bombing, and that carried with it the natural inference that the police believed that reasonable grounds existed for suspecting that the respondent was implicated in the bombing.

[78] To make that statement of a person is in my view defamatory for in the eyes of ordinary right thinking people his or her hitherto unblemished character will at least be placed in doubt by such an assertion albeit that the diminution in reputation might only be temporary.[37] A statement to that effect seems to me to be analogous (though perhaps less serious) to a statement that a person has been charged with a serious offence, of which Colman J said the following in *Hassen v Post Newspapers (Pty) Ltd & Others* 1965 (3) SA 562 (W) 562 at 565D-E:

'In my view the reasonable, normally intelligent, right thinking member of society, when he hears that a man known to him has been charged with a crime, will withhold final judgment on that man. But, temporarily at any rate, the news will tend to lower that man in his estimation, and diminish his willingness to associate with him.'

But to say of a person that he or she has been arrested in connection with an offence is in my view also more damaging than to say merely that the police questioned him or her in connection with the offence because they believed that he or she might possibly be implicated, for no doubt the police question many people when they are investigating the commission of an offence. It is all a question of degree.

[79] The defamatory statement in the present case was that the respondent was arrested in connection with the bombing, which carried the natural inference that the police believed that reasonable grounds existed for suspecting that he was implicated in the commission of the offence, and that was what was required to be justified. Whether it was capable of being justified merely by proof that the respondent was arrested in connection with the bombing, or whether it was necessary to establish in addition that the police indeed believed that reasonable grounds existed for suspicion, is not necessary to decide.[38] In both respects the appellants failed. The respondent was not arrested in connection with the bombing: he was arrested because his passport was suspected to be irregular. Moreover, reasonable grounds did not exist for suspecting that the respondent was implicated in the bombing (I do not think that undisclosed information from an anonymous source can be said to constitute reasonable grounds justifying an arrest) nor did the police believe they did, which is precisely why they refrained from arresting him on those grounds. Perhaps the respondent would not have been arrested for the passport irregularity if police had not wanted to question him in connection with the bombing but in my view that does not meet the sting of the defamatory statement. If that was the truth then no doubt the appellants were free to publish those facts but it did not justify the truth being distorted. The fact that Inspector Knipe was willing to resort to an unlawful arrest if that had been necessary to enable the respondent to be questioned before he left the country also does not seem to me to take the matter further when that is not what occurred.

[80] The appellants also sought – albeit tentatively – to rely upon the defence that is foreshadowed in *Bogoshi's* case. I am not at all sure that the nature of the statement in the present case is such that its publication is required to be protected even if it is untrue (see *Bogoshi,* 1211D-1212J) but in any event the appellants, who bear the onus, have not established that reasonable steps were taken to avoid publishing what was in fact untruthful.

[81] For those reasons I agree with the learned judge in the court *a quo* that the publications were defamatory of the respondent and were unlawful. But I agree with Marais JA that the ⭑damages⭒ that were awarded were excessive. I have already pointed out that the defamatory statement did not impute that the respondent was guilty but merely cast temporary doubt upon his hitherto good character. Moreover, the respondent was released from arrest that very afternoon and he took the opportunity to announce that fact at a press conference. I also agree with Marais JA that the respondent's privacy was

not invaded, and that the harm to his dignity is properly to be taken into account in the assessment of the ⏷**damages**⏷ for ⏷**defamation**⏷, generally for the reasons that he has given, subject to what I have said earlier in this judgment, and I agree with his approach to the question of costs.

[82] For those reasons I agree with the order that is proposed.

_____

**R W NUGENT**
**JUDGE OF APPEAL**

**PONNAN AJA ) CONCURS**

---

[Context⏷] [Hide Context]

---

[1] *National Media Ltd & Others v Bogoshi* 1998 (4) SA 1196 (SCA).

[2] So said Lord Nichols in *Charleston v News Group Newspapers Ltd* [1995] 2 AC 65 at 74C-D. Lord Bridge said: 'Whether the text of a newspaper article will, in any particular case, be sufficient to neutralize the defamatory implication of a prominent headline will sometimes be a nicely balanced question for the jury to decide and will depend not only on the nature of the libel which the headline conveys and the language of the text which is relied on to neutralize it but also on the manner in which the whole of the relevant material is set out and presented. But the proposition that the prominent headline, or as here the headlines plus photographs, may found a claim in libel in isolation from its related text, because some readers only read headlines, is to my mind quite unacceptable in the light of the principles discussed above.' (At 72H-73B). Cf *Leon v Edinburgh Evening News Limited* 1909 SC 1014.

[3] [1963] 2 All ER 151 (HL).

[4] At 167H.

[5] At 155F.

[6] At 173 I-174A.

[7] At 173H.

[8] At 157C.

[9] At 163D-E.

[10] At 163E-164B.

[11] See the numerous cases cited at p96, note 85 by Burchell, *The Law of* ⏷**Defamation**⏷ *in South Africa*.

[12] [1936] 2 All ER 1237 (HL).

[13] At 1240.

[14] Burchell, *The Law of* ⏷**Defamation**⏷ *in South Africa*, p 96.

[15] Jansen JA in *SA Associated Newspapers Ltd en 'n ander v Samuels* 1980 (1) SA 24 (A) at 30 and *Demmers v Wyllie* 1980 (1) SA 835 (A) at 840.

[16] [1963] 2 All ER 151 (HL). See too the observations of Colman J in *Hassen v Post Newspapers (Pty) Ltd and others* 1965 (3) SA 562 (W) at 564 D-565H.

[17] [1962] 2 All ER 698 (CA) at 713.

[18] Cf *Campbell v MGN Limited* [2004] UKHL 22, a decision (as yet unreported) of the Appellate Committee of the House of Lords rendered on 6 May 2004. See, in particular, paras 12, 20, 55, 84-86, 103-126, 138-142 and 167. See too *Khumalo and others v Holomisa* 2002 (5) SA 401 (CC) at 417-419 and Professor J Neethling's article, 'Indringing in privaatheid en die openbare inligtingsbelang', *TSAR* 2003 3 568 at 572.

[19] S 10 of the Constitution 1996.

[20] S 14 of the Constitution 1996. The circumstances of this case do not necessitate an enquiry into the question 'whether there are now two potential delictual actions for invasions of privacy – a common law action and a constitutional action – or whether the common law action should subsume the constitutional action without creating a new delict'. The question is debated by Professor David McQuoid-Mason in his article, 'Invasion of privacy: common law v constitutional delict – does it make a difference?', 2000 *Acta Juridica* 227.

[21] Prosser, *Law of Torts*, 4 ed (1971) at 811.

[22] *National Media Ltd & Others v Bogoshi* 1998 (4) SA 1196 (SCA) 1207I-1208G; 1210G-H.

[23] Sections 9, 10 and 12 of the Bill of Rights.

[24] *Carmichele v Minister of Safety and Security and Another (Centre for Applied Legal Studies Intervening* 2001 (4) SA 938 (CC) para 54

[25] See too *Lyon v Steyn* 1931 TPD 247; *Patterson v Engelenburg & Wallach's Limited* 1917 TPD 350 356-7.

[26] *Groenewald v Homsby* 1917 TPD 81.

[27] 1928 AD 190 at 206.

[28] Cf *Mirror Newspapers v Harrison* (1982) 42 ALR 487 (HC of A) 494 in which Mason J said that it was 'unquestionably ... in the public interest' to publish the mere fact that someone has been arrested and charged for an offence (in contradistinction to the imputation that the person is guilty).

[29] Footnote 1 at 1209G.

[30] 2002 (5) SA 401 (CC) 421C-D.

[31] Cf *Ross McConnel Kitchen & Co (Pty) Ltd v John Fairfax & Sons Ltd* (1980) 2 NSWLR 845 paras 25 and 26;

[32] See too: *Lewis v Daily Telegraph Ltd* [1964] AC 234 (HL)

[33] That section, amongst others, was repealed by Act 206 of 1993.

[34] See, for example, *Duncan v Minister of Law and Order* 1986 (2) SA 805 (A) 818G-H.

[35] See Mason J's view, obiter, to that effect in *Harrison's* case, above, at 493.

[36] *Duncan v Minister of Law and Order*, above, 819G-821E.

[37] Even to say no more than that there is suspicion that a person might have committed an offence has been said in other jurisdictions to be capable of giving rise to a defamatory imputation: *Lewis v Daily Telegraph Ltd*, above; *Ainsworth Nominess (Pty) Ltd v Hanrahan* [1982] 2 NSWLR 823; *Sergi v Australian Broadcasting Commission* [1983] 2 NSWLR 670; *Whelan v John Fairfax & Sons Ltd* [1988] 12 NSWLR 148.

[38] Cf *Cadam & Others v Beaverbrook Newspapers Ltd* [1959] 1 QB 413 (CA) 422; *Stern v Piper* [1997] QB 123 (CA) 134F; *Shah v Standard Chartered Bank* [1999] QB 240 (CA); Gatley, above, para 11.6.

[Context↴] [Hide Context]

**SAFLII:** | Terms of Use | Feedback
URL: *http://www.saflii.org/za/cases/ZASCA/2004/57.html*

# EXHIBIT H



**SWEET & MAXWELL UNITED KINGDOM LAW IN FORCE**
COMPANIES ACT 2006 CHAPTER 46
**PART 31 DISSOLUTION AND RESTORATION TO THE REGISTER
CHAPTER 2 PROPERTY OF DISSOLVED COMPANY
PROPERTY VESTING AS BONA VACANTIA**
UK Statutes Crown Copyright. Reproduced by permission of the
Controller of Her Majesty's Stationery Office.

In-force date: Date not available (see Analysis Tab for Commencement
Information)

s 1012 Property of dissolved company to be bona vacantia

(1) When a company is dissolved, all property and rights whatsoever vested in or held on trust for the company immediately before its dissolution (including leasehold property, but not including property held by the company on trust for another person) are deemed to be bona vacantia and-

(a) accordingly belong to the Crown, or to the Duchy of Lancaster or to the Duke of Cornwall for the time being (as the case may be), and

(b) vest and may be dealt with in the same manner as other bona vacantia accruing to the Crown, to the Duchy of Lancaster or to the Duke of Cornwall.

(2) Subsection (1) has effect subject to the possible restoration of the company to the register under Chapter 3 (see section 1034).

GENERAL MATERIALS

Royal Assent date - Long Title - Notes
UK-LIF ST 2006 c 46 Pt 31 c 2 s 1012

UK ST 2006 c 46 Pt 31 c 2 s 1012
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-275-GMS |
| | ) | |
| BRETT J. CORMICK and ELAN SUISSE | ) | |
| INTERNATIONAL HOLDINGS (USA) LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| ELAN SUISSE LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 07-60-GMS |
| v. | ) | |
| | ) | |
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 16, 2007, I caused a true and correct copy of

the foregoing ***Robert D. Christ's Opening Brief in Support of His Motion for Judgment on the***

***Pleadings*** to be served on counsel for defendants as listed below, via electronic CM-ECF:

*Attorneys for Defendants:*

David L. Finger, Esquire
Finger & Slanina, P.A.
One Commerce Center, Suite 725
1201 North Orange Street
Wilmington, DE  19801-1155

Dated:  October 16, 2007

*/s/ Thad J. Bracegirdle*
Thad J. Bracegirdle (No. 3691)

WILLIB-49001.2