IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-275-GMS |
| | ) | |
| BRETT J. CORMICK and ELAN SUISSE | ) | |
| INTERNATIONAL HOLDINGS (USA) LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| ELAN SUISSE LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-60-GMS |
| | ) | |
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Defendant. | ) | |

**ROBERT D. CHRIST'S REPLY BRIEF IN SUPPORT OF
HIS MOTION FOR JUDGMENT ON THE PLEADINGS**


REED SMITH LLP

Thad J. Bracegirdle (No. 3691)
1201 Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 778-7500

Attorneys for Robert D. Christ

Dated: November 9, 2007

## <u>TABLE OF CONTENTS</u>

**Page(s)**

**PRELIMINARY STATEMENT** ...................................................................1

**ARGUMENT** ...............................................................................................4

I. THE ALLEGATIONS OF MR. CORMICK'S COUNTERCLAIMS FAIL TO ESTABLISH A CAUSE OF ACTION PURSUANT TO THE ALIEN TORT CLAIMS ACT ..................................................................................5

II. THE ALLEGATIONS OF MR. CORMICK'S COUNTERCLAIMS FAIL TO ESTABLISH A CAUSE OF ACTION PURSUANT TO ZIMBABWEAN LAW .............................................................................9

III. NEITHER MR. CORMICK NOR ELAN SUISSE IS ENTITLED TO GENERAL OR SPECIAL DAMAGES ON THEIR CLAIMS FOR DEFAMATION ......................................................................12

IV. MR. CHRIST SHOULD BE AWARDED HIS FEES AND COSTS EXPENDED IN DEFENDING ELAN SUISSE'S NOW-WITHDRAWN LANHAM ACT CLAIMS.............................................................14

**CONCLUSION** .........................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Almog v. Arab Bank, PLC*
   471 F. Supp.2d 257 (E.D.N.Y. 2007) ............................................................ 6, 7, 8

*Baker Indus., Inc. v. Cerberus Ltd.*
   764 F.2d 204 (3d Cir. 1985) ................................................................................ 15

*Bande v. Muchinguri*
   1999 Z.L.R. 476 (High Court, Bulawayo) ........................................................ 10

*Bell Atlantic Corp. v. Twombly*
   127 S. Ct. 1955 (2007) ...................................................................................... 5, 9

*Bowoto v. Chevron Corp.*
   2006 WL 2455752 (N.D. Cal. Aug. 22, 2006) ................................................... 6

*Campbell v. City of San Antonio*
   43 F.3d 973 (5th Cir. 1995) .................................................................................. 4

*Chambers v. NASCO, Inc.*
   501 U.S. 32 (1991) .............................................................................................. 14

*Devaney v. Chester*
   813 F.2d 566 (2d Cir. 1987) ................................................................................. 9

*DM Research, Inc. v. College of American Pathologists*
   170 F.3d 53 (1st Cir. 1999) ................................................................................... 5

*Doe v. Saravia*
   348 F. Supp.2d 1112 (E.D. Cal. 2004) ................................................................. 6

*Elan Suisse Ltd. v. Christ*
   2006 WL 3838237 (E.D. Pa. Dec. 29, 2006) ..................................................... 15

*First Nationwide Bank v. Gelt Funding Corp.*
   27 F.3d 763 (2d Cir. 1994) .................................................................................... 4

*Huyler's v. Ritz-Carlton Restaurant & Hotel Co. of Atlantic City*
   6 F.2d 404 (D. Del. 1925) .................................................................................... 12

*In re Agent Orange Prod. Liab. Litig.*
   373 F. Supp.2d 7 (E.D.N.Y. 2005) ....................................................................... 6

*In re Orthopedic Bone Screw Products Liab. Litig.*
   193 F.3d 781 (3d Cir. 1999) ........................................................................... 15

*In re Sofamor Danek Group, Inc.*
   123 F.3d 394 (6th Cir. 1997) ........................................................................... 4

*In re TMJ Implants Prod. Liab. Litig.*
   872 F. Supp. 1019 (D. Minn. 1995) ................................................................. 9

*MacDonough v. A.S. Beck Shoe Corp.*
   10 A.2d 510 (Del. Super. 1939) ..................................................................... 12

*Ores v. Willow West Condominium Ass'n*
   1996 WL 111894 (N.D. Ill. Mar. 12, 1996) .................................................. 12

*Pfizer Inc. v. Ranbaxy Laboratories Ltd.*
   321 F. Supp.2d 612 (D. Del. 2004) ................................................................. 4

*Sheridan v. Intern. Broth. Elec. Workers, Local 455*
   940 F. Supp. 368 (D. Mass. 1996) .................................................................. 4

*Southmark Prime Plus, L.P. v. Falzone*
   776 F. Supp. 888 (D. Del. 1991) ................................................................... 13

## Other Authorities

2 James Wm. Moore
   *Moore's Federal Practice* § 12.34[1][b], at 12-61 (3d ed.) .............................. 5

## Rules

Fed. R. Civ. P. 9(b) ..................................................................................... 8, 9

Fed. R. Civ. P. 9(g) ....................................................................................... 12

Fed. R. Evid. 201(b) ...................................................................................... 13

## PRELIMINARY STATEMENT

From its inception, this litigation simply has been about Brett J. Cormick's fraudulent misappropriation of $250,000 from Robert D. Christ and Mr. Christ's attempt to recoup those funds. The Court acknowledged as much when, during a July 5, 2007 discovery teleconference, it pointedly asked Mr. Cormick's counsel "where is the $250,000?" – a question that Mr. Cormick, to date, still has failed to answer.

For almost as long as this action has been pending, Mr. Cormick has attempted mightily to evade the Court's personal jurisdiction and obfuscate the sole issue Mr. Christ has brought before the Court – namely, the fraudulent misappropriation of his assets – by raising an endless array of red herrings and distractions. First, Mr. Cormick – through Elan Suisse Ltd., a defunct British entity – filed an action in Montgomery County, Pennsylvania seeking injunctive relief against Mr. Christ and his website based largely upon Lanham Act claims which, Mr. Cormick now concedes, were entirely baseless. Mr. Cormick also sought to dismiss Mr. Christ's claims against him in this Court, arguing as he did in a similar action brought by Mr. Christ in South Africa, that as a foreign national he was not subject to personal jurisdiction in this forum.

Once those two gambits failed to derail Mr. Christ's claims, Mr. Cormick – now forced to answer for his unlawful conduct – launched his *pièce de résistance*. After the Court denied Mr. Cormick's motion to dismiss, he filed counterclaims against Mr. Christ that, Mr. Cormick undoubtedly hopes, are so sensationalistic as to completely distract a potential jury from the simple fraud claims which form the core of this case. The 152 paragraphs of Mr. Cormick's counterclaims spin a tale of personal suffering that includes not only allegations of defamation over the Internet but also physical and mental torture at the hands of authorities in Zimbabwe that purportedly (yet inexplicably) was caused by

Mr. Christ, a private United States citizen living half a world away. Mr. Cormick's claims of torture are so sensational, in fact, that they caught the attention of the local press. *See* Sean O'Sullivan, "International intrigue in Del. – Theft, torture, pedophila among claims, counterclaims in civil lawsuit filed here," *Wilm. News Journal*, Aug. 6, 2007, at B1 (Ex. A hereto).[1]

In an effort to restore this litigation to its essential issue – *i.e.*, the recovery of Mr. Christ's funds – and eliminate any distraction from Mr. Cormick's outrageous and baseless allegations, Mr. Christ filed with the Court a motion for judgment on the pleadings with respect to claims asserted by Mr. Cormick and Elan Suisse Ltd. Not surprisingly, Mr. Cormick's response to that motion is yet another attempt to steer the Court's attention away from the merits of this dispute. While Mr. Christ demonstrated in his opening brief that the allegations of Mr. Cormick's counterclaims fail to state any causes of action, Mr. Cormick's answering brief – recognizing the inadequacy of those allegations – attempts to hide behind a host of ill-fitting procedural arguments in an effort to evade dismissal. Put simply, the Court should put an end to Mr. Cormick's attempts to

---

[1] This type of tactic is not new for Mr. Cormick, who has a long history of scandalous personal attacks against those who dare challenge his unlawful conduct. For example, in June 2005, Mr. Cormick registered the website *www.juliuscobbett.com* and then posted to that site numerous statements concerning the qualifications of Julius Cobbett (*see* Counterclaims ¶¶ 91-92), an investigative reporter in South Africa researching his business operations. *See* Ex. B hereto. In August 2005, Mr. Cormick undertook an e-mail smear campaign against Christine Gagnier, a 20-year-old college student who provided information about Mr. Cormick to Mr. Christ and Mr. Cobbett. *See* Ex. C hereto. On October 3, 2005 – days after Mr. Christ launched the Website at issue in Mr. Cormick's counterclaims – Mr. Cormick himself registered the *www.bobchrist.net* and *www.bobchristamericantraitor.com* websites on which Mr. Cormick posted defamatory, lewd and obscene statements about Mr. Christ and his wife in an attempt to deflect attention away from the fraud perpetrated against Mr. Christ. *See* Exs. D, E hereto.

muddy the waters through sensational and meritless allegations and restore order to this

action by granting Mr. Christ's motion for judgment on the pleadings.

## ARGUMENT

Since the gravamen of defendants' arguments is that their allegations, no matter how conclusory, are sufficient to state a claim, it is important to reiterate the standard to be applied to Mr. Christ's motion. As is the case with a motion to dismiss under Rule 12(b)(6), the Court, in considering a motion for judgment on the pleadings, must accept as true the allegations of a complaint and draw all *reasonable* inferences in favor of the non-moving parties. *See, e.g., Pfizer Inc. v. Ranbaxy Laboratories Ltd.*, 321 F. Supp.2d 612, 614-15 (D. Del. 2004). In determining the sufficiency of a pleading, however, the Court need not blindly accept as true bald assertions or allegations which are completely devoid of factual support. *See In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997) (on a motion to dismiss, a court "need not accept as true legal conclusions or unwarranted factual inferences"); *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995) ("'[A] statement of facts that merely creates a suspicion that the pleader might have a right of action' is insufficient.") (quoting 5 Wright & Miller, *Federal Practice & Procedure: Civil 2d* § 1216, at 163); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994) (under Rule 12(b)(6), "the well-pleaded material allegations of the complaint are taken as admitted; but ... unwarranted deductions of fact are not admitted"); *Sheridan v. Intern. Broth. Elec. Workers, Local 455*, 940 F. Supp. 368, 372 (D. Mass. 1996) ("[d]espite the highly deferential reading" afforded a pleading, a court "need not credit bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, or outright vituperation"). Rather, "the pleading must at least set forth sufficient information for the court to determine whether some recognized legal theory exists upon which relief could be accorded the pleader." 2 James Wm. Moore, *Moore's*

*Federal Practice* § 12.34[1][b], at 12-61 (3d ed.). *See also DM Research, Inc. v. College of American Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999) (while a complaint "need not include evidentiary detail, … the price of entry, even to discovery, is for the plaintiff to allege a *factual* predicate concrete enough to warrant further proceedings").

      In re-examining the requirement under Rule 8(a) of alleging "a short and plain statement of the claim showing that the pleader is entitled to relief," the United States Supreme Court very recently held that a complaint must plead "enough facts to state a claim for relief that is *plausible on its face.*" *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007) (emphasis added). It is against this standard that defendants' counterclaims must be judged. As explained below and in Mr. Christ's opening brief, defendants' unsupportable allegations do not, to borrow from the Supreme Court, "nudge[] their claims across the line from conceivable to plausible," *id.*, and thus should be dismissed.

## I.    THE ALLEGATIONS OF MR. CORMICK'S COUNTERCLAIMS FAIL TO ESTABLISH A CAUSE OF ACTION PURSUANT TO THE ALIEN TORT CLAIMS ACT.

      Neither Mr. Cormick's arguments nor any of the authorities cited in his answering brief alter the fundamental requirement that, to state a cause of action for aiding and abetting under the Alien Tort Claims Act ("ATCA"), Mr. Cormick must allege facts from which the Court reasonably can infer that Mr. Christ – assuming *arguendo* that he did, in fact, submit a false affidavit to Zimbabwean authorities[2] – *knew* that his actions would

---

[2] In another effort to avoid dismissal, Mr. Cormick asks the Court to strike Mr. Christ's September 6, 2006 affidavit submitted to Zimbabwean police based solely on his suspicion that there is an earlier affidavit which predates his incarceration. *See* Ans. Brief of Brett J. Cormick, et al. in Opp. to Robert D. Christ's Motion for Judgment on the

*(Continued on following page)*

lead to Mr. Cormick's torture and abuse in violation of international law. *See Almog v. Arab Bank, PLC*, 471 F. Supp.2d 257, 291 (E.D.N.Y. 2007) (aiding and abetting claim under ATCA requires that defendant "acted intentionally and with the knowledge that its conduct would … facilitate the underlying violations when it engaged in the acts alleged"); *Bowoto v. Chevron Corp.*, 2006 WL 2455752, at *4 (N.D. Cal. Aug. 22, 2006) (to establish claim for aiding and abetting Nigerian military in the commission of crimes against humanity, plaintiffs were required to show "that defendants knew that the Nigerian military intended to commit the crime"); *Doe v. Saravia*, 348 F. Supp.2d 1112, 1148-49 (E.D. Cal. 2004) ("[T]hose who assist in the commission of acts prohibited by international law may be held individually responsible … [if] the accomplice knows that his or her actions will assist the perpetrator in the commission of the crime."). Contrary to Mr. Cormick's arguments (*see* AB at 24), this is true regardless of whether the defendant is a company selling its product in commerce or a private individual such as Mr. Christ. *See In re Agent Orange Prod. Liab. Litig.*, 373 F. Supp.2d 7, 54 (E.D.N.Y. 2005) (recognizing that "the mens rea required [for aiding and abetting a violation of international law under the ATCA] is the knowledge that [the defendant's] acts assist the commission of the offence").

The recent *Almog* opinion, which Mr. Cormick cites as "[t]he leading contemporary case on aiding and abetting liability" under the ATCA (AB at 20), makes

---

*(Continued from previous page)*

Pleadings ("AB") at 28-29. As the accompanying affidavit from Mr. Christ makes clear (*see* Ex. F hereto), the September 6, 2006 affidavit is the *only* one he provided to authorities in Zimbabwe and Mr. Cormick has no grounds upon which to allege that Mr. Christ has withheld any documents from discovery.

clear that such knowledge is an essential element of Mr. Cormick's claim. In *Almog*, the

U.S. District Court for the Eastern District of New York denied a motion to dismiss

claims that the defendant bank, by providing banking services to Hamas and other known

terrorist organizations, aided and abetted those organizations in committing various

crimes against humanity. In contrast to Mr. Cormick's counterclaims, the complaint in

*Almog* set forth detailed factual allegations establishing the defendant's knowledge that it

was facilitating terrorist activities:

> According to plaintiffs, Arab Bank knew that the accounts of these various
> organizations and individuals were being used to fund suicide bombings
> and other attacks sponsored by the terrorist organizations. Plaintiffs allege
> that the terrorist organizations act with an openly and publicly stated
> united purpose of eradicating the State of Israel through a campaign of
> terror, genocide, and crimes against humanity. The terrorist organizations
> allegedly sought to accomplish their goals principally by widespread and
> systematic suicide bombings, which resulted in the death and injury of
> thousands of individuals in Israel, the West Bank, and the Gaza Strip, the
> majority of who were innocent civilians.
>
> Despite knowledge of HAMAS's purposes and its status as a
> Specially Designated Global Terrorist Entity, Arab Bank provided
> banking services to HAMAS directly by collecting funds into HAMAS
> accounts in its Beirut, Lebanon and Gaza Strip branches. The funds
> collected by Arab Bank were solicited by HAMAS through its website and
> through advertisements it publicized throughout the Middle East. These
> solicitations sought financial support for the Second Intifada. With
> respect to the charitable front organizations, plaintiffs allege that, despite
> knowledge that they were affiliated with the various terrorist
> organizations, Arab Bank maintained accounts and solicited and collected
> funds for them. In their amended complaints, plaintiffs specifically allege
> that the various charitable committees they identify are terrorist front
> organization which raise and launder funds to subsidize the Second
> Intifada and bankroll the terrorist organizations.

471 F. Supp.2d at 290-91. The *Almog* plaintiffs also alleged in detail that a program

administered by the defendant bank openly was operated to solicit and pay funds to

families of suicide bombers; these allegations led the court to infer "that Arab Bank knew

it was administering a financial benefit to designated families of Palestinian 'martyrs' and

those wounded or imprisoned in perpetrating terrorist attacks, i.e., those who perpetrated the primary violations of the law of nations." *Id.* at 291.

Mr. Cormick's counterclaims contain no factual allegations of the type from which the *Almog* court inferred the defendant's knowledge. The most that Mr. Cormick can allege is that Mr. Christ "*knew or should have known* ... by reason of the political climate in Zimbabwe at the time, that it was *reasonably probable* that Cormick would be subject to confinement that violated specific, universal, and obligatory international norms including but not limited to inhumane conditions as well as psychological and physical torture." Counterclaims ¶ 99 (emphasis added). Sustaining Mr. Cormick's claim based solely on this scant allegation would require the Court to make at least two unreasonable inferences:

- First, the Court would have to conclude that Mr. Christ *knew* that his contact with the Zimbabwean authorities inevitably would cause those authorities to arrest Mr. Cormick. While Mr. Christ may have hoped that Mr. Cormick would be arrested, at the time he provided information he would have had no way of knowing whether Zimbabwean police ultimately would act on that information.

- Second, the Court would have to infer, based solely on the ambiguously alleged "political climate at the time," that Mr. Christ *knew* that his contact with the Zimbabwean authorities not only would lead to Mr. Cormick's incarceration, but also would lead inevitably to torture and abuse. Conspicuously absent from Mr. Cormick's counterclaims are any specific allegations concerning the "political climate" in Zimbabwe or any facts from which Mr. Christ or anyone else could conclude that Zimbabwean authorities knowingly would violate international law.

Even under the Federal Rules' liberal pleading standards, the Court cannot draw these inferences from Mr. Cormick's conclusory allegations concerning Mr. Christ's "knowledge." In defending his wholly inadequate counterclaim, Mr. Cormick clings to the language of Rule 9(b), which provides in relevant part that "knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). This rule,

however, does not authorize the Court simply to accept as true Mr. Cormick's unsupported blanket allegation that Mr. Christ "knew or should have known" that Zimbabwean authorities would torture or abuse Mr. Cormick. Rather, "[a]lthough Rule 9(b) permits knowledge to be averred generally, plaintiffs must still plead the events which they claim give rise to an inference of knowledge." *Devaney v. Chester*, 813 F.2d 566, 568 (2d Cir. 1987). *See also In re TMJ Implants Prod. Liab. Litig.*, 872 F. Supp. 1019, 1039 (D. Minn. 1995) (dismissing fraud claim where plaintiff failed to allege any facts that could give rise to an inference that defendants had knowledge of material facts). Moreover, as the Supreme Court recognized recently in *Bell Atlantic*, "[f]actual allegations must be enough to raise a right to relief above the speculative level … on the assumption that all the allegations in the complaint are true." 127 S. Ct. at 1265. For the reasons discussed above, Mr. Cormick's counterclaim is based on nothing more than speculation and cannot allege facts from which the Court reasonably can infer that Mr. Christ possessed the knowledge required to establish a claim under the ATCA.

## II.　THE ALLEGATIONS OF MR. CORMICK'S COUNTERCLAIMS FAIL TO ESTABLISH A CAUSE OF ACTION PURSUANT TO ZIMBABWEAN LAW.

As is the case with Mr. Cormick's ATCA claim, the specious allegations of his counterclaims likewise fail to state a cause of action sounding in "delict" under the law of Zimbabwe. The treatise cited by Mr. Cormick makes clear that, under Zimbabwean law, a defendant is liable for the delict of "abuse of legal proceedings" if he "actuated by malice and with no reasonable and probable grounds for doing so … procures the arrest or detention of the plaintiff by the proper authorities." G. Feltoe, *A Guide to the*

*Zimbabwean Law of Delict* 57 (3d ed. 2001).[3]  In support of this claim, Mr. Cormick alleges only in conclusory fashion that Mr. Christ "knowingly made material false statements to the Zimbabwe police with the intent of getting Cormick arrested." AB at 27.  Once again, however, Mr. Cormick does not and cannot allege that Mr. Christ acted with the knowledge that the Zimbabwean authorities ultimately would, based upon the information he provided, arrest Mr. Cormick or detain him unlawfully.  As Mr. Christ noted in his opening brief, the Zimbabwean delict of malicious prosecution requires that the defendant do more than simply provide facts upon which the authorities may or may not act in their discretion; rather, the defendant must "lay a charge, [which] amounts to an active instigation of proceedings." *Bande v. Muchinguri*, 1999 Z.L.R. 476, 484 (High Court, Bulawayo).  Even were the Court to disregard the affidavit expressly incorporated in Mr. Cormick's counterclaims, at most Mr. Cormick alleges that Mr. Christ made statements to the Zimbabwean police which, in turn, led the police to detain Mr. Cormick. *See, e.g.*, Counterclaims ¶¶ 97-98, 131, 133.  As the authorities cited above make clear, these allegations are insufficient to state a cause of action.

To the extent that Zimbabwe law even recognizes an action for intentional infliction of emotional distress, Mr. Cormick's claim is similarly deficient.  The treatise cited by Mr. Cormick in his answering brief does not identify "intentional infliction of emotional distress" as a cause of action under the Zimbabwean law of delict (and if it did, there can be no doubt that Mr. Cormick would have cited it in his answering brief). *See*

---

[3] The treatise is equally clear that liability for "false imprisonment" under Zimbabwean law is limited to police who, under color of authority, make an illegal arrest. *See* Feltoe at 56-57.

*generally* Feltoe at 1-34 (attached as Ex. G hereto). Moreover, Zimbabwean law does *not* recognize an action for damages for "transient nervous distress which does not lead on to a recognized psychiatric complaint requiring treatment." *Id.* at 34. Mr. Cormick does not allege that he has suffered emotional distress requiring medical treatment and, as such, his claim has no merit.

Nonetheless, Zimbabwe law recognizes "Aquilian actions," which provide a remedy for injuries to person, damage to property, harm to economic interests and loss of support. *See id.* at 7-8. Similar to the law of torts under Anglo-American jurisprudence, the Aquilian action under Zimbabwean law requires that:

- There must have been some conduct on the defendant's part (*i.e.*, an act or omission) which the law of delict recognizes as wrongful or unlawful;

- The conduct must have led either to physical harm to person or property or financial loss;

- The defendant must have inflicted the loss intentionally or negligently; and

- There must be a causal link between the defendant's conduct and the loss.

*Id.* at 9. As discussed above and in Mr. Christ's opening brief, Mr. Cormick's counterclaims fail to allege facts from which the Court can infer a causal link between Mr. Christ's alleged conduct (*i.e.*, providing a statement to Zimbabwean police) and Mr. Cormick's alleged loss (*i.e.*, detention and torture by Zimbabwean police). Again, Mr. Cormick does not and cannot sufficiently allege that Mr. Christ acted with the requisite intent or knowledge that Mr. Cormick ultimately would suffer abuse at the hands of Zimbabwean authorities. This absence of proximate cause is fatal to any claims alleged by Mr. Cormick pursuant to Zimbabwean law.

### III.    NEITHER MR. CORMICK NOR ELAN SUISSE IS ENTITLED TO GENERAL OR SPECIAL DAMAGES ON THEIR CLAIMS FOR DEFAMATION.

To the extent Mr. Cormick is claiming general damages from Mr. Christ's alleged defamation, the counterclaims make clear that any purported harm to Mr. Cormick's reputation has been manifested in his loss of employment opportunities and his ability to earn a living. *See, e.g.*, Counterclaims ¶¶ 122, 142. As explained in Mr. Christ's opening brief, Mr. Cormick himself has admitted under oath that he was destitute and unable to secure employment *prior* to the publication of any statements on Mr. Christ's website and, accordingly, any damage to Mr. Cormick's reputation or livelihood could not have been caused by the Website.[4]

Nonetheless, even if the Court determines that Mr. Cormick is entitled to proceed with defamation claims for nominal general damages, his admissions to the High Court in Zimbabwe leave no doubt that any claim for special damages is meritless and should be dismissed. The authorities cited in Mr. Cormick's answering brief make clear that special damages must be specifically alleged. *See Ores v. Willow West Condominium Ass'n*, 1996 WL 111894, at *5 (N.D. Ill. Mar. 12, 1996); *MacDonough v. A.S. Beck Shoe Corp.*, 10 A.2d 510, 514 (Del. Super. 1939); *Huyler's v. Ritz-Carlton Restaurant & Hotel Co. of Atlantic City*, 6 F.2d 404, 406-07 (D. Del. 1925); *see also* Fed. R. Civ. P. 9(g)

---

[4] Incredibly, Mr. Cormick attempts to side-step this obvious flaw in his pleading by arguing that "[t]he date that Christ began publishing his website is not alleged in the Counterclaim." AB at 30 n.18. In the first instance, Mr. Cormick should not be rewarded for failing to plead this key fact in his counterclaims. Nonetheless, the text of the website itself (which undoubtedly *is* incorporated by reference in the counterclaims) makes clear that the first postings were not made until October 2005, months *after* Mr. Cormick claimed before the High Court of Zimbabwe that he was unemployed and

*(Continued on following page)*

("When items of special damage are claimed, they shall be specifically stated."). Here, any claim by Mr. Cormick that he suffered economic loss by reason of Mr. Christ's website is belied by the affidavits he filed with the High Court of Zimbabwe and in which he affirmed under oath that he was, prior to the time Mr. Christ made any postings to the Website, already unemployed and unable to earn a salary. *See* OB at 19, Ex. A, Ex. C.

Of course, Mr. Cormick does not challenge the accuracy of his prior sworn statements, but argues only that the Court should not consider them in deciding Mr. Christ's motion for judgment on the pleadings. *See* AB at 30 n.18. However, the Federal Rules of Evidence permit the Court to take judicial notice of a fact "not subject to reasonable dispute in that it is … capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). This includes court filings made by the parties in other jurisdictions, since they are public records "that cannot be reasonably disputed and whose accuracy cannot reasonably be questioned." *Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888, 892 (D. Del. 1991). Even though Mr. Cormick's affidavits were filed in Zimbabwe, Mr. Cormick offers no reason to believe that, as a public record, those documents are not accurate or reliable. Notably, Mr. Cormick does not question the accuracy of his sworn statements, because he cannot. Accordingly, the Court properly may take judicial notice of those statements in determining that Mr. Cormick's claim for defamation has no merit.

---

*(Continued from previous page)*

destitute. *See* Robert D. Christ's Op. Brief in Supp. of His Motion for Judgment on the Pleadings ("OB") at 19-20.

For the same reasons, the Court likewise may take judicial notice of the public records filed with the Register of Companies for England and Wales seeking to dissolve Elan Suisse. *See* OB at 20, Ex. D. Once again, Mr. Cormick and Elan Suisse do not challenge the authenticity of this document, nor can they. Rather, they attempt to divert the Court's attention from the merits of Mr. Christ's argument by challenging Mr. Christ's "candor." However, whether or not Mr. Christ objected to Elan Suisse's dissolution does not alter the fact that Mr. Cormick voluntarily sought to dissolve the sole entity which claims in this action that it was defamed. These actions (as well as Elan Suisse's withdrawal of its frivolous Lanham Act claims, as discussed below) confirm that Elan Suisse never could have suffered any harm and never had standing to assert its claims. Once the dissolution is effectuated, there will be no question under British law that Elan Suisse's claims will be extinguished. *See id.* at 20.

## IV.    MR. CHRIST SHOULD BE AWARDED HIS FEES AND COSTS EXPENDED IN DEFENDING ELAN SUISSE'S NOW-WITHDRAWN LANHAM ACT CLAIMS.

It is well settled that the Court's inherent judicial powers authorize it to award attorneys' fees as a means of sanctioning a party when it "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991). In his opening brief, Mr. Christ demonstrated that Elan Suisse's claims purportedly brought under the Lanham Act were frivolous and wholly without merit. In response, Elan Suisse – more than a year after it first filed them – withdrew those claims. *See* AB at 33. Having only now acknowledged that its claims were baseless, Elan Suisse should be ordered to reimburse Mr. Christ for the fees and expenses he has expended in defending those claims.

First, Mr. Christ was forced to remove Elan Suisse's federal claims from Pennsylvania state court to the U.S. District Court for the Eastern District of Pennsylvania. Mr. Christ then moved to dismiss those claims or, alternatively, transfer them because he was not subject to personal jurisdiction in Pennsylvania. Elan Suisse opposed Mr. Christ's motion to dismiss and then, after the action was transferred to this Court, opposed Mr. Christ's motion to have his action and the Elan Suisse action consolidated. In granting Mr. Christ's motion to transfer the action to this forum, the U.S. District Court for the Eastern District of Pennsylvania surmised that Elan Suisse originally had brought its claims in Pennsylvania solely for the purpose of avoiding this Court's jurisdiction. *See Elan Suisse Ltd. v. Christ*, 2006 WL 3838237, at *4 n.13 (E.D. Pa. Dec. 29, 2006). Put simply, Mr. Christ would not have incurred any expense had Elan Suisse not alleged what it now concedes were meritless claims. Since Elan Suisse's conduct in doing so was "of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation," *In re Orthopedic Bone Screw Products Liab. Litig.*, 193 F.3d 781, 795 (3d Cir. 1999) (quoting *Baker Indus., Inc. v. Cerberus Ltd.*, 764 F.2d 204, 208 (3d Cir. 1985)), the Court should exercise its inherent judicial powers to award Mr. Christ reimbursement of his expenses paid to defend those claims.

**CONCLUSION**

For the foregoing reasons, as well as the reasons set forth in his opening brief, Mr. Christ respectfully requests that the Court enter judgment in his favor and dismiss in their entirety all claims alleged in Civil Action No. 07-60-GMS and Counts I, II, III and IV of the counterclaims alleged in Civil Action No. 06-275-GMS.

REED SMITH LLP

/s/ Thad J. Bracegirdle
Thad J. Bracegirdle (No. 3691)
1201 Market Street
Suite 1500
Wilmington, Delaware 19801
(302) 778-7500

Attorneys for Robert D. Christ

Dated:  November 9, 2007

# EXHIBIT A

# B

**MONDAY**
**AUG. 6, 2007**

The News Journal
WILMINGTON, DEL.

Updates and latest news:
www.delawareonline.com

# Local

News tips: 324-2882 or newsdesk@delawareonline.com    •

## CLAYMONT FIRE DISPLACES 8
Town house blaze caused by electrical malfunct

## STRICTER CHILD SAFETY SEAT LA
Booster seats must be used for older, bigger chi

# International intrigue in Del.

## Theft, torture, pedophilia among claims, counterclaims in civil lawsuit filed here

By SEAN O'SULLIVAN
The News Journal

What started out as an unremarkable civil suit over a failed business deal has fermented into a tale of international intrigue, with accusations of greed, sexual deviance and state-sanctioned torture.

"You've got adventure, drama, villains," said Robert D. Christ, 46, of Louisiana, who filed the original lawsuit in U.S. District Court in Delaware. "It would probably make a good novel."

Christ filed suit against Brett J. Cormick and several others in April 2006 alleging breach of contract, fraud and civil conspiracy over $250,000 he had invested in a failed

holding company aimed at investors in South Africa.

Christ said the lawsuit is about obtaining justice and exposing Cormick.

To read the response and counterclaim filed this month by Cormick, 48, of Australia, Christ is a vindictive individual who got cold feet on the eve of a multimillion-dollar international business deal coming to fruition and then set about destroying the enterprise and Cormick, complete with making false accusations that led to Cormick being held and tortured in a Zimbabwe prison for five days.

The other defendants named in Christ's suit have been dismissed.

Cormick could not be reached for com-

ment and his Delaware attorney, David Finger, would not say where his client is living.

"Mr. Christ keeps filing various spurious complaints seeking to get my client arrested. So to protect him from that, we are not disclosing his location," Finger said.

Christ, who now runs a business specializing in hurricane cleanup, said that was nonsense. "It is my opinion that he is in hiding right now, and I'm not the only one he is in hiding from."

According to both sides, the two men became friends while on an expedition to the North Pole in 1996, where, Christ said, they were strapped to each another when they parachuted in tandem over the geographic top of the world. "We flew to the North Pole, had a bunch of vodka and came back," he said.

Christ, who was operating the tour, said Cormick was a client who presented himself as a former Australian government "secret

See LAWSUIT — B5

*"I hope this helps flesh out who I am and what I am about, and that will be for the public to decide whether that's good or bad."*

**Presidential hopeful Sen. Joe Biden, on his new autobiography "Promises to Keep"**



# Lawsuit: Plaintiff seeks $250,000

FROM PAGE B1

agent" and wealthy international investor.

They became friends and, several years later, they met up again in South Africa and – while the two disagree about who approached whom – agreed to go into business together on a venture to create an investment fund, like Fidelity, in South Africa.

This was something that would have been new to that market and could have produced millions, according to court papers.

Christ was to invest $350,000 with Cormick, provide his expertise as a forensic accountant and give the venture – called Elan Suisse – a presence and access to financial markets in the United States through a Delaware-based corporation.

Christ provided $250,000, and by all accounts was an active participant in setting up the business.

But, Christ said, they were supposed to put the arrangement in writing – which is why he held back the final $100,000. When that didn't happen, Christ said, he asked for his money back.

Cormick, in court papers, claims that a written agreement was not needed and had not been part of the deal. Instead, he said, in 2004 Christ wanted out, then back in, then out. "Christ suddenly seemed to be under enormous pressure (possibly from his wife) and seemed to be getting cold feet. ..."

Cormick alleges he was attempting to find a buyer for Christ's interests but then Christ filed suit in South Africa, describing the whole venture as "a scam," voiding their partnership.

Cormick further stated that Christ declared "he intended to get his money back by whatever means necessary," and published "a false letter in the Zimbabwean Financial Gazette attacking the credibility of Cormick and Elan Suisse" by erroneously tying them to a financial scandal, effectively killing the business.

The lawsuit stated Christ later retracted the letter, and Christ said he never intended for it to be published, describing it as a personal inquiry to a reporter.

Christ said he originally believed in the business plan, but after he did research on past failed business ventures involving Cormick he came to believe that it was all a charade.

Cormick further charged in court papers that Christ started publishing lies about him on a Web site, including not only allegations of financial misdeeds but personal attacks accusing him of not paying child support, soliciting prostitutes, having a criminal record and "being a pedophile."

Christ admits that he put up information about Cormick on the Web – but said he never posted lies or the sexual claims mentioned in Cormick's lawsuit.

Christ also admits he "stalked" Cormick over the Web, "sending him hate mails and terrorizing him," but he said he was just responding in kind to Cormick, who had been doing the same to him for months. He said it was Cormick, on his own Web site, who made ugly, personal charges.

Cormick further alleges Christ made false criminal complaints about him to authorities "around the world," including in Zimbabwe, where Cormick's children from a previous marriage lived.

As a result of Christ's sworn affidavit to Zimbabwe officials, Cormick states in court papers, he was picked up Aug. 23, 2006, while he was the sole adult looking after his two small children.

The lawsuit alleges the police did not identify themselves or state what the charges were and, without a hearing, he was humiliated and tortured by officials.

He claims to have been held in inhumane conditions, packed into a cell made for 15 people but occupied by 50 and filled with lice, fleas and excrement. The lawsuit claims he was deprived of food and water for days at a time.

His counterclaim also states he was tortured with a laundry list of techniques including being nearly suffocated with a plastic bag over his head; beaten around the eyes, nose and head; made to choke; hit in the groin; urinated on; and threatened constantly with death.

And as a final humiliation, he alleges, authorities marched him through the streets in freezing temperatures, in his underwear, as he was being transferred from one facility to another. Cormick states he was released only after the Australian ambassador intervened.

As a result of this torture, which Cormick blames on Christ, Cormick claims to have suffered a number of physical and psychological injuries, including post-traumatic stress disorder.

A spokesman for the Zimbabwe Embassy denied Cormick's claims, saying the government would have no interest in a financial dispute between two businessmen, neither of whom is a citizen.

Wilbert Gwashavanhu, the political counselor and press officer for the Zimbabwean embassy in Washington, said Zimbabwe is being "tarnished all over" for alleged human-rights abuses and Cormick may be trying to "take advantage of that" in his counterclaim.

The human rights group Amnesty International claims on its Web site that there are documented reports of the Zimbabwe Republic Police using torture and beating human-rights activists.

Christ said he didn't intend for Cormick to be tortured and doesn't believe his allegations.

"I've never seen anyone use the red herring so effectively. He wants to talk about everything and anything except my $250,000," said Christ.

*Contact Sean O'Sullivan at 324-2777 or sosullivan@delawareonline.com*

# EXHIBIT B

# Mail&Guardianonline

## The Media ONLINE

**09 November 2007**

M&G ONLINE
MEDIA NEWS
INSIGHT

COVER STORIES
FEATURES
EDITORIALS

COLUMNS

FOURTH ESTATE
IN BLACK AND WHITE
MEDIA SPECIALIST
NET SAVVY
FROM THE BACK SEAT
LIGHTS, CAMERA, ACTION!

INTERACTIVE

MEDIA FORUM
SUBSCRIBE TO MAGAZINE

ADVERTISING QUERIES

**Mondi Shanduka Awards**
See who scooped top honours in the prestigious 2006 Mondi Shanduka Newspaper Awards
Find out more .....

make this your homepage

MEDIA NEWS

## 'Smear campaign' directed at Moneyweb journalist

Kevin Bloom                                          21 June 2005 07:07

A website dedicated to questioning the motives and credentials of Moneyweb journalist Julius Cobbett has been uploaded by investment group Elan Suisse Capital. The site, at www.juliuscobbett.com, appears in the form of a letter in which the directors of the investment group focus on the journalist's age, qualifications and experience.

Amongst other challenges, the site directs the following at Cobbett: "[W]e have prepared a list of questions for you, based specifically on your previous article about us and your expertise. Our questions are designed to elucidate what, if any, investigation you did, or if you simply publish what appeals to you."

The "previous article" refers to a story written by Cobbett that appeared on the Moneyweb site on May 11. Under the header "Assassin or prey", the piece details the plight of US national Bob Christ, who is involved in a legal battle with Elan Suisse over the whereabouts of an alleged US$250,000 investment he had made with the group in 2004.

Cobbett writes in the article: "Incidentally, it seems that Christ's attack on Elan Suisse is not the first time the name has been tarnished. A previous scheme, run in Zimbabwe under the guise 'Elan Suisse Financial Advisory Services (ESFAS)', lost its investors millions of Zimbabwean dollars."

According to Moneyweb investigations editor Barry Sergeant, the website put up by Elan Suisse – which gave Cobbett until 8am this morning to publicly respond to the list of questions – is a "highly focused smear campaign that attacks an individual journalist and ignores the Moneyweb environment." Sergeant states that Cobbett works within the investigations unit at Moneyweb, where "all work must go through the normal process of supervision, editing and checking".

Says Sergeant: "One of the rules in investigative journalism is you play the ball, not the man. We

are not playing [Elan Suisse directors] Brett Cormick and John Walters, we are playing Elan Suisse. We want to know where the money is. This elaborate smear campaign does not intimidate us in the least, we take it as a bizarre and underhanded compliment."

Elan Suisse directors Cormick and Walters have not as yet responded to eMedia's requests for comment.

*From e-Media, the inside scoop on the media industry. Get The Media's FREE breaking news newsletter, delivered by e-mail. Subscribe by e-mail now*

➜ Talkback: Have your say about this article

➜ Daily cellphone alerts: Get news headlines by SMS
➜ Daily Newsletter: Get the news by email

MEDIA NEWS | HOMEPAGE

CONTACT US | ABOUT US | ADVERTISING | SUBSCRIBE

All material copyright The Media.

# EXHIBIT C

**From:** Dr Brett Cormick [mailto:brett.cormick@elan-capital.com]
**Sent:** 14 September 2005 10:51
**To:** 'Chrissie982@aol.com'
**Subject:** Thank You Very Much

Dear Chrissie

This is just a short note to thank you very much in bringing Bobbit and his little bitch Juliet down for us

This morning the email below arrived here from South Africa, (via Leanne Bloomenthall) originating from you of course, as we were very much anticipating that it eventually would

This completes the Gagnier - Christ - Cobbett link that our lawyers wanted to see.

Both are now in serious trouble; nicely legally air-tight for us.

We profiled you on the red and black web site quite a few weeks ago

It is not a good profile, and I would be very happy to give you details if you would like them at a later date, as it highlights things that you should
seriously take professional advice on. (Not as a result of the incident mentioned, but your inherent personal issues)

The information that I gave you subsequently was mainly low grade or commercially inaccurate, with a couple of serious exceptions that were traceable to origin and designed for you to compromise us - it had to be given your profile.

Seems it helped establish what we wanted to on Christ and Cobbett.

We now have both of these naughty lads where they need to be.

Thanks once again for your assistance

Kind personal regards

Yours sincerely

Dr Brett Cormick

Question: What do 20 year olds do after they have brilliant monkey sex with 45 year old men (me)????

Answer: Eat ice cream..of course!!!! (Disney movie afterwards!!!  Ha ha ha )

Hi John,

I just received this on my e mail from Julius. Thought you should see this.

 Lee

Attached Message

From:

 Dr Brett Cormick <brett.cormick@elan-capital.com>

To:

 matchmaker@valentiinternational.com

Cc:

 Valbaer@aol.com

Subject:

 Ms Irene Valenti Utmost Urgency Pse

Date:

 Thu, 8 Sep 2005 11:41:16 +0100

Dear Ms Valenti

 I am writing to you concerning a very upsetting incident that has just happened to me in relation to your company

Several weeks ago I accepted a very kind offer from Val and her husband Rolf to accompany them on their boat for a sailing holiday in Brittany

This was a very delicate time for me, as my ex wife had just kidnapped my children in the middle of an access period, and I was frankly quite emotionally devastated and very vulnerable.

During this trip, which I must say was nothing short of  bliss through the superb efforts of both Val and Rolf, I was introduced to Val's 21year old niece Chrissie (Christina Gagnier)

Chrissie implied that she had some sort of quasi association with Valenti and sighted confidential client details such as Ted Turner's client status, payment plans etc as proof of her bona fides

She also claimed that she wanted to steal a wealthy client for herself, so that the rest of her family would have to "kiss her arse", as she explained that one of her cousins had married a wealthy man, and she wanted the same status.

Being in the emotionally delicate state that I was, she further enticed me with stories of sexual exploits involving her and over 20 partners in the last 2 years, where she would perform oral sex on men with her close friend Dominique in actual attendance to give her instruction.

Falling for her charms she persuaded me to lend her money so that she could travel with me on business and pleasure trips, where by I would pay the bills initially and she would reimburse me for her half share of airline

tickets, hotels, spa and massage treatments etc

She borrowed money from me to accompany me to Paris, Bath, London, and Dubai, where she made a point of borrowing more money still in order to go shopping in all of these locations, claiming that she would reimburse me. She then started to insist that I buy her a red Ferrari, Channel hand bag's etc so that all of her college friends would have to "kiss her arse" and she repeatedly insisted on enquiring as to how much money I had in my bank account.

During our trip to Dubai, and being satisfied that I was a man of some means, and preying further on my emotional vulnerability, she began to insist that we get married immediately and began shopping for a 7 karat pink diamond ring for herself.

While I was certainly deeply under her spell, I am saddened to admit that I was taken for a ride by her charms, but fortunately became very uncomfortable when she would not stop physically accessing my personal computer whenever she could, personal financial and corporate documents constantly, and persistently demanding that I buy her expensive gifts like cars, in addition to the money that I had loaned her.

Eventually being unsure as how to proceed, and while still being very much captivated by her indeed, as well as having lent her serious sums of cash, I decided to visit her in America in Athens Georgia where she attends university, to attempt to retrieve my loaned money and discuss our future together.

To my surprise, she informed me, upon my arrival in Atlanta, having made arrangements to further our relationship and to secure the return of the cash that I had loaned her, that she was refusing to pick me up from the airport.

Organising my own transport to Athens I found that the reason for this was

that she was physically sick from serious cocaine and alcohol abuse from the night before, the cocaine having been supplied by one of her friends from a recent French trip.

While being physically appalled at the drug induced condition I found her in, I then discovered that she had deliberately passed on confidential commercial information concerning our operating technology companies to individuals that we are in a legal battle with, which includes serious and somewhat bizarre and disingenuous defamation issues (which she proceeded to subscribe to), who then proceeded to use this information, to attempt to destroy one of our operating companies.

I informed her that this matter was viewed in the most serious light, as it affects people's livelihoods and millions of dollars in intellectual property, and that our board would be meeting to decide what her roll would be in this matter, and her accountability.

  She then confirmed in a subsequent email, that she was not in a position to repay the thousands of dollars cash that I had loaned her, and that if I attempted to contact her again that she would have an injunction taken out against me.

Ms Valenti, I do not know what to say

Is this the Valenti way, cocaine, sexual entrapment for cash, breaching client confidentiality, corporate sabotage and more?

I feel betrayed and hurt and physically shocked

I do not blame Val or Rolf for this appalling episode, as doubtless they are innocent parties like myself.

This young woman, taking advantage of my emotional vulnerability, has made a fool of me, has borrowed money from me, has jeopardised my work, and in hind sight used me like a commodity, perhaps to feed her drug habits..I do not know, under the initial guise of a quasi Valenti association.

Please could you give some thought as to how I should proceed from this point

I am very concerned that my experience will taint the Valenti name internationally permanently

My friends and colleagues in Europe who are aware of the circumstances are simply appalled and it has certainly made me look very foolish indeed, which perhaps I deserve to be.

I am very keen to recover whatever I possibly can of my dignity from this dreadful matter and of course the cash that I loaned her as a matter of principle.

Thank you very much for your immediate attention to this matter

Kind personal regards

Yours sincerely

Dr Brett Cormick

 Dr Brett Cormick

 +27 (0)82 355 2543      +27 (0)21 410 8786        +27 (0)21 410 8711

# EXHIBIT D

introduction | disclaimer | bob christ | open letter to bob christ | karen | our reply | new correspondence

**3RD OCTOBER 2005**

**THIS DOCUMENT IS A REPLY TO MR. BOB CHRIST AND HIS MEANDERING DRIVEL.**

**THIS STATEMENT IS MADE WITHIN THE DISCLAIMER SET OUT BELOW.**

**BOB CHRIST HAS FILED A CASE IN RESPECT OF AN INVESTMENT SHE MADE. ALL ELEMENTS OF THIS CASE WILL SOLELY BE DEALT WITH THROUGH THE APPROPRIATE COURT(S).**

**THE PUBLIC DOMAIN DOCUMENTS INVOLVED IN THE ABOVE MENTIONED LITIGATION MAKE IT CRYSTAL CLEAR THAT SHE IS A LIAR.**

**PURGERY IS A CRIMINAL OFFENCE.**

**WHEN THIS CASE COMES TO COURT THERE IS LITTLE DOUBT THAT MR BOB CHRIST WILL FACE CRIMINAL CHARGES AND PROBABLE IMPRISONMENT.**

**HERE WE DO NOT DEAL WITH THIS SAD, SICK, PATHETIC AND LONELY-CHILD/DR STRANGE LOVE NAPPY-STAINED MESS THAT CHRIST HAS FABRICATED. WE DO DEAL WITH THE BITS THAT MR. BOB CHRIST DOESN'T REVEAL TO ANYONE ELSE: THE TRUTH.**

**BOB CHRIST IS A LIAR.**

**PIVOTAL POINTS TO NOTE:**

1. **BOB CHRIST EXTENDS THE OFFER OF HIS WIFE'S SEXUAL SERVICES.**
2. **BOB CHRIST HAS THE SAME IP ADDRESS AS A FAILED HACK ALREADY REPORTED TO POTTS TOWN POLICE AND THE HACKER'S ISP.**
3. **BOB CHRIST USES STOLEN DOCUMENTS TO FURTHER HIS CAUSE.**
4. **BOB CHRIST'S SOURCE OF "INTELLIGENCE" IS A COCAINE-TAKING GOLD-DIGGING 21 YEAR OLD WHO REPRESENTS HERSELF ON THE INTERNET AS A LIFE-THREATENED WOMAN, SUFFERING FROM VIOLENCE (SADLY UNDERMINING THOSE WITH LIGITIMATE HORRORS)**
5. **BOB CHRIST USES UNQUALIFIED JOURNALISTS TO FURTHER BOB CHRIST'S FANTASIES.**

**FACT OR FICTION BOB?**

**IT'S ALL TOO SADLY TRUE!**

**BOB YOU DO NOT HAVE ENOUGH ASSETS TO COVER THE DAMAGE YOUR STUPIDITY HAS DONE.**

**PLEASE READ ON …**

## DISCLAIMER

### Bobchrist: An Adult "Fairy" Tale

This site was originally registered to enable us to profile our love and affection for our flatulent pet Bobchrist. Bobchrist was a small ineffectual little brown turd, floating in a yellow bucket.

The yellow bucket was called seatrepid (small "s" no relation to any corporate or any person obviously) We loved our little brown turd called Bobchrist We suspect that it may in fact be a little girly turd. "Yoooo hoooo Bobchrist the little brown turd" we would call to her affectionately.............as we would push her around the yellow bucket seatrepid, playfully with a pointed stick. Oh how we laughed... as Bob erh...bobbed...as it were... ha ha ha ha

We tried to train Bobchrist the little brown turd to do tricks, to roll over, to sit up, to beg. but sadly Bobchrist the little brown turd is not very bright – positively absorbent in fact! Nor as turds go is she very attractive

Our pet Bobchrist the little brown turd from seatrepid, is a malicious little shit, who tells lots and lots of lies of all descriptions. Lies of omission, big lies, small lies and very colourful lies. Lies that suit it; they depend upon the day, its whim of its insecurities.

As a turd, naturally Bobchrist also likes to stir shit vigorously (if ineffectually) in her poo poo version of reality. She also gets a lot of shit on those who are her friends, or gets them into very deep shit indeed. Bobchrist doesn't have any friends, because shits don't.

This web site was not used for our pet at the time, so we thought it would be economical to use it to rejoin some comments by a likely-lad from Pottstown PA, purely as a reasonable use of economic resources, and nothing more.

Any similarities between our beloved Bobchrist the little girly brown turd from seatrepid and Bob Christ of Pottstown PA are therefore of course just coincidental. (Although some wags have pointed out that they are a little too coincidental....such a cheek, how could anybody suggest such a thing)

### Bob Christ

### Fanatical Lying Reality Distorting Disingenuous Dribbling Buffoon or a Very Sad Little Man?

It has been brought to our attention that Bob Christ of Pottstown PA, having failed to excite any interest in his ludicrous and malicious email-based character assassination programme over the last several months has now resorted to his traditional route - the public domain.

His dribbling fantasies, lies and incompetent contradictory collection of continuously-changing half-truths are now available for all to view.

Some of these will be addressed in an open letter to Bob that we hope you all enjoy reading very much.

We have certainly had many laughs at Bob's insanely deceitful snivellings and hope she provides you with as much entertainment as she has provided us.

Bob loves to pepper her rancid musings with "apparently's" "reportedly's" "in my opinions" "It seems that's" "I understand that's" "I heard that's" and the classic......"I do not vouch for its accuracy's"; its not simply poor diction – it's would appear it's simply about extending her shit-stained shroud of tarnishing detritus.

---

## OPEN LETTER TO BOBCHRIST

*Dear Bobby Sox,*

*(Like the type worn by 12 year old girls...geddit?? :- ))*

*We note with a yawn once again the malodours tinge of discontent, emanating from your puerile and disingenuous typographic wind.*

*We need to look very carefully at your work Bobbsie Wobbsie, lest someone mistakenly forms the impression that you are a hateful little impotent premature-ejaculatory man, bent on blatant character assassination in the public domain to fuel some deep-seated inadequacies in your nasty nappy.*

*We would not want people to think that you simply make up things that suit you and deceitfully and purposefully hide things that do not suit your purpose.*

*As you know there are many pieces of your correspondence that you have conveniently and deviously failed to share, because they sort of incriminate you and make it clear that some may reasonably conclude that you could be called a big fat "Bobchrist liar liar – pants on fire"*

*Perhaps we should look at one of these now.*


### *Bob Christ & Yes My Wife will Suck your Cock*

*We have a piece of correspondence, which is also on file with our lawyers. As it emanates from you, like the flatulent stench of your normal mindless drivel, we must conclude that you actually have a copy too.*

*In this email from you, it **specifically states** that you are so happy with the way that things are going, that your wife Karen Christ wants to suck my cock!*

*Seriously!*

*You wrote that your wife wants to suck my cock!!*

*Well Bobster, that's just great.*

*That's a really fine and generous "in writing" offer.*

*Of course your wife <u>Karen Christ can suck my cock, but Bobbsy, what's in it for me</u>??*

*Ha ha ha ha ha that's a good one eh???: -)*

*What's in it for me!! Geddit?? : -)*

*But seriously...Bob*

*Sure, I can have my blood engorged purple helmeted Todgersaurus  tickle her tonsils (as you so generously offer) and shoot my "yummy cummy throat yogurt" down her gasping gullet...but Bobby-Wobby, what will I use as a stiffy?*

*Let's face it matey, claiming in writing that things are going so well that your wife - <u>Karen Christ wants to suck my cock</u> - is one thing, but.....she is not exactly the type of hottie that I am used to!*

*Eh??*

*Is she going to provide her own paper bag so that I can cover her head, or must I bring one?*

*Does she spit, swallow or gargle?*

*Or is it your intention that one cums on her tits, face or just to matt her hair with man-muck?*

*Can you please be specific?*

*The invitation is in writing, but not specific in procedure.*

*Also..*

*Can I bring my mates??*

*There are quite a few extremely talented professionals involved in this venture, that is apparently making her so happy, and it would seem churlish to leave them out....so Bob, can your wife <u>Karen Christ suck my mates cocks as well?</u>*

*You are aware that under South African law that a written offer has basic contract status........and well...*

## <u>BOB CHRIST & BUTT FUCKING</u> *(ICING THE SWEET CINAMON RING)*

*Bobby: another point.*

*Many associates have read your fantastic correspondence over the months.*

*It all seems the mindless drooling of a disturbed simpleton, attempting infantile character assassination, without any real basis, or (on any pitiful excuse that you can manufacture) mostly leaving out key facts that you are very well aware whose omission create a bad impression for you, and has some very serious consequences..*

*What is that called Bob? Is it called lies of omission?*

*Well that certainly sounds very jolly naughty doesn't it?*

*Its hard to avoid the view that you would only do this to deliberately make one look bad…………… in absolute disregard of facts that you are clearly aware of and conveniently leave out, perhaps because they don't fit your spazzy zany thesis, or character assassination agenda?*

*What sort of cunt would do that?*

*This has led you to be described by associates as an obsessed reality bending "cocoa shunter and purveyor of felched-to-death rodents".*

*Bob Christ a cocoa shunter and purveyor of felched-to-death rodents?*

*Or is it*

*Bob Christ of Seatrepid cocoa shunter and purveyor of felched-to-death rodents?*

*Or is it*

*Bob Christ of Sea Trepid cocoa shunter and purveyor of felched-to-death rodents?*

*Well, I don't know about that personally…but people are entitled to their opinions… I imagine.*

*However, if I am able to bring some mates, on your generous written offer to have your wife Karen Christ (of Seatrepid?) suck my cock, are they allowed to "putt from the rough" as it were, while my huge tasty intercontinental ballistic moisture seeking missile is dislocating her giggle gear?*

*Put basically…..is her "priceless poo poo valve" available as well?… Seeing as you seem to be inclined that way, according to consensus here anyway?*

*A couple of the lads would be just ecstatic to "ice her sweet cinnamon ring"*

*Please can you confirm the exact arrangements that you had in mind when you wrote that email?*

*After all if your wife Karen Christ is going to be sucking my cock, thanks to your generous written offer, because things are going so well, and you are described by many associates as Bob Christ the butt fucking queer, is it right to assume that we could negotiate some hot arse wreckage action with Karen Christ?*

*Shall we do a few other emails like that as well……… I have lots from you ; - ). Bob selectively eh! Bob!*

*Erh…your wife is aware of these emails isn't she?? (Sorry, just a thought she must be; you said she wants to do it and you are a CPA Bob Christ, right?)*

---

**This page was first posted on September 27, 2005**

*Last Update: October 1, 2005*

## PUBLIC NOTICE

### The Case of Dr. Brett Cormick Marketing

## For Investment Capital

### In "The Elan Suisse Group of Companies"

Elan Suisse (Pty) Ltd (RSA Registration No.2003/000050/07)
Elan Suisse International Holdings (USA) LLC (a Delaware LLC)
Elan Suisse (Purportedly Operated by BNP Paribas Fund Services Jersey Limited)
Elan Suisse Financial Advisory Services (a Zimbabwean Company – Cormick veshemently denies any links)
For more information on Elan Suisse Financial Services, please perform a web search on: "Elan Suisse" Zimbabwe
Elan Suisse Capital (no known domain)
Aquacine (no known domain)
Nicotea (reportedly operated by Aquacine)

**Note**: All links to this brief are from unedited (except wshere noted [edited out] to strip out sensitive banking details) e-mails and attachments. A complete digital record of these e-mails and documents is available to interested parties in Microsoft Outlook format by contacting the following:
Robert D. Christ
2333 Jones Road
Pottstown, Pennsylvania 19465 USA
Phone/Fax: +1(610)469-1730
e-mail: bob.christ@seatrepid.com

**Erh Booby Poo Poos, not to cloud the issue with facts, but why have you stated that Aquacine has no known domain?**

*I don't know Sherlock...or Shitlock..this is not a very good start to your latest tirade, after all if you can't even get that right, what else did you get wrong.*

*Did you do that on purpose you tricky little fellow.... It seems that any festering fool can google search a name..so what does this make you??*

# For a PRESS SUMMARY OF THIS CASE written by Moneyweb in Johannesburg, South Africa please see here. It is my understanding that Julius Cobbett of Moneyweb has done extensive investigative work on both Cormick

# and Elan Suisse.  For more information, <u>contact her</u> directly.

## *Bob the Nob..it's our understanding that Julius Cobbett of Moneyweb is almost in your employ, in your fantastic little fantasy.*

*Where does it say on your site that you astonishingly used one of our confidential contracts, which you <u>Bob Christ of Seatrepid, illegally obtained and forwarded to Cobbett</u> of Moneyweb (legal action now in process against Cobbett) who in turn used an illegally obtained confidential contract to attempt to destroy one of our commercial transactions, with a government body signatory?*

*Why did you do that again Bob?*

*Why on earth would anybody do that?*

*What kind of cunt would do a thing like that?*

*Deliberately try to destroy one of our commercial contracts with the signatory from a government agency?*

*And….*

*For some very very strange reason we can't find any reference to that "Affair" on your web site…*

*Maybe you just forgot eh Bob?*

*Where is the illegal copy of that signed contract on your web site Bob? The one Cobbett used…..you know the one.*

*You have this draft on your web site, proving that you are in receipt of such <u>illegally obtained correspondence from Chrissie Gagnier or Christina Gagnier</u>*

*Where does it mention that you <u>Bob Christ attempted to destroy a commercial transaction worth millions, with an illegally acquired document</u>? Out of spite, disbelief, or non acceptance of reality and was immediately rebuffed and a legal statement made for damages against you and Cobbett by the government signatory?*

*Hmmmm, we have looked, but just can't find it anywhere.*

*Doesn't matter mate, we will keep the record here for you.*

*You must be just too busy being a very busy gurly boi fuelling fantasies.*

*You have told your lawyers that you did this Bob, right? If you haven't (ha!) do it now Bobby, right*

*now.*

**E-MAIL SUMMARY**

Most e-mails for this project are grouped by date.

E-mail from <u>January 2004 to the end of March 2004</u> (time period during which negotiations took place)

E-mail from <u>April 2004 to the end of September 2004</u> (time period awaiting formalized agreement)

E-mail from <u>October 2004 to December 2004</u> (time period awaiting repayment from Cormick – then beginning of law suit)

E-mail from <u>January 2005 to Present</u> (time period wshere Cormick goes on to other conquests).  There are numerous confidential e-mails received during this period.  I will post shere wshen permission is given.

On Cormick's <u>Academic Credentials</u> and the relationship of the LSE IEDG to LSE.

On the so-called "<u>Alan Dean Affair</u>" wshereby Cormick was <u>arrested by New Scotland Yard</u> in 1997 on suspicion of fraud.  For more information on the "Alan Dean Affair", please contact me so that I may get you in touch with people who were close to the situation.

*My goodness, what a loser you are!!*

*Are you deliberately trying to make me look good or something?*

*You have the real facts on this incident, (3 times now isn't it??); but you insist on repeating them because you simply need something to play with instead of your dick.*

*You know very well that this was emphatically proven to be a completely false and baseless charge, orchestrated by an individual operating under an alias, who had stolen IPR and was trying to raise finance on it, who I had the moral courage to stop and expose, once his deception  became clear and thisis simple fact.*

*This was done in spite of the fact that I knew full-well that he would make some baseless retaliatory accusation, to give him time to cover his tracks.*

*All of my professional colleagues in the UK are fully aware of all of these circumstances, and celebrate my integrity and courage in taking this action.*

On the so-called "<u>HIVEX Affair</u>" wshereby <u>BAE Systems</u> invested a large amount of money into HIVEX Ltd. (according to <u>public records</u>, Cormick was a board member of HIVEX Ltd.) as a R24 million offset for <u>an arms deal with South Africa</u>.  At first glance, it would seem that BAE Systems paid for this program, but this was reportedly an offset for an arms deal.  Ultimately, it would seem, the South African government paid the bill.  I do not know if anything about this project is untoward, but Cormick's involvement is documented.  If details on this program are needed, it will require research by someone more experienced than me.

*Ha ha ha ha! You are truly a carping fucking idiot!! And the point of this is what?*

*I have read this 3 times and don't even understand what it means, or even what you are trying pathetically to imply.*

*Is it that I am an international arms dealer for the South African government as well…?*

*Did you seriously write..*

*" I do not know if anything about this project is untoward, but Cormick's involvement is documented."*

*Ha ha ha ha ha*

*You purulent dick head!!*

*How about this instead ….*

*"A 13 year old school boy was ruthlessly buggered, I don't know if anything about this event is dodgy, but the fact that Bob Christ was once a 13 year old school boy is documented"*

*Ha ha ha ha ha*

*Or*

*"Karen Christ wants to suck my cock, and that is documented"*

*Ha ha ha ha ha you are such a supurating tosser!!*

# PUBLIC FORUM QUESTIONS FOR CORMICK

1. 1)    You have represented to me and to others that you have a PhD from the London School of Economics.  Per the London School of Economics, you have no formal qualification from that institution.  Which begs the question - from what institution is your elusive PhD allowing you to use the term "Dr."?

*Ha ha ha …this is really a good one. Even your bullshit is bullshit*

*You just cannot keep up with your own lies.*

*This is why we simply must go to court Bobby boy. Spell perjury.*

*You have a copy of my CV Bob, it says so below.*

*You have a telephone, an internet connection and seem capable of contacting everyone from my past including  the milkman if you could…*

*So one has to ask oneself, why don't you just read it off that…..*

*Why even ask a question like this?*

*Hmmmmmmmmmm : -)*

1. 2)    What relationship does the London School of Economics <u>International Economic Development Group</u> have with the London School of Economics?  Is this an LSE Chartered organization?  According to LSE, it is not.  I also notice that you own the **lsesadc.org** domain.

*I notice that you already have the answer to this question too.*

1. 3)    I notice that Elan Suisse (Pty) Ltd. has veshemently denied any links to Elan Suisse Financial Advisory Services in Zimbabwe and that fiasco.  Did you, at any time, have any personal involvement with this company?  I have never seen a denial of this.

*Your quark must get very embarrassed some times eh?  If you had two quarks, would they bullshit each other?*

*You have deliberately failed again to state the complete and truthful facts as you know them. (I wonder why?? Not being consistently disingenuous again are we Bobby?)*

*Any gibbering idiot with an internet connection (I think you may just qualify) can review the entire case on the Zimbabwean Financial Gazette web site, as you have repeatedly done many times, and all of the directors and participants are actually named.*

*As you very well know, you wicked little monkey boy, I am not one of them.*

*You also fail to mention that you were forced to retract a very deceitful article that you paid to have printed in the Zimbabwean Financial Gazette, where you publicly attempted to link me to this "Affair" and you were forced to print an unreserved apology and retraction.*

*Why do you fail to mention that eh?*

*Surely only a pestilent little cunt would do a thing like that?*

*Is that the case… <u>is Bob Christ of Seatrepid a pestilent little cunt who tells lies?</u>*

*Do you remember that your own lawyers almost shat their pants when they found out that you were so stupid as to do this, that you were forced to issue a written apology immediately against another of your obviously malicious falsehoods….*

*Oh Bob….you are a very sad little bastard, neigh a septic little rodent.*

4)    I understand that you owned and operated a company named European Venture Finance during most of the 1990s.  I cannot see this on any of your <u>FSB filing</u> or <u>CV</u> nor do I see BMI.  Why is that?

*Why is what?*

*I notice that you consistently write crap with no meaning and no relevance to anything to pad out your pages.*

*Why is that?*

5)    You certainly have a very impressive <u>CV</u> - which you used to solicit investment funds from me. Would you please provide support for the claim of "Dr Brett Cormick BSc (Mil) B.Econ MA.Econ PhD FRGS" which appears on your CV?  Since you misrepresented to me your PhD from LSE, I am now calling into question all of your qualifications.  Also, I notice the LSE logo prominently displayed on your CV – was that authorized by LSE?

*You are now calling into question all of my qualifications?*

*Ha ha ha ha*

*I am now calling into question all of your brain cells!*

*I am also calling into question your real motivation here!*

*Woooooo Hooooo!!!*

*Lets get this straight.*

*You have a copy of my "very impressive CV" as you claim, which clearly lists all of my qualifications, institutions and date of academic and professional awards.*

*Some of the best universities in the world there eh Bob? Didn't see you at any of them though!!*

*You and Cobbett seem to be capable of contacting everybody on earth, related to me, past employers, past secretaries, even my school bus driver if you could.....*

*Do you seriously expect anyone to believe that you would not be able to use a telephone to contact my academic institutions when you have all of the exact details in front of you, and you seem to spend a significant percentage of your sad, desperate and fanatical  little life, ringing anybody you can.. to find out anything that you can about me*

*Ha ha ha ha*

*No wonder many of my associates and independent observers repeatedly reach the conclusion that <u>Bob Christ of Seatrepid is an inbred butt fucking moron.</u>*

*Everybody is entitled to their own opinions I guess, and that is theirs.*

*Is this also the real reason that your wife <u>Karen Christ wants to suck my cock?</u>*

*Not everyone is as stupid as you!!*

*This is documented..ha ha ha ha*

6)    Wshere do you live?

*I am actually considering a nice little place in Pottstown PA !! But after your impending divorce with your <u>Cock sucking wife Karen Christ</u> I'm not sure there'd be much left.*

7)     Please give me a legitimate reason why you will not refund my earnest monies as agreed and accepted.

*Now Bob, you are telling very big lies again.*

*Come to court Bob.*

*You know we are waiting in the public forum for you, specifically to deal with this matter, where evidence is incontestable and there are penal consequences for people who tell lies about events under oath.*

*Are you scared for some reason?? Is your nose getting longer or something??*

1.   You have explained to me repeatedly of the commercial success your business ventures are currently enjoying.  Were my funds used to finance these ventures?  If not, how were my funds used?

*Come to court and ask any question that you want, we are waiting.*

*It's in the public domain for all to see. All issues will be addressed.*

*Serious consequences of any falsehoods on your part will be waiting!*

1.   Beginning with my first request for an audit (over one year ago) of what you did with my earnest monies, I have received numerous threats of lawsuits.  Are you going to sue or not?  If so, please get on with it.  My only interest in this case is gaining recovery of my property.

*Well this is not exactly true either is it Bob?*

*Hmmmmm?*

*You really need to separate reality from Bob Christ World.*

*So no interest in making up silly questions that you already know the answers to then, which make it clear that you are a deceitful liar, or questions that just don't seem to have any meaning??*

1.   10)  Will you ever account for the disposition of this US$250,000 in a business-like fashion?

*Court is waiting.....why are you so intimidated by the thought of being cross-examined about your claims in a public forum for all to see; where there are serious penal  consequences for those who lie under oath...and all of the real documentation is available.*

*You can hide here Bob, and even in Bob Christ World,  but what about there??*

1.   11)  Do you foresee wshen I will ever recover my US$250,000 entrusted to you in any fashion or form?

*I foresee you are in very big trouble Bobby boy, there are serious damages and serious consequences for your actions.*

*You really need to be a little more honest and transparent about ALL of your actions, correspondences and claims..*

*The fact that your wife Karen Christ wants to suck my cock, according to you, being very small beer compared to the others...*

*...*

*But don't worry little fellow, we have all of your details waiting for you... what stories will you spin then, we can't wait!!*

*Remember though...there you will have to stick to just one story, and you will have some very serious explaining to do...hmmmmmmmm???*

1.  12) Can "Investors" in Elan Suisse companies (or Aquacine or Nicotea or other company managed by you) anticipate this type of investor relations or am I somehow in another class that requires 'special treatment'?

*I think its possible to say that no grown up I have ever met has ever behaved like you... outside of a loony bin of course..or a pathological liars convention....or a whore house run by a demented pimp (is that what you call people who offer their wife around for sexual favours??)*

## SYNOPSIS

This is an obvious classic bait-and-switch scam perpetrated by someone I trusted. Unfortunately, Cormick failed to complete the paperwork. I operated a tour company that took Cormick as a client on two expeditions to the Geographic North Pole (she was a client on those expeditions – she neither conceived of nor led either expedition and made one skydive in 1996 as my tandem passenger). I have never had a cross word with sher until I entrusted sher with funds; therefore, I can only assume that I was a soft target. Since that time, I have had repeated threats of legal action (and more) stating that I am injuring Cormick's reputation by asking questions about my investment. Also, I received a long series of red sherrings attempting to divert the issue away from my misappropriated US$250,000. I have never received an accounting by Cormick of what happened to my US$250,000 in retirement savings deposited into his personal account in March 2004. This case is about misappropriated funds and gross misrepresentation.

*Did you seriously just claim that you had been scammed again in an open forum? The word libel just doesn't feature in your dictionary does it?*

*Oh dear... : - )*

*Don't worry it will very very soon!!*

*As we will be taking all of your meager assets in damages, I am really serious about getting a black hummer, and would really appreciate it, if you could purchase one now, and kind of run it in for me, until we take possession of everything you own.*

*Also don't think that you will be able to pay the damages off in kind, by continuing to offer your wife Karen Christ to suck my cock and having her chocolate chute available for the other litigants.*

I have placed this page as a public service announcement so that others will ask hard questions I failed to ask and perhaps can avoid a similar fate. If you are contemplating investment in any organization

managed by Cormick, you should be able to recreate my work above to come to your own conclusion. I suggest you not trust my statements, but perform your own basic research. This page gives you the roadmap.

*Erh Bob.....*

*Are you allowed to do this?*

*Seriously now.....*

*Are you?*

*I mean ....you know....you seem to have published peoples' email addresses on the internet without even asking their permission*

*Isn't that...you know.....a little naughty even for you....illegal even?*

*Does your lawyer even know that you have done this?*

*Remember what happened the last time you did something like this without telling your lawyers?*

*Uh oh!!!*

*Do any of these people know that you have done this?*

*Are you a dribbling incontinent idiot in a hurry who learns nothing?*

*Is it all just to fill up space because you haven't anything else to say?*

*Just to make trouble?*

*To try to create shit because you have nothing else to say?*

*What do you think these people are going to say when they find out that you have done this, just put their personal email addresses in the public domain without their permission?*

*Perhaps we can publish records of their response to you here, just to save you the trouble?*

*Will that be convenient for you Bobby Wobby.....a permanent record that you do really tricky stuff like this I mean??*

*We don't want people to think that you <u>Bob Christ of Seatrepid is just a hateful, impotent little school gurly with her tail between her legs,</u> on a fantasist fuelled mission, who just publishes whatever she wants on the net without regard for the consequences ...just to make people look bad do we????*

*Hmmmmmmmmmmm??*

If you would like to recreate my work, shere are some sources I suggest you try:
<u>Judith Higgin</u> – London School of Economics (e-mail: <u>Lsemagazine@lse.ac.uk</u> and <u>j.a.higgin@lse.ac.uk</u>)

Professor John Simpson – University of Cape Town (e-mail: jsimpson@commerce.uct.ac.za)
Taddy Blecsher – CIDA City Campus Johannesburg (e-mail: mailto:tblecher2002@yahoo.com)
The status of the defunct Columbia Pacific University
The Cormick Educational Foundation for Africa (CEFA) – unable to find any information
Ms. Pat Churchill, Group Shead of HR - SG Hambros Bank & Trust Limited (Tel : +44 20 7597 3223)
Patrice Dhliwayo, MD - Elan Suisse Financial Advisory Services (no Zimbabwe contact information)
Marigold J. Musiyarira nee Siwela, Former Office Manager ESFAS (+263-4-573003)
Robert Paterson, Former Director of BMI (e-mail: robertpt3@aol.com and mobile: +44 7880 726 026)
Gerry Anderson, Deputy Executive Officer - South Africa Financial Services Board (e-mail: gerrya@fsb.co.za)
Inge Leutscsher, President – EXCELLENCE International (e-mail: il@excellence-international.ch)
Christina Gagnier, Student – University of Georgia (e-mail: chrissie982@aol.com)
Norman Botha, Former Portfolio Manager with Barnard Jacobs Mellet (no contact information)
Nelson Banya, Reporter - The [Zimbabwe] Financial Gazette (e-mail: nelson@fingaz.co.zw)
Peter Kipps, Investor – Elan Suisse (e-mail: kipps@africaonline.co.zw and phone +263 4 335877)
Dirk Mostert, CEO - Mercari Financial Services (Pty) Ltd (http://www.mercari.co.za/)
Angelo Coppola, Editor - FANews (e-mail: editor@fanews.co.za)
David Keep, MD - BNP Paribas Fund Services Jersey Limited (e-mail: david.keep@bnpparibas.com)
Dr. Michael Wolff, Partner - Saxonia Partners (e-mail: drmichaelwolff@saxoniapartners.com)
Apostolos Zographos, Reportedly an Investor – Elan Suisse (e-mail: mailto:zog@seychelles.net)
Bob Wass, Owner – Island Divers (e-mail: subsea1@aol.com and phone +1 516 360-1997)
Dr. Michael V. Safonov, VP - Moscow University Diving Club (e-mail: club@dive.ru and phone +7 (095)105-77-99)
Julius Cobbett, Investigative Reporter – Moneyweb.co.za (e-mail: julius@moneyweb.co.za)
Anthony J. Carter, Former MD – Telecel Zimbabwe (e-mail: antcart@ic.co.zw)
Valerie Baerlocsher, Director European Operations - Valenti International (e-mail: Valbaer@aol.com)

Please also browse the e-mails [linked above] for contact details of the folks whom were and/or still are involved with this case.

This investigation is ongoing.  I will keep this page updated as the situation develops.

**NARRATIVE**
I have been encouraged by several folks close to this situation to write a narrative explaining the history of this event.  This section is going to grow as more information is gained (and the information is flowing in daily on this project).  The sources for this section vary from hard to soft – and I cannot vouch for the veracity of each and every statement.  I will cite the source so that you can decide for yourself.

*I can't wait to read them either..this is the most extensive use of the terms*

*"apparently"*

*"I do not vouch for its accuracy"*

*"quite sketchy"*

*"it seems that"*

*"I understand that"*

*"I heard that" – do you mean "hearsay?"*

*"as of last information I have"*

*"based on the research I have done to date"*

*Etc etc*

*Not including the old classics which I am sure that we will get around to like "purportedly" and "reportedly"..*

*So we are about to read what exactly...basically anything that you want to make up....right?? : -)*


*Could we give it a go as well then....you know just to be fair?*

*Something like...*

*"Based on the research I have done to date", and " as of the last information that I have", "I understand that" <u>Bob Christ of "Seatrepid" "apparently" was fucked roughly and vigourously by a small horse!</u> "Details are quite sketchy" but "I heard" that "it seems that" the horse was not satisfied..."but I do not vouch for its accuracy"*

*Ha ha ha ha ha*

*You are such a pathetic fuckhead!!! "apparently" and "as best that I can tell" of course*

*Ha ha ha ha ha*

*Using this tricky little technique you can say anything that you like....and look ...you do...*

*ha ha ha ha ha*

*Lets do one more for the old internet meta tags shall we... jism breath?*

*Using your clever little word scam..we can say..anything really..*

*Right?*

*Like for instance..*

*"I cannot vouch for its accuracy", "but apparently" "I heard that" <u>Karen Christ takes it in the arse and then cleans your dick off with her tongue.</u> "Based on the research that I have done todate" "and of the last information that I have", "although details are quite sketchy", "I have never seen any denial of this".*

*"If anybody out there is able to verify this please contact us."*

*Ha ha ha ha you are a good teacher eh Bob?*

*Did we do it right?*

*Look Bob a whole paragraph using all of your own quotes…*

*You complete fucking moronic arse muncher!! "allegedly", "I heard that", "it would seem", "some would say"*

*Although the fact that your wife <u>Karen Christ wants to suck my cock</u> is documented.*

# EXECUTIVE SUMMARY

In March 2004, I advanced <u>Brett Cormick</u> US$250,000 into his personal account at Natwest in London (Kensington Branch) as earnest monies in anticipation of starting an RSA-based business by the name of Elan Suisse. In September 2004, after failing to reach an agreement on what was being purchased, I demanded a refund of my earnest monies. After Cormick made numerous promises of repaying these monies, in November 2004 I made <u>formal demand</u> for return of my earnest monies. Cormick has since steadfastly claimed that I now <u>own 36% of a Delaware sshell corporation</u> and that I have endured huge penalties per some purported articles of association.

*Ha ha ha ha Bob I can't believe that you have written this. Come to court Bob. It's an open venue in the public domain.*

*But beware if you lie there under oath, (and we have all of the real documentation showing exactly what really happened)…well there are serious consequences for you right??*

*So let's go to court!!!*

*We have some very interesting surprises for you when you arrive!!*

*Sadly, you are going to have to deal with all of the facts, not just the ones that you chose, or the ones that you make up.*

The case is now in THE HIGH COURT OF SOUTH AFRICA (WITWATERSRAND LOCAL DIVISION – Case number 2005/2033). Per Cormick's plea in the case, the court does not have jurisdiction since she does not live in RSA (wshere she has business operations). I am unable to establish wshere Cormick <u>lives</u> which has frustrated my efforts to get this case sheard in court with proper jurisdiction.

*Bob if you are going to write bollocks, then at least write semi believable bollocks.*

*Why didn't you mention that you have already paid the $10,000 deposit for the court case, to be held in Pretoria, if you felt that it would not be held there?*

*No wonder many argue that you simply couldn't lie straight in bed!!*

*If you are going to just make any old Bobollocks up like you normally do…please make more effort to be creative*

BRETT JOHN CORMICK (Australian Citizen as of last information I have)
Born: September 29, 1959
(source for this section is internet genealogy) Father is Neil John Cormick. She married Margaret May
Sheber, daughter of Leonard James Sheber and Ellen Pritchard.

*This is included….…..erh..... Why????*

*You also couldn't even spell my mothers name properly you genetic retard.*

*If you can't even spell my mothers name properly, how many other inaccuracies are there in here?*

*Hmmmmm?*

*Wow what a clever little private investigator (Not!!), with a stupid agenda based on obvious lies you are
eh??*

Children of Neil John Cormick and Margaret May Sheber are:
i.    +Brett Cormick, b. 1959.
ii.    +Craig Cormick, b. 1961.
iii.    +Wesley Cormick, b. 1961.

   1. iv.      +Gavin Cormick, b. 1962.

Brett married Shirley Breckenridge (unknown date).  Children of Brett Cormick and Shirley
Breckenridge are:

   1. i.      James Cormick, b. 1988.

Brett divorced and married Jennifer Mortleman in approximately 1990.  Children of Brett Cormick and
Jennifer Mortleman are:
i.    +Jordan Cormick, b. 1992.
ii.    +Joshua Cormick, b. 1996.

   1. ii.      +Jessica Cormick, b. 2000.

(This work history is quite sketchy and comes from a number of sources including Cormick.  I do not
vouch for its complete accuracy, but it is fairly close – I invite Cormick or others with knowledge to
give more accurate details)

*What the hell is any of this for you frothing rabid simpleton? : -)*

*More padding?*

*Is it because you have nothing else to say?*

*Why did you even include this?*

*What is the relevance…you know…to anything?*

*Is it because perhaps you thought that while I was reading this unrelated and irrelevant little distraction that I would forget that Karen Christ wants to suck my cock?*

*As has been documented...*

*Is your poisonous little sperm soaked brain that dysfunctional?*

*Or is it to make you seem like a thorough investigator... when you are a turn-up full of diarrhea?*

*What the hell does any of this have to do with anything, you silly little man?*

1. 1959-1981 Schooling in Australia
2. 1982-1986 Australian Army
3. 1987-1989 Reportedly worked for Intersuisse Australia
4. 1990-1992 Hambros Bank doing sales to institutional investors
5. 1992-1999 European Venture Finance
6. 2000-2002 HIVEX Ltd. (Durban)

2002-Pres. Elan Suisse (in various forms)

*Wow you really got this very wrong of course... just like the rest of your bullshit and deliberate bollocks : -)*

*I just don't understand that as you have a copy of my CV, why you have made so many errors....is this deliberate?*

*There are some very big institutions that I held very significant positions in that seem to have somehow not transcribed from the CV to your list...*

*Why???*

*Because that would make me look you know...good?? (Good enough for your wife Karen Christ to want to suck my cock certainly) ; - )*

*You have a phone Bob, you have my CV and I have all of my employment contracts... : -)*

As best I can tell, his residences are as follows:
1990-1998 - Near Holland Park in London
1998-1999 - West Sussex
1999 (for 6 months) - Bath
1999-2004 - Masvingo and Harare Zimbabwe
Present Residence - unknown

*What the hell does this have to do with anything Sherlock?*

*More extraneous padding?*

*You really are a total dick smoking fuckwit... "according to sources"*

*Do you intend to publish my library card as evidence of me taking out books??*

*What a dick swallower you are "as of the last information that I have" "although details are quite sketchy" : -)*

*Or did you include this very incomplete list of places that I may have resided near, so that your wife* <u>*Karen Christ can suck my cock*</u> *on a European and African Tour of my old dwellings?*

*Ha ha ha ha ha*

I graduated from Louisiana Tech University in 1982 with a dual major in Aviation and Accounting. I spent several years at the international public accounting firm of Coopers & Lybrand in the New Orleans, Louisiana office before getting into smaller businesses. I hold a Certified Public Accountant's Certificate (the USA equivalent of a Chartered Accountant – certificate currently inactive) as well as an Airline Transport Pilot Certification. In 1992, I operated a parachuting school in Hammond, Louisiana wshere I met a man by the name of Bill Booth that operated a parachute equipment manufacturing company in DeLand, Florida. She invited me in 1994 to go with sher on a skydiving expedition to the <u>geographic North Pole</u> through Russia.

In 1996, I took over <u>this tour</u> from sher as the tour operator for taking parachutist to the Geographic North Pole. My theory was that I would allow inexperienced passengers the thrill of a skydive over the Geographic North Pole safely attacshed to an experienced tandem skydiving professional. The first customer (see <u>shere</u> for link) of my new venture was Brett Cormick.

I had periodic contact with Brett in 1996 through 1998 via e-mail. In early 1998, my Russian contacts asked if I had anyone interested in doing a scuba dive at the North Pole since the Moscow University Diving Club wanted to do a scientific dive and wanted to share costs. I missed the 1998 expedition for personal reasons and the MUDC made a short dive wshereby the leader (Andrew Rozhkov) died during the first dive. I made the arrangements for Brett and Michael Wolff to make a dive on the 1999 trip. I also hired Bob Wass (a commercial diver from Smithtown, New York) to supervise the operation for safety reasons. That dive was successful (see <u>this</u> link) with Brett making the last dive of the trip.

I started another business in late-1999 manufacturing and marketing underwater robotic equipment of which I sold in late-2003. I was in Cape Town in January 2004 dealing with a close personal friend's estate. Graham Hoal had just died in a tragic <u>parachuting accident</u> wshen Brett phoned me with a "fantastic investment opportunity". The rest is detailed above.

WHAT HAPPENED TO BRETT?
I spoke yesterday to David De Leeuw formerly of the De Leeuw McCow Fund and now with <u>Lion Cshemical</u> Capital. David certainly remembered Brett. She stated she was pleased with Brett's services in the mid-1990s while raising funds in Europe. She also sheard that Brett had gotten into some trouble significantly hurting Brett's business.

*Uh sorry to once again throw the dampening waters of reality on your mindless bullshit..but is the "she" you refer to here, in fact not a male?*

*You make up so much garbage that you can't even get the genders right?*

*She also heard?*

*Hurt my business??*

*How hurt my business??*

It seems that Brett had a legitimate business with European Venture Finance until this "Alan Dean Affair" occurred. The details of this incident are slow in coming, but shere is a link to the subsequent operations from the "Zebra Project". From discussions with people close to Brett, I understand that this incident ruined his business operations and caused sher to move to Zimbabwe wshere Jennifer's family resides. I understand that Brett was represented in this criminal investigation by Keith Oliver of Peters & Peters.

*"Slow in coming"…like me in your wife Karen Christs mouth?*

*"I understand that this incident ruined his business"*

*Ha ha ha ha ha*

*Like "I understand" that my mates want to fuck your wife Karen Christ in the arse?*

*"It seems that"…*

*"I understand that" from where…????*

*You need to check your facts again willy Bobby boy*

*But what is certainly fact.. is that Karen Christ does want to suck my cock, and that is documented*

I also understand from people very close to Brett that this "Alan Dean Affair" also ruined sher emotionally. It seems that Brett was well connected in the UK financial community until this event happened. I am also told that Brett had to sell his house in order to pay for legal expenses with regards to this case.

*" I also understand from people very close to Brett".???*

*Ha ha ha ha..good one*

*Like "I also understand from people very close to Brett" that Bob Christ of Seatrepid is a butt fucking queer, and his wife Karen Christ wants to suck his cock..*

*"I am also told by"…??*

*This is a really great trick!!*

*You can actually basically say whatever you want here Bob, just make up anything…*

*"I understand that"…ha ha ha*

I have been told that Brett was in partnership with Patrice Dhliwayo of Elan Suisse Zimbabwe. I still have not independent corroborating evidence of this however since investigation of businesses in Zimbabwe is difficult at the moment. I suggest you contact Nelson Banya with the Financial Gazette in Harare on this subject. My source told me that Brett closed the company wshen Patrice performed some unauthorized transactions. Patrice reportedly re-opened the company with the results stated above.

*"I have been told"?*

*"My source told me"??*

*"I still have not independent corroborating evidence of this however"*

*This is excellent..*

*anything you want to say, you just say "it's a source"..brilliant!!*

*You can make up anything again : -)*

*And you are doing just that!!*

*Shall we give it a go*

*"I still have not independent corroborating evidence of this however" "My sources told me" that Karen Christ, also of Seatrepid, is married to a lying little flaccid cunt, who pimps her oral sex services internationally*

*NO maybe we got that one wrong. We do have independent corroborating evidence of this.....from you!!!!*

I wanted an RSA-based business in order to have the opportunity to stay in touch with my god-son Garner Hoal (Graham's son) whom lives with his mother in Cape Town. Brett and I were going to start a global business as partners with me providing the funding and sher providing some funding and contacts. As per the e-mails shere, Brett was in a hurry to get the business running and could not wait until we met to sign papers. I advanced to sher earnest monies in anticipation of formalizing an agreement. We met in London wshere Brett agreed to have the attorneys in RSA draw up the papers. At a Hyde Park restaurant wshen I confronted sher on our formalized agreement in March 2004, his statement was "Bob, are you an attorney? Well neither am I. Let's let them do this properly." In sworn court documents, Brett stated that a formalized written agreement was never contemplated.

*Oh dear Bob, Naughty naughty naughty...*

*You see, big consequences!!*

*We really understand your pathological need to make things up, but.....that's why you must come to court...say one thing...say another...read some facts...have to explain a few things that are lies under oath, you know...fun!!!*

We were scsheduled to meet in July 2004 with Lehman Brother in New York at which time the deal was to be formalized. The meeting was cancelled. In September 2004, Brett informed me that the company was out of money. I could not account for wshere my US$250,000 went wshereby I demanded an audit (to be conducted by Kevin Wright – a Chartered Accountant from Cape Town). Instead of cooperating with the audit, Brett then agreed to refund my earnest monies (a total of 15 separate times).

*You realize that this is a permanent record in public of you telling complete and outright lies right? : -)*

*And you wonder why we are so keen to get you into court.*

*Under oath!!!*

*With perjury being a criminal offense.*

*Oh dear...*

Brett forwarded to me a <u>document</u> she wanted me to execute in order for me to obtain my refund. It was at that point I knew for sure that Brett had scammed me. I retained a Cape Town-based attorney and formally accepted his <u>offer to repay</u> my earnest monies. In sworn court documents filed by Brett, she stated that we had made a complete agreement one afternoon while drinking wine in Stellenbosch in late-January 2004. Further, I had deposited the funds into a UK bank account. Also, she stated that she did not live in South Africa; therefore, the RSA court does not have jurisdiction.

*So you paid the deposit for the court action after this why????*

*Bob are you being honest here?*

*Come on..are you??*

*Bob you lie... like you write and investigate..very very badly and sadly with a very transparent agenda*

Brett Cormick skillfully planned and carried out a scam on me and my family. I have forwarded the file to the US Federal Bureau of Investigation. They can do nothing about this other than forward the file to the RSA authorities (which I understand that have) since this crime happened outside of the USA. The UK authorities stated they have no jurisdiction either since neither Cormick nor I live there. The RSA authorities have not reacted as yet.

*You just did it again. Crime...Scam.. This is a permanent record right?*

*You know this right?*

*You can't take it down because we are keeping a copy....oh dear Bob!*

*You can't pretend that you didn't do this or say this, 2 weeks from now like you normally do either, when you normally change your stories, and some how completely blank out the reality of the paper trail of evidence that you create yourself.*

*Its why you need to come to court..you really are fucked when EVERYTHING that you have said comes into the public arena aren't you??!!*

*Or will you crawl back into your smelly rat dropping infested little shell for a while, and just make all of your previous statements go away by pretending that they...just don't exist?*

*You can't do that in court Bob!!*

From correspondence with Christina Gagnier, I am told that Cormick is now forming an investment fund selling interest in funds that purchase companies that she and John Walters own (i.e. a classic "Boiler Room" setup). Please read through the <u>correspondence</u>.

*Oh dear...did anybody else actually read this before you posted it Bob?*

*I mean really...did they?*

*Your lawyers I mean...*

*You know what happens to you when you just write things without consulting them*

*You know what happens to you right?*

*You checked out the consequences of making things like this up and putting it on the net??*

*Oh dear!!*

WHAT IS THIS ALL ABOUT?
Everyone is entitled to his/sher opinion – and shere is mine based upon the research I have done to date. I again encourage you to recreate my work shere to form your own opinions.

*Everybody is entitled to their opinion??  Ha ha ha ha great one!!*

*I get it!!*

*You can make up anything you want again can't you!!*

David De Leeuw stated that Brett was a "typical promoter" (she said that she had worked with quite a few).  Others close to Brett stated that she was always very concerned about appearances.  I could not understand why instead of participating in the North Pole scuba diving expedition (which is what happened), she had to have "Conceived of and Led" the Expedition.  Andy Hardie-Brown spoke to me yesterday about how Brett portrayed that expedition (i.e. Brett stated that the expedition was extremely dangerous and that she would have died instantly if the dry suit or regulator had problems – I will leave that one to Bob Wass and Dr. Safonov).  Instead of simply going on a tandem skydive at the North Pole, Brett had to have "several freefall trips to the Pole".

Instead of being a small business owner of European Venture Finance, Brett had to be "a Managing Director, Director & Consulting Director for several of the largest & most respected institutions in Europe and the United States" (per his CV).

*Eh Bob you fucking mindless idiot..I was!!*

*You simply don't know when to stop or what damage you are doing to yourself and your family.*

*What happens when I produce my employment contracts and bank brochures in court...(yes I will do this in court..I get money from you for doing it there see??) are you going to simply deny that you have written this, like you normally do???*

*Or pretend that they do not exist?*

*Like you normally do?*

*Anything that does not conveniently suit your current state of mental decomposition...just strangely did*

*not happen..because you go into denial*

*We just have to get you out of Bob Christ World and into the real world..although its going to hurt*

Instead of having a PhD via a correspondence course (sources close to sher stated that she had several correspondence courses in the early 1990s), the PhD had to be from the London School of Economics. Please speak with Professor Simpson and Robert Paterson about Brett's usage of official letterhead.

*Bob when you lie like this, you need to be a little bit more careful...please get my black hummer cleaned before I take it from you*

Brett apparently came from modest means in Australia. She clawed his way up from Australia to the ranks of the London Banking Community. She seemed to have had a decent business in EVF until this "Alan Dean Affair" which apparently killed his business and forced sher to move to Africa. I do not know if this affair was Brett's fault, but she certainly paid a high price for it.

*I "apparently" came from modest means?? Ha ha ha ha ha ...you dithering dickhead, our family house was so big that it's now an embassy*

*"clawed his way up from Australia"....*

*Ha ha ha ha ha*

*What a dick smoker!!*

*Are you just sucking all of this out of your arse like normal, or is this from "a source close to Brett" or is this just you running out of crap.*

*"I do not know if this was Brett's fault",*

*Was "apparently" forced to move to Africa ha*

*ha ha ha ha*

*You are just the most ridiculous peddler of stupid bullshit on the planet. What a waste of space you are .."I have been told"...<u>maybe by your cocksucking wife Karen Christ?</u>*

Brett is now using his significant persuasion skills in creating new investment ventures. I suggest you perform a thorough due diligence. His project may be commercially viable. But my experience with monies managed by sher (as documented above) has been very negative.

Information is flowing in daily on this subject. Please csheck back for updates.

*Well I think that we will..."apparently"...you make up stories better than anybody that I have ever seen....but Bobster, there is a big price to pay for doing this!!!*

*And this is staying with us as yet another permanent record of your lies and duplicity*

*See you in Court you sad little man...bring the keys to your house and the keys to my new black hummer with you though!!!*

**Scroll down to look into previous additions**

**08/10/05 Email exchange - Bob is clearly insane - Bob call's Zog a crook! after agreeing never to write to him again... where did you put that plot Bob?**

----- Original Message -----

From: Apostolos Zographos <mailto:zog@seychelles.net>

To: Bob Christ <mailto:bob.christ@seatrepid.com>

Sent: Saturday, October 08, 2005 10:16 AM

Subject: Re:

ATTENTION : BOB CHRIST

I refer to yet more unsolicited correspondence from you, this time implying that I am a crook.

1. A copy of your mail has been forwarded to my lawyers.

2. I also refer to : mail from myself to you on Thursday 6th October 2005, directing you not to contact me again in any manner or form; and, your reply of the same date "...yes - I

won't contact you again. This thing is over as far as I am concerned."

Apostolos Zographos

----- Original Message -----
From: "Bob Christ" <bob.christ@seatrepid.com>
To: "Apostolos Zographos" <zog@seychelles.net>
Sent: Saturday, October 08, 2005 6:58 AM

> Zog,
>
> You never answered my question - are you a crook too?
>
> Bob
>

**06/10/05 Email exchange**

From: Dr Brett Cormick
Sent: 06 October 2005 11:11
To: 'Bob Christ'

Subject: Uh Oh!!!

Bob

It appears that there are a lot of people out there that do NOT like you in the Sky diving community

We have NOT been idle

Are you aware what the penalty is for impersonating a US military officer is?

In a foreign country, with foreign military?

While many brave Americans are fighting and dying in Iraq, the thought that you would deliberately don a US serviceman's uniform, which you had no right to wear and…give yourself the rank of major..to which you are not entitled, is both appalling and disgusting.

It is a appalling scam.

This action as you are aware, coming in a time of war carries the harshest imaginable penalties in the US and rightly so

I speak on behalf of service men both past and present everywhere in condemning your violation of the sanctity of the US serviceman and hope that the ensuing punishment is meted out fully

========

From: Apostolos Zographos <mailto:zog@seychelles.net>

To: Bob Christ <mailto:bob.christ@seatrepid.com>

Sent: Thursday, October 06, 2005 7:49 AM

Subject: Re : Web Site et al

Attention : Mr Bob Christ

It has been brought to my attention that you have published my personal email address on your web site without my permission.

Who, or what, gives you the right to do so?

As of receipt of this correspondence you are hereby directed to remove my personal email address from your site immediately.

I have been in receipt of unsolicited correspondence from you since the 13th July 2005, and this serves to notify you not to attempt any contact with me again, in any form or manner.

I also note in your correspondence of 26th September to Brett Cormick, your assertion that you "gleaned" various email addresses, mine included by inference, from his previous correspondence to you in the year 2000. This is a blatant lie. I was not even in possession of this address at that time. The

question then is, who was the source of your information of my email address?

I will be making a formal complaint to your ISP about your actions, and my lawyers are in receipt of a copy of this correspondence and are aware of your actions.

Apostolos Zographos

============================

**04/10/05 Email exchange**

Earth to Bob World……. Earth to Bob World

Can we please have a reality check

I know that might be inconvenient for you, however…..

There is already a declared venue for court

YOU have even paid the $10,000 deposit

I say again in big writing

THERE IS ALREADY A DECLARED VENUE FOR COURT AND YOU HAVE PAID THE DEPOSIT $10,000

Even your bullshit really is bullshit..

No wonder many people say to me that "Bob" rhymes with

1. "Nob"

2. "Slob"

3. "Lying Arsehole" ; - )

_____

From: Bob Christ [mailto:bob.christ@seatrepid.com]
Sent: 03 October 2005 14:47
To: Dr Brett Cormick
Cc: 'John Walters'; 'Apostolos Zographos'
Subject: RE: Press Conference Today

I tell you what - you leave yours up. I'll leave mine up. When you are ready to go to court (and not run around the globe trying to dodge my law suit), you just let me know.

Then we can have this heard on its merits.

That sounds fair enough.

---



| Resellers Home | Wholesale Services ▼ | OpenSRS Platform ▼ | Manage My Services ▼ | About Tucows | Cont |

**SEARCH SITE**

[SEARCH ▶]



**DOMAIN LOOKUP**

[WHOIS ▶]



**Existing Resellers**

[SIGN INTO RWI ▶]

[RESOURCE CENTER ▶]

**Become a Reseller**

Sign up now! ▶

FAQs Answered ▶



[Refer me to a Reseller]

**OpenSRS Whois Utility**

Whois info for, **bobchrist.net**:

```
Registrant:
Brett Cormick
Suite 334
2 Lansdowne Row
London, London W1J 6HL
UK

Domain name: BOBCHRIST.NET

Administrative Contact:
    Cormick, Brett    brett@aquacine.com
    Suite 334
    2 Lansdowne Row
    London, London W1J 6HL
    UK
    +44.2076917890
Technical Contact:
    Technical, PIPEX    services@123-reg.co.uk
    Portland Street
    Beeston
    Nottingham, Nottinghamshire NG9 2LP
    UK
    +44.1159170000    Fax: +44.1158770213


    Registration Service Provider:
    PIPEX Communications Uk Ltd, services@123-reg.co.uk
    +44.115-917-0000
    http://www.123-reg.co.uk/
    This company may be contacted for domain login/passwords,
    DNS/Nameserver changes, and general domain support questions.


    Registrar of Record: TUCOWS, INC.
    Record last updated on 17-Jun-2005.
    Record expires on 17-Jun-2007.
    Record created on 17-Jun-2005.

    Domain servers in listed order:
        NS.123-REG.CO.UK
        NS2.123-REG.CO.UK


    Domain status: REGISTRAR-LOCK
```

The Data in the Tucows Registrar WHOIS database is provided to you by
for information purposes only, and may be used to assist you in obtain
information about or related to a domain name's registration record.

Tucows makes this information available "as is," and does not guarante
accuracy.

By submitting a WHOIS query, you agree that you will use this data onl

lawful purposes and that, under no circumstances will you use this dat
a) allow, enable, or otherwise support the transmission by e-mail,
telephone, or facsimile of mass, unsolicited, commercial advertising c
solicitations to entities other than the data recipient's own existing
customers; or (b) enable high volume, automated, electronic processes
send queries or data to the systems of any Registry Operator or
ICANN-Accredited registrar, except as reasonably necessary to register
domain names or modify existing registrations.

The compilation, repackaging, dissemination or other use of this Data
expressly prohibited without the prior written consent of Tucows.

Tucows reserves the right to terminate your access to the Tucows WHOIS
database in its sole discretion, including without limitation, for exc
querying of the WHOIS database or for failure to otherwise abide by th
policy.

Tucows reserves the right to modify these terms at any time.

By submitting this query, you agree to abide by these terms.

NOTE: THE WHOIS DATABASE IS A CONTACT DATABASE ONLY.  LACK OF A DOMAIN
RECORD DOES NOT SIGNIFY DOMAIN AVAILABILITY.



 

Site Map | Korean | Contact us | Tucows.com | Press Releases | Marketplace | Feedback | Help

©2004 Tucows Inc.
TUCOWS is a registered trademark of Tucows Inc. or its subsidiaries. OpenSRS is a trademark of Tucows Inc.
or its subsidiaries. All other trademarks and service marks are the properties of their respective owners.
Tucows Inc. has no liability for any content or goods on the Tucows site or the Internet, except as set forth in the
terms and conditions and privacy statement.



# EXHIBIT E

# Public Service Announcement

## SeaTrepid's "Major" Bob Christ:

## "American Traitor" and "Man of Dishonour"
## A Military Impersonator
## Lives Off Fat Government Contracts In Pottstown PA

It is illegal under federal law in the United States, to wear an unauthorized military uniform or unearned decorations. It is an offence that the United States Attorney General will indite by Federal Grand Jury.

People that wear the uniform of the United State military, who are not entitled to, for profit or personal gain, are also prosecuted by the Department of Veterans Affairs.

These individuals are often referred to as "American Traitors" and "Men of Dishonour". This is especially true today when real American heroes are serving in Iraq and Afghanistan.

Bob Christ of "SeaTrepid" Pottstown PA is one such American Traitor or Man of Dishonour. He is a military impostor.

Bob Christ of SeaTrepid , who has never served his country for one day in his life, saw fit to dishonour his country, and his flag, for personal advantage, by not only wearing then uniform of the United States of America, to which he was not entitled, for personal gain, but also gave himself the bogus rank of Major.

This was done deliberately to scam free helicopter rides and parachute jumps, with the Malaysian Military in Malaysian Military Air Transport (Huey Helicopter) on a Malaysian Military base.

This crime is heinous enough to commit on US soil, but for a civilian with absolutely no military service to impersonate a US serviceman with the rank of Major in a foreign country, on a foreign military base, with foreign servicemen simply serves to exacerbate the atrocious nature of this federal crime.

Christ compounded this felony by having himself photographed as "The Major" with genuine Malaysian Military personnel in the Huey aircraft, and by handing out copies of these photographs and laughing.

Christ has never served his country in any branch of the service.

Christ is not entitled to wear the uniform of the United State of America

Christ is has no rank in the US Military

Christ impersonated a US Military Officer with the Rank of Major for personal gain

Christ has dishonoured all US servicemen past and present who have served their nation

Christ has a company called SeaTrepid. This company feeds off fat government contracts of the nation that he has actually disgraced.

Latest information while sketchy, has Christ living in Pottstown PA

"Major" Robert D. Christ
2333 Jones Road
Pottstown,
Pennsylvania
19465
USA
Phone/Fax: +1(610)469-1730
e-mail: bob.christ@seatrepid.com

This offence, which carries a prison sentence and a serious fine, comes under the remit of FBI Special Agent Thomas A. Cottone Jr, who has been informed in detail of Christ's crime against the American people.

Additionally there are numerous public service organisations that seek out these military impostors, who dishonour the uniform of the United States.

They will contact employers, customers, family members, news organizations and even the federal government about the alleged impostor. The fraudsters' personal information along with a photo will

be posted on the Web.

A brief sample of news agencies, public service associations and federal law enforcement agencies that are currently investigating and pursuing Bob Christ for prosecution, publication and "outing" include:

Home of Heroes

Wall Street Journal

FBI (Special Agent T. A Cottone Jr)

POW's

Mary Schantag

VFW Magazine

VAOIG Investigations

American Legion Magazine

The American War Library

Wannabe Warriors

vva.org

Infamous American Traitors

Stolen Valour

American Traitor US

Pottstown Mercury

The Community Connection (Online Pottstown News)

Malaysian Military

Tin Soldiers

Lie Detectors

Military Officers Association of America



| Resellers Home | Wholesale Services ▾ | OpenSRS Platform ▾ | Manage My Services ▾ | About Tucows | Cont |

**SEARCH SITE**

[ SEARCH ▸ ]

## OpenSRS Whois Utility

Whois info for, **bobchristamericantraitor.com**:

Registrant:
Brett Cormick
Suite 334
2 Lansdowne Row
London, London W1J 6HL
UK

Domain name: BOBCHRISTAMERICANTRAITOR.COM

Administrative Contact:
    Cormick, Brett   brett@aquacine.com
    Suite 334
    2 Lansdowne Row
    London, London W1J 6HL
    UK
    02076917890
Technical Contact:
    Technical, PIPEX   services@123-reg.co.uk
    Portland Street
    Beeston
    Nottingham, Nottinghamshire NG9 2LP
    UK
    +44.1159170000    Fax: +44.1158770213


Registration Service Provider:
    PIPEX Communications Uk Ltd, services@123-reg.co.uk
    +44.115-917-0000
    http://www.123-reg.co.uk/
    This company may be contacted for domain login/passwords,
    DNS/Nameserver changes, and general domain support questions.


Registrar of Record: TUCOWS, INC.
Record last updated on 10-Oct-2005.
Record expires on 10-Oct-2007.
Record created on 10-Oct-2005.

Domain servers in listed order:
    NS.123-REG.CO.UK
    NS2.123-REG.CO.UK


Domain status: REGISTRAR-LOCK

The Data in the Tucows Registrar WHOIS database is provided to you by
for information purposes only, and may be used to assist you in obtain
information about or related to a domain name's registration record.

Tucows makes this information available "as is," and does not guarante
accuracy.

By submitting a WHOIS query, you agree that you will use this data onl

**DOMAIN LOOKUP**

[ WHOIS ▸ ]





lawful purposes and that, under no circumstances will you use this dat
a) allow, enable, or otherwise support the transmission by e-mail,
telephone, or facsimile of mass, unsolicited, commercial advertising c
solicitations to entities other than the data recipient's own existing
customers; or (b) enable high volume, automated, electronic processes
send queries or data to the systems of any Registry Operator or
ICANN-Accredited registrar, except as reasonably necessary to register
domain names or modify existing registrations.

The compilation, repackaging, dissemination or other use of this Data
expressly prohibited without the prior written consent of Tucows.

Tucows reserves the right to terminate your access to the Tucows WHOIS
database in its sole discretion, including without limitation, for exc
querying of the WHOIS database or for failure to otherwise abide by th
policy.

Tucows reserves the right to modify these terms at any time.

By submitting this query, you agree to abide by these terms.

NOTE: THE WHOIS DATABASE IS A CONTACT DATABASE ONLY.  LACK OF A DOMAIN
RECORD DOES NOT SIGNIFY DOMAIN AVAILABILITY.



**RUS** **org** **.tv**

Site Map | Korean | Contact us | Tucows.com | Press Releases | Feedback | Help

©2004 Tucows Inc.
TUCOWS is a registered trademark of Tucows Inc. or its subsidiaries. OpenSRS is a trademark of Tucows Inc.
or its subsidiaries. All other trademarks and service marks are the properties of their respective owners.
Tucows Inc. has no liability for any content or goods on the Tucows site or the Internet, except as set forth in the
terms and conditions and privacy statement.



# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-275-GMS |
| | ) | |
| BRETT J. CORMICK and ELAN SUISSE | ) | |
| INTERNATIONAL HOLDINGS (USA) LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| ELAN SUISSE LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-60-GMS |
| | ) | |
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Defendant. | ) | |

**AFFIDAVIT OF ROBERT D. CHRIST**

| | |
|---|---|
| STATE OF LOUISIANA | ) |
| | ) ss: |
| PARISH OF TANGIPAHOA | ) |

Robert D. Christ, being duly sworn, hereby deposes and says:

1.    I am a party to the above-captioned actions and submit this affidavit in support of my Motion for Judgment on the Pleadings. I have personal knowledge of the facts set forth herein and can testify truthfully as to those facts if called upon to do so.

2.    In counterclaims he has asserted against me, Brett J. Cormick alleges that I provided a false affidavit to authorities in Zimbabwe which led to his arrest on or about August 23, 2006. To the best of my knowledge and recollection, however, the only sworn statement I ever furnished to Zimbabwean police is the document attached as

Exhibit B to my Opening Brief in Support of the Motion for Judgment on the Pleadings (which is a true and correct copy of such document).

3.    As that affidavit clearly indicates, I executed it on September 6, 2006, after Mr. Cormick was released from custody by the Zimbabwean authorities. I specifically provided this sworn statement to the Zimbabwean police at that time because they informed me that they were unable to detain Mr. Cormick further in the absence of such a statement from me.

4.    I have provided to my counsel, and my counsel has produced in discovery in these actions, all documents in my possession, custody and control that I furnished to any authorities in Zimbabwe concerning Mr. Cormick (including the affidavit referenced above). I have not withheld any such documents from discovery in these actions.

FURTHER AFFIANT SAYETH NOT.

_____
Robert D. Christ

Subscribed and sworn to before me
this _8th_ day of _November_ , ~~2006~~ 2007
My commission expires _At Death_

_____
Notary Public _Pearl Weaver_
_A52161_

- 2 -

# EXHIBIT G



A GUIDE TO THE
ZIMBABWEAN
LAW OF DELICT

Third Edition, 2001

by

G Feltoe

UC SOUTHERN REGIONAL LIBRARY FACILITY

A A 0 0 1 1 7 5 4 0 6   6





California
Regional
Facility

06/50809998

A Guide to the Zimbabwean Law of Delict was first published by the University of Zimbabwe in 1985.

Second edition published by the Legal Publications Unit, 1990

Third edition (2001) published by the Legal Publications Unit of the Legal Resources Foundation
P O Box 918
Harare
Zimbabwe

Copyright © G Feltoe

All rights reserved

Typeset by Martin Pireyi

Print production by Ann Blair Marketing (Pvt) Ltd

ISBN 0-908312-63-6

# Contents

Introduction ............................................................... 1
  Definition of a delict ................................................ 1
  Purpose of the law of delict ..................................... 2
  Delict, contract and crime ....................................... 3
  Fault liability system ............................................... 3
  Sources ................................................................... 4
  Financial means of defendants ................................ 4

Delicts in Customary Law ......................................... 5
  General aspects ....................................................... 5
  Specific customary law delicts ................................. 5
  Rape ....................................................................... 6
  Assault ................................................................... 6
  Wife and child beating ............................................ 6
  Harm caused by animals .......................................... 6
  Defamation ............................................................. 7
  Speaking disrespectfully to another .......................... 7
  Lying ...................................................................... 7
  Quarrelling .............................................................. 7
  Adultery .................................................................. 7
  Persuading wife to leave husband ............................. 7

Maint Delictual actions in General Law ..................... 7

  The Aquilian Action ................................................ 8
  Requirements .......................................................... 9
  Concept of duty care ............................................... 9
  The patrimonial loss requirement ............................ 9
  The wrongfulness requirement ................................. 10
  The fault requirement .............................................. 10
  Intention ................................................................. 11
  Negligence .............................................................. 11
  Determining whether there has been negligence ....... 11
  Learner drivers ....................................................... 14
  Persons with physical disabilities ............................ 14

Persons with mental incapacity ... 15
Professionals ... 15
Doctors ... 15
Lawyers ... 17
Accountants ... 18
Auditors ... 18
Engineers, architects and contractors ... 19
Trainees and newly qualified professionals ... 19
Relative or directional negligence ... 20
Res ipsa loquitur ... 21
Apportionment of damages ... 21
General ... 21
Intentional wrongdoing ... 22
Failure to wear seat belts or crash helmets ... 22
Contributory negligence of children ... 23
Dependant's claim ... 25
Concurrent and joint wrongdoers ... 26
Joining of wrongdoers ... 27
The Causation requirement ... 27
Areas where wrongfulness issue arises ... 28
Omissions ... 29
Negligent misstatements causing purely pecuniary loss ... 30
Purely financial loss caused other than by negligent misstatements ... 32
Nervous shock ... 34
Fear for personal safety ... 34
Shock due to injury to third party ... 34
Defamation and other actions under the actio injuriarum ... 35
Defamation ... 35
Competing interests ... 35
Animus injuriandi ... 36
What constitutes defamation ... 36
Oral and written defamation ... 38
Persons who can be defamed ... 38
Publication ... 39
Re-publication ... 39
Damages ... 40
Defences to defamation ... 40
Justification ... 41
Fair Comment ... 41
Privilege ... 42
Absolute Privilege ... 42
Qualified Privilege ... 42
Compensation ... 44
Jest ... 44
Rixa ... 44
Consent ... 44
Customary Law defamation ... 44
Newspapers and defamation ... 45
Test applied ... 46
Defences ... 46
Parliamentary reporting ... 46
Reporting court proceedings ... 46
Reporting proceedings of other public bodies ... 48
Reporting public meetings ... 48
Investigative reporting ... 49
Accuracy ... 49
Suggested changes to the law ... 50
Injuria (excluding defamation) ... 51
Harm caused by animals ... 51
Aquilian action ... 52
Pauperian action (domesticated animals) ... 52
Quasi-pauperian action (wild animals) ... 53
Edict concerning wild animals (Edictum de feris) ... 53
Harm caused by grazing animals (Actio de Pastu) ... 54
Nuisance ... 54
Cattle and other animals on rural roads ... 55
Delicts arising out of arrest, imprisonment and legal proceedings ... 56
Unlawful arrest and imprisonment (false imprisonment) ... 56
Abuse of legal proceedings ... 57
Assault ... 57
Delicts relating to sexual intercourse and to marriage ... 58
Abuse of legal proceedings ... 58

General ........................................................................................... 58
Customary law .............................................................................. 59
Adultery ......................................................................................... 59
Abduction, enticement, harbouring of another's spouse .... 59
Illegitimate trading practices ..................................................... 60
Deceptive practices ...................................................................... 60
Fraud ............................................................................................... 60
Injurious falsehood ...................................................................... 60
Passing off ...................................................................................... 61
Interference with contractual relations and business ........... 62
Inducement to breach of contract ............................................ 62
Other forms of unlawful interference in trade or business ... 62
Intimidation ................................................................................... 62
Conspiracy ...................................................................................... 62
Stealing or disclosing trade secrets .......................................... 63
Nuisance ................................................................................................ 63
Private Nuisance ........................................................................... 63
Public Nuisance ............................................................................. 65
Special Delicts relating to things falling from buildings ...... 65
Actio de effusis vel dejectis ....................................................... 65
Actio de positu vel suspensi ...................................................... 66
Breach of statutory duty ............................................................. 66
Negligent performance of statutory duty .............................. 66
Trespass ................................................................................................ 66
Vicarious Liability .............................................................................. 66
The doctrine ................................................................................... 67
Rational for doctrine .................................................................... 67
Operation of the doctrine ........................................................... 68
Employee who is not an independent contractor ................. 68
Course of employment ................................................................ 68
Claim by employer against employee ...................................... 70
Delicts committed by independent contractors ................... 70
Vicarious liability of State ........................................................... 71
Parents and spouses .................................................................... 72
Defences ............................................................................................... 72
Authority ......................................................................................... 72
Contributory negligence ............................................................. 73

Inevitable accident ....................................................................... 73
Necessity ......................................................................................... 73
Negligence of a third party ........................................................ 74
Private defence .............................................................................. 74
Public policy ................................................................................... 74
Trivialities ....................................................................................... 75
Voluntary assumption of risk .................................................... 75
General ...................................................................................... 77
Which test should Zimbabwe adopt ......................................... 77
Intentional infliction of harm .................................................... 78
Dependant's action ...................................................................... 78
Representative and group actions ............................................ 80
Group actions ................................................................................ 82
Excemption clauses excluding delictual liability .................. 82
Prescription .................................................................................... 83
Legislative compensation systems ............................................... 84
Workers compensation ............................................................... 84
War victims ..................................................................................... 85
Persons suffering loss due to the activities of
      dishonest lawyers .............................................................. 85
Persons injured by uninsured or hit and run drivers .......... 86
Victims of crime ............................................................................ 86
Insurance ............................................................................................. 87
Assessment of damages ................................................................... 88
General aspects ............................................................................. 88
Single action ................................................................................... 89
Special and general damages ..................................................... 92
Medical and hospital expenses ................................................. 93
General damages ........................................................................... 93
Pain and suffering ........................................................................ 93
Disfigurement ............................................................................... 94
Disability ......................................................................................... 94
Loss of amenities of life .............................................................. 94
Loss of earnings and of earning capacity ................................ 95
Parties who may sue in bodily injuries cases ........................ 96
Father .............................................................................................. 97
Husband .......................................................................................... 97

# Introduction

## Definition of a delict

The word delict is derived from the Latin word *delictum*, meaning a wrong. In England and America the term used for what we call a delict is a tort, which is also derived from a Latin word, namely, *tortus* meaning twisted or wrong. Thus in Roman-Dutch law we refer to the law of delicts whereas in English and American law they refer to the law of torts.

The law of delict is a branch of private law falling under the law of obligations. It deals with civil wrongs as opposed to criminal wrongs. It does not, however, cover all civil wrongs. The special rules relating to the legal consequences of breaches of contracts that are also civil wrongs are dealt with under the law of contract and not the law of delict. Although the same act or omission may constitute a delict and a crime or both a delict and a breach of contract, the law of delict must be carefully distinguished from criminal law or contract.

A delict has been variously defined as:

- A civil wrong to an individual for which damages can be claimed for compensation and for which redress is not usually dependent on a prior contractual undertaking to refrain from causing harm.

- An unlawful, blameworthy act or omission which causes another person damage to person or property, or injury to personality, and for which a civil remedy for recovery of damages is available.

- A breach of a general duty imposed by law giving rise to a civil action at the suit of the injured person.

- The breach of a duty, imposed by law, independently of the will of the party bound, which will ground an action for damages at the suit of any person to whom the duty was owed and who has suffered harm in consequence of the breach.

1

Wife and children .................................................... 97
Employer ............................................................... 98
Property damage ..................................................... 98
Interest on damages ................................................ 98
Damages for causing death ...................................... 99
Patrimonial loss to estate ........................................ 99
Loss of support ...................................................... 99
Duty to mitigate loss .............................................. 100
Collateral source rule (res inter alios actae) ............... 101
Inflation (fall in value of money) .............................. 102
Reforming the law of delict ..................................... 103
Social context ........................................................ 103
Individual responsibility ......................................... 104
Social responsibility ............................................... 105
Defects in the operation of the fault system ............... 105
Particular shortcomings of fault system in
    relation to underprivileged ................................. 107
Need to reform ....................................................... 108
Possible reform measures ........................................ 108
Government no-fault scheme .................................... 109
Private no-fault scheme .......................................... 109
Strict liability ....................................................... 109
Harm caused by criminals ....................................... 110
Delict cases ........................................................... 111
List of Legislation .................................................. 164
Index .................................................................... 179

## Purpose of the law of delict

From these definitions we can discern that the essential purpose of the law of delict is to afford a civil remedy, usually by way of compensation, for wrongful conduct that has caused harm to others. This civil remedy is not in any way dependent upon the existence of any contractual relationship between the plaintiff and the defendant. The law, thus, imposes a general duty upon all persons not to harm others wrongfully and sets out to define when an act or omission is wrongful so as to attract civil liability. An English writer depicts this as follows:

The law of torts constitutes a body of liability rules. These rules signal when a person is to compensate another by the payment of damages or to be restrained from doing certain acts by way of injunction. [In our law this is known as interdict.] Those rules, then, indicate whether or not losses caused by human conduct will be shifted from one party to another (or the loss will be where it falls).

In broad terms, the law of delict acts as a regulator of social conduct in the sense that it establishes how people should behave in relation to one another by laying down when one person is delictually liable to another. The wrongdoer who causes harm is made to pay compensation to the wronged person.

The two main types of loss for which compensation can be claimed under the law of delict are wrongs of substance leading to financial loss and wrongs to personality leading to sentimental loss. Wrongs of substance are wrongs that cause tangible harm, such as injury to person (including psychological harm), damage to property and harm to economic interests. Wrongs to personality are those that cause intangible harm, for example, by harming reputation or subjecting a person to indignity.

Not every type of harm suffered by a person is actionable in the field of delict. A person can only sue successfully in delict if the law of delict recognises that there is legal liability for that type of harm. An easy example of where the law of delict does not provide a remedy for loss is where P and D are both store-owners and D lowers the prices of his goods so as to attract to his business the customers who have previously been buying those goods from P's store. Trade competition is the essence of a free market economy and in such an economy the law allows such competition and thus provides no

---

remedy for the person who suffers economic loss as a result of such competition.

## Delict, contract and crime

The main object of a criminal prosecution is the punishment of the offender whereas a delictual action is a civil action in which the injured party will be claiming compensation. Many wrongs, however, can lead to both criminal prosecution and also a civil claim. Wrongs such as negligent driving resulting in a collision with another vehicle, assault and rape are both crimes for which persons can be punished and delicts for which the wrongdoers can be made to pay compensation to the persons injured by the wrong. Some wrongs, however, are only delicts and are not crimes, such as, seduction and adultery. The main object of a contractual action is either to enforce the contractual obligation or to obtain damages for breach of the contract. This is different from a delictual action. The table below sets out the major differences between a delict and a contract.

| Delict | Contract |
| --- | --- |
| General obligation imposed by law | Obligation deriving from agreement between the parties |
| Compensation for monetary or sentimental loss | Compensation for breach of contract |
| Fault is normally the basis of liability | Proof of fault not required |

## The fault liability system

Most delictual actions in our system require proof of fault. There are only a few strict actions, such as the Pauperian action where no proof of either intention or negligence is required. All the rest of the actions require proof of either intention or negligence. Some actions, such as fraud and assault, require proof of intention. By far the most frequently brought action in our system, the Aquilian action, requires proof of either intention or negligence. Most Aquilian actions are based upon allegations of negligence. Negligence is thus the most important species of fault in our system of delict.

The theory underlying the fault liability system is that a blameworthy individual who injures another intentionally or carelessly should be made to compensate the injured party. The defendant is "punished" by having to pay money to the plaintiff. This causes him suffering and acts as a deterrent in the future and thus helps to reduce the accident rate in society. But the defendant should only be made to pay for the loss (i.e. the loss should only be transferred to him) if he has been at fault. It is seen as being unfair to make him pay the loss if he was not at fault. But this theory is premised upon payment for the loss by the wrongdoer himself. In many instances in the modern world, the defendant will be covered by liability insurance and the insurance company and not the defendant will pay the loss. The only "punishment" that the insured person may suffer is that he may sometimes lose his no claim bonus. Because the injurer does not personally pay for the loss, there is little deterrent effect. Loss spreading also undermines deterrence. For example, a manufacturer who is made liable to pay damages for the harm caused by his poorly manufactured product may be able to absorb the costs of this liability by passing them on to his customers by raising the prices of his products. (There are clearly limits to this process. A manufacturer is likely to go out of business if he continues to manufacture shoddy products and seeks to pass on to his customers the liabilities incurred for harm caused by such products.)

## Sources

Zimbabwe's modern law of delict is based squarely upon Roman Law as received and developed in Holland and further developed in Southern Africa. Native Germanic law was almost entirely displaced by Roman Law in the field of delict, although one or two Germanic elements were retained, e.g. the right of dependants to claim compensation and the right of injured parties to claim compensation for pain and suffering.

## Onus

The general rule which applies in all delict cases is that the plaintiff must prove his claim on a balance of probabilities.

## Financial means of defendants

In deciding upon liability in delict the financial means of defendants is not considered; the fact that they are poor does not affect liability or serve to reduce the amount of damages to be awarded. (The amount of damages is assessed on the basis of the loss or damage caused.) However, in practical terms there will be no point in suing a completely poverty stricken, uninsured defendant.

# Delicts in customary law

## General aspects

Customary law is basically the collection of traditionally accepted legal rights and duties of black Zimbabweans who live a traditional way of life.

In general law there is a clear differentiation between crime and delict. In customary law, on the other hand, there is almost no distinction between crime and delict. Most wrongs in customary law are dealt with by extracting compensatory damages. The primary emphasis was upon the correcting of the upset equilibrium and the restoration of social harmony. In customary law where the wrong is serious the damages may be partly penal and partly compensatory e.g. with homicide there was a penalty payable to the Chief and damages to the guardian or family of the person killed.

Whereas in general law liability is based upon fault, in customary law liability is based upon causation and not fault (although damages may be reduced where there was an absence of fault.) In customary law, unlike in general law, a parent will be held vicariously liable for the delicts of his children

## Specific customary law delicts

### Unlawful killing

This was treated as a serious delict for which damages were payable to the dead person's family, to the Chief and to the court. As part of these damages the defendant's family would have to give the family of the dead person a young girl as compensation to ward off the avenging spirit of the dead (*ngozi*). The giving of a young girl as compensation is now illegal and, if it is done, the authorities will take action to protect the girl. It is also illegal to extort payment of compensation from the family of the person responsible for causing the death by dumping the body at the homestead of that family and refusing to bury the body until compensation has been paid.

*A Guide to the Zimbabwean Law of Delict*

## Rape

This is a serious delict. However, it is not the raped woman who will claim damages for the rape. If she is married her husband can claim damages for adultery against the person who raped her. If the woman is unmarried her guardian can claim damages for seduction.

## Assault

This consists of causing of harm to another either intentionally or accidentally. Traditionally the amount of damages increases if the offender assaults a person to whom he or she owed special respect such as his or her *sekuru* or father.

## Wife and child beating

Although traditionally a man was entitled to discipline both his wife and his child by beating them, customary law did not allow him to beat his wife excessively. A wife whose husband beats her excessively and for no reason can claim damages from her husband for assault. Under general law a husband has no right to beat his wife and, if he does so, he can be found guilty of assault. A wife can also claim damages from her husband if he criticises or nags her unreasonably or if he constantly causes quarrels between them.

## Harm caused by animals

A person is held liable for harm caused by his animals. Thus if cattle trample the maize in the plaintiff's field, the plaintiff can claim damages from the owner of the cattle. If the defendant's bull kills a person, the family of the deceased may be able to claim damages from the owner of the bull.

## Defamation

This consists of damaging another's good name and reputation in the community by saying something untrue about a person in public or writing something untrue about someone and showing that written statement to others. The traditional courts would nearly always investigate whether the defamation resulted in a disturbance of peace in the community. The most serious form of defamation is to make a false accusation that a person is a witch. Under general law, it is a criminal offence under the Witchcraft Suppression Act [*Chapter 9:19*] to make an accusation that a person is a witch.

*A Guide to the Zimbabwean Law of Delict*

## Speaking disrespectfully to another

Damages can be claimed from a person who speaks disrespectfully to the plaintiff and this has resulted in a breach of the peace. If the plaintiff is a person to whom the defendant owes special respect the court will order the defendant to pay extra damages as, for example, where a man speaks rudely to his mother-in-law or father-in-law.

## Lying

A person who has lost money because of a lie that another person told has the right to claim damages from the liar.

## Quarrelling

A traditional court could order a person who is very quarrelsome to pay damages and to keep the peace in the future.

## Adultery

A husband can claim damages from a man who commits adultery with his wife.

## Persuading wife to leave husband

The plaintiff can claim damages from a person who has persuaded the plaintiff's wife to leave him.

## Seduction

The guardian of a minor girl has the right to claim damages from the person who has seduced her. If she is a major, however, then the seduced woman may herself claim damages for seduction. The legal age of majority is 18.

# Main delictual actions in general law

By far the most important actions in our law of delict are the aquilian Action (*actio legis Aquiliae*) and the *actio injuriarum*. The overwhelming majority of cases brought to court are Aquilian actions for negligent causing of harm. Actions brought under the *actio injuriarum* usually involve the claiming of damages for defamation.

Essentially, the Aquilian action provides a remedy for what are known as wrongs of substance. It provides a remedy for loss due to:

- injury to person including psychological harm (for example, where a person is injured in a motor vehicle accident);

- for damage to property (for example, where D starts a fire on his land and the fire spreads to P's land and causes damage to his property);

- harm to economic interests (for example, where D defrauds P and causes him financial loss); and

- loss of support (for example a young child is left without support when her parents are killed in a motor vehicle accident).

On the other hand, the *actio injuriarum* provides a remedy for wrongs to personality. It provides a remedy for sentimental loss or intangible harm. This harm can be:

- harm to reputation, that is harm to one's standing in the eyes of others (for example a newspaper publishes an article about P in which it alleges that he has engaged in corruption);

- harm to dignity (for example D makes sexual advances to P, a woman); and

- invasion of privacy (for example, D, a policeman, enters P's house to carry out a search of the premises when he has no search warrant and there was no lawful justification for him to carry out the search).

In addition to these two major actions, there are certain other delictual actions which have their own separate and distinct requirements such as the Pauperian action for harm done by animals, the action for seduction, the action for wrongful arrest and imprisonment and so on.

# The Aquilian action

This action is the cornerstone of our law of delict. Most of the delictual actions that are brought are Aquilian actions.

## Requirements
The requirements for this action are:

- There must have been some conduct on the defendant's part (i.e. an act or omission) which the law of delict recognises as being wrongful or unlawful (the wrongfulness requirement);

- The conduct must have led either to physical harm to person or property and, thereby, to financial loss, or have caused purely financial loss which does not stem from any physical harm to person or property. (The so-called patrimonial loss requirement, one's patrimony being one's property and finances);

- The defendant must have inflicted the patrimonial loss intentionally or negligently (the fault requirement); and

- There must be a causal link between the defendant's conduct and the loss (the causation requirement).

## Concept of duty of care
The expression "duty of care" is frequently used in such cases. The phrase is, however, somewhat confusing insofar as it is used in two separate and distinct senses. It is therefore necessary to identify in which of the two senses the expression is being used in the context concerned. The first sense in which it is used is in connection with negligence. A person is said to have breached the duty of care (i.e. to have been negligent) when he fails to foresee and guard against harm which the reasonable person would have foreseen and guarded against. The second connotation of this phrase is in connection with wrongfulness. When it is used to denote wrongfulness, it will be used in this sort of way: although the reasonable man would have foreseen and guarded against harm, the defendant is not liable in the circumstances as the law does not recognise any duty of care to avoid causing that sort of harm (i.e. the conduct was not wrongful or, to put it another way, there was no recognised legal duty to avoid causing harm by negligent conduct).

## The patrimonial loss requirement
There must be some quantifiable financial loss stemming from the defendant's conduct. This financial loss usually arises out of damage or destruction of property or physical injury to person or the causing of the

*A Guide to the Zimbabwean Law of Delict*

death of a breadwinner. Sometimes, however, the loss is purely financial not flowing from harm to person or property. Loss includes prospective loss, e.g. loss of profits. Frequently, in an Aquilian action for personal injury, damages are also claimed for pain and suffering.

## The wrongfulness requirement

This requirement operates as a device for controlling the scope of actionable negligence.

It has two main roles, namely:

— to decide whether there is any liability at all for that type of conduct.

— to restrict the ambit of liability where liability is recognised.

In most cases, this requirement poses no problem. The law of delict lays down that it is always wrongful or unlawful by a positive act intentionally or negligently to cause physical harm to person or property resulting in financial loss. Where, however, there was not a positive act but instead an omission (i.e. a failure to act positively), or the positive act did not result in physical harm to person or property but only purely financial loss, or the harm caused was psychological harm, the courts have used the wrongfulness criterion to limit the range of liability in these cases further than would be the case if the fault criterion was the sole determinant of liability. (These special situations are dealt with in more detail later).

### Range of Liability



Negligence

Wrongfulness

## The fault requirement

It must be proved that the defendant caused the harm either intentionally or negligently.

*A Guide to the Zimbabwean Law of Delict*

## Intention

Only rarely is the basis of the action an allegation of deliberate and intentional infliction of harm, although, of course, crimes such as assault and malicious injury to property are also delictual wrongs. Intention includes both knowing and deliberate infliction of harm and cases where the main object is not the infliction of the harm but the defendant recklessly engages in some enterprise with realisation that the harm will probably or possibly occur.

For a case involving intentional injury, see *M v N* (1981) where a woman was awarded substantial damages for rape.

## Negligence

Almost all Aquilian actions are based upon allegations of negligence. Negligence is a societal norm (interpreted by judges) of socially desirable and acceptable behaviour. It is a community standard to measure conduct.

In actions based on negligence the courts have to deal with a wide range of situations. For example, injury, death, property damage or harm to economic interests caused by:

• careless driving;

• dangerous conditions on land and in buildings;

• defects in manufactured products;

• faulty design or construction of buildings and bridges;

• careless handling of dangerous substances and firearms;

• improper medical treatment;

• inadequate control over dangerous animals; and

• negligent advice by a lawyer or accountant to his client.

### Determining whether there has been negligence

Negligence is concerned with the protection of society against the dangers posed by a conduct that falls below the standard of the average prudent person. Negligence is tested by applying the objective standard of the reasonable person.

The first stage in any case of alleged negligence is for the court to decide the facts. The facts will frequently be in dispute. The plaintiff will be trying

*A Guide to the Zimbabwean Law of Delict*

to establish facts that point clearly in the direction of clear-cut negligence, whereas the defendant will be seeking to show a version of the facts that points to a complete lack of negligence. More rarely, the facts may not be in dispute but the parties will be in dispute as to whether or not, on the agreed facts, there was negligence. The facts are vitally important in a case of alleged negligence as whether or not there was negligence may turn on a number of particular facts. Where the facts are disputed the court must carefully decide which version of the facts to accept.

After the facts have been decided, the court has to determine how an ordinary, average, reasonably careful Zimbabwean would have behaved in the circumstances. Often, the situation may be one that has arisen in the past and there will be previous court rulings setting out what constitutes negligence in that situation. This is particularly the case in motoring situations. To take one example, there are numerous cases laying down that it is negligent for a driver to attempt to overtake on a blind rise when there may be oncoming traffic. But if the situation has not arisen in the past and the courts have thus not ruled on what constitutes negligence in that situation, the court must decide what standard of care a reasonable person would have exercised in that situation. Once it has determined this standard, the court will then decide whether the defendant's conduct measured up to this standard. If it did not he will be adjudged to have been negligent. Negligence is thus the failure to display the same degree of care in avoiding the infliction of harm which the reasonable person would have displayed in the circumstances. The decisions in criminal cases which revolve around principles of negligence, e.g. culpable homicide and negligent driving, can be cited as authority in civil cases because the same tests for negligence which are applied in civil cases are also applied in criminal cases.

More specifically, the issue of negligence is examined by asking two main questions. The first is whether harm was reasonably foreseeable and the second is whether the reasonable person would have guarded against that harm?

The second enquiry is necessary because there are some situations where, despite the fact that harm was reasonably foreseeable, the reasonable person might not necessarily have taken any steps at all to prevent that particular harm or he might only have taken certain limited precautions. Therefore, in addition to reasonable foreseeability, the question of what

*A Guide to the Zimbabwean Law of Delict*

steps, if any, the reasonable person would have taken has to be investigated. The way in which the enquiry is customarily broken down into its component parts is as follows:

• Would a reasonable person placed in the position of the defendant have foreseen the possibility that harm would result from the sort of conduct in which the defendant was engaged?

• If he would have foreseen harm, would the reasonable person have taken steps to prevent that harm from eventuating?

• If he would have taken steps, what steps would he have taken?

When deciding whether the reasonable person would have guarded against harm which was reasonably foreseeable the courts will take into account the following factors:

• The degree of risk that the harm would occur (was it probable or unlikely that the harm would occur?)

• The nature of the harm that would occur (if the harm occurred would it be serious harm or only trivial harm?)

• The nature of the precautions required to prevent the harm (were these elaborate and expensive or easy and inexpensive?)

• The objective which the defendant was seeking to attain (was this legitimate or illegitimate?)

These factors are weighed against one another and the court then decides whether, on balance, the reasonable person would have taken certain precautions. For instance, if the defendant was pursuing a legitimate objective, the risk of harm was very slight, the harm that might occur was likely to be very slight, and the precautions necessary to prevent the harm were complicated and costly, the court may well find that the reasonable person would not have guarded. On the other hand, if the harm would be great and was very probable that it would occur and the precautions to guard against it are straightforward and not costly, the court will be likely to find that the reasonable person would guard.

See for example, *Lomagundi Sheetmetal v Basson* (1973) and *Peattie & Ors NNO v Clan Syndicate* (1984).

If the court decides that harm was reasonably foreseeable and that the reasonable person, having foreseen this harm, would have taken certain precautions to prevent this harm from occurring, it will find the defendant guilty of negligence if either he failed to advert to the risk of that harm and, because of this failure to appreciate the risk, he failed to take reasonable precautions to prevent it, or if, although he was aware of some risk of harm, he failed to take reasonable steps to prevent it.

Having described the process used to determine whether a person has been negligent, it is now necessary to look at a number of specific situations.

### Learner drivers

Learner driver needs to acquire skills by practice on the roads but if the law was to apply the standard of the "reasonable learner driver" injured plaintiffs would often end up going without compensation. Additionally, the standard of the reasonable learner driver would be difficult if not impossible to apply. Thus, in the interests of ensuring proper compensation of injured parties, the standard of the reasonable driver who is not a learner is applied in such cases. But where the supervisor/instructor of the learner is primarily to blame, the supervisor/instructor is also delictually liable for the resulting harm to the plaintiff e.g. an instructor taking a brand new driver into busy traffic conditions, or he falls asleep in the passenger seat leaving the learner driver to fend for himself.

### Persons with physical disabilities

The blind, deaf, one-legged and are allowed to live in the world and allowances are expected to be made for their disabilities e.g. a blind man crossing the street with a white stick. The same sort of approach would be adopted here as in relation to cases where young children are on or in the vicinity of the road. In such cases, drivers are expected to exercise special care and caution because children are prone to run out into the road. So too, a motorist seeing a person with a white stick should exercise special caution. But obviously, it is negligent for a blind person to attempt to perform a task that his disability prevents him from performing such as driving a car.

### Persons with mental incapacity

It would seem that the mentally deranged are held liable for causing accidents. See Prosser and Keaton on *Torts* 5 ed pp 177-178.

### Professionals

Where an allegation of negligence is made against a professional or skilled person, such as a doctor, an engineer or a lawyer, it would obviously be inappropriate for the court to use the standard of the ordinary reasonable person who has no expertise in that professional field. Thus, the test that will be applied in this situation is how the ordinary, reasonable skilful professional person operating within that field would have dealt with the situation. For example, the test that will be used to decide whether a doctor has been negligent is how would a reasonable doctor have dealt with that situation. Naturally, it is negligent for a person without any training within a skilled field to attempt any procedure requiring proper training and expertise for that procedure to be carried out safely.

### Doctors

Doctors receive lengthy and intensive training to equip them with the necessary skills to practise their profession proficiently. After qualification, doctors acquire practical experience under supervision and if they wish to become specialists, they have to sit further examinations after acquiring specialist skills under supervision. Doctors therefore have skills that others do not have and they are required to make good use of these skills.

The law requires doctors to behave as ordinary, reasonably skilful doctors would have behaved in the circumstances. They are not obliged to exercise the highest possible skill. If a patient suffers harm as a result of the negligence of a doctor, he/she is entitled to sue the doctor for compensation. If a patient dies as a result of the doctor's negligence, the doctor may be prosecuted for culpable homicide. In a legal action, the doctor's degree of negligence does not have to be gross before the doctor is liable. Any degree of negligence suffices. This standard is used in respect of cases involving allegations of negligence in relation to diagnosis, treatment and post-operative care.

Doctors are not expected to be miracle workers who will undertake always to cure their patients. Nor are they expected to be infallible. Certain mistakes are excusable; what is not excusable are blatant, indefensible mistakes that would not be made by reasonably competent doctors. It is

these sort of errors that rightly attract sanctions. In a recent South African case, the test for medical negligence was stated in these terms:

> Both in performing surgery and in his post-operative treatment, a surgeon is obliged to exercise only reasonable diligence, skill and care, no more than the general level of skill and diligence possessed and exercised at the time by members of that branch of the profession to which he belongs. The mere fact that an operation was not successful or that the treatment he administered did not have the desired effect does not necessarily justify an inference of lack of diligence, skill or care on the surgeon's part.

As regards doctors who are specialists, the court will apply the test of how would a reasonably skilful doctor specialising in that particular branch of medical practice have dealt with the situation.

When applying the test for negligence a court of law will take into account the circumstances in which the doctor was working. A doctor dealing with an emergency, with inadequate facilities, and under great pressure, is not judged by the standard of the doctor working in more ideal circumstances. It must be noted that, not infrequently, medical accidents are not so much the result of poor professional behaviour, but rather of intolerable pressure on doctors due to under-staffing. Indeed, it must be said that drastically overworked doctors working under great pressure will eventually end up making mistakes. The situation is compounded where a shortage of specialist skills leads to junior doctors being given only minimal supervision.

One of the ways to seek to prove negligence is to allege that the doctor who caused harm deviated from a usual and normal practice. If there is a widely recognised way of dealing with a particular condition or there is a generally accepted precaution that needs to be taken, departure from the normal practice will point to negligence and the doctor will have to justify this departure. But this will only apply where there is a commonly accepted approach. Where there are differing medical opinions as to the best way to proceed, the doctor is entitled to adopt the approach that he believes is the most appropriate.

Resort to innovative techniques may be appropriate in certain circumstances but doctors should be cautious in employing such

techniques, especially where they carry greater risks than more conventional forms of treatment. In deciding whether resort to a novel technique is justified the court takes into account such facts as the seriousness of the patient's condition, his previous response to more conventional treatment, and his attitude to the use of the new procedure upon him.

## Lawyers

Lawyers are trained professionals. In performing their professional legal work, they are expected to exercise reasonable skill and competence. If they fail to measure up to this standard they can be sued for damages. In South Africa, over the last few years there has been an increasing number of claims against lawyers for negligence. The most common situation where lawyers have been sued successfully for damages is where they have negligently allowed claims to prescribe. As regards damages, if the negligence deprives the plaintiff of the chance of bringing proceedings, the damages would be the value of the opportunity that has been lost. If there was a good chance of the claim succeeding, an award can/will be made of most of what would have been recovered if the claim had not been allowed to prescribe. See *Kitchin v Royal Air Force* (1958). In a case where there was a good defence to the claim, but due to the lawyer's negligence it was not raised and the plaintiff had to pay out on the claim, the measure of damages would be the amount the plaintiff had to pay out. If the lawyer has settled the plaintiff's claim for a paltry amount without authorisation, the amount claimable would be the difference between the settlement amount and the amount originally claimed.

In respect of court work, it seems that under the common law lawyers have an immunity from delictual liability. The main rationale for this immunity is that lawyers owe an overriding duty to the court when appearing in court and if they were liable to be sued by their clients, they might find it very difficult to discharge their duty to the court. Another reason advanced for the immunity is that if clients could sue for negligent performance of court work, this would result in having to retry cases. The immunity, however, does not cover pre-trial work that is not so intimately connected with the conduct of the case in court that it constitutes a preliminary decision on the way the case is to be conducted when the case is tried. See *Rondel v Worsley* (1969). For criticism of the blanket immunity of lawyers in respect of court work see (1977) 94 *SAL J* 184. The author argues that in certain cases lawyers could be held liable without any

adverse effect on their duty to the court e.g. a lawyer uses an entirely wrong procedure, or the lawyer arrives drunk in court and is incapable of presenting the case, or he fails to come to court at all when he was fully aware of the court date. The author of this article argues that lawyers should not be allowed to get away with such blatant blunders.

## Accountants

Accountants are responsible for keeping accurate books of account and they also give financial advice on matters such as investment and taxation. If they perform their work carelessly this can result in financial loss. For example, his client, P, asks D, an accountant, whether he should invest money in a certain corporation. D says the investment would be a good investment. Acting on D's advice, P invests in the company. The company goes insolvent soon after P had invested in it and P loses the money he has invested. In these circumstances, D would be liable to P if a reasonable accountant would not have given the advice to P that D gave, as the reasonable accountant would have known of the bad financial position of the company or would have found it out had he taken reasonable care.

## Auditors

Auditors carry out audits of various institutions such as commercial companies in order to provide independent and reliable information of the true financial position of the institution in question at the time the audit is carried out. One of the main reason for audits is to uncover errors and fraud in commercial and other institutions that are handling money. The auditor is expected to perform these tasks with due care, diligence and competence. It is not always negligent for an auditor to fail to detect a fraudulent practice within the company he is auditing. The fraud may be so ingenious and difficult to uncover that no reasonable auditor performing his work diligently would have uncovered the fraud in question; if this is the case the auditor who failed to detect the fraud will be found not to have been negligent. If, on the other hand, the reasonable auditor would have uncovered the fraud, the commercial corporation that employed him to carry out the audit could sue the auditor.

The more difficult question with auditors is whether they can be liable to third parties if they carelessly carry out their professional work. For example, if the audit creates a completely false picture of the company as being financially sound when it is in deep financial trouble, can current shareholders or new shareholders who invest money on the strength of

the audit report sue the auditors for the losses they had suffered? Does it make any difference that the audit report was included in a prospectus soliciting share investment and the auditors knew that the audit report was going to be put in the prospectus. The courts in England and South Africa have generally been unwilling to make auditors liable to persons other than those who engaged them to carry out the work. The reason for this reticence has been the fear of opening the floodgates to a huge scale of liability. (For further discussion on this point, see under Purely Economic Loss below.)

## Engineers, architects and constructors

Again, such professionals are expected to exercise the general level of skill and diligence possessed and exercised at the same time by the members of the branch of the profession to which the belong. In the leading South African case of Randeree & Ors v WH Dixon & Associates & Anor (1983), the court cited with approval this passage from a book on engineering contracts:

The architect or engineer is under a special duty to take the best advice available upon the use of such new techniques and to advise his employer of any potential risks; and where the selection of the technique is the architect's, the onus of justifying his action will be correspondingly heavier, since nearly all building and civil engineering techniques are empirical in origin and have evolved gradually by experience and trial and error, and non-traditional methods are notoriously susceptible to unexpected difficulties and failure.

The court went on to point out that this passage from a South African case applied with equal validity to the work of professionals such as engineers. If there is proof that a precaution is usually observed by other persons, a reasonable and prudent man will follow the usual practice in the like circumstances.

## Trainees and newly qualified professionals

As regard newly qualified professionals, these persons will be negligent if they attempt to do something which they do not have the competence to do, for example, a newly qualified doctor, engineer or lawyer must not try to perform a complex and difficult procedure beyond their capabilities. A newly qualified doctor, however, may be able to rely on

the defence of necessity if he attempts to perform a medical procedure when the patient is in a critical condition and there isn't a qualified doctor available, or by the time a more qualified doctor is summoned the patient would have died. Conversely, if a senior doctor instructs a newly qualified doctor to carry out a difficult or complex procedure, the major responsibility for any harm that eventuates may lie with the senior doctor.

## Relative or directional negligence

In our law, negligence is a relative or directional concept. Thus, it is said that "negligence in the air" will not be sufficient to found delictual liability. Before a plaintiff can succeed in a delictual claim, he has to establish that the defendant was negligent in relation to him. In other words, there may be situations where the defendant was negligent in his conduct, but yet he was not negligent as regards the particular harm which accrued to the plaintiff. It may have been reasonably foreseeable that harm to some other person might result but not reasonably foreseeable that plaintiff would be adversely affected, or it may have been reasonably foreseeable that harm of a particular type (for instance, trivial harm) might result but not harm of the character which actually occurred (such as serious harm). In the latter case, the plaintiff will only be able to recover for the harm that was reasonably foreseeable.

This concept of relative negligence must not, however, be taken to mean that it is invariably required that harm to a specific pre-identified plaintiff must have been prospectively reasonably foreseeable. In many situations it is quite sufficient that it was reasonably foreseeable that harm would result to persons within the field of danger created by the defendant's negligent conduct. For example, if due to carelessness at a chemical factory there is an explosion and numerous people some distance away in a public street are injured, the question is not whether those victims were pre-identified but simply whether it was reasonably foreseeable that the explosion would result in injury to any persons who happened to be in the street. This is sometimes expressed by saying that injury to the class of persons of whom the plaintiff was a member must be reasonably foreseeable.

For a critical discussion on the concept of relative negligence see (1990) 107 SAL J 56.

## Res ipsa loquitur

Sometimes a person seeking to recover damages for harm done to him does not know how the occurrence that caused the harm came about and he cannot produce any evidence to establish how the occurrence came about. In these circumstances, he may seek to invoke the concept of res ipsa loquitur. This expression means that the occurrence speaks for itself. If the occurrence in question would not normally occur without negligence this may lead to an inference of negligence. This doctrine can only be invoked where the cause of the occurrence is unknown and thus there is no direct evidence that can be led to establish negligence. In order for the inference to arise:

- the injury must have been caused by a thing which was under the control of the defendant; and

- that sort of occurrence would not have been taken if reasonable care had been exercised.

Res ipsa loquitur cannot be relied upon where it is possible for the claimant to call evidence of how the occurrence came about.

## Apportionment of damages (contributory negligence)

### General

This matter is relevant in regard to cases under the Aquilian action based upon negligence. The type of situation with which we are dealing here is, for example, where a vehicle being driven by D collides with P, a pedestrian. It turns out that both parties were negligent in causing the accident because P tried to cross the road without ensuring that it was safe to do so and because D was driving at an excessive speed and was not keeping a proper look out. In the event of P suing D for damages, how does our law deal with the claim? Since 1971 we have had apportionment legislation, namely, the Damages (Apportionment and Assessment) Act [Chapter 8:06]. Under this legislation, if P and D were involved in an accident and both were at fault, in the event of P suing D for damages, P's claim will be reduced to such an extent as the court deems "just and equitable having regard to the respective degrees of fault of the claimant" and of the defendant "insofar as the fault of either of them contributed to the damage". Apportionment is thus based on "the equitable precept that A (person) should not recover in full for damage caused partly by his own fault".

For instance, if P was 20% at fault, and D was 80% at fault, P will be able to recover 80% of his damages from D and D in turn will be able to recover 20% of his damages from P. This methodology of examining the respective degrees of fault of the two parties in relation to one another is the one that is usually employed in these sorts of cases. (In a motor accident situation, where the events happened over a very brief space of time, it is, however, by no means easy to apportion blame.) Sometimes our courts have used a more complicated methodology to deal with apportionment. This entails measuring individually the percentage deviation of the two parties from the norm of the reasonable person and then reducing these figures to proportions. To give an example of this manner of computation:

- If P deviated from the norm by 20% and D by 40%;
- Reduced to proportions this is 1 : 2;
- Therefore, P is liable to pay ⅓rd of D's loss and D is liable to pay ⅔rds of P's loss.

### Intentional wrongdoing
Fault does not include intentional wrongdoing. See *Minister of Law and Order & Anor v Ntsane* 1993 (1) SA 560 (A).

### Failure to wear seat belts or crash helmets
Following English and South African cases to similar effect, the Zimbabwean High Court in *Koen v Keates* (1989) ruled that the failure by a front seat passenger to wear a seat belt fitted in the car can amount to contributory negligence under s 4(1) of the Law Reform (Contributory Negligence) Act. Although the failure to wear a seat belt did not contribute to the accident, s 4(1) required that damages are to be reduced to an extent deemed just and equitable if the fault of the claimant contributed to his or her damage. The failure to wear a seat belt amounted to fault on the part of the claimant as not only was it a negligent failure to take reasonable safety precautions, but it also amounted to a breach of a statutory duty under s 4(1) of the Road Traffic (Safety-Belt) Regulations SI 288 of 1983 and as such constituted fault as defined in s 4(6) of the apportionment legislation. Such fault would have contributed to the damage suffered (unless exactly the same injuries would have been suffered even if the seat belt had been worn) and thus the court would be obliged to reduce the plaintiff's damages. However, in this type of situation the negligent driver must bear the greater share of responsibility. (In the *Koen* case, the plaintiff's damages were reduced by 15%.) The same approach would have

to be applied in cases involving failure by motor cyclists and pillion riders to wear crash helmets, it being compulsory under Zimbabwean legislation that crash helmets be worn. See s 60A of the Roads and Road Traffic (Construction, Equipment and Use) Regulations RGN 412 of 1972 as amended by RGN 223 of 1975).

Boberg argues that the reduction should only apply to the extra damage which would not have been suffered had safety precautions been taken. But in practice it will usually be very difficult to separate out which harm would have occurred in any event and which harm is the extra harm which would not have occurred had the safety precautions been taken.

### Contributory negligence of children
If a child runs across a road and is hit by a car and the driver is sued for damages for the injuries that the child has sustained, then the issue of contributory negligence on the part of the child may arise. Where the child is under 7, the child is irrebuttably presumed to lack capacity (to be *culpae incapax*) and thus the child cannot be found to have been guilty of any contributory negligence such as to reduce the damages payable to that child. See *Muchechetere v Boka* (1989). On the other hand, with children between 7 and 14 the presumption that they are *culpae incapax* is a rebuttable one. If the presumption is rebutted, and the child in question is found to be *culpae capax*, the issue which arises is whether the degree of contributory negligence of the child is to be assessed according to the standard of the reasonable adult or the reasonable child of that age? In South Africa, the standard of the reasonable adult is applied (to assess the degree of contributory negligence on the part of the child) whereas in the United Kingdom the courts ask what reasonably could be expected of a child of that age and development. (In the UK, capacity and negligence issues are merged and the question is whether an ordinary child of that age could be expected to have done any more than P or was he simply following instincts natural to child of that age. The Pearson Commission recommended that in car accident cases contributory negligence should not be a defence where a child in under 12 (Vol 1 para 1077).

The reasonable adult test has been severely criticised as being harsh, unrealistic and unfair in its consequences. (See *1973 Annual Survey of SA Law* 160-162, *Boberg* pp 674-682.) Although the South African courts still apply the reasonable adult test, the stringency of this approach has been

*A Guide to the Zimbabwean Law of Delict*

somewhat alleviated as a result of the recent SA Appellate Division case of *Weber v Santam Insurance* (1983).

Firstly, the court in the *Weber* case stated that in deciding whether or not the child is *culpae capax* courts must be careful not to place "an old head on young shoulders". Not only must facts like age, knowledge and experience be taken into account to decide this, but also it must be remembered that knowledge is not the same as experience and therefore it must also be decided whether the particular child was mature enough to control the impulses which children often have to act heedlessly. Under this approach, many children under 14 may be adjudged to be *culpae incapax*.

Secondly, even if the child in question is found to be *culpae capax*, the negligence of the motorist knocking down the child would always be adjudged to be greater than that of the child in circumstances where the driver knew or should have known that children might be in the vicinity and he failed to take extra care to guard against childish folly. Special care and vigilance must guard against the propensity of children to dash across the road, etc. In other words, in apportioning in circumstances where both the driver and the child who is *culpae capax* are guilty of contributory negligence, the driver will be held to be guilty of greater negligence than the child even testing the child against the austere standard of the reasonable adult.

There is no Zimbabwean case dealing with this situation. However, in the criminal case of *S v Ferreira* (1992) the court stressed that motorists must exercise special care and vigilance when they know that there are children in the vicinity of the road, as it is known that children have a propensity for impulsive and irrational behaviour. It would be open to our courts to adopt the less harsh standard of a reasonable child of comparable age and experience instead of the full-blown reasonable adult standard if the child is found to be *culpae capax*. The standard of the reasonable child would be rather difficult to apply in practice, however. As the *Weber* case goes so far in the direction of not placing an old head on young shoulders at the stage that the child's capacity is considered, it could be maintained that our law should go one stage further and adopt the position that the childish heedlessness of children under 14 should not be held against them at all in these sorts of cases. It could simply say that as the adult driver has been negligent in not guarding against harm to the child, he should be made solely liable and apportionment should not apply in respect of a child

*A Guide to the Zimbabwean Law of Delict*

under 14. In other words, the law could excuse the foolhardiness of young children by laying down that below the age of 14 all children are irrebuttably presumed to be *culpae incapax* thereby casting the responsibility solely on the driver to guard against harm to these young children. Against this it could be said that this approach does not encourage children to display greater caution on the roads and it would be unduly harsh upon the negligent motorist.

## Dependant's claim

A is dependant upon B for support. B is killed or is seriously injured. B's death or injuries were caused partly as a result of C's negligence and partly as a result of B's own negligence. What happens if A sues for loss of support?

The section of the Damages (Apportionment and Assessment) Act, 1985 that used to cover this situation before it was repealed in 1985, s 4(4), simply stated that:

> Damages recoverable by any person in consequence of the death or injury to another person shall be reduced to such an extent as the court may deem just and equitable having regard to the respective degrees of fault of the person killed or injured and of the other party in relation to the occurrence which resulted in such death or injury.

Under this, the court would simply reduce the damages payable to A based upon the proportionate degree of fault of B.

In 1985, s 4(4) was repealed and s 8 was inserted. Under s 8, A's claim is no longer subject to reduction on the basis of the negligence of B. What now will happen is that if A sues C and B (if he is alive) or his estate (if he is dead) will be treated as a joint wrongdoer with C in relation to the dependant. If the court apportions liability in terms of s 5 between C and B, it could hold C and B or B's estate liable to pay damages to A in amounts proportional to their degrees of fault. If C pays the dependant's damages, he can then claim a contribution from B (if B is injured but does not die) or from B's estate if B had died in the accident.

In South Africa the legislation also provides for the breadwinner or his estate to be treated as a joint wrongdoer. However, the South Africans have added this proviso (which we do not have in Zimbabwe):

Provided that if the court in determining the full amount of the damage suffered by the plaintiff deducts from the estimated value of the support of which the plaintiff has been deprived by reason of the death of any person, the value of the benefit which the plaintiff has acquired from the estate of such deceased person, no contribution which the joint wrongdoer may so recover from the estate of the deceased person shall deprive the plaintiff of the ... benefit or any portion thereof.

Commenting upon this proviso Burchell states at p 244 of his *Principles of Delict* that:

The effect of this proviso is unsatisfactory in the amount of the protection it gives to dependants. In many cases, the bulk of a deceased breadwinner's estate consists of insurance monies or pension benefits. Since, in terms of the Assessment of Damages Act 9 of 1969 these insurance or pension benefits are not taken into account in reduction of the dependant's damage, they are available for the satisfaction of the joint wrongdoer's action for a contribution against the breadwinner's estate. The only possible limit to such claim is in terms of s 40 of the Insurance Act 27 of 1943 which protects on death the proceeds of life policies against creditors up to a certain amount. Perhaps a practical way of avoiding the unsatisfactory result of s 1 of the Assessment of Damages Act read with s 2(6)(a) of the Apportionment of Damages Act is for the breadwinner to stipulate in the insurance policy that the benefit is to be paid to the dependants i.e. they become the beneficiaries not the estate.

As regards whether *volenti non fit injuria* can be a complete defence to a dependant's claim, see later under the defence of *volenti*.

## Concurrent and joint wrongdoers

Previously, there was no provision for apportionment between concurrent wrongdoers. Thus, if A and B acting independently of one another were both at fault in causing harm to P, even if A was 80% at fault in causing P his injuries and B was only 20% at fault, P could still nonetheless claim 100% of his damages from either A or B. The concurrent wrongdoer who has paid the damages, was, however, entitled to claim a contribution of 50% from the other concurrent wrongdoer (or if there were two other concurrent wrongdoers he can claim a third from each or if there were

three others a quarter from each, and so on). In other words, the proportion of contribution which concurrent wrongdoers were obliged to pay was not dependent upon their respective degrees of fault.

However, an amendment was made to our apportionment legislation in 1985 allowing our courts to apportion damages as between concurrent wrongdoers or between joint wrongdoers. (Concurrent wrongdoers are persons who acting independently both cause harm to the plaintiff whereas joint wrongdoers act in concert in causing harm to the plaintiff.) Under this amendment, (Act 28 of 1985) a court may either make a single award or may apportion liability as between concurrent or joint wrongdoers in the light of the respective degrees of fault of the wrongdoers. Thus if A and B are concurrent wrongdoers who cause harm to P who is blameless and the court decides that A is 90% at fault and B is 10% at fault in the causing of P's harm, the court can now order A to pay P 90% of his damages and B to pay P 10% of his damages. If A pays the entire amount of damages to the injured party he can claim a contribution from B based upon his respective degree of fault.

## Joining of wrongdoers

The plaintiff should join all wrongdoers in the action otherwise he will be barred from claiming damages from the other wrongdoers unless they can obtain leave of the court on good cause shown: See (s 6(1)(a)).

A defendant should join all wrongdoers in the action otherwise he will be barred from claiming a contribution from other wrongdoers not joined in the action unless they can obtain leave of the court on good cause shown: See (s 6(1)(b)).

For a commentary on these provisions, see 1988 *Legal Forum* Volume 1 Number 2 p 34.

## The causation requirement

The conduct of the defendant must be both the factual and the legal cause of the harm to the plaintiff. The test for factual cause is: but for the defendant's action would that harm have occurred to the plaintiff? The test for legal cause is the narrower test of reasonable foreseeability, namely, was it reasonably foreseeable or was it within the range of ordinary human experience that the harm would result from the defendant's conduct? (The direct consequences test is not used in Zimbabwe.)

As the test for legal cause is essentially the same test as for the fault requirement where negligence is alleged, it has been suggested that the two tests could be merged together into a single inquiry, namely, whether the particular harm to that plaintiff in respect of which he is suing was reasonably foreseeable. However, given the fact that the inquiry into causation contains a policy element, at times it seems that the test for legal cause is applied in a more extensive fashion than that for negligence and that the test for legal cause is applied with hindsight knowledge, namely, looking at the events which actually occurred the courts enquire as to whether that sequence of events was so exceptional as not to be reasonably foreseeable. On the other hand, in the fault context the test for negligence has more of a prospective character and the question asked is: would a reasonable person placed in the shoes of the defendant have foreseen the harm which flowed from the conduct?

All that is necessary is that harm of the kind in question is in general terms foreseeable; neither the precise manner in which it occurs nor its exact degree or extent has to be foreseeable before liability will ensue. In practice, however, these distinctions are often difficult to draw.

The thin skull rule applies in the field of delict as it does in criminal cases. The courts have laid down that it is reasonably foreseeable that some people in society suffer from ailments and other physical conditions which make them more susceptible to injury or more serious injury than persons who do not suffer from those conditions. The general rule is that defendants must take their victims as they find them and if, for instance, the victim in the case of a collision caused by the defendant's negligence has a weak heart and the shock of the accident induces a fatal heart attack the defendant may be liable to the victims even though a person without that condition would not have died in the accident.

## Areas where wrongfulness issue arises

As indicated earlier there are only a limited number of particular types of harm that result from negligent conduct, where the issue of wrongfulness is a live one. In these situations, the courts have been concerned that if liability were to be based upon negligence, the scope of liability would be far too extensive and far too onerous. (The so-called spectre of liability "in an indeterminate amount to an indeterminate number of plaintiffs over an indeterminate period".) As a matter of legal policy therefore, the courts have sought in these situations to impose further legal requirements based

upon policy so as to limit the extent of liability for the negligent causing of patrimonial loss. There are four situations where this has been done:

- Liability for omissions;
- Liability for causing purely economic loss by negligent misstatements;
- Liability for causing purely economic loss other than by negligent misstatements; and
- Liability for causing nervous shock.

## Omissions

Where patrimonial loss accrues as a result of harm caused by an omission as opposed to positive physical conduct there are special rules which apply. In general terms, there is no delictual liability for an omission unless, in the circumstances, the law recognises that there is a legal duty to take positive action to prevent the harm from occurring. Thus, even though harm may have been clearly foreseen or foreseeable and the good citizen would have felt himself morally obliged to take action, the defendant will still not be liable for the harm unless the situation was one recognised by the law as one in which there was a legal obligation to take preventive action.

The situations recognised as leading to such a legal duty are:

- Creation of a dangerous situation;
- Assumption of control over a dangerous situation which the defendant did not create;
- Protective relationship (which includes both blood relationships, such as a mother and her own child, and other relationships, such as baby-sitter and a child which she is looking after);
- Public office or calling (e.g. a policeman);
- Statutory duty; and
- Contract or undertaking.

In addition to these recognised categories, in the leading case of *King v Dykes* (1971) the appeal court reserved to itself the power to create additional legal duties to act positively in cases falling outside the scope of these specific categories. It would recognise such further legal duties only in borderline cases where, on a value judgment, the court decides

that it is appropriate that an undoubted moral duty should be translated into a legal duty. The fact situation in *King v Dykes* (1971) which led to the court exercising this power to create a new legal duty was one of fire spreading in a farming area. The appeal court laid down that there was a legal duty on a farmer who had not started the fire but onto whose land a fire had spread from an adjoining property, to take reasonable steps to fight the fire and to try to prevent it from spreading further.

Since the decision in *King v Dykes* (1971), the power to translate moral duties into legal ones has not been used to impose new legal duties in any other situations than fire spreading. Thus, the fire spreading situation at present is the only one where the courts have created liability for an omission which would not fall into the previously recognised categories of liability. It would seem likely therefore that the need to resort to this residual power to create a new legal duty will arise only very rarely in exceptional cases which do not fit into the traditional categories of liability for omission.

In South Africa, the courts have laid down that in a situation where there is no precedent for making the defendant liable in this type of case, the courts will only recognise a legal duty so as to impose liability if in that situation, not only does the omission evoke moral indignation but also the legal convictions of the community demand that the omission be regarded as wrongful and that the loss should be compensated by the person who failed to act positively. See the cases of *Minister of Police v Ewels* (1975) and *Minister of Law and Order v Kadir* (1995). There appears to be little difference between the test applied in South Africa and that applied in Zimbabwe to decide whether a new legal duty should be recognised because the final decision will obviously revolve around policy considerations such as social utility, practicality of enforcing a new duty, and the likely impact upon the defendant's activities of such a duty.

## Negligent misstatements causing purely pecuniary loss

Where a person suffers physical harm to his person or property and resultant patrimonial loss by acting upon a negligent misstatement, no issue of wrongfulness arises. In such a case, provided there was a cause and effect relationship between the negligence and the physical harm, the defendant's conduct will automatically be deemed to be wrongful and the loss will be recoverable.

Where there is an issue of wrongfulness is in cases where there is no physical harm or damage but only pecuniary loss. An example of purely financial loss not arising out of physical damage is: P is considering extending credit facilities to B and P asks B about B's credit-worthiness. D negligently informs P that B is a very good credit risk when, with the information at his disposal, he should have known that B's financial position was extremely precarious. Acting on this information, P extends credit to C and soon thereafter C goes insolvent and P loses his money.

Because of fears of liability in this context in an indeterminate amount to an indeterminate number of persons over an indeterminate period arising out of the volatile character of words and statements and their potentiality for reaching many people, our courts have adopted a test for causing purely pecuniary loss by negligent misstatements which imposes further restrictions on top of the negligence criterion. The test adopted is taken from the American case of *International Products Co v Erie Railway Co*, which test has several component parts. The test is as follows: in deciding whether there was a duty to give correct information, there "must be knowledge or its equivalent" (this has been interpreted to mean that the defendant either knew or ought to have known) that —

• the information was desired for a serious purpose;

• the recipient intended to rely on the information;

• if the information was erroneous the recipient would suffer loss; and

• the relationship of the parties, arising out of contract or otherwise, must be such that in morals and good conscience the recipient had the right to rely upon the other for information and the giver of the information owed a duty to give it with care.

An analysis of the different facets of this test disclose that the first three criteria are really just an extrapolation of the test for negligence, whereas the fourth criterion allows the court to scrutinise the relationship between the parties and to decide whether this is the sort of relationship which it should recognise as creating a legal duty to take care. Given the inherent vagueness of this last criterion, the courts will be obliged to make a value judgment based upon policy considerations, especially the policy of keeping within reasonable bounds liability for negligent misstatements.

Under this heading, the special situation of negligent misrepresentation

inducing contract needs to be considered. The situation under consideration here is as follows: P and D are negotiating a contract. During the course of the negotiations, D makes certain material representations to P that induce P to enter into the contract. The representations made by D at the pre-contractual stage are not made terms of the contract. They are, however, erroneous and the effect of these erroneous statements is that P suffers financial loss at the post-contractual stage because the contractual deal is inferior to that which P was led by D's representations to believe it would be. P seeks to sue D in delict for negligent misrepresentation. Until fairly recently, the approach in South Africa was that the courts adopted the position that it was unnecessary to allow recovery in delict in this type of case, the main reason being that any reasonable business-person would extract guarantees as to the accuracy of any such material representations, have them included as contractual terms, and would thereby be able to sue in contract if the representations proved to be erroneous. Under this approach, it was argued that to allow an additional delictual right of action would lead to unnecessary proliferation of actions. More recently, however, in the Cape Provincial Division decision in *Kern Trust v Hurter* (1981) (which decision was approved in the Zimbabwean case of *Automana (Pvt) Ltd v Farm Equipment Auctions* (1984), the court held that there was no compelling reason for denying a delictual right of action in this type of case, it being unreasonable to expect the plaintiff to have to have included as contractual terms every single representation which has been made to him at the pre-contractual stage. He should rather be able to expect reasonable care from the defendant in making statements that would induce the plaintiff to conclude the deal. The South African Appellate Division has ruled emphatically that there can be liability in this situation. See *Bayers SA Ltd v Frost* (1991).

## Purely financial loss caused other than by negligent misstatements

The type of situation falling into this category is as follows:

D is digging a ditch near a factory belonging to P. Whilst digging this ditch D negligently severs the power cable supplying P's factory with electricity and the factory cannot resume operations until the cable is repaired. During this time, P suffers financial loss due to lack of production.

In respect of cases falling into this category, the courts have again adopted

the approach that there must be some further limiting criteria additional to the criterion of negligence because in some cases liability could be almost limitless if such further restrictions were not imposed. In the leading Zimbabwean case, namely, *Tobacco Finance v Zimnat Insurance* (1981) the court therefore lays down that in addition to negligence there must be, in the circumstances, a legal duty to avoid causing financial loss. It goes on to lay down that policy requires that liability in these sort of cases should be kept within reasonable and manageable bounds and only where the loss was specific and would not expose the defendant to a multiplicity of claims would the loss be recoverable. The plaintiff must not simply be part of an indeterminate or unascertained class of potential claimants.

The courts have been called upon to apply these principles in relation to a range of situations. One group of situations relate to banking transactions. In the case *Zimbabwe Banking Corp v Pyramid Motor Corp* (1985), a bank had negligently paid out on a restrictively endorsed cheque to a person other than the named payee. The court decided that the bank should be held liable as this would not lead to a opening of the floodgates to a multiplicity of actions. On the other hand, the court decided in the case of *The Music Room (Pvt) Ltd v ANZ Grindlays Bank Zimbabwe Ltd* (1995) that the bank should not be held liable as this would open the floodgates to such a multiplicity of actions. The second case involved a situation where an employee of the bank negligently handed over a chequebook belonging to one of its customers to a person falsely claiming to be a messenger of the customer and one of these cheques was then used to defraud the plaintiff company.

Sometimes third parties who are in contractual relationships with injured parties suffer purely economic loss. For example, if D carelessly burns down A's factory, can A's workers sue D for damages for loss of wages if they are put out of work as a result of the destruction of the factory? Or if P who owns the factory is killed in a motor accident due to the carelessness of D and P's factory closes as a result, can P's workers sue for damages for their lost wages? Or if P's employee A is negligently injured by D, and P has to pay A whilst he is off work and has to pay someone else to do A's work whilst he is away, can P sue D for his economic loss? It would seem that in all these cases the indirect economic loss to the third parties is not recoverable.

## Nervous shock

Whereas damages can be claimed for pain and suffering, damages cannot be claimed for transient nervous distress which does not lead on to a recognised psychiatric complaint requiring treatment. Where, however, nervous shock has resulted in psychiatric harm necessitating medical treatment, in certain circumstances, damages can be claimed for such harm.

## Fear for personal safety

Firstly, it is clearly established that where the psychiatric harm was sustained as a result of the plaintiff's being in fear for his own safety, then damages will be awarded. Thus, if D drives carelessly and nearly knocks down P, if P is so badly shocked by narrowly escaping death that he suffers psychiatric harm requiring treatment, P can recover damages from D.

## Shock due to injury to third party

What is the position if a person suffers psychiatric harm not because he/ she has been in fear for his/her own safety, but because of traumatic shock from observing someone else being physically injured? For example, a mother witnesses her own child being run down due to the carelessness of a driver; she is so shocked that she suffers deep-seated, emotional disturbance of more than a transient nature requiring psychiatric treatment.

Over the years, a wide variety of fact situations have come before the English and South African courts wherein the psychiatric harm has occurred when one person has been shocked about what has happened to another person. These situations include cases where persons have suffered nervous shock when they have witnessed their close relatives being killed right in front of them, cases where the witness is a stranger to the person who dies or is injured, and cases where a relative has not seen the accident but is informed when he is informed about it some time later.

The present position in South Africa is that liability in all such cases is to be determined simply by applying the ordinary test for negligence, namely, reasonable foreseeability. See *Bester v Commercial Union* (1973). Prior to this decision, a debate had raged as to whether, in addition to the test for negligence, other limiting factors should be applied, such as the closeness of relationship between the person physically injured and the person emotionally harmed, and the proximity of the emotionally harmed person to the scene of the accident. In England, also, the highest court decided in the case of *McCloughlin v O'Brian* (1982) that the sole test was that of

reasonable foreseeability. However, the House of Lords in the *Alcock v Chief Constable of South Yorkshire* (1991) decided that additional factors to reasonable foreseeability had to weighed such as the closeness to the scene of the accident.

The reasonable foreseeability test is certainly not without its difficulties as the sole determinant of liability in these sort of cases which span a wide spectrum of differing situations. On the other hand, criteria such as proximity and relationship are also very difficult to apply with any precision. There is no leading Zimbabwean case laying down definitively what approach is to be adopted in this sort of situation and if such a case comes before our courts a decision will have to be made as to how we should tackle these sort of cases.

# Defamation and other actions under the *actio injuriarum*

## General note

The leading textbook on this subject is Burchell *The Law of Defamation in South Africa*. However, as substantial differences exist between South African and Zimbabwean law arising out of differing approaches to the concept of *animus injuriandi* care should be taken in relying upon this South African text. As English law has heavily influenced our law in the field, reference should be made to English texts. Additionally, the chapter in McKerron's book *The Law of Delict* 7 ed dealing with defamation in South Africa is a useful reference as it states the South African law prior to the subjectivisation of *animus injuriandi*, which subjective approach has not been adopted in Zimbabwean law.

## Defamation

### Competing interests

The law of defamation seeks to balance two competing interests. On the one hand, it recognises the right of the individual to be afforded protection against harm to his reputation. On the other hand, it also recognises that the public have a right to free speech and proper access to information. Put in the context of newspaper reporting it is vitally important that

# EXHIBIT H

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
**(Cite as: 2006 WL 2455752 (N.D.Cal.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
Larry BOWOTO, et al., Plaintiffs,
v.
CHEVRON CORP., et al., Defendants.
No. C 99-02506 SI.

Aug. 22, 2006.

Michael S. Sorgen, Joshua Nathan Sondheimer, Law
Offices of Michael Sorgen, Cindy Ann Cohn,
Electronic Frontier Foundation, San Francisco, CA,
Anne K. Richardson, Lauren Teukolsky, Hadsell &
Stormer, Inc., Barbara Enloe Hadsell, Patrick Mark
Dunlevy, Law Office of Hadsell & Stormer, Inc, Bert
Voorhees, Jocelyn Sperling, Theresa M. Traber, Esq.,
Traber & Voorhees, Pasadena, CA, Jennifer M.
Green, New York, NY, Jose Luis Fuentes, Siegel &
Yee, Oakland, CA, Judith Brown Chomsky, Law
Offices of Judith Brown Chomsky, Elkins Park, PA,
Marco Simons, Richard Lawrence Herz, Earthrights
International, Washington, DC, Robert Dexter
Newman, Law Office of Robert D. Newman, Los
Angeles, CA, for Plaintiffs.

Caroline N. Mitchell, Robert A. Mittelstaedt, Adam
Richard Sand, Esq., David L. Wallach, Elaine
Wallace, Katherine S. Ritchey, Natausha A. Wilson,
Jones Day, Eric Danoff, Emard Danoff Port Tamulski
& Paetzold LLP, Jordan Cunningham, Martha A.
Boersch, San Francisco, CA, David M. Bays, Huston,
TX, Joseph P. Shereda, Chicago, IL, Lucas W.
Andrews, Atlanta, GA, for Defendants.

**ORDER GRANTING IN PART DEFENDANTS'
MOTION TO DISMISS**

SUSAN ILLSTON, District Judge.

**\*1** On March 24, 2006, the Court heard argument on
defendants' motion to dismiss plaintiffs' claims under
the Torture Victim Protection Act, 28 U.S.C. § 1350,
note ("TVPA"), and the Alien Tort Statute, 28 U.S.C.
§ 1350 ("ATS"). Having considered the arguments
of counsel and the papers submitted, and for good
cause appearing, the Court hereby GRANTS IN
PART defendants' motion.

**BACKGROUND**

Defendant Chevron Corporation ("Chevron") is a
corporation organized under the laws of Delaware
and headquartered in San Francisco, California.
[FN1] Seventh Am. Compl., ¶ 28. Through its
wholly owned subsidiary, defendant Chevron
Investments, Inc., Chevron owns a Nigerian
subsidiary, Chevron Nigeria Limited ("CNL"). Id. at
¶ 29. CNL operates a joint venture with the Nigerian
National Petroleum Company, an entity owned by the
Nigerian government, to exploit oil and gas reserves
in the Niger delta region of Nigeria. Id. at ¶ 28. In
connection with this joint venture, CNL hires
Nigerian government security forces to protect its
installations. Id. at ¶ 40. One such installation was
the "Parabe platform," an oil platform located off the
coast of Nigeria. Id. at ¶ 47.

> FN1. Because this is a motion to dismiss, the
> factual allegations from plaintiffs' complaint
> are taken as true and are construed in the
> light most favorable to the nonmoving party.
> Watson v. Weeks, 436 F.3d 1152, 1157 (9th
> Cir.2006).

On May 25, 1998, approximately 100 residents of
nearby communities traveled to the Parabe platform
to protest the environmental impact of Chevron's oil
operations. Id. After the protesters had occupied the
platform for two days, Chevron contacted the
Nigerian military and requested that it intervene. Id.
at ¶ ¶ 50-51. Chevron provided helicopters to
transport its own security personnel and Nigerian
government security forces to the platform. Id. When
the security forces reached the platform, they began
firing on the protestors, killing two and injuring
others. Id. at ¶ 52. After the forces secured the
platform, they seized a number of the protestors. Id.
at 54. The complaint alleges that the security forces
later tortured Bola Oyinbo by hanging him by his
wrists from a ceiling fan. Id.

Approximately seven months after this incident, on
January 4, 1999, Nigerian military forces attacked
two small communities in the Niger delta located
near Chevron's oil and gas operations. Id. at ¶ 56.
The complaint alleges that Chevron provided the
military forces with helicopters, sea trucks, pilots and
other crew members that were used in the attacks. Id.
at ¶ 57. At least four people were killed in the
attacks, and the villages were burnt to the ground. Id.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                      Page 2
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
(Cite as: 2006 WL 2455752 (N.D.Cal.))

at ¶¶ 56, 60-64.

 On May 27, 1999, individuals injured or killed in the incidents described above filed this lawsuit, seeking to hold Chevron liable for the actions of CNL and the Nigerian military. The original complaint included causes of action under the ATS for numerous violations of international law, including summary execution, crimes against humanity, and torture. [FN2] In 2001, Chevron moved to dismiss plaintiffs' second amended complaint, based in part on its assertion that it could not be held liable under the ATS for the international law violations that plaintiffs alleged. Then-presiding Judge Legge denied the motion. He found that the international law violations at issue only applied to official conduct, but that plaintiffs had adequately alleged that Chevron acted under color of law, and that it could therefore be held liable for the violations. Based on the Supreme Court's decision in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), defendants now request that the Court revisit this holding. [FN3]

> FN2. The complete list of plaintiffs' ATS claims now includes: summary execution; crimes against humanity; torture; cruel, inhuman, or degrading treatment; violation of the rights to life, liberty and security of person and peaceful assembly and association; and consistent pattern of gross violations of human rights.

> FN3. Chevron's prior argument was somewhat different from the argument presented here. Before Judge Legge, Chevron characterized plaintiffs' ATS claims as "excessive force" claims, and argued that there was no universally accepted international norm that prohibited the use of excessive force by government security personnel. Here, in contrast, defendants accept the characterization of plaintiffs' ATS claims as claims for torture and summary execution, but argue that they may not be held liable under a color of law analysis.

*2 Defendants move to dismiss plaintiffs' claims under the TVPA and ATS. This Court has already decided that plaintiffs' TVPA claims are barred because the TVPA applies only to natural persons, not corporations. Accordingly, the Court considers only whether plaintiffs' ATS claims must be dismissed.

## LEGAL STANDARD

 Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). In answering this question, "[a]ll allegations of material fact in the complaint are taken as true and construed in the light most favorable to the plaintiff." *McGary v. City of Portland*, 386 F.3d 1259, 1261 (9th Cir.2004). "Dismissal of the complaint is appropriate only if it appears beyond doubt that the claimant can prove no set of facts in support of the claim which would entitle him to relief." *ARC Ecology v. United States Dept. of the Air Force*, 411 F.3d 1092, 1096 (9th Cir.2005).

## DISCUSSION [FN4]

> FN4. Plaintiffs have moved to strike portions of the declaration of David Wallach, arguing that the declaration provides factual evidence that is inappropriate on a motion to dismiss. Defendants oppose this request, but acknowledge that their motion does not rely on the factual evidence in any way. Thus, the Court GRANTS plaintiffs' motion to strike and will not consider Exhibits 1, 2, 4-10, 14, and 26-34 of Wallach's declaration. Defendants have requested that the Court take judicial notice of *amicus* briefs filed by the United States government in cases involving the ATS. The Court GRANTS that request.

 The ATS gives aliens a federal cause of action for violations of international law. *See Kadic*, 70 F.3d 232, 238 (2d Cir.1995) ("[The ATS] confers federal subject-matter jurisdiction when the following three conditions are satisfied: (1) an alien sues (2) for a tort (3) committed in violation of the law of nations (i.e., international law)."). Not all violations of international law are actionable under the ATS, however; in order to state a claim under the ATS, a party must allege a violation of a definite and accepted norm of international law. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 732, 738, 124 S.Ct. 2739 (2004) ("[W]e are persuaded that federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
(Cite as: 2006 WL 2455752 (N.D.Cal.))

familiar when § 1350 was enacted."); *see also Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 781 (D.C.Cir.1984)* (Edwards, J., concurring). Thus, courts have rejected claims brought under the ATS involving allegations that a defendant violated such norms as "right to life," "right to health," or "intranational pollution." *See Flores v. S. Peru Copper Corp., 414 F.3d 233, 254-65 (2d Cir.2003); see also Sosa, 542 U.S. at 735-38* (finding that arbitrary arrest and detention was not an actionable international norm). Courts have recognized causes of action under the ATS, however, for "definite and accepted" violations of international law such as genocide and war crimes. *See, e.g., Kadic, 70 F.3d at 241-43.*

In addition to the requirement that an ATS suit must be based on a sufficiently well-defined norm of international law, parties suing under the ATS must also bring their suit against a proper defendant. *See Sosa, 542 U.S. at 732 n. 20* ("A related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual."). Indeed, because of the peculiar underpinnings of international law, who an ATS claim may be brought against is almost as important a question as what international norm the claim is based on. Customary international law has historically only applied to states, *see Kadic, 70 F.3d at 240,* but over the past half century it has evolved to place liability on private parties for violations of the most serious international norms. *See id. at 241-244.* These extensions cover such crimes as slave trading, war crimes, and genocide. *Id. at 239* ("[W]e hold that certain forms of conduct violate the law of nations whether undertaken by those acting under the auspices of a state or only as private individuals."); *Tel-Oren, 726 F.2d at 795* (Edwards, J., concurring) (stating that there exists a "handful of crimes to which the law of nations attributes individual responsibility"); *see also Restatement (Third) of Foreign Relations § 404* (identifying "certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism").

**\*3** With these principles in mind, the Court turns to the specific violations of international law that plaintiffs have alleged: crimes against humanity; summary execution; torture; cruel, inhuman, or degrading treatment; violation of the rights to life, liberty, and security of person and peaceful assembly and association; and consistent pattern of gross violations of human rights.

## I. Crimes Against Humanity

The only international law norm included in plaintiffs' complaint that is applicable to private actors is crimes against humanity. [FN5] *See Kadic, 70 F.3d at 236* ("[W]e hold that ... Karadzic may be found liable for genocide, war crimes, and crimes against humanity in his private capacity."); *see also United States v. Yousef, 327 F.3d 56, 105 & n. 40 (2d Cir.2003)* ("Following the Second World War, the United States and other nations recognized 'war crimes' and 'crimes against humanity,' including 'genocide,' as crimes for which international law permits the exercise of universal jurisdiction."); *Flores, 414 F.3d 233, 244 n. 18* ("Customary international law rules proscribing crimes against humanity, including genocide, and war crimes, have been enforceable against individuals since World War II."). Plaintiffs allege that the crimes against humanity here were committed by the Nigerian military, but argue that defendants may be held liable under a number of theories of indirect liability.

> FN5. Neither party has provided the Court with the definition of "crimes against humanity," although other courts have found that such a cause of action requires proof of "a widespread or systematic attack directed against any civilian population." *See Cabello v. Fernandez-Larios, 402 F.3d 1148, 1161 (11th Cir.2005); see also Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242, 1247 (11th Cir.2005);* Statute of the International Tribunal for Rwanda (adopted November 8, 1994, by United Nations Resolution 955) ("The International Tribunal for Rwanda shall have the power to prosecute persons responsible for [crimes including murder, enslavement, deportation, imprisonment, torture, and rape] when committed as part of a widespread or systematic attack against any civilian population on national, political, ethnic, racial or religious grounds."). *But see* Statute of the International Criminal Tribunal for the Former Yugoslavia (adopted May 25, 1993, by United Nations Resolution 827) (no "widespread or systematic" requirement, but requiring crimes to be committed "in armed conflict"). While the Court questions whether plaintiffs' complaint alleges a "widespread and systematic attack" by the

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                              Page 4
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
**(Cite as: 2006 WL 2455752 (N.D.Cal.))**

Nigerian military, defendants have not provided any argument on the subject and have therefore failed to meet their burden.

Defendants challenge plaintiffs' ability to impose liability based upon an aiding and abetting theory, arguing that they may not be held liable under an aiding and abetting theory because such liability is not available under customary international law. [FN6] The Court disagrees. Since the early days of this country, courts have recognized that private individuals may be held liable for aiding and abetting violations of international law. *See Breach of Neutrality,* 1 Op. Att'y Gen. 57, 59 (1795) (finding that individuals could be liable under international law for "committing, aiding, or abetting" violations of the laws of war); *Talbot v. Jansen,* 3 U.S. (3 Dall.) 133 (1795) (holding that French citizen who aided U.S. citizen in unlawfully capturing Dutch ship was civilly liable for the value of the captured assets). This international law principle has continued through modern times. In the criminal context, private persons can be held liable for aiding and abetting, as demonstrated by the International Criminal Tribunal for the Former Yugoslavia ("ICTY") and the International Criminal Tribunal for Rwanda ("ICTR"). *See* Steinhardt Decl., ¶ 24. Further, legal systems around the world recognize civil aiding and abetting liability. *Id.* at ¶¶ 30-31.

> FN6. Defendants do not discuss plaintiffs' other theories of liability, which include agency, ratification, and conspiracy. Because plaintiffs seek to hold defendants liable for crimes against humanity, a violation of an international law norm that is binding on private parties, their other theories of liability also survive defendants' challenge. *See Sarei v. Rio Tinto, PLC,* 456 F.3d 1069, 2006 WL 2242146 (9th Cir. Aug. 7, 2006) ("Courts applying the [ATS] draw on federal common law, and there are well settled theories of vicarious liability under federal common law.").

Indeed, the vast majority of courts to have considered the issue have found that aiding and abetting liability is available under the ATS. *See, e.g., Hilao v. Estate of Marcos,* 103 F.3d 767 (9th Cir.1996) (affirming aiding and abetting jury instruction); *Presbyterian Church of Sudan v. Talisman Energy,* 244 F.Supp.2d 289, 321-24 (S.D.N.Y.2003) (*"Presbyterian Church I"* ) (finding that corporation could be held liable for aiding and abetting foreign government); *Burnett v. Al Baraka*

*Inv. & Dev. Corp.,* 274 F.Supp.2d 86, 100 (D.D.C.2003) (allowing aiding and abetting liability for airplane hijacking); *Cabello v. Fernandez-Larios,* 402 F.3d 1148 (11th Cir.2005). This trend has survived *Sosa.* Since *Sosa* was decided, at least three district courts have discussed whether aiding and abetting liability is available under the ATS. Two have concluded that aiding and abetting liability was sufficiently well established in international law to apply in suits under the ATS. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 374 F.Supp.2d 331, 341 (S.D.N.Y.2005) (*"Presbyterian Church II"* ) (finding that aiding and abetting was one of the "core principles that form the foundation of customary international legal norms--principles about which there is no disagreement"); *In re Agent Orange Product Liability Litig.,* 373 F.Supp.2d 7, 53 (E.D.N.Y 2005) (agreeing with plaintiffs that "[t]here is simply no question that the ATS provides for aiding and abetting liability").

*4 The final case disagreed with the previous two. The court in *In re South African Apartheid Litig.,* 346 F.Supp.2d 538 (S.D.N .Y.2004), concluded that aiding and abetting liability was not available under international law. In reaching this conclusion, the court found that the international authority other cases had relied on was taken from the criminal, not the civil, context. In the civil context, the court believed that the Supreme Court's holding in *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164 (1994), demonstrated that civil aiding and abetting liability was "at best uncertain in application." *Id.* at 181; *see also In re South African Apartheid Litig.,* 346 F.Supp.2d at 550 ("[In *Central Bank* ] the Court held that where Congress has not explicitly provided for aider and abettor liability in civil causes of action, it should not be inferred.").

The Court finds the former two cases more convincing. *Central Bank* concerned whether aiding and abetting was available for a violation of § 10(b) of the Securities Exchange Act, and the Supreme Court's decision was based upon the specific language of the act. *See Central Bank,* 511 U.S. at 173 ("With respect, however, to the first issue, the scope of conduct prohibited by § 10(b), the text of the statute controls our decision."). Indeed, the Court specifically noted that its discussion applied to statutorily created remedies. *Id.* at 182 ("[W]hen Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors."). Because the ATS

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
(Cite as: 2006 WL 2455752 (N.D.Cal.))

specifically invokes international common law, *Central Bank* is not particularly persuasive. *Cf. Sosa,* 542 U.S. at 732 n. 20 ("A related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued....").

Thus, the Court concludes that defendants may be held liable under international law for aiding and abetting the Nigerian military in the commission of "crimes against humanity." In order to be held liable, plaintiffs must show 1) that defendants provided "practical assistance, encouragement, or moral support which ha[d] a substantial effect on the perpetration of the crime," *see* Wallach Decl., Exh. 39 (*Aleksovski,* IT-95-14/1 -A (March 24, 2000)), and 2) that defendants knew that the Nigerian military intended to commit the crime, *see id;* Wallach Decl., Exh. 38 (*Prosecutor v. Semanza,* Case No. ICTR-97-20-T (May 15, 2003)); *see also Presbyterian Church II,* 374 F.Supp.2d at 340 (referencing "settled, core notion of aider and abettor liability in international law 'for knowing practical assistance or encouragement which has a substantial effect on the perpetration of the crime' ") (quoting *Doe v. Unocal,* 395 F.3d 932, 951 (9th Cir.2002), *vacated by* 395 F.3d 978 (9th Cir.2003)); *In re Agent Orange Product Liability Litig.,* 373 F.Supp.2d 7, 54 (E.D.N.Y.2005) (concluding that "the actus reas of aiding and abetting consists of 'practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime,' and that the mens rea required is the knowledge that these acts assist the commission of the offence; the accomplice need not share the principal's wrongful intent"); *Doe v. Saravia,* 348 F.Supp.2d 1112, 1148-49 (E.D.Cal.2004) (finding that "those who assist in the commission of acts prohibited by international law may be held individually responsible" where they know[ ] that [their] actions will assist the perpetrator in the commission of the crime").

## II. Remaining International Law Violations

**\*5** The remaining violations of international law alleged in plaintiffs' complaint do not involve those norms of customary international law that apply to private parties. [FN7] *See, e.g.,* Restatement (Third) of Foreign Relations § 404. Thus, state action is required for plaintiffs to pursue those claims under the ATS. *See Kadic,* 70 F.3d at 243 ("[T]orture and summary execution--when not perpetrated in the course of genocide or war crimes--are proscribed by international law only when committed by state officials or under color of law."); *Tel-Oren,* 726 F.2d

at 795 (Edwards, J., concurring) (declining to read "section 1350 to cover torture by non-state actors"). As above, plaintiffs seek to hold defendants liable for the acts of the Nigerian military, either directly under a "color of law" analysis or indirectly under a number of theories, including aiding and abetting. The Court does not believe that defendants can be held liable either directly or indirectly.

> FN7. The parties agree that at least two of these norms, torture and extrajudicial killing, are sufficiently well-defined to support a cause of action under the ATS. *See Kadic,* 70 F.3d at 243.

## A. Direct Liability

Prior to the Supreme Court's decision in *Sosa,* there was a general consensus among courts that color of law jurisprudence derived from 42 U.S.C. § 1983 could be used to hold a private party liable under the ATS. *See, e.g., Kadic,* 70 F.3d at 245 ("The 'color of law' jurisprudence of 42 U.S.C. § 1983 is a relevant guide to whether a defendant has engaged in official action for purposes of jurisdiction under the Alien Tort Act."); *Estate of Rodriguez v. Drummond Co., Inc.,* 256 F.Supp.2d 1250, 1264 (N.D.Ala.2003) ("In assessing whether a plaintiff has adequately alleged state action, courts generally look to the standards developed under 42 U.S.C. § 1983."); *Sinitrainal v. Coca-Cola Co.,* 256 F.Supp.2d 1345, 1353 (S.D.Fla.2003) ("[I]f the complaint alleges that the Defendants murdered Gil by acting together with the paramilitary unit who acted under color of law by acting in concert with Colombian officials or with significant aid from the Colombian government, then an international law violation is sufficiently stated for purposes of subject matter jurisdiction."). [FN8] Based on the Supreme Court's interpretation of the ATS in *Sosa,* however, defendants argue that these decisions must be reexamined.

> FN8. The Ninth Circuit also adopted this view in *Doe v. Unocal Corp.,* 395 F.3d 932 (9th Cir.2002), although technically "color of law" was unnecessary to its holding because the acts alleged were committed in furtherance of forced labor, which is an international law violation that can be committed by private parties. *See id.* at 954 ("[U]nder *Kadic,* state action is also not required for the acts of murder, rape, and torture which allegedly occurred in furtherance of the forced labor program."); *see also Kadic,* 70 F.3d at 243-44 (torture

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
(Cite as: 2006 WL 2455752 (N.D.Cal.))

and summary execution were actionable under ATS "to the extent they were committed in pursuit of genocide or war crimes"). The Ninth Circuit's opinion in *Doe* was later vacated when the court took the case *en banc. See Doe v. Unocal Corp.,* 395 F.3d 978 (9th Cir.2003). The case later settled, so no *en banc* opinion was ever produced. *Doe v. Unocal Corp.,* 403 F.3d 708 (9th Cir.2005).

At least three courts have continued to apply "color of law" jurisprudence following *Sosa,* although none have considered the impact of *Sosa* on the viability of the practice. *See Aldana v. Del Monte Fresh Produce, N.A., Inc.,* 416 F.3d 1242, 1247 (11th Cir.2005) ("In construing this state action requirement, we look to the principles of agency law and to jurisprudence under 42 U.S.C. § 1983."); *Chavez v. Carranza,* 413 F.Supp.2d 891, 899 (W.D.Tenn.2005) ("When persons who are not government officials 'act[ ] together with state officials' or act with 'significant state aid[,]' they are deemed governmental actors for the purposes of the state action requirement under the TVPA and the ATCA."); *Doe v. Saravia,* 348 F.Supp.2d 1112, 1150 (E.D.Cal.2004) (In bench trial following entry of default against individual defendants: "Courts have looked to the jurisprudence of 42 U.S.C. § 1983 as a guide to determine when persons who are not themselves government officials, nonetheless act under apparent authority or color of law."); *but see Doe v. Exxon Mobil,* 393 F.Supp.2d 20, 26 (D.D .C.2005) ("Grafting § 1983 color of law analysis onto international law claims would be an end-run around the accepted principle that most violations of international law can be committed only by states .").

In *Sosa,* the Supreme Court engaged in a comprehensive examination of the ATS in an effort to determine the statute's reach. The Court first considered two competing visions of the statute: whether the ATS "does no more than vest federal courts with jurisdiction, neither creating nor authorizing the courts to recognize any particular right of action without further congressional action," *Sosa,* 542 U.S. at 712; or whether the ATS allows courts to hear "claims in a very limited category defined by the law of nations and recognized at common law." *Id.; see also Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774 (D.C.Cir.1984) (opinions of

Edwards, J., concurring, and Bork, J., dissenting). The Court found the latter approach to be more sensible. In doing so, however, the Court was careful to narrowly circumscribe the limits of the ATS:

*6 [T]here are good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind. Accordingly, we think courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized.

*Sosa,* 542 U.S. at 725.

The Supreme Court articulated five reasons for the "judicial caution" that it found appropriate. The first reason was a desire to limit judicial discretion. Second, in light of federal courts' "general practice" of looking "for legislative guidance before exercising innovative authority over substantive law," the Court found that "[i]t would be remarkable to take a more aggressive role in exercising a jurisdiction that remained largely in the shadow for much of the prior two centuries." *Id.* at 726. Third, the Court believed that "a decision to create a private right of action is one better left to legislative judgment in the great majority of cases." *Id.* at 727. Fourth, the Court cited concerns over the impact on foreign relations of expanding the reach of the ATS. *Id.* ("[T]he potential implications for the foreign relations of the United States of recognizing such causes of action should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs."). The final reason was the lack of a "congressional mandate to seek out and define new and debatable violations of the law of nations...." *Id.* at 728.

After discussing the above reasons for judicial restraint, the Supreme Court held that courts could recognize civil actions based upon violations of recognized international norms, provided that the exercise of judicial authority was "subject to vigilant doorkeeping ." *Id.* at 729. It concluded that "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted." *Id.* at 732.

Based on the Supreme Court's restrictive view of the ATS, defendants argue that it would be inappropriate to import "color of law" jurisprudence from § 1983

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
**(Cite as: 2006 WL 2455752 (N.D.Cal.))**

to expand the statute's reach. The Court agrees. *Sosa* requires that an international law norm be definite and accepted before a court may recognize a cause of action under the ATS. Because an integral feature of international law is that it is only binding on specific defendants, allowing a private party to be held liable based upon notions of "color of law" developed in this country would blur the applicability of the obligations that international law imposes. Expanding the reach of the ATS in this way would be inconsistent with the Supreme Court's repeated calls for judicial restraint. *See Doe v. Exxon Mobil Corp., 393 F.Supp.2d 20, 26 (D.D.C.2005)* ("Grafting § 1983 color of law analysis onto international law claims would be an end-run around the accepted principle that most violations of international law can be committed only by states."). Indeed, the Supreme Court appears to have endorsed this view by stating that the determination whether liability extends to private actors is a factor of international law:

> *7 A related consideration is *whether international law* extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual. Compare *Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 791-795 (C.A.D.C.1984)* (Edwards, J., concurring) (insufficient consensus in 1984 that torture by private actors violates international law), with *Kadic v. Karadzic, 70 F.3d 232, 239-241 (C.A.2 1995)* (sufficient consensus in 1995 that genocide by private actors violates international law).

> *Sosa, 542 U.S. at 732 n. 20* (emphasis added); *cf. Presbyterian Church I, 244 F.Supp.2d at 320* ("Thus, whether or not aiding and abetting and complicity are recognized with respect to charges of genocide, enslavement, war crimes, and the like is a question that *must be answered by consulting international law*.") (emphasis added).

In this case, the "color of law" jurisprudence developed under § 1983 is not a well developed international norm. Indeed, plaintiffs cite no authority for their assertion that a private party may be held liable for conduct "sufficiently infused with or related to state action as to engage international standards." *See* Decl. of Prof. Ralph G. Steinhardt in Support of Pl. Oppo. Br., ¶ 14. Further, in their entire discussion about the propriety of importing § 1983 standards into the ATS, plaintiffs cite only to American cases that predate *Sosa*. In short, plaintiffs have not provided any international authority for the prospect that a private actor may be found to have acted "under color of law" in cases involving violations of international law norms. [FN9]

FN9. Of course, to a certain degree, both international law and § 1983 have aspects of "color of law" jurisprudence in common; there is no dispute that foreign officials may be held individually liable for their official actions. *See Sosa, 542 U.S. at 727* (stating that violations of international law are cognizable against "a foreign government or its agent"). But placing liability on an individual operating as the agent of a foreign government is a far cry from finding a private party liable for participating in or conducting a violation of an international law norm that only applies to states. Indeed, plaintiffs' theory of the case is unique in that it does not allege that defendants acted as agents of the Nigerian government; to the contrary, it alleges that the Nigerian military acted as defendants' agent.

The rarity with which this color of law theory has occurred under § 1983 further convinces the Court that it would be inappropriate to apply it to the international realm. That plaintiffs' case lies at the fringe of § 1983 color of law jurisprudence is evidenced by the fact that plaintiffs cite only a single case in which a private actor has been held liable in similar circumstances under U.S. law. In *Groom v. Safeway, Inc., 973 F.Supp. 987 (W.D.Wash.1997)*, the court held that a Safeway store could be held liable under § 1983 for the conduct of an off-duty police officer that it hired for store security based on a theory of inadequate training. *Id.* at 992. Other courts in analogous circumstances have recognized the possibility of § 1983 liability if a private defendant controlled state authority, but have not actually found liability. *See, e.g., Arnold v. Int'l Bus. Machines Corp., 637 F.2d 1350, 1356 (9th Cir.1981)* ("If Arnold could point to any fact that would tend to show that defendants had some control or power over the Task Force, and that defendants directed the Task Force to take action against Arnold, there would certainly be a dispute of material fact on the issue of proximate cause sufficient to reverse the summary judgment."); *Mann v. City of Tucson, 782 F.2d 790 (9th Cir.1985)* ("[I]n order to establish the requisite proximate cause between the conduct of private persons and searches in violation of section 1983, a plaintiff must prove the private

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                          Page 8
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
(Cite as: 2006 WL 2455752 (N.D.Cal.))

individuals exercised control over the decision making in a police investigation."); *Alexis v. McDonald's Restaurants of Mass., Inc.,* 67 F.3d 341, 351-52 (1st Cir.1995) (stating that to find private party liable plaintiff would have to establish "concerted action tantamount to substituting the judgment of a private party for that of the police or allowing the private party to exercise state power").

Plaintiffs' primary argument in support of applying § 1983 color of law jurisprudence to this case is that *Sosa* stands for the proposition that the "ATS requires only that the tort be committed in violation of a specific, universal, and obligatory norm of international law," and that federal common law thereafter governs ancillary legal issues. [FN10] Pl. Oppo. Br. at 3. Plaintiffs base this argument on the following sentence from *Sosa:* "The jurisdictional grant is best read as having been enacted on the understanding that *the common law* would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time." *Sosa,* 542 U.S. at 724 (emphasis added). [FN11] Thus, plaintiffs argue, because international law recognizes their claims for official torture, American common law principles of liability derived from § 1983 determine the reach of those claims.

FN10. This is the view advanced by Judge Reinhardt in his *Doe* concurrence. *See Doe v. Unocal,* 395 F.3d 932, 963-78 (9th Cir.2002) (Reinhardt, J., concurring), *vacated on rehearing en banc by Doe v. Unocal,* 395 F.3d 978 (9th Cir.2003).

FN11. Plaintiffs also base their argument on a statement from a footnote in the Supreme Court's recent decision in *Hamdan v. Rumsfeld,* 548 U.S.---, 126 S.Ct. 2749 (2006). The footnote plaintiffs rely on is found in a discussion in Justice Stevens' opinion of whether "conspiracy to commit war crimes" is a violation of the laws of war. *Id.* at 2784-85. The footnote distinguishes conspiracy, which is "a crime on its own," from aiding and abetting, which it describes as a "theory of liability." *Id.* at 2785 n. 40. Plaintiffs argue that this brief footnote supports their argument that theories of liability under the ATS are determined by federal common law.
The Court finds no such support in the

footnote plaintiffs cite. As an initial matter, the footnote is found in a section of Justice Stevens' opinion in which only three other justices joined, and is therefore not part of the majority opinion. More importantly, while the footnote is consistent with plaintiffs' theory, it contains no language, either express or implicit, that affirmatively supports plaintiffs' interpretation of the ATS.

The Court does not find this argument convincing. As discussed above, the Supreme Court clearly stated that the scope of liability under the ATS was to be decided by international law. *Sosa,* 542 U.S. at 732 n. 20 ("A related consideration is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual."). This view makes sense; given that international law norms are only binding on specific entities, the applicability of the international law norm can hardly be deemed ancillary. Thus, while American common law may play some role in determining the contours of an ATS claim, the Court believes that international law should determine whether a given defendant may be held liable for a particular international law violation. *Cf. Presbyterian Church I,* 244 F.Supp.2d at 320 ("In order to determine whether a cause of action exists under the ATCA, courts must look to international law.").

*8 The Ninth Circuit's recent decision in *Sarei v. Rio Tinto, PLC,* 456F.3d 1069, 2006 WL 2242146 (9th Cir. Aug. 7, 2006), does not change this analysis. There, the Ninth Circuit briefly considered whether Rio Tinto, a private mining group, could be held vicariously liable for "alleged war crimes and crimes against humanity committed at its behest by the [Papua New Guinea] army." *Id.* at *5. In a short paragraph, the court concluded that Rio Tinto could be held vicariously liable for the army's actions: "A predicate question is whether, post *Sosa,* claims for *vicarious liability* for violations of jus cogens [FN12] norms are actionable under the [ATS]. We conclude that they are. Courts applying the [ATS] draw on federal common law, and there are well settled theories of vicarious liability under federal common law." *Id.* (emphasis in original). While the Ninth Circuit's statement provides some support for plaintiffs' argument, it is far too brief to be of much use. Indeed, the Ninth Circuit's opinion does not discuss color of law jurisprudence, and certainly does not consider importing color of law jurisprudence

Not Reported in F.Supp.2d                                                                                          Page 9
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
**(Cite as: 2006 WL 2455752 (N.D.Cal.))**

into ATS claims. More importantly, the only norms that the plaintiffs sought to enforce against Rio Tinto were war crimes and crimes against humanity, international law norms that are binding on private actors. *Id.* Thus, the Ninth Circuit did not address the question whether federal common law could be used to "bootstrap" a claim that is only actionable against government actors into a claim against private parties.

> FN12. "As defined in the Vienna Convention on the Law of Treaties, a jus cogens norm, also known as a 'peremptory norm' of international law, 'is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.' " *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 714 (9th Cir.1992) (quoting Vienna Convention on the Law of Treaties, art. 53, May 23, 1969, 1155 U.N.T.S. 332, 8 I.L.M. 679).

Plaintiffs' theory of liability is far removed from the core of color of law jurisprudence. Without evidence from the international arena that demonstrates that defendants may be considered state actors by hiring Nigerian government security forces, the Court believes it inappropriate to apply American color of law principles to the case at hand. Accordingly, the Court finds that plaintiffs may not proceed with their theory that defendants can be held liable because they acted under color of law.

**B. Indirect Liability**

As discussed above, based upon its review of the materials, the Court agrees with plaintiffs that aiding and abetting liability is generally available under international law. [FN13] It cannot agree, however, that such liability is appropriate here. The problem with plaintiffs' argument is that it attempts to hold defendants, who are private actors, accountable for aiding and abetting violations of international law that can only be committed by state officials. Because the international law norms that plaintiffs invoke place no obligation on the defendants, allowing aiding and abetting liability would be inappropriate. Defendants could not be held liable for directly committing the offenses; it therefore makes little sense to find them liable for lesser conduct.

> FN13. The discussion below addresses only

plaintiffs' aiding and abetting theory of liability. The Court believes, however, that it applies with equal force to all of plaintiffs' theories of liability that would expose a private party to liability for the violation of an international law norm that is only binding on state actors, including the "joint criminal enterprise" liability that plaintiffs reference in a recent letter brief.

The history of aiding and abetting liability supports this analysis. Plaintiffs seek to incorporate aiding and abetting liability from international criminal law norms. From Blackstone's time, however, courts have treated those guilty of aiding and abetting a crime as a principal. *See* William Blackstone, Commentaries on the Laws of England, Book IV, Chap. 5 (1769) ("[A]nd all accessories to piracy, are declared to be principal pirates ...."); *see also* 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."); U.S. Dep't of Defense, *Military Commission Instruction No. 2,* Art. 6(c), at 16 (April 30, 2003) ("A person is criminally liable as a principal for a completed substantive offense if that person ... aids or abets the commission of the offense."); Allied Control Council Law No. 10, Punishment of Persons Guilty of War Crimes, Crimes Against Peace and Against Humanity, 20 Dec. 1945, Art. II.2 ("Any person without regard to nationality or the capacity in which he acted, is deemed to have committed [crimes against peace, war crimes, crimes against humanity, or membership in a criminal group], if he was ... (b) was an accessory to the commission of any such crime or ordered or abetted the same."). Defendants, however, cannot be held liable as a principal for the offenses in question.

**\*9** Indeed, none of the authorities plaintiffs cite involve a private party being held liable for aiding and abetting conduct that violates an international law norm that only applies to states. For example, plaintiffs rely on the recognition of aiding and abetting liability in the International Criminal Tribunal for the former Yugoslavia ("ICTY"). That tribunal, however, prosecuted war crimes and genocide, crimes for which individuals may be held liable. *See* Statute of the International Criminal Tribunal for the Former Yugoslavia (adopted May 25, 1993, by United Nations Resolution 827); *see also* Statute of the International Tribunal for Rwanda (adopted November 8, 1994, by United Nations Resolution 955). Other authorities plaintiffs rely on similarly involve aiding and abetting liability for

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                        Page 10
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
**(Cite as: 2006 WL 2455752 (N.D.Cal.))**

private parties where private parties could be held liable for the underlying conduct. *See, e.g., The Amiable Nancy,* 16 U.S. 546, 559 (1818) (shipowners could be held liable for piracy committed by officers and crew). [FN14]

> FN14. The cases from this country that plaintiffs cite similarly either involve aiding and abetting by government officials or by private parties for crimes for which private parties may be held liable. *See, e.g., Hilao v. Estate of Marcos,* 103 F.3d 767 (9th Cir.1996) (affirming aiding and abetting jury instruction for torture and summary execution in case against former government official); *Presbyterian Church I,* 244 F.Supp.2d at 321-24 (finding that corporation could be held liable for aiding and abetting foreign government with enslavement, war crimes, and genocide); *Presbyterian Church II,* 374 F.Supp.2d at 337-41 (same); *Mehinovic v. Vuckovic,* 198 F.Supp.2d 1322 (N.D.Ga.2002) (finding that defendant could be held liable for aiding and abetting genocide, war crimes, and torture); *Burnett v. Al Baraka Inv. & Dev. Corp.,* 274 F.Supp.2d 86, 100 (D.D.C.2003) (allowing aiding and abetting liability for airplane hijacking, which is "generally recognized as a violation of international law of the type that gives rise to individual liability"); *Bodner v. Banque Paribas,* 114 F.Supp.2d 117 (E.D.N.Y.2000) (allowing aiding and abetting liability for facilitating Nazi genocide); *Cabello v. Fernandez-Larios,* 402 F.3d 1148 (11th Cir.2005) (allowing aiding and abetting liability for acts of Chilean military officer); *Doe v. Saravia,* 348 F.Supp.2d 1112 (E.D.Cal.2004) (finding that head of former paramilitary group constituted a state official and could be held liable for aiding and abetting an assassination); *Doe v. Qi,* 349 F.Supp.2d 1258 (N.D.Cal.2004) (finding that local government officials of the People's Republic of China could be held liable for aiding and abetting torture); *but see Aldana v. Fresh Del Monte Produce, N.A., Inc.,* 416 F.3d 1242 (11th Cir.2005) (finding that corporation could be held liable for torture by its private security force if government official's participation in torture was sufficient to create state action); *Mujica v. Occidental Petroleum Corp.,* 381 F.Supp.2d 1164, 1173 n. 6 (C.D.Cal.2005) (stating in

dicta that ATS allows for aiding and abetting liability in claims for torture against private party).

Because defendants are private actors, they may not be held liable for aiding and abetting violations of international law that only apply to official conduct. Accordingly, defendants' motion to dismiss is GRANTED with respect to plaintiffs' theories of aiding and abetting liability as to the claimed violations of international law, with the exception of crimes against humanity, discussed above in Part I.

**III. Corporate Liability**

Defendants' final argument is that international law does not extend to corporations, and that corporations therefore cannot be held liable under the ATS. The Court disagrees. The dividing line for international law has traditionally fallen between states and private actors. Once this line has been crossed and an international norm has become sufficiently well established to reach private actors, there is very little reason to differentiate between corporations and individuals. Defendants certainly provide no such reason in their briefs.

Both before and after *Sosa,* courts have concluded that corporations may be held liable under the ATS. *See, e.g., Iwanowa v. Ford Motor Co.,* 67 F.Supp.2d 424 (D.N.J.1999) (finding that private individuals and corporations could be held liable for use of slave labor); *Presbyterian Church I,* 244 F.Supp.2d at 308-319 ("Given that private individuals are liable for violations of international law in certain circumstances, there is no logical reason why corporations should not be held liable, at least in cases of *jus cogens* violations."); *In re Agent Orange Product Liability Litig.,* 373 F.Supp.2d at 58 ("Limiting civil liability to individuals while exonerating the corporation directing the individual's action through its complex operations and changing personnel makes little sense in today's world."); *Presbyterian Church II,* 374 F.Supp.2d at 339. The Court agrees with these decisions, and therefore holds that defendants may be held liable for the violation of any international law norm that is binding on private entities.

**CONCLUSION**

***10** For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART defendants' motion to dismiss (Docket No. 1072).

**IT IS SO ORDERED.**

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                Page 11
Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)
**(Cite as: 2006 WL 2455752 (N.D.Cal.))**

Not Reported in F.Supp.2d, 2006 WL 2455752 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT I



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3838237 (E.D.Pa.)
**(Cite as: 2006 WL 3838237 (E.D.Pa.))**

Page 1

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
ELAN SUISSE LTD., Plaintiff,
v.
Robert D. CHRIST, Defendant.
**Civil Action No. 06-3901.**

Dec. 29, 2006.

Nicholas Casamento, Media, PA, for Plaintiff.

Andrew J. Soven, Reed Smith, LLP, Philadelphia, PA, Thad J. Bracegirdle, Reed Smith LLP, Wilmington, DE, for Defendant.

**Memorandum and Order**

GENE E.K. PRATTER, J.

*1 Defendant Robert D. Christ has filed a Motion to Dismiss plaintiff Elan Suisse Ltd.'s Complaint pursuant to Federal Rule of Civil Procedure 12(b)(2) and (b)(3) for lack of personal jurisdiction and improper venue, and in the alternative, a Motion to Transfer this action to the U.S. District Court for the District of Delaware or the U.S. District Court for the Eastern District of Louisiana.

FACTS AND PROCEDURAL BACKGROUND

On April 27, 2006, Robert D. Christ filed a complaint in the U.S. District Court for the District of Delaware against Brett J. Cormick, Elan Suisse (Pty) Ltd., Elan Suisse International Holdings (USA) LLC and other defendants (the "Delaware Action"). [FN1] In the Delaware Action, Mr. Christ alleges that Mr. Cormick induced Mr. Christ to invest in a holding company that would operate to promote and sell United States-based financial products and investment vehicles to investors in South Africa. [FN2] Mr. Christ alleges that, based on misrepresentations by Mr. Cormick, Mr. Christ wired $250,000 to Mr. Cormick, purportedly as an initial capital infusion to help launch the venture. In exchange for this investment, Mr. Christ was to receive an equity interest in Elan Suisse (Pty) Ltd., a South African corporation, and Elan Suisse International Holdings (USA) LLC, a Delaware

limited liability company. In short, Mr. Christ alleges that despite assurances from Mr. Cormick as to the use of the purported "investment," Mr. Cormick never gave Mr. Christ any equity shares of the Elan Suisse entities, returned the funds that Mr. Christ initially invested or provided any return on Mr. Christ's investment.

> FN1. *Robert D. Christ v. Brett J. Cormick et al.,* Civil Action No. 06-275.

> FN2. The complaint in the Delaware Action consists of four counts, including claims of promissory estoppel, breach of contract, fraud and civil conspiracy. *See* Def. Mem. Supp. Ex. A.

On May 22, 2006, the defendants in the Delaware Action, including Mr. Cormick and the two Elan Suisse entities, moved to dismiss that proceeding based on, among other grounds, the District Court for the District of Delaware's alleged lack of personal jurisdiction over the defendants, some of whom are citizens of, or corporations formed in, foreign countries. [FN3]

> FN3. Mr. Christ's complaint in the Delaware Action states that Brett J. Cormick is a citizen of Australia who resides in the United Kingdom and the Republic of Zimbabwe, Elan Suisse International Holdings (USA) LLC is a Delaware limited liability company, and Elan Suisse (Pty) Ltd. is a South African corporation. Def. Mem. Supp. Ex. A ¶¶ 2-4.

A month after the Elan Suisse entities filed the Motion to Dismiss for lack of personal jurisdiction in the District of Delaware, plaintiff "Elan Suisse Ltd." filed a complaint in the present action against Mr. Christ in the Court of Common Pleas of Montgomery County, Pennsylvania on June 23, 2006. On September 1, 2006, Mr. Christ removed the case to this Court based on federal question jurisdiction inasmuch as the Complaint alleges violations of the Lanham Act, 15 U.S.C. § § 1125, *et seq.* [FN4] In the present action, Plaintiff Elan Suisse Ltd. alleges, and Mr. Christ admits, that he maintained a website, www.elansuisse.co.za, based on an Internet server located in South Africa, in order to publish his "findings" as to Mr. Cormick's "misdeeds" and in

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 3838237 (E.D.Pa.)

(Cite as: 2006 WL 3838237 (E.D.Pa.))

order to prevent others from being misled by Mr. Cormick as Mr. Christ had been. On his website, Mr. Christ describes in detail Mr. Cormick's alleged misrepresentations and fraudulent dealings that are the subject of the pending Delaware Action that Mr. Christ initiated.

> FN4. Plaintiff's Complaint here contains three counts, including allegations of commercial disparagement and violations of two sections of the Lanham Act, 15 U.S.C. § § 1125(a)(1)(A) and (d)(1) (A).

**\*2** In the Delaware Action, Mr. Christ's complaint stated that he was a citizen of Pennsylvania residing in Pottstown, Pennsylvania. *See* Def. Mem. Supp. Ex. C ¶ 2. Quite appropriately then, when Elan Suisse Ltd. filed its Montgomery County state court complaint less than two months later, Plaintiff identified Mr. Christ as a resident of Pottstown, Pennsylvania.

Following his removal of this action to this Court, Mr. Christ filed a Motion to Dismiss or Transfer (Docket No. 2), Plaintiff filed a Memorandum in Response (Docket No. 3), and Mr. Christ filed a Reply Memorandum in Support of his Motion to Dismiss or Transfer (Docket No. 6). On December 21, 2006, the Court heard oral argument on these motions.

In his Motion to Dismiss or Transfer, Mr. Christ claims that on or about June 2, 2006, approximately 21 days before Elan Suisse Ltd. filed its complaint in this action, he moved from Pennsylvania to Abita Springs, Louisiana. Def. Mem. Supp. 4. Mr. Christ asserts that he sold his house and relocated his business to Louisiana so that, at the time Elan Suisse Ltd. filed this current action, he did not reside or operate a business in Pennsylvania. *Id.* at 5. Thus, Mr. Christ argues that this Court lacks personal jurisdiction over him. Mr. Christ also moves to dismiss the Complaint for improper venue. As an alternative to his Motion to Dismiss, Mr. Christ requests the Court to transfer this action to either the District of Delaware, to be consolidated with the Delaware Action that is currently pending, or to the Eastern District of Louisiana, where Mr. Christ currently resides. Plaintiff opposes both dismissal and transfer of this action. Elan Suisse Ltd. argues that Mr. Christ was a resident of Pennsylvania through at least early June 2006 which allows an inference that Mr. Christ operated the website in question from his home in Pennsylvania from October 2005 through June 2006. Thus, Plaintiff argues that personal

jurisdiction is appropriate and venue is proper in the Eastern District of Pennsylvania.

For the reasons stated below, the Court will grant Mr. Christ's Motion to Transfer and will transfer this action to the U.S. District Court for the District of Delaware to be consolidated with the related action pending in that court. Because such a transfer is appropriate, the Court will not address Mr. Christ's argument that this Court lacks personal jurisdiction over him and will deny Mr. Christ's Motion to Dismiss without prejudice. [FN5]

> FN5. The Court of Appeals for the Third Circuit has held that a district court may transfer venue to another district court even if the transferor court lacks personal jurisdiction over the defendant. In *United States v. Berkowitz,* 328 F.2d 358, 361 (3d Cir.1964), the Court of Appeals cited the Supreme Court's decision in *Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962), which held that a court may transfer venue under § 1406(a) notwithstanding the court's lack of personal jurisdiction over the defendant. The Court of Appeals held that the Supreme Court's "rationale applies equally to § 1404(a), for these are companion sections, remedial in nature, enacted at the same time, and both dealing with the expeditious transfer of an action from one district or division to another." *Berkowitz,* 328 F.2d at 361.

## DISCUSSION

Mr. Christ asserts that venue should be transferred pursuant to 28 U.S.C. § 1400, [FN6] § 1404(a) or § 1406(a). Section 1406(a) [FN7] permits a district court to transfer venue when a case is "filed ... in the wrong division or district." 28 U.S.C. § 1406(a). Mr. Christ argues that under 28 U.S.C. § 1391, [FN8] venue is "wrong" here in this district because Mr. Christ does not reside in this district and a "substantial part of the events or omissions giving rise to the claim" did not occur in this district. However, § 1406(a), by its own terms, only applies to cases that were "filed" in this Court, which is not the case here; rather, Mr. Christ properly removed this action to this Court pursuant to 28 U.S.C. § 1441(a) after it had been "filed" elsewhere. *See* Notice of Removal ¶ 4 (Docket No. 1). As the Supreme Court has clearly stated, once a case is properly removed to district court, transfer of venue pursuant to 28 U.S.C. § 1406(a) is not available. *See*

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                           Page 3
Not Reported in F.Supp.2d, 2006 WL 3838237 (E.D.Pa.)
(Cite as: 2006 WL 3838237 (E.D.Pa.))

*Polizzi v. Cowles Magazines, Inc.,* 345 U.S. 663, 665, 73 S.Ct. 900, 97 L.Ed. 1331 (1953) (holding that 28 U.S.C. § 1406(a) and § 1391 had no application to an action that had been removed from state court pursuant to 28 U.S.C. § 1441(a)); *see also Wallace v. Mercantile County Bank,* 2006 U.S. Dist. LEXIS 82565 at *9 (E.D.Pa.2006) ("If a case is properly removed pursuant to § 1441(a), venue is properly laid, and the removed action may not be challenged under § 1391. Thus, § 1406(a), which governs improper venue, does not apply to a properly removed action." (citation omitted)). Therefore, this Court may not transfer or dismiss this case pursuant to § 1406(a). [FN9]

> FN6. Mr. Christ asserts that venue is appropriate in Louisiana due to 28 U.S.C. § 1400, which defines the appropriate venue for copyright claims. This statute provides that "[c]ivil actions, suits, or proceedings arising under any Act of Congress relating to copyrights or exclusive rights in mask works or designs may be instituted in the district in which the defendant or his agent resides or may be found." 28 U.S.C. § 1400(a). Courts have held that the tests for where a defendant "may be found" under this statute is the same as the test for whether personal jurisdiction exists. *See Kogan v. Longstreet,* 374 F.Supp. 47, 50 (N.D.Ill.1974) ("As a practical matter, the test for determining whether a non-resident corporation or its agent is "found" within a district, pursuant to 28 U.S.C. § 1400(a), is the same as that for determining whether a corporation is amenable to suit in a jurisdiction other than that in which it is incorporated."); *John Wiley & Sons, Inc. v. Fuchs,* 1981 U.S. Dist. LEXIS 16043 at *8 (SD.N.Y.1981) ("The copyright statute does not require a stronger presence of the defendant in the district to determine venue than to establish personal jurisdiction."). Since the Court declines to address Mr. Christ's personal jurisdiction claims and instead will transfer this action to the District of Delaware, the Court need not address Mr. Christ's § 1400 argument with respect to Louisiana. The Court notes that Mr. Christ "may be found" in the District of Delaware for purposes of § 1400 because Mr. Christ initiated the Delaware Action within that district and Mr. Christ, by requesting such transfer, consents to venue lying in Delaware.

> FN7. 28 U.S.C. § 1406(a) states that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a).

> FN8. 28 U.S.C. § 1391(b) states:
> A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.
> 28 U.S.C. § 1391(b).

> FN9. In addition to transfer, Mr. Christ seeks dismissal of this action due to improper venue. Because § 1406(a) cannot be applied here, dismissal on the grounds of improper venue is off the table as well. *See Jumara,* 55 F.3d at 878 (noting that while either § 1404 or § 1406 provide a basis for transfer, only § 1406 can support a dismissal).

*3 In a case that has been removed from state court, a district court may, however, entertain a motion to transfer venue pursuant to § 1404(a). [FN10] *Wallace,* 2006 U.S. Dist. LEXIS 82565 at *9. Requests for transfer under § 1404(a) may be granted when venue is proper in both the original and the requested venue. *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 878 (3d Cir.1995); *Schiller-Pfeiffer, Inc. v. Country Home Prods.,* 2004 U.S. Dist. LEXIS 24180 at *28 (E.D.Pa.2004). Under § 1404(a), district courts have broad discretion "to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.' " *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) (quoting *Van Dusen v. Barrack,* 376 U.S. 612, 622, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)). The Court of Appeals for the Third Circuit has outlined several factors for the district court to consider when

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 3838237 (E.D.Pa.)
(Cite as: 2006 WL 3838237 (E.D.Pa.))

Page 4

adjudicating a motion to transfer. [FN11] The Court acknowledges the familiar maxim that in considering a transfer request, "a plaintiff's choice of forum is entitled to great weight and is not to be disturbed unless the balance of convenience strongly favors the defendants' forum." *Blanning v. Tisch,* 378 F.Supp. 1058, 1060 (E.D.Pa.1974) (citing *Shutte v. Armco Steel Corp.,* 431 F.2d 22 (3d Cir.1970), cert. denied, 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808 (1971). However, the pendency of a related case in its early phases in the transferee forum is a powerful reason to grant a change of venue. *Blanning,* 378 F.Supp. at 1061.

>FN10. 28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).

>FN11. In *Jumara,* the Court of Appeals noted that various considerations include "private interests," such as (a) the plaintiff's forum preference as manifested in the original choice, (b) the defendant's preference, (c) whether the claim arose elsewhere, (d) the relative convenience of the parties as indicated by their relative physical and financial condition, (e) and the location of the witnesses, books and records (but only to the extent that the witnesses, books or records may actually be unavailable for trial in one of the fora). *Jumara,* 55 F.3d at 879-80 (citations omitted). The considerations also include "public interests," such as (a) the enforceability of the judgment, (b) practical considerations that could make the trial easy, expeditious or inexpensive, (c) the relative administrative difficulty in the two fora resulting from court congestion, (d) and the local interest in deciding local controversies at home. *Id.* (citations omitted).

Pursuant to § 1404(a) a court may transfer a case: (1) to a district where the case could have been brought; and (2) where the convenience of parties and witnesses, and the interest of justice weigh in favor of the transfer. *Wallace,* 2006 U.S. Dist. LEXIS 82565 at *9 (citing 28 U.S.C. § 1404(a)). With respect to the first requirement, this case clearly could have been brought in the Eastern District of Louisiana, where Mr. Christ currently resides. See 28 U.S.C. § 1391(a) (providing that an action may be brought in "a judicial district where any defendant resides, if all defendants reside in the same State"). However, Mr. Christ argues that Plaintiff's claims also could have been brought as counterclaims in the pending action in the District of Delaware. *See* Fed.R.Civ.P. 13. Mr. Christ claims that the parties to this action are also parties to the Delaware Action and that the claims pending in both actions revolve around the same nucleus of facts.

Notwithstanding the statement in Plaintiff's Memorandum of Law that "the parties in the State of Delaware District Court action, are not the same as the parties in [Plaintiff Elan Suisse Ltd.'s] current action," at oral argument on this motion, counsel for Elan Suisse Ltd. admitted that "Elan Suisse (Pty) Ltd.," one of the defendants in the Delaware Action, is in fact the same entity as "Elan Suisse Ltd.," the Plaintiff in this case. Pl.'s Mem. Response 5. At oral argument, counsel for Mr. Christ argued that although Plaintiff's claims in the current action pertain to Mr. Christ's alleged defamatory statements on his website, because Mr. Christ created the website as a result of Mr. Cormick's alleged fraudulent activity, which is the basis of Mr. Christ's Delaware Action, the facts and circumstances surrounding the two actions are the same. Counsel for Plaintiff Elan Suisse Ltd. agreed that Plaintiff's current claims could have been brought as counterclaims in the Delaware Action. Counsel for Elan Suisse Ltd. stated that one of the reasons Plaintiff elected not to bring counterclaims in the Delaware Action was because of concerns that the Delaware court lacked personal jurisdiction over the Elan Suisse defendants. With respect to Plaintiff's choice of forum in the current action, rather than submitting to the Delaware court's jurisdiction and bringing counterclaims against Mr. Christ, the Elan Suisse defendants filed a motion to dismiss the Delaware Action for lack of personal jurisdiction, and then one month later, one of the same Elan Suisse defendants filed suit in this Court against Mr. Christ, now, ironically, defending itself against a motion to dismiss for lack of personal jurisdiction.

*4 Mr. Christ argues that because a similar case is currently pending in Delaware, in the interest of conserving the courts' time and resources, this action should be transferred to the District of Delaware for consolidation with the Delaware Action. The Court agrees. Rather than having this Court and the District Court for the District of Delaware each address one of the dueling motions to dismiss for lack of personal jurisdiction, the Court finds that the appropriate

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2006 WL 3838237 (E.D.Pa.)
**(Cite as: 2006 WL 3838237 (E.D.Pa.))**

course would be to transfer this action to the District Court for the District of Delaware to be consolidated with the related action currently under way there.

As noted above, the presence of a related case in the transferee forum is a powerful reason to grant a change of venue. *Blanning,* 378 F.Supp. at 1061. In addition, at oral argument, counsel for the Plaintiff could not provide any reason why this action should not be transferred to Delaware, aside from Plaintiff's argument that venue is proper here and because of the motion to dismiss that is pending in the Delaware court.

It would be no less convenient or more burdensome for Elan Suisse Ltd. to assert its claims as counterclaims in the Delaware Action than it would be to conduct a separate action here. If anything, it should be both more convenient and less burdensome for all parties to litigate these issues on a consolidated basis. Elan Suisse Ltd. is a South African corporation whose principal, Mr. Cormick, is citizen of Australia. The non-Elan Suisse parties in the Delaware Action are all foreign nationals or foreign business entities. [FN12] Mr. Christ is a resident of Louisiana. Thus, whether or not these cases continue separately or on a consolidated basis in Delaware, extensive travel during discovery and trial will likely be required. Pursuing consolidated litigation will at least decrease the need for multiple depositions of the same parties involving the same factual issues. In addition, in response to Mr. Christ's motion, Plaintiff has not offered a single reason why venue is more convenient for the parties or witnesses in Pennsylvania than in Delaware (or for that matter, why venue would be less convenient in Delaware than in Pennsylvania). Plaintiff has not argued that Elan Suisse Ltd. has any ties to Pennsylvania that necessitate conducting litigation here. The Court surmises that Plaintiff chose Pennsylvania as a forum because Mr. Christ resided in Pennsylvania when he created and, at least to some extent, maintained the website in question. [FN13] Although the legal claims in the current action and the Delaware Action are different, upon consideration of a careful reading of the complaint in the Delaware Action, the Court agrees that the facts and circumstances surrounding both actions sufficiently align such that consolidation of these actions would be appropriate. *See Schiller-Pfeiffer,* 2004 U.S. Dist. LEXIS 24180 at *31 (transferring venue pursuant to § 1404(a), even though the claims of the two cases were not exactly the same, because the claims arose from the same set of facts and occurrences). Furthermore, at oral argument in this case counsel for both parties noted that discovery had

not begun in either the current action or the Delaware Action. As such, by transferring this action to Delaware, the Delaware district court would be able to set a consolidated schedule for carrying out discovery and other matters and address discovery disputes. All things being equal, since Wilmington, Delaware and Philadelphia, Pennsylvania are approximately 30 miles apart, if Elan Suisse Ltd. (or Elan Suisse (Pty) Ltd.) is able to maintain a lawsuit in the Eastern District of Pennsylvania, then that entity should be able to defend a lawsuit in the District of Delaware. Conversely, if Mr. Christ is able to bring an action in the District of Delaware, then he should be able to defend an action there as well.

> FN12. To the extent such non-Elan Suisse parties remain as defendants in the Delaware Action, the Court assumes that discovery related to such parties will commence. To the extent that any of these parties should succeed in their motion to dismiss in the Delaware Action, such parties may still be required as witnesses. In either event, Plaintiff has not proposed any reason why Wilmington, Delaware is any less convenient than Philadelphia, Pennsylvania in this regard.

> FN13. Because Mr. Christ has not raised any argument alleging bad faith on the part of Elan Suisse Ltd., the Court will resist concluding that Elan Suisse Ltd. chose to file suit in Pennsylvania solely to avoid submitting to the district court's jurisdiction in Delaware.

CONCLUSION

**\*5** For the reasons stated above, Mr. Christ's Motion to Dismiss will be denied and Mr. Christ's Motion to Transfer this action to the U.S. District Court for the District of Delaware will be granted. [FN14] An appropriate Order follows.

> FN14. The Court also notes that the "first-filed rule," although not addressed by either party, mitigates in favor of transfer to the District of Delaware. Approximately 65 years ago, the Third Circuit Court of Appeals stated that "in all cases of federal concurrent jurisdiction, the court which first has possession of the subject must decide it." *Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925, 929 (3d Cir.1941) (quoting *Smith v. M'Iver,* 22 U.S. (9 Wheat.) 532, 6 L.Ed.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                                     Page 6
Not Reported in F.Supp.2d, 2006 WL 3838237 (E.D.Pa.)
**(Cite as: 2006 WL 3838237 (E.D.Pa.))**

152 (1824)), cert. denied, <u>315 U.S. 813, 62 S.Ct. 798, 86 L.Ed. 1211 (1942)</u>; *see also* <u>EEOC v. Univ. of Pennsylvania, 850 F.2d 969, 971 (3d Cir.1988)</u> (quoting same). The first-filed rule "gives a court 'the power' to enjoin the subsequent prosecution of proceedings involving the same parties and the same issues already before another district court." *EEOC, 850 F.2d at 971.* Although this Court's injunctive powers are not implicated by the pending motions, the Court notes the "first-filed rule" in this case to note that transfer to the District Court for the District of Delaware is appropriate because the action first filed by Mr. Christ in Delaware is based on the same facts as the action filed two months later by Elan Suisse Ltd. in state court in Pennsylvania.

## ORDER

**AND NOW** this 28th day of December, 2006, upon consideration of Defendant Robert D. Christ's Motion to Dismiss or Transfer (Docket No. 2), Plaintiff Elan Suisse Ltd.'s Response to Defendant's Motion to Dismiss or Transfer (Docket No. 3), and Defendant's Reply Memorandum (Docket No. 6), for the reasons stated in the attached Memorandum, it is **ORDERED** as follows:

1. Defendant Robert D. Christ's Motion to Dismiss is **DENIED** without prejudice;

2. Defendant Robert D. Christ's Motion to Transfer is **GRANTED** and this action is transferred to the United States District Court for the District of Delaware, to be docketed as related to *Robert D. Christ v. Brett J. Cormick et al.,* Civil Action No. 06-275.

Not Reported in F.Supp.2d, 2006 WL 3838237 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT J

Westlaw.

Not Reported in F.Supp.                                                                                                           Page 1
Not Reported in F.Supp., 1996 WL 111894 (N.D.Ill.), 15 A.D.D. 275, 7 NDLR P 440
**(Cite as: 1996 WL 111894 (N.D.Ill.))**

H
United States District Court, N.D. Illinois.
Paul ORES, Kirk Ores, Warren Ores, Louise Ores,
and Anna Niemer, Plaintiffs,
v.
WILLOW WEST CONDOMINIUM
ASSOCIATION, et al., Defendants.
No. 94 C 4717.

March 12, 1996.

*MEMORANDUM & ORDER*

MANNING, District Judge.

**\*1** This matter is before the court on motions by the
defendants challenging the plaintiffs' Second
Amended Complaint ("Complaint") in their suit for
violations of the Fair Housing Act. For the reasons
stated below, defendants' motions are denied.

BACKGROUND
Because we address the defendants' motions at the
pleadings stage, all facts herein are from plaintiffs'
allegations and are assumed to be true. *South East
Lake View Neighbors v. Department of Housing and
Urban Development, 685 F.2d 1027, 1034 (7th Cir.
1982).* Plaintiffs Paul Ores and Kirk Ores are adults
who suffer from a developmental disability, fragile X
syndrome. In 1994, with the aid and encouragement
of their parents, Warren and Louise Ores, Paul and
Kirk sought to purchase a condominium at 344
Sheridan Drive in Willowbrook, Illinois. Plaintiff
Anna Niemer ("Niemer") also assisted Paul and Kirk
in her capacity as a real estate broker between them
and the owner of the condominium.

According to the Complaint, in or around March
1994, Frank Urban and Smilja Gladich, as
representatives or agents of the Willow West
Condominium Association ("Association"), made
discriminatory inquiries and statements concerning
Paul and Kirk's handicap condition in violation of 42
U.S.C. § 3604(f) and 42 U.S.C. § 3604(c) (1988).
Plaintiffs further complain that on or about March
1994 members of the Association promulgated rules
or policies concerning the approval of the sale of the
condominium unit at issue which discriminated
against Paul and Kirk because of their condition. The
Complaint separately pleads that on or about March
18, 1994, defendants Image Control Property

Management, Inc., ("Image Control") as an agent of
the Association, and Jean M. Wojcik, as an agent for
Image Control and the Association, adopted and
participated in advancing these discriminatory rules
and additionally took steps to disguise alleged
violations of the Fair Housing Act. Finally, the
Complaint alleges that the Association requested that
Paul and Kirk, because of their handicap, submit to
an interview in a hostile and intimidating setting with
the Association's members.

In sum, the Complaint pleads that, through the
conduct set forth above, the defendants discriminated
against Paul and Kirk in the sale of the condominium
or otherwise made the condominium unavailable to
Paul and Kirk because of their handicap in violation
of 42 U.S.C. § 3604(f). The Complaint further
alleges that the defendants coerced, intimidated and
interfered with Paul and Kirk's exercise of their fair
housing rights in violation of 42 U.S.C. § 3617
[FN1] . Defendants include Urban, Gladich, Image
Control, Wojcik, the Association, several named
[FN2] and unnamed members of the Association, and
First Illinois Bank and Trust ("Banc One"), as trustee
for Association member, trust number 10233. In
addition to injuries arising from humiliation and
mental distress, Paul and Kirk claim that because the
defendants' conduct rendered the condominium
unavailable to them, they lost potential financing for
housing pledged by the Consumer Owned and
Controlled Housing Program as well as $50,000 per
year for living expenses pledged by the Illinois
Department of Mental Health.

**\*2** As to the remaining plaintiffs, the Complaint
asserts that the defendants coerced, intimidated and
interfered with Warren, Louise and Niemer because
of their efforts to aid Paul and Kirk in exercising their
rights granted under the Fair Housing Act in violation
of 42 U.S.C. § 3617. The Complaint alleges that, as
a result of the defendants' misconduct, Warren and
Louise suffered financial and emotional injuries
arising from their own lost opportunity for "physical,
financial and emotional independence." Warren and
Louise also plead that they suffered lost peace of
mind because of their sons' inability to obtain
housing. Niemer alleges that she suffered injury
through the loss of her commission from the
anticipated sale.

In response, defendants Image Control and Wojcik

Not Reported in F.Supp.                                                                          Page 2
Not Reported in F.Supp., 1996 WL 111894 (N.D.Ill.), 15 A.D.D. 275, 7 NDLR P 440
**(Cite as: 1996 WL 111894 (N.D.Ill.))**

and other defendants, including the Association, several named Association members and Banc One ("Certain Defendants"), each filed two separate but overlapping motions challenging the sufficiency of the Complaint. First, Certain Defendants move to dismiss defendant Banc One because it does not have the capacity to be sued. Second, Certain Defendants move to dismiss plaintiffs Warren, Louise and Niemer for lack of standing, or in the alternative, move for a more definite statement to demonstrate their standing. Third, Certain Defendants move to strike the Complaint's general claim for damages or, in the alternative, for a more definite statement describing the alleged special damages. Finally, all defendants move for a more definite statement as to the alleged conduct that violated the Fair Housing Act.

## DISCUSSION

### I. *Motion to Dismiss Defendant Banc One.*

Certain Defendants move to dismiss defendant Banc One because Illinois law generally does not permit a trustee to be sued as a representative for the beneficiaries of the trust. *Schmitd v. Kellner*, 307 Ill. 331, 138 N.E. 604 (1923); Ill. Rev. Stat. Ch. 735, para. 616(e); *see* Fed. R. Civ. Pro. 17(b) (capacity to be sued is determined by the law of defendant's domicile). However, Illinois law permits a plaintiff to name a land trustee as a defendant until it has ascertained, with reasonable diligence, the identities of the underlying beneficiaries of the trust. *See* Ch. 735, para. 616(e). In their response to the defendants' motion, plaintiffs attest that they have submitted discovery requests to Banc One and the Association in order to identity the beneficiaries of trust no. 10233. Consequently, the court finds that the plaintiffs have been reasonably diligent in their efforts to identify and name the beneficiaries. Certain Defendants' motion to dismiss Banc One is denied pending the outcome of plaintiffs' efforts to identify and join the true parties in interest.

### II. *Warren, Louise and Niemer's Standing.*

Certain Defendants also argue that Warren, Louise and Niemer should be dismissed as plaintiffs for lack of standing to pursue their claims. In the alternative, Certain Defendants ask the court to order plaintiffs to furnish a more definite statement as to their standing under Federal Rules of Civil Procedure 8(a) and 12(e).

**\*3** Defendants argue that the Fair Housing Act does not confer standing on parents or other third parties to

pursue a claim for harm that arises from another's inability to obtain housing because of alleged discrimination. Consequently, the defendants contend that the Complaint fails to plead facts to support Warren's or Louise's standing to sue as parents of Paul and Kirk in light of the fact that they were not formal parties to the real estate transaction. As to Paul and Kirk's real estate broker, Niemer, defendants argue that the alleged misconduct could not have caused her any injury because, even after Paul and Kirk abandoned the purchase, Niemer remained legally entitled to her commission from the seller of the real estate. *See Gordon v. Bauer*, 172 Ill.App.3d 1073, 532 N.E.2d 855 (5th Dist. 1988). Rather, defendants claim that Niemer must have lost her commission because either the seller breached the brokerage contract or, Niemer or her employer waived the condominium owner's obligation to pay the commission.

Because the question of standing goes to the court's subject matter jurisdiction, we treat defendants' motion under Federal Rule of Civil Procedure 12(b)(1). A plaintiff bears the burden of establishing that he or she meets the required elements of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). However, at the pleadings stage, a plaintiff's general factual allegations of injury resulting from the defendants' conduct may satisfy this burden. *Id.* at 561, 2137; *South East Lake View*, 685 F.2d at 1034 (in motion to dismiss for lack of standing, court must accept all of a plaintiff's factual allegations and liberally construe complaint in his favor).

To raise a claim in federal court, Article III of the Constitution requires that a plaintiff (1) have suffered a particular and concrete injury, (2) that was caused by the defendants' alleged misconduct, and (3) is fairly likely to be redressed by the court if the plaintiff receives a favorable holding. *See Lujan*, 504 U.S. at 560, 112 S.Ct. at 2135. Because "Congress intended standing under [the Fair Housing Act] to extend to the full limits of Article III", courts may not create additional prudential barriers to standing against a fair housing plaintiff. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372, 102 S.Ct. 1194, 1119, 71 L.Ed.2d 214 (1982). Rather, a fair housing plaintiff need only allege "distinct and palpable injuries that are ' fairly traceable' to [the defendants'] actions." *Id.* at 375-76, at 1122-23.

Furthermore, to raise a suit under the Fair Housing Act, a plaintiff need not allege that the defendant violated his own substantive rights under the statute.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                          Page 3
Not Reported in F.Supp., 1996 WL 111894 (N.D.Ill.), 15 A.D.D. 275, 7 NDLR P 440
**(Cite as: 1996 WL 111894 (N.D.Ill.))**

*Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 103, 99 S.Ct. 1601, 1609, 60 L.Ed. 66 (1979). As an "aggrieved person" who has suffered an injury because of a violation of the underlying provisions of the Fair Housing Act, a plaintiff may raise a suit to enforce another party's rights. *Id.*

*4 Plaintiffs' pleadings in support of Warren and Louise satisfy the Fair Housing Act's permissive standing requirements. First, the Complaint pleads particular and concrete injuries: Warren and Louise suffered mental distress and financial hardship arising from Paul and Kirk's failure to attain anticipated independence. Although somewhat vague, the Complaint alleges that Warren and Louise "lost physical, financial and emotional independence" because Paul and Kirk did not obtain the housing or concomitant funds from the public service agencies. From this allegation of lost independence and Paul and Kirk's pled handicapped status, it is appropriate to infer Paul and Kirk's dependence upon their parents. The Federal Housing Act protects not only those who are excluded from housing by discrimination, "but also those whose complaint is that the manner of managing a housing project affects 'the very quality of their daily lives.'" *Trafficante v. Metropolitan Life Ins.,* 409 U.S. 205, 211, 93 S.Ct. 364, 367-68, 34 L.Ed.2d 415 (1972) (citation omitted). Consequently, emotional damages arising from parents' physical burden of continuing to care for their sons because they did not attain independent living, though not economic or tangible in character, may constitute an injury-in-fact implied by the statute. *See also Havens,* 455 U.S. at 376, 102 S.Ct. at 1123 (deprivation of social benefits of living in an integrated neighborhood constitutes an injury-in-fact under the Fair Housing Act). Similarly, Warren and Louise's loss of financial independence because Paul and Kirk did not obtain the housing or attendant financial assistance states a 'distinct and palpable' injury. *Cf. Growth Horizons, Inc. v. Delaware County, Pennsylvania,* 983 F.2d 1277, 1282 (3d Cir. 1992) (finding standing for housing corporation for the disabled that paid clients' rents because defendant refused to assume those rents in alleged violation of Fair Housing Act).

Second, the Complaint adequately pleads that Warren and Louise's injuries were caused by the defendants' alleged misconduct. The Complaint alleges that Paul and Kirk's failure to purchase the home undermined their ability to obtain the prospective funding. From the Complaint's pleadings, it is appropriate to infer that Paul and Kirk's failure to purchase the condominium prevented them from

obtaining the pledged funding long enough to place some burden on Warren and Louise. *See also South East Lake View,* 685 F.2d at 1034-45 (even very slight injuries satisfy the low constitutional threshold for standing). If defendants engaged in conduct which, under the Federal Housing Act, intimidated and interfered with Warren and Louise's efforts to aid their sons, and also prevented their sons from purchasing the condominium, Warren and Louise's alleged emotional and financial burden of caring for their sons would be fairly traceable to that misconduct.

Third, assuming that Warren and Louise obtain a favorable holding that the defendants violated the Fair Housing Act, the court may redress their loss through compensation. *See* 42 U.S.C. § 3614(d)(1)(B) (the court "may award such relief as [it] deems appropriate, including monetary damages to persons aggrieved"); *see also* H.R. Rep. No. 711, 100th Cong., 2d Sess., at 40 (1988) ( "relief may be awarded to all persons affected by the discriminatory housing practice"). After discovery or at trial, defendants still may challenge the existence of damages arising from Warren's and Louise's financial and emotional burden as well as whether those damages were in fact legally caused by the alleged misconduct. *See Havens,* 455 U.S. at 379 n. 21, 102 S.Ct. at 1125 n. 21.

*5 Because the Complaint pleads that Warren and Louise Ores suffered distinct and palpable injuries that are fairly traceable to the defendants' alleged misconduct, the defendants' motion to dismiss Warren and Louise as plaintiffs due to lack of standing is denied. *See Lujan,* 504 U.S. at 561, 112 S.Ct. at 2136. For these same reasons, defendants' motion for a more definite statement as to Warren's and Louise's standing is denied.

The Complaint also sufficiently pleads facts alleging plaintiff Niemer's standing. The Complaint alleges Niemer lost her anticipated commission; clearly an injury-in-fact. The Complaint further alleges that Niemer suffered this loss because of the defendants' alleged misconduct which allegedly prevented Paul and Kirk from purchasing the condominium. Defendants respond that Niemer's loss of her commission was not due to the defendants' alleged discrimination. Because a real estate agent is generally entitled to her commission from the seller if she presents a willing buyer, defendants argue that Niemer's loss was due to either the seller's illegal refusal to pay the commission or Niemer's own waiver of the commission. *See Gordon,* 172

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                                                    Page 4
Not Reported in F.Supp., 1996 WL 111894 (N.D.Ill.), 15 A.D.D. 275, 7 NDLR P 440
(Cite as: 1996 WL 111894 (N.D.Ill.))

Ill.App.3d at 1094, 532 N.E.2d at 868. However, this argument at least assumes that the Niemer's brokerage contract contained no special conditions on the sale and that the parties did not sign a buyer's broker agreement. *See id.,* at 1094-95, at 868-70. Consequently, it presents a factual issue not appropriately resolved on the pleadings. Defendants' motions to dismiss Niemer as a party plaintiff and for a more definite statement of Niemer's standing are denied [FN3].

III. *Specificity of Plead Damages.*

Defendants move to strike the Complaint's single prayer for relief or, in the alternative, move for a more definite statement as to special damages under Federal Rule of Civil Procedure 9(g). General damages are damages of the type that necessarily flow from the defendants' alleged violation. Special damages arise naturally, but not necessarily, from the alleged conduct. *Moore v. Boating Industry Ass'n,* 754 F.2d 698, 716 (7th Cir.), *vacated on other grounds,* 474 U.S. 895, 106 S.Ct. 218, 88 L.Ed. 218 (1985). A plaintiff need not specifically plead general damages outside of a general claim for proper relief. However, Federal Rule of Civil Procedure 9(g) requires that any special damages "be specifically stated."

Defendants argue that plaintiffs' damages arising from emotional distress and lost funding each constitute special damages. In particular, they assert that the Complaint must indicate why the plaintiffs did not obtain the lost financing by locating alternative housing. Defendants also assert that plaintiff Niemer's damages arising from her lost commission constitute special damages requiring specific pleading.

Damages arising from embarrassment, humiliation and emotional distress are contemplated by a violation of the Fair Housing Act as general damages. *See Gore v. Turner,* 563 F.2d 159, 164 (7th Cir. 1978) (award of damages for emotional distress for Fair Housing Act violation is proper where plaintiff demonstrates illegal conduct caused distress); *Seaton v. Sky Realty Co., Inc.,* 491 F.2d 634, 636-37 (7th Cir. 1974) (damages for humiliation is appropriate under Fair Housing Act where established by testimony); *Bryan v. Jones,* 519 F.2d 44, 46 (5th Cir. 1975). Such injury necessarily flows from being subject to discriminatory conduct, and certainly flows from discriminatory coercion or intimidation. *See Seaton,* 491 F.2d at 636-37. Consequently, plaintiffs' claim for damages for emotional distress is sufficient.

*6 On the other hand, plaintiffs' request for actual damages arising from their lost opportunity to acquire financing for housing and living costs are not of the type that necessarily flow from a violation of the Fair Housing Act. Damages arising under the Fair Housing Act sound basically in tort. *See Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974). Lost profits, earnings or other more speculative injuries are generally considered special damages in tort. *See Great American Indem. Co. v. Brown,* 307 F.2d 306 (5th Cir. 1962). Plaintiffs' claims for damages arising from lost financing are similar to lost profits or wages and, consequently, also constitute special damages. *See also McNeil v. P-N & S, Inc.,* 372 F.Supp. 658, 659 (N.D.Ga. 1973) (damages that require greater degree of proof, such as lost equity due to lost housing, constitute special damages under Fair Housing Act).

However, the Complaint pleads these damages with sufficient specificity. Rule 9(g) does not require that the plaintiff set forth his or her entire legal theory underlying asserted special damages. Instead, it requires that the plaintiff plead facts that adequately reveal the nature of the claimed damages to permit the defendant to respond in his answer and further delineate the claim during pretrial discovery. *Everco Industries, Inc. v. O.E.M. Products Co.,* 63 F.R.D. 662, 666 (N.D.Ill. 1974); *see Suarez Matos v. Ashland Presbyterian Community Hosp., Inc.,* 4 F.3d 47, 52 (1st Cir. 1993) (Rule 9(g) is intended to provide defendant with adequate notice of damages); *In Continental Nut Co. v. Robert L. Berver Co.,* 345 F.2d 395, 397 (5th Cir. 1965) (special damages are pled with sufficient specificity if they notify defendant of the nature of damages); *Diaz v. Irizarry v. Ennia,* 678 F.Supp. 957, 959 (D. Puerto Rico 1988). The Complaint alleges the facts underlying the plaintiffs' claim for these damages: (1) the Illinois Department of Mental Health and the Consumer Owned and Controlled Housing Program pledged financial assistance to Paul and Kirk for the purchase of the condominium and subsequent living expenses, and (2) the defendants' alleged misconduct prevented Paul and Kirk from purchasing the condominium. This information provides the defendants with ample information to pursue their mitigation theory through pre-trial discovery [FN4].

Consequently, Certain Defendants' motion to strike plaintiffs' claim for damages and motion for a more definite statement as to damages are denied.

IV. *Alleged Violations.*

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

All defendants also move for a more definite statement under Federal Rule of Civil Procedure 12(e) as to the alleged conduct that violated the Fair Housing Act. First, defendants argue that the Complaint fails to put each defendant on notice of which misconduct they are accused. Second, defendants maintain that the Complaint fails to adequately identify the nature of the alleged misconduct.

Federal Rule of Civil Procedure 8(a) only requires that a complaint provide sufficient notice to the opposing party through a "short and plain statement of the claim showing that the pleader is entitled to relief." Under Federal Rule of Civil Procedure 12(e), however, a defendant is entitled to a more definite statement only if "a pleading is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading." See American Nurses Ass'n v. Illinois, 783 F.2d 716, 723 (7th Cir. 1986). Defendants may not use a motion under 12(e) to test a plaintiff's case by requiring them to allege certain facts or retreat from their allegations. Juneau Square Corp. v. First Wisconsin Nat. bank, 60 F.R.D. 46, 48 (E.D. Wisc. 1973). Rather, a more definite statement is required if, after the complaint and likely answer are filed, "the court would have no clear notion of the essence of the case." Teradyne, Inc. v. Clear Communications Corp., 707 F.Supp. 353, 354 (N.D.Ill. 1989).

*7 In light of the Rule 8(a)'s minimal requirements, the Complaint adequately alerts each defendant of their alleged connection with the alleged misconduct. Each pleading alleging conduct in violation of the statute accuses either specific defendants, "members of the Association", or "all" defendants. Where the Complaint refers to members collectively, it clearly alleges that all of the Association's members are implicated [FN5]. On its face, the Complaints' references to defendants in its claims for damages and assertion of intentional misconduct denote all of the named defendants unless otherwise indicated. See Resolution Trust Corp. v. Gershman, 829 F. Supp. 1095 (E.D.Mo. 1993). Consequently, there is no ambiguity as to which defendants are accused of involvement in each misconduct.

Moreover, the Complaint sets forth the conduct complained of with adequate specificity for the defendants to form responsive answers. It provides the essence of the lawsuit: plaintiffs allege that defendants prevented Paul and Kirk from purchasing a condominium because of their handicap status. It

alleges that these acts occurred around March 1994 and were composed of such conduct as discriminatory inquiries, statements, instituted policies, and a requested interview. It alleges that around March 18, 1994, defendants Image Control and Wojcik, as agents for the Association, adopted and advanced alleged discriminatory policies instituted by the Association and later attempted to disguise violations of the Fair Housing Act. Further, through this conduct, and possibly additional conduct, all of the defendants coerced, intimidated and interfered with Paul and Kirk in their efforts to purchase the condominium as well as intimidating and interfering with the other plaintiffs' in their efforts to aid Paul and Kirk. Finally, the Complaint alleges that all of the defendants' misconduct prevented Paul and Kirk from purchasing the condominium.

In contrast to Certain Defendants' assertion, Hope, Inc. v. County of Dupage, 738 F.2d 797, 815 (7th Cir. 1984) (en banc), does not stand for the broad proposition that a fair housing plaintiff need allege "specific and particular discriminatory acts" in order to satisfy the requirements of notice pleading. In Hope, plaintiffs sued the County of DuPage asserting that it engaged in exclusionary zoning practices which prevented the construction of any low income housing in DuPage. Id. at 799. The Seventh Circuit dismissed the plaintiffs for their failure to establish standing because neither their pleadings nor proof at trial evidenced specific discriminatory acts that were fairly traceable to their alleged injury. Id. Therefore, Hope did not address the adequacy of the plaintiffs' complaint but rather their failure to produce any evidence of specific discrimination at trial. See id. at 807- 808 & 815-16. In fact, the plaintiffs were allowed to proceed to trial based upon an allegation of a conspiracy among defendants to perpetuate zoning practices that excluded the construction of low income housing. See id. at 808. Moreover, the Seventh Circuit required the plaintiffs to identify particular discriminatory acts to establish their standing, not to satisfy the requirements of notice pleading. See id. at 815.

*8 Although the defendants did not raise this issue in their briefs, Hope does not require the plaintiffs to plead more particular discriminatory conduct to demonstrate the standing of Warren, Louise or Niemer. As noted, Hope did not address whether the plaintiffs' complaint satisfied the requirements for standing. It addressed whether the plaintiffs succeeded in demonstrating standing at trial. In addition, Hope required the plaintiffs to demonstrate

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.                                                                Page 6
Not Reported in F.Supp., 1996 WL 111894 (N.D.Ill.), 15 A.D.D. 275, 7 NDLR P 440
**(Cite as: 1996 WL 111894 (N.D.Ill.))**

particular misconduct because they could not point to a single concrete housing project allegedly impeded by the defendants' zoning practices. *See id.* at 807, 812 & 815. Without any specific proposed housing project at issue, plaintiffs could not demonstrate that their alleged injury, the absence of any low income housing in DuPage County, was fairly traceable to the defendants' zoning practices. *Id.* at 810 & 815. Consequently, the court required the plaintiffs to identify some specific discriminatory conduct indicating that the defendants hindered housing developers from ever proposing a low income housing project in DuPage. *See id.* at 815-16. In contrast, the instant Complaint alleges that the defendants rendered the condominium at 344 Sheridan Drive unavailable to Paul and Kirk. Furthermore, the Complaint adequately pleads particular conduct at this stage in the proceedings through its allegations that the defendants impeded the availability of the condominium through discriminatory statements, inquiries and official policies all occurring around March 1994.

Although the precise statements, inquiries and policies are not described, plaintiffs are not required to plead all of the facts logically entailed by a claim. *American Nurses,* 783 F.2d at 727; *see also U.S. v. Metro Development Corp.,* 61 F.R.D. 83, 87 (N.D.Ga. 1973) (fair housing complaint that pleads violations substantially in statutory language adequately puts defendants on notice). Exploration of the plaintiffs' ability to substantiate their claims is reserved for pre-trial discovery. *See Juneau,* 60 F.R.D. at 48.

Accordingly, defendants' and Certain Defendants' motions for a more definite statement as to the plaintiffs' allegations are denied.

CONCLUSION

For the reasons set forth above, Certain Defendants' motion to dismiss Banc One is denied, Certain Defendants' motion to dismiss Warren Ores, Louise Ores and Anna Neimar is denied, Certain Defendants' motion for a more definite statement as to standing is denied, Certain Defendants' motions to strike and for a more definite statement as to special damages is denied, and defendants' motions for a more definite statement of alleged violations is denied [FN6].

FN1. § 3617 provides that:
It shall be unlawful to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.
42 U.S.C. § 3617 (1988).

FN2. Named defendants who are members of the Association are Mary Fratto, Mohammed Ghousedin, Terry E. Maly, and Lana Baima.

FN3. The Federal Rules of Civil Procedure also do not require the plaintiffs to attach any documentation or evidence related to alleged damages to substantiate their pleadings. Defendants do not require this information to frame their answer. Further, the Federal Rules provide the defendants with liberal discovery for precisely this purpose.

FN4. The Complaint also adequately pleads Niemer's claim for her lost commission even though it may constitute special damages. The Complaint puts the defendants on notice of the nature and elements of the claim. As Certain Defendants' brief reveals, they have already constructed a theory to attack the merits of Niemer's asserted damages. Defendants may develop these facts through discovery and pursue this theory at trial or through summary judgment.

FN5. Plaintiffs are not required to identify specific members of the Association involved in devising or instituting the alleged discriminatory policies or interview. Prior to discovery, such information is outside the ambit of the plaintiffs' knowledge. The pleadings indicate that the plaintiffs accuse all named members of the Association of participating directly or through agents.

FN6. With leave of the court, plaintiffs amended their complaint first on October 5, 1994, and then again on January 23, 1995. Defendants Image Control, Wojcik, and the Association filed a motion for a more definite statement against the First Amended Complaint. Certain Defendants also filed a motion to dismiss and a motion for a more particular statement against the First Amended Complaint. In light of defendants'

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 111894 (N.D.Ill.), 15 A.D.D. 275, 7 NDLR P 440
**(Cite as: 1996 WL 111894 (N.D.Ill.))**

similar motions challenging the superseding
Complaint, these previous motions are moot.

Not Reported in F.Supp., 1996 WL 111894
(N.D.Ill.), 15 A.D.D. 275, 7 NDLR P 440

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-275-GMS |
| | ) | |
| BRETT J. CORMICK and ELAN SUISSE | ) | |
| INTERNATIONAL HOLDINGS (USA) LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| ELAN SUISSE LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 07-60-GMS |
| v. | ) | |
| | ) | |
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 9, 2007, I caused a true and correct copy of

the foregoing ***Robert D. Christ's Reply Brief in Support of His Motion for Judgment on the***

***Pleadings*** to be served on counsel for defendants as listed below, via electronic CM-ECF:

*Attorneys for Defendants:*

David L. Finger, Esquire
Finger & Slanina, P.A.
One Commerce Center, Suite 725
1201 North Orange Street
Wilmington, DE 19801-1155


Dated:  November 9, 2007

*/s/ Thad J. Bracegirdle*
Thad J. Bracegirdle (No. 3691)

WILLIB-49001.2