IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-275-GMS |
| | ) | |
| BRETT J. CORMICK and ELAN SUISSE | ) | |
| INTERNATIONAL HOLDINGS (USA) | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF ROBERT D. CHRIST'S OPENING BRIEF
IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT**

REED SMITH LLP

Thad J. Bracegirdle (No. 3691)
1201 Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 778-7500

Attorneys for Plaintiff Robert D.
Christ

Dated: December 20, 2007

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

NATURE AND STAGE OF THE PROCEEDING ........................................... 1

SUMMARY OF ARGUMENT .......................................................................... 3

STATEMENT OF UNDISPUTED FACTS ...................................................... 4

I.     THE PARTIES ........................................................................................ 4

II.    BACKGROUND .................................................................................... 4

ARGUMENT ...................................................................................................... 7

I.     PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON HIS
BREACH OF CONTRACT CLAIM ...................................................... 7

        A.    Delaware Law ............................................................................. 8

        B.    Zimbabwe Law ......................................................................... 10

CONCLUSION .................................................................................................. 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986).................................................................................... 7

*Eaton v. Eaton*
    2005 WL 3529110 (Del. Ch. Dec. 19, 2005)................................................ 8

*First Mortgage Co. of Pa. v. Fed. Leasing Corp.*
    456 A.2d 794 (Del. 1982) .......................................................................... 9

*Groman v. Twp. of Manalapan*
    47 F.3d 628 (3d Cir. 1995) ........................................................................ 7

*Healey v. Southwood Psychiatric Hosp.*
    78 F.3d 128 (3d Cir. 1996) ........................................................................ 7

*Lony v. E.I. du Pont de Nemours & Co.*
    821 F. Supp. 956 (D. Del. 1993).................................................................. 7

*Lyons v. U.S. Marshals*
    840 F.2d 202 (3d Cir. 1988) ...................................................................... 7

*Martin v. Star Publ'g Co.*
    126 A.2d 238 (Del. 1956) .......................................................................... 10

*Meding v. Hurd*
    607 F. Supp. 1088 (D. Del. 1985)............................................................... 7

*Michaels v. New Jersey*
    222 F.3d 118 (3d Cir. 2000) ...................................................................... 7

*Salisbury v. Credit Serv., Inc.*
    199 A. 674 (Del. Super. 1937)..................................................................... 8

*Szymanska v. Equitable Life Ins. Co.*
    183 A. 309 (Del. Super. 1936)..................................................................... 9

*Wood v. State*
    2003 WL 168455 (Del. Jan. 23, 2003) ........................................................ 8

**Other Authorities**

R. H. Christie, *Business Law in Zimbabwe* (2d ed. 1998) ........................................ 10, 11

*Williston on Contracts* § 113 (3d ed.).................................................................................. 9

## NATURE AND STAGE OF THE PROCEEDING

On April 27, 2006, plaintiff Robert D. Christ filed the complaint in this action alleging claims of fraud, promissory estoppel, breach of contract and civil conspiracy against defendants Brett J. Cormick, Elan Suisse International Holdings (USA) LLC ("Elan Suisse USA"), Elan Suisse (Pty) Ltd., Nicogel Ltd. ("Nicogel"), John Walters, Dianne Marshall and Mercari Financial Services (Pty) Ltd. ("Mercari"). *See* D.I. 1. Defendants moved to dismiss Mr. Christ's complaint on May 22, 2006. *See* D.I. 16. Mr. Christ subsequently filed an amended complaint on March 2, 2007 (D.I. 29), which defendants moved to dismiss on March 15, 2007 (D.I. 30). On July 10, 2007, the Court granted in part defendants' motion, dismissing Mr. Christ's claim for civil conspiracy and holding that Elan Suisse (Pty) Ltd., Nicogel, Mr. Walters, Ms. Marshall and Mercari were not subject to the Court's personal jurisdiction. *See* D.I. 46.

On July 20, 2007, Mr. Cormick and Elan Suisse USA answered Mr. Christ's amended complaint and asserted counterclaims against Mr. Christ. *See* D.I. 47. Specifically, Mr. Cormick seeks damages from Mr. Christ arising from alleged violations of the Alien Tort Claims Act, 28 U.S.C. § 1350 (Count I), false imprisonment (Count II), intentional infliction of emotional distress (Count III) and defamation (Count IV). *See id.* In addition, Elan Suisse USA has alleged against Mr. Christ a breach of contract claim relating to that entity's purported operating agreement (Count V). *See id.* On October 16, 2007, Mr. Christ moved for judgment on the pleadings with respect to, *inter alia*, Counts I, II, III and IV of Mr. Cormick's counterclaims. *See* D.I. 60. That motion has been fully briefed and currently is pending before the Court.

Mr. Christ today is moving for partial summary judgment with respect to Count II of his amended complaint alleging breach of contract against Mr. Cormick. Mr. Christ hereby respectfully submits his opening brief in support of that motion.

## SUMMARY OF ARGUMENT

1.    The facts relating to Count II of Mr. Christ's amended complaint are simple, undisputed and straightforward.  Those facts prove that, in September 2004, Mr. Christ and Mr. Cormick entered into a contract pursuant to which Mr. Cormick agreed to repay Mr. Christ $250,000 which Mr. Christ previously had wired to Mr. Cormick as an "investment" in Mr. Cormick's purported business venture.  Mr. Cormick's ongoing failure to repay those funds constitutes an indisputable and continuing breach of the parties' contract.  This is true regardless of whether the law of Delaware or Zimbabwe applies to Mr. Christ's claim.

## STATEMENT OF UNDISPUTED FACTS

### I.    THE PARTIES.

Plaintiff Robert D. Christ is a citizen of Louisiana who resides in Abita Springs, Louisiana.  D.I. 29, Plaintiff's Amended Complaint ("Am. Compl.") ¶ 1; D.I. 47, Defendants' Answer ("Ans.") ¶ 1.

Defendant Brett J. Cormick is a citizen of Australia who maintains a legal residence in the Republic of Zimbabwe.  Ans. ¶ 2.

Elan Suisse USA is a limited liability company formed and organized under the laws of Delaware.  Am. Compl. ¶ 3; Ans. ¶ 3.

### II.    BACKGROUND.

In the mid- to late 1990's, Mr. Christ operated a tour company specializing in expeditions to the geographic North and South Poles.  Am. Compl. ¶ 14; Ans. ¶ 14.  Mr. Christ first met Mr. Cormick in April 1996, when Mr. Cormick participated in one of Mr. Christ's expeditions, after which time the two men maintained a friendship.  *Id.*

In January 2004, Mr. Christ traveled to Cape Town, South Africa to attend to the affairs of a close friend who had died suddenly in an accident.  Am. Compl. ¶ 15; Ans. ¶ 15.  While Mr. Christ was in South Africa, Mr. Cormick traveled to Cape Town from his residence in Harare, Zimbabwe to meet with Mr. Christ.  *Id.*  At that time, Mr. Cormick discussed with Mr. Christ his potential involvement in a purported United States-based management services business devised by Mr. Cormick.  Ans. ¶ 15.  In January and February 2004, Mr. Cormick and Mr. Christ continued to have discussions concerning the terms of a possible investment by Mr. Christ in a holding company that would operate to promote and sell United States-based financial products and investment vehicles to

investors located in South Africa. *See* Am. Compl. ¶¶ 16-17; Ans. ¶¶ 16-17; D.I. 52, Declaration of Brett J. Cormick, dated Aug. 20, 2007 ("Cormick Decl.") ¶ 3.

These negotiations culminated in a proposal by Mr. Cormick on February 15, 2004 pursuant to which Mr. Christ would invest $350,000 in exchange for, at a minimum, a 50% equity interest in Elan Suisse USA. Affidavit of Robert D. Christ, dated Dec. 19, 2007 ("Christ Aff.") ¶ 4 & Exs. A, B ¶ 9.38.[1]  After further discussions, in March 2004 Mr. Christ ultimately wired an initial investment of $250,000 (in two separate payments of $125,000 each) to Mr. Cormick's personal bank account in London pursuant to Mr. Cormick's instructions. Am. Compl. ¶¶ 19, 23; Ans. ¶ 23; Christ Aff. ¶ 5 & Exs. B ¶ 10.5, C, D ¶ 9.1; Cormick Decl. ¶ 4.

While the parties disagree as to whether and to what extent Mr. Christ thereafter received equity in Elan Suisse USA as consideration for his $250,000 payment, the following facts cannot be disputed:

- Mr. Christ never signed any written agreement with Mr. Cormick, Elan Suisse USA or any other entity governing his $250,000 "investment." *See* Am. Compl. ¶ 23; Ans. ¶ 23; Christ Aff. ¶ 6 & Ex. B ¶¶ 9.44, 12.17.

- In September 2004, by which time Elan Suisse USA had yet to commence operations and Mr. Christ began to grow suspicious about its legitimacy, Mr. Christ sent e-mails to Mr. Cormick inquiring as to the status of his investment and demanding an audit of Elan Suisse (Pty) Ltd. and Elan Suisse USA. Christ Aff. ¶ 7 & Ex. E.

---

[1] While the parties dispute whether Mr. Cormick and Mr. Christ also agreed that Mr. Christ would receive an equity interest in Elan Suisse (Pty) Ltd., a South African corporation which would manage the investment operations, that dispute is not relevant to the present motion.

- In an e-mail dated September 9, 2004, Mr. Cormick – in response to Mr. Christ's prior e-mails and rather than submit to the audits demanded by Mr. Christ – offered to repay Mr. Christ the $250,000 he had wired previously to Mr. Cormick. Christ Aff. ¶ 8 & Exs. D ¶ 1.10, F; Cormick Decl. ¶ 5.

- Mr. Christ accepted Mr. Cormick's offer to repay the $250,000 in a letter from his counsel to Mr. Cormick dated November 30, 2004. Christ Aff. ¶ 8 & Exs. D ¶ 1.10, G; Cormick Decl. ¶ 5.

- To date, Mr. Christ has never been repaid the $250,000 he wired to Mr. Cormick. Christ Aff. ¶ 8 & Ex. D ¶ 11.

Indeed, Mr. Cormick already has admitted the facts relevant to Count II of Mr. Christ's amended complaint in affidavits and pleadings filed with the High Court of South Africa in a related action. *See* Christ Aff. Exs. B, D. In that proceeding, Mr. Cormick's only defense related to the South African court's exercise of personal jurisdiction, not the merits of Mr. Christ's claims. *See id.* Since this Court previously determined that Mr. Cormick properly is subject to its personal jurisdiction, and the salient facts are undisputed, Mr. Christ's claim for breach of contract is ripe for summary judgment.

## ARGUMENT

**I.    PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT ON HIS BREACH OF CONTRACT CLAIM.**

Summary judgment is appropriate where, viewing the record in a light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *E.g.*, *Michaels v. New Jersey*, 222 F.3d 118, 121 (3d Cir. 2000); *Healey v. Southwood Psychiatric Hosp.*, 78 F.3d 128, 130 (3d Cir. 1996). If the moving party carries its initial burden of demonstrating the absence of any genuine issue of material fact, then the burden shifts to the non-moving party to produce evidence in support of specific facts showing there is a genuine issue for trial. *Meding v. Hurd*, 607 F. Supp. 1088, 1107 (D. Del. 1985). An issue of fact is "genuine" "only if the evidence is such that a reasonable jury could find for the party opposing the motion." *Lyons v. U.S. Marshals*, 840 F.2d 202, 204 (3d Cir. 1988). *See also Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) (in order to defeat "a properly supported summary judgment motion, the party opposing it must present sufficient evidence for a reasonable jury to find in its favor") (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986)). In determining whether a fact is "material," only disputes over facts that "might affect the outcome of the suit under the governing law" will defeat summary judgment. *Lony v. E.I. du Pont de Nemours & Co.*, 821 F. Supp. 956, 959 (D. Del. 1993) (quoting *Anderson*, 477 U.S. at 248).

Currently pending before the Court is defendants' motion to determine the substantive law applicable to various claims, including plaintiff's claim for breach of contract. *See* D.I. 51-55. While plaintiff argues that his breach of contract claim is governed by Delaware law, defendants contend that the law of Zimbabwe applies.

However, regardless of which jurisdiction's law applies, the undisputed factual record entitles plaintiff to summary judgment on Count II of his amended complaint for breach of contract.

### A.    Delaware Law.

In order to establish the existence of a contract, Delaware law requires proof of the traditional elements of offer, acceptance and consideration. *See, e.g., Eaton v. Eaton*, 2005 WL 3529110, at *3 (Del. Ch. Dec. 19, 2005); *see also Wood v. State*, 2003 WL 168455, at *2 (Del. Jan. 23, 2003) ("The formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."), *disposition reported at* 815 A.2d 350 (Del. 2003) (TABLE).[2] The undisputed evidence here satisfies all three elements and demonstrates that Mr. Christ and Mr. Cormick entered into a contract for repayment of $250,000 to Mr. Christ.

First, there can be no question that Mr. Cormick offered to repay $250,000 to Mr. Christ and that Mr. Christ accepted that offer. *See Salisbury v. Credit Serv., Inc.*, 199 A. 674, 681 (Del. Super. 1937) ("It is elementary law that in order to constitute a contract there must be an offer made by one person to another and an acceptance of that offer by the person to whom it was made."). In his e-mail to Mr. Christ dated September 9, 2004, Mr. Cormick very clearly and unambiguously gave Mr. Christ a choice: "You can have your money back no problem ... or you can fire up Elan Suisse Holdings and start building the sale ...." Christ Aff. Ex. F. In other words, Mr. Cormick offered Mr. Christ repayment of his $250,000 "investment" or continued participation in the Elan Suisse

---

[2] Pursuant to District Court Local Rule 7.1.3(a)(7), all unreported opinions cited in this brief are attached as exhibits hereto.

business.  Mr. Christ accepted the offer of repayment in equally clear terms through his counsel's correspondence to Mr. Cormick dated November 30, 2004.  *See* Christ Aff. Ex. G.[3]

Second, Mr. Christ' acceptance of repayment in forbearance of pursuing an audit of Elan Suisse constitutes valid consideration in support of the parties' contract.  Under Delaware law, "[i]t is well settled that consideration for a contract can consist of either a benefit to the promisor or a detriment to the promisee."  *First Mortgage Co. of Pa. v. Fed. Leasing Corp.*, 456 A.2d 794, 795-96 (Del. 1982).  Here, Mr. Christ's decision – at Mr. Cormick's request – to give up participation in the Elan Suisse venture was consideration supporting Mr. Cormick's repayment of $250,000.  *See id.* at 796 ("[I]f the promisee parts with something at the promisor's request, it is immaterial whether the promisor receives anything ....") (quoting *Williston on Contracts* § 113 (3d ed.)).  Moreover, Mr. Cormick's offer of repayment was made expressly in response to Mr. Christ's demand for audits of Elan Suisse USA and Elan Suisse (Pty) Ltd.  *See* Christ Aff. ¶¶ 7-8.  Mr. Christ's agreement not to pursue such audits in exchange for repayment of his $250,000 constitutes additional consideration for his contract with Mr. Cormick.  *See Szymanska v. Equitable Life Ins. Co.*, 183 A. 309, 314 (Del. Super. 1936) (agreement to forbear gives rise to consideration for promise).

---

3 Delaware law long has recognized that, as is the case here, parties may form a contract through the exchange of correspondence.  *See Universal Prods. Co. v. Emerson*, 179 A. 387, 394 (Del. 1935).  In addition, the Court properly may determine whether a contract has been formed when the relevant evidence consists of letters or other documentary evidence the authenticity of which is not denied.  *Id.* at 393.

There likewise can be no dispute that Mr. Cormick has breached – and continues to breach – the contract formed between the parties. In accepting Mr. Cormick's offer, Mr. Christ demanded payment of $250,000 within seven days of that acceptance. *See* Christ Aff. Ex. G. Mr. Cormick failed to remit payment to Mr. Christ within that time period. *See* Christ Aff. ¶ 8. Even if the parties had not specifically agreed to a time frame in which Mr. Cormick was required to pay Mr. Christ, the Court should imply a "reasonable" time for performance. *Martin v. Star Publ'g Co.*, 126 A.2d 238, 244 (Del. 1956). By any measure, Mr. Cormick's failure to repay Mr. Christ within the more than three years that have passed since the contract was formed cannot be reasonable and constitutes a breach of the contract.

### B.    Zimbabwe Law.

Under the law of Zimbabwe, "the first step in deciding whether a contract has come into existence … is … to inquire whether agreement was reached." R. H. Christie, *Business Law in Zimbabwe* 31 (2d ed. 1998).[4] "[T]he most common and convenient method of investigating whether an agreement … has been reached is to look for an offer and an acceptance of that offer." *Id.* at 33. Unlike Delaware law, Zimbabwe does not require that consideration be given to form an enforceable contract. *Id.* at 45.

The same undisputed facts which establish the formation of a contract between Mr. Christ and Mr. Cormick under Delaware law also prove the existence of a contract under Zimbabwe law. "An offer … is identifiable as being accompanied by *animus contrahendi*, the intention of putting the conclusion of the negotiations out of one's

---

[4] Relevant excerpts from this reference work are attached for the Court's convenience as an exhibit hereto.

further power and enabling the offeree, by mere acceptance, to create the contract." *Id.* at 33. Mr. Cormick plainly exhibited this intent in his September 9, 2004 e-mail by extending to Mr. Christ the option of accepting repayment of his $250,000 "investment" or continuing his involvement in Elan Suisse. *See* Christ Aff. Ex. F. Mr. Christ's acceptance of the offer of repayment in writing was clear, unambiguous and sufficient to create a contract under Zimbabwe law. *See* Christie at 39 ("To be effective in creating a contract, acceptance must be so clear and unequivocal as to leave no reasonable doubt in the offeror's mind that his offer has been accepted ….") (citation omitted). Like Delaware law, Zimbabwe law also permits the formation of contract through the exchange of correspondence. *See id.* at 41-42.

Zimbabwe law recognizes that, upon a breach by one party of his contractual obligations, the other party becomes entitled to a remedy. *See id.* at 116. Under the Roman-Dutch law upon which Zimbabwe law is based, when the breach takes the form of failure to perform the debtor is said to be "in mora." *Id.* "For a debtor to be in mora performance must be due, the debtor must be or be deemed to be aware of the performance required of him and the fact that it is due, and he must have no valid excuse for his failure to perform." *Id.* Here, Mr. Cormick plainly failed to repay Mr. Christ within the seven days stipulated in Mr. Christ's acceptance letter. However, even if the parties' contract is deemed to be silent on the time for payment, Zimbabwe law holds that a debtor is in mora after "a reasonable time for performance has elapsed and the creditor has demanded performance." *Id.* at 117. As is true under Delaware law, there can be no question that Mr. Cormick's failure to remit payment to Mr. Christ for more than three

years, and despite Mr. Christ's repeated demands, constitutes a breach of contract under Zimbabwe law.

## CONCLUSION

For the foregoing reasons, Mr. Christ respectfully requests that the Court enter summary judgment in his favor on Count II of his complaint.

REED SMITH LLP

*/s/ Thad J. Bracegirdle*
Thad J. Bracegirdle (No. 3691)
1201 Market Street
Suite 1500
Wilmington, Delaware 19801
(302) 778-7500

Attorneys for Robert D. Christ

Dated: December 20, 2007

# EXHIBIT 1



Not Reported in A.2d                                                                                                 Page 1
Not Reported in A.2d, 2005 WL 3529110 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**C**Eaton v. Eaton
Del.Ch.,2005.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
EATON
v.
EATON
No. 286-S.

Submitted Aug. 1, 2005.
Decided Dec. 19, 2005.

Dear Counsel:
NOBLE, J.
**\*1** A father executes a will devising his home to one
of his three sons. Soon thereafter, the father offers to
change his will to devise the home to his three sons in
equal shares if they make certain improvements to
the home. The sons begin the requested performance,
but the father dies before performance is completed;
the will is left unmodified. The inheriting son, who
also serves as executor under the will, asserts that he
will honor the father's promise regardless. The other
two brothers complete performance of the
improvements, but the inheriting son then refuses to
deviate from the express terms of the will. May the
two brothers recover their claimed shares in their
father's home? Is their claim barred by the non-claim
statute because they filed their statement of claim
with the Register of Wills more than six months after
their father's death (but less than six months after
they completed the work)? These questions are
answered in this post-trial letter opinion.

I.

Andre Eaton and Kelly Eaton (the "Plaintiffs"), two
brothers, seek specific performance of an alleged oral
contract to make a will entered into with their
brother, Rex Eaton (the "Defendant"), and their now-
deceased father, Joseph Eaton.

On August 7, 2002, the father duly executed a
handwritten will (the "Will") devising his home (the
"Property") solely to the Defendant.[FN1]During the
middle of August 2002, the father orally offered to
modify the terms of his Will to devise the Property to
the three brothers, in equal shares, if the brothers

made certain improvements to their father's home.
The father's offer was never reduced to writing. The
Defendant has conceded, however, that the father
stated, "Fix the place up and I'll give ya's the
place."[FN2]Further discussions took place shortly
thereafter among the brothers and their father to
determine the scope of improvements requested. It
was ultimately decided that substantial improvements
to the exterior of the home would be made. The
primary purpose was the installation of a new roof
over the father's home, but new windows, a door,
soffit, siding, and a wall were to be added as well.
The father wanted his home to be improved to a level
commensurate with neighboring homes.[FN3]

> FN1. Pls.' Ex. 1. The decedent's home is
> located at 203 Longleaf Road, Dagsboro,
> Delaware 19939.

> FN2. Pls.' Ex. 4 ("Letter of Rejection to
> Statement of Claim B-6"). This letter was
> mailed to the Plaintiffs by the Defendant in
> his capacity as executor of the estate.

> FN3. At trial, the parties demonstrated a
> belief that ownership of a portion of the
> decedent's structure may have remained in
> Plaintiff Kelly Eaton, who had owned the
> trailer that comprised one-half of the
> decedent's home (the other half having been
> built as an addition to the trailer). The
> evidence indicated that, as part of the
> agreement reached among the brothers and
> the father, Kelly Eaton was to give any
> interest that he held to his father. The trailer,
> however, having already become a fixture to
> the land, passed with the devise of the lot.

Application for a building permit for construction of
a new roof for the father's home, signed by the father,
was submitted shortly after the offer was made, and
the permit was issued on August 30, 2002.[FN4]Work
on the Property commenced in early September 2002.
Construction of the new roof took place over a period
of roughly two-and-one-half weeks that September.
All three brothers contributed significant time and
labor to the effort. The expenses of the roof project
were shared equally among the three brothers and
their father and totaled approximately $4,000.00.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 2
Not Reported in A.2d, 2005 WL 3529110 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Improvements continued to be made to the Property, but at a slower pace. The Defendant installed new windows for which the Plaintiffs contributed part of the cost.

FN4. *See* Pls.' Ex. 5.

**\*2** The father died on March 27, 2003, before the agreed upon work was completed and less than a year after making the offer to his sons. The August 2002 Will was admitted to probate, and the Defendant was appointed executor and granted Letters Testamentary on April 14, 2003.[FN5] The father had left unchanged the terms of his Will, which, thus, failed to reflect the offer that he made. Instead, the Will, as probated, retained its original provision devising the Property, in its entirety, to the Defendant.[FN6]

FN5. *See* Pls.' Ex. 2 (Register's Order).

FN6. There remains some question as to when the Defendant learned that the Will had not been revised.

The Plaintiffs continued with the improvements to the Property after their father's death, replacing a door, wall, and additional windows and adding soffit and siding to the home. The Defendant was fully aware that these improvements were ongoing and made a key to the premises for each of the Plaintiffs after the father's death so they could have access to the home. In his trial testimony, the Defendant acknowledged that he had observed the improvements personally, having stopped by the Property on his way to go fishing. He spoke with the Plaintiffs at this time and understood that they were attempting to satisfy the terms of their father's offer with respect to the Property.

At no time during the course of these improvements after the father's death did the Defendant indicate that he would deviate from the terms of the father's offer-nor did he help with the improvements. Indeed, to the contrary, the Defendant made affirmative statements to the Plaintiffs that he would honor the terms of their father's offer.

Approximately two to three months after their father's death, the Plaintiffs completed the improvements. At that time, however, the Defendant indicated that he would no longer adhere to the terms of the father's offer; instead, the Defendant stated that, as executor

of the estate, he would only recognize the express terms of their father's Will, which made no mention of the offer to divide the Property equally in return for the improvements.

The Plaintiffs filed statements of claim [FN7] to assert their interest in the Property on November 12, 2003-roughly seven-and-one-half months after their father's death.[FN8] The Defendant, in his capacity as Executor of his father's estate, then rejected the Plaintiffs' claims.[FN9]

FN7. *See* 12 *Del.C.* § 2104.

FN8. *See* Def.'s 1 (Plaintiffs' Statements of Claim).

FN9. *See* Pls.' 4 ("Letter of Rejection to Statement of Claim B-6," dated December 3, 2003). The Defendant rejected the claim in part because "it was a verbal agreement, there is no written document...." *Id.*

II.

The Plaintiffs rely on four alternate grounds: (1) specific performance of the contract to make a will, (2) imposition of a constructive trust on the Property, (3) imposition of a resulting trust on the Property, and (4) damages resulting from breach of the contract to make a will. Because I find the Plaintiffs' claim for specific performance succeeds on the merits, I address only their first claim: analysis of the remainder of the Plaintiffs' claims thus is unnecessary.[FN10]

FN10. I note that authorities apparently differ as to whether specific performance of a contract to make a will is a remedy available for breach of such a contract. Some case law holds that, because the testator is, by definition, deceased, the contract to make a will can no longer be specifically enforced in the "technical" sense. *See* 1 *Page on the Law of Wills,* § 10.30, at 535-37 (rev'd ed.2003) [hereinafter, *Page on Wills* ]; *Brickley v. Leonard,* 149 A. 833, 836 (Me.1930). Put simply, regardless of the seemingly boundless remedial powers some observers accord courts of equity, even the most enthusiastic use of equitable powers could

Not Reported in A.2d                                                                                                    Page 3
Not Reported in A.2d, 2005 WL 3529110 (Del.Ch.)
(Cite as: Not Reported in A.2d)

hardly command the deceased to re-write their wills in accordance with their contractual obligations.

However, "[t]he real purpose of such ... proceeding[s] is to have the heirs ... held as trustees of the property which the promisor had agreed to devise ..., and to compel them to hold the legal title thereto for the benefit of the promisee."*See* 1 *Page on Wills,* § 10.30; *Brickley,* 149 A. at 836. This appears to be underlying approach followed in Delaware, as well. *See, e.g., Equitable Trust Co. v. Hollingsworth,* 49 A.2d 325, 327 (Del.1946) ("Equity will enforce a valid contract to make a will, usually by imposing a trust upon the property involved...."); *In re Estate of Smith,* 1986 WL 4873, *4 (Del. Ch. April 24, 1986)* ("[A] court of equity may specifically enforce the contract, *through* the device of constructive trust or otherwise."(emphasis added)); *Estate of Magargal,* 1984 WL 137721, at *2 (Del. Ch. Dec. 14, 1984).

Indeed, our case law continues to refer to specific performance in crafting remedies for breach of contracts to make a will, since the relief is "in the nature of specific performance."*See* 1 *Page on Wills,* § 10.30; *see also Mazzetti v. Shepherd,* 1987 WL 15551 (Del. Ch. Aug. 11, 1987) (granting specific performance through requirement that executrix administer estate "as if [testator's] promise had been kept and a will devising the property to plaintiff were probated"), *aff'd,*545 A.2d 621 (Del.1988); *Hughes v. Frank,* 1995 WL 632018 (Del. Ch. Oct. 20, 1995) (granting specific performance while denying imposition of constructive trust and without mention of resulting trust).

### III.

The Plaintiffs contend that, by failing to alter his Will to devise the Property in equal shares to each of the three brothers, their father breached a contract to make a will-one arising from their father's offer for a unilateral contract to be accepted through performance of the requested work. The Plaintiffs seek specific performance of the contract, as remedy for its breach, in order to confer upon the Plaintiffs each a one-third share in the Property.

*3 Delaware case law recognizes the validity of contracts to make a will.[FN11] Moreover, other than the heightened elements of scrutiny described below, general principles of contract law are applied in determining the enforceability of such agreements.[FN12]The traditional requirements of offer, acceptance, and consideration, therefore, must be satisfied.[FN13]A party attempting to enforce a contract to make a will must always appreciate, however, that the law looks askance at such contracts, with probate law serving as the preferred means of devising property.[FN14]As a consequence, the party seeking enforcement of the alleged contract "must show clear and convincing evidence the parties entered into a legally binding agreement."[FN15]Thus, it is the "clear and convincing" standard that applies in determining both the existence and the terms of an alleged contract to make a will.[FN16]

FN11.*See In re Sparks,* 1981 WL 88261, at *3 (Del. Ch. Sept. 1, 1981) ("There is no dispute that contracts to make a will are recognized under Delaware law....").

FN12.*See Hughes,* 1995 WL 632018, at *3; 1 *Page on Wills,* §§ 10.1, 10.4-10.9 ("[S]uch a contract is held to be valid and enforceable, if it possesses the other elements of a valid contract."(footnotes omitted)).

FN13.*See Hughes,* 1995 WL 632018, at *3 ("The essential elements to a contract are all present: (1) a promise on the part of one party to act or refrain from acting in a given way; (2) offered to another, in a manner in which a reasonable observer would conclude the first party intended to be bound by acceptance, in exchange for; (3) some consideration flowing to the first party or to another; (4) which is unconditionally accepted by the second party in the terms of the offer, which may include (a) a verbal act of acceptance; and (b) performance of the sought-after act.").

FN14.*In re Sparks,* 1981 WL 88261, at *2 (explaining that contracts to make a will are "viewed ... with suspicion and misgivings" given that "these cases arise after death has silenced the only person who actually knows the decedent's true intent"); *In re Estate of Smith,* 1986 WL 4873, at *4;*Rash v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

_Equitable Trust Co._, 159 A. 839, 840 (Del.Super.1931) (explaining that "claims of this nature against dead men's estates, resting entirely in parol, based largely upon loose declarations ... and when the lips of the party principally interested are closed in death, require the closest and most careful scrutiny to prevent injustice being done").

FN15._Hughes_, 1995 WL 632018, at *3 (citing _Hunter v. Diocese of Wilmington_, 1987 WL 15555 (Del. Ch. Aug. 4, 1987) (defining "promise" as "a manifestation of intention to act ... in a specific way so made as to justify ... [an] understanding that a commitment has been made.")).

FN16._See In re Maull_, 1994 WL 374302, at *3 (Del. Ch. June 9, 1994) ("A court of equity will enforce a contract to make a will as long as the contract is clearly proved and there is sufficient consideration."); _Mazzetti v. Shepherd_, 1986 WL 9199, at *4 (Del. Ch. Aug. 26, 1986) (holding that plaintiff must "clearly prove the existence of the promise and he must also establish that the terms of the agreement are both certain and unambiguous"); _Equitable Trust Co._, 49 A.2d at 327 (Del.1946) ("[I]n order to be [enforceable], the contract must be clearly proved and must be certain and unambiguous in all its terms....").

The Plaintiffs also face the added burden of attempting to prove the existence and terms of an oral contract, because specific performance of oral contracts carries attendant policy concerns. Indeed, "a written will executed with the formalities [required under statute] is a document of great dignity and not to be deviated from lightly."[FN17]Therefore, "[g]enerally, under ... Delaware's Statute of Frauds, oral promises to make a will are unenforceable."[FN18]Yet, courts have not been entirely unwilling to employ principles of equity in recognizing an exception to the Statute of Frauds in this context.[FN19] It is now well-settled that "[a] court may enforce a partly performed oral contract [to make a will] upon proof of clear and convincing evidence of actual part performance,"[FN20] where the elements described above are also met. In addition, it must be established that such performance "occurred in reliance on the oral agreement, suggesting a _quid pro quo_ arrangement."[FN21]

FN17._Shepherd v. Mazzetti_, 545 A.2d 621, 623 (Del.1988).

FN18._Boush v. Hodges_, 1996 WL 652762, at *6 (Del. Ch. Nov. 6, 1996), _aff'd_705 A.2d 243 (Del.1998); _see also Quillen v. Sayers_, 482 A.2d 744, 747 (Del.1984). The statute of frauds appears at 6 _Del.C._ § 2714(a) & 2715.

FN19._See Shepherd_, 545 A.2d at 623 ("However, in law there are few absolutes without exceptions, and the statute of frauds is but one example.").

FN20._Hughes_, 1995 WL 632018, at *2;_see also Shepherd_, 545 A.2d at 623;_Boush_, 1996 WL 652762, at *6.

FN21._Boush_, 1996 WL 652762, at *6. In _Boush_, the court also noted that "the plaintiff must show that such an agreement or exchange of promises was made prior to the rendering of services."_Id_. This appears directed at the question of whether consideration exists, or whether the performance was performed under a pre-existing duty or otherwise gratuitous-certainly a concern in the familial context.

IV.

With the above concepts in mind, I now address whether the Plaintiffs have, in fact, satisfied their "heavy burden" of proof in order to obtain their requested remedy-a difficult but not insurmountable obstacle.

In this case, there exists no doubt that an agreement was reached by the deceased father and his three sons. The parties' conduct both before and after the father's death is entirely consistent with the understanding that if they made improvements to the roof, as well as the windows, door, siding, soffit, and wall, the "place" would be divided equally among the brothers at their father's death. Normally, conduct in a familial context raises questions as to whether work was performed gratuitously.[FN22]Without question, the brothers were partially motivated by a desire to see their elderly father well-housed; however, the improvements, involving substantial contributions of

Not Reported in A.2d                                                                                                          Page 5
Not Reported in A.2d, 2005 WL 3529110 (Del.Ch.)
(Cite as: Not Reported in A.2d)

money and labor, were clearly conducted pursuant to an agreement regarding equal distribution of the Property.[FN22] This is consistent with the testimony of both the Plaintiffs and the Defendant. Furthermore, the father was involved in the project, as indicated not only by trial testimony and his contributions of money, but also by his signature on the application for the building permit.[FN24] Moreover, the Defendant has conceded, in both his testimony and his letter rejecting the Plaintiffs' Statements of Claim, that an offer was made by the father to his sons with respect to the division of the Property.[FN25] Further evidence is the post-death conduct of the Plaintiffs. Indeed, the continued performance of improvements, with the knowledge and acquiescence of the Defendant, is strongly persuasive that an offer for unilateral contract, capable of acceptance by performance of the requested improvements, existed, and that the Plaintiffs' work was performed pursuant to it.

> FN22. *See, e.g.,* Restatement (Second) of Contracts, § 19, comment (a) (describing concerns arising from claims against decedent's estate for services rendered). Comment (a) provides that "[i]n such cases the line between a contractual claim based on agreement and a quasi-contractual claim based on unjust enrichment is often indistinct; on either basis a major question may be whether the services were rendered gratuitously, and the circumstances are often critical." *Id.*

> FN23. *Cf. Industrial America, Inc. v. Fulton Indus., Inc.,* 285 A .2d 412, 415 (Del.1971) ("There may be primary and secondary reasons or motives for a performance constituting manifestation of assent to an offer inviting acceptance by performance; and the 'chief reason' or the prevailing motive need not necessarily be the offer itself.").

> FN24. Payments by the father, as well as his signature on the building permit application, demonstrate a "joint act" sufficient to relieve concerns that the work was merely gratuitous. *See Shepherd v. Niles,* 125 A. 669 (Del. Ch.1924) (addressing requirements of joint act and evidence of mutual assent as proof that part performance is not gratuitous); *see also Equitable Trust,* 49 A.2d at 328 (holding that acts by plaintiff

"suggest[ed] something more than mere gifts").

> FN25. In his testimony, the Defendant indicated that the reasoning underlying his rejection, as executor, of the Plaintiffs' claims was that no agreement had been entered into because it was merely verbal and the parties had not shaken hands on it. Indeed, the Defendant, conceded that the offer had been made by their father-he merely disputes its characterization as an agreement on the grounds that it was oral and the parties had not shaken hands on it. *See also* Pls.' Ex. 4 (Def.'s Letter of Rejection of Claims: "Furthermore [the existence of the offer is] totally irrelevant because it was a verbal agreement, there is no written document stating this said proposition...."). Of course, merely because the agreement was in part oral does not necessarily preclude its enforcement.

**\*4** Because I therefore am persuaded that clear and convincing evidence demonstrates that an offer for unilateral contract was made to the sons by their father, I must now determine the terms of that offer. Testimony at trial indicated that, although a new roof was the primary concern of the father, discussions between the brothers and their father at the outset of construction eventually culminated in an agreement to install not only the roof but also siding, windows, soffit, a wall, and door. The father wanted to bring his home up to a standard consistent with neighboring properties. While the Defendant testified that the scope of improvements also included repairs to the inside of the father's home, no corroboration was offered for such an expansion of the scope of the agreed-upon work. To the contrary, the behavior of the parties, continuing improvements until the exterior of the home was modernized, is fully consistent with the testimony of both the Plaintiffs and the Defendants. While I also acknowledge that the Plaintiffs testified that their father had requested only installation of a roof in return for his devise of the Property to the brothers in equal shares, the totality of the evidence presented indicates that, during the course of discussions prior to the commencement of work, the scope of requested work ultimately included the other improvements to the exterior mentioned above.[FN26] Indeed, the Defendant's behavior after the father's death, permitting Plaintiffs to continue work on the house, corroborates not only

Not Reported in A.2d                                                                                                  Page 6
Not Reported in A.2d, 2005 WL 3529110 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

the existence of an oral agreement, but also the terms set out above.

> FN26. Also at trial, the Defendant unpersuasively testified to his belief that his father was only referring to his trailer, and not the land on which it stands, when he said "the place." It was the Defendant's contention that, when the father said, "fix the place up and I'll give ya's the place," he meant only the home (*i.e.*, the improvements). In fact, later testimony by the Defendant regarding whom he believed owned the trailer contradicted these statements. I find "the place," therefore, to have referred to the entire Property.

The only remaining element that must be found to exist is actual part performance of the requested work. At trial, the Plaintiffs presented clear and convincing evidence establishing that they had completed the improvements requested by their father. Installation of the new roof took place in the month following the initial discussions of the arrangement in August 2002. Work continued during the remaining few months of the father's life, with the installation of replacement windows, and was completed approximately two to three months following his death in late March 2003. By the time work was completed, siding, additional windows, a door, wall, and soffit had also been installed on the home, as agreed upon.[FN27] This work, in addition, satisfies the legal requirement of consideration;[FN28] and its scope, timing, and expense indicates it was performed according to a *quid pro quo* arrangement (thereby mitigating any concern the work may have been gratuitous).

> FN27. *See* Pls.' Ex. 9. *Cf. Quillen,* 482 A.2d at 747 ("Part performance may be deemed to take a contract out of the provision of the statute of frauds on the theory that acts of performance, even if incomplete, constitute substantial evidence that a contract actually exists.").

> FN28. While the value of the Plaintiffs' work is not commensurate with the value of the interests in the Property they will receive if they succeed in their claims, the relative amount of consideration tendered is of no concern here-only its legal adequacy.

Therefore, I find the Plaintiffs to have met their burden of showing an enforceable oral contract to make a Will, the terms of which were that if the brothers performed the improvements to the exterior of their father's house described above, he would change his Will to devise the Property in equal shares to each of them. As I explained above, an oral contract to make a will necessarily involves several elements of proof with which the law displays understandable discomfort. As a result, the evidentiary requirements are substantially heightened in order to avoid the potential for fraud on the court, as well as frustration of testator intent. Nevertheless, contracts to make a will are a valid (though disfavored) means of transferring a decedent's property. As a consequence, where the contract has been proved to the extent sufficient to relieve the court of its policy concerns, its enforcement must follow, provided no other legal impediments exist.

V.

**\*5** I note that contracts, such as the one presented here, implicate special concerns for the court in addition to those listed above. Foremost among them is the potential to obstruct the prompt settlement of decedents' estates-a clear policy goal of our statutory law. Nevertheless, where such contracts survive intense scrutiny by the court and are otherwise enforceable, it becomes incumbent on the court to give effect to the terms of contract-a remedy foreseeable at the time of contract. While such concerns might alter the balance of the equities under different facts, they constitute no impediment here.[FN29]

> FN29. This concern is substantially alleviated, however, by the implicit requirement that performance occur within a reasonable time, if not otherwise stated. *See* Part VI, below.

It is reassuring that the testimony of the parties, as well as the exhibits submitted, not only corroborates, but virtually mandates the finding of the existence and terms of the contract. That the Defendant, in both his testimony and an exhibit he authored, did not deny the existence of the offer-and quibbled only slightly over its terms, but to the Plaintiffs' advantage-engenders confidence in this result. The parties' conduct during their father's life is consistent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 7
Not Reported in A.2d, 2005 WL 3529110 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

with the finding; and, most importantly, the parties' conduct in the months following their father's death is consistent with the terms of the offer. The Defendant acknowledges that he observed the Plaintiffs continuing their work while he was on his way to go fishing and was aware they were performing under their view of their father's offer. Significantly, the Defendant did nothing at that time to disabuse the Plaintiffs of their belief that, as executor, he would honor the contract, too; indeed, credible testimony was presented that the parties had even discussed the project among themselves following their father's death, agreeing that it would continue in accordance with the terms of the offer. Taken together, these facts clearly satisfy the requirements for demonstrating an enforceable oral contract to make a will.

## VI.

The Plaintiffs, therefore, have satisfied their burden with respect to the preliminary questions permitting enforcement of this oral contract to make a will. In order to recover under specific performance, however, the Plaintiffs must have complied with the requirements for filing of claims (or must demonstrate applicability of an exception to such requirements). The primary question to be answered, then, is whether the Plaintiffs' claim is barred under the Non-Claim Statute. Resolution of this issue will ultimately depend on when the Plaintiffs' claim arose.

In his defense, the Defendant contends that the Plaintiffs ran afoul of Delaware's Non-Claim Statute. The Defendant relies on the fact that the Plaintiffs filed their statements of claim on November 12, 2003-roughly seven-and-one-half months after their father's death. Under 12 Del.C. § 2102, claimants must file a statement of claim within certain statutorily provided time limits. If the claim arose before death, the claim is barred if the statement of claim is not filed within eight months of death; [FN30] if the claim arose at or after death, the claim is barred if proof is not filed within six months after the claim arose.[FN31]

FN30.12 Del.C. § 2102(a) ("All claims against a decedent's estate which arose before the death of the decedent ..., if not barred earlier by other statute of limitations, are barred against the estate, the personal representative and the heirs and devisees of the decedent unless presented as provided in

§ 2104 of this title within 8 months of the decedent's death....").

FN31.12 Del.C. § 2102(b) ("All claims against a decedent's estate which arise at or after the death of the decedent ..., unless presented in accordance with § 2104 of this title, are barred against the estate, the personal representatives and the heirs and devisees of the decedent, as follows: (a) A claim based on a contract with the personal representative, within 6 months after performance by the personal representative is due; (b) Any other claim, within 6 months after it arises.").
This statute is intended to effectuate public policy favoring prompt settlement of estates. See, e.g., Estate of Stetter, 1996 WL 162256, at *3 (Del. Ch. Mar. 1, 1996) ("There is a strong public policy interest in settling estates in a timely fashion. That is why there is a definite time period during which challenges may be filed and also why there are definite limitations on the period during which claims may be made against an estate.").

**\*6** Typically, a claim for breach of a contract to make a will arises at the death of the party offering to make the will. The reasoning underlying this rule is persuasive. A testator may, at least theoretically, amend his will at any time prior to his death. Therefore, even though the other party may have fully performed, breach is generally deemed not to occur until the will takes legal effect on the testator's death, at which point it is certain that further modification of the will cannot occur.[FN32]Indeed, this was the conclusion of Justice Holmes, who, while serving as Chief Justice of the Supreme Court of Massachusetts, wrote that generally in actions for breach of a contract to make a will, the "cause of action [does] not arise until the death of the [testator] without having [complied with the terms of the contract], because only then was there a breach of contract...."[FN33]

FN32. This letter opinion does not address the potential for anticipatory breach by the testator.

FN33.Morrissey v. Morrissey, 62 N.E. 972, 973 (Mass.1902) (Holmes, C.J.); see also Estate of Stetter, 1996 WL 162256.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 8
Not Reported in A.2d, 2005 WL 3529110 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

In the instance of a unilateral contract, the general rule described above applies with equal force where performance is complete by, or at the time of, death of the testator.[FN34]The general rule, however, does not apply without exception. Were the general rule applicable to the present facts, the Plaintiffs' cause of action for breach would have arisen at the death of their father, and the Plaintiffs' date of filing of the proof of claim would thereby have exceeded the six-month time limit established by 12 Del.C. § 2102(b).[FN35]

> FN34.See, e.g., Estate of Stetter, 1996 WL 162256. In Estate of Stetter, the court apparently viewed the plaintiff's contract to make a will in exchange for lifetime personal services under the lens of bilateral contract principles. Only a slight variation in the facts alleged, however, could have easily re-characterized the agreement as one in the unilateral mode-though the distinction would not have affected the outcome of the case (i.e., the claim under contract for personal services necessarily arose at the testator's death). Therein lies the distinction between the facts of the present case and the more typical case of a contract to make a will involving performance of lifetime services for the testator.

> FN35. Although the father was ill before his death, the evidence is insufficient to determine that this absolutely precluded the father from revising his Will. Therefore, any theoretical potential argument that the claim arose prior to the father death, which would implicate 12 Del.C. § 2102(a)'s eight-month period of limitations, is unavailing.
> I also note the analysis employed in Tunnell v. Kreer, 1978 WL 22458 (Del. Ch. June 15, 1978). In Tunnell, the Court ruled that a claim for quantum meruit did not arise until "the date letters testamentary were granted and the will admitted to probate."Id. at *2. On similar facts as these, the plaintiff in that case had brought her claim after it was discovered that the decedent had failed to amend her will to provide for the plaintiff, as promised, in return for certain services rendered to the decedent. The Court ruled that the six months for filing of a statement of claim did not begin to run at the date of

death, because "it was not the death of the testatrix which revealed the breach of the alleged understanding. Rather, it was the revelation derived from the formal probate of [the will] which made no provision for plaintiff."Id. Thus, the Court applied a type of "discovery rule" for the running of the non-claim statute. That, however, may not be a favored approach. See, e.g., Estate of Stetter, 1996 WL 162256;Shuttleworth v. Abramo, 1991 WL 160260, at *6 (Del. Ch. Aug. 15, 1991). In any event, the Plaintiffs tendered their statements of claim more than six months after the Will was probated.

At trial, the Plaintiffs pressed their theory that a unilateral contract arose by the Plaintiffs' successful completion of the work requested by their father. Therefore, I employ the principles of unilateral contract to frame my analysis of their claim.[FN36]Under the Restatement (Second) of Contracts, an offer may be accepted, unless the offeror provides otherwise, by performance of the act requested.[FN37]In such an instance, beginning the requested performance is deemed **acceptance** of the **offer** and, provided **consideration** exists, a contract is formed. Where an **offer** may only be **accepted** through performance (the terms or circumstances indicating a return promise would be insufficient),[FN38] then only completed performance of the requested act will be deemed acceptance such that a contract arises.[FN39]In the latter instance, however, commencement of performance under the offer by the offeree creates an "option contract" binding the offeror such that the offer must remain available for a reasonable period, unless otherwise specified, for the offeree to accept through performance of the requested act.[FN40]Significantly, in that case, the offeror has no duty to perform under his offer until completion of the requested act-acceptance and full performance thereby occurring simultaneously.[FN41]In other words, the offeror has no reciprocal, binding duty to perform until the requested work is finished.[FN42]

> FN36. I acknowledge the reluctance of the drafters of the Restatement (Second) of Contracts to employ the term "unilateral" (contrary to the drafters' method in the Restatement (First)), but use of the term remains recognized and is efficient for my analysis here. See2 Samuel Williston & Richard A. Lord, A Treatise on the Law of

*Contracts* § 6:2 (4th ed.1991) [hereinafter *Williston on Contracts* ]; *In re Estate of Hunter,* 1994 WL 273947, at *5 (Del. Ch. June 10, 1994)* (analyzing claim "in terms of bilateral and unilateral contracts").

FN37. *See* Restatement (Second) of Contracts, §§ 30 ("Form of Acceptance Invited"), 62 ("Effect of Performance by Offeree Where Offer Invites Either Performance or Promise"), 50 ("Acceptance of Offer Defined, Acceptance by Performance ...").

FN38. This is referred to as an "offer for a unilateral contract." *See id.* at § 45, comment (a). The Restatement (Second) contains the presumption that an offer may be accepted through either a return promise or performance. *See id.* at § 32 ("Invitation of Promise or Performance"). This is contrary to the presumption of the Restatement (First), which provided that an invitation of acceptance by return promise was to be the default presumption. *See* 2 *Williston on Contracts,* § 6:26.

Nevertheless, the offeror is the "master of his offer" and may specify that acceptance may only occur through performance. *See* Restatement (Second) § 60 ("Acceptance of Offer Which States ... Manner of Acceptance"), 58 ("Necessity of Acceptance Complying with Terms of Offer"). Moreover, the language and circumstances of the offer are to be considered in determining the manner of acceptance required. *See id.* at § 30(2). The facts of this case, set forth above, including the Plaintiffs' reliance on a theory of unilateral contract, are at odds with the normal assumption that offers not providing otherwise may be accepted either by return promise or by the commencement of performance, at the offeree's election. *See id.* at § 32. The language of, and circumstances surrounding, the offer clearly required performance in order for acceptance to occur, and thereby create a binding contract. This conclusion is supported by comment (b) to § 32, which provides that "[l]anguage or circumstances sometimes make it clear" that performance is the required means of acceptance. Indeed, the comment lists

"[n]on-commercial arrangements among relatives and friends" as an example of circumstances in which such a presumption may arise. *See also id.* at § 45, comment (a). The father's offer for unilateral contract therefore invited acceptance only through completed performance of the requested work, and it was understood that the father's duty to change his will would not arise until completion of such work.

FN39. *See* 2 *Williston on Contracts,* § 6:31 ("[I]f the offeror clearly seeks ... a performance, the offeree may accept only by complying with the terms of the offer."). This creation of contract, of course, assumes that consideration exists-normally, the performance constitutes consideration, as well.

I note that a much earlier Delaware decision, *Abbott v. Stephany Poultry Co.,* 62 A.2d 243 (Del.Super.1948), arguably does not recognize the exception to the general rule regarding the time of acceptance and contract explained in the text above. The court in *Stephany Poultry* held that the plaintiff, "by partly performing [the defendant's] open offer ... converted it from a unilateral into a binding bilateral agreement under which [the defendant] is liable...." *Id.* at 248. This result was reached in derogation of, and as a reaction to, strict application of the then-traditional "principal of law peculiar to unilateral contracts-that is, to treat them as offers calling for completed acts and, so long as the required act remains but partially performed, then subject to the right of cancellation by the offeror ...," application of which the court believed would cause an inequitable result. *Id.* at 246; *see also* 1 *Williston on Contracts,* § 5:13. This is not the modern view, however, since finding the beginning of performance to create an "option contract," as described in the text above, alleviates the concerns over potential injustice referenced by the court in *Stephany Poultry* without attendant doctrinal complications. *See id. Cf. Marvel v. Dannemann,* 490 F.Supp. 170, 175 (D.Del.1980) (acknowledging rule of Restatement (Second), but not resolving precisely this issue).

Not Reported in A.2d                                                                                                                Page 10
Not Reported in A.2d, 2005 WL 3529110 (Del.Ch.)
(Cite as: Not Reported in A.2d)

FN40. Restatement (Second) of Contracts at § 45 ("Option Contract Created By Part Performance Or Tender"). Section 45 provides:
(1) Where an offer invites an offeree to accept by rendering a performance and does not invite a promissory acceptance, an option contract is created when the offeree tenders or begins the invited performance or tenders a beginning of it.
(2) The offeror's duty of performance under any option contract so created is conditional on completion or tender of the invited performance in accordance with the terms of the offer.
*See also id.* at § 41 ("Lapse of Time").

FN41. Restatement (Second) of Contracts at § 45. Comment (e) states that "[t]he offeror alone is bound [by part performance or tender by the offeree], but his duty of performance is conditional on completion of the offeree's performance."*Id.*

FN42.*But see id.* at § 45, comment (e) ("The offeror alone is bound, but his duty of performance is conditional on completion of the offeree's performance.... But the condition may be excused, for example, if the offeror prevents performance, waives it, or repudiates."). The Defendant offered testimony of Joan Clark that the father had changed his mind about modifying his Will. The testimony, however, was uncorroborated. Furthermore, even if accepted as true, it fails to demonstrate an intent to repudiate the oral agreement (assuming, for these purposes, repudiation was a possibility).

Furthermore, this case presents the unusual circumstance of when power of acceptance in the offeree is not terminated as a necessary consequence of the death of the offeror, as would be the case otherwise.[FN43]The Restatement (Second) provides that where an offeree has begun performance of the requested act prior to the death of the offeror, power of acceptance will not terminate in the offeree. On the contrary, he may continue to perform even after the death of the offeror, with (post-death) completion of the requested act constituting valid acceptance of the offer-thereby causing, for the offeree, an enforceable claim in contract to arise.[FN44]This rule is

not without exceptions, however: work performed prior to the death of the offeror must amount to more than "mere preparations" to perform,[FN45] and the requested act(s) must ultimately be completed within a reasonable time.[FN46] Nevertheless, in sum, performance begun during the lifetime of the offeror-being more than "mere preparations" to perform-and completed within a reasonable time will create a valid claim on completion of the requested work. Such is the case here.

FN43.*See id.* at § 48 ("Death Or Incapacity Of Offeror Or Offeree"). Were the exception described in the text that follows not available, then, since acceptance of the father's offer for unilateral contract could occur only on completion of the work requested, the Plaintiffs' power to accept their father's offer would have terminated with his death and no contract would have been formed.

FN44.*See id.* at § 37 ("Termination Of Power Of Acceptance Under Option Contract").

FN45.*See id.* at § 45, comment (f) ("What is begun or tendered must be part of the actual performance invited in order to preclude revocation under this Section. Beginning preparations, though they may be essential to carrying out the contract or to accepting the offer, is not enough.").

FN46.*See id.* at § 41. It should be noted that the "mere preparations" and "reasonable time" exceptions described here apply not just to the narrow case of death of the offeror, but to the more general case of the special "option contract" described in the previous passages, as well.

**\*7** The father requested that his sons make certain improvements to his home and, if such work was completed, he promised to modify his Will to devise the Property to each of the sons in equal shares. The sons did, in fact, perform a significant portion of the requested work within a month of the initial offer. Improvements to the home continued until roughly three months after the father's death, at which time the work was completed according to the terms of the agreement. Furthermore, performance of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                Page 11
Not Reported in A.2d, 2005 WL 3529110 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

requested act was accomplished within a reasonable time-testimony at trial made it clear that the father's death coming so soon on the heels of the August 2002 offer was unexpected, at least as of that date. Indeed, were it not for the father's untimely death soon after commencement of the work, the doctrinal implications of this case would be far less difficult to parse-either the duties arising under the contract would presumably have been performed by both the sons and their father, or, in the alternative, the case would involve the typical analysis of a claim arising at death.

I stress that the circumstances of this case compel an equitable result that might not frequently obtain otherwise. The existence of an option in the offeree, described above, to complete the requested performance, though overriding termination of the offeree's power of acceptance that would otherwise occur on the death of the offeror, does not override such termination for the failure of any "condition of acceptance" under the terms of such offer. [FN47]

> FN47. *Compare id.* at § 36 *with id.* at § 37; *see also* § 48, comment (d). Comment (b) to § 36 provides that "[a] condition of acceptance, like a condition, may be express or implied in fact or constructive."

In the mill run of cases, prevailing on an option to perform surviving death of the offeror, in the context of contracts to make a will, would likely not be an easy challenge for a plaintiff. On the contrary, it may be that courts, finding themselves confronted with contracts to make a will arising out of the familial, non-commercial setting, would find, as an implied condition of acceptance, that performance must be completed during the life of the offeror in order that the offeror may enjoy the fruits of the bargain. Indeed, the rationale underlying the option to accept an offer for unilateral contract may be more apparent when applied in a commercial context. Yet, evidence at trial indicated that the father's intent in making his offer was not merely to obtain certain improvements to his home. For example, the family had experienced strained relations, and it was apparently the father's hope that this family project would heal wounds between not only father and son, but among the brothers, as well. Although this litigation is not indicative of success in that regard, such an intent in the father at the time of offer makes implication of a condition of acceptance that performance be complete by the father's death inappropriate.

Equally significant, however, is the father's passing soon after the making of the offer for unilateral contract. Had his death in so short a span been foreseen, then implication of the additional condition of acceptance would perhaps have been warranted. Because the brothers performed with reasonable diligence under the circumstances, however, it would be inequitable to deny them the option where a significant portion of the requested work, involving substantial outlays of time and money, had been accomplished before their father's death and the remainder of the work was completed shortly thereafter. Therefore, under these facts, the Plaintiffs may take advantage of an option arising to complete performance under the offer for unilateral contract, thereby permitting them to impose a duty on the Defendant [FN48] to perform, even and necessarily after the father's death.

> FN48. This obligation reaches the Defendant in both his individual capacity and as Executor. As successor to his father's interest in the Property, he acquired it, burdened as it was, by the commitments of his father. Although one can conceive of instances where the separate capacities might give rise to conceptual difficulties, those possibilities are not present here because the Defendant was party to the agreement under which the work was to be performed and because his post-death conduct recognized and may fairly be deemed to have ratified the agreement, one that he may not now disclaim.

**\*8** Therefore, only on completion of the work did the obligation of the individual "standing in the father's shoes" arise to perform according to the terms of the contract-i.e., only at that time could the Plaintiffs' claim be fairly said to have arisen, thus commencing the running of the six month time limit under the Non-Claim Statute. In this case, the father died on March 27, 2003. The work was finished two or three months after their father's death. The Plaintiffs filed statements of claim on November 12, 2003, which, under even the most conservative calculation, was within the six-month window allowed by 12 *Del.C.* § 2102(b)(2). [FN49] Therefore, the Plaintiffs' claim for breach of contract is not time barred.

> FN49. Though the non-claim statute is a statute of repose intended to provide

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2005 WL 3529110 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

certainty in the administration of estates, its terms dictate this result.

### VII.

Accordingly, the Plaintiffs have prevailed on Count I of their Complaint. The Plaintiffs are entitled to specific performance of the terms of the contract, as outlined above. The Defendant is directed to convey title to the Property in fee simple to each of the Plaintiffs and the Defendant in equal shares as tenants in common.

IT IS SO ORDERED.

Del.Ch.,2005.
Eaton v. Eaton
Not Reported in A.2d, 2005 WL 3529110 (Del.Ch.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2



815 A.2d 350                                                                                          Page 1
815 A.2d 350, 2003 WL 168455 (Del.Supr.)
**(Cite as: 815 A.2d 350, 815 A.2d 350 (Table))**

**H**Wood v. State
Del.Supr.,2003.
(The decision of the Court is referenced in the Atlantic Reporter in a 'Table of Decisions Without Published Opinions.')
Supreme Court of Delaware.
Elton WOOD, Claimant Below, Appellant,
v.
STATE of Delaware, Employer Below, Appellee.
**No. 307,2002.**

Submitted Nov. 13, 2002.
Decided Jan. 23, 2003.

State employee's widow appealed decision of the Industrial Accident Board dismissing her petition for workers' compensation survivor benefits. The Superior Court, Kent County, affirmed, and widow appealed. The Supreme Court held that exchange between widow and State's counsel at earlier commutation hearing provided substantial evidence that parties understood that commutation of death benefits was being offered and accepted in exchange for full settlement of benefits named in agreement.

Affirmed.
West Headnotes
**[1] Workers' Compensation 413 ☞1006**

413 Workers' Compensation
   413X Payment of Compensation and Compliance with Award
      413X(B) Periodical or Commuted Payments
      413X(B)2 Agreements for Commutation of Payments
         413k1006 k. In General. Most Cited Cases
Although state employee's widow signed commutation agreement while acting for employee and not individually, exchange between her and State's counsel at the commutation hearing provided substantial evidence that parties understood that commutation of survivor benefits, which widow sought after employee's death, was being offered and accepted in exchange for full settlement of workers' compensation benefits named in agreement.

**[2] Workers' Compensation 413 ☞2003**

413 Workers' Compensation
   413XVII Increase, Diminution, Termination, Reinstatement, or Additional Award of Disability Compensation
      413XVII(A) Awards Generally
         413XVII(A)1 Adjustment or Termination of Compensation
            413k2002 Necessity and Sufficiency of Grounds
               413k2003 k. In General. Most Cited Cases
Workers' compensation claimant, who was not requesting benefits that had been excluded in earlier commutation agreement, failed to establish that her circumstances changed, as was required to permit her to petition for and receive additional benefits, notwithstanding commutation agreement.

Court Below: Superior Court of the State of Delaware in and for Kent County, C.A. No. 01A-07-011.

Before VEASEY, Chief Justice, WALSH and STEELE, Justices.

*ORDER*

*1 This 23rd day of January 2003, on consideration of the briefs of the parties, it appears to the Court that:

(1) Alice Wood, widow of Claimant-Appellant Elton Wood appeals from the decision and Order of the Superior Court affirming an Order of the Industrial Accident Board. The Board conducted a hearing at the request of the Employer/Appellee, the State of Delaware, seeking dismissal of her petition for death benefits. The Board granted the State's request and dismissed the petition because the parties previously commuted the death benefits by way of Stipulation and Order of Commutation, I.A.B. No. 483858, dated March 18, 1999. Alice Wood filed an appeal from the Board's decision to the Superior Court on July 31, 2001. By order Dated May 24, 2002, the Superior Court affirmed the decision of the Board.

(2) On November 17, 1971, Elton Wood sustained an injury while working as a prison guard at the Stevenson House in Milford, Delaware. While he was on duty, an inmate struck him on the head with a pool

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

815 A.2d 350                                                                                                          Page 2
815 A.2d 350, 2003 WL 168455 (Del.Supr.)
**(Cite as: 815 A.2d 350, 815 A.2d 350 (Table))**

cue and severely beat him. As a result, Mr. Wood sustained a <u>brain injury</u> that caused total disability. His spouse, Alice, cared for him during his initial incapacity. Mr. Wood entered a nursing home during the final years of his life because his wife could no longer provide the necessary care.

The State paid Mr. Wood total disability benefits from the date of his injury until his death on February 24, 2001. In addition, the State compensated Mr. Wood for a 100% permanent impairment to the brain and a 26% permanent impairment to his right ear. Mr. Wood also received disfigurement benefits for a scar on top of his head.

In February 1999, Alice Wood acting under a power of attorney granted earlier by Elton, entered into a commutation agreement with the State. The agreement stipulated that the State would continue to pay total disability and all causally related medical expenses, including nursing home charges, until Elton's death. The State and Alice, acting for Elton, also agreed to commute certain benefits, including partial disability benefits, permanent impairment benefits, and allegedly, death benefits, related to the 1971 injury. Alice Wood testified in support of the commutation. The following conversation took place between the State's counsel and Wood:
Counsel: Now there is one other benefit that I put in the stipulation and I negotiated with [counsel for the claimant] just so it's clear on the record. You are also commuting any kind of death benefits, do you understand that?
Mrs. Wood: Yes.
Counsel: In other words if Mr. Wood, when Mr. Wood eventually passes away you would not come back and file a petition for death benefits as a widow.
Mrs. Wood: No.
Counsel: Is that your understanding?
Mrs. Wood: I understand that.
Counsel: Alright. And you are satisfied with this arrangement?
Mrs. Wood: Yes I'm satisfied with that.

(3) Alice Wood now asserts she is entitled to survivor's benefits. First, she argues that, through her appointment as attorney for her husband's affairs, she could only commute his benefits and not the benefits of a third party (i.e., her benefits as widow). Second, Alice argues that commutation of benefits does not foreclose the right to petition for and receive additional benefits in the future. We conclude that Board correctly dismissed Alice Wood's petition for

survivor's benefits pursuant to <u>19 Del. C. § 2330</u>.

*2[1] (4) With respect to her first argument, we find that Alice overtly manifested at the 1999 commutation hearing that the agreement commuted her death benefits from her husband's injury. "The formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."[FN1]"The manifestation of assent may be made wholly or partly by written or spoken words or by other acts or by failure to act."[FN2]While it is correct that Alice signed the commutation agreement while acting for Elton and not individually, the exchange between her and the State's counsel at the commutation hearing provides substantial evidence that the parties understood that commutation of death benefits was being offered and accepted in exchange for full settlement of the named benefits. Counsel specifically directed questions to Alice addressing her potential as a future claimant. This is not a case where the claimant agreed to waive death benefits without the death benefits beneficiary's permission or consent. Here, the potential beneficiary/claimant dealt directly with the employer and specifically waived her right to benefits in return for the benefits flowing from the commutation. Accordingly, this case is distinguishable from the cases cited by Alice.[FN3]

FN1.Restatement 2d of Contracts, § 18.

FN2.*Id.* at § 19.

FN3.*Adams v. T.G. Adams & Son, Inc.,* Del. I.A.B., Hearing No. 782582 (March 30, 2001) (Order); *Molitor v. Wilder,* 195 A.2d 549 (Del.1963).

[2] (5) Alice correctly asserts that commutation of benefits is not a foreclosure of the right to petition for and receive additional benefits under certain, specific situations.[FN4]However, none of those situations apply here. Alice's circumstances did not change nor is she requesting benefits not included in the earlier commutation agreement. Accordingly, Alice Wood's argument is without merit.

FN4.*See Molitor v. Wilder,* 195 A.2d 549 (Del.1963).

NOW, THEREFORE, IT IS ORDERED that the decision of the Superior Court be, and hereby is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

815 A.2d 350                                                                            Page 3
815 A.2d 350, 2003 WL 168455 (Del.Supr.)
**(Cite as: 815 A.2d 350, 815 A.2d 350 (Table))**


AFFIRMED.

Del.Supr.,2003.
Wood v. State
815 A.2d 350, 2003 WL 168455 (Del.Supr.)

END OF DOCUMENT

# EXHIBIT 3

# BUSINESS LAW IN ZIMBABWE

SECOND EDITION

R H CHRISTIE

QC MA LLB (CanTab) FCIArb FAArb
President Association of Arbitrators (Southern Africa)
Vice-President Pan-African Council LCIA

L.A. COUNTY

AUG 1 6 2007

LAW LIBRARY



JUTA & CO, LTD
1998

## BUSINESS LAW IN ZIMBABWE

understand that their minds had met, then there was a contract even if, in truth, their minds did not meet. The doctrine stems from Blackburn J's words[1] adopted in Zimbabwean law in *Diamond v Kernick* 1947 (3) SA 69 (A) 83; *Levy* above at 562A; *Springvale* above at 148-9, 469-70:

'If, whatever a man's real intention may be, he so conducts himself that a reasonable man would believe that he was assenting to the terms proposed by the other party, and that other party upon that belief enters into the contract with him, the man thus conducting himself would be equally bound as if he had intended to agree to the other party's terms.'

An equally authoritative statement of the doctrine is by Innes J in *Pieters & Co v Salomon* 1911 AD 121 137 (and see *Springvale* above at 147-8, 469; *Mtoko Heavy Haulage (Pvt) Ltd v Sykes & another* 1975 (2) RLR 132; *Musgrove and Watson (Rhodesia) (Pvt) Ltd v Rotta (1)* 1978 RLR 129 134, 1978 (2) SA 918 922):

'When a man makes an offer in plain and unambiguous language, which is understood in its ordinary sense by the person to whom it is addressed, and accepted by him *bona fide* in that sense, then there is a concluded contract. Any unexpressed reservations hidden in the mind of the promisor are in such circumstances irrelevant. He cannot be heard to say that he meant his promise to be subject to a condition which he omitted to mention, and of which the other party was unaware.'

It will be observed from these two classical statements of the doctrine of quasi-mutual assent that its object is:

'to establish a positive sanction for the expectation of good faith which has grown up in the mutual dealings of men of average rightmindedness'.[2]

Thus nobody can successfully invoke the doctrine unless he is in the position of the reasonable man, relying on words or actions of the other party which he has understood in their ordinary sense. To assist such a person without being unfair to the other party the courts have worked out three matters of detail. First, the party seeking to invoke the doctrine must be treated as if he had been aware of all relevant facts of which a reasonable man in his position ought to have been aware.[3] Second, no fault or blame need be attributable to the other party beyond 'blame in the sense that by his conduct he has led the [party seeking to invoke the doctrine], as a reasonable man, to believe that he was binding himself'.[4] Third, the party seeking to invoke the doctrine need not prove, as he would have to prove if he were relying on the estoppel, that he has acted to his prejudice in reliance on the other party's words or actions: *Springvale Ltd v Edwards* 1968 (2) RLR 141 (A) 149, 1969 (1) SA 464 470.

1 In *Smith v Hughes* (1871) LR 6 QB 597 607, restating the rule in *Freeman v Cooke* (1848) 2 Ex 654 663.
2 Pollock *Contract* 1.
3 *Van Ryn Wine and Spirit Co v Chandos Bar* 1928 TPD 417 423.
4 *George v Fairmead (Pty) Ltd* 1958 (2) SA 465 (A) 471. And see (1984) 101 *SALJ* 16.

## CONTRACT

### AND ACCEPTANCE — OFFER

Experience has shown that almost all contracts are made by the acceptance by one party of the other party's offer,[5] so the most common and convenient method of investigating whether an agreement, either true or on quasi-mutual assent, has been reached is to look for an offer and an acceptance of that offer.

An offer, in the specialized sense in which that word has come to be used in the law of contract, is identifiable as being accompanied by animus contrahendi, the intention of putting the conclusion of the negotiations out of one's further power and enabling the offeree, by mere acceptance, to create the contract.[6] Thus an 'offer' made in jest or anger or in other circumstances from which it is clear that no animus contrahendi is present cannot be accepted so as to make a contract. The circumstances must be gathered from the wording of the possible offer if they are sufficiently clear,[7] but if they are not, evidence of the surrounding circumstances known to the offeror at the time (and therefore possibly affecting his intentions) may be given.[8]

In the course of negotiations leading towards a contract, a variety of statements may be made which on analysis will be seen not to be offers because they lack animus contrahendi. Such statements include invitations to negotiate,[9] requests for an offer,[10] statements of information,[11] statements of intention[12] and proposals for partial, incomplete or provisional agreement, typically when the constituent parts of a complex contract are discussed as separate issues in the course of negotiations. In such a case agreement on one issue would not be intended to be singled out and treated as an enforceable contract independently of the negotiations as a whole.[*] But there is nothing to prevent the parties adopting a different approach and offering a binding contract combined with an invitation to negotiate on additional terms, as in *Belmore v Minister of Finance* 1948 (2) SA 852 (SR) and *Associated Printing and Packaging (Pvt) Ltd v Lavin* S-7-96. Nor is there anything to prevent the parties entering into a pactum de contrahendo defining the terms by which they will be bound if they contract with each other (eg the discount a seller will allow to a buyer). It will not normally be implied that the parties thereby oblige themselves to enter into any contracts with each other: *Maceys Stores Ltd v Tangonda Tea Co Ltd* 1983 (1) ZLR 255 (S).

5 See s 44 below for contracts formed without identifiable offer and acceptance.
6 *Saambou-Nasionale Bouvereniging v Friedman* 1979 (3) SA 978 (A) 991G adopting Grotius 3 1 10.
7 *Blakie–Johnstone v Holliman* 1971 (4) SA 108 (D) 112H 113F.
8 *Bird v Summerville* 1960 (4) SA 395 (N) 408-9.
9 *Crawley v Rex* 1909 TS 667 680.
10 *Efroiken v Simon* 1921 CPD 367; *Bird v Summerville* above at 401 D.
11 *Harvey v Facey* [1893] AC 552 (PC); *Société Commerciale de Moteurs v Peughold (Pty) Ltd* 1980 (1) SA 109 (T) 111 D.
12 *Reed v Venter* 1903 TS 221; *Connat Brown & Co v Jacobson* 1915 OPD 42.
* *Thompson v Hamburg* 1907 TS 629 632; *Pinar v Northern Cape Livestock Co-op Ltd* 1977 (4) SA 842 (A) 850D.

The effect of signing a written contract and handing it to the other party for signature will depend on the circumstances. If the document is grammatically complete this action (unless accompanied by words or actions indicating a contrary intention) must be interpreted as an offer, as the signatory has thereby put the conclusion of the negotiations out of his further power. But if the document contains blanks the proper interpretation of the signatory's actions must be gathered from the wording of the document and the nature of the blanks and, if these give no clear answer, from the evidence of the surrounding circumstances. See Christie in 1973 *RLJ* 12, commenting on *National and Grindlays Bank Ltd v Yelverton* 1972 (1) RLR 364, 1972 (4) SA 114. Thus a display of goods may be held to be binding himself to whatever proportion of the purchase price as a deposit and whatever time for payment the offeree might insert in the blank spaces,[14] while in different circumstances the nature of the blanks has been held to indicate that they were to be the subject of further negotiation.[15] The common practice of handing over a form of transfer of shares signed in blank as a pledge or for some similar purpose is clearly an offer acceptable in whatever circumstances are specified at the time of handing over.[16]

## ADVERTISEMENTS, CATALOGUES, PRICE TICKETS

An offer may be made by advertisement or other means of mass communication, becoming a contract with anyone who accepts in conformity with the terms of the offer.[17] The onus is on a party seeking to take advantage of such an advertisement to satisfy the court that, properly interpreted, it amounts to an offer.[18] But an advertiser should not make the mistake of thinking that this onus cannot be discharged, because if the wording he has used is so clear that any reasonable member of the public would be justified in taking it as an offer and not a mere advertisement, the advertiser may find himself contractually bound to an embarrassingly large number of people.[19]

From cases on catalogues,[20] placards outside shops,[21] cars in showrooms[22] and price tickets on goods in supermarkets[23] it can be deduced as a general principle that a statement that goods are for sale at a particular price is not an offer. This is partly because of the ridiculous situation that would arise if many more people accepted the offer than the seller could possibly supply, and partly because the law agrees with the general understanding in the

[14] *Blundell v Blom* 1950 (2) SA 627 (W); and see *Inrybelange (Edms) Bpk v Pretorius* 1966 (2) SA 416 (A) 425E.
[15] *King v Potgieter* 1950 (3) SA 7 (T).
[16] *West v Pollak & Freemantle* 1937 TPD 64; *West v De Villiers* 1938 TPD 96.
[17] *Lee v American Swiss Watch Co* 1914 AD 121; *Bloom v American Swiss Watch Co* 1915 AD 100; *Gersten v United Tobacco Co (South) Ltd* 1951 TPD 283.
[18] *Neugebauer & Co Ltd v Hermann* 1923 AD 564 572.
[19] As in *Carlill v Carbolic Smoke Ball Co* [1893] 1 QB 256 (CA).
[20] *Grainger & Son v Gough* [1896] AC 325 334.
[21] *Crawley v R* 1909 TS 1105.
[22] *Harmonius Holland Motors (Pty) Ltd v R* 1956 1 PH K22 (C).
[23] *Pharmaceutical Society of Great Britain v Boots Cash Chemists (Southern) Ltd* [1952] 2 QB 795.

business world that a trader may well wish to exercise some choice in the matter of his customers. This general principle seems firmly established by the cases,[24] but it could not prevail over sufficiently clear wording denoting a contrary intention on the part of the seller[25] and, especially in times of shortage, it may be overridden by legislation.[26]

## TENDERS, AUCTIONS

Calling for tenders and conducting auctions are methods of endeavouring to obtain the best contractual terms by inviting members, or selected members, of the public to bid in competition with each other. It is characteristic of tenders that they are not revealed to rival tenderers, and of auctions that bids are made publicly. What concerns us here is who makes the offer, thereby putting the conclusion of the negotiations out of his further power.

A call for tenders will, unless worded in a most unusual way, be interpreted not as an offer but as an invitation to submit offers, and each tender is an offer which the person who called for tenders may accept or reject at will.[27] And because the tenderer makes the offer he is free to frame it as he wishes, so if he bases it on plans, specifications or other documents supplied by the other party, he will have to accept responsibility for any mistakes in those documents unless they were supplied to him with a guarantee of accuracy.[28]

In a sale by auction an auctioneer who has bound himself to sell 'without reserve', or 'to the highest bidder', makes an offer by calling for bids, and this offer is accepted by the highest bona fide bidder, the auctioneer having no discretion to refuse to sell.[29] In any other case the auctioneer calling for bids is inviting offers, and each bid is an offer which, so far as the bidders are concerned,[30] he may accept or reject at his discretion.[31]

## TERMINATION OF OFFER

No agreement can arise from the acceptance of an offer that is no longer open for acceptance, so the ways in which an offer can come to an end must be considered.

The most obvious way is by effluxion of the time fixed by the offeror in making his offer. There is nothing to prevent an offeror specifying the period

[24] Despite the doubts of academic writers, reviewed in Christie *Contract* (3 ed) 42.
[25] Cf *Carlill* above.
[26] Control of Goods (Distribution and Disposal of Commodities) (Prevention of Hoarding) Order SI 613 of 982.
[27] *G & L Builders CC v McCarthy Contractors (Pty) Ltd* 1988 (2) SA 243 (SEC) 247 B-H.
[28] *Robertson v Maurice Nichols (Pty) Ltd* 1938 NPD 34; *Felton Skead and Grant v Port Elizabeth Municipality* 1964 (4) SA 422 (E).
[29] *Neugebauer & Co Ltd v Hermann* 1923 AD 564 570-1, which also decides that a 'knock-out' agreement between bidders to keep bids down means that the highest bid is not bona fide and may be rejected.
[30] The auctioneer may, of course, owe a contractual duty to the seller, whose agent he is, and will be liable to him, but not to bidders, for disobeying his instructions.
[31] Christie *Contract* (3 ed) 47-8, where this conclusion is drawn from the rather unsatisfactory authorities.

## 36     BUSINESS LAW IN ZIMBABWE

of his offer in this way and if he does so, then, in the words of Innes CJ in *Laws v Rutherfurd* 1924 AD 261 262:

> 'Speaking generally, when the acceptance of an offer is conditioned to be made within a time... prescribed by the offeror, then the prescribed time limit... should be adhered to.'

A purported acceptance out of time does not bring the parties into agreement but the offeror may, of course, waive the time limit he has set, treating the late acceptance as a counter-offer and accepting it.

An offer for the acceptance of which no time limit is fixed cannot be treated as everlasting unless its wording or the surrounding circumstances indicate that that was the intention of the offeror. It will therefore lapse after what, in the circumstances, must be considered a reasonable time.[32]

Death of the offeror or offeree before acceptance will terminate the offer unless, as in *Costain & Partners v Godden* 1960 R & N 658, 1960 (4) SA 456, it can be concluded that the offeror intended to empower his executor to receive the offeree's acceptance or the offeree's executor to accept. It seems clear that the same should be said of loss of contractual capacity (eg supervening insanity), as the early authorities to the contrary[33] are based on the old idea that true consensus was necessary for the formation of any contract.

Rejection of an offer brings it to an end, freeing the offeror to take his business elsewhere, and the making of a counter-offer by the offeree will normally incorporate such a rejection (*Orion Investments (Pvt) Ltd v Ujamaa Investments (Pvt) Ltd* 1987 (1) ZLR 141 (S)) unless carefully worded so as to keep the original offer alive. An inquiry about possible modification of the offer, on the other hand, will not normally be interpreted as rejecting it,[34] but even an inquiry may be so framed as to incorporate a rejection of the offer.[35]

Our law accepts as a general rule that an offeror may withdraw his offer at any time before it is accepted (*Stewart v Zagreb Properties (Pvt) Ltd* 1971 (1) RLR 180 (A) 187, 1971 (2) SA 346 352),[36] the withdrawal becoming effective only from the time it comes to the notice of the offeree.[37]

### IRREVOCABLE OFFERS

It seems clear from *Reich v Stone* 1949 SR 178 that an offer that is expressed to be irrevocable, or irrevocable for a fixed time, may not be revoked at all or within the fixed time. This view of the law, which conforms with reasonable expectations of good faith in business, appears to be

32 *Dietrichsen v Dietrichsen* 1911 TPD 486 496.
33 *Sacke* 1911 TS 248 and D 33 5 8 2.
34 *Amalgamated Society of Woodworkers of SA v Schoeman* 1952 (3) SA 85 (T) 87-8.
35 *Stephen v Pepler* 1921 EDL 70 83.
36 And see *Herzich v Nel* 1948 (3) SA 686 (A) 693.
37 *Yates v Dalton* 1938 EDL 177. *Gerson v United Tobacco Cos (South) Ltd* 1931 TPD 283 shows how an offer... has worked in such a way that withdrawal without the knowledge of the offeree may nevertheless be effective.

## CONTRACT     37

accepted in some South African cases[38] but is rejected in others.[39] Even on the latter view it would have to be accepted that an offeror who, by declaring his offer to be irrevocable, has induced the offeree to act to his detriment (eg by taking time to consider the offer) would be estopped from denying that he was bound by his declaration. As this estoppel could be raised in almost every case it would make little practical difference if our courts were to adopt the latter view.

### OPTIONS

The nature of an option, despite some confusing dicta in earlier cases which need not be considered here, is clear. It is an offer to enter into the main contract together with a concluded subsidiary contract (the contract of option) binding the offeror to keep that offer open for a certain period.[40] It thus achieves for sure what, as appears from the previous paragraph, can probably (but not quite certainty) be achieved by a unilateral declaration that an offer is irrevocable.[41]

Although an option to buy is the most common type of option, there may be an option to sell or to enter into any other type of contract.[42] An option to buy, if exercised by the buyer, obliges the seller to sell, but a right of pre-emption or first refusal entitles the holder to the first opportunity of buying if the seller decides to sell.[43]

Closely linked as it is to the main contract, an option contract nevertheless stands on its own two feet, so if it is broken (by, for instance, the giver of the option selling to another person during the currency of the option) the option holder may claim an interdict[44] or damages[45] without first deciding whether to exercise his option, as the breach has deprived him of the opportunity of making this decision. If he decides to exercise his option he may claim specific performance of the main contract.[46]

An option for a fixed period may be exercised at any time within that period, but not after it has expired unless it can be shown that the giver of the option has waived the time limit: *Laws v Rutherfurd* 1924 AD 261 264. An option for which no period is fixed lasts for a reasonable time,[47] but there is

38 *Ahrend v Winter* 1950 (2) SA 682 (T) 686; *Phillips v Aida Real Estate (Pty) Ltd* 1975 (3) SA 198 (A) 207G; *Dlamlachimme v Naidoo* 1975 1 PH A30 (D); *Building Material Manufacturers Ltd v Marais* 1990 (1) SA 243 (O) 248-9.
39 *Anglo Carpets (Pty) Ltd v Snyman* 1978 (3) SA 582 (T) 585H; *Katze v Newmant SA Ltd* 1977 (3) SA 368 (NC) 374E. And see Kraininger 'The irrevocable offer' (1983) 100 SALJ 441.
40 *Venter v Birchholtz* 1972 (1) SA 276 (A) 283-4.
41 *Conradie v Rossouw* 1919 AD 279.
42 *Thompson v Van der Vyver* 1954 (2) SA 192 (C) 194.
43 *Owsianick v African Consolidated Theatres (Pty) Ltd* 1967 (3) SA 310 (A) 316; *Hirschowitz v Moolman* 1985 (3) SA 739 (A) 766-70.
44 *Van der Merwe v Scheepers and the Calgro Village Council* 1946 TPD 147.
45 *Boyd v Nel* 1922 AD 414. For the measure of damages see *Israel v Lauwerda* 1942 WLD 160 167-8; *Sommer v Wilding* 1984 (3) SA 647 (A).
46 *Owsianick* above at 326-7.
47 *Innamma v Moodley* 1943 AD 531 538.

no reason why an option should not be so expressed as to be perpetual.[48] An option expressed to be for an indefinite time is not on that ground void for vagueness: *Tobacco Sales Ltd v Agriculture Investments (Pvt) Ltd 1982 (1) ZLR 180.*

An option to buy for cash, and any other option in which there is no element of delectus personae (i e the personality or creditworthiness of the option-holder is unimportant) may be ceded by the option-holder without the consent of the giver of the option, unless the wording of the option contract or the surrounding circumstances indicate to the contrary.[49] Obvious examples of options that cannot be ceded without the consent of the giver of the option, because the personality or creditworthiness of the option-holder is important, would be options to buy on credit, or to obtain a loan, or to hire machinery.

### OFFER AND ACCEPTANCE — ACCEPTANCE

To produce the necessary evidence of agreement, an offer must be accepted. This requirement applies to donations as well as to other contracts, because no one can be permitted to force a donation on another without his consent.[50]

It has not yet been authoritatively decided whether simultaneous identical cross-offers create a contract without the acceptance of either offer, but the view that acceptance is necessary in such a case for the avoidance of doubt commends itself as conducing to certainty in business dealings.[51]

Normally, of course, acceptance will follow the offer, but *Flashco (Pvt) Ltd v Fox and Carney (Pvt) Ltd 1979 RLR 407 (A), 1980 (1) SA 235,* in which an estate agent prepared an agreement between buyer and seller providing for payment of his commission, illustrates how advance notice of acceptance may suffice to establish agreement.

### WHO MAY ACCEPT

As a general principle, an offer made to a specific person can be accepted only by that person, and no one else will be permitted to intervene and force himself upon the offeror by accepting.[52] This obviously necessary principle gives way to any indication to the contrary in the offer or the surrounding circumstances.[53]

One of the surrounding circumstances may be that the person to whom the offer is addressed is an estate agent, from which it may be deduced that the

[48] *Mouton v Hanekom* 1959 (3) SA 35 (A).
[49] *Hersch v Nel* 1948 (3) SA 686 (A); *Detmann v Goldfam* 1975 (3) SA 385 (A). From the reasoning of Schreiner JA in *Hersch v Nel* at 693 it can be concluded that an irrevocable offer must be equated with an option for the purpose of deciding whether it can be ceded.
[50] *Union Free State Mining and Finance Corp Ltd v Union Free State Gold and Diamond Corp Ltd 1960 (4) SA 547 (W).*
[51] Lord Blackburn in *Tinn v Hoffman & Co (1873) 29 LT 271.*
[52] *Levin v Driepark Properties (Pty) Ltd 1975 (2) SA 397 (A) 407C.*
[53] *Hersch v Nel* 1948 (3) SA 686 (A) 692-3.

offer to buy was intended to be accepted by the owner, whoever he might be, and not by the estate agent. Legislation in South Africa requiring contracts for the sale of land to be in writing forbids the leading of evidence from which this deduction can be made,[54] but as we fortunately have no similar legislation in this country there is no reason why the evidence should not be led and the deduction made.

As seen above, another relevant circumstance might be that the offer is irrevocable or contained in an option, and there is no element of delectus personae, so a cessionary from the offeree is entitled to accept. This reasoning does not apply to ordinary revocable offers, which cannot be ceded because they are too evanescent.[55]

### KNOWLEDGE OF OFFER

It has been held that a person who gives information to the police in ignorance of an advertised offer of a reward for such information is not entitled to claim the reward when he subsequently hears of the offer.[56] This illustrates the necessity of knowledge of the offer before words or actions that would otherwise signify acceptance can be taken as doing so. The result may seem hard but is inevitable, as the unwitting offeree cannot be said to have had animus contrahendi and therefore the parties cannot be said to have reached agreement.

### ACCEPTANCE MUST BE UNEQUIVOCAL

To be effective in creating a contract, acceptance must be so clear and unequivocal as to leave no reasonable doubt in the offeror's mind that his offer has been accepted: *Selected Mines and Marketing (Rhodesia) Ltd v Trees Asbestos Mining Co Ltd 1952 SR 57.* The reason for requiring a higher degree of certainty than the standard of proof on the preponderance of probability that is universally accepted in civil cases as opposed to criminal cases[57] is that the offeror is entitled to expect an answer on which he can immediately act, without interrupting his business while he weighs up conflicting probabilities in order to decide whether he has a contract or not.

A purported acceptance in the form 'Yes, but...' will not do, because by seeking to add to or subtract from the terms of the offer it does not create the necessary agreement but leaves the negotiations still open.[58] An unequivocal acceptance coupled (eg in the same letter) with a demand for performance not justified by a proper interpretation of the contract also will not do, as it must leave the offeror in doubt whether agreement has been reached, but if the two were sufficiently separated it would be possible to reject the

[54] *As in Blew v Snoxell* 1931 TPD 226.
[55] *Hersch v Nel* above at 693.
[56] *Bloom v American Swiss Watch Co* 1915 AD 100.
[57] *Ley v Ley's Executors* 1951 (3) SA 186 (A).
[58] *Jones v Reynolds* 1913 AD 366 370-1.

unjustified demand for performance as not being in accordance with the previously concluded contract.[59]

It is not necessary for the acceptance to correspond exactly with the offer provided it corresponds in substance and the difference is immaterial, such as the addition of a term already implied by law,[60] the acceptance of a price less than that offered,[61] or the insertion of an irrelevant comment in the margin of a written contract.[62]

## METHOD OF ACCEPTANCE

If the offeror, as he is clearly entitled to do, specifies in his offer that it is to be accepted by a particular method (eg registered post), an offeree who accepts by any other method cannot claim to have reached an agreement with the offeror: *Laws v Rutherford* 1924 AD 261; *Orion Investments (Pvt) Ltd v Ujamaa Investments (Pvt) Ltd* 1987 (1) ZLR 141 (S). Whether the offeree can validly accept by a different method which is as quick and reliable as that specified has not been decided, but *Levben Products (Pvt) Ltd v Alexander Films (SA) Pvt Ltd* 1959 (1) R & N 418 421, 1959 (3) SA 208 209E, where a letter of acceptance may have been incorrectly addressed in an immaterial respect, indicates that the courts will not be astute to give a narrow interpretation to an offeror's prescription of the method of acceptance.[63]

An offeror will not be permitted to force a contract on an offeree who may be unwilling by prescribing that he will take the offeree's silence as acceptance:

'Quiescence is not necessarily acquiescence and one party cannot, without the assent of the other, impose upon such other a condition to that effect.[64]

But, especially when there has been prior correspondence or negotiations, a party who fails to reply to an assertion that a contract exists will be held to that contract if in ordinary commercial practice and human expectation he would have challenged the assertion if it were not true.[65] This principle will be applied only in a clear case, however, and in *Martin v De Kock* 1948 (2) SA 719 (A) 735 it was not applied against a tobacco farm assistant who failed to reply to a number of dogmatic and equivocal assertions by his employer, nor in *Gonese v Mafudza* 1977 (1) RLR 49 against a tribesman who raised no objection to an unjustified order that the hand over cattle as compensation.

59 *JRM Furniture Holdings v Cowlin* 1983 (4) SA 541 (W).
60 *Ibid* at 544E.
61 *Parow Lands (Pty) Ltd v Schneider* 1951 (3) SA 183 (SWA).
62 *Nichols v Stanley* 1962 2 PH A29 (N).
63 But see *De Jager v Burger* 1994 (1) SA 402 (C), tellingly criticised by McLellan in 1994 *SA Merc LJ* 102.
64 *Collen v Rietfontein Engineering Works* 1948 (1) SA 413 (A) 422, per Watermeyer CJ.
65 *McWilliams v First Consolidated Holdings (Pty) Ltd* 1982 (2) SA 1 (A).

## COMMUNICATION OF ACCEPTANCE

For there to be a true agreement each party must be aware that the other is in agreement with him. The offeree knows this from his acceptance of the offer, but the offeror cannot know this until he is aware of the acceptance. As a general rule, therefore, communication of acceptance to the offeror is necessary to create a contract: *Madam v Macedo Heirs* 1991 (1) ZLR 295 (S).

As has been seen above, however, the offeror is entitled to prescribe the method of acceptance, and if he is content to allow the contract to come into existence before the acceptance is communicated to him, he may prescribe a method which produces this result: *Orion Investments (Pvt) Ltd v Ujamaa Investments (Pvt) Ltd* 1987 (1) ZLR 141 (S). He may do this expressly, as do many companies when allotting shares (*Ex parte Davies* 1950 SR 270) and as did the advertiser who specified the giving of certain information to the police as sufficient acceptance of the offer of a reward,[66] or impliedly as when a customer who sends an order for goods to a trader impliedly authorizes the trader to accept the order (which is an offer) by dispatching the goods.[67]

An offeree who tries to communicate his acceptance, but fails because the offeror has changed his address or otherwise hindered communication, may be held to have done sufficient to create the contract.[68]

## CONTRACTS MADE BY POST

An offeror who sends his offer by post may, like any other offeror, specify the method by which the offer may be accepted.[69] If he does not it will be assumed that he expects the offeree to adopt the same method he has adopted and post a letter of acceptance. If the general rule that acceptance must be communicated to the offeror were to be applied it would hamper the efficient conduct of business. The letter of acceptance might be delayed or even lost in the post or in the offeror's office, or a dishonest offeror who had had second thoughts about the contract might pretend not to have received the letter, so the offeree could not be sure he had a contract until he had received an acknowledgement of his acceptance. To avoid these difficulties our law therefore follows English, Scottish and American law in regarding the contract as created by the posting of the offeree's letter of acceptance.[70]

This rule recognizes that by posting his letter the offeree has done all he can be expected to do, and leaves the risk of delay or loss on the offeror. This is only fair, as it was the offeror who chose to use the post in the first place, and if he was not prepared to accept the risk he could have specified

66 *Bloom v American Swiss Watch Co* 1915 AD 100.
67 *R v Nel* 1921 AD 339. And see *Hawkins v Contract Design Centre (Cape Division) (Pty) Ltd* 1983 (4) SA 296 (T).
68 *Fitchburg Transport (Edms) Bpk v Rautenbach* 1988 (1) SA 318 (A) 334F-335F 314C-343B.
69 *Kergeulen Sealing and Whaling Co Ltd v Commissioner for Inland Revenue* 1939 AD 487 503.
70 *Kergeulen* above.

some other method of acceptance (eg 'I will regard the contract as complete when I receive your letter of acceptance').

If the offer is made while the parties are in each other's presence but it is contemplated that acceptance will take place later, when they are no longer in each other's presence, the rule does not apply in our law: *Odendaal v Norbert* 1973 (1) RLR 130 134, 1973 (2) SA 749 751.[71] This accords with business practice, as an offeror who, in saying goodbye to the offeree, says 'I'll leave my offer open until the 15th' obviously expects to have the letter of acceptance in his hands by the 15th, and not to remain in a state of uncertainty for however many days a letter posted on the 15th might take to arrive.

The rule also does not apply when normal postal communications are not operating, as in times of war or revolution,[72] and no doubt during postal strikes. The letter of acceptance must be correctly addressed, but an immaterial error will be ignored: *Levben Products (Pvt) Ltd v Alexander Films (SA) (Pvt) Ltd* 1959 (1) R & N 418, 1959 (3) SA 208.

Whether the rule is so rigid as to prevent an offeree who has posted his letter of acceptance from changing his mind and cancelling his acceptance with a telegram that reaches the offeror before or simultaneously with the letter, is not certain. It has been held in the CPD that the rule is so rigid as to produce this result, but on appeal the correctness of this view was doubted, the AD finding it unnecessary to decide the point.[73]

It is to be hoped that when the question has to be decided the courts will hold that the telegram has the effect of withdrawing the letter of acceptance, as this would bring the law into line with the understanding of the honest business man in the position of the offeror, who would take the telegram at face value and treat his offer as rejected. The law would be achieving no useful purpose by permitting him to ignore the telegram and hold the offeree to the contract. It should be added that if it is decided that the offeror can choose to hold the offeree to the contract in these circumstances no similar choice would rest with the offeree, as if he changed his mind a second time it seems clear that he would be estopped from arguing that his telegram was ineffective in law.

TELEGRAMS

When an offer is made by telegram the contract is concluded by handing a telegram of acceptance to the post office for dispatch, the analogy with a contract by post being exact.[74] But an offer by letter does not impliedly

[71] English law differs, and applies the rule in these circumstances: *Henthorn v Fraser* [1892] 2 Ch 27.
[72] *Bal v Van Staden* 1902 TS 128.
[73] *A to Z Bazaars (Pty) Ltd v Minister of Agriculture* 1974 (4) SA 392 (C); 1975 (3) SA 468 (A). In *Kahler en Staal Industriele Korporasie Bpk v Kaschula* 1983 (4) SA 83 7 (T) the full bench of the TPD took a decisive step away from the mechanical application of the rule and stressed the necessity of ascertaining the common intention of the parties.
[74] *Yates v Dalton* 1938 EDL 177 179-80.

---

an acceptance by telegram, so the general rule should be applied and the contract not considered complete until acceptance has been communicated to the offeror receiving and reading the telegram.

Cablegrams and phonograms may be garbled in transmission, giving rise to the question whether a contract ought to be found in conformity with the offeror's intent, or received, or not at all. *Stewart v Zagreb Properties (Pvt) Ltd* 1971 (1) RLR 180 (A), 1971 (2) SA 346 favours the 'no contract' view, but ignores the possibility that the recipient of the telegram might in the circumstances be able to invoke the doctrine of quasi-mutual assent, so the Supreme Court may well reconsider the question.[75]

TELEPHONE

Contracts made by telephone do not present the same difficulties as contracts made by post or telegram, as the effect of the telephone is virtually to bring the parties into each other's presence. The general rule therefore applies, and the contract is concluded when the offeror becomes aware of the offeree's acceptance: *Odendaal v Norbert* 1973 (1) RLR 130, 1973 (2) SA 749.[76]

TELEX, FAX, E-MAIL ETC

Whether an electronic method of communication is to be equated with the post or the telephone will depend on whether or not the chosen method of communication puts the parties virtually in each other's presence in a conversational situation.[77]

TIME AND PLACE OF CONTRACTING

It may be necessary to ascertain when and where a contract was made for any one of a number of reasons. These include: deciding whether the offer has already expired or been withdrawn (*Stewart v Zagreb* above); deciding which system of law applies to an international contract;[78] deciding whether the court has jurisdiction;[79] locating the source of gross income for income tax purposes;[80] deciding whether a criminal offence has been committed by trading at a prohibited time (*Mark Friend Radio Co v Smith's Garage* 1938 SR 83) or in a prohibited place.[81]

For any of these purposes, the contract should be analysed into offer and acceptance, where this is possible, and the time and place of conclusion of the contract ascertained in accordance with the preceding paragraphs.

[75] See *Christie Contract* (3 ed) 83.
[76] And see *S v Henckert* 1981 (3) SA 445 (A) 451B.
[77] *Entores Ltd v Miles Far East Corpn* [1955] 2 All ER 493 (CA) 495.
[78] *Standard Bank of South Africa Ltd v Efroiken and Newman* 1924 AD 171.
[79] See *Magistrates Court Act* [Chapter 7:10] s 11(1)(a)(iv).
[80] *Kergeulen Sealing and Whaling Co Ltd v Commissioner for Inland Revenue* 1939 AD 487.
[81] *R v Nel* 1921 AD 339.

## CONTRACT WITHOUT OFFER AND ACCEPTANCE

In rare cases it is not possible to isolate an offer and acceptance in the making of a contract, so the time and place of its making, if material, will have to be ascertained from the particular circumstances. Such cases include the simultaneous signature and exchange of copies of a written agreement, the simultaneous acceptance of terms suggested by a third party, and schemes in which participants enter into contracts with the originator of the scheme in the expectation that all other participants will obey the rules of the scheme. These expectations may be fulfilled by a finding that a contract exists between the participants who are otherwise strangers to each other.[82]

Legislation may also create a contract in circumstances where analysis of offer and acceptance is impossible.[83]

## TACIT CONTRACTS

Offer or acceptance or both may take the form of actions instead of words, in which case the resulting contract can be described as tacit. If the existence of such a contract is disputed the court must decide whether the conduct of the parties shows that they intended to contract with each other (*Salisbury Municipal Employees Association v Salisbury City Council* 1957 R & N 127 131, 1957 (2) SA 554 557; *Salisbury Bottling Co (Pvt) Ltd v Lomagundi Distributors (Pvt) Ltd* 1965 RLR 268 280; *Municipality of Bulawayo v Zimbabwe Football Association* 1989 (3) ZLR 261 (S)) and the inquiry involves drawing inferences from the proved facts. In *Bristow v Lycett* 1971 (2) RLR 206 (A) 224-5, 1971 (4) SA 223 239 the Appellate Division accepted that the inference of agreement cannot be drawn unless the court is satisfied 'beyond doubt' that it is the correct inference. This accords with dicta in a number of cases, but requires reconsideration by the Supreme Court because it ought by now to be regarded as settled law that in drawing an inference of agreement, as in deciding any other issue in a civil case, proof on a balance of probabilities is sufficient: *Rhodesia Fertilizer Corpn Ltd v P and G Farming (Pvt) Ltd* 1977 (2) RLR 192 (A).[84] The inference of intention to contract cannot be drawn if the conduct of the parties is explained by their erroneous belief that they were already contractually bound to each other: *Willoughby's Consolidated Co Ltd v Copthall Stores Ltd* 1913 AD 267 288-9.

A good example of a tacit agreement is *Menashe v Georgiadis* 1936 SR 59 in which promissory notes were sent under cover of a letter containing certain conditions. By cashing one of the notes the recipient was held to have tacitly agreed to the conditions. Sales without mention of the price have had to be analysed by the courts in criminal cases arising out of price control

[82] Christie *Contract* (3 ed) 85-7.
[83] For example the Companies Act [*Chapter 24:03*] s 27 giving the memorandum and articles the effect of a contract between members.
[84] Christie *Contract* (3 ed) 89-92; *Landmark Real Estate (Pvt) Ltd v Brand* 1992 (3) SA 983 (W).

regulations, with the result that the fulfilment of an order from a distance is interpreted as a sale at the normal or controlled price, but the sending with the goods of an invoice for a higher price is a counter-offer which may be accepted by silence: *Cadamas v R* 1949 SR 22, 1949 (2) SA 742; *R v Frankel* 1951 SR 25, 1951 (2) SA 272. An over the counter sale cannot be dissected in this way, but is a sale at the price demanded by the shopkeeper even if the handing over of the goods took place a few moments before.[85]

The contract between a passenger and a bus company is usually tacit, and it has been held that by stepping aboard the passenger accepts the offer made by stopping the bus,[86] but this cannot be correct, and it must be the passenger who is the offeror.[87]

In *Ellison's Electrical Engineers Ltd v Barclay* 1969 (2) RLR 461 (A) 464, 1970 (1) SA 158 160 Beadle CJ analysed a type of contract that is very common:

'A customer takes a machine which requires repairs to a firm skilled in such repairs in order that the firm may repair it, and nothing is said about price or about what repairs might or might not be necessary. In such a case a tacit contract comes into being between the customer and the firm under which the customer agrees to pay the reasonable charges for such repairs as may be reasonably necessary.'

## LACK OF ANIMUS CONTRAHENDI

Just as there may be a contract without offer and acceptance, so may there be offer and acceptance without a contract.[88] This may be so because the parties, though in agreement, have no intention to bind themselves by a legally enforceable contract — they lack animus contrahendi; or the agreement cannot in law be treated as a contract; or the agreement is impossible to enforce. These situations will be considered in turn.

Lack of animus contrahendi may be expressed in an agreement, as in *De Villiers & another v Sports Pools (Pvt) Ltd* 1976 (2) RLR 233 (A), 1977 (1) SA 832 in which, as it happened, the 'honourable pledge' clause was held inconsistent with the Pools Control Act [*Chapter 10:19*] so the agreement was a binding contract. Or lack of animus contrahendi may be implied from the circumstances, as in a social or family arrangement.

Since 1919 it has been settled that, unlike English law, our law does not require that consideration (a quid pro quo) be given if a contract is to be enforceable.[89] So a gratuitous promise (eg to give a donation) is enforceable provided it is accompanied by what the old Roman-Dutch authorities variously described as *redelijke oorzaak* or *causa*. The South African Appellate Division interpreted these words as meaning no more than a

[85] *R v Davila* 1948 (4) SA 791 (T).
[86] *Goodwood Municipality v Joyce and McGregor Ltd* 1945 CPD 424 428.
[87] Christie *Contract* (3 ed) 46-7.
[88] *Estate Breet v Peri-Urban Areas Health Board* 1955 (3) SA 323 (A) 332E.
[89] *Conradie v Rossouw* 1919 AD 279.

## 46    BUSINESS LAW IN ZIMBABWE

serious and deliberate intention to create a legal obligation, or animus contrahendi.

### AGREEMENTS WHICH CANNOT IN LAW BE CONTRACTS

Marriage, testamentary guardianship, the proclamation of a township on agreed conditions and the issue of a passport are examples of situations in which an agreement is not a contract but acquires legal force only from some other act. The law denies contractual status to the agreement because it is only a necessary step in the creation of a different legal relationship.

### INITIAL IMPOSSIBILITY

The principle that no legal obligation can arise out of an agreement that is impossible of performance is summed up in the maxim 'lex non cogit ad impossibilia'. For this principle to apply, the impossibility must be absolute and not merely likely to arise,[90] absolute as opposed to relative,[91] not the fault of either party,[92] and not treated in the contract as a risk which one party expressly[93] or impliedly[94] undertakes to bear.

If the impossibility fulfils these requirements it is next necessary to consider the difference between substance and form, because performance will be considered impossible if, although there can be technical compliance with what has been promised, the real object of the contract cannot be fulfilled. This is illustrated by the unwitting purchase of one's own property.[95]

The same concern for substance rather than form can be seen in cases of partial impossibility. If, although full performance is impossible, the real object of the contract can be fulfilled, the creditor is entitled to demand such reduced performance as is possible, in exchange for proportionately reduced performance on his part. Thus the buyer of a half-acre plot for £500 was entitled to demand 0,471 of an acre for £471 when that turned out to be the size of the plot.[96]

Legal impossibility is treated in exactly the same way as physical impossibility.[97]

### CONTRACTS VOID FOR VAGUENESS

Another type of agreement which is impossible to enforce is one the terms of which are so uncertain that no clear line can be drawn between what

[90] Heyneke v Abercrombie 1974 (3) SA 338 (T) 345F.
[91] 345 I 337 5.
[92] Theron Ltd v Gross 1929 CPD 345.
[93] Inkambana Oil and Mineral Development Syndicate Ltd v Mears and Ford (1906) 23 SC 250.
[94] Wilson v Smith 1956 (1) SA 393 (W) 396D.
[95] Cowcass v Tepperson and Spacks 1916 CPD 405.
[96] Stangfeld v Kuhn 1940 NPD 238.
[97] Aird v Hockley 1936 EDL 117 125; Hylock v Milford Investments (Pty) Ltd 1962 (4) SA 298 (C) 318-19.

## CONTRACT    47

would be proper performance and what would not. The contract is therefore said to be void for vagueness and is treated as a nullity.

In Levenstein v Levenstein 1955 SR 91 97, 1955 (3) SA 615 619 Quénet J classified the 'void for vagueness' cases into four classes:

1. Contracts which reserve an unlimited option to the promisor.
2. Contracts where the vague and uncertain language indicates that the parties were never truly in agreement.
3. Incomplete negotiations not yet amounting to a contract.
4. Contracts which, although apparently incomplete, can be shown by evidence to be complete.

The third class has already been considered at 33 above. Because the offer is made without animus contrahendi the resulting agreement is designedly incomplete rather than vague.

Of the remaining three classes it is better to take the fourth first in order to understand the general approach of the courts to questions of vagueness, which is to uphold the contract if possible rather than treat it as void: Madan v Macedo Heirs 1991 (1) ZLR 295 (S). Recognising that business men often record their agreements in an abbreviated form that is clear enough to them, even if not to outsiders, the courts will construe their contractual documents in such a way that:

'without violation of essential principles the dealings of men may as far as possible be treated as effective, and that the law may not incur the reproach of being the destroyer of bargains.'[98]

Essential principles that must not be violated are that the court is limited to interpreting the parties' contract and cannot go further and make a contract for them,[99] and evidence to explain the contract is admissible only in the circumstances which are examined at 63 below.

A case that arguably goes too far towards the forbidden ground of making a contract for the parties is Regenstein v Brabo Investments (Pty) Ltd 1959 (1) R & N 392 (FS), 1959 (3) SA 176, a contract for the sale of portion of a ranch, the agreed plan prepared by the seller being inaccurate. The seller contended that the contract was void for vagueness, but the court ordered specific performance of the contract with slight adjustments of the boundaries to give effect to the common intention of the parties as disclosed by the evidence.

The general approach of the courts is exemplified by Elite Electrical Contractors v Covered Wagon Restaurant 1972 (2) RLR 221 (A), 1973 (1) SA 195, in which an apparently vague contract to do work and supply materials was saved by the implication of a term that the contractor would be entitled to charge a reasonable amount. And in Hilliard and Wenborne v Tabor Frost 1938 SR 89 95 evidence was admitted in order to fix the meaning of the word 'etc' in a contract of sale. In a line of cases of which

[98] Per Lord Tomlin in Hillas & Co Ltd v Arcos Ltd (1932) 147 LT 503 (HL) 512.
[99] As Lord Wright warned in Hillas v Arcos at 514.

116    BUSINESS LAW IN ZIMBABWE

any other indication of an intention that the rights and duties should not be transmissible by death.[412]

## MORA AND BREACH OF CONTRACT

Breach by one party of his contractual obligations does not automatically discharge a contract, even if the contract expressly states that it will do so, because the party in breach cannot be permitted to profit from his own wrong by bringing the contract to an end if the innocent party wishes it to continue.[413] Conversely, a party who has caused the other to commit a breach cannot found a claim on the breach, and *Green v Luiz* 1966 RLR 633 illustrates the application of this principle to a contract in which one party is required to take some positive action before the other party's obligation becomes due.

The significance of a breach, in the eyes of the law, is that the other party thereupon becomes entitled to a remedy. It is not sufficient for him merely to show that he has suffered loss; he must prove that a breach has been committed, and *Freelance Contracting (Pvt) Ltd v De Clerk* 1982 (1) ZLR 193 (S), 1982 (4) SA 296 applies this requirement to an allegedly negligent performance of a contractual obligation, holding that when the plaintiff relies on the maxim 'res ipsa loquitur' the ultimate inquiry is not into the cause of the occurrence but into the conduct of the defendant.

When a breach takes the form of failure to perform or performance out of time the debtor is said, in Roman-Dutch law, to be in mora, and this type of breach will be considered first. For a debtor to be in mora performance must be due, the debtor must be or be deemed to be aware of the performance required of him and the fact that it is due, and he must have no valid excuse for his failure to perform.[414] The first and last of these requirements are sufficiently straightforward, but in order to decide whether performance is fixed due it is first necessary to ascertain whether the time for performance is fixed by the contract, in which case the mora is said to arise ex re, or whether a demand (*interpellatio*) by the creditor is necessary, in which case the mora is said to arise ex persona.

### MORA EX RE

In *Laws v Rutherfurd* 1924 AD 173 195 Innes CJ referred to the:
'principle which applies when a debtor undertakes to discharge an obligation on a speci-fied date; the creditor need make no demand: *dies interpellat pro homine*, and the debtor is in mora if he fails to pay on the appointed day'.

The principle applies not only to the obvious case where the contract fixes the precise date for performance but also, as decided in *Laurie v Wright* 1940 SR 62 71, when the contract fixes the time for performance by reference to an event the happening of which will, in the nature of things, be

412 *Friedlander v De Aar Municipality* 1944 AD 79 93.
413 *Associated Manganese Mines of SA Ltd v Claassens* 1954 (3) SA 768 (A) 774.
414 *Legogote Development Co (Pty) Ltd v Delta Trust and Finance Co* 1970 (1) SA 584 (T) 587.

CONTRACT    117

peculiarly within the knowledge of the debtor, because the creditor cannot be expected to make demand in such a case.

If the contract does not fix the time for performance the general rule is that a demand is necessary to place the debtor in mora,[415] but this general rule does not apply if it is clear that immediate performance was contem-plated (as when one telephones a garage to come to tow in one's car), or when performance by a specific time is essential (as when a box office contracts to deliver a theatre ticket),[416] and, in the words of Tredgold J in *Smart v Rhodesian Machine Tools Ltd* 1949 SR 226 227, 1950 (1) SA 735 736:

'It may well be that where one party's delay is so unreasonable as to indicate an intention not to be bound by the contract no demand is necessary.'

But whether a demand is necessary when no time for performance has been fixed but a reasonable time for performance has elapsed is a matter of controversy. *Laurie v Wright* 1940 SR 62 70-1 and a line of South African cases[417] hold that in such circumstances no demand is necessary, but this view creates the unsatisfactory position that the debtor might find the contract cancelled without warning when he and the creditor hold genuinely differing views on whether a reasonable time has yet elapsed, and the South African Appellate Division has indicated that this line of cases will have to be reconsidered.[418] It is to be hoped that, when the opportunity arises, the Supreme Court will overrule *Laurie v Wright* on this point.

### MORA EX PERSONA

In *Smart v Rhodesian Machine Tools Ltd* 1949 SR 226, 1950 (1) SA 735 Tredgold J, although not expressly deciding the point, accepted the general rule referred to in the previous section, that when a contract fixes no time for performance the debtor is not in mora until a reasonable time for perform-ance has elapsed and the creditor has demanded performance. To be effective the demand must be made after a time that is reasonable in all the circumstances, and must allow a further (but normally much shorter) reasonable time for compliance: *Barrowby Real Estate (Pvt) Ltd v Olsen* 1980 ZLR 448 (A).

The nature of the demand depends on the subsequent action the creditor intends to take on it. If he wishes simply to claim damages or interest it is sufficient simply to demand performance, but if he wishes to cancel the contract the demand must incorporate or be followed by a warning to that effect: *Asharia v Patel* 1991 (2) ZLR 276 (S).

415 *Breytenbach v Van Wijk* 1923 AD 541 549.
416 *Henry v Trust Administrateurs Bpk* 1971 (1) SA 896 (W) 903.
417 *Cubbinson in Brigdrick Properties Ltd v Rood* 1962 (4) SA 447 (T).
418 *Nel v Cloete* 1972 (2) SA 150 (A) 177C.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-275-GMS |
| | ) | |
| BRETT J. CORMICK and ELAN SUISSE | ) | |
| INTERNATIONAL HOLDINGS (USA) LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on December 20, 2007, I caused a true and correct copy

of the foregoing ***Plaintiff Robert D. Christ's Opening Brief in Support of His Motion for Partial***

***Summary Judgment*** to be served on counsel for defendants as listed below, via electronic CM-ECF:

*Attorneys for Defendants:*

David L. Finger, Esquire
Finger & Slanina, P.A.
One Commerce Center, Suite 725
1201 North Orange Street
Wilmington, DE 19801-1155

Dated: December 20, 2007

*/s/ Thad J. Bracegirdle*
Thad J. Bracegirdle (No. 3691)