IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-275-GMS |
| | ) | |
| BRETT J. CORMICK and ELAN SUISSE | ) | |
| INTERNATIONAL HOLDINGS (USA), | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF ROBERT D. CHRIST

| | |
|---|---|
| STATE OF TEXAS | ) |
| | ) ss: |
| COUNTY OF HARRIS | ) |

Robert D. Christ, being duly sworn, hereby deposes and says:

1.       I am the plaintiff in the above-captioned action and submit this affidavit in support of my Motion for Partial Summary Judgment.  I have personal knowledge of the facts set forth herein and can testify truthfully as to those facts if called upon to do so.

2.       In the mid- to late 1990's, I operated a tour company specializing in expeditions to the geographic North and South Poles.  I first met the defendant in this action, Brett Cormick, in April 1996, when Mr. Cormick participated in one of my expeditions.  After meeting Mr. Cormick, he and I maintained a friendship.

3.       In January 2004, I traveled to Cape Town, South Africa to attend to the affairs of a close friend who suddenly had died in an accident.  While I was in Cape Town, Mr. Cormick traveled there from his residence in Harare, Zimbabwe to meet me.  During this visit, Mr. Cormick discussed with me my potential investment in what Mr. Cormick described to me as a management services business based in South Africa.

Throughout January and February 2004, Mr. Cormick and I continued to have discussions concerning the terms of my possible investment in a holding company that would operate to promote and sell United States-based financial products and investment vehicles to South African investors.

4.      My discussions with Mr. Cormick culminated in a proposal from Mr. Cormick, memorialized in a February 15, 2004 e-mail (a true and correct copy of which is attached hereto as **Exhibit A**), pursuant to which I was to invest $350,000 in exchange for, at a minimum, a 50% equity interest in Elan Suisse International Holdings (USA) LLC ("Elan Suisse USA"), the United States-based holding company which was to be formed in Delaware.  Attached hereto as **Exhibit B** is a true and correct copy of a sworn affidavit executed by Mr. Cormick on or about April 15, 2005 and filed with the High Court of South Africa in which Mr. Cormick confirms, at paragraph 9.38, that he made this offer to me.[1]

5.      After further discussions with Mr. Cormick, I ultimately wired $250,000 to Mr. Cormick's personal bank account in London (in two separate payments of $125,000 each) pursuant to Mr. Cormick's instructions.  As I explained in a previous affidavit submitted to the Court, I cannot recall with specificity the exact date on which I wired the first $125,000 payment to Mr. Cormick because, at Mr. Cormick's request, I provided him with the original confirmation of my wire transfer.  However, my second payment of $125,000 was wired to Mr. Cormick on March 16, 2004 (a true and correct copy of the wire confirmation is attached hereto as **Exhibit C**).  In any event, Mr.

---

[1] I understand that Mr. Cormick disputes whether he also offered me an equity stake in Elan Suisse (Pty) Ltd., a South African entity, in exchange for my $350,000 investment, but that dispute is irrelevant to resolving my Motion for Partial Summary Judgment.

Cormick admitted in his prior sworn affidavit attached as **Exhibit B** (at paragraph 10.5) that I wired these funds to his personal bank account.  Mr. Cormick further admitted receipt of these payments at paragraph 9.1 of another pleading filed with the High Court of South Africa on or about June 23, 2005 (a true and correct copy of which is attached hereto as **Exhibit D**).

6.    At no time after I wired $250,000 to Mr. Cormick did I ever sign a written agreement purporting to govern the terms of my "investment" in Elan Suisse USA or any other entity.  Mr. Cormick admits this fact at paragraphs 9.44 and 12.17 of the sworn affidavit attached hereto as **Exhibit B**.

7.    By September 2004, operations for Elan Suisse USA still had not yet commenced and, as a result, I began to grow suspicious about the legitimacy of Mr. Cormick's business venture.  At that time, I sent e-mails to Mr. Cormick (true and correct copies of which are attached hereto as **Exhibit E**) inquiring as to the status of my investment and demanding an audit of Elan Suisse USA and Elan Suisse (Pty) Ltd.

8.    In an e-mail dated September 9, 2004 (a true and correct copy of which is attached hereto as **Exhibit F**), Mr. Cormick responded to my demands for an audit by offering to repay me the $250,000 I had wired to him in March 2004.  In a letter dated November 30, 2004 from my South African counsel (a true and correct copy of which is attached hereto as **Exhibit G**), I accepted Mr. Cormick's offer to repay $250,000 to me. As of the present time, however, Mr. Cormick has not paid me one cent of this amount.

FURTHER AFFIANT SAYETH NOT.

_____
Robert D. Christ

Subscribed and sworn to before me
this 19th day of December , 2007
My commission expires December 29, 2010

_____
Notary Public

YIM LUN SZETO
Notary Public, State of Texas
My Commission Expires
December 29, 2010

- 4 -

# EXHIBIT A

**From:** Dr Brett Cormick [brettc@elan-capital.com]
**Sent:** Sunday, February 15, 2004 11:18 AM
**To:** bob.christ@seatrepid.com
**Subject:** The Kimono is Open Baby

Bob

OK this is the real meat of the thing

The REAL OBJECTIVE is to create the largest possible cash payout for the principles (THEE & ME) in the shortest amount of time possible

In other words

SELL IT....SIMPLE !!!!!

Elan Suisse is positioned as a Financial Engineering vehicle (eventhough it is a fully registered asset management, mutual fund management, broking institution) .............so the competition does not even see what it is doing until it is far too late

That is also true of the REAL HOMERUN!!!!!!!  The real game here in other words

No one gets it, and will not until its too late........

I want to sell the thing out well within 2 years for +$US 17 million (or much much more which I know how to do......)

THE REAL GAME IS THIS..............

No financial institution in history has ever been able to nab the 13,000 South African IFA's and their client base, which on a per capital basis globally, for the fees, is by far the most profitable institutionally in the world

Just check out the household name US banks that are all operating in Johannesburg (running all at a loss), trying to nab that famous retail market

Alliance
Fidelity
Templeton
Credit Suisse First Boston
Goldman Sachs
Merrill Lynch
Citibank
JP Morgan
SEI
Solomon Smith Barney
UBS Warburg
Bank of New York
HSBC
Schroeder
Prudential
Oppenheimer
etc etc

These are the best names in the US, and they are all happy to run at a local loss, because they can say to their shareholders in the US..hey look, we are part of the African Renaissance...so they get good publicity from it, and get good market share from black investors, and socially conscious pension funds like Calpers, Calsters etc so they make a profit in the US by loss leading a sexy South African operation.....

1

RDC 05933

They look like really good guys......but the reason they can't penetrate is they only offer their own dogshit named product which no body buys

But Elan Suisse is going to CAPTURE the entire 13,000 IFA market nationally.for our own product base (which is groups like Strong etc chosen because they are independant, with our name on them and with better returns)

But

How do you make FUCK OFF money.......QUICKLY and SIMPLY???????

Now if we had a little one man operation in the US the primary function would be to :

1. Data Capture the richest retail investor base in the world (piece of piss).pumped in and over from RSA

2. Promote the business to the Business Brokers in the US for sale.....at the highest price possible for a sale as quickly as possible

3. Help with product development to keep capturing the IFA's (Jewels)

The RSA Department of trade and Industry estimates that 4 US banks per month enquire about South African banking licenses

BUT

We will own the most important retail market in the world

We already looked at the US market and have identified over 1000 US institutions that could be contacted directly to sell the proprietary retail IFA investment network that we would own to directly

Its every bank, insurance company, asset management firm, financial consulting  etc in the US

Depending on the institution (and because of who is already there, we could get up to $25 million within two years for this)

Look at the obscene multiples they pay for market share in the US......even $25m is piddle..but it does not have the cache that South Africa has

i.e play off the biggest black bank in Alabama against the biggest pinko lefty bank in California to be the driving force for good in Africa (not to mention the most lucrative retail market in the world)

If you look at what they pay on advertising, good will promotions, competitive advantages etc nationally even $25 m is not much for the marketing value of FIRST NATIONAL BLACK BASTARD BANK OF CAROLINA to beat the GAY WHALE BANK OF SAN FRANCISCO to become the first ever US Bank to run at an immediate profit when opening in South Africa beating out the likes of Citibank, Merrill, JP Morgan etc

WOW......their stock price goes up

Then FIRST NATIONAL BLACK BASTARD BANK OF CAROLINA  gets photos with Mandela etc, shows off their social conscience, gets money from CALPERS etc etc (and puts us on huge buyout wages for 3 years while we are replacing ourselves) and triples its state side business......


AND how do we sell it....

The business brokers and Investment bankers do it all for us, just coordinated through our Philly office

We just keep driving up the price by opening the opportunity up to as many buyers as possible

2

RDC 05934

The sale price could actually be obscene if we did it right (i.e. I redid Imatron)

So

If you are willing to show the same kind of FUCK ME WHAT HAVE I DONE!!!!! commitment as me by putting in $350,000 which will take you to a similar place to me financially, after my $1.6m I will absolutely go 50 50 on this with you on the real upside, and do it proudly

So its 2 companies really

The  South African "show company" which will get its listing, pump in the product etc which acts as THE NET  (we will get you proportional shares etc against its valuation in that with $350,000 worth as well)

You will always be looked after here...........

The international Intellectual Property Holding Company that we are selling as soon as possible FOR MILLIONS!!!!!!!THE CATCH....the BIG ONE you get 50% of EVERYTHING!!!

If you are committing the farm...you are in all the way!!!

So you will get many times double the investment value jut starting out

A fisherman sells THE FISHING GROUNDS not the net

When Fidelity pays $600 million to Schwab for their business, they are buying their CLIENTS not their products

We are going to do the same

Sell the most lucrative client base (in the most prestigious geography for investor relations) in the world that we capture in RSA and Philly and then SELL IT!!!!!!!

ASAP!!!!!

There the Kimono is open......do you like my pussy???? : - )

We will be fucking rich bastards

3

RDC 05935

# EXHIBIT B

IN THE HIGH COURT OF SOUTH AFRICA

(WITWATERSRAND LOCAL DIVISION)

CASE NO: 05/2033

In the matter between:

CHRIST: ROBERT D                                    PLAINTIFF

AND

CORMICK: JOHN BRETT                                 DEFENDANT

> GRIFFIER VAN DIE HOOGGEREGSHOF
> (WITWATERSRANDSE PLAASLIKE AFDELING)
> PRIVAATSAK/PRIVATE BAG X7
> 2005 -04- 1 5
> JOHANNESBURG 2000
> (WITWATERSRAND LOCAL DIVISION)
> REGISTRAR OF THE HIGH COURT

**FILING NOTICE**

DOCUMENT:            DEFENDANT'S AFFIDAVIT OPPOSING
                     APPLICATION FOR SUMMARY JUDGMENT

DATED AT HALFWAY HOUSE this 15th DAY OF APRIL 2005.

(Get/Sgd) J.J. LOOTS

**J.J. LOOTS INCORPORATED**
Attorneys for Defendant
512 NUPEN CRESCENT
P O BOX 5143 – DOCEX 20
HALFWAY HOUSE, 1685
TEL: (011) 805-5030
FAX: (011) 805-4633
**C/o JOWELL GLYN & MARAIS INC**
4th FLOOR – 72 GRAYSTON DRIVE
SANDOWN
TEL: (011) 292-6700
FAX: (011) 784-4215

TO:    THE REGISTRAR OF THE
       ABOVE HONOURABLE COURT
       **JOHANNESBURG**


AND
TO:        ASSHETON-SMITH INC
           Attorneys for Plaintiff
           C/o CHRIS LEE ATTORNEY
           75 KING STREET – BERARIO
           JOHANNESBURG
           C/o **JAYS INCORPORATED**
           NO 9 ARNOLD ROAD
           ROSEBANK

                              Received copy hereof
                              this ___15___ day of
                              APRIL 2005.


                              _____

                              Jay Mkhubi Incorporated
                              Without prejudice
                              Time: 11:00
                              Date: 15/04/05

*File copy.*

# IN THE HIGH COURT OF SOUTH AFRICA
## (WITWATERSRAND LOCAL DIVISION)

CASE NO: 06/2033

In the matter between:

**CHRIST: ROBERT D.**                                              **PLAINTIFF**

and

**CORMICK: BRETT JOHN**                                    **DEFENDANT**

### DEFENDANT'S OPPOSING AFFIDAVIT

I, the undersigned,

**BRETT JOHN CORMICK,**

do hereby make oath and state:

**1.**

1.1    I am an adult male director of companies, currently employed as such as a director of Elan Suisse (Pty) Limited ("Elan"). The registered adress of Elan is at Ground Floor, Oxford Gate, Hyde Park Lane, Hyde Park, Sandton, in the Gauteng Province.

X430750-0...
J. F. VAN WYK

1.2   I currently reside in Hermanus in the Western Cape Province.

1.3   I conduct the business of Elan from its principal place of business in South Africa at 3rd Floor, Safmarine House, 22 Riebeeck Street, Cape Town, in the Western Cape Province.

1.4   I currently devote me time fully to the business of Elan.

**2.**

The facts contained in this affidavit are, except as far as the contrary may appear from the contents and context of this affidavit, within my personal knowledge, and are both true and correct.

**3.**

3.1   I am the Defendant in this matter, and as such I am duly authorised to depose to this affidavit.

3.2   I am also the sole director and shareholder of Elan.

J430750-0  J.F. VAN WYK

**4.**

I deny that I do not have a *bona fide* defence against the claim of the Plaintiff herein and that I have entered an appearance to the defend the Plaintiff's claim purely for the purposes of frustrating and delaying same.

**5.**

5.1  In fact, the Plaintiff brought an urgent application against Elan under case number 5401/2005 ("the liquidation application") in the above Honourable Court which, by the time that this application for summary judgment will be heard, has been finalised, on the basis that it, without prejudice to the parties' rights, became settled.

5.2  In the liquidation application I filed a comprehensive answering affidavit on behalf of Elan in which my defence herein as well as Elans' defence in the liquidation application is fully canvassed.

5.3  Notwithstanding, the Plaintiff persists in this application for summary judgment.

5.4  I am advised, which advise I accept, that, in the event that a Plaintiff is aware of the defence of a Defendant, and nonetheless persists with an application for summary judgment in respect thereof, the Plaintiff may be ordered to pay the costs thereof.

J.F. VAN WYK

4

5.5     In the premises, I shall apply to the Honourable Court that the application for summary judgment herein be dismissed with costs in the event of the Plaintiff persisting in same.

6.

Before I outline my *bona fide* defence on the merits of the Plaintiffs' claim herein, I wish to point out to the Honourable Court, *in limine*, that the Honourable Court has no jurisdiction to entertain this action.

7.

**JURISDICTION:**

7.1     I am an Australian citizen.

7.2     My wife was born in Zimbabwe and I, my wife and our children reside in Zimbabwe.

7.3     By virtue of my business with Elan, my presence is often required in South Africa, Europe, and the United States (the"US").   For the purpose of visiting South Africa I often, temporarily, reside in Hermanus outside Cape Town in the Western Cape Province.

0430750·D
J.F. VAN WYK

5

7.4    From the particulars of claim filed by the Plaintiff herein it appears that:

7.4.1  the Plaintiff alleges that I carry on business at Ground Floor, Oxford Gate, High Park Lane, High Park, Johannesburg;

7.4.2  Certain discussions were held between me and the Plaintiff pertaining to an investment of US $ 350 000 to be made by the Plaintiff in Elan and another company.  The place of these discussions is not divulged;

7.4.3  Pursuant to such discussions the Plaintiff deposited the amount of US $ 250 000 into my account during March 2004.   The place of this deposit is not divulged;

7.4.4  On or about the 9th of September 2004, and in writing, I offered to refund the Plaintiff the sum paid to me of US $ 250 000;  and

7.4.5  Such offer was accepted in writing by the Plaintiff on the 30th of November 2004 and, consequently, I am liable to repay the amount of US $ 250 000 to the Plaintiff. Again, the place of such offer and acceptance is not divulged in the Plaintiffs' Particulars of Claim. In fact, no specific allegation as to which fact the Plaintiff relies on for jurisdiction is made therein.

7.5    In this regard I wish to point out to the Honourable Court:



J.F. VAN WYK

6

7.5.1  I never "carried on business" at the address cited by the Plaintiff in this regard. This is the registered address of Elan, and the said premises is occupied by Elan from time to time. I carry on business, when I am in South Africa, which is rare, from Hermanus. I temporarily visit the offices of Elan in Johannesburg for the purposes of attending a meeting or opening mail but I am certainly never present in Johannesburg, from the 1st of December 2004, for more than one day a month on average;

7.5.2  Elan rents office space in Cape Town at the address set out therefore herein above, which is its principal place of business in South Africa. I spend most of my time on Elans' business there.

7.5.3  Before the 1st of December 2004, when Elans' business started taking more of my time, I certainly wasn't present in Johannesburg for more than one day every second or third month.

7.6  In the liquidation application, the Plaintiff declared under oath:

7.6.1  While the discussions alleged in the particulars of claim filed on behalf of the Plaintiff with reference to his investment in the relevant companies were held, the Plaintiff was in the United States of America;

7.6.2  At the same time, I was either abroad in Europe, in Zimbabwe, or in Hermanus;

430760-0    J.E. VAN WYK

7

7.6.3 I categorically state that I never held any discussions pertaining to the investment of the Plaintiff as alleged while in Johannesburg or anywhere in Gauteng for that matter;

7.6.4 The investment of US $ 250 000 by the Plaintiff was made by electronically transferring same to my personal bank account from the United States, where the Plaintiff was present at the time, held at National Westminster Bank and/or LLoyds TSB in London or the Isle of Man; and

7.6.5 While I wrote the e-mail of 9 September 2004 on which the Plaintiff relies for my undertaking to repay the said investment to him I was in Hermanus, in the Western Cape, and, on the Plaintiff's own version, he was in the United States when accepting same, alternatively same was accepted on his behalf by his attorney of record in Cape Town, and I received communication thereof in Cape Town.

7.7 Accordingly, without admitting any of the facts pleaded by the Plaintiff in this regard, it is clear that:

7.7.1 Neither myself nor the Plaintiff is usually resident within the area of jurisdiction of the Honourable Court;


J.F. VAN WYK

7.7.2  Neither myself nor the Plaintiff is usually employed or carries on business within the area of jurisdiction of the Honourable Court;

7.7.3  The agreement that led to the investment of the Plaintiff with me, which is not admitted, as alleged, was not concluded within the area of jurisdiction of the Honourable Court;

7.7.4  The relevant investment was not made within the area of jurisdiction of the Honourable Court; and

7.7.5  The alleged agreement for repayment, which is denied as will be set out hereunder, was not concluded within the area of jurisdiction of the Honourable Court.

7.8  Full legal argument will be addressed to the Honourable Court at the hearing of this application in this regard.

**8.**

8.1  The Plaintiff, by virtue of the facts set out in the liquidation application, was aware of these facts, but nonetheless persisted in this application. It is, amongst others, on this basis that I pray for the Plaintiff to pay the costs of this application.



1430750-0.
J.F. VAN WYK

8.2 Accordingly I respectfully submit that the abovementioned point of jurisdiction alone clearly illustrates that I have a *bona fide* defence against the Plaintiff's claim herein and pray that the Plaintiff's claim for summary judgment herein for this reason alone be dismissed with costs.

**9.**

## AD *BONA FIDE* DEFENCE:

9.1 I am a person with extensive experience and an excellent worldwide reputation in the financial services industry.

9.2 During the past fifteen years:

9.2.1 I was employed by some of the biggest financial services firms in the world;

9.2.2 I was a managing director ABN Amro, one of the biggest banks in the world, in Europe;

9.2.3 I was the director of corporate sales at Electra, one of the largest private equity firms in Europe;



9.2.4   I was the managing director of global sales at Mees Pierson, a boutique investment bank associated with ABN Amro;

9.2.5   I obtained my doctorate in economics; and

9.2.6   I lecture worldwide at business schools and universities on the financial services industry.

9.3   As such, I gained vast experience in the development and marketing of financial services products.

9.4   My wife is Zimbabwean, and our family resides there. As a consequence of my residence in Zimbabwe, I came into contact with the South African financial services industry.

9.5   One of the big difficulties in the South African economic environment, is the archaic system of exchange controls that is being kept in place by the South African government.

9.6   Approximately three years ago, I developed an investment product ("the product") that effectively provides:

9.6.1   a safe investment vehicle by investing in AAA bonds underwritten by the government of the USA, the investment with the lowest risk one can attain in the money market;

1430750-0
J.P. VAN WYK

11

9.6.2   a tax effective investment vehicle in that the investment is held off-
shore in a tax haven; and

9.6.3   an alternative investment vehicle which provides offshore returns in
foreign currency. The investment is made for example in South African
rands, but returns can be paid in pounds sterling or US dollars, as the
case may be.

9.7     By virtue of the fact that the product is the trade secret of Elan and that
the true nature of the product is not really at issue here, I would at this
stage not elaborate further thereon. My rights in this regard are
reserved.

9.8     Simultaneously, I noticed a trend in the South African financial services
industry that foreign banks are having a tough time to enter the local
market. Many foreign banks apply for licenses to operate in the South
African market and establish offices here at great cost, only to return
their licenses shortly thereafter because of their inability to generate
profits for their shareholders.

9.9     In my view, the key to this market is access to the retail investment
sector of the market. The foreign banks that did set up offices in South
Africa to date has not been able to break the local banks' stranglehold
on this market, purely by reason of the fact that they do not have the

APR 2005 13:50 FROM-BLOOSTS INC 805 4633          NO.481   P.15/2

necessary innovative products to entice the market to utilize their services.

9.10   I strongly believe that the product has this ability.

9.11   Accordingly, I set up the Elan Suisse Group ("the group") as a structure to facilitate the marketing and selling of the product.

9.12   The group consist, in chief, of Elan in South Africa, and similarly named private companies in the US and the Bahamas.

9.13   The structure of the group is:

9.13.1 Elan in South Africa will front the product. Thus, Elan will market the product to the retail investment market locally, and, as investors buy into the concept, will manage the fund so created;

9.13.2 Elan Suisse in the Bahamas, a tax haven, will act as custodian of the fund created by Elan in South Africa and, later, by similarly named entities worldwide. The fund so created will be administered there and returns will be paid there; and

9.13.3 The intellectual property of Elan, consisting in the main of the product and the customer data base built up from the sale of the product in the



0430750-0                                    J.P. VAN WYK

South African retail investment market, will be held by the entity registered therefore in the US.

9.14 I strongly believe that any good business plan also includes a exit strategy, being a way, after the business of Elan has been sufficiently built up to my satisfaction, and I want to move on to other pastures, to sell the said business for a profit in order to be rewarded for my input and to provide me with working capital for my next project.

9.15 The reason why the intellectual property of Elan would be held in the entity incorporated in the US is exactly such an exit strategy. The American banks who would like to enter the South African market, would pay dearly for the product and the said customer information, as a way into the South African retail investment market.

9.16 Consequently, the structure was designed so as to maximize the possible profit from the eventual sale of the Elans' intellectual property.

9.17 Accordingly, I proceeded to set up all the relevant entities.

9.18 The first step was to set up Elan, and to ensure that Elan comply with all the relevant statutory requirements necessary to operate as an investment vehicle and fund manager as is set out above.

X30750-0
J.F. VAN WYK

9.19    For this purpose, I contacted a friend of mine, Dirk Mostert ("Mostert"), in South Africa. Mostert is a director of a reputable company that mainly trades in money market instruments called Mercari (Pty) Limited ("Mercari").

9.20    Mercari has been trading as such for six years now, and Mostert has been a money market trader for more than ten years now. As such their clients include all of the major banks in South Africa, and especially FNB and Nedbank, the latter of which they trade with on an open account. This means that Nedbank allows Mercari to settle contracts on its behalf in the latter's discretion, theirs being a relationship of the utmost trust.

9.21    In the financial services industry, a good reputation is of immense value. For this reason I always deal only with entities operating in the main stream of the industry with a good reputation.

9.22    Mostert was familiar with the requirements of setting up a private company in South Africa and assisted me in the incorporation of Elan. Mostert also referred me to his auditors, Leader, Arendse and Associates, whom I enrolled as Elans' auditors.

9.23    Accordingly, during or about July 2003, Elan was incorporated with me as the sole shareholder and director.

05 SEP 2005 12:58 CT ROOTS INC 605 4633 NO.481 P.18

15

9.24 Elans' auditors was retained on Mosterts' recommendation, and, by virtue of the fact that Mostert and I became friends:

9.24.1 Mostert offered that Elan "incubates" in the offices of Mercari. To this end Elan had free use of the said offices, and Mostert offered his employees' labour free of charge to Elan. Mostert also dedicated one of the telephone lines allocated to Mercari to Elan, free of charge. It must be kept in mind that I started Elan from my own funds, and appreciated any opportunity to save costs; and

9.24.2 The offices of Mercari was also chosen to be the registered address of Elan.

9.25 As an aside, Mostert also asked me to become a non-executive director of Mercari, in order to contribute my insights and extensive experience in the money market and the financial services industry to Mercari's business. Naturally, I agreed.

9.26 Thus, Elan was set up and incorporated during or about July 2003.

9.27 I also started negotiations with the Financial Services Board ("the FSB") in order to ensure that Elan obtain the necessary statutory approval for its proposed activities.

F. VAN WYK

9.28   This approval was initially granted to myself on the 13th of May 2003 in my personal capacity, as appears from the letter from the FSB to myself attached as **Annexure "BC1"** hereto.

9.29   Later, during or about September 2004, the same approval was granted to Elan, as appears from an e-mail from the FSB attached hereto as **Annexure "BC2"**.

9.30   The registration number of Elan with the FSB is 852. I constantly keep in contact with the FSB about the business of Elan. Recently, Norman Bothe, a portfolio manager at Barnard Jacobs Melet ("BJM"), a major stock broking firm, joined Elan. I kept the FSB informed of this, and complied with all their requirements in this regard, as is evidenced by the e-mails attached hereto as **Annexure "BC3"**.

9.31   So, the business of Elan slowly took shape. One must with respect keep in mind that we have to do with a start up business here. It takes a long time to get the structure in place for such a business to operate. Since the incorporation of Elan I have worked eighteen hours a day in order to:

9.31.1 Set up a broker network for the marketing of the product. In this regard several major players in the financial services industry have expressed an interest to market the product, such as ABSA and RMB;

9.31.2 Draft and create the standard forms and computer systems which will be utilized by Elan in the marketing and selling of the product;

9.31.3 Set up communications channels and systems with the relevant authorities such as the FSB, the Reserve Bank and the likes which will be crucial once the sales of the product commences;

9.31.4 Set up the other entities in the structure in the US and the Bahamas and the necessary structures there to ensure that the whole structure of the Elan Suisse Group is operational when sales of the product commence; and

9.31.5 Draft and create all the necessary agreements in order to turn Elan into an operational entity within the structure as is set out above.

9.32   This is an immense task, and takes a lot of time to accomplish. Several months of work just went into the finalization of the standard forms Elan intends to utilize once the sales of the product commence.

9.33   One must also, with respect, bear in mind that the product is unique to South African and the world financial services industry in many respects. This necessitates a lot of the work to be done from scratch, I can not simply use standard systems utilized before. All of this I did from Cape Town, with Botha being Elans' representative in Johannesburg.

15-APR-2005 13:53   J.J. LOOTS INC 905 4633   NO.481   P.21

18

9.34  Initially I funded the setting up of Elan within the structure as is set out above from my own pocket. By the beginning of 2004, this has cost me in the region of US$ 1.6. million.

9.35  Also, around this time, the time came to set up and incorporate the entity in the US as part of the structure set out above.

9.36  I was stretched thin on time and resources, and it became clear to me that I would need assistance in the US, both in terms of physical time and in terms of capital.

9.37  I knew the Plaintiff since 1996, and, in the normal course of correspondence between us, I informed him of the product and the structure for the sale thereof as is set out above.

9.38  From the beginning of 2004, several discussions ensued between me and the Plaintiff in this regard. The result was that, during or about February 2004, I agreed, orally, with the Plaintiff that:

9.38.1 An entity in the form of a corporation, would be incorporated in Delaware in the US;

9.38.2 The Plaintiff would invest US$ 350 000.00 in this entity;



0430750-0-  J.F. VAN WYK

9.38.3 In return for his said investment in the said entity the Plaintiff would receive 50% of the shareholding therein;

9.38.4 The Plaintiff would represent the said entity in the US and assist with the development thereof by attending to issues such as marketing and the likes;

9.38.5 The intellectual property of Elan and the product would be seated in the said entity as part of the exit strategy as is set out above; and

9.38.6 On the sale of Elan and the said entity in the US as is anticipated by the exit strategy as is set out above, the Plaintiff would receive a further amount equal to his initial investment.

9.39   These were the terms of the oral agreement concluded between myself and the Plaintiff. The Plaintiff specifically travelled to Stellenbosch, where we discussed this agreement.

9.40   During said discussion in Stellenbosch, approximately during January 2004, I specifically made it clear to the Plaintiff:

9.40.1 He invests his money. It is not a loan.

9.40.2 He invests his money in the entity incorporated in the US alone. He has nothing to do with Elan in its day to day activities, and he receives no

equity in Elan. His only link to Elan would be when it is sold, together with the entity incorporated in the US, as part of the aforesaid exit strategy; and

9.40.3 He is only authorized to, once his aforesaid investment is made, represent the entity incorporated in the US.

9.41   It is on the basis of this oral agreement that the Plaintiff invested US$ 250 000.00 in the entity that was incorporated in the US as Elan Suisse International Holdings ("Holdings").

9.42   Both Holdings and Elan are legitimate businesses. Their integrity as corporate entities is beyond question, the product real, and its potential substantial.

9.43   As I have set out above, I have been occupied with the business of Elan and Holdings for the past three years on a full time basis. The said business is about to be launched.

9.44   The Plaintiff, as will appear more fully hereunder, repeatedly confirmed his investment. His said investment was a repudiation of the aforesaid oral agreement in that he invested less than agreed. Nonetheless, I chose to hold the Plaintiff to our agreement, on the basis that he simply receive less equity in Holdings for his lower investment.


J. F. VAN WYK

SEP. 2008  12:58  ROOTS INC 805 4633               NO. 481  P. 24

9.45  The Plaintiff agreed to this.

10.

10.1  In a series of e-mails that passed between myself and the Plaintiff from the 28th of January 2004 to the 14th of February 2004, I advised the Plaintiff and represented to him that:

10.1.1 I have spent the previous two years in setting up Elan in South Africa as a financial engineering company, with a national network of independent financial advisors ("brokers") and institutions, through which certain United States based financial products would be sold to an investor base of some one million investors, accessed through such brokers and institutions, in South Africa; and

10.1.2 I had already invested some US $ 1 600 000 in setting up the business of Elan; and

10.1.3 I was looking for an investor to enable me to complete the project.

10.2  The discussion centered around an investment in Holdings, and I explained the entire structure and the exit strategy as is set out above to the Plaintiff. I emphasize that the discussion was not limited to the e-mails that passed between myself and the Plaintiff. It was supplemented by our

J430750-0
J.F. VAN WYK

15:28 2006 13:30   JJ LOOTS INC 805 4633                    NO.481    P.25

22

oral conversations, resulting in the aforesaid agreement, for which the Plaintiff traveled to Stellenbosch specifically to discuss same with me.

10.3   I deny that any amount other than US$ 350 000 was ever discussed between me and the Plaintiff. With the substantial profits that the product will no doubt generate in Holdings through the intellectual property held there, I was loathe to allow the Plaintiff to invest in Holdings for a lesser sum.

10.4   The simple reason why the Plaintiff and his investment was necessary was that I needed both capital and labor in the US to assist in the activities of Holdings, which I could not handle myself. The Plaintiff is an accountant with "local knowledge", and I considered him a suitable person to assist in this regard.

10.5   Form our aforesaid discussions the Plaintiff decided to invest in holdings and did so by transferring the total of US $ 250 000 to my off shore bank account held in London, from the US.

**11.**

11.1   The Plaintiff invested in Holdings.

11.2   He simply had no contribution to make to Étan, whereas I needed him to assist with Holdings.

X30750-0.                   F VAN WYK

23

11.3   I have already set out the oral agreement between the Plaintiff and myself pertaining to his investment in Holdings herein above.

## 12.

12.1   The agreement pertaining to the intellectual property being held in Holdings and the incorporation of Holdings was reached before the Plaintiff transferred a cent to me. This was all agreed simultaneously as part of the agreement set out above.

12.2   At the time, Holdings was obviously not incorporated yet and had no banking facilities. Also, his investment was in Holdings, and it would defy logic to bring that money into South Africa. Holdings had nothing here.

12.3   As I have already pointed out, the Plaintiffs' investment was merely for the purpose of establishing and running Holdings. None of the funds were utilized in any other fashion.

12.4   This is the only reason why the funds were received in my offshore banking accounts.

12.5   The first year in which Holdings was incorporated had not run yet. At the end of the book year, the said funds shall be accounted for fully within Holdings as a capital investment.

J430TSO-D/JF  VAN WY

24

12.6   By 15 September 2004, the Plaintiff had second thoughts about his investment. He now all of the sudden saw it as a loan, and wanted his money back. This appears fully from the e-mail from the Plaintiff attached hereto as **Annexure "BC4"**.

12.7   After I contacted the Plaintiff and reminded him of the terms of the agreement, he reconsidered and proposed that only a certain portion of his investment be refunded to him, but that the remaining portion of his investment remain in Holdings under certain conditions. I attach a copy of the relevant e-mail hereto as **Annexure "BC5"**.

12.8   From **Annexure "BC5"** hereto it is clear that the Plaintiff effectively attempts to renegotiate the agreement in terms far more favorable for him than what the agreement is.

12.9   The Plaintiff, as an accountant, is fully aware that, where an investor invests in a company, public or private (not a loan), it is not as simple as asking for your money back when one wants to liquidate such investment.

12.10  From the very beginning, I held out to the Plaintiff that his investment is governed by the articles of association of Holdings, and I supplied him with a copy of same.



12.11 The Plaintiff was aware of this, as appears from his later e-mail of 17 September 2004, a copy of which I attach hereto as Annexure **"BC6"** and his e-mail dated 18 September 2004, a copy of which I attach hereto as Annexure **"BC7"**, from which he clearly intimates that he knows his investment must be "liquidated" through the sale of his shares.

12.12 It is in this sense that I reply to the Plaintiffs' said e-mail on Annexure **"BC7"** hereto that "cash" is coming. It simply refers to my efforts that I shall find other investors in Holdings to replace him.

12.13 However, the Plaintiff, on the 21st of September 2004, suddenly, without any warning, changed his mind and informed me by way of e-mail, a copy of which is attached hereto as Annexure **"BC8"**, that he no longer wishes to liquidate his position.

12.14 Also, on the 21st of September 2004, the Plaintiff by way of e-mail confirmed that, to his mind, I was not a "scam artist". I attach a copy of said e-mail hereto as Annexure **"BC9"**.

12.15 I was now under the impression that the Plaintiff is fully aware of the terms of the agreement and its nature and is satisfied with his investment. Moreover, it appeared that the Plaintiff was aware of the terms of the articles of association of Holdings, and that:

12.15.1        his investment was in Holdings; and

J.F. VAN WYK

12.15.2    It can only be repaid to him by holdings upon the sale of his shares in holdings for the price he so obtains.

12.16 It must also be borne in mind that I spoke to the Plaintiff continuously, and that e-mail was not our only form of communication. During our said conversations the Plaintiff also gave repeated indications that he is happy with his investment and understood the terms thereof.

12.17 The Plaintiff invested his money in accordance with the terms of the agreement. There was no written agreement contemplated between the parties. Certain paperwork, like share transfer forms, had to be concluded in order to fully implement the oral agreement, but no more than that.

12.18 I again point out that the Plaintiff invested less than what we agreed upon. This entitled him to less equity in Holdings, a fact to which I will show hereunder he agreed to.

12.19 I have spent many years working on this project, which the Plaintiff expects to make him rich in less than a year. The simple truth of the matter is that the Plaintiff had expectations of earlier returns, and now doesn't have the patience to wait for his returns as the prudent investor would do.

12.20 Moreover, while I have no problem that the Plaintiff liquidate his position by taking possession of his shares and selling same as he is

aware he must do, he clearly seems unable or unwilling to perform this step. I have, throughout, tendered delivery of the said shares to the Plaintiff, and I still do so.

12.21 It is clear from what I have set out herein above that my offer to repay the Plaintiff his investment was made in our mutual understanding that the only way of doing so would be to take possession of and sell his shares in Holdings.

12.22 I attach hereto, as Annexure "BC10", a copy of my e-mail sent to the Plaintiff dated the 17th of February 2004 in which I clearly ask him if he is aware that he only buys into Holdings.

12.23 Further, it is clear from the full paper trail as I have set out above, that I never undertook to repay the investment of the Plaintiff personally. His shares in Holdings would have to be sold, and he would be paid from that. He knew this.

12.24 In any event, in Annexure "BC8" hereto, the Plaintiff changes his mind, and stands down from the position where he wanted to liquidate his position in Holdings. Even if I am wrong in my position that I never undertook personally to repay the Plaintiffs' investment to him, which I still deny, the Plaintiff clearly waived such payment, before the attempted "acceptance" thereof by the Plaintiffs' attorneys of record.



B.F. VAN WYK

15 SEP 2005  13:54  H LOOTS INC 805 4633                    NO.461    P.31

28

12.25 Contrary to what the Plaintiff wants the Honourable Court to believe now, he actually agreed with me that he is only entitled to 35% of the shareholding in Holdings.

12.26 This is simply another of the blatant lies of the Plaintiff herein.

12.27 Also contained in **Annexure "BC11"** hereto, is an e-mail sent by the Plaintiff later on the same day, wherein he indicates that he is ready to proceed with the project again.

12.28 The only issue unresolved after my receipt of the e-mails contained in **Annexure "BC11"** hereto, was the issue of the Plaintiffs' alleged shareholding in the Elan.

12.29 In this regard I wrote to the Plaintiff as early as 17 February 2004 that he only buys into Holdings.

12.30 This issue again, as is set out above, cropped up during September 2004, when I fully set out the terms of the agreement, and the Plaintiff agreed with me.

12.31 I again reiterate that, in terms of the agreement, the Plaintiff would not receive any equity in Elan.



J.F. VAN WYK

29

12.32 In the first instance I never offered to repay the Plaintiff in my personal capacity. I have explained the context of the said offer fully herein above, and stand by what I have declared in this regard.

12.33 Secondly, the Plaintiff waived any offer that was made in Annexure "BC9" hereto.

12.34 It is ironic that the whole basis of the Plaintiffs' claim is belied by contents of the Plaintiffs' own correspondence, all of which the Plaintiff deliberately and dishonestly withholds from the Honourable Court.

13.

From what I have set out above it is with respect clear that:

13.1 The Plaintiff invested in Holdings;

13.2 The Plaintiff's investment in Holdings can only be liquidated on the basis that his shares in Holdings are sold, be that for a profit, a loss, or the same amount of his investment, and the purchase price of the shares paid to him;

13.3 This is in accordance with the Articles of Association of Holdings of which the Plaintiff is aware and to which he bound himself;



13.4  I never personally undertook to repay the said amount of the investment to the Plaintiff; and

13.5  Even if I undertook to so repay the said investment, the Plaintiff, in writing, waved such undertaking.

## 14.

14.1  In the premises I submit that I clearly have a *bona fide* defence against the Plaintiff's claim herein, which, if proved at the trial, will constitute a good defence.

14.2  Furthermore, my defence as is set out above, was fully conveyed under oath in the liquidation application to the Plaintiff. I shall ensure that the full court file in the liquidation application is available for the Honourable Court's inspection and reference at the hearing of this application.

## 15.

15.1  In the circumstances, the Plaintiff's persistence in the application for summary judgment constitutes an abuse of process.

15.2  Full legal argument shall be addressed to the Honorable Court in this regard in due course.

31

16.

In the premises, I pray that the Plaintiff's application for summary judgment be dismissed with costs.

_____

DEPONENT

SIGNED AND SWORN TO BY THE ABOVE DEPONENT BEFORE ME ON THE 15 DAY OF April 2005 AFTER THE SAID DEPONENT CONFIRMED THAT HE HAS READ THIS AFFIDAVIT, THAT HE UNDERSTANDS THE CONTENTS THEREOF, AND THAT SAME IS TRUE AND CORRECT, AFTER HE HAS TAKEN THE PRESCRIBED OATH, WHICH HE CONSIDERS BINDING ON HIS CONSCIENCE.

_____

COMMISSIONER OF OATHS

2005 -04- 1 5

KLEINMOND
COMMUNITY SERVICE CENTRE
SOUTH AFRICAN POLICE SERVICE

# EXHIBIT C

```
             CURRENT ACTIVITY                          03/23/04

KAREN E CHRIST                      ACCT NBR   1010084543624
ROBERT D CHRIST                     PROD DESC  HIGH PERFORM'CE MM
2333 JONES ROAD
POTTSTOWN PA  19465                 STMT DATE  03/12/2004
                                    STMT AMT         230618.73+

                                    DAILY BAL        230,618.73+
03/16/2004
              40.00-   FUNDS TRANSFER FEE   (ADVICE 040316009287)
         125,000.00-   INTL FUNDS TRANSFER  (ADVICE 040316009287)
                       SENT TO  WACHOVIA BANK NA /LLOYDS TSB ISLE O
                       BNF=DR BRETT CORMICK RFB=040316400085
                        AMT=     125000.00 CUR=USD RATE=
                       REF=040316400085       03/16/04  09:59AM
           6,000.00-   COUNTER WITHDRAWAL

                                    DAILY BAL         99,578.73+



     *** INCLUDES TRANSACTIONS POSTED FROM 03/13/2004 TO 03/22/2004 ***
          *** INFORMATIONAL COPY ONLY - NO ENCLOSURES ***
```

# EXHIBIT D

# IN THE HIGH COURT OF SOUTH AFRICA
## WITWATERSRAND LOCAL DIVISION



CASE NO: 05/2033

In the matter between:

**CHRIST: ROBERT D.**                                              **PLAINTIFF**

and

**CORMICK: BRETT JOHN**                                          **DEFENDANT**

---

### DEFENDANT'S PLEA

---

The Defendant pleads as follows to the Plaintiff's particulars of claim:

1.

**SPECIAL PLEA _IN LIMINE_:**

The Defendant pleads _in limine_:

1.1     The Defendant is an Australian Citizen;

1.2     The Defendant permanently resides in Zimbabwe;

1.3     The Defendant, for the purposes of visiting South Africa, temporarily resides from time to time in Hermanus, in the Western Cape Province;

1.4     The Defendant neither resides nor carries on business at any place within the area of jurisdiction of the Honourable Court;

2

1.5    The Plaintiff resides in the United States of America;

1.6    The Plaintiff is employed in the United States of America;

1.7    The Plaintiff owns no property within the area of jurisdiction of the Honourable Court;

1.8    The Defendant owns no property within the area of jurisdiction of the Honourable Court;

1.9    Plaintiff's claim against the Defendant is for the amount of US$250 000 which was:

1.9.1    deposited by the Plaintiff from the United States of America in two amounts of US$125 000 each into the bank accounts of the Defendant in London in the United Kingdom; and

1.9.2    agreed to be so deposited while the Plaintiff and the Defendant were outside the borders of the Republic of South Africa.

1.10    The basis on which the Plaintiff claims the aforesaid sum of money from the Defendant is that, on or about the 9th of September 2004, and in writing, the Defendant offered to refund the Plaintiff the said sum and said offer was accepted in writing by the Plaintiff on or about the 30th of November 2004; and

1.11    In this regard, while making the alleged offer, the Defendant was resident or carrying on business within the area of jurisdiction of the Honourable Court and while accepting such offer the Plaintiff was not residing or carrying on business within the area of jurisdiction of the Honourable Court.

3

**2.**

2.1    In the premises the Defendant pleads:

2.1.1    Neither the Plaintiff nor the Defendant is ordinarily resident or carries
        on business within the area of jurisdiction of the Honourable Court;
        and

2.1.2    The cause of action herein did not arise within the area of jurisdiction of
        the Honourable Court; and

2.1.3    that the Honourable Court consequently has no jurisdiction to entertain
        this action.

**3.**

**AD THE PLAINTIFF'S PARTICULARS OF CLAIM:**

**AD PARAGRAPH 1 THEREOF:**

The Defendant admits this paragraph.

**4.**

**AD PARAGRAPH 2 THEREOF:**

4.1    The Defendant admits that he is Dr Brett John Cormick, an adult male
       businessman.

4.2    The Defendant denies that he carries on business at Ground Floor,
       Oxford Gate, Hyde Park lane, Hyde Park, Johannesburg and puts
       Plaintiff to the proof thereof.

4

4.3     The Defendant in particular pleads, at all times relevant to this action:

4.3.1   the Defendant neither carried on business nor resided within the area
        of jurisdiction of the Honourable Court;  and

4.3.2   the Defendant does not own any property, be it movable or immovable,
        within the area of jurisdiction of the Honourable Court.


5.


**AD PARAGRAPH 3 THEREOF:**

5.1     The Defendant admits that, during or about December 2003 to
        February 2004, the Plaintiff and the Defendant held certain discussions
        pertaining to an investment of US$350 000 to be made by the Plaintiff
        in a company to be incorporated in Delaway, United States of America.

5.2     The balance of the allegations contained in the paragraph under reply
        are denied as if specifically traversed and the Plaintiff is put to the proof
        thereof.


6.


**AD PARAGRAPH 4, 4.1, 4.2 AND 4.2.1 THEREOF:**

The Defendant admits the contents of these paragraphs.

5

7.

**AD PARAGRAPH 4.2.2 THEREOF:**

The Defendant denies the contents of this paragraph as if specifically traversed and puts the Plaintiff to the proof thereof.

8.

**AD PARAGRAPHS 4.3 AND 4.4. THEREOF:**

The Defendant admits the contents of these paragraphs.

9.

**AD PARAGRAPH 5 THEREOF:**

9.1     The Defendant admits that the Plaintiff deposited the sum of US$250 000 to the accounts of the Defendant during or about March 2004.

9.2     The Defendant denies the balance of the allegations contained in the paragraph under reply as if specifically traversed and puts the Plaintiff to the proof thereof.

10.

**AD PARAGRAPHS 6 AND 7 THEREOF:**

The Defendant denies the contents of these paragraphs as if specifically traversed and puts the Plaintiff to the proof thereof.

6

## 11.

__AD PARAGRAPH 8 THEREOF:__

The Defendant admits demand and his failure to pay but pleads that the Defendant is not indebted to the Plaintiff in the amount claimed or any amount and puts the Plaintiff to the proof thereof.

**WHEREFORE THE DEFENDANT PRAYS** that the Plaintiff's claim be dismissed with costs.

SIGNED and DATED at Pretoria                 on the 21st day of June 2005.

_____
__K SWANEPOEL__
__DEFENDANT'S COUNSEL__

J J LOOTS INCORPORATED
ATTORNEYS FOR DEFENDANT
512 NUPEN CRESCENT
HALFWAY HOUSE
TEL: (011) 805-5030
C/O JOWELL GLYN & MARAIS INC
4TH FLOOR, 72 GRAYSTON DRIVE
SANDOWN
TEL: (011) 292-6700

TO:          THE REGISTRAR OF THE HIGH COURT
             WITWATERSRAND LOCAL DIVISION

AND TO:      ASSHETON-SMIT INC.
             ATTORNEYS FOR PLAINTIFF
             C/O CHRIS LEE ATTORNEY
             75 KING STREET
             BERARIO
             C/O JAY INCORPORATED

7

**9 ARNOLD ROAD**
**ROSEBANK**
**JOHANNESBURG**

Received a copy hereof on
the        day of June 2005.

# EXHIBIT E

**From:**   Bob Christ
**Sent:**   Sunday, September 05, 2004 3:00 PM
**To:**   brettc@elan-capital.com
**Subject:**   Re: Elan Suisse Status

Brett,

Where are you?  I would like to go over and have an extended meeting on this.

Your offer to take me out of this on initial funding of the platform is meaningless since if it doesn't get off of the ground (Barbados Part 2) then I'm fucked anyway.  I want specific information as to the status of this company and why it is not operational.

You told me that $350,000 is all that was needed (I think that I asked you this a whole bunch of times BEFORE sending you the $250k) in order to get this up and running.  And now Elan Suisse is out of money.  Why is it out of money, Brett?

Fran Chilcot made similar promises.  Everyone in Barbados had doctorates and advanced degrees.  But everyone left penniless since no one could afford to pay the hotel and communications bills (which I ended up taking the lion's share of – read, equity participant for the loss and employee participant for the profit).  It never got off of the ground due to credibility gaps which caused lack of trust.  The difference here is that my stakes in this is higher and I knew you before and consider you a friend.  I cannot explain what is happening with this company and I want answers.

So, I want an audit done on Elan Suisse – specifically the spending of the $250,000 which I have given to you thus far.  That is independently verified truth.  I'll find someone locally in Cape Town to do it.  Transparency.  I want to see where the money went and that is my right as a shareholder.
Then we're going to either a) together make this company work, or b) I am going to get my money back.

So, either do one of 2 things this week:
1) Begin preparing a dossier of all of the information on this company which I will view in person next week.  We can work out the problems, together.
or
2) Send my $250,000 back and we'll just call it a little misunderstanding.
No hard feelings.  I am not going to wait for some payout that never happens.

Please specify which of these you would like.

I gave you complete trust.  I feel you have broken that trust.  I hope I am – and please do prove me – wrong.

Bob

----- Original Message -----
From: "Dr Brett Cormick" <brettc@elan-capital.com>
To: "Bob Christ" <bobc@elan-capital.com>
Sent: Saturday, September 04, 2004 11:15 AM
Subject: Re: Elan Suisse Status


> Nope
>
> Completely incorrect on all points actually
>
> Did the old scheme particulars scare you or something?/
>
> Status is simply this.
>
> 1. Funds pre sold and pre approved by all buyers and end users (biggest on

1

the
> continent)...usually this happens only after approval
>
> 2. New Expert Investor Scheme (Jersey) provides fast track registration
(10
> days only for approval)
>
> 3. FSB approves on new understanding of umbrella fund structure
>
> 4. Funds are subscribed to...
>
> thats it.
>
> The only difference is that before it was necessary to use someone elses
> platform in Guernsey (M3's...approval took 3 months or so)but it was used
by
> the biggest institutions in RSA
>
> Now Elan Suisse has approval for its OWN platform...same as Old Mutual,
> Investec etc.....
>
> This is out of budget, but I am getting it funded now, and will then be a
fund
> supermarket
>
> Thats it...
>
> If you want out let me know, its no problem...will organise it as part of
the
> fundng of the platform
>
>
>
>
>
> ---- Original message ----
> >Date: Fri, 3 Sep 2004 16:55:22 -0400
> >From: "Bob Christ" <bobc@elan-capital.com>
> >Subject: Elan Suisse Status
> >To: "Brett Cormick" <brettc@elan-capital.com>
> >
> >    Brett,
> >
> >    This is the status of Elan Suisse from what I can gather:
> >
> >    1) In order for ES to take in its first dollar of revenue, FSB and
> >    Jersey approval of the scheme and the cells must be gained.
> >    2) In order for the FSB/Jersey regulators to approve the scheme,
> >    approval of the scheme particulars as well as all of the custodian,
> >    management, investment advisor(s) and administration agreements must
> >    be in place.
> >    3) As far as I can tell, none of these agreements are in place [or
> >    drafted] or on file and we're still in the "Talk" phase.
> >    4) If 1) through 3) are correct then we are not days or weeks but
> >    literally months if not years away from launching this company and
> >    generating revenue to pay back the investment in this company.
> >
> >    Please tell me if my assessment of the above is correct.  If it is
> >    incorrect, please tell me which points are incorrect and what is the
> >    proper status.
> >
> >    Bob
> >
> >
> >
> >
> >

2

RDC 14556

3

RDC 14557

**From:** Bob Christ
**Sent:** Tuesday, September 07, 2004 6:48 AM
**To:** Brett Cormick
**Subject:** Re: Elan Suisse Status

I'm in a negotiating mood up until 1000 eastern US time next Monday morning (September 13th).

Return of my $250k will be the easiest way here.  I'll absorb my time and expenses and interest on the money for the past 6 months.  And this will go no further.  I won't be made whole, but I will be relieved.  It will save me the trouble of what is to come.  This dream, for me, is over.  You can still keep your dream up until next Monday morning.

I'm giving you and easy way out of this, Brett.  Take it.
----- Original Message -----
From: "Bob Christ" <bobc@elan-capital.com>
To: <brettc@elan-capital.com>
Sent: Sunday, September 05, 2004 3:59 PM
Subject: Re: Elan Suisse Status

> Brett,
>
> Where are you?  I would like to go over and have an extended meeting on
> this.
>
> Your offer to take me out of this on initial funding of the platform is
> meaningless since if it doesn't get off of the ground (Barbados Part 2)
then
> I'm fucked anyway.  I want specific information as to the status of this
> company and why it is not operational.
>
> You told me that $350,000 is all that was needed (I think that I asked you
> this a whole bunch of times BEFORE sending you the $250k) in order to get
> this up and running.  And now Elan Suisse is out of money.  Why is it out
of
> money, Brett?
>
> Fran Chilcot made similar promises.  Everyone in Barbados had doctorates
and
> advanced degrees.  But everyone left penniless since no one could afford
to
> pay the hotel and communications bills (which I ended up taking the lion's
> share of - read, equity participant for the loss and employee participant
> for the profit).  It never got off of the ground due to credibility gaps
> which caused lack of trust.  The difference here is that my stakes in this
> is higher and I knew you before and consider you a friend.  I cannot
explain
> what is happening with this company and I want answers.
>
> So, I want an audit done on Elan Suisse - specifically the spending of the
> $250,000 which I have given to you thus far.  That is independently
verified
> truth.  I'll find someone locally in Cape Town to do it.  Transparency.  I
> want to see where the money went and that is my right as a shareholder.
> Then we're going to either a) together make this company work, or b) I am
> going to get my money back.
>
> So, either do one of 2 things this week:
> 1) Begin preparing a dossier of all of the information on this company
which
> I will view in person next week.  We can work out the problems, together.

1

RDC 14565

> or
> 2) Send my $250,000 back and we'll just call it a little misunderstanding.
> No hard feelings.  I am not going to wait for some payout that never
> happens.
>
> Please specify which of these you would like.
>
> I gave you complete trust.  I feel you have broken that trust.  I hope I
> am - and please do prove me - wrong.
>
> Bob
>
> ----- Original Message -----
> From: "Dr Brett Cormick" <brettc@elan-capital.com>
> To: "Bob Christ" <bobc@elan-capital.com>
> Sent: Saturday, September 04, 2004 11:15 AM
> Subject: Re: Elan Suisse Status
>
>
> > Nope
> >
> > Completely incorrect on all points actually
> >
> > Did the old scheme particulars scare you or something?/
> >
> > Status is simply this.
> >
> > 1. Funds pre sold and pre approved by all buyers and end users (biggest
on
> the
> > continent)...usually this happens only after approval
> >
> > 2. New Expert Investor Scheme (Jersey) provides fast track registration
> (10
> > days only for approval)
> >
> > 3. FSB approves on new understanding of umbrella fund structure
> >
> > 4. Funds are subscribed to...
> >
> > thats it.
> >
> > The only difference is that before it was necessary to use someone elses
> > platform in Guernsey (M3's...approval took 3 months or so)but it was
used
> by
> > the biggest institutions in RSA
> >
> > Now Elan Suisse has approval for its OWN platform...same as Old Mutual,
> > Investec etc.....
> >
> > This is out of budget, but I am getting it funded now, and will then be
a
> fund
> > supermarket
> >
> > Thats it...
> >
> > If you want out let me know, its no problem...will organise it as part
of
> the
> > fundng of the platform
> >
> >
> >
> >
> >

2

RDC 14566

```
> > ---- Original message ----
> > >Date: Fri, 3 Sep 2004 16:55:22 -0400
> > >From: "Bob Christ" <bobc@elan-capital.com>
> > >Subject: Elan Suisse Status
> > >To: "Brett Cormick" <brettc@elan-capital.com>
> > >
> > >   Brett,
> > >
> > >   This is the status of Elan Suisse from what I can gather:
> > >
> > >   1) In order for ES to take in its first dollar of revenue, FSB and
> > >   Jersey approval of the scheme and the cells must be gained.
> > >   2) In order for the FSB/Jersey regulators to approve the scheme,
> > >   approval of the scheme particulars as well as all of the custodian,
> > >   management, investment advisor(s) and administration agreements must
> > >   be in place.
> > >   3) As far as I can tell, none of these agreements are in place [or
> > >   drafted] or on file and we're still in the "Talk" phase.
> > >   4) If 1) through 3) are correct then we are not days or weeks but
> > >   literally months if not years away from launching this company and
> > >   generating revenue to pay back the investment in this company.
> > >
> > >   Please tell me if my assessment of the above is correct.  If it is
> > >   incorrect, please tell me which points are incorrect and what is the
> > >   proper status.
> > >
> > >   Bob
> > >
> > >
> > >
> > >
> > >
> >
> >
```

3

RDC 14567

# EXHIBIT F

From:          Dr Brett Cormick [brettc@elan-capital.com]
Sent:          Thursday, September 09, 2004 10:31 AM
To:           Bob Christ
Subject:      OK YOU NEED TO READ THIS

Bob

OK

Sit down take a deep breath and deal with this....

You are a little wide of the mark here....and I am not going to respond to hooded threats

These are the facts

Just the facts

Share with Kevin immediately OK??

Its very important that you do this for your sake

1. When we were orginally looking at this we were looking at putting the products AAA into the market...that was fine

2. You agreed to put in $350K which was fine ($250K went in)...we both have these emails

3. I said in exchange you would get 50% of the Elan Suisse International Holding Company in the US, which was to be the vehicle that we would use to sell the entity to a US financial service entity (the captured IFA market), and your principle job was to source this sale through the local US business brokers....we both have these emails it was the big home run!!

4. It did NOT give you any equity in Elan Suisse RSA at all.(Not sure where you even pulled that one from)...not that its worth much

5. Check your emails

6. This is just fact

7. I have my copies so you must have yours

8. I then incorporated the US company in Deleware as soon as possible and sent you all of the details of the Elan Suisse International Holdings (which you have) for your 50%

9. I was actually in the process of giving you the 50% of Elan Suisse International Holdings for $250K instead of the full $350K and just forgetting about the rest as that would be cool because you were 110% behind the project and it would keep some extra cash in your pockets

These are just the facts

Now during this process it became possible to establish our own Jersey platform, which added such incredible value to the entire structure (which we discussed on the phone)....added to that it became possible to capture the Morgan Stanley CDO fund, the AA bespoke bond platform etc etcwhich put the entire vehicle into another league immediatley, UBS, Sky News etc etc...etc all of the value accruing to Elan Suisse International Holdings!!!!! (Your half entity)

This stuff was not cheap, in fact its hellishly expensive, but was worth it...ESPECIALLY the Jersey platform...although we now have UBS in Switzerland as well as a 100% backup!!

How do you think this stuff was all achieved???

For free????

So this is the exact position

CHECK YOUR EMAILS!!!

1. You are the benficial owner of $250K worth of Elan Suisse International Holdings...as per our agreement (50% being worth $350K) see emails to this effect, incorporation certificates etc This is the primary exit company!!!

2. You do not have any equity in Elan Suisse RSA, its a local South African operating company

3. If you do anything that damages the reputation of Elan Suisse RSA then I will be pissed...VERY PISSED

4. You need to be very careful about what you are representing to 3rd parties like Kevin

5. VERY CAREFUL indeed...

6. YOu were supposed to come over from the States with your Elan Suisse International Holdings business cards....the draft of which you have...to sell the investments from a US point of view etc

7. You would have received appropriate renumeration that we would work out to make sure that it was vular, and hopefully at somepoint in the near future..take over the physical South African operation, so that we could link the two for the sale of the IFA network into the US, with you being the critcal link...

8. That's how it is simple....check all of your mails....check the company incorporation docs that you received, check the draft business cards etc etc

Do a word search on your email for Elan Suisse International Holdings...that is you

Elan Suisse Pty (Ltd) South Africa is a totally different entity

It has none of the upside of the US company, just for capturing the IFA market

Now

1. Send me back an email apologising for being a dick

2. I will send you one apologising for being a dick (too much running around too little sleep...to much Zim strain etc)

3. Tell Kevin you were mistaken and that you were thinking of the wrong company...

4. You can have your money back no problem ........or you can fire up Elan Suisse Holdings and start building the sale (we have Nelson's son inlaw as bait now!!) and we will get drunk and never mention how grown men can be idiots

Whatever you like

Hint Hint

Its bigger than you have any idea of....and I still don't have anyone else that I trust as much as I trust you...how is that for fucking desperate!!! for what is to come!!!

So money back for Elan Suisse International Holdings (US)

or

Run it now that the story is there and it is ten times bigger (though it cost more)

```
---- Original message ----
>Date: Thu, 9 Sep 2004 09:47:38 -0400
>From: "Bob Christ" <bobc@elan-capital.com>
>Subject: Re: Further
>To: <brettc@elan-capital.com>
>
>Right.  Let's get this audit done next week then we're back on track.
>I'll arrange for more help so that you are not tasked with doing everything.
>Then this thing will be off and running.
>
>Perhaps this will be a healthy move forward.  I sincerely hope so.
>----- Original Message -----
>From: "Dr Brett Cormick" <brettc@elan-capital.com>
>To: "Bob Christ" <bobc@elan-capital.com>
>Sent: Thursday, September 09, 2004 9:38 AM
>Subject: Re: Further
>
>
>> The truth is that you and I are having an argument and behaving like
>> a
>pair of
>> 13 year old girls.....
>>
>> Which I am now starting to think is very funny!!
>>
>> ---- Original message ----
>> >Date: Wed, 8 Sep 2004 11:07:52 -0400
>> >From: "Bob Christ" <bobc@elan-capital.com>
>> >Subject: Further
>> >To: "Brett Cormick" <brettc@elan-capital.com>
>> >
>> >    You see Brett, I still think you are quite talented and exceptionally
>> >    bright.  And this company could still work if you are able to be
>> >    pointed in the right direction and kept on track.
>> >
>> >    So let's get all of the truth out on the table and we'll make some
>> >    decisions as to where to go from here.
>>
>
>
--
No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.1.408 / Virus Database: 268.13.4/476 - Release Date: 10/14/2006
```

# EXHIBIT G

## ASSHETON-SMITH INC.

ATTORNEYS & CONVEYANCERS

Dr Brett Cormick
c/o Elan Suisse (Pty) Ltd

Fax No :- (011) 325 0819
*& via email : brettc@elan-capital.com*

30 November 2004

Dear Dr Cormick

**MR ROBERT D CHRIST / YOURSELF**

1    We act for Mr Robert D Christ.

2    We are instructed by our client that in and during January and February 2004, following various discussions held between you and our client in respect of an investment to be made by our client of US350 000,00 in Elan Suisse International Holdings, and Elan Suisse (Pty) Ltd, our client deposited the sum of US250 000,00 into your personal bank accounts held in the United Kingdom.

3    From the correspondence that has passed between you and our client, it appears that no final agreement was ever reached between the parties regarding the proposed investment. In addition, you in an email to our client of 9 September 2004, offered to refund the amount paid to you by our client of $250 000,00.

4    We have been instructed by our client to accept such offer, which we hereby do, and call upon you to effect payment of the said sum of US250 000,00 to our client within seven days of the date of this letter, failing which we have been instructed to institute legal proceedings against you for payment of the aforesaid sum, together with interest and legal costs, without further notice or delay.

5    Please be guided accordingly.

Yours faithfully
**ASSHETON-SMITH INC.**

**CRAIG ASSHETON-SMITH**

Ground Floor, West Block, Tannery Park, Belmont Road, Rondebosch 7700   PO Box 270, Newlands 7725, Cape Town, South Africa
Tel: +27 (0)21 685-6766   Fax: +27 (0)21 685-6796   E-Mail: asi@telkomsa.net
Director: CB Assheton-Smith   Company Registration No: 2002/010819/21

RDC 01589

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ROBERT D. CHRIST,                           )
                                            )
            Plaintiff,                      )
                                            )
      v.                                    )          C.A. No. 06-275-GMS
                                            )
BRETT J. CORMICK and ELAN SUISSE            )
INTERNATIONAL HOLDINGS (USA) LLC,           )
                                            )
            Defendants.                     )

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 20, 2007, I caused a true and correct copy

of the foregoing *Affidavit of Robert D. Christ* to be served on counsel for defendants as listed below,

via electronic CM-ECF:

*Attorneys for Defendants:*

David L. Finger, Esquire
Finger & Slanina, P.A.
One Commerce Center, Suite 725
1201 North Orange Street
Wilmington, DE  19801-1155


Dated:  December 20, 2007

                                            */s/ Thad J. Bracegirdle*
                                            Thad J. Bracegirdle (No. 3691)