IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ROBERT D. CHRIST,         )
                                 )
             Plaintiff,     )
                                 )
        v.            )      C.A. No. 06-275-GMS
                                 )
BRETT J. CORMICK and ELAN SUISSE  )
INTERNATIONAL HOLDINGS (USA)   )
LLC,                                  )
                                 )
            Defendants.  )

**PLAINTIFF ROBERT D. CHRIST'S REPLY BRIEF**
**IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT**

REED SMITH LLP

Thad J. Bracegirdle (No. 3691)
1201 Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 778-7500

Attorneys for Plaintiff Robert D. Christ

Dated:  January 16, 2008

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

**PRELIMINARY STATEMENT** ........................................................................1

**ARGUMENT** ...........................................................................................2

I.     MR. CHRIST AND MR. CORMICK ENTERED INTO A VALID CONTRACT WHICH MR. CORMICK SUBSEQUENTLY BREACHED..........2

II    MR. CORMICK HAS NO DEFENSE TO MR. CHRIST'S BREACH OF CONTRACT CLAIM .......................................................8

      A.    The Principal Purpose of the Parties' Contract Was Not Frustrated ..........9

      B    The "Articles of Association" Do Not Bar Mr. Christ's Claim ................11

**CONCLUSION** ....................................................................13

# <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

## Cases

*Chase Manhattan Bank v. Iridium Afr. Corp.*
  474 F. Supp.2d 613 (D. Del. 2007) ................................................................... 9

*In re Atlantic Gulf Communities Corp.*
  369 B.R. 156 (Bankr. D. Del. 2007) ................................................................ 9

*Jones v. City of Wilmington*
  299 F. Supp.2d 380 (D. Del. 2004) ................................................................. 3

*Martin v. Star Publ'g Co.*
  126 A.2d 238, 243 (Del. 1956) ................................................................. 10, 11

## Rules and Statutes

6 *Del. C.* § 18-101(7) ........................................................................................ 11

## Treatises

Restatement (Second) of Contracts § 261 ........................................................ 10

Restatement (Second) of Contracts § 347 ........................................................ 11

## <u>PRELIMINARY STATEMENT</u>

Over the course of four years, plaintiff Robert D. Christ has chased defendant

Brett J. Cormick across Africa, Europe and now the United States in an attempt to

recover his missing property.  To date, Mr. Cormick has blithely but skillfully erected a

clever running defense of legal maneuvers to prevent Mr. Christ from recovering the

funds he entrusted to Mr. Cormick in March 2004.  Mr. Cormick's answering brief in

opposition to Mr. Christ's Motion for Partial Summary Judgment is simply the latest of

these maneuvers, Mr. Cormick having selectively omitted from the Court's analysis key

correspondence between the parties in an effort to forestall an adverse ruling.  Despite

Mr. Cormick's evasive tactics, however, Mr. Christ's motion represents the first time

during his entire ordeal that a tribunal has an opportunity to consider the real issue raised

by the litigation – Mr. Christ's entitlement to a return of the missing $250,000.  While

Mr. Cormick has attempted to distract the Court from this issue through sensational

claims and accusations, the teachings of Occam's Razor – the simplest explanation is

usually the correct one – are particularly apt here.

As was true with his pending Motion for Judgment on the Pleadings, Mr. Christ

filed this motion in order to separate the wheat of his primary claim from the chaff Mr.

Cormick has introduced into this litigation.  The evidence provided in this reply brief fills

the gaps left by Mr. Cormick's answering brief and provides the Court with an ample

record on which to grant Mr. Christ summary judgment.  Mr. Christ respectfully requests

that the Court do so in order to finally conclude his lengthy pursuit of the funds Mr.

Cormick unlawfully misappropriated from him.

## ARGUMENT

In his answering brief, Mr. Cormick argues that Mr. Christ has based his motion for partial summary judgment on "over-simplification and convenient disregard of inconvenient evidence." Defendants' Ans. Br. in Opp. to Motion for Partial Summary Judgment (D.I. 77, cited hereinafter as "AB") at 9. Mr. Cormick further contends that Mr. Christ's opening brief "entirely ignores the two months of correspondence between the parties subsequent to the alleged 'offer' and before the purported 'acceptance.'" *Id.* Ironically, however, Mr. Cormick's own brief fails to disclose to the Court critical correspondence between Mr. Christ and Mr. Cormick that took place in and around the period from September 9, 2004 (when Mr. Cormick offered to repay Mr. Christ's $250,000 "investment") to September 16, 2004 (when Mr. Christ allegedly extended a "counteroffer").

When the Court considers all of the relevant evidence – none of which is disputed or contradicted – and views the parties' communications in their proper context, it will become clear that Mr. Cormick entered into a contract pursuant to which he agreed to repay Mr. Christ "ASAP" and which he unquestionably breached. The undisputed record also demonstrates that none of Mr. Cormick's purported defenses to Mr. Christ's breach of contract claim have any merit. Accordingly, Mr. Christ is entitled to summary judgment on Count II of his amended complaint.

## I.     MR. CHRIST AND MR. CORMICK ENTERED INTO A VALID CONTRACT WHICH MR. CORMICK SUBSEQUENTLY BREACHED.

Mr. Christ's opening brief explained that, under the law of either Delaware or Zimbabwe, a contract will be formed upon the extension of an offer and acceptance of that offer. *See* Plaintiff's Op. Br. in Supp. of Motion for Partial Summary Judgment (D.I.

75, cited hereinafter as "OB") at 8, 10.[1]  Mr. Cormick does not dispute that his September 9, 2004 e-mail stating that Mr. Christ "can have [his] money back no problem" (Affidavit of Robert D. Christ, dated Dec. 19, 2007 (D.I. 76, cited hereinafter as "Dec. 19 Christ Aff."), Ex. F) constitutes an offer to repay Mr. Christ the $250,000 he wired to Mr. Cormick in March 2004 if Mr. Christ did not wish to participate in the Elan Suisse venture.  *See* AB at 10.  Instead, Mr. Cormick argues that, by way of a September 16, 2004 e-mail, Mr. Christ made a counteroffer which, by law, rejected Mr. Cormick's original offer.  *See id.*  The numerous e-mails which Mr. Cormick did not disclose to the Court, however, place Mr. Christ's September 16, 2004 correspondence in its proper context and demonstrate that Mr. Christ did not reject, but accepted, Mr. Cormick's September 9, 2004 offer.

As Mr. Christ recounted in his opening brief, by September 2004 he began to grow concerned that, nearly six months after he wired his $250,000 "investment" to Mr. Cormick, the cash was gone but Elan Suisse had yet to begin operations.  *See* AB at 5; Dec. 19 Christ Aff. ¶ 7.  When Mr. Christ voiced these concerns to Mr. Cormick, Mr. Cormick initially offered to repay Mr. Christ, but only out of future investments which purportedly would be made by institutional investors into the Elan Suisse funds.  *See* Affidavit of Robert D. Christ, dated January 15, 2008 (cited hereinafter as "Jan. 15 Christ Aff."), Ex. A (Cormick on Sept. 4, 2004:  "If you want out let me know, its [*sic*] no problem … will organise [*sic*] it as part of funding of the platform").

---

[1] To the extent Delaware law applies and requires consideration for the formation of a contract (*see* OB at 8), Mr. Cormick does not argue in his answering brief that the parties' contract lacked sufficient consideration and, therefore, concedes the point.  *See, e.g.*, *Jones v. City of Wilmington*, 299 F. Supp.2d 380, 389-90 (D. Del. 2004).

On September 5, 2004, Mr. Christ rejected this offer, since under Mr. Cormick's proposal he only would be repaid if and when Elan Suisse became operational. *See id.* Instead, Mr. Christ demanded "specific information as to the status of this company and why it is not operational" as well as "an audit done on Elan Suisse – specifically the spending of the $250,000 which I have given to you thus far." *Id.* As an alternative to the audit, Mr. Christ proposed that Mr. Cormick return his $250,000 immediately. *See id.* Later that same day, Mr. Cormick confirmed his intention to repay Mr. Christ's funds, e-mailing to Mr. Christ "[i]f we are paying you out, can I contact [the web site developer] directly to keep the web site moving?" Jan. 15 Christ Aff. Ex. B. Mr. Christ responded by stating, "[s]end me back my $250,000 USD this week and you can have whatever you want." *Id.*

Over the next few days, while Mr. Cormick continued to evade questions about how he had spent Mr. Christ's $250,000, Mr. Christ began to move forward with pursuing an audit of Elan Suisse, even going so far as to contact and retain a South African accountant. *See* Jan. 15 Christ Aff. Exs. C, E, F, G, H, L. At the same time, Mr. Christ continued to leave Mr. Cormick the option of repaying his funds rather than subject Elan Suisse to an audit. On September 7, 2004, Mr. Christ e-mailed to Mr. Cormick:

> I'm in a negotiating mood up until 1000 eastern US time next Monday morning (September 13th).
>
> Return of my $250K will be the easiest way here. I'll absorb my time and expenses and interest on the money for the past 6 months. And this will go no further ….
>
> I'm giving you [an] easy way out of this, Brett. Take it.

*Id.* Ex. D.

By the morning (United States time) of September 9, 2004, Mr. Christ had instructed his South African accountant to review Mr. Cormick's and Elan Suisse's records to determine how his $250,000 had been spent – unless Mr. Cormick agreed to return Mr. Christ's funds by September 13, 2004.  *See* Jan. 15 Christ Aff. Ex. I.  Between 8:27 a.m. and 9:53 a.m. Eastern time on September 9, 2004, Mr. Christ sent Mr. Cormick no fewer than three e-mails confirming his intent to proceed with the audit the following week.  *See id.* Exs. J, K.

It was in response to these e-mails and Mr. Christ's actions to pursue the audit that Mr. Cormick e-mailed Mr. Christ at 10:31 a.m. Eastern time on September 9, 2004 and pleaded with him to "[s]it down[,] take a deep breath and deal with this …."  Dec. 19 Christ Aff. Ex. F.  As detailed in Mr. Christ's opening brief, it also was in this e-mail that Mr. Cormick asked Mr. Christ to call off the audit and offered that "[y]ou can have your money back no problem … or you can fire up Elan Suisse Holdings and start building the sale."  *Id.*  The next day, September 10, 2004, Mr. Cormick reconfirmed his offer by e-mail, stating to Mr. Christ:  "Its cool if you are in … then we soldier on, *if you are out, no sweat, I will just sell your position and you get your money back ASAP.*"  Jan. 15 Christ Aff. Ex. M (emphasis added).[2]

On September 13, 2004 – three days before Mr. Cormick contends Mr. Christ made a counteroffer and rejected Mr. Cormick's offer of repayment – Mr. Christ

---

[2] Mr. Cormick's extreme aversion to having an audit performed of Elan Suisse no doubt explains why, to this day, he still has never explained to Mr. Christ how his $250,000 "investment" was spent.  *See* Jan. 15 Christ Aff. ¶ 3.

indisputably accepted Mr. Cormick's September 9, 2004 offer by e-mail, writing to Mr.

Cormick:

> I tell you what Brett, per your offer below please liquidate my position and
> send my money ($250,000 USD plus the $8,000 USD I spent for the web
> site development) back to my Wachovia account from your National
> Westminster account.  That way the funds don't bounce.
>
> Once I get the funds back, we can renegotiate my position in this thing so
> that I know better where I stand.  Because right now I am really unclear.
> Please do so by October 15th.  That gives you over 30 days.
>
> *      *      *
>
> I don't see an end in sight.  And the pieces don't add up.  This is the best
> way I can think of to properly get this in writing and firm it up.
>
> $258,000 into my account by October 15th.  Please.

*Id.*  As this e-mail makes clear, Mr. Christ intended to "renegotiate my position" in Elan

Suisse upon return of his $250,000.  *See also* Jan. 15 Christ Aff. Ex. H (Christ on Sept. 8,

2004:  "When all of this is finished and all is said, I would still like to be able to continue

our relationship – albeit on a more business-like basis.").  It was in this vein that, three

days later, Mr. Christ proposed to Mr. Cormick that he remain involved in Elan Suisse at

a lesser investment level and subject to some additional requirements – in the September

16, 2004 e-mail that Mr. Cormick characterizes incorrectly as a "counterproposal."  AB

at 10; *see also* Declaration of Brett J. Cormick, dated Jan. 4, 2008 (D.I. 77, cited

hereinafter as "Jan. 4 Cormick Decl."), Ex. 2.

The September 4-13, 2004 e-mail correspondence Mr. Cormick omitted from his

answering brief also helps explain and places in their proper context the other e-mails Mr.

Cormick cites selectively in his brief.  For example, when Mr. Christ requested by e-mail

on September 17, 2004 that Mr. Cormick "liquidate my position in Elan Suisse and place

the funds back into my account" (Jan. 4 Cormick Decl. Ex. 3), Mr. Christ was not

"backing away from his previous day's position," as Mr. Cormick contends (AB at 11), but rather was reconfirming his September 13, 2004 acceptance and repeating his demand that Mr. Cormick repay his funds promptly. The October 15-20, 2004 e-mails in which Mr. Christ and Mr. Cormick negotiate the parameters of Mr. Christ's continued participation in Elan Suisse (*see* Jan. 4 Cormick Decl. Exs. 6-16) – and which Mr. Cormick cites as demonstrating that Mr. Christ "had abandoned any thought of getting his money back" (AB at 12) – are entirely consistent with Mr. Christ's September 13, 2004 statement that he would "renegotiate [his] position" upon Mr. Cormick's agreement to repay the investment. It was only after Mr. Christ hired counsel to review the parties' correspondence that it became clear to Mr. Christ that Mr. Cormick had no intention of honoring his agreement to return Mr. Christ's funds and thus, on October 22, 2004, demanded once again that Mr. Cormick "send me my money back." Jan. 4 Cormick Decl. Ex. 17.[3]

    After Mr. Christ retained counsel in South Africa, that counsel formally confirmed Mr. Christ's acceptance of Mr. Cormick's September 9, 2004 offer via letter dated November 30, 2004 (*see* Dec. 29 Christ Aff. Ex. G) in anticipation of filing suit in South Africa to enforce the parties' contract. Jan. 15 Christ Aff. ¶ 4. While Mr. Christ's counsel did so some time after Mr. Cormick's original offer, the correspondence detailed above and omitted from Mr. Cormick's answering brief makes clear that Mr. Christ previously had accepted the offer personally on September 13, 2004. In any event, the

---

[3] The September 21, 2004 e-mails which Mr. Cormick mischaracterize as an "epiphany" by Mr. Christ (AB at 11; Jan. 4 Cormick Decl. Exs. 4-5) do not in any way discuss the status of Mr. Christ's investment, let alone indicate that Mr. Christ no longer expected Mr. Cormick to repay $250,000 to him.

parties' correspondence also demonstrates that, between September 9 and November 30, 2004, the parties' intent never changed – that Mr. Cormick would refund Mr. Christ's investment, but the parties still could discuss whether and on what terms Mr. Christ might maintain a reduced role in the Elan Suisse venture.  Once it became clear to Mr. Christ that he wanted no part of Mr. Cormick's alleged business venture, and given the fact that, by that time, Mr. Cormick still had not returned Mr. Christ's funds as agreed, Mr. Christ's counsel formally confirmed the parties' agreement on November 30, 2004.

As the undisputed documentary record demonstrates, Mr. Cormick and Mr. Christ entered into a valid contract (under either Delaware or Zimbabwe law) pursuant to which Mr. Cormick agreed to refund to Mr. Christ the $250,000 that was wired to Mr. Cormick in March 2004.  Mr. Cormick has not disputed and cannot dispute the fact that he has never repaid those funds to Mr. Christ and, therefore, has breached that contract. Accordingly, Mr. Christ is entitled to summary judgment on Count II of his amended complaint.

## II.  MR. CORMICK HAS NO DEFENSE TO MR. CHRIST'S BREACH OF CONTRACT CLAIM.

In defense of Mr. Christ's claim for breach of contract, Mr. Cormick cites certain conduct undertaken by Mr. Christ after formation of the contract – namely, Mr. Christ's initiation of litigation against Mr. Cormick in South Africa and Mr. Christ's public statements in print and on the Internet which allegedly defamed Mr. Cormick and "destroyed" Elan Suisse's business.  *See* AB at 12-15.  Specifically, Mr. Cormick argues that Mr. Christ's conduct relieved him of any obligation to perform under the parties' contract pursuant to (1) the legal doctrine of impossibility or frustration of purpose, and (2) the "Articles of Association" which allegedly govern the affairs of Elan Suisse (Pty)

Ltd. ("Elan Suisse RSA") and Elan Suisse International Holdings (USA) LLC ("Elan Suisse USA").  As discussed below, neither defense relieves Mr. Cormick of liability or precludes entry of summary judgment in Mr. Christ's favor.

**A.      The Principal Purpose of the Parties' Contract Was Not Frustrated.**

First, Mr. Cormick has not proven and cannot prove that the primary purpose of his contract with Mr. Christ – *i.e.*, repayment of $250,000 to Mr. Christ – was, as a matter of law, rendered impossible or impracticable by Mr. Christ's actions.  In order to claim frustration of purpose, a defendant must establish, *inter alia*, "substantial frustration of the principal purpose of the contract."  *Chase Manhattan Bank v. Iridium Afr. Corp.*, 474 F. Supp.2d 613, 620 (D. Del. 2007).  *See also In re Atlantic Gulf Communities Corp.*, 369 B.R. 156, 167 (Bankr. D. Del. 2007) ("[T]he purpose that is frustrated must be the principal purpose of the contract ….").[4]  Even assuming the truth of Mr. Cormick's declaration for the purposes of this motion, the most he asserts is that Mr. Christ's actions "inhibited" his ability to solicit additional investors for Elan Suisse whose capital infusion would be used to reimburse Mr. Christ.  *See* AB at 13-14; Jan. 4 Cormick Decl. ¶¶ 8-9.  Putting aside Mr. Cormick's concession that he still could have successfully sought a new investor during the pendency of Mr. Christ's litigation (*see id.*), Mr. Cormick fails to account for the fact that "liquidation" of Mr. Christ's "investment" was not the only method by which Mr. Cormick could have satisfied his obligation under the

---

[4] While the law of Zimbabwe recognizes the principle of "supervening impossibility," the defense is available to a defendant only if the impossibility of performance is "absolute."  *See* R. H. Christie, *Business Law in Zimbabwe* 46, 111-12 (2d ed. 1998) (attached as an exhibit hereto).  For the reasons discussed herein, Mr. Cormick's ability to repay Mr. Christ as required by the parties' contract was not rendered absolutely impossible under Zimbabwe law.

contract to repay Mr. Christ. *See* Restatement (Second) of Contracts § 261 cmt. f (1979) (where performance under a contract may be satisfied by one or more alternatives, "the fact that one or more of the alternatives has become impracticable will not discharge the party's duty to perform if at least one of them remains practicable").

The initial transaction by which Mr. Christ paid $250,000 to Mr. Cormick was between two individuals – a reality made clear by the fact that Mr. Christ, at Mr. Cormick's request, wired the funds directly to Mr. Cormick's personal bank accounts, rather than an account managed by or for Elan Suisse. As the parties' correspondence shows, the subsequent agreement to repay that amount likewise was between Mr. Christ and Mr. Cormick as individuals. Therefore, neither Mr. Christ's litigation nor his Internet website precluded Mr. Cormick from simply paying Mr. Christ from Mr. Cormick's personal funds. Even if Mr. Cormick agreed to repay Mr. Christ in his capacity as a representative of Elan Suisse, Mr. Christ's actions similarly had no effect on Elan Suisse's ability to reimburse Mr. Christ from its operating budget or seek additional forms of financing. The fact that Mr. Cormick or Elan Suisse may not have had the financial means to repay Mr. Christ does not excuse Mr. Cormick's failure to perform under the contract. *See Martin v. Star Publ'g Co.*, 126 A.2d 238, 243 (Del. 1956) ("Impossibility originating in financial incapacity is no excuse.").

Mr. Cormick also does not account for his failure to perform under the contract *before* Mr. Christ's actions. Contrary to Mr. Cormick's answering brief, Mr. Christ did not formally commence legal proceedings in South Africa against Mr. Cormick until January 2005 (*see* Jan. 15 Christ Aff. ¶ 4 & Ex. N) – and even Mr. Cormick concedes that those legal proceedings did not preclude him from performing under the parties' contract

(*see* AB at 13).  In addition, the letter and news article which Mr. Cormick claims harmed his reputation and the value of Elan Suisse were not published until March 30, 2005 and May 11, 2005, respectively.  Jan. 15 Christ Aff. ¶ 5 & Exs. O, P.  Finally, Mr. Christ did not begin posting to the website which allegedly defamed Mr. Cormick and Elan Suisse until October 2005, more than a year after the formation of the parties' contract.  *Id.* ¶ 5.  Once Mr. Cormick failed to repay Mr. Christ his funds within a reasonable time after their agreement, he breached the contract.  *See Martin*, 126 A.2d at 244.  Therefore, even if Mr. Christ's actions subsequently would have rendered performance impossible, Mr. Cormick's liability for that breach arose well before those actions.  *See* Restatement (Second) of Contracts § 347 cmt. e (breach of contract is not cured "[i]f, after the breach, an event occurs that would have discharged the party in breach on grounds of impossibility of performance or frustration of purpose"; rather, the intervening event only potentially may affect damages).

### B.    The "Articles of Association" Do Not Bar Mr. Christ's Claim.

Mr. Cormick likewise has not demonstrated that the Elan Suisse RSA or Elan Suisse USA Articles of Association by which Mr. Christ purportedly was bound precludes his recovery for breach of contract.  In the first instance, there is no indication on the face of Elan Suisse USA's "Articles" that the document is in fact or was intended to be an "agreement … of the member or members as to the affairs of a limited liability company and the conduct of its business," as required by the Delaware Limited Liability Company Act (the "LLC Act").  6 *Del. C.* § 18-101(7).[5]  Notably, the Articles purport to

---

5 While Mr. Cormick claims that Mr. Christ "reviewed and approved" the Articles in February 2004 while in South Africa (*see* Jan. 4 Cormick Decl. ¶ 10), one of the e-mails

*(Continued on following page)*

be dated March 22, 2004 – *after* Mr. Christ made his initial payment to Mr. Cormick (*see* Jan. 4 Cormick Decl. Ex. 9) – but in no way mention Mr. Christ or describe themselves as an agreement between and among Mr. Cormick and the other members of Elan Suisse USA.  *See id.* Ex. 19.  Nor do the Articles even mention Delaware law or the LLC Act, let alone purport to govern an LLC formed under the laws of Delaware – instead describing the subject entity as a "private company limited by shares" whose affairs are governed by the "Companies Act of South Africa."  *Id.* §§ 1, 9.  Therefore, there is no basis for the Court to conclude, as a matter of law, that the purported "Articles of Association" are valid under the LLC Act or even apply to Elan Suisse USA, let alone bind Mr. Christ to its draconian "conduct" provisions.

Nonetheless, even assuming that Mr. Christ was bound by the Articles, Mr. Cormick's defense – *i.e.*, that Mr. Christ forfeited his ownership interest in the Elan Suisse entities and, thus, was not entitled to compensation for that interest – presumes that "liquidation" was the only means by which Mr. Cormick could satisfy his obligations under the parties' contract.  As discussed above, the contract between Mr. Christ and Mr. Cormick (as individuals) required simply that Mr. Cormick repay the $250,000 which Mr. Christ had wired to Mr. Cormick's personal accounts.  As a result, the Articles of Association, even if valid, had no impact on Mr. Cormick's personal obligation to

---

*(Continued from previous page)*

submitted by Mr. Cormick makes clear that, as late as October 16, 2004, Mr. Christ was requesting – and had not yet seen, let alone agreed to – governing documents for Elan Suisse RSA and Elan Suisse USA.  *See id.* Ex. 8 ("So what I want is … Articles of incorporation showing how the organization was formed and its methods of conduct ….").  The Court need not resolve this factual discrepancy, however, in order to decide Mr. Christ's motion, since the Articles on their face are unenforceable as a matter of law.

- 12 -

reimburse Mr. Christ – an obligation that could have been satisfied by any number of means that did not require a third party sale of Mr. Christ's alleged interest in Elan Suisse USA, including but not limited to payment from Mr. Cormick's personal funds.

Finally, as is the case with his "impossibility" defense, Mr. Cormick fails to explain why he did not or could not have repaid Mr. Christ and complied with the contract *before* Mr. Christ's alleged forfeiture of his equity interest in Elan Suisse USA. Mr. Cormick's failure to do so breached the parties' contract well in advance of any actions by Mr. Christ which could have been viewed as violating the Articles of Association, the earliest of which did not take place until January 2005. Therefore, even assuming that Mr. Christ was bound by the Articles of Association, his conduct did not cure or relieve Mr. Cormick of personal liability for his pre-existing breach of the agreement to repay Mr. Christ.

## <u>CONCLUSION</u>

For the foregoing reasons, and for the reasons set forth in his opening brief, Mr.

Christ respectfully requests that the Court enter summary judgment in his favor on Count

II of his amended complaint.

REED SMITH LLP


*/s/ Thad J. Bracegirdle*
Thad J. Bracegirdle (No. 3691)
1201 Market Street
Suite 1500
Wilmington, Delaware 19801
(302) 778-7500

Attorneys for Robert D. Christ

Dated: January 16, 2008

# EXHIBIT A

# BUSINESS LAW IN ZIMBABWE

## SECOND EDITION

### R H CHRISTIE

QC MA LLB (Cantab) FCIArb FAArb
President Association of Arbitrators (Southern Africa)
Vice-President Pan-African Council LCIA



L.A. COUNTY
AUG 1 6 2007
LAW LIBRARY

JUTA & CO, LTD
1998

serious and deliberate intention to create a legal obligation, or animus contrahendi.

## AGREEMENTS WHICH CANNOT IN LAW BE CONTRACTS

Marriage, testamentary guardianship, the proclamation of a township on agreed conditions and the issue of a passport are examples of situations in which an agreement is not a contract but acquires legal force only from some other act. The law denies contractual status to the agreement because it is only a necessary step in the creation of a different legal relationship.

## INITIAL IMPOSSIBILITY

The principle that no legal obligation can arise out of an agreement that is impossible of performance is summed up in the maxim 'lex non cogit ad impossibilia'. For this principle to apply, the impossibility must be absolute and not merely likely to arise,[90] absolute as opposed to relative,[91] not the fault of either party,[92] and not treated in the contract as a risk which one party expressly[93] or impliedly[94] undertakes to bear.

If the impossibility fulfils these requirements it is next necessary to consider the difference between substance and form, because performance will be considered impossible if, although there can be technical compliance with what has been promised, the real object of the contract cannot be fulfilled. This is illustrated by the unwitting purchase of one's own property.[95]

The same concern for substance rather than form can be seen in cases of partial impossibility. If, although full performance is impossible, the real object of the contract can be fulfilled, the creditor is entitled to demand such reduced performance as is possible, in exchange for proportionately reduced performance on his part. Thus the buyer of a half-acre plot for £500 was entitled to demand 0,471 of an acre for £471 when that turned out to be the size of the plot.[96]

Legal impossibility is treated in exactly the same way as physical impossibility.[97]

## CONTRACTS VOID FOR VAGUENESS

Another type of agreement which is impossible to enforce is one the terms of which are so uncertain that no clear line can be drawn between what

90 *Köpke v Abercrombie* 1974 (3) SA 338 (T) 345F.
91 D 45 1 137 5.
92 *Theron Ltd v Gross* 1929 CPD 345.
93 *Inhambane Oil and Mineral Development Syndicate Ltd v Mears and Ford* (1906) 23 SC 250.
94 *Wilson v Smith* 1956 (1) SA 393 (W) 396D.
95 *Cawcutt v Teperson and Saacks* 1916 CPD 406.
96 *Stansfield v Kuhn* 1940 NPD 238.
97 *Aird v Hockley* 1936 EDL 117 125; *Wylock v Milford Investments (Pty) Ltd* 1962 (4) SA 298 (C) 318-19.

would be proper performance and what would not. The contract is therefore said to be void for vagueness and is treated as a nullity.

In *Levenstein v Levenstein* 1955 SR 91 97, 1955 (3) SA 615 619 Quénet J classified the 'void for vagueness' cases into four classes:

1. Contracts which reserve an unlimited option to the promisor.
2. Contracts where the vague and uncertain language indicates that the parties were never truly in agreement.
3. Incomplete negotiations not yet amounting to a contract.
4. Contracts which, although apparently incomplete, can be shown by evidence to be complete.

The third class has already been considered at 33 above. Because the offer is made without animus contrahendi the resulting agreement is designedly incomplete rather than vague.

Of the remaining three classes it is better to take the fourth first in order to understand the general approach of the courts to questions of vagueness, which is to uphold the contract if possible rather than treat it as void. *Madam v Macedo Heirs* 1991 (1) ZLR 295 (S). Recognising that business men often record their agreements in an abbreviated form that is clear enough to them, even if not to outsiders, the courts will construe their contractual documents in such a way that:

'without violation of essential principles the dealings of men may as far as possible be treated as effective, and that the law may not incur the reproach of being the destroyer of bargains'.[98]

Essential principles that must not be violated are that the court is limited to interpreting the parties' contract and cannot go further and make a contract for them,[99] and evidence to explain the contract is admissible only in the circumstances which are examined at 63 below.

A case that arguably goes too far towards the forbidden ground of making a contract for the parties is *Regenstein v Brabo Investments (Pty) Ltd* 1959 (1) R & N 392 (FS), 1959 (3) SA 176, a contract for the sale of portion of a ranch, the agreed plan prepared by the seller being inaccurate. The seller contended that the contract was void for vagueness, but the court ordered specific performance of the contract with slight adjustments of the boundaries to give effect to the common intention of the parties as disclosed by the evidence.

The general approach of the courts is exemplified by *Elite Electrical Contractors v Covered Wagon Restaurant* 1972 (2) RLR 221 (A), 1973 (1) SA 195, in which an apparently vague contract to do work and supply materials was saved by the implication of a term that the contractor would be entitled to charge a reasonable amount. And in *Hilliard and Wenborne v Tabor Frost* 1938 SR 89 95 evidence was admitted in order to fix the meaning of the word 'etc' in a contract of sale. In a line of cases of which

98 Per Lord Tomlin in *Hillas & Co Ltd v Arcos Ltd* (1932) 147 LT 503 (HL) 512.
99 As Lord Wright warned in *Hillas v Arcos* at 514.

## DELEGATION

Delegation is a form of novation in which, by agreement between all concerned, a third party is introduced as debtor in substitution for the original debtor, who is discharged.

As with any other form of novation, and for the same reason (that it involves a waiver of existing rights, which is never presumed) it must be strictly proved. *Nicol, Nicol, Thrush and Thrush v Crowley* 1960 R & N 313 317 draws the distinction between true delegation and a mandate to pay, where a debtor requests a third party to pay his creditor without creating privity of contract between the creditor and the third party, and assignation, where the debtor requests the creditor to apply to a third party for payment, again without creating privity of contract between them.

## CESSION

Cession is the opposite of delegation, as it involves the substitution of a new creditor (the cessionary) for the old creditor (the cedent). It is not strictly a form of novation, as the cessionary merely becomes entitled to sue on the existing contract and the consent of the debtor is unnecessary.

Our law, unlike English law, favours cession because of the commercial advantages it offers, such as the ability to sell one's rights (perhaps before they fall due) instead of enforcing them oneself, and the avoidance of circuity of actions by empowering one's creditor to sue one's debtor. Hence, as accepted in *Northern Assurance Co Ltd v Methuen* 1937 SR 103 111, an agreement not to cede rights or *pactum de non cedendo* will be void unless it serves some useful purpose to the debtor.

Nevertheless the common law prohibits the cession of certain rights, such as ordinary offers (as opposed to options) which have no commercial value because they are revocable,[391] and the right to maintenance or alimony which is of a strictly personal nature.[392] Cession may also be prohibited by statute, as in the case of civil service salaries and pensions.

No formalities are required for a valid cession, and notice need not be given to the debtor, but is advisable because if, in ignorance of the cession, he pays the cedent he is discharged.[393]

A document embodying a right which cannot exist without it must be delivered to the cessionary, but if the document merely evidences the right, delivery is not legally necessary.[394] Similarly, the cession of book debts is valid without delivery of the books, but the cessionary may demand them in order to collect the debts.[395]

391 *Hersch v Nel* 1948 (3) SA 686 (A) 693. See above, 38.
392 *Tregoning v Tregoning* 1914 WLD 95.
393 *Pillay v Hardband* 1976 (2) SA 681 (D).
394 *Botha v Fick* 1995 (2) SA 750 (A).
395 *Randbank Bpk v Morris* 1977 (2) SA 21 (SE).

It would obviously be wrong to permit a creditor to increase the burden on the debtor without his consent, so part of a claim cannot be ceded without the debtor's consent, as this would involve him in having to meet, and possibly defend, two claims instead of one.[396] It follows that a cession to two or more cessionaries is invalid, but not if it is to the cessionaries jointly and severally, as that does not amount to a splitting of the debt and does not impose any additional burden on the debtor: *Anglo-African Shipping Co (Rhodesia) (Pvt) Ltd v Baddeley* 1977 (1) RLR 259, 1977 (3) SA 236.

The cedent can cede no more than his entitlement, so the debtor may raise against the cessionary all defences that he could have raised against the cedent at the time of cession (*Salisbury Board of Executors v Dunning and Ambrose* 1922 SR 14; *General Finance Co (Pvt) Ltd v Robertson* 1980 ZLR 166 (A), 1980 (4) SA 122), but not any defence based on a transaction with the cedent after the cession (eg waiver — the cedent no longer having any rights to waive).[397] If a cession is entered into in bad faith in order to deprive the debtor of a counterclaim against the cedent the debtor may raise his counterclaim against the cessionary, who must then 'defend the cedent'.[398]

## COMBINED CESSION AND DELEGATION

The complete substitution of one contracting party for another, involving a cession of rights and a delegation of duties, obviously requires the consent of the other party to the contract, but where no element of *delectus personae* exists (as in a building contract requiring no special skills), one party may, without the consent of the other, cede all his rights and delegate all his duties while remaining personally responsible for the proper performance of all those duties.[399] There being no recognized single word to describe a combined cession and delegation, a contract will often have to be examined closely to see if that is what was intended, and *General Finance Co (Pvt) Ltd v Robertson* 1980 ZLR 166 (A), 1980 (4) SA 122 shows how, depending on the context, even the word 'cession' may produce such a result.

## SUPERVENING IMPOSSIBILITY

The methods of variation and discharge considered above all result from the act of the parties. Those now to be considered take place by operation of law.

Supervening impossibility discharges a contract and releases the parties from their respective duties to perform: *Acting Minister of Industry v Tanaka Power (Pvt) Ltd* 1990 (2) ZLR 208 (S); *Field v Compuserve (Pvt) Ltd* 1990 (2) ZLR 253. In this context impossibility bears the same meaning as initial impossibility (for which see 46 above), caused by irresistible force or

396 *Blakie & Co Ltd v Lancashire* 1951 (4) SA 571 (N) 576. And see above 74.
397 *Oppermann v de Beer* 1915 TPD 92.
398 *ZZA Engineering Co Ltd v Seacat Investments (Pty) Ltd* 1974 (1) SA 747 (A).
399 *Brook v Jones* 1964 (1) SA 765 (N).

inevitable accident. Especially, the fact that a contract has become uneconomical to perform does not mean it has become impossible.[400]

Interruption by irresistible force or inevitable accident of a contract requiring continuity of performance, such as a contract of employment, is not treated as supervening impossibility because it would obviously be unfair to treat the contract as discharged when the interruption might turn out to be of short duration. *Beretta v Rhodesia Railways Ltd* 1947 SR 48, 1947 (2) SA 1075 shows how in such a case the contract is not discharged by operation of law but may be cancelled by the party to whom the performance is due if the interruption continues for an unreasonably long time.

Irresistible force includes legislation or act of state making performance illegal,[401] but in *William Maine & Son (Pvt) Ltd v Rhodesia Railways* 1976 (2) RLR 108, 1976 (4) SA 914 a ministerial directive given without statutory authority was held not to be irresistible force, so obedience to it did not excuse non-performance.

It will not be a case of supervening impossibility if the parties have foreseen and made provision for or accepted the risk of the very event that has happened. They may do this expressly or impliedly, as when they enter into a contract of a speculative nature.[402] Impossibility resulting from the act of one of the parties will also not be taken into account,[403] but illness disabling a person from performing a contract that must be performed in person is treated as supervening impossibility: *Fairclough v Buckland* 1913 SR 186.

## SET-OFF

Set-off, or compensation, comes into effect when two parties are reciprocally indebted to each other, a natural obligation being sufficient: *Municipality of Kwe Kwe v Space Age Investments (Pvt) Ltd* 1985 (1) ZLR 300 (S). It takes effect automatically, by operation of law, and does not have to be claimed (ibid) but like any other fact it must be pleaded and proved so the court can take it into account.

The reciprocal debts must be liquidated in the sense of being either admitted or capable of easy and speedy proof.[404] The concept of easy and speedy proof is rather elastic, and was held in *Bain v Barclays Bank (DC & O) Ltd* 1937 SR 191 to cover a bank overdraft and bank charges, but it clearly does not cover a claim for damages: *African Banking Corp Ltd v Rainsford* 1912 SR 157.[405]

There must be true reciprocity of debts, in the sense not only that they must be owing between the same parties but that in respect of each debt each

400 *Yadalien v Angelou and Piel* 1914 TPD 260.
401 *Pieters, Flannnan and Co v Koksad Municipality* 1919 AD 427.
402 *Hersman v Shapiro & Co* 1926 TPD 367.
403 *Grobbelaar v Bosch* 1964 (3) SA 687 (E).
404 *Treasurer-General v Van Vuren* 1905 TS 582 589.
405 And see *Colonial Government v Bomer* (1904) 21 SC 347.

party must have been acting in the same capacity. Thus in *Rixom v Mashonaland Building Loan and Agency Co Ltd* 1938 SA 207 a debt due by a deceased (and therefore payable by his executrix out of his estate) could not be set off against a debt due to the executrix which arose after the death of the deceased. And *Bain* above shows that debts owing by or to a partnership cannot be set off against debts owing to or by a partner unless the partnership has come to an end. *Central African Airways Corpn v Williams (Pvt) Ltd* 1963 R & N 106 does not permit debts owing by or to an agent to be set off against debts owing to or by his principal.

At common law a debt owed by one department of the state cannot be set off against a debt owed by another department, and set-off cannot be raised against taxes due to the fiscus or where goods are sold for the benefit of the state: *Commissioner of Taxes v First Merchant Bank Ltd* S-51-97.

## MERGER

Since it is notionally impossible to be creditor or debtor to oneself, a contract is discharged when the one party acquires the other's interest in the contract, as when a tenant buys the property he is leasing.[406] This principle may be put to good use by a landlord buying his tenant's right, title and interest in the lease at a sale in execution. By thus discharging the lease he can evict the tenant and resume occupation.[407]

## PRESCRIPTION

The Prescription Act [*Chapter 8:11*] is squarely based on the South African Prescription Act 1969, and abolishes the old distinction between the extinction of rights and the barring of remedies by lapse of time, s 14 making it clear that the expiration of the period specified by s 15 extinguishes the debt entirely, except that by s 14(3) payment of a prescribed debt is regarded as payment of the debt, so no action lies for the recovery of such a payment. For the application of the Act to international contracts see *Coutts and Company v Ford* HH-71-97. Section 15 reads:

The period of prescription of a debt shall be —

(a)   thirty years in the case of —
   (i)   a debt secured by mortgage bond;
   (ii)   a judgment debt;
   (iii)   a debt in respect of taxation imposed or levied by or under any enactment;
   (iv)   a debt owed to the State in respect of any tax, royalty, tribute, share of the profits or other similar charge or consideration payable in connection with the exploitation of or the right to win minerals or other substances;

(b)   fifteen years in the case of a debt owed to the State and arising out of an advance or loan of money or a sale or lease of land by the State to the debtor unless a longer period applies in respect of the debt concerned in terms of paragraph (a);

(c)   six years in the case of —

406 *Something Lohelp Salt Works Ltd v Van Tonder* 1920 AD 492 497.
407 *Curro v Hossam* 1958 (2) SA 630 (D).

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-275-GMS |
| | ) | |
| BRETT J. CORMICK and ELAN SUISSE | ) | |
| INTERNATIONAL HOLDINGS (USA) LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 16, 2008, I caused a true and correct copy of

the foregoing *Plaintiff Robert D. Christ's Reply Brief in Support of His Motion for Partial Summary*

*Judgment* to be served on counsel for defendants as listed below, via electronic CM-ECF:

*Attorneys for Defendants:*

David L. Finger, Esquire
Finger & Slanina, P.A.
One Commerce Center, Suite 725
1201 North Orange Street
Wilmington, DE  19801-1155

Dated:  January 16, 2008

                                        /s/ Thad J. Bracegirdle
                                        Thad J. Bracegirdle (No. 3691)