IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRETT J. CORMICK and ELAN SUISSE | ) | C.A. No. 06-275-GMS |
| INTERNATIONAL HOLDINGS (USA) | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |
| ELAN SUISSE, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-60-GMS |
| | ) | |
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

## MOTION IN LIMINE TO EXCLUDE THE DEPOSITIONS TESTIMONY OF MR. CHRIST'S PROPOSED WITNESSES

Defendants Brett J. Cormick and Elan Suisse International Holdings (USA) LLC, and plaintiff Elan Suisse, Ltd., hereby move *in limine* to either (i) exclude Mr. Christ's proposed deposition testimony as improper character evidence, and in support thereof state as follows:

1.    Mr. Christ proposes to introduce the deposition testimony of four witnesses, each describing business dealings with Dr. Cormick years before the transaction that gives rise to Mr. Christ's claims:

    a.    Andre Alan Dean, who testified that in early 1995 he hired Dr. Cormick to obtain funding for his business, and paid him a monthly fee for such services.  After six or seven

months, the funding never emerged.  Mr. Dean believes that he was defrauded by Dr. Cormick and

filed a complaint with the police[1] (Ex. A hereto);

      b.     Graham Lyman, who testified that in 2001 he was referred to Dr. Cormick,

and was told that Dr. Cormick could obtain financing for his technology through South African

bankers who had access to United Nations funds for investment in South Africa.  Dr. Cormick

arranged a meeting with Mr. Lyman and the bankers, who had delegated the negotiations to Dr.

Cormick, but Mr. Lyman backed away from the project because it was his view that Dr. Cormick's

"structure" for the financing was unethical[2] (Ex. B hereto);

      c.     Carl W. Palmer, who testified that around 2000 he attended a meeting in

Switzerland to discuss financing of his business, and that Dr. Cormick, in "association" with DeSean

Burkich, prepared written material for the investors which "grossly misrepresented" information to

the investors, and that subsequently Mr. Burkich undertook several actions detrimental to Mr.

Palmer's business[3] (Ex. C hereto);

---

[1]

If this testimony is admitted, Dr. Cormick will testify that after a third-party claimed ownership rights to the technology, investors backed away because Mr. Dean was not at the time able to provide adequate proof of ownership.

[2]

If this testimony is admitted, Dr. Cormick will testify that Mr. Lyman made a presentation of his technology to the bankers, but it did not work, which is why the financing did not go through.

[3]

If this testimony is admitted, Dr. Cormick will testify that he organized the meeting at the request of Mr. Donald Whitlock , met DeSean Burkich only a few times, and had nothing to do with either the preparation of the written materials or the subsequent activities of Mr. Burkich.

d.     Gordon Subloo, who testified that, around 1996-97, in exchange for a monthly fee, Dr. Cormick offered to obtain financing for his company, but never succeeded. (Ex. D hereto).[4]

2.     None of these witnesses testifies as to any facts regarding the transaction between Mr. Christ and Dr. Cormick.  Instead, they all provide "character" evidence through specific instances of unrelated conduct seven-to-thirteen years ago, which is controlled by F.R.E. 404 and 405(b).

3.     Because evidence of other alleged bad acts has the greatest propensity to arouse prejudice, confusion, surprise and consume time, such evidence may be used only when the defendant's character is in issue "in the strict sense."  F.R.E. 405, advisory committee note.

4.     Dr. Cormick assumes that Mr. Christ seeks to introduce this testimony in defense to the defamation claim.  However, in defamation, the issue is not injury to one's character, but rather injury to one's reputation.[5]  *Spence v. Funk*, 396 A.2d 967, 969 (Del. 1978); 7 Joubert, W.A., *The Law of South Africa* §236 (LexisNexis Butterworths 2005) ("defamation is aimed at the protection of a person's *reputation*, that is the *public* estimation of the worth or value of a person, as opposed to the individual's *personal* sense of *self-worth* or *self-esteem*...") (italics in original).  For this reason, Rule 405(b) does not permit specific instances of other conduct in defamation cases, particularly where such other conduct was not generally known in the community.  *Foster v. West Dakota Veterinary Clinic, Inc.*, 689 N.W.2d 366, 382  (N.D.2004); *Gosden*, 687 N.E.2d at 494-95;

---

[4]

If this testimony is admitted, Dr. Cormick will testify that he obtained initial funding through a company called Oakwood Investments, which declined further investment after Mr. Subloo delivered non-voting stock to Oakwood instead of the promised voting stock.

[5]

The two terms are not synonymous.  "Character" is what a person actually is. "Reputation" is what others think a person to be.  *Proper v. Mowry*, 568 P.2d 236, 243 (N.M. App. 1977); *Gosden v. Louis*, 687 N.E.2d 481, 494-95 n.5 (Ohio App. 1996)

*Proper*, 568 P.2d at 243. *See also* Christopher B. Muller & Laird C. Kirkpatrick, *Evidence: Practice Under the Rules* §4.20 at 315 (Aspen 1999) ("in a defamation action, the plaintiff's reputation, not his character, is the benchmark from which to assess injury and compute damages. FRE 405(b) is inapplicable to such cases, although courts are occasionally confused on this point"). Thus, the depositions are improper and should be excluded.

5.    Additionally and alternatively, the depositions should be excluded pursuant to F.R.E. 403 on the ground that the prejudice outweighs any claimed probative value. For example, Mr. Dean does not provide any evidence that Dr. Cormick did not provide professional service for his fees. Mr. Dean's dissatisfaction with the outcome 13 years ago is all that leads him to conclude that Dr. Cormick was engaged in wrongdoing. This is not sufficient proof of fraud or other wrongdoing to justify using it to tarnish Dr. Cormick in the eyes of the jury.

6.    Further, Mr. Dean reviewed notes during his telephonic deposition (Dean Dep. at 9:22, 33:5), which were not produced to Dr. Cormick, thereby precluding full and fair cross-examination. *See La Chemise Lacoste v. Alligator Co., Inc.*, 60 F.R.D. 164, 168 (D. Del. 1973).

7.    Although Mr. Lyman offers his opinion that the Dr. Cormick proposed a financing "structure" that was unethical, he offers no evidence showing the proposed structure, or any supporting basis from which a jury can assess his opinion, and so the testimony does not meet the requirements of F.R.E. 701-705. Dr. Cormick further objects on the ground that Mr. Lyman's testimony about financial structures and the ethics thereof constitutes expert opinion, and Mr. Christ did not identify any experts in response to Dr. Cormick's interrogatories (Ex. E), and did not provide an expert report or any supporting documentation, denying Dr. Cormick a fair opportunity to prepare a meaningful cross-examination.

8.    Similarly, Mr. Palmer provided expert testimony as to financial data about his company, as to what was correct and what was not, as to which no supporting documentation was provided to Dr. Cormick, and with no prior identification of him as offering expert testimony. Additionally, he did not testify as to any knowledge that Dr. Cormick had any involvement in preparing the written materials. Given that many of Mr. Palmer's conclusions were assumptions based on circumstantial evidence, the risk of prejudice outweighs the slight probative value (if any) of the testimony.

9.    Finally, Mr. Subloo relied on notes during at least part of the telephonic deposition. (Subloo Dep. 15). Dr. Cormick was not afforded access to those notes. *La Chemise Lacoste*, 60 F.R.D. at 168. Furthermore, Mr. Subloo's testimony is nothing more than his belief that he did not receive the services for which he had contracted. He does not identify any fraudulent statements, or prove their falsity. Nor does he establish that Dr. Cormick did not provide any service, or that he did not make any effort to achieve his client's financial goals, irrespective of the outcome.

WHEREFORE, for the foregoing reasons, the Court should not allow the depositions transcripts to be introduced at trial.

Dated: March 28, 2008

Respectfully submitted,

 /s/ David L. Finger
David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155
(302) 884-6766
Attorney for Brett J. Cormick, Elan Suisse
International Holdings (USA) LLC and Elan
Suisse Ltd.



**CONFIDENTIAL**

In the Matter Of:

# Christ

v.

# Cormick and Elan Suisse International Holdings (USA) LLC

C.A. # 06-275-GMS

———————————————

Transcript of:

## Andre Alan Dean

March 3, 2008

———————————————

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ROBERT D. CHRIST,           )
                            )
      Plaintiff,            )
                            )
        v.                  ) C.A. No. 06-275-GMS
                            )
BRETT J. CORMICK and ELAN   )
SUISSE INTERNATIONAL        )
HOLDINGS (USA),             )
                            )
      Defendants.           )
                            ) CONFIDENTIAL
                            )
ELAN SUISSE LTD.,           )
                            )
      Plaintiff,            )
                            )
        v.                  )
                            )
ROBERT D. CHRIST,           )
                            )
      Defendant.            )


            Telephonic deposition of ANDRE ALAN DEAN
taken pursuant to notice at the law offices of Reed
Smith, LLP, 1201 North Market Street, Suite 1500,
Wilmington, Delaware, beginning at 2:03 p.m., on Monday,
March 3, 2008, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

            THAD J. BRACEGIRDLE, ESQUIRE
            REED SMITH, LLP,
               1201 North Market Street - Suite 1500
               Wilmington, Delaware 19801
               for Robert D. Christ

cont'd...
                    WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                     (302) 655-0477
                     www.wilfet.com

Electronically signed by Kim Hurley (501-043-872-4654)                88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC

Page 2

```
 1   APPEARANCES (cont'd):

 2            DAVID L. FINGER, ESQUIRE
              FINGER & SLANINA, LLC
 3              1201 North Orange Street - Suite 725
                Wilmington, Delaware 19801
 4              for Brett Cormick and Elan Suisse

 5                      - - - - -

 6                  ANDRE ALAN DEAN,

 7        the witness herein, having first been

 8        duly sworn on oath, was examined and

 9       testified as follows:

10   BY MR. BRACEGIRDLE:

11      Q.    As I mentioned earlier, my name is

12   Thad Bracegirdle.  I'm an attorney here in Wilmington,

13   Delaware, and I represent Robert Christ in a litigation

14   that's pending in the United States Federal Court here.

15   You are giving your deposition in that proceeding.

16            The first thing I'd like you to do, please,

17   is state your full name for the record.

18      A.    Andre Alan Dean.

19      Q.    Mr. Dean, what country do you currently reside?

20      A.    England.

21      Q.    How long have you lived in England?

22      A.    Twenty-one or twenty-two years, thereabouts.

23      Q.    Are you a native of England?

24      A.    No, I'm not.  I was born in Africa.  My mother
```

Electronically signed by Kim Hurley (501-043-872-4654)    88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL      Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

Page 3

1    was a native of England.

2        Q.    Where in Africa were you born?

3        A.    Born in Zambia, Lusaka.

4        Q.    Sorry?

5        A.    Northern Rhodesia.  Town called Lusaka.

6        Q.    Could you spell the town for me, please?

7        A.    L-u-s-a-k-a.

8        Q.    Thank you.  In what line of business do you

9    currently work?

10       A.    I manage an IT department that deals in the

11   connectivity of customers to trade stocks and shares,

12   bond exchange, etcetera.

13       Q.    How long have you worked in that business?

14       A.    In that type of business or specific role right

15   now?

16       Q.    No.  In that kind of business.

17       A.    Since 1993, thereabouts.

18       Q.    Are you familiar with Brett Cormick?

19       A.    I am indeed.

20       Q.    When did you first meet Mr. Cormick?

21       A.    I first met him -- I believe the first time I

22   came across him must have been in 1994, '95.  I can't

23   remember the exact date.  I know when my dealings started

24   with him.

Electronically signed by Kim Hurley (501-043-872-4654)                                88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL      Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

Page 4

1      Q.      When you first met Mr. Cormick, were you in the

2  IT line of business that you were describing earlier?

3      A.      Yes, I was.

4      Q.      Specifically what was your job or what company

5  did you work for at the time that you met Mr. Cormick?

6      A.      I was a contractor contracting with a company

7  which was  Network Bank.  They owned a subsidiary company

8  and I was contracting to the bank.

9      Q.      Can you describe to the best of your

10  recollection the circumstances under which you first met

11  Mr. Cormick?

12      A.      I had been to a financial marketing seminar

13  where I met somebody who understood what I was doing and

14  said they had met this fellow in England who specialized

15  in getting funds for small companies, companies like

16  myself.  And they introduced me to him.  This young lady

17  introduced me to him.

18              I had a brief chat with him.  We weren't

19  ready to talk.  We went away and produced a business

20  plan.  That's when he came back and started to fill him

21  up.  I met him after -- it was probably latter part of

22  1994, early part of 1995 I would have met him for the

23  very first time.

24      Q.      Where was this conference where you met

Electronically signed by Kim Hurley (501-043-872-4654)                                88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL      Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

Page 5

1    Mr. Cormick?

2        A.    I didn't meet him.  I met an individual who

3    previously had dealings with him and recommended that I

4    look him up when I get back to England.  That conference

5    was in Palm Springs, U.S.A.

6        Q.    Then, when you returned to England from the

7    conference, did you call Mr. Cormick?

8        A.    I made contact with him.  I can't remember

9    exactly when.  It had certainly been after the

10   conference, because that's where I was given the details.

11   But I do know that I engaged with him to do business,

12   finalizing that roundabout the end of the first quarter

13   of 1996.  That's when I engaged him.

14       Q.    What is it that you engaged Mr. Cormick to do?

15       A.    To seek funds.  We had been developing software

16   and we were looking to take to market and we were looking

17   to raise the money to take the product to market, to

18   finish it and take it to market.

19       Q.    When you say that "we were" getting ready to

20   take a product to market, who is the "we" that you're

21   referring to?

22       A.    Well, it was for myself and there was people

23   that we had paid to develop technology, and what we had

24   done is we had put together an entity and given them

Electronically signed by Kim Hurley (501-043-872-4654)                    88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

Page 6

1    stock in the entity.  They continued developing the

2    product which I designed.  And I'm the guy that

3    interfaced with Cormick to raise the money.  There was a

4    group of people that had all contributed to the

5    development of the software over a period.

6        Q.    Can you describe for me the software that you

7    were taking to market at that time?

8        A.    The core component was a work flow engine.

9    What we discovered was taking work flow to the market was

10   not what people were interested in.  They were interested

11   in something that actually, one, they could relate to the

12   business they were in, and, two, it was something they

13   could use to either make money with or to manage down

14   their costs.  A sales or company management system to

15   track the leads from customers, improve the way people

16   work, those typical systems that are out there.  The work

17   flow engine that we had developed was something that we

18   would have used to have built that sort of capability for

19   a company.  What we discovered was we needed to build an

20   end-user product using our engine and we started to build

21   a dealing system because that's where you could make

22   money, not manage down the costs.

23       Q.    I'm sorry.  Were you finished?

24       A.    Yes.

Electronically signed by Kim Hurley (501-043-872-4654)                              88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

Page 7

```
 1      Q.    I'd like to focus on the point at which you

 2   engaged Mr. Cormick to raise funds for your company.

 3   Between the time that you first started communicating

 4   with Mr. Cormick and when you finally engaged him, what

 5   was it that convinced you to retain him to raise funds

 6   for your company?

 7      A.    I was certainly out of my debt.  I had no idea

 8   how one goes and looks for money.  On the recommendation

 9   we were told this guy was a specialist, dealt with

10   high-net-worth individuals and he had focused on small

11   Internet companies.

12              When we went and spoke to him or two or

13   three of us went to go and speak to him the first time,

14   he made it sound as though it's something he does all the

15   time.  He's full of confidence.  And we were all

16   technicians.  We weren't business people.  We weren't

17   chief executives of companies.  He told us he had done

18   this numerous times before and this is exactly the thing

19   that he does; he can raise the money for us.

20              So we went away from that knowing that we

21   had to develop a business plan and we could come back and

22   this was a guy that could go and talk to the people with

23   money and present our case on our behalf.

24      Q.    At that time did Mr. Cormick discuss with you
```

Electronically signed by Kim Hurley (501-043-872-4654)                          88024abe-c93c-413e-bcc4-99cdc9bc4005

Page 8

1    what his background or his experience was?

2         A.    He did.  He painted a pretty rosy picture to us

3    about what his background was.  He painted himself as a

4    leader in this space in Europe, European venture finance.

5    And we had no way of benchmarking that other than he gave

6    us a business card with his name on it from another large

7    company.  We took the card away.  We looked up the

8    company.  They were a large organization.  It looked

9    kosher.

10        Q.    What was the company on his business card, if

11   you recall?

12        A.    I would have to look it up for you, but I will

13   come back to you with that in a moment.  I'll have to do

14   a quick search.

15        Q.    Did Mr. Cormick discuss with you what his

16   educational background was?

17        A.    Yes.  He said he was -- he had a doctorate;

18   hence, he was Dr. Cormick.  And he had an M.B.A. or along

19   those lines.  Basically he put himself out as highly

20   educated and a specialist in this space.

21        Q.    These meetings with Mr. Cormick leading up to

22   his engagement, where did they take place?

23        A.    They took place in offices which were presented

24   to us as BMI, the BMI business.  In fact, he presented us

Electronically signed by Kim Hurley (501-043-872-4654)                                    88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL      Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

Page 9

1    with a second business card he gave us, his name on a BMI

2    card where he was supposed to be some senior executive of

3    this company BMI.  Almost all the meetings took place at

4    the BMI offices after the first meeting.

5         Q.    Are those offices in London?

6         A.    They are, yes, near Victoria.

7         Q.    When you engaged Mr. Cormick to raise funds,

8    what were the terms under which you engaged him, if you

9    recall?

10        A.    In this type of business, to know that we were

11   serious and we weren't going to go to other people while

12   he was doing a whole lot of legwork and bringing his

13   contacts to the table, there would be a

14   10,000-pound-a-month fee and within three months he

15   should have the money in place for us.

16        Q.    Did you then pay him that $10,000-per-month

17   fee?

18        A.    We did once we signed the initial documentation

19   which was presented to us on BMI letterhead.  So we

20   thought we were dealing with a company called BMI.

21             If I can take you back on the education

22   piece, I have just looked up my notes.  What he told us

23   was a B.A., a BE (hons), an MAE (hons), a Ph.D.

24             MR. FINGER:  Can we go off the record for a

Electronically signed by Kim Hurley (501-043-872-4654)                          88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

Page 10

1    second?

2              MR. BRACEGIRDLE:  Yes.  We're going off the

3    record for just a minute, Mr. Dean.

4              (Discussion off the record.)

5    BY MR. BRACEGIRDLE:

6       Q.    Just so the record's clear, Mr. Dean, in my

7    last question I was asking you about the fees you paid to

8    Mr. Cormick.  I may have accidentally said "dollars."

9    Was it $10,000?

10      A.    It was pounds.

11      Q.    I'm sorry, yes, thank you.

12              How many of those monthly payments did you

13   make to Mr. Cormick?

14      A.    All in all, it was seven of them.

15      Q.    So then you had engaged him for a total of

16   seven months; is that correct?

17      A.    Yes.  After the first three months, he said,

18   "The money's there.  You just got to do a couple of

19   things first."  He got us to do more work.  The next

20   month rolls, the next month.  Each time he told us,

21   they're coming over, we got to do this stuff, but you

22   need to pay the money.  And he always arranged those

23   meetings at the beginning of the next month.  And

24   literally rolled us over, rolled us over, rolled us over

Electronically signed by Kim Hurley (501-043-872-4654)                                        88024abe-c93c-413e-bcc4-99cdc9bc4005

Page 11

1    to the point where we eventually said something is wrong.

2        Q.    If my math is correct, then, you paid

3    Mr. Cormick a total of 70,000 pounds?

4        A.    It was 70, yes.

5        Q.    During this time that you were paying him the

6    fee, it sounds like through your testimony you had

7    ongoing communications with him?

8        A.    We did.  There were times we couldn't contact

9    him.  He was just noncontactable.  But we discovered when

10    we looked at our diary and looked at all the meetings and

11    all the notes, we discovered there was a pattern.

12    Towards the end of each month, the hype would step in.

13    "Yes," he said, "they got the money.  They bumped some

14    other funding exercise to make some money available.  We

15    have got to meet with them on the 2nd or 3rd of next

16    month.  They're coming for a weekend to Geneva.  The deal

17    is done," etcetera, etcetera.

18            So what would happen is the buildup towards

19    the end of the month, he would bring in the hype, we

20    would have to pay him the next 10,000 for those meetings.

21    I'd go to those meetings and their people were the

22    Antichrist summit.  When I would say to them, "So when

23    can we get the funding put on the table?"

24            And they would say, "Well, Brett just asked

Electronically signed by Kim Hurley (501-043-872-4654)                    88024abe-c93c-413e-bcc4-99cdc9bc4005

Page 12

1    to have this meeting with you.  I'm not sure what you

2    mean about funding."

3                And after we had a few of those, towards

4    the end of this six-, seven-month period, we realized

5    something was drastically wrong.

6        Q.    So let me focus on those meetings you just

7    referred to.  Did Mr. Cormick ever identify to you who

8    these potential investors were?

9        A.    Yes, he did.

10       Q.    So what did you do then with that information

11   once you received it?

12       A.    Well, he set up these meetings.  We would go

13   and see them.  There were numerous people.  On a few

14   occasions, not all of them, a few occasions, they were a

15   little bit bemused as to why the meeting had been set up

16   and had come clean, saying, well, they had done this as a

17   favor for Mr. Cormick.

18                MR. FINGER:  I want to object to hearsay.

19                THE WITNESS:  It's not hearsay.  That's

20   what was said.

21   BY MR. BRACEGIRDLE:

22       Q.    Mr. Dean, Mr. Finger may occasionally make

23   objections, but I won't go at any length as to what the

24   hearsay objection is about, but you can provide your

Electronically signed by Kim Hurley (501-043-872-4654)                    88024abe-c93c-413e-bcc4-99cdc9bc4005

Page 13

1   testimony and I'll ask questions and then you can respond

2   to my questions instead of responding to Mr. Finger's

3   objections.

4              So when you say that you realized that

5   something was wrong, what did you do next?

6        A.   We started to question him and he started

7   giving us various responses.  My wife went and saw him,

8   and we did a complete transcript of what he said.  He

9   literally told us the money was there, the $6 million was

10  there, it was just a matter of due diligence that we had

11  to go through.

12             He introduced us to someone called

13  Barry Stants and said that they had to go through and do

14  the due diligence.  And there was a company that they

15  used, Technology something, which I believe Mr. Stants

16  had a relationship with these people before and got them

17  to look at the tape.  And this was yet another way of

18  delaying the process and putting the onus on us to do

19  some work so that he could extend it to the end of the

20  month.

21             MR. FINGER:  Objection.  Lay opinion.

22  BY MR. BRACEGIRDLE:

23        Q.   As a result of Mr. Cormick's efforts, was any

24  money ever invested in your company?

Page 14

1      A.    Never.  Nothing.

2      Q.    Did you ever receive any of the 70,000 pounds

3   that you had paid him back?

4      A.    Nothing.

5      Q.    So then what happened at the end of the seven

6   months after you had made these payments to Mr. Cormick

7   and still had no investment?

8      A.    We had put some pressure on him, saying that we

9   weren't happy with this.  He was very difficult to

10  contact.  Literally avoided us.  And my wife saw him and

11  we stated the case to him that we weren't happy with this

12  whole episode and we wanted the money back.  He was

13  virtually impossible to contact.  But we then went to the

14  police.

15     Q.    Do you recall when it was that you went to the

16  police?

17     A.    The exact dates I don't have in my head, but I

18  would be able to look them up.

19     Q.    Just roughly, do you remember what year it was?

20     A.    1996, I think.

21     Q.    Why was it that you went to the police?

22     A.    Because first we thought something was

23  definitely wrong about the way this was looking and we

24  went to the police and explained what happened and they

Electronically signed by Kim Hurley (501-043-872-4654)                    88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

Page 15

1    said this is advanced fee fraud, what you described to us

2    is advanced fee fraud.  And they said that they would

3    engage the fraud office, which they did, then Scotland

4    Yard eventually contacted us and said, give us the

5    address.  We went through the details with them and they

6    said, yes, this is definitely a case of advanced fee

7    fraud here.

8        Q.    Where, then, did you go to the police?  What

9    location did you go to the police?

10       A.    Local in Hampshire.  We went to a local in

11   Hampshire.  And then they referred it to the fraud

12   office, who then referred it to Scotland Yard in London.

13       Q.    Do you recall what kind of information you

14   provided to the authorities?

15       A.    Statement and lots of reams of evidence,

16   physical pieces of paper and faxes.  We pointed them to a

17   Web site which they looked at and then as soon as it was

18   registered, Cormick was approached by the police.

19       Q.    When you say that you provided reams of

20   evidence and documents, can you remember with any

21   specificity what kind of documents you provided to the

22   authorities?

23       A.    Mostly e-mails.  In fact, documentation we were

24   asked to prepare, any communications, invoices, anything

Electronically signed by Kim Hurley (501-043-872-4654)    88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL      Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

Page 16

1    that actually went on between the two parties.

2        Q.    After you provided this information to the

3    authorities and eventually Scotland Yard informed you

4    that it was an advanced fee fraud, what steps did the

5    authorities take next?

6        A.    They needed a more detailed statement from us.

7    We had to go to London and we met with somebody from

8    their offices.  We had to take all the evidence with us

9    that we still had that they hadn't seen yet.  They took a

10   much more detailed statement.  We believe they then

11   approached Cormick and started discussing with him.

12       Q.    Do you have any knowledge of when the

13   authorities approached Mr. Cormick?

14       A.    That would be hearsay because I certainly

15   wasn't present when they did.

16       Q.    Did Mr. Cormick ever have communications with

17   you in which he talked about the authorities visiting

18   him?

19       A.    Can you ask me that again?  Sorry.

20       Q.    Did Mr. Cormick ever have discussions with you

21   or communications in which he indicated that the

22   authorities had visited him or contacted him?

23       A.    No.  As I said, he started to become very

24   evasive, uncontactable, basically he was finished with

Electronically signed by Kim Hurley (501-043-872-4654)                    88024abe-c93c-413e-bcc4-99cdc9bc4005

Page 17

1    us.  We had run out of money and we were of no use to

2    him, so he didn't contact us.  The police, I can't

3    remember exact dates, but I believe it was over a period

4    of three or four months possibly that they did their

5    investigation.

6        Q.    Then after that investigation started, did you

7    have any further communications with Mr. Cormick?

8        A.    Only via lawyers.

9        Q.    When you say, "Only via lawyers," can you

10   explain what you mean by that?

11       A.    Cormick had been making representations on my

12   behalf to his -- to people about me being an employee of

13   EVF and that trying to set up meetings for me to go and

14   talk to them.

15            MR. FINGER:  Objection.  Hearsay.

16   BY MR. BRACEGIRDLE:

17       Q.    How did you become aware of that?

18       A.    Because he printed business cards for me and

19   asked me to attend meetings initially, and I was very

20   curious as to why and he said, "This is how it's done.

21   It's all part of the family.  These people see you as the

22   guru" were the words he used, and "they want to leverage

23   you in meetings they had with other people so you can do

24   due diligence on their behalf," etcetera.  So that's the

Electronically signed by Kim Hurley (501-043-872-4654)    88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL     Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

Page 18

 1    line he spun.

 2         Q.    Did you attend meetings where Mr. Cormick made

 3    his representations?

 4         A.    On a few meetings that were called, he asked me

 5    to attend the meetings under -- when I was spoken to, it

 6    was about these guys that got funding, he's got funding

 7    on the back of them, and they've got to pull money out of

 8    that funding.  When we got to the meetings, it turned out

 9    that he was doing something similar with them and getting

10    me to technically vet their stock.  And when I spoke to

11    those parties independently, we began to smell a rat,

12    because they said that's not what they thought the

13    meeting was about, and I said I had the exact same

14    impression.

15         Q.    So then after you made your claim to the

16    authorities and they were investigating Mr. Cormick, did

17    Mr. Cormick take any further actions with respect to you

18    or your company or the technology you were marketing?

19         A.    Cormick had written to the main individuals

20    that he had spoken to and said that we are seeking to

21    deal with him.  This was sometime down the track.  Again,

22    I can't remember the exact dates without referring to my

23    notes.  He then did a libel case against me, saying I

24    libeled him.  And he used the libel exercise to extract

Electronically signed by Kim Hurley (501-043-872-4654)                                    88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

Page 19

1    all the evidence that I had given the police.

2        Q.    Do you recall if that libel case -- how did

3    Mr. Cormick allege that you libeled him?

4        A.    Because we had gone to a solicitor, explained

5    to him what was going on and said that I was being

6    misrepresented to the authorities.  They then dropped a

7    letter for me which we sent to the main individuals to

8    say that I no longer have any dealings with Cormick.  On

9    the strength of that, he went and pushed the libel charge

10   which he never followed through in the end which all

11   along we knew it was just a tactic of his to get access

12   to the evidence.

13       Q.    Did Mr. Cormick make any allegations about the

14   ownership rights to the technology of your company?

15           MR. FINGER:  Objection.  Form, leading.

16           MR. BRACEGIRDLE:  You can answer.

17       A.    He did.  There was an incident where an

18   individual that we had paid money to had gone off with

19   technology, hawking the benefits, and we were pursuing

20   that individual.  He fled the country and went to

21   Australia.  And Cormick eventually got ahold of him and

22   used him to go around and bad-mouth us with our

23   customers.

24           MR. FINGER:  Objection.  Assumes facts not

Electronically signed by Kim Hurley (501-043-872-4654)                                        88024abe-c93c-413e-bcc4-99cdc9bc4005

Page 20

1    in evidence.

2    BY MR. BRACEGIRDLE:

3        Q.    How did you learn of what Mr. Cormick had said

4    to your customers?

5        A.    That individual called me and told me.  He said

6    Cormick was his new best friend.

7        Q.    What's your understanding of what Mr. Cormick

8    told your customers?

9        A.    Not Cormick, this individual.

10        Q.    Who is this individual?

11        A.    This was a technician that we had used to

12    develop some of the dealing software, because we had been

13    pretty open with Cormick.  We had pretty much given him

14    everything.  We were an open book to him.  Basically he

15    could share anything he wanted, the information, to turn

16    it against us.  We put our absolute faith in Cormick.  He

17    just looked for something that he could use to hurt us

18    with.

19        Q.    Eventually whatever happened to the

20    authorities' investigation of the charges that you had

21    filed?

22        A.    I don't know what the official line is.  We

23    were told that it wasn't in the public interest to pursue

24    the prosecution, the amount of money was too low, and if

Electronically signed by Kim Hurley (501-043-872-4654)    88024abe-c93c-413e-bcc4-99cdc9bc4005

Page 21

1   it was more than a million, they would pursue it.  That's

2   what we were told.  The reality of what they told Cormick

3   or what they said, we have no idea.

4       Q.    Do you recall when that happened?  How long

5   after you initiated the proceedings did they tell you

6   that?

7       A.    I think it was during the course of '97 when we

8   were told that.  Mid-to-late '97.

9       Q.    After that point do you know if the authorities

10  did anything else to pursue the case?

11      A.    No, not that I'm aware of.

12      Q.    At the time that they closed the case, do you

13  know where Mr. Cormick was living?

14      A.    We were told he had left the country.

15      Q.    Who told you that?

16      A.    The police.

17      Q.    Whatever happened with the libel lawsuit that

18  Mr. Cormick had filed against you?

19      A.    As predicted by the lawyer, it wasn't carried

20  through.

21      Q.    What do you mean by "it wasn't carried

22  through"?  Can you expand on that?

23      A.    He used the whole exercise to get us to put the

24  evidence at the disposal of his lawyers.  Everything the

Electronically signed by Kim Hurley (501-043-872-4654)                                88024abe-c93c-413e-bcc4-99cdc9bc4005

Page 22

1    police were going to use in their case he had previous

2    view of.

3        Q.    Do you mean to say that his lawyers had

4    requested that you produce those documents in the

5    litigation?

6        A.    As part of the whole libel exercise, step by

7    step they went through and made sure everything was

8    just -- he wanted to see what everyone else was looking

9    at.  They asked for everything.  Literally the whole

10    criminal case was eroded because the evidence was taken

11    by his lawyers as part of their discovery for the libel.

12        Q.    Then once that discovery was taken, did

13    anything further happen with the case?

14        A.    Nothing.  It just fizzled out.  I'm not sure

15    how the law works, but our lawyers said that it probably

16    won't come to anything.  They came back to the bench and

17    said done and nothing happened.

18        Q.    Did you have any further contact with

19    Mr. Cormick after that?

20        A.    No.  We did ask the police for his address and

21    they wouldn't give it to us.  We asked our lawyers if

22    they were able to get the address and they said no, they

23    didn't have the address.  And that was it.  We were under

24    the impression he had left the country.

Electronically signed by Kim Hurley (501-043-872-4654)                                    88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

Page 23

```
 1      Q.    What, if any, were the consequences of your

 2   dealings with Mr. Cormick?

 3      A.    What were the consequences?  Is that what

 4   you're asking?

 5      Q.    Yes.

 6      A.    Besides the fact that I had drained what cash I

 7   had available, my house had gone south as I was battling

 8   to keep the software company running that had its entire

 9   coffers eroded by the salacious acts of that individual

10   who claims he was acting on Cormick's behalf.  Literally

11   nearly ended in divorce from my wife because it was so

12   stressful.  Our lives were pretty ruined and it took a

13   long while to recover and get myself a job.

14      Q.    How long did it take you to get another job?

15      A.    I think I was unemployed for at least a year.

16   My reputation was pretty trashed after that incident.

17            MR. BRACEGIRDLE:  Mr. Dean, those are all

18   the questions I have for now.  As I said, Mr. Finger may

19   have some questions to ask you.  But I thank you for your

20   time.

21            THE WITNESS:  No problem.

22   BY MR. FINGER:

23      Q.    Mr. Dean, my name is David Finger.  I am

24   representing Brett Cormick and Elan Suisse.
```

Electronically signed by Kim Hurley (501-043-872-4654)    88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

Page 24

1           At the outset, Mr. Dean, have you ever gone

2    by any other name?

3      A.    I was born with a different name and I dropped

4    the fourth name in my title.

5      Q.    What was the name given to you at birth?

6      A.    Andre Alan Dean Pilliers.

7           MR. BRACEGIRDLE:  Could you spell that last

8    part, please?

9           THE WITNESS:  P-i-l-l-i-e-r-s.

10   BY MR. FINGER:

11     Q.    Did you have that name change legally

12   formalized?

13     A.    I did.  It was given to the police, given to my

14   lawyers, given to my employees.  Employers, sorry.

15     Q.    You mentioned that Dr. Cormick had set up

16   meetings with financiers on a couple of occasions at

17   which you attended, correct?

18     A.    That's correct.

19     Q.    Do you have any reason to say now that those

20   were not really financiers?

21     A.    I can't answer the question whether they were

22   financiers or not.  They were presented as financiers or

23   presented as fund managers or people who dealt with

24   high-net-worth individuals' investments.  That's how they

Electronically signed by Kim Hurley (501-043-872-4654)                    88024abe-c93c-413e-bcc4-99cdc9bc4005

Page 25

1    were represented to me.

2        Q.    Are you familiar with the Algonquin Trust?

3        A.    The name rings a bell.  I have a feeling that's

4    the one in Switzerland.

5        Q.    Do you recall discussing an investment in your

6    technology with the Algonquin Trust?

7        A.    Do you happen to have the name of the

8    individual of the company?

9        Q.    I'm afraid I do not, sir.  I'm sorry.

10       A.    I recall talking with a gentleman called

11   Alec Steffan and I think he may have been the person in

12   Algonquin Trust.  But I can't be sure now.  I have to

13   refer back to my notes.

14       Q.    Do you recall what came of your conversations

15   with this gentleman?

16       A.    No, I don't.

17       Q.    Did he tell you that his organization was

18   declining to invest?

19       A.    Give me the name of the individual.

20       Q.    I'm going with the individual you just

21   identified, sir.

22       A.    Sorry.  You're going with the individual I

23   identified.

24       Q.    You just identified a gentleman whose name has

Electronically signed by Kim Hurley (501-043-872-4654)                88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

Page 26

1    already slipped my mind.  If you will just bear with me a

2    second, I'll ask the court reporter to locate that.

3        A.    Alec Steffan?

4        Q.    Yes.  Thank you.  Did he ever say to you that

5    he or whatever entity he was representing was declining

6    to invest in your technology?

7        A.    I don't know if Algonquin Trust -- I don't

8    recall -- I can't remember if he's the man from Algonquin

9    Trust.  But Alec Steffan was one of the people who came

10   clean to me and said, "We were never going to invest in

11   your company.  We did this as a favor to Brett."

12       Q.    Now, you mentioned an ex-employee of yours, if

13   I'm characterizing him correctly, who made claims of

14   ownership of your technology?  Do I have that correctly?

15       A.    Yeah.  He literally took a version of the

16   software and restated it as his own in Australia.  Made a

17   claim of ownership.  He just said -- he passed it off to

18   Cormick that the technology we were representing was not

19   ours, which clearly we had proved that it was.

20       Q.    How did you prove that?

21       A.    Because we had some of the original architects

22   that developed the technology put affidavits in to the

23   lawyers.  Intellectual property lawyers got involved.

24   And they looked at it and said, there is no case here,

Electronically signed by Kim Hurley (501-043-872-4654)                                    88024abe-c93c-413e-bcc4-99cdc9bc4005

Page 27

```
 1    it's a total waste of time, please.

 2         Q.    What are the names of these architects?

 3         A.    The lawyers were Bird & Bird I think they were

 4    called.

 5         Q.    I'm sorry.  My question was the name of the

 6    architects of the software.

 7         A.    One of the architects that did the affidavit

 8    was a guy called David Sinfield.

 9         Q.    How do you spell that last name, please?

10         A.    S-i-n-f-i-e-l-d.

11         Q.    Thank you.  Do you have any other names of

12    architects?

13         A.    Not offhand, no.

14         Q.    What was the name of the gentleman who was

15    making the claim or passed -- did you say passed off a

16    version of the software to Dr. Cormick?

17         A.    Gentleman called Chris Ferri.

18         Q.    F-e-r-r-i?

19         A.    You have the details more than I do.

20         Q.    No, sir, I don't.  That's why I'm asking.

21         A.    Just talk to him directly.

22         Q.    Thank you.  Do you know where Mr. Ferri is

23    currently?

24         A.    No, I don't.
```

Page 28

```
 1      Q.    What is the name of the company with which you
 2  are currently employed?
 3      A.    I don't think that's relevant to this.
 4            MR. BRACEGIRDLE:  Mr. Dean, what I'm going
 5  to do is once you answer the question, I'm going to
 6  designate your answer as highly confidential under the
 7  terms of the protective order that we have, which means
 8  that under court order it can be disclosed to Mr. Finger
 9  and to myself but to no one else.
10            So based on that --
11            THE WITNESS:  I've heard this before.  My
12  entire life was turned upside-down by this gentleman and
13  I was given that promise as well.  The lawyers said they
14  will never give him the stuff, but they did.  I have been
15  there before.
16  BY MR. FINGER:
17      Q.    Notwithstanding that, sir, this is a
18  deposition --
19      A.    That's what they told me last time.
20      Q.    Are you declining to answer?
21      A.    What I'm saying is I have no control over how
22  you will use this information.  I know from various
23  experience in the past that this stuff was used
24  maliciously against me and it all turned out to be
```

Page 29

1    unfounded.

2        Q.    Sir, will you answer the question?

3        A.    I don't see the relevance of who I'm employed

4    with now has to what your case is.

5        Q.    The relevance is not a question for you to

6    judge in this court.  I'll ask you one more time.  Will

7    you answer the question?

8        A.    I'm still not convinced why I have to answer

9    that question.  And I have explained to you why I don't

10   want to answer that question because it's been used

11   maliciously in the past when I put this information at

12   your disposal.

13       Q.    I understand that, sir.  Will you answer, yes

14   or no?  Are you going to answer the question?  Sir?

15       A.    I hear you.

16       Q.    I'm waiting for an answer, yes or no.

17       A.    I know you're waiting for an answer.

18       Q.    Why do you decline to say "yes" or "no," sir?

19       A.    Because I want to talk with the other lawyer

20   first before I disclose this information.  I want to know

21   that there's going to be some compensation if this is

22   used maliciously because it cost me all my livelihood the

23   last time I did this.

24              MR. BRACEGIRDLE:  Mr. Dean, I'm not your

Electronically signed by Kim Hurley (501-043-872-4654)    88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL     Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

Page 30

1    lawyer, I don't represent you, so I can't technically

2    give you legal advice, but I can tell you, and Mr. Finger

3    would, I think, agree with me, that the two of us are

4    both under court order to maintain any information that

5    we designate as highly confidential for our eyes only and

6    are not to communicate them to our clients.  There would

7    be serious repercussions for either of us if we were to

8    violate that order.  I believe that's the best comfort I

9    can give you.  And Mr. Finger --

10                    THE WITNESS:  I have to know that I can

11    come for punitive damages against Mr. Finger and his

12    company if this is used maliciously against me because it

13    happened before and my life was ruined.  You must

14    understand how I would rather cut my throat now and bleed

15    to death on my desk before I put my wife through the hell

16    we were put through last time.

17                    I need to know:  Will there be a chance for

18    me to get punitive damages if this is used maliciously

19    against me?  Because if I hear just one inkling like last

20    time with the discredited information and salacious

21    absolute bumps that came down that line which I have a

22    tape-recording of, I will come for damages.

23                    MR. FINGER:  That is your right, sir.

24                    THE WITNESS:  Thank you.

Electronically signed by Kim Hurley (501-043-872-4654)                    88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL      Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

Page 31

1   BY MR. FINGER:

2        Q.    Now will you answer the question?

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Electronically signed by Kim Hurley (501-043-872-4654)                                    88024abe-c93c-413e-bcc4-99cdc9bc4005

Page 33

1    Q.    You mentioned when you were in Palm Beach

2    someone recommended Dr. Cormick to you.  Do you remember

3    the name of that person?

4    A.    Offhand, no.  It was Palm Springs.

5    Q.    I apologize.  Sir, you mentioned some notes you

6    were looking at earlier and we had a discussion about

7    that.  Did you review any other documents to prepare for

8    today's deposition?

9    A.    No.  And purposely not.  I could have pulled

10   the entire ream of documentation that we gave the lawyers

11   and gave to the police, but I didn't do it because I

12   didn't really want to bring up the past and go through

13   the hell I went through last time.

14   Q.    Sir, did I hear you correctly earlier you made

15   a reference to Electra Inovatech?

16   A.    I did a quick search in my mailbox to look for

17   the company that was registered originally with Electra

18   Inovatech I think it was called.

19   Q.    When you say "registered" --

20   A.    It was a fairly large company here in the U.K.

21   May still be.

22   Q.    What was the connection that you found between

23   Electra Inovatech and Dr. Cormick?

24   A.    He presented himself in one of his business

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

Page 34

1    cards.  The first time I met him he gave me the business

2    card which I gave to the police.

3        Q.    Did you find anything that indicated that that

4    was not the case?

5        A.    Yes.  Later on, obviously not in the beginning

6    because we had no reason to doubt the guy, but later on

7    when we started to investigate in our defense for the

8    libel, he was not employed by them and he misrepresented

9    us.

10       Q.    How did you make that determination?

11       A.    We found out and asked somebody in the company

12   and they said, no, nobody's worked there by that name.

13   We said we got a business card, blah, blah, blah.  They

14   asked for details and they said, no, that's a

15   misrepresentation.

16       Q.    Do you recall the name of the individual with

17   whom you spoke?

18       A.    No, but I'm sure it must be on record with the

19   lawyer who did the libel.

20       Q.    Do you recall the department with which the

21   person you spoke was employed?

22       A.    No.  It was the same -- the first meeting was

23   in their building.

24       Q.    I heard you use the word "transcript" in

Electronically signed by Kim Hurley (501-043-872-4654)    88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

Page 35

1    connection with you said one of the meetings you had with

2    Dr. Cormick, you or your wife made a transcript.  Do you

3    recall using that word?

4        A.    Yes, we did.  We basically made detailed notes

5    of conversations.

6        Q.    This was based on your memory of the

7    conversation; is that correct?

8        A.    Yes.

9        Q.    Did you make these notes immediately after the

10   conversation?

11       A.    We did.  And we gave that to the lawyers.

12       Q.    You said you went to the police in around 1996;

13   is that correct?

14       A.    It's thereabouts.  1997, it was certainly

15   around that period.

16       Q.    I'm not trying to play a game of got you, just

17   your best memory.

18              You said you went to the local Hampshire

19   police originally; is that correct?

20       A.    Yes.  I believe it was Hamble, H-a-m-b-l-e.

21       Q.    Thank you.  Do you remember the name of the

22   police officer with whom you spoke?

23       A.    Again, from memory, no.

24       Q.    You had meetings with Scotland Yard you said;

Electronically signed by Kim Hurley (501-043-872-4654)                                    88024abe-c93c-413e-bcc4-99cdc9bc4005

Page 36

1    is that correct?

2         A.    Yes.  They referred it to fraud squad.  The

3    fraud squad -- I believe the fraud squad in Hamble.  They

4    then referred it to Scotland Yard.  I believe that was

5    the sequence of events.

6         Q.    How many conversations do you recall having

7    with someone from Scotland Yard?

8         A.    There was several conversations.  I think there

9    may have been between two and four fairly lengthy

10   meetings.

11        Q.    Do you remember the names of any of the

12   officers of Scotland Yard with whom you spoke?

13        A.    There was a primary officer, a female officer.

14   Detective Smith I believe it was.  Christine Smith.

15        Q.    You're quite sure that she was with Scotland

16   Yard?

17        A.    She was with Scotland Yard, yes.

18        Q.    I may have misheard again, and I apologize if I

19   did.  You mentioned you saw Dr. Cormick on some Web site?

20        A.    No.  His Web site.

21        Q.    You saw his Web site.

22        A.    Yes.  He had his own Web site where he made

23   various representations which we referred the police to

24   which they saw and then, of course, it all vanished.

Page 37

```
 1      Q.    I'm curious.  After three months and 30,000

 2   pounds, why did you continue to keep paying?

 3      A.    Because he hung the carrot just into the next

 4   month and said the money's there.

 5      Q.    Did you ask for any proof of that?

 6      A.    That's what we had to go to the meeting for.

 7   And we had to go and he said, they want to have

 8   confidence in investing in you as individuals, along

 9   those lines.  Each time without fail he hung it just into

10   the next month.

11      Q.    Help me here.  You said you went to the meeting

12   and you got bemused looks from people who then confessed

13   that they had no intention of financing?

14      A.    Yes.  What happened in the beginning, in the

15   beginning, towards the middle and end of this exercise

16   which started getting me these problems of people saying,

17   hang on, why are we having this meeting.  And I'd

18   explain, well, Dr. Cormick had said X, he had talked

19   about the technology and you're interested in the

20   business.  One of them said, "We did this as a favor to

21   Brett."  Those were his words.  The gentleman,

22   Barry Stants I mentioned earlier, we saw him on two

23   separate occasions, he was the guy I believe was asked to

24   do the due diligence towards the end of the process.
```

Electronically signed by Kim Hurley (501-043-872-4654)    88024abe-c93c-413e-bcc4-99cdc9bc4005

Page 38

1      Q.    Let's turn to your attempt to seek criminal

2    prosecution.  You agree that there was no criminal

3    prosecution of Dr. Cormick, correct?

4      A.    It didn't go to court, no.  But there was an

5    investigation and I believe he was arrested.

6      Q.    But you believe he was arrested.

7      A.    Well, I wasn't there when they did it.

8      Q.    You only know it from somebody telling you?

9      A.    Yes.  The police informed us that they had

10   arrested him.

11     Q.    Do you know around when that was?

12     A.    From memory, I can't recall.

13     Q.    Do you know how long he was detained by the

14   police?

15     A.    I wouldn't have been privy to that information.

16   The police don't share that sort of stuff.

17     Q.    Let me ask you this, then:  How long was it

18   between the time you learned of his arrest to the police

19   coming to tell you that they were not going to prosecute?

20     A.    Several months.

21     Q.    You said they told you that the reason that

22   they were not going to prosecute is that the value was

23   too low.  Correct?

24     A.    I think the exact words that they used were

Electronically signed by Kim Hurley (501-043-872-4654)                                    88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL     Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

Page 39

1    "It's not in the public interest to pursue this.  We

2    would have to go and interview all these witnesses all

3    over Europe and Australia," etcetera, etcetera.  "The

4    cost would be huge compared to the amount of money that

5    was stolen.  It's not in the public interest" -- "public

6    interest, public purse to spend that money pursuing this

7    crime," because the amount was too small.  If it was in

8    excess of a million or so, it may well have been

9    worthwhile.

10       Q.    Who was the person who told that to you?

11       A.    That was the Detective Smith.

12       Q.    You said that was the line you were told, but

13   you don't know what the truth is, correct?

14             MR. BRACEGIRDLE:  Objection.

15       A.    I have no idea other than we were told it

16   wasn't in the public interest to pursue it because of the

17   cost of it.  That may have been the line they gave to us

18   just to get us off their backs.  I have no idea.

19       Q.    You know that Dr. Cormick left England.  You

20   don't know the date, do you?

21       A.    No, I don't.  We were just told by the police

22   that they believe he had left the country.

23       Q.    They believed, not that they knew?

24       A.    I do recall asking for the address and they

Electronically signed by Kim Hurley (501-043-872-4654)                                        88024abe-c93c-413e-bcc4-99cdc9bc4005

Page 40

1    said no, they don't have it.  I had no idea whether they

2    knew or not.

3        Q.    Do you have any knowledge of whether he left

4    before or after the police determined not to prosecute

5    him?

6        A.    No idea.

7        Q.    Do you know if the police told Dr. Cormick they

8    were not going to prosecute him?

9        A.    No idea.  Wouldn't have been present if they

10   did.

11       Q.    You have no idea what reasons they gave him for

12   not prosecuting?

13       A.    Absolutely not.

14       Q.    You know that your name had been used in

15   Mr. Christ's Web site, correct?

16       A.    Yes.  I became aware of that and that's how I

17   came to know.  We contacted him and explained to him that

18   we were unhappy to have our dirty laundry in the public

19   domain.

20       Q.    He agreed to remove your name, correct?

21       A.    He did.  Yes, he did.

22       Q.    Have you been helping him since then?

23       A.    What do you mean by "helping"?

24       Q.    Have you given him documents relating to

CONFIDENTIAL      Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

Page 41

1    Dr. Cormick?

2        A.    I talked about documents.  I can do a quick

3    search through my e-mail to see if I sent him documents

4    attached.  I believe I did.

5        Q.    I just prefer you work through your memory.

6    For example, you spoke of reams of evidence you gave to

7    Scotland Yard.  Did you give any of that evidence to --

8        A.    No.

9        Q.    -- Mr. Christ?

10       A.    No.

11       Q.    Did you give Mr. Christ copies of business

12   cards; for example, Dr. Brett Cormick business card from

13   Electra Inovatech?

14       A.    I believe we sent a scanned image of the cards,

15   yes.  I believe we did do that.

16       Q.    Why did you do that?

17       A.    Because Mr. Christ, when he spoke with me, had

18   difficulty believing some of the claims I had made.

19       Q.    So you sent him that as proof of your claims?

20       A.    Correct.

21       Q.    Did you also send him a European venture

22   investment finance memorandum?

23       A.    The brochure?

24       Q.    Yes, the brochure.

Electronically signed by Kim Hurley (501-043-872-4654)                    88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

1    A.    I think if it's the one I think it is, it's the

2    one where I was portrayed in the brochure.

3    Q.    I ask what you mean when you say "portrayed,"

4    sir.

5    A.    If it's the one I think it was, there was an

6    article where I was -- there was a drawing of me and I

7    was introduced as an EVF person, which it was a surprise

8    when we discovered that it happened.

9    Q.    How did you discover that it happened?

10    A.    I forget who it was, but somebody gave me a

11    copy of the brochure and said, "Are you aware of this?"

12    Q.    You did not receive this brochure in connection

13    with your relationship with Dr. Cormick?

14    A.    No, but we did discuss it and he explained it

15    away at the time.

16    Q.    One last question, I think.  We talked about

17    the issue of the ownership or creation of the software.

18    Did any of these financiers that you recall ask of you

19    about who actually owned the software?

20    A.    I think in the very last exercise that was a

21    topic of discussion.  But it was never -- in those early

22    stages of early meetings, it was never an issue.  It was

23    only an issue when the individual from Australia started

24    to spread the innuendo and rumor.  And that's when we had

Electronically signed by Kim Hurley (501-043-872-4654)    88024abe-c93c-413e-bcc4-99cdc9bc4005

Page 43

1    the affidavit put together by the original architect who

2    developed the technology.  And we actually spent money

3    going away to the IP lawyers to certify.

4        Q.    Did you hand that affidavit to any of the

5    financiers who were questioning it?

6        A.    That was all well after the case.

7        Q.    So at the meeting at which this issue arose,

8    you had nothing to give them by way of proof, correct?

9        A.    No, I think -- again, the dates are a little

10   bit fuzzy, but the due diligence exercise and questioning

11   who owns the software, who owns the IT, etcetera, we

12   claimed it was ours, rightly so.

13       Q.    Do you know why --

14       A.    It was part of the due diligence exercise.  I

15   don't believe at that point in time the other individual,

16   other character, had got involved, and I don't believe

17   the two were connected because they were months apart.

18       Q.    Maybe I wasn't clear, and if I wasn't, I

19   apologize.

20             My question was not during the due

21   diligence period, but I asked about when speaking with

22   financiers whether this issue came up and you said it

23   came up at one of the last meetings.  Correct?

24       A.    Yeah.  At the diligence.  Towards the end as

Electronically signed by Kim Hurley (501-043-872-4654)                    88024abe-c93c-413e-bcc4-99cdc9bc4005

Page 44

1    part and parcel of the 6 million, we just got to get this

2    due diligence done and Barry Stants organized with this

3    company Technology something and they will do the due

4    diligence for them and get the rubber stamp.  And in

5    those due diligence exercises they asked about the

6    ownership of the IP, etcetera, which we made the

7    appropriate statements at the time and stand by to this

8    day.  Which we subsequently, as a result of the malicious

9    stuff that went on, later on we had to go away and get it

10   certified by lawyers who said there was nothing to

11   answer.

12       Q.    Does the word "zebra" have anything to do with

13   this process?

14       A.    The project was called the Zebra Project.

15            MR. FINGER:  I thank you, sir.  I have no

16   other questions.

17            MR. BRACEGIRDLE:  Mr. Dean, this is

18   Thad Bracegirdle.  I have no other questions as well.  I

19   thank you for your time.  What will happen is the court

20   reporter will produce a transcript of your testimony.  I

21   will then be able to provide you with a copy of that

22   transcript and you can review it for any errors in your

23   testimony, and I'll coordinate that with you.

24            Again, we will designate those certain

Electronically signed by Kim Hurley (501-043-872-4654)                    88024abe-c93c-413e-bcc4-99cdc9bc4005

Page 45

1    portions that I did as highly confidential.

2            Mr. Dean, thank you very much for your

3    time.  I appreciate it.

4            THE WITNESS:  Just to stress again, please,

5    the last time I went through this exercise we had people

6    going through my rubbish.  Everything you can imagine was

7    happening.  If I get a sniff of that happening again this

8    time, I am going to have to take the necessary steps to

9    protect myself this time because my life was made hell

10   and I have given you information in this deposition today

11   which I have had to keep very close to my heart and my

12   chest because of the damage it's caused to my wife the

13   last time.  The impact was huge and I really would not

14   like that to be repeated.

15           MR. FINGER:  Mr. Dean, this is

16   David Finger.  I don't know what comfort it gives you,

17   but all I can do is assure you that neither

18   Mr. Bracegirdle nor I desire to cause you any pain or

19   desire to have anybody else cause you any further pain.

20   To that end, we are going to both be diligent and

21   upstanding and abide by the confidentiality of which we

22   have spoken.

23           THE WITNESS:  I appreciate that.  As I said

24   at the beginning, I look forward to getting this thing

Electronically signed by Kim Hurley (501-043-872-4654)                    88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Andre Alan Dean

Page 46

1    over with and moving on with our lives.

2                  MR. BRACEGIRDLE:  I think that concludes

3    it.

4                  THE WITNESS:  This is history for me.  I

5    want it past.

6                  MR. BRACEGIRDLE:  Thank you very much,

7    Mr. Dean.  Enjoy the rest of your evening.

8                  (Deposition concluded at 3:10 p.m.)

9                       -  -  -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Electronically signed by Kim Hurley (501-043-872-4654)                                    88024abe-c93c-413e-bcc4-99cdc9bc4005

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC

Page 47

```
 1                  T E S T I M O N Y

 2

 3   DEPONENT:  ANDRE ALAN DEAN              PAGE

 4

 5   BY MR. BRACEGIRDLE.......................... 2

 6   BY MR. FINGER.............................. 23

 7

 8        (No exhibits were marked at this time.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Electronically signed by Kim Hurley (501-043-872-4654)                    88024abe-c93c-413e-bcc4-99cdc9bc4005

Page 48

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

Electronically signed by Kim Hurley (501-043-872-4654)    88024abe-c93c-413e-bcc4-99cdc9bc4005

Page 49

## CERTIFICATE OF REPORTER

STATE OF DELAWARE )

)

NEW CASTLE COUNTY )

        I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 3rd day of
March, 2008, the deponent herein, ANDRE ALAN DEAN, who
was duly sworn by me and thereafter examined by counsel
for the respective parties; that the questions asked of
said deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use of
computer-aided transcription and computer printer under
my direction.

        I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.

        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

                Kimberly A. Hurley

                Certification No. 126-RPR
                (Expires January 31, 2011)

DATED:  March 17, 2008



**CONFIDENTIAL**

In the Matter Of:

# Christ

v.

# Cormick and Elan Suisse International Holdings (USA) LLC

C.A. # 06-275-GMS

———————————————

Transcript of:

# Graham Bruce Lyman

March 3, 2008

———————————————

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ROBERT D. CHRIST,                )
                                 )
        Plaintiff,               )
                                 )
        v.                       ) C.A. No. 06-275-GMS
                                 )
BRETT J. CORMICK and ELAN )
SUISSE INTERNATIONAL             )
HOLDINGS (USA),                  )
                                 )
        Defendants.              )
                                 ) CONFIDENTIAL
                                 )
ELAN SUISSE LTD.,                )
                                 )
        Plaintiff,               )
                                 )
        v.                       )
                                 )
ROBERT D. CHRIST,                )
                                 )
        Defendant.               )

            Telephonic deposition of GRAHAM BRUCE LYMAN
taken pursuant to notice at the law offices of Reed
Smith, LLP, 1201 North Market Street, Suite 1500,
Wilmington, Delaware, beginning at 5:10 p.m., on Monday,
March 3, 2008, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

        THAD J. BRACEGIRDLE, ESQUIRE
        REED SMITH, LLP,
           1201 North Market Street - Suite 1500
           Wilmington, Delaware 19801
           for Robert D. Christ

cont'd...

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC

Page 2

```
 1   APPEARANCES (cont'd):

 2           DAVID L. FINGER, ESQUIRE
             FINGER & SLANINA, LLC
 3             1201 North Orange Street - Suite 725
             Wilmington, Delaware 19801
 4             for Brett Cormick and Elan Suisse

 5                       - - - - -

 6               GRAHAM BRUCE LYMAN,

 7         the witness herein, having first been

 8         duly sworn on oath, was examined and

 9        testified as follows:

10   BY MR. BRACEGIRDLE:

11      Q.    Mr. Lyman, as I mentioned, my name is

12   Thad Bracegirdle.  I'm an attorney here in Wilmington,

13   Delaware, in the United States, and we're taking your

14   deposition today in the case of Robert Christ versus

15   Brett Cormick and others.  I represent Mr. Christ in

16   those proceedings.  I will be asking you some questions

17   and once I'm done, David Finger, who represents

18   Brett Cormick and the other defendants, may also have

19   some questions for you as well.

20             The first thing I'd like to ask you,

21   Mr. Lyman, is could you please state your full name for

22   the record?

23      A.    My full name is Graham Bruce Lyman.

24      Q.    Mr. Lyman, where do you currently reside?
```

Wilcox & Fetzer, Ltd.    Registered Professional Reporters         302-655-0477

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL      Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Graham Bruce Lyman

Page 3

1       A.      I currently reside in Sydney, Australia.

2       Q.      What is your current occupation?

3       A.      I'm a company director.

4       Q.      You are a company director for what company?

5       A.      Argus Solutions Limited.

6       Q.      What is the business of Argus Solutions?

7       A.      We are a biometrics company.

8       Q.      By "biometrics," what do you mean, for those of

9  us who are uninitiated in the field?

10      A.      Sure.  It's about the use of technologies such

11 as face recognition, iris recognition, fingerprinting, to

12 identify people.

13      Q.      How exactly does Argus Solutions use that in

14 its business?  What kind of products do you develop and

15 sell?

16      A.      We have built our own -- we built proprietary

17 software applications that use those biometric

18 technologies to deliver a variety of business benefits.

19 So, for example, we use our applications to manage time

20 capture and payroll for companies or managing visitors

21 into prisons, contractors into hospitals, secure

22 personnel or brief personnel to secure facilities.

23 There's a range of applications like that.

24      Q.      When you say that you're a company director, is

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Graham Bruce Lyman

Page 4

1    that your title?

2         A.    Technically I'm the CEO.  That's my

3    appointment.

4         Q.    How long have you been the CEO of Argus

5    Solutions?

6         A.    Ten years.

7         Q.    Mr. Lyman, could you briefly describe for me

8    your educational background?

9         A.    Sure.  I'm not sure how to relate it to U.S.

10   equivalence, but I was educated by -- my schooling was

11   partially here in Australia.  Through the years in

12   New Zealand I undertook undergraduate university studies

13   in Cambra and in Queensland.  I did a Master's degree in

14   defense studies with the University of New South Wales.

15   So from a formal education point of view, that's a quick

16   summary.  And I'm currently doing another Master's.

17        Q.    With the exception of the Master's that you're

18   currently pursuing, when was the last year of your formal

19   education?

20        A.    1991.

21        Q.    Could you just explain for me in summary

22   fashion your work experience between 1991 and when you

23   became CEO of Argus Solutions?

24        A.    In '91 I was working in the Australian

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

Page 5

1    intelligence community in mainly symmetry analysis, but,

2    equally, I was doing political and economic analysis

3    focusing on north Asia, so Koreas and China.

4              I then moved to our Department of Foreign

5    Affairs and Trade, the equivalent of your State

6    Department, and I spent four years there.  I was an

7    analyst -- I was a chemical weapons analyst for the

8    Chemical Weapons Convention at the time.

9              I then spent another three years with their

10   Department of Defense and I was heading up intelligence

11   operations out of Sydney.

12      Q.    Thank you.  Switching gears back to Argus

13   Solutions, is Argus a privately held company or publicly

14   traded?

15      A.    It's publicly traded.

16      Q.    When was it first offered for public trading?

17      A.    October in 2000 -- actually, just to answer

18   your question more directly, we were a public analystic

19   company prior to going onto the exchange.  I don't recall

20   when we became a public company.  It would have been in

21   late 2002, early 2003.  We offered our stock on the

22   exchange in October 2004.

23      Q.    Prior to 2002 did you have experience in

24   raising capital for Argus Solutions?

Page 6

1    A.    Yes.  I was raising capital for the company

2    from 1999 would have been our first -- 1999 was our first

3    foray into the venture capital market.

4    Q.    Just if you could briefly describe for me what

5    kind of things you did in terms of raising capital for

6    Argus Solutions.

7    A.    It was primarily directed at, in the first

8    instance, the venture capital market.  It was middle of

9    the tech boom, of course, and there were numerous

10    opportunities to seek venture capital from anyone who was

11    looking to find a technical market.

12                As that dried up, but, equally, as we

13    matured our company and the product and got more clarity

14    around where we wanted to take the technology, the shift

15    in venture capital focus moved from the more traditional

16    venture capital funds to the banks that had slightly more

17    sophisticated investment groups that were prepared to

18    work with things like available loads and alternative

19    structures than simply exchanging cash for a percentage

20    of the company.

21                Eventually the venture capital group that

22    invested in the company was, in fact, a group that came

23    out of one of the local banks here.  There was also --

24    initial capital was raised through a fairly sophisticated

Electronically signed by Kim Hurley (501-043-872-4654)    844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Graham Bruce Lyman

Page 7

1    group that positioned themselves as -- they don't like to

2    be called investors, but if I have the right definition,

3    that's what they were.  That was back in '99, 2000.

4        Q.    Thank you.  In the course of your fund-raising

5    for Argus Solutions, did you have an occasion to meet

6    Brett Cormick?

7        A.    Yes, I did.  And that was initially wholly

8    tasked in terms of potential to raise capital for the

9    company.

10       Q.    When did you first have communications with

11   Mr. Cormick, do you recall?

12       A.    I meant to dig out the diaries on this, but

13   going back to 2000 -- sorry.  2001.

14       Q.    A rough estimate is fine.

15             Describe for me, please, the circumstances

16   surrounding when you first came into contact with

17   Mr. Cormick.

18       A.    I had employed -- I go back to my time in trade

19   where I had occasion to meet a lot of people in our trade

20   department and through our trade department.  And I had

21   met a gentleman there who -- or through that environment

22   who had spent some time in the Australian army.  He knew

23   Brett.  And I ended up employing this gentleman from the

24   Australian army, and in the course of doing that, he

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

Page 8

1    suggested to me that I might like to meet someone who he

2    knew from his Army days who might be able to help us with

3    raising capital.

4         Q.    Who was the individual who suggested that you

5    speak with Mr. Cormick?

6         A.    Just to confuse things, his name is also Brett,

7    but his surname is Caldwell.

8         Q.    After that did you act upon his suggestion and

9    contact Mr. Cormick?

10        A.    He was actually visiting Australia from the

11   U.S.  So yes, I traveled to Cambridge to meet with him

12   one evening.  And we had dinner with a number of other

13   folk who were either investors in the company or were the

14   founding team who were looking at doing this.

15        Q.    What did you discuss with Mr. Cormick at that

16   dinner meeting?

17        A.    That particular evening was really focused on

18   the notion that he could raise capital out of Africa,

19   that it would be UN funds that would direct that

20   infrastructure project in the southern African states,

21   the southern states, that he and his banking team in

22   Africa had the responsibility in part for the oversight

23   of some of those funds, and that if we met the

24   requirements of the UN for investing in technologies in

Electronically signed by Kim Hurley (501-043-872-4654)    844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Graham Bruce Lyman

Page 9

1    those southern states, then we would stand a good chance

2    of securing some of those dollars.

3              The emphasis placed at the time in that

4    meeting on our being involved in that sort of investment

5    was that we had to invest some of our technology with

6    companies in those southern African states, which we

7    were, coincidentally, quite happy to do.  It wasn't a

8    case of money coming into Africa -- or being intended for

9    Africa but then coming to Australia.  It was a case of we

10   would transfer technology to Africa; investment would be

11   tied to that transfer.

12       Q.    At the time did Mr. Cormick represent to you

13   that he was affiliated with or working on behalf of a

14   certain company or bank?

15              MR. FINGER:  Objection.  Form.

16       A.    No, he did not.  He actually represented

17   himself -- I have got his card here still -- from the

18   London School of Economics, and really played up or

19   presented himself as an independent consultant but with

20   an LSE credential.  He was headquartered in Mayfair in

21   London.  But no, the banking group at the time was not

22   clear to me.  I was introduced to the banking groups

23   later when I got to Africa.

24       Q.    Did Mr. Cormick tell you anything else about

Electronically signed by Kim Hurley (501-043-872-4654)                844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Graham Bruce Lyman

Page 10

1    his educational or his working experience?

2        A.    That evening he gave me a little booklet he had

3    had published.  It was part of his Ph.D. program.  I had

4    no -- I'm not even sure -- I recall reading the first

5    couple of pages and deciding that economics at this level

6    was way beyond me.  Theoretical, that is.

7            There were a whole lot of -- as you would

8    expect with a bunch of ex-Army people who get together,

9    there were a whole lot of stories about time spent in the

10   military.  But there was also a lot of talk about his

11   activity of ethanol poly, which he had photographs of,

12   and his then plans to buy a Russian submarine and sail it

13   up in the Arctic.

14       Q.    What did Mr. Cormick tell you about his

15   military background?

16       A.    He was reasonably coy at the time.  There was

17   clearly some stories that had resonance of the other

18   Britons.  The two of them had spent sometime in the

19   military together.  But there was not a lot beyond the

20   normal sort of drinking stories that ex-military tops

21   like to spin, especially all the ones spending time

22   talking to each other about.

23       Q.    Did Mr. Cormick make any statements to you

24   about how far he had attained in rank?

Electronically signed by Kim Hurley (501-043-872-4654)                844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL      Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Graham Bruce Lyman

Page 11

1     A.    No, he didn't.  My own military experience, I

2  was ex-air force intelligence, and one of the issues was

3  that community -- one of the attributes of that community

4  of the military intelligence or even the whole

5  intelligence community is it's a very small community and

6  you know who's in it and who's not.  And so there were a

7  couple of attempts to -- and this didn't happen just at

8  this particular meeting, but it happened in some bar we

9  went after as well.  There was stories there that were

10  clearly inventions and were embarrassing to his friend

11  Brett at the time.  Made no sense to the rest of us who

12  are in the intelligence community, and we just knew that

13  stories that he was trying to tell us didn't add up

14  because he wasn't part of it.

15          If you're a very junior person in the

16  intelligence community, he might have been visible, but

17  he was painting himself as an officer in the military and

18  in that community, and if you're a captain or a major,

19  you're very visible and he just -- bottom line was he was

20  not a member of the community and we knew it.

21     Q.    Why do you say that the stories didn't add up?

22     A.    You can't invent stories about the intelligence

23  community and expect those in the intelligence community

24  to give them any credence.  You just can't invent them.

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Graham Bruce Lyman

Page 12

1    You're either inside the tent or you're not.  If you're

2    inside the tent, you don't have any reason to invent

3    stories.

4        Q.    Following up on after that initial dinner

5    meeting, how did things progress between you and

6    Mr. Cormick?

7        A.    He went back to Africa and there was a

8    reasonably paced -- and I say that deliberately.  There

9    was a reasonably paced dialog with us and my other

10   directors discussing the possibility of having monies

11   invested into Argus.  I say "reasonably paced" because

12   there was no overpressure, there wasn't a hard sell, if

13   you like.  It was an opportunity.  As farfetched as it

14   might have seemed, there was something that the rest of

15   my directors felt that was worth exploring on the basis

16   of the proposals that he put up.

17              I did have one dissenting voice in my team

18   and he was one of the founders.  He was a

19   Japanese-American banker from out of Philadelphia and he

20   couldn't understand how the banking arrangements -- there

21   was nothing in the banking arrangements that added up to

22   him, nor could we get any clarity at the time to make him

23   happy that the banking or the investment structure -- let

24   me rephrase that.  There was no investment structure that

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Graham Bruce Lyman

Page 13

1    was forthcoming, and my colleague didn't want to make any

2    commitments until we had seen that structure.

3              I say that to be fair to him because in the

4    end he turned out to be absolutely correct.

5    Q.    I guess taking me through the series of events,

6    after Mr. Cormick then returned to Africa, I assume you

7    then continued to have communications with him?

8    A.    Yes.  That was through early 2002.  I flew to

9    Africa in May 2002.  And notwithstanding our reservations

10   about his intelligence community war stories -- which I

11   qualify by saying Brett's not the only one who throws

12   those sorts of stories out.  There are all sorts of

13   wannabes who want to fly in that field who don't and you

14   get these people that want to associate themselves with

15   that part of the world and that sort of work and for some

16   reason they see it as glamorous and want to be part of

17   it.  We weren't too perturbed by that.

18             I will say that I went to Africa.  By that

19   point he had introduced me to -- the Trust group sent me

20   some material and -- but I flew there thinking I could

21   trust Brett, but I had no visibility of these other

22   African bankers.

23             He also before I arrived advised me that I

24   would be meeting with some bankers from Standard

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Graham Bruce Lyman

Page 14

1    Chartered.  That takes us into May.  And I went and spent

2    a week in Zimbabwe with Brett.  I met with a number of

3    African bankers and we introduced the technology to them.

4    I was introduced to the Standard Chartered bankers.  It

5    turns out that the Standard Chartered people were the

6    folk handling the United Nations funds.  They briefed me

7    independently, as best I can tell, and confirmed that the

8    United Nations funding was real, that of the three

9    programs they had one for technology, one for education,

10   and one for health.  And these programs were intended to

11   bring new levels of technology into the southern African

12   states.  Each fund was U.S. dollars 10 million.  A total

13   of $30 million a year was invested in bringing new

14   technologies into those three areas.

15            So the Standard Chartered people confirmed

16   Brett's briefing to us.  I was still reasonably

17   comfortable that there was a real possibility that this

18   might happen.

19            By the time I got to the third day of five

20   days of meetings, I was wanting to understand how the

21   money would be invested.  It was at that point things

22   started to unravel.  I wanted to understand what the

23   investment structure would be, who would manage it, how

24   the funds would be supervised, and how it would be

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Graham Bruce Lyman

Page 15

1    ordered.

2                I need to now go back a couple years, jump

3    back to my time at the State Department.  I had been

4    involved in similar funding structures for the Australian

5    government and I knew fortuitously how these funds would

6    be managed out of the UN, how a recipient is held

7    accountable and how they ordered it.  So I went looking

8    for the same matrix, I went looking for the same

9    structures out of Brett.  I couldn't find them.

10                I met with the group of bankers that

11    represented the banks from the different African states.

12    They had flown in from South Africa, from Botswana, one

13    from England, a couple from Zimbabwe.  And over the

14    course of those first two or three days, they were happy

15    that we had some real technology, we had technology that

16    would -- they would be happy to invest in.  And they

17    signed up an arrangement with Brett that had nothing to

18    do with me directly, but they had an arrangement with

19    Brett and said to me, look, we would like to invest in

20    your technology.  We're going to ask Brett to handle all

21    of the funding.  Then they all flew home on a Wednesday

22    night.  I then started to discuss the funding structure.

23                I then spent Thursday looking for how those

24    funds would come, how they would be managed.  I couldn't

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Graham Bruce Lyman

Page 16

1   get a straight answer.  The evasiveness started to

2   concern me.  I went back to the bankers, the local

3   Zimbabwe ones.  They said, no, look, we trust Brett.  He

4   will sort out the structure.  So I couldn't get any

5   answers out of them.

6              In the course of the Thursday, while I was

7   scrambling around looking for something concrete, I was

8   introduced to the Trust people.  They appeared on the

9   scene.  There was a slightly surreal meeting with their

10  CEO where I was told that he would be involved in

11  handling the money.

12             On the last day I was in Harare, I asked

13  Brett to sketch for me the structure.  I put a piece of

14  paper in front of him and he drew an investment structure

15  which was built on a trust investment structure designed

16  doing only one thing:  That was hide money.  He had it

17  set up in Seychelles.  The trust structure is that.  The

18  beneficiaries were not known to me or anyone else.  The

19  fees that Brett would take personally were varied from

20  trust to trust, from 10 to 15 percent, which would not be

21  able to be audited.

22             I asked him in the end of listening -- you

23  can imagine I was sitting there surprised would be an

24  understatement.  Apart from the start of the structure,

Electronically signed by Kim Hurley (501-043-872-4654)                          844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Graham Bruce Lyman

Page 17

1    my concern was that this particular facility would be

2    impossible to audit and I would be accountable for the

3    dollars but not be able to account for them, as being

4    transferred from the UN to me, going through this part

5    full of holes, all of the dollars wouldn't turn up and I

6    wouldn't know where they had gone.

7            I asked him if that was the only structure

8    he would entertain.  I didn't want to accuse him of

9    something that was clearly duplicitous.  He said, "No,

10   this is the only structure," upon which I said, "We don't

11   have a deal, then."  This, by the way, was in the

12   presence of two young accountants out of Standard

13   Chartered who I don't think had any idea what Brett was

14   drawing.  I wouldn't have either except I had been

15   dealing with similar structures for four years in my time

16   at trade.

17           He then suggested that that evening he

18   would talk to the bankers and that evening he would come

19   to the hotel and put up some alternative structures.  He

20   arrived that evening with no alternative structures,

21   excused himself from dinner when I questioned the

22   structures, and he said he would give me a call back and

23   meet for drinks later that evening.

24           He didn't do that.  He rang and said that

Electronically signed by Kim Hurley (501-043-872-4654)    844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Graham Bruce Lyman

Page 18

1    he had a sick child, couldn't make drinks that evening,

2    but he would meet me the next morning before I flew out

3    and he would have an alternative structure for me.  And

4    he simply didn't turn up and vanished.

5              The end of that particular episode dribbled

6    on for a little bit, but really the end of it was the

7    banking group that came from the eight different states

8    were quite disappointed that I had not done the deal, but

9    were appalled when I told them the precise reasons.  I

10   don't think they were privy to or otherwise aware of what

11   he was planning.  For whatever reason, they trusted him

12   to handle the structure to bring those funds in.

13             The gentleman at Trust, that was a

14   different story.  It was quite clear that he was part of

15   whatever it was that Brett was planning.

16             As to the structure in the Seychelles, I

17   don't have those details in hand, but I still have those

18   notes somewhere.  I probably could dig them up.

19      Q.    That was a long answer.  I have got some

20   specific points I'd like to double back and ask you

21   about.

22             When you say that during your time in the

23   Zimbabwe -- first of all, when you say you went to

24   Zimbabwe, were you in Harare?

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

Page 19

1      A.      I was, yes.

2      Q.      When you were in Harare and you say that you

3   were trying to get a straight answer as to the structure

4   of the trust funding, who did you go to for that

5   information?

6      A.      Initially I asked the group of -- the panel of

7   bankers that had come to Harare.  I have to say that was

8   a very positive experience.  And even in the context of

9   all of the banking work that I had done before for

10  government, but equally all of the venture capital and

11  other banking financial world involvement I have had,

12  they were straight up-and-down bankers.  They weren't

13  doing anything except working on a program of seeing this

14  investment coming from the UN.  But their reply simply

15  was, look, we have engaged Brett to handle the structure.

16  He's an investment banker.  He knows how to do this best.

17  We will hand everything -- we handed everything to him.

18  You need to talk to him about that.

19              At that point I was -- I wasn't smelling a

20  rat.  I didn't have any reason to believe that there was

21  anything untoward planned.  And I then had a conversation

22  with Brett.

23              It really wasn't -- for me that was really

24  the key issue.  Not that the money -- whether the money

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

Page 20

1    was available or not, but when you have visibility that

2    it was, but how it would be managed, through what

3    structures, and how would the accountability be managed.

4    Every time I raised it with Brett -- and I would have

5    been -- over the course of the Wednesday, maybe two or

6    three times, certainly on the Thursday, I caught him at

7    the hotel and having coffee in the street, on the phone

8    to him every couple of hours, I need to understand the

9    structure, I need to understand the structure.  Maybe

10   another time, the next day.  And over the course of

11   that -- the evasiveness around that answer put off alarm

12   bells in my head, loud ones.

13       Q.    When you say that the answers were evasive, can

14   you describe that any further?

15       A.    Simply, "Look, we have got that under control.

16   We will talk about that.  We got plenty of time to do

17   that.  We can do that over dinner."  There was just never

18   any -- there wasn't even any attempt to say, look, we

19   will do it through a particular discretionary trust

20   structure or whatever.  It was just "We have got that

21   under control.  Don't worry about that.  I'll sort it

22   out."

23       Q.    You had mentioned that Mr. Cormick had drawn

24   the investment structure for you, but aside from that,

CONFIDENTIAL      Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Graham Bruce Lyman

Page 21

1    did he provide you with any documentation that would

2    illustrate what the structure was or describe how the

3    money would be funded?

4         A.    No.   No.   He had nothing like that.   That was

5    part of my concern as well.   We met and chartered an

6    office in Harare.   There was no documentation, there was

7    no one providing any documentary support, there was no --

8    there was no -- there was none of the normal sort of

9    contractual paraphernalia that you would have associated

10   with a deal of this size and complexity.   And like I say,

11   I put a piece of paper in front of him and said, could

12   you sketch out, give me squares connected to lines and

13   show how you would move the money into Africa and how we

14   would account for it.   Of course, as I say, it came out

15   of Europe and went straight to the Seychelles -- sorry,

16   into a structure that was in its own name.

17        Q.    When you say that there wasn't the kind of

18   documentation that you would normally see in a deal of

19   that size, what do you base that judgment on?

20        A.    I have had -- we start to get into some fairly

21   sensitive areas that I can't give you details about, but

22   I had many years working with our government on

23   understanding these structures, of working with banks in

24   Australia and in Europe.   I was very familiar with this

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL      Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Graham Bruce Lyman

Page 22

1    sort of thing that would be associated with this sort of

2    level of investment and the sort of contracts and

3    paperwork and the due diligence that we would see around

4    this sort of investment.  And there was none of that.

5        Q.    When you described the drawing that Mr. Cormick

6    made for you of the investment structure, I believe what

7    you said that your conclusion was is that the only intent

8    for that structure would be to hide money.  Why did you

9    reach that conclusion?

10       A.    Because the structure mimicked the sort of

11   structures we were trying to pull apart in my government

12   work.  So just the shape of it was familiar.  But,

13   equally, the fact that this money was now going to be

14   part of the Seychelles.  It wasn't telling to any of the

15   bankers that I had met.  It was completely bypassing the

16   eight African states.  There was no auditability of fees.

17   There was no way we could trace so-called fees that

18   Cormick was taking and proposing to take for looking

19   after this structure.  The mere fact that he was involved

20   in the structure as beneficiary was absolutely unethical

21   and not right.  But there were too many things going off

22   in my head.  It wasn't just a mere suspicion.  This is a

23   structure that quite clearly was designed to take that

24   $10 million.

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Graham Bruce Lyman

Page 23

1       Q.    Why do you say there would be no way to trace

2    the fees that Mr. Cormick --

3       A.    In the first instance, money going into the

4    Seychelles would have been problematic for me to audit

5    and then where would it go after that?  Once it

6    disappeared into beneficiary accounts or any other

7    account, for that matter, we would have no idea where it

8    went.

9              The way the UN managed its funds was every

10   quarter once an audit -- where I spent most dollars and

11   how I spent them, particularly given the obligation on

12   us, would have been to be transferring technology into

13   Africa.  Just the fact that I had a delta between what

14   had come to me and what he said and what had actually

15   arrived, that delta would have vanished somewhere over

16   the Indian Ocean or would have been a major problem.

17      Q.    Why do you say you wouldn't have been able to

18   audit those particular trust accounts?

19      A.    I would have no access to any of those

20   accounts.  The way the trust structure that he proposed

21   was set up, it would drop into a company owned by the

22   trust and you would never get past that particular

23   company.

24      Q.    In addition to the bankers that you had met

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL      Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
                        Graham Bruce Lyman

Page 24

1   from the various South African countries, you described

2   what you called the trust group.  Could you describe for

3   me what you meant by that?

4        A.    There was another banker, a Zimbabwe-only bank,

5   and I met with the CEO of that bank.  Ostensibly -- I was

6   introduced to him as the person that would be managing

7   any of the technology transfer.  It was very obvious that

8   Brett was very friendly with this guy, quite close, and

9   it's very difficult to get empirical about this because

10  all I felt was that I trusted the other bankers from

11  around southern Africa.  This particular guy I wasn't

12  comfortable with.  And it's really a hindsight

13  perspective.  I met him before I really had a full view

14  of what Brett was planning, and in hindsight I felt it

15  was that particular group introduced at the last minute

16  that may well have been part of the Seychelles planning.

17            But that's speculation on my part.  I

18  should qualify.  But I didn't trust him.

19       Q.    Do you recall the name of that particular bank

20  in Zimbabwe?

21       A.    You know, I don't right now, but I do still

22  have -- I'm a nuisance here in the office.  I never throw

23  a card away.  I have a zillion of those things.  I do

24  have those details filed away somewhere.

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

Page 25

```
 1      Q.    Does the name Trust Bank of Zimbabwe ring a

 2  bell?

 3      A.    Well, I thought it was that group.  It was

 4  certainly Trust something.  I still have their material

 5  somewhere.

 6      Q.    Do you remember the name of the individual you

 7  met at the bank you were just describing?

 8      A.    I don't, but I do have that filed away

 9  somewhere.

10      Q.    At some point in your testimony you mentioned

11  that you had talked to somebody at the Trust Bank about

12  the structure that Mr. Cormick had proposed to you.  Was

13  it the same individual, the CEO of the bank, that you

14  were talking about?

15      A.    Yes.  Yes.

16      Q.    I believe you testified that it was your

17  conclusion that you thought that he knew what was going

18  on in terms of Mr. Cormick's proposed structure.  Why did

19  you say that?

20      A.    There was a familiarity in that meeting with

21  Brett and with why I was there and with the whole view on

22  funding opportunity that it just didn't seem appropriate.

23  May have been appropriate in certain circumstances for

24  Brett to share those with a banking group, but
```

Electronically signed by Kim Hurley (501-043-872-4654)    844c9955-96b1-4e03-ab6b-26eec2b81f12

Page 26

1    responsibility for the funding and not being passed to

2    these guys, the other group of bankers, including

3    Standard Chartered who I met earlier in the week.

4        Q.    After you left Harare, did you have any further

5    communications with Mr. Cormick?

6        A.    No.  We attempted numerous communications,

7    including through his Army friend here in Australia, who

8    at that point still felt that Brett had an honest agenda.

9    I can't put words in his mouth, but he came to a

10   different view shortly thereafter.  We attempted to get

11   him on the line to just try and work out what his

12   alternative structure was, if any.

13            There were some -- wasn't accusations, but

14   there was eventually a single conversation that was

15   certainly fairly specific at which he levelled -- he

16   directed a view of us that we had reneged on the deal.

17   There was no deal.  And thereafter went silent.

18            There was some embarrassing conversations

19   with the group of eight African bankers, including people

20   out of Harare, who couldn't understand why we hadn't gone

21   ahead with the deal, gone ahead with the UN opportunity.

22   I didn't say anything specific to them about Brett.  I

23   didn't know what sort of relationships he had with them.

24   I just said I wasn't happy with the investment structure

Page 27

 1    that was proposed to me and left it at that.

 2        Q.    Did Argus Solutions ever enter into any

 3    transaction through Mr. Cormick for financing?

 4        A.    No, we did not.  We became allergic to anything

 5    that he might have proposed.

 6        Q.    Why do you say that?

 7        A.    If you put up anything like what he had

 8    proposed in Harare, then we would have been suspicious of

 9    his fingers being in the pie like they quite clearly were

10    intended when he sketched out that structure.

11              There was in the mix of all of this

12    something a lot more subjective but in many respects

13    quite meaningful to me, and that was a meal I had with

14    him on the Thursday night in which he had, not

15    appreciating my background or not my story fully, told me

16    gospel-truth stories about an intelligence unit in the

17    Australian government and his involvement in it and he

18    didn't know I had been in that unit for many, many years

19    and I knew that he had not been part of that unit at all.

20              Between those sort of representations about

21    himself and the evasiveness, it's at that point I had

22    that conversation he had not pretended to put the

23    proposed structure in front of me.  But at that point I

24    was concerned about who I was dealing with, and then

Page 28

1    certainly by the time it got to the conversation about

2    the structure, it was quite clear to me that I was

3    dealing with, one, a talented liar and, two, someone who

4    if not was a thief was planning on being a thief.

5        Q.    Upon your return to Australia, did you have any

6    discussions with your coworkers at Argus Solutions about

7    your trip to Zimbabwe?

8        A.    Numerous, numerous.  There were some members of

9    my team who were quite enamored of his adventure

10   activities and wanted to get involved in those.  One of

11   my founding colleagues got involved in the HIV

12   investment, which, of course, was a complete fabrication

13   as well.  The medication treatment of HIV.  It was a

14   syringe deal at -- well, that was a fabrication.  A

15   couple of my lads got stung.  They still were wanting to

16   believe he was the real deal.  And they had to learn the

17   hard way that he was not.

18              There were numerous conversations, yeah,

19   absolutely.

20       Q.    Who were the individuals that you just

21   mentioned who continued to do dealings with Mr. Cormick

22   who, in your words, got stung?

23       A.    One in particular gentleman's name was

24   Jonathan Ashton.  Sadly deceased.  Died in a plane

Electronically signed by Kim Hurley (501-043-872-4654)                844c9955-96b1-4e03-ab6b-26eec2b81f12

Page 29

1    accident last year.  He was one of my founding team.

2    Brett Caldwell was stung as well.

3                 MR. BRACEGIRDLE:  Mr. Lyman, those are all

4    the questions that I have.  I thank you for your time.

5    Mr. Finger may have some questions he would like to ask

6    you.

7    BY MR. FINGER:

8        Q.    Good morning, sir.

9        A.    Good morning.

10       Q.    It's correct that Dr. Cormick told you he could

11   connect you with financiers in Africa who were involved

12   with this UN finance situation, and he did do that,

13   correct?

14       A.    I believe so, yes.

15       Q.    So he was telling the truth about that,

16   correct?

17       A.    I believe so, yes.

18       Q.    He did not charge you for his services; is that

19   correct?

20       A.    No, he did not.

21       Q.    So the only thing that prevented the deal going

22   forward from your perspective was that you were not

23   comfortable with the structure that Dr. Cormick proposed,

24   correct?

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

Page 30

 1     A.     It wasn't the only thing.  It was certainly a

 2  major element.

 3     Q.     What were the other things?

 4     A.     Well, the issues that I raised there about

 5  funds that would vanish into his -- he was reasonably

 6  open about putting his name on elements of that

 7  structure.  So the percentages that he would take, the

 8  trust structures that were in his name, the companies

 9  that were in his name that the funds would be directed

10  to, my inability to audit any of those, my inability to

11  account for a portion of those.  So they all went back to

12  the structure.

13          Equally, the discovery in the last couple

14  of days that he was not telling the truth -- certainly

15  none of this was obvious to the banking group that was

16  responsible for the UN money.  They had no visibility of

17  any of the --

18     Q.     Excuse me.  First of all, you talk about his

19  percentages.  Maybe I misheard you earlier.  Did you not

20  say that his percentages were not out of line for his

21  industry?

22     A.     No, I didn't say that.  Some of his percentages

23  were not clear.  He wanted in the first instance, though,

24  10 percent of the $10 million.  That's not in line with

Electronically signed by Kim Hurley (501-043-872-4654)                          844c9955-96b1-4e03-ab6b-26eec2b81f12

Page 31

1    anything except greed.  That's not a financial-world

2    percentage even out of Wall Street or my own banking

3    world here.

4              But then my expectation looking at his

5    structure is that it could have been anywhere up to

6    another maybe 25 to 30 percent that would disappear

7    through this multiline structure that he proposed.

8         Q.    Mr. Lyman, prior to this transaction had you

9    had experience dealing with African banks?

10        A.    I had not had experience dealing with any of

11   the African banks except for Standard Chartered, which at

12   the end of the day is a British bank, of course.

13        Q.    Had you had any experience with people in

14   Africa who were what I will call financial matchmakers

15   such as Dr. Cormick was here?

16        A.    I had extensive experience with bankers.

17        Q.    In Africa, sir.

18        A.    Not in Africa, but one of the things that made

19   me comfortable about that group was it was quite obvious

20   they were a banking group, that they were speaking in

21   genuinely representing bank interests.  Had I had

22   experience with this sort of matchmaker like Brett?  Yes,

23   I had dealings with merchant bankers here in Australia --

24        Q.    I'm sorry, sir.  Again, my question was related

Page 32

1    to Africa.

2         A.    Not specifically African bankers, no.

3         Q.    Thank you.  Were you familiar at the time with

4    any of the regulations relating to restrictions on the

5    transfer of currency in African nations?

6         A.    I was very familiar with the range of

7    restrictions on funds out of UN coffers into any country,

8    including Africa.  I'm not a banker, so I'm not across

9    specific banking or jurisdictional restrictions, but I

10    was familiar with how UN funds into Africa had to be

11    managed.

12        Q.    I understand, sir -- but again, maybe I wasn't

13    clear with my questions.  Were you familiar with the

14    restrictions on currency movement in African nations?

15        A.    No.

16        Q.    You said that after the fact you had some

17    conversation with the African bankers and I think you

18    used the word that they were appalled by what you had

19    told them regarding Dr. Cormick's proposed structure.

20    Did I hear you correctly?

21        A.    I think that's right, yes.

22        Q.    Who did you speak to, sir?

23        A.    I have to give you the details.  There's

24    certainly the Standard Chartered gentleman in Harare, the

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

Page 33

1    gentleman out of South Africa.

2        Q.    I'm a little bit confused because toward the

3    end of your testimony you said you didn't say anything

4    specifically about Dr. Cormick because you were not

5    certain of the relationship they had with him.

6        A.    Yes.  By that I meant I wasn't accusing him

7    of -- I didn't address any of his motives.  I outlined

8    the structure and left it for them to draw their own

9    conclusions.

10        Q.    But you're not able as you sit here today to

11    identify any of them?

12        A.    Not sitting here at my desk, no.

13        Q.    Bear with me for one moment, sir.

14        A.    Sure.

15            MR. FINGER:  I have no further questions.

16    Thank you.

17    BY MR. BRACEGIRDLE:

18        Q.    Mr. Lyman, this is Thad Bracegirdle again.  I

19    have just a couple of questions to ask you to follow up

20    on what you were just testifying to.

21            When Mr. Finger asked you about your

22    experience with and I guess his term was financial

23    matchmakers in Africa, I believe that you were describing

24    your experience generally with those types of individuals

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Graham Bruce Lyman

Page 34

1    before you were cut off.

2              Could you just explain for me in general

3    what your experience was with those types of bankers who

4    like Mr. Cormick were trying to match you up with sources

5    of funding?

6    A.    Yeah.  Ironically, South Africa -- primarily

7    the South African group are represented here in Australia

8    as well.  Merchant banking group, you invite them into a

9    company to understand how the company ticks.  So in a

10   sense they help you become investor-ready so when you do

11   present to other banks or to the venture capital types,

12   that, one, you have got a voluted story and, two, you're

13   as transparent as you possibly can be about how business

14   runs and how it might look in the future.

15   Q.    Was your experience with Mr. Cormick different

16   from your experience with other bankers that you just

17   described?

18   A.    It was, but it's a tricky thing.  Again, I

19   guess I'm making -- I am making this comment in

20   hindsight.  There was a lot of the banking language that

21   made me comfortable, stuff that Brett was very familiar

22   with and very familiar with different sort of investment

23   structures that can be put in place.

24              What was different was he never actually

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Graham Bruce Lyman

Page 35

1    got into the nitty-gritty of dollars and cents.  He never

2    got into the detail.  To be fair to him, though, at that

3    point it wasn't really the expectation that he needed to.

4    That was really up to the group in Africa who I met to

5    get a better understanding of the sort of company that we

6    were and sort of technology that we were offering.

7        Q.    Did Mr. Cormick say anything to lead you to

8    believe that there was anything unique or different about

9    banking in Africa than your other experiences with other

10   banks in other countries?

11            MR. FINGER:  Objection.  Form, leading.

12            MR. BRACEGIRDLE:  You can answer the

13   question, Mr. Lyman.

14       A.    Nothing specific.  I don't know your

15   background, but if it was put to you today that there was

16   an opportunity to take investment out of Africa, I

17   suspect your own native antenna would go up and you'd do

18   as much due diligence as you possibly could to -- before

19   you got on a plane.  That's exactly what we did.

20            We were on a certain amount of alert before

21   we got on the plane, and my directors had had a hard look

22   at this, too, and this was not a case of going over there

23   on a whim, but, equally, I like to think we went over

24   there with our eyes open.

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

Page 36

1      Q.      Putting aside your skepticism or heightened

2   awareness, for lack of a better word, you described your

3   discussions with the various bankers from the African

4   countries, and I guess with respect to those discussions,

5   did that lead you to any conclusions that there was

6   anything unique about investment banking in Africa

7   than --

8      A.      That's actually a good question.  I made a

9   comment on a number of occasions, including in a phone

10  call back to my fellow directors here, that one of the

11  things that made me comfortable about this banking group

12  and the integrity of the whole concept was that they were

13  very much like the bankers I had dealings with in Europe

14  over the years.  That was one of the things that made me

15  comfortable with them, that I felt that I was sitting in

16  the same room as bankers I had sat in the same room in

17  practicing in England over the years.

18              So there was no reason for me to expect --

19  I was not expecting banking in that part of the world to

20  be any different than the banking I put my hands on in

21  Europe or Australia.

22              MR. BRACEGIRDLE:  Thank you, Mr. Lyman.  I

23  have no further questions, but Mr. Finger apparently

24  does.

Electronically signed by Kim Hurley (501-043-872-4654)                                        844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Graham Bruce Lyman

Page 37

1    BY MR. FINGER:

2        Q.    I'm sorry, Mr. Lyman, to drag this out.

3            When you spoke to these bankers after the

4    fact, did you ever suggest to them, I'd still like to do

5    business with you, but I can't work under Dr. Cormick's

6    structure?  Can we do something without him or with a

7    different structure?

8        A.    I raised it with the Standard Chartered guys.

9    My view there was -- the short answer is yes.  I didn't

10   raise it there.  I said it to Standard Chartered, in part

11   because they were the most accessible.  I got no response

12   from them and I suspect that was because that they were

13   too far down the pecking order.  But the other guys I was

14   dealing with, VPs and senior executives from the various

15   banks.  The Standard Chartered people were not quite so

16   senior.

17           I think, too, I came back feeling so burned

18   by it that I wasn't prepared to explore it as

19   aggressively as I could pursue options in Australia.

20   It's not a cheap exercise to get to Harare.  So that was

21   also a factor in that.

22       Q.    My follow-up question is:  When you made your

23   presentation to these bankers, did you make any

24   demonstrations of your technology?

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Graham Bruce Lyman

Page 38

1              MR. BRACEGIRDLE:  Objection.  Doesn't

2    relate to my redirect.

3       A.    Do you want an answer there?

4              MR. BRACEGIRDLE:  Yes, you can answer.

5              THE WITNESS:  Yes, it was a requirement.

6    They were quite insistent on seeing something that

7    worked.  So that was part of the expense, of course.  We

8    transported a lot of technology into Africa and

9    demonstrated it.  But we didn't do that unwillingly.  It

10   demonstrates very well and we wanted to make the point

11   that we had something real to offer and real for them to

12   invest in.  And so in the couple of days I had with those

13   bankers there was a lot of hands-on with the technology.

14      Q.    And the technology worked in the demonstration?

15             MR. BRACEGIRDLE:  Same objection.

16      A.    Absolutely, it did.

17             MR. FINGER:  Thank you.

18             MR. BRACEGIRDLE:  Mr. Lyman, I have no

19   further questions, so the deposition is concluded.  What

20   will happen is the court reporter will provide me with a

21   copy of the transcript of your testimony.  I can then

22   provide it to you and you will have an opportunity to

23   review it to check for any typos or other things that may

24   have been taken down incorrectly.  But beyond that,

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL     Christ v. Cormick and Elan Suisse International Holdings (USA) LLC
Graham Bruce Lyman

Page 39

1    that's the end, and you can get on with the rest of your

2    workday.

3            THE WITNESS:  No problem.  You can get on

4    into the evening, I guess, which is pushing on a little

5    for you guys.

6            MR. BRACEGIRDLE:  It's not too bad, but

7    thank you for your time.

8            THE WITNESS:  Thank you.

9            (Deposition concluded at 6:18 p.m.)

10                -  -  -  -  -

11

12              T E S T I M O N Y

13

14   DEPONENT:  GRAHAM BRUCE LYMAN                PAGE

15

16   BY MR. BRACEGIRDLE............................ 2

17   BY MR. FINGER................................ 29

18   BY MR. BRACEGIRDLE........................... 33

19   BY MR. FINGER................................ 37

20

21        (No exhibits were marked at this time.)

22

23

24

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12

CONFIDENTIAL    Christ v. Cormick and Elan Suisse International Holdings (USA) LLC

Page 40

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

Electronically signed by Kim Hurley (501-043-872-4654)    844c9955-96b1-4e03-ab6b-26eec2b81f12

Page 41

CERTIFICATE OF REPORTER


STATE OF DELAWARE)

                 )

NEW CASTLE COUNTY)


        I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 3rd day of
March, 2008, the deponent herein, GRAHAM BRUCE LYMAN, who
was duly sworn by me and thereafter examined by counsel
for the respective parties; that the questions asked of
said deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use of
computer-aided transcription and computer printer under
my direction.

        I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.

        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

                Kimberly A. Hurley

                Certification No. 126-RPR
                (Expires January 31, 2011)


DATED:  March 17, 2008

Electronically signed by Kim Hurley (501-043-872-4654)                    844c9955-96b1-4e03-ab6b-26eec2b81f12



# CONFIDENTIAL

In the Matter Of:

# Christ
v.
# Cormick, et al.

C.A. # 06-275-GMS

_____

Transcript of:

# Carl W. Palmer

March 4, 2008

_____

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

CONFIDENTIAL       Christ v. Cormick, et al.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ROBERT D. CHRIST,        )
                        )
    Plaintiff,       )
                        )
     v.            ) C.A. No. 06-275-GMS
                        )
BRETT J. CORMICK and ELAN )
SUISSE INTERNATIONAL   )
HOLDINGS (USA),       )
                        )
    Defendants.      )
                        ) CONFIDENTIAL
                        )
ELAN SUISSE LTD.,     )
                        )
    Plaintiff,       )
                        )
     v.            )
                        )
ROBERT D. CHRIST,     )
                        )
    Defendant.      )

Telephonic deposition of CARL W. PALMER taken pursuant to notice at the law offices of Reed Smith, LLP, 1201 North Market Street, Suite 1500, Wilmington, Delaware, beginning at 2:10 p.m., on Tuesday, March 4, 2008, before Kimberly A. Hurley, Registered Merit Reporter and Notary Public.

APPEARANCES:

        THAD J. BRACEGIRDLE, ESQUIRE
        REED SMITH, LLP,
          1201 North Market Street - Suite 1500
          Wilmington, Delaware 19801
          for Robert D. Christ

cont'd...

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

Electronically signed by Kim Hurley (501-043-872-4654)        2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL        Christ v. Cormick, et al.

Page 2

```
 1   APPEARANCES (cont'd):

 2           DAVID L. FINGER, ESQUIRE
             FINGER & SLANINA, LLC
 3             1201 North Orange Street - Suite 725
               Wilmington, Delaware 19801
 4             for Brett Cormick and Elan Suisse

 5                     - - - - -

 6                 CARL W. PALMER,

 7         the witness herein, having first been

 8         duly sworn on oath, was examined and

 9         testified as follows:

10   BY MR. BRACEGIRDLE:

11      Q.    Thank you, Mr. Palmer.  As I mentioned, my name

12   is Thad Bracegirdle.  I'm the attorney for Bob Christ in

13   litigation that is pending here in the U.S. District

14   Court for the District of Delaware.  You're giving a

15   deposition in that case today, and the first thing I

16   would like you to do is please state your full name for

17   the record.

18      A.    My name is Carl W. Palmer.

19      Q.    Mr. Palmer, where do you currently reside?

20      A.    I reside primarily in California; however, I'm

21   a Nevada resident.

22      Q.    Are you currently employed, sir?

23      A.    I'm president and CEO of a public company, but

24   as an employee I am not.
```

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL    Christ v. Cormick, et al.
Carl W. Palmer

Page 3

1      Q.    Of what company are you the CEO?

2      A.    The name of the company is Seychelle

3   Environmental Technologies.  I'll spell that for you.

4   S-e-y-c-h-e-l-l-e, Environmental Technologies.

5      Q.    What is the business of Seychelle Environmental

6   Technologies?

7      A.    The business is water purification invention,

8   design, manufacturing, marketing, sales.

9      Q.    How long have you been the CEO of this company?

10     A.    The company has been public for eight years,

11  and I have been a CEO since inception.  You know what, I

12  should rephrase.  I have been CEO one month after

13  inception, okay?  So I wasn't CEO when it first became

14  public but a very short while after that I became CEO.

15     Q.    So then for roughly eight years?

16     A.    I'm sorry?

17     Q.    You have been CEO for roughly eight years, if I

18  understand you correctly?

19     A.    That's correct.

20     Q.    I'd like to ask you if you're familiar with an

21  individual named Brett Cormick.

22     A.    Yes, I am.

23     Q.    Describe for me how you know Mr. Cormick.

24     A.    He was introduced to me by a person named

Electronically signed by Kim Hurley (501-043-872-4654)                                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL      Christ v. Cormick, et al.
Carl W. Palmer

Page 4

1    DeSean Burkich and Don Whitaker.

2       Q.    First, could you please spell DeSean Burkich,

3    please?

4       A.    That's a tough one.  D-e, I think, and then

5    S-e-a-n, B-u-r-k-i-c-h.

6       Q.    When was it that you were introduced to

7    Mr. Cormick, if you recall?

8       A.    I was asked to travel to Switzerland to put

9    on -- to do a demonstration and sales explanation of our

10   products, of the product of Seychelle eight years from

11   now, that would be 2000, I guess, and while I was there I

12   was introduced to him and at a presentation between

13   bankers and investors.

14      Q.    I'm sorry, you recall that was in or around the

15   year 2000?

16      A.    Yes, that's correct.

17      Q.    Was that before or after Seychelle

18   Environmental Technologies went public?

19      A.    That's correct.  That's exactly correct.

20      Q.    Was it before or after?

21      A.    Well, let me explain.  At the time this

22   happened, I owned a company called Aqua Vision.  Two

23   words, Aqua, Vision.  It was a private company owned by

24   my trust that happens to be my family's trust.  Okay?

Electronically signed by Kim Hurley (501-043-872-4654)                              2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL       Christ v. Cormick, et al.
Carl W. Palmer

Page 5

1    And DeSean Burkich approached this company, me, and

2    offered me an amount of money, happened to be

3    $10 million, for this company.

4              Now, my background, and I don't want to

5    bore you, but just for a second, I have been in the water

6    business for about 40 years and have been acquired --

7    four of my companies have been acquired.  One by

8    Coca-Cola, one by AMS Corporation, one by Shaklee

9    Corporation and, one by Trudeau International.  All

10   public companies have acquired my last four companies.

11             This particular company, so it sounds like

12   a lot of money because it's just a small proprietary

13   company, but it had to do with technology and product

14   design.  Their interest was to market the product and

15   they offered me $10 million and asked me to come to

16   Switzerland to make presentation to two banking groups or

17   two investment groups, and they had a corporation that

18   they had bought a shell corporation and with that shell

19   they were trying to fund that shell to develop the

20   corporation called Seychelle.

21             So at that time I made two presentations

22   for them, and also they asked me to go to Paris to make a

23   presentation to Banque Worms and at that particular time

24   I think both parties were there.  And then it was kind of

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL    Christ v. Cormick, et al.
Carl W. Palmer

Page 6

1    an interesting activity only in the fact that you aren't

2    asking me these questions.  I don't want to splurge this

3    onto you, but at that time when I heard their

4    presentations, I made some specific requirements that I

5    thought they were making -- presentations were

6    misrepresented.  I told them I wanted -- I wanted -- I

7    requested hold harmless agreements from both parties,

8    both DeSean Burkich and from -- I can't think of his

9    name.

10        Q.    Mr. Cormick?

11        A.    Yes, Mr. Cormick.  Brett Cormick, I'm sorry.

12   They grossly misrepresented operational activity,

13   potential income, potential profit, etcetera, and I don't

14   want to be any part of that.

15        Q.    Let me back up for a moment.  Can you take me

16   through after Mr. Burkich approached you and offered to

17   buy Aqua Vision through to your meeting in Switzerland

18   where you met Mr. Cormick, what transpired between those

19   two points in time?

20        A.    Well, they made me the kind of offer, I thought

21   it was a legitimate offer.  They offered me the

22   $10 million and at the time -- and they had no further

23   association with that entity.  And in addition to that,

24   they offered me a hundred thousand dollar nonrefundable

Wilcox & Fetzer, Ltd.    Registered Professional Reporters         302-655-0477

CONFIDENTIAL      Christ v. Cormick, et al.
Carl W. Palmer

Page 7

1    deposit at the time of offer, which I accepted, and the

2    understanding was that they would close this offer or

3    close the acquisition of Aqua Vision and merge it into

4    what they were calling Seychelle within 30 days or they

5    would pay me an additional deposit.  30 days -- they paid

6    the $100,000 and the check was good.  I met with their

7    attorney at that time, a fellow named David Wagner.  I

8    don't know, have you talked to David Wagner?

9        Q.    No, sir.  So continue, please.

10       A.    At that time -- and then right after that is

11   where they asked me to make -- go make presentations of

12   the technology and the product and the problems and the

13   needs and the solutions and opportunity with this

14   company.  I didn't meet Brett Cormick here in the United

15   States.  I met him in Switzerland.  And then later I met

16   with him again in Paris.

17       Q.    First, then, focusing on the meeting in

18   Switzerland, who attended that meeting, if you recall?

19       A.    You know, I didn't personally know anybody

20   there.  I was simply a speaker.  But primarily investment

21   bankers, banks, and just I think general investors.

22       Q.    Who introduced you to Brett Cormick at that

23   meeting?

24       A.    DeSean Burkich did.

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

Page 8

1      Q.    How did Mr. Burkich introduce Mr. Cormick?

2    What was Mr. Cormick's role in the meeting?

3      A.    At that time it seemed as an associate or as a

4    potential owner of Seychelle.

5      Q.    Did Mr. Cormick at that time represent to you

6    that he was affiliated with any particular company or

7    bank?

8      A.    I'd say there was a lot of inferences, but,

9    quite frankly, I don't know who they were.  The only

10   people that I met that were supposedly a direct

11   association -- not as far as employed by, but direct

12   association in activity with Banque Worms.

13     Q.    Could you spell Worms, please?

14     A.    I'd love to try.

15     Q.    To the best of your knowledge.

16     A.    W-o-r-m-s, I guess.  It's the second largest

17   bank in France.  I suppose you can find out where it is.

18            I met two gentlemen there that were

19   primarily -- they were primary officers of that

20   corporation.  Supposedly they're No. 1 and No. 2 men in

21   Banque Worms where the intent -- and this is something

22   that I won't say -- I'm much more than that now, but I

23   was a total neophyte with regards to the operation and

24   activities of public companies and it wasn't my intent to

Electronically signed by Kim Hurley (501-043-872-4654)                          2bd5d6db-6195-46d3-8fd3-560516d6899d

Page 9

1   be part of that.  My intent was simply to sell my company

2   and go on down the road and good-bye to everybody.

3   That's what it was.

4               But at the time they also made arrangements

5   with me to meet with supposedly the director of the EPA

6   in France and the director of the municipal water systems

7   in France, which I met with both parties.  I didn't meet

8   with the director of the EPA, but I met with his

9   assistant.

10      Q.    Focusing still on that meeting in Switzerland,

11   I know you testified that you made a presentation.

12   Specifically do you recall what types of communications,

13   if any, did you have with Mr. Cormick at that meeting?

14      A.    Well, pretty powerful guy.  I mean, in respect

15   of his representation.  They were telling me a lot of

16   things of their intention, which was to take the

17   Seychelle corporation and to take it public in the Euro

18   stock market.  And because my background, as you can tell

19   from the different companies I have acquired, it's pretty

20   significant and a lot of it's osmosis in the world and

21   that type of thing.  I have had a lot of experience.  So

22   they were looking to my future, I guess, consultant.  Not

23   as a principal but simply as a consultant.  And they were

24   looking for this help and he came on pretty strong.  In

Page 10

1    fact, he came on extremely strong, To the point where I

2    think the reason that I wanted out of any association is

3    because I felt there was a good deal of misrepresentation

4    going on.  I didn't feel it.  I knew it.  It's pretty

5    evident that -- because I saw the documents.  They had

6    performance documents and letters of presentation in a

7    package of presentation that was extremely exaggerated.

8             So at that time I stayed there for only two

9    days and my interest was no more than that.  My

10   understanding was before I left from Cormick and

11   Don Whitlock -- I may have said Whitaker.  Don Whitlock,

12   lives in Aspen, Colorado.  My understanding was that they

13   had the money, they had a commitment for the money that

14   they were supposed to pay me and I was supposed to be

15   receiving my money and leave.

16            Part of the arrangement of this particular

17   acquisition was the fact that I was selling the

18   technology, manufacturing rights and production rights

19   and sales rights of the product that I had invented in

20   the United States, but not in the international market.

21            My primary reason for that was is that I

22   developed and invented this product because of my

23   background in the water business.  As a missionary

24   activity, I wanted to get the product back to the

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL      Christ v. Cormick, et al.
Carl W. Palmer

Page 11

1   environs.  So I thought it was an ideal product and

2   inexpensive product to be used worldwide to eliminate the

3   dysentery problems with children dying from diseases from

4   water contamination.  That was the primary use of this

5   product.  I didn't want to relieve that and my fear was

6   that they would not honor that.  That was my fear.  And I

7   was right.

8              So later, to further that, after I found

9   out what they were trying to do, I decided I want to get

10  out as quick as I can.  So I came back to the States.

11  When I got back to the States, they contacted me and they

12  asked me if I would consider staying in the corporation

13  and I said, under the conditions, I didn't want anything

14  to do with it, simply because of the representation.

15  It's impossible to make those kind of numbers.

16             So they said -- here's what they offered

17  me:  They offered me the $10 million and they offered me

18  half the stock of Seychelle if I would stay involved and

19  if I would give up half of the marketing international

20  rights.  Half the marketing rights, I didn't pay anything

21  for them as it was.  All it was was something I was going

22  to do.

23             So as a result of that, I said, well, any

24  man would do that.  That's simple.  But I said under

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL      Christ v. Cormick, et al.
Carl W. Palmer

Page 12

 1   certain conditions.  So they said, okay, you got a deal.

 2   We will be back.  We will fund the money, etcetera.

 3               The unfortunate part about that story --

 4   I'm probably getting ahead of your questions.  I'll tell

 5   you the result of this and then you can kind of go back

 6   with me if you like.  But within that short term

 7   DeSean Burkich was back, was back here in the States.  I

 8   had already come back.  In the progress of doing -- are

 9   you with me still?

10   Q.    Yes.  We're listening.

11   A.    At that time they were supposed to fund and pay

12   the $10 million and were supposed to start this thing.

13   To the grand and glorious day of this company becoming

14   public on the counter, which it did, and at that time I

15   kept waiting for my money.  My money never showed up

16   ever.  They never ever funded that.  The problem that I

17   made, they convinced me that they were going to fund the

18   money within a three-day period.  What they needed was a

19   document that I was willing to transfer this proprietary

20   ownership of a small proprietorship, wasn't even a

21   corporation, into this public name, meaning Seychelle,

22   which I did.  Obviously they never funded it.  Because of

23   my background as a stock man, which I'll be happy to send

24   to you, that was done by Don Whitlock and Brett Cormick

Electronically signed by Kim Hurley (501-043-872-4654)                2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL    Christ v. Cormick, et al.
Carl W. Palmer

Page 13

1    and DeSean Burkich that came out in a daily transcript of

2    a stock newspaper that promoted money to be -- to sell

3    stock in this company.  The stock came out at $15, went

4    to $22, went over the rainbow, up and down, up and down.

5    I'm still waiting for my money and I'm still wondering

6    what's going on.

7              Then I found a huge discrepancy in activity

8    that DeSean activated, and he had daily communications

9    going on with Cormick on I guess what they were going to

10   plan to do.  They were moving that stock all over

11   everywhere.  DeSean had transferred the stock to Cormick,

12   and I couldn't tell you how much.  They used different

13   companies and names.  I didn't know what was going on

14   half the time.

15             As a result of that, I contacted the SEC

16   because it worried me.  I had never been down that road

17   before and I was concerned that I might become in some

18   manner liable in this activity.  So I wanted to make damn

19   sure that I wasn't.  I contacted them.  I also contacted

20   David Wagner.  I told him, I want my company out of that

21   activity.  The problem is in order to -- these people are

22   good, really good.

23             In order to make this happen, it created an

24   activity.  So I brought in some of my key people.  They

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL       Christ v. Cormick, et al.
Carl W. Palmer

Page 14

1    made commitments of offer, how much money they were going

2    to pay, the money was always coming in.  So I brought in

3    three associates and friends to sit on the board of

4    directorship, and one was my personal attorney, one was

5    my personal banker, one was just a friend and

6    Don Whitlock was the other and DeSean Burkich were all on

7    this board.  When I found out what's going on, of course

8    I wanted to get out of it as quick as I could.

9              So as a result that's why I called the SEC

10   to find how I could get out of it.  They won't offer any

11   advice in that respect.  So I contacted the attorney and

12   I said, I want out.  Here's the answer he gave me:  If

13   you get out, what's going to happen, you're going to have

14   a major stockholder lawsuit against the board of

15   directorship.  So all of a sudden I'm in a lawsuit with

16   three of my closest friends, my personal attorney, my

17   banker, and another very close friend of mine in the

18   water business and all of a sudden they're going to get

19   sued for obviously fraud.

20              At that point when I found these

21   discrepancies that DeSean Burkich and Cormick had put

22   together with regards to buying and what they were doing

23   with the money, etcetera, etcetera and obligated this

24   poor little corporation to the tune of almost $2 million,

Wilcox & Fetzer, Ltd.    Registered Professional Reporters        302-655-0477

Page 15

1   what I did is we went after DeSean's stock and we stopped

2   all of his stock activity.  We stopped all the trading of

3   his activity in the corporation and filed suit against

4   DeSean Burkich immediately, which eventually he backed

5   down on and we received all the stock back and that was

6   the end of DeSean Burkich.  We never ever worked one

7   single day and one activity beside Seychelle

8   Environmental Technology.  It was a sad, sad story.  Cost

9   me about three years, four years of my time, money, a lot

10  of investment, a lot of loss, activity.

11           But anyway, that is kind of the story.

12      Q.    Thank you for that.  I do have some follow-up

13  questions.

14           You mentioned at one point that, in

15  addition to the meeting that you had in Switzerland,

16  there was also a meeting in Paris; is that correct?

17      A.    That's correct.

18      Q.    When was that meeting in relation to the

19  meeting in Switzerland?

20      A.    It was during the same week.  I went from

21  Switzerland straight to Paris.  That was primarily

22  organized and orchestrated through Cormick.

23      Q.    Was Mr. Cormick at that meeting in Paris?

24      A.    Yes, he was.

Electronically signed by Kim Hurley (501-043-872-4654)    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL     Christ v. Cormick, et al.
Carl W. Palmer

Page 16

1     Q.     Who else was at that meeting, if you recall?

2     A.     DeSean Burkich was, Don Whitlock was there, and

3     my ex-wife was a witness to that meeting.

4     Q.     You had mentioned that at these meetings you

5     were given some gross misrepresentations I think was the

6     term you used.

7     A.     What it was, they had a package -- excuse me, a

8     package that disclosed everything about the product, but

9     then subsequent to that -- and I may be able to get my

10    hands on it.  I'm not sure.  That's been a while.  I can

11    look around and see if I can find one.  Their

12    representations that were going to Bank One and also

13    other investors that projected over a billion dollars in

14    profit the second year, which is a dream.  The company

15    has never done over a million and a half in a year since.

16    But you can dream of that.  They were going for the long

17    haul, believe me, and they were trying to raise

18    $25 million is my understanding.

19    Q.     So these statements were contained in documents

20    that you saw?

21    A.     Yes, sir.

22    Q.     Who furnished those documents to you?

23    A.     DeSean Burkich and at that time I assumed and I

24    think it was told to me that Cormick was associated with

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

Page 17

1    DeSean Burkich.  Don Whitlock was a finder as far as

2    finding people to put in money was what his position was.

3    That's what I understood.

4         Q.    Were there any oral statements other than the

5    documents you saw that you thought were --

6         A.    I'm sorry.  Would you say that again?

7         Q.    Sure.  In addition to these documents that you

8    saw, were there any representations made orally that you

9    thought were exaggerated or misleading?

10        A.    I thought every single thing they told me was

11   exaggerated and misleading.  This was the great hoax if I

12   have ever seen one.  I think you can realize, my

13   background has been pretty well documented.  I'm happy to

14   send you that information on it, but when you sell out to

15   somebody like Coca-Cola and AMS Corporation, those are

16   big companies and they check you out like there's no

17   tomorrow both personally they do, of course, and then

18   subsequent to that, what your business is and what it

19   does and what your technologies are and things like that

20   or they don't buy your company.  I had four of those.

21   What they did is they used that as a call it an

22   association or using that to try to generate money to put

23   into the new corporation.  I had no idea.  The guy told

24   me, talked to me over the phone one day and next thing I

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

Page 18

1   know I see a full-page article in this daily transcript.

2   I couldn't believe it.

3            So yes, there's a lot of that -- of

4   presentation, and my ego doesn't have to be stroked, not

5   a bit.  Doesn't need that.  But they were coming on

6   pretty strong in the activities of what we were going to

7   be able to do with this company.  Of course, I wanted to

8   believe that because my goal is -- Seychelle Corporation,

9   we only have three major partners -- not partners, but

10  primarily three major operational people in this

11  corporation and none of us take salaries.  None of us

12  have taken a salary.  Not a nickel out of this

13  corporation have we ever taken since its inception.  No

14  salaries, no income.  It's all done on commission basis.

15  But it has to be done, obviously, for stockholders.  They

16  invested money, so our intent is to give them good

17  earnings and a value.

18      Q.   At the beginning of your answer you were saying

19  that they had been making misrepresentations, and when

20  you say "they," who are you referring to?

21      A.   I'm referring to Cormick and Burkich.  I think

22  Whitlock to some degree, but I think Whitlock was just

23  kind of a whipping boy.  He was the kind of guy that

24  supposedly sets schedules up for people, and I don't

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL    Christ v. Cormick, et al.
Carl W. Palmer

Page 19

1    think he knew very much about what was going on.

2    Whitlock came in as one of the board members for about

3    two years after that.  He never -- he was only here --

4    only at the physical site one time.  We never saw Burkich

5    or Cormick again after this activity after I went to the

6    SEC.  Everybody disappeared.

7        Q.    Walking through the chronology, then, after

8    this meeting in Paris you said you flew back to the

9    United States, correct?

10       A.    Yes, correct.

11       Q.    Then at some point after that you were

12   contacted by Mr. Burkich again?

13       A.    Within two days.

14       Q.    And then --

15       A.    That's when they offered me half the company

16   and the $10 million.

17       Q.    It was at that point, then, that I think, as

18   you testified, Aqua Vision was then taken public through

19   the Seychelle entity?

20       A.    That's correct.

21       Q.    Was the Seychelle company taken public in

22   Europe or the United States?

23       A.    In the United States, in Nevada.  It's a Nevada

24   corporation.

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL       Christ v. Cormick, et al.
Carl W. Palmer

Page 20

```
 1     Q.    That's the company that is currently Seychelle
 2   Environmental Technologies?
 3     A.    Yes, sir, that's correct.  I don't want to
 4   appear stupid, but these people were good.  They know
 5   what they're doing.  It's not the first time they have
 6   done this, from what I understand.  It was represented to
 7   me that Cormick's family was exceptionally wealthy and
 8   they had the funds available at all times and they were
 9   from -- I can't remember.  I think they said Africa, if
10   I'm not mistaken.  I don't know where the family was
11   from.  They owned a lot of major assets in the world and
12   he was, of course, the prize son supposed to accomplish
13   all these things financially for us.  There's a lot of
14   things that were very believable in the presentation
15   until I saw the light and that was the end of it for me.
16     Q.    Just to back up, then.  Who was it that told
17   you that Mr. Cormick came from a wealthy family?
18     A.    He did.
19     Q.    Did Mr. Cormick tell you anything else about
20   his educational background or his work experience?
21     A.    You know, I wouldn't want to misrepresent
22   something.
23     Q.    Just to the extent you can recall.
24     A.    Definitely.  He told me a lot about himself.
```

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL      Christ v. Cormick, et al.
Carl W. Palmer

Page 21

1    Just because it's been that period of time and I was only

2    there for a few days, that he supposedly had exceptional

3    knowledge, referring to this field, and had the ability

4    to put the money and financing together.  Because

5    remember, at that time I had no interest of staying

6    involved.  So they were all -- seemed like they were

7    going to pay me and get me out of the picture and that

8    was fine with me.  I think the only reason they kept me

9    in the picture was when I declined to stay involved in

10    any manner with the representations that I saw that were

11    in this projection dossier that they put together.

12        Q.    If you could explain for me, sir, once you

13    returned to the United States after your meeting in

14    Paris, why did you then pursue the transaction with

15    Mr. Burkich after you had seen what you thought were

16    exaggerated and mis --

17        A.    When I came back -- I took a very strong stand

18    when I was in Paris about what the reality of this

19    business is, not what they are presenting to people.  I

20    mean, my God.  And I said that was the end of that.  I

21    said I can't be in any association with that, no way.

22    Just pay me my money, I'm gone.

23                At the time there was no offer about being

24    any part of the ownership of it or the money.  So when I

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

Page 22

1    got back to the States, their remark or their request was

2    is that they said that their investors were willing to

3    put up the money, but they wanted to own half of my

4    international marketing activities.  And at the time it

5    made sense to me, and why not?  It's a great world

6    product.  It's used all over the world.  It still is now.

7    We placed over two million of these products all

8    throughout the world.

9              Importantly, my thought was is that that --

10   if they want to be part of that, then I didn't think they

11   wanted to be part of an international activity because

12   that's going to be a contribution.  That's a

13   philanthropic activity.

14             So as a result of that, they agreed at that

15   time, and this was over the phone, to give me $10 million

16   but also to give me half the company if I would stay with

17   it and continue this, and I said the only way I would do

18   that is if I direct it.  I could not let them do what

19   they were trying to do or looked like they were trying to

20   do.

21             So that's the reason I stayed in.  It's an

22   easy offer.  But I demanded control.  I said if I can

23   control it, I might be of interest.

24   Q.    In those discussions that followed your

Electronically signed by Kim Hurley (501-043-872-4654)    2bd5d6db-6195-46d3-8fd3-560516d6899d

Page 23

1   meetings in Europe, did you then have additional

2   conversations or communications with Mr. Cormick?

3       A.    He would call me on the phone once in a while

4   and tell me something was going on which, quite frankly,

5   never ever came true.  Not a single one of these things

6   came true.  I think from what my attorney has told me --

7   and I would welcome you to call David Wagner, he might be

8   a good man for you to talk to.  At that particular time

9   they were bringing in I guess investors that were

10  supposed to come in to buy Seychelle stock out of Europe

11  and that's what Cormick was supposed to be doing.  We

12  ended up -- later in the activity of this whole program,

13  I had to pay all those people off.

14      Q.    Specifically what things do you recall

15  Mr. Cormick telling you that weren't true?

16      A.    First of all, the amount of investment money

17  that was coming in.  That was the prime issue.  They are

18  going to give you $10 million.  I received a lot of money

19  from my other companies before.  It was a fair price.

20  But the value, that, of course, never happened.  Him

21  creating investors to take the company public in Europe,

22  of course that never happened.  And the activity of

23  ongoing distributorships and sales to primary entities

24  throughout Europe, that never happened.  The same thing

CONFIDENTIAL      Christ v. Cormick, et al.
Carl W. Palmer

Page 24

1    is true here with -- he had 7-Eleven.  I can go on and on

2    and on with all the projections that this guy had.  None

3    of that happened.

4              Numerous, numerous activities that were,

5    quite frankly, just pie in the sky.  Nothing even

6    potentially -- I got to tell you -- so you can understand

7    that after a very short while that was the end of the

8    association.  I never heard from him again.  After we

9    voted DeSean Burkich off and we attacked his stock, we

10   stopped all movement of his stock completely, that was

11   kind of the end of it.  I never heard from either of

12   them.

13       Q.    Earlier you testified that after the company

14   went public, that you had found that there was some

15   discrepancies in what Mr. Burkich and Mr. Cormick were

16   doing.  Could you describe that in a little more detail

17   for me?

18       A.    Sure.  In any proforma you have got a product

19   that has specific costs and, of course, it has to have

20   specific abilities in order for it -- even before you

21   want to manufacture it, which, of course, this product

22   did and it has since then.  The bottom line is that they

23   projected numbers that were impossible to even think

24   about manufacturing.  They predicted numbers up in the

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL      Christ v. Cormick, et al.
Carl W. Palmer

Page 25

1    millions and income up in the billions.  It was so far

2    out that when I saw it, I couldn't believe it.  I thought

3    they just -- somebody had fooled with this thing wrong.

4    It was terrible.  Way way out of sight.

5              So that was the primary thing.  The other

6    issues were that they also misrepresented I won't call it

7    skill level or their association or knowledge of this

8    industry which was zero.  They had no background

9    whatsoever in manufacturing, marketing, sales, or who the

10   market was, where the market was going to go.  It was

11   completely erroneous.

12   Q.    How did you learn that their representations

13   about their experience were false?

14   A.    A strange way.  I got a phone call one day.  If

15   you remember, I came back and I'm still operating Aqua

16   Vision, so to speak, and now it's got a new name.  So I

17   get a phone call and the guy calls me and says, we're

18   going to be delivering a million bottles to your facility

19   sometime this week and -- excuse me, a million boxes, and

20   we want to make sure we have a place to put them.  Okay.

21   What do you mean a million boxes?  Well, DeSean Burkich

22   ordered a million boxes.  I said, who's going to pay for

23   them?  He said, well, Seychelle is going to pay for it.

24   I said, no way, because one of the things I did is I

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL       Christ v. Cormick, et al.
Carl W. Palmer

Page 26

1    closed down -- there wasn't much in the checking account

2    anyway, but I closed it down.  I made myself the only

3    signatory on that checking account until such time as

4    they paid me off.  If we had money in the -- Aqua Vision

5    had money in the bank.  I said, I think you better hurry

6    down here, mister.  I found out the representation that

7    Mr. Burkich -- he signed a contract with a PR company for

8    a half a million dollars, he hired five people that

9    the -- monthly on each one.  The lowest was $8,000, but

10   the highest was $12,000, and I think there were three at

11   $10,000 a month.

12              That's just a few.  He had us upside-down

13   so fast I didn't know where to go.  Everybody who didn't

14   get their money were seriously upset about it and filed

15   suit.  They filed suit within 90 days.  They were suing

16   us all over the place.  This doesn't make any sense.

17              But that's basically what happened.  That's

18   basically what happened.  Obviously I found out about

19   them as soon as I started searching it.  I started trying

20   to track DeSean Burkich down.  What he had done was given

21   an awful lot of stock to his family.  They also stole --

22   one of his wife's sons worked for -- I'll probably have

23   to call you back on his name.  One of the major stock

24   brokerages in the United States.  I can't think of their

CONFIDENTIAL      Christ v. Cormick, et al.
Carl W. Palmer

Page 27

1    name.  Anyway, a major stock brokerage, within the top

2    five or ten.

3              He stole stationery and wrote letters out

4    to all kinds of people, hundreds of people, telling them

5    that they're going to be the market maker for Seychelle,

6    which is an absolute lie.  Next thing you know I get a

7    call from an attorney saying I understand -- he starts

8    telling me this whole story.  I said, wait a minute.  I

9    don't know anything about this.  He said, well, this is

10   what's happened.  To me that's major fraud going on.

11             Just numerous, one thing after another was

12   happening.  Just completely -- absolute bonding this poor

13   little company.  You can understand my position.  The

14   only thing I could do is to have a major downfall effect

15   on my friends that I put on the board.  I'm sure they

16   would have all gotten sued.  One was an attorney, one was

17   a banker.  Hell, it would have ruined their lives.  I

18   tried to stick with it and I stuck with it.  We will be

19   back up on the board probably this week and we were in

20   the pink sheets for almost three or four years because we

21   couldn't afford to keep our audits current.  We have done

22   it due diligently.  We've just been approved by the SEC.

23   We have gone through our 211, 215.  Could be today or

24   tomorrow, one day this week, we should be public again.

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL      Christ v. Cormick, et al.
Carl W. Palmer

Page 28

1    It's sure been a struggle.

2        Q.    When was it that you contacted the SEC about

3    Mr. Burkich and his activities?

4        A.    The minute -- within a day or two of when the

5    guy called me about delivering a million boxes.  What's

6    going on?  There's a good deal of fraud going on.  There

7    wasn't a single order whatsoever to support the purchase

8    of one box, let alone a million.  There wasn't an order.

9    There wasn't any activity.  I could see where he was

10   taking this.  He made a deal with a PR company to give

11   them stock for a lot of PR activity to run the stock up

12   and they had started that, but didn't do a very good job

13   of it.  It ended pretty quickly.

14       Q.    What is it that you communicated to the SEC?

15       A.    I explained the situation, and they really

16   couldn't help me at all.  They said the best thing for me

17   to do is get ahold of my SEC attorney and stop the stock

18   as fast as I could.  They followed this very closely.

19   Very closely.

20               DeSean had another partner named

21   John Ferguson that had gotten involved with them in the

22   stock pooling or transferring or whatever it was.  We

23   ended up in a lawsuit with that which cost me about

24   20 grand to win that lawsuit.  It never even went to

Electronically signed by Kim Hurley (501-043-872-4654)                2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL      Christ v. Cormick, et al.
Carl W. Palmer

Page 29

1    court.  These guys all backed down.  We never had any

2    communications with any of them after my contacting the

3    SEC, after me contacting my attorney, had kicked them all

4    off the board and required a return of all the stock.

5                Although what we finally got them to do,

6    Burkich, I don't know about Whitlock or Cormick, had to

7    return not only the stock that they received that we

8    could get our hands on, but also they had to return some

9    of the money that was -- this is all restricted stock.

10   None of this -- everything that we had was restricted, as

11   you know.  I think it's restricted for two years.

12       Q.    Do you know whether Mr. Cormick held shares of

13   Seychelle?

14       A.    I honestly don't.  So many things happened at

15   that time through brokerages, hell, I couldn't keep track

16   of anything or who anybody was.

17       Q.    Could you explain in a little more detail for

18   me, please, how it was that you, for lack of a better

19   word, ended Mr. Burkich's association with the company?

20       A.    How did I end it?

21       Q.    You have explained --

22       A.    I can tell you.  I was doing a presentation for

23   a group in the Water Quality Association in Florida and I

24   had a telephonic board meeting with the board members

Electronically signed by Kim Hurley (501-043-872-4654)                2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL      Christ v. Cormick, et al.
Carl W. Palmer

Page 30

1    that were left and our SEC attorney, and DeSean Burkich
2    was on that call, and at that call we asked for his
3    resignation.  He fought like hell about it, but he
4    finally resigned because we had so many things on him
5    that we were going after, and at the time we requested
6    his stock back, which he did not give us, but we never
7    saw or heard from him again.
8        Q.    When did that board meeting take place, if you
9    recall?
10       A.    Yes, I do.  It was in Fort Lauderdale, Florida.
11       Q.    Do you recall when?
12       A.    No.  It would have been within the days that
13   was sequential to the communications that we had had --
14   it all ended in about 90 days.  The whole damn thing
15   ended.  It took me two years to get the stock back.
16       Q.    Explain to me how that process worked.  How was
17   it that you got the stock back?
18       A.    We filed suit against him and we did that
19   through a private law firm, and at the time of going
20   actually to court, the day of the court, he folded and
21   they called me and they said he folded and he's returning
22   all the stock today, which is 4 million shares of stock.
23   A hell of a lot of stock.  That's the last we ever heard
24   of the guy.

Electronically signed by Kim Hurley (501-043-872-4654)                        2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL       Christ v. Cormick, et al.
Carl W. Palmer

Page 31

1      Q.      Where was that lawsuit filed?

2      A.      In Los Angeles.

3      Q.      Do you recall when that was that Mr. Burkich

4   agreed to return his stock?

5      A.      It took almost two years from that time.  I

6   would guess sometime in --

7      Q.      2002?

8      A.      Yes, 2002 probably is about when it happened.

9   He had to return all the stock.  Any stock issued that

10  came through him with regards to his family, that stock

11  also had to all be returned.  That stock was all returned

12  to our treasury.  I didn't take any of that stock.  It

13  all simply went back to the treasury.

14     Q.      I think you said after that point when the

15  stock was returned you haven't had any communications

16  with Mr. Burkich since that time?

17     A.      I haven't had any since -- really didn't have

18  much communication from that board meeting activity and

19  that really wasn't having a conversation.  That was

20  really directing what was going to happen.  I haven't

21  talked to him since then.  I heard all kind of stories,

22  but don't know anything about him other than that.

23     Q.      Then as for Mr. Cormick, did you have any

24  communications with him following the time that you

Electronically signed by Kim Hurley (501-043-872-4654)                                2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL        Christ v. Cormick, et al.
Carl W. Palmer

Page 32

1    contacted the SEC?

2        A.    None whatsoever.  I tried at one point, but I

3    couldn't find him.  I was trying to get something

4    straight with activity of the stock that we had to get

5    returned, and I can't even remember the whole story, but

6    I know that I tried to contact him.  I went -- I didn't

7    have any communications.  I didn't know -- I heard so

8    many damned stories.  The only person I knew that knew

9    him that had any communications with him was

10   Don Whitlock.

11       Q.    Are you aware of whatever happened to

12   Mr. Burkich after he left your company?

13       A.    I just heard stories.  I heard the story about

14   the bank down off the coast of Argentina.  Supposedly

15   bulked them out of $200 million.

16              MR. FINGER:  Objection to hearsay.

17              THE WITNESS:  Heard the story of bank

18   activity in Indonesia.  Apparently he was at that time --

19   at that time he was -- I guess the government went after

20   him and found him guilty of some major fraud and he was

21   using a different name at that time.  So I heard --

22   that's where I had heard he had committed suicide.

23   BY MR. BRACEGIRDLE:

24       Q.    Where did you hear these things?  How did you

Wilcox & Fetzer, Ltd.    Registered Professional Reporters        302-655-0477

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL      Christ v. Cormick, et al.
Carl W. Palmer

Page 33

1    become aware of them I should say?

2       A.    I think Don Whitlock is the one that told me

3    about his suicide.  But since then somebody told me they

4    read it in the paper.  Obviously didn't want anything to

5    do with this person.  He was mostly a stockbroker and

6    also a minister and we had a document that came out that

7    showed that he had been -- he had lost his license which

8    we didn't know.  He was doing a lot of things illegally.

9    A bad man.  That whole group was a bad group.  Very

10   interesting experience.  Expensive but interesting.

11              MR. BRACEGIRDLE:  Mr. Palmer, I thank you.

12   I have no other questions at this time, although

13   Mr. Finger may have some questions for you at this point.

14              THE WITNESS:  I'll try if I can -- I had

15   one of those documents someplace and after eight years

16   I'm not sure where they might be filed, but I'll take a

17   look in my personal files because I'll be more than happy

18   to give them to you and you can see how grossly

19   misrepresented these guys put this thing to be.  They can

20   go after some big money.  Pretty bad.

21   BY MR. FINGER:

22      Q.    Mr. Palmer, this is David Finger.  Good

23   morning.

24      A.    Hi, how are you?

Electronically signed by Kim Hurley (501-043-872-4654)                                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL     Christ v. Cormick, et al.
Carl W. Palmer

Page 34

1     Q.    I'd like to follow up on a couple things you

2  said.

3              At the time you were asked to attend this

4  meeting in Switzerland, first of all, who invited you to

5  attend this meeting?

6     A.    DeSean Burkich.

7     Q.    Did he just contact you cold?

8     A.    Oh, no.  No.  Prior to that DeSean Burkich and

9  his associate, John Ferguson, were selling our product in

10  the Orange County area of California.  We knew him as a

11  customer at that time.

12     Q.    Do you know who arranged that meeting in

13  Switzerland?

14     A.    I don't know how his association with Cormick

15  came about.  I have no idea.  But I know that it was --

16  that the introductory to the bankers, etcetera, were

17  primarily Cormick.

18     Q.    Are you suggesting that DeSean arranged the

19  meeting with Cormick?

20     A.    Yes, I am.  I'm not suggesting it.  I'm telling

21  you that.

22     Q.    How do you know that to be a fact?

23     A.    I was told.

24     Q.    By whom?

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

Page 35

1      A.     By DeSean Burkich and Cormick.  You have to

2  remember, they're getting involved in a business they

3  know not a first thing about.  It's like me going and

4  becoming an attorney tomorrow.

5      Q.     When did Dr. Cormick tell you that, that it was

6  arranged through Mr. DeSean?

7      A.     Is he a doctor?

8      Q.     He's a Ph.D.

9      A.     I'm sorry?

10     Q.     He's a Ph.D., sir.

11     A.     Okay.  Never heard of that.  Not that that

12 makes any difference to me.  What's the question again?

13     Q.     When did Dr. Cormick tell you that he was

14 approached by DeSean to set up this meeting in

15 Switzerland?

16            MR. BRACEGIRDLE:  Objection.  That

17 misstates the testimony.

18 BY MR. FINGER:

19     Q.     Let me go back again, sir, because there's an

20 objection by Mr. Bracegirdle.

21            Was it your testimony that Dr. Cormick set

22 up the meeting in Switzerland at the request of DeSean?

23     A.     Yes.  They presented themselves as an

24 association; together they were doing this.

Electronically signed by Kim Hurley (501-043-872-4654)                                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL     Christ v. Cormick, et al.
Carl W. Palmer

Page 36

1      Q.    How did they present that?

2      A.    Well, first of all, there was a luncheon,

3   approximately 20, 30 men at this luncheon, or bankers,

4   investors, etcetera, at this activity, and they made the

5   introductory to me.  Cormick made that introduction for

6   me.  Of me.  To me.  Whatever you call it.

7      Q.    He introduced you to the bankers?

8      A.    Yes, sir.

9      Q.    Did he say he was doing that on behalf of

10  himself and DeSean?

11     A.    Yes, sir.

12     Q.    Do you recall his precise words?

13     A.    No, of course not.  Well, you know, you heard

14  my background.  Get my file.  You will see my background.

15  I'm pretty easy to introduce if you have been in the

16  water business as long as I have and had as many

17  successes as I've had.  I'm not bragging about this.

18  It's just been -- God helped me invent a good product

19  that's now presently being marketed by people like

20  Coca-Cola and AMS, and 3M just bought two of my companies

21  two years ago for $1.3 million.  I'm not hard to

22  introduce.  This was done specifically because they

23  couldn't do it.

24     Q.    But I'm asking you, sir, whoever introduced you

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

Page 37

1    at that meeting, did he say on behalf of Brett Cormick

2    and DeSean, we introduce you?

3         A.    Yes, sir.

4         Q.    That was the language that was used?

5         A.    Say that again.  On behalf of --

6         Q.    On behalf of Mr. DeSean and Dr. Cormick, and

7    then did he come out and say that those two were in

8    business together?

9         A.    It seemed pretty obvious to me.  They traveled

10   everywhere together.  They were with each other

11   constantly as I saw it.  At least while I was in Europe.

12        Q.    The reason I ask you, sir, is you testified

13   earlier -- first you assumed and then you were told that

14   DeSean was associated with Dr. Cormick.

15        A.    Well, you know, I'll tell you what, it appeared

16   that both were principals in the future, in the future of

17   Seychelle Environmental Technology.

18        Q.    It appeared that way; is that what you're

19   saying?

20        A.    Yes, I am.  That's why the presentation was

21   probably introduced by both of them at these meetings.

22   Remember, it was three meetings.  And DeSean is not from

23   Europe.  He couldn't have anyway arranged this meeting.

24   It had to happen through Cormick.  Had to happen.

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL       Christ v. Cormick, et al.
Carl W. Palmer

Page 38

1    Mr. DeSean was from Orange County.

2        Q.    I'm asking you did you see any business cards

3    or hear any statements that DeSean and Mr. Cormick were

4    in business together?

5        A.    No, I did not.

6        Q.    At the time you were invited to this meeting,

7    was Mr. Whitlock part of Aqua Vision?

8        A.    No, definitely not.

9        Q.    Was he a friend of yours at that time?

10       A.    No.  Never been a friend of mine.

11       Q.    Did you know him at that time?

12       A.    I knew him because, as I already exposed, that

13   he would find product for our company.  He and

14   John Ferguson had a company named Better Health and they

15   were buying our product and marketing it on a radio talk

16   show.

17       Q.    I'm sorry.  Maybe I didn't ask the question or

18   maybe I'm confused.  I apologize.  I thought you

19   testified that Mr. Ferguson was a partner of DeSean.

20       A.    He was.

21       Q.    I was asking you about Mr. Whitlock.

22       A.    I'm sorry.  I thought you were talking about

23   Cormick.  Whitlock lived I think in Aspen, Colorado, and

24   he seemed to me from what he explained to me is he was a

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

Page 39

 1    finder involved with the activity of this, bringing in

 2    Cormick as an investor.

 3         Q.    When did you meet Mr. Whitlock?

 4         A.    I met Mr. Whitlock when I went to Europe, when

 5    I went to Switzerland.

 6         Q.    That was the first time?

 7         A.    Yes, sir.

 8         Q.    He said to you that he had brought in

 9    Dr. Cormick on this transaction?  Did I understand that

10    correctly?

11         A.    I don't want to misrepresent that to you.  I'm

12    not sure how those two people became acquainted.  I don't

13    know how that happened.  I don't know if they had

14    business associations or what, because I'm not in that

15    world.  And the activity that -- I'm not sure how they

16    became associated.  But I know that they spent all their

17    time together and appeared to me in the activity, the

18    whole program, that these three people were going to be

19    acting in the future of Seychelle Environmental.

20         Q.    Speaking of Mr. Whitlock, do you know where he

21    is today?

22         A.    You know, I think somebody called me and I

23    tried to help them.  The closest I know that he might be

24    is in Aspen, Colorado.  That's the last I heard.  His

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

Page 40

1    father lives in Aspen, Colorado.  Very prominent man in

2    that area.  If I was to try to find him, that's where I

3    would call first.

4         Q.    Turning back to the Switzerland meeting, you

5    said there were a number of bankers and financiers

6    present; is that correct, sir?

7         A.    That's correct.  By the way, there were two

8    meetings.

9         Q.    Thank you.  It was your understanding that

10   Dr. Cormick was the one who was able to get all these

11   financiers and bankers to this meeting?

12        A.    Yes, sir.

13        Q.    Your concern was that there were presentation

14   materials that you considered to be gross

15   misrepresentations; is that correct, sir?

16        A.    That is correct.

17        Q.    Do you believe that these bankers and

18   financiers were sophisticated people?

19             MR. BRACEGIRDLE:  Objection.  Calls for

20   speculation.

21        A.    I'm sorry?

22        Q.    Put it this way:  Did these bankers and

23   financiers appear to you to be commercially

24   sophisticated?

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL      Christ v. Cormick, et al.
Carl W. Palmer

Page 41

1      A.    Positively.

2      Q.    You're familiar with the concept of due

3   diligence, are you not, sir?

4      A.    Probably.

5      Q.    Would you believe that the financiers and

6   bankers who reviewed these presentation materials would

7   engage in due diligence before deciding whether to invest

8   money?

9            MR. BRACEGIRDLE:  Objection.  Calls for

10  speculation.

11           MR. FINGER:  You can answer the question,

12  sir.

13     A.    I can?

14     Q.    Yes.

15     A.    Of course I do.

16     Q.    If they had done the due diligence, would they

17  have found that these misrepresentations were, in fact,

18  misrepresentations, would it be reasonable to assume

19  that, sir?

20     A.    Absolutely.

21     Q.    Did you get any indication from any of these

22  bankers or financiers that they wanted to go ahead with

23  the financing?

24     A.    Yes, sir, I did.

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL      Christ v. Cormick, et al.
Carl W. Palmer

Page 42

1      Q.    Even though they could have or would have done

2    due diligence and found that these misrepresentations --

3      A.    I have to tell you, at that point I had no idea

4    what these people had seen prior to me arriving.  I

5    didn't know if they saw this proforma or the package that

6    was put together or not.  I had no idea.  I don't know

7    what numbers that they were -- my discussion was

8    primarily solution, opportunity.  That's what it was.

9    Had nothing to do with projection of income, expenses or

10   costs or taking it public in Europe or all that.  I

11   wasn't involved in that whatsoever.

12     Q.    Then you have no knowledge that these bankers

13   or financiers saw any misrepresentations, correct?

14     A.    That's correct.  I really don't know that.

15     Q.    You mentioned you wanted a hold-harmless

16   agreement to remain involved.  Do I recall that

17   correctly, sir?

18     A.    Yes, I did, because I did see this presentation

19   made to Banque Worms.

20     Q.    Did they agree to that hold-harmless agreement?

21     A.    They said they would give me one, yes.  I may

22   still have that.

23     Q.    You did get one?

24     A.    It wouldn't have made any difference to me if

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

Page 43

1    they gave it to me or not if I wasn't going to be

2    associated in the company.  At the time when I was there

3    I had no intent of being associated with them any longer.

4        Q.    You did later agree to be associated for

5    $10 million and half the stock?

6        A.    That's affirmative.  That's affirmative.  If I

7    had all controlling rights of the company.

8        Q.    You testified Mr. DeSean had the daily

9    communications with Mr. Cormick -- or Dr. Cormick,

10   correct?

11       A.    Yes, sir, that's correct.

12       Q.    Were you in on those conversations?

13       A.    No.

14       Q.    How do you know it was daily?

15       A.    I was told.

16       Q.    By whom?

17       A.    By DeSean Burkich.  Also by Don Whitlock.

18   Don Whitlock sat on our board.  I received information

19   from him from time to time.  We're busy trying to run a

20   business, not play the stock game.

21       Q.    You never got confirmation of that from

22   Dr. Cormick; is that correct?

23       A.    I'm sorry.  I didn't hear you well.

24       Q.    I'm sorry.  You did not get such a confirmation

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

Page 44

1    from Dr. Cormick; is that correct?

2        A.    Confirmation of what?

3        Q.    That he had daily or regular communications

4    with DeSean.

5        A.    Yes, they had to be.  I got some of their

6    e-mails and communications.  So they had to be talking

7    for me to receive the information I received.  It was

8    generally about deals it was.  The big buyers of the

9    world.

10       Q.    I just want to be precise here because you used

11    the words "daily communications."

12       A.    Yeah.  The reason it was daily is because I was

13    on their case pretty hard about the money.  I allowed my

14    company to become I call it an asset to Seychelle

15    Environmental.  I wanted my damn money and I didn't see

16    it coming.  So they were supposed to be -- DeSean and

17    Cormick were supposed to be putting it together.

18       Q.    On whose back were you specifically?  Would you

19    make communication with DeSean or Dr. Cormick?

20       A.    On both.  But I didn't call Cormick all the

21    time.  I might talk to him once a week.  But I talked to

22    DeSean every day.  I also talked to Don Whitlock every

23    day.

24       Q.    Did you see any communications between DeSean

Electronically signed by Kim Hurley (501-043-872-4654)                              2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL      Christ v. Cormick, et al.
Carl W. Palmer

Page 45

1    and Dr. Cormick relating to those issues that you were

2    concerned about?

3         A.    No.  I couldn't.  Their offices were separate

4    from mine.

5         Q.    You said you saw e-mails.

6         A.    You can be wherever you are, I can be here, I

7    can get a copy of an e-mail.

8         Q.    I don't understand.  What would happen?  Would

9    DeSean show you the e-mails?

10        A.    No.  I was copied on them.

11        Q.    So my question was on those e-mails on which

12   you were copied, was the conversation about the issues

13   that you raised with DeSean?

14        A.    You betcha.  Money is coming in.  Put yourself

15   in my position.  You can understand it pretty easily.

16   Somebody owes you $10 million on a deal, I suppose you'd

17   be talking to them every day.  Now, they had my assets

18   tied up, as far as I'm concerned, and exposed my, let's

19   call it, people that were near and dear to me in this

20   world in a position where I didn't want them exposed.  If

21   I could have gone out completely, I would have walked out

22   on them without a stockholders lawsuit against me and

23   other people.  I didn't want that to happen.

24        Q.    Do you have those e-mails currently?

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

Page 46

1      A.    Hell no.  I'll tell you what, after this

2    eight-year period I doubt if I have very much about this,

3    but I think I have the booklet somewhere and I think that

4    I might have some of the e-mails.  I went through a whole

5    cleanup last time Seychelle moved.  I had boxes full of

6    this stuff and just dumped most of it.  Especially after

7    I heard DeSean committed suicide, which I'm not even sure

8    that happened.

9      Q.    You talked about a number of activities of

10   DeSean that you thought were wrongful, including sending

11   you boxes to pay for and sending letters trying to be a

12   market maker.  Can you state as you sit there for a fact

13   that those actions by DeSean were done with the knowledge

14   and participation of Dr. Cormick?

15     A.    If they're associated like it appeared to be, I

16   would say yes, but I had no proof of that.

17     Q.    But you just assumed that fact; is that

18   correct?

19     A.    I presumed it, yes.  Because see, I knew

20   Burkich didn't have any money.  So it was always left

21   that Cormick was coming up with the money.  So I knew

22   that Burkich wasn't going to come up with the money.

23     Q.    But you can't point to anything today and say

24   this proves that DeSean was doing these things in

CONFIDENTIAL      Christ v. Cormick, et al.
Carl W. Palmer

Page 47

1    coordination with Dr. Cormick?

2        A.    Only thing I can tell you is after having three

3    meetings with -- three luncheons with two of them with

4    I'd say anywhere with 30 to 20 people and the other one

5    meeting with the executive VP of Banque Worms, I presume

6    that's pretty damn serious.  And Burkich was there,

7    Cormick was there, and I was there.  They were doing this

8    specifically because what they wanted to do is take the

9    company public and I didn't even know if that was legal.

10   Take the company public in Europe.  I didn't even know if

11   that was legal.  I had a lot of questions in my mind.

12       Q.    Did you ask those questions?

13       A.    Damn right I did, when I got back from the

14   attorney, my attorney.

15       Q.    But it is conceivable, is it not, sir, that

16   DeSean could have done all these things independently of

17   Dr. Cormick?

18              MR. BRACEGIRDLE:  Objection.  What do you

19   mean by "these things"?

20              MR. FINGER:  Do all of the things that have

21   been testified to such as the issue with the boxes, the

22   issue with the letters and the stationery.

23       A.    As mutual stockholders and controlling

24   stockholder of the activity they were doing, I can't

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL      Christ v. Cormick, et al.
Carl W. Palmer

Page 48

1    imagine him going off and doing it on his own.  That

2    would have to be -- I guess to surmise that.  I surely

3    wouldn't spend two or three million dollars without

4    telling my partner about that.

5        Q.    Isn't that possible, sir?

6        A.    I doubt if it's possible.

7        Q.    You doubt it's possible?

8        A.    I doubt if it's possible.

9        Q.    You don't think one person can go off and take

10   certain actions without the knowledge of another person?

11       A.    In the real world of business, no, I don't

12   think so, but maybe with the kind of people you're

13   talking about, it could happen.  But not in the world I'm

14   in.  I can't imagine me doing anything like that, even

15   today, without my board knowing it and all the directors

16   of the corporation knowing it because I'm responsible to

17   the stockholders.  They had no due diligence whatsoever.

18       Q.    DeSean was a member of the board of directors;

19   isn't that correct?

20       A.    Yes, sure he was.

21       Q.    When he sent out these letters, until you found

22   out about them, the board didn't know about it; is that

23   correct?

24       A.    The board knew everything that I knew.  I

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

Page 49

1    didn't retain any of that away from the board ever.

2    Remember, Don Whitlock was also on that board.  Remember,

3    when I met Don Whitlock, those three people appeared to

4    be associated.  I presumed that they would be -- I know

5    Whitlock owned a lot of stock and he still does today.

6        Q.    I'm sorry, sir.  My questions may be confusing,

7    and I apologize.  Let me try to rephrase it.

8               DeSean sent out letters to people claiming

9    to be a market maker, correct?

10       A.    I told you he sent letters from -- I can't

11   think of the name.  I'll remember it.  Yes.  His son

12   stole stationery from a major stockbroker that was mailed

13   out to a lot of people that established the fact that

14   they were going to be a market maker for Seychelle, which

15   is an absolute lie.

16       Q.    Until after that stationery was taken and the

17   letters sent out, and until you were notified about it,

18   you were not aware in advance that it happened, correct?

19       A.    Not that that happened, hell no, I wasn't aware

20   of it.

21       Q.    In that case a board member did something

22   without your knowledge even though you were all board

23   members, correct?

24       A.    Okay.

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL       Christ v. Cormick, et al.
Carl W. Palmer

Page 50

1       Q.      Do you understand my point, sir?

2       A.      I understand your point.

3       Q.      Again, I ask the question.  Is it possible that

4    DeSean's actions were done without the knowledge and

5    approval of Dr. Cormick?

6       A.      That's speculation.  I'll speculate with you.

7    Sure, it could possibly happen.  At the position that I

8    saw him in, I can't imagine DeSean laying a debt of two,

9    three, four million dollars up against Seychelle without

10   talking to your banker, your banking contact, your

11   investment contact knowing about it.  I can't imagine

12   that.  Maybe people do things like that, I don't know.

13   Not in my world they don't do things like that.

14              At the very moment we found an order for

15   boxes alone, I put a stop to everything I could find.  I

16   can verify all of that with my attorney.  We fought it in

17   lawsuit after lawsuit after lawsuit.  None of those

18   actually went to court, fortunately.  We settled on

19   everything we could settle on.  It cost us a good deal of

20   stock of this company to settle.  I'd say approximately

21   two million shares of stock it cost us.

22      Q.      Was Dr. Cormick ever on the board of directors

23   of Seychelle?

24      A.      No.

Electronically signed by Kim Hurley (501-043-872-4654)                                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL    Christ v. Cormick, et al.
Carl W. Palmer

Page 51

1    Q.    Was he a participant in the telephone

2    conference where DeSean was asked to resign?

3    A.    No.

4    Q.    Do you have minutes of that meeting?

5    A.    Sure.

6    Q.    Do you know if Dr. Cormick's name appears on

7    those minutes?

8    A.    I doubt it.  No, I wouldn't know that.  I

9    wouldn't know that.  I doubt that, though.  I doubt if

10    his name was on that.

11            MR. FINGER:  Thank you, sir.  I have no

12    other questions.

13    BY MR. BRACEGIRDLE:

14    Q.    Before you go, Mr. Palmer, this is

15    Thad Bracegirdle, if you will indulge me.  I have a

16    couple of follow-up questions based on your testimony.

17    A.    You're going to lose my phone pretty quick.

18    Q.    I'll make it fast.

19            Simply what I'd like you to do is tell me

20    as specifically as you can everything that you observed

21    that led you to the conclusion that Mr. Burkich and

22    Mr. Cormick were working together on this transaction.

23    A.    They picked me up at the airport together, they

24    went to the hotel together, had dinner with them

Electronically signed by Kim Hurley (501-043-872-4654)    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL      Christ v. Cormick, et al.
Carl W. Palmer

Page 52

1    together.  Everywhere I went in Europe, I was with both

2    of them and Don Whitlock.  All three of them.  And the

3    conversations led me to believe that he was a prominent,

4    wealthy man in Europe and had lots of money and was

5    interested in getting involved in this company or was

6    involved in this company or had put money into the

7    company.  I really didn't know that, but I didn't have

8    any way to prove it.  After that they seemed to be in

9    constant communications, from what DeSean had told me and

10   from what Don Whitlock had told me.

11      Q.    The presentation materials that you were given

12   that contained the misstatements, who gave you those

13   materials?

14      A.    It was passed out at a meeting with all three

15   of those persons that I mentioned.

16      Q.    Do you have an understanding of who prepared

17   those materials?

18      A.    They told me it was prepared by a couple of

19   doctors from MIT that had done the proforma agreement --

20   excuse me, proforma projections on this thing.  I had met

21   one of them.  I couldn't believe anybody could possibly

22   come up with anything like that.

23      Q.    When you say they told you that, who do you

24   mean?

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL       Christ v. Cormick, et al.
Carl W. Palmer

Page 53

1        A.      I mean these three gentlemen.

2        Q.      Those three gentlemen would be Mr. Cormick,

3    Mr. Burkich, and Mr. Whitlock?

4        A.      That's affirmative.

5              MR. BRACEGIRDLE:  That's all that I have,

6    Mr. Palmer.  Mr. Palmer, I believe Mr. Finger may have

7    another question for you.

8    BY MR. FINGER:

9        Q.      You keep saying that these gentlemen told you

10   something.  Did they each individually tell you who

11   prepared the materials?

12       A.      I had a lot of conversations with them.  When

13   this was first done, when this first came about prior to

14   the trip to Europe, they had mentioned -- they wrote me a

15   letter.  They were going to be all officers of the

16   corporation and they were offering me this position, a

17   couple hundred thousand dollars a year to be the

18   technological specialist and water specialist and they

19   were going to use me as a consultant.

20       Q.      This is confusing to me.  You said they sent

21   you a letter.  Were all three signatures on the letter?

22       A.      No, there wasn't all three signatures.  It was

23   handwritten and it was written in DeSean Burkich's

24   signature.

Wilcox & Fetzer, Ltd.    Registered Professional Reporters        302-655-0477

CONFIDENTIAL     Christ v. Cormick, et al.
Carl W. Palmer

Page 54

1      Q.    It was DeSean Burkich who sent you a letter,

2    not they, correct?

3      A.    That's correct.

4      Q.    You said they told you that this organization

5    prepared these documents?

6      A.    They made the presentation to me.  Remember,

7    this is a two-stage activity.  And we went to Europe.

8    The reason we went to Europe is because they didn't have

9    any money.

10     Q.    I'm not asking you about the presentation.  I'm

11   asking you about the dossier.  Did each of them

12   individually tell you separately or together in unison

13   voice the fact of who prepared the dossier or was it only

14   one of them?

15     A.    They represented themself as a group of people.

16   There are three of them that were making this

17   presentation to me.  And they're not like Donald Duck.

18   One guy says hand and the other guy says duh, etcetera.

19   They were all there making the presentation.  They seemed

20   quite pleased with it and were happy to make the

21   presentation to Banque Worms and also to their other

22   investors.  The fact that some of these other investors

23   couldn't speak English, I'm presuming that Dr. Cormick,

24   who apparently had knowledge of other languages, was

Electronically signed by Kim Hurley (501-043-872-4654)                2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL      Christ v. Cormick, et al.
Carl W. Palmer

Page 55

1    apparently the one doing the presentation.

2         Q.    I understand, sir, that all three of them made

3    a presentation and you took that as collective action.

4         A.    That's correct.

5         Q.    But I am talking about what was actually said

6    to you -- please allow me to ask the question.

7         A.    I just said it.  You don't have to read it to

8    me.  I can read.  I saw what they presented.

9         Q.    It would be helpful if you'd allow me to finish

10   my question.  That way --

11        A.    You're asking the same thing twice.  What's the

12   question?

13        Q.    I'm trying to get an answer.

14              What was said to you by each individual?

15   I'll rephrase the question.

16        A.    Let me answer that.  I can answer that.

17        Q.    I move to strike.

18        A.    They were always together.  They never singled

19   me out one by one.  I never had a chance to talk to

20   anybody individually.  Maybe that helps you a little.

21        Q.    No, sir, it didn't, unfortunately.  I'm going

22   to ask you one by one.

23              What did Mr. Whitlock tell you about the

24   business association between himself, DeSean, and

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

Page 56

1   Dr. Cormick?

2       A.    I don't remember.

3       Q.    What did DeSean tell you about the business

4   relationship between himself, Mr. Whitlock, and

5   Dr. Cormick?

6       A.    That they were associated.

7       Q.    What does "associated" mean?

8       A.    When you say "associated," it means the

9   stockholder.  Is that associated in your term?  I'm going

10  to presume it is.  That Burkich and also Cormick were

11  associated and especially the development of the public

12  company for Europe.

13      Q.    Did he use the term "associated"?

14      A.    Sure.

15      Q.    I'm sorry?

16      A.    Yes.  I don't know if he used "associated" or

17  "we're together," or "partners," but they were doing it.

18  They were doing it together and talking to together.  I

19  presume that's what that means.

20      Q.    Try to focus attention way from what you

21  presumed and what actually occurred.

22      A.    I know what you're trying to do.

23      Q.    Good.  Tell me, please, you don't recall the

24  specific language that was used.  That's correct?

Electronically signed by Kim Hurley (501-043-872-4654)                                    2bd5d6db-6195-46d3-8fd3-560516d6899d

Page 57

```
 1      A.    I don't recall the specific language, only the

 2  visual association.

 3      Q.    Finally, sir, what, to the best of your

 4  recollection, did Dr. Cormick say to you about his

 5  involvement with --

 6      A.    What happened?

 7      Q.    To the best of your recollection, what did

 8  Dr. Cormick say to you about his dealings with

 9  Mr. Whitlock and Mr. DeSean?

10      A.    That they were associated putting this thing

11  together to take it public and that he had the background

12  of the investors, etcetera, to put these meetings

13  together, so he is the only one that could have done

14  this.  Neither Whitlock or Burkich could not do this

15  together -- could not do this alone or with one together.

16  Had to happen through Cormick.

17      Q.    Again, you don't recall the specific language;

18  is that fair?

19      A.    No, I don't recall the specific language.

20            It's been a pleasure talking to you guys.

21            MR. BRACEGIRDLE:  Mr. Palmer, before you

22  go, you will have an opportunity to review the

23  transcript.  The court reporter will provide it to me and

24  I can provide it to you in turn and you can review it for
```

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL      Christ v. Cormick, et al.
Carl W. Palmer

Page 58

1    any typographical errors or things like that, but I will

2    be in touch with you on that.

3                    THE WITNESS:  Okay.  Thank you.

4                    (Deposition concluded at 3:25 p.m.)

5                        -  -  -  -  -

6

7                    T E S T I M O N Y

8

9    DEPONENT:  CARL W. PALMER                    PAGE

10

11   BY MR. BRACEGIRDLE............................ 2

12   BY MR. FINGER................................ 33

13   BY MR. BRACEGIRDLE........................... 51

14   BY MR. FINGER................................ 53

15

16           (No exhibits were marked at this time.)

17

18

19

20

21

22

23

24

Electronically signed by Kim Hurley (501-043-872-4654)                2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL        Christ v. Cormick, et al.

Page 59

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

Electronically signed by Kim Hurley (501-043-872-4654)                                    2bd5d6db-6195-46d3-8fd3-560516d6899d

CONFIDENTIAL        Christ v. Cormick, et al.

Page 60

## CERTIFICATE OF REPORTER


STATE OF DELAWARE)

                 )

NEW CASTLE COUNTY)


        I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 4th day of
March, 2008, the deponent herein, CARL W. PALMER, who was
duly sworn by me and thereafter examined by counsel for
the respective parties; that the questions asked of said
deponent and the answers given were taken down by me in
Stenotype notes and thereafter transcribed by use of
computer-aided transcription and computer printer under
my direction.

        I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.

        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

*Kimberly A. Hurley*

        Kimberly A. Hurley

        Certification No. 126-RPR
        (Expires January 31, 2011)


DATED:  March 20, 2008

Electronically signed by Kim Hurley (501-043-872-4654)                    2bd5d6db-6195-46d3-8fd3-560516d6899d



# CONFIDENTIAL

### In the Matter Of:

# Christ
### v.
# Cormick, et al.

### C.A. # 06-275-GMS

_____

### Transcript of:

# Gordon N. Subloo

### March 4, 2008

_____

Wilcox & Fetzer, Ltd.
Phone:  302-655-0477
Fax:  302-655-0497
Email:  depos@wilfet.com
Internet:  www.wilfet.com

CONFIDENTIAL      Christ v. Cormick, et al.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ROBERT D. CHRIST,        )
                         )
     Plaintiff,          )
                         )
     v.                  ) C.A. No. 06-275-GMS
                         )
BRETT J. CORMICK and ELAN )
SUISSE INTERNATIONAL     )
HOLDINGS (USA),          )
                         )
     Defendants.         )
                         ) CONFIDENTIAL
                         )
ELAN SUISSE LTD.,        )
                         )
     Plaintiff,          )
                         )
     v.                  )
                         )
ROBERT D. CHRIST,        )
                         )
     Defendant.          )

          Telephonic deposition of GORDON N. SUBLOO
taken pursuant to notice at the law offices of Reed
Smith, LLP, 1201 North Market Street, Suite 1500,
Wilmington, Delaware, beginning at 5:25 p.m., on Tuesday,
March 4, 2008, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

          THAD J. BRACEGIRDLE, ESQUIRE
          REED SMITH, LLP,
            1201 North Market Street - Suite 1500
            Wilmington, Delaware 19801
            for Robert D. Christ
cont'd...

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

Electronically signed by Kim Hurley (501-043-872-4654)                                    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL        Christ v. Cormick, et al.

Page 2

 1   APPEARANCES (cont'd):

 2            DAVID L. FINGER, ESQUIRE
             FINGER & SLANINA, LLC
 3             1201 North Orange Street - Suite 725
             Wilmington, Delaware 19801
 4             for Brett Cormick and Elan Suisse

 5                    - - - - -

 6            GORDON N. SUBLOO,

 7       the witness herein, having first been

 8       duly sworn on oath, was examined and

 9       testified as follows:

10   BY MR. BRACEGIRDLE:

11       Q.    Thank you, Mr. Subloo.  As I mentioned earlier,

12   my name is Thad Bracegirdle.  I'm an attorney here in

13   Wilmington, Delaware, in the United States, and I

14   represent Robert Christ in litigation against

15   Brett Cormick and other defendants.

16       A.    Yes.

17       Q.    You're giving your deposition in that case

18   today, and to start off, I'd like to ask you to please

19   state your full name for the record.

20       A.    My name is Gordon Neal Subloo, S-u-b-l-o-o.

21       Q.    Where do you presently reside?

22       A.    9 Sandpiper Court, Bayview Heights, Queensland.

23       Q.    That's in Australia?

24       A.    Yes.  Queensland, Australia, yes.

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 3

1      Q.     What's your present occupation?

2      A.     I'm a company director.

3      Q.     For what company are you a director?

4      A.     I'm a company -- for a family group which is

5   several companies, and we're involved in building of

6   motorcycle trikes and also involved in consulting work

7   and mineral trading as well.

8      Q.     Does your family group of companies include a

9   company called CoalCorp Pty Limited?

10     A.     Yes.

11     Q.     What is the nature of that company's business?

12     A.     That company has got a clean coal technology

13   into that company.

14     Q.     When you say "a clean coal technology," can you

15   expand on that, please?

16     A.     It is material you add with coal.  If you're

17   familiar with coal, you get the high-sulfur coal, you add

18   this additive to the coal prior to burning, and it

19   reduces the NOx and also takes the sulfur out of it in

20   the process.

21     Q.     Do you have any day-to-day involvement with

22   that company?

23     A.     Well, the company -- I'm still the chairman and

24   controlling interest of the company and it's actually

Electronically signed by Kim Hurley (501-043-872-4654)                2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 4

1    sitting idle since the debacle with Mr. Cormick.

2        Q.    Back around, say, 1997 or 1998, were you more

3    involved with that company than you are now?

4        A.    Oh, yes.   Yes.   It was full-time.

5        Q.    Back around that time frame in the mid-to-late

6    '90s, what was your involvement with CoalCorp Pty

7    Limited?

8        A.    Again, I represent the controlling shareholder.

9    I was the chairman and the CEO of the company.

10       Q.    You mentioned Mr. Cormick a moment ago.   How

11   are you familiar with Mr. Cormick?

12       A.    Mr. Cormick, I was familiar with him.   He had

13   made contact with my son, Shane, and then he talked to

14   me -- talked to us about he had this company that could

15   raise money for basically anything, and that's how --

16   that's basically how we started being involved with him.

17       Q.    Do you recall when it was that you first had

18   contact with Mr. Cormick?

19       A.    It would have been in '96, I believe.   Late

20   '96, early '97.

21       Q.    You mentioned that you met Mr. Cormick through

22   your son.   I'd like you to tell me specifically what you

23   recall about circumstances under which you first met

24   Mr. Cormick or at least when you first spoke to him.

Electronically signed by Kim Hurley (501-043-872-4654)                              2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL      Christ v. Cormick, et al.
Gordon N. Subloo

Page 5

1      A.      What happened is -- Shane had come across him

2    on the Internet, EVF, European Venture Finance, and had a

3    brief discussion with him, and then what happened is I

4    actually made direct contact with Brett several times and

5    talked about the coal technology and went into raising

6    funds for this technology.  He said that that wasn't a

7    problem; basically that was his business.

8      Q.      Is it true, then, to say that you reached out

9    to talk to Mr. Cormick?  Is that how it happened?

10      A.      Yes.

11      Q.      What was your purpose in doing so?

12      A.      Just to find out what he had to offer, what he

13    could do.  And then he gave us the full spiel on his

14    credentials of being the youngest broker ever to head a

15    big organization in Europe and how he's raised hundreds

16    of millions of dollars for companies now with EVF, with

17    the offices in Geneva and Jersey and England.  They had

18    this network where they could tap into literally

19    unlimited funds.

20      Q.      Was it true, then, that your company was

21    looking for investments?  Is that why you contacted him?

22      A.      Yes.

23      Q.      You mentioned when you first spoke to

24    Mr. Cormick you talked about his credentials.  Can you

Electronically signed by Kim Hurley (501-043-872-4654)                          2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL        Christ v. Cormick, et al.
Gordon N. Subloo

Page 6

1    recall any specifics about what he told you concerning

2    his background or his experience?

3         A.    Oh, yes.  He told us that he was Dr. Cormick

4    and he was an Australian citizen and he had been in the

5    SAS and went through all of his background information.

6    And then he told us the different companies that he had

7    worked with and for over the years and how that basically

8    he was able to with his companies raise literally

9    hundreds and hundreds of millions of dollars and that's

10   the reason why that he went out to offer the same

11   services for his own company or his group.  He said that

12   he had other partners in the group, and he mentioned a

13   man called Mark Kearns in Jersey.

14        Q.    Do you know at the time that you talked to

15   Mr. Cormick where he was located?

16        A.    He said he was in -- he lived in one of the

17   main areas in London.  He said he lived next door to

18   Sting, the musician guy.  And he said he lived in a big

19   mansion in London and that's where he lived.  He said, "I

20   was never aware of his address.  I had never been to his

21   house."

22        Q.    So Mr. Cormick told you he lived in a mansion

23   in London?

24        A.    Yes.

Electronically signed by Kim Hurley (501-043-872-4654)                          2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 7

1    Q.    You mentioned in one of your answers that

2    Mr. Cormick told you that he had been in the SAS.  What

3    is the SAS?

4    A.    That's Australian like a commando force.  The

5    elite soldiers in Australia.  I think in the U.S. they

6    call them Navy SEALs or that's equivalent to the SAS of

7    Australia.  The special forces, basically.

8    Q.    Do you recall specifically any of the companies

9    that Mr. Cormick said he had worked for or worked with

10   when he first spoke to you?

11   A.    As I said, I haven't got -- it's been a while.

12   I haven't got all of this.  But the companies that he

13   worked for, I think it was -- it will come to me in a

14   minute.  It's some of the biggest names in the world.

15   And he basically worked in Europe and in Europe mainly in

16   London with these companies, and that was basically what

17   it was.

18                As I said, at the moment it sort of escapes

19   me the companies because he must have worked for about

20   20 different companies over the period of time.

21   Q.    You mentioned that Mr. Cormick was representing

22   himself as working on behalf of an organization called

23   EVF.  Did he describe to you what EVF's business was?

24   A.    Yes.  We even have -- which I sent to your

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL       Christ v. Cormick, et al.
Gordon N. Subloo

Page 8

 1   client.  I think there is even brochures in there which

 2   you sent to us with EVF, company raising and venture

 3   capital, quite glossy brochure.  And what he was saying

 4   is no problem, we can raise your funds.  And then we

 5   started to, first of all, send him brief information by

 6   fax and that's when he started to sort of demanding that

 7   he had to have this 10,000 pounds a month to keep us

 8   basically legal to be able to accept the funds on their

 9   behalf.

10       Q.    Mr. Subloo, I'm going to ask you some questions

11   now about one of the documents that I sent you.  Bear

12   with me a moment.

13              I'm going to ask the court reporter to mark

14   this as Subloo Exhibit 1.

15              (Subloo Deposition Exhibit No. 1 was marked

16   for identification.)

17   BY MR. BRACEGIRDLE:

18       Q.    Mr. Subloo, what I'd like you to do is the

19   document I'm going to ask you questions about is one that

20   has at the top of the page, it says, "European Venture

21   Finance" and then it says, "Letter of Agreement."

22       A.    One second.  Yes.

23       Q.    It's a three-page document.  And I'd like you

24   to take a minute to look at it and tell me if you

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL     Christ v. Cormick, et al.
Gordon N. Subloo

Page 9

1    recognize it.

2       A.    Yes.  That was the agreement sent to us by

3    Cormick or basically from Jersey and where he said his

4    head office was.

5       Q.    If I could ask you to look at the third page of

6    the document where there's a signature.

7       A.    Yes.

8       Q.    It appears there's a signature on behalf of

9    CoalCorp.  Do you recognize whose signature that is?

10      A.    That is my signature.

11      Q.    Then you agreed to this document on behalf of

12   CoalCorp?

13      A.    Yes.  This was done after we received the

14   information about the company and which we were certainly

15   convinced that this guy being an Australian citizen and

16   he had the wherewithal to raise the money and do what he

17   said he could do.

18      Q.    When you say you signed this after you received

19   information, what kind of information?

20      A.    There was brochures which we have -- I don't

21   know whether your client has them there.  But it was

22   stuff that was held by the metropolitan police in London

23   and which I then sent the documents to Bob.  So I assume

24   that those brochures are in the documents as well.  But

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL     Christ v. Cormick, et al.
Gordon N. Subloo

Page 10

1    he sent documents and basically faxes of different

2    amounts of money he raised over a period.

3        Q.    Based on this document, is it true to say that

4    CoalCorp retained EVF to render services?

5        A.    Yes.  And the agreement we signed was

6    basically -- came after a lot of the information that was

7    passed backwards and forwards with us, and, in fact,

8    Cormick met myself, my son Shane, and my daughter

9    Janelle, who was a lawyer, met her in Brisbane as well.

10        Q.    Did that meeting take place before or after you

11    signed this document?

12        A.    After.

13        Q.    I guess moving forward chronologically, once

14    your company signed this document and retained EVF, what

15    happened next?

16        A.    Well, then -- first of all, Cormick then put

17    the pressure on about getting these 10,000 pounds a

18    month; otherwise, he couldn't proceed forward to raise

19    any money because it was against the law under the act

20    governed by -- that you had to be financial to basically

21    be legal.  That was one of the biggest issues that he was

22    going on about, was him getting his money.  And then soon

23    after I actually arranged to go to London.

24        Q.    I'm going to ask you to look at another

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL      Christ v. Cormick, et al.
Gordon N. Subloo

Page 11

1    document.  I would like this marked Subloo 2.

2              (Subloo Deposition Exhibit No. 2 was marked

3    for identification.)

4    BY MR. BRACEGIRDLE:

5       Q.    Mr. Subloo, the next document I'd like you to

6    look at is one that has at the top of the page the title,

7    "CALAMANSI PTY LTD."

8       A.    Yes.

9       Q.    Do you have that with you?

10      A.    Yes.

11      Q.    I'd like you to take a quick look at that

12   document and tell me if you recognize that.

13      A.    Yes.  Yes, I do.

14      Q.    First of all, can you tell me what Calamansi

15   Pty Limited is?

16      A.    It's trustee for the Subloo family trust.

17      Q.    I see that this document is signed by a

18   Noelleen Subloo.  Who is that?

19      A.    That's my wife.

20      Q.    Can you just tell me, what does this document

21   represent?

22      A.    Basically what the document represents is I was

23   away and with Cormick pressuring about the money, I got

24   Noelleen to send a fax to the company that was trading

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL    Christ v. Cormick, et al.
Gordon N. Subloo

Page 12

1    shares in Canada to transfer the money direct to the

2    Barclays account for EVF.  Ten thousand pounds.

3        Q.    I notice that the date on this is the 17th of

4    February of 1997.

5        A.    That's right.

6        Q.    Was this the initial 10,000-pound payment you

7    made or was it a subsequent one, if you recall?

8        A.    I'm not too sure.  It could have been the

9    second one.  It would have been either the first one or

10   the second one.  As I said, it's a while ago.

11       Q.    Did your company then make subsequent payments

12   to EVF?

13       A.    Yes.  I believe we -- we have other companies

14   also, and I believe that he was paid four payments.

15       Q.    So he was paid four payments of 10,000 pounds

16   apiece?

17       A.    Yes.

18       Q.    For a total of 40,000 pounds?

19       A.    Yes.

20       Q.    Once you retained EVF and started making

21   payments to Mr. Cormick's company, what then took place

22   in terms of the services that he purported to provide to

23   you?

24       A.    Well, I went to London not long after that, and

Electronically signed by Kim Hurley (501-043-872-4654)                                    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL      Christ v. Cormick, et al.
Gordon N. Subloo

Page 13

1    I met Brett personally and just down near Victoria

2    Station.  And we went through and he told me he had

3    business plans and stuff that my son had sent across.

4    And he basically said even before I got there, it was no

5    problem, we can raise $100 million, and now we got the

6    stuff, I'll go out and do that.  He was rattling off

7    names of people who actually he had approached and DuPont

8    and some of the wealthiest people in the world and used

9    these people to basically tell me that they were going to

10   take down various tranches of the hundred million.

11       Q.    How long were you in London on this trip?

12       A.    That trip, probably a week and a half.

13       Q.    What exactly did you do during that trip?

14       A.    Basically every morning at about 10 o'clock

15   Cormick would turn up and wheel me through the maze of

16   mirrors like a publicist and various people that he

17   wanted me to see, and, of course, visited several of the

18   people that I believe he knew well who worked in

19   financial houses.  But at that point it was always just

20   meet and greet.  There was never any straightforward

21   discussion between them and myself, Cormick about the

22   thing.  He would just brush over the funding for the

23   CoalCorp venture and then we would move on.

24       Q.    Do you recall any of the prospective investors

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 14

1    that you met with in London, any of the companies?

2        A.    Yeah.    There was several companies.    I'm just

3    trying to think.    One was -- he introduced us to AMEC,

4    which was basically a consulting company, and after a

5    week we found out that all they did was sell services to

6    proved products and stuff like that.

7              Oak Royal was another company which

8    basically we were looking for funding rather than wanting

9    to pay out money.

10             The other one was that -- there was another

11   company that he introduced us to.    Just skips my mind for

12   one second.    If you will bear with me, I will -- because

13   I had so many of these -- one second.    Excuse me for one

14   second.    I have got some of the documentation I have

15   here.

16       Q.    Mr. Subloo, it's okay.    Just from your

17   recollection, please.

18       A.    As I said, I have been to some of the highest

19   profile people in England all over half of Britain, and

20   never once did we sit down and discuss.    He would roll me

21   in and out of the doors like basically it was a

22   meet-and-greet and then he would always mention sort of

23   in passing what it was and what representative and he was

24   looking to raise money, and basically that's where it

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 15

1    went to.  I think a name -- he's out of New York, a

2    partner.  Umanoff, I think.  It was a Carey Umanoff, and

3    he was supposed to be out of New York, but that was also

4    raising funds.  Another one from Standard & Partners.  I

5    just got to my notes.  A guy called Andrew West --

6                    MR. FINGER:  Thad, he's using notes.

7                    THE WITNESS:  -- from Standard & Partners.

8    Another one was Frank Lumley from Lumley Lewis

9    Communications.  That was the public relations people.

10   BY MR. BRACEGIRDLE:

11       Q.    Mr. Subloo?

12       A.    Yes?

13       Q.    Without looking at notes or any other documents

14   right now, I'm only asking you to testify as to your

15   recollection without refreshing your memory.  With the

16   exception of whatever documents I might show you --

17       A.    This is just stuff that I -- I just went

18   through my notes.  I had some stuff there.

19                    One of the companies that he had worked

20   for, I'm trying to think of the guy's name that we went

21   and saw, was Samuels was one -- I think Brett was a

22   manager of that at one stage before he started EVF.  I

23   know that we went to that office as well.

24       Q.    About how many of those meetings do you recall

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL     Christ v. Cormick, et al.
Gordon N. Subloo

Page 16

1    having during the week and a half in London?

2        A.    Probably about 10 meetings.

3        Q.    By the time you left, what was the status, if

4    any, of any investment in your company?

5        A.    Nothing.  He was still working to get it

6    together.  That was the word he said.  He said it was no

7    problem; he got the commitment.

8        Q.    Did he specify who he had any commitments from?

9        A.    No.  No.  He just said that he was going to his

10   office in Geneva because he also had money arranged from

11   a company in Geneva, which I did ring up at later times

12   and that person said he was never involved in raising

13   money for Cormick or anyone else from EVF.

14       Q.    Do you recall who it was that you called in

15   Geneva?

16       A.    I don't recall his name.  I got his number

17   because it just happened to be on one the e-mails that

18   Cormick had sent to him and vice versa.  And I went

19   through my books and I thought I'll phone this person and

20   ask him.

21       Q.    Does the name Alec Steffan refresh your

22   recollection?

23       A.    Yes.  Yes.  Yes.

24       Q.    Is that the person who you spoke to?

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL       Christ v. Cormick, et al.
Gordon N. Subloo

Page 17

1        A.      That's it.

2        Q.      What did you do, then, after your trip to

3    London?  Did you return to Australia?

4        A.      I went back to Australia and not long after

5    that is when Cormick was coming to Australia to do some

6    flight testing in a wind chamber, and he just said, if

7    you could come to Brisbane, we can meet, which Brisbane

8    is two hours by jet plane from Cairns.

9        Q.      What kind of flight testing did Mr. Cormick say

10   he was doing?

11       A.      Mr. Cormick said he was heading a group, his

12   group, which was doing skydiving on the North Pole, and

13   what he was doing was he needed a flight chamber and the

14   one in Kingsboro was the only one in the world that he

15   could get at this time because he was doing this testing.

16   He was taking a group of people up to do a jump on the

17   North Pole, and that the equipment that he had been using

18   was from Russia and it had predetermined deployment of

19   the parachute.  He said, we had been throwing dummies out

20   of planes over the North Pole and because the freezing

21   conditions would freeze up the mechanism, some of the

22   dummies would hit the ground; the parachute would open

23   after.  He was also talking with his people from his Army

24   training organization as well about technology.

Wilcox & Fetzer, Ltd.    Registered Professional Reporters         302-655-0477

Page 18

1             So that's primarily what he was in

2    Australia for, and he asked us to meet with him, which we

3    met him at the Hilton Hotel in the lobby.

4        Q.     What did you talk about at that meeting?

5        A.     Well, he was talking about no problem raising

6    the funds.  At the meeting I will tell you it was my

7    daughter Janelle, who's a lawyer, at the time she was in

8    law school, and my son Shane, who was also -- he got a

9    business degree in IT.  And he spent most of his time

10   telling us how good the children were and that Shane's

11   business plan is so good that he's actually giving him a

12   job to start with by the end of the next year at the EVF

13   office in Geneva.  As a matter of fact, the unit that

14   Shane would be living in would be overlooking the lake.

15   He was basically working on the theory of the children

16   and also offered my daughter a job when she finished her

17   law school.  The meeting took about two and a half hours.

18       Q.     During those two and a half hours, did he tell

19   you anything about the progress of any investments?

20       A.     Oh, yes.  He just said that all of these people

21   were in place and he just had to complete a statement

22   which was going through the business plan and he would do

23   up a proper statement and present it to them and we

24   should start getting the first tranche of money in in the

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 19

1    next couple of weeks.

2        Q.    Did he identify any investors by name?

3        A.    No.  Not at that meeting.

4        Q.    If you can give me a rough time frame.  How

5    long after your trip to London did this meeting in

6    Australia take place?

7        A.    Could have been six weeks.  As I said, I have

8    to -- I have to check back.  It was an original amount of

9    time, because I went to London not long after that.

10       Q.    You made a return trip to London?

11       A.    Yes.  I actually made -- I think I made three

12   trips to London.

13       Q.    Let me focus, then, on your second trip.  That

14   took place sometime after Mr. Cormick's visit to

15   Australia?

16       A.    Yes.

17       Q.    What transpired during that second trip to

18   London?

19       A.    Well, I actually took two Chinese gentlemen

20   with me on another project that we were doing and they

21   came to London, and I also introduced them to Cormick and

22   said this is a technology to turn basically rubber and

23   polystyrenes into fuel.  Of course, Brett said, we will

24   take up, I will raise all the money for that, and then

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL      Christ v. Cormick, et al.
Gordon N. Subloo

Page 20

1    that's when he started putting pressure on about his

2    payment was due and he can't do any more work for

3    CoalCorp until we pay because EVF in Geneva, they do all

4    of the housework and he just said that they complained to

5    him that we never paid our next month's retainer, we're

6    behind, and they have to take us off the list because

7    it's illegal to present our thing to fund us if we're not

8    current.  And that was another one of the things that

9    Brett was doing.

10                The same thing, I was marched around London

11   again.  He even organized for the publicist to take

12   photos of me all over London on the London Bridge and in

13   the financial district which Cormick was going to use as

14   part of a big roll-out once all the funds were in place.

15       Q.    If you recall, how long was the second trip to

16   London?

17       A.    I was in London for two weeks.

18       Q.    Do you recall how many meetings that you

19   attended with Mr. Cormick?

20       A.    Would have been -- in that period he would have

21   been with us for six days, and one of the trips was -- I

22   had several meetings and also he had breakfasts with some

23   of the people.  I think it was a gentlemen's club with

24   one of the DuPont people.  And we had a breakfast meeting

Electronically signed by Kim Hurley (501-043-872-4654)                                    2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 21

1    with them, and it was two people there.

2              Again, Brett always sort of brushed over

3    and said about we're raising this funding for CoalCorp

4    and then it was like a half-a-minute conversation.  Then

5    we would leave.

6       Q.    Were these meetings on your second trip with

7    the same people you met on your first trip or were they

8    with new potential investors?

9       A.    Different ones.  And at the same time he told

10   me that he had arranged for me to go to the House of

11   Lords to do a presentation of this technology.  It was

12   part of their pull with all the government people and the

13   people who could make this all happen.

14             And on the 11th hour on the day, he said,

15   oh, no, we had a bit of uphill with Parliament and some

16   urgent matter came in and they had to cancel the

17   appointment.  I knew that before I went to London that

18   we're going to meet with the House of Lords and this was

19   all Brett's connections there which will just make this

20   thing flow through without any problem.

21      Q.    Did you ever meet with anyone from Parliament?

22      A.    No.  Just rode past.

23      Q.    These meetings that you had on your second

24   visit to London, did they progress any further than your

Electronically signed by Kim Hurley (501-043-872-4654)                                    2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 22

1    meetings during your first trip?

2        A.    No.  No.  It was always -- in a couple of those

3    days when we were there, he was flying to Europe to big

4    meetings with these fund managers and his other staff

5    that he had in Europe and the EVF staff and that he would

6    be away for two days and he would just send e-mails off

7    his -- he used to have one of these Nokia portable

8    machines.  It was the first ones out.  And he would send

9    all of his e-mails when he was either in the Triangle or

10   wherever from this mobile phone so you wouldn't know

11   where they were coming from.

12       Q.    At the conclusion of this trip, what then

13   happened next in terms of your dealings with Mr. Cormick?

14       A.    Well, there was no money, no commitment, and we

15   were getting a little bit edgy and we kept asking

16   basically we needed proof that some of the funding was

17   going, and at the time, the second time -- the third time

18   he mentioned another guy, and I can't think of his name.

19   We found out after that he had a merchant bank in London

20   and he was going to take down $400,000 to basically keep

21   everything working.

22             After we finally tracked the guy down and

23   spoke with him, he was having problems because the board

24   had kicked him off the company and he was fighting for

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL    Christ v. Cormick, et al.
Gordon N. Subloo

Page 23

1    his own survival, let alone raising money for us.  I just

2    don't -- IMS or EMS.  It was a genuine office in London,

3    but, as I said, the guy was -- which was basically Brett,

4    we had lunch with him one day and Brett brushed over the

5    same thing and going back to the same issue was that

6    nothing had changed.  It was just a smoke and mirrors.

7    We're being played out.

8              And finally I spoke to the guy and he just

9    said to me he's having problems because his board

10   basically sacked him and kicked him out of the company.

11   During that period of time he was in no position to raise

12   40 cents, let alone $400,000.

13       Q.    So this meeting that you just referred to, this

14   took place during your third trip to London?

15       A.    Yes.

16       Q.    When did you make that third trip, how long

17   after your second trip?

18       A.    It would have been within a couple of months

19   after that.  And that was the time that we met with -- I

20   met with Mike Coons and Brett as well, because I just

21   basically -- on the last trip that I spent there, I had

22   met him a couple days and he was always flying over to

23   either Scotland or Europe or somewhere with other deals

24   and he was too busy doing those.  And it was the old

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 24

1    story again.  He was trying to extort more money.  By

2    this time we paid our last payment to him and we weren't

3    going to pay more until we got some sort of results.  So

4    just the excuses.

5        Q.    Between your second trip to London and your

6    third trip, did you continue to have communications with

7    Mr. Cormick?

8        A.    Yes.  Yes.

9        Q.    How often would you say you communicated with

10    him during that time?

11        A.    I would fashion every other day.  And the thing

12    is that, as I said, towards the end it was going nowhere

13    because he wouldn't basically answer the faxes or he's

14    too busy or we were in default and they couldn't raise

15    any money because legally under the act of the EVF or the

16    financial act of Europe, you had to be a financial

17    member.  He was just trying to play the card at the time

18    to get more money.

19        Q.    What were the nature of the faxes that you sent

20    to Mr. Cormick during this time?

21        A.    Well, there was faxes just asking where it's at

22    and we're concerned.  My other directors and shareholders

23    of CoalCorp were saying to me, you're spending this

24    money.  What the hell is going on?  I would basically

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 25

1    translate that in letter, and quite friendly exchanges

2    initially, and really Cormick just basically went

3    sideways.  He only would communicate when he had to and

4    go from there.

5        Q.    What led to your third trip to London?

6        A.    Well, basically the third trip, I had enough,

7    and the thing is I wanted to get there.  I had been

8    ringing Mike Kearns in Jersey myself and telling him, I

9    think this is a scam, and he said, no, no, no.  I

10   mentioned to him -- by this time I mentioned another chap

11   from England called Alan Dean.  I believe that he had had

12   action going with Cormick where Cormick was arrested by

13   the police in London.  And when I looked back at this, he

14   was actually arrested the first -- on the week of my

15   first trip, because where I met him wasn't at the office

16   where the police seized all the files and raided the

17   office.  And I said to Mike Kearns -- he said, I will be

18   in London.  I will get Brett.  And we had a meeting not

19   far from the Queen Mother's palace.  And I started

20   putting pressure on Cormick in front of Mike Kearns and

21   in the end about the company structures and about

22   different things and him being a Ph.D. on corporate law

23   or whatever his string of credentials were.  And he

24   then -- when I realized the problem, he said to Mike

Page 26

1   whatever, you know, about company structures.  And I

2   realized then that we had come to the end and I mentioned

3   that I have to then look at my options.  And Mike Kearns

4   made an excuse and basically vacated the meeting and left

5   me with Brett after about 10 minutes and then that was

6   the last time I actually seen Brett.  And then I made a

7   meeting to go to the fraud squad in London which I filed

8   a complaint.

9       Q.    Just to back up a minute.  You mentioned

10  Mike Kearns.  What was your understanding as to

11  Mr. Kearns's involvement with EVF?

12      A.    Initially I thought he was an innocent party

13  running like a shell, company shell, producing things in

14  Jersey which all of the English use to run their

15  companies to avoid tax.  He always come over as being the

16  squeaky clean lawyer.  But at that point I realized that

17  I believe that he's -- he was well aware of Cormick

18  because it was himself or one of his girls had sent

19  letters on behalf of EVF, and the contract, as a matter

20  of fact, was sent from there and he actually signed the

21  letter when it was sent to us, expressed to us, the

22  original one.  And the thing is I believe that he was

23  aware of what was happening.  I don't know whether he was

24  actually involved with Cormick, but I believe that he was

Electronically signed by Kim Hurley (501-043-872-4654)                                2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 27

1    much closer than what he said he was.

2        Q.    Was it your understanding that Mr. Kearns was

3    working with EVF?

4        A.    Not until that meeting, because Mike Kearns

5    just said that he had known Brett from within the

6    industry for 21 years and then when I mentioned to him in

7    front of Brett about this guy who had filed a complaint,

8    he said, "Oh, he's a crook from Adelaide.  He was

9    actually trying to peddle someone else's technology."

10   And basically he was found out and Brett just told him to

11   go away.  And he lied and that's when I realized Mike,

12   being someone who was just working at an office and Brett

13   happened to be a client of his, that he had fairly good

14   knowledge.

15       Q.    You mentioned earlier that you had learned

16   about Alan Dean.  How is it that you learned about

17   Mr. Dean?

18       A.    I went with people from AMEC Process Energy to

19   the -- I think it's the directors' club in London.  It's

20   a businessmen's club, for men and women.  But it was a

21   business club.  I believe Brett had some contact with

22   these people before.  Someone mentioned, they said, oh --

23   who wasn't in the meeting with us who actually came over

24   and met with one of the people from AMEC and said yes,

Electronically signed by Kim Hurley (501-043-872-4654)                                    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL       Christ v. Cormick, et al.
Gordon N. Subloo

Page 28

1    Cormick, seems he was arrested and that's basically -- I

2    asked a question.  I think it was one of the AMEC guys

3    that said, "Oh, didn't you know?  Some guy had him

4    arrested."  And then when we worked back the dates, that

5    was the first time I arrived in London, because when I

6    arrived at the office where I met him, it was some little

7    room with an old broken-down table down from Victoria

8    Station.

9        Q.    You mentioned that you asked Mr. Cormick about

10   his incident with Mr. Dean?

11       A.    Yes.  In front of Mike Kearns.  I said Mike --

12   they said basically straight out this guy here and he

13   went through the spiel again that he was from Australia,

14   from Adelaide, I believe, and that he had this technology

15   that he was peddling and he stole it from someone, and

16   basically Brett just cut him off and then he ran to the

17   police and he said, but it's not going to go anywhere

18   because he could be charged himself, this guy.

19                As I said, that was basically the last

20   meeting when everyone was face-to-face.  But just after

21   that Mike Kearns exited the meeting and Brett stayed with

22   me for probably 30 minutes still telling me that there's

23   no problem, bring you all up-to-date, we should be able

24   to raise the money.  So the next day I believe I rang the

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL      Christ v. Cormick, et al.
Gordon N. Subloo

Page 29

1    metropolitan police and started talking with them.

2        Q.    What, if anything, did Mr. Cormick say to you

3    about Mr. Dean?

4        A.    That was basically it.  Mike Kearns done all

5    the talking.  Brett just said that, yes, he embarrassed

6    me, something about they come to his office, an office

7    between Victoria Station and the city, and he had to get

8    out of the office.  They took the files.  And also the

9    police came to his house, the house next to Sting, and it

10   really embarrassed him because he's in a very upminded

11   neighborhood, but there was nothing in it.  He was

12   released.  He told me then that there was no charges,

13   just that they wanted information.  But he didn't -- he

14   wasn't the one that told me that Alan Dean was a crook.

15   It was Mike Kearns that mentioned it.

16       Q.    Did Mr. Cormick tell you that he had been

17   arrested?

18       A.    After that, yes, he said, "I didn't want to say

19   anything because my lawyers have got it in hand."  I had

20   already known when I met with the AMEC people on the side

21   and that's how come someone said to me or said to the

22   AMEC guy, he's been arrested by Scotland Yard or

23   metropolitan police at Richmond Place or something.  And

24   I didn't know where that was.  I just basically went

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL      Christ v. Cormick, et al.
Gordon N. Subloo

Page 30

1    there one afternoon to the police, the fraud squad.  I
2    rang them and made an appointment and went up there and
3    started talking to them.
4        Q.    This meeting with the police in London was
5    during that same trip?
6        A.    Yes.  I went back -- I went back two times
7    after that to meet -- specifically to meet with the
8    police and go through various things with them as well.
9        Q.    Originally what led you to go to the police in
10   London?
11       A.    After I heard this conversation when I was at
12   the directors' club, I then realized that -- and the
13   meeting with Kearns and Brett, I realized that there was
14   something up and it was pretty true to what Brett had
15   been doing in the past while not returning calls and
16   basically stepping sideways with his hand computer,
17   mobile phone, he wouldn't answer it.  And the thing is he
18   would do it all the time.  Anyway, he would look at the
19   phone and then he would put it on silent even when he was
20   with us.  We weren't calling.  The thing is that there
21   was nothing unusual about that, but kept looking at it.
22   I could probably see that's what he was doing to us.  And
23   occasionally I had his home number.  I rang it once.  I
24   picked it up or something, a number.  And that's what he

Electronically signed by Kim Hurley (501-043-872-4654)                2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL       Christ v. Cormick, et al.
Gordon N. Subloo

Page 31

1    said, even when I was pinning him down, he was still

2    talking about the money was still available, but we have

3    to -- we have to be up-to-date with the payments.

4        Q.    What happened during your meetings with the

5    fraud squad in London?

6        A.    Well, they never mentioned Alan Dean.  I

7    mentioned to them.  He said, yeah, there's another case

8    pending and he has been arrested and he's actually out on

9    what they call police bail.  And that after I had met

10   with them, I think it was when I went back to London,

11   they arranged to get him with his lawyer and I believe

12   after that meeting or one just after that they actually

13   charged him with our offense as well.

14       Q.    Did you provide any information to the police?

15       A.    Yes.  Yes.  I supplied e-mails, written notes

16   and information that Brett had given us which was a few

17   hundred -- couple of boxes, which I also have sent copies

18   to Mr. Christ as well some of the information.  But yeah,

19   we supplied -- there was a couple of file boxes full.

20       Q.    How do you know that the police pressed charges

21   against Mr. Cormick?

22       A.    The lady that was handling the case at the

23   time, she would talk to me on the phone in Australia, a

24   Christine Smith.  She was one of the fraud squad -- all

Electronically signed by Kim Hurley (501-043-872-4654)                                   2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 32

1    my dealings were in the fraud squad building.  And she

2    told me that they had got Mr. Cormick and had actually

3    charged him and he was released on police bail.  But she

4    didn't elaborate anymore as far as what they were doing

5    or weren't doing until she contacted me and basically

6    said that they weren't going to proceed with the case

7    because Cormick had left the country and really I think

8    that her boss has said that was it.  I think they sent

9    all the documentation back to me by Air Express.  I

10   believe the same thing happened to Mr. Dean as well.

11        Q.    This is Ms. Smith that told you all this?

12        A.    Yes.

13        Q.    Do you recall when it was that she told you

14   that they were closing the case because Mr. Cormick had

15   left the country?

16        A.    She phoned me one Friday evening our time and

17   she told me what it was, and I was actually devastated by

18   this and said, "You are joking," and she just said "Yep."

19   And it wasn't until sometime after they sent the

20   documentation back.

21        Q.    Did Ms. Smith tell you where Mr. Cormick had

22   gone?

23        A.    He just left the country.  I knew he had family

24   because one of the stories Brett told myself, even my

Electronically signed by Kim Hurley (501-043-872-4654)                                    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL      Christ v. Cormick, et al.
Gordon N. Subloo

Page 33

1    wife when she was with me in a meeting, one of the

2    meetings we had, my wife was on a trip in Europe and we

3    went around -- that was on the second meeting -- the

4    third meeting, sorry.  And he told her that his in-laws

5    owned a big safari park and he was actually stocking it

6    with elephants and tigers and everything and that was

7    going to be a legacy for his children to have for the

8    people of Africa.  And he had this massive sanctuary that

9    he was building.

10        Q.    Did CoalCorp ever receive any of their 40,000

11   pounds back that they paid Mr. Cormick?

12        A.    Not a cent.  No funding from him either.

13        Q.    That was my next question.  Did any investment

14   ever come of Mr. Cormick's efforts?

15        A.    No.  He never gave us one cent either.

16        Q.    Did you ever have any discussions with any

17   potential investors beyond these initial meetings that

18   Mr. Cormick took you to?

19        A.    No.  A couple of people when I was in Europe, a

20   few of the names that he was dropping, and at the time it

21   was all extremely clear some of the bits and pieces.  And

22   then after I was talking to the people from Oak Royal,

23   AMEC, and various people that included Lumley and he had

24   been wheeling people into them from Israel and they just

Electronically signed by Kim Hurley (501-043-872-4654)                              2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 34

1    said to me, look, these guys are flying in and out of the

2    country on a regular basis and they get nothing.  As a

3    matter of fact, Lumley Lewis, I believe that Brett

4    organized them to do a PR thing for the other people and

5    they never paid their bill.

6              When we were there, Cormick committed us to

7    6,000 pounds of public relations.  They did some spreads

8    in the financial magazines for us.  But we had to pay

9    6,000 on top of that upfront to Lumley Lewis, which was

10   one of Brett's contacts that were going to do the PR work

11   which would just make it a lot easier.

12       Q.    Mr. Subloo, I'm going to ask you to look at one

13   more document.

14              Mark this as Subloo 3, please.

15              (Subloo Deposition Exhibit No. 3 was marked

16   for identification.)

17   BY MR. BRACEGIRDLE:

18       Q.    Mr. Subloo, the next document is a letter with

19   your name at the top and it's dated February 25th, 1998,

20   to Brett Cormick.

21       A.    Yes.  I have that in front of me.

22       Q.    It has "Without Prejudice" at the top?

23       A.    Yes.

24       Q.    First I'd like you to take a look at this

Page 35

1    document and tell me if you recognize it.

2        A.    It's a document -- I e-mailed it to him.

3        Q.    Just so I can place this in proper chronology,

4    in relation to your various trips to London, when did you

5    send this letter?

6        A.    That was sent basically I believe on my

7    second-to-last trip, because I had another guy, Chinese

8    guy, David Wang, with me at the time, and I had been to

9    London I believe four times in relation to the Cormick

10   deal.  And on this particular time that I went to London,

11   Cormick never surfaced at all.  And I was trying to do

12   other business in London at the time.

13       Q.    What was your purpose in sending him this

14   letter?

15       A.    Basically everything had stalled and anytime I

16   sent him an e-mail or tried contacting him for a couple

17   of months, it was just silence, and I wanted to basically

18   find out where it was at.  This is sort of putting it to

19   him -- if you read it for yourself, you see that we were

20   getting -- I was getting pressure from my people and I

21   was getting P'd off with him not communicating back.

22   Basically like he walked away from everything.

23       Q.    Bear with me a moment, Mr. Subloo.

24             Mr. Subloo, just a couple more questions

Electronically signed by Kim Hurley (501-043-872-4654)                                    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL      Christ v. Cormick, et al.
Gordon N. Subloo

Page 36

1   for you.

2           You mentioned that Mr. Cormick had at times

3   told you that DuPont was a possible investor.

4       A.    One second.  Yes.  Yes.  Just repeat it again.

5   I just had someone knock on the door.

6       Q.    I apologize.  You mentioned, I think, that at

7   one time Mr. Cormick had told you that DuPont was a

8   possible investor in your company?

9       A.    Yes.  As a matter of fact, he actually put that

10  in an e-mail as well.  I haven't got it with me.  But

11  there's an e-mail of that as well.

12      Q.    Did he mention any specific names of anyone at

13  DuPont that --

14      A.    Yes.  He had a name there, and this is one of

15  the DuPonts himself, I believe, and that they were

16  looking to invest a billion dollars or something into

17  projects, and Brett told me in the past that he had a

18  close relationship with the DuPont family as well.

19      Q.    Did he mention John DuPont?  By any chance, is

20  that one of the names he mentioned?

21      A.    Yes, that was the name.  It was actually a

22  DuPont family member that he mentioned, and I don't think

23  he was the founder of the company.  He was one of the

24  guys that Brett was dealing with on various projects and

Wilcox & Fetzer, Ltd.    Registered Professional Reporters        302-655-0477

Electronically signed by Kim Hurley (501-043-872-4654)                                                          2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL      Christ v. Cormick, et al.
Gordon N. Subloo

Page 37

1    that was one.  He certainly -- the numbers he said they

2    had to invest were telephone book numbers were certainly

3    a lot more than he was telling us our project was worth.

4              But I will revert one thing.  Originally we

5    were looking to raise about 5 to 10 million dollars and

6    it was -- Brett was the one that had told us no, we can

7    raise -- I have to look at the business plan.  We can

8    raise a hundred million.  We were never ever looking to

9    raise a hundred million dollars.

10   Q.    Mr. Cormick told you that he had contacts with

11   DuPont family members who were involved with the

12   business?

13   A.    They were looking at investments and he had

14   slated the CoalCorp project to them to take down a

15   significant piece of the action.  I don't remember the

16   figures, but I know they had several hundred millions of

17   dollars to invest in projects.

18   Q.    Did you ever have any meetings with anyone from

19   DuPont?

20   A.    I had a meeting with a person that was at

21   breakfast.  It was in a private men's club.  It was an

22   early morning breakfast.  We went in there and there was

23   two guys that were middle-aged guys, and the reason I

24   know is he was sort of upper-class English people and the

Electronically signed by Kim Hurley (501-043-872-4654)                                    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL    Christ v. Cormick, et al.
Gordon N. Subloo

Page 38

1    guy was having kippers and eggs.  I said, shoot, mate, we

2    use those for bait in Australia.  And Brett said he had

3    known these people reasonably well, not so much, but well

4    enough to then at the end of the breakfast mention

5    CoalCorp and this is part of the fund that he was raising

6    for us.

7             And basically there was no -- they didn't

8    ask any specific questions about the technology or about

9    any specifics during the breakfast.  It didn't take long.

10   Probably half an hour at the most.  I believe I would

11   have business cards somewhere in my files.

12   Q.    Did you ever have any communications with

13   Mr. Cormick in which he was telling you that he was

14   actually dropping your company as a client?

15   A.    Basically one of the telephone conversations I

16   had, he said that they couldn't do anything for us

17   anymore because we were in default and I said to him,

18   "You get the money you said you had available and we will

19   pay your fee."  And that was probably towards the end

20   before we went to the metropolitan police.  I believe

21   that transpired when I was in Australia.  That wasn't a

22   face-to-face thing, because I couldn't track the guy

23   down.

24             MR. BRACEGIRDLE:  Mr. Subloo, thank you.

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 39

1    Those are all the questions I have for now, although

2    Mr. Finger may have some for you at this time.

3    BY MR. FINGER:

4        Q.    Hello, Mr. Subloo.  I hope you can hear me all

5    right.

6        A.    Yes, I can hear you.

7        Q.    I would like to turn back to that letter of

8    agreement that you signed with European Venture.

9        A.    Could you speak a little bit louder or get

10   closer to the phone?

11       Q.    Yes, I'm sorry.  Can you hear me better now?

12       A.    Yes.

13       Q.    The letter of agreement that was signed between

14   European Ventures and CoalCorp --

15       A.    Yes.

16       Q.    -- when you signed that, you understood that

17   there was no guarantee that Dr. Cormick would have money

18   for you by a specific date; is that correct?

19       A.    Yes.  In the document, yes, verbally to myself

20   and my son, Brett basically said when he was discussing

21   with us that within 60 days he will have the first

22   tranche of money.  But nothing in the document that says

23   any specific day.  I agree with you there.

24       Q.    But it also says, if you look at paragraph 3,

Electronically signed by Kim Hurley (501-043-872-4654)    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL      Christ v. Cormick, et al.
Gordon N. Subloo

Page 40

1    the last sentence, "At the completion of this agreement,

2    if both parties wish to pursue a further term of retained

3    representation, an additional letter of agreement will be

4    negotiated under substantially similar terms."

5              Do you see that language?

6    A.    Yes.

7    Q.    By the agreement it contemplated possibly

8    lasting more than the term of this agreement, correct?

9    A.    Repeat that last sentence again.

10   Q.    I said by the terms of this agreement, it

11   contemplated that the job might not be completed within

12   three months.  Correct?

13   A.    Look, you can look at this document, it's a

14   legal document, and I can tell you now that the

15   documentation -- what you're saying is correct.  The

16   situation with Brett talking to myself and my son, and we

17   have various e-mails in our file I believe that when

18   Brett's reporting that he's getting the first tranche of

19   money and also when he was talking with myself and my

20   daughter and my son in Brisbane, the money was basically

21   ready to be transferred across -- it was imminent.

22              So yes, if you look at the agreement, if

23   you read the agreement now and you read through it, what

24   you're saying is correct.

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 41

1    Q.    That's the agreement that you signed, correct?

2    A.    Oh, yes.  Look, I don't deny that.  Okay?  And

3    Brett's reason for the agreement was basically keeping

4    housekeeping in place because he had to have this

5    agreement under the law of the fund-raising in Europe and

6    that he put the agreement together.  We would have signed

7    it because at the time we had already committed on the

8    project and the agreement came fairly well after we were

9    talking on the project and after he took the business

10   plan.

11   Q.    You said Dr. Cormick shepherded you through a

12   number of meetings, correct?

13   A.    Yes.

14   Q.    Is it your testimony that none of those

15   meetings were with banks or financiers?

16   A.    Oh, no.  There was -- as I said, some of them

17   were.  Some of them were people that Brett had worked

18   with that had moved to other companies.  And he would --

19   a guy named Samuel Hill, Brett had worked with him

20   before, and Brett was probably the manager or the

21   youngest broker with this company ever in Europe and made

22   hundreds of millions of dollars before he left.

23            But he took me to probably about four of

24   the people who were in the finance industry.  And after

CONFIDENTIAL      Christ v. Cormick, et al.
Gordon N. Subloo

Page 42

1    the period of time when it was going south, I had

2    actually phoned most of these people up so I'd have some

3    diary notes on different stuff, and that was one of the

4    reasons why that we realized that most of those meetings

5    were just show and tell because one of the guys at --

6    it's something Partners and Brett said, "Don't say too

7    much to him because he's a homosexual."  But this guy

8    represents all these product funders offshore off England

9    and he could fund this out of basically the back pocket.

10    And after I found the guy, he just said this certainly

11    didn't come under the investment scheme and he was never

12    presented with a business plan.

13        Q.    Did any of these financiers express interest in

14    CoalCorp?

15        A.    There was never a discussion.  The meetings

16    were in there, a discussion and Brett says, this is

17    Gordon Subloo, a representative of CoalCorp.  No one sat

18    down and asked a question, what do you have or we read

19    the business plan or we're going through the brief that

20    Mr. Cormick is giving us, we think it's a great company.

21    No one -- at none of the meetings no one expressed any

22    details or any question about the company or the project.

23        Q.    What would happen during these meetings?

24        A.    It was just basically the meetings were always

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 43

1    fairly short where it would be bring a cup of tea in and

2    sit down and have a general talk.  I don't believe --

3    except for the one we had breakfast, which was about

4    30 minutes, most of the meetings would have been

5    15 minutes.  We waited longer in the waiting room than we

6    did having the meeting.

7        Q.    What did you talk about during the 30-minute

8    meeting?

9        A.    The guys were just talking to Brett basically

10   general stuff.  Not about business.  And just towards the

11   end Brett says he's raising this money for CoalCorp and

12   we got this coal technology.  But as I said, no one, not

13   one of the people that we met with in the financial

14   people, asked us any questions about the technology,

15   which is clean coal technology, or any testing or any

16   technical information whatsoever.

17       Q.    I want to ask you about Oak Royal Investments.

18       A.    Yes.

19       Q.    When did you meet with them?

20       A.    I met with them through AMEC.  I'm trying to

21   think.  Go back to that period.  As I said, I have the

22   documentation there.  I'm just trying to go back on

23   timing.  So I don't have any of the paperwork in front of

24   me.  I believe it was all in the police files.

Electronically signed by Kim Hurley (501-043-872-4654)                                2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 44

1       Q.    It's your testimony, then, that Dr. Cormick had

2    nothing to do with you meeting Oak Royal, correct?

3       A.    What's that?  I met Oak Royal at AMEC when

4    Brett was there.  But he didn't specifically wheel these

5    people into a meeting for an investment in the company.

6       Q.    Did Oak Royal give you any money?

7       A.    Yes.

8       Q.    How much?

9       A.    I think they paid for some testing in England.

10   It was about 110, 115 thousand pounds.

11      Q.    So that went toward testing in England?

12      A.    All of it did.  AMEC went to China as well to

13   do testing.  There was testing done in -- people were

14   sent to China and basically there was a number of things

15   that we started that we had to pay for.

16      Q.    I want to understand the time line.

17      A.    I haven't got -- I don't have the Oak Royal

18   documentation here.  If you like, I can get -- I can go

19   to the document -- go and find the boxes that were sent

20   back by the police and see if I can dig up the bits and

21   pieces.

22      Q.    Just to the best of your recollection.

23      A.    I can tell you one thing.  Cormick was long

24   gone before we could conclude any deal with Oak Royal.

Electronically signed by Kim Hurley (501-043-872-4654)                              2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 45

1      Q.    From the best of your recollection, did you

2   meet AMEC through Dr. Cormick?

3      A.    Yes.  He took me to AMEC and he was doing other

4   deals with them and he introduced me.  He was doing some

5   other stuff with them and I believe he had been there on

6   a couple of the projects that he was talking to them.

7   And he wheeled me in there.  That's how come I met with a

8   guy, I think Max Hawks, at the time.

9      Q.    At that time you met with AMEC, is that when

10  you met someone from Oak Royal?

11     A.    It was the next meeting, I believe.  Oak Royal

12  was there.

13     Q.    Oak Royal was there and --

14     A.    That was also doing some other technology with

15  a company out of London as well.  They were trying to do

16  some work.  AMEC were advising them with that as well.

17     Q.    At that second meeting was Dr. Cormick present?

18     A.    He was present for a little while, yes.  As I

19  said, I have to go through and find a date.

20     Q.    When did you next meet someone from Oak Royal?

21     A.    When did I meet them?

22     Q.    The next time.

23     A.    I must have met them 10 or 15 times before and

24  after and that original meeting.

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 46

```
 1      Q.    How many times did you meet them with
 2   Dr. Cormick present?
 3      A.    I believe once or maybe twice.  And they
 4   certainly weren't introduced as investors at the time.
 5   Those were people who was also doing -- I believe he was
 6   doing a bit of work for them as well or had spoke to
 7   them.  But I don't believe that he was retained by them
 8   to raise any money.
 9      Q.    Do you have any knowledge whether Dr. Cormick
10   spoke to them outside your presence about financing you?
11      A.    No.  I believe that he knew them because they
12   were chasing funding as well for their own projects.
13      Q.    Tell me when you contacted Oak Royal outside of
14   Dr. Cormick's presence.
15      A.    I don't know.  As I said, I would have had
16   probably 10 meetings or more and with various -- there
17   was about four or five guys at Oak Royal, and the thing
18   is that there was various meetings.  I know one meeting
19   with Oak Royal my wife was present and two of the guys
20   from Oak Royal was a born-again Christian, was sitting
21   there and just talking, and basically I dragged him
22   outside to tell him that I'm religious myself, but don't
23   come to the meeting using that.  I said, we're here to
24   talk, and there was just general talk about the
```

Electronically signed by Kim Hurley (501-043-872-4654)                                   2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 47

1    technology.  But there was never any discussion in regard

2    to investigating the company.  They were only interested

3    in their own technology at the time.

4        Q.    How many of these meetings that you had with

5    Oak Royal occurred while you were still retaining

6    Dr. Cormick?

7        A.    Two or three.  I had other meetings with Oak

8    Royal on other stuff as well, but didn't pertain to any

9    investments or anything.  It was other stuff we were

10   talking to some of the people from Oak Royal.

11       Q.    Do you believe that Dr. Cormick was making

12   efforts to obtain financing for you?

13       A.    Look, myself personally?  No.  But I didn't

14   know.  He had all these contacts in Europe and around

15   England, because every time we had talked, we have got

16   this hundred million, it's all but in the bank.  And the

17   thing is that we're used to dealing in hundreds of

18   thousands of dollars, and the thing is that we don't know

19   whether he spoke to anyone and gave them the business

20   plan or whatever.  All we can say is that he's coming to

21   us and saying that was the best business plans he's ever

22   come across in his life.  He promised my son a job at the

23   EVF headquarters in Geneva.

24       Q.    Let me flip it around.  You have no proof that

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 48

1    he wasn't making any efforts to find financing?

2        A.    The proof was he never fronted with anything,

3    and the biggest pressure -- the only thing he used to do

4    was always harp about the 10,000 pounds.  And every time

5    that he wanted to put more pressure, get more money just

6    so that I can't discuss it with anyone because it's

7    illegal under the act.  And that you pay the money and

8    then I can go out and keep banging for you, basically.  I

9    don't know if he ever spoke to anyone.

10       Q.    Are you saying that because he wanted money and

11   because he didn't succeed in finding financing, that

12   meant he wasn't trying?

13       A.    What's that?  No, I didn't say that.  I didn't

14   say that at all.  See, he stipulated to us, we have three

15   people who are quite credible people who he said when he

16   spoke to all but got the money in the bank.  He said to

17   my son and said within the 60 days the deal will all be

18   closed.  I will have it all wrapped up and finished.  And

19   the thing is that you don't know what the guy is saying.

20   I'm very familiar now with advanced fee scam because one

21   of the things we have got is we have actually studied it

22   very closely and the thing is that for what transpired, I

23   believe that was the case, that it was -- the biggest

24   thing was getting the fees in.

Electronically signed by Kim Hurley (501-043-872-4654)                                    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL      Christ v. Cormick, et al.
Gordon N. Subloo

Page 49

1             MR. FINGER:  Thank you.  I have no further

2    questions.

3    BY MR. BRACEGIRDLE:

4       Q.    Mr. Subloo, this is Thad Bracegirdle.  There's

5    just one area I'd like to clarify with you.  If I could

6    ask you to take another look at the letter agreement

7    between EVF and CoalCorp, please.

8       A.    Yes.

9       Q.    Mr. Finger was talking to you about

10   paragraph 3.  In that paragraph it states:  "The term of

11   this agreement will extend for a period of three months

12   from the 1st day of February, 1997, to the last day of

13   April 1997."

14             On that point I'd like to ask you:  Did

15   your dealings with EVF and Mr. Cormick last longer than

16   three months?

17      A.    Oh, yes.

18      Q.    Did you have dealings with Mr. Cormick past

19   April 1997?

20      A.    Oh, yes.

21      Q.    Did Mr. Cormick ever tell you you needed a new

22   agreement with him?

23      A.    Never.  Just wanted 10,000 quick.

24      Q.    Since you made four payments to him, did you

Electronically signed by Kim Hurley (501-043-872-4654)                                    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL      Christ v. Cormick, et al.
Gordon N. Subloo

Page 50

1    make any payments to him after April '97?

2        A.    I would have to check.  I believe so, because

3    the payment went on a regular basis.  I can tell you that

4    the payments weren't every 30 days.  And it was done on

5    his persistence.  I kept pushing that we would pay after

6    the second and third payment and stuff like that.  So we

7    didn't pay one, two, three, four payments.  They were

8    dragged over a period of time.  He dragged it out of us

9    with all these constant threats about, I can't put the

10   money in the bank until EVF is legal.

11       Q.    Your payments to Mr. Cormick, then, were made

12   over a period of longer than three months.

13       A.    Yes.  Our contact with him was longer than

14   three months.

15       Q.    So when you made payments to him after three

16   months' time, he didn't send them back to you, did he?

17       A.    Never asked us to sign an amendment to the

18   agreement or another agreement, no.

19       Q.    He never said, you don't owe me this money

20   because we don't have an agreement?

21       A.    No.  Never.  At the time we were promised the

22   money and it was -- the agreement was something that was

23   in the drawer.  It was the good faith and the people --

24   when the number of people sitting there and the guy comes

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

Page 51

1    up and tells you this is what I'm doing, this is where

2    I'm at, you don't always put things in writing when

3    you're face-to-face and he's giving you an update where

4    you're at.  You take the people for their word.

5        Q.    One other point I wanted to clarify,

6    Mr. Subloo.  Was your criminal complaint with the London

7    police ever dismissed formally?

8        A.    I believe what the London police said that they

9    weren't going to proceed with this case against Cormick,

10   and then when I got upset and that's when they told me he

11   was no longer in the country and the other case was under

12   review and I found out after that both cases that were

13   there -- and I can tell you that Cormick was on police

14   file for a long, long time from when Dean filed his case,

15   we filed ours.  I believe, though, that they were going

16   to proceed with it because their discussions I had at the

17   various times that I was in London, I actually flew back

18   to London to give an interview with the senior people on

19   this.  I had no reason to believe that they weren't going

20   to proceed with it.

21       Q.    But the only reason they told you that they

22   weren't going to proceed was because Mr. Cormick left the

23   country?

24       A.    Yes, he gone out of the country, and really I

CONFIDENTIAL      Christ v. Cormick, et al.
Gordon N. Subloo

Page 52

1    think what happened is that, when he left, they believed

2    he wasn't coming back and so I would assume that they

3    actually dumped the case, both cases.  They said we

4    weren't going to proceed.

5                    MR. BRACEGIRDLE:  Thank you, Mr. Subloo.

6                    THE WITNESS:  No problem.

7                    MR. FINGER:  No other questions.

8                    MR. BRACEGIRDLE:  That concludes the

9    deposition, Mr. Subloo.  What will happen next is the

10   court reporter will provide me with a transcript of your

11   testimony.  You will then have a chance to review it.

12   I'll coordinate that with you and you will have a chance

13   to correct any misspellings or any other errors in your

14   testimony that you find, but I will be in touch with you

15   about that.

16                    THE WITNESS:  No problem at all.

17                    MR. BRACEGIRDLE:  Thank you very much for

18   your time.

19                    THE WITNESS:  Okay.  Thank you.

20                    (Deposition concluded at 6:50 p.m.)

21                        - - - - -

22

23

24

Wilcox & Fetzer, Ltd.    Registered Professional Reporters        302-655-0477

CONFIDENTIAL       Christ v. Cormick, et al.

Page 53

1                    T E S T I M O N Y

2

3   DEPONENT:  GORDON N. SUBLOO                    PAGE

4

5   BY MR. BRACEGIRDLE........................... 2

6   BY MR. FINGER............................... 39

7   BY MR. BRACEGIRDLE.......................... 49

8

9                      E X H I B I T S

10

11  SUBLOO DEPOSITION EXHIBIT NO.             MARKED

12

13  1 - Letter of Agreement...................... 8

14  2 - Document dated February 17, 1997.......... 11

15  3 - Document dated February 25, 1998.......... 34

16

17

18

19

20

21

22

23

24

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL        Christ v. Cormick, et al.

Page 54

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

CONFIDENTIAL        Christ v. Cormick, et al.

Page 55

CERTIFICATE OF REPORTER


STATE OF DELAWARE )

                           )

NEW CASTLE COUNTY )


        I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 4th day of
March, 2008, the deponent herein, GORDON N. SUBLOO, who
was duly sworn by me and thereafter examined by counsel
for the respective parties; that the questions asked of
said deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use of
computer-aided transcription and computer printer under
my direction.

        I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.

        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


                _Kimberly A. Hurley_

                Kimberly A. Hurley

                Certification No. 126-RPR
                (Expires January 31, 2011)


DATED:  March 20, 2008

Electronically signed by Kim Hurley (501-043-872-4654)                    2784936b-0d70-40fe-b108-6f6ccdc5d023

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRETT J. CORMICK, ELAN SUISSE | ) | C.A. No. 06-275-GMS |
| INTERNATIONAL HOLDINGS (USA) | ) | |
| LLC, ELAN SUISSE (PTY) LTD., | ) | |
| NICOGEL LTD., JOHN WALTERS, | ) | |
| DIANNE MARSHALL and MERCARI | ) | |
| FINANCIAL SERVICES (PTY) LTD., | ) | |
| | ) | |
| Defendants. | ) | |
| ELAN SUISSE LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 07-60-GMS |
| v. | ) | |
| | ) | |
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Defendant. | ) | |

**ROBERT D. CHRIST'S RESPONSES TO FIRST SET OF INTERROGATORIES
AND FIRST REQUEST FOR PRODUCTION OF DOCUMENTS PROPOUNDED
BY BRETT J. CORMICK, ELAN SUISSE INTERNATIONAL HOLDINGS (USA) LLC,
ELAN SUISSE (PTY) LTD., AND ELAN SUISSE, LTD.**

Pursuant to Federal Rules of Civil Procedure 26, 33 and 34, plaintiff Robert D. Christ

("Plaintiff"), by his undersigned attorneys, hereby objects and responds to the First Set of

Interrogatories (the "Interrogatories") and First Request for Production of Documents (the

"Request") propounded by Brett J. Cormick, Elan Suisse International Holdings (USA) LLC,

Elan Suisse (Pty) Ltd and Elan Suisse Ltd:

<u>General Objections</u>

1.      Plaintiff objects to the Interrogatories and the Request to the extent they seek to

impose requirements that are greater than or different from those imposed by the Federal Rules

WILLIB-54909.3

72.    State the name and present or last known address and e-mail address of each person who you expect to call as an expert witness at the trial and, as to each person named, state:

(a) The field in which the witness is an expert and a description of the witness' expertise therein;

(b)    The subject matter on which the witness is expected to testify;

(c)    The substance of the facts to which the witness is expected to testify;

(d)    The substance of the opinions to which the witness is expected to testify;

(e)    A summary of the grounds for each of the witness' opinions;

(f)    The dates of all writings made by the witness with respect to the present case;

(g)    The names and present or last known address, e-mail address and the present or last known employer of each person who presently has custody, possession, or control of the original and all copies of such writings;

(h)    The dates on which the witness was interviewed or consulted, the names and present or last known address, e-mail addresses and present or last known employers of those persons interviewed or consulted the witness, and the names and present or last known address, e-mail addresses and present or last known employers of all persons who were present during each such interview or consultation;

(i)    A brief chronological resume of the witness' educational and professional background, including the associations and societies of which he or she is a member and, as to medical personnel, the names and present or last known

        address, e-mail addresses of all hospitals on whose staff such experts serve or

        where they have courtesy privileges or act as consultants; and

(j)       The title, publisher, date and form of all documentary material published by the

        witness within his or her field.

**RESPONSE:** In addition to and without waiver of the General Objections set forth

above, Plaintiff objects to this interrogatory on the grounds that is premature since, at this time,

Plaintiff has not determined whether he will retain any expert witnesses to testify at trial in these

action. Consistent with his obligations under Federal Rule of Civil Procedure 26(b)(4), Plaintiff

will supplement his response to this interrogatory if and when he retains an expert witness or

expert witnesses to testify at trial in these actions.

73.     State the name and present or last known address and e-mail address of each

person who has been consulted as an expert in anticipation of litigation or preparation for trial,

whether or not that person is expected to be called as a witness by you at trial and, as to each

person, state:

(a)      The field in which the person is an expert and a description of the person's

        expertise therein;

(b)      The subject matter on which the person was consulted;

(c)      The dates of all writings made by the person with respect to the present case;

(d)      The name and present or last known address, e-mail address and present or last

        known employer of each person who presently has custody, possession, or control

        of the original and all copies of such writings;

(e)      The dates on which the person was interviewed or consulted, the names and

        present or last known address, e-mail addresses and present or last known

- 38 -

employers of those persons who interviewed or consulted the person, and the

names and present or last known address, e-mail addresses and present or last

known employers of all persons who were present during each such interview or

consultation;

(f)    A brief chronological resume of the witness' educational and professional

background, including the association or societies of which he or she is a member

and, as to medical personnel, the names and present or last known address, e-mail

addresses of all hospitals on whose staff such experts serve or where they have

courtesy privileges or act as consultants; and

(g)    The title, publisher, date and form of all documentary material published by the

person within his or her field.

**RESPONSE:**  In addition to and without waiver of the General Objections set forth

above, Plaintiff objects to this interrogatory on the grounds that it calls for disclosure of

information protected by the attorney-client privilege and work product doctrine.  Subject to and

without waiver of the foregoing objections, Plaintiff responds by stating that he has not at this

time consulted any experts in anticipation of litigation or in preparation for trial.

74.    State the name and present or last known address, e-mail address and telephone

number of each individual who is performing any sort of detective of investigatory work for

Christ, directly or indirectly, relating to any of the allegations and/or claims made in the above-

captioned actions.

**RESPONSE:**  In addition to the foregoing General Objections, Plaintiff objects to this

interrogatory on the grounds that it seeks information that is neither relevant to these actions nor

reasonably calculated to lead to the discovery of admissible evidence in these actions.