IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-275-GMS |
| | ) | |
| BRETT J. CORMICK and ELAN SUISSE | ) | **REDACTED** |
| INTERNATIONAL HOLDINGS (USA) | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## OPENING MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF BRETT J. CORMICK'S PHYSICAL AND PSYCHOLOGICAL INJURIES

Plaintiff-counterclaim defendant Robert D. Christ hereby respectfully submits this memorandum of law in support of his Motion *In Limine* to preclude defendant-counterclaim plaintiff Brett J. Cormick from offering at trial in this action any testimony concerning physical or psychological injuries he alleges to have suffered or the cause of such injuries:

### Introduction

In this action, Mr. Cormick has alleged counterclaims against Mr. Christ for, *inter alia*, violation of the Alien Tort Claims Act, 28 U.S.C. § 1350 (Count I), false imprisonment (Count II), and intentional infliction of emotional distress (Count III). *See* Ex. A hereto (Answer to Amended Complaint and Defendants' Counterclaims). Each of these claims arises from Mr. Cormick's alleged incarceration in Harare, Zimbabwe in August 2006, during which time Mr. Cormick alleges he was tortured and subjected to inhumane treatment by Zimbabwean authorities. *See id.* ¶¶ 100-121. Each of these claims also seeks damages from Mr. Christ as a result of various "physical and psychological injuries" Mr. Cormick alleges to have suffered

while held in a Zimbabwean prison. *See id.* ¶¶ 129, 134, 137. Specifically, Mr. Cormick alleges to have suffered (and continues to suffer): (a) shock and nervous reaction; (b) great fear and apprehension; (c) post-traumatic stress disorder (manifesting itself in regular nightmares, bouts of depression, and partial memory loss); (d) double pneumonia coinciding with malaria; (e) a broken nose, with resultant breathing difficulty; (f) long-term impairment of hearing; (g) long-term impairment of vision; and (h) soft tissue damage in the kidney region. *Id.* ¶ 119. Mr. Cormick also alleges that he "will continue to incur substantial medical expenses for both physical and psychological injuries" and "has undergone multiple medical procedures and will continue to do so in the future." *Id.* ¶¶ 120-121.[1]

Despite these claims, however, Mr. Cormick has not produced one piece of evidence to prove his injuries, nor has he listed any medical bills, physician's reports or similar documents on his trial exhibit list. Perhaps more significantly, Mr. Cormick also has not given any notice that he intends to call a medical expert to testify at trial (or produced any expert's report) concerning the existence or cause of Mr. Cormick's injuries. Since the discovery cut-off in this action has passed, it is clear that Mr. Cormick will not be providing any expert evidence required to establish a causal link between his alleged injuries and Mr. Christ's conduct. As such, Mr. Cormick should be precluded from presenting to the jury any fact testimony or other evidence concerning his purported injuries, both physical and psychological.

---

[1] Mr. Christ has moved for judgment on the pleadings with respect to Counts I, II and III of Mr. Cormick's counterclaims (*see* D.I. 60), a motion that is pending before the Court. Mr. Christ's motion *in limine* would be mooted to the extent the Court grants the motion for judgment on the pleadings for some or all of those counterclaims.

**Argument**

It is well settled that, in an action sounding in tort, the plaintiff is required to establish that the defendant's actions were the proximate cause of the plaintiff's injury. *E.g.*, *Money v. Manville Corp. Asbestos Disease Compensation Trust Fund*, 596 A.2d 1372, 1375 (Del. 1991).[2] Before the question of proximate causation may be submitted to a jury, however, the plaintiff must establish a *prima facie* case on that issue. *Id.* When the proximate cause of a plaintiff's injuries is an issue "within the knowledge of experts only and not within the common knowledge of laymen, it is necessary for the plaintiff to introduce expert testimony in order to establish a *prima facie* case." *Id.* As a result, it is "generally recognized that the causation of latent physical conditions or the existence of a particular disease must rest upon the individualized findings and opinion of a trained physician." *Id.* at 1376. *Accord Rayfield v. Power*, 840 A.2d 642 (TABLE), *disposition reported at* 2003 WL 22873037, at *1 (Del. Dec. 2, 2003) ("With a claim for bodily injuries, the causal connection between the defendant's alleged negligent conduct and the plaintiff's alleged injury must be proven by the direct testimony of a competent medical expert.") (attached hereto as Ex. C); *Adams v. Sheldon*, 2007 WL 2936193, at *3 (D. Del. Oct. 5, 2007) (attached hereto as Ex. D). The same is true with respect to a plaintiff's alleged psychological or emotional injuries. *See Collins v. African Methodist Episcopal Zion Church*, 2006 WL 1579718, at *4-5 (Del. Super. March 31, 2006) (requiring expert testimony to prove proximate causation between defendant's actions and plaintiff's emotional distress, depression, stroke, headaches and slurred speech) (attached hereto as Ex. E).

---

[2] While the law of Zimbabwe governs the merits of Mr. Cormick's claims for false imprisonment and intentional infliction of emotional distress, Zimbabwe and Delaware law do not differ in that both require a plaintiff to prove a causal connection between his injuries and the defendant's actions. *See* G. Feltoe, *A Guide to the Zimbabwean Law of Delict* 9 (3d ed. 2001) (attached hereto as Ex. B).

Here, the proximate cause of the injuries claimed by Mr. Cormick is an issue which falls

outside the knowledge of laymen.  Mr. Cormick claims that, as a result of Mr. Christ's actions,

he suffered or is suffering from, *inter alia*, the following medical conditions:  (a) shock and

nervous reaction; (b) "great fear and apprehension"; (c) post-traumatic stress disorder

(manifesting itself in regular nightmares, bouts of depression, and partial memory loss); (d)

double pneumonia coinciding with malaria; (e) a broken nose, with resultant breathing difficulty;

(f) long-term impairment of hearing; (g) long-term impairment of vision; (h) soft tissue damage

in the kidney region; and (i) "extreme and permanent psychological damage and distress."  Ex. A

¶ 119.  Putting aside the absence of evidence proving that Mr. Cormick even suffers from these

maladies,[3] there can be no dispute that the proximate causation of these latent physical and

psychological conditions (most notably, but not limited to, post-traumatic stress disorder,

pneumonia, malaria, impairment of breathing, hearing and vision, and kidney damage) is an

issue that the jury cannot determine based solely on its knowledge as laymen.  Rather, as

discussed above, Mr. Cormick can only prove the proximate cause of these injuries through

competent expert testimony.

Having failed to furnish *any* expert evidence on proximate causation, Mr. Cormick

should not be permitted to offer any factual evidence (whether through his own testimony or

otherwise) concerning his purported injuries or the cause of such injuries.  Since Mr. Cormick

cannot prove a *prima facie* element of his tort claims, any non-expert evidence concerning his

physical or psychological condition would be irrelevant.  Moreover, allowing Mr. Cormick to

_____

3 ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████

present such evidence to the jury would be wasteful and serve only to unfairly prejudice Mr.

Christ. *See* F.R.E. 403 ("Although relevant, evidence may be excluded if its probative value is

substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading

the jury, or by considerations of undue delay, waste of time, or needless presentation of

cumulative evidence.").

**Conclusion**

For the foregoing reasons, Mr. Christ respectfully requests that the Court enter an order

precluding Mr. Cormick from offering at trial in this action any testimony or other evidence

concerning physical or psychological injuries he alleges to have suffered or the cause of such

injuries.

REED SMITH LLP

*/s/ Thad J. Bracegirdle*
Thad J. Bracegirdle (No. 3691)
1201 Market Street, Suite 1500
Wilmington, Delaware 19801
(302) 778-7500

Attorneys for Robert D. Christ

Dated:  March 31, 2008

**Original Filed Under Seal March 28, 2008**

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRETT J. CORMICK and ELAN SUISSE | ) | C.A. No. 06-275-GMS |
| INTERNATIONAL HOLDINGS (USA) | ) | |
| LLC, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

## ANSWER TO AMENDED COMPLAINT, AND
## DEFENDANTS' COUNTERCLAIMS

1.      Admitted.  By way of further answer, at the time of the actions giving rise to plaintiff's Amended Complaint, plaintiff was a resident of the Commonwealth of Pennsylvania.

2.      Denied, except that it is admitted that defendant Brett J. Cormick ("Cormick") is a citizen of the Commonwealth of Australia whose legal residence is the Republic of Zimbabwe.

3.      The first sentence of numbered paragraph 3 of the Amended Complaint is admitted. The second sentence of numbered paragraph 3 is denied as stated.  By way of further answer, both Cormick and plaintiff Robert D. Christ ("Christ") were originally each members of defendant Elan Suisse International Holdings (USA) LLC ("ESUS").  Christ subsequently lost his equity position in ESUS by virtue of his violation of Sections 6.0, 6.1, 6.2, 6.3, and 6.4 of the Operating Agreement of ESUS.

4.      As Elan Suisse (Pty.) Ltd. has been dismissed from this action, no response to this allegation is required.

5.      As Nicogel Ltd. has been dismissed from this action, no response to this allegation is required.

6.     As John Walters has been dismissed from this action, no response to this allegation is required.

7.     As Dianne Marshall has been dismissed from this action, no response to this allegation is required.

8.     As Mercari Financial Services (Pty) Ltd. has been dismissed from this action, no response to this allegation is required.

9.     Admitted.

10.     Admitted.

11.     Denied.

12.     Denied.

13.     Denied.

14.     Admitted.

15.     The first two sentences of numbered paragraph 15 are admitted. The third sentence of numbered paragraph 15 is denied as stated. By way of further answer, Cormick advised Christ that he was looking for someone in the United States to run a U.S.-based management services corporation, to see if Christ could recommend anyone. Christ repeatedly stated at that time that he would be a great candidate and would like the job. That discussion led to further discussions regarding Christ becoming an equity holder in ESUS.

16.     Denied, except that it is admitted that Cormick and Christ communicated about the terms of an investment by Christ.

17.     Denied, except that it is admitted that Cormick and Christ communicated about the terms of an investment by Christ.

2

18.    Denied, except that it is admitted that Cormick and Christ communicated about the terms of an investment by Christ.

19.    Denied, except that it is admitted that Cormick and Christ communicated about the terms of an investment by Christ.

20.    Denied, except that it is admitted that Cormick and Christ communicated via e-mail.

21.    Cormick repeats and re-alleges his responses listed in numbered paragraphs 1-20 above as if fully set forth herein.

22.    Denied.

23.    Denied, except that it is admitted that Cormick received $250,000 from Karen Christ. The need for writing or executing a formal agreement is denied given that subscription agreements are the proper documents to be issued in this scenario and given that Cormick was in the process of issuing those but was awaiting Christ's full and agreed to payment of $350,000.

24.    Denied.

25.    Cormick repeats and re-alleges his responses listed in numbered paragraphs 1-24 above as if fully set forth herein.

26.    Denied.

27.    Denied.

28.    Denied.

29.    Cormick repeats and re-alleges his responses listed in numbered paragraphs 1-28 above as if fully set forth herein.

30.    Denied.

31.    Denied.

32.    Denied.

3

33.    Denied.

34-40.  The civil conspiracy claim has been dismissed by the Court, and so no response to

these allegations is required.  To the extent a response is required, the allegations are denied.

## FIRST AFFIRMATIVE DEFENSE

The Court lacks personal jurisdiction over defendant Brett J. Cormick.

## SECOND AFFIRMATIVE DEFENSE

The fraud claim is barred by the applicable Statute of Limitations.

## THIRD AFFIRMATIVE DEFENSE

Any claim by Christ to recovery of his investment is barred by Christ's breaches of Sections

6.0, 6.1, 6.2, 6.3 and 6.4 of the Operating Agreement of ESUS.

## COUNTERCLAIMS

1.    At the end of 2000, the technology boom in the U.S. financial market was creating

investment returns that the international finance markets had not seen before. South Africa was in

a unique position in that it had the world's 10th largest stock market by capitalization, but whereas

the U.S. had over 9,000 mutual funds, South Africa at the time had only access to 80 different non-

South African investment vehicles despite the presence of many of the world's largest financial

institutions there.  As a result, there clearly existed an opportunity to bring an innovative (for South

Africa) type of financial institution to South Africa, one that would provide access to better quality

hard currency investment products than had been available up to that point to South Africans.

2.    To offer the host of asset classes in the various areas of financial expertise that were

missing in South Africa at the time (Bio-Tech, US Government Bonds, CDO's etc), would be

beyond the scope of any single "Asset Manager."  As such, an entity capable of doing this would

need to be what is traditionally described in the finance industry as a "Multi-Manager."  A Multi-

4

Manager is a registered asset manager who in turn manages other asset managers beneath him based on performance. The Multi-Manager chooses the best performing sub-managers (asset managers who specialize in specific fields) and subcontracts the investing of funds into their specific areas of expertise.

3.    The ultimate goal of bringing an innovative type of financial institution to South Africa would be to offer higher returns than South African investors had experienced before, across a broader range of absent and innovative hard currency asset classes, albeit through a South African registered and regulated fund management entity, established specifically for this purpose.   A financial institution as described in the above paragraph would be a novelty in the South African financial markets, given that it would be capable of financially engineering new investment products based on the superior asset classes available in the US and Europe but for deployment into the South African financial market.

4.    Every investment market in the world, including the market in South Africa, has its own very unique and specific regulatory investment legislation. As an isolated investment market with a non free-trading currency, the legislation for South Africa in particular was very complex, with many investment rules still originating from the old apartheid regime, *e.g.*, no hedge funds were allowed, the existence of the mandatory regulation 750K limiting the amount any South African was allowed to invest outside of South Africa in a lifetime, no gearing allowed, no regulation covering private equity investments or venture capital funds, etc.

5.    To set up such an innovative financial institution in South Africa would require 4 phases which would need to be implemented consecutively over several years:

    a.    PHASE 1: Development of a new investment platform necessary for the general market testing of the efficacy of the principle of "South Africans being able to invest in

previously unavailable hard currency asset classes and gaining higher returns than they had been able to do to date";

      b.     PHASE 2: Deployment of a working prototype of the investment vehicle into a real market, but one that was not South Africa, in order to demonstrate its effectiveness as a vehicle and to iron out any potential issues prior to deploying into the main target market (intended to be South Africa);

      c.     PHASE 3: Obtaining regulatory approval and registration for the new investment vehicle; registration and authorization of the absent asset classes to be brought into South Africa; appointment of an international custodian; appointment of an administration facility; selection of appropriate sub-managers; pre-marketing of the investment product; approval for distribution of the investment product by national financial institutions; the deployment of the product into the South African financial markets;

      d.     PHASE 4: Bringing the Elan Suisse concept to other financial markets which lacked the missing hard currency asset classes. These other financial markets would be located regionally or internationally.

      5.     Given that these absent asset classes would be completely unfamiliar to the South African regulatory authorities and the South African financial market, given the extremely risk-adverse nature of the South African investment market, and given the isolation of the South African market in previous history, the authorities in South Africa as well as the South African institutional and independent financial advisors would need to be very thoroughly educated on the soundness of the new asset classes as well as on their superior performance track record (as had been demonstrated in the more developed capital markets where these investment vehicles had been used successfully for decades).

6.    While the effort required to pull the above outlined plan together would be costly and very time consuming, Cormick decided that the opportunity was even greater, not only from a personal investment point of view, but also in terms of giving financial returns to people who needed it yet simply couldn't get access to it under the existing system.

## PHASE 1

7.    Phase 1 commenced in January of 2001.  During this phase, Cormick made a close inspection of the existing asset classes available in South Africa in order to determine which were the most important absent asset classes.  From the technology-fueled performance of the U.S. and European stock markets at this time (dot.com boom), it was clear that there was no proper representation in South Africa of numerous investment funds.

8.    Subsequently, Cormick conceived the concept of Elan Suisse as a potential working platform to address this situation and to revolutionize the South African financial markets.  The Elan Suisse concept was launched under the working title of Elan Suisse International Equity Partners.

8.    In early 2001, Cormick commissioned a draft internet site from Cyberplex in Harare, Zimbabwe.  The goal was to create, for a period of approximately 6 months, a working Internet portal that could, in real time, track and present the investment performance of the best performing U.S. sub-managers, in different asset classes, to the African market, which had never accessed them before.  The method used for tracking and presenting the investment performance of these different asset classes was identical to that used by all asset managers worldwide prior to them actually investing in a new asset class: namely "a shadow tracking portfolio."  A shadow tracking portfolio is a process through which one can hypothetically invest an amount of money in an asset class, through a sub-manager one is considering employing, while subsequently tracking what would have happened to that investment if one would have actually made the investment in reality.

7

9.     At this stage Cormick was not offering any opportunity to South Africans or Zimbabweans or anyone to participate in the underlying investment funds in reality. They were only to be given the chance to watch, understand, and evaluate the markets and the asset classes that would perhaps be offered in the future.

10.     Cormick undertook the implementation of Phase 1 with the aid of Mr. A. Zographos, an MBA from the University of Southern California. Mr. Zographos had also previously worked as a fund- manager in South Africa and immediately saw the enormous value in the idea.

11.     The results of Phase 1 showed that indeed there would be enormous investment interest on behalf of potential investors to actually invest in superior and novel asset classes. It also demonstrated the ability to properly educate potential investors on the markets of these new asset classes which most people in the U.S. and Europe simply took for granted.

## PHASE 2

12.     Cormick initiated Phase 2 in mid-2001 after successfully testing the efficacy of the working internet portal in Phase 1. As a result of the excellent feedback received from potential novel asset class investors (the "spectators" in Phase 1) and the market performance of the novel asset classes presented in Phase 1, Cormick decided to implement a "beta test" version (meaning a restricted and limited real test version) of the potential investment vehicle into the Zimbabwean financial markets, which were quite healthy at the time. Zimbabwe was chosen as a pilot market in order to avoid running into any potential glitches starting up in the real intended markets (South Africa, and possibly others including Seychelles, Botswana, etc.) as this would be a very delicate process.

13.     Cormick approached all local Zimbabwean banks to discuss the opportunity. The understanding was that Cormick would personally fund the operation (the beta test version of the

8

investment vehicle) while they would share in the activity and profits, allowing Cormick to conduct

the beta test under their banking license. Cormick conducted this activity with the assistance of an

individual named Patrice Dhilwayo who facilitated bank introductions in Harare.

14.    After meeting with most of the major banks and financial institutions in Harare over

a period of several months, Cormick reached an agreement with Trust Bank. At that time, Trust

Bank was the fastest growing and most aggressive bank in Zimbabwe. Its IPO on the Zimbabwe

bourse produced returns of up to 50 times initial investment. Trust Bank and Cormick agreed that

Trust Bank would incorporate a new division to be known as Trust Bank Investment Services. Trust

Bank would own 40% of this division while an Elan Suisse Management Services Company

(Zimbabwe) would own the remaining 60% of the operation. The Elan Suisse Management Services

Company (Zimbabwe) was a standard international asset management company structure. Elan

Suisse Management Services Company (Zimbabwe) was incorporated by Cormick on July 24, 2001

in Harare, Zimbabwe. Elan Suisse Management Services Company (Zimbabwe) was also fully

funded by Cormick personally.

15.    Cormick had incorporated Elan Suisse Management Services Company (Zimbabwe)

specifically for Phase 2 of the development and implementation of the project. At that time,

Cormick allotted 50% of the Elan Suisse Management Services Company (Zimbabwe) to Mr.

Dhilwayo who would serve as Managing Director for this Phase 2. In the agreement with Trust

Bank, Cormick would be the Chairman and CEO of Trust Bank Investment Services.

16.    During this Phase 2, Elan Suisse Management Services (Zimbabwe) (trading as Trust

Bank Investment Services given that it was using Trust Bank's banking license) performed

exceptionally well and exceeded all expectations focusing on money market activities. Trust Bank

Investment Services very rapidly attracted clients from all sectors of the Zimbabwean commercial

9

and finance sectors. As anticipated, it produced superior returns to any other investment entity in the market, and played a significant role in paving the way for the eventual regulation of the Zimbabwean financial markets, which were unregulated at the time.

17.    This initial success also enabled the first steps to be taken for the "Elan Suisse concept" to explore entry of the superior and safer hard currency investment products into non–South African, regional key-markets such as Botswana, Lesotho, Seychelles, Mauritius and Swaziland. To that end both, Mr. Ndaba Goalath, the son of the Minister of Finance of Botswana who has an MBA from Wharton and the daughter of the President of Botswana were hosted by Cormick in Harare on two separate occasions. Cormick also made several trips to neighboring countries with and without Trust Bank personnel to secure foreign investment markets status. Presentations on the Elan Suisse concept were made to the National Pension Fund of the Seychelles (Mr. Frank Hoareau), the Minister of Finance and Governor of the Reserve Bank of Mauritius, The National Pension Fund of Swaziland (Crown Prince), Reserve Bank of Lesotho, etc.

## PHASE 3

18.    A realistic base for the beginning of Phase 3 of the project, meaning the actual launch into the South African financial market, was now ready. At that point the test platform had fulfilled its function and since the financial market conditions in Zimbabwe were now dramatically worsening, the relationship between Elan Suisse Management Services (Zimbabwe) and Trust Bank was terminated by mutual consent. Elan Suisse Management Services (Zimbabwe) was left dormant in Harare while Cormick initiated the final phase of the physical deployment into South Africa. This coincided with the collapse of the Zimbabwean capital markets due to the political situation in Zimbabwe under President Robert Mugabe, so Cormick considered the timing to be auspicious.

10

19.     For Phase 3, Cormick made a highly concentrated effort to establish national relationships with all major institutional investors, banks, and major independent financial advisors in South Africa.  When embarking on this process, Cormick was fully aware that it would take an enormous effort in time and money.  Cormick had also been very well aware that any success of the Elan Suisse concept was completely dependent on his reputation and credibility given that Elan Suisse was coming into a very conservative, mistrusting and isolated market, as an outside group with innovative products.

20.     Establishing national relationships and working business relationships involved contacting, negotiating, meeting with, and looking for synergies with over 260 financial institutions over many months.  At some point during this period Cormick learned that Mr. Dhilwayo, who had remained in Zimbabwe, had usurped the Elan Suisse name in Zimbabwe during Cormick's extensive absence from that country as a result of business travels.  Mr. Dhilwayo had done so without Cormick's permission and knowledge.  On his own initiative, Mr. Dhilwayo had incorporated several more Elan Suisse companies in Zimbabwe and was trading under these entities.

21.     Cormick sought local legal advice about Mr. Dhilwayo using the Elan Suisse name and reputation without permission, but the local lawyers in Zimbabwe made it clear that there was very little legal recourse for such actions in Zimbabwe and that nothing would come of pursuing this.

22.     At this stage, Cormick consulted with the other Elan Suisse participants and past clients.  All were furious, but felt that the Elan Suisse name already had significant presence and credibility, and that it therefore would not be undermined by having been hijacked by an unscrupulous operator in Zimbabwe.  Thus, it was decided to pursue an Elan Suisse company in South Africa regardless.  It was also decided to construct a new website once the entity had been

11

launched in order to distinguish that from anything that Mr. Dhilwayo was doing in Zimbabwe after

having hijacked the name. The Elan Suisse entity in South Africa would be an innovative financial

institution to South Africa, a financial institution that would provide access to better quality

investment products than had been available up to that point in that country.

23.     Subsequently, Cormick undertook an enormous effort to create a South African "Elan

Suisse" in the spirit of the original undertaking (namely bringing novel investment vehicles into the

financial market in South Africa), despite Mr. Dhilwayo's unauthorized use of the Elan Suisse name

in Zimbabwe. Cormick incorporated the South African Elan Suisse entity as "Elan Suisse (Pty)

Ltd." on August 11, 2003. The entity would trade as Elan Suisse Capital.

24.     After many exhaustive months of continuous work, Phase 3 commenced in full when

several key financial institutions in South Africa pledged their support for the initiative based on the

professional benefit of these new asset classes to the financial market in South Africa.

25.     Key institutional support came from groups such as: AOS (the largest fund

administrator in South Africa); Mercari Financial Services (the largest independent money market

operator in South Africa), which also provided national product distribution introductions,

incubation office facilities, and financial service registration advice while the Elan Suisse entity was

being registered;  Barnard Jacob Mallet (the largest independent stock broker at the time in South

Africa); Rand Merchant Bank (the most prestigious financial institution in the country); ABSA (the

largest retail bank in South Africa); FIS Trust  and several key financial institutions, including

European-based entities operating from South Africa (*e.g.* Scottish Life) which could not provide

the asset classes even though they were a European entity by themselves, but which had clients who

would certainly benefit from these asset classes.

26.    Cormick was assisted by AOS and Mercari in obtaining his FSB regulated fund management license which was granted on April 22, 2003. As such Elan Suisse (Pty) Ltd. would become the asset manager or multi-manager of the investment products.

27.    Cormick determined that the first investment product to be launched in South Africa under the Elan Suisse (Pty) Ltd. entity should be the simplest, safest and most obviously missing asset class from the South African market: short term U.S. Government Bonds. For no obvious reasons, no financial institution in South Africa was offering short term U.S. Government Bonds as an investment vehicle at the time. Even the South African Government in its own domestic market did not have access to what is considered one of the most basic, simplest and safest forms of hard currency investment.

28.    With the South African Rand relatively weak against the U.S. Dollar, and given the very conservative investment culture in South Africa, Cormick decided that Elan Suisse (Pty) Ltd. would launch the first U.S. Government Bond Fund in the history of South Africa with AOS as the largest fund administrator in the country sponsoring the registration. The fund would be offered by Elan Suisse (Pty) Ltd. as the Multi-Manager (or senior asset manager) to all institutional investors and IFA's (Independent Financial Advisors) in South Africa. The Fund would be administered from AOS's newly established Guernsey offices as a Guernsey-registered Collective Investment Scheme, thus allowing local South African financial institutions, *e.g.*, ABSA, the innovative ability to "home brand" the fund under the Elan Suisse (Pty) Ltd./AOS umbrella to their own clients, as their own product.

29.    Contrary to what it may seem, it is actually not easy to implement such an initiative. It involved an extensive and very complex series of legal submissions, negotiations, and complicated communications taking place over many months, both internationally and domestically. The final

13

result was the registration of the U.S. Government Bond Fund by the South African Financial Services Board, under the AOS Guernsey registered Collective Investment Scheme, and the registration of Cormick as an investment advisor.

30.    All of the processes regarding administration, reconciliation, pricing, transference, fees, reporting, monitoring, etc. of the U.S. Government Bond Fund had to be established from scratch as no fund like this had been offered before in South Africa. All of this also had to be coordinated across three different countries simultaneously (US, Guernsey, and South Africa). This entire process took an enormous effort but resulted in a proprietary administrative system in place at AOS for the U.S. Government Bond Fund, and a fully registered fund by the FSB.

31.    Simultaneously, the pre-marketing of the U.S. Government Bond Fund began. Over several months, institutional investors across South Africa, as well as national South African IFA syndicates were introduced to the new investment product and educated to its merits. Their support for it was established. The largest and most prestigious financial firms in South Africa approved the historic fund for distribution. These included ABSA (largest retail bank in South Africa to date and recently acquired by Barclays Bank), Barnard Jacobs Mellet (and its Sr. Portfolio advisor, Norman Botha), Rand Merchant Bank, FIS Trust, SAIPEX (SAIPEX is the national IFA newsletter which was going to be used for distribution to the national IFAs through the then Managing Editor), etc.

### Enter Christ

32.    At this point in time, due to rapidly increasing demand for the product (which was much beyond expectation) and given the fact that Cormick was launching the first U.S. Government Bond Fund in South Africa's history with some of the largest institutional investors and financial administrators in the nation, it had become obvious to Cormick that it would be of significant benefit if he had a dedicated U.S. office to act as the management services company for Elan Suisse (Pty)

Ltd. This U.S.-based management services company would need to handle the management services activities for Elan Suisse (Pty) Ltd.'s US-based asset classes. Even in these early stages of growth Cormick was aware that he did not have sufficient management services support to match the national (and increasingly regional/international) demand for the U.S. Government bond investment product.

33.    Within the international fund management or asset management industry, a management services company is the standard industry practice and most conventional structure for all fund management and investment operations worldwide, dedicated to *servicing* the management of funds. Trillions of dollars around the world are managed under just this exact structure. Every management services company attracts an annual management fee for its services of managing and servicing the underlying funds. This management fee is paid as an annual fee on funds under management. The management services company may also hold proprietary interests in the fund. The administration of the actual investment is often done by an outsourced/offshore third party specialist administrator and the physical investment capital itself is held by another third party specialist known as the custodian. The investment capital is provided by investors who participate in the fund run by the Multi-manager or Asset manager.

34.    Obviously, it is essential to identify an offshore administrator and a custodian of the highest quality and reputation who is acceptable to all institutional investors that have approved the fund or would be participating in the Fund. So, in the case of the fully FSB registered U.S. Government Bond Fund for South Africa, Elan Suisse (Pty) Ltd., as the South African registered primary Asset Manager and Multi-Manager (and as such it interfaced with the South African investors directly), would be employing a sub-asset manager based in the U.S. which specialized in the investment of U.S. Government Bonds. Originally a group called MPI was identified as the

U.S. sub-asset manager, which was later substituted by Strong Capital which was acquired by Wells Fargo. The actual capital would be invested through a custodian while the administration of the actual funds was outsourced to AOS (which had helped register the product in Guernsey and in South Africa with the FSB).

35.     Given that U.S. Government Bonds were going to be managed from the U.S., Elan Suisse (Pty) Ltd. needed a management services company in the U.S. which would be responsible for identifying and interfacing with the top-performing U.S. Bond managers, who would be selected as sub-managers. An appropriately qualified individual would be required to head up this operation in the U.S. and to service the operational fund needs of Elan Suisse (Pty) Ltd. in the U.S. A management services company operation actually managing the product base in the U.S. would be the most effective operational way to go about this as this would allow Elan Suisse (Pty) Ltd. to focus on the development and marketing of new investment products.

36.     At the time, Cormick contacted Christ, whom Cormick had known from expeditions to the North Pole, and explained the kind of individual Cormick was looking for in case Christ had any ideas or knew potential candidates. Christ replied that he was a CPA and a highly experienced forensic accountant. He also stated that he was looking to get out of the ROV business (Underwater Observation Vehicles) as it was keeping him away from his wife and children, plus he had fallen out with Scott Bentley, one of his business associates. Christ expressed an interest in possibly offering his candidacy for the position Cormick was looking to fill.

37.     Christ and Cormick agreed to meet in Cape Town, as Christ was traveling there to attend the funeral of one of his close friends. At this point Cormick had not yet agreed that Christ would become involved with Elan Suisse at all. The parties were only in a stage of initial discussions about the need to find someone who could run the Elan Suisse management services

16

company in the US. Promoting his qualifications as a CPA and highly experienced forensic accountant who had been employed by a Big 8 accounting firm, Christ explained to Cormick that he was professionally qualified specifically in matters of financial due diligence. In Cape Town, Christ and Cormick went through every aspect of the proposed transaction, at length and in great detail.

38.     During the period of due diligence, Christ and Cormick traveled from Cape town to Stellenbosch. During a working lunch with Cormick, Christ chatted on the phone with the Managing Editor of Saipex, the national South African IFA Professional Electronic Intranet/Newsletter Forum. The Managing editor of Saipex explained to Christ how very important the entire Elan Suisse initiative was to the empowerment of IFA's in South Africa and how Saipex wanted to link its web site to that of Elan Suisse, a facility Saipex had never offered to even the largest banks of the world which were represented in South Africa.

39.     At this time, Christ and Cormick conducted a review of all of the paperwork, including but not limited to the proposed subscription agreements, incorporation options, etc. As a highly experienced CPA and forensic accountant, Christ was extremely thorough. Christ and Cormick went through the draft operating agreements for the proposed US company (called Articles of Association), and both agreed to all points, with Christ concluding that the operating agreement was completely to his satisfaction.

40.     Christ's due diligence also included, but was not restricted to, a review of: South African Financial Services Board full license and regulatory approvals of multi manager (Elan Suisse (Pty) Ltd,); South African Financial Services Board full approvals and registration of product base for national distribution (first of its kind in history); Guernsey Financial Services Commission approval and registration (International Mutual Fund PCC Ltd.) of multi-manager offshore

17

investment structure; national product distribution channels; national institutional product approval

by largest banks (ABSA IMCO)/brokers, etc; sub-manager sector performance; sub-manager profile,

qualifications and experience; Cormick's qualifications and experience; absent asset classes

nationally; competing market products; "white label" distribution platform; new $USD product

development opportunities (10 new funds identified); marketing platforms secured; product

administration facilities (redemption procedures, calculation of daily NAV, pricing, reporting,

conversion procedures etc); administration provider credentials and background; product

management fee tolerances (brokerage fees-placement fees-initial charges-performance fees-admin

fees-custodian fees); fund subscription process; Regulation 750K investment allowance provisions,

etc.

41.    It became clear to Cormick at the time that Christ, as a CPA and an experienced

forensic accountant, had the professional experience and training enabling him to know exactly how

to value and interrogate a company so as to ascertain its value.

42.    After further discussion and negotiation, Cormick reached an agreement with Christ

that Christ could purchase 50% of the Elan Suisse management services company that was to be

established in the U.S.(Delaware) for $350,000.  This would allow Christ to acquire an equity

position in this Elan Suisse management services company in Delaware and to serve as its Senior

Vice President.  This was considered by Cormick to be a discounted price given the value that had

obviously been created to date.

43.    As a CPA and a highly experienced forensic accountant, Christ understood

completely from the outset that this company, ESUS, in which he wanted to buy equity was a

management services company, set up to provide management services to U.S.-based investment

funds for Elan Suisse (Pty) Ltd.  This is exactly the same structure that fund managers such as

Fidelity, Vanguard, PIMCO, Schwab, Dreyfus, State Street, etc and others use globally to manage trillions of dollars in funds under management.

44.    As a result of having purchased 50% of ESUS from Cormick for the agreed discounted figure of $350.000, Christ would get 50% of all annual management fees generated by U.S. investment funds deployed by Elan Suisse (Pty) Ltd. and serviced by ESUS, as well as a beneficial participation in Elan Suisse (Pty) Ltd. ($USD component only).

45.    The remuneration of Elan Suisse International Holdings LLC would be derived from the industry standard annual management fee, levied on all USD investment funds/products (usually calculated between .25% up to 2.75% of assets under management annually depending on the type of fund), plus (a) a carried interest (profit participation) on $USD private equity (VC Fund) exits in the event that $USD venture capital funds were offered, (b) performance bonuses against the market on $USD funds, and (c) proprietary ownership of the actual underlying client bases, investor bases, product distribution channels, proprietary IFA contracts and relations, etc. (all of these items listed as related to the $USD based investment products only, and not related to the activities or/ investment products, etc. of non-$USD investment products in any of the other Elan Suisse entities; all of these listed items being "the actual business" of the South African FSB registered multi-management company (Elan Suisse (Pty) Ltd.) that the Delaware company would service, being the business asset value (IPR) of ESUS.)

46.    As an additional performance incentive, in recognition of the importance of the $USD product base to the value of Elan Suisse (Pty) Ltd., and in the event of an exit of Elan Suisse (Pty) Ltd., Christ would receive a participation in proportion and equivalent to his original investment in ESUS.

19

47.    Christ's participation in the U.S. management services entity did not entitle him to equity in Elan Suisse (Pty) Ltd., because Elan Suisse (Pty) Ltd. already had participants - dating back to 2002 - and because Christ in his position with ESUS, would not be able to contribute to non-$USD product management that would need to be deployed under the South African Multi-Manager platform.

48.    Christ fully understood the scope and content of his investment from the very beginning, not in the least because of his professional background being a CPA and an experienced forensic accountant. As such, Christ began to prepare to start-up of the operations for ESUS , even though Cormick specifically stated at that time (early February 2004) that he should not commence yet and that Cormick would not sell him any equity until a final operational dry run of the concept had been completed.

49.    Prior to Christ becoming involved with ESUS, Cormick had explained to him that Cormick had been searching for the right offshore custodian for the U.S. Government Bond Fund due to the mounting national market demand. Cormick had also explained to him that one of the most prestigious South African institutional investors who was very keen to launch/sell the proposed fund (Rand Merchant Bank), had proposed BNP Paribas (the second largest bank in Europe) to be selected as the custodian for the U.S. government Bond Fund.

50.    In February 2004, upon effecting a professional introduction and understanding the value of a U.S. Government Bond Fund to the financial markets in South Africa, the Managing Director of BNP Paribas Fund Services in Jersey, Mr. David Keep, kindly agreed to fly to London at his own expense for an initial meeting. He was accompanied by the head of UK operations for BNP Paribas, Nick Emmins, and made a presentation to pitch for the Elan Suisse (Pty) Ltd. business. This was the first time Cormick had ever met with either of these two gentlemen.

51.    Cormick had invited Christ to fly to London to meet Cormick and to attend the meeting given the extraordinary implications of the fact that the second largest bank in Europe was pitching for the Elan Suisse (Pty) Ltd. business.  Such efforts on the part of BNP Paribas demonstrated very clearly how real, serious and immensely exciting the entire enterprise was. Cormick also wanted to use this meeting as the final due diligence step for both himself and Christ prior to allowing Christ to become an investor in ESUS.  Christ was so committed that, even though he was not yet an investor, he insisted on producing business cards for the meeting, as well as Elan Suisse logo sport shirts, which he brought with him to London, for Cormick to hand out upon his return to South Africa.

52.    At this time Cormick still had not sold Christ any portion of ESUS, which had not even been incorporated.  Cormick was however delighted by and taken with Christ's enthusiasm and contribution to the meeting.  Cormick had taken a significant risk allowing Christ to attend that meeting in that Cormick could have lost BNP Paribas as a potential custodian had Christ not lived up to expectations. Cormick was delighted to see that Christ's CPA training enabled him to not only understand the simple structure that had been agreed to, but he even managed to make positive contributions to the meeting.

53.    It had become very clear to Cormick that it was going to be necessary at this stage to have a U.S. presence for the FSB approved U.S. government Bond Fund for Elan Suisse (Pty) Ltd. under any circumstances.

54.    Prior to Christ's return to the U.S., Christ and Cormick sat together and once again confirmed the simple position that they had agreed to: that Christ, for a total of $350,00, may buy 50% of ESUS and a proportional participation in the $USD business of Elan Suisse (Pty) Ltd. (IPR, or customer base, or so-called "good will").  Cormick suggested that the parties could even have the

subscription agreement drafted properly by lawyers if that was necessary, and told Christ that he would now be prepared to accept Christ's investment, as Cormick planned to incorporate the appropriate Delaware company (to be known as "Elan Suisse International Holdings LLC") immediately upon his return to Zimbabwe.

55.    Christ agreed and subsequently returned to the U.S. to commence operations for ESUS,  following which his wife, Karen Christ, transferred $250,000 of the agreed $350,000 upon his return.  Cormick returned to Zimbabwe and formed ESUS in Delaware, sending copies of the incorporation documents to Christ.  As Christ and Cormick had agreed to a total of $350,000 when in London, Cormick waited for Christ to transfer the outstanding balance of $100,000 so that Cormick could issue all of his subscription agreements as fully paid for.

56.    Among Christ's first duties to allow for commencing operations for ESUS was the urgent commissioning and completion of a web site for the Elan Suisse Group ("Group" as there were now two companies, Elan Suisse (Pty) Ltd. and ESUS) as well as various fund logos, in order to distinguish the different $USD investment funds of the Elan Suisse Group from the rest of the market.

57.    These logistical steps had to be completed prior to engaging in the real work of starting to build the new management services company in the U.S.  The new website had to replace the older more technologically primitive, non-interactive, Elan Suisse International Equity Partners test website with its outdated investment product base.  As described above, this older website had previously been used successfully during the phase 1 hypothetical rollout in Zimbabwe, beyond which it had been misused by Mr. Dhilwayo and his clone companies, resulting in Cormick having to have it taken down.  Also, the new website had to be more current, sophisticated, and market focused in part because the dot.com technology boom which had dictated market performance had

22

now passed. Because the new website was intended for a more sophisticated market, it had to reflect

a corporate image as good or better than any of the largest banks in the world, many of whom would

be competing for business in South Africa. As a newly launching financial services group, image

and credibility was every bit as important as the value of the underlying funds themselves. As a

CPA, Christ appreciated this rationale and began to work on this critical component of the business.

58.    During this period Cormick kept extremely busy increasing the underlying value of

the entire Elan Suisse Group. This included: securing the development of more advanced and

innovative financial service products, continuing to pre-market the U.S. Government Bond Fund,

organizing the offshore administration of the U.S. Government Bond Fund and any other investment

products that may follow it (each which would have very different technical and regulatory

requirements), and ensuring that the South African entity was adequately prepared for the launch

of the first investment product: the U.S. Government Bond Fund.

59.    Christ's enthusiasm appeared to increase while Cormick tirelessly worked on

launching the initiative. Christ performed his duties as the Senior Vice President of ESUS. Christ

also did his best to produce a credible web site, but every time that Cormick showed the results to

the end users they were critical of its quality.

60.    By mid-September, 2004, seven months into the project with Christ, things began to

unravel. Christ suddenly seemed to be under enormous pressure (possibly from his wife), and

seemed to be getting cold feet about having made the investment, and began to deliberately argue

an alternative version of factual events. For example, although he had previously argued that his

experience as a forensic CPA for a Big 8 accounting firm made him uniquely qualified to handle the

job, in an e-mail dated September 15, 2004, he argued that he had no specialized knowledge that

would qualify him for participation in the enterprise. Christ also began characterizing his investment as a "loan."

61.     In an e-mail dated September 17, 2004, Christ told Cormick that he had gotten cold feet, and asking Cormick to "liquidate" his "position."

62.     Cormick proceeded to assure Christ that Cormick would do his best to sell Christ's investment. Cormick was confident that this could be done in a timely fashion given the amount of interest that was being generated in the company at this point and as a result of all of Cormick's efforts.

63.     Cormick consulted with one of the pre- existing participants in Elan Suisse (Pty) Ltd. and determined to immediately market Christ's shares in good faith, as per Christ's request, and to liquidate Christ's position. As a CPA and an experienced forensic accountant, Christ was clearly aware that liquidating any position in any private company requires the marketing of this position to other third party investors.

64.     Because Elan Suisse (Pty) Ltd. and ESUS each had their own respective participants and investors, equity and investments could not be mixed between the two corporate entities. Cormick therefore decided at that point that it would speed up and facilitate the sale of Christ's shares to non-U.S.-based investors if Cormick were to consolidate the Elan Suisse Group through a holding company (BVI/Bahamas) and possibly run it through a Dubai company administrator. Hence and to that effect, Cormick set up an Elan Suisse Group entity with Sovereign services in London who opened a new bank account in Zurich at Coutts Bank Von Ernst specifically to sell Christ's interest.

65.     In the meantime Cormick actively marketed Christ's interest and made presentations to 30+ individuals, representing the highest echelons of the mining, law, service, commerce and

24

banking sectors in Zimbabwe. Zimbabwe was the country where investors had seen the returns on investment by Elan Suisse management services previously (through Trust Bank Investment Services in Phase 2 and through Elan Suisse International Equity Partners in Phase 1) and where the name brand (and therefore investment products) had the proper credibility in order to ensure a timely sale of Christ's equity in ESUS to a non-U.S. resident.

66.    Almost all introductions to these potential new investors were done with the assistance and in the presence of existing participants in Elan Suisse (Pty) Ltd. with the initial meetings generally held in the interview office rooms and main office of Mr. Peter Kipps in Harare. Many potential investors went on to have 3 to 4 follow up meetings, often at restaurants, family functions, the homes of existing participants, etc., as interest was very keen and extremely high.

67.    Due to the rapid realization of the business roll out, due to the institutional support at the highest levels, and due to the sheer number of interested and qualified individual investors, selling Christ's shares was not considered a problem at all at this point in time. And indeed, it was Cormick's highest priority so as to avoid as much as possible hurting the business by Christ's actions.

68.    At the same time, Christ continued to behave in a very erratic way. Several e-mails were exchanged between Christ and Cormick in which it was obvious Christ increasingly misconstrued what he thought he was getting for his investment. Then Christ suddenly decided that he had changed his mind altogether about wanting to liquidate his position, and that he wanted to stay in ESUS after all, or even possibly re-engage after his current position had been liquidated.

69.    While all of this was going on and while Cormick was continuing to give the requested liquidation of Christ's position in ESUS his utmost attention and efforts, Christ began attempting to negotiate his return back to the company.

70.    On November 19, 2004, Norman Botha from Barnard Jacobs Mallet, the largest independent stockbroker in South Africa, flew to Harare for two days to give an institutional presentation on the extraordinary progress of the Elan Suisse group to that date. The audience was carefully selected from amongst the increasing number of interested investors ready to purchase Christ's equity ownership in ESUS. The presentation luncheon was organized at 40 Cork Rd, an outdoor restaurant in Harare and was attended by many wealthy businessmen invited by Mr. Kipps for the specific purpose of liquidating Christ's position in ESUS. Interest was very high. Mr. Botha stated publicly to those attending that he himself would actually like to resign from BJM to join the Elan Suisse Group. He also explained that, as the largest independent stock broker in South Africa, BJM had grown its own investment business from nothing to 10 Bn RAND (or +/- 1.4 Bn $USD with the exchange rate of 7/1) under management in only 6 years.

71.    Mr. Botha confirmed that the Elan Suisse (Pty) Ltd. investment product base was about 10 years ahead of anything that the South African financial markets had available at that time, and that BJM wanted to be as aggressively involved with the Elan Suisse Group as possible going forward.

72.    Responding to a question from Grahame Flemming of Innscor, who had previously been a fund manager at Old Mutual in South Africa, Norman Botha said that while it was not possible to put a cash value on it, it was very clear that he felt that if BJM would have had access to the Elan Suisse (Pty) Ltd. product base, they would have much more than just 10 Bn RAND under management by now, and possibly even two to three times that. He also confirmed to this potential investor group, which had specifically been brought together to acquire Christ's position, that BJM wanted to put about 1 billion Rands of offshore capacity through the Elan Suisse (Pty) Ltd.'s investment product base, in addition to switching old offshore amnesty investments into Elan Suisse

26

(Pty) Ltd.'s new investment products, going after pension funds (under South African Law allowed into off-shore products for up to 15%), etc.

73.     The Q&A session following the presentation lasted for about 90 minutes to ensure that the potential new investors would feel comfortable buying out Christ's position. All attendees indeed seemed to be very happy both with the level of institutional commitment and excitement from the South African financial markets, the financial engineering plans to increase Elan Suisse (Pty) Ltd.'s stock price, and the exit strategy for the company, all of which was supported completely by BJM.

74.     In the meantime, Norman Botha confirmed in writing that there would be no problem bringing in some investors and, with the very high level of interest already demonstrated, Cormick was able to convey this to Christ by assuring him that there would be no problem in liquidating his stock and getting his money back. Since Christ seemed to be getting more erratic with each day, Cormick decided that it was a good thing to keep him as involved and abreast of the process as much as possible.

75     However, while Cormick was having Christ's revised share subscription documents prepared and forwarded to him (the revised documents reflected Christ's lower than agreed to purchase level of Cormick's personal equity) so that Christ could sign them in order for Cormick to effect the liquidation of his position as per Christ's request, and while Cormick was organizing the investors meetings (including the one with Norman Botha) to liquidate his position, Christ suddenly decided to show his most recent correspondence (in which he changed and re-debated his position as it was being sold) to a lawyer in the U.S. Christ apparently did so without telling this lawyer that he had previously issued a request to have his position liquidated and that Cormick was complying with that request.

27

76.    This lawyer apparently had no understanding of the context of the e-mail correspondence, nor of the efficacy and history of the business itself, and as such (according to Christ) he made the uninformed claim that ESUS was a scam, a "shell company" and worthless.

77.    As a CPA and forensic accountant, Christ was or should have been aware from the beginning that ESUS was a completely conventional, industry standard, management services company. It does not hold any assets because it does not need them. It was to provide a professional service on a management services contract, like every fund management company (or any professional service company) in the world, and be remunerated with management fees and capital gains in value, on a standard management services contract.

78.    Now that Christ had inexplicably converted the entire global financial and professional services industry standard structure into a scam somehow, he also suddenly declared that he was going to get his money back by whatever means necessary – even with the full knowledge that Cormick was in the final stages of liquidating his position and that it was a matter of weeks for him to receive his investment back upon him signing the revised subscription agreements so that this could be effected.

79.    On November 29, 2004, while Cormick was actually in an advanced closing negotiations with a potential investor (Mr. John Travlos), Cormick was informed that Christ had retained the services of an attorney in South Africa and had sued the company, misrepresenting the facts and with the false claim of a "loan" for $250.000.

80.    Given that Christ had misrepresented his position to the lawyer in South Africa and that he had also misrepresented the position of the company, deliberately distorting the actual facts, it was necessary to halt the sale of Christ's interest until this matter was sorted out given that it would be unethical, illegal and not acceptable to market his shares while forced to litigate with him.

81.    Christ's legal action also created a very serious operational problem for Elan Suisse (Pty) Ltd. The withdrawal of Christ from the project (although in between alternating emails he was in/out/in/out), not only had the U.S. management services operation become inoperative, but Christ and Cormick were actually litigating over it. In reality, this meant that it would not be possible to launch the U.S. Government Bond Fund in the fashion in which Cormick had intended, because there would be no effective U.S. management services company in place to specifically service the escalating demand for the product.

82.    Determined not to let 3 years' work evaporate over the completely erratic and inappropriate behavior of Christ, and determined to keep on implementing the Elan Suisse concept regardless, Cormick began gearing up for the possible launch of another investment product that would be equally exciting to the South African financial market. The development of each investment product takes about 9 months to develop, and Cormick had been preparing additional Funds for launch after the successful launch of the U.S. Government Bond Fund. The fund Cormick decided would be next, given that the U.S. Government Bond Fund could not proceed on schedule for reasons explained above, would be the Bio-Pharma Fund. This Bio-Pharma fund would be a conventional venture capital fund and unique in that investors in South Africa would be able to use it to make RAND-based investments into a series of ready–to-commercialize Bio-Pharma technology companies. These Bio-Pharma technology companies would be grown commercially in South Africa, with the product subsequently exported to the rest of the world before the company was to be sold in an hard currency geography. This unique investment vehicle would provide South African investors, who can only invest in Rands (a trapped currency), the ability to make investments in the local currency while securing hard currency dividends based on foreign profits,

and a hard currency payout (of their Rand based investment), once the South African incubated companies would be sold overseas.

83.     Thus, while making significant and very complicated structural adjustments to the offshore custodial and administrative arrangements of the U.S. Government Bond Fund, moving the jurisdiction and registration of the U.S. Government Bond Fund from Guernsey to Jersey (BNP Paribas), searching for a new sub-manager for the U.S. Government Bond fund product in the U.S. while physically being in Africa, simultaneously creating several other novel funds for launch through Elan Suisse (Pty) Ltd., continuing to deal with the weight of inquires into the purchase of Christ's shares that Cormick had created but could not execute due to Christ's pre-emptive litigation based on a false premise, dealing with an increasingly demanding institutional market wanting the U.S. government bond fund to launch on their distribution platforms, and at the same time also dealing with the fact that Christ had now unilaterally declared the very structure that is the industry norm for trillions of dollars under management throughout the world to be a scam, Cormick decided to prepare to launch the Bio-Pharma fund regardless.

84.     Cormick made this decision to launch the Bio-Pharma Fund based on the fact that it would add enormous value to the Elan Suisse group as a whole, and therefore also underpin the value of Christ's equity position, the value of Cormick's own investments as a majority equity holder in all of the Elan Suisse entities, and that of any of the other participants. It would also make it even easier to liquidate Christ's position in ESUS upon the conclusion of the litigation Christ had launched in South Africa.

85.     Unfortunately, when Christ declared that he intended to get his money back by whatever means necessary, Cormick had not expected that it would also include a highly publicized attack on the Elan Suisse name, the Elan Suisse group and entities, on everyone Cormick have ever

30

spoken with or merely have heard the name of, and on Cormick's own personal and professional reputation.

86.     Just as Cormick was completing the initial Rands' based financing round for the Bio-Pharma fund, having established operational credibility and having secured 8,200 pharmacies nationally through four major national distribution groups for RTD product, in addition to having entered into extensive and very serious negotiations for new RTD product with SA Breweries, Clicks, Woolworths, Pick N Pay, etc., Christ deliberately published a false letter in the Zimbabwean Financial Gazette attacking the credibility of Cormick and Elan Suisse.

87.     While Cormick had been working tirelessly to create financial history in South Africa, Mr. Dhilwayo in Zimbabwe had continued to run his hijacked version of Elan Suisse Management Services (Zimbabwe). It transpired that he had placed the investment money from some clients under management with his own Elan Suisse vehicle with a group called ENG which had lost or misappropriated the funds. Mr. Dhilwayo then called in the authorities.

88.     This became a major scandal in the financial world in Zimbabwe. Cormick had however never met or heard of ENG, and had no contact with Mr. Dhilwayo since phase 2 of the operational roll out had been concluded years before, and had no operational interests in Zimbabwe at all. Additionally, Cormick was not even aware of the scandal, which was entirely the fault of misconduct of ENG and had even little to do with Mr. Dhilwayo's hijacked version of Elan Suisse. Finally, from any cursory glance at the reports appearing on the Internet, it was obvious who the principal participants of this scandal were, and it was also clear that Cormick was simply not involved. Disregarding all of the facts, Christ proceeded by penning a false letter to the editor article for the Zimbabwean Press, deliberately implicating Cormick in this scandal, by pure innuendo and malice:

31

# Might this be the same man?

EDITOR — There is a South African company by the name of Elan Suisse (Pty) Ltd that has a man by the name of Dr Brett Cormick as its sole director.

Until a couple of months ago, Cormick lived in Harare (to the best of my knowledge he now lives in Hermanus, South

Africa). I have read extensively about William Suisse's involvement in the ENG scandal which you reported.

From the news reports, this is the biggest financial scam in Zimbabwe's history. Now Cormick is in RSA. I am looking for a positive link between

Cormick and the Elan Suisse Financial Advisory Services scandal in Zimbabwe.

Currently, Cormick vehemently denies any involvement in the implausible denial at http://www.ar.artslink.c e.za/~bob.christ/sexire p=2/mail&p=Sep04/Re s=20&s=2ncrum/e?=200 s=20questions.rtf).

This may be the same person that was involved with the ENG scandal. I would like to know if you have any information linking him to that company.

This man and Elan Suisse (Pty) Ltd are now marketing investment products in the South African financial marketplace.

I realise that the election coverage is taking precedence, but if you are able to link Dr Cormick to ESFS the picture of the scam might become clearer allowing some of those victims to get their money back.

**Bob Christ**
**South Africa**

88.    Cormick and Elan Suisse (Pty) Ltd. had nothing to do with the scandal in Zimbabwe. The effect of Christ's malicious and false article on marketing efforts in South Africa was devastating: anyone who entered Cormick's name on an Internet search engine during due diligence procedures would find this maliciously contrived article. This, along with the litigation improperly

initiated by Christ from South Africa, destroyed Cormick's ability to market any Elan Suisse equity

stock, crushing the value of Christ's investment, as well as that of Cormick and the other investors.

90.    Additionally, the article devastated the Bio-Pharma fund and its national launch in

the IFA National News, which was read by over 40,000 investment professional in South Africa.

At a later point in time, Christ wrote an apology retracting his claim in the Zimbabwean Financial

Gazette, as part of a settlement of a separate lawsuit he brought over website development expenses.

His retraction and apology was published as well, but by then it was too late and the damage had

been done.

91.    This event was immediately followed by what Christ described at the time as "the

coming storm," which was to include aside from other things, a 2+-year long series of stalking via

threatening e-mails.  Christ also engaged a 22-year old untrained Internet investigative journalist

called Julius Cobbett ("Cobbett").  Cobbett worked for a company called Money Web.  Cobbett

claimed in a conversation with an Elan Suisse (Pty) Ltd. representative that he was under pressure

to come up with 5 scams a week in order to keep his job.

92.    Christ enticed Cobbett to publish stories based on his accusations.  No other

newspaper, magazine or Internet-based publication ran Christ's stories.  Christ's intended net-effect

of these articles was to damage the Elan Suisse name and reputation, Cormick's name and

reputation, and the ability to market and distribute the investment product after 3 years of exhaustive

work.

93.    Cormick tried to continue with the Elan Suisse concept over the coming months, but

investor support evaporated.  Doors that had taken 3 years of tremendous effort at the highest levels

to open up were now closed permanently.

33

94.     Cormick did attempt to re-launch the physical RTD product in other geographies,

such as Malaysia, but Christ continued his quest for utter and complete destruction by subsequently

publishing false and defamatory statements on a website growing to over 200 printed pages.  The

"facts" he lists on his website are utterly false, based on either, un-named and possibly fictitious

sources, or on sources with obvious biases (including but not limited to ex-wives and girlfriends),

or on individuals speculating without firsthand knowledge, or on simply poor or non-existent

research.

95.     On that website, Christ falsely and outrageously accuses Cormick of the following

(but not limited to this list):

        a.     being a scam artist practiced and proficient at his craft;

        b.     being a "crook";

        c.     having plastic surgery to hide;

        d.     misrepresenting his academic, military and prior employment credentials;

        e.     engaging in "theft";

        f.     operating a "pseudo-legitimate business";

        g.     being fired from a prior employment with HIVEX due to allegations of fraud;

        h.     operating a "boiler room type operation selling worthless (or significantly

overvalued) securities to relatively unsophisticated investors";

        i.     running advance fee scams;

        j.     running an equity scam;

        k.     running a pyramid scheme;

        l.     running a ponzi scam;

        m.     running a bait-and-switch scam;

n.   being a liar;

o.   having stolen Christ's money;

p.   being a deadbeat dad, not paying child support;

q.   being a pathological liar;

r.   having been in and out of jail for years;

s.   having solicited prostitutes;

t.   being let go from an earlier employer for misuse of a company credit card;

u.   being asked to cease teaching at the University of Cape Town due to questions
about his qualifications and unauthorized use of official letterhead;

v.   being "fired from [HIVEX] after attempting to open a First National Bank
checking account without a corporate resolution requiring only a single signature (Cormick's of
course)";

w.   being fired by BZW Meares because he "disgraced himself at that firm...;

x.   having "eluded the law in Europe, RSA and the USA....";

y.   running "scams on various girlfriends";

z.   being a pedophile.

96.    In addition, Christ has made false criminal complaints about Cormick to various

authorities around the world, including police and government, most of which resulted in no action.

However, one false complaint to the Zimbabwean police resulted in significant injury to Cormick.

97.    Contrary to Christ's false representation on his website, Cormick used to regularly

exercise his visitation rights to his children during their school holidays, often in Zimbabwe, a fact

which Christ knew. Prior to or shortly after August 1, 2006, Christ contacted Zimbabwean officials

and in a sworn affidavit falsely testified that Cormick "has eluded the law in Europe, RSA and the

35

103.    These Zimbabwean officials refused Cormick's request to investigate the false
allegations which caused Cormick to believe that he was about to become one of many Zimbabwean
victims who would be executed without a formal hearing or trial.

104.    Cormick was put in a dark, cold room until late in the afternoon on August 23rd,
2006. He was cold and had not eaten for 22 hours by that time. Cormick's passport was confiscated
and he was incarcerated with the personal knowledge that inhumane confinement, torture and
execution in Zimbabwean prisons were common.  He was given no reason for his incarceration
despite repeated requests for an explanation.

105.    During the transfer to prison, the Zimbabwean officials made intimidating comments
and threats to Cormick indicating that he would be in for a very, very rough time.  When Cormick
requested how long he would be incarcerated, the response was "forever."

106     It was winter in Harare at that time with temperatures below freezing at night. Upon
arrival at the prison Cormick was informed that he would be allowed to retain only one item of
clothing. This was done in order to make the inmates as uncomfortable as possible. Cormick chose
to retain a very light woolen sweater next to his skin as his chosen item of clothing, which he tucked
into his underware.

107.    The cell in which Cormick was incarcerated was meant to hold about 15 people, but
held around 50 at that time.  The cell also was filthy with lice and fleas; there was no toilet, food or
water. Other inmates in the cell defecated and urinated wherever they were standing.  Many inmates
were extremely ill, comatose or dying, but because of the crowdedness of the cell, they were forced
to stand throughout the incarceration. Cormick stood barefoot and semi-naked in the cell in
subfreezing conditions and continued to suffer from hunger, thirst and exhaustion, becoming
disoriented since he had been without food and water for 28 hours by that time.

37

108.    Later that night, Cormick was moved to a "holding area" believed to be used for the torture of inmates. The wet concrete floor of the holding area contained hundreds of inmates. While sitting huddled on the wet, bare, concrete floor in that holding area, in human excrement, he was barefoot, semi-naked, and subjected to sub-freezing temperatures. He was also exposed to numerous potentially fatal, contagious diseases. Freezing wind inducing hypothermic conditions came straight into the holding area.

109.    Cormick was subjected to aggressive and threatening gestures over the course of the night, which became increasingly menacing over time and suggested that he would not live to see the light of the next day.

110.    Later that night Cormick was moved into yet another confinement area where the floors were concrete; there were open sewers that were overflowing and blocked by excrement, and the cells had no heat. The cell that Cormick was confined to had thirty-five inmates even though the cell could only accommodate six. Inmates were very sick (including with a variety of highly contagious diseases) and were covered with lice, fleas, ticks and excrement. Some had been brutally tortured. The bare concrete was so cold that Cormick's entire body violently shook and spasmed with hypothermia.

111.    On or about 8:00 a.m. on August 24, 2006, Cormick was once again taken to the holding area. He had not had anything to eat or drink for 36 hours. He had not slept for 24 hours at this point. He had also not been charged with any crime.

112.    Around 10 a.m. on August 24, 2006, Cormick was taken back to the facility where he had originally been taken after being abducted from the place where he and his children had been staying. Cormick was forced to walk from the prison to that facility through the main street of Harare, filthy, barefoot, shackled and semi-naked in plain view of all in the middle of winter.

38

113.    During the night of August 24, 2006, Cormick was placed on the 4th floor holding area with hundreds of inmates, in subfreezing temperatures, semi-naked, in complete darkness lying on the concrete floor, in excrement, fluid and subject to freezing wind biting through the cracks in the walls.

114.    During confinement, Cormick was tortured using different techniques including but not limited to:

      a.    a plastic bag was placed over his head to prevent him from breathing;

      b.    he was repeatedly beaten in or around his eyes, nose, and head to the point of concussion-like symptoms and disorientation;

      c.    he was held down while an individual sat on his chest, making him almost black-out from pain;

      d.    he was made to sit in humiliating and uncomfortable stress positions;

      e.    knees were placed on his throat to induce gagging and vomiting;

      f.    he was restrained on a filthy, wet cement floor covered with excrement and blood, likely contaminated with contagious diseases;

      g.    he was urinated on;

      h.    he was repeatedly struck in the groin;

      i.    his eyes were covered with a rag to keep him disoriented;

      j.    his face was held to the cement floor and rubbed in dirt and excrement;

      k.    his arms were placed in a stress position and his hair pulled back;

      l.    he was repeatedly beaten in the kidneys and in the stomach;

      m.    his fingers were bent back;

      n.    death threats were repeatedly made;

39

      o.      he was made to go 69 hours without food or water;

      p.      he was made to go 57 hours without sleep (by the time of his release);

      p.      he was held in sub-freezing conditions while semi-naked, and likely exposed to contagious diseases.

115.    During one of these torture sessions specific references to Christ were made.

116.    By the time Cormick was returned to the sleeping cells in the wee hours of August 25, 2006, the open sewers and hypothermic conditions of the critically overcrowded cells were worse given that the fluids had turned into ice on the filthy concrete floors. He was still semi-naked.

117.    On or about 5:00 p.m. on August 28, 2006, Cormick was released pursuant to the intervention of the Australian ambassador and with full acknowledgment by the Zimbabwean Attorney General that the statements submitted by Christ in his affidavit were false.

118.    By the time of his release Cormick had been without food or drink for 60+ hours, and had been without sleep for 57 hours.

119.    As a direct and proximate result of the actions and knowledge of Christ, Cormick has suffered (and continues to suffer):

      a.      shock and nervous reaction;

      b.      great fear and apprehension;

      c.      post-traumatic stress disorder, manifesting itself in regular nightmares, insomnia (requiring the aid of sleeping pills), bouts of depression, and partial memory loss;

      d.      double pneumonia coinciding with malaria;

      e.      a broken nose, with resultant breathing difficulty;

      f.      long-term impairment of hearing;

      g.      long-term impairment of vision;

40

h.    soft tissue damage in the kidney region;

i.    inhibition from further visitation with his minor children in Zimbabwe during his access legal period, which has caused him extreme and permanent psychological damage and distress;

120.    Cormick will continue to incur substantial medical expenses for both physical and psychological injuries, the total sum of which cannot be reasonably estimated at this time.

121.    Cormick has undergone multiple medical procedures and will continue to do so in the future.

122.    The end result of Christ's actions is a complete destruction of his own investment and that of all other investors, including Cormick, and with that: destruction of 3 years of hard work, personal and professional reputations to the extent that they are beyond solvable, destruction of any potential future employment possibilities, destruction of Cormick's family life, including his children, and additional physical and psychological trauma to Cormick.

## COUNT I
(Alien Tort Claims Act)

123.    Defendants reassert and incorporate the allegations contained in paragraphs 1-122 of this Counterclaim as if fully set forth herein.

124.    The actions of the Zimbabwean officials constituted torture in violation of the law of nations and constitute tortious conduct as defined by 28 U.S.C. § 1350.

125.    By his actions and knowledge, Christ is civilly liable under 28 U.S.C. § 1350 as an aider and abettor of human rights abuses carried out by a foreign government because he knowingly and intentionally provided practical assistance or encouragement which had a substantial effect on the perpetration of the torture against Cormick.

41

126.    But for the actions and knowledge of Christ, Cormick would not have been damaged, tortured, and subjected to inhumane conditions.

127.    At the time Christ executed the affidavit he knew or should have reasonably known that his conduct would assist or encourage Zimbabwean officials to incarcerate Cormick.

128.    Christ knew or should have known that by reason of executing the affidavit, and by reason of the political climate in Zimbabwe at the time, that it was reasonable and probable that Cormick would be subject to confinement that violated specific, universal, and obligatory international norms including but not limited to inhumane conditions as well as psychological and physical torture.

129.    As a consequence of Christ's actions, Cormick has suffered physical and psychological injury.

## COUNT II
(False Imprisonment)

130.    Defendants reassert and incorporate the allegations contained in paragraphs 1-129 of this Counterclaim as if fully set forth herein.

131.    Christ knowingly made materially false statements to the Zimbabwean authorities which resulted in Cormick's being incarcerated and tortured.  Such knowingly false statements lacked probable cause.

132.    Christ made such false statements with malice.

133.    At the time Christ executed the affidavit he knew or should have reasonably known that his conduct would assist or encourage Zimbabwean officials to incarcerate Cormick.

134.    As a consequence of Christ's actions, Cormick suffered false imprisonment, torture, and physical and psychological damage.

42

## COUNT III
(Intentional Infliction of Emotional Distress)

135.    Defendants reassert and incorporate the allegations contained in paragraphs 1-134 of this Counterclaim as if fully set forth herein.

136.    The action of Christ in submitting a false affidavit to the Zimbabwean authorities, for the purpose and with the effect of having Cormick incarcerated, was intentional and outrageous, and constitutes the intentional infliction of emotional distress.

137.    But for Christ's actions, Cormick would not have been incarcerated and subjected to torture and injury.

## COUNT IV
(Defamation)

138.    Defendants reassert and incorporate the allegations contained in paragraphs 1-137 of this Counterclaim as if fully set forth herein.

139.    The statements set forth in paragraph 95 herein above (the "Defamatory Statements") were intentionally published by Christ on a website for the world to see and read.

140.    The Defamatory Statements are false (as are many other statements posted on that web site).

141.    Christ published the Defamatory Statements intentionally, recklessly, negligently, with knowledge of their falsity or with reckless disregard for their truth or falsity, and maliciously.

142.    The publication of the Defamatory Statements did immeasurable damage to Cormick's reputation, credibility and professional standing, and destroyed his ability to practice his profession or earn a living.

143.    The publication of the Defamatory Statements did immeasurable damage to ESUS, as it entirely precluded ESUS from operating and generating income.

144.    The continued publication of the Defamatory Statements will cause irreparable injury to Cormick.

## COUNT V
(Breach of Contract/Declaratory Judgment)

145.    Defendants reassert and incorporate the allegations contained in paragraphs 1-144 of this Counterclaim as if fully set forth herein.

146.    The Operating Agreement of ESUS (labeled "Articles of Association") constitutes a binding contract between ESUS and its members.  In accordance with Section 4 of the ESUS Operating Agreement, Christ, by virtue of his investment of $250,000, was a member of ESUS.

147.    Christ knew and approved of the terms of the Operating Agreement prior to his investment.

148.    Section 6 of the Operating Agreement states that:

Any action by an member who is deemed by the Director(s) to have made a false, misleading or orchestrated financial or other claim against the Company or any of its Director(s) shall have his shares or share entitlements permanently revoked and returned to the Company without financial compensation.  The Company will then be paid within seven days as penalty from the member equal to the amount of his full investment.  This penalty will also apply with respect to multiple infringements, where the respective penalties will be added together to create a final lump sum due the company.

149.    Section 6.1 of the Operating Agreement states that:

Any member who instigates legal action of any nature against the Company or any of its Director(s) shall have his shares or share entitlements permanently revoked and returned to the Company without financial compensation.  The Company will then be paid within seven days as penalty from the member equal to the amount of his full investment.  This penalty will also apply with respect to multiple infringements, where the respective penalties will be added together to create a final lump sum due the company.

44

150.    Section 6.2 of the Operating Agreement states that:

> Any member who through any action causes a loss of business, capital, reputation, income, revenues, or any other benefit to the Company or its Director(s) shall have his shares or share entitlements permanently revoked and returned to the Company without financial compensation. The Company will then be paid within seven days as penalty from the member equal to the amount of his full investment. This penalty will also apply with respect to multiple infringements, where the respective penalties will be added together to create a final lump sum due the company.

151.    Section 6.3 of the Operating Agreement provides that:

> Any member who through any action or inference, be it written or verbal which impugns the professional or personal reputation of the Company or its Director(s) shall have his shares or share entitlements permanently revoked and returned to the Company without financial compensation. The Company will then be paid within seven days as penalty from the member equal to the amount of his full investment. This penalty will also apply with respect to multiple infringements, where the respective penalties will be added together to create a final lump sum due the company.

152.    Section 6.4 of the Operating Agreement provides that:

> Any member who makes misleading, selective, contradictory, inflammatory, deceptive, ambiguous or disingenuous claims or statements to third parties concerning the Company or its Director(s) shall have his shares or share entitlements permanently revoked and returned to the Company without financial compensation. The Company will then be paid within seven days as penalty from the member equal to the amount of his full investment. This penalty will also apply with respect to multiple infringements, where the respective penalties will be added together to create a final lump sum due the company.

153.    Christ's conduct, described above, violates the express terms of the Operating Agreement, and so his interest in ESUS is forfeit, and ESUS is entitled to payment of a penalty of $250,000 for each violation.

45

WHEREFORE, for the foregoing reasons, defendants/counterclaim-plaintiffs Brett J. Cormick and Elan Suisse International Holdings USA LLC respectfully request that the Court:

1.    Enter judgment in favor of defendants and against plaintiff on plaintiff's claims;

2.    Enter judgment in favor of counterclaim-plaintiffs and against counterclaim-defendant on counterclaim-plaintiffs' claims, and award them:

      a.    Compensatory and punitive damages in an amount to be determined at trial;

      b.    A mandatory injunction requiring plaintiff to remove the Defamatory Statements from his website;

      c.    A declaration that Christ violated the Operating Agreement of ESUS, and so has forfeited his interest therein and must pay a penalty to ESUS; and

      d.    Defendants' costs, including reasonable attorneys' fees as authorized by Section 6.5 of the Operating Agreement of ESUS; and

      e.    Such other and further relief as the Court deems just.

Dated: July 20, 2007

                                    /s/ David L. Finger
                                    David L. Finger (DE Bar ID #2556)
                                    Finger & Slanina, LLC
                                    One Commerce Center
                                    1201 Orange Street, Suite 725
                                    Wilmington, DE 19801-1155
                                    (302) 884-6766
                                    Attorney for defendants/counterclaim
                                    plaintiffs Brett J. Cormick and Elan Suisse
                                    International Holdings (USA) LLC

# EXHIBIT B



A GUIDE TO THE
ZIMBABWEAN
LAW OF DELICT

Third Edition, 2001

by

G Feltoe

UC SOUTHERN REGIONAL LIBRARY FACILITY

AA 001 1 7 5 4 0 6 6

A Guide to the Zimbabwean Law of Delict

- injury to person including psychological harm (for example, where a person is injured in a motor vehicle accident);

- for damage to property (for example, where D starts a fire on his land and the fire spreads to P's land and causes damage to his property); and

- harm to economic interests (for example, where D defrauds P and causes him financial loss); and

- loss of support (for example a young child is left without support when her parents are killed in a motor vehicle accident).

On the other hand, the *actio injuriarum* provides a remedy for wrongs to personality. It provides a remedy for sentimental loss or intangible harm. This harm can be:

- harm to reputation, that is harm to one's standing in the eyes of others (for example a newspaper publishes an article about P in which it alleges that he has engaged in corruption);

- harm to dignity (for example D makes sexual advances to P, a woman); and

- invasion of privacy (for example, D, a policeman, enters P's house to carry out a search of the premises when he has no search warrant and there was no lawful justification for him to carry out the search).

In addition to these two major actions, there are certain other delictual actions which have their own separate and distinct requirements such as the Pauperian action for harm done by animals, the action for seduction, the action for wrongful arrest and imprisonment and so on.

# The Aquilian action

This action is the cornerstone of our law of delict. Most of the delictual actions that are brought are Aquilian actions.

A Guide to the Zimbabwean Law of Delict

## Requirements
The requirements for this action are:

- There must have been some conduct on the defendant's part (i.e. an act or omission) which the law of delict recognises as being wrongful or unlawful (the wrongfulness requirement);

- The conduct must have led either to physical harm to person or property and, thereby, to financial loss, or have caused purely financial loss which does not stem from any physical harm to person or property. (The so-called patrimonial loss requirement, one's patrimony being one's property and finances);

- The defendant must have inflicted the patrimonial loss intentionally or negligently (the fault requirement); and

- There must be a causal link between the defendant's conduct and the loss (the causation requirement).

## Concept of duty of care
The expression "duty of care" is frequently used in such cases. The phrase is, however, somewhat confusing insofar as it is used in two separate and distinct senses. It is therefore necessary to identify in which of the two senses the expression is being used in the context concerned. The first sense in which it is used is in connection with negligence. A person is said to have breached the duty of care (i.e. to have been negligent) when he fails to foresee and guard against harm which the reasonable person would have foreseen and guarded against. The second connotation of this phrase is in connection with wrongfulness. When it is used to denote wrongfulness, it will be used in this sort of way: although the reasonable man would have foreseen and guarded against harm, the defendant is not liable in the circumstances as the law does not recognise any duty of care to avoid causing that sort of harm (i.e. the conduct was not wrongful, or, to put it another way, there was no recognised legal duty to avoid causing harm by negligent conduct).

## The patrimonial loss requirement
There must be some quantifiable financial loss stemming from the defendant's conduct. This financial loss usually arises out of damage or destruction of property or physical injury to person or the causing of the

# EXHIBIT C

Westlaw.

840 A.2d 642                                                                                        Page 1
840 A.2d 642, 2003 WL 22873037 (Del.Supr.)
**(Cite as: 840 A.2d 642, 840 A.2d 642 (Table))**

C Rayfield v. Power
Del.Supr.,2003.
(The decision of the Court is referenced in the
Atlantic Reporter in a 'Table of Decisions Without
Published Opinions.')
Supreme Court of Delaware.
Francis W. RAYFIELD, Jr., and Pansy Rayfield,
Plaintiffs Below-Appellants,
v.
June POWER and Thomas W. Power, Defendants
Below-Appellees.
**No. 434, 2003.**

Submitted Nov. 3, 2003.
Decided Dec. 2, 2003.

Injured occupants of vehicle brought negligence
action against left-turning driver. The Superior Court,
Sussex County, granted left-turning driver summary
judgment. Occupants appealed. The Supreme Court,
Randy J. Holland, J., held that injured occupants
could not establish causal connection between
alleged negligence and their injuries without expert
testimony.

Affirmed.

West Headnotes

**Damages 115 ☞185(1)**

115 Damages
    115IX Evidence
        115k183 Weight and Sufficiency
            115k185 Personal Injuries and Physical
Suffering
                115k185(1) k. In General. Most Cited
Cases
Injured occupants of vehicle could not establish a
causal connection between the left-turning driver's
alleged negligent conduct and the occupants' alleged
injuries without an expert witness who would offer
competent medical testimony regarding causation.

Court Below-Superior Court of the State of
Delaware, in and for Sussex County, C.A. No. 01C-

08-016.

Before HOLLAND, and BERGER and STEELE,
Justices.

*ORDER*

*1 This second day of December 2003, upon
consideration of the appellants' opening brief and the
appellees' motion to affirm, it appears to the Court
that:

(1) The plaintiffs, Francis and Pansy Rayfield, filed
this appeal from the Superior Court's order granting
summary judgment to the defendants, June and
Thomas Power. The Rayfields filed a complaint
seeking damages for personal injuries allegedly
caused by an automobile accident in which June
Power struck the Rayfields' automobile after she
allegedly failed to yield the right of way while
making a left-hand turn.[FN1] The Superior Court
granted summary judgment to the Powers because the
Rayfields had failed to offer any expert medical
testimony in support of their complaint for damages.

> FN1. The Powers disputed the Rayfields'
> allegations and filed a counterclaim against
> Francis Rayfield, whom police had cited for
> improper passing on the shoulder pursuant
> to 21 Del. C. § 4117(a).

(2) In order to survive the Powers' motion for
summary judgment, the Rayfields were required to
adequately establish all the elements essential to their
case that they would have the burden of proving at
trial.[FN2] In Delaware, in order to prevail in a
negligence action, a plaintiff must prove by a
preponderance of the evidence that the defendant's
action breached a duty of care in a way that
proximately caused injury to the plaintiff.[FN3] With a
claim for bodily injuries, the causal connection
between the defendant's alleged negligent conduct
and the plaintiff's alleged injury must be proven by
the direct testimony of a competent medical
expert.[FN4] The Superior Court directed the Rayfields
to identify their expert witness, but the Rayfields
failed to comply with the Superior Court's directives.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

840 A.2d 642                                                                                     Page 2
840 A.2d 642, 2003 WL 22873037 (Del.Supr.)
**(Cite as: 840 A.2d 642, 840 A.2d 642 (Table))**

Summary judgment, therefore, was appropriate.[FN5]

> FN2.*Burkhart v. Davies,* 602 A.2d 56, 59
> (Del.1991) (citing *Celotex Corp. v. Catrett,*
> 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91
> L.Ed.2d 265 (1986)).

> FN3.*Russell v. K-Mart Corp.,* 761 A.2d 1, 5
> (Del.2000).

> FN4.*Money v. Manville Corp.,* 596 A.2d
> 1372, 1376-77 (Del.1991).

> FN5.*See Reybold Group, Inc. v. Chemprobe
> Tech., Inc.,* 721 A.2d 1267, 1270-71
> (Del.1998).

NOW, THEREFORE, IT **IS** ORDERED that the
judgment of the Superior Court is AFFIRMED.

Del.Supr.,2003.
Rayfield v. Power
840 A.2d 642, 2003 WL 22873037 (Del.Supr.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

Westlaw.

Slip Copy                                                                                                          Page 1
Slip Copy, 2007 WL 2936193 (D.Del.)
(Cite as: 2007 WL 2936193 (D.Del.))

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Ashley ADAMS, Plaintiff,
v.
Jo Ellen Chapin SHELDON, Defendant.
**Civ. Action No. 04-251-JJF.**

Oct. 5, 2007.
Ashley Adams, Newark, DE, Pro se Plaintiff.

Beth H. Christman, Esquire, Casarino, Christman &
Shalk, P.A., Wilmington, DE, for Defendant, Jo Ellen
Chapin Sheldon.

### *MEMORANDUM OPINION*

FARNAN, District Judge.

**\*1** Presently before the Court are Defendant's
Motion For Summary Judgment (D.I.79), Plaintiff's
Motion To Deny/Dismiss Defendant's Motion For
Summary Judgment (D.I.84), Plaintiff's Motion For
Enlargement Of Time For Response Of Plaintiff To
Defendant's Motion For Summary Judgment (D.I.86),
Plaintiff's Motion For Order For Procedures For
Filing Summary Judgment Motions (D.I.87),
Plaintiff's Motion For Fees For Expert Witness
Report(s) From Defendant, and numerous Responses
and Replies (D.I.88, 90, 92, 93, 95, 96, 97, 99, 103,
104). For the reasons set forth below, the Court will
give Plaintiff leave to submit/provide expert reports,
will deny without prejudice Defendant's Motion for
Summary Judgment (D.I.79) with leave to renew if
Plaintiff fails to submit expert reports, will grant
Plaintiff's Motion For Enlargement Of Time For
Response Of Plaintiff To Defendant's Motion For
Summary Judgment (D.I.86), will deny Plaintiff's
Motion To Deny/Dismiss Defendant's Motion For
Summary Judgment (D.I.84), will deny as moot
Plaintiff's Motion For Order For Procedures For
Filing Summary Judgment Motions (D.I.87), and will
deny Plaintiff's Motion For Fees For Expert Witness
Report(s) From Defendant (D.I.93).

### I. BACKGROUND

Plaintiff Ashley Adams ("Adams") filed this lawsuit
for injuries she allegedly received as a result of a car
accident that occurred in Delaware on April 23, 2002.
The parties in this case are from different states, and
the Court has jurisdiction by reason of the diversity
of their citizenship pursuant to 28 U.S.C. § 1332.
Plaintiff was initially represented by counsel, but
now proceeds *pro se.*

Plaintiff alleges the vehicle she was driving on April
23, 2002, was stopped at a red traffic light, and was
struck in the rear by a car negligently driven by
Defendant Jo Ellen Chapin Sheldon ("Sheldon").
(D.I.1, ¶ 8.) Plaintiff alleges she suffered severe and
permanent orthopedic and neurological injuries
representing a substantial impairment of her bodily
functions to her head, neck, back, arm, hands,
shoulder, legs and body, bones, muscles, tendons,
ligaments, nerves and tissues of her head, neck, back,
arms, hands, shoulder, legs and body, including but
not limited to fracture of the lamina at C7 and non
displaced fracture of the spinous process at C7, left
paracentral disc herniation at C6-7 and C6-7
radiculopathy, cervical sprain and strain, lumbar
strain and sprain, and exacerbation of all known and
unknown pre-existing medical conditions, internal
injuries of an unknown nature, severe aches, pains,
mental anxiety and anguish, and a severe shock to her
entire nervous system, and other injuries that will be
permanent and the full extent of which is not yet
known. (D .I. 1, ¶ 9.)

The Court entered a Rule 16 Scheduling Order on
March 24, 2005. (D.I.17.) It required Plaintiff to
produce her expert reports by no later than August
12, 2005. *Id.* On July 20, 2005, Plaintiff identified
seven expert witnesses. (D.I.81, A29-A30.) After the
initial Scheduling Order had expired, the Court
entered another Rule 16 Scheduling Order on
December 7, 2006 (D.I.70.) By this time Plaintiff was
proceeding *pro se.* The Order set a discovery
deadline of February 28, 2007. *Id.* It required
Plaintiff to produce her expert reports by no later than
April 30, 2007. *Id.* Plaintiff initiated requests for
expert reports on August 4, 2007. (D.I.97, A1-A3.)

**\*2** Defendant has filed a Motion For Summary
Judgment which Plaintiff opposes. Plaintiff has also
filed several other miscellaneous Motions including a
Motion For Fees For Expert Witness Report(s) From
Defendant.

### II. MISCELLANEOUS MOTIONS

Slip Copy
Slip Copy, 2007 WL 2936193 (D.Del.)
(Cite as: 2007 WL 2936193 (D.Del.))

Page 2

On July 16, 2007, Plaintiff filed a Motion For Enlargement Of Time For Response Of Plaintiff To Defendant's Motion For Summary Judgment. (D.I. 86.) Defendant does not object to the motion and, in fact, asked the Court to give Plaintiff additional time to respond to the Motion for Summary Judgment. (D.I.92.) There being no objection, the Court will grant the Motion. The Court notes that Plaintiff filed Responses to the Motion for Summary with supporting brief and exhibits, found at D.I. 88, 95, 96, and 97. They are deemed filed instanter.

Plaintiff also filed a Motion To Deny/Dismiss Defendant's Motion For Summary Judgment. (D.I.84.) Plaintiff argues that Defendant's Motion should be denied or dismissed because the Court had not issued a separate Order regarding procedures for filing summary judgment motions prior to the filing of the Motion. More particularly, she argues that she cannot answer the Motion because no procedures "exist per Scheduling Order or docket entries showing such an order for procedures for filing summary judgment procedures and the procedures can not be presumed." (D.I.84.) On the same date that she filed her Motion For Enlargement Of Time, Plaintiff also filed a Motion For Order For Procedures For Filing Summary Judgment Motions. (D.I.87.) It is similar to the Motion To Dismiss/Deny as it again raises the issue of an Order regarding procedures for filing summary judgment motions.

Initially the Court notes that the procedures for filing summary judgment motions are found on the District Court's website. Moreover, subsequent to the filing of these Motions Plaintiff filed a Response, Supporting Brief, and Appendix opposing Defendant's Motion For Summary Judgment, and has, therefore, complied with the requirements contained in the Court's standard case management Summary Judgment Procedure Order. *See* www.ded.uscourts.gov/JJFmain. (D.I.95, 96, 97.) Accordingly, the Court will deny the Motion To Deny/Dismiss Defendant's Motion For Summary Judgment (D.I.84) and will deny as moot the Motion For Order For Procedures For Filing Summary Judgment Motions (D.I.87).

Finally, Plaintiff moves the Court to enter an Order requiring Defendant to share the cost of Plaintiff's expert reports, depositions, and expert witnesses for trial testimony fees. (D.I.93.) It is Plaintiff's burden to prove her case and it is her responsibility to pay the costs she incurs. The Court will deny the Motion. (D.I.93.) The Court now turns to Defendant's Motion For Summary Judgment.

**III. STANDARD OF LAW**

The Court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The Court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt,* 63 F .3d 231, 236 (3d Cir.1995).

*3 The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

**IV. DISCUSSION**

Defendant moves for summary judgment on the basis that Plaintiff was required to produce expert reports on or before April 30, 2007, and she failed to do so. Defendant contends that without an expert report Plaintiff cannot establish that the medical problems for which she is treating were caused by the April 23, 2002 accident or whether the treatment is for pre-existing medical problems.

Plaintiff responds that discovery is not complete as

Slip Copy                                                                                           Page 3
Slip Copy, 2007 WL 2936193 (D.Del.)
**(Cite as: 2007 WL 2936193 (D.Del.))**

Defendant has not answered interrogatories served on July 18, 2007, and Defendant's response to a request for production of documents was incomplete. Plaintiff states that all requisites of the first Scheduling Order were met, including production of expert reports by August 12, 2005. Plaintiff explains that, subsequent to entry of the December 7, 2006 Scheduling Order, counsel for Defendant indicated she had all the necessary requirements of the prior (i.e., March 24, 2005) Scheduling Order up to the point of the pre-trial conference, which includes expert reports. Plaintiff states that she relied upon that representation. Additionally, Plaintiff states that she "understood those 'expert reports' where [sic] complete by the prior scheduling order and the prior attorney involved in the case." (D.I.95.) On August 4, 2007, after Defendant had filed her Motion For Summary Judgment, Plaintiff initiated requests for expert reports, and in her Motion For Fees states that she requires three experts, at a minimum. (D.I.93.)

Inasmuch as jurisdiction in this case is based on diversity of citizenship, the Court applies the substantive law of Delaware. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64 (1938). "In Delaware, in order to prevail in a negligence action, a plaintiff must prove by a preponderance of the evidence that the defendant's action breached a duty of care in a way that proximately caused injury to the plaintiff. With a claim for bodily injuries, the causal connection between the defendant's alleged negligent conduct and the plaintiff's alleged injury must be proven by the direct testimony of a competent medical expert." *Rayfield v. Power,* 840 A.2d 642, No. 434,2003, 2003 WL 22873037, at *1 (Del. Dec. 2, 2003) (table decision) (citing *Money v. Manville Corp.,* 596 A.2d 1372, 1376-77 (Del.1991); *see also Bushman v. Halm,* 798 F.2d 651, 659 (3d Cir.1986) ("[A]s a matter of ordinary experience, a particular act or omission might be expected under the circumstances to produce a particular result. If that result has indeed followed, it may be permissible to conclude that a causal relation exists. On the other hand, the correlation between certain conditions ... may be beyond lay knowledge. Therefore, expert medical testimony should be used to aid [the trier of fact's] comprehension that a particular condition may arise out of a specific injury.")

*4 Case law supports Defendant's position. The Court, however, takes into consideration the fact that Plaintiff now proceeds *pro se,* and was under the mistaken impression that her former attorney had obtained the required expert reports. Accordingly, the Court will give Plaintiff leave to obtain the required expert reports. The Court will deny without prejudice, Defendant's Motion For Summary Judgment, with leave to renew should Plaintiff fail to obtain and provide to Defendant the expert reports within the time period provided by the Court.

## V. CONCLUSION

The Court will deny without prejudice Defendant's Motion for Summary Judgment and will give Plaintiff leave to obtain expert reports. (D.I.79.) The Court will give Defendant leave to file a motion to extend time to file rebuttal expert reports. The Court will grant Plaintiff's Motion For Enlargement Of Time For Response Of Plaintiff To Defendant's Motion For Summary Judgment, (D.I.86.) The Court will deny Plaintiff's Motion To Deny/Dismiss Defendant's Motion For Summary Judgment, will deny as moot Plaintiff's Motion For Order For Procedures For Filing Summary Judgment Motions, and will deny Plaintiff's Motion For Fees For Expert Witness Report(s) From Defendant. (D.I.84, 87, 93.)

### *ORDER*

At Wilmington, this 5 day of October, 2007, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1. Defendant's Motion For Summary Judgment (D.I.79) is *DENIED* without prejudice with leave to renew.

2. Plaintiff's Motion To Deny/Dismiss Defendant's Motion For Summary Judgment (D.I.84) is *DENIED.*

3. Plaintiff's Motion For Enlargement Of Time For Response Of Plaintiff To Defendant's Motion For Summary Judgment (D.I.86) is *GRANTED.*

4. Plaintiff's Motion For Order For Procedures For Filing Summary Judgment Motions (D.I.87) is *DENIED* as *moot.*

5. Plaintiff's Motion For Fees For Expert Witness Report(s) From Defendant (D.I.93) is *DENIED.*

6. Plaintiff shall *SUBMIT/PROVIDE* expert reports within *seven (7) days* from the date of this Order.

7. If necessary, Defendant is given *LEAVE* to file a motion for additional time to obtain expert rebuttal reports.

Slip Copy
Slip Copy, 2007 WL 2936193 (D.Del.)
**(Cite as: 2007 WL 2936193 (D.Del.))**

Slip Copy, 2007 WL 2936193 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHIBIT E

Westlaw.

Not Reported in A.2d                                                                                         Page 1
Not Reported in A.2d, 2006 WL 1579718 (Del.Super.)
(Cite as: Not Reported in A.2d)

**H**Collins v. African Methodist Episcopal Zion
Church
Del.Super.,2006.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware,New Castle County.
Katina COLLINS, Plaintiff,
v.
The AFRICAN METHODIST EPISOCAL ZION
CHURCH, a North Carolina Corporation; Bishop
Milton A. Williams, Sr.; Scott A.M.E. Zion Church;
and Rev. D. William L. Burton, Jr., Defendants.
C.A. No. 04C-02-121.

Submitted: Dec. 13, 2005.
Decided: March 31, 2006.

**Background:** Plaintiff brought action against church
pastor, alleging intentional infliction of emotional
distress, negligent infliction of emotional distress,
and negligence, based on pastor's alleged sexually
harassing and intimidating conduct. Pastor filed
motion for summary judgment.

**Holdings:** The Superior Court, <u>Scott</u>, J., held that:
(1) fact question as to extreme and outrageous
conduct precluded summary judgment on claim for
intentional infliction of emotional distress, and
(2) medical expert testimony was necessary to
establish proximate cause on claims for negligence
and negligent infliction of emotional distress.

Motion denied in part and granted in part.

**[1]** Judgment 228 ⬤⟳181(33)

228 Judgment
    228V On Motion or Summary Proceeding
        228k181 Grounds for Summary Judgment
            228k181(15) Particular Cases
                228k181(33) k. Tort Cases in General.
<u>Most Cited Cases</u>
Genuine issue of material fact as to whether church
pastor's alleged sexually harassing, intimidating

conversations with plaintiff over the telephone
constituted extreme and outrageous conduct
precluded summary judgment in favor of pastor in
action alleging intentional infliction of emotional
distress. <u>Superior Court Civil Rule 56</u>.

**[2]** Damages 115 ⬤⟳192

115 Damages
    115IX Evidence
        115k183 Weight and Sufficiency
            115k192 k. Mental Suffering and
Emotional Distress. <u>Most Cited Cases</u>
Medical expert testimony was necessary, in action for
negligence and negligent infliction of emotional
distress, to establish that plaintiff suffered her stroke,
slurred speech and headaches as the proximate result
of pastor's sexually harassing, intimidating
conversations with plaintiff over the telephone, where
plaintiff had a pre-existing neurological disorder,
plaintiff had suffered prior physical and sexual abuse,
and a layperson would be unable to form an
intelligent judgment, without the aid of a medical
expert, as to whether pastor's actions caused physical
injuries. <u>Rules of Evid., Rule 702</u>.

Upon Consideration of Defendant Reverend Burton's
Motion for Summary Judgment. **DENIED IN
PART. GRANTED IN PART.**
<u>John M. LaRosa</u>, Esquire, Wilmington, Delaware;
<u>Keith O. Dews</u>, Esquire, Foley Thompson & Dews,
LLP, Philadelphia, Pennsylvania; Attorneys for
Plaintiff.
<u>Kathleen M. Jennings</u>, Esquire, Oberly, Jennings &
Rhodunda, P.A., Wilmington, Delaware; Attorney for
Defendant Reverend Dr. <u>William L. Burton, Jr.</u>

*MEMORANDUM OPINION*

<u>SCOTT</u>, J.

**I. INTRODUCTION**

*1 This case arises from the alleged harassment of
Plaintiff Katina Collins ("Collins") by Reverend
William L. Burton, Jr. ("Burton"). Collins has sued
Reverend Dr. William L. Burton, Jr., ("Burton") for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1579718 (Del.Super.)
(Cite as: Not Reported in A.2d)

intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence. Presently before the Court is Reverend Burton's Motion for Summary Judgment. The Court finds that Collins has established that a genuine issue of material fact exists as to whether Burton's conduct was extreme and outrageous. Therefore, Burton's Motion for Summary Judgment is denied with respect to Collins' claim of intentional infliction of emotional distress. However, because Collins has failed to identify an expert to substantiate the physical injuries she has alleged and to link those alleged physical injuries to her emotional distress, Burton's Motion for Summary Judgment will be granted with respect to the negligent infliction of emotional distress and negligence claims.

## II. *BACKGROUND*

Collins alleges Defendant Burton made sexually harassing, intimidating phone calls to her between the period of November 2002 until September 2003. Burton was pastor and Collins was a member and Vice Chairman of the Steward's Board at the Scott Church during the time in question. Collins states she initially went to the administration of Scott African Methodist Episcopal Zion Church ("Scott Church") to stop the harassing phone calls, but no action was taken. Collins next attempted to contact Bishop Milton A. Williams, Sr., ("Bishop Williams") who presided over the Mid-Atlantic District of the denomination and who was also a representative for International Ministers. Bishop Williams refused to listen to the tape recordings of Burton's comments to Collins and initially refused certified letters from Collins.

In September 2003, Collins filed a complaint with the Wilmington Police Department who subsequently arrested Burton. Bishop Williams then convened a committee who found Burton guilty of sexual harassment in violation of International Ministers' and *The Book of Discipline of the A.M.E. Zion Church ("The Book of Discipline").*

Collins states she has suffered from a stroke, slurred speech, headaches, and mental and emotional anguish as the result of the actions and failure to act of the Defendants.

## III. *STANDARD OF REVIEW*

Summary judgment may only be granted when no genuine issues of material fact exist.[FN1]The moving party bears the burden of establishing the non-existence of genuine issues of material fact.[FN2]If the burden is met, the burden shifts to the non-moving party to establish the existence of genuine issues of material fact.[FN3]"Where the moving party produces an affidavit or other evidence sufficient under Superior Court Civil Rule 56 in support of its motion and the burden shifts, then the non-moving party may not rest on its own pleadings, but must provide evidence showing a genuine issue of material fact for trial."[FN4]Summary judgment will not be granted if the record reasonably indicates a material fact in dispute or a need to inquire more thoroughly into the facts to clarify the application of law to the circumstances.[FN5]The court must view the facts in the light most favorable to the non-moving party.[FN6]

> FN1.*Moore v. Sizemore,* 405 A.2d 679, 680 (Del.1979).

> FN2.*Id.*

> FN3.*Id.* at 681.

> FN4.Super. Ct. Civ. R. 56(3); *Ramsey v. State Farm Mutual Automobile Insurance Co.,* 2004 WL 2240164, at *1 (Del.Super.)(citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

> FN5.*Ebersole v. Lowengrub,* 180 A.2d 467, 470 (Del.1962).

> FN6.*Lupo v. Medical Center of Delaware,* 1996 LEXIS 46, at *5, 1996 WL 111132 (Del.Super.).

**2** Moreover, summary judgment is generally not appropriate for actions based on negligence.[FN7]It is rare in a negligence action "because the moving party must demonstrate not only that there are no conflicts in the factual contentions of the parties but that, also, the only reasonable inferences to be drawn from the uncontested facts are adverse to the plaintiff."[FN8]

> FN7.*Ebersole,* 180 A.2d at 468.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                    Page 3
Not Reported in A.2d, 2006 WL 1579718 (Del.Super.)
(Cite as: Not Reported in A.2d)

FN8.*Upshur v. Bodie's Dairy Market,* 2003
WL 21999598, at *3 (Del.Super.).

## IV. *DISCUSSION*

In Count I of the Second Amended Complaint
Collins sets forth a claim of intentional infliction of
emotional distress against Reverend Burton. She
alleges that Burton's conduct was extreme,
outrageous, intentional, malicious, willful, and
reckless and that as a result of said conduct, she
suffered severe emotional distress and bodily
harm.[FN9]Burton, however, alleges that his relationship
with Collins was that of one layperson to another and
did not rise to the level of extreme and outrageous
conduct. Additionally, in Counts II and III Collins
sets forth a claim of negligent infliction of emotional
distress and negligence against Reverend Burton.
Collins alleges that Burton had a duty as a pastor as
set forth in the Policies & Procedures Concerning
Sexual Misconduct contained in *The Book of
Discipline* and a duty as an individual to exercise due
care.[FN10]It is alleged that Burton's actions were not
what an ordinary prudent person or pastor would
have done under similar circumstances and thereby
caused Collins to suffer emotional distress and
depression.[FN11]As a direct result of this emotional
distress and depression, Collins alleges that she has
suffered from a stroke, headaches and developed
slurred speech.[FN12]Defendant Burton argues that
Collins has failed to produce any expert testimony
linking her claims of physical injury to her emotional
distress. Specifically, he contends that Collins has not
produced medical evidence of a stroke nor has she
provided medical evidence linking her headaches and
slurred speech to her distress. Although Collins has
designated Dr. Alvin Turner, a psychologist, as an
expert, Burton alleges that this is insufficient since he
is not a medical doctor.

FN9. Compl. at ¶¶ 72-73.

FN10. Compl. at ¶¶ 76, 82.

FN11. Compl. at ¶¶ 77-78, 83-84.

FN12. Compl. at ¶¶ 79, 84.

**A. Collins Has Established That A Genuine Issue**

**Of Material Fact Exists As To Whether Burton's
Conduct Was Extreme And Outrageous**

The tort of intentional infliction of emotional distress
may form the basis of an award of damages, but a
plaintiff must establish the following elements as set
forth in the *Restatement (Second) of Torts* § 46
(1965):
... One who by extreme and outrageous conduct
intentionally or recklessly causes severe emotional
distress to another is subject to liability for such
emotional distress, and if bodily harm to the other
results from it, for such bodily harm.

In *Cummings v. Pinder,*[FN13] the Supreme Court of
Delaware held that a claim for intentional infliction
of emotional distress may be made even in the
absence of accompanying bodily harm, if the conduct
is outrageous.[FN14]It is the Court's gatekeeping
responsibility to determine whether Burton's conduct
was so extreme and outrageous as to permit
recovery.[FN15]However, where reasonable people may
differ, it is for the trier of fact to determine whether
there has been sufficiently extreme and outrageous
conduct as to result in liability.[FN16]Liability has only
been found to result where the conduct is so
outrageous and extreme that it "exceeds the bounds
of decency and is regarded as intolerable in a
civilized community."[FN17]It is not enough that a
defendant acted with tortious or criminal intent,
intended to inflict emotional distress, or even that his
conduct has been characterized by malice or a degree
of aggravation that would entitle the plaintiff to
punitive damages under another tort.[FN18]

FN13.574 A.2d 843, 845 (Del.1990).

FN14.*Id.*

FN15.*Farmer v. Wilson,* 1992 WL 331450,
at *4 (Del.Super.).

FN16.*Thomas v. Harford Mutual Insurance
Co.,* 2004 WL 1102362, at *3 (Del.Super.).

FN17.*Id.*

FN18.*Farmer,* 1992 WL 331450, at *4.

*3 Burton relies upon *Teadt v. Lutheran Church*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00275-GMS     Document 106-8     Filed 03/31/2008     Page 5 of 8
Not Reported in A.2d                                                                 Page 4
Not Reported in A.2d, 2006 WL 1579718 (Del.Super.)
(Cite as: Not Reported in A.2d)

*Missouri Synod,*[FN19]*Doe v. Hartz,*[FN20] and *Hoy v. Angelone,*[FN21] to support his assertion that his relationship with Collins did not rise to the level of extreme and outrageous conduct. In *Teadt,* the court held that a minister's conduct could not be reasonably regarded as extreme and outrageous when an adult parishioner alleged that a minister pursued her, gained her trust, and eventually engaged in a consensual sexual relationship with her, albeit that her consent was given when she was in a vulnerable position.[FN22] Because the defendant's conduct could not be reasonably regarded as extreme and outrageous, plaintiff had failed to state a claim upon which relief could be granted and summary disposition was appropriate.[FN23]In *Hartz,* the court agreed that being grabbed and kissed by a priest against one's will involved conduct that was unacceptable, but could not find that such conduct alone was extreme and outrageous.[FN24]Additionally, in *Hoy v. Angelone,* the court found that a supervisor's conduct in sexually harassing an employee and thereby creating a sexually hostile work environment was not sufficiently outrageous to support the employee's claim for intentional infliction of emotional distress.[FN25]The court stated that as a general rule, sexual harassment alone does not rise to the level of outrageousness necessary to make out a cause of action for intentional infliction of emotional distress and that "the only instances in which courts applying Pennsylvania law have found conduct outrageous in the employment context is where an employer engaged in both sexual harassment and other retaliatory behavior against an employee."[FN26]However, the court in *Hartz* did recognize that courts have considered claims for intentional infliction of emotional distress based on sexual misconduct by a clergyman where considerably more egregious conduct was at issue.[FN27]For instance, in *Sanders v. Casa View Baptist Church,*[FN28] the court held that the evidence raised a genuine issue of material fact on plaintiff's allegations of outrageous conduct, where there was evidence that the defendant minister sexually harassed the plaintiffs at work, made graphic sexual comments and gestures, and engaged in sexual relationships with two of the plaintiffs who worked just a few feet from each other.[FN29]

FN19.237 Mich.App. 567, 603 N.W.2d 816 (Mich.App.1999).

FN20.52 F.Supp.2d 1027 (N.D.Iowa 1999).

FN21.456 Pa.Super. 596, 691 A.2d 476 (Pa.Super.Ct.1997).

FN22.*Teadt,* 603 N.W.2d at 824.

FN23.*Id.*

FN24.*Hartz,* 52 F.Supp.2d at 1069.

FN25.*Hoy,* 456 Pa.Super. 596, 691 A.2d 476.

FN26.*Id.* at 483 (citing *Cox v. Keystone Carbon,* 861 F.2d 390, 395-96 (3rd Cir.1988)).

FN27.*Hartz,* 52 F.Supp.2d at 1069.

FN28.898 F.Supp. 1169 (N.D.Tex.1995).

FN29.*Id.* at 1177;*see also Walker v. Dickerman,* 993 F.Supp. 101, 102-03 (D.Conn.1997)(finding in the plaintiff's favor and awarding punitive damages on the plaintiff's claim of intentional infliction of emotional distress, because the defendant minister had engaged the plaintiff in years of sexual abuse, including oral sex and digital penetration, while the plaintiff was a minor)); *Schieffer v. Catholic Archdiocese of Omaha,* 244 Neb. 715, 508 N.W.2d 907, 910-11 (Neb.1993)(an adult parishioner failed to state a claim for intentional infliction of emotional distress against a priest, despite years of consensual sexual relations in the course of counseling, because there were no allegations that the defendant used force or fraud to accomplish his sexual relations or that her "vulnerability" made her incapable of consenting to what took place)); *Destefano v. Grabrian,* 763 P.2d 275, 286 (Colo.1988)(allegations that a Catholic clergyman took advantage of the plaintiff's vulnerable emotional state to induce her to engage in a sexual relationship after the clergyman had held himself out to be trained and capable of conducting marital

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1579718 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 5

counseling and she consulted him for such counseling were sufficient to withstand the clergyman's motion to dismiss the plaintiff's claim of intentional infliction of emotional distress).

[1] In the present case, Collins has not cited to any cases to support her assertion that Burton's conduct was extreme and outrageous. However, she has provided examples of different incidents involving the allegedly outrageous language Burton used during his telephone conversations. This evidence raises a genuine issue of material fact on Collins' allegation of outrageous conduct. Whether the facts of this case support a claim for intentional or reckless infliction of emotional distress is a matter appropriate for the jury.[FN30] Thus, the Court is of the opinion that Burton's Motion for Summary Judgment should be denied with respect to Collins' intentional infliction of emotional distress claim.

> FN30.*Thomas*, 2004 WL 1102362, at *3 (where reasonable people may differ, it is for the trier of fact to determine whether there has been sufficiently extreme and outrageous conduct as to result in liability).

### B. Collins Cannot Establish Her Claim For Negligent Infliction Of Emotional Distress Because She Has Failed To Produce Expert Testimony

*4 To recover under a theory of negligent infliction of emotional distress a plaintiff must provide evidence of a physical injury.[FN31]Courts have held that where the physical phenomena accompanying emotional disturbance are transitory and non-recurring, they do not amount to the physical injury needed for recovery under a negligent infliction of emotional distress claim.[FN32] In *Lupo v. Medical Center of Delaware, 1996 WL 111132* the court found that the plaintiffs had suffered physical injury.[FN33]After the death of their baby, the plaintiffs suffered from recurring episodes of sleeplessness, nightmares, headaches, clinical depression, irritability, rage, crying spells, and mental distress.[FN34]Relying on the testimony of plaintiff's psychologist, the court found that the plaintiff's injuries were more substantial than transitory, non-recurring physical phenomena and that sufficient evidence of a physical injury had been produced to

overcome a motion for summary judgment.[FN35]

> FN31.*Garrison v. Medical Center of Delaware, Inc.*, 581 A.2d 288, 293 (Del.1990).

> FN32.*Lupo*, 996 LEXIS 46, 1996 WL 111132.

> FN33.*Id.* at *10.

> FN34.*Id.*

> FN35.*Id.* at *11.

[2] In the present case, Defendant Burton does not allege that the physical phenomena accompanying Collins' emotional disturbance are transitory and non-recurring. Rather, he alleges that sufficient evidence of a physical injury has not been produced to overcome a motion for summary judgment because Collins has failed to produce any expert testimony linking her claims of physical injury to her emotional distress. Burton contends that he has repeatedly requested disclosure of such information in Defendants' Joint Request for Production of Documents and Defendants' Joint Interrogatories Directed to Plaintiff, but to date no expert has been provided. Moreover, by Stipulation dated August 2, 2005, the parties agreed to extend the discovery deadline until September 15, 2005. However, Collins has yet to submit an expert report. Burton asserts that Collins' designation of Dr. Alvin Turner ("Dr.Turner"), a psychologist who is not a medical doctor, as an expert is insufficient to causally link Collins' alleged injuries to her emotional distress.

The Court finds that a medical expert, other than Dr. Turner, is required to link Collins' claims of physical injury to her emotional distress. Delaware Rule of Evidence 702 provides that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."Where the medical question as to proximate cause is complicated and carries the fact finder into realms properly within the province of medical experts, then expert medical testimony is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 6
Not Reported in A.2d, 2006 WL 1579718 (Del.Super.)
(Cite as: Not Reported in A.2d)

necessary to establish proximate cause between an act and an injury.[FN36] The general rule is that expert testimony is required to establish a proximate cause of an injury when the explanation of the cause and effect are not matters normally within the knowledge of laymen.[FN37] To be "competent," the expert testimony must be reliable in the circumstances of the case.[FN38]

> FN36. *Rea v. Midway Realty Corporation,* 1990 WL 35285, at *1 (Del.Super.).

> FN37. *Id.*

> FN38. *See Bell Sports, Inc. v. Yarusso,* 759 A.2d 582, 588 (Del.2000).

*5 Under the present circumstances, the Court finds that a layperson would be unable to form an intelligent judgment, without the aid of a medical expert, as to whether Burton's actions caused Collins' physical injuries. Since Collins did have a pre-existing medical condition and her alleged physical injuries could have been caused by a prior occurrence the Court finds that Collins' physical injuries are not obviously related to the actions of Burton. Therefore, a medical expert is necessary to establish the causal nexus. Specifically, Collins has a neurological disorder called Arnold-Chiari Malformation which is a condition in which the cerebellum portion of the brain protrudes into the spinal canal.[FN39] Arnold-Chiari II type malformation is associated with myelomeningocele (a defect of the spine) and hydrocephalus (increased cerebrospinal fluid and pressure within the brain), which usually are apparent at birth.[FN40] Myelomeningocele usually causes paralysis of the legs and, less commonly, the arms.[FN41] If left untreated, hydrocephalus can cause mental impairment.[FN42] Any type of Arnold-Chiari Malformation can cause symptoms of headache, vomiting, difficulty swallowing, and hoarseness.[FN43] Moreover, symptoms of progressive brain impairment may include dizziness, an impaired ability to coordinate movement, double vision, and involuntary, rapid, downward eye movements.[FN44] Without a medical expert, it would be impossible to determine whether Collins' headaches were caused by this neurological disorder or whether they were in fact caused by the alleged conduct of Reverend Burton. Moreover, Collins' unique background further establishes the need for a medical

expert to causally link her emotional distress, depression, stroke, headaches, and slurred speech to the actions of Burton. She reported to Dr. Turner that she had been exposed to domestic violence between the ages of twelve and thirteen, her parents had gotten divorced and she was both physically and sexually abused between the ages of five and thirteen, she had been mentally abused by the father of her third child, and physically abused by the father of her first and second children. Based upon the totality of these circumstances, the Court finds it necessary to have a medical expert's opinion showing that Collins' physical complaints were in fact caused by Burton's actions and were not caused by the cumulative effect of prior physical and sexual abuse. Expert testimony is needed to buttress Collins' subjective complaints of physical injuries not readily identifiable with the alleged actions of Burton. In addition to not proving a causal link between her physical injuries and the alleged actions of Burton, Collins has not provided any medical evidence whatsoever of a stroke. Based on the facts as they now exist, Collins will not be able to establish her claim for negligent infliction of emotional distress because she does not have a medical expert listed as a witness. Therefore, with respect to the negligent infliction of emotional distress claim, Defendant's Motion for Summary Judgment is hereby granted.

> FN39. National Institute of Neurological Disorders and Stroke, Chiari Malformation Information Page, *http:// www.ninds.nih.gov/disorders/chiari/chiari.h tm* (last visited February 23, 2006).

> FN40. *Id.*

> FN41. *Id.*

> FN42. *Id.*

> FN43. *Id.*

> FN44. *Id.*

**C. The Court Finds As A Matter Of Law That Expert Testimony Is Needed To Establish That Burton's Conduct Caused Collins' Physical Injuries**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 1579718 (Del.Super.)
(Cite as: Not Reported in A.2d)

*6 Collins also claims damages for emotional distress due to Defendant Burton's negligence. It is settled law in Delaware that, in a negligence action, for a claim of mental anguish to lie, an essential ingredient is present and demonstrable physical injury.[FN45] As noted above, the Court finds under these circumstances that a layperson would be unable to form an intelligent judgment, without the aid of medical expert, as to whether Burton's actions caused Collins' physical injuries. The causal nexus between Collins' injuries and Burton's actions is not obvious and is not within the common knowledge of a layperson. A lay jury's finding that Burton's conduct caused Collins' injuries would be mere speculation. Therefore, this Court finds that expert testimony is needed to establish that Collins' physical injuries would not have occurred but for Burton's actions. Because Collins has not produced any expert testimony linking her physical injuries to her emotional distress, Defendant Burton's Motion for Summary Judgment is granted with respect to the negligence claim.

> FN45. *Garrison,* 581 A.2d 288 at 293; *Cooke v. Pizza Hut, Inc.,* 1994 WL 680051 (Del.Super.)(granting summary judgment to defendant where plaintiff sought to recover mental anxiety in negligence claim but failed to establish physical injury).

### V. *CONCLUSION*

For the foregoing reasons, the Court determines that Collins has established that a genuine issue of material fact exists as to whether Burton's conduct was extreme and outrageous. Therefore, the Court denies Burton's Motion with respect to Collins' claim of intentional infliction of emotional distress. The Court also concludes that expert testimony is needed to establish that Burton's conduct caused Collins' physical injuries. Since Collins has failed to produce this expert testimony she cannot prove her claims of negligent infliction of emotional distress and negligence.

Accordingly, Defendant Burton's Motion for Summary Judgment is **DENIED IN PART, GRANTED IN PART.**

**IT IS SO ORDERED.**

Del.Super.,2006.
Collins v. African Methodist Episcopal Zion Church
Not Reported in A.2d, 2006 WL 1579718 (Del.Super.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

# REDACTED

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-275-GMS |
| | ) | |
| BRETT J. CORMICK and ELAN SUISSE | ) | |
| INTERNATIONAL HOLDINGS (USA) | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 31, 2008, I caused a true and correct copy

of the foregoing *REDACTED Opening Memorandum Of Law In Support Of  Plaintiff's*

*Motion In Limine To Exclude Evidence Of Brett J. Cormick's Physical And Psychological*

*Injuries* to be served on counsel for defendants as listed below, electronically by cm/ecf.

*Attorneys for Defendants:*

David L. Finger, Esquire
Finger & Slanina, P.A.
One Commerce Center, Suite 725
1201 North Orange Street
Wilmington, DE 19801-1155

Dated: March 31, 2008

_____*/s/ Thad J. Bracegirdle*_____
Thad J. Bracegirdle (No. 3691)

WILLIB-58172.1