IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRETT J. CORMICK and ELAN SUISSE | ) | C.A. No. 06-275-GMS |
| INTERNATIONAL HOLDINGS (USA) | ) | |
| LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| ELAN SUISSE, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-60-GMS |
| | ) | |
| ROBERT D. CHRIST, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**ANSWERING MEMORANDUM OF BRETT J. CORMICK, ELAN SUISSE
INTERNATIONAL HOLDINGS (USA) LLC AND ELAN SUISSE, LTD.
TO ROBERT D. CHRIST'S MOTION FOR
ENTRY OF DEFAULT JUDGMENT AND ATTORNEYS' FEES**

Brett J. Cormick and Elan Suisse International Holdings (USA) LLC (defendants in Civil

Action No. 06-275-GMS) and Elan Suisse, Ltd. (plaintiff in Civil Action No. 07-60-GMS)

(collectively, "Respondents") hereby respond to Robert D. Christ's Motion for Entry of Default

Judgment and Attorney's Fees as follows:

## ARGUMENT

Mr. Christ has requested three categories of compensation (in addition to the claim for $250,000 constituting his original investment, as to which Respondents have no dispute): (1) special damages, (2) punitive damages, and (3) attorneys' fees.  As demonstrated below, these claims are inappropriate, unjustified and unsupported, and constitute overreaching on the part of Mr. Christ.

## I.    THE CLAIM FOR SPECIAL DAMAGES IS IMPROPER AS NO SPECIAL DAMAGES WERE PLEADED, AND THE ALLEGED SPECIAL DAMAGES ARE NEITHER PROPER NOR DOCUMENTED.

"A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." *Fed. R. Civ. P.* 54(c).  "Therefore, a default judgment must be supported by specific allegations as to the exact amount of damages asked for in the complaint." *Philip Morris USA, Inc. v. Castworld Products, Inc.*, 219 F.R.D. 494, 499 (C.D. Cal. 2003).   The only "amount" specifically identified in the Amended Complaint is Mr. Christ's investment of $250,000.

It is true that the *ad damnum* clause requests unidentified "consequential damages." To the extent this is intended as a demand for special damages, it is insufficient.  Special damages must be pleaded with specificity.  *Fed. R. Civ. P.* 9(g).  Failure to so plead precludes their recovery upon judgment. *Maidmore Realty Co., Inc. v. Maidmore Realty Co., Inc.*, 474 F.2d 840, 843 (3d Cir.1973). This rule applies equally in the context of default judgments.  *See Blanchard v. Cortes-Molina*, 453 F.3d 40, 45 (1st Cir. 2006).[1]

---

[1]

Special damages are those damages which may be the natural and consequential result of the wrong, but do not necessarily or inevitably result from the wrong. *Huyler's v. Ritz-Carlton Restaurant & Hotel Co. of Atlantic City*, 6. F.2d 404, 406 (D. Del. 1925).  The claimed damages (other than the $250,000) did not inevitably result from the wrong, but were collateral to it.  *See, e.g., Duncan v. Duncan*, No. CK92-4672, 1998 WL 420750, WL Op. at *2, Walls, J. (Del. Fam. Jan. 9, (continued...)

As Mr. Christ did not set forth his special damages in his Amended Complaint, he is foreclosed from seeking them now.[2]  Additionally, as set forth below, the requested amounts are not properly compensable.

1.     Travel Expenses: Mr. Christ seeks "approximately $5,000" to travel to England to meet with Dr. Cormick and representatives of BNP Paribas.[3] (Christ Aff. ¶4).  The purpose of this trip was to allow Mr. Christ to see that the proposed business had serious interest by important players in the financial industry so as to give Mr. Christ some comfort before investing. (Exs. A at 64-69, C).[4]  Even if this was a properly compensable item, Mr. Christ has not provided any evidence to support his self-serving statement as to the actual cost of this trip.   Merely giving an "approximate" rounded figure renders the amount speculative and insufficient.  *See O'Keefe v. Niagara Mohawk Power Corp.*, 714 F.Supp. 622, 634 (N.D.N.Y. 1989).  *See also Duncan*, WL Op. at *3 (special damages must be proven "to a reasonable degree of certainty").  As Mr. Christ has declined to provide any supporting documentation, or an exact figure, and did not plead these items in his Amended Complaint, thereby denying Dr. Cormick an opportunity to obtain discovery on the

---

[1](...continued)
1998) ("[a] claim for loss of income constitutes special damages which require proof to a reasonable degree of certainty").

[2]
Although Mr. Christ listed his proposed special damages in the pretrial order, Respondents noted an objection thereto, thereby preserving the issue.

[3]
BNP Paribas is a leading European bank. http://en.wikipedia.org/wiki/BNP_Paribas.

[4]
Mr. Christ sent an e-mail to his wife after that meeting, apparently excited about the prospects, although on deposition Mr. Christ testified that he misled his wife about his true feelings, and that the meeting (and other events preceding it) raised alarm bells in his head about the venture, which he ignored because of his feelings for Dr. Cormick.  (Ex. A at 69-72).

issue and develop rebuttal evidence, he should not be allowed to claim this as damages at this late date.

Mr. Christ also appears to claim "approximately $3,000" in travel expenses coming to Delaware for his deposition. Apart from the fact that this claim is undocumented and merely an estimate, Mr. Christ is not entitled to recover costs incurred in coming to Delaware (the jurisdiction where he filed suit) for his deposition. *Matthews v. Wilson*, 123 F.R.D. 522, 523 (E.D. Pa. 1989).

2.    Communication Expenses: Mr. Christ "estimate[s]" that he "incurred $4,000 in communications expenses (for telephone, fax, Internet, etc.) relating to the 'business' of Elan Suisse." (Christ Aff. ¶5). This conclusory statement is wholly inadequate. Where is the documentation? What is the correct amount? Was this money used to purchase equipment? If so, where is the equipment? Is Mr. Christ making personal use of it? What percentage of use of the equipment's use was business-related? Is Mr. Christ improperly attempting to obtain recovery of his payments for home Internet service (or worse, his business Internet for which he may take a tax deduction as a business expense) by claiming it was used as part of Elan Suisse's business? Absent clear evidence of the methodology and basis for this claim, it amounts to nothing but speculation, and so Respondents are not answerable for such alleged damages.

3.    Pelican Hard Case: Mr. Christ wants $225.00 for a "Pelican hard case" he purchased. Where is the receipt? Where is the evidence that a case of this expense was necessary to ship t-shirts (after all, Mr. Christ had a duty to mitigate expense)?

4.    Lost Revenues: Perhaps the most questionable of all Mr. Christ's special damages claims is the claim for lost revenue. Mr. Christ claims that he should be compensated for time spent (i) working on the Elan Suisse project, and (ii) doing investigation for this lawsuit, because it

4

precluded him from doing work for his business. Mr. Christ seeks compensation at his daily rate in his business times the number of days he "estimates" that he spent on this work. (Christ Aff. ¶¶6-8).[5]

First, Mr. Christ previously sued an Elan Suisse entity for compensation in connection with his work on the Elan Suisse website referred to in paragraph 5 of his affidavit, and agreed to a settlement. (Ex. A at 185-86). Mr. Christ did not disclose the fact of that lawsuit to the Court, provide documentation or explain why he should be compensated in this lawsuit as well.

Second, Mr. Christ again "estimates" the number of days he spent, with no time records, no explanation of what work was done on those days or how they were essential to Elan Suisse or his case.[6] This is rank speculation.

Third, there is no evidence (much less objective evidence) that, but for his time spent on behalf of Elan Suisse and doing research for the litigation, there would have been work offered to him in his business that he had to turn away.

Fourth, there is no justification offered as to why, even if these other failures of proof were overcome, Mr. Christ should be entitled to compensation at the rate he is paid in his business. There is no evidence that such rate is comparable to the rates paid to individuals doing comparable work.

---

[5]

In his affidavit, Mr. Christ swears that his daily rate is $1,475 (Christ Aff. ¶8), but in his deposition (three months ago) he swore that his daily rate was $985. (Ex. A at 185).

[6]

Mr. Christ's web site shows that much of his "research" was aimed not at Dr. Cormick, but at individuals previously associated with Dr. Cormick. Mr. Christ's "research" also consisted of gathering complaints and criticisms from former wives and lovers of Dr. Cormick, and others with biases or grudges, entirely unrelated to his claim, and repeating their untested accusations on his web site. This information would be neither relevant nor admissible in his lawsuit. Mr. Christ has not explained how much of the time for which he seeks compensation was spent on these pursuits or, if none, how he determined such.

Finally, irrespective of the above, as a matter of law a litigant has no right to compensation for time spent in furtherance of his or her lawsuit. *See Wesley v. Don Stein Buick, Inc.*, C.A. No. 97-2271-FWL, 1998 WL 709600, WL Op. at *1, Lungstrum, J. (D. Kan 1998); *Steinberg v. Grasso*, C.A. No. A-2508-0ST1, 2007 WL 701689, WL Op. at *7 (N.J. Super. A.D. Mar. 9, 2007), *certification denied mem.*, 927 A.2d 1291 (N.J. 2007) ("[l]itigants generally are not entitled to recover their time lost in attending court or participating in litigation...").

Mr. Christ's claims are simply attempts to win the default judgment lottery. As they are unpleaded, unsupported and unlawful, they should be rejected.

## II.    UNDER THE CIRCUMSTANCES, PUNITIVE DAMAGES ARE UNWARRANTED.

On a default judgment, the allegations of the Amended Complaint are *not* accepted as true for the purpose of establishing punitive damages. *Deshmukh v. Cook*, 630 F.Supp. 956, 959-60 (S.D.N.Y. 1986). Thus, Mr. Christ must affirmatively prove entitlement to punitive damages. *Matter of Gober*, 100 F.3d 1195, 1205 (5th Cir. 1996).

To obtain punitive damages for fraud or deceit, it must be gross, oppressive or aggravated or involve a breach of trust or confidence.[7] *Stephenson v. Capano Development, Inc.*, 462 A.2d 1069, 1076-77 (Del. 1983). Thus, Mr. Christ must provide evidence to show Dr. Cormick's state of mind, to the extent that Mr. Christ is claiming that Dr. Cormick acted "intentionally and

---

[7]

Mr. Christ does not claim any breach of trust or confidence, nor could he under the facts. In the four-years the two men knew each other prior to the transaction at issue, they had spent only approximately twenty-two days together, the vast majority of which was spent with Mr. Christ serving as a paid tour guide. (Ex. A at 35-37; Ex. B at 312-13). This does not rise to the level of a relationship of trust or confidence, no matter how strongly Mr. Christ may have felt toward Dr. Cormick. *See, e.g., Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005) (friendship and plaintiff's subjective trust does not create a fiduciary relationship).

maliciously" (Christ Memorandum at 5). *See Lothschuetz v. Carpenter*, 898 F.2d 1200, 1205-06 (6th Cir. 1990). Mr. Christ is also obligated to establish that the amount of punitive damages is reasonable under the circumstances. *Beck v. Atlantic Contracting Co., Inc.*, 157 F.R.D. 61, 65 (D. Kan. 1994). Mr. Christ has done none of this.

Mr. Christ claims that he is entitled to punitive damages because Dr. Cormick "deliberately and continually threw up roadblocks in legal proceedings in two countries in an effort to hinder Mr. Christ's legal efforts at reclaiming Mr. Cormick's ill-gotten gains." In other words, Mr. Christ seeks punitive damages because Dr. Cormick defended himself.

There is no basis for awarding punitive damages for defending oneself in litigation, and Mr. Christ has not offered any precedential support for his argument. Moreover, there is no basis to suggest that Dr. Cormick did anything improper in defending himself.[8]

Mr. Christ claims that punitive damages are warranted because Mr. Christ avoided his deposition. However, this Court has already sanctioned Dr. Cormick for that by granting a default judgment. Although Mr. Christ characterizes Dr. Cormick's failure to appear for a deposition as an "act of defiance" (Christ Mem. at 5), as counsel stated at the hearing on default, Dr. Cormick decided for various reasons (primarily economic) to give up the fight and concede to a default judgment, with the deposition being a collateral issue. As such, this does not justify punitive damages.

---

[8]

As shown at Exhibit F at F-22-27, Mr. Christ, on his website, has accused Dr. Cormick's counsel of unethical conduct in connection with his representation of Dr. Cormick in violation of the Delaware Rules of Professional Conduct (which do not apply in federal proceedings, *see* D. Del. L.R. 83.6(d)). However, Mr. Christ has not identified any conduct which any court or disciplinary body would recognize as an ethical violation. Mr. Christ's comments are the result of blind rage rather than reasoned analysis.

Finally, in determining whether to award punitive damages and the amount, Respondents are entitled to submit evidence in mitigation of punitive damages. *Germanio v. Goodyear Tire & Rubber Co.*, 732 F.Supp. 1297, 1304 (D.N.J. 1990). In mitigation, Respondents ask the Court to consider two things: (i) Mr. Christ's own culpability, and (ii) the punishment Mr. Christ's website has inflicted and will continue to inflict on Dr. Cormick.

     a.    **<u>Mr. Christ's Own Culpability.</u>**

The Court should understand that Mr. Christ is not an innocent babe in the woods fleeced by an avaricious predator, but a commercially sophisticated party. Mr. Christ is a college graduate who earned a CPA license and worked for Coopers & Lybrand, then one of the top accounting firms with clients with net worths in the hundreds of millions and in the billions. Thereafter he was employed by companies of significant size to do accounting work. Mr. Christ was familiar with the concept of due diligence. (Ex. A at 4-20). Indeed, on his website he identifies himself as an "experienced forensic accountant." (Ex. F at F-11). Thus, Mr. Christ had the full knowledge and skills to protect himself, which he deliberately decided not to use.

Part of that knowledge came from experience. This was not Mr. Christ's first encounter of this kind. He had previously accepted an offer to go to Barbados from a man he had never met to work on a "get rich quick" scheme involving currency exchange. When Mr. Christ got there he discovered that he would not be paid as promised, but still decided to stick it out in hope. He ended up not being paid, not being able to pay his hotel bill, having the hotel take his passport until he could pay not only his own bill but the bill of other participants, and only getting his passport back after being bailed out by a friend. Curiously, unlike the present case where Mr. Christ's anger with Dr. Cormick remains unabated, Mr. Christ still thought well of those who caused his predicament,

and even had a friendly reunion with the ringleader some months after his return to the U.S.  (Ex. A at 21-34).

Although Dr. Cormick continues to maintain that Elan Suisse was a legitimate business[9], for the purposes of the default judgment he must accept that he has been found to have made false statements.  But in that regard, Mr. Christ testified that there were several instances where he was put on notice that things may not have been as they represented.  Notwithstanding these "alarms" (one of which Mr. Christ described as "screaming"), he never investigated, although Mr. Christ testified that had it been anyone other than Dr. Cormick, he would have avoided the project entirely. (Ex. B at 300-09, 398-99, 410-11).

Thus, in determining whether Mr. Christ should be the beneficiary of punitive damages, the Court should consider his own conduct.

### b.    Mr. Christ's website.

As the function of punitive damages is punishment, it is appropriate for the Court to consider other punishments meted out against Dr. Cormick. *See Wilhelm v. Ryan*, 902 A.2d 745, 749-52 (Del. 2006) (evidence of criminal punishment admissible in mitigation of punitive damages).

In this case, Mr. Christ has been punishing, and continues to punish, Dr. Cormick via his website.  On that website, Mr. Christ routinely excoriates Dr. Cormick (and anyone associated with him, including counsel), repeatedly referring to Dr. Cormick (directly or by innuendo) as a scam artist, a grifter, a cheat, a pathological liar, a criminal, a crook, a thief, one who has been "in and out

---

[9]

Indeed, witnesses Richard Crook and Apostolos Zographos testified on deposition how investors in Zimbabwe had benefitted from Elan Suisse's pilot program. (Ex. D at 14-18; Ex. E at 5-6).

of jail for years," a "dead beat dad," a "dirt bag," a pedophile, etc. Selections from Mr. Christ's website are gathered at Exhibit F.  Mr. Christ also seeks out ex-wives and lovers, and others with biases or grudges, and publishes on his web site whatever bad things they tell him, with no regard for whether what he is repeating is false, incomplete or misleading. Indeed, Mr. Christ testified that he tends to accept any malignant interpretation of information presented to him over any benign interpretation, and that he feels no obligation to ensure the accuracy of what he posts as he is merely repeating what he was told by others. (A-133, 141-42, 144-47, 194-98, 228-29, 251-55).

Because of the default judgment, Dr. Cormick has lost his opportunity to obtain compensation for the defamatory aspects of the website.  He has also lost the opportunity to have the website taken down.  Now Mr. Christ can post vitriolic statements with impunity.  Whenever any potential employer, investor, friend, or girlfriend types "Brett Cormick" into Google, Mr. Christ's website will be the first link that comes up. (Ex. G).  This will follow Dr. Cormick wherever he goes for at least as long as the website is up.[10]  Indeed, it is ironic that Mr. Christ adamantly pursues all avenues to recover his investment, while at the same time taking deliberate action to prevent Dr. Cormick from ever being in a position to generate revenue to pay the default judgment.

All of this is in addition to the fact that Mr. Christ had Dr. Cormick arrested and imprisoned in Zimbabwe. (A-231-35).

The purpose of punitive damages is to punish. *Sterner v. Wesley College, Inc.*. 747 F.Supp. 263, 268 (D. Del. 1990). In light of Mr. Christ's website, an award of punitive damages would

---

[10]

If there is any question as to the impact of such public accusations, Mr. Zographos (who, though treated unfairly by Mr. Christ, was not attacked nearly as much as was Dr. Cormick) testified on deposition as to the adverse effect Mr. Christ's website has had on his business. (Ex. D at 25-26, 30-37).

exceed the need for punishment, and would constitute an improper windfall to Mr. Christ. For these reasons, the Court should decline to award punitive damages.

## III.    AN AWARD OF ATTORNEY'S FEES IS NOT WARRANTED.

Under the American Rule, absent contract or statute, each litigant is responsible for his or her own attorney's fees, irrespective of the outcome of the litigation. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247 (1975). Exceptions to this rule are narrowly circumscribed. *Miller-Wohl Co., Inc. v. Commissioner of Labor and Industry State of Mont.*, 694 F.2d 203, 204 (9th Cir. 1982).

In seeking an award of fees, Mr. Christ relies *exclusively* on the argument that Respondents supposedly acted in bad faith in the litigation. However, this argument is without factual or legal support, and so should be rejected by this Court.

### A.    THE SOUTH AFRICAN LITIGATION.

Prior to bringing suit in Delaware, Mr. Christ sued Dr. Cormick in South Africa. In connection with that litigation, Mr. Christ was required to post security for costs. (Christ Aff. ¶9).

Dr. Cormick sought dismissal of that action on the ground of lack of personal jurisdiction. (Christ ¶10). Mr. Christ chose not to litigate the issue, but did not dismiss the action and seek a return of his deposit from the South African court. (A-87-88). Instead, he filed suit in Delaware.

As a legal matter, Mr. Christ has not identified aby authority for this Court to award fees incurred in foreign litigation, especially where Mr. Christ was not successful in that litigation. Nor has Mr. Christ justified his failure to apply to the South African court for his fees and a return of his security deposit. Moreover, Mr. Christ has not established that South African courts award attorneys' fees in such circumstances, which would be important under principles of comity.

As a factual matter, Mr. Christ has not provided any evidence that Dr. Cormick's defense in South Africa was made in bad faith (whatever the test is under South African law). Although he accuses Dr. Cormick of making inconsistent statements in the South African and this litigation, he offers no proof of this.

Finally, as an evidentiary matter, a summary statement of fees such Mr. Christ provided is inadequate, as it prevents Dr. Cormick from making argument as to the reasonableness of the charges, and prevents the Court from deciding same. *Intel Corp. v. Terabyte Intern., Inc.*, 6 F.3d 614, 623 (9th Cir. 1993).

Mr. Christ's request for fees in the South African litigation is extraordinary, without legal or factual foundation, and so should be rejected.

## B.    THE PRESENT LITIGATION.

As to Civil Action No. 07-60-GMS, contrary to Mr. Christ's argument, the U.S. District Court for the Eastern District of Pennsylvania did not find bad faith in Elan Suisse Ltd's decision to file suit in Pennsylvania. To the contrary, that Court expressly stated that it was not so concluding. *Elan Suisse, Ltd. v. Christ*, C.A. No. 06-3901, 2006 WL 3838237, WL Op. at *4 n.13, Pratter, J. (E.D. Pa. Dec. 29, 2006).[11] Moreover, Mr. Christ has not provided any evidence that the claims in that action were frivolous.

As to Civil Action No. 06-275-GMS, Mr. Christ's argument is that Dr. Cormick litigated in bad faith because he dared to defend himself against the claims instead of conceding at the outset, and further had the temerity to assert counterclaims. There is no evidence that either the defenses

---

[11]    Counsel in the Delaware litigation was not involved with the Pennsylvania litigation, and his not been able to obtain information from Pennsylvania counsel about events there.

or counterclaims were meritless.  The fact that Dr. Cormick was forced to abandon his claims and defenses because he lacked the financial wherewithal to come to Delaware for trial (or even for no reason whatsoever) does not render those claims and defenses meritless or made in bad faith.

Mr. Christ accuses Dr. Cormick of "throw[ing] up two years of repeated procedural roadblocks and prolong the litigation as long as possible in an obvious and blatant attempt at driving up my expenses." (Christ Aff. ¶14).  This statement is more venting of spleen than reasoned analysis. After Mr. Christ filed Civil Action No. 06-275-GMS in Delaware, the defendants moved to dismiss for lack of personal jurisdiction and failure to state a claim.  The Court dismissed most of the defendants (other than Dr. Cormick) and dismissed the conspiracy claim.  Although the Court denied the motion as to Dr. Cormick, there was no suggestion, and no finding, that Dr. Cormick's legal arguments were frivolous or made in bad faith, nor could there be.

After the motion was decided, the Court held a conference and set a litigation schedule.  That schedule was adhered to (the Court denied one motion by Dr. Cormick to continue the trial date). Moreover, any expenses being driven up were the results of Mr. Christ's serial filing of motions for judgment on the pleadings and for partial summary judgment, as well as discovery disputes he

caused.[12]   As such, Mr. Christ's suggestion that Dr. Cormick did anything wrong in terms of litigation conduct is simply frivolous.

Mr. Christ next argues bad faith because of a comment at the last hearing stating "good luck trying to collect [any judgment]."  For reasons unexplained, Mr. Christ considers this to be "blatant abuse of the federal judicial system and its limited resources...." (Christ Aff. ¶6).  However, this statement merely expresses the fact that Dr. Cormick has no money to pay any judgment.  Mr. Christ does not believe this (A-235-38), of course, but that does not change the fact.  Nor does it mean that Dr. Cormick's legitimate attempt to defend himself and seek redress of his grievances against Mr. Christ  constituted acts of bad fath in the law.

In addition to these points, Mr. Christ is not entitled to attorney's fees because he has not submitted proper evidence of them.  As noted above, a party seeking attorney's fees has an obligation

---

[12]

Mr. Christ's position is not without irony given his actions during the discovery phase.  Most notably, in connect with Mr. Christ's fraud claims, Dr. Cormick propounded an interrogatory asking Mr. Christ to identify the statement(s) he claimed were false and upon which he claimed to rely.  Mr. Christ produced over 17,000 pages of documents on cds (in a non-text-searchable format), and responded that the statements could be found therein.  Dr. Cormick objected on the ground that such response violated *Fed. R. Civ. P.* 33(d)(1). Mr. Christ refused to alter his position, necessitating a conference call with the Court.  The Court instructed Mr. Christ to either identify the specific statements or the specific documents containing the statements.

After delaying (over Dr. Cormick's objections) for several months, Mr. Christ submitted revised interrogatory responses, identifying over 200 documents which he claimed contained false statements upon which he relied.  As this still required Dr. Cormick to locate needles in a haystack, another teleconference with the Court ensued.  Ultimately, Mr. Christ's counsel acceded to the suggestion of Dr. Cormick's counsel that Mr. Christ take a yellow pen and highlight the alleged statements.

Although this was done, at his deposition Mr. Christ revealed that it was done incorrectly, with Mr. Christ highlighting statements he claimed to be false, without regard to whether he was claiming reliance on them.  This required Mr. Christ to engage in further editing, which still may not have been done properly.  (B-370-71).

to produce detailed bills, not mere summaries, so the Court can determine whether such fees are reasonable. *Intel Corp.*, 6 F.3d at 623. That was not done here, and such omission is important. For example, is Mr. Christ seeking fees for litigating the claims against the defendants who were dismissed on motion? Such would be improper. Moreover, is he seeking fees for motions he filed which were not granted, or for discovery disputes that were resolved against him?

Another important issue is whether he is entitled to claimed fees equal to or in excess of his claim for $250,000. It is, of course, Mr. Christ's right to fight for principle, but that does not mean that such fees are reasonable when he seeks to impose them on Dr. Cormick.

Mr. Christ has not offered any compelling reason to depart from the American Rule. As such, this Court should deny his request for an award of fees.

## IV.    PRE-JUDGMENT INTEREST.

As noted above, Respondents strongly oppose the award of any damages beyond the $250,000 pleaded in the Amended Complaint. If, however, the Court decided to award additional amounts, Respondents wish to point out to the Court that, under Delaware law[13], pre-judgment interest may not be awarded as to punitive damages, *Tekstrom, Inc. v. Savla*, C.A. No. 03-06-0033, 2005 WL 3589401, WL Op. at *1, Trader, J. (Del. Comm. Pls. Nov. 22, 2005), and there is no Delaware authority for an award of pre-judgment interest on attorneys' fees, which remain unliquidated until the amount (if any) is set by the Court.

---

[13]    In diversity cases, the Court must look to state law to determine the entitlement to pre-judgment interest. *W.A. Wright, Inc. v. KDI Sylvan Pools, Inc.*, 746 F.2d 215, 219 (3rd Cir. 1994).

## CONCLUSION

Mr. Christ has not established a *prima facie* case for damages beyond the $250,000 pleaded, or for punitive damages or attorney's fees.  As such, there is no need for an evidentiary hearing.[14]

WHEREFORE, for the foregoing reason, Respondents respectfully request that the entry of default judgment limit Mr. Christ's compensatory damages to $250,000, and deny his request for punitive damages and attorney's fees.

Dated:   June 9, 2008

Respectfully submitted,


/s/ David L. Finger
David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155
(302) 884-6766
Attorney for Brett J. Cormick and Elan Suisse International Holdings (USA) LLC (defendants in Civil Action No. 06-275-GMS) and Elan Suisse, Ltd. (Plaintiff in Civil Action No. 07-60-GMS)

---

[14]

Of course, Mr. Christ should not be permitted to use his reply brief to supplement the record in attempt to correct his deficiencies.  *D. Del. L.R.*  7.1.3(c)(2).

16

**From:**      Dr Brett Cormick [brettc@elan-capital.com]
**Sent:**      Monday, March 01, 2004 3:15 AM
**To:**        Bob Christ
**Subject:**   Re: "The Open Komono Agreement"


Bob

We are mates

We look after each other

I am not even letting you anywhere near the company until you walk out of BNP going..

"erh........OK you know what.....this could just be real"

; -)

Brett

---- Original message ----
>Date: Sun, 29 Feb 2004 13:48:10 -0500
>From: "Bob Christ" <bob.christ@seatrepid.com>
>Subject: "The Open Komono Agreement"
>To: "Brett Cormick" <brettc@elan-capital.com>
>
>You've heard of Open Skies?  Well...
>
>I'm thinking we can just sign the e-mail, but I think a simple one page
>document will do the job.  I just want something in writing in case Mr.
>IRS man comes a-knockin' at my door and asked why I was trying to
>launder all that money.
>
>Let me know your feedback asap.  I'm ready to roll.  I'll send over
>money to the appointed accounts this week (as soon as I can find where
>the fuck MetLife put my $200k).
>
>If this thing takes off, it is because of you.  I could never have
>pulled this off.  If it tanks, well, then I have only myself to blame.
>I know the risks.  With that said, let's rock-n-roll.  I got some
>mountains to climb, some Poles to jump and some money to make.  This is gonna be fun!
>
>
>Dr Brett Cormick
>elan capital
>2 Lansdowne Row
>Berkely Square
>Mayfair
>London W1J 6HL
>
>Tel: +44 (0) 20 691 7890
>Fax: +44 (0)20 7493 4935
>Email: brettc@elan-capital.com



"The contents of this electronic message and any attachments relating to the official
business of elan capital  and subsidiaries ("elan capital") are proprietary to elan
capital. They are confidential, legally privileged and protected by law. Views and
opinions are those of the sender and do not represent elan capital's views and opinions
nor constitute any commitment by or obligation on elan capital unless otherwise stated or
agreed to in writing by elan capital.

1

RDC 07378

The person addressed in this electronic message is the sole authorised recipient. If you have received this message in error, you are to delete it immediately and notify the sender that it has unintentionally reached you.
You may not use or disclose the contents of this message to any other person.

elan capital cannot assure that the integrity of this communication has been maintained, nor that it is free of errors, viruses, interception, tampering or interference. elan capital therefore does not accept liability or legal responsibility for the contents of this electronic message, its non-delivery or incorrect delivery for whatever reason, its effect on electronic devices or its transmission in an unencrypted medium."

RDC 07379

020808az.ac.txt

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ROBERT D. CHRIST,                     ) CONFIDENTIAL
                                  )
    Plaintiff/Counterclaim Defendant;   )
                                  ) C.A. No.
v.                             ) 06-275-GMS
                                )
BRETT J. CORMICK and ELAN SUISSE    )
INTERNATIONAL HOLDINGS (USA) LLC,    )
                                )
    Defendants/Counterclaim Plaintiffs. )

Telephonic deposition of APOSTOLOS
ZOGRAPHOS taken pursuant to notice at the Law Offices
of Reed Smith, LP, 1201 North Market Street, Suite
1500, Wilmington, Delaware, beginning at 9:00 a.m. on
Friday, February 8, 2008, before Ann M. Calligan,
Registered Merit Reporter and Notary Public.

APPEARANCES:

          THAD J. BRACEGIRDLE, Esquire
          REED SMITH LLP
            1201 North Market Street - Suite 1500
            Wilmington, Delaware 19801
            on behalf of the Plaintiff/Counterclaim
            Defendant;

          DAVID L. FINGER, Esquire
          FINGER & SLANINA, LLC
            One Commerce Center
            1201 Orange Street - Suite 725
            Wilmington, Delaware 19801-1155
            on behalf of the Defendants/
            Counterclaim Plaintiffs.

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

2

1              APOSTOLOS ZOGRAPHOS,

2         the witness herein, having first been

020808az.ac.txt

3          duly sworn on oath, was examined and

4          testified as follows:

5                              EXAMINATION

6   BY MR. FINGER:

7     Q.    Mr. Zographos, I hope I am pronouncing your

8   name correctly.

9     A.    Yes.

10    Q.    For the record, I'm David Finger.  I represent

11  Brett Cormick and Elan Suisse International.

12          So you understand the process, I'm going

13  to begin by asking you a series of questions.  When I

14  am finished, Mr. Thad Bracegirdle, representing

15  Mr. Christ will ask you some questions.  If, at any

16  time, either of our questions are unclear to you,

17  please let us know and we will attempt to restate them

18  in a clearer manner.

19    A.    Okay.

20    Q.    Also, if, at any time, you need to take a break

21  for any reason for a couple of minutes, let us know

22  and we will do our best to accommodate you.

23    A.    All right.

24    Q.    Finally, because we are working by telephone,

3

                 Apostolos Zographos - Finger

1   for the court reporter's benefit, please make sure

2   that you answer our questions with words as opposed to

3   saying "mm-hmm" or shrugs which she can not see or get

4   down.  And also try not to speak too quickly.

5   Otherwise she may get some blisters on her fingers.

                        Page 2

020808az.ac.txt

6    A.    Right.  Okay.  Understood.

7    Q.    All right.  Could you please begin by stating

8    your full name for the record?

9    A.    My full name is Apostolos Zographos.

10   Q.    And where were you born, sir?

11   A.    I was born in Masvingo, Zimbabwe, in 1955 on

12   May 1st.

13   Q.    Could you please give us a brief history of

14   your education?

15   A.    Right.  I went to school in Masvingo.  I

16   completed my A level studies.  That's the high school

17   there.  I was a school prefect in my final year, and I

18   achieved the best eligible results in my year and was

19   awarded a commendation, a prize for that.  After

20   that --

21   Q.    Excuse me.  Before you go on --

22   A.    Yes.

23   Q.    For the benefit of those of us here in the

24   States, what does it mean when you say you were a

4

Apostolos Zographos - Finger

1    prefect?

2    A.    Well, it's with an English-based school system.

3    So we had prefects.  That's where -- I would imagine

4    something like monitors that you might have in

5    America.  But in sort of a position of some authority

6    over the other students at the school.

7    Q.    Thank you.  Please continue.

8    A.    Right.  After I finished my schooling, I

020808az.ac.txt

 9   studied at university in South Africa for a bachelor

10   of commerce degree.

11       Q.   What was the name of that university?

12       A.   Rhodes University in Grahamstown.

13       Q.   Did you have any post-university education?

14       A.   Yes.  Well, in my final year at university, I

15   was selected to go overseas on a graduate student

16   exchange work program, and I spent six months in

17   Greece.

18                And then, after that, I returned to South

19   Africa to Johannesburg and I started working there.  I

20   was trainee manager in the property department of an

21   investment company.  They sent me to the University of

22   Capetown Business School for a two-week management

23   program.  And I'd been with the company for almost two

24   years when I went over to America to study for an MBA

                                                              5

                    Apostolos Zographos - Finger

 1   at the University of Southern California.

 2       Q.   Did you receive your MBA degree?

 3       A.   Yes.  I have received my -- I did receive it.

 4       Q.   You mentioned that you were working for an

 5   investment company.  Could you please give us a brief

 6   history of your work background after that?

 7       A.   Okay.  Well, I worked for that investment

 8   company for almost two years as a trainee assistant

 9   manager in the property department.  I went over to

10   America to study for the MBA.  After I completed the

11   MBA, I returned to South Africa and I started working

                         Page 4

020808az.ac.txt

12    for a merchant bank in Johannesburg by the name of UAL

13    Merchant Bank.  I started off as a trainee investment

14    manager in the investment department.  I was then

15    moved over to the research department, and I was there

16    for a while.  And I was due to go over into the

17    capital markets division, but my father passed away in

18    Zimbabwe, and my brother who was also living and

19    working in Johannesburg -- we left South Africa to

20    return to Zimbabwe.

21    Q.    What did you do after you returned to Zimbabwe?

22    A.    My brother and I carried on with my late

23    father's businesses which was wholesale and retail and

24    property development and management.  And that was

                                                          6


                    Apostolos Zographos - Finger

1    19 -- at the end of 1985, '86.

2              In 1997 I opened up a tire retread factory

3    in Masvingo.  It was probably the most advanced

4    technologically tire company in Zimbabwe with the

5    latest technology from South Africa, and I ran that

6    company until I sold it off in 2001.

7              And then I left Zimbabwe in 2001 to come

8    over to the Seychelles.

9    Q.    Are you currently living in the Seychelles?

10    A.    Yes.  I've been living here since October 2001.

11    Q.    For the benefit of us here, where are the

12    Seychelles Islands located?

13    A.    Seychelles Islands, it's a group of islands,

14    115 islands located four degrees below the equator in

                    Page 5

020808az.ac.txt
15    the Indian Ocean, about 1,000 miles from the African

16    coast.

17        Q.    Are you involved in any business in the

18    Seychelles?

19        A.    Yes, I am.  I'm involved in the registration of

20    offshore companies.

21        Q.    Thank you.  I'd like to now change the topic

22    over to Dr. Brett Cormick.  Do you know Dr. Cormick?

23        A.    Yes, I do.

24        Q.    When and how did you meet him?

7

Apostolos Zographos - Finger

1        A.    I met Brett Cormick in the mid 1990s.  It was

2    either 1994 or '95.  When he came out to Zimbabwe with

3    his wife Jennifer.  I was introduced to him by his

4    mother-in-law who was showing off Jennifer's husband

5    off to the community and what a fine catch Jennifer

6    had managed to land.  And then I met him whenever he

7    and Jennifer came out to Zimbabwe after that.

8    Subsequently they moved to Zimbabwe.

9        Q.    Did you develop a friendship with Dr. Cormick?

10        A.    Yes.  Not immediately on the first meeting.  It

11    was a very brief meeting.  As I say, he was introduced

12    to me by his mother-in-law.  I met him again in 1998

13    at the theater in Masvingo.  He came up to me

14    immediately he saw me to offer his condolences on my

15    brother's death.  And we developed a friendship from

16    there on.  And then it was at that time, when he was

17    out there in 1998 with Jennifer that Jennifer and her

Page 6

020808az.ac.txt

18    mother stated to me that Jennifer and Brett were

19    planning to move to Zimbabwe during the next 12 months

20    and that they would be moving into the house that was

21    currently occupied at the time by Jennifer's brother,

22    who then bought a house for himself and his family,

23    and Brett and Jennifer went and moved to Zimbabwe in

24    1999 and moved into the house which was about -- not

8

Apostolos Zographos - Finger

1    even a five-minute walk from where I was living at the

2    time.

3        Q.    And after Dr. Cormick and his wife moved to

4    Zimbabwe, how frequently did you interact with him?

5        A.    Frequently.  Several times a week.  I would go

6    over to their place.  They would have dinner at my

7    place.  I would have dinner at their house.  They had

8    dinner with me New Year's Eve of 2000 with myself and

9    a group of other friends at my house.  And apparently

10    that was the night that their daughter Jessica was

11    conceived, and subsequently they asked me to be a

12    godfather to Jessica.

13        Q.    Did you agree to that?

14        A.    Yes, I did.

15        Q.    As far as you knew, at that point that

16    Dr. Cormick moved back to Zimbabwe, was he employed in

17    any manner?

18        A.    I wasn't aware that he was employed, but I knew

19    that he would occasionally go overseas for work

20    purposes.  So I presumed that he was doing some work

020808az.ac.txt

21  of some sorts.

22      Q.    Did you ever ask him about what work he was

23  doing?

24      A.    No, I didn't because in those -- at that stage

9

Apostolos Zographos - Finger

1   of the friendship, I mean, that was more or less a

2   private thing and I didn't want to pry.  It was only

3   later that we -- when we became involved in sort of

4   quite a few community activities and the friendship

5   was very solid that we started talking about

6   investment ideas.

7       Q.    Could you please describe the community

8   activities that you just referred to?

9       A.    Well, okay.  Brett -- he was quite actively

10  involved with both the Kyle College Secondary School

11  in Masvingo and also the Kyle Junior Primary School in

12  Masvingo.  He would be asked by the headmasters to

13  give inspiration-type talks and activities for the

14  students.  And he was also involved in sponsoring

15  several children whose parents were not able to afford

16  to pay for the school fees.  I know that at Kyle

17  Primary School, he was paying the school fees of -- I

18  think it's either eight or nine children, whose

19  parents weren't able to pay for their fees.

20          Other community activities that I was

21  involved with him, there was a child there at school

22  whose -- who was actually a very good swimmer and

23  whose parents could not afford to send him to South

020808az.ac.txt
24    Africa for an international competition.   So Brett and

                                                                    10

                    Apostolos Zographos - Finger
 1    I put some money together to pay for this child's trip
 2    to South Africa so he could participate in the
 3    competition.
 4                Other things that Brett had got involved
 5    in was a lady and her children, who was suddenly
 6    widowed.   Her husband had been a priest, and he was
 7    killed in a car accident.   And this woman was left
 8    destitute, and she was going to be thrown out of the
 9    church house because there was some scandals
10    surrounding her husband's death.   And Brett, when he
11    heard about the situation, he put up a whole lot of
12    money together and went and handed it over to her.
13                There was also the case of our local
14    private vet, who relied primary on income generated
15    from working with farmers' animals, mostly livestock,
16    cattle.   But because of the farm situation in
17    Zimbabwe, a lot of the farmers were vacating their
18    properties and a vet was not earning the income that
19    he was earning before.   And he also had a problem
20    having to pay for his children's school fees.   So
21    Brett, again, got a whole lot of money together and
22    went and handed it over to the vet.   Actually didn't
23    hand it over.   Put the money a plain brown bag and put
24    it in the mailbox at the entrance to the house.

                                                                    11

020808az.ac.txt

Apostolos Zographos - Finger

1          And then also I know, when he and Jennifer

2    moved to Harare, they were both involved with paying

3    to feed and provide vitamins for a big group of

4    homeless street children who didn't have homes and

5    didn't have parents.  Yeah.  He was -- there was that.

6    Q.    You've mentioned several times about

7    Dr. Cormick putting money together.  Was that simply a

8    question of him paying out of his own pocket, or was

9    it fund raising from various other sources.

10          MR. BRACEGIRDLE:  Objection to form.

11    A.    No.  Primarily out of his own pocket.  One or

12    two instances he mentioned it to me and I offered to

13    assist as well by way of cash, which I did.

14    Q.    Speaking of community involvement, are you a

15    member of the Round Table?

16    A.    Yes, I am.  I was a member of Round Table in

17    Zimbabwe.  And I am an honorary member of Round Table

18    in Seychelles.  Brett in Zimbabwe always sponsored the

19    Round Table fund raising activities.  And there was

20    also an instance where he made an anonymous donation

21    to the old people's home in Masvingo.

22    Q.    Could you please explain what the Round Table

23    is?

24    A.    Well, the Round Table is an international

                                                              12

Apostolos Zographos - Finger

1    fellowship group of like-minded men.  Parts of the
                         Page 10

020808az.ac.txt

2    world have opened up and have taken female members as

3    well.   But primarily it's a fellowship organization

4    pretty much along the lines of Rotary International

5    and Lions International.   And out of our fellowship we

6    commit ourselves to generating funds, raise funds

7    through various activities to donate to community

8    projects in whatever community that we are in.

9             Here in Seychelles the Round Table

10   primarily has supported the Ministry of Health by way

11   of raising funds to buy ambulances.   Last year we

12   raised funds to purchase a mammogram machine to be

13   donated to the Ministry of Health, specialized

14   ambulance for disabled people so they can be collected

15   on a daily basis from their homes and taken to the

16   rehabilitation center and then delivered back to their

17   homes afterwards.

18   Q.    You describe a number of community activities

19   involving Dr. Cormick.   Did he keep his involvement

20   anonymous?

21   A.    The majority of the time, yes.   There were

22   times, you know, when he was asked by the headmasters

23   of schools to assist with student activities and to

24   give talks and lectures, motivational lectures,

13

Apostolos Zographos - Finger

1    motivational talks, organizing and arranging Outward

2    Bound-type activity, prefect selection courses, and

3    also, because it was a small community, with very

4    little social facilities -- there wasn't a cinema in

020808az.ac.txt

5   the town; there was only the theater -- Brett got

6   involved in the theater as well, helped to increase

7   membership numbers.  He would organize activities for

8   children during the holidays, you know, adventure-type

9   activities at game lodges during the day, that sort of

10  stuff.

11     Q.    You mentioned Outward Bound, could you explain

12  what that is?

13     A.    Well, basically you get a whole lot of children

14  together and put them through some things similar to

15  an obstacle course where they would have to undergo

16  sort of a whole lot of physical actions and endurance

17  tests.  And also he would evaluate them as well and

18  see how they would cope.

19     Q.    You discussed all of these things that

20  Dr. Cormick did.  Do you have any personal knowledge

21  of what Dr. Cormick's reputation was like in the

22  community?

23     A.    Well, personally speaking, I would say that

24  people are very grateful for what he was doing.  He

                                                        14

              Apostolos Zographos - Finger

1   was certainly seen to be active, more than a whole lot

2   of other people in the community, and he was a

3   newcomer to the community as well.  And you know,

4   there were individuals that he helped out as well

5   financially, also, as I said, with the instance of the

6   youngster that was selected to represent Zimbabwe in

7   an international swimming competition.  So, yes, the

020808az.ac.txt

8    parents were very grateful for Brett's involvement.

9      Q.    You said that once your relationship, your

10    friendship with Dr. Cormick solidified, then you would

11    be able to discuss with him his work or his

12    employment.  Did you ever learn what his work was?

13     A.    Well, yes.  He had told me that he had been

14    involved with some major European financial

15    institutions and had connections with some American

16    financial institutions, that he had held fairly senior

17    positions among those institutions.

18     Q.    Did he ever identify any of those institutions

19    by name?

20     A.    No.  Not at the time he didn't.  I didn't

21    inquire.

22     Q.    Are you familiar with a project of

23    Dr. Cormick's call Elan Suisse?

24     A.    Yes, I am familiar with that.

15

Apostolos Zographos - Finger

1      Q.    What is your understanding of the business of

2    Elan Suisse or the business Elan Suisse was intended

3    to have?

4      A.    Brett and I had this concept whereby, through

5    his connections with these financial institutions in

6    Europe, we would approach investors and put forward an

7    investment proposal to them that, with Brett having

8    access to -- firsthand access to investment

9    opportunities overseas, that people in South Africa

10    normally don't have -- they are sort of stuck at the

Page 13

020808az.ac.txt

11  back end of -- well, at the end of the investment

12  queue just investing in bank investments offering very

13  low returns.

14       Brett had this concept of getting

15  investment opportunities from these financial

16  institutions, getting potential investors to invest,

17  the idea being that we wouldn't charge them anything

18  at the time, but once they started achieving a return

19  on investment of over 20 percent, then, we would be

20  charging them on a rate, pro rata.

21  Q.   What was the intended market for this business?

22  A.   Well, basically, it was going to -- we were

23  going to start off in Zimbabwe.  And at that stage, I

24  was planning to sell my business in Masvingo and move

                                                          16

Apostolos Zographos - Finger

1  to Seychelles, and this would be an opportunity for me

2  to be able to conduct Brett's line of business over

3  here and approach investors both here and in the

4  region, mostly Mauritius and then hopefully, after

5  that, in Reunion as well.

6  Q.   What sort of investment products, did Elan

7  Suisse intend to market.

8  A.   Well, they would be initially IPOs, also

9  looking at biotechnology stocks, renewable energy,

10  commodities, and then also U.S. government bonds.

11  Q.   Did you consider this an innovative business

12  idea?

13  A.   Yes, I did.  You know, having worked in South

                        Page 14

020808az.ac.txt

14    Africa with UAL Merchant Bank and having a slight feel

15    for investments, stocks, shares, I thought this was a

16    good opportunity for investors to generate returns and

17    this would be a good line of business for me.

18        Q.    Was this type of business in existence in

19    Zimbabwe at the time?

20        A.    No, it wasn't.

21        Q.    Do you know?

22        A.    There wasn't anything like it.  There wasn't

23    anything like it available in the region.

24        Q.    Do you know why that is?

17

Apostolos Zographos - Finger

1        A.    Well, no one had access to the markets that

2    Brett had, and no one could actually -- they didn't

3    have access to the investments that Brett would have

4    had.  And, you know, we just had individual financial

5    advisors there, but basically they were offering basic

6    bank-type portfolios.

7        Q.    Did you personally invest any money into the

8    project?

9        A.    Yes, I did.

10        Q.    How much did you invest?

11        A.    $81,667.

12        Q.    Is that American dollars, Zimbabwe dollars?

13        A.    Yes.  U.S. dollars.

14        Q.    And what did you receive in exchange for that

15    investment?

16        A.    Well, Brett issued me with a receipt, so I have

Page 15

020808az.ac.txt

17   that on file.  And we were going to take it from there

18   once I moved to Seychelles and got the company

19   registered and operational here.

20      Q.   Did you engage in any due diligence or

21   investigation prior to investing the money?

22      A.   No, I didn't.

23      Q.   What, if anything, did Brett do to confirm his

24   access to these markets?

                                                          18

                    Apostolos Zographos - Finger

1      A.   Well, by that stage he was telling me all the

2   names of companies that he had access to and, you

3   know, showed me business cards that he had with

4   companies that he had worked with.  And he just said

5   that he had access to these people and he was

6   operating a similar type pilot scheme in Zimbabwe with

7   a whole lot of private schools, independent schools in

8   Zimbabwe actually invested funds through Brett and

9   they achieved far greater than average returns.  So as

10   far as I was concerned, he was actually in a --

11   proving what he claimed to be able to do.

12      Q.   Did you confirm that with any of the schools?

13      A.   Well, I confirmed with the headmaster of the

14   Lennox School at the time.

15      Q.   What did the headmaster tell you?

16      A.   He just said that the school had invested funds

17   that they would normally put in coal deposits or in

18   government treasury bonds, but through the investments

19   they made on Brett's advice, his words were something

Page 16

020808az.ac.txt

20  along to the effect that they were achieving

21  phenomenal returns, far better than they would have

22  been able to under other circumstances.

23    Q.    Did you take an active part in the development

24  of Elan Suisse beyond investing money?


                                                          19


                    Apostolos Zographos - Finger

1    A.    No.  Not in Zimbabwe.  Only in Seychelles.

2    Q.    What did you do in Seychelles for Elan Suisse?

3    A.    Well, Brett and I came up to Seychelles in May

4   2001, and we had a series of meetings with various

5   people here in Seychelles.  We met with the special

6   advisor to the president.  We met the advisor to the

7   vice-president, who was the minister of finance at the

8   time.  We met with the manager of the central bank

9   here in Seychelles.  We met the manager of the

10  government social welfare fund.  And we met various

11  individuals.  We also met with the manager of the

12  Seychelles Institute of Management.  Brett offered to

13  lecture students for free whenever he would come out

14  to Seychelles.

15           We then, while we were here in Seychelles

16  in May 2001, we also took a trip to Mauritius where we

17  met the director of the central bank there.  We also

18  met the consultant to the minister of finance, the

19  managing director of Mauritius Commercial Bank, which

20  is the largest bank in Mauritius, and we met with the

21  largest investment group in Mauritius as well.

22    Q.    What would you do at these meetings?
                        Page 17

020808az.ac.txt
```
23    A.    Well, I would introduce Brett, and he would
24    explain the concept of Elan Suisse and the investment
```

                                                              20


                      Apostolos Zographos - Finger
```
 1    prospects, and he would explain to them what would be
 2    involved, what if they were to invest.
 3    Q.    What was the purpose of these meetings?
 4    A.    Well, basically it was to -- initially,
 5    primarily for me to get Elan Suisse established here
 6    in Seychelles and, secondly, offer both public and
 7    private individuals and institutions the opportunity
 8    to be able to invest.
 9    Q.    What sort of reaction did you observe from
10    these presentations?
11    A.    Well, wherever and whoever we met, the reaction
12    was very positive, and everyone was very keen and
13    inquired when they would be able to invest.  They were
14    as keen as mustard to jump in and start immediately.
15    But we said, no, this is still in early stages and we
16    will keep you posted of developments.  And when we are
17    established and operational we will let you know and
18    we will meet you again and take it from there.
19    Q.    Were there any firm commitments to invest from
20    any of the people to whom you made presentations?
21    A.    Well, yes, certainly.  The government of
22    Seychelles through various departments and the central
23    bank and the welfare fund were very keen to invest as
24    were institutions and individuals in Mauritius as
```

                            Page 18

020808az.ac.txt

21

Apostolos Zographos - Finger

1    well.

2        Q.    Did you meet a gentleman named James

3    McWilliams?

4        A.    Yes, I did.

5        Q.    Who is --

6        A.    Well, wait.  I know James McWilliams, but I

7    didn't actually meet him at the time of Elan Suisse.

8    I introduced Brett to him --

9        Q.    All right.

10       A.    -- by way of correspondence.

11       Q.    I see.  Who is he?

12       A.    James McWilliams was also born and brought up

13   in Masvingo, the home town.  He went to school there.

14   He was also at Rhodes University, and he was also

15   working at UAL Merchant Bank when I worked there.

16       Q.    What was the reason for introducing Dr. Cormick

17   to Mr. McWilliams?

18       A.    Well, at the time, Mr. McWilliams was working

19   with a large investment group in South Africa, and the

20   idea was for James to meet Brett and discuss the

21   project and for Brett to describe to him what would be

22   involved because James had access to high net worth

23   individuals and pension funds that were investing

24   through him through the company.  So, yes, the idea

22

020808az.ac.txt
Apostolos Zographos - Finger

1  was for Brett to meet James and to find out if James,

2  or through his company, would be interested in

3  investing.

4    Q.    Do you know whether Mr. McWilliams ever

5  expressed an interest in investing in Elan Suisse?

6    A.    Well, no.  Initially, he was -- he showed some

7  interest, but then he said the rest of the investors

8  that he had on their books were able to actually

9  invest directly overseas.  So as far as I'm aware,

10  nothing actually ever came of it.

11    Q.    Did you make any presentations about Elan

12  Suisse without Dr. Cormick?

13    A.    I did here in Seychelles after he had left and

14  to one or two individuals in Zimbabwe before I had

15  left Zimbabwe to come to Seychelles.

16    Q.    Did you ever make a presentation to Barclays

17  Bank?

18    A.    No, I didn't.

19    Q.    Do you know if anyone did?

20    A.    I'm not sure whether Brett might have done so.

21  I'm not aware or I can't recall, but I simply wasn't

22  involved in that.

23    Q.    Were you required to obtain any permits from

24  any Seychelles entities to operate Elan Suisse in the

23

Apostolos Zographos - Finger

1  Seychelles?

2    A.    Well, basically I had to register the company

Page 20

020808az.ac.txt
3   here in Seychelles and pay for the company license.
4       Q.    Were you required to get a residence permit?
5       A.    Well, it's a fairly complicated procedure here
6   in Seychelles.   The permit that I was granted was a
7   combination work and residence permit based on the
8   Elan Suisse project.
9       Q.    Apart from making presentations, did you
10  provide any type of investment advice to Dr. Cormick
11  for the benefit of Elan Suisse?
12      A.    No.
13      Q.    What happened to your investment in Elan
14  Suisse?
15      A.    Well, I moved to Seychelles and Brett had
16  advised me that it would take him some time to fine
17  tune everything.   And he was busy meeting with
18  potential investors.   And he would be overseas
19  speaking to the various financial institutions.   So
20  some time passed, and in the meantime I just had to
21  keep on telling the people here in Seychelles what
22  Brett was doing.   And then, I would ask Brett what was
23  going on, what was happening.   He was saying he was
24  conducting meetings, everything was positive.   He was

                                                        24

                    Apostolos Zographos - Finger
1   registered with the financial service board in South
2   Africa.   He had independent financial advisors lined
3   up in various institutions.   So, as far as I was
4   concerned everything was progressing positively and
5   going ahead.   It was just a matter of time before
                        Page 21

020808az.ac.txt

6    everything got into gear and kicked off and became

7    operational.  And then I would become active here in

8    Seychelles.

9              It was during 2005 that I inquired of

10   Brett what was happening, and he told me about the

11   fact that Mr. Christ had published on the Internet,

12   and around about that time there was a letter that

13   appeared in the Financial Gazette in Zimbabwe written

14   by Mr. Christ inquiring about Brett.  And of course,

15   this all was very negative publicity.

16             So I told Brett that I would actually have

17   to advise the people here in Seychelles of the

18   situation.  And it seemed to me that there was -- this

19   was building up to some sort of litigation.  And Brett

20   confirmed that and he said, "Well, we can't do

21   anything if there's going to be litigation.  We can't

22   go ahead with the project."  So, as far as I was

23   concerned, the project never took off.

24   Q.    To what did you attribute that?

25

Apostolos Zographos - Finger

1    A.    Simply the fact that Mr. Christ published on

2    the Internet.

3    Q.    Do you have any personal experience that would

4    confirm that?

5    A.    Yes.

6    Q.    What would be that experience?

7    A.    Well, of course, I advised people here in

8    Seychelles of the situation and gave them details.

Page 22

020808az.ac.txt

9   Obviously, they looked up the website and just said,

10  well, if this is what is going on, there is no

11  likelihood in any way that they would invest.  And so

12  everything just collapsed basically.

13          Also a side effect of that was that,

14  because this project didn't take off as planned, my

15  situation here in Seychelles, based on the work permit

16  and residence permit of Elan Suisse, was now

17  jeopardized, and I stood to be refused permission to

18  reside here any longer.  And that's when I got

19  involved with this other business, the registration of

20  offshore companies, and was able to renew my work and

21  residence permit based on that.  But I have had

22  negative reaction to the website through prospective

23  clients wanting -- who were looking at registering

24  offshore companies here in Seychelles.  And what they

                                                    26

Apostolos Zographos - Finger

1   would do is Google my name on the Internet and up pops

2   Mr. Christ's website and people would take one look at

3   that and say, well, if this is what you're involved

4   in, there's no way that we are going to operate or do

5   any business with you.  So that's had a negative

6   impact on my other business.

7   Q.    Do you actually have conversations with people

8   where they decline to do your business because of the

9   website?

10  A.    Yes.

11          MR. BRACEGIRDLE:  Objection to form.

Page 23

020808az.ac.txt
12    Q.    Can you give an example?

13    A.    I was on a trip to Zimbabwe and I met

14    prospective clients wanting to register offshore

15    companies here in Seychelles, and the meetings would

16    go fairly well.  In one instance one guy contacted me

17    afterwards and he said, "Sorry, I can't do it any

18    more."  And I asked him why.  And he said, "Well, I

19    had to look at your name on the website on Google.

20    Came up with this website, and if that's what you're

21    involved in, there's no way I'm doing business with

22    you."

23    Q.    As far as you're concerned, based on your

24    experience, did you consider the Elan Suisse business

27

Apostolos Zographos - Finger

1    to be a legitimate business?

2              MR. BRACEGIRDLE:  Objection to form.

3    A.    Yes, I did.

4    Q.    Did you have any reason to believe that

5    Dr. Cormick was not legitimate -- was not truly trying

6    to develop the business as you described it?

7    A.    No.

8    Q.    Did you have any reason to believe that

9    Dr. Cormick was using the Elan Suisse idea as a means

10    to scam people out of money?

11    A.    No.

12              Sorry.  Could I just say one thing here?

13    Q.    Sure.

14    A.    Getting back to this relationship with Brett, I

Page 24

020808az.ac.txt

15    met him on the various trips that he and his wife made

16    out to Zimbabwe prior to their move to Zimbabwe, and

17    we became fairly close.  I had recently lost my

18    brother very suddenly.  And Brett and I formed a

19    fairly close bond.  It was almost like he was -- he

20    became a surrogate brother to me, to the point that he

21    and his wife asked me to be godfather to their

22    daughter.  You know, I don't think that -- personally,

23    I wouldn't believe that Brett was asking me to be

24    godfather to his daughter so that he could set me up

                                                          28

                  Apostolos Zographos - Finger

1     to scam me, as you might put it.

2         Q.    Is it possible that your close relationship

3     with Dr. Cormick affected your business judgment?

4         A.    No.

5         Q.    Are you aware that Dr. Cormick had been

6     imprisoned for a period recently by Zimbabwe

7     authorities?

8         A.    Yes, I was aware of that, or became aware of

9     that.

10        Q.    How did you become aware of that?

11        A.    Well, I read it on Mr. Christ's website, and

12    then, after he got out of jail, he was -- he stayed at

13    Mr. Ricky Crook's house in Harare.  Mr. Ricky Crook

14    and I have been friends, and I'm godfather to his

15    daughter as well.  Mr. Crook and I have been friends

16    since 1979.

17        Q.    Have you seen Dr. Cormick since his

                           Page 25

020808az.ac.txt

18  imprisonment?

19      A.    Yes.  He came out to the Seychelles shortly

20  after that.  He came to Seychelles -- it was towards

21  the end of September 2005.

22      Q.    Did you observe any changes in his physical

23  appearance from before his imprisonment?

24      A.    Well, from when I -- from when I last seen him,

29

Apostolos Zographos - Finger

1   Brett had lost drastic amount of weight.  His hair had

2   practically turned completely white.  He looked fairly

3   gaunt, hollow-eyed, bags under his eyes.  He appeared

4   very nervous constantly.  He had a persistent cough.

5   I noticed that, while he was here in Seychelles, he

6   was not sleeping well and he wasn't eating well.

7       Q.    How long had it been from the last time you had

8   seen him to this time you just described?

9       A.    I had seen him in 2004 in Harare -- 2003.  I

10  can't remember which year it was.  I had flown out to

11  Zimbabwe.  He was still living in Harare at the time,

12  and he and Ricky Crook met me at the airport.

13      Q.    Have you ever met Robert Christ?

14      A.    No.  I have not met him.  I have not spoken to

15  him.

16      Q.    Have you ever had --

17      A.    And I have had -- sorry.

18      Q.    Please go ahead.

19      A.    I have had communication from him.

20      Q.    What sort of communications have you had from

Page 26

020808az.ac.txt

21    him?

22        A.    I first received an e-mail from Mr. Christ.

23    Must have been in the middle of 2005.  It appeared

24    totally out of the blue.  I didn't know who he was.

30

Apostolos Zographos - Finger

 1    And he was inquiring from me about Brett.  Wanted to

 2    know where Brett was and what the latest news about

 3    Brett was.  I didn't know who Mr. Christ was.  I

 4    mailed Brett my reply to the query of what was going

 5    on.  And then I sent a copy of my e-mail to Mr. Christ

 6    as well.

 7        Q.    What did you state in your reply?

 8        A.    I just said to Brett, I said, "Who is this Bob

 9    Christ fellow and why is he contacting me?"

10        Q.    Did Dr. Cormick explain the situation to you?

11        A.    Yes.

12        Q.    Did you receive any other communications from

13    Mr. Christ?

14        A.    Yes.  I, from that point on, I started

15    receiving mail from him, which was totally

16    unsolicited, on a regular basis.  And then Brett

17    advised me as to the existence of Mr. Christ's

18    website, and I looked it up.  And I saw that

19    Mr. Christ had published or featured my name and

20    e-mail address on the website.  I then mailed to

21    Mr. Christ, requesting him to remove all reference to

22    me on his site and to cease communicating with me.  He

23    replied -- well, first of all, he removed my e-mail

Page 27

020808az.ac.txt
24    address from the website, but he didn't remove any

31

Apostolos Zographos - Finger
1    references to me on the website.  He replied to me
2    that he would undertake to do so, and in his reply
3    stating, "Complied.  The matter is over as far as I am
4    concerned."
5            Shortly after that, I continued to receive
6    e-mail from Mr. Christ right through to November 2007.
7    Q.    Are you aware of whether there are still
8    references to you on his website?
9    A.    Constantly.
10           MR. FINGER:  Thank you, Mr. Zographos.  I
11   have no further questions, but Mr. Bracegirdle, I
12   believe, has some.  I'm going to turn you over now.
13           THE WITNESS:  Sorry.  David?
14           MR. FINGER:  Yes.
15           THE WITNESS:  Sorry.  Before we continue,
16   could I just sort of like go over a couple of things
17   about this communication with Mr. Christ.
18           MR. BRACEGIRDLE:  There is no question
19   pending.
20           MR. FINGER:  Let me ask a question.
21   Normally you can only respond to questions.
22           THE WITNESS:  Okay.
23           MR. FINGER:  Let me see if I can ask a
24   question.

32

020808az.ac.txt

Apostolos Zographos - Finger

1   BY MR. FINGER:

2       Q.    Were there any other communications with

3   Mr. Christ?

4       A.    Well, in his -- okay.  He continued to

5   communicate through until November last year.   And his

6   e-mail --- his approach in his e-mails would

7   continuously change constantly.  He would either ask

8   me for assistance in tracking Brett down to recover

9   funds, and he stated that, if I assisted him, he would

10  help me recover my funds.  But then, he changed, and

11  he stated that, if he recovered any funds, he would

12  use the proceeds of mine to pay the woman in South

13  Africa whose house I had stayed in when I first

14  arrived in Seychelles.

15          He asked me twice in two separate e-mails

16  if I was a crook.  In another e-mail he threatened me

17  with sending debt collectors after me, describing them

18  as a professional bounty hunters of the world who are

19  ruthless in their methods, and that he would claim his

20  pound of flesh from me.

21          He then also sent me an e-mail thanking me

22  for providing him with a photo of Brett after the

23  surgery that Mr. Christ claims that Brett underwent.

24  And there was a photo attached which was recent one of

33

Apostolos Zographos - Finger

1   Michael Jackson.   Now, he may have thought that was

020808az.ac.txt

2    funny, but I actually thought that was seriously

3    disturbing.

4            He also sent me a separate mail, which is

5    also copied to other investors threatening to report

6    us to the Zimbabwe police for trading illegally in

7    foreign currency and that you would go to jail.

8            And there was another mail insulting me by

9    calling my a flaming idiot.

10           And in his website, he either variously

11   portrays me as an insider and a minion.  At other

12   times he describes me as a victim and refers to me as

13   "poor guy."

14           And he just -- that just seems to be his

15   pattern that he's fairly contemptuous of most people,

16   some that he hasn't even met in Zimbabwe and

17   Seychelles.  I think there was a reference to

18   Mr. David Finger as some back street ambulance chasing

19   lawyer.  He's contemptuous of the ruling that was

20   made, handed down in the U.K. because supposedly Brett

21   had paid for an expensive solicitor, Keith Oliver.

22           And his site is constantly factually

23   incorrect.  I'll give you an example.  He talks on his

24   website about the police raid on Brett's house when

34

Apostolos Zographos - Finger

1    Brett was questioned in the U.K., and Mr. Christ

2    mentioned or stated that two of the kids got out of

3    bed, implying that there were more than two kids.

4    Well, there were only two children at the time, but

Page 30

020808az.ac.txt

5    implied that there were more than two.

6              He said that he met Brett for a beer in

7    Capetown, and in all the time I've known Brett, I have

8    never known him to drink beer.  So that just seemed

9    strange.

10             He also claims that Jennifer was left

11   completely destitute by Brett, but he doesn't mention

12   and he doesn't explain that, shortly afterwards, she

13   went on a two-week holiday to Mauritius with at least

14   one of the children.

15             He also stated the amount incorrect of

16   what I had invested.  Claims that shortly after I had

17   invested that Brett had bought a new motor car, and

18   I've never seen any evidence of that.

19             He also said that he contacted Maxiprest

20   of South Africa who were trying to distance themselves

21   from this fiasco, he states.  Well, they never had

22   anything to do with this.  I don't know what his point

23   was.

24   Q.    What is Maxiprest?

                                                          35

                    Apostolos Zographos - Finger

1              MR. BRACEGIRDLE:  Before you go on, I'm

2    going to make a motion to strike that last answer.

3    It's irrelevant.  Go ahead.

4    Q.    What is Maxiprest?

5    A.    Maxiprest South Africa, the company that

6    granted me the rights to open up the tire factory in

7    Zimbabwe.

                    Page 31

020808az.ac.txt

8    Q.    Are you aware --

9    A.    And he --

10   Q.    Please go on.

11   A.    Am I aware?

12   Q.    Please go on.  I didn't mean to interrupt.

13   A.    Okay.  He said that he contacted them about

14   this fiasco, as he describes it, and he said that they

15   were trying to distance themselves from this.  Well,

16   my point is that they never had anything to do with

17   this, and through this website he destroyed what

18   reputation or past relationship I had with them.

19              (Phone call disconnected.)

20              MR. FINGER:  We seem to have lost him.  I

21   call this a break.

22              (Pause and phone call reconnected.)

23   BY MR. FINGER:

24   Q.    I'll start by asking a new question.


                                                        36


                    Apostolos Zographos - Finger

1    A.    Yes.

2    Q.    Can you describe what you know to be false on

3    Mr. Christ's website?

4    A.    Well, there are various things.  His statement

5    about two of the kids getting out of bed in the U.K.

6    There were only two kids.  Mr. Christ implied that

7    there were more than two children.

8    Q.    Is there anything else?

9    A.    Yes.  He claims that he met Brett in Capetown

10   over a beer.  I somehow don't think that is quite

                         Page 32

020808az.ac.txt

11    correct because Brett does not drink beer.   Period.

12              He also stated the amount that I invested

13    as $70,000, and that is not correct.

14              He claims that Brett bought a new motor

15    car after I had invested, and as far as I'm aware,

16    there's never been any evidence of that.

17    Q.    Anything else?

18    A.    Well, I have observed Mr. Christ has

19    consistently changed his website.   The most obvious

20    example of that was his posting of the 11th of July

21    2007.

22    Q.    What posting is that?

23    A.    Well, the judge -- Judge Sleet had passed down

24    some judgment, and Mr. Christ's response to that

37

Apostolos Zographos - Finger

1     implied defeat.   And he stated that it was a very,

2     very, very good day for the bad guys.   And before the

3     day was out, he had taken down their statements and

4     amended the posting.   He had also, in my opinion, come

5     very close to disrespecting Judge Sleet.

6               MR. FINGER:   All right.   Thank you,

7     Mr. Zographos.   I have no further questions, but at

8     this time Mr. Bracegirdle will have some questions for

9     you.

10              I'm going to move the speaker phone closer

11    to him, so bear with me for a second.

12              THE WITNESS:   Sure.

13                     EXAMINATION

Page 33

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


ROBERT D. CHRIST,                    ) CONFIDENTIAL
                                     )
    Plaintiff/Counterclaim Defendant; ) HIGHLY
                                     ) CONFIDENTIAL
v.                                   )
                                     ) C.A. No.
BRETT J. CORMICK and ELAN SUISSE     ) 06-275-GMS
INTERNATIONAL HOLDINGS (USA) LLC,    )
                                     )
    Defendants/Counterclaim Plaintiffs. )


          Telephonic deposition of RICHARD JOHNS
CROOK taken pursuant to notice at the Law Offices of
Reed Smith, LP, 1201 North Market Street, Suite 1500,
Wilmington, Delaware, beginning at 9:00 a.m. on
Thursday, February 28, 2008, before Ann M. Calligan,
Registered Merit Reporter and Notary Public.


APPEARANCES:

                THAD J. BRACEGIRDLE, Esquire
                REED SMITH LLP
                  1201 North Market Street - Suite 1500
                  Wilmington, Delaware  19801
                  on behalf of the Plaintiff/Counterclaim
                  Defendant;

                DAVID L. FINGER, Esquire
                FINGER & SLANINA, LLC
                  One Commerce Center
                  1201 Orange Street - Suite 725
                  Wilmington, Delaware  19801-1155
                  on behalf of the Defendants/
                  Counterclaim Plaintiffs.

                    WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com

1                    RICHARD JOHNS CROOK,

2            the witness herein, having first been

3            duly sworn on oath, was examined and

4            testified as follows:

5                        EXAMINATION

6    BY MR. FINGER:

7      Q.    Mr. Crook, just for the record, I am David

8    Finger, the attorney for the defendants, including

9    Brett Cormick.  Here also is the attorney for

10   Mr. Christ, Robert Christ, Thad Bracegirdle.

11             I'm going to begin by asking you some

12   questions.  When I'm done, Mr. Bracegirdle will ask

13   you some questions.  Then we may each have some brief

14   follow-ups.

15     A.    Okay.

16     Q.    If at any time you don't understand a question,

17   please let us know and we will try to clarify it for

18   you.

19     A.    Okay.

20     Q.    And if you need to take a break for any reason,

21   please let us know, and we will do our best to

22   accommodate you.

23     A.    Okay.  Thank you.

24     Q.    Would you please begin by stating your full

Richard Johns Crook - Finger

Page 3

1    name?

2       A.    My name is Richard Johns, J-o-h-n-s, Crook,

3    C-r-double-o-k.

4       Q.    Where did you reside?

5       A.    I reside at Bishopslea School in Harare in

6    Zimbabwe.

7       Q.    What is your age?

8       A.    I'm 54 years old.

9       Q.    And what is it that you do for a living?

10      A.    I am headmaster of the Bishopslea Preparatory

11   School for Girls.

12      Q.    What type of school is that?

13      A.    It's an Anglican private school, preparatory

14   school, which is a, I suppose you call it, a prep

15   school for girls and age range from five to twelve.

16      Q.    How long have you served as headmaster?

17      A.    Headmaster of this particular school or

18   headmaster of other schools as well?

19      Q.    Well, start with the Bishopslea school.

20      A.    Okay.  I've been here for just over six years.

21      Q.    And prior to that, where did you serve?

22      A.    I was headmaster of the Hellenic School in

23   Harare for 14 years, and prior to that I was

24   headmaster of a British international school called

Page 4

1    St. Lawrence in Athens, Greece, for six years.

2      Q.    Do you know Brett Cormick?

3      A.    Yes, I do.

4      Q.    How long have you known him?

5      A.    I've known Brett for about seven years I think,

6    seven or eight years.

7      Q.    How did you meet him?

8      A.    I met him when he was living in Masvingo with

9    his wife.  He was a very close friend of a friend of

10   mine.  And I know his wife very well.  And he was

11   coming to Harare to start a venture here, and I met

12   him when he came up to Harare.  In fact, he came and

13   stayed with me.  His wife asked and his friend asked

14   if he could come and stay.  I had a cottage in my

15   garden at my home, which was not at Bishopslea, and he

16   stayed for a couple of months with me in my cottage.

17     Q.    You referred to his wife.  Is he still married

18   to that woman?

19     A.    I'm sorry.  Sorry.  His ex-wife.

20     Q.    How well would you say you came to know

21   Dr. Cormick?

22           MR. BRACEGIRDLE:  Objection to form.

23     A.    Extremely well.  We became very good friends.

24   And I was very good friends with both him and his

Richard Johns Crook - Finger

Page 5

1    ex-wife.  And yes, I think I've known him -- got to

2    know him probably better than most people have.

3      Q.   Are you familiar with a business called Elan

4    Suisse?

5      A.   Yes, I am.  I know that was the name of his

6    company that he had.

7      Q.   When you say his, are you referring to

8    Dr. Cormick?

9      A.   Yes, I am.

10     Q.   Did you ever give Dr. Cormick any money to

11   invest through Elan Suisse?

12     A.   Yes, we did.  He had a joint venture with the

13   bank in Harare, and with Elan Suisse and Trust Bank,

14   they formed a joint venture called Trust Investment

15   Services, and we advanced them as a school funds to

16   invest on our behalf in the money market.

17     Q.   Just to clarify, were these were funds owned by

18   Bishopslea school?

19     A.   That is correct, yes.

20     Q.   What sort of return did the school receive on

21   that investment?

22     A.   Well, we got a far better return than we had

23   been getting with the other finance houses.

24     Q.   Do you know whether any other schools in

Richard Johns Crook - Finger

Page 6

1    Zimbabwe invested their money through Elan Suisse?

2     A.    Yes.   There were a couple of other schools and

3    Dr. Cormick gave a presentation to a number of schools

4    and some of them did invest with him and I know they

5    got good returns as well.

6     Q.    Have you ever met a man -- I hope I'm

7    pronouncing his name correctly -- Ndaba Goalathe.

8     A.    Sorry.   Could you repeat that, please?

9     Q.    Yes.   Have you ever met a man named Ndaba

10   Goalathe, if I'm pronouncing it --

11    A.    Yes, I have.   Ndaba, right?

12    Q.    I'm sorry.   Am I pronouncing his name

13   correctly?

14    A.    Yes.   Yes.   I think so.   I have met Ndaba, yes.

15            MR. BRACEGIRDLE:   Can you spell that for

16   the record, please?

17            MR. FINGER:   Yes.   For the benefit of the

18   court reporter, first name is spelled N-d-a-b-a.   The

19   last name is spelled G-o-a-l-a-t-h-e.

20   BY MR. FINGER:

21    Q.    Who is he?

22    A.    He is the son of the minister -- the minister

23   of finance of Botswana at the time when I met him.

24    Q.    How did you come to meet him?

Richard Johns Crook - Finger

Page 7

1    A.    He also --

2    Q.    I'm sorry.  Go on.

3    A.    He was staying with Brett and his wife at the

4    time at their home.  He'd come from Botswana to

5    discuss a venture that -- similar to the joint venture

6    that Elan Suisse had with Trust Bank here in Zimbabwe.

7    I believe they were going to start -- they wanted to

8    start a venture in Botswana.  And he had come to

9    discuss that.

10   Q.    I'm sorry.  Just to make sure we are clear, did

11   Mr. Goalathe have any position in the Botswana

12   government that you knew of?

13   A.    His actual position I'm not aware of.  I was

14   just aware that he was the son of the minister of

15   finance and that he was an advisor to the ministry and

16   to the president.

17   Q.    Have you ever met a woman named Chedza Mogae,

18   if I'm pronouncing that correctly.  The first name is

19   spelled C-h-e-d-z-a.  And the last name is spelled

20   M-o-g-a-e.

21   A.    Yes.  She is the daughter of the president of

22   Botswana.  I have met her, yes.

23   Q.    How did you come to meet her?

24   A.    Brett had a reception at his home when he was

Richard Johns Crook - Finger

Page 8

1    doing the joint venture with Trust Bank and -- and for

2    the president's daughter and a number of dignitaries

3    from Zimbabwe.  And I was fortunate enough to be

4    invited to that function.

5       Q.   You said that it was attended by dignitaries of

6    Zimbabwe.  Can you give any sort of explanation of the

7    sort of people that attended?

8       A.   Yes.  They were probably from the banking world

9    and from the corporate world.

10      Q.   Now, are you aware that Dr. Cormick was at one

11   point arrested and detained by the Zimbabwe police?

12      A.   Yes.  I am aware of that.

13      Q.   Did you see Dr. Cormick after he was released

14   from detention?

15      A.   Yes, I did.  I saw him a few days after he was

16   released.  I didn't see him while he was -- as he was

17   released because I was on holiday with my family in

18   Greece, visiting my family in Greece, and Dr. Cormick

19   was arrested while I was there.  On my return from

20   Greece -- he was released a couple of days before I

21   returned.  But he was staying at my house during my

22   absence with his children when he was arrested, and he

23   was there when I returned.

24      Q.   When you returned and saw Dr. Cormick, did you

Richard Johns Crook - Finger

Page 9

1    notice any change in his physical appearance?

2      A.   Yes.  He was -- his physical appearance, he was

3    definitely thinner.  And he looked very run down.  He

4    was pale in color and looked very anxious, I think,

5    about the whole situation.  And he was also a bit

6    depressed and concerned about not having his children

7    or having his children taken away from him.

8      Q.   Did you note any other change in his behavior?

9      A.   Yes.  He was quieter and a bit more anxious,

10   which is not characteristic of him at all.

11          MR. FINGER:  Mr. Crook, that ends my

12   questions.  I'm now going to turn it over to

13   Mr. Bracegirdle who will ask you some questions.

14                    EXAMINATION

15   BY MR. BRACEGIRDLE:

16     Q.   Good afternoon, Mr. Crook.  My name is Thad

17   Bracegirdle.

18     A.   Good morning to you.

19     Q.   And before we start, I just want to ask you, I

20   had asked Mr. Finger to e-mail to you a document,

21   which I may ask you questions about today.  Did you

22   receive that document?

23     A.   Yes.  Yes.  I had received it, and I have

24   printed it out and have it in front of me.

PUBLIC NOTICE

## Due Diligence Results of Dr. Brett Cormick Marketing
## For Investment Capital
## In ☐The Elan Suisse Group of Companies☐

F-1

**Elan Suisse (Pty) Ltd** (RSA Registration No.2003/000050/07)
**Elan Suisse International Holdings (USA) LLC** (a Delaware LLC)
**Elan Suisse Jersey** (Purportedly Operated by BNP Paribas Fund Services Jersey Limited)
**International Corporate Development SA** (Cormick UK Trading Name)
**Elan Suisse Ltd.** (UK Corporate Registered No. 04998672)
Elan Suisse Capital (Unclear as to which of these shell companies this moniker is attached)
Aquacine Ltd. ☐ UK Registration No. 5613063
Nicotea (reportedly operated by Aquacine ☐ which is now Nicogel Ltd.)
Nicogel Ltd. (Operated by John Walters in the UK ☐ now Registration No. 05190095)
☐The Aquacine Group☐ (Unclear as to what organization this moniker attaches - Aquacine Ltd. was renamed)
**Please Note:** Anthony Carter is now with Econet Wireless in Harare, Zimbabwe

**Note to Reader: There are numerous updates to this page by date with the latest news at the bottom.☐ This case has unfolded through an investigation conducted over a period of 2 years and is still building with each passing day.☐ The initial write-up gives the basics of the case, but the later details fill in significant gaps in the evidence.☐ This investigation is ongoing and will conclude upon the arrest and conviction of Australian Citizen Brett John Cormick.**

NEW INFORMATION: John Walters☐ sentencing hearing transcript on fraud charges.☐ This explains why we had no information on this player ☐ if this transcription is genuine, it would seem apparent that he had just gotten out of prison.☐ I will verify this information with the Ipswich Court when they come back from the holidays and update this site with verification.☐ NOTE: (Dec. 28, 2005) I received verification from two separate sources that the Ipswitch Crown Court transcript is genuine.

Note: All links to this brief are from unedited (except where noted [edited out] to strip out sensitive banking details) e-mails and attachments.☐ A complete digital record of these e-mails and documents is available to interested parties in Microsoft Outlook format by contacting the following:
Robert D. Christ
1250 SW Railroad Avenue, Suite 230B
PO Box 2927
Hammond, LA☐ 70404
Tel: (985) 350-6299
Fax: (985) 542-2917
e-mail: bob.christ@@seatrepid.com (remove one of the ☐@☐ signs to e-mail)

For a detailed analysis of this case done in April 2005 as a legal brief, see this series of pages.

**For a PRESS SUMMARY OF THIS CASE written by Moneyweb in Johannesburg, South Africa please see here.☐ It is my understanding that Julius Cobbett of Moneyweb has done extensive investigative work on both Cormick and Elan Suisse.☐ For more information, contact him directly.**

### EXECUTIVE SUMMARY

In March 2004, I advanced Brett Cormick US$250,000 into his personal account at Natwest in London (Kensington Branch) as earnest monies in anticipation of starting an RSA-based global investment business by the name of Elan Suisse.☐ In September 2004, after months of demanding a formalized agreement, I demanded an audit of the whereabouts of my earnest monies.☐ After refusing to cooperate with an audit, Cormick instead made numerous promises to refund these monies.☐ In November 2004 I made formal demand for return of my earnest monies.☐ Cormick has since steadfastly claimed that I now own 36% of an empty Delaware shell corporation and that I have endured huge penalties per some purported articles of association (of which I have, of course, never seen ☐ nor do I believe that they exist).

→ The theft of this money to someone I trusted fueled this lengthy investigation into Cormick☐s business and personal history.☐ The findings made through this investigation are quite disturbing and lead one to the obvious conclusion and lingering question ☐How well do you know your so-called ...friends☐?☐☐

I began this investigation cautiously mindful of any damage this project could do to Cormick☐s reputation.☐ But as I uncovered more details, the facts made it increasingly clear that this man needed to be exposed.☐ Cormick is (and has been for several years ☐
→ with impunity) running a large international investment scam based in the UK and the Republics of Zimbabwe and South Africa.☐ Please read through this document and glean the source details to make your own conclusions.

The case is now in THE HIGH COURT OF SOUTH AFRICA (WITWATERSRAND LOCAL DIVISION ☐ Case number 2005/2033).☐ Per Cormick☐s plea in the case, the court does not have jurisdiction since he does not live in RSA (where he has business operations).☐ I am unable to establish where Cormick lives which has frustrated my efforts to get this case heard in court with proper jurisdiction.☐ See Cormick☐s Plea (page 3 4 5 6 7 8 9).☐ So, in short, this money was lost upon signing of the wire transfer document because this entire transaction was and is a sham.

### E-MAIL SUMMARY
Most e-mails for this project are grouped by date.

E-mail from January 2004 to the end of March 2004 (time period during which negotiations took place)

E-mail from April 2004 to the end of September 2004 (time period awaiting formalized agreement)                    F-2

E-mail from October 2004 to December 2004 (time period awaiting repayment from Cormick ⬜ then beginning of law suit)

E-mail from January 2005 to Present (time period where Cormick goes on to other business dealings).⬜ There are numerous confidential e-mails received during this period.⬜ I will post here when permission is given.

On Cormick⬜s Academic Credentials and the relationship of the LSE IEDG to LSE.

**[item removed ⬜ January 2007]**

On the ⬜HIVEX Affair⬜ whereby BAE Systems invested a large amount of money into HIVEX Ltd. (according to public records, Cormick was a board member of HIVEX Ltd.) as a R24 million offset for an arms deal with South Africa.

**SYNOPSIS**

This is a classic bait-and-switch scam perpetrated by a friend.⬜ For a diagram of the scam done in MS Word.⬜ I operated a tour company that took Cormick as a client on two expeditions to the Geographic North Pole.⬜ I have never had a cross word with him until I entrusted him with funds; therefore, I can only assume that I was a soft target and this is what Cormick does for a living (i.e. scam people close to him).⬜ Since that time, I have had repeated threats of legal action (and more) stating that I am injuring Cormick⬜s reputation by asking questions about my investment.⬜ Also, I received a long series of red herrings attempting to divert the issue away from my misappropriated US$250,000.⬜ I have never received an accounting by Cormick of what happened to my US$250,000 in retirement savings deposited into his personal account in March 2004.⬜ This case is about misappropriated funds and gross misrepresentation.

I have placed this page as a public service announcement so that others will ask hard questions I failed to ask and perhaps can avoid a similar fate.⬜ If you are contemplating investment in any organization managed by Cormick, you should be able to recreate my work above to come to your own conclusion.⬜ I suggest you not trust my statements, but perform your own basic research.⬜ This page gives you the roadmap.

The e-mail addresses and contact information for this work are located in the e-mails located in the subdirectories herein.⬜ Please browse the e-mails [linked above] for contact details of the people whom were and/or still are involved with this case.

**NARRATIVE**

I have been encouraged by several people close to this situation to write a narrative explaining the history of this event.⬜ This section is going to grow as more information is gained (and the information is flowing in daily).⬜ The sources for this section vary from hard to soft ⬜ and I cannot vouch for the veracity of each and every statement.⬜ I will cite the source so that you can decide for yourself.

BRETT JOHN CORMICK (Australian Citizen as of last information I have)
Born: September 29, 1959
(source for this section is internet genealogy) Father is Neil John Cormick. He married Margaret May Heber, daughter of Leonard James Heber and Ellen Pritchard.

Children of Neil John Cormick and Margaret May Heber are:
i.⬜⬜⬜⬜.⬜⬜⬜ +Brett Cormick, b. 1959.
ii.⬜⬜⬜⬜⬜⬜ +Craig Cormick, b. 1961.
iii.⬜⬜⬜⬜⬜ +Wesley Cormick, b. 1961.
iv.     +Gavin Cormick, b. 1962.

Brett married Shirley Breckenridge (unknown date).⬜ Children of Brett Cormick and Shirley Breckenridge are:
i.     James Cormick, b. 1988.

Brett divorced and married Jennifer Mortleman in approximately 1990.⬜ Children of Brett Cormick and Jennifer Mortleman are:
i.⬜⬜⬜⬜⬜.⬜⬜ +Jordan Cormick, b. 1992.
ii.⬜⬜⬜⬜⬜.⬜⬜ +Joshua Cormick, b. 1996.
ii.     +Jessica Cormick, b. 2000.

(This work history varies widely and comes from a number of sources including Cormick.⬜⬜ I do not vouch for its complete accuracy, but it is fairly close ⬜⬜ and it is in contradiction to the represented CV from Cormick)
1959-1981    Schooling in Australia
1982-1983 Australian Army
1987-1989    Reportedly worked for Intersuisse Australia
1990-1992    Hambros Bank doing sales to institutional investors
1992-1999    European Venture Finance (with a few months at Mees Pierson)
2000-2002    HIVEX Ltd. (Durban)
2002-Pres.⬜⬜⬜ Elan Suisse (in various forms)

As best I can tell, his residences are as follows:
1990-1998 - Near Holland Park in London
1998-1999 - West Sussex
1999 (for 6 months) - Bath
1999-2004 - Masvingo and Harare Zimbabwe
Present Residence - unknown

I graduated from Louisiana Tech University in 1982 with a dual major in Aviation and Accounting. I spent several years at the international public accounting firm of Coopers & Lybrand in the New Orleans, Louisiana office before getting into smaller businesses. I hold a Certified Public Accountant's Certificate (the USA equivalent of a Chartered Accountant certificate currently inactive) as well as an Airline Transport Pilot Certification. In 1992, I operated a parachuting school in Hammond, Louisiana where I met a man by the name of Bill Booth that operated a parachute equipment manufacturing company in DeLand, Florida. He invited me in 1994 to go with him on a skydiving expedition to the geographic North Pole through Russia.

F-3

In 1996, I took over this tour from him as the tour operator for taking parachutist to the Geographic North Pole. My theory was that I would allow inexperienced passengers the thrill of a skydive over the Geographic North Pole safely attached to an experienced tandem skydiving professional. The first customer (see here for link) of my new venture was Brett Cormick.

I had periodic contact with Brett in 1996 through 1998 via e-mail. In early 1998, my Russian contacts asked if I had anyone interested in doing a scuba dive at the North Pole since the Moscow University Diving Club wanted to do a scientific dive and wanted to share costs. I missed the 1998 expedition for personal reasons and the MUDC made a short dive whereby the leader (Andrew Rozhkov) died during the first dive. I made the arrangements for Brett and Michael Wolff to make a dive on the 1999 trip. I also hired Bob Wass (a commercial diver from Smithtown, New York) to supervise the operation for safety reasons. That dive was successful (see this link) with Brett making the last dive of the trip.

I started another business in late-1999 manufacturing and marketing underwater robotic equipment of which I sold in late-2003. I was in Cape Town in January 2004 dealing with a close personal friend's estate. Graham Hoal had just died in a tragic parachuting accident when Brett phoned me with a fantastic investment opportunity. The rest is detailed above.

**WHAT HAPPENED TO BRETT?**
I spoke recently to David De Leeuw formerly of the De Leeuw McCow Fund and now with Lion Chemical Capital. David certainly remembered Brett. He stated he was pleased with Brett's services in the mid-1990s while raising funds in Europe (Brett made introductions for David). He also heard that Brett had gotten into some trouble significantly hurting Brett's business.

It seems that Brett had a pseudo-legitimate business with European Venture Finance [until this **[item removed  January 2007]** occurred] by making and arranging introductions between American fund companies European institutional investors. **[item removed  January 2007]** From discussions with people close to Brett, I understand that this incident ruined his business operations and caused him to move to Zimbabwe where Jennifer's family resides. I understand that Brett was represented in this criminal investigation by Keith Oliver of Peters & Peters.

I also understand from people very close to Brett that this **[item removed  January 2007]** also caused an emotional toll. It seems that Brett was well connected in the UK financial community until this event happened. I am also told that Brett had to sell his house in order to pay for legal expenses with regards to this case.

**[item removed  January 2007]**

I wanted an RSA-based business in order to have the opportunity to stay in touch with my god-son Garner Hoal (Graham's son) whom lives with his mother in Cape Town. Brett and I were going to start a global business as partners with me providing the funding and him providing some funding and contacts. As per the e-mails here, Brett was in a hurry to get the business running and could not wait until we met to sign papers. I advanced to him earnest monies in anticipation of formalizing an agreement. We met in London where Brett agreed to have the attorneys in RSA draw up the papers. At a Hyde Park restaurant when I confronted him on our formalized agreement in March 2004, his statement was "Bob, are you an attorney?" Well neither am I. Let's let them do this properly... In sworn court documents, Brett stated that a formalized written agreement was never contemplated.

We were scheduled to meet in July 2004 with Lehman Brother in New York at which time the deal was to be formalized. The meeting was cancelled. In September 2004, Brett informed me that the company was out of money. I could not account for where my US$250,000 went whereby I demanded an audit (to be conducted by Kevin Wright a Chartered Accountant from Cape Town). Instead of cooperating with the audit, Brett then agreed to refund my earnest monies (please see these e-mails).

Brett forwarded to me a document in October 2004 which he wanted me to execute in order for me to obtain my refund. It was at that point, Brett's intention became clear. I retained a Cape Town-based attorney and formally accepted his offer to repay my earnest monies. In sworn court documents filed by Brett, he stated that we had made a complete agreement one afternoon while drinking wine in Stellenbosch in late-January 2004. Further, I had deposited the funds into a personal UK bank account plus he stated that he did not live in South Africa; therefore, the RSA court does not have jurisdiction. Thus far, I can find (and I have looked) no assets owned by Cormick other than collapsible shell companies [which I believe is on purpose] possessed of liquid assets shuffling from jurisdiction to jurisdiction via international wire. Clearly this organization is a sham with Cormick a con artist (as demonstrated below).

From correspondence with a friend of Cormick's [name omitted], I am told that Cormick is now forming an investment fund selling interest in funds that purchase companies that he and John Walters own (i.e. a classic Boiler Room setup). Please read through the correspondence.

**WHAT IS THIS ALL ABOUT?**
David De Leeuw stated that Brett was a typical promoter (he said that he had worked with quite a few) in that he never let the truth stand in the way of promoting a project. Others close to Brett stated that he was always very concerned about appearances (as most promoters do). I could not understand why instead of participating in the North Pole scuba diving expedition (which is what happened), he had to have Conceived of and Led the Expedition (which did NOT happen). Andy Hardie-Brown spoke to me recently about how Brett portrayed that expedition (i.e. Brett stated that the expedition was extremely dangerous and that he would have died instantly if the dry suit or regulator had problems I I will leave that one to Bob Wass and Dr. Safonov). Instead of simply going on a tandem skydive at the North Pole, Brett portrayed himself to have several freefall trips to the Pole (Cormick

made one tandem skydive out of an Mi-8 helicopter attached to me in April 1996).

Instead of being a small business owner of European Venture Finance, Brett portrayed himself to be □a Managing Director, Director F-4 & Consulting Director for several of the largest & most respected institutions in Europe and the United States□ (per his CV).□ Instead of having a PhD via a correspondence course (which is what happened) from a diploma mill, the PhD had to be from the London School of Economics (which he does not possess according to LSE).□ Please speak with Professor Simpson (University of Cape Town) and Robert Paterson (former business associate from the UK) about Brett□s unauthorized usage of official letterhead.

**UPDATES:**
**October 2, 2005**

? After **[item removed □ January 2007]** and probably after the □99 North Pole Expedition (I say that because I did not mention any planned or recent trip to Russia during the expedition □ although I must say that I had no need to know), I am told (from a very close source to Brett) that he went to Russia to check out a new technology for treatment of HIV.□ Another source from HIVEX told me he knew of no such trip that Cormick took. □ The HIV technology came from HEX Ltd. in Southampton.□ Some time in 2000, HIVEX Ltd. came into existence with Brett on the board.□ Then BAE Systems became involved.□ Brett was terminated from HIVEX Ltd. due to allegations of fraud.
? In late 2003, the ESFAS scandal erupted (i.e. fraud).
? In January 2004, Brett contacted me for investing into his organization (i.e. fraud).
? In late-2004/early-2005, Aquacine and Nicotea showed up.
? In September 2004, John Walters was sentenced in the UK for criminal fraud.
? In February 2005, I entered suit against both Brett Cormick and Elan Suisse (Pty) Ltd (the ESPL suit was settled approximately 2 hours before going to trial).
? In May 2005, the Moneyweb article came out.
? In October 2005, Nicogel showed up.

**[item removed □ January 2007]**

This paraphrased from a source close to Brett from 1997:
Brett said that when Scotland Yard arrested him, the first thing he said is that they did it in front of his kids.□ He was a family man and he loves his kids.

Reportedly, the police came to their house on a Thursday morning at around 7 AM while they were all still in bed, asleep.□ Brett heard a loud hammering on the front door.□ It is unclear as to if the police broke the door down or if Brett let them in.□ But they woke everyone up, and two of the kids got out of their beds in fear.□ Brett was still in his pajamas and it□is unclear as to whether he had time to get dressed to go to the police station.□ The police put him in handcuffs in front of his whole family.□ Reportedly, his wife was quite distressed over the matter.□ The biggest problem was dealing with the kids□ questioning.□

They also took all of Brett□s computers, files - everything he had in his office.□ It is unclear as to if they searched the entire house.□ It must have been quite distressing for him □ the whole family witnessed it all.□ I guess Brett's pride was probably damaged from this whole mess.□ There were at least two officers that made the arrest (perhaps more).

This may explain some of Brett's behavior since.□ According to my source, this may be the reason why they sold the house [*I assume the West Sussex house - BC*] so soon after buying it.□ Brett mentioned that neighbors were probably wondering why the police came so early that day.□ That may have wanted to get away from that house and from what he saw as a humiliating affair.

I got the distinct impression when we were on the ice in 1996 that Brett adored his wife.□ He talked constantly about his kids and his son□s medical problems.□ He was a family man.□ That was the thing that really warmed me toward Brett.□ I was 35 years old at that point and was thinking about a family myself.□ That conversation really affected me.□ Then I have this from Brett from September 2005.

**[item removed □ January 2007]**

Fast forward to 2004 □ Brett took a trip to Cape Town to get me to invest in Elan Suisse.□ We agreed that Elan Suisse □ the entire organization □ would be in the deal.□ When I finally pinned him down months later for a formalized agreement, he then informed me that I only get a minority interest in a Delaware shell corporation.□ I demanded my money back.□

So, Cormick□s MO is to convince the target to transfer funds through massive misrepresentation on trust then he back-fills with a so-called □agreement□ [to which the target has never agreed □ and in my case I have still never seen] with impossible terms that overwhelmingly favor him.□ That□is the scam in a nutshell.□ He purposely spreads the transaction over several venues complicating any legal relief the target may obtain thus forcing the target to squander time and money attempting to get this matter heard in a court of proper jurisdiction.

For the past 15 years, I am told that Brett has made his living fund raising (i.e. when money changes hands).□ As far as I can tell, during that time he has not been required to run the commercial aspects of a company □ only to earn commissions on projects he has promoted.□ A promoter does not necessarily care about the commercial viability of the underlying project except when his reputation is at stake.□ Prior to **[item removed □ January 2007]** Brett may have had a reputation to protect.□ Whatever that reputation may have been, it was decimated after that incident.□ I believe he no longer has any regard for the underlying value of the projects he is promoting □ and my personal experience is that he only wanted to separate me from my money.

I think that this **[item removed □ January 2007]** totally ruined him as a human being. □And my opinion is that he is organizing a Boiler Room type operation selling worthless (or significantly overvalued) securities to relatively unsophisticated investors.□

**November 29, 2005 Update:**
I notice that Elan Suisse Ltd. (UK corporation Registered No. 04998672) last week increased its total issued capital. Cormick    F-5
seems to be setting up for another valuable equity placement. Nicogel Ltd. is not currently in the companies registry in the UK
nor is Nicotea Ltd. The domain registration address for nicogel.co.uk has recently been changed from the Elan Suisse Ltd. address
(i.e. the Mayfair PO Box) to an unpublished listing. The nicogel.co.uk domain is registered to Nicotea Limited. Smoke.
Mirrors.

**December 1, 2005 Update:**
New information on Elan Suisse Ltd.:
Changes for ELAN SUISSE LTD (04998672)

25/11/2005 - Change in total issued capital
25/11/2005 - New annual return analysed

Click here to view changes:
http://web.archive.org/web/20070606163013/http://www.ukdata.com/companies/04998672.258361

**December 14, 2005 Update:**
I have not received an update as to how Cormick s equity sale of Elan Suisse. is proceeding.

I spoke last week with a collections attorney in Philadelphia about this case. His statement on this situation was poignant  Bob,
you would be surprised at how often this happens.   According to this attorney, many successful people have deadbeats that
Hang On to them in hopes of gaining through deceit what they could not obtain through their own merits.

Cormick has registered the following domains for purposes of slandering and defaming the named targets [Julius Cobbett and Barry
Sergeant work for Moneyweb in South Africa  the news organization investigating Elan Suisse s business ethics]:
bobchrist.net (registered 17-Jun-2005)
bobchrist.org (registered 17-Jun-2005)
bobchristamericantraitor.com (registered 10-Oct-2005)
barrysergeant.com (registered 20-Jun-2005)
juliuscobbett.com (registered 17-Jun-2005)

According to sources in Zimbabwe who are familiar with the divorce proceedings, Cormick is completely destitute (as filed in sworn
court documents) and will not be able to afford to pay child support for his three children [in Zimbabwe] until he is back on his feet
again .  According to sources in Australia, Cormick has never paid child support for his son [James in Australia] from his first
marriage. [Note from February 6, 2006 update: I have subsequent information that maintenance is being paid on James, but it is
reportedly being paid by Brett Cormick s father, Neil Cormick].

**December 15, 2005 Update:**
Further domains currently registered to Cormick are as follows:
elan-capital.com
elansuisse.com
aquacine.com (registered to Dianne Marshall)
aquacine.co.uk (registered to Dianne Marshall)
nicogel.co.uk (registered to Nicotea)
nicotea.co.uk (registered to Dianne Marshall)
elan-biocapital.com
lsesadc.com
trust.co.zw (there is no easy way to determine the .zw domain whois lookup)

Cormick did cover his tracks after slandering Julius Cobbett and myself by registering:
brettcormick.com (registered 17-Jun-2005)
brettcormick.org (registered 17-Jun-2005)
brettcormick.net (registered 17-Jun-2005)
brettcormick.info (registered 17-Jun-2005)

This does seem like a childish game. It would seem more businesslike to just address the issues. But the worst enemy of the con
artist is the truth.

The domains properly registered to Cormick are registered to the mailbox in London at:
Dr Brett Cormick
Suite 334
2 Lansdowne Row
Mayfair, London W1J 6HL
UK
Phone: + 44 (0) 207 691 7890
Fax: 123 123 1234

Domains registered to Dianne Marshall are as follows:
For the aquacine.com domain:
Dianne Marshall
18 Gordon Richards Close

I received the following e-mail overnight from Walters:
>>Dear Mr Christ,

F-6

I feel I ought to write to you about your dispute with Brett Cormick. I haven't written to you so far because it did not seem to me appropriate to comment on a matter that has clearly become too acrimonious to be resolved by anyone but the courts. However, now that you've decided to post on the web numerous thoughts about me of varying accuracy, relevance and intent, I have no option but to write to you to set the record straight.

To give you some background first, I am a research scientist by training and I have spent the past few years of my life developing novel technologies for the liquid delivery of pharmacological agents. Curiously, drug delivery is an area that is largely neglected by the pharmaceutical giants, despite the fact that patient non-compliance with medication is extremely common, and much of it is due to idiosyncratic reasons that have nothing to do with side effects, the classic one being "I don't like taking tablets!" I find this a very interesting area of development both from a technical and a commercial point of view.

Now, some time ago I presented some of my ideas to Brett Cormick and he suggested we collaborate on setting up a biopharma fund in SA that would provide an opportunity for investing in the commercial development of these ideas. He offered to provide the financial expertise for setting up such a venture, and never gave me any reason to believe he would be unable to fulfill this role. The fund was ruined by your campaign. Sadly, half a year of my time and money went with it. This is where my association with Brett Cormick ended.

I have of course continued to develop my ideas through three companies:
Aquacine, Nicotea, and Nicogel. These companies bear no relation to Cormick whatsoever: he is neither a shareholder nor acts for them in any capacity. They are currently trading perfectly healthily and there are no substantive grounds for believing that they are "front" companies for anyone or thing.

Now on your webpage you've suggested that I and these companies are assisting Brett in some nefarious activity or other. I have to tell you that this is plainly untrue, and the onus should not be on me to prove it.

Of course, if you were publishing your thoughts is some medium where you had to be wary of libel you would probably have been more careful before making these allegations. But - for better or for worse - the internet is a free place, and you can do as you please with impunity.

The flippant manner in which you treat significant parts of my life is simply unfair. I am sure you would not wish it upon yourself.

I do however ask you this: does the injustice apparently perpetuated against you justify your attempting freely to damage others who do not bear any responsibility for it?

However sympathetic I or another bystander may be, I think you'll agree that any reasonable person would reply in the negative.

What you do now is entirely up to you. I have not benefited from your money in any way, and I have already conveyed my belief to Brett that the dispute between you should be settled in court and not in an internet slanging match. I am therefore under no legal or moral obligation to you, and I think you will remain - both legally and morally - heavily in my debt if you continue to publish unrelated matter concerning me and my activities.

Yours,

John Walters<<

In reply to the above (since my e-mail address has been blocked by the aquacine.com administrator; therefore, I could not reply to him directly) I pose the following questions to Walters:

1) Is the transcript from the Ipswich Crown Court (as posted on my web site) accurate? Are you a convicted felon?
2) Why does Nicogel (according to the disclaimer on that website) have a relationship with Elan Suisse [it specifically mentions The Elan Suisse Group] if you and Cormick are no longer partners?
3) You stated above that information on this web site is inaccurate without being specific. Please let me know which information is inaccurate so I may update it.
4) I sent to you a reply only to find that my e-mail address has been blocked by the administrator. You were apparently unaware that this action had been taken. The administrative contact on several domains (including bobchrist.org, bobchrist.net, juliuscobbett.com, barrysergeant.com, bobchristamericantraitor.com) lists as Brett Cormick with an e-mail address of brett@aquacine.com. How can Mr. Cormick be in charge of those domains with a contact address of an organization to which he is unrelated?
5) I see you state above that Cormick is not a shareholder in these three companies: Aquacine, Nicogel or Nicotea. It does not make sense that he would be a shareholder for obvious reasons and it seems meaningless for you to deny this. Is any company of the so-called Elan Suisse Group shareholder in those three companies? That would be a far more meaningful denial. Your severing of relations with Cormick (in his personal capacity) is meaningless when Elan Suisse as a shareholder. If Elan Suisse (or related companies) is a shareholder in any of these three companies, it would seem clear that this is just more business as usual.

Despite your assertions above (and I take note of Judge HOLT's - who has much more experience dealing with the likes of you and Cormick than I - comments on your character in the sentencing transcript), you and your companies appear to be linked to an organization controlled by a man who has stolen a lot of money from me and my family. If the Ipswich Crown Court sentencing transcript is accurate, then a court of law has determined you as a convicted criminal. I consider any statement you make with that fact in mind.

I further note your assertion that this case between Cormick and myself has degraded into an acrimonious dispute. I disagree. I demanded an accounting of the funds I placed with Cormick. He, as a reply, insulted my wife and questioned my sexuality. That is not termed Acrimony ... that is termed a Red Herring. The issue is and remains misappropriated [i.e. stolen] funds. Cormick is clearly attempting to change this issue from the obvious, blatant and clear scam that it is into an Acrimonious dispute so as to divert the issue away from the disposition of the funds.

If your three companies are (as you assert) currently trading perfectly healthily, I would assume that your shareholders would demand accurate and full disclosure to legitimate business inquiries about their investment - instead of replying with pithy personal insults. I find this as no joking matter. Did you disclose to those shareholders the details surrounding the Ipswich Crown Court sentencing? I would certainly want to know if the manager of a company into which I am considering investing is a convicted criminal.

The Internet is a public forum as is any print medium. I disagree with you that my statements here have any less legal implications than any other medium and I believe you will find that if you check with an attorney he/she will agree that this is the case [note: Elan Suisse (Pty) Ltd. has already sued me for defamation over this web page thus disproving Walters assertion here. Dr. Walters, please feel free to do the same if you find anything here inaccurate RDC]. I fully stand behind any statement I have made and expect as well as fully encourage you to take whatever legal steps you deem necessary if I have injured your reputation (although I doubt that it is in my power to further degrade the reputation of a convicted felon) through issuance of inaccurate information. To the best of my knowledge, everything presented on this web page is true and fully accurate. If you have information to the contrary, please advise so that I may update this site.

And I hope you will excuse me if my sympathy for you is lacking. If Judge HOLT's sentencing document is genuine, my sympathy does go out for the victims of the subject matter within that case. I, in particular, feel their pain. I do not, however, feel yours. And I do find it incredible that Walters (a convicted criminal and known scam artist) is attempting to play the victim in this plot.

**December 27 at 1330 local East Coast USA time** Whoa! That was fast. Within one hour of the posting of the above, the Confidentiality Agreement on the Nicogel site was updated to remove all references to The Elan Suisse Group. Here is the old version which I saved from October 31st. Please notice in point 21. that the so-called agreement is governed under the laws of the Republic of South Africa. That is interesting given that this is represented to be a UK-based company.

The true question here is not the amount of window dressing that is apparently taking place. The question will be if Walters is truly going to distance himself from Cormick and Elan Suisse or that will determine if he is just playing lip service to defeat this investigation or if he is truly trying to reform his criminal ways to save his company. I have received no indication that Walters is internet-savvy which means that, in all likelihood, the page update was done by Cormick [who is internet-savvy]. This would indicate that the distancing of Cormick from Aquacine/Nicogel/Nicotea is part of an orchestrated program. If Elan Suisse is a shareholder in the three Walters companies, it will most difficult (if not impossible) for Walters to separate himself from Cormick (despite his assertion that his relationship with Cormick has ended). To my knowledge, Cormick is still in the UK.

**December 27 at 1530 local East Coast USA time** I just tried to e-mail Walters from my hotmail account. That bounced as well.

I sincerely believe that this investigation (and the posting of the results thereof on this page) has saved countless people from being scammed. It was very difficult for me to dig up all of these details (which were buried pretty deeply). I just wish that someone else had done for me the same favor prior to 2004 and I would not be in this position today. One of the acid tests I performed before wiring Cormick US$250,000 was that I could not find him on anyone's radar screen (and I looked obviously not deeply enough; however). Now, I believe, both Cormick and Walters are on everyone's radar screen.

I will make this offer to John Walters (and anyone else anywhere in the world for that matter): If anyone would like to buy my rights (which amounts to, after all of the rubbish falls away, a contractual obligation to refund the US$250,000 I advanced to Cormick as earnest money in March 2004) to this Elan Suisse fiasco it is definitely for sale. Then Walters can take that issue up directly with Cormick. I really doubt that Walters is interested because that would obviously mean that he would need to trust his partner [and obviously he knows what his own partner is all about]. What do you think John? Do you trust Cormick enough to buy one of his obligations?

I also take note of yet another veiled threat of a lawsuit. I do wish those guys (Cormick and Walters) would simply get on with it. It would seem to be much more cost-effective for Elan Suisse to simply cooperate with an audit. But Elan Suisse is a scam.

This investigation ends only when I gain recovery of my US$250,000 or the players are in jail. I am confident that one of those events will happen in 2006.

**December 28, 2005 Update:**
This Walters case gets stranger by the day. I was forwarded this document containing the judgment results from a patent hearing on Walters supposed ownership of the RTD technology patent. The way I understand it, the Elan Suisse Biopharma Fund was established to fund the development of RTD products based upon a patent owned by Walters. This document is rather lengthy, but pay particular attention to paragraphs 97, 98, 99 and 100 (page 24 of the document). This Patent Office judgment [it might be interesting to note that at least one of the hearings was postponed due to Walters incarceration] was dated October 12, 2005 and awarded five of the patents solely to Shannon Biotechnologies Limited and jointly awarded other patent ownership to Walters and Shannon Biotechnologies Limited jointly. I did not notice from that document any patents owned solely by Walters.

The basic issue here is (according to the judgment please read it in detail) the research for the RTD technology was funded by (and was done while Walters was in the employ of) Shannon Biotechnologies Limited of Ireland.

I had a report from sources in Zimbabwe that Cormick was in Harare the week of February 27th. I understand that he normally stays with Rick Crook when in Harare. Rick's last e-mail address I have is hellense@internet.co.zw - if you would like to track down Cormick, you may have luck coordinating with Rick Crook.

**March 11, 2006 Update**
My friends and family have repeatedly asked that I just drop this case and get on with life. Cormick deliberately ran a scam on me and my money is gone. He has done this before. He will do it again. I refuse to drop this, however, until there is a resolution to this case. The three most probable resolutions I can see are (in order of preference):
1) Return of the money stolen from me
2) Incarceration for Cormick (and Walters for that matter)
3) Having him "sorted out" by one of his many other so-called "partners"
Option 3) would be the most expedient. I do request and encourage non-violent (i.e. legal) means to "sort out" Cormick. I would like to assist any interested party in locating Cormick physically so as to help in this quest.

So, let us go through his most probable location. I believe that Cormick has Walters on a short purse string. That would make Walters economically tied to Cormick (Cormick apparently has everyone's money – he certainly has mine). You will probably find Cormick near Walters since the only operating company in this whole daisy chain of shell companies is Nicogel Ltd. (located in the UK). You will probably find Walters very close to Dianne Marshall (let us just say that they have something in common). And you will find Dianne Marshall here:
Dianne Marshall
18 Gordon Richards Close
Newmarket, Suffolk CB8 0BH
United Kingdom
Phone: +448701998585
Or here:
11 Hamilton Road
Newmarket, Suffolk CB8 0NQ

When in Zimbabwe, Cormick stays at Rick Crook's house. Look Rick up in the Harare phone directory. I have been keeping tabs on Cormick's travels to South Africa (so that I can have him arrested to found jurisdiction), but I cannot find that he has traveled there recently. I believe he has pulled out of RSA.

In order to place Cormick in one of the regions, just ring him up on his cell phone (don't bother with his so-called "Office" phones, they simply ring to an answering service at one of his many "virtual offices"):
+27 82 355 2543 Cormick's Cell Phone in South Africa
+44 783 419 7452 Cormick's Cell Phone in the UK (1400 East Coast USA Time; I just phoned him – he answered his UK cell phone number [I received a report today from a reliable source that Cormick is in Zimbabwe – which means that his UK cell phone is operational internationally])

So, if you would like to find Cormick my best estimate of where he is located at this moment is at Rick Crook's house in Harare. Look him up in the Harare phone directory. Then go over and pay Cormick a visit.

**Note:** I made an extensive disclosure today to the UK National Criminal Intelligence Service with regards to this large and complex international scam. After over one year of investigating this organization and Cormick, I have put together this estimation of the players within this organization. I have categorized anyone who has not been identified a victim as a suspect – whether or not they are guilty is up to a court of law to decide. I remain open to assisting any crime-fighting organization worldwide in bringing these players to justice.

**March 12, 2006 Update**
I had another report yesterday from a close inside source that Cormick keeps as many as eight SIM chips for his cell phone with him at all times. I suppose that is to keep several phone numbers active at all times while using the same handset. But I do not know enough about cellular technology to fully understand why this has advantages. He may be doing this to substantiate his "virtual offices" in different venues with active phone numbers. This same inside source is searching through records to find the remaining cell phone numbers – which I will post here upon acquiring. Once we have these, we can call all of these phone numbers in all of these countries. And what we will probably find is that all of these phones will be answered by the same person (Cormick) on the same cell phone handset located physically outside of the venue where the scam is taking place.

We also had an interesting discussion yesterday about whether or not Cormick had a chance to visit Walters while he was in prison. The reason this is interesting is that if Cormick did visit Walters in prison [because the reason for the visit would have been to discuss Elan Suisse] then the whole Elan Suisse Biopharma fiasco was hatched with obvious criminal intent *while Walters was still in prison*. The prison will have visitation records so that we may query this topic.

The Mercari Financial Services page is still active as of today with both Dirk Mostert and Cormick listed as directors. Which leads again to the question – was Dirk duped or in on the scam?

I have a lot of other source documentation for which I have been requested to keep in confidence by my sources – I will, however, share this information with legal authorities in order to help shut down this criminal organization. Please contact me for transmission of this information.

**March 13, 2006 Update**
I still cannot track what happened to all of the money Cormick has scammed from these investors. I can count over $500,000 USD in money entrusted to him in early-2004 alone. I know where Peter Kipps' money went; however, I cannot see how he could have

F-8

spent this much money in Zimbabwe □ and it is highly unlikely that he would have converted any substantial amount of this money into Zimbabwean dollars (for obvious reasons).□ He does not own a home.□ He does not own any real property.□ He must have this money stashed away somewhere.□ I understand from discussions with various sources that he has the main money holding company F-9 managed by David Keep of BNP Paribas in Jersey.□ I also understand that he has trust arrangements set up in The Seychelles.□ If you are looking for your money, those are the places you are most likely to find it.

From reports I am receiving from sources inside Zimbabwe, Cormick is still indigent and unable to pay for the support of his minor children.□ I also understand that his excuse as to why he cannot find work is that this web page has smeared his reputation.□ Good.□ That means that a lot of investors are still in possession of their money as a result.□

Cormick□s profession is □scam artist□.□ The work of a scam artist is a negative sum game □! he steals your money you have worked so hard to save and then wastes your time while he busily spends or hides your money away from you.□ If I have complicated his career, I believe I have saved some honest folks from trouble.□ Again, I only wish that someone else had done me this favor that I am doing here □ I would be in possession of my $300,000+ and the two years of time I have wasted trying to get my money back would have been spent with my family and with money-making endeavors.□ This little □business venture□ has been a nightmare.□ The whole transaction was over as soon as I transferred the money □ the problem was that I honestly believed that Cormick and I were going into business together when in fact Cormick was busily squandering away my money.□ Where are my hard-earned savings today?□ I believe that Cormick is reading this page □ □So Brett, what did you do with my money?□□ I suppose the more pertinent question is □Who did you share my money with?□□ That will reveal who else is in on this scam.

I also cannot understand why Cormick is penniless and cannot find work.□ Is there no work for □the most extreme polar explorer or this century□ (if for nothing else, as a guide)?□ Is there no work in the SAS since he has so much experience as a SAS commando? □ Is there no work as an intelligence operative in that troubled area of the world (Southern Africa)?□ And the entire continent of Africa has been mired in economic trouble for quite some time □ is there no work for a brilliant London School of Economics PhD such as Cormick?□ Why is there no work for a man with so many life accomplishments to his credit?□ See his CV for all of his brilliant career highlights.

What happens to the grifter that has been exposed?□ In Walters□ case, he went to jail after being convicted of fraud.□ But unlike Cormick, I think that Walters sincerely would like to build his company.□ And I actually think that Nicogel is commercially viable.□ Unfortunately, I do not believe that Walters has the character or the track record to attract the capital necessary to lead this company into success.□ For Nicogel to have any measure of success, another management team will be needed (and a licensing agreement with Shannon Biotechnologies).□ As far as Cormick goes, that man is a sociopath and needs to be taken off of the street as soon as possible.

I received a report from a separate source that Cormick is □freeloading□ (my sources words) at Rick Crook□s house in Harare.□ That makes sense.□ He leeches off of all of his other so-called friends.□ Why not Rick.□ Scam artists are parasites anyway.□ It seems in character.□ The brilliant yet broke Dr. Cormick is obviously running out of friends off of which to sponge.□ I understand that he sponged off of the Mortleman family (Cormick represented to me that **He** was supporting the Mortleman family) for so long that it lead to a divorce.□

**March 14, 2006 Update**
I have uncovered the above details about Cormick by simply making phone calls and e-mails to folks from his past.□ If a governmental agency with better expertise and more persuasive techniques were to get this case, I am positive they will find the above as just the proverbial □tip of the iceberg□.□ I believe this is a huge international criminal organization performing money laundering and other sham transactions stretched over several international boundaries.□ It functions through world banks with ties to many shadowy organizations worldwide.□ Dig a little deeper.□ I believe what you will find to be quite interesting.

I received feedback from Cormick□s incident with the management of BZW Meares in Australia before leaving for the UK.□ It seems there was a bit of an issue with a girl named □Alexis□ that worked in the office.□ During this same period, Cormick□s first wife was pregnant with his first son James.□ I understand that Cormick divorced soon after James was born and moved to the UK with Alexis.□ Cormick reportedly dumped Alexis soon after arriving in the UK.□ I told this incident to my wife □ her response was immediate □ □Obviously Alexis must have paid for the trip to the UK...□

**March 15, 2006 Update**
I received a report from sources within Zimbabwe that Cormick is stating that he cannot find work because this investigation and resultant web page has □ruined his reputation□.□ I disagree.□ To ruin someone□s reputation presupposes a good reputation.□ I have not ruined Cormick□s good reputation, I have simply exposed his bad reputation by detailing the findings of my investigation here.

I do not know what is the right thing to do on this case.□ My money is lost.□ Cormick stole it.□ Is the right thing to do here to post all of this information?□ I certainly have spent a lot of time gathering it.□ If I am going to err, I would rather it be on the side of full disclosure, full information and the truth.□ Then let the reader decide.□

**POSTSCRIPT:**
The world of international business is rapidly changing □ fueled chiefly by the proliferation of the internet.□ The □Great Scammer□ himself, Ponzi, got away with scamming his entire life without ever spending a day in jail.□ He was a clever crook such that word never fully spread of his nefarious schemes allowing him to run scam after scam.□ On the other hand, Cormick would have gotten away with it for an even longer time (I understand that Africans have a fairly narrow world view □ allowing slick-talking Europeans and foreigners to come down and run shady business operations with impunity) had it not been for the following:
1. When Moneyweb linked this page to its article (along with Cormick□s page □ I believe their reporting on the subject has been balanced and fair), it immediately was recognized by the internet search engines.
2. Cormick has cheated and lied to such a vast number of people that practically **Everyone** has been more than willing to contribute to this page (some overtly and some covertly).

3. Cormick himself has been so bold and brazen as to be high-profile while this whole episode was transpiring allowing for scrutiny by the business community. If he would have just done what scammer do and faded away, he would have probably gotten away with it. But he did what the great modern day scammers such as Kenneth Lay (former CEO of Enron) and Dennis Kozlowski (former CEO of Tyco) did and  Deny-Deny-Deny.    **F-10**

4. He was sloppy and left clues that I simply followed.

Throughout history it has shown that a short-term tactical advantage can be gained through amoral cunning and audacity in attacking one's opponents. Hitler perhaps would have been hailed a great leader had it not been for a slight defect in his plan – what he did was wrong and the world as one rose up to stop him. Cormick has gotten away with this type of behavior for years through audacious attacks and intimidation techniques thus cowing his victims. But I think we have all had enough of this.

## Where Is Everyone Now?

[item removed  January 2007]
Robert Paterson – the same
Brett Cormick – His troubles are just beginning
Julius Cobbett – Enjoying a rapidly expanding career as an investigative journalist with Moneyweb
John Walters and Dianne Marshall – Still trying to get Nicogel off the ground (with the albatross of Cormick still around their necks)
Anthony Carter – I have not been able to determine the outcome of his criminal trial in Zimbabwe that began in October, 2005.
Peter Kipps – Finally coming to the realization that he's been had
Apostolos Zog Zographos - Finally coming to the realization that he's been had
Bob Christ – Finally getting over this Elan Suisse financial disaster with the biggest-ever boom in the underwater robotics business hitting due to the hurricane clean up work in the Gulf of Mexico
Parashkev Nachev – On to other projects
Norman Botha – Found work for another brokerage firm in RSA
Dirk Mostert – Moved on to Merchant West Treasury Partners
Cameron Scott and Alex McAlery – Still operating HIVEX Ltd. in Durban and Johannesburg
Rick Crook – Still headmaster of the Bishopslea School in Harare and reluctant host to Cormick
Jennifer Mortleman – Trying to get on with life and raise three children without income or assistance from the brilliant Dr. Cormick. I also noticed that Cormick registered the jennifermortleman.com domain on January 16, 2006 yet has not posted anything to that as yet (which does seem out of character for Cormick – perhaps he is finally growing a conscience. Do you think so? No? Neither do I).

I would call this the end to this rather sordid story, but more things keep coming in on Cormick and this Elan Suisse affair. I do have a lot of other work to do; therefore, this site may go quiet for a while so that I can get some of that work done. I will update again when I have more to report. Until then, remember, do your due diligence.

## March 20, 2006 Update
## I Will Gladly Pay You Tuesday for a Hamburger Today!!!
Cormick was coddling up to Valenti International and Wendy Seinturier of "The Perfect Partner" in mid to late-2005 (look through the web pages to see the type business) to act as majordomo for a man of his means. So, he was obviously looking for a rich widow off of which to sponge. In African and European cultures, the word may be different but the concept remains the same. We in America call this type of person a Bum.

And see this rather entertaining Cormick muse [this one is over the edge – we should sell it to daytime soaps] as well as these e-mails. My favorite quote in that muse is Cormick's I *I feel betrayed and hurt and physically shocked* Dr. Cormick used his [purportedly] considerable wealth and power to beat up and discredit a very hard target – a 20-year-old female college student from Georgia that was so crass as to warm Ms. Valenti that he is not what he says he is (in order to save Ms. Valenti the embarrassment and potential liability of having her clients scammed). Here is Cormick's explanation of the incident. This is high drama indeed! And Cormick's other comment that brought a smile to my face as Pure Brett was Is this the Valenti way, cocaine, sexual entrapment for cash, breaching client confidentiality, corporate sabotage and more? That Cormick is Brilliant!!!

## March 21, 2006 Update
➤ The question persistently lingers as to what happened to all of the money Cormick has gained on the backs of investors through his life of crime? I certainly want my money back. I am positive there are a whole bunch of others that feel likewise.

Do you think that Cormick has squandered this entire cache of money? Do you think that Cormick does not have an Exit Plan for this drama? I believe there is a considerable stash of money hidden away that (at least Cormick thinks) only Cormick can find. That money belongs to me as well as to all of the other Targets of Cormick's schemes. It may require some strong-armed methods of persuasion to unearth the location of that money however. That will probably require governmental agency intervention. I will continue to assist any and all agencies to gaining opening of these offshore accounts and return this money to its rightful owners.

➤ But I must admit, Cormick is certainly a clever crook [unlike that idiot, Walters, who got caught]. He outsmarted London's Metro Police in 1997 after they arrested him on Fraud charges (they could not make the charges stick – even after they had all of the goods on him) allowing him to get away with [item removed  January 2007] money. It has taken the RSA FSB over three years to figure out this newest scheme – and Cormick has already been there, scammed that and left with the investors' money.

## March 28, 2006 Update
There are two dangling issues from John Walters' only e-mail to me:
1) His statement that he never received any benefit from the money Cormick stole from me, and
2) His statement that he is no longer associated with Cormick

personal (my sexual orientation, my wife□s sexual preferences, whatever□) issues as well as arguments over jurisdiction.□ The motion to dismiss, as filed in the Delaware court, was an exhausting 63-pages [all for a simple breach of contract case].□

Also on page 11 of the □Motion to Dismiss□ is the following footnote □Mercari Financial Services (Pty) Ltd., a South African Corporation (Complaint □8), apparently is defunct.□□□ If this is true, it would appear that Mercari has served its purpose and is no longer needed.□□ Within the last two weeks, the web site for Mercari has finally been either taken down or the web master has blocked this IP.□□ So that leads back to the question, was Dirk Mostert (president of Mercari) in on the scam?

F-11

From the excitement of starting a new business with someone I thought was a trusted friend, to the shock of finding out I have been scammed by someone I trusted (who, consequently, turned out to be a seasoned professional scam artist), to the determination to get this placed into a court of law to have it heard.□ It is a matter now of slowly and steadily navigating the legal gauntlet before me.□

→ It might be interesting to note that today I spoke with the gentleman from Philadelphia doing the due diligence (as mentioned on the May 18th update above) stating he did not want to become involved with this case.□ These people [Cormick/Walters et al] have been successful at scamming investors for years due to the simple fact that no one was willing to step forward with the information on their business practices.□ But I do respect the right to □Not Get Involved□.□ The information on this page has been gathered meticulously in support of my attempts at recovery.□ I have placed it here since I would want someone to do me the same favor if the roles were reversed.□ It is the reader□s choice to use it or not use it.

There are many scams out there.□ When one shuts down, the next one pops up since there will always be dishonest people (as well as trusting, honest and hardworking people as targets).□ There is no way to shut them all down.□ But I want to shut this one down.

**May 31, 2006 Update:**
I received request to take the reference on this page to the manager of the US manufacturing facility for Nicogel Ltd. off of this page.□ Complied.□ If someone would like the information about this operation, please contact me via e-mail.□ My interpretation of this is that everyone can now see that this is going to trial and thus is running for cover.□ I am an experienced forensic accountant.◄— I will rip apart every organization attached to this scam to find out what happened to my money.□ Then I will hold those responsible accountable.

Here are the requisite court documents so that the reader can view and draw his/her own conclusions:
- ?  Original Particulars of Claim done in RSA
- ?  Cormick□s RSA Opposing Affidavit (it completely contradicts the e-mail correspondence)
- ?  My RSA Replying Affidavit
- ?  Cormick□s Plea Denying Jurisdiction in RSA
- ?  My suit filed in Federal District Court in Wilmington, Delaware USA
- ?  Cormick/Walters et al Reply

So, let us cover the points in the Cormick/Walters et al Reply:
1. Nicogel has nothing to do with this case.□ Aquacine became Nicogel in December 2005.□ Cormick used as part the representation/enticement for me to trust him with funds that Elan Suisse was in the midst of forming a biotech fund.□ Here is the June 22, 2004 advertisement for Elan Suisse□s promotion of Aquacine.
2. Dianne Marshall has nothing to do with Elan Suisse. □Here is an Elan Suisse BioPharma Fund detailed presentation with Dianne Marshall as the author (6 mb PowerPoint).
3. John Walters has nothing to do with Brett Cormick or Elan Suisse.□ Here is an article in the reputable financial publication MoneyWeb in Johannesburg.
4. The Delaware Courts have no jurisdiction.□ A Delaware corporation was used/abused by a group of international scam artists [Cormick/Walters et al] as a conduit to defraud a US-based investor [me].□ I am pretty sure a competent judge in the US District Court will see this.□ The playing field is level here and this case will finally be heard upon its merits.□ We will take about that in court.
5. Pennsylvania laws apply.□ And if we go to Pennsylvania, I am sure they will claim that Delaware laws apply.□ This jurisdictional shuffle game has now stopped.□□ We will talk about this in court.
6. The Pennsylvania two-year statue of limitations applies.□ I became suspicious of Cormick in late-summer 2004 when he has already stashed away all of my money.□ That was less than two years ago.□ We will talk about this in court.
7. The court should stay the Delaware proceedings pending outcome of the RSA case.□ We will talk about this in court.
8. The court should sanction Mr. Christ (that would be me) for his unjustified actions designed to harass and increase expense.□ Right.□□ We will talk about this in court.

So, the hardest part of this case has been accomplished - which is simply getting this into court.□ We are going to court.□ We will save the remainder of the talk for that forum.□ The remainder of the files and information I have held back due to confidential sources will come out during trial.

It makes no difference to me if I obtain recovery from Cormick or Walters or Marshall or Nicogel or Elan Suisse or any other responsible party.□ But one of these entities (in all likelihood the deepest pocket) will be held accountable.□ My strategy is quite simple □ 1) I will bring this to court.□ 2) I will get a judgment, and 3) I will start seizing anything and everything of value that the responsible people own.□□ I do not think that any of either the Elan Suisse or the Nicogel companies is worth anything since they are apparently only conduits to defraud investors.□ The only entity that I can see that has any value in this colossal scam is Dianne Marshall.□□ I will start with her.□ Once she satisfies the judgment, she can take this up with the remainder of her □partners□ in this □business venture□.

**June 21, 2006 Update**
Mercari Financial Services (a South African corporation) which Cormick et al referenced as being □defunct□ suddenly became □un-defunct□ and filed a similar Motion to Dismiss.□ Great!□ Now we have everyone.□□ We will hear the motion to dismiss in about

Switch subjects: I see that Moneyweb is all over J. Arthur Brown after his arrest this week. The parallels between he and Cormick are amazing.

F-12

**March 17, 2007 Update**
On Thursday, Elan Suisse et al re-filed their motion to dismiss the case in Delaware. The only thing interesting I noticed was point 7. of the sworn declaration by Dirk Mostert of Mercari:
>>"It is correct that Mercari briefly permitted Dr. Cormick to utilize Mercari's offices at one point as a courtesy. However, Mercari never learned of Mr. Christ or Dr. Cormick's dealings with him until this lawsuit was filed [**note:** this lawsuit was filed in early 2006 - RDC]. No employee of Mercari ever assisted with or was aware of any dealings between Dr. Cormick and Mr. Christ."<<

In response to the lawsuit in South Africa, my South African attorney wrote a letter to Dirk Mostert in November of 2004 and here is his reply. Notice the date on the fax of January 25, 2005 - a full year before this lawsuit was filed as well as Brett Cormick as director on the stationary. Which, of course, makes Dirk Mostert a liar [under oath which technically makes him a perjurer, but that's semantics on a small lie right Dirk?]. Gosh, what a surprise! I'll bet you are beating a path to Merchant West Trading Partners to place money with them! And by the way, I no longer see Dirk's name on the director list of their web page. I wonder what happened there???

**March 18, 2007 Update**
Well, Nicogel seems to be attracting quite a following!!! Our UK researcher is in the medical industry and questions the medical functionality of the product (since, in his opinion, it lacks a basis in solid science [and paid-for clinical trials and any form of medical procedural substance]), but that sure hasn't stopped Nicogel from selling and promoting their products. Which, I believe, is a good thing since there will (in all likelihood) be something to the company (financially) to which to attach once the judgment is gained.

All focus now goes to the office of Judge Sleet in Wilmington, Delaware. We have not heard back from the Attorney General's office in Harare as yet on the status of Cormick's criminal complaint there. These clowns are pulling every trick in the book to avoid adjudicating this in a court of law, but I am persistently plodding onward towards the courtroom in Delaware. We will have our day in court. And this case drags on

I again (I am losing count of the requests) ask of The Honorable Dr. John Anthony Walters and (The Brilliant Oxford/LSE-Doctorate and Great Polar Explorer) Professor Brett John Cormick to point out any inaccuracies in this page so that I may update it with current information to keep it up to date and accurate.

**March 24, 2007 Update:**
During a revisit of The Gary Halbert Letter, it stuck me of the similarities of all of these con men. In this passage from the letter about DuSean Berkich:
>>One thing about DuSean Berkich: He has a personality trait very typical of con men. Believe it or not, most con men will walk around a [sic] honest one hundred million dollars in order to dishonestly scam someone out of a far lesser amount. The "scam" is far more important to them than the money. They get off by destroying people much more than they do by making a legitimate profit.

In case you think I'm being harsh, I think you should know not only did he milk millions of dollars out of people, he was abusive to his wife and children (who by the way attempted suicide while I was in California) and he was indeed a "cancer" on the people of the earth.<<

Cormick was horrible to both of his ex-wives and apparently has no contact with any of his four children. He ran scams on various girlfriends. Walters ran a credit card scam on at least one of his many girlfriends [as well as other nastiness which I have been asked not to post, but will come out in court]. These con men are all the same. Not only did Cormick run an effective scam on me, he had me doing meaningless marketing work on a fictitious business for almost a year that was never meant to materialize. This is sick! He did the same thing to Apostolos Zographos as well as various other of his Business Associates. These people [Cormick, Walters and these con men in general] are a sickness in society that must be eradicated.

Another interesting passage from The Gary Halbert Letter comes:
>>About 1-1/2 years ago, I got a call from someone who knew DuSean Berkich. We exchanged stories about what an evil and despicable being he was. The reason this man called me was to tell me DuSean had committed suicide. But there was something strange... It seems his body was cremated almost immediately after his death and his lawyer and no one else could come up with a death certificate.<< So, is DuSean in an urn somewhere or has he assumed another name to preach the gospel in a loin cloth (like Joseph Conrad's character Kurtz). This is the stuff of urban legend

We must examine the very real possibility that Cormick and Walters could change their names and go on under an assumed name since they cannot continue their chosen profession [con artist] with the yoke of the Elan Suisse exposure around their collective necks. But unlike Walters (who apparently HAS a legitimate doctorate from a legitimate educational institution), Cormick has been exposed as being the Tar Paper Doctor that he is (i.e. possessing a questionable educational background from a shut-down diploma mill correspondence course). So, Walters has an incentive to keep his name despite the criminal record and personal bankruptcy and-and-and But Cormick is another story. We are starting a betting pool here to speculate as to what Cormick's new name will be. I certainly expect something clever out of Cormick on the line of Don to DuSean (from DuSean Berkich's name change). Maybe Brett to Blake or Brett to Bonaire or Brett to Bennett or something similar. Or maybe he'll adapt an Austrian accent (Austrian and Australian sounding similar) and adapt Arnold or Dieter or Dietrich. The question then becomes the surname. Then it must be Habsburg so that he can tediously trace his [fictitious] lineage back to royalty. That's it! That's the ticket!! Cormick is now 47 years old, but it is never too late to start over again with a clean slate and a new name. Unfortunately, he can change his name and run from everyone else but he cannot run from himself. If anyone knows of Cormick's new name [if it has, in fact, been changed], please get in touch with me so that I may post it here.

along with Bob Wass and Michael Wolff whom were all attempting to put together a   F-13
North Pole scuba diving expedition of their own. I was there as an exhibitor for my (at
the time) new company VideoRay. I obviously looked haggard after spending 2 months
attempting to get 80 people from all over the world to Southern Chile then to the South
Pole and back. Everyone on the trip had issues which took its toll and finally, at the end
of the trip, I had felt as if I had been through a meat grinder. When summarizing the
trip to Cormick at the show, he was solicitously complimentary of me – and he was
about the only person to do so. I felt like I had a friend for life. He felt like he had an
easy target. And that, folks, is where this all started.

It is said that pedophiles spend years cultivating their targets. Scam artist do the same.
They are apparently the same personality. One of Cormick's family members had
claimed Cormick as a pedophile, but I had discounted that since it occurred during a   ←
nasty divorce proceeding (claims of pedophilia are common during child custody
battles). But from the information I have received recently, I am not so certain
anymore.

Tomorrow we will take up the story of the man who ran Cormick out of England then
we will re-run Cormick's history based upon the updated information obtained during
this trip. This is good fun – the investigation is blossoming!

**June 26, 2007 Update**
Last Friday, I had a lovely afternoon with an English couple whom had a particularly
bad two [plus] year experience with Cormick. The gentleman in question (whom
prefers to remain anonymous for privacy reasons) is in the IT business as a
programmer/businessman. This man has a deep technical background in both stock
trading and in programming. He conceived and jointly financed the development of a
technology for performing secure stock and foreign exchange trading over the internet
during the early 1990s (during the net's early years) and sought to bring this product to
market. This brought him into contact with one Brett John Cormick (the self-
proclaimed 'financial engineering wizard').

For a small £10,000 per month retainer (the proceeds of which would be deductible
from the proceeds from financing once they were obtained), Cormick committed to raise
capital for this new venture. What struck me while I heard this story was the stark
similarities between this man's experience and the scam pulled on me in 2004. Cormick
(instead of producing marketing materials and business plan) had this man and his wife
producing all manner of marketing materials for the proposed 'road show' to promote
this technology. Cormick had these folks manufacture document after document upon
which he would blithely order up wholesale reworks of the materials. It was obviously
"Make Work" (but they did it anyway). It was difficult to secure time from Cormick
and establish progress until the end of the month (whereby substantial progress was
magically being made in the last two to three days of the month), but the funding was
just about to pop – and the £10,000 "retainer" needed to be paid in order for any further
work to be performed… Cormick would throw around big names. He used John
Dupont's name for a 'definitely interested party – you are in the big league now' just as
he did with Gordon Subloo. You might remember John Dupont as one of the heirs of
Dupont Corporation – whom was eventually jailed for killing one of his protégé
wrestlers while on a delusional fit (in other words, he was mentally deranged).

After four months of this game being pulled on this unsuspecting couple, no funding

And this case drags on…

**September 18, 2007 Update**                                          F-14
I realize that we are off of Walters, but he just keeps shooting himself in the foot.  More overnight from our UK Sleuth:
>>Here JW is now accredited with his correct title: D.Phil. (Oxon)

http://www.dietgel.info/origins.php [note: check out the girl's pants – too long AND oversized – as pure Bottie 'truth in advertising' – RDC]

I see he worked in conjunction with the well-known Pennsylvia (sic) University.

Rocket Science from Bottie "to lose weight you simply have to expend more calories than you consume".<<

Words of wisdom and truth from the infamous/notorious Bottie!  He should start a religious sect – complete with the powdered drink for the non-believers.  And then we must change his name from "Bottie" to "The Cool Aid Kid"…

**September 20, 2007 Update**
Remember, the bobchrist.net postings?  How about the juliuscobbett.com postings?  And jennifermortleman.com?  And the bobchristamericantraitor.com rants?  Well, I was copied on an email this morning from South Africa [which is self-explanatory]:
>>**From:** Dr Brett Cormick [mailto:brettc@elan-capital.com]
**Sent:** Thursday September, 20 2007 11:35
**To:** abuse@is.co.za
**Cc:** konrad@netbasket.net; brettc@elan-capital.com
**Subject:** Immediate Removal of Defamatory Hate Sites

Dear Sirs,

**Reference: Immediate Removal of Defamatory Hate Sites**

I am writing to you to request that you immediately remove the following two web sites hosted by you: www.elansuisse.co.zw and www.elan-suisse.com .

The sites in question have been authored by an individual known as Bob Christ (Robert D. Christ) in the US, and are defamatory and offensive beyond any concept of human decency.

The sites take the disingenuous form of a 200 page ranting, twisted and maniacal "investigation" by Christ where he deliberately manufactures false claims about myself and anyone that he can find that has "shaken my hand" under the guise of a false "investigation" for fraud

This allows Christ through his unnamed "sources" to claim that I am a..

Scam artist [yep, that's true – RDC]
Pedophile [read the site – that's not what I said.  But what the heck, he's on a roll – RDC]
Liar [yep, that's true – RDC]
Crook [yep, that's true – RDC]
Hiding via plastic surgery [no comment other than 'Ha-Ha-HAAA'.  This guy is really funny! – RDC]
Thief [yep, that's true – RDC]
Run equity scams [yep, that's true and he forgot the advanced fee scams – RDC]
Have been in and out of jail for yours ['yours'?  But yep, that's true – RDC]
Dead beat dad [yep, that's *really* true – RDC]

Pathological liar [yep, that's true – RDC]
Soliciting prostitutes [I don't remember ever saying that, but he's on a roll – RDC]
Have been fired for theft [yep, that's true – RDC]
Run scams on girlfriends [actually, it was Walters that ran the scam on his girlfriend, but... just details... – RDC]
Eluding the law [yep, that's true – RDC]
Etc [he forgot the advanced fee scams he pulled in the 1990s in the UK – RDC]

F-15

I am currently suing Christ for defamation in the Supreme Court in Delaware (C.A 06-275-GMS) [it's Federal Court in Delaware where all of the legal stuff is happening. And it is not him but some unclear version of Elan Suisse – a case currently dormant because the objective of the case (to draw jurisdiction away from Delaware) failed. But what's in a name – RDC] and criminal complaints are being made to the FBI [really? It's news to me. Perhaps he can just account for the money he stole from me and have done with it. But it is easier to just write rubbish emails to people whom don't know the situation. – RDC] and several other US Federal Agencies for Cyber Stalking, Harassment and several other more serious non internet related crimes that he has committed [ah, more of this rubbish red herring stuff again. This is getting very tiresome... – RDC].

I have also contacted Google directly and made a MDCA complaint requesting that these deliberate and disgusting sites be removed from their search engines [you go, girl! – RDC].

He has used these sites to insight the removal of my FSB license in South Africa (redressing action is being taken within the FSB now) and has further enlisted the assistance of an individual named Julius Cobbett at Money Web to print what the FSB are claiming is a false story about me in their publication, which will also be dealt with [I think that the FSB can make up their own mind and don't need a bilked investor in the USA to influence them that Cormick is a fraud. And the FSB is claiming that the Moneyweb stories are false? Right! – RDC].

While I am sure that Christ will simply post his deliberate and malicious fantasy sites elsewhere upon your removal (he has stated this intention by hate mails that I have also been the victim of for several years) I believe that removing these *disgraceful, defamatory, untrue and hateful sites* [my emphasis added – RDC] immediately will at least cause him the inconvenience of seeking another ISP [So Cormick is seeking to inconvenience me? Hum... – RDC].

I have copied Advocate Swaneopol on this communication, who is handling my legal action against the FSB and Cobbett from Money Web for their role in the hate sites that you are hosting [hum, that's news to me. I wonder if it is news to Moneyweb. And is Cormick suing the FSB as well? The guy can't afford child support, but he can afford to sue everyone (or at least *claim* to be suing everyone) – RDC].

I look forward to your prompt compliance in this matter.

Please do not hesitate to contact me on brettc@elan-capital.com for further clarification

Kind personal regards

Yours sincerely

**Dr Brett Cormick**<<
Would someone PLEASE give this guy a job? This little game of Cormick's was really cute and funny 2 years ago where he posted to:
www.bobchristamericantraitor.com this site - http://www.elansuisse.co.za/Email2005/traitor.htm

and to: www.bobchrist.net this site - http://www.elansuisse.co.za/Email2005/cormicreply1.htm
(and what does my wife have to do with this?)

I guess Cormick no longer likes this game. The FSB revoked his license. The Zimbabwean Police threw him in jail. Moneyweb posted news articles about his business operations. All

*the Counterclaim (and who may not even be aware of Christ's dragging her name into the public record in this action). Exhibits D and E purport to be from long-defunct websites.<<*    F-16

**Exhibit A** is from a public domain source. I am not sure why Cormick objects to that, other than he just doesn't like what the reporter had to say.

**Exhibit B** is from the Mail & Guardian (which is a ***South African*** news organization – not Zimbabwean) and is also a public domain source.

**Exhibit C** is an email Cormick copied to me. And don't worry Brett, she will be at the trial. She doesn't like you. I cannot image why...

**Exhibits D & E** are both Cormick-produced. Excuse me, but they "purport" to be from long-defunct websites? Can you do better than that (like refute that you wrote them – that would be more meaningful)?

The objective of inclusion of these exhibits is plain and clear – that Cormick has a long history of using the red herring to obfuscate the *real issue* and that these counterclaims are meant to draw attention away from the *real issue*. And the *real issue* is that he is a con artist. The *real issue* is the money and its whereabouts. Cormick knows what happened to the money. And he is spending a lot of money (***MY MONEY***) in protecting the disposition of that money.

The only real issue is the money. *Period.*

**November 15, 2007 Update**
Well, since Cormick seems to have all of this money stashed away [somewhere] to conduct this lawsuit, let's just ask the question that we all would love to know:

***An Open Letter to Brett J. Cormick:***
Dear Mr. Cormick,

Please identify to me the source of funds you are using to fund this lawsuit. I would like to get that information to your family in Australia and Zimbabwe so that they may attach that source of funds [through the court system] in order for them to help pay for the living expenses of **your children**.

⟶ I realize your indigence towards my raising the *possibility* that you are a **deadbeat dad**, but just image your ex-wives' and children's feelings on the matter. I believe that they are indignant as well (but for a different reason, however). Please send this information via email, post, court filings, smoke signals, whatever. I will make sure that it gets to the right place.

Sincerely...

**November 17, 2007 Update**
As ridiculous as that Motion to Strike Exhibits (filed by Cormick) is, it still needs to be answered. I filed this opposition to Cormick's motion to strike yesterday.

**November 19, 2007 Update**
Remember that news article about Nicogel where they will need to open up a bank account on the moon for all of the profits? Well, there hasn't been much in the way of movement here of late. NO entries in Google News for the past month on Nicogel. According to Companies House, the company is "Dormant" since the accounts have been overdue from 30 September 07. What is Bottie up to?

**January 5, 2008 Update**                                                    F-17
Happy New Year everyone!  With this month, the Elan Suisse fiasco has been ongoing now for four, very long, years.

In January 2004, my friend Graham Hoal died in a tragic parachuting accident near Cape Town, South Africa bringing me to Cape Town to assist in the accident investigation as well as in settling his affairs.  While I was there dealing with the mess, my "New Best Friend" Brett Cormick flew down from Harare, Zimbabwe to convince me to invest in his new venture – Elan Suisse.  It took about four months for me to figure out that I had been duped and that he had stolen the entire investment.  Then it has taken me over three years and countless frustrating hours (and hundreds of thousands of dollars in legal fees) in attempts to recover my stolen property.

I have gathered tens of thousands of pages of evidence for the upcoming trial.  I am fully prepared to go to court and bring me witness after witness as well as document after document to demonstrate the extent of "Dirt Bag" with which we are dealing here.  But I am hoping that Judge Sleet will save us the trouble so that we can all get on with life.  I will post here Cormick's reply to my motion for summary judgment once it is received (due by January 12th).

Once the judgment is gained, I will hand this over to a collections agency in the UK so that they can "Sort Out" "The Good Professor".  And I am going to then close this chapter of my life and chock it up as a hard lesson learned.

I sincerely believe that I have saved countless small investors their respective life's savings.  But it was too late to save Zog.  And Peter Kipps.  And Anthony Carter.  And countless others.  The most important lesson I have learned here is to fully research with whom you are dealing *before* you give up control of something of value.

One other new item of information I gained today – shortly after Apostolos Zographos invested into Elan Suisse, Cormick (according to a close inside source) bought a brand new vehicle with the windfall.  Go figure.  Zog, did you know about that?

**January 7, 2008 Update**
Cormick's reply to my Motion for Partial Summary Judgment is below.
Brief
Cormick Declaration
I'll save you the drudgery of the attachments since they are already listed within my original web page.

It really is amazing – to witness the amount of money that Cormick has to spend on legal expenses!  I wonder where he gets it from…

**January 17, 2008 Update**
Ladies and Gentlemen: Yesterday represented a MAJOR milestone in this case.  It was the first time that a motion in this case was completed whereby the subject matter is the only real substance within this case – and that is the disposition of the $250,000 that Cormick stole from me.  All of the previous briefs were procedural meant to frustrate my efforts to get to the real issue.  As Gordon Subloo said with regards to this case, "No one has ever gotten this far before with Cormick."

anything less than forthright and honest about Cormick and this fiasco. One of the things that I did find interesting in our talk was that Cormick's attorney had already contacted him a few weeks prior. What was interesting about that was that Finger (from Whitlock's impression) was trying to get to the truth (instead of, as usual, trying to find something incriminating against me). Could it be that Finger has finally figured out who/what is his client? Whitlock's impression was that Finger wasn't exactly thrilled with representing Cormick. So, could it be that Finger is suddenly growing a conscious? Unlikely. What is more likely is that he is finally coming to the conclusion that his client has been *somewhat* less than forthright with him (oh, what a surprise!) making his case extremely weak thus throwing into doubt his ability to win the case and to get paid.

*[This item was removed on April 9, 2008 at 2120 CST due to Cormick's attorney righteously, pompously and indignantly notifying my attorney that my disclosure here of Cormick's latest attempt/gambit to avoid deposition violated the court's confidentiality rules – which, of course, is absolute rubbish. He doesn't argue issues based upon merit – but only upon legal technicalities and procedural issues… What else would a scam artist's attorney argue? But my attorney is on travel at this time (which, of course, Cormick's attorney knew – hence the big flap) and has requested that I remove this update until we can petition the court as to whether or not my disclosure here of Cormick's sordid tale of woe (i.e. attempts to avoid deposition) violate the confidentiality rules - which Cormick waives around (a lot like Eliot Spitzer righteously prosecuting the Wall Street Elite for soliciting prostitutes…) in attempts to again deflect the attention away from the central issue of this case – which is, of course, the stolen money. How many different ways can you say 'Red Herring'?]*

F-18

Whitlock and I came to the same observation yesterday about Cormick having that "right accent", living in the right "posh place" in Kensington [although Cormick would describe it to him in minute detail but would never show him] and talking that sophisticated London "*Kensington Talk*". And when you live in Kensington and have that Kensington accent… And talk that sophisticated London talk... And 'hob-knob' with all of those sophisticated bankers. You must be, well, *cool*. Right? But what happens when you are from Louisiana – or worse – from Queensland, Australia? And have an "Advanced Degree" from a diploma mill? But when you call yourself "Professor" and "Commander" and "Doctor" and other self-appointed titles, well, it makes up for any deficiencies (like coming from the "wrong side of the tracks", so to speak). But Cormick *IS* one of them, right? Right? RIGHT??? Right. *The Australian with the Kensington accent.* Per Bruce Lyman's definition

of Cormick, "Wannabee". Per Alex MacAlery's, "Walter Mitty". My
RSA attorney's, "Complete and Total Fraud". And
mine/Patrice's/countless others' definition, "Con Artist". But what's in a
name anyway?

F-19

My attorney and I are still trying to nudge Judge Sleet into doing
something to pin this Cormick clown down so that we can get this whole
thing over with. But for whatever reason, this case doesn't seem to be a
priority with him. There are a whole bunch of motions pending on this
case grinding this process to a halt due to the backlog. The trial is six
weeks away and I still have not been able to depose 'Dr.' Cormick. So it
is difficult to produce a pre-trial order outlining the issues under
contention [so that we can figure out what we have to try]. Cormick can
apparently now travel (Oh, joy!). But he is broke (Oh, no!). Cormick
certainly is having fun with 'the run of the court'!

**April 10, 2008 Update**
I had a chat with Malcolm Burke yesterday. He said that he didn't have
that much interaction with Cormick since he was only on the board of
Upgrade International. Then referred me to the guy who was the CEO –
Daniel Bland. I spoke with Danny Bland later in the day. The story he
told tracks with everyone else's story about Cormick's tactics and means
by which he extracted money in exchange for, well, *nothing*. Which is
why they call it an 'advance fee ***scam***'.

And all of this talk yesterday about how I am violating confidentiality
rules... Why do we have these things [highly *"hush-hush"* confidentiality
rules] here anyway? What will happen? We all *might* find out that
Cormick is NOT a LSE/Oxford/Cambridge/Columbia/etc. PhD? Or a
"Great Australian Warrior/SAS Veteran"? Or a "Super Secret Agent
Man"? Or a "Professor/Doctor/Commander/etc." [fill in the various self-
appointed titles]? In short, we wouldn't be here if there was some sort of
transparency on all of the money I trusted to Cormick – and [I know this
seems petty, but...] **TRUTH**!!!

**April 11, 2008 Update**
Well, I guess that Cormick has me at this point. He has disappeared into
the ether again. He continues to play games to avoid deposition – and,
particularly, to play games aimed directly at unnecessarily running up my
costs with regards to this proceeding. His attorney is obviously advising
him to do so because Mr. Finger is, of course, an honest and honourable
guy as well. Cormick is broke; therefore, there can be no monetary
recourse [to him] for his perpetually playing games. He can keep this
game up forever (or as long as Judge Sleet allows him to – and Judge Sleet

doesn't appear to be very interested in this case). His attorney continues to maintain Cormick's location as 'Confidential' because Cormick is scared of my filing "Spurious Criminal Complaints" against "The Honest and Honourable Doctor" [And *Great Australian Warrior*, of course].

F-20

That Cormick is a sly one indeed. We have no deposition scheduled. He has avoided interrogatories. He has produced practically no discovery documents (under the guise that he lost them all in Zimbabwe – because I had him tortured…). He can now travel (Oh Joy!). But he cannot afford to travel (Oh NO!). This, of course, begs the question, "What are we doing here?" The answer is pretty simple – we are all playing Cormick's game.

**NOTE:** See the "Updates" section at the top of this page. At the request of our African readers (whom don't have the trans-Atlantic bandwidth of our US readers [since this web page is hosted on a US server]), I have archived all of the updates from May 2007 to March 2008 to this page and continue the updates from March 31, 2008 to present (or until this page fills up again).

**April 12, 2008 Update**
Before I started this entire process in 2005, I called Michael Wolff in Australia (Cormick's dive partner on the 1999 North Pole trip). Michael is now an attorney in Melbourne. I explained to him what was going on with Brett and what he had just done (i.e. scammed me for $250,000). After he got finished laughing then telling me how stupid I had been (for you guys out there that know him, you'll remember him as a bit less than diplomatic), he explained to me how to sue someone.

First off, it is *extremely* difficult to sue someone – especially when that someone has pre-planned this out so well (as Brett did here). So, you must have a very strong 'slam dunk' case before you start. Then you have to find a jurisdiction where a court will accept it. Then you have to go after it and NEVER-NEVER-NEVER let up. And he ended his email with the following quote, "Do you think he was really in the SAS?". But that was after I filed suit in South Africa.

I started this quest to get back my stolen property in The High Court of South Africa (Witwatersrand Local Division - Case Number 2005/2033). It was a waste of time and money – and it was another expensive lesson learned. That didn't work because Cormick kept jumping back and forth across the border to Zimbabwe thus denying me jurisdiction there (and he was having fun hurling threats and insults while laughing at my lame efforts to chase him while he happily squandered away all of my money –

he had baited and executed the trap well). Then I looked long and hard at
Delaware. Then I filed suit and have kept after that ever since.               F-21

*Which leads to Cormick's latest gambit (in addition to all of the others):*
Remember that character 'Simon' from the movie "*True Lies*" (played
exquisitely by Bill Paxton)? In one of the last scenes, Harry and Helen
meet Simon again at a cocktail party where he is playing his Cormick-
style 'secret agent' routine. Helen takes out her lipstick case and shoves it
under Simon's chin – then he urinates all over himself. Why is this
pertinent? Well…

Cormick is now claiming that continuing this case is only an act of
vengeance and revenge. He has no assets to recover. He can no longer
get a job and has suffered the tortures of the damned and and… (I'll
spare you the litany of woes again). What he is now claiming is that I
have now gotten much more than "My Pound of Flesh". So ***now*** it's the
sympathy card (more money for another box of Kleenex to mop up the
tears…). Such *DRAMA*!!!

I am not interested in 'my pound of flesh', any vengeance, any revenge
(although most would say that I certainly deserve it) or anything other than
recovery of the property that Cormick has stolen from me. ***I*** worked for
that property and ***I*** want it back. I have absolutely no chance of
recovering that property until such time as I get a judgment. It is not in
my interest to pursue Cormick or waste any more time and money on him
*AFTER* I get back my stolen property. Until then, this will continue.

I do NOT believe that he is broke. I do NOT believe that he was tortured
in a Zimbabwean prison (under *my* definition anyway – not having
chocolates on his pillow and having his pillow fluffed is *HIS* definition of
torture). I do NOT believe anything that comes from either Cormick or
his attorney. Cormick is a proven liar, a known scam artist and his
attorney is his mouthpiece (and he chose his attorney carefully – you
know, *birds of a feather*…).

If Cormick really is broke (he wouldn't lie about that, would he?), I *do*
wish/hope he would just acquiesce to this judgment, let me verify his
assets (or lack thereof) and we can all just go on with life. Why is he
fighting this thing so hard? This is Cormick's game and it was all cute
and funny [to Cormick] right up to the time that he started losing *at his
own game*…

On the status of Delaware Federal Court: I had an email exchange with the
reporter from Delaware that covers the Federal Courts trying to ascertain

subject to the ongoing criminal complaints filed by various parties over the years once he lands on U.S. soil).

F-22

Personally, I think that Cormick has *everyone* duped – he is likely sitting on an island somewhere in the Southern Pacific sipping rum drinks and keeping entertained by this whole drama.  In other words, he is just having a bit of fun at all of our expense (including Judge Sleet's court AND his own attorney – which would really be ironic considering who is his attorney).  And, on that note, the decision tree on this one is binary: 1) Does Finger know about all of these games that Cormick is playing and is actively advising him to play them, or 2) Is Finger being duped by Cormick (like all of the rest of us)?  [Or, could Cormick possibly be telling the truth for once?  I seriously doubt it…]  If it is 2), then, indeed, Cormick deserves his enjoyment on this one for his masterful scam on David Finger!  If it is 1), then I wonder what the Delaware Bar Association's Code of Professional Ethics has to say about all of these unethical games being played.  Because if Finger is advising Cormick to play these games [if they are found to have been played], who is the one responsible for this unethical conduct?

On the likely case that Cormick is lying [again], that would put Finger in a bit of a dilemma in that one of two possible facts would be present: either a) Cormick stung Finger and he was stupid, or b) Finger was conducting himself in an unethical manner.  Folks, for once in the four plus years of this case, I am actually being entertained by this!!!  That Cormick is a sly one indeed.

Let's explore this a bit more: Finger told Judge Sleet that ▄▄▄▄▄▄▄▄▄▄
▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

INFORMATION
DISCLOSED FROM
DOCUMENT MARKED
"CONFIDENTIAL"

▄▄▄▄▄.  So, if Finger is telling the truth (and if Cormick is not) that would make Finger another victim of a Cormick scam (and probably the laughing stock of the Wilmington legal community).  If Finger is lying (**note:** Finger also told Judge Sleet that Cormick used my money for business purposes when queried as to the disposition of those funds), that would seriously jeopardize his license to practice in Delaware.  Oh… This is *precious*…

subject to the ongoing criminal complaints filed by various parties over
the years once he lands on U.S. soil).                                    F-23

Personally, I think that Cormick has *everyone* duped – he is likely sitting
on an island somewhere in the Southern Pacific sipping rum drinks and
keeping entertained by this whole drama. In other words, he is just having
a bit of fun at all of our expense (including Judge Sleet's court AND his
own attorney – which would really be ironic considering who is his
attorney). And, on that note, the decision tree on this one is binary: 1)
Does Finger know about all of these games that Cormick is playing and is
actively advising him to play them, or 2) Is Finger being duped by
Cormick (like all of the rest of us)? [Or, could Cormick possibly be
telling the truth for once? I seriously doubt it...] If it is 2), then, indeed,
Cormick deserves his enjoyment on this one for his masterful scam on
David Finger! If it is 1), then I wonder what the Delaware Bar
Association's Code of Professional Ethics has to say about all of these
unethical games being played. Because if Finger is advising Cormick to
play these games [if they are found to have been played], who is the one
responsible for this unethical conduct?

On the likely case that Cormick is lying [again], that would put Finger in a
bit of a dilemma in that one of two possible facts would be present: either
a) Cormick stung Finger and he was stupid, or b) Finger was conducting
himself in an unethical manner. Folks, for once in the four plus years of
this case, I am actually being entertained by this!!! That Cormick is a sly
one indeed.

**April 18, 2008 Update**
Continuing our discussion from yesterday, the games being played here
are pretty blatant and have been from the start. Which brings into question
whether Finger is being duped or he is actively advising his client to
conduct these games. They are obviously banking on the fact that Judge
Sleet (and that small court system) is very squeezed for resources.

If Finger believes his client, then I would say that he's pretty stupid (I
can't fault him too badly – I believed Cormick also). Then that would be
the case of a slick big city attorney getting scammed while defending a
scam artist. So, that would be another notch in Cormick's expensive
necktie attached to his hollow suit (and would probably make Finger the
laughing stock of the Wilmington legal community).

But the clear strategy of delay and obfuscation in order to avoid justice is
obviously a violation of the principals of the legal process. And even
attorneys are governed by a code of professional ethics. So if Finger

knew/knows of Cormick's antics (and worse, is advised him to play them), then Finger must be answerable to someone or something. So, let's do a bit of research.

F-24

A little research with the Delaware Courts reveals just such an organization – it is called The Office of Disciplinary Counsel ("ODC"). Per the web site, the ODC "is an Arm of the Supreme Court of Delaware, which assists the Court in regulating the practice of law. In this capacity, the ODC is charged with evaluating, investigating, and, if warranted, prosecuting lawyer misconduct."

Here is their published Code of Ethics:
http://courts.delaware.gov/odc/DLRPCJan2008.pdf

*"Rule 3.1. Meritorious claims and contentions*
*A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law."*
There is a whole bunch of them here, but the one that is glaring is that a defamation case was brought in Pennsylvania against me by some [still unclear] organization under a whole bunch of weak legal points [most obvious is the Lehman Act – a point for which Cormick/Finger have since withdrawn] that even Judge Pratter [unsolicitedly] stated that the whole case was brought about in bad faith. I believe that this point is a clear and obvious violation of this rule, but this is my opinion only and I'm admittedly not an expert in this field. This would need to be sorted out by the ODC.

*"Rule 3.2. Expediting litigation*
*A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client."*
It is in the interest of his scam artist client to delay, obstruct, frustrate, obfuscate and avoid paying the price for his fraudulent activity. On that point, it is my opinion that Finger is doing his client justice. Let's see if the ODC agrees.

*"Rule 3.3. Candor toward the tribunal*
*(a) A lawyer shall not knowingly:*
*(1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer"*
Well, the reason Finger keeps coming out with these pompous and indignant exceptions to the postings to this web page is specifically about

statements he made to Judge Sleet that I believe to be false. The question is whether or not Finger knows [or reasonably should have known] these representations to Judge Sleet to be false. But I will say here that Finger/Cormick have made a whole bunch of statements to which they continue to refuse to supply evidence backing up their statements – which, of course, screams "What? Don't you trust me?" Dear Mr. Finger and Mr. Cormick, no.

F-25

The remainder of the infractions of Rule 3.3 will be listed in the ethics complain I am about to file.

*"Rule 3.4. Fairness to opposing party and counsel*
*A lawyer shall not:*
*(a) unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act;"*
Banking records. Evidence of Cormick's living conditions. Documents evidencing the financial arrangement between Finger and Cormick (the ones not consistent with attorney/client privileges) because it will back up (or refute) statements made by Finger to Judge Sleet. And, for Christ's sake, all of the discovery documents they are claiming to figuratively have been eaten by Cormick's dog.

The remainder of the infractions of Rule 3.4 can be read to Finger during the ODC tribunal.

*"Rule 4.1. Truthfulness in statements to others*
*In the course of representing a client a lawyer shall not knowingly:*
*(a) make a false statement of material fact or law to a third person; or*
[Would Judge Sleet fall into the category of 'a third person'? - RDC]

*"Rule 8.4. Misconduct*
*It is professional misconduct for a lawyer to:*
*...*
*(d) engage in conduct that is prejudicial to the administration of justice;"*
Would that cover the strategy of delay, obfuscation and misdirect? I certainly think so. Let's see if the ODC agrees.

Here is the link to filing a complaint with the ODC. What do you think guys? Should I do it? Should I let the ODC sort out "The Honourable Mr. Finger"?

Folks, I don't necessarily have a beef with Finger. My beef is with

Cormick – specifically, the location of my stolen property. But Cormick has perpetuated his fraudulent activities across several continents for many years because of [in my opinion] slimy attorneys like Finger. Cormick had Keith Oliver go after the English Gentleman for defamation in order to gain the file from Metro Police and to avoid the criminal complaint filed for advance fee fraud through misdirect/obfuscation. He continues to skirt across the world plying his trade. He used the Delaware Companies System to run a scam on a US citizen (me) and now he is using the US Court System to go after me. So, if I must be held accountable by my own legal system and Cormick does not have to be held accountable by my legal system then I would certainly hope that SOMEONE in that chain can/will be held accountable. Cormick/Finger continues to, in my opinion, play games to avoid justice and unnecessarily drive up my cost of getting back my stolen property. The strategy is obvious – if they continue to frustrate me long enough, I will go away. I doubt the ODC will get around to this case before it is over, but perhaps they can sort out Finger so that he doesn't do this to the next guy. Cormick is happily continues to play these games with impunity. Let's see if the ODC will allow Finger to do the same.

**May 1, 2008 Update**
Yesterday was an interesting day:
1. Congratulations are in order for Cormick finding the money to renew the domain www.elan-capital.com through Network Solutions!
2. But, Cormick's reply to my Motion for Sanctions was due in to the court by Wednesday April 23rd. When it didn't show up on the docket, my attorney called David Finger (Cormick's attorney). His reply was that it is "End Game". I wasn't exactly sure what he meant by that.
3. So, we decided to wait one week then file a letter to Judge Sleet notifying him that our Motion for Sanctions was unopposed; therefore, we request a ruling on that motion.
4. As a reply, Finger resigned!!!

**May 2, 2008 Update**
Another interesting day today:
1. Cormick filed *another* request with the UK Companies House to strike off Elan Suisse Ltd. and I filed *another* objection to having it dissolved. He is not going to get off that easy.
2. Judge Sleet issued an oral order to convert the Pre-Trial Conference set for May 8, 2008 from an informal conference to a formal hearing. I am hoping that he will issue a ruling on this motion for sanctions and end this whole nightmare. I will cross my fingers (or

*two years* of Delaware and Pennsylvania County and Federal Court time **BEFORE** he decided to just *not show up* for court. In other words, he wasted his attorney's time (ah, Finger and Nicholas Casamento of Front Street Lawyers, P.C. were paid, so it wasn't a waste of time to them…), The Montgomery County Court's time, The Eastern District of Pennsylvania Federal Court's time, Judge Sleet's and the Delaware Federal Court's time and ran up in excess of $225,000 in attorney's fees for me to get this to a point where he decided to just "Not Show Up". And, of course, the South African High Court's time – heck, Cormick doesn't care about that…

F-27

Judge Sleet requires another hearing in order to determine the damages amount. I still have some work to do before I can begin the collections process. But this nightmare is finally over. Now it is on to collections.

From Sean O'Sullivan's report comes **The Honorable David L. Finger** (of Finger & Slanina, LLC – in my opinion [and I certainly have basis for that opinion!], the slimiest of slimy attorneys) quote, >>"And good luck trying to collect," said Finger in court.<<

**May 15, 2008 Update**
Here is the transcript from last Thursday's hearing conducted in Judge Sleet's Court. It is very telling on a lot of fronts!

What you will notice from this is the *glaringly obvious* statement that Cormick is making in this whole procession – and that is that he took a default judgment rather than letting this get into court (thus having him lose this case on its merits).

**May 19, 2008 Update**
Looking back over the hearing transcript listed in the May 15, 2008 Update above, there comes a few points worth mentioning:
- [Page 14] >>Mr. Christ in his deposition testified that he believes his $250,000 is hidden somewhere, and he wants to be able to go after it. From what I know, it's not there. It's gone. I don't know where it is.<< Well, Mr. Finger, that has been the point of this entire 4+ year ordeal – to find out what happened to my $250,000. *DAFT!!!*
- [Page 15] >>The last point is, yes, I did a couple of days ago receive an e-mail from him at a new e-mail address, saying that the reason he changed -- shut down the other e-mails is Mr. Christ had been sending him harassing e-mails, profanity-laden…<< Hum, the last email I exchanged with Cormick was in June of 2007 – which was two weeks after he sent to me pictures of my own home here in

Case 1:06-cv-00275-GMS    Document 131-8    Filed 06/09/2008    Page 1 of 2

**Web**  Images  Maps  News  Shopping  Mail  more ▼    david562@aol.com | My Account | Sign out

Google

"Brett Cormick"    [Search]  Advanced Search
                                              Preferences

**Web**                              Results **1** - **10** of about **91** for **"Brett Cormick"**. (**0.18** seconds)

### Dr. **Brett Cormick** and Elan Suisse Elan Capital Nicogel Elan-Suisse ...
Upgrade is pleased to announce that Dr. **Brett Cormick** will become the Chief Financial
Officer of Global Cybersystems SA and Upgrade International Corp. ...
elan-suisse.com/ - 168k - Cached - Similar pages - Note this

### [PDF] Professor **Brett Cormick** Director Polar Dive Operations The Polar ...
File Format: PDF/Adobe Acrobat - View as HTML
Professor **Brett Cormick**. Commander. Shagashe Leopards ... Professor **Brett Cormick**.
Cell: 011 211 728. BSc. (Mil) BEcon. MA Econ. Ph.D. ...
elan-suisse.com/DESuit/BJCBizCards.pdf - Similar pages - Note this
More results from elan-suisse.com »

### Nicholas Grose and Jane 1603 England:Information about **Brett Cormick**
View Tree for **Brett Cormick Brett Cormick** (b. 1959). **Brett Cormick** (son of ... Children of
**Brett Cormick** and Shirley Breckenridge are:. James Cormick, b. ...
familytreemaker.genealogy.com/users/s/m/i/Edwina-Smith/WEBSITE-0001/UHP-1566.html -
8k - Cached - Similar pages - Note this

### Dr. **Brett Cormick** and Elan Suisse Marketing for Investment Capital
I met **Brett Cormick** while operating a tour company that conducted expeditions to the High
Arctic and Antarctic latitudes. **Brett Cormick** was my first tandem ...
www.elansuisse.co.za/ElanSuisse1.htm - 19k - Cached - Similar pages - Note this

### Dr. **Brett Cormick** and Elan Suisse Marketing for Investment Capital
On January 28, 2004, I was contacted by Dr. **Brett Cormick** to explore business
opportunities in the Republic of South Africa. During the course of the next ...
www.elansuisse.co.za/ElanSuisse.htm - 33k - Cached - Similar pages - Note this
More results from www.elansuisse.co.za »

### [PDF] *Mag Winter LIVE (715)
File Format: PDF/Adobe Acrobat - View as HTML
LSE's most daring alumnus must be **Brett Cormick**. The 40-year-old ... Dr **Brett Cormick**
was a research student from 1991 to 1993 in the ...
www.lse.ac.uk/resources/LSEMagazine/pdf/Winter%202000/Winter%2000,%20Ice%
20Cold.pdf - Similar pages - Note this

### Julius Cobbett, **Brett Cormick** and Elan Suisse Capital
Julius Cobbett Webpage, Elan Suisse Capital Biopharma Fund fraud involving **Brett Cormick**
and John Walters,
www.juliuscobbett.com/ - 10k - Cached - Similar pages - Note this

### Welcome to the Financial Gazette Online!
Any intimation of any association between Dr **Brett Cormick** and the Elan Suisse entity
operating in Zimbabwe, the National Discount House of Zimbabwe or the ...
205.209.107.101/fingaz/2005/April/April22/8305.shtml - 17k -
Cached - Similar pages - Note this

### Welcome to the Financial Gazette Online!
EDITOR — There is a South African company by the name of Elan Suisse (Pty) Ltd that has
a man by the name of Dr **Brett Cormick** as its sole director. ...

www.fingaz.co.zw/fingaz/2005/March/March30/8136.shtml - 17k -
Cached - Similar pages - Note this

**enjoy Korea**
The scheme was operated by Zimbabwean resident **Brett Cormick** and his partner, John
Bott-Walters (also John Walters), who is a convicted criminal. **...**
j2k.naver.com/j2k_frame.php/japan/www.juliuscobbett.com/ - 1k -
Cached - Similar pages - Note this

**1** 2 3 4 5 6          **Next**

"Brett Cormick"          Search

Search within results | Language Tools | Search Tips | Dissatisfied? Help us improve | Try Google Experimental

©2008 Google - Google Home - Advertising Programs - Business Solutions - About Google



Not Reported in A.2d                                                                                    Page 1
Not Reported in A.2d, 1998 WL 420750 (Del.Fam.Ct.)
**(Cite as: Not Reported in A.2d, 1998 WL 420750 (Del.Fam.Ct.))**

Duncan v. Duncan
Del.Fam.Ct.,1998.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Family Court of Delaware.
Robert M. DUNCAN,
v.
Sharon DUNCAN.
**No. CK92-4672.**

Jan. 9, 1998.

William S. Hudson, Esquire, for Petitioner.
Dana J. Schaefer, Esquire, for Respondent.

Before the Honorable WILLIAM J. WALLS, Jr.,
Judge of the Family Court of the State of Delaware.

WALLS, J.
**\*1** Assigned to the Court for judicial determination
is a Request for Review of a Commissioner's Order
filed by Sharon Duncan, in response to an Order
rendered by Commissioner James G. McGiffin, Jr.,
dated October 3, 1997. A party may seek a review
of an order of a Commissioner to a Judge pursuant
to 10 *Del. C.* § 915(d). The Judge shall make a *de
novo* determination of those portions of the Com-
missioner's order to which the requesting party is
objecting.FN1

FN1.10 *Del. C.* § 915(d)(1).

The matters before the Commissioner were cross
applications for contempt filed by Robert Duncan
and Sharon Duncan. A hearing was held on
September 3, 1997, at which Ms. Duncan was rep-
resented by Dana J. Schaefer, Esq. and Mr. Duncan
was represented by William Hudson, Esq. After an
evidentiary hearing the Court requested letter
memoranda which counsel submitted to the Court
on September 26, 1997 and September 30, 1997, re-

spectively. The Court entered an Order on October
3, 1997, awarding damages to Mr. Duncan in the
amount of $10,550 to be offset by $2,500. Accord-
ingly, a judgment was entered on behalf of Mr.
Duncan and against Ms. Duncan in the amount of
$8,050.

Ms. Duncan objects to the Commissioner's Order
and raises the following issues on appeal:

(1) The Commissioner's Order contained errors of
fact and law;

(2) The amount of damages based upon a $50/day
storage charge was based on hearsay testimony, ob-
jected to on the record, but allowed as evidence by
Commissioner McGiffin;

(3) The Commissioner failed to consider any mitig-
ating circumstances regarding Ms. Duncan's inabil-
ity to remove the caboose and her efforts to remove
the caboose;

(4) The Commissioner was mistaken as a matter of
law in not ruling that the relationship regarding the
parties and the caboose was that of a bailment;

(5) The Commissioner was mistaken as a matter of
law in ruling that the proceeds sought by Mr.
Duncan were not barred by the Statute of Frauds;

(6) The Commissioner was in error in awarding Mr.
Duncan damages and in error for failing to award
Ms. Duncan the proceeds from the sale of the ca-
boose.

The parties entered into a stipulated settlement
agreement (hereinafter "Agreement") which was
entered as an order of this Court on April 3, 1997.
Pursuant to paragraph 14 of the Agreement, Ms.
Duncan received a caboose which was, at that time,
located on property which her husband received un-
der the same Agreement. Paragraph 14 required that
Ms. Duncan remove the caboose at her expense
within six months of the signing of the Agreement.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 2
Not Reported in A.2d, 1998 WL 420750 (Del.Fam.Ct.)
**(Cite as: Not Reported in A.2d, 1998 WL 420750 (Del.Fam.Ct.))**

At the expiration of the six months the caboose remained on the property and Mr. Duncan wrote the first in a series of monthly letters informing Ms. Duncan that he had a use for the property and that he would assess storage fees in the amount of $50/day so long as the caboose remained on the property. Ms. Duncan's attorney at the time wrote to Mr. Duncan's attorney claiming that no storage fees were due and that the amount being charged by Mr. Duncan was unreasonable.

**\*2** The caboose was sold to a third party in June of 1996 for $2,500. Mr. Duncan kept the $2,500 proceeds as an offset against the disputed storage fees. Mr. Duncan filed a Rule to Show Cause in this Court on July 10, 1997, requesting damages for breach of the Agreement. Ms. Duncan filed a counterclaim on August 11, 1997, requesting that the Court order Mr. Duncan to turn over the $2,500 representing the purchase price of the caboose.

On a review of a Commissioner's order, the Court may review the facts and law as well as deductions made by the Commissioner. In performing this review, the Court may accept, reject or modify all or part of the Commissioner's Order.[FN2] The Court will accept the findings of fact of the Commissioner unless those findings were clearly wrong and justice requires a different result.[FN3] I find that Mr. Duncan did not sustain his burden of proof in proving damages. The Commissioner erred in admitting hearsay evidence as to the actual damages sustained by the presence of the caboose on the property. The Commissioner also erred by not requiring that Mr. Duncan prove his special damages to a reasonable certainty.[FN4]

    FN2.13 *Del. C.* § 915(d)(1).

    FN3.13 *Del. C.* § 915(d)(1).

    FN4. Due to my findings regarding Mr. Duncan's failure to bear his burden of proof, it is unnecessary to discuss the issues of Statute of Frauds, bailment and mitigation raised by Ms. Duncan on appeal.

Mr. Duncan claimed that he sustained damages from the caboose being present on his property and that he was owed storage fees as a result. Mr. Duncan based his $50/day storage fee, in part, on information which he received from Dover Auto Body as to the amount of rent they charged for auto storage. A hearsay objection was raised on the record because the out of court declarant was unavailable for cross-examination. The Court allowed the testimony, reasoning that the rental quote was not being offered to prove what someone would charge for storing an automobile but rather was being offered to prove how Mr. Duncan arrived at his $50/day storage fee. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."[FN5] It is my opinion that the purpose of Mr. Duncan's testimony regarding the Dover Auto Body rental fee was offered to show that a local business would charge $20/day for outside storage of an automobile and $40/day for inside storage of an automobile. This was an assertion, the value of which rested on the validity of Dover Auto Body's rental quotation. Therefore, Mr. Duncan's testimony was hearsay. Hearsay can only be admitted if it fits one of the hearsay exceptions,[FN6] and this testimony does not fall into any of the hearsay exceptions. Therefore that testimony is stricken on hearsay grounds.

    FN5.Delaware Uniform Rules of Evidence, Rule 801(c).

    FN6.*Smith v. State,* Del.Supr., 647 A.2d 1083 (1994).

Mr. Duncan also offered testimony regarding his loss of rental income as a basis for the $50/day storage fee. According to Mr. Duncan, the caboose prevented him from renting the warehouse located behind the caboose. Mr. Duncan used the monthly rental amount of the current lease on the warehouse as proof of what he could have rented the warehouse for if the caboose had been removed from the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 420750 (Del.Fam.Ct.)
**(Cite as: Not Reported in A.2d, 1998 WL 420750 (Del.Fam.Ct.))**

premises. A claim for loss of income constitutes special damages which require proof to a reasonable degree of certainty.[FN7]The degree of certainty depends on the nature of the underlying claim, but, in general, the claimant must provide sufficient proof so that a trier of fact would have a reasonable basis upon which to determine the probable loss.[FN8]To prove loss of rental income, the claimant must prove that the defendant's actions resulted in waste of the property, such that the property could not be used until the situation was corrected.[FN9]As to the actual amount of damages, the loss of rental income requires proof of the fair market value of the premises in the open market; conjecture or probable profits are insufficient proof of loss of rental income.[FN10]Although Mr. Duncan provided testimonial evidence to the effect that he lost a potential renter because of the caboose, I find that Mr. Duncan failed to prove, to a reasonable certainty, that he lost income in the amount of $50/day due to the presence of Ms. Duncan's caboose.[FN11]

FN7.*See Moody v. Nationwide Mut. Ins. Co.,* Del.Supr., 549 A.2d 291.293 (1988); *Henne v. Balick,* Del.Supr., 146 A.2d 394, 396 (1958).

FN8.*See Moody* at 293.

FN9.*See Merganthaler v. M. & K.,* Del.Super., C.A. No. 90C-12-085.DelPesco. J. (September, 1995); *See also* 49 Am.Jur.2d § 847.

FN10.*See Hyde v. Wellpinit School Dist. No. 49,* 32 Wash.App. 465, 648 P.2d 892, 895 (Wash.App.1982); C. McCormick, *Damages* § 29 (1935).

FN11. Mr. Duncan testified that Mike of Mike's Clearinghouse expressed an interest in renting the property but declined because of the caboose. Mike was not present to testify and there was no collaborating testimony or documentary evidence sub-

mitted to support this claim. Also, Ms. Duncan testified that, in the years during which she operated a business from the caboose, there was never an interruption of business at the warehouse. Finally, Mr. Duncan admitted that the warehouse, as a whole, had never been rented for profit to a unrelated third party prior to September of 1996.

**\*3** Since no other evidence was admitted on which to assess actual or special damages, Mr. Duncan has not met his burden of proof and his Petition For Rule To Show Cause is DISMISSED. Mr. Duncan shall return the $2,500 representing the sale proceeds of the caboose to Mrs. Duncan within 15 days.

Del.Fam.Ct.,1998.
Duncan v. Duncan
Not Reported in A.2d, 1998 WL 420750 (Del.Fam.Ct.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 1998 WL 709600 (D.Kan.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 709600 (D.Kan.))**

**H** Wesley v. Don Stein Buick, Inc.
D.Kan.,1998.
Only the Westlaw citation is currently available.
United States District Court, D. Kansas.
Rhonda Sue WESLEY, Plaintiff,
v.
DON STEIN BUICK, INC., et al. Defendants.
**No. 97-2271-JWL.**

Sept. 25, 1998.

*MEMORANDUM AND ORDER*

LUNGSTRUM, J.
**\*1** Plaintiff, an attorney, appears pro se in this civil
rights action. The particular allegations in this case,
which are not pertinent to the resolution of the
pending motion, are set forth in *Wesley v. Don Stein
Buick, Inc.,* 985 F.Supp. 1288 (D.Kan.), *order va-
cated in part,*996 F.Supp. 1299 (D.Kan.1997).
Presently before the court are motions from defend-
ants Don Stein Buick, Inc., Don Stein, Jerry Ka-
plan, and multiple unnamed sales agents of Don
Stein Buick, Inc., ("Don Stein Defendants") and de-
fendants T.A. Stovall, one unnamed desk clerk of
the Overland Park, Kansas Police Department, and
the City of Overland Park, Kansas ("Overland Park
Defendants") to strike plaintiff's claims for attor-
neys fees and opportunity costs (Docs.148, 153).
For the reasons set forth below, these motions are
granted.

I. Discussion

Plaintiff seeks lost wages and income from the date
of her alleged injury to April 24, 1998, the date she
became a member of the bar, at a rate of $65.00 per
day. She seeks lost wages and income from April
24, 1998 to the present at the rate of $150.00 per
hour. Plaintiff asserts two theories as to why these
claims are allowable. First, she asserts that she has
suffered lost income, profits, and earning capacity

because she has had to divert time, skills, and ex-
pertise away from her "income-producing legal
practice" to pursue this litigation. Second, she as-
serts that she is entitled to attorneys' fees pursuant
to 42 U.S.C. § 1988. Notably, she does not contend
that injuries she sustained as a result of the defend-
ants' allegedly wrongful conduct caused her to lose
income.

The income plaintiff has allegedly lost in her pur-
suit of this lawsuit is not a proper element of dam-
ages. In order to qualify as damages under section
1983, the relief sought must generally be "the legit-
imate consequence of the tort ... sued upon."*Tax-
payers for the Animas-La Plata Referendum v. Ani-
mas-La Plata Water Conservancy Dist.,* 739 F.2d
1472, 1480 (10th Cir.1984); *see also*22 Am.Jur.2d
*Damages,* § 611 (1988) ("[L]itigation costs are not
ordinarily recoverable as an element of damages in
the absence of a statute or enforceable contractual
provision providing for them. Some reasons given
for the rule are that ... litigation expenses are not
the legitimate consequence of the tort...."). The
same rule applies to plaintiff's supplemental claims
under Kansas state law. *See Carter Elec. Co. v..
Travelers Indemnity Co.,* 382 F.2d 567, 571 (10th
Cir.1967) (claim cannot "be premised upon allega-
tions that the defendant forced the plaintiff into the
expenses of litigation. Such expenses, with the ex-
ception of ordinary court costs, are recoverable
only if a statute ... so provides.") (interpreting Kan-
sas law)).

The cases plaintiff cites have no bearing on her
case. Plaintiff points to a number of common law
cases from various jurisdictions that discuss the
propriety of damages for lost income or lost time
when such loss is the legitimate consequence of the
tort sued upon. *See, e.g., Shirley v. Smith,* 261 Kan.
685, 693, 933 P.2d 651 (1997) (where defendant
doctor's medical malpractice caused plaintiff to be
unable to urinate, plaintiff was entitled to compens-
ation for time spent self-catheterizing). Nothing in
those cases indicates that plaintiffs are eligible to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 2
Not Reported in F.Supp.2d, 1998 WL 709600 (D.Kan.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 709600 (D.Kan.))**

receive damages for time and income lost as a result of their pursuit of present litigation.

**\*2** Plaintiff also argues that she can collect her lost income as attorneys' fees for her pursuit of this case. This argument is patently frivolous and without any basis in law because it is in direct contravention of a United States Supreme Court case of which the plaintiff had been given notice. The Supreme Court specifically held in *Kay v. Ehrler,* 499 U.S. 432, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991), that attorneys who appear pro se are not entitled to receive section 1988 attorneys' fees even if they are successful in litigating the merits of their claims:

Even a skilled lawyer who represents himself [or herself] is at a disadvantage in contested litigation. Ethical considerations may make it inappropriate for him [or her] to appear as a witness. He [or she] is deprived of the judgment of an independent third party in framing the theory of the case, evaluating alternative methods of presenting the evidence, cross-examining hostile witnesses, formulating legal arguments, and in making sure that reason, rather than emotion, dictates the proper tactical response to unforeseen developments in the courtroom. The adage that "a lawyer who represents himself [or herself] has a fool for a client" is the product of years of experience by seasoned litigators.

A rule that authorizes awards of counsel fees to pro se litigants-even if limited to those who are members of the bar-would create a disincentive to employ counsel whenever such a plaintiff considered himself competent to litigate on his own behalf. The statutory policy of furthering the successful prosecution of meritorious claims is better served by a rule that creates an incentive to retain counsel in every such case.

*Id.* at 437-38.Plaintiff points to a number of pre-*Kay* cases decided by lower courts in support of her claim. These cases are, of course, irrelevant in light of the Supreme Court's detailed decision on the very point at issue here. Accordingly, the court grants the defendants' motions to strike.[FN1]

FN1. Plaintiff may one day obtain counsel to represent her in this matter. The appropriate course of action at that time would be to move to amend her prayer for damages to include section 1988 attorneys fees.

The Overland Park Defendants seek costs and attorneys' fees related to their motion to strike because plaintiff's response on the attorneys' fee issue was patently frivolous. The court will not direct the plaintiff to pay the defendants' attorneys' fees in connection with this motion to strike because the defendants' request for such fees is procedurally improper. *See*Fed.R.Civ.P. 11(c)(1)(A) (requiring motion for sanctions to be "separate from other motions or requests"). The court, however, on its own initiative by separate order this day, has directed plaintiff to show cause why she should not be sanctioned for advancing a frivolous argument. Approximately ten months ago, the court carefully notified this plaintiff of her precise responsibilities pursuant to Fed.R.Civ.P. 11 and that she could be subject to sanctions for failure to comply with the rule. *See Wesley,* 985 F.Supp. at 1306 ("Plaintiff is also cautioned that she may be subject to monetary sanctions, including the payment of attorney fees for the defense of her claims, if her pleadings and other papers before this court do not conform with Fed.R.Civ.P. 11(b).") (explaining exactly what is required of plaintiff to avoid sanctions under rule). The plaintiff has apparently violated Fed.R.Civ.P. 11(b)(2):

**\*3** By presenting to the court ... a ... paper, an ... unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,-the ... legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law....

Accordingly, plaintiff may be subject to sanctions under Fed.R.Civ.P. 11(c): "If, after notice and a reasonable opportunity to respond, the court determines that subdivision [11](b) has been violated,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1998 WL 709600 (D.Kan.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 709600 (D.Kan.))**

the court may ... impose an appropriate sanction upon the ... parties that have violated subdivision [11](b)."

IT IS THEREFORE ORDERED BY THE COURT THAT the defendants' motions to strike (Docs.148, 153) are granted.

IT IS SO ORDERED.

D.Kan.,1998.
Wesley v. Don Stein Buick, Inc.
Not Reported in F.Supp.2d, 1998 WL 709600 (D.Kan.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                                                          Page 1
Not Reported in A.2d, 2007 WL 701689 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d, 2007 WL 701689 (N.J.Super.A.D.))**

Steinberg v. Grasso
N.J.Super.A.D.,2007.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of New Jersey,Appellate Division.
Frederick STEINBERG, D.O., Plaintiff-Appellant,
v.
Donald J. GRASSO, esq., Defendant-Respondent,
andMedical Inter-Insurance Exchange of New Jersey, Defendant.
Argued Feb. 5, 2007.
Decided March 9, 2007.

SYNOPSIS

On appeal from Superior Court of New Jersey, Law Division, Camden County, Docket No. L-3327-03.

Saul J. Steinberg argued the cause for appellant (Sufrin Zucker Steinberg Sonstein & Wixted, attorneys; Mr. Steinberg, on the brief).
Michael S. Saltzman argued the cause for respondent (Fineman Krekstein & Harris, attorneys; Mr. Saltzman and Hema Patel Mehta, on the brief).

Before Judges LINTNER and C.L. MINIMAN.

PER CURIAM.
**\*1** Plaintiff Fredrick Steinberg, D.O. (Steinberg), appeals from a summary judgment dismissing his complaint against defendant Donald Grasso, Esquire (Grasso), which alleged legal malpractice and fraud in connection with Grasso's representation of Steinberg in a medical malpractice complaint against Steinberg. We affirm in part and reverse in part.

I.

These are the relevant facts, viewed in a light most favorable to Steinberg with all inferences drawn in his favor. *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540 (1995). Steinberg, a specialist in obstetrics, was sued by one of his patients for alleged medical malpractice related to his delivery of a child. The delivery was impeded by shoulder dystocia and the patient alleged that Steinberg was negligent in treating the condition, causing the child to develop Erb's palsy. Grasso was selected by Steinberg's insurance carrier, defendant Medical Inter-Insurance Exchange of New Jersey (MIIX), FN1 to defend Steinberg. Steinberg told Grasso throughout the medical malpractice action that he had not been negligent and that he did not wish to settle the underlying claim.

> FN1. The record on appeal does not reflect the manner in which the claims against MIIX were resolved. MIIX did not participate in this appeal.

During discovery in the medical malpractice action, the plaintiff's expert testified at deposition that he could not identify specifically how Steinberg injured the child. However, based on the injuries to the child, he opined that Steinberg must have deviated from the standard of care. Discovery also revealed the existence of twenty-four color photographs taken during delivery of the child by a friend of the birth mother. Those pictures were transmitted to Grasso in June 2001. Steinberg told Grasso he believed the photographs exonerated him of any wrongdoing or negligence in delivering the child. Grasso did not provide the defense expert with the photographs of the delivery, and therefore, the defense expert did not render an opinion as to the significance, if any, of the photographs.

On December 4, 2001, Grasso wrote to MIIX to provide it with his evaluation of the underlying claim. Grasso provided an overview of the underlying action, including the child's injuries and his impressions regarding the likely trial witnesses. Grasso informed MIIX that:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 2
Not Reported in A.2d, 2007 WL 701689 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d, 2007 WL 701689 (N.J.Super.A.D.))**

The insured [Steinberg] is a pleasant direct and knowledgeable man who speaks strongly and definitively. Unfortunately, he does not make a great overall appearance and looks somewhat sloppy at times. We will hope to control this at the time of trial and in the overall I will hope that he will make a good witness in his own behalf....

....

This is clearly a case in which a child has suffered an injury which the plaintiffs are claiming does not occur without the use of excessive force or as we are claiming that there was no excessive force and that these injuries sometimes do occur despite the best efforts of the physician. A jury will have good experts on both sides and they will probably balance each other out. Much will therefore depend on the jury's impressions of Dr. Steinberg. This will be counterbalanced by the sympathy which the jury will feel for this 5 year old child with lifelong limitations on his ability to use his non-dominant arm. Since neither side has anything to sway the medical issue to either side, I would estimate the chances of a jury verdict on liability in favor of Dr. Steinberg to be about 50%. If liability is found, proximate cause will not be in issue.

**\*2** I would estimate the jury verdict potential in this case to be in the range of $1.2 to $1.5 million dollars. I would estimate settlement value to be in the range of $350,000.00 to $400,000.00[.] I would recommend that it be considered. However, I do not believe that Dr. Steinberg wished to settle this case at this time and accordingly we may have to see how things go during trial to influence him.

The medical malpractice case was scheduled for trial on February 4, 2002. On January 29, 2002, Grasso met with Steinberg at Steinberg's home to prepare for trial. Grasso discussed the possibility of settling the underlying action within Steinberg's coverage limits, and presented Steinberg with a "Consent to Settle" form. According to Steinberg,

Grasso discussed settling the underlying action using a high-low settlement. Grasso denies that a high-low settlement was the chosen method of settlement, however he admits that he advised Steinberg that if settlement was accomplished on a high-low basis and Steinberg was exonerated at trial, Steinberg would not be reported to the National Practitioner Data Bank.

On January 29, 2002, Steinberg signed a "CONSENT TO SETTLE" agreement authorizing his insurance carrier, MIIX,

TO SETTLE THE CLAIM OF [PLAINTIFF] ... ON SUCH TERMS AS [MIIX] DEEMS TO BE APPROPRIATE.

IN SO CONSENTING, I AM IN NO WAY ADMITTING LIABILITY, BUT I AM AUTHORIZING [MIIX] TO SETTLE THIS CLAIM ON MY BEHALF.

I UNDERSTAND NEW JERSEY'S PROFESSIONAL MEDICAL LEGAL ACT OF 1989 AND THE HEALTH CARE QUALITY IMPROVEMENT ACT OF 1986 REQUIRE THE MIIX INSURANCE COMPANY TO REPORT ALL SETTLEMENTS TO THE BOARD OF MEDICAL EXAMINERS OF NEW JERSEY AND THE NATIONAL PRACTITIONER DATA BANK. I FURTHER UNDERSTAND THAT ANY SETTLEMENT ON MY BEHALF MAY AFFECT MY ELIGIBILITY FOR THE MERIT RATING PLAN AND FUTURE INSURABILITY.

On February 5, 2002, Grasso, on behalf of Steinberg, settled the underlying action for a sum certain. As a result of the settlement, MIIX filed a medical malpractice payment report with the National Practitioner Data Bank.

On June 6, 2003, Steinberg filed a complaint against Grasso alleging legal malpractice and fraud. In Count One Steinberg alleged that Grasso was negligent in (1) failing to provide the defense ex-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pert in the underlying action with the photographs taken during delivery of the child, (2) failing to seek an expert report analyzing the significance of the photographs to the underlying claim, (3) failing to "adequately explain ... the significance of the Consent to Settle form," and (4) in "[s]uggesting to Steinberg to settle the [underlying] claim based on a high/low arrangement without advising Steinberg that Grasso and/or MIIX intended to settle the case outright if possible."

In Count Two of the complaint, Steinberg alleged that Grasso engaged in fraud and misrepresentation by misrepresenting that the underlying action would be settled on a high-low basis and by misrepresenting that Grasso possessed the ability to try the underlying action on its merits. Steinberg alleged that he would not have given consent to settle had he known the underlying action was not going to be settled on a high-low basis.

*3 Steinberg alleged that Grasso's actions caused damages including (1) damage to his reputation as a result of being reported to the National Practitioner Data Bank, (2) significant interference with his ability to obtain insurance coverage, (3) significant limitations on his ability to form professional associations, and (4) emotional distress and anguish.

On September 26, 2003, Grasso filed an answer denying Steinberg's substantive allegations. On October 8, 2003, Grasso filed an amended answer, again denying Steinberg's substantive allegations. The parties participated in discovery thereafter.

Grasso moved for summary judgment on July 25, 2005. He asserted that Steinberg had not served an expert report on liability, and argued that Steinberg could not prove his legal malpractice claim without an expert. He also argued that Steinberg had not produced any documentary evidence of identifiable damages nor had he served an expert report on damages. As a consequence, Grasso urged that the complaint should be dismissed. Grasso submitted, among other things, three pages of testimony from Steinberg's deposition in which Steinberg admitted

that he did not undergo formal treatment for the emotional distress and anguish which he claimed to have suffered as a result of Grasso's actions, nor did he miss any work as a result of that emotional distress.

Steinberg opposed Grasso's motion, asserting that the parties had agreed to extend discovery and to provide expert reports on liability and damages at a scheduled August 22, 2005, case management conference. Steinberg argued that in any event an expert was not required to establish a prima facie case of legal malpractice based on Grasso's misrepresentations respecting the settlement of the medical malpractice action. Steinberg also argued that expert testimony respecting damages was not required to prove the emotional distress component of his damages claim.

In his reply, Grasso argued that Steinberg had conceded that he had no damages but emotional distress.[FN2] He then asserted that Steinberg could not sustain a claim for intentional infliction of emotional distress under *Buckley v. Trenton Sav. Fund Soc.,* 111 *N.J.* 355 (1988).[FN3] Grasso did acknowledge receiving an expert report on Steinberg's behalf, but asked the court to disregard it as untimely.

> FN2. We have searched the record for such a concession but find none. To the contrary, Steinberg's attorney at oral argument on the summary judgment motion addressed the expert report he had recently served and, based on that report, he argued that Steinberg was entitled to recover his attorney's fees in prosecuting the legal malpractice action, costs of suit, and prejudgment interest. He also argued that Steinberg had "lost chance" damages with respect to malpractice insurance ratings and opportunities for career optimization.

> FN3. No such cause of action was advanced in Steinberg's complaint, which set forth only two causes of action, medical negligence and fraud.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 4
Not Reported in A.2d, 2007 WL 701689 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d, 2007 WL 701689 (N.J.Super.A.D.))**

The motion judge, following oral argument, granted Grasso's motion for summary judgment dismissing Steinberg's claims against Grasso. In doing so, the judge held:

The [c]ourt has had an opportunity ... to review the moving papers and hear arguments of counsel. The [c]ourt is also aware of Rule 4:46-2, the motion for summary judgment as well as the guidelines that follow pursuant to *Brill v. Guardian Life Insurance Company of America,* [142 *N.J.* 520, 523 (1995),] but the Court is clearly aware of ...*Buckley* [*supra,* 111 *N.J.* at 544].

And the [c]ourt reviewing the case as well as the documents provided by counsel, I'm satisfied that consistent with *Buckley v. Trenton* the motion is granted. There's nothing that the [c]ourt has reviewed which would suggest that the alleged damage to the plaintiff is within the scope of *Buckley v. Trenton.*

**\*4** There has to be some demonstration and there has been no demonstration whatsoever with respect to the extreme or outrageous character of the injury that may have been sustained by the plaintiff. I just don't see how this case would escape the *Buckley v. Trenton* ruling by the Supreme Court. The motion is granted.

On September 29, 2005, Steinberg filed a motion for reconsideration, which Grasso opposed. Steinberg certified that his claim included economic and non-economic components. First, he asserted the damage to his reputation for which he sought damages stemmed from MIIX reporting the settlement of the claim against him to the National Practitioner Data Bank, which he classified as damage to his "reputation per se." Steinberg also relied on an expert report of Mark Molz, Esq.,[FN4] as proof of Steinberg's damages respecting interference with his ability to maintain associations and medical malpractice insurance. Steinberg also asserted that he believed that an expert report was not needed to understand these damage claims. Additionally, Steinberg certified that he spent "hundreds of

hours, if not up to one thousand" hours preparing for the medical malpractice trial, and that he should be compensated for that time because the matter was settled without his consent. As to his emotional distress, Steinberg certified that the settlement "eats at me every day" because his attorney dropped the ball.

FN4. The expert report prepared by Mark Molz and referenced by plaintiff is not contained in the appellate record.

Grasso opposed any reconsideration because the material presented by Steinberg did not satisfy the requirements of *Rules* 4:49-2 and 4:50-1. He argued, again, that the evidence was insufficient to require a trial.

In a supplemental certification dated November 28, 2005, Steinberg submitted certain evidence regarding malpractice insurance premiums being lower for "preferred risks" and stated that he would no longer qualify for the lowest rates available. Steinberg also certified that this matter had been "extremely stressful" and that he spent time preparing for trial which he otherwise would have spent with patients, all of which was wasted by Grasso's conduct, thereby demonstrating the damages he incurred.

Steinberg's attorney argued that the judge erred in granting the summary judgment because the Court in *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 *N.J.* 37 (1984), held that a claim of legal fraud did not require proof of compensatory damages, but rather permitted an award of nominal and punitive damages so long as the plaintiff has shown some detriment or loss. He pointed out that Steinberg's expert opined on damages with respect to insurability and future economic opportunity.

Grasso's attorney, again, represented to the court that Steinberg conceded at the time of the September 9, 2005, summary judgment motion that his only damages were emotional and those damages were barred by *Buckley.*[FN5]He also argued that

Not Reported in A.2d                                                                                    Page 5
Not Reported in A.2d, 2007 WL 701689 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d, 2007 WL 701689 (N.J.Super.A.D.))**

subsequent case law precluded emotional damages in a legal malpractice action unless they were severe.

> FN5. This argument is, again, advanced on appeal without any reference to the record to support it.

**\*5** On December 16, 2005, following oral argument, the lower court denied Steinberg's motion for reconsideration, finding the following:

> On June the 23rd, 2003 the plaintiff filed a complaint alleging that the defendant committed legal malpractice in the course of his representation of the plaintiff.... Plaintiff claims that the defendant improperly settled the ... case on behalf of the plaintiff ... even though plaintiff had signed a consent to settle form.

> Now, counsel moves this [c]ourt to reconsider the order dated September 9, 2005 wherein defendant's motion for summary judgment was granted on the basis that the facts supporting plaintiff's claim for emotional distress did not meet the ... requisite threshold.

> Plaintiff's personal certification urged the [c]ourt to consider the fact that his claim includes economic as well as ... a non-economic component. Plaintiff argues that a jury should determine whether or not his emotional distress is tangible, extreme, and pervasive enough to justify recovery.

> ....

> In this [c]ourt's opinion, plaintiff has not made any allegations that the [c]ourt's reasoning was incorrect or that the [c]ourt failed to consider controlling case law. Moreover, the [c]ourt finds that the plaintiff has not submitted new information or facts which would impact upon the [c]ourt's prior decision.

> As such, the [c]ourt reviewing the moving papers as well as hearing arguments by counsel to

reconsider ... the September 9, 2005 order, ... the motion for reconsideration is denied.

### II.

On January 20, 2006, Steinberg filed a notice of appeal challenging the lower court's grant of summary judgment in favor of Grasso as well as the court's denial of his motion for reconsideration. He contends on appeal that the motion judge erred in dismissing both counts of his complaint, legal negligence and legal fraud and misrepresentation. He asserts that he suffered both economic and non-economic damages, precluding a summary judgment.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."*R.* 4:46-2(c). The court must make "a determination whether there exists a 'genuine issue' of material fact."*Brill, supra,* 142 *N.J.* at 540.There are no genuine issues of material fact if "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party."*Ibid.*"[W]hen the evidence 'is so one-sided that one party must prevail as a matter of law,' the trial court should not hesitate to grant summary judgment."*Ibid.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 *L. Ed.*2d 202, 214 (1986)). An appellate court employs the same standard in reviewing a trial court's summary judgment determination. *Prudential Property & Cas. Ins. Co. v. Boylan,* 307 *N.J.Super.* 162, 167 (App.Div.), *certif. denied,*154 *N.J.* 608 (1998).

**\*6** A motion for reconsideration may be made if a party believes the court erred in entering a previous order. *R.* 4:49-2. "The motion shall state with spe-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 6
Not Reported in A.2d, 2007 WL 701689 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d, 2007 WL 701689 (N.J.Super.A.D.))**

cificity the basis on which it is made, including a statement of the matters or controlling decisions which counsel believes the court has overlooked or as to which it has erred."*Ibid.*" 'Reconsideration is a matter within the sound discretion of the Court, to be exercised in the interest of justice.' " *Cummings v. Bahr,* 295 *N.J.Super.* 374, 384 (App.Div.1996) (quoting *D'Atria v. D'Atria,* 242 *N.J.Super.* 392, 401 (Ch. Div.1990)). Moreover,

"[r]econsideration should be utilized only for those cases which fall into that narrow corridor in which either 1) the Court has expressed its decision based upon a palpably incorrect or irrational basis, or 2) it is obvious that the Court either did not consider, or failed to appreciate the significance of probative, competent evidence...."

[*Ibid.*(quoting *D'Atria, supra,* 242 *N.J.* at 401.]

### III.

In an action for legal negligence, the plaintiff is required to prove three elements: "(1) the existence of an attorney-client relationship creating a duty of care by the defendant attorney, (2) the breach of that duty by the defendant, and (3) proximate causation of the damages claimed by the plaintiff."*Mc-Grogan v. Till,* 167 *N.J.* 414, 425 (2001) (citing *Conklin v. Hannoch Weisman,* 145 *N.J.* 395, 416 (1996)); *Grunwald v. Bronkesh,* 131 *N.J.* 483, 492 (1993); *Lieberman v. Employers Ins. of Wausau,* 84 *N.J.* 325, 342 (1980). Because the motion judge dismissed this cause of action for failure to prove any damages, we do not address the sufficiency of the proofs with regard to the balance of the elements.

Steinberg contends that the motion judge erred in failing to take into account as cognizable damages (1) his on-going emotional distress over the settlement; (2) the amount of time Steinberg, himself, spent preparing for trial, all of which was wasted by the settlement; (3) the damage to his reputation from the inclusion of his name in the National Prac-

titioner Data Bank; (4) his legal fees and costs incurred in connection with the prosecution of the legal malpractice action; (5) the potential increase in malpractice premiums, which Steinberg may have to pay as a result of the settlement of the underlying case; and (6) the diminution in his ability to form future business associations. Steinberg urges that the trial court erred in relying on *Buckley, supra,* in finding that Grasso's emotional distress claim could not be maintained.

Because Steinberg did not include his expert's report in the appendix on appeal, we cannot evaluate the sufficiency of his fifth and sixth claims of damages. As a consequence, our analysis is limited to the first four damage claims: emotional distress damages, lost-time damages, damage to his reputation, and legal fees and costs.

**\*7** Steinberg may not recover emotional distress damages in a legal malpractice case "in the absence of egregious or extraordinary circumstances."*Gautam v. De Luca,* 215 *N.J.Super.* 388, 399 (App.Div.) (holding "that damages should be generally limited to recompensing the injured party for his economic loss"), *certif. denied,*109 *N.J.* 39 (1987). Furthermore, even in egregious or extraordinary circumstances, "in the absence of medical evidence establishing substantial bodily injury or severe and demonstrable psychiatric sequelae proximately caused by the tortfeasor's misconduct[,]" emotional distress damage awards are not permissible. *Id.* at 399-400."Aggravation, annoyance and frustration, however real and justified, constitute unfortunate products of daily living. Damages for idiosyncratic psychiatric reactions should not be permitted."*Id.* at 400 (citing *Caputzal v. The Lindsay Co .,* 48 *N.J.* 69, 76 (1966). This is consistent with *Picogna v. Bd. of Educ. of Cherry Hill,* 143 *N.J.* 391, 396-97 (1996), in which the Court held that "[t]he potential for fabricated claims justifies a requirement of enhanced proof to support an award of such damages."In a case where emotional distress damages are sought, the " 'court decides whether as a matter of law such emotional

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

distress can be found, and the jury decides whether it has in fact been proved.' " *Id.* at 397 (citing *Buckley, supra,* 111 *N.J.* at 367).

In the context of a claim for legal malpractice seeking emotional distress damages, *Gautam* is dispositive. Steinberg has not presented evidence that he sought treatment for his emotional distress, nor that he suffered the type of "severe" emotional reaction that warrants recovery for emotional distress. In fact, Steinberg admitted at deposition that he had not sought treatment for his emotional distress, nor had he taken any medication regarding his distress. Moreover, Steinberg has not presented expert testimony regarding his emotional distress. Therefore, the judge did not err in concluding that Steinberg could not prove emotional distress damages proximately caused by Grasso's negligent representa- tion.

Turning to his claim of lost-time damages, we note that Steinberg has not brought any case law to our attention that permits him to recover damages for the time he spent defending an action lost as the result of legal malpractice. Neither has our research revealed any such case. We are not inclined to permit such a recovery because the time spent defending the action was compelled by the medical malpractice suit and not by Grasso. Litigants generally are not entitled to recover their time lost in attending court or participating in litigation, *Westfield Ctr. Serv., Inc. v. Cities Serv. Oil Co.,* 162 *N.J.Super.* 114, 126 (Ch. Div.1978)*aff'd,*86 *N.J.* 453 (1981), and we see no reason to make an exception to this rule in the case of legal malpractice claims.

**\*8** Steinberg's remaining claims for damage to his reputation and for legal fees and costs resulting from the alleged legal malpractice should not have been summarily dismissed. Damage to reputation does not require proof of economic loss. Under the law of libel, damages are divided into three categories:

(1) Punitive or exemplary damages, where actual malice or recklessness is shown; (2) special damages, such as loss of business, which are recoverable only upon proof of loss of specific economic benefits; and (3) general damages which the law presumes to follow inevitably from a defamatory publication and which, therefore, are often recoverable without proof of injury.

[*Bock v. Plainfield Courier-News,* 45 *N.J.Super.* 302, 309 (App.Div.1957).]

Where legal malpractice is alleged to have proximately resulted in damage to the client's reputation, as here, we see no reason to impose a more stringent proof requirement than is imposed by the law of libel. Thus, a client whose reputation has been damaged as a result of legal malpractice may recover general, or nominal, damages in the absence of "proof of loss of specific economic benefits."*Ibid.*

With respect to the legal fees and costs incurred in prosecuting the legal malpractice action, the Supreme Court in *Saffer v. Willoughby,* 143 *N.J.* 256, 272 (1996), held that "a negligent attorney is responsible for the reasonable legal expenses and attorney fees incurred by a former client in prosecuting a legal malpractice action."We have held that neither *R.* 4:42-9(a) nor the "American Rule" preclude such an award in a legal malpractice action. *Bailey v. Pocaro & Pocaro,* 305 *N.J. Super* . 1, 6 (App.Div.1997). Accordingly, the motion judge erred in dismissing the legal malpractice action in its entirety.

### IV.

Steinberg also contends that the motion judge erred in granting summary judgment on the fraud count because, Steinberg asserts, he "made a sufficient showing of loss or detriment upon which a jury, at the very least, could have awarded nominal, if not compensatory damages."Steinberg further contends that the trial court erred in denying his motion for reconsideration because the trial court failed to consider the holding in *Nappe, supra.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 8
Not Reported in A.2d, 2007 WL 701689 (N.J.Super.A.D.)
**(Cite as: Not Reported in A.2d, 2007 WL 701689 (N.J.Super.A.D.))**

Legal fraud requires demonstration of five elements: (1) a material representation by the defendant of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intent that the plaintiff rely upon it; (4) reasonable reliance by the plaintiff; and (5) resulting damage to the plaintiff.... [F]raud is never presumed, but must be established by clear and convincing evidence.

*Weil v. Express Container Corp.,* 360 *N.J.Super.* 599, 612-13 (App.Div.) (citing *Jewish Ctr. of Sussex County v. Whale,* 86 *N.J.* 619, 624-25 (1981); *Albright v. Burns,* 206 *N.J.Super.* 625, 636 (App.Div.1986)), *certif. denied,*177 *N.J.* 574 (2003).

**\*9** Summary judgment was granted only on the failure to prove resulting damage. In *Nappe,* the Court addressed the issues of whether a cause of action for fraud can be maintained where the plaintiff cannot prove compensatory damages and whether the plaintiff could recover punitive damages without having recovered compensatory damages. *Nappe, supra,* 97 *N.J.* at 41-42.The plaintiff in *Nappe* agreed to loan a developer $200,000 for construction of a model unit in a high-rise condominium building in exchange for a ten-percent interest in the projected $1.8 million return on the development. *Id.* at 43-44.The loan proceeds were not used to construct and furnish the model unit and its completion was brought to a halt as a result of lack of funds *Id* . at 44.The plaintiff sued in fraud, but was unable to prove any loss in profits, i.e. compensatory damages, as a result of the misallocation. *Ibid.*

The Court first addressed whether compensatory damages were an essential element of a cause of action for legal fraud. *Id.* at 45.After exploring common law developments which led to the requirement of showing actual damages in a fraud action, the Court held that

the requirement of actual damage to sustain a cause of action for intentional torts no longer serves a useful purpose, at least where a victim of an intentional wrong has suffered *some loss, detriment, or injury* but is unable to prove that he is entitled to compensatory damages. His rights have been invaded and he should be entitled to vindication in an award of nominal damages. Indeed, it is difficult to justify permitting nominal damages in a trespass action and not in a case of a wilful and malicious intentional tort. We hold, therefore, that compensatory damages are not an essential element of an intentional tort committed wilfully and without justification *when there is some loss, detriment, or injury,* and that nominal damages may be awarded in such cases in the absence of compensatory damages.

[*Id.* at 47-48 (footnote omitted) (emphasis added).]

Here, Steinberg did not produce evidence that would allow him to recover compensatory damages, which must be proven to a reasonable degree of certainty. *Kelly v. Berlin,* 300 *N.J.Super.* 256, 268 (App.Div.1997). Grasso contends that Steinberg produced no evidence to support his assertions that his reputation has been damaged, that he has been unable to obtain insurance, or that he has been unable to form business associations as a result of his inclusion in the National Practitioner Data Bank. We disagree. If a person falsely reported in a publication that Steinberg committed malpractice in treating a patient, that accusation would constitute libel per se that would entitle Steinberg at least to general damages in the absence of proof of economic loss. *Ricciardi v. Weber,* 350 *N.J.Super.* 453, 475 (App.Div.2002) ( "[Actual damage as an] element of the slander plaintiff's prima facie case is waived if the statement is deemed slander *per se,* because damage to reputation is presumed to flow from such statements."), *certif. denied,*175 *N.J.* 433 (2003); *Sokolay v. Edlin,* 65 *N.J.Super.* 112, 121 (App.Div.1961) ("[W]here spoken language is of such a character as to make the slander actionable *per se,* a suit will lie without proof of special damages.")."[A] slander which ascribes to another conduct ... incompatible with the proper conduct of his

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lawful ... profession is liable for slander *per se.*" *Sokolay, supra* 65 *N.J.* at 121-22. No different result should obtain where the damage to Steinberg's reputation grew out of a legal fraud by his attorney. We are satisfied that, if there was no malpractice, the inclusion of his name in the National Practitioner Data Bank as a proximate result of the fraud damaged his reputation and will continue to do so in the future.

**\*10** The Nappe Court also addressed whether a plaintiff could recover punitive damages without having recovered compensatory damages. *Id.* at 48-51.The Court held that "punitive damages may be assessed in an action for an intentional tort involving egregious conduct whether or not compensatory damages are awarded, at least where some injury, loss, or detriment to the plaintiff has occurred."*Id.* at 51.The Court concluded that its "holding that nominal and punitive damages may be appropriately assessed in certain circumstances for intentional torts in the absence of a compensatory damage award is fully applicable in actions for legal fraud."*Id.* at 53.

We are satisfied that Steinberg did not produce any evidence that Grasso's conduct was so egregious that he should be able to recover punitive damages from Grasso. *See ibid.*His conduct was not so egregious that it would warrant imposition of punitive damages. The dismissal of that damage claim was appropriate.

Reversed and remanded for further proceedings consistent with this opinion.

N.J.Super.A.D.,2007.
Steinberg v. Grasso
Not Reported in A.2d, 2007 WL 701689 (N.J.Super.A.D.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                      Page 1
Not Reported in A.2d, 2005 WL 3589401 (Del.Com.Pl.)
**(Cite as: Not Reported in A.2d, 2005 WL 3589401 (Del.Com.Pl.))**

Tekstrom, Inc. v. Savla
Del.Com.Pl.,2005.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Common Pleas of Delaware.
TEKSTROM, INC., A Delaware Corporation,
Plaintiff/Counterdefendant,
v.
Sameer K. SAVLA, Defendant/Counterclaimant,
v.
Charan MINHAS, Individually, Counterdefendant.
**No. Civ.A. 03-06-0033.**

Submitted Nov. 21, 2005.
Decided Nov. 22, 2005.

Granted in part and denied in part.

Thad J. Bracegirdle, Buchanan Ingersoll, PC,
Wilmington, Delaware, for Plaintiff/coun-
terdefendant and Defendant.
John S. Grady, Grady & Hampton, LLC, Dover,
Delaware, for Defendant/Counterclaimant.

Decision on application for attorney's fees, interest,
and costs

TRADER, J.
**\*1** On September 9, 2005, this court entered judg-
ment in behalf of Savla and against Tekstrom and
Minhas for $91,200.00, plus costs of these proceed-
ings, prejudgment interest, and reasonable attorney
fees. The issue of when prejudgment interest begins
to run on the violation of Delaware's wage and
labor laws and the various tort actions was not de-
cided in that opinion. I also requested an affidavit
from Savla's counsel concerning Savla's request for
attorney's fees. This is the court's decision on pre-
judgment interest on the compensatory damages
awarded, as well as the award of attorney's fees and
other costs of these proceedings.

*Prejudgment Interest as a Matter of Right*

Prejudgment interest is awarded in Delaware as a
matter of right and not of judicial discretion.
*Collins v. Throckmorton,* 425 A.2d 146 (Del.1980).
The allowance of interest is in the nature of dam-
ages and it is as much of an injured plaintiff's sub-
stantive right as a right to damages themselves.*Su-
perior Tube v. Delaware Aircraft Industries,* 60
F.Supp. 573 (D.Del.1945).

*Prejudgment Interest for Savla's Claim Under 19
Del. C. Sec. 902*

Under 19 *Del. C.* Sec. 1103, if the employer fails to
pay an employee wages when due, he shall be liable
to the employee for the unpaid wages as well as
10% of the unpaid wages for each day such failure
continues after the payment is due, or the amount
equal to the unpaid wage, whichever is smaller. In
the case before me, Savla's unpaid wages from Feb-
ruary 15, 2003 to May 25, 2003 is computed to
$11,200.00 and he is entitled to an additional sum
of $11,200.00 in liquidated damages. Where there
is no contract rate, the legal interest rate prevailing
at the time that interest became due is to be awar-
ded. 6 *Del. C.* Sec. 2301(a).

6 *Del.C.* Sec. 2301(a) provides that where there is
no expressed contract rate, the legal rate shall be
5% over the Federal Reserve discount rate includ-
ing any surcharge therein as of the time from which
interest is due. The Federal Reserve discount rate in
May 2003 was 2.25%. Therefore, interest would be
calculated on $22,400 at 7.25% from May 25, 2003.
I conclude Savla is entitled to prejudgment interest
on the sum of $22,400 from May 25, 2003.

*Prejudgment Interest on Savla's Various Tort Claims*

In tort actions, including fraud and deceit, the gen-
eral rule is that prejudgment interest is calculated

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

from the date of the alleged wrong.*Stephenson v. Capano Development Co.,* 1985 WL 636429, at *3 (Del.Super. July 10, 1985). Savla has requested prejudgment interest from January 2004 and the Federal Reserve discount rate was 3.25% on that date. Interest is therefore calculated on $28,800 at the interest rate of 8.25%. Prejudgment interest is not a proper element of damages in civil actions based on bodily harm or emotional distress. *Rollins v. Environmental Services v. WSMW Industries,* 426 A.2d 1363 (Del.Super.1980). Prejudgment interest is also not recoverable on punitive damages. 9 A.L.R. 5th 63.

### Assessment of Attorney's Fees

**\*2** In the case at bar Savla has filed a civil action to recover unpaid wages and liquidated damages. Under 19 *Del. C.* Sec. 1113(c) any judgment entered for Savla shall include an award of the costs of this action and reasonable attorney's fees. Since Savla recovered a judgment on his claim for unpaid wage and liquidated damages, he is entitled to reasonable attorney's fees in connection with that civil action.

The general rule is that the law courts may not order the payment of attorney's fees as a part of the costs paid by the losing party unless the payment of such fees is authorized by some provision of statute or contract.*Casson v. Nationwide Ins. Co.,* 455 A.2d 361 (Del.Super.1981). In the case before me, Savla's counterclaim alleged six claims against Tekstrom and Minhas. He abandoned his claim based on promissory *estoppel* and he was unsuccessful on his claim for a violation of Section 1981. He was successful on the three remaining tort claims and the claim for unpaid wages and liquidated damages.

Savla requests attorney's fees in the amount of $84,541.50. Savla contends that he is entitled to all of his requested attorney's fees on the basis of the bad faith exception to the American rule. Under the bad faith exception, "the Court would permit attorney's fees to a prevailing party where the Court

finds litigation to have been brought in bad faith or finds that a party conducted a litigation process in bad faith, thereby unjustifiably increasing the cost of litigation."*Beck v. Atlantic Coast PLC,* 868 A.2d 840, 851-852 (Del. Ch.2005).*See also Arbitrium (Cayman Islands) Handels AG v. Johnston,* 705 A.2d 225 (Del. Ch.1997) and *Cantor Fitzgerald, LP v. Cantor,* 2001 WL 536911 (Del. Ch. May 11, 2001) The application to pre-litigation conduct is described as "quite narrow" and "unusual relief".*Arbitrium,* at 231.Courts of equity point out that "The American Rule would be eviscerated if every decision holding defendants liable for fraud or the like also awarded attorney's fees"*Barrow v. Bowen,* 1994 WL 514868, at *2 (Del Ch. Sept. 7, 1994).

All the cases cited by Savla are decisions by the Court of Chancery. He has cited no case in the law courts of this state which would permit the imposition of attorney's fees on the losing party under the bad faith exception. Hence, this contention is rejected.

Savla next contends that under *Hensley v. Eckerhart,* 461 U.S. 424 (1983) that where a plaintiff prevails on some claims, he should recover for attorney's fees on all claims both successful and unsuccessful. In *Hensley* the Court reasoned that "if the plaintiff's general results are 'excellent' and if the services performed in litigating both successful and unsuccessful claims have a common core of facts and the services relating to each cannot be easily allocated, then the plaintiff should recover a full compensatory fee."*In re Mattera,* 128 B.R. 107, 113 (Bankr.E.D. Pa 1991) (citing *Hensley* )). It should be noted in the *Hensley* case, *supra,* all of the plaintiff's claims were brought under 42 U.S.C.1983, but in the case before me there are claims under 42 U.S.C Sec.1981, common law tort actions, and the claim for unpaid wages under federal and state law. The majority rule appears to be that if the work can be reasonably apportioned between the fee claims and non-fee claims, only the work performed on the fee claims should be com-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 3
Not Reported in A.2d, 2005 WL 3589401 (Del.Com.Pl.)
**(Cite as: Not Reported in A.2d, 2005 WL 3589401 (Del.Com.Pl.))**

pensated. *Baughman v. Wilson Freight Forwarding Co.,* 583 F.2d 1208, 1215-16 (3d Cir.1978).

**\*3** Tekstrom and Minhas contend that Savla's award should be limited to one-sixth of Savla's requested attorney's fees. They argue that the award should be limited to Savla's success on the wage collection claim. I disagree. Although there were different legal theories, there was one common set of facts. The claims for intentional infliction of emotional distress, violation of the covenant of fair dealing, and misrepresentation concerning employment arise from the failure to pay wages to Savla. It was necessary for Savla to defend Tekstrom's claim against him in order for him to prevail on his wage claim. Although it is difficult to apportion the claim for wages from time spent on other legal theories, it is my duty to reasonably apportion the work performed on the different claims.

In awarding the amount of attorney's fees, I will also consider the factors set forth in Rule 1.5 of the Professional Rules of Conduct.

The factors are as follows: (1) the time and labor required, the novelty and difficulty of questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment would preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and the ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.

I will consider all the various factors but I will primarily consider factors 1, 3, 4, and 7. This was a complex case with many difficult questions. A considerable amount of time and labor was required in behalf of Savla. Four pretrial motions were fully briefed, and the trial took two days. There were

post trial briefs and oral argument. The fee charge by Mr. Grady is a fee customarily charged to the community in which he practices. He is a person with considerable experience in the practice of civil law and he has a good reputation in the county in which he practices. As to the results obtained, Savla was successful on Tekstrom's claim against him and he prevailed on all but one of Savla's claims against Tekstrom and Minhas. The net result for Savla was a $91,200.00 judgment, plus prejudgment interest and reasonable attorney's fees and court costs.

Counsel for Savla have submitted a detailed list of all of the services rendered in this case. I have carefully reviewed Savla's attorneys' submissions as well as all of the various briefs and motions filed in this case. I have also considered the testimony of plaintiff's attorneys at the evidentiary hearing. In connections with the affidavits supplied by Laura F. Browning, Esquire I conclude that 43.5 of the 231.85 hours submitted was for work on the unsuccessful claim under Sec.1981 and the various tort claims. The disallowed hours included .5 hours legal research on 6/10/04, 3 hours legal research on 6/03/04, 2 hours research on Sec.1981 on 8/23/04, and 8 hours for drafting response to motion to dismiss related to various tort claims from 12/24/04 to 1/15/05, 12 hours for work on pretrial motion from 3/23/05 to 3/30/05, and 18 hours for work in post trial briefs, 5/04/05 to 5/18/05. Therefore, I conclude that she is entitled to an award of attorney's fees for 188 .35 hours at $175.00 an hour and 22.5 hours at $100.00 an hour as a law clerk, for a total of $35,211.25.

**\*4** In connection with the submission of John S. Grady, Esquire, I have disallowed 30.5 hours for services rendered on claims other than the wage and hour claim. The disallowed hours included 3 hours on 11/14/03 for research into promissory estoppel, 1 hour research on 11/21/03, 2 hours work on memorandum on 1/02/05, 2 hours for the response to motion to dismiss from 1/04/05 to 1/05/05, 12.5 hours for motion for reargument on 4/15/05 and 4/18/05, 1 hour review of memor-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 4
Not Reported in A.2d, 2005 WL 3589401 (Del.Com.Pl.)
**(Cite as: Not Reported in A.2d, 2005 WL 3589401 (Del.Com.Pl.))**

andum on 5/10/05, 1 hour review of brief on
5/24/05, 2 hours for the reply brief on 6/20/05 and
6/22/05, 2 hours preparation for oral argument on
7/18/05 and 7/19/05, and 4 hours research on
9/11/05 and 9/12/05 on Section 1981. Deducting
30.5 hours from the 179 hours submitted, and
adding 5 hours for the preparation of the affidavit
for attorney's fees, Mr. Grady should be com-
pensated for 154 hours at $250.00 an hour for a
total of $38,500.00. The total award for Savla's at-
torneys is $73,711.25.

Savla also seeks an award of costs in the amount of
$3,418.02. Ordinarily, court costs are allowed to
the prevailing party. *Walsh v. Hotel Corp. of Am.,*
231 A.2d 458 (Del.1967). Awarding court costs is a
matter of judicial discretion. *Donovan v. Delaware
Water & Air Resources Comm.,* 358 A.2d 717
(Del.1976). As to any depositions introduced into
evidence, I will allow the court costs associated
with any transcript introduced into evidence. I will
allow the costs of the arbitration, as well as the
costs of witnesses subpoenaed for trial. All other
costs are disallowed.

In summary I allowed interest on the unpaid wages
and liquidated damages at the rate of 7.25% from
May, 2003, interest on $28,800.00 at 8.25% from
January 1, 2004, attorney's fees in the amount of
$73,711.25, plus allowable court costs.

IT IS SO ORDERED.

Del.Com.Pl.,2005.
Tekstrom, Inc. v. Savla
Not Reported in A.2d, 2005 WL 3589401
(Del.Com.Pl.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# SEALED DOCUMENT

# SEALED DOCUMENT